**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MICHAEL DAVID SILLS and** | ) | |
| **MARY SILLS,** | ) | |
| | ) | **Case No. 3:23-cv-00478** |
| **Plaintiffs,** | ) | |
| | ) | **JUDGE WILLIAM L. CAMPBELL, JR.** |
| **v.** | ) | **Magistrate Judge Frensley** |
| | ) | |
| **SOUTHERN BAPTIST CONVENTION,** | ) | **JURY TRIAL DEMANDED** |
| **et al.** | ) | |
| | ) | |
| **Defendants** | ) | |

**PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO**
<u>**DEFENDANTS' MOTIONS TO DISMISS**</u>

## INTRODUCTION

Defendants have wrongly publicized Plaintiff David Sills as a violent sex abuser, when nothing could be further from the truth. While it is true that Mr. Sills and Defendant Jennifer Lyell had a consensual relationship, Mr. Sills was never violent or abusive against Lyell and the two never engaged in sexual intercourse. When confronted with his affair, Mr. Sills did the right thing and promptly resigned from his position at Southern Baptist Theological Seminary ("Seminary"). Lyell, however, facing pressure from her employer Lifeway Christian Resources of the Southern Baptist Convention ("Lifeway") and the Southern Baptist Convention ("SBC") to likewise resign, recanted her initial reporting of a consensual affair and rebranded it as violent sexual abuse for which she claimed she was groomed, despite being more than 26 years old. Lyell's story eventually included wrongful allegations that Mr. Sills' wife, Mary Sills, enabled their affair. Other Defendants propagated the same unsubstantiated details.

Defendants, and each of them, saw Lyell's story as an opportunity to improve the SBC's reputation after facing backlash from a decades-long sexual abuse scandal within its ranks. That scandal was entirely unrelated to David Sills. In order to achieve this goal, the SBC, in concert with the other Defendants, namely SBC subsidiaries, agents and employees, would perpetuate Lyell's lies as truth and contrive an "investigation" which would maliciously depict Mr. Sills as a criminal. The SBC would appear to have taken a "tough" stance on an issue it had never before addressed. Notably, Mr. Sills was never investigated, charged or convicted for any of the criminal behavior alleged by the Defendants. In fact, Mr. Sills was never even contacted to be interviewed by any law enforcement or even interviewed for any alleged criminal behavior. Ultimately, Defendants' efforts culminated in an article by the Baptist Press, the SBC's public relations arm, and report by Defendant Guidepost Solutions, LLC (the "Report"), which was circulated to several hundred thousand readers and included a photograph of Mr. Sills labeling him as an abuser.

2

As a result of Defendants' unconscionable conduct, Mr. and Mrs. Sills suffered extreme mental anguish, loss of reputation, lost income, and have been blacklisted by former friends and acquaintances. They seek redress from Defendants' actions and have brought claims for defamation, defamation per se, civil conspiracy, negligence and intentional infliction of emotional distress.

Defendants have moved to dismiss Plaintiffs' claims, arguing that the Court lacks jurisdiction over them, and Plaintiffs have failed to plausibly state any actionable claim for relief. Defendants do not, and cannot, satisfy their burden and their motions must be denied.

As described more fully below, the Court has subject matter jurisdiction over Defendants; the ecclesiastical abstention doctrine does not apply because Plaintiffs' claims do not raise qualifying questions of religious doctrine or implicate the free exercise rights of the SBC or any other Defendant. This Court also has personal jurisdiction over Defendants under Tennessee law and it's long-arm statute, because Defendants acted (both individually and/or in concert) in Tennessee, directed their speech and opinions toward this jurisdiction, registered to, and did conduct, business in this jurisdiction, and because Plaintiffs plead a plausible conspiracy, conspiracy jurisdiction applies.

Defendants' motion to dismiss the tort claims fare no better; they have not satisfied their burden. Plaintiffs have properly pleaded their defamation claims. Mr. Sills and Mrs. Sills are private figures, and the actual malice requirement does not apply. Plaintiffs have also adequately pleaded negligence claims and they likewise survive. Defendants, and each of them, owed a duty to Plaintiffs, including to conduct a fair and credible investigation after undertaking the so-called investigation, and it was foreseeable that Plaintiffs would be harmed by Defendants' conduct as alleged. Plaintiffs have also alleged that Defendants' conduct was reckless and outrageous so as

3

to cause Plaintiffs to suffer mental anguish. Plaintiffs' conspiracy allegations also survive as they have adequately alleged a common design among the Defendants to defame Plaintiffs and did so through Defendants' phony investigation of the Lyell claims, and subsequently through the published Report, which resulted in substantial irreparable injury to Plaintiffs. As a result, Plaintiffs' Complaint should stand, in its entirety, and Plaintiffs should be allowed to proceed with their claims.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12.02(6) tests only the legal sufficiency of the complaint. *Byars v. Frazier*, No. W2011-01771-COA-R3-CV, 2012 Tenn. App. LEXIS 456, at *15 (Ct. App. July 10, 2012) (citations omitted)). A motion to dismiss is resolved solely by an examination of the pleadings. *Id.* (citations omitted). A defendant moving to dismiss admits the truth of all of the relevant material allegations contained in the complaint, but . . . asserts that the allegations fail to establish a cause of action." *Id.* (citations and quotations omitted). In considering a motion to dismiss, the Court "must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences." *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31-32 (Tenn. 2007).

## ARGUMENT

### A.  Tennessee Law Applies.

Tennessee law applies to Plaintiffs' claims. Defendants SolutionPoint International, Inc. ("SolutionPoint"), Guidepost Solutions, LLC ("Guidepost"), Lifeway, Lyell, the Seminary, Albert Mohler, and Eric Geiger agree. *See* SPI Mem. at 16-17; Lifeway Mem. at 5 (applying Tennessee law for statute of limitation purposes), 8 (defamation), 12 (negligence), 18 (IIED), 21 (conspiracy), 24 (punitive damages); Lyell Mem. at 11 (applying Tennessee law to conspiracy claim), 15 (libel),

17 (defamation); Seminary Mem. at 7 (applying Tennessee law to conspiracy claim); Geiger Mem. at 5 (applying Tennessee law to personal jurisdiction argument).

Defendants Executive Committee of the Southern Baptist Convention ("Executive Committee"), Willie McLaurin, Rolland Slade, SBC, Bart Barber and Ed Litton, however, argue that Mississippi law should apply. Executive Committee Mem. at 13; SBC Mem. at 14-15. They are incorrect. "Typically, '[a] federal court exercising its diversity jurisdiction must apply the choice-of-law rules of the state in which it is located." *Selby v. Schroeder*, 522 F. Supp. 3d 388, 395 (M.D. Tenn. 2021) (citing *Yang_Ming Marine Transport Corp. v. Intermodal Cartage Co., Inc.*, 685 F. Supp. 2d 771, 779 (W.D. Tenn. 2010)). As noted by the Executive Committee, Tennessee follows the Restatement (Second) of Conflict of Laws § 150(2) for conflict of law resolution. Executive Committee Mem. at 13 (citing *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)).

Relying on Restatement (Second) of the Law – Conflict of Laws § 150(2), Defendants argue that because Plaintiffs reside in Mississippi, Mississippi law should apply not only to the defamation claim, but to the negligence, conspiracy and IIED claims as well. SBC Mem. at 15, Executive Committee Mem. at 14. However, comment c to § 150 recognizes that when there has been publication in two or more states (which is the case, here), the forum should apply the law of the state that has the most significant relationship to the occurrence and the parties. *See* Restat 2d of Conflict of Laws, § 150, comment c (2nd 1988). The facts at bar cause Tennessee law to apply, where the SBC is headquartered, where  as recent  July 2022, Defendants' defamatory statements were being aimed, published and have been published multiple times not only in the Guidepost Report, which was circulated to hundreds of thousands of readers, but also in interviews and social media. Because there has been more than one defamatory publication, the Court should apply the

5

significant relationship test for all of Plaintiffs' tort claims. Notably, all of the defamatory statements start and end with Jennifer Lyell, who at all relevant times was in this jurisdiction.

Under the most significant relationship approach, the law of the state where the injury occurred will apply unless some other state has a more significant relationship to the litigation. *Selby*, 522 F. Supp 3d at 398 (citing *Hataway*, 830 S.W.2d at 59). "Tennessee courts determine the most significant relationship by examining four contacts: '(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered.'" *Id.* (quoting *Montgomery v. Wyeth*, 580 F.3d 455, 459-60 (6th Cir. 2009) (other citations omitted). "These [four] contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* (citing Restatement (Second) of Conflict of Laws § 145). Factor one weighs in favor of applying Tennessee law because Defendant Lyell's initial defamatory statements which caused Plaintiffs' injuries were initially received by her Co-Defendants in Tennessee. As to factor two, Plaintiffs allege that a "substantial number" of Defendants' actions took place in Nashville, Tennessee. Compl. ¶¶ 16 (SBC); 17 (Litton); 18 (Barber); 21 (Slade); 22 (Seminary); 26 (Geiger); 27 (SPI); 28 (Guidepost). As to factor three, multiple Defendants are citizens of Tennessee or are registered to do business in Tennessee. Compl. ¶¶ 16 (SBC); 19 (Executive Committee); 20 (McLaurin); 24 (Lifeway); 25 (Lyell); 30 n.4 (SBC, Executive Committee, Lifeway, Seminary, and SPI registered with Tennessee to conduct business). Factor four also weighs in favor of applying Tennessee law as it is the center of gravity of the conduct giving rise to Plaintiffs' claims due to the presence of SBC, Lifeway, and their employees' unlawful actions occurring within Tennessee. Therefore, Tennessee law applies to Plaintiffs' defamation, conspiracy, negligence, and IIED claims.

6

### B.    Plaintiffs' claims are not time-barred.

The statutory period for commencing a libel action in Tennessee is one year after publication. Tenn. Code. Ann. 28-3-104.  Likewise, the limitations period for personal injury claims is one year.  *Id*.  Because conspiracy is not a stand-alone cause of action, the statute of limitations on a civil conspiracy claim is determined with regard to the statute of limitation applicable to the underlying substantive alleged tort.  *Stratienko v. Chattanooga-Hamilton Cnty. Hosp. Auth.,* No. 1:07-CV-258, 2009 WL 736007, at *12 (E.D. Tenn. Mar. 17, 2009), aff'd, 402 F. App'x 990 (6th Cir. 2010). Defendants Lifeway, Lyell, Executive Committee, McLaurin, and Slade raise various arguments that Plaintiffs' claims are barred under the prevailing statute of limitations, but their assertions fail in several respects.

### 1.  Jennifer Lyell

Lyell appears to contest her liability for any defamatory statements she made prior to May 11, 2022, on statute-of-limitations grounds, but then concedes that Plaintiffs do not appear to allege any such statements in their cause of action for defamation. (Doc. 76 at 14, 16). She does not appear to seek dismissal of any particular claim, but rather urges dismissal of all claims on the basis that they are "grounded … in Dr. Sills' belated attempt to retract or revise his prior admissions of sexual abuse… ." (*Id*. at 16-17). However, this is not a cognizable argument; Lyell merely attempts to raise a factual dispute (albeit, with a further statement untethered to anything other than speculation and hearsay) and unrelated to the applicable statute of limitations. Accordingly, her motion for dismissal on statute-of-limitations grounds must be denied.

Lyell also states, without explanation, that "Plaintiffs have alleged no new actions or different harm occurring after May 11, 2022, to support their claims for negligence and intentional infliction of emotional distress." (*Id*. at 17). But that is incorrect on its face, as Plaintiffs have raised detailed claims of negligence and intentional infliction of emotional distress based on false

7

and defamatory statements made by Lyell and other Defendants within the one-year statutory period. (Doc. 1 ¶¶ 78-93, 98-116). Thus, Lyell's arguments lack merit.

To the extent Lyell may attempt to argue that defamatory statements published within the statutory period may nonetheless be barred to the extent they merely republish prior false statements, that is an incorrect statement of Tennessee law. The "republication doctrine" provides that "where the same defamer communicates a defamatory statement on several different occasions to the same or different audience, each of those statements constitutes a separate publication," triggering a new the statute of limitations. *Am. Addiction Centers, Inc. v. Nat'l Ass'n of Addiction Treatment Providers*, 515 F. Supp. 3d 820, 842 (M.D. Tenn. 2021) (citing *Lokhova v. Halper*, 441 F. Supp. 3d 238, 254 (E.D. Va. 2020)). Republication includes instances where the publisher has "affirmatively reiterated" the statement. *Id.* "The general rationale behind the rule is that if the speaker affirmatively says the same thing again at a later time to a new audience, then [she] has intended to engender additional reputational harm to the plaintiff." *Id*. Lyell cannot satisfy her burden.

### 2. Lifeway

Defendants Lyell and Geiger both were high-ranking executives at Lifeway at various times relevant to the issues in this case. Both Defendants contributed to the conspiracy to defame Mr. and Mrs. Sills and, as set out below in Section G.4., they are named in the Complaint individually and as employees/agents of Lifeway, and their conduct may be imputed to Lifeway under the theory of respondeat superior.

As set out in Plaintiffs' initial Complaint and in greater detail below, Lyell's consensual relationship with Mr. Sills was ongoing at the time of her employment with Lifeway. Lyell initially disclosed to Geiger her relationship in his capacity as a senior executive, setting in motion the

chain of events that would result in the Sillses defamation action. Geiger's participation in the defamation of Plaintiff is alleged in the Complaint. (*See* doc. 1 at ¶¶ 26, 35, 38, 40, 47, 60-62).

As to Lyell, Plaintiffs set out a series of published defamatory statements against Mr. Sills, including within the statutory timeframe, and her defamatory statements were repeated in published statements by other Defendants. Allegations against Lyell within the statutory period are set out in the Complaint. (*See, e.g., id*. at ¶¶ 65-70, 78-93). As set out below, Lifeway is vicariously liable for the damage wrought by Ms. Lyell's tortious conduct.

## C.    The Ecclesiastical Abstention Doctrine does not apply.

Defendants[1] seek to shield themselves from liability under the ecclesiastical abstention doctrine, but the claims brought by Mr. and Mrs. Sills do not raise questions of religious doctrine, nor do they implicate the free exercise rights of the SBC or any other Defendant.

The ecclesiastical abstention doctrine holds that where "the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by … church judicatories …, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Watson v. Jones*, 80 U.S. 679, 727 (1871). In other words, U.S. courts lack jurisdiction over a matter that is "strictly and purely ecclesiastical in its character." *Watson*, 80 U.S. at 733.

In this 150-year-old precedent, the Supreme Court defined "ecclesiastical" disputes as those concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Id*. at 733; *see also Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich*, 426 U.S. 696, 713-14

---

[1] Defendants claiming entitlement to an ecclesiastical exception are Lyell, the Seminary, the SBC, the Executive Committee, SolutionPoint/Guidepost, Mohler, Slade, McLaurin, Barber, Linton, and Geiger. Lifeway does not assert the exception.

9

(1976) (quoting *Watson*, 80 U.S. at 733). Accordingly, this Court maintains jurisdiction over a dispute so long as it can be determined "without resolving questions of religious doctrine, polity, or practice." *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976). The claims at issue here—defamation, defamation per se, conspiracy, negligence, and intentional infliction of emotional distress—are not ecclesiastical in nature, but, rather, secular civil claims rooted in neutral principles of tort law. Plaintiffs' claims are premised on Defendants' false, published accusations that Mr. Sills physically and sexually assaulted, sexually abused, and threatened Lyell over more than a decade and the resulting damage to Mr. and Mrs. Sills.

The Court need not resolve questions of religious doctrine, polity, or practice to adjudicate Plaintiffs claims. Instead, the relevant questions concern questions of civil law, including whether the accusations levied against Mr. Sills were false; whether they were published; whether Defendants exercised sufficient care in determining whether the accusations were true or false prior to publication; and how the Plaintiffs were damaged by the public accusations. Notably, the legal contract executed between Guidepost and the SBC governing the engagement under which Guidepost produced the defamatory report specifically contemplates litigation in a court of law. (*See, e.g.,* Doc. 1, Ex. 1 at ⁋⁋ 3.3, 7.1, 7/2, 8.1, 12.1). Defendant Barber, as president of the SBC, reportedly at the SBC annual meeting in June 2022, proposed asking state legislatures to shield churches from legal liability in sexual abuse cases in order to "make them more willing to share information."[2]

Defendants rely heavily in their motions on *Ogle v Church of God*, but that case has no bearing here. In *Ogle*, an ordained bishop brought claims against a church governing body

---

[2] *See* https://www.wunc.org/2022-06-15/southern-baptists-vote-to-fight-sexual-abuse-and-elect-a-leader-eager-for-change.

stemming from internal disciplinary proceedings in which the church deemed the bishop had engaged in unbecoming ministerial conduct, suspended him, and subsequently declined to reinstate him. *Ogle v. Church of God*, 152 F. App'x 371, 373-74 (6th Cir. 2005). Based on the facts presented, the Court determined that "all of defendants' actions of which Ogle complains were part of church disciplinary proceedings which were initiated precisely because Ogle's actions violated the Church of God Minutes of the General Assembly." *Id*. at 376.

By contrast, Plaintiffs' claims are not predicated on any internal disciplinary proceedings or on questions of church doctrine polity or practice. As set out in the Complaint, Mr. Sills acknowledged his consensual extramarital relationship with Lyell and resigned his job as a professor at the Seminary in 2018, well before the defamatory statements were made that form the basis of this action. Importantly, Mr. Sills was never subject to internal church disciplinary proceedings.

The gravamen of the Plaintiffs' Complaint is that, subsequent to Mr. Sills' resignation, Lyell and other Defendants published a series of defamatory public statements falsely portraying Mr. Sills as a perpetrator of physical and sexual assault and abuse against Ms. Lyell. Despite claims by some Defendants that Lyell's accusations of criminal behavior were "investigated," none of the Defendants ever contacted Mr. Sills for comment, nor did they inform him of the accusation that would be published against him or the database of sexual predators in which his name and face would be included. (*See* doc. 1 at ¶¶ 50-53).

More on point is a separate lawsuit filed by Ogle against the minister who accused him of unbecoming conduct, *Ogle v. Hocker*. In that case, the Sixth Circuit determined that ecclesiastical abstention was unwarranted because the defendant's "statements were unrelated to any pending employment decision." *Ogle v. Hocker*, 279 F. App'x 391, 395 (6th Cir. 2008).

The Sixth Circuit noted that, although the defendant's allegedly defamatory statements were made as part of a church sermon, the defendant "also repeated the allegations, along with others, on numerous occasions after the sermon, thus taking the bulk of his comments outside of the religious practice context." *Id*. at 396. The Sixth Circuit determined that the "sermon statements themselves were not related to employment or polity issues, but were given as a personal life example of deception." *Id.* The court also noted that it was "not asked to determine whether Ogle's actions complied with church law, whether Hocker's religious condemnation of Ogle comport[ed] with the religious tenants of the [church's governing body], or whether Hocker's statements supported his doctrinal point," and the defendant's statements couldn't be construed as involving "pastor-parishioner discipline" because Ogle was not a member of the defendant's church. *Id*.

Such considerations are also relevant here. The accusations against Mr. Sills were personal accusations of criminal behavior levied by Lyell and adopted whole cloth by other Defendants, including Guidepost/SolutionPoint, for-profit, secular businesses otherwise wholly unaffiliated with the SBC and its entities. The accusations were not related to Mr. Sills' employment since he had resigned his position at the Seminary in 2018 and the relevant defamatory statements were published in 2022-2023. Primarily, however, Mr. Sills' claims against Lyell and other Defendants do not invoke religious tenets or church doctrine, nor do they touch on issues of pastor-parishioner discipline.

In another case cited by Defendants, the Tennessee Supreme Court, overturning a decision by the intermediate appellate court, determined that ecclesiastical abstention was inapplicable to civil claims brought by a victim of child sex abuse against the Catholic Diocese of Memphis *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W. 3d 436, 441-42 (Tenn. 2012). Plaintiff sued for negligent hiring, negligent retention, negligent supervision, and breach of

fiduciary duty, and the state Supreme Court determined that none of the claims was barred by the ecclesiastical abstention doctrine. *Id.* at 444-45.

The Court noted in its decision: "Based on our consideration of the decisions in similar cases handed down by our colleagues on other state and federal courts, we have concluded that … Tennessee's courts may address these claims, as long as they can do so using neutral principles of law and can refrain from resolving religious disputes and from relying on religious doctrine. *Id.* at 452 (citing *Jones v. Wolf*, 443 U.S. 595, 602-07 (1979)).

The Court further noted that determining whether the ecclesiastical abstention doctrine requires the dismissal of a complaint does not depend on whether the complaint contains some allegations that would be improper for adjudication. Rather, it depends on whether the complaint contains claims that Tennessee's courts may properly adjudicate. *Redwing*, 363 S.W. 3d at 453. Here, Plaintiffs have brought claims that this Court may properly adjudicate and seek only the neutral application of secular civil law. The ecclesiastical abstention does not bar this action.

> **D.** **This Court has personal jurisdiction over all the defendants in this dispute.**

The SBC, Executive Committee, Lifeway, the Seminary, and Guidepost all concede to personal jurisdiction, as do individual defendants Lyell, Mohler, McLaurin, and Slade. Only Defendants SPI, Litton, Barber, and Geiger assert that this Court lacks personal jurisdiction over them.

> **1. SolutionPoint**

Exercising jurisdiction over SolutionPoint would not violate due process because it is structurally and operationally indistinguishable from Defendant Guidepost for purposes of jurisdictional review.

"The long-arm statute of the state in which a federal court sits determines the federal court's personal jurisdiction." *Valentine v. SSC Newport Operating Co. LLC*, No. 2:19-CV-00147, 2020

WL 7018265, at *3 (E.D. Tenn. Mar. 30, 2020) (citing Fed. R. Civ. P. 4(k)(1)(A); *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)). Tennessee's long-arm statute confers jurisdiction "to the full extent permissible under the United States Constitution." *Id*. (citing Tenn. Code Ann. § 20–2–225; *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 646 (Tenn. 2009)). Where the court "relies on the pleadings, submissions, and affidavits, the burden on the plaintiff is 'relatively slight,' and the plaintiff only needs to make a prima facie showing." *Id*. (citing *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 847 (6th Cir. 2017)). In determining whether the plaintiffs have met their burden, this Court must view the facts "in a light most favorable to the plaintiff without weighing the controverting assertions of the party seeking dismissal." *Id.* (citing *Anwar*, 876 F.3d at 847).

The Sixth Circuit and Tennessee provide for personal jurisdiction under the "alter-ego" theory where a parent company and its subsidiary "do not exist as separate entities but are one and the same for purposes of jurisdiction." *Id.*, at *4 (citing *Anwar*, 876 F.3d at 848) (internal quotations omitted). Determinations of personal jurisdiction under the alter-ego theory are a matter of Tennessee law; however, because Tennessee's long-arm statute reaches to the limits of the U.S. Constitution, Sixth Circuit precedent also is relevant.

Relevant factors in determining whether two entities are acting as one include whether the subsidiary corporation is a sham or dummy; the two corporations are, in fact, identical and indistinguishable; [or] the subsidiary corporation is merely an instrumentality, agent, conduit, or adjunct of the parent corporation…" *Id*. (quoting *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 653 (Tenn. 2009)) (internal quotations omitted). An entity is an instrumentality when "the parent company dominates 'finances, policies and practices [so] that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.'" *Id*. (citing *Stigall v. Wickes Mach., a Div. of Wickes Corp.*, 801 S.W.2d 507, 511 (Tenn.

14

1990)). Other relevant factors include whether the entities share the same employees and corporate officers; engage in the same business enterprise; have the same address and phone lines; use the same assets; complete the same jobs; do not maintain separate books, tax returns, or financial statements; and/or exert control over the daily affairs of another corporation. *Id.* (citing *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362–63 (6th Cir. 2008)).

Here, Guidepost is a "limited liability" company, and SolutionPoint is its sole owner. (Doc. 79 at 1). The two companies share a physical office address in New York. (Doc. 79 at 1, ⁋⁋ 3, 7).

Based on publicly available information—having conducted no discovery as yet in this case—Guidepost and SolutionPoint also share common leadership. Anthony Collura concedes in his attached Declaration that he serves as Chief Legal Officer for both SolutionPoint and Guidepost, as well as serving as chief operating officer of Guidepost and corporate secretary of SolutionPoint. (*Id.* ⁋ 1). He is also listed on the Guidepost website as a member of the board of directors.[3]

Guidepost Chairman Bart M. Schwartz, Vice Chairman Joseph Rosetti, and Chief Executive Officer Beth Wood also occupy concurrent leadership positions with SolutionPoint.[4] Ms. Wood serves on the boards of directors of both Guidepost and SolutionPoint.[5] Notably, Ms. Wood, as CEO, was signatory to Guidepost's contract with the SBC relating to the sex-abuse investigation. (Doc. 1 Ex. A).

As Mr. Collura declares, SolutionPoint "is purely a holding company which does not engage in any independent business activities. It has no paid employees and does not have any

---

[3] *See* https://guidepostsolutions.com/contact/#leadership.
[4] *See* https://guidepostsolutions.com/contact/#leadership.
[5] *See* https://wallmine.com/people/34528/julie-myers-wood

15

operations." (Doc. 79 at 6). Its New York address is merely a mailing address it maintains at Guidepost's offices. (*Id*. at 7). Despite having no business activities, however, SolutionPoint maintains a separate board of directors from Guidepost and has its own bank accounts and financial records. (*Id*. at 8, 12).

Under these facts, Guidepost is an agent or instrumentality of parent company SolutionPoint. SolutionPoint's leaders are Guidepost's leaders. By its own admission, SolutionPoint has no business activities but is merely a vessel for Guidepost. It has no offices, no employees, no operations—yet it has bank accounts and finances. Based on the above, Plaintiffs have demonstrated a prima facie case that personal jurisdiction exists under an alter-ego theory because the known facts demonstrate that SolutionPoint has no independent existence apart from Guidepost; for purposes of jurisdiction, they are indistinguishable.

### 2. Bart Barber, Ed Litton, and Eric Geiger

Messrs. Barber, Litton, and Geiger are or were leaders of Defendant entities at times relevant to this action and each engaged, individually and as agents and/or employees, in the topics and activities that gave rise to defamatory statements against Mr. and Mrs. Sills. Specifically, Litton was elected to a one-year term as president of the SBC in 2021, and was replaced by Barber, who was elected in 2022 and again in 2023. Geiger was senior vice president of Lifeway and a Tennessee resident in 2018 when Lyell disclosed her affair with Mr. Sills to Geiger and others. More recently, in July 2022, Geiger inserted himself back into the fray when he affirmatively tweeted false statements about Mrs. Sills, which again referred back to his tenure at LifeWay.

Under Tennessee law, "[a] court may exercise personal jurisdiction over a person, who acts directly or indirectly, as to a claim for relief arising from the person's "(1) Transacting any business in this state … (3) [c]ausing tortious injury by an act or omission in this state … or … (7) [c]onduct

as a director or officer of a domestic corporation or the conduct of a domestic corporation while the person held office as a director or officer." Tenn. Code Ann. § 20-2-223.

The three men calling the Court's personal jurisdiction into question here all have been named Defendants as a result of conduct that occurred when they were officers of a Tennessee-based entity or republishing and redistributing false statements arising from their time with the SBC and its subdivisions and subsidiaries. Moreover, the entities on whose behalf each men took the relevant action all have conceded the Court's personal jurisdiction in this case. (*See generally* docs. 73-74, 88-89).

Defendants Litton and Barber attempt to evade this Court's jurisdiction because they presently reside outside Tennessee. However, both men during the relevant time period served as the President of the SBC, a Tennessee-based entity. It is their conduct as agents of the SBC that is at issue in this case. In their motion, Barber and Litton note that the Plaintiffs now reside in Mississippi, but the domicile of the plaintiff is irrelevant to whether the court may exercise personal jurisdiction over the defendants. Nor is the question of general personal jurisdiction relevant where the Court has specific personal jurisdiction over them as a matter of Tennessee law. *See* Tenn. Code Ann. § 20-2-223.

Specific personal jurisdiction is also available under the Sixth Circuit's three-part test cited by the defendants. One, these defendants purposely availed themselves of the "privilege of acting in the forum state or causing a consequence in the form state" when they acceded to the presidency of the SBC, a large, Tennessee-based institution. *See Southern Machine Co. v. Mohasco Industries, Inc*., 401 F. 2d 374, 380 (6th Cir. 1968). Two, there is no question that the causes of action alleged by Plaintiffs arise directly from these Defendants' activities on behalf of the SBC. *Id*. Three, their actions are directly connected to Tennessee because each action was conducted on behalf of the

SBC and/or its Executive Committee and its leadership and affiliated entities are headquartered in Tennessee. *Id.*

There is no question that Geiger was "at home" in Tennessee, both literally and for purposes of personal jurisdiction, when he reported Lyell's initial disclosure to Defendant Mohler in 2018, setting in motion the series of third-party disclosures that culminated in Mr. Sills' very public defamation. Geiger was directly and intimately involved in the issue from the beginning and continued to comment and tweet. Additionally, even if seldom, he does still avail himself to Tennessee, whether visiting an SBC church or his parents.

As late as July 2022, Geiger made defamatory public statements about Mr. Sills and Mrs. Sills the social media platform Twitter (now known as "X") describing the relationship as "sexual abuse" and referencing a second-hand reported interaction with Mr. Sills—at which Geiger was not present—as "the epitome of evil," and of "threatening" text messages from Mrs. Sills to Lyell.[6] Geiger's Tweet belies his declaration that he had no involvement in the controversy after 2018. Contrary to his statement that his "only involvement was reporting Jennifer Lyell's claims up the chain of command in 2018," his Tweet demonstrates that (1) he was involved in the subsequent public reporting of Lyell's version of events; and (2) he directly contributed to the defamation of Mr. Sills in 2022.

Notably, Geiger does not specify in his Declaration that what Lyell described to him in 2018 was sexual assault or sexual abuse. (*See generally* doc. 92-1). Defendants appear to disagree

---

[6] "When ruling on a motion to dismiss for lack of personal jurisdiction, a district court may rely on the pleadings, submissions, and affidavits provided by the parties, permit the parties to perform jurisdictional discovery, or conduct an evidentiary hearing." *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 847 (6th Cir. 2017).

in their court filings about whether Lyell initially disclosed that her relationship with Mr. Sills was consensual or whether she reported it as sexual abuse.

Geiger attaches to his motion a Declaration, to which he cites in support of his argument against personal jurisdiction. However, Geiger cites to only eight of 17 numbered paragraphs in his personal jurisdiction argument. (Doc. 92 at 8, 11). Geiger cites to other portions of the Declaration in support of a narrative introduction to the motion, with no connection to his legal arguments. (*Id*. at 3-4). See Cahoon v. Premise Health Holding Corp., No. 3:21-CV-0235, 2021 WL 2474460, at *4 (M.D. Tenn. June 16, 2021) ("Defendant did cite to several exhibits in its memorandum of law in support of its Motion, but the Court cannot consider them in assessing the Motion."). Accordingly, Plaintiffs move the Court to strike Geiger's declaration as extraneous and inappropriate in a motion to dismiss.

Importantly, our United States Supreme Court has recently clarified how the Defendants' conduct and choices all factor into jurisdiction, stating in pertinent part:

> "[L]egion of precedents . . . attach jurisdictional consequences to what some might dismiss as mere formalities. Consider some examples we have already encountered. In a typical general jurisdiction case under *International Shoe*, a company is subject to suit on any claim in a forum State only because of its decision to file a piece of paper there (a certificate of incorporation). The firm is amenable to suit even if all of its operations are located elsewhere and even if its certificate only sits collecting dust on an office shelf for years thereafter. *See*, e.g., *Goodyear*, 564 U.S. at 924, 131 S.Ct. 2846. Then there is the tag rule. The invisible state line might seem a trivial thing. But when an individual takes one step off a plane after flying from New Jersey to California, the jurisdictional consequences are immediate and serious. See *Burnham,* 495 U.S. at 619, 110 S.Ct. 2105 (plurality opinion).

*Mallory v. Norfolk S. Ry. Co*., 143 S. Ct. 2028, 2044 (2023). Without question, this Court has jurisdiction over each of these Defendants.

### 3. Conspiracy

Finally, even where the Court lacks general or specific jurisdiction over an individual Defendant (which it does not, in the case at bar), jurisdiction is proper under a conspiracy theory

of jurisdiction. Under such doctrine, a defendant with no direct contacts to the forum is nevertheless subject to its personal jurisdiction by virtue of a co-conspirator's contacts. *First Cmty. Bank, N.A. v. First Tennessee Bank, N.A.,* 489 S.W.3d 369, 394 (Tenn. 2015).

The doctrine applies where two or more individuals conspire to do something that "they could reasonably expect to lead to consequences in a particular forum." *Id.* Where "one co-conspirator commits overt acts in furtherance of the conspiracy, and those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state, then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum." *Id.*

This theory of personal jurisdiction is based on two principles: "(1) that the acts of one co-conspirator are attributable to all co-conspirators; and (2) that the constitutional requirement of minimum contacts between non-residential defendants and the forum can be met if there is a substantial connection between the forum and a conspiracy entered into by such defendants." *Id.* at 395. "[T]he proper inquiry under this theory is an assessment of the contacts of the *resident* co-conspirator, not the contacts of the non-resident co-conspirator." *Id.* At this stage in the proceedings, a plaintiff need only plead sufficient factual allegations from which the existence of a conspiracy may be inferred. *Manufacturers Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d 846, 861 (Tenn. Ct. App. 2000).

The tort of conspiracy is an agreement "between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *Id.* at 395. "Civil conspiracies are rarely proven directly" but are more often established with "circumstantial evidence and inferences drawn from the evidence, coupled with common-sense

knowledge of the behavior of persons in similar circumstances." *Id*. at 396 (quoting *First Am. Title Ins. Co. v. Cumberland Cnty. Bank,* 633 F.Supp.2d 566, 588 (M.D.Tenn.2009)) (internal quotations omitted). Fact finders consider "the nature of the acts themselves, the relationship of the parties, the interests of the conspirators, and other circumstances." *Id*.

The Complaint properly alleges that Defendants conspired to defame Mr. Sills, and then Mrs. Sills, as part of an effort to shore up the public relations nightmare faced by the SBC and its affiliates as a result of its failures to address legitimate sexual abuse. (Doc. 1 at ¶¶ 94-97). The Executive Committee included Mr. Sills on a formal list of sexual predators within the SBC without any meaningful investigation, published that information to Guidepost/SolutionPoint, which in turn recklessly and publicly disseminated the information despite its own determination that the SBC had seriously mishandled sexual abuse allegations for years. As alleged, each Defendant contributed to and/or approved the publication of defamatory statements about Mr. Sills, thereby becoming a member of the conspiracy. (*See generally* doc. 1 at ¶¶ 32-97). Thus, even if Geiger or another Defendant lacked sufficient contact for personal jurisdiction individually (which they do not), jurisdiction exists by virtue of the properly alleged conspiracy.

### E. Group Pleading

Defendants Lifeway, the Southern Baptist Convention, Dr. Barber, Dr. Litton, the Executive Committee, McLaurin and Slade argue that Plaintiffs' complaint should be dismissed for improper group pleading because Plaintiffs do not allege any specific actions by them in support of their claims. *See* Lifeway Mem. at 7; SBC Mem. at 13; Executive Committee Mem. at 12. This argument fails for two reasons. First, Plaintiffs have pled sufficient facts to put each Defendant on notice of its unlawful acts under the pleading standard of Rule 8. Second, there is "no categorical rule against describing defendants—particularly affiliated corporate defendants with a history of acting in concert—by using collective language, if doing so is appropriate in the

context of a particular case." *Nissan N. Am., Inc. v. Cont'l Auto. Sys.*, No. 3:19-cv-00396, 2019 U.S. Dist. LEXIS 170225, at *10 (M.D. Tenn. Oct. 1, 2019).

"Rule 8's notice pleading standard does not require 'detailed factual allegations.'" *In re AME Church Emple. Ret. Fund Litig.*, No. 1:22-md-03035-STA-jay, 2023 U.S. Dist. LEXIS 45748, at *44-45 (W.D. Tenn. Mar. 17, 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)). Rule 8 only requires that a complaint contain: 1) a short and plain jurisdictional statement; 2) a short and plain statement of the claim, and 3) an explanation of the relief sought. *Id.*, at *44. "That's it. By listing these elements, Rule 8 implicitly 'excludes other requirements that must be satisfied for a complaint to state a claim for relief.'" *Id.* (citing *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019) (other citation omitted).[7]

Defendant Lifeway argues that Plaintiffs fail to distinguish it from other Defendants. This argument fails because in addition to the allegations against it acknowledged by Lifeway (Lifeway Mem. at 7-8 citing Compl. ¶¶ 40, 60), Plaintiffs have pled additional unlawful conduct by Lifeway independent from unlawful conduct by its employees.[8] *See* Compl. ¶ 47 (Defendant Lifeway along with other Defendants decided to retain an investigator); ¶ 61 (Defendant Lifeway propagated misinformation); ¶ 62 (Defendant Lifeway acted in concert with other Defendants to perpetuate the false narrative in SPI and Guidepost's report).

The Executive Committee, McLaurin and Slade likewise argue that the complaint fails to allege sufficient allegations against them, including the defamation claims. Executive Committee Mem. at 12, 13. This argument, however, is disingenuous when reading the complaint as a whole.

---

[7] There is no heightened pleading standard for state law civil conspiracy claims, and Defendants do not argue otherwise. *See Carroll v. TDS Telecomms. Corp.*, No. 1:17-cv-01127-STA-egb, 2017 U.S. Dist. LEXIS 213012, at *29 (W.D. Tenn. Dec. 29, 2017).
[8] Plaintiffs address Lifeway's argument that its employees were not acting within the scope of their employment in Section G.4. herein.

22

It was at the request of the Executive Committee that the sham investigation by Guidepost (and directed by the Executive Committee) culminated in publishing the defamatory statements against Mr. Sills. Compl. ¶ 47 (Executive Committee and other Defendants' decision to retain an investigator); ¶ 48 (the Executive Committee had control over the investigation's outcome); ¶ 49 (five members of the Executive Committee served on the go-between committee between Guidepost and the Executive Committee); ¶ 52 (the Executive Committee, Slade, and McLaurin issued an apology to Defendant Lyell in anticipation of the publishing of the defamatory report); ¶ 53 (the Executive Committee, McLaurin, and Slade noted the Executive's Committee failure to clarify that Lyell's allegations of sexual abuse were investigated and "unequivocally corroborated."); ¶ 60 (the Executive Committee and other Defendants published the unsubstantiated claim that Lyell's and Dr. Sills affair was non-consensual and involved violence); ¶ 64 (the Executive Committee had an indemnity agreement with Guidepost for work related to the investigation; SPI and Guidepost were an extension of the Executive Committee).

Defendants SBC, Barber, and Litton similarly ignore Plaintiffs' allegations as a whole and complain they are "rarely mentioned by name in the complaint." SBC Mem. at 14. As stated above, all Defendants are employees, agents, affiliates or subsidiaries of SBC of which the SBC has control. Indeed, the SBC is mentioned in the Complaint over 80 times and includes, but is not limited to, allegations that the SBC tried to control the public reaction of Mr. Sills being branded as a pervert (Compl. ¶ 38); that the SBC accepted Lyell's offer to write for the Baptist Press in order to demonstrate the SBC's reformative efforts in addressing sexual abuse cases (Compl. ¶ 39); the SBC implemented the investigation designed to shame Mr. Sills and exonerate Lyell (Compl. ¶ 40); and agreed to indemnify SPI and Guidepost for any liability incurred as a result of the investigation (Compl. ¶ 64).

Plaintiffs also state sufficient facts against Barber and Litton and allege that Barber and Litton, along with other Defendants, recklessly published Lyell's claims that her affair was abusive and non-consensual (Compl. ¶ 60); propagated this misinformation (Compl. ¶ 61); and acted in concert with SPI and Guidepost to perpetuate Lyell's false narrative; (Compl. ¶ 62). Barber furthered the defamatory statements through tweets. (Compl. ¶ 72). Litton hand-picked the committee members who were to oversee the sex abuse investigation, served on that committee himself, and directed and approved the false narrative against Plaintiffs. Compl. ¶ 49.

Given these specific allegations against Lifeway, the Executive Committee, Slade, McLaurin, the SBC, Barber, and Litton, Plaintiffs have not improperly relied solely on group pleading and their claims should be allowed to proceed.

Further, Plaintiffs' decision to plead liability collectively is not fatal to their complaint. *Nissan N. Am., Inc.*, 2019 U.S. Dist. LEXIS 170225, at *10. At the pleading stage, Plaintiffs often lack information of the division of responsibilities among affiliated corporate defendants and expect to learn more in discovery. *Id.*, at *10-11 (noting that "It might turn out, after discovery, that some grounds for recovery apply to one defendant but not others. At the pleading stage, however, [the plaintiff] is not required to foresee how that issue will be resolved."). Plaintiffs have properly alleged that all Defendants are either subsidiaries, affiliates, employees, or agents of Defendant SBC. Compl. ¶¶ 17-28. Discovery will reveal the relationship and division of responsibilities among these entities, and therefore to the extent there is any "group pleading" (which Plaintiffs dispute) dismissal for any alleged group pleading is inappropriate at this stage.

### F. Plaintiffs have adequately pled defamation.

#### 1. Neither David Sills nor Mary Sills are a public figure.

None of Defendants allege that Mr. Sills or Mrs. Sills are, in fact, public figures in any way; they are not. However, the Executive Committee, McLaurin, and Slade (collectively, "the

Executive Committee"), in their joint motion to dismiss (Doc. 87), allege that Mr. Sills has identified himself as a "limited purpose" or "vortex" public figure for purposes of this litigation. Mr. Sills has done no such thing. These Defendants rely on a single sentence within the Complaint referencing "public reaction" to Defendants' prior actions. This reference which is pulled out of context is insufficient to suddenly render Mr. Sills a public figure or, by extension, subject his defamation claim to a higher standard of proof. *See Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (noting that, where the plaintiff is a public figure, he "must also prove that the libelous statements were made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.") (internal quotations and citation omitted).

Again, the Executive Committee does not claim that Mr. Sills is a public figure, but rather they propose that a single turn of phrase in the Complaint confers on him public-figure status in this litigation because it is tantamount to alleging that he has been "thrust into the vortex of a matter of legitimate public interest." But this is not an accurate representation of the law or the facts. Indeed, the Supreme Court has identified "public figures" for purposes of defamation claims as "[t]hose who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office… ." *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 342 (1974).

Tennessee's appellate courts have further identified public figures as "those who have thrust themselves into the vortex of important public controversies; those who achieve such pervasive fame or notoriety that they become public figures for all purposes, and in all contexts; those who voluntarily inject themselves, or are drawn into public controversies, and become public figures for a limited range of issues; and those who assume special prominence in the resolution

of public questions." *Hibdon v. Grabowski*, 195 S.W. 3d 48, 58 (Tenn. Ct. App. 2005). "More commonly, those classed by the courts as public figures have thrust themselves to the forefront of a particular public controversy in order to influence the resolution of the issues involved, inviting attention and comment." *Id*. at 58-59. Mr. and Mrs. Sills were not public figures at the time of the Defendants making and spreading false and defamatory statements. To the extent the Defendant continue to tweet and foment the congregants now, about the lawsuit, that does not serve to transform Mr. and Mrs. Sills into public figures; they never have been and are not, now.

Among the court's considerations when determining whether an individual is a public figure are whether a public controversy exists and the nature and extent of the individual's participation in that controversy—specifically, the extent to which his participation is voluntary, the extent to which there is access to channels of effective communication to counteract false statements, and the prominence of his role in the public controversy. *Id*. at 59 (citing *Cloyd v. Press, Inc*., 629 S.W. 2d 24, 25-26 (Tenn. Ct. App. 1981) (itself quoting *Gertz*, 418 U.S. at 342).

The Executive Committee cites no relevant authority for their assertion that Mr. Sills should be considered a public figure for purposes of this lawsuit, nor does it make any argument or provide any facts other than the one misrepresented phrase plucked from Plaintiffs' Complaint in an effort to support its bald assertion. Defendants' attempt fails. The public controversy at the heart of this matter is the SBC's—along with its agents' and affiliated organizations'—handling of sexual abuse allegations, a large and public controversy that encompasses Lyell's false and defamatory accusations against Mr. and Mrs. Sills, Defendants' announcement of a big investigation and subsequent blatant failure to investigate Lyell's questionable and contradictory claims, and the consequent false and defamatory public reports of Mr. Sills as a sexual predator (with Mrs. Sills framed as complicit and threatening) resulting in enormous damage to the Sills'

lives and reputations. In other words, Lyell's false accusations against Mr. Sills and Mrs. Sills were one part of a much broader public controversy, but one that Defendants elected to catapult into the spotlight, thereby increasing the damage to Mr. and Mrs. Sills. Defendants do not allege that Mr. Sills thrust himself into the SBC's controversy or that he has taken public part in it. No Defendant alleges that Mr. Sills voluntarily placed himself in a spotlight as a falsely accused sexual predator, or that he accessed channels of effective communication to counteract the false statements made against him. Mr. And Mrs. Sills' only involvement in the SBC's ongoing controversy is being entangled by the false accusations lodged against them by Defendants, which decimated their personal and professional lives and continue to follow them despite their attempts to start fresh in a new place. Mr. Sills has not actively interjected himself in the SBC's controversy in any way that could render him a public figure for purposes of this litigation. Mr. Sills is a private citizen falsely and publicly excoriated by Defendants for their own purposes and who Defendants used as a scapegoat.

### 2. The "actual malice" standard is inapplicable.

Mr. Sills is a private figure, and the "actual malice" standard does not apply. The Executive Committee's assertion that the Complaint fails to adequately allege actual malice are moot. Nevertheless, even if a "reckless disregard" is the legal standard, Plaintiffs have pled sufficient facts which support this higher standard for actual malice. (*See* doc. 1 at ¶¶ 33-77).

The Executive Committee argues that it could not have acted with reckless disregard because, when Ms. Lyell "changed her story" to report that the consensual affair between her and Mr. Sills was instead nonconsensual and abusive, the Executive Committee simply had to choose whether to believe Lyell or Mr. Sills. That is absurd and, if true, merely serves as additional evidence of just how reckless the Executive Committee acted with regard to the matter. First, the fact that Lyell changed her story in the face of criticism over the affair is a red flag. Second,

Defendants did not bother to question Mr. Sills about Lyell's subsequent false accusations of nonconsensual sex or abuse, and thus, the "he said, she said" on which the Executive Committee relies was only a "she said." Third, Defendants had a duty to investigate accusations of heinous and criminal conduct before publicly parroting them to the public. Fourth, Guidepost concedes that it did not investigate the veracity of the accusations, but merely parroted them in the resulting report with no regard for whether they were false, compounding the recklessness with which Defendants falsely painted Mr. Sills as a sexual predator.

### 3. Lyell's accusations were not privileged.

In her motion, Lyell asserts that her accusations against Mr. Sills to "any of the SBC Defendants" are conditionally privileged under either the "public interest" or "common interest" privilege. They are not.

A conditional privilege "is recognized where the interest which the defendant is seeking to vindicate or further is regarded as sufficiently important to justify some latitude for making mistakes. *Pate v. Serv. Merch. Co*., 959 S.W. 2d 569, 575-76 (Tenn. Ct. App. 1996) (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 115, at 825 (5th ed.1988)).

As set out in *Pate*—a case cited by Lyell in support of her motion to dismiss—the public-interest privilege applies to a communication "made in good faith in the prosecution of an inquiry regarding a crime which has been committed, and for the purpose of detecting and bringing to punishment the criminal." *Id*. at 576. "[T]he cornerstone of the public interest privilege should be good faith" and "it is the good faith of the speaker, not the recipient, that is the key to the public interest privilege." *Id*. at 577.

Thus, the public-interest privilege is intended to encourage individuals to assist in the investigation and prosecution of an actual crime by shielding them from liability in the case of good-faith mistakes. Accordingly, such statements "cannot include irrelevant defamatory matter

28

not related to the public interest and cannot be made in the presence of a third person who does not have a legitimate interest in the matter." *Id*. No crimes were committed, no crimes were reported, no crimes occurred.

For example, in *Pate*, the Court determined that two store clerks were shielded by the public-interest privilege where they mistakenly identified the plaintiff as a store customer who made a purchase with a credit card that turned out to be stolen. *Id*. at 577-78. The Court noted that the good-faith statements by the clerks were "direct and to the point and were not overheard by any third parties." *Id*. at 577.

The Court also noted that the recipients of the statements—store security guards and the victim of the crime—were not law enforcement officers but nonetheless were the type of recipients contemplated by the public-interest privilege because it "affords protection to a private citizen who publishes defamatory matter to a third person even though he is not a law enforcement officer, under circumstances which, if true, would give the recipient a privilege to act for the purpose of preventing a crime or of apprehending a criminal...." *Id*. (quoting Restatement (Second) of Torts § 598 cmt. f (1977)) (internal quotations omitted).

In this case, neither Lyell nor anyone else pursued with law enforcement the contrived and unsubstantiated allegations raised against Mr. Sills despite their purported criminal nature. Moreover, Mr. Sills already had resigned from the seminary when Lyell changed her story to allege that their consensual relationship was nonconsensual (sparing her own employment which was similarly jeopardized for having an affair), so the SBC and its agents and affiliates had no authority to pursue the allegations as an employment matter. Nor can this be a case of mistaken identity, as contemplated in *Pate*, because Lyell herself is the purported victim. It is not possible for Lyell to

make false allegations in good faith. These circumstances are not contemplated by the public-interest privilege.

Finally, even if these circumstances could be shoehorned into the public-interest privilege, it is not a complete shield, but merely places a burden on the plaintiff to show malice. As the Court noted in *Pate*, "[t]o prove actual malice, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication, and that publishing, with such doubt, shows reckless disregard for truth or falsity and demonstrates actual malice." *Id*. at 577-78 (citing *Moore v. Bailey*, 628 S.W. 2d 431, 433-34 (Tenn. App. 1981)). Such a conclusion is unavoidable where Lyell has falsely accused Mr. Sills of sexual abuse.

Similarly, the common-interest privilege has been recognized in Tennessee to cover communications between employees or agents of the same business or corporation. *Pate*, 959 S.W. 2d at 576. Specifically, the Tennessee Supreme Court held in *Freeman v. Dayton Scale Co*. that a communication of a defamatory matter between the agents and officers of a corporation in the ordinary course of business was not a "publication." 19 S.W.2d 255, 256 (Tenn. 1929). The Tennessee courts "interpret *Freeman* and its progeny to mean that communication among agents of the same corporation made within the scope and course of their employment relative to duties performed for that corporation are not to be considered as statements communicated or publicized to third persons." *Certain v. Goodwin*, No. M201600889COAR3CV, 2017 WL 5515863, at *8 (Tenn. Ct. App. Nov. 17, 2017). The Freeman court also noted that "the more liberal rule, and the one which seemingly has the support of the weight of modern authority, is that, where the communication is made to a servant or business associate in the ordinary and natural course of business, there is no actionable libel." *Freeman*, 19 S.W. 2d at 257 (quoting 18 ALR 772, 778). Central to the privilege "is the concept of 'need to know,' with the communication flowing through

the proper chain of command, particularly in employee performance reviews or disciplinary action." *Woods v. Helmi*, 758 S.W.2d 219, 223 (Tenn. Ct. App. 1988).

Here again, however, "the term 'in good faith' … is crucial to the applicability of the claimed privilege… ." *Am. Addiction Centers, Inc. v. Nat'l Ass'n of Addiction Treatment Providers*, 515 F. Supp. 3d 820, 845-46 (M.D. Tenn. 2021) (finding that the Plaintiffs sufficiently alleged the absence of good faith (i.e., bad faith), intent, and malice). Lyell cannot claim to act in good faith where she has falsely accused Mr. Sills of long-term sexual abuse, and falsely depicted Mrs. Sills as complicit to the acts. Additionally, it is difficult to see how Lyell's communications of these false accusations to agents at Lifeway or other SBC entities are "need to know" under the common-interest doctrine since Mr. Sills already had admitted the extramarital relationship and resigned from the seminary. Moreover, the privilege is negated when those agents and/or employees publicly published the statements , went on podcasts and radio programs and social media and blogged, as they did when they issued a public report. Lyell continued to falsely accuse Mr. Sills of heinous behavior through public interviews, online posts, and other means.[9] Ms. Lyell has a whole website devoted to the false accusations.[10] Thus, Lyell cannot meet the requirements for common-interest privilege.

### G. Plaintiffs' negligence claims are adequately pled.

Plaintiffs have adequately alleged their claim for negligence, gross negligence, and wantonness. "Under Tennessee law, to plead negligence a plaintiff must allege the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or

---

[9] Indeed, Lyell referred to Mr. Sills as a "rapist" to a third-party process server after the initial filing of this case in Alabama. The service of process was recorded by the process server.
[10] *See* https://www.lyellstatementonabuse.com/.

loss; (4) causation in fact; and (5) proximate, or legal, causation." *Doe v. Vanderbilt Univ.*, No. 3:18-cv-00569, 2019 U.S. Dist. LEXIS 173269, at \*58 (M.D. Tenn. Sep. 30, 2019) (citations and quotations omitted). "To plead gross negligence, a plaintiff must allege the elements of negligence, and also allege that the act in question was done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." *Id.*, at \*59 (citations and quotations omitted). "Wanton negligence is defined as '[a] heedless and reckless disregard for another's rights, with the consciousness that the act or omission may result in injury to another.'" *KMI Grp., Inc. v. Wade Acres, LLC*, No. W2018-00301-COA-R3-CV, 2019 Tenn. App. LEXIS 169, at \*28-29 (Ct. App. Apr. 5, 2019) (quoting *Craig v. Stagner*, 159 Tenn. 511, 19 S.W.2d. 234, 236 (Tenn. 1929)).

Defendants SPI and Guidepost argue that Plaintiffs' negligence claims fail because they are predicated on their libel claim. SPI Mem. at 23. However, "[u]nder Tennessee law, a plaintiff has license to bring multiple claims or alternative theories of liability in a single action to redress an injury. *Steffey v. Beechmont Invs., Inc.*, No. 3:16-CV-223, 2017 U.S. Dist. LEXIS 138443, at \*8 (E.D. Tenn. Aug. 29, 2017) (citations omitted). Federal Rule of Civil Procedure 8(d) allows a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Fed. R. Civ. P. 8(d)(2). "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3); *see also Cayton v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:20-cv-00859, 2022 U.S. Dist. LEXIS 9359, at \*11 (M.D. Tenn. Jan. 19, 2022). Thus, at this stage, Plaintiffs have properly pleaded both libel and negligence claims.

### 1. Defendants owed a duty to Plaintiffs, including Mrs. Sills.

Defendants Lifeway, SPI, Guidepost, the Executive Committee, Slade, McLaurin, the SBC, Litton, and Barber argue that Plaintiffs' negligence claims fail because they owe no duty to

32

Plaintiffs. Lifeway Mem. at 12; SPI Mem. at 23; Executive Committee Mem. at 20; SBC Mem. at 17. These Defendants, however, did owe a duty to Plaintiffs. "In general, all persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others." *In re AME Church Emple. Ret. Fund Litig.*, No. 1:22-md-03035-STA-jay, 2023 U.S. Dist. LEXIS 45748, at *105 (W.D. Tenn. Mar. 17, 2023) (citations and quotations omitted). Tennessee courts "balance the foreseeability and gravity of the potential harm against the feasibility and availability of alternatives that would have prevented the harm" to determine whether a defendant owes a duty of care to the plaintiff. *Id.* "There is, however, no affirmative duty to act for the protection of another . . . *unless* the defendant 'stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger." *Id.* (internal citations and quotations omitted). The Court should weigh public policy considerations in determining whether a defendant has a relationship to the plaintiff such that the plaintiffs are entitled to protection, which are crucial in determining whether a duty of care existed in a particular case. *Biscan v. Brown*, 160 S.W.3d 462, 479 (Tenn. 2005) (internal quotations and citations omitted). To determine duty to a third party, Tennessee courts undertake a balancing test which considers the following: 1) the foreseeable probability of the harm or injury occurring; 2) the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; 3) the usefulness of the conduct to defendant; 4) the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; 5) the relative usefulness of the safer conduct; and 6) the relative safety of alternative conduct. *Id.* at 480.

Lifeway owed a duty to the Plaintiffs. Mr. and Mrs. Sills were both SBC members and employees, and Lifeway was publishing some of Mr. Sills writings. Lifeway had an affirmative duty to act for the protection of Plaintiffs. First, Lifeway came to learn that its employee

Defendant Lyell made allegations against Mr. Sills that were false (an actual 180 degree turn-around in the story reported by the SBC, and eventually including the false allegations that Mary Sills enabled the alleged sexual abuse. Lyell's allegations were unsubstantiated. Defendant Lyell first reported to Lifeway that her affair with Mr. Sills was consensual but then rebranded her story as sexual abuse amid the public backlash that would have caused her to resign her powerful position. Compl. ¶¶ 35, 38. Lifeway, along with its co-conspirators, coordinated and decided to retain an investigator regarding sexual abuse within the SBC, with a particular focus on Defendant Lyell's false accusations against Dr. Sills. Compl. ¶¶ 47, 49. Reading Plaintiffs' allegations in favor of the non-movant, and taking them as true at this stage of the litigation, Plaintiffs have plausibly alleged that Lifeway had a duty to Plaintiffs because it had knowledge that Defendant Lyell's statements were false, but instead Lifeway perpetuated Lyell's false statement despite knowing the truth. Compl. ¶ 60. It was foreseeable that these false statements would cause injury to Plaintiffs.[11] Furthermore, a safer alternative to Lifeway's and its agents and/or employees' reckless promotion of false statements would have included an insistence by Lifeway that Mr. and Mrs. Sill be interviewed or permitted to submit evidence to rebut Lyell's misstatements. That would have been free and would have reflected rational conduct. Alternatively, Lifeway could have decided not to support the retaining of an investigator, and Plaintiffs would not have been harmed by the Report that was published at the request of Lifeway and, after reading the report

---

[11] Lifeway's complaint that Plaintiffs have lumped it in as owing a duty with all the other Defendants is misplaced. *See* Lifeway Mem. at 13. "[P]articularity is not the pleading standard for a common law negligence claim. Reading the pleadings as whole and keeping in mind the Rule 8 notice pleading standard for a claim of negligence, the Amended Complaint plausibly alleges [defendants] owed Plaintiffs a duty of care." *In re AME Church Emple. Ret. Fund Litig.*, 2023 U.S. Dist. LEXIS 45748, at *106.

34

and seeing that Dr. Sills was painted as a sexual predator, could have prevented it from being published.

SPI and Guidepost similarly owed a duty to Plaintiffs. Under Tennessee law, "'one who assumes to act . . . may thereby become subject to the duty of acting carefully.'" *Draper v. Westerfield*, 181 S.W.3d 283, 291 (Tenn. 2005) (quoting *Biscan*, 160 S.W.3d at 482-83).

Taking Plaintiffs' allegations as true, SPI and Guidepost assumed a duty to Plaintiffs, including Mrs. Sills, by conducting an investigation that deviated from the standard in that was affirmatively designed to prohibit any input from Mr. or Mrs. Sills, who were not even on notice of the detrimental sham investigation undertaken. Nonetheless, the investigation that excluded the accused was undeniably a foreseeable harm against Plaintiffs. First, it was foreseeable that SPI & Guideposts' failure to conduct a thorough investigation would harm Plaintiffs. Plaintiffs properly allege that SPI and Guidepost failed to interview Plaintiffs or their pastor in connection with the "investigation." Compl. ¶ 51. Second, it was foreseeable that reporting that Mr. Sills was a sexual abuser would have a huge effect on his ability to serve the church in the future, and Plaintiffs allege that the investigation prevented Dr. Sills from gaining employment. Compl. ¶ 39, 117-120. Third, the conduct was useful to SPI and Guidepost. Guidepost was paid for the investigation and " under no circumstance would Guidepost be liable to Defendants SBC or Executive Committee for its work in relation to the investigation." Compl. ¶ 64, Dkt. No. 1-2 (Sept. 1, 2021, Guidepost Engagement Letter, Exhibit A to the Complaint). The fourth, fifth and sixth factors also weigh in favor of SPI and Guidepost owing a duty to Plaintiffs. SPI and Guidepost could have chosen to perform a more thorough investigation rather than relying solely on interviews with Defendants Lyell and Mohler and some SBC documents, including but not limited to interviewing Plaintiffs or their pastor. Performing a more thorough investigation would not have imposed any additional

35

burden, and any additional time or cost would have been minimal. Had SPI and Guidepost simply talked to Plaintiffs or fact checked any of Lyell's allegations, they would have uncovered the truth that Mr. Sill's and Defendant Lyell's relationship was consensual, and Plaintiffs would not have suffered injury from the Report's outrageous claims that Mr. Sills was an abuser, with his photograph featured as a "mugshot" style photo alongside such actual mugshots of convicted criminal offenders. Compl. ¶ 63.

The same is true for the SBC, Litton, Barber, the Executive Committee, McLaurin, and Slade. These Defendants were aware that Defendant Lyell initially reported her affair with Dr. Sills as consensual. Compl. ¶ 35. Yet they conspired with other Defendants to retain an investigator with the Executive Committee (or several of its members) overseeing the "investigation." Compl. ¶¶ 47-49. This investigation was an effort by the SBC and the Executive Committee to improve its reputation in light of criticism for their alleged mishandling of significant sexual abuse cases. Compl. ¶ 39. And despite their knowledge that the affair was consensual, the Executive Committee, McLaurin and Slade took it a step further by publicly issuing an apology to Defendant Lyell for the Baptist Press' "inaccurate" reporting of the affair as consensual, noting the Executive Committee's failure to clarify that Defendant Lyell's allegations of "nonconsensual sexual abuse was investigated and unequivocally corroborated by the SBC entities with authority over (Lyell) and her abuser." Compl. ¶¶ 52-53. These Defendants could have refrained from perpetuating Defendant Lyell's false statements and could have instructed Guidepost to perform a thorough investigation but failed to do so.[12] Plaintiffs allege they suffered harm as a result of these actions.

---

[12] In fact, the Executive Committee's outside counsel raised the issue of whether Dr. Sills should be interviewed before Lyell's article was published in the Baptist Press over concerns that one indicia of malice in a defamation suit is whether the publisher of the defamatory statement gave the allegedly defamed person an opportunity to dispute the facts. Report at 86.

Compl. ¶ 112. Because Plaintiffs have alleged that each Defendant owed them a duty and breached that duty causing harm to Plaintiffs, Plaintiffs' negligence claims proceed.

## 2. The economic loss doctrine does not apply.

Lifeway argues that the economic loss doctrine applies to Plaintiffs' negligence claims and that the economic loss doctrine should apply because Plaintiffs have only suffered economic and emotional damages. Lifeway Mem. at 14. Lifeway is wrong. The "economic loss doctrine does not apply when the plaintiff seeks damages for nonpecuniary losses including personal injuries and mental anguish." *Turnage v. Oldham*, 346 F. Supp. 3d 1141, 1157 (W.D. Tenn. 2018). Plaintiffs have pled that they suffered mental anguish as a result of all Defendants' conduct, including Lifeway. Compl. ¶ 117.

Additionally, Tennessee law *does* recognize injury to reputation as recoverable, non-economic damages for negligence claims. Under Tennessee law, injury to reputation is recognized as injury to the person and is considered non-economic damages.

T.C.A. § 29-39-101 provides:

> "Noneconomic damages" means damages, to the extent they are provided by applicable law, for: physical and emotional pain; suffering; inconvenience; physical impairment; disfigurement; mental anguish; emotional distress; loss of society; companionship, and consortium; ***injury to reputation***; humiliation; noneconomic effects of disability, including loss of enjoyment of normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; and all other nonpecuniary losses of any kind or nature.

(emphasis added). Indeed, "injuries to the person are not limited to physical injuries and that damage done to a plaintiff's reputation is an 'injury to the person'" for purposes of a negligence claim. *Gunter v. Lab. Corp. of Am.*, 121 S.W.3d 636, 642 (Tenn. 2003) (quoting *Brown v. Dunstan*, 409 S.W.2d 365, 367 (Tenn. 1966)). Plaintiffs have pled they suffered injury to reputation. Compl. ¶¶ 13, 118, 119. "Because the remedies Plaintiffs seek do not constitute purely economic damages, the economic loss doctrine does not apply." *Turnage*, 346 F. Supp. 3d at 1157.

37

### 3. Plaintiffs have adequately pled gross negligence and wantonness.

Defendants Lifeway, SPI and Guidepost argue that Plaintiffs have failed to plausible pled gross negligence or wantonness. Lifeway Mem. at 15; SPI Mem. at 24. As described below, Lifeway is responsible for its employees' actions. Defendants have also independently acted with reckless disregard for the injuries caused to Plaintiffs. As described above in Section G.1, above, Defendants acted with reckless disregard for the consequences of their actions which resulted in harm to Plaintiffs. Defendants knew that Defendant Lyell's accusations of sexual abuse by Dr. Sills were false but, nevertheless, coordinated and implemented a sham investigation with no regard as to how reporting Dr. Sills as a violent sex abuser would impact him, his life, his wife, and his family. *See* Compl. ¶ 60.

### 4. Defendants Lyell and Geiger were working within the scope of their employment.

Lifeway argues that it is not liable for the actions of its employees. Lifeway Mem. at 16. As described herein, Lifeway is independently liable for its actions and injuries to Plaintiffs. Lifeway is also liable for the actions of its employees, Defendants Lyell and Geiger, as both were acting within the scope of their employment. Plaintiffs have pled sufficient facts to support vicarious liability and respondeat superior.

"The general rule in Tennessee is that a principal is liable for the negligence or wrongful acts of his agent acting within the actual or apparent scope of his employment in the principal's service." *Willis v. Settle*, 162 S.W.3d 169, 182 (Tenn. Ct. App. 2004) "Vicarious liability is based on an agency relationship between a principal and the principal's negligent agent, such as the family purpose doctrine or respondeat superior." *Chrisman v. SP Title, LLC*, No. M2022-00944-COA-R3-CV, 2023 Tenn. App. LEXIS 291, at *37 (Ct. App. July 20, 2023) (quotations and citations omitted). Respondeat superior renders employers vicariously liable for torts their

38

employee's commit while acting within the scope of their employment. *Id.*[13] To establish an employer's vicarious liability, Plaintiffs must establish: "(1) that the person who caused the injury was an employee, (2) that the employee was on the employer's business, and (3) that the employee was acting within the scope of his employment when the injury occurred." *Id.*, at *37-38 (quotations and citations omitted). Notably, whether an employee was acting within the scope of his employment is a question of fact not suitable for determination on a motion to dismiss. *Id.*

Plaintiffs have pled the requirements of Lifeway's vicarious liability. As Lifeway acknowledges, Plaintiffs allege that Lyell and Geiger were Lifeway employees. Compl. ¶ 35 (Lyell); ¶ 36 (Geiger). Plaintiffs also plausibly allege that Lyell and Geiger were acting within the scope of their employment. Compl. ¶¶ 99-105. At the time of her confession of her consensual affair with Mr. Sills, Geiger was Lyell's superior. Compl. ¶ 25, 26, 34, 35, 57. Due to the SBC's control over Lifeway, Lyell had to disclose the affair to them as well. Compl. ¶ 35. Plaintiffs also allege that Lyell was reporting directly to Geiger and Lifeway when she offered to write an article about the affair to the Baptist Press. Compl. ¶ 38. Lyell had to rebrand her story in order to preserve her own powerful position at Lifeway. Compl. ¶¶ 35, 38. Despite Lifeway's assertions, Lyell's writing benefitted Lifeway and Geiger because they (along with its co-conspirators) "saw an opportunity to improve the appearance and reputation of SBC by adopting the narrative publicly advanced by Lyell." Compl. ¶ 40. And as stated previously, Lifeway and Geiger were among Defendants who decided to retain an investigator. Compl. ¶ 47. Plaintiffs further allege that Lyell,

---

[13] Lifeway cites *Borg v. Chase Manhattan Bank USA, N.A.*, 247 F. App'x 627, 640 (6th Cir. 2007) for the proposition that whether an employee is acting within the scope of their employment is a question of law. However, *Borg* was decided at the summary judgment stage, not the motion to dismiss stage. Whether an employee is acting within the scope of their employment only becomes a question of law "when the facts are undisputed and cannot support conflicting conclusions." *Chrisman*, 2023 Tenn. App. LEXIS 291, at *38 (citations omitted).

Geiger, and Lifeway acted in concert with SPI and Guidepost to publish the malicious claims against Dr. Sills. Compl. ¶ 60.

Taking these allegations as a whole, it is clear that Lyell and Geiger were acting within the scope of their employment. Lifeway knew that Lyell's rebranding of her story was false, yet in an effort to restore the SBC's reputation, embraced the false narrative and undertook to perform and investigation and publish a false report on Dr. Sills. Lyell and Geiger's participation in the conspiracy was in direct furtherance of Lifeway's efforts in this regard. Alternatively, should the Court find that Plaintiffs have not plausible alleged respondeat superior at this stage, Plaintiffs respectfully request leave to amend their complaint.

### 5. Plaintiffs' Negligence and IIED claims are independent of their defamation claim

Defendants Lifeway, SPI, Guidepost; Executive Committee, McLaurin, Slade, SBC, Litton, and Barber summarily state that Plaintiffs' negligence and IIED claims are derivative of their defamation claims. Lifeway Mem. at 16; SPI Mem at 23; Executive Committee Mem. at 14; SBC Mem. at 17. However, Plaintiffs' complaint is clear that their negligence and IIED claims are not dependent upon the defamation claim and are standalone claims for relief.[14] While it is true that Defendants were negligent and caused emotional distress through the publishing of the Report, Plaintiffs have alleged that the investigation undertaken by Defendants was negligent in and of itself and the negligent investigation caused harm to Plaintiffs. Compl. ¶¶ 110, 112. Taking the allegations in Plaintiffs' Complaint as true, a jury could find that Defendants' actions were negligent and caused emotional damage to Plaintiffs outside of the defamation claim.

### H. Plaintiffs have stated a claim for intentional infliction of emotional distress

---

[14] Plaintiffs respond to Defendants' arguments regarding their IIED claims below in Section H.

Defendants argue that Plaintiffs have failed to plead outrageous conduct or mental anguish sufficient enough to sustain a claim for intentional infliction of emotional distress ("IIED"). Lifeway Mem. at 18; SPI Mem. at 24; Executive Committee Mem. at 19; SBC Mem. at 17. However, the Sixth Circuit has upheld intentional infliction of emotional distress claims in similar circumstances. In *Ogle v. Hocker*, the plaintiff, an ordained minister, brought defamation and IIED claims against the defendant, also an ordained minister, for spreading false rumors that the plaintiff had homosexual inclinations to large audiences. 279 F. App'x 391, 400 (6th Cir. 2008). The Sixth Circuit reversed and reinstated the plaintiff's IIED claim and held that "[c]onstruing all inferences in [the plaintiff's] favor, a reasonable jury could potentially find 'extreme and outrageous conduct'" and that a jury could find that this conduct "extends well beyond mere insults, indignities, threats, annoyances, petty oppressions, [and] other trivialities." *Id.* (quotations and citation omitted). Here, Defendants have engaged in a similar course of outrageous conduct by publishing and perpetuating false claims to several hundred thousand readers that Dr. Sills is a violent sex abuser without first conducting a thorough investigation to discover the truth. *See* Compl. ¶¶ 38, 39, 42, 43, 50, 53- 63, 66, 67, 69, 70, 71, 72. As in *Ogle*, Plaintiffs have stated sufficient facts that would allow a reasonable jury to find Defendants liable of intentional infliction of emotional distress and the motions to dismiss should be denied.

## I.     Plaintiffs have adequately pled a conspiracy claim

All Defendants except for Geiger argue that Plaintiffs' conspiracy claims fail for failure to plead conspiracy with the required specificity.   Defendants Lifeway, Lyell, SPI, Guidepost, Seminary, Mohler, the Executive Committee, Slade, and McLaurin. Lifeway Mem. at 21; Lyell Mem. at 11; SPI Mem. at 22; Seminary Mem. at 7; Executive Committee Mem. at 21; SBC Mem. at 17. However, Plaintiffs have pled a plausible conspiracy claim, and Defendants' motion to dismiss on this ground should be denied.

41

"The elements of a cause of action for civil conspiracy are: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Ingram v. Tenn. Dep't of Health*, No. 3:17-cv-01565, 2018 U.S. Dist. LEXIS 250521, at *31 (M.D. Tenn. Feb. 6, 2018) "In a civil conspiracy, each conspirator is responsible for everything done by his co-conspirator." *Brown v. Birman Managed Care, Inc.,* 42 S.W.3d 62, 67 (Tenn. 2001). The purpose of a conspiracy claim is to ensure that each conspirator may be held "'responsible for everything done by his confederate which the execution of the common design makes probable as a consequence.'" *Freeman Mgmt. Corp. v. Shurgard Storage Centers, LLC*, 461 F. Supp. 2d 629, 642 (M.D. Tenn. 2006). Plaintiffs have adequately pled conspiracy.

*First*, Plaintiffs pled that Defendants acted in concert. Compl. ¶¶ 46, 60, 61, 62. That is enough to satisfy the first element of civil conspiracy. *JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, 615 F. Supp. 3d 750, 782 (M.D. Tenn. 2022) (holding allegation that defendants acted in concert satisfied pleading common design). Contrary to Lifeway's arguments, Plaintiffs plead additional concerted action by Defendant Lifeway. Compl. ¶ 47 (Defendant Lifeway coordinated with other Defendants and decided to retain an investigator). Plaintiffs have also pled SPI and Guidepost's intent, via their sham investigation on behalf of the SBC and subsequent false allegations against Dr. Sills in the Report, with fake footnotes, and got paid for it without the risk of incurring any liability for publishing those false statements. Compl. ¶¶ 51, 57, 62, 64. Taken as a whole, "the Complaint can be fairly read that the other defendants acted in concert with [Lifeway]. The Court finds that the Complaint states a civil conspiracy claim under state law." *Ingram v. Tenn. Dep't of Health*, No. 3:17-cv-01565, 2018 U.S. Dist. LEXIS 250521, at *32-33 (M.D. Tenn. Feb. 6, 2018).

42

**Second**, Plaintiffs have sufficiently alleged that Defendants' unlawful purpose was to implement a public relations strategy and perform an "investigation" with the goal of improving the tarnished reputation of the SBC for its mishandling of sexual abuse in the church. Defendants intended to redeem their public reputation by making an example out of Dr. Sills and other SBC ministers by perpetuating Defendant Lyell's false narrative regarding the nature of her and Dr. Sills' affair. Compl. ¶¶ 38, 39, 40. Despite Defendant Lifeway's assertion, Plaintiffs have sufficiently pled that Lifeway had the intent to defame. Plaintiffs pled that Defendant Lyell confessed the affair to Lifeway, Lifeway knew the rebranding of Lyell's story was false, Lifeway reached out to the Baptist Press about reporting Lyell's "disclosure," and they published Lyell's "unsubstantiated and malicious claim" anyway. Compl. ¶ 35, 38, 58, 60; Exhibit A to Lyell Mem., Dkt. No. 76-1 at 3 (Lifeway's communication department was the first to contact the Baptist Press).

**Third**, Plaintiffs have pled the required overt acts of Defendants. Plaintiffs allege Defendants SBC, Lifeway, Lyell, Geiger, the Executive Committee, McLaurin, Slade, Seminary, Mohler and Litton coordinated to retain an investigator and implement a phony investigation designed to shame Mr. Sills and exonerate Defendant Lyell. Compl. ¶¶ 40, 47. Defendant Executive Committee directed this investigation, and hired Defendant Guidepost to investigate the Executive Committee. Compl. ¶ 48. Defendants also hired Defendants SPI and Guidepost to investigate the SBC's sexual abuse crisis, but despite actual crime committed by convicted sexual predators, Defendants devoted an inordinate amount of space to Mr. Sills, who was excluded from any actual investigation. Compl. ¶ 50. This sham project would culminate in a written report (Compl. ¶ 50, 57, 58) and be solely based on statements from Defendant Mohler, some SBC documents (Compl. ¶ 51), and predominately Defendant Lyell's lies about her relationship with Dr. Sills, which evolved from "an affair with Plaintiff Sills" (Compl. ¶ 35) to sexual abuse from a

violent cult-leader (Compl. ¶¶ 42, 43) despite the fact that the affair lasted for over a decade with Defendant Lyell driving out of her way to visit the Sills family on multiple occasions. Compl. ¶¶ 7, 43.  In anticipation of the report and in furtherance of the public relations strategy, Defendants Executive Committee, McLaurin, and Slade published a public statement that offered an apology to Defendant Lyell for the Baptist Press' "inaccurate" reporting of Lyell and Mr. Sills' relationship as consensual. Compl. ¶¶  52, 53). Defendants SPI and Guidepost, in concert with Defendants SBC, Lifeway, Lyell, Geiger, Executive Committee, Barber, McLaurin, Slade, Seminary, Mohler, and Litton furthered the publishment of the unsubstantiated report and provided links that redirected readers to various articles where Defendant Lyell publicly made untrue statements and/or published the false narrative and statements identified through this complaint. Compl. ¶ 60.

**Fourth,** Plaintiffs have pled they were injured by Defendants' conduct. Compl. ¶¶13, 86, 90, 93, 97, 116-120.

Contrary to the Seminary Defendants argument, Sills is not required to plead that the Guidepost Report was specifically written about him. Seminary Mem. at 7. Even if this was required, Plaintiffs have pled that the Report had "disproportionate page space dedicated to Defendant Lyell's statements against Plaintiffs." Compl. ¶  50. Plaintiffs further pled that "Defendants nevertheless included a photo and listing for Plaintiff Sills, a man who was never charged, never convicted, and never even interviewed. Defendants published that Plaintiff Sills was fired for sexually abusing Defendant Lyell (whose name is redacted) for 12 years." Compl. ¶ 63. And, Plaintiffs allegations against Seminary go beyond merely supporting Lyell. Seminary Mem. at 7. Plaintiffs have alleged that the Seminary Defendants "urged" Lyell to write the public relations piece for the Baptist Press and participated in the coordination and ultimate decision to hire an investigator. Compl ¶¶38, 47.

Because Plaintiffs have pled conspiracy with the requisite specificity, this claim should survive.

**J.        Plaintiffs are entitled to punitive damages.**

Lifeway argues that Plaintiffs are not entitled to punitive damages. Lifeway Mem. at 24. However, at this stage, Plaintiffs' task "is simply 'to allege enough fact to make it plausible that [the defendant] bears legal liability,' so as to 'unlock the doors of discovery.'" *Allen v. Quest Diagnostics, Inc.*, No. 3:17-cv-00897, 2017 U.S. Dist. LEXIS 111394, at *13 (M.D. Tenn. July 17, 2017) (quoting *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

As discussed herein, Plaintiffs have pled that Lifeway (and the other Defendants) acted recklessly in investigating and publishing the Report. Compl. ¶¶ 87, 92, 95, 111, 114. After all, Defendants intentionally published the Report maliciously claiming Dr. Sills was a violent sex abuser, despite the fact that they knew this was false. Compl. ¶¶ 5, 56, 57, 60. Plaintiffs will prove Lifeway's intent through discovery. "The time for proving by clear and convincing evidence that [Lifeway] acted with the requisite ill intent comes later, and [Lifeway's] actual intent can only be discerned through discovery." *Id.*, at *13.

**K.        Ms. Sills claims also survive.**

The Seminary Defendants argue that all claims against them by Ms. Sills fail. Seminary Mem. at 8. Mrs. Sills' claims survive at this stage. Plaintiffs allege that as a co-conspirator, the Seminary Defendants perpetuated Defendant Lyell's false narrative, which included statements that Mrs. Sills enabled the affair. Compl. ¶¶60, 61, As late as July 8, 2022, the Seminary Defendants continued to perpetuate Lyell's lies and published a statement seemingly confirming Lyell's allegations of abuse. Compl. ¶ 71. The Seminary Defendants knew Lyell's statements were false, but published them anyway. Compl. ¶ 58. As discussed herein and in Section G.1., the

45

Seminary Defendants therefore owed a duty to Ms. Sills and it was foreseeable that their actions would cause her harm. As such, her claims should proceed.

## CONCLUSION

Defendants saw an opportunity to use Dr. Sills as a scapegoat to improve their public reputation as a result of the SBC's mishandling of sexual abuse cases. Defendant Lyell spurred the conspiracy, the goal of which was to save her job and the SBC's reputation. Despite knowing that Defendant Lyell's claims were false, Defendants undertook a shoddy investigation and never interviewed Dr. Sills, his wife, their pastor or any law enforcement. Ultimately, Defendants featured Dr. Sills in a highly-publicized Report likening him to a criminal sex abuser. As a result, Dr. Sills has been unable to find employment and he and his wife have suffered severe mental anguish. The Court should deny Defendants' Motions to Dismiss. In the event the Court finds Defendants' jurisdictional arguments to be persuasive, prior to dismissal Plaintiffs respectfully request that they be permitted to conduct limited jurisdictional discovery. In the event the Court finds Defendants' jurisdictional arguments to be persuasive, prior to dismissal, Plaintiffs respectfully request that they be permitted to conduct limited jurisdictional discovery. Alternatively, should the Court find that Plaintiffs have not plausibly stated a claim for relief, Plaintiffs respectfully request that the Court allow them to amend their Complaint.

Dated: August 28, 2023

Respectfully submitted,

By: /s/ *Katherine B. Riley*
Katherine Barrett Riley (admitted *pro hac vice*)
John W. ("Don") Barrett (admitted *pro hac vice*)
Sterling Aldridge (to be admitted *pro hac vice*)
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, MS 39095
Ph: (662) 834-2488
Fax: (662) 834-2628

46

kbriley@barrettlawgroup.com
dbarrett@barrettlawgroup.com
saldridge@barrettlawgroup.com

Shannon M. McNulty (admitted *pro hac vice*)
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, 36th Floor
Chicago, Illinois 60602
(312) 899-9090
(312) 251-1160 Facsimile
SMM@cliffordlaw.com

Gary E. Brewer (TN BPR#: 000942)
BREWER AND TERRY, P.C.
Attorneys at Law
1702 W. Andrew Johnson Hwy.
Morristown, TN 37816-2046
(423) 587-2730

Steven A. Martino
Tiffany Ray
TAYLOR MARTINO, P.C.
P.O. Box 894
Mobile, AL 36601
Telephone: (251) 433-3131
Facsimile: (251) 405-5080
stevemartino@taylormartino.com
riffany@taylormartino.com

*Counsel for Plaintiffs David and Mary Sills*

## CERTIFICATE OF SERVICE

I, Katherine B. Riley, an attorney, hereby certify that on August 28, 2023, I served the above and foregoing Plaintiff's Omnibus Response in Opposition to Defendants' Motion to Dismiss, by causing a true and accurate copy of such papers to be filed and served on the below listed counsel of record via the Court's CM/ECF electronic filing system.

Louis Gino Marchetti, Jr., Esq.
Matthew C. Pietsch, Esq.
Taylor, Pigue, Marchetti & Blair, PLLC
2908 Poston Av.
Nashville, TN 37203
(615) 320-3225
Fax: (615) 320-3244
Gmarchetti@tpmblaw.Com
Matt@tpmblaw.Com

*Counsel for Defendants Southern Baptist*
*Convention, Dr. Ed Litton and Bart Barber*

George H. Cate, III, Esq.
Kimberly Michelle Ingram-Hogan, Esq.
Virginia Adamson, Esq.
Bradley Arant Boult Cummings LLP
1600 Division St., Suite 700
P.O Box 340025
Nashville, TN 37203-0025
(615) 252-2347
Fax: (615) 252-6347
Gcate@bradley.Com
Kingram@bradley.Com
Jadamson@bradley.Com

Richard C. Mangelsdorf, Jr., Esq.
McAngus Goudelock & Courie, LLC
120 Brentwood Commons Way, Suite 625
Brentwood, TN 37027
(615) 499-7281
Fax: (615) 523-1496
Chuck.Mangelsdorf@mgclaw.Com

*Counsel for Defendant Lifeway Christian*
*Resources of the Southern Baptist Convention*

2

Olivia Rose Arboneaux, Esq.
Philip N. Elbert, Esq.
Ronald G. Harris, Esq.
Neal & Harwell, PLC
1201 Demonbreun St., Ste. 1000
Nashville, TN 37203
(615) 244-1713
Fax: (615) 726-0573
Oarboneaux@nealharwell.Com
Pelbert@nealharwell.Com
Rharris@nealharwell.Com

*Counsel for Defendant Jennifer Lyell*

Catherine M. Newman, Esq.
J. Graham Gilmore, Esq.
R. Bruce Barze, Esq.
Barze Taylor Noles Lowther, LLC
2204 Lakeshore Dr., Ste. 425
Birmingham, AL 35209
205-872-1032
Fax: 205-872-0339
Cnewman@btnllaw.Com
Ggilmore@btnllaw.Com
Bbarze@btnllaw.Com

*Counsel for Defendant Eric Geiger*

3

Brigid M. Carpenter, Esq.
Ryan P. Loofbourrow, Esq.
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
1600 West End Ave., Ste. 2000
Nashville, TN 37203
(615) 726-5600
Bcarpenter@bakerdonelson.Com
Rloofbourrow@bakerdonelson.Com

*Counsel for Defendants Executive Committee*
*of the Southern Baptist Convention, Willie*
*McLaurin, and Rolland Slade*

Byron E. Leet, Esq.
Wyatt, Tarrant & Combs
400 West Market St.
Louisville, KY 40202
(502) 589-5235
Bleet@wyattfirm.Com

James C. Bradshaw, III, Esq.
Wyatt, Tarrant & Combs
333 Commerce St., Ste. 1000
Nashville, TN 37201
(615) 244-0020
Fax: (615) 256-1726
Jbradshaw@wyattfirm.Com

Thomas E. Travis, Esq.
Wyatt, Tarrant & Combs
250 W Main St., Ste. 1600
Lexington, KY 40507
Ttravis@wyattfirm.Com

*Counsel for Defendants The Southern Baptist*
*Theological Seminary and Dr. R. Albert*
*Mohler*

4

John R. Jacobson, Esq.
Katharine R. Klein, Esq.
Riley & Jacobson, PLC
1906 West End Ave.
Nashville, TN 37203
615-320-3700
Jjacobson@rjfirm.Com
Kklein@rjfirm.Com

Steven G. Mintz, Esq.
Terence William McCormick, Esq.
Mintz & Gold LLP
600 Third Ave., 25th Floor
New York, NY 10016
(212) 696-4848
Mintz@mintzandgold.Com
Mccormick@mintzandgold.Com

*Counsel for Defendants SolutionPoint*
*International, Inc. d/b/a Guidepost Solutions*
*and Guidepost Solutions, LLC*

/s/ *Katharine B. Riley*
Katharine B. Riley