# Exhibit F

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE MIDDLE DISTRICT OF TENNESSEE
 3                     NASHVILLE DIVISION
 4   MICHAEL DAVID SILLS and MARY    )
     SILLS,                          )
 5                                   )
                                     )
 6                                   )
                  Plaintiffs,        )
 7                                   )
     vs.                             ) No. 3:23-cv-00478
 8                                   )
                                     )
 9   SOUTHERN BAPTIST CONVENTION, a  )
     nonprofit corporation, et al., )
10                                   )
                                     )
11                                   )
                                     )
12                                   )
                  Defendants.        )
13
14
15
16
17         VIDEOTAPED DEPOSITION OF DR. ERIC GEIGER
18                    Irvine, California
19               Wednesday, October 30, 2024
20
21
22
23   Reported by:
     Heather Ayers
24   CSR No. 11871
25   Job No. MDLG6982715
```

Golkow Technologies,
877-370-3377    A Veritext Division    www.veritext.com
Case 3:23-cv-00478    Document 229-5    Filed 04/01/25    Page 2 of 7 PageID #: 4559

1  I respect him a lot, but there was no -- I would -- we
2  would not say that we have a close relationship.
3      Q    What about Bart Barber, do you know Bart Barber?
4      A    I know Bart Barber.
5      Q    And how do you know Bart Barber?
6      A    I know Bart as a respected pastor in the Southern
7  Baptist Convention and as someone that a lot of the
8  pastors that we served at Lifeway, especially smaller
9  church pastors, they really look to Bart for leadership.
10 And just his -- he was known as highly trustworthy and
11 filled with integrity.  But I think our interactions -- my
12 interactions with Bart were at events.  I don't -- we
13 don't have each other's numbers.  We've never talked on
14 the phone.  I do not recall having any -- any interaction
15 with him post coming to Mariners Church.  So I don't think
16 I've talked to Bart Barber in over six years.
17     Q    And, again, that's around the 2018 time frame?
18     A    That's right.  Around 2018.
19     Q    Ed Litton, do you know Ed Litton?
20     A    I do know Ed Litton.
21     Q    And how do you know Ed Litton?
22     A    Kathy Litton, his wife, was on the resolutions
23 committee that Rolland Slade was also on.  I actually know
24 Kathy, his wife, better than Ed in terms of
25 conversations -- in terms of length of conversations.

1  I've had more conversations with Kathy Litton than I had
2  with Ed.
3         Ed was also a pastor who hired a worship pastor
4  that I worked alongside years ago when I was in Cincinnati
5  when I was a youth pastor.  Jason Breland was our worship
6  pastor.  Ed Litton hired him, and so I knew of Ed through
7  Jason Breland.  And then all my interactions with
8  Ed Litton have been at events, not -- no -- I -- we
9  haven't, like, had dinner together that I can remember, or
10 of the -- all of the -- the defendants, I believe he's the
11 only one that I've had any conversations with post-Lifeway
12 and post the lawsuit.
13        When I was first served the lawsuit -- the
14 lawsuit two years ago, Thanksgiving, I reached out to Ed,
15 either text or phone call, and just asked, "Hey, how
16 does" -- "how does this work?  Because I'm no longer at
17 Lifeway.  Do I" -- "does the SBC contact me in terms of
18 representation?  Do I have to find my own representation?
19 Should I go to my elders?  I'm just curious.  Do you have
20 any suggestions?"  We had a bri- -- we had a brief
21 interaction.  And then I realized I probably shouldn't be
22 talking to him or -- and I think he realized he probably
23 shouldn't be talking to me.  So that was -- if it was a
24 phone call, it was less than two minutes.  And if it was a
25 text message, it was one exchange.

1      Q    So other than that conversation or text you just
2  described, no conversations with Ed Litton since around
3  2018?
4      A    No.  The conversation with Ed Lit- -- other than
5  that one, correct.
6      Q    Okay.
7      A    Other than that one, no conversation with
8  Ed Litton.
9      Q    Okay.  And then Willie McLaurin is also a
10 defendant in this case.
11        Do you know Willie McLaurin?
12     A    I know of Willie more than I know Willie.  When I
13 was in Nashville, I served as interim pastor several
14 different times.  And at a church called ClearView
15 Baptist, Willie spoke there either before or after I
16 spoke.  And I know that people -- people really spoke
17 highly of him and really liked him.  I only heard good
18 things about Willie during that time, but I don't remember
19 if he and I have interacted.
20     Q    So as to any of these individual people we just
21 went over, have you ever talked to them specifically about
22 David Sills or Jennifer Lyell that you recall?
23     A    On social media, I know that Bart Barber and -- I
24 think maybe just Bart might have retweeted something that
25 I posted, or maybe he might have retweeted something that

1  someone else posted that I posted.  I think that would be
2  the only interaction that I can re- -- that I -- I think
3  that's the only interaction that I had with any of these
4  defendants post the phone calls with Mohler -- with
5  Dr. Mohler after the accusations were brought forth from
6  Jennifer.
7      Q    Okay.  And we'll -- we will go back and talk
8  about those in detail.
9         So you've described to us that you started with
10 Lifeway in the 2011 time frame; is that right?
11     A    That's right.
12     Q    Labor Day.
13        And your position at least at first was you were
14 a vice president overseeing church resources?
15     A    Yes.
16     Q    Okay.  Was that the position you held the whole
17 time?
18     A    No.
19        And for the sake of clarity, because I know
20 that's been expressed, I'll try to sum it up really
21 quickly, but it is important because it defines my
22 relationship with Jennifer.
23        When I first went to Lifeway, there were three
24 what was called "strategic business units."  And the
25 church resources division was the one I initially led, and

Page 30

1  people we served, I viewed as, in my mind, top of the org
2  chart. That's who I -- we were existing to serve them.
3  And then the employees, I wanted to serve our employees
4  and work alongside them, and then -- and then our authors.
5      So we were connecting, again, not in every
6  space -- for example, Lifeway Kids, it wasn't an
7  author-centric area. We developed a lot of content, but
8  we wouldn't use author names particularly on the content
9  we developed for kids ministries. But books, highly
10 author-driven, and so an author would be a -- we would
11 view that as a partner.
12   Q   What was your impression of Jennifer in your work
13 with her for those two years? How would you describe her
14 as an employee?
15   A   Driven, intelligent, work ethic, responsive,
16 effective, credible, respected by our team. You know, not
17 everybody -- she's -- because she's -- was driven, you
18 know, some -- some would perhaps think that maybe she was
19 too driven at times. But -- but she was -- she was very
20 effective. I -- I really enjoyed working with her.
21   Q   Did you ever write or give to her orally a
22 performance review or evaluation?
23   A   Yes.
24   Q   How often did you do that, if you remember?
25   A   Annually.

Page 31

1   Q   And do you recall if those were positive?
2   A   Very positive.
3   Q   How large was her team, if you can recall? How
4  many people did she work with?
5   A   So there was a season where -- when we've
6  combined those two divisions where she was responsible for
7  the publishing of the books, and then when we were asked
8  to oversee the retail division or the stores, she was then
9  also responsible for the selling of those books through
10 the channels, including the retail stores. So her team
11 got larger during that time.
12      So I'd say half of the time with her, her team
13 was probably -- I'm -- I only want to speak truthfully. I
14 can't really remember. I would be shocked if it was less
15 than 30. You know, maybe 30 to 50 at the end. Maybe 25
16 to 30 in the first -- first run. She obviously didn't
17 oversee all of those people directly, but she had a large
18 team.
19   Q   When Lifeway was negotiating a contract with an
20 author, I assume that would involve payment or some sort
21 of monetary gain for the author; is that correct?
22   A   Yes.
23   Q   And -- and who was responsible for those
24 negotiations while you were there?
25   A   It depended on which segment of -- of work. So

Page 32

1  if it was a general book, there would -- there would be --
2  that would be Jennifer. If it was a bible study, that
3  wouldn't be Jennifer. If it was a global resource, that
4  would not be Jennifer. But if it was a book, in the --
5  the trademark in the U.S., that would be Jennifer or her
6  team.
7      But we had -- we had -- sometimes it was a lot of
8  negotiation. There was simple rates that we had
9  established where you get -- first-time author, here's
10 what you get, you know, X percent for so many sales; after
11 you climb that hurdle, X percent for more sales. I don't
12 remember the percentages. But there wasn't a ton of
13 negotiations with most authors. It was a templated,
14 "Here's" -- "here's what we do."
15   Q   You've mentioned Thom Rainer.
16      Did you work with Thom Rainer throughout your
17 time at Lifeway?
18   A   Yes.
19   Q   Do you know if Thom Rainer knew Jennifer Lyell?
20   A   They knew each other, yes.
21   Q   Okay. Did -- were they friends or coworkers?
22 How -- or how would you describe their relationship as
23 best you know?
24   A   I believe they knew each other even from
25 Southern Seminary. And I -- and Jennifer and Thom had

Page 33

1  probably a -- a closer working relationship than -- than
2  some -- than most employees because Jennifer was his
3  publisher. So there were several books that Thom released
4  through Lifeway that did really well, and he believed
5  Jennifer was one of the reasons. So he had a high, high
6  regard of Jennifer's effectiveness as a publisher. So I
7  think his book "I Am a Church Member" was, I mean -- I
8  think it was the best-selling church leadership book in
9  history. And Jennifer was his publisher for that book.
10   Q   Carol Pipes --
11   A   Yes.
12   Q   -- that name has come up.
13      Who is Carol?
14   A   I -- I don't know her title now. She was
15 communi- -- in communications, maybe the communications
16 director when I was there.
17   Q   Do you know Rachael Denhollander?
18   A   I've never met Rachael Denhollander. I know -- I
19 know of her. I've read -- I've read some work. I can't
20 remember if I read her book or a section of her book. And
21 I know of the -- of the ending of the trial of Na- --
22 Nassar -- Larry Nassar. I -- I remember watching that and
23 using that as an illustration with that.
24   Q   But she's not somebody you've talked to or
25 consulted with at any point in time?

9 (Pages 30 - 33)

Page 34

1  A  We had a -- a social media interaction, I think,
2  one time. But -- but -- but pub- -- publicly, not
3  privately. A public social media inter- -- interaction.
4  But I've never met her -- I've never met Rachael
5  face-to-face.
6  Q  Okay. You described -- again, we're talking
7  about -- about a two-year period where you and Jennifer
8  were working more closely together.
9      Do you know how many authors she would have been
10 working with during that time frame?
11 A  I -- it would be in the dozens, but I don't know
12 the number.
13 Q  Did you know that Jennifer worked with the author
14 David Sills?
15 A  I knew that Jennifer was involved in a ministry
16 that he either founded or was leading called Reaching &
17 Teaching. I think that's the name of the ministry,
18 Reaching & Teaching.
19     MS. MCNULTY: Objection. Objection. And will
20 subsequently move to strike the nonresponsive portions of
21 the answer.
22 BY MS. CALLAS:
23 Q  So did you know that David Sills was an author?
24 A  I did.
25     MS. MCNULTY: Objection. Form.

Page 35

1  BY MS. CALLAS:
2  Q  Let -- let's go back and talk about what -- what
3  you knew and maybe how you knew about Jennifer Lyell's
4  working with David Sills.
5      You've mentioned the Reaching & Teaching
6  Ministry; is that right?
7  A  Right. I think I found out about all of that
8  subsequent to the allegation. He was not a name that
9  was -- that Jennifer brought up many times. I don't
10 remember her ever bringing up his name. He would have --
11 the resource that Lifeway published with him, as best I
12 remember, would have been in the global bucket of our
13 work, which Jennifer did not oversee and a man named
14 Craig Featherstone was responsible for.
15     So Jennifer, because of her effectiveness, often
16 was looked to by other leaders for some processes,
17 processes like being sure resources, when they're uploaded
18 on the website, are tagged with the right information so a
19 customer can find them, those type of processes. And so I
20 think Craig might have looked to Jennifer for process
21 help. But Craig Featherstone was responsible for the
22 global work and Reaching & Teaching resource. I think it
23 was called Head, Hearts, and Hands (sic), was in
24 Featherstone's portfolio.
25 Q  And what you've just described to us is

Page 36

1  information and knowledge you had prior to May of 2018
2  when you --
3      MS. MCNULTY: Objection.
4      Go ahead. Sorry. Sorry, Gretchen. Go ahead.
5      MS. CALLAS: That's okay.
6  BY MS. CALLAS:
7  Q  Is that correct?
8      MS. MCNULTY: Oh. Well, objection. Form.
9  Leading.
10     Go ahead.
11     MR. BARZE: You can answer. She's just making an
12 objection for the record.
13     THE WITNESS: I'm able to answer the question?
14 BY MS. CALLAS:
15 Q  Yeah.
16     MR. BARZE: Yes.
17     THE WITNESS: I knew of the resource because of
18 Craig Featherstone sharing how David Sills' resource was
19 effective -- being used effectively throughout the globe.
20 Craig Featherstone was excited about the resource.
21 BY MS. CALLAS:
22 Q  And --
23 A  And he reported to me as well.
24 Q  Okay. And do you have, as you sit here today, a
25 time frame when you would have been informed of this by

Page 37

1  Featherstone?
2  A  I do not. I -- I'm -- clearly, I -- I would have
3  said it was 2016 when I started working with Jennifer, and
4  she says '17. So a lot of this -- a lot of the time
5  frames are blurred in my mind. I do not remember when I
6  was aware of the resource.
7  Q  So kind of to simplify things, did you know
8  David Sills or know of David Sills prior to May of 2018?
9  A  I knew --
10     MS. MCNULTY: Objection. Form. Compound.
11     Go ahead.
12     THE WITNESS: I knew of -- of David Sills because
13 of his resource and because he -- the resource was
14 recommended via David Platt, who was an author that we
15 worked with and -- and had respect for.
16 BY MS. CALLAS:
17 Q  So let's -- let's talk about May of 2018.
18     Do you recall having a conversation with Jennifer
19 Lyell in May of 2018 that related to David Sills?
20 A  I do.
21 Q  And tell us what you recall of that conversation.
22 A  She stopped by my office, and I remember I was
23 eating pistachios. It's in -- it's like I would snack on
24 them and, like, just printed in my mind. It was a very
25 painful conversation. Jennifer shared that she had been

10 (Pages 34 - 37)

| | |
|---|---|
| 1 very surprised if they had a relationship outside of the<br>2 workplace.<br>3   Q  Okay. I want to be careful with your answer.<br>4 You're saying "I don't believe." And I guess what I'm<br>5 asking is, do you know? I'm not asking if you believe,<br>6 like, this is Santa Claus. I'm asking, do you know if<br>7 they had a personal relationship outside of the workplace?<br>8   A  I do not know.<br>9   Q  Okay. Do you know if Jennifer and Brad Waggoner<br>10 had a personal relationship outside of the workplace?<br>11   A  I do not know.<br>12   Q  Have you ever heard from any source whatsoever<br>13 that Thom Rainer called a meeting with Brad and Jennifer<br>14 and forbade them to ever communicate in public or be seen<br>15 in public again?<br>16   A  I do not know of that meeting.<br>17   Q  Have you heard rumors that Jennifer and Brad were<br>18 having an inappropriate relationship outside of work?<br>19   A  I have never heard that.<br>20   Q  How did Thom Rainer leave Lifeway?<br>21   A  Thom Rainer retired from Lifeway.<br>22   Q  Did you understand that Jennifer and Thom did --<br>23 or strike that.<br>24     Okay. I want to put up Lyell 00175930.<br>25     Doctor, go ahead and take a look at this tweet, | 1   Q  Okay. Do you know if it was around the time that<br>2 the Baptist press article came out or the Guidepost<br>3 report?<br>4   A  I would be speculating.<br>5   Q  But you do know you sent out this tweet?<br>6   A  I believe that I sent this tweet out. But I do<br>7 not have record of sending this tweet out but it -- I --<br>8 I'm repeating myself.<br>9   Q  Yeah. So there is a tweet that was produced by<br>10 Lyell in this case. And it is a screenshot of what looks<br>11 like your Twitter account.<br>12     Do you have that photo, or did you, at some<br>13 point, have that photo associated with your Twitter<br>14 account?<br>15   A  The photo in the top left?<br>16   Q  That's right, the only photo that's on this<br>17 screenshot, yep.<br>18   A  Yes. I -- that -- that might still be my photo.<br>19   Q  Uh-huh. And is your --<br>20   A  Still my photo.<br>21   Q  -- Twitter handle @EricGeiger?<br>22   A  Yes, that is my Twitter handle.<br>23   Q  And did you post a -- a tweet that said, "I<br>24 respect, appreciate, and care deeply for @jenlyell and<br>25 grieve for her. And I know my grief is but a miniscule |

| | |
|---|---|
| 1 and tell me when I can ask you a question.<br>2   A  I'm ready.<br>3     (Exhibit 16 was marked for identification by the<br>4     deposition officer and is attached hereto.)<br>5 BY MS. MCNULTY:<br>6   Q  Is this -- does the document we have now marked<br>7 as Exhibit 16, does this document truly and accurately<br>8 reflect the tweet that you posted to social media?<br>9   A  I believe that it does.<br>10   Q  Well, when you say "I believe it does," here we<br>11 go, it either does or it doesn't, or is there something<br>12 that's causing you to think it -- it -- it is not your<br>13 tweet?<br>14   A  I answered the same way that I'm answering text<br>15 messages. I would -- this is something I would have said,<br>16 and I'm -- I have my tweets on auto delete. So I don't<br>17 think I can pull this tweet back up. But I'm not<br>18 disputing that this is a tweet that I sent.<br>19   Q  Okay. And when did you send this tweet?<br>20   A  I don't see a date.<br>21     MR. BARZE: If you scroll down, maybe he can see<br>22 it -- or not.<br>23     THE WITNESS: I do not know when I sent this<br>24 tweet.<br>25 BY MS. MCNULTY: | 1 fraction of the pain she has endured"?<br>2     Do you see that?<br>3   A  I do.<br>4   Q  Okay. And then you attached another screenshot<br>5 that appears to be your notes; is that right?<br>6   A  Yes.<br>7   Q  Okay. How many notes like this had you prepared<br>8 and saved to your phone between 2018 and present?<br>9   A  Very few.<br>10   Q  Did you prepare this, or did Jennifer Lyell?<br>11   A  I have my phone with me now. I have very few<br>12 notes; no notes about Lifeway or Jennifer or -- they're<br>13 all sermon notes.<br>14     What was -- what was your question?<br>15   Q  Did you prepare this note, or did Jennifer Lyell?<br>16   A  I prepared this note.<br>17   Q  And is it currently in your phone?<br>18   A  It is not.<br>19   Q  When you sent this tweet, when you posted this<br>20 tweet, you understood that it would go out to -- what's<br>21 colloquial referred to as the "Twitterverse"?<br>22   A  Yes, I did. Any tweet that I tweet, I understood<br>23 that.<br>24   Q  Uh-huh.<br>25     How many people are on Twitter? |

Page 254

1  A  I don't know.
2  Q  More than 100?
3  A  Yes.
4  Q  More than 100,000?
5  A  Yes, but not all of those follow my feed.
6  Q  Okay. If I told you that this tweet had gone out
7  on October 17, 2019, would that refresh your recollection
8  and correspond with some of the other exhibit dates that
9  we've discussed this afternoon?
10     MS. CALLAS: Object to the form.
11     THE WITNESS: I think it would not help me. It
12  would not help me place when I sent this.
13  BY MS. MCNULTY:
14  Q  Uh-huh. Do you think Twitter has more than a
15  hundred million registered users?
16  A  We can Google it. I do not know the answer.
17  Q  How many followers do you have?
18  A  25,300.
19  Q  You would agree that your messages posted to
20  Twitter are not limited to the 25,300?
21  A  I would agree that a -- a message on Twitter
22  could -- could go beyond the 25,000, but I also would say
23  this. There is a lot of messages that aren't seen by the
24  25,000. So I can't speculate on how widespread this
25  message --

Page 255

1  Q  I'm not asking you to speculate. Yes. I'm just
2  saying, you agree that anything you post has the potential
3  to be observed by anyone, including me -- I don't belong
4  to Twitter, and I was able to upload your messages --
5  right?
6     MS. CALLAS: Objection to form.
7  BY MS. MCNULTY:
8  Q  That doesn't strike you as inaccurate, does it?
9     MS. CALLAS: Objection to the form.
10    THE WITNESS: Well, it's inaccurate that you're
11  able to print this message. Because without -- you
12  printed it from a -- an upload of Jennifer's messages to a
13  server. You didn't print this message from Twitter
14  because it's not currently on Twitter.
15  BY MS. MCNULTY:
16  Q  No. I actually didn't say "this message," sir.
17  I said "your messages." I've printed other messages from
18  your Twitter feed.
19     You would agree that, even though I'm not a
20  Twitter member, I have the capability to access messages
21  one might post to Twitter, right?
22  A  That is true.
23  Q  And you knew that when you posted Twitter
24  messages in 2018, '19, '20, and through today, correct?
25  A  Correct.

Page 256

1  Q  Okay. I want to direct your attention to
2  Lyell 00345439. And this is part of a larger exhibit. It
3  goes 00345438 through 41. We will mark this as
4  Exhibit 17.
5     (Exhibit 17 was marked for identification by the
6     deposition officer and is attached hereto.)
7     THE WITNESS: Okay.
8  BY MS. MCNULTY:
9  Q  Okay. And I would like to direct your attention
10  to page 439.
11    And right there at 1:49 p.m. -- first, do you see
12  that this is, in fact, a text exchange between you and
13  Jennifer Lyell?
14  A  Yes.
15  Q  Okay. And do you see where she says, "I still
16  follow Reaching & Teaching on Facebook"?
17  A  Yep.
18  Q  And she says, "So glad he did the right thing and
19  signed over rights so this can contribute and I suspect
20  God will now bless it more."
21    Do you see that?
22  A  I do.
23  Q  Who is she talking about signing over rights?
24  A  If my memory is correct, I believe she's
25  referring to David Sills releasing ownership of his

Page 257

1  resources so that Reaching & Teaching could still use
2  those globally.
3  Q  Okay. Do you have any understanding of how
4  Reaching & Teaching came into existence?
5  A  I have a small amount of understanding because
6  for a while, I supported one of their employees
7  financially, who was a former intern of mine. And so I
8  knew of Reaching & Teaching more from him than I did from
9  Jennifer. But my knowledge is limited.
10 Q  I want to direct your attention, in this same
11 exhibit, to 441.
12    Okay. And right there at the top is you at
13 6:04 p.m. This is all the same text exchanges. It's
14 several pages long.
15    And so at 6:04, you say, "When you look at data,
16 am curious how 25, slash, 25 performed. Also, what are we
17 seeing in fiction? I emailed Rachel S. about fiction
18 because we had a handful of comments from store customers
19 about not having the books."
20    Do you see that?
21 A  Yes.
22 Q  Now, a moment ago, we talked about Rachel, and
23 you didn't know who it was because there was so many
24 Rachels on your team.
25    And do you know who Rachel S. is?