Michael David Sills, et al. v. Southern Baptist Convention
3:23-cv-00478

# Exhibit 3



IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

MICHAEL DAVID SILLS AND MARY SILLS,

    Plaintiffs,

vs.                                       CASE NO. 3:23-cv-00478

SOUTHERN BAPTIST CONVENTION,

A NON-PROFIT CORPORATION; ET AL.,

    Defendants.

                                              VIDEOTAPED DEPOSITION OF

                                                       JENNIFER LYELL

                                                           DAY 2

                                                           TAKEN ON

                                        THURSDAY, APRIL 10, 2025

                                                       9:05 A.M.

                                                  NEAL AND HARWELL PLC

                   1201 DEMONBREUN STREET, SUITE 1000

                                NASHVILLE, TENNESSEE 37203



Page 10

```
 1              EXHIBIT INDEX
 2   EXHIBIT                                PAGE
 3
 4   81   LYELL_00347008                    N/A
 5   82   LYELL_00345026                    N/A
 6   83   LYELL_00103681                    216
 7   84   LYELL_00097146 2010               221
 8   85   LYELL_00122313                    224
 9   86   LYELL_00078843                    N/A
10   87   LYELL_00113173                    N/A
11   88   LYELL_00102504                    234
12   89   LYELL_00344960                    N/A
13   90   LIFE162981                        N/A
14   91   EC_0003663                        282
15   92   GPSILLS_017902                    287
16   93   GPSILLS_017912                    289
17   94   SILLS_096525                      N/A
```

Page 11

```
 1              VIDEOTAPED DEPOSITION OF
 2                   JENNIFER LYELL
 3                        DAY 2
 4                      TAKEN ON
 5              THURSDAY, APRIL 10, 2025
 6                      9:05 A.M.
 7
```

 8          THE VIDEOGRAPHER: We're on the record.
 9  The time is 9:05 a.m. Date is April 10th, 2025.
10  This is the beginning of the deposition of Jennifer
11  Lyell. The case caption is Sills versus Southern
12  Baptist Convention.
13          Will counsel introduce yourselves and
14  state whom you represent.
15          MS. McNULTY: Shannon McNulty for the
16  plaintiff.
17          MR. ELBERT: Phil Elbert for Defendant
18  Jennifer Lyell. And I would note that this is a
19  continuation of yesterday's deposition. It's --
20  it's not the --
21          THE VIDEOGRAPHER: Thank you. Court
22  reporter will now swear in the witness.
23          THE REPORTER: Ms. Lyell, please raise
24  your right hand.
25          Thank you, ma'am. Do you affirm, under

Page 12

 1  penalty of perjury, that the testimony you're about
 2  to give will be the truth, the whole truth, and
 3  nothing but the truth?
 4          THE DEPONENT: Yes.
 5          THE REPORTER: Thank you, ma'am.
 6          THE VIDEOGRAPHER: You may now proceed.
 7          MS. McNULTY: Could -- could I turn that
 8  down -- that just a little bit. Thank -- thank you.
 9  Sorry. Thanks a lot. I know -- yeah, I appreciate
10  it.
11          THE REPORTER: Could we please have
12  everybody introduce themselves.
13          MS. RILEY: Yes.
14          MR. ELBERT: Yes.
15          MS. RILEY: Katherine Riley with the
16  Barrett Law Group for the plaintiffs.
17          MS. KLEIN: Kathy Klein with Riley and
18  Jacobson. I represent Defendant Guidepost
19  Solutions.
20          MS. CALLAS: Gretchen Callas with the law
21  firm of Jackson Kelly for the executive committee
22  and Rolland Slade.
23          MR. LOOFBOURROW: Ryan Loofbourrow for the
24  executive committee and Rolland Slade.
25          MR. PIETSCH: Matt Pietsch for the

Page 13

 1  Southern Baptist Convention, Ed Litton, and Bart
 2  Barber.
 3          MS. POOLE: Nicole Poole for Defendant
 4  Willy McLaurin.
 5          MR. LEET: Byron Leet for the Southern
 6  Baptist Seminary and Dr. Mohler.
 7          MR. HARRIS: Ron Harris of Neal and
 8  Harwell for the defendant, Jennifer Lyell.
 9          MS. STOCKTON: Mariam Stockton for
10  Jennifer Lyell.
11          MR. FOWLER: I'm Satchel Fowler for
12  Jennifer Lyell.
13          MR. ELBERT: And can we get a verbal
14  greeting on the people on screen.
15          MR. OTCHY: Alex Otchy, Mintz and Gold,
16  for Defendant Guideposts.
17          MR. ANDERSON: Jon Anderson for the EC and
18  Rolland Slade.
19          MR. RIDDLE: Kris Riddle on behalf of
20  plaintiff.
21          MS. ALDRIDGE: Sterling Aldridge, Barrett
22  Law Group, on behalf of the plaintiff.
23          MR. BREWER: Gary Brewer on behalf of the
24  plaintiff.
25          MR. WHITE: Ben White for the plaintiff.

Page 294

1  me give an objection.  I'm going to object to
2  leading questions.
3         THE DEPONENT:  I -- I would -- to the --
4  in all -- I resisted -- attempted to resist
5  verbally, physically squirming, reasoning, no, all
6  these things.  Obviously, in those circumstances, I
7  couldn't speak.
8         And I would try to push back with my head,
9  but it generally would be futile.
10        I would say another way that he used force
11 was the space that he would do things in.  So, you
12 know, in his home and relative to certain walls or
13 corners or things.  So it wasn't just his body, but
14 a piece of furniture or a wall or something to where
15 it's, like, I would have even fewer ways to maneuver
16 away.  And he always knew that I did not want that
17 to happen.
18 BY MR. ELBERT:
19     Q.  Did he verbalize his understanding of
20 whether or not you wanted that to happen after the
21 acts?
22     A.  Yes.
23     Q.  Please describe that.  Just example.
24     A.  An example would be, like, in a reassuring
25 tone, there was -- for the kind of several -- for

Page 295

1  several years of knowing him, being part of the
2  family, and -- and those events at times happening,
3  it would be that reasoning around -- that I've
4  shared is an answer to previous questions in this
5  deposition of, I know you didn't want this.  God
6  knows you didn't want this.  I don't want this, too.
7  This is redemptive.  It -- it --
8      Q.  What do you mean "redemptive"?
9      A.  The way that I understood it was that I
10 was -- I, you know, struggled and felt guilty for,
11 you know, being 26, 27, 28, however old, and still
12 really longing to have godly parents and be part of
13 a godly family.
14 And not just wanting the glory of God.
15         And so I thought that that desire for
16 parents, when God had -- for godly parents, when God
17 had not chosen me to give -- had not chosen to give
18 me those, was sinful.  And that somehow, that was
19 making him do that.
20         In the same kind of way that, you know,
21 you might hear in a sermon that a girl wearing a
22 short skirt or a tight shirt was making someone -- a
23 -- a man lust, and then sin.  And -- yes.  I'm
24 sorry.  I forget the rest of your question.
25     Q.  Well, so did you -- well, I think -- let's

Page 296

1  see.
2      A.  I was --
3      Q.  Did he -- did he -- did -- did Dr. Sills
4  express to you that there were things he thought
5  were wrong with you or broken in you -- that if you
6  worked on them, it would solve this problem?
7         MS. RILEY:  Objection, leading.
8         THE DEPONENT:  I believe that states what
9  I've stated before that he said, so yes.  I would
10 also like to amend my answer to your previous
11 question that, another thing after -- when you asked
12 about statements that he would make after.
13        When it became the nature of things, I
14 started to realize that he actually wanted it, and
15 it wasn't this broken thing in me.  And I tried to
16 navigate it in different ways.  And then that is
17 where a lot of the aggression escalated in the forms
18 of force.  And some aspects changed later in the
19 years.
20        And he would then -- very often, when he
21 would finish, like in that example of the oral sex,
22 the hand would come off of my head, and he would
23 say, now, go fix your face and repent.  Because I
24 would often be crying and there'd be makeup and
25 things.

Page 297

1         And so -- and then he had rules, such as
2  that after you repent, because of First John 1:9,
3  that you can never speak of whatever you've repented
4  of, or that's blasphemous.  And so I was stuck
5  without a way to figure out how to navigate the --
6  all of the confusing and seemingly conflicting
7  dynamics.  But he always knew that I never, ever
8  wanted any instance.
9         And I always, always tried to stop it.
10 BY MR. ELBERT:
11     Q.  And -- and did you also -- you mentioned
12 ways to try to navigate it.  Did -- well, did you --
13 you mentioned Mary being home or the kids being
14 home.
15     A.  Yes.
16     Q.  Explain the types of things -- just a few
17 examples of what you would do to try to navigate the
18 situation, so as not to be alone with Dr. Sills.
19        MS. RILEY:  Object, leading.
20        THE DEPONENT:  So I stated that I -- I
21 would, you know, it was kind of, like, this cat-and-
22 mouse thing.  I tried to navigate it.  So, like, one
23 example is, if I -- you know, time frame was going
24 to be coming to town, something going on, or spend
25 time with the family.

Page 298

    But I would pick a weekend when he was going to be preaching on that Sunday, because first of all, his schedule would be different because he would be working on the sermon part of the time of the weekend. So therefore, he wouldn't be able to come up with some sort of household project that he then asked me to help him with, that then would leave us alone in some, you know, sector of the house.

    Plus my hope and what, at times, would very well be the case is, you know, he's spending more time in scripture, and so he's just not operating out of whatever that motivation was and maybe is more reticent to do that when he knows he's going to need to stand and preach 12 or 24 hours later. I -- obviously, times whenever, you know, it was more members of the family there.

    MR. ELBERT: Was -- was -- yeah.
BY MR. ELBERT:
    Q. You -- you read Dr. Sill's deposition?
    A. Yes.
    Q. And -- and I may have this wrong, but my recollection is, he said that these encounters would occur only maybe ten times a year. So were -- were there occasions where there was -- were these

Page 299

assaults on you or abuse of you, but were there other occasions where the family situation would appear normal and appropriate to you and -- and inviting?
    A. Yes. And there were -- it's not as though the instances and the abusive actions or assaults were, you know, evenly spaced or predictable. There could be long -- there could be, you know, more months between them. There could be, you know, a -- a weekend where it was just absolute nightmare, and I couldn't control anything.

    And also, I would say -- I would note that -- that every time something happened, you know, although it felt like the minutes were forever, I know that they were very, very brief in actual minutes -- time.

    And he could go from -- and then would lead me -- thus, lead me from, you know, what I just explained of the forced oral sex and me cleaning my face, repenting, him washing his hands, and truly, within five minutes, being like, hey, Mary's calling, let's get up, dinner's ready. Sit down at the table, and we're joining hands, and he's leading in prayer.

    And that was obviously jarring and

Page 300

shocking. But at the same time, there was also -- he was, as reflected in, you know, a lot of the e-mails, we've looked and things, he could also be, at times, you know, just -- and was, in general, you know, paternal and encouraging and a mentor.

    And it is -- it was -- to say deeply confusing is a dramatic understatement, because you would think for one thing to be true, that the others couldn't. But I -- it -- it is the reality that they all were.
    Q. Were -- were what?
    A. Were true -- were the case. They all existed together.
    MR. ELBERT: That's all I have. Thank you.
    THE DEPONENT: Thank you.
    THE REPORTER: Counsel, may I please get your name.
    THE DEPONENT: Phil?
    MR. ELBERT: Phil Elbert.
    THE REPORTER: Thank you.
    MS. RILEY: Anybody else? It's okay for me to redirect?
    T, will you pull up Sills 096526.
    MS. MADDUX: Wait. Say that number again.

Page 301

I'm sorry.
    MS. RILEY: Sills 096526.
    MS. MADDUX: Okay.
    MS. RILEY: Can you blow it up?
    MR. ELBERT: Literally, or just bigger?
    MS. RILEY: What?
    MR. ELBERT: Are you literally going to blow it up, or just make it bigger?
    MS. RILEY: Just blow it up so Ms. Lyell can identify it for me.
    MR. ELBERT: I was -- I was just kidding you.
EXAMINATION
BY MS. RILEY:
    Q. What's that, Ms. Lyell?
    A. Can they -- well, first, let me see because there's multiple -- I'm sorry. Can you scroll --
    MS. RILEY: T, she needs to identify it.
    THE DEPONENT: I need to see the -- I'm looking at the participants.
    Okay. I don't know what that was. You can scroll down now so I can see the full image, please.
    This is a photo that I sent, it looks

Page 302

1  like, from the airport in Ecuador of an homita and a
2  juice drink on the family text thread.
3           MS. RILEY:  Let's see.  I can't see that
4  far. Let me see if I can pull it up.
5           THE DEPONENT:  Oh, okay.  Now I see the
6  replies.  And then there are replies.  I don't know
7  who "me" is on this.  But again, this was sent to
8  David Sills, Mary Sills, Molly Sills, and
9  Christopher Sills and Carol Sills.  Daniel wasn't, I
10 don't think, on that thread.  I don't know the date
11 in --
12          MS. RILEY:  Okay.
13          THE DEPONENT:  -- in 2016, yeah.
14          MS. RILEY:  All right.
15          THE DEPONENT:  And then the messages
16 reflect that I'm talking about -- I must be leaving
17 a visit with Christopher and Carol, because I state
18 that I probably gained ten pounds this week.  Your
19 daughter-in-law, referencing Carol, who looks like
20 would be on King Cook.
21          MS. RILEY:  Okay.
22          THE DEPONENT:  I see the numbers at the
23 top. It -- we had a family text thread that was
24 everybody.  I don't know if this one -- and I had
25 Christopher, Carol on it.  I don't remember their

Page 303

1  numbers, but --
2  BY MS. RILEY:
3       Q.   Did anybody -- so who -- do you know who
4  -- do you know who else responded?  Which -- which
5  is your telephone number?
6       A.   My phone number is (615) 495-5765.
7       Q.   Okay.
8       A.   Mary is (502) 558-6261, so she replied.  I
9  believe the green is -- yeah.
10      Q.   Okay.
11      A.   Snort, snort.  That's David.
12          MS. RILEY:  Okay.  You can pull that down,
13 T.
14          At the beginning of Ms. Klein's
15 questioning, she -- you talked about -- that an e-
16 mail was sent to you from Baptist Press or from the
17 executive committee right before the -- the
18 conference.
19 BY MS. RILEY:
20      Q.   Do you remember talking about that?
21      A.   Yes.  The -- it was actually an e-mail
22 from -- that was sent -- sent to a lot of people
23 that was a forward of an e-mail that Ronnie Floyd
24 had sent to EC trustees.
25      Q.   And -- and who sent it to you?

Page 304

1       A.   I actually don't recall.  I think I got it
2  from multiple people.  It was very broadly
3  circulated.
4       Q.   Okay.  So it wasn't a confidential e-mail
5  that you received that you shouldn't have?
6       A.   I mean, I don't recall it being labeled as
7  such.  And generally, those things always leak.  But
8  it wasn't sent specifically or only to me.
9       Q.   Okay.
10      A.   It was sent to -- and discussed openly
11 online.
12      Q.   You've testified -- I'm sorry.  You have
13 stated before that when you went to this -- well,
14 let me ask you: Was this the convention that you
15 went to that you said you had to have nine armed
16 guards?
17      A.   No.
18      Q.   Okay.  Which is the convention that you
19 went to that you -- that you had to have nine armed
20 guards?
21      A.   To the Southern Baptist Convention in 2019
22 in Birmingham.
23      Q.   Okay.  The --
24      A.   The EC meeting is a very small meeting --
25      Q.   Okay.  So --

Page 305

1       A.   -- relative.
2       Q.   Okay.  So the one that you're talking
3  about with the -- the meeting was just the -- the
4  board of directors of the executive committee; is
5  that correct?
6       A.   It's the trustees, which there are about
7  70.
8       Q.   Okay.  But it -- so it wasn't the whole
9  convention?
10      A.   Correct.
11      Q.   Okay.
12      A.   Correct.
13      Q.   All right.  So it -- the Birmingham
14 convention is when you had to have the nine armed
15 guards?
16      A.   I don't believe that they were armed.
17      Q.   But that's what you said, isn't it?
18      A.   I don't think I said armed.  Maybe I did
19 closer to the event, and maybe they were.  I just
20 know that they were all around us.
21      Q.   Who -- who were these people?
22      A.   I know two of them, but I didn't know the
23 others.  And it wasn't just me.  It was me, Megan
24 Lively, and Rachael Denhollander.
25      Q.   Somebody pay for y'all to have armed