## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **MICHAEL DAVID SILLS and MARY SILLS,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No.: 3:23-cv-00478** |
| **SOUTHERN BAPTIST CONVENTION, et al.,** | ) ) ) ) | **Judge William L. Campbell, Jr.** **Magistrate Judge Jeffery S. Frensley** |
| **Defendants.** | ) ) | |

## <u>PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs, Michael David Sills and Mary Sills, through their counsel, respond to the Executive Committee of the Southern Baptist Convention ("ECSBC") and Rolland Slade's ("Slade") Motion for Summary Judgment with Respect to Plaintiff Mary Sills (Dkt. No. 310)[1] and in opposition thereto state the following:

### I.     INTRODUCTION

Mary Sills and David Sills brought this action to recover for the injuries caused by Defendants' negligence and false statements, including that Mary Sills knew about, facilitated or made threats concerning abuse allegedly committed by David Sills. Each Defendant knew or should have known that ███████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████. No Defendant reviewed communications indicating Lyell ██████████████████████████████, yet Defendants publicly █████

---

[1] The supporting memorandum (Dkt. No. 312) is referred to herein as "MSJ."



███████████████████████████████████.[2] Defendants, including SBC Presidents Ed

Litton and Bart Barber, ECSBC leaders and Dr. Mohler made or amplified ████████████

███████████████████████████████████.[3] Although Litton believed the

███████████████████████████████████, Guidepost admits █████████.[4]

Not a single person or entity investigated what was described by █████████████████,

but many social media posts were made by these Defendants in the context of a public relations

campaign to repair ██████████████████████████████████████████████

████.[5]

　　　　Mary was thrust into the public eye relative to Defendants jointly executed public relations

scheme concerning the mishandling of prior SBC cases of sexual abuse. Defendants recklessly and

publicly stated that Mary knew about the sexual abuse and that she threatened Lyell. Defendants

now move for summary judgment against Mary, suggesting that her claims rest solely on a single

social media post by Barber, that the Barber tweet is protected by the Communications Decency

Act ("CDA"), 47 U.S.C.S. § 230, and that the underlying statements are not actionable as

---

[2] Ex. 1, Slade Dep. at 34:21-35:5; 41:4-20; 47:13-21;56:19-57:1; Ex. 2, McLaurin Dep. at 124:15-125:7
[3] Ex. 3, Mohler Dep. at 132:12-133:2; Ex. 4, Litton Dep. at 46:13-47:10; Ex. 5, Barber Dep. at 27:15-23.
[4] Ex. 4, Litton Dep. at 117:11-119:7; Ex. 6, Supp. Resp. and Obj. of Def. Guidepost Sols., LLC to Pltfs.' First Set of Interrog. Nos. 11-12 (████████████████████████████████████████
██████████████████████); *see also* Guidepost's Mem. of Law in Support of Mot. to Dismiss, Dkt. No. 78 at 21 (████████████
[5] Ex. 7, LYELL_00357668 at 69-70 (████████████████████████████████████
████████████████████████████████████████████
███████████████"); Ex. 8, Geiger Dep. at 237:2-240:7; Ex. 9, LYELL00344973 (██████████████████████████████████);
Ex. 10, LYELL_00344960 (█████████████████████████████████████
█████████████████████████); *Out of Darkness*, Citygate Films (2022), https://tinyurl.com/3ru2rebu (Lyell and Mohler star in documentary recounting Lyell's allegations of abuse).

defamation.[6] Specifically, Defendants contend that Barber's social media post cannot give rise to liability because (1) Section 230 immunizes Barber as an online user republishing third-party content; and (2) the statements about Mary are either mere opinion ("threatening tone") or substantially true and non-defamatory ("had known of the sexual encounters").[7]

Regarding Barber's tweet, evidence shows that Defendants ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. ████████████████ ████████████████████████████████████████████████████████████████

███████[8] That accusation against Mary was deliberate, and Barber did not innocently post it. Barber, capitalizing on his powerful platform as president of the SBC, in concert with the other Defendants amplified and endorsed these malicious claims, thus taking them outside the safe harbor of § 230 and squarely into the territory of traditional publisher/republisher liability. Moreover, the nature of the statements (accusing Mary of threatening a victim and condoning abuse) constitutes defamation per se under Tennessee law, as they impute serious wrongdoing and moral turpitude to her. Defendants' attempt to sanitize these statements as harmless "opinion" or technically "true" ignores context and the reasonable inferences a jury would draw. In Tennessee, the defamatory gist of a publication is what matters.  Here, the gist is plainly that Mary acted as an accomplice to sexual abuse, a claim she vehemently denies and that has never been substantiated. The claim is false; the implication grave. At a minimum, there is evidence concerning the negligent scheme jointly perpetuated by Defendants, and the issue of falsity, meaning, and intent that must be

---

[6] Oddly, ECSBC does not represent Barber. Barber is represented by the SBC who notably chose not to bring or join in this motion.
[7] MSJ at 3.
[8] Ex. 9, LYELL00344973 at 74.

resolved by a jury.

Even apart from the defamation claim, Mary has asserted other standalone causes of action, including negligence, civil conspiracy and intentional infliction of emotional distress (IIED). Defendants seek a wholesale dismissal of Mary's case; however, they have failed to show any entitlement to judgment as a matter of law on these counts. As explained below, Tennessee law and Sixth Circuit precedent recognize that a coordinated campaign of false accusations can support liability on multiple theories. Ample evidence demonstrates that Defendants' conduct was extreme, outrageous, and grossly negligent. Defendants breached duties of care in causing unsubstantiated and uncorroborated allegations to proliferate. Their concerted actions harmed Plaintiffs. Mary's claims cannot be summarily dismissed, particularly at the behest of parties who have not negated the factual underpinnings of her case.

In short, summary judgment must be denied. Defendants' motion relies on an unduly narrow view of some facts, a misapplication of immunity and defamation doctrines, and a non-existent record with respect to the totality of Mary's claims. When the evidence is viewed in Mary Sills's favor, a reasonable jury would find that she was falsely defamed and otherwise tortiously harmed by Defendants' actions, including by Barber's social media posts. The Court should allow Mary the opportunity to present her case to a jury.

## II.    LEGAL STANDARD

Summary judgment is only appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the "initial responsibility" to show that there is no genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986), but the Court must view all facts and make all reasonable inferences in the light most

favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the non-movant presents evidence on which a reasonable jury could decide in her favor on any claim, summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Genuine issues of material fact exist if there is any dispute over facts that "might affect the outcome of the suit under the governing law." *Id.* Moreover, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted).

47 U.S. Code § 230(c)(1) states: "(1) Treatment of publisher or speaker. No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." [9]

### III.     ARGUMENT

ECSBC and Slade have not met their burden under Rule 56, and summary judgment should be denied. Notably, Barber, the defendant for whom judgment is sought, neither signed nor joined the motion. ECSBC denies Barber acted on its behalf, ██████████████████████████ ██████████████████████████████ [10] ECSBC's position is inconsistent with the law where ECSBC seeks judgment on behalf of Barber.[11] Barber served on the ████████ ████████████████████████████████████████ [12] He attended all

---

[9] Known as *Protection for "Good Samaritan" blocking and screening of offensive material*.
[10] MSJ at 3.
[11] *See Hammer Brand, LLC v. Voro, Inc.*, 2024 WL 5430594, at *1 (M.D. Fla. Dec. 20, 2024) (defendant lacked standing to move for summary judgment on claims not made against it). *See also, Cash v. Unocal Corp.*, 2008 U.S. Dist. LEXIS 70223, at *7-8, *11 (W.D. La. Sept. 16, 2008) (denying motion for summary judgment based solely upon arguments raised by a codefendant).
[12] Ex. 5, Barber Dep. at 14:1-2; 13:6-14.

█████████████████████████████████████████████████████

███████████████████████████████████. His social media posts reflected his role

███████████████████████████████████.[13] Whether Barber tweeted in

his personal or official capacity is a fact issue. Even so, Barber's posts amplified defamatory

content. His unsolicited statements ████████████████████████████ only

underscore the need for a jury to assess his intent and role in the broader campaign against the

Sills.[14]

Defendants falsely accused Mary of threatening Lyell and knowingly enabling abuse.

Defendants engineered this false narrative to bolster ████████████████████████

███.[15] Barber's tweets from December 2021 through 2022 (including the one which referenced

Geiger's statement) were part of Defendants' collaborative scheme. Barber was the SBC President,

a position that portrayed great respect and influence. As part of his platform, he intentionally

published and endorsed Lyell's allegations on social media. His tweets, including the one which

references Geiger's statement, amplified the defamatory statements. CDA immunity does not

apply because Barber endorsed and amplified the defamatory statements in conjunction with Lyell

and Geiger as part of the public relations scheme undertaken by Defendants. Barber's tweets were

not passive. They falsely imputed criminal or unethical conduct to Mary. Mary's claims for

intentional infliction of emotional distress, civil conspiracy, and negligence also survive summary

judgment, as fact issues remain regarding Defendants' extreme, concerted, and reckless conduct.

---

[13] *Hunt v. S. Baptist Convention*, No. 3:23-cv-00243, 2025 U.S. Dist. LEXIS 62180, at *124 (M.D. Tenn. Apr. 1, 2025); *see also* Bart Barber X bio and tweets of official SBC business, *Hunt v. S. Baptist Convention,* No. 3:23-cv-00243, Dkt. Nos. 2418-18 through 2418-24 (M.D. Tenn. Aug. 31, 2024) (identifying himself as "SBC President" and tweeting in his official capacity).
[14] Ex. 11, LYELL_00189523, deposition of Bart Barber at 45:2-9, *Rollins v. Pressler, et al*., No. 2017-69277A (Harris Cnty. Tex. D. Ct. Feb. 10, 2023).
[15] Ex. 9, LYELL00344973.

**A.     Genuine Issues of Material Fact Exist as to Mary Sills's Defamation Claim.**

Defendants conspired and caused injury to Mary by publishing false statements accusing her of threatening Lyell and of knowingly enabling or facilitating the purported sexual abuse of Lyell. This is a lie, ████████████████████.[16] There is no evidence to the contrary.

Section 230 does not immunize Barber's tweet because Barber was "in part responsible for the creation or development of content" and is therefore not immune under the CDA from defamation claims predicated on his social media. *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398 (6th Cir. 2014). Because of Barber's use of social media[17] in his prominent status and positions within the SBC, his participation in the official response of ECSBC and SBC with respect to the sex abuse scandal reported by the Houston Chronicle,[18] and his collaborative efforts in spreading the false narrative (all without any investigation into the claims), a jury could easily find that the posting was not innocent but rather another prong in the multi-faceted public relations campaign undertaken by Defendants.

The principal publication raised in the motion, though not the only one, is a July 2022 Twitter post by Geiger.[19] That post was ████████████████████.[20] Thereafter, Lyell tweeted the post, and then Barber, the then SBC President, posted the same material.[21] Geiger wrote: "████

████████████████████████████████████████████████████████

---

[16] Ex. 3, Mohler Dep. at 132:12-133:2; Ex. 4, Litton Dep. at 46:13-47:10; Ex. 5, Barber Dep. at 27:15-23.

[17] Ex. 15, LYELL_00348617; Ex. 21, LYELL_00176297; Ex. 22, LYELL_00175855; Ex. 20, LYELL_00349570; Ex. 19, EC_0011516. Barber has 32,800 followers on X. *See* https://x.com/bartbarber.

[18] *See* Robert Downen and John Tedesco, *As ex-Southern Baptist figure alleges 'criminal conspiracy,' prominent leader defends abuse response*, HOUSTON CHRONICLE (May 25, 2022), https://www.houstonchronicle.com/news/investigations/article/As-ex-Southern-Baptist-figure-alleges-criminal-17193616.php.

[19] MSJ at 2-3.

[20] Ex. 9, LYELL00344973.

[21] Ex. 12, LYELL_00176244, Exhibit 13 to Barber Dep.

7

██████████████████████████████████████████

████████████████████████████████.” The undisputed evidence in this case is that

no investigation of the allegations was ever conducted. As the prominent SBC President, Barber

knew or should have known that. Nevertheless, Barber elected to amplify the false narrative by

making his post and endorsing the message of Mary's involvement. Defendants argue that these

statements are not legally actionable; however, genuine issues of fact exist as to the applicability

(or not) of CDA § 230 immunity, namely, that Barber was "in part responsible for the creation or

development of the content" and thus not immune.

### 1.   Defendants Are Not Entitled to Immunity Under CDA § 230

Defendants contend that Mary's claims are barred by CDA § 230 because Barber's alleged

role was merely that of an internet "user" who simply re-shared content created by someone else.[22]

Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be

treated as the publisher or speaker of any information provided by another information content

provider." 47 U.S.C. § 230(c)(1). While this provision often applies to website operators or social

media platforms, courts have extended it to individual "users" who repost content created by

others. *Holmok v. Burke*, 2022 WL 2256413, at *3 (Ohio Ct. App. June 23, 2022). Defendants cite

this rule in arguing that Barber (and by extension the SBC entities) cannot be treated as the

"publisher" of Geiger's tweet.[23]

However, Section 230 does not immunize the conduct at issue here for several reasons.

First, Barber was not a passive, unrelated individual casually "liking" a stranger's content. Barber

was President of the SBC at the time, and his decision to post Geiger's allegation about Mary Sills

was orchestrated as part of a larger strategic response, in coordination with Lyell and Geiger, and

---

[22] MSJ at 7.
[23] MSJ at 5.

carried the weight of an official endorsement. This Court has recognized that a jury could conclude that Barber tweeted in his capacity as SBC President.[24] By tweeting the accusation to his own followers (without any disclaimer such as "retweets ≠ endorsement"), Barber simply used the mode of communication as (1) yet another prong in the public relations campaign and (2) an adoption and ratification of the statement. As one commentator noted at the time, "newly elected SBC President Bart Barber retweeted Geiger's statement, which compounded its reach.[25] Barber himself admitted to Megan Basham that he retweeted Geiger's message "██████████████████ ████████████████████████████████████████████."[26] This was in furtherance of Defendants' false narrative. Geiger's tweet was posted in mid-July 2022, and Barber retweeted it shortly thereafter. After the Guidepost report was published on May 22, 2022, a media frenzy followed. Barber's posts perpetuated the false narrative that the Guidepost report was reliable in proving that David Sills abused Lyell. The Report, however, was inadequate and failed to make any competent or diligent inquiry into Lyell's allegations.[27] In the eyes of an average reader, Barber's post gave credibility and legitimacy to the claim about Mary. This is significant because courts have recognized that if a user adds any substantive content to the third-party post, even tacit endorsement, the user may be liable for that added content. *Gilmore v. Jones*, 370 F. Supp. 3d 630, 663 (W.D. Va. 2019) (producing and ratifying another's article supports an inference that the defendant played a role in "developing" the content).

---

[24] *Hunt v. S. Baptist Convention*, No. 3:23-cv-00243, 2025 U.S. Dist. LEXIS 62180, at *124 (M.D. Tenn. Apr. 1, 2025); *see also* Bart Barber X bio and tweets of official SBC business, *Hunt v. S. Baptist Convention,* No. 3:23-cv-00243, Dkt. Nos. 2418-18 through 2418-24 (M.D. Tenn. Aug. 31, 2024) (identifying himself as "SBC President" and tweeting in his official capacity).

[25] *See Bart Barber retweets unsubstantiated allegation against Mary Sills*, CAPSTONE REPORT (July 14, 2022), https://capstonereport.com/2022/07/14/bart-barber-retweets-unsubstantiated-allegation-against-mary-sills/38486/ ("CAPSTONE REPORT"); https://tinyurl.com/y23ckzmt.

[26] Ex. 13, Sills_076718 (emphasis added).

[27] *See* Ex. 14, Expert Report of Amy McDougal, June 2025 at 6-7, 9-12, 40-53.

In *U.S. Dominion, Inc. v. Byrne*, the court denied CDA immunity to a defendant who "quote-tweeted" an article and prefaced it with the remark "I vouch for this," holding that by "stating that he 'vouch[ed] for' the evidence" in the article, the defendant had made additional defamatory statements outside § 230's protection. 600 F. Supp. 3d 24, 36 (D.D.C. 2022). Here, Barber may not have typed the words "I vouch for this," but his actions as President had the same effect. A reasonable juror could easily find that the SBC President's deliberate republication of Geiger's tweet signaled his agreement with and "vouching for" the content, particularly given that Barber was engaged in a public online discussion defending all Lyell's claims as true in furtherance of the conspiracy.[28] Under the logic of *Dominion*, Barber's endorsement of Geiger's tweet would "fall outside the ambit of § 230 immunity." *Id.*

At the very least, there is a factual issue whether Barber's posts were neutral transmissions or an affirmative "adoption" of the defamatory message as his own. Traditional defamation law has long held that one who repeats or republishes a defamatory statement can be held just as liable as the original speaker, because republication is a new publication to a new audience. Congress, in enacting § 230, did not intend to give a free pass to those who truly adopt and ratify a defamation. Congress aimed to protect interactive service providers and passive users from being automatically treated as "publishers" of every third-party post they might host or share. 47 U.S.C.S. § 230. Barber is no passive user and far from being an uninvolved bystander. Shielding him (and by extension the SBC or ECSBC) from liability under § 230 would stretch the statute beyond its purpose and create perverse incentives, allowing high-profile individuals to launder defamation through surrogate speakers and then amplify it with impunity. The Court should decline to apply § 230 in such an extreme fashion.

---

[28] *See* Ex. 12, LYELL_00176244, Barber Dep. Ex. 13.

Further, unlike the passive, private users in *Barrett*, *Banaian,* and *Holmok*, Barber, as SBC President, posted deliberately during an ongoing controversy to defend Lyell's story. This context, coupled with the absence of any disclaimer and the amplification to a large, expectant audience, transformed the posts into an official endorsement and adoption of the defamatory statement. In other words, by posting Geiger's tweet and asserting that all of Lyell's claims were "███████ ███████,"[29] Barber was soliciting support for Lyell to the detriment of David and Mary Sills. This solicitation precludes § 230 immunity. *See Banaian v. Bascom*, 281 A.3d 975, 979 (N.H. 2022) (acknowledging that an allegation of solicitation of content could prevent immunity). At a minimum, this creates a triable issue of fact as to whether Barber's conduct falls outside the scope of Section 230 immunity. To hold otherwise would be to permit organizational leaders to evade accountability by using social media as a shield for official defamation—a result Congress did not intend.

Additionally, CDA immunity is not as absolute as Defendants suggest. Courts have occasionally expressed "doubts over a very broad interpretation" of § 230's user immunity, noting that literal application can lead to unjust results. The California Supreme Court in *Barrett v. Rosenthal* did extend § 230 to users who repost content, but it also acknowledged concern that Congress's wording "comprehensively immunized republication by individual Internet users." 146 P.3d 510, 529 (Cal. 2006). Since *Barrett*, there have been evolving views, including legislative changes such as FOSTA (2018) removing immunity for certain content, showing that § 230 is not untouchable as digital and internet technologies evolve.[30] The key inquiry is often whether the defendant materially contributed to the unlawfulness of the content or "developed" it in some way.

---

[29] Ex. 15, LYELL_00348617.
[30] *See* 115 P.L. 164; 132 Stat. 1253; 2018 Enacted H.R. 1865 (noting that the CDA was not intended to protect websites that facilitate sex trafficking).

*See Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008) (en banc) (an entity that contributes to the content's illegality is a creator or developer, not merely a provider/user). Here, Barber's post (and related tweets, editorials and interviews – including 60 Minutes- in which he vigorously defended all Lyell's allegations as true) further developed the curated network of defamatory content.[31] By selectively amplifying Geiger's post while holding the position of SBC President, Barber gave the content a new context and a seal of approval that it otherwise lacked. Barber's post elevated the accusation into a de facto announcement from SBC leadership that Mary threatened Lyell and complied in sexual abuse. Given these considerations, it would be improper to let § 230 foreclose Mary's claims against Barber or the SBC entities at summary judgment. The statute was never intended as a sword to be used by would-be defamers in positions of power, and its limitations are evident in scenarios like this where the "user" is effectively a co-publisher. At the very least, whether or not Barber is protected by § 230 involves mixed questions of law and fact that should not be resolved in Defendants' favor without a fair trial.

2. **Accusing Mary Sills of Having a "Threatening" Tone and Knowing of Sexual Encounters Are Defamatory Meaning and Not Protected**

Defendants next argue that if CDA immunity does not apply, Mary's defamation claim fails because the content at issue is not defamatory or is categorically non-actionable.[32] They assert that Geiger's description of Mary's message as having a "threatening tone" is merely a subjective opinion, and that his statement that the message indicated Mary "had known of the sexual encounters" is true because Mary eventually did learn of her husband's conduct and, in any case, does not imply any misconduct by Mary. These arguments mischaracterize both the law and the

---

[31] Ex. 5, Barber Dep. at 86:13-88:16; Ex. 19, EC_0011516.
[32] MSJ at 8-13.

actual tenor of the statements. When properly analyzed, both aspects of the publication are actionable as defamation per se – meaning they intrinsically carry defamatory meaning – and Mary has the right to prove their falsity to a jury. The Supreme Court has refused to give blanket First Amendment protection for opinions; however, its precedents make clear that the First Amendment does protect "statements that cannot reasonably be interpreted as stating actual facts about an individual." *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 597 (6th Cir. 2013) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)). In this instance, the statements posted by Barber most certainly do state actual facts about Mary Sills.

### a. "Threatening Tone"

Defendants' claim that Mary threatened Lyell via email is not protected opinion.[33] When prominent figures like Geiger and Barber assert Mary issued a threat, it implies an objective fact, not a vague impression. Tennessee law recognizes that a statement implying undisclosed defamatory facts is actionable. *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 737 (Tenn. Ct. App. 2004). Geiger did not share Mary's actual message; he stated it had a "threatening tone," implying undisclosed facts. This led readers to assume Mary intimidated Lyell to stay silent. In truth, Mary's message posed a single question: "Why would you want to completely destroy the lives of people that opened their home, heart, family, and lives to you?"[34] This is not a threat. It is a plea. Calling the message "threatening" inserted a false narrative that damaged Mary's reputation. The accusation was specific and factual, not figurative or hyperbolic.[35] The Court must consider how an average reader would interpret the statement. Here, that interpretation is

---

[33] MSJ at 9-12.
[34] Ex. 16, Sills_082292.
[35] Indeed, Mary understood the statement this way, testifying that the post "said I was complicit in this inappropriate relationship" and specifically accused her of threatening Lyell. Ex. 17, M. Sills Dep. at 99:21-25.

defamatory—and at minimum, creates a jury question.

Under Tennessee law, a statement is actionable if it implies an assertion of objective fact. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990); *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 737 (Tenn. Ct. App. 2004). Geiger's statement that Mary's message had a "threatening tone" was not presented as opinion based on disclosed facts. Instead, it implied undisclosed, defamatory content and suggested that Mary intimidated Lyell, an assertion that can be proven true or false and is therefore actionable.

Defendants rely on *Revis v. McKenna*, 31 S.W.3d 250 (Tenn. Ct. App. 2000), but that case is distinguishable. In *Revis*, the employer described an employee's expression during a union vote as "threatening" and disclosed the basis for that impression—namely, past behavior and an observed facial expression. The court held this was subjective opinion based on disclosed facts. Here, by contrast, Geiger did not disclose the content of Mary's email. He simply asserted it was threatening, leaving the reader to assume the worst. That invites defamatory inference and makes the statement actionable under *Milkovich*. Mary's email, asking why Lyell would destroy people who opened their home to her, is not threatening. Geiger's characterization was false and damaging, and whether it is defamatory is a question for the jury.

By calling Mary's email "threatening," Geiger effectively inserts a defamatory lie into the public narrative –that Mary tried to scare or bully Lyell. This kind of charge is unquestionably injurious to reputation: accusing someone of threatening a victim of sexual abuse is implying morally despicable and potentially criminal behavior. Under Tennessee law it would be deemed defamatory per se because it imputes conduct that would subject the target to public hatred and contempt (and could be a criminal offense). The seriousness of the allegation cannot be understated. It certainly "did seriously threaten [Mary's] reputation or hold [her] up to public

hatred, contempt, or ridicule," which is the test for defamatory meaning. *Revis*, 31 S.W.3d at 253. Indeed, Mary was inundated with ignominy and disgrace once this claim circulated. As the Capstone Report describes, Barber's post of Geiger's statement "compounded the reach of this explosive and now public allegation."[36]

Even case law cited by Defendants supports submitting this to a jury. In *Kersey v. Wilson*, a Tennessee appellate court found that calling a letter "threatening" or "extortion" could in context be non-actionable opinion because it was an evaluation of a known letter in the course of legal disputes. *See* 2006 Tenn. App. Lexis 826 (Tenn. Ct. App. Dec. 29, 2006). But that is worlds apart from our scenario. Mary's actual message was intended only for Lyell, who subsequently shared it with Geiger. The public did not see the message; they only saw Geiger's characterization and the many other tweets from Barber which supported Lyell in her claims of sexual abuse. That characterization carries a clear (and false) factual implication about Mary's conduct. Therefore, the Court should hold that the "threatening tone" statement is capable of defamatory meaning – it conveys that Mary engaged in wrongful intimidation – and is not immune as pure opinion. At the very least, reasonable minds could differ on whether the term "threatening" in this context implies a verifiable fact (a threat was communicated) or is just colorful rhetoric. Such ambiguity should be resolved by the jury, not on summary judgment. "If a statement is capable of sustaining both a defamatory and a non-defamatory interpretation, then it is for the jury to decide whether it was understood as being defamatory." *Hoffman v. Roberto*, 1987 U.S. Dist. LEXIS 13920, at *6 (W.D. Mich. 1987) (citing *Clark v. Am. Broadcasting Companies, Inc.*, 684 F.2d 1208, 1214 (6th Cir. 1982).

---

[36] *See* CAPSTONE REPORT, *supra* n. 24.

### b. "Had known of the Sexual Encounters"

This statement defames Mary by implying her complicity in sexual abuse. Defendants argue that saying Mary "had known of the sexual encounters" between Sills and Lyell is not defamatory.[37] They claim it's a benign statement, only indicating Mary was aware of an extramarital affair and by itself, this "is a far cry from aiding, abetting, or facilitating abuse."[38] But Defendants misrepresent the facts and ignore the context and sting of the statement as published. Mary did not know about the affair *until after it ended*.[39] Courts assess defamation by how an average reader would interpret the statement in its context. Here, the context was a public discussion about Lyell's allegations of non-consensual sexual abuse by Sills. By July 2022, it was widely understood – not least because SBC leadership had issued statements – that Lyell was claiming she had been sexually abused and that earlier characterizations of a "consensual" relationship were inaccurate. In that setting, Geiger's tweet presented itself as supporting Lyell's claims: he literally said the correspondence from Mary "reinforced all [Lyell] had shared with me," including evidence that Mary knew.[40] In other words, readers would take away that Mary knew about the sexual encounters (abuse) and was correspondingly involved.

Accusing someone of knowing about ongoing sexual abuse and doing nothing, or worse, covering it up, is inherently defamatory. It paints Mary as morally bankrupt and complicit in egregious misconduct. That fits squarely within defamation per se. The Tennessee Supreme Court has recognized that even technically true statements can be defamatory if they omit context and create false implications. *See Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978).

---

[37] MSJ at 12-13.
[38] MSJ at 13.
[39] Ex. 17, M. Sills. Dep. at 53:14-16 (Mary learned of affair in August 2016); Ex. 18, D. Sills. Dep. at 338:14-339:9 (David Sills and Lyell's relationship ended in 2014 or 2015).
[40] Ex. 12, LYELL_00176244, Exhibit 13 to Barber Dep.

Here, Geiger's tweet lacked critical context. It did not clarify that Mary only learned of the affair after it ended or that she believed it was consensual. The tweet's timing and placement suggested Mary knew of abuse while it was ongoing and condoned it. That implication is false and damaging. Defendants claim the statement merely acknowledged Mary's eventual knowledge of the affair, but in the context of an abuse narrative, it conveys a far more sinister meaning. Courts look to how an average reader would understand the statement, not how a defendant spins it in hindsight. A reasonable reader would infer Mary had knowledge of abuse, not just an affair, and said nothing. That implication is false and actionable. At a minimum, it is a question for the jury.

Tennessee courts have held that defamation by implication or innuendo is actionable, and that literal truth of the words is not a defense if the overall impression is false. *See Nichols*, 569 S.W.2d at 420 (publication omitting key fact created a defamatory implication of adultery, making it actionable despite literal truth of published facts). Here, Defendants' focus on a narrow literal truth, that Mary did eventually "know" about the encounters by 2016, fails to negate the larger false implication: that Mary knew in a timely way and enabled the wrongdoing. When Mary learned of her husband's inappropriate relationship with Lyell in 2016, she understood it as a consensual affair (albeit an immoral lapse), not a non-consensual "abuse."[41] She did not know of any "abuse" because, to her knowledge, none was occurring. David Sills admitted the affair and repented to his wife.[42] Furthermore, once the issue came to light at the Seminary in 2018, Mary did not try to keep it secret; on the contrary, the matter became known to church and seminary leadership and David Sills resigned.[43] There is zero evidence Mary conspired to cover up a crime

---

[41] Ex. 17, M. Sills. Dep. at 53:8-13 ("[David] would never do anything with someone that was nonconsensual.").

[42] Ex. 17, M. Sills. Dep. at 54:20-55:5.

[43] Ex. 17, M. Sills. Dep. at 46: 3-47:2 (resignation from Seminary); 79:21-80:4 (Pastor announced David Sills' affair to congregation).

or pressured Lyell to stay silent. Thus, the innuendo that "Mary knew and did nothing (or worse)" is provably false in substance.

Defendants admit Mary interprets the tweet as accusing her of enabling abuse but argue the Court is not bound by her reading. [44] While true, the Court must consider whether an ordinary reader could reasonably understand th0"e statement that way. See *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 51 (Tenn. Ct. App. 2013) (the question is how persons of common and reasonable understanding would perceive the statement). A reasonable person reading Geiger's tweet, which was amplified by Barber, could infer that Mary knew of and facilitated her husband's alleged abuse. At a minimum, this is a factual dispute for the jury. See *Aegis Scis. Corp. v. Zelenik*, 2013 Tenn. App. LEXIS 30, *18 (whether a statement was understood as defamatory is generally a question for the trier of fact). That Defendants suggest a benign interpretation ("she just found out about the affair") doesn't resolve the issue, especially when their own context suggests the opposite. The tweet was part of a campaign to discredit David Sills and anyone perceived as supporting him. Mary became collateral damage, falsely portrayed as complicit.

## B.      Mary's Other Claims Survive and Should Proceed to Trial.

In addition to defamation, Mary has asserted causes of action for intentional infliction of emotional distress (IIED), civil conspiracy, and negligence/gross negligence (including wantonness) against these Defendants. These claims are grounded in the same overall course of conduct, Defendants' campaign of spreading false allegations, but involve distinct legal elements and serve to ensure full redress for the Sills' injuries. Defendants' motion appears to seek dismissal of all Mary's claims, yet their motion focuses almost entirely on defamation and a § 230 defense. Mary's other claims are not defeated by those arguments.

---

### 1.    Intentional Infliction of Emotional Distress

To prove IIED under Tennessee law, a plaintiff must show that the defendant's conduct was (1) intentional or reckless, (2) so extreme and outrageous as to be beyond the pale of civilized society, and (3) caused severe emotional distress. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). The bar for "outrageousness" is high, but this case meets it. Consider the scenario: Mary was a private figure who had already endured the turmoil of her husband's inappropriate relationship coming to light privately. Then, years later, powerful figures in the nation's largest Protestant denomination decide to single her out publicly, branding her as complicit in sexual abuse, without even taking the minimal due diligence of interviewing her or her husband a single time, as part of a public relations narrative.[45] They name her (or cause her to be named) in tweets, reports, and interviews as someone who knew about a sex crime and threatened the victim. This sort of public shaming and false accusation would foreseeably cause intense emotional distress to anyone, let alone a woman whose life had been devoted to Christian ministry. Mary has suffered severe distress: she has been ostracized and vilified in her community, required psychological counseling, and lived under the shadow of these defamatory accusations.[46] A jury could readily find that Defendants' conduct was "extreme and outrageous." It was a blatant abuse of their platform and power to falsely portray Mary as an accomplice to abuse, which any reasonable person would find utterly intolerable and atrocious.

Defendants acted with a knowing or reckless disregard for the truth and recklessly disregarded Mary's emotional well-being when they published these statements. In fact, one could infer actual intent to inflict distress: by threatening Mary's reputation and accusing her of heinous

---

[45]Ex. 18, D. Sills Dep. at 158:12-20.
[46] Ex. 17, M. Sills Dep. at 83:3-85:2.

behavior, Defendants could have anticipated that she would be punished in the court of public opinion. In their view, perhaps, she deserved to be castigated for standing by her husband. If so, that is a quintessential IIED scenario, where a defendant intends to subject the plaintiff to public humiliation and mental anguish through outrageous lies.

It is important to stress that IIED is a separate tort from defamation. Even if the statements about Mary aren't technically defamatory (which they are), she can still prevail if Defendants' conduct was outrageous and caused severe harm. Section 230 doesn't bar claims based on a defendant's own wrongful acts. Mary's claim focuses not just on the statements, but on the malicious campaign behind them. Barber's actions weren't merely publishing—they were part of a willful effort to deepen ███████████████████████████████████████████ ███████████████████████████████████████.[47] For example, ██████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████.[48] Such distress goes beyond what was considered in *Holmok*, where the conduct lacked sufficient extremity. Here, the accumulation of Barber's online campaign, alongside his role as both a developer of narrative and a solicitor of public support for Lyell's version of events, as defined in *Banaian*, meets the 'outrageous' standard under Tennessee law. Likewise, the

---

[47] Ex. 7, LYELL_00357668 at 69-70; Ex. 8, Geiger Dep. at 237:2-240:7; Ex. 9, LYELL00344973; Ex. 10, LYELL_00344960; *Out of Darkness*, Citygate Films (2022), https://tinyurl.com/3ru2rebu.
[48] Ex. 19, EC_0011516 ("████████████████████████████████████████ ████████████████████"); Ex. 15, LYELL_00348617 ("████ ██████████████████████████████████████████████"); Ex. 20, LYELL_00349570 (████████████████████████████████ ████████████████); Ex. 21, LYELL_00176297 (██████████████ ████████████████); Ex. 22, LYELL_00175855 (███████████ ██████████████████████████████████████.")

ECSBC and other leaders' actions in ████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████.[49]

Tennessee courts have allowed IIED claims to go forward in cases of severe harassment, deliberate public humiliation, or false accusations outside the employment context. *E.g., Miller v. Willbanks*, 8 S.W.3d 607, 615–16 (Tenn. 1999) (noting false diagnoses or accusations could be IIED if extreme). The conspiracy to defame and scapegoat Mary Sills is extreme by any measure. At minimum, whether Defendants' conduct was "outrageous" is a fact question particularly ill-suited for summary judgment. *See Weaver v. Pardue*, No. M2010-00124-COA-R3-CV, 2010 Tenn. App. LEXIS 672, at *19 (Ct. App. Oct. 28, 2010) (whether conduct is outrageous is for jury if reasonable minds could differ). Given the evidence here, reasonable minds could certainly find outrage.

### 2. Civil Conspiracy

Under Tennessee law, a civil conspiracy is "a combination of two or more persons who, each having the intent to accomplish an unlawful purpose or a lawful purpose by unlawful means, do an overt act in furtherance of the conspiracy, resulting in damage to the plaintiff." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002). Mary alleges that Defendants conspired to defame and otherwise injure the Sills as part of the above-described strategy.

---

[49] Ex. 23, LYELL_00348701 (████████████████████████████████████
████████████████████████); Ex. 24, LYELL_00176204 (████████████████████
██████████████████████████); Willie McLaurin and Rolland Slade, *A Statement on the release of a list of alleged abusers*, SBC.net (May 26, 2022), https://www.sbc.net/on-the-release-of-a-list-of-alleged-abusers/; "List of Abusers" (which accompanied McLaurin and Slade's joint statement), *available at* https://sbcec.s3.amazonaws.com/FINAL+-+List+of+Alleged+Abusers+-+SBC+REDACTED.pdf; Ex. 25, GPSILLS_004175 (the Guidepost Report); Ex. 26, GPSILLS_008161 (Appendices to the Guidepost Report);

Importantly, the conspiracy claim is not defeated simply because one underlying tort might fail against a particular defendant. The conspiracy creates joint and several liability for all acts done by any conspirator in furtherance of the scheme. *Brown v. Birman Managed Care, Inc.*, Appeal No. M1999-02551-COA-R3-CV, 2000 Tenn. App. LEXIS 66, at *7-9 (Ct. App. Feb. 1, 2000) (quoting 16 Am. Jur. 2d, *Conspiracy* § 58). Thus, even if, hypothetically, the Court found that Barber individually is immune from defamation due to § 230, he could still be liable for conspiracy if he agreed with others to propagate the defamatory accusations, and one of the co-conspirators (like Lyell) committed defamation or IIED or another tortious act in furtherance of that agreement.

The evidence supports the finding of such an agreement and concert of action. Each Defendant took steps that harmonized:



.[50] The tight chronology and the alignment of messaging are compelling

---

[50] For example: Ex. 37, LYELL_00192330 (transcript of interview with Ron Henzel and Don Veinot); LYELL_00175855 (███████████████████████████████████████████████ .”); Ex. 25, GPSILLS_004175 (the Guidepost Report); Ex. 26, GPSILLS_008161 (Appendices to the Guidepost Report); Willie McLaurin and Rolland Slade, *A Statement on the release of a list of alleged abusers*, SBC.net (May 26, 2022), https://www.sbc.net/on-the-release-of-a-list-of-alleged-abusers/; “List of Abusers” (which accompanied McLaurin and Slade’s joint statement), *available at*

circumstantial evidence of a common plan rather than independent decisions. Further, certain Defendants met or corresponded behind the scenes about how to handle the Sills matter and the broader abuse investigation. For example, ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████.[51] It is reasonable to infer that Mary's reputation was knowingly sacrificed in the process – effectively, that these actors agreed to cast Mary as an enabler to bolster the credibility of Lyell's abuse claim and show SBC's new leadership taking a hard line on anyone complicit. That is an unlawful means (defamation/IIED) to achieve perhaps a lawful goal (improving SBC's image or addressing abuse).

Therefore, Mary's civil conspiracy claim should proceed as long as any underlying tort is viable. Dismissing the conspiracy claim at summary judgment would be improper, as the existence of a conspiracy is a question of fact. *See Pittman v. Cuyahoga Valley Career Ctr.*, 451 F. Supp. 2d 905, 927 (N.D. Ohio 2006) (civil conspiracy factual issues are for jury).

## C. Negligence / Gross Negligence / Wantonness

Defendants owed a duty to exercise reasonable care in their handling of the situation and breached that duty, proximately causing harm to Mary. Even if one put aside any intentional malice, the record screams negligence. For example, SBC entities had a duty not to disseminate

---

https://sbcec.s3.amazonaws.com/FINAL+-+List+of+Alleged+Abusers+-+SBC+REDACTED.pdf; Ex. 29, GPSILLS_007953 (███████████████████████ ); Ex. 30, GPSILLS_031013 (██████████████████ ); Ex. 31, LYELL_00041508 (████████████████████████████████ ); Ex. 32, LYELL_00033568 (████████████████████████████████████ ); LYELL_00360043 (████████████████████████████ ); Ex. 33, EC_0011353 (the Tennessean article reporting the ECSBC's public apology to Lyell); Ex. 34, EC_0010716 (ECSBC's apology); Ex. 27, Sills_001276 ("I really need to see you somehow"); Ex. 28, Sills_017301 ("I miss you. It's making me grumpy."). Numerous other examples exist but are omitted herein due to page restraints.

[51] Ex. 35, LYELL_00360043 (████████████████████████████████ )

false information that would foreseeably harm innocent third parties. The ECSBC had a duty of care when making public statements (such as the Feb. 2022 statement) to avoid unjustly damaging persons like Mary.[52] Instead, they acted at least recklessly in how they flipped the narrative and let Mary become collateral damage. Gross negligence in Tennessee is essentially a conscious neglect of duty or utter disregard for others' rights. *Leatherwood v. Wadley*, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003). A jury could find that here Barber's conduct in posting a grave allegation about Mary without a second thought was a gross deviation from how a reasonable person would act, given the high risk of harm to Mary's reputation and mental health.

To illustrate: any reasonable church leader in Barber's shoes would have realized that posting a bombastic claim about someone's wife being complicit in abuse could ruin that person's life. The prudent course would be to verify or refrain. Barber did the opposite. Barber knew or should have known that Guidepost ███████████████████████████████████

██████████████████████████,[53] and he had access to █████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████.[54] Similarly, a reasonable organization (like the ECSBC or SBC) would have, upon hearing that one of their agents wanted to accuse a minister's wife of wrongdoing, consulted legal or factual sources before allowing that claim to be broadcast under the SBC banner.

Mary's additional claims are supported by the evidence and provide alternative pathways

---

[52] Brandon Porter, *SBC Executive Committee approves resolution with sexual abuse survivor*, Baptist Press (Feb. 22, 2022), https://www.baptistpress.com/resource-library/news/sbc-executive-committee-approves-resolution-with-sexual-abuse-survivor/.

[53] Ex. 6; *see also* Guidepost's Mem. of Law in Support of Mot. to Dismiss, Dkt. No. 78 at 21.

[54] Ex. 36, GPSILLS_014235 (██████████████████████████████████████████████

████████████████████████████████████████████.").

to relief. They are not automatically mooted if the defamation claim fails (it should not). For instance, if the Court found that the statements about Mary were not "of and concerning" her enough to be defamatory, Mary could still argue that the very act of discussing the Sills' case in a way that implicated her was negligent or outrageous. If § 230 shielded Barber from defamation, it doesn't shield him from an IIED claim based on his conduct in endorsing an allegation he suspected might be false – the law on that interplay is not settled, and Mary would contend that his role as a high-profile amplifier transcended mere "user" activity and became his own tortious conduct. Regardless, at this stage, because the evidence shows genuine issues of fact regarding Defendants' wrongful conduct and Mary's resultant injuries, none of these claims should be cut off before trial.

Finally, Tennessee law allows a plaintiff to plead and pursue multiple theories; she need not elect a single remedy now. If the jury finds for Mary on defamation, it may or may not also find for her on IIED or conspiracy (depending on how they view intent, outrageousness, etc.), but that is for the jury. Dismissing those counts now would unfairly limit Mary's potential recovery and ignore the multifaceted wrongs she suffered.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff Mary Sills respectfully requests that the Court deny Defendants' motion for summary judgment.


Dated: July 11, 2025                              Respectfully submitted,


By: /s/ *Katherine B. Riley*
Katherine Barrett Riley (TN BPR#021155)
John W. ("Don") Barrett (admitted *pro hac vice*)
Sterling Aldridge (admitted *pro hac vice*)
BARRETT LAW GROUP, P.A.

P.O. Box 927
404 Court Square North
Lexington, MS 39095
Ph: (662) 834-2488
Fax: (662) 834-2628
kbriley@barrettlawgroup.com
dbarrett@barrettlawgroup.com
saldridge@barrettlawgroup.com

/s/ *Shannon M. McNulty*
Shannon M. McNulty (admitted *pro hac vice*)
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, 36th Floor
Chicago, Illinois 60602
(312) 899-9090
(312) 251-1160 Facsimile
SMM@cliffordlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Katherine B. Riley, hereby certify that on July 11, 2025, I served the above and foregoing on all counsel of record via the Court's CM/ECF filing system.

/s/ *Katherine B. Riley*
Katherine B. Riley