THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MICHAEL DAVID SILLS<br>and MARY SILLS, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CASE NO. 3:23-cv-00478** |
| v. | ) | |
| | ) | **JUDGE WILLIAM L. CAMPBELL, JR.** |
| | ) | **Magistrate Judge Frensley** |
| SOUTHERN BAPTIST CONVENTION, | ) | |
| *et al.* | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE EXECUTIVE COMMITTEE OF
THE SOUTHERN BAPTIST CONVENTION's MOTION FOR
SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF DAVID SILLS**

The Executive Committee of the Southern Baptist Convention ("ECSBC") respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment With Respect to Plaintiff David Sills.

## INTRODUCTION

A tenet of Baptist faith is that adultery is a sin. Only in late 2024, did David Sills publicly admit in this proceeding that for more than a decade he engaged in sexual acts with a former student of the Southern Baptist Theological Seminary ("SBTS"), including oral sex in his family home. Though Sills testified, "I don't remember any dates or exactly what happened when, but there would have been some interaction during those years," Sills admits the sexual acts began in 2004.

1

What is undisputed is that Sills intentionally kept this extramarital sexual conduct a secret. Sills did not tell his wife about the "inappropriate" relationship until 2016. Sills admitted that he kept his sin of ongoing adultery secret from his employer, the SBTS, as well as the publisher of his Christian books and the various boards of Christian and Baptist organizations on which he served. Fully knowing that if revealed, his sexual conduct would (and once it was revealed in fact did) end his ministry and career, Sills stayed silent to protect his stature in the Southern Baptist community for personal and monetary gain.[1]

Here, Sills claim is that he was defamed by the accusation that the relationship with the late Jennifer Lyell ("Lyell") was abusive and not consensual. But even if his version of the "truth" about Jennifer Lyell —that the relationship was consensual—is to be believed, Sills has not and cannot demonstrate damages attributable to the accusation that it was abusive. Sills' claimed damages to his reputation, his career, and his book deals, are all closely and inextricably tied to the Southern Baptist community where the adulterous relationship itself disqualified him from employment in that community.

Against this undisputed factual backdrop, the ECSBC challenges the legal and factual basis for the claims asserted by Sills. First, public statements accusing Sills of acts of sexual abuse date back to March 2019. As such, his alleged reputational and vocational damages long pre-date any alleged conduct by the ECSBC, which must have occurred after May 11, 2022 to be actionable under Tennessee's applicable one year statute of limitations. Tenn. Code Ann. § 28-3-104(a)(1). Ignoring this, Sills and his experts made no effort to differentiate or establish damages from statements made within the one-year limitations period. Second, Sills has produced no evidence that the ECSBC acted with either actual malice or negligence within the limitations period. The

---

[1] In fact, Sills admitted that this was not the first, but one of several women with whom he had extramarital sexual encounters. [Doc. 211-1].

2

evidence is undisputed that Sills remained silent for years in the face of Lyell's accusations, and further that the ECSBC appropriately relied upon Guidepost in issuing a Report which Sills claims defamed him. Third, Sills' emotional distress claims fails because he has presented no evidence that he has suffered new and extreme emotional harm since May of 2022. Lastly, the claim of conspiracy fails because the ECSBC cannot conspire with itself and further, there is no evidence within the statutory period of a common design to engage in an unlawful purpose with a third party. For these reasons the ECSBC respectfully asks the Court to grant its motion for summary judgment on the claims asserted by Sills.

## STATEMENT OF FACTS

**A.      The 2018 Disclosure by Lyell and the Seminary Meeting With Sills**

In May 2018, Jennifer Lyell ("Lyell") disclosed to her employer, Lifeway Christian Resources, and David Sills' employer, the SBTS, that she had an abusive, sexual relationship with Sills which began when she was a student and Sills was a professor. [Doc. 1 at p.10; Ex. B, Depo. E. Geiger 52:7-53:5]. As a result, SBTS President, Dr. Al Mohler, arranged an in-person meeting with David Sills. [Ex. A, Depo. D. Sills 65:5-68:22].

During this meeting in May of 2018, Sills admits he was confronted with Lyell's allegations of a non-consensual sexual relationship. [*Id*. at 68:23-70:7, 71:15-23, 77:22-78:4]. Sills admitted to Dr. Mohler that "in all the years that we have known [Lyell], there may have been something inappropriate" which according to Sills meant "things would have happened that I wouldn't want to happen on the platform of the chapel. . . ." [*Id*. at 70:8-71:6]. In that meeting Sills did not admit that for many years he had oral sex with Lyell in the Sills' family home. [*Id*. at 306:21-307:18, 71:24-72:4].

Sills was presented with two options: the SBTS would perform a third-party investigation, or he could resign. [*Id*. at 69:18-23]. Sills chose to resign. [*Id*. at 74:14-75:1]. Sills claims he chose to resign because SBTS and the Christian ministry is a "zero-tolerance world" and an extramarital affair alone would result in his termination. [Doc. 1 at pp.4-5; Ex. A, Depo. D. Sills 51:5-12, 72:13-73:8]. In addition to his employment at SBTS, Sills shortly thereafter resigned from all other boards on which he was serving, including Reaching and Teaching Ministries. [*Id*. at 52:19-22, 54:24-25]. Sills' Christian book publisher(s) also terminated his contracts. [*Id*. at 103:13-104:5].

**B.      From 2019 to 2022 Sills Stands Silent in the Face of Public Allegations that He Sexually Abused Lyell.**

In early March 2019, Lyell approached the Baptist Press (the "BP")[2] about publishing an article concerning her abuse by Sills. She provided a first-person piece titled "My Story of Sexual Abuse in the SBC." [Ex. C, Depo. D. Roach 96:3-17]. The article was assigned to reporter Dr. David Roach. [*Id*. at 134:11-136:10].

As part of the research for and drafting of the story, Dr. Roach spoke with several individuals. In addition to Lyell, Dr. Roach spoke with Eric Geiger; Dr. Mohler; Bill Cook, the pastor Ninth & O Baptist Church in Louisville where both Lyell and the Sills attended church; and two others at Reaching and Teaching Ministries, which Sills had founded. [*Id*. at 25:17-26:5, 43:5-44:21, 45:45-46:3, 47:2-9, 59:12-61:24]. Lyell also provided Dr. Roach with phone records showing she had attempted to contact the Louisville Metro Police's Special Victims Unit with respect to her allegations. [*Id*. at 72:20-73:14].

---

[2]      The BP is the official news service of the Southern Baptist Convention and is staffed by ECSB employees.

Roach also called Sills and left at least one voicemail. [*Id*. at 183:17-184:1]. The voicemail was received and saved by Sills who testified that he chose not to respond. [Ex. A, Depo. D. Sills 86:7-87:8]. Sills claims that he did not call Roach back because the voicemail stated Lyell was reporting an inappropriate relationship, which according to Sills was accurate. [*Id*. at 87:9-22, 372:11-373:2].

Based upon his work, Roach drafted an article which relayed that Lyell had come forward with allegations of sexual abuse by Sills. [Ex. C, Depo. D. Roach at ex.6]. Despite this, the language of the article was editorially changed to remove the allegations of sexual abuse and instead describe a "morally inappropriate relationship." [*Id*. at ex.8]. Within days, Lyell created a website, https://www.lyellstatementonabuse.com, where she published her allegations of sexual abuse by Sills. Her first post, titled "My Story of Sexual Abuse & Initial Response in the SBC" was published on March 8, 2019. [Ex. D, App'x D to Jansen Rpt. at p.15]. The post made clear allegations that Sills had sexually abused her. [*Id*.].

In response, news organizations ran stories about the allegations on Lyell's website. On March 12, 2019, the Courier Journal ran a story titled "Southern Baptist professor accused of sexually abusing student 'by design' over a decade". [Ex. E, Courier Journal Article].[3] The article

---

[3]     https://www.courier-journal.com/story/news/religion/2019/03/12/louisville-southern-baptist-seminary-professor-accused-sex-abuse/3130024002/. It has been long recognized that courts can take judicial notice of items such as newspaper articles, magazines, books, and websites, not for their truth, but for the fact of their existence, date, and contents and to show what was in the public realm at the time. *See, e.g.*, *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (affirming judicial notice of newspaper articles to show "what was in the public realm at the time, not whether the contents of those articles were in fact true"); *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 662 n.10 (6th Cir. 2005) ("We take judicial notice of the fact that the media articles cited above were published, without reaching any conclusions about their truth."); *Breeden Media LLC v. Daily Wire, LLC*, No. 3:24-cv-00723, 2024 WL 5239886, at *3 (M.D. Tenn. Dec. 27, 2024) ("Courts, however, may judicially notice facts not subject to reasonable dispute, including contents of a website."); *Roane County, Tennessee v. Jacobs Engineering Group, Inc.*, No.: 3:19-cv-206-TAV-HBG, 2020 WL 2025613, at *4 (E.D. Tenn. Apr. 27, 2020) ("Generally, news reports and similar source cannot be judicially notice for the truth of their contents. But such sources can be judicially noticed for facts such that a fact was printed . . . .") (citation omitted); *United States v. Davis,* No. 3:06–cr–020, 2012 WL 1313498, at *6 n.

5

described Sills as a "prominent author and professor" and further noted that he "did not respond to a request for comment, while Dr. Mohler said he supported Lyell's decision to go public as a 'brave and right thing to do.'" [*Id.*] The same article was published by The Tennessean on the same day, March 12, 2019:



https://www.tennessean.com/story/news/religion/2019/03/12/louisville-southern-baptist-seminary-professor-accused-sex-abuse/3130024002/

**Southern Baptist professor accused of sexually abusing student 'by design' over a decade**

Andrew Wolfson
Courier Journal

Pouring more fire on allegations of sex abuse in Southern Baptist circles, a former student at Louisville's Southern Baptist Theological Seminary says she was groomed and abused by a professor for more than a decade.

When prominent author and professor David Sills resigned last May from the seminary, President R. Albert Mohler Jr. issued a vague statement saying it was committed to the "highest standards of policy and procedure" but couldn't elaborate because Sills' departure was a personnel matter.

Now the mystery of Sills' exit has been revealed.

In a statement posted on her website, Jennifer Lyell, who is now 41 and works for a major Christian book publisher, said Sills first "sexually acted" against her on a mission trip in 2004 and that the relationship continued until she was 38.



She said she was a 26-year-old Master of Divinity student when it began.

[Ex. F, Depo. E. Dixon at ex.1]. The Christian Post ran a similar article on March 12, 2019, titled "Ex-SBTS prof. accused of 'grooming' former student in decade-long abusive relationship." [Ex. G, Christian Post Article].[4] On March 9, 2019, SBC Voices published an article titled "Lyell

---

4 (M.D. Pa. Apr. 17, 2012) ("The Court . . . takes judicial notice of the full and accurate date of publication (June 5, 2010) from the Scranton–Times–Tribune as a fact 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'") (quoting Fed. R. Evid. 201). Thus, the Court can properly take judicial notice of the existence, date, and contents of these articles and websites for purposes of showing what was in the public realm.

4     https://www.christianpost.com/news/ex-sbts-prof-accused-of-grooming-former-student-in-decade-long-abusive-relationship.html.

Statement on Sexual Abuse Released, Details Circumstances of SBTS Professor Resignation" based upon the allegations posted on her website. [Ex. H, SBC Voices Article].[5] On March 11, 2019, Baptist News Global published an article titled "Woman in SBC leadership post says #MeToo." [Ex. I, Baptist News Global Article].[6]

In March 2021, Religion News Service published an article titled "Jennifer Lyell wanted to stop her abuser by telling her story. Instead, her life fell apart." [Ex. J, RNS Article]. At that same time, this article was carried by other sites, such as Ministry Watch. [Ex. K, Ministry Watch Article]. [7]

In February 2022, a settlement was reached between the ECSBC and Lyell. In connection with the settlement, Lyell provided to the ECSBC an email written by Mohler on May 23, 2018 which stated that he "would characterize the behavior involved as described in your call as abuse." [Ex. L, 30(b)(6) Depo. J. Howe 124:7-125:20]. On February 22, 2022, the ECSBC released a statement that "Ms. Lyell's allegations of nonconsensual sexual abuse were investigated and unequivocally corroborated by the SBC entities with authority over Ms. Lyell and her abuser." [Ex. D, App'x D to Jansen Rpt. at p.3].

Throughout this three year period, Sills offered no response, refutation, denial, or comment of any kind. Documents produced by Sills show that he had the opportunity to comment, considered doing so, but made no response.

---

[5]     https://sbcvoices.com/lyell-statement-on-sexual-abuse-released-details-circumstances-of-sbts-professor-resignation/.

[6]     https://baptistnews.com/article/woman-in-sbc-leadership-post-says-metoo/.

[7]     https://ministrywatch.com/jennifer-lyell-wanted-to-stop-her-abuser-by-telling-her-story-instead-her-life-fell-apart/.

For example, on March 13, 2019, after Lyell published her allegations on her website, Mary Sills noted that the story had "hit the Courier Journal and USA Today." [Ex. M, 3/13/19 M. Sills Email].[8] Similarly, on March 16, 2021, Bob Smietana texted Sills stating: "I am a reporter for Religion News Service and am working on a story surrounding the abuse case of Jennifer Lyell. Would you have time today to talk with me. We are hoping to run a story tomorrow." [Ex. N, Smietana 3/16/21 Text and Email]. Sills read the text from Mr. Smietana within minutes. [*See id*.]. Yet, Sills admits he choose not to respond. [Ex. O, 7/7/22 Sills Email to Basham]. It is undisputed that Sills made no public declaration or denial before November of 2022. [Ex. U, Depo. R. Fisher 284:12-285:15].

**C.     The May 2022 Release of the Guidepost Report and the list of alleged abusers.**

In 2021, in response to allegations suggesting the ECSBC had ignored complaints of sexual abuse, the Messengers to the SBC Annual Meeting approved a motion authorizing the creation of a Sexual Abuse Task Force (the "Task Force") to engage a third party to conduct an independent investigation. The Task Force retained Guidepost Solutions LLC ("Guidepost"). [Doc. 1-2 at pp.2-11. The scope of Guidepost's engagement included investigating the following: (1) allegations of abuse by Executive Committee members; (2) mishandling of abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021; (3) allegations of mistreatment of sexual abuse victims by Executive Committee members from January 1, 2000, to June 14, 2021; (4) patterns of intimidation of sexual abuse victims or advocates from January 1, 2000, to June 14,

---

[8]     The parties have stipulated to the authenticity of documents they or it produced in the course of discovery. [Ex. X, Depo. J. Austin 163:20-165:20].

2021; and (5) resistance to sexual abuse reform initiatives from January 1, 2000, to June 14, 2021. [*Id*. at p.3].

Guidepost took numerous precautions to ensure the independence and integrity of its investigation, including ensuring the ECSBC had absolutely no insight or input into the investigative process or responsibility for the contents of Guidepost's investigative report (the "Report"). The ECSBC could not "conduct, direct, or otherwise manage or influence [Guidepost's] independent investigation in any manner." [*Id*. at p.4]. The ECSBC had no ability to edit, alter, modify, or otherwise have input into the contents of the Report. [Ex. P, Depo. K. Tongring 228:13-16].

On May 22, 2022, Guidepost's Report was released publicly. [Ex. Q, Guidepost Report]. The Report contained a discussion of the relationship between Lyell and Sills and the ECSBC's handling of her disclosure to Baptist Press. According to Guidepost, this was included in the Report in connection with the second and third prongs of the scope of the engagement: mishandling of abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021 and allegations of mistreatment of sexual abuse victims by Executive Committee members from January 1, 2000, to June 14, 2021. [Ex. P, Depo. K. Tongring 96:10-19].

The Report also mentioned that an ECSBC staff member had been maintaining a list of ministers accused of sexual abuse, including the minister's name, year reported, relevant news articles, state, and denomination. [Ex. Q, Guidepost Rpt. at pp.4-5]. According to the Report, the most recent version of the list contained the names of 703 individuals, with 409 believed to have been in SBC-cooperating churches at some point in time. [*Id*. at p.5].

The ECSBC employee compiled the list over the years from information that was "largely pulled from news articles compiled from 2007 until 2022." [Ex. R, List at p.1]. This would involve

periodic Google searches for news articles regarding church sexual abuse which would then be added to the spreadsheet. [Ex. F, Depo. E. Dixon 47:2-15, 103:10-15]. The March 2019 Tennessean article about Sills was added after a Google search, [*Id.* at 23:2-19, 37:16-38:7, 46:21-47:15, 51:18-24, 52:10-19].

The list consists of 205 total pages containing over 700 entries. The entry with respect to Sills appears on page 169:



| Sills | David Sills | 2019 | ████████████████ | | KY | SBC |
|---|---|---|---|---|---|---|
| | | | **David Sills,** former professor of missions and cultural anthropology, Southern Baptist Theological Seminary, fired for sexually abusing ████ from 2004-2016. The abuse began when she was a 26-year-old Master of Divinity student.<br><br>CHURCH POSITION: professor, Southern Baptist Theological Seminary<br>CHURCH POSITION: Ninth & O Baptist, Louisville, KY – No longer a member there.<br><br>Source: *Baptist Press* | | | |

After the publication of the Guidepost Report, the ECSBC decided to publicly release the list on May 26, 2022.

**D.    Sills and His Experts Admit His Reputation Was Harmed Before May 2022.**

Both Sills and his experts admit that his reputation and employability were harmed by the public allegations of sexual abuse long before May 2022. In October of 2021, Sills himself acknowledged that the "truth" of the allegations made against him had ended his ministry and career, and further that the accusations made as of October 2021 "prevented me from finding a job of any kind since then." [Ex. S, 10/3/21 Text].

His experts agree. Erin Bailey, Sills' vocational expert, conceded: (1) once public allegations of sexual abuse are made, there is a permanent stigma associated with those that affects employability; (2) public allegations of sexual abuse made against Sills beginning in March 2019 negatively impacted his employability; and (3) following his resignation from SBTS up to May of

10

2022, Sills was unable to find employment and was denied dozens of jobs due to the public sexual abuse allegations against him. [Ex. T, Depo. E. Bailey 50:23-51:20, 57:22-60:16, 81:12-82:9].

Robert Fisher, a purported public relations and reputational repair expert, similarly agreed that public allegations of sexual abuse against Sills began in 2019. [Ex. U, Depo. R. Fisher 40:14-42:8]. Mr. Fisher testified that there was no way to decipher or determine the reputational harm that occurred after the May 2022 Guidepost Report versus before. According to him, when the reputational harm occurred is not germane:

> Q. [W]hen you're speaking of a reputational repair program, there would be no way within that program, or at least your don't, or there's no way to differentiate between reputational harm occurring to Dr. Sills, for example, prior to 2022 versus after; is that correct?
>
> A. There would be no need to. You know, the train has left the station, the horse is out of the barn. You know—the ship has left. You know the bottom line at that point in time that you do a program, it wouldn't matter timetable or whether the Baptist article was more hurtful than a report or whether the tweet by—by Barber was worse than the email by Lyell. At that point you're dealing—you know, as I say, it—it doesn't matter. You're dealing with reputational harm already exists and it doesn't matter where it came from so much. You have to deal with the program, you know, and—which is a reputation harm. So who caused it, when they caused it, at that point, is not germane.

[*Id.* at 42:13-43:7 (emphasis added)].

It is, most significantly, this lack of evidence of new, actual harm that defeats Sills' claims as a matter of law and entitles the ESCBC to summary judgment.

## ARGUMENT

## I. CLAIMS PREDICATED ON STATEMENTS MADE AND/OR CONDUCT OCCURRING PRIOR TO MAY 11, 2022 ARE BARRED BY THE ONE-YEAR STATUTE OF LIMITATIONS.

11

Under Tennessee law, actions for libel and personal injury, including negligence and intentional infliction of emotional distress, are subject to a one-year statute of limitations. *See* Tenn. Code Ann. § 28-3-104(a)(1); *Johnson for Estate of Johnson v. Fitz*, No. 2:24-cv-02722-TLP-tmp, 2025 WL 1659245, at *2 (W.D. Tenn. June 10, 2025) (negligence subject to a one-year limitations period under Tennessee law); *Jackson v. Falcon Transport Co.*, No. 3:08–0771, 2011 WL 1627319, at *3 (M.D. Tenn. Apr. 29, 2011) ("The statute of limitations in Tennessee for invasion of privacy, false imprisonment, personal injury and libel are expressly subject to the one-year Tennessee statute of limitations."); *Leach v. Taylor*, 124 S.W.3d 87, 91 (Tenn. 2004) ("[I]ntentional infliction of emotional distress is a personal injury tort, governed by the general one-year statute of limitations."). As noted above, Sills was publicly accused of having sexually abused Lyell as early as March 2019. However, Sills did not file his Complaint here until May 11, 2023, making any statements / actions occurring prior to May 11, 2022, outside of the one-year limitations period. The Court has already found May 11, 2022 to be the operative date in the context of Lyell's motion to dismiss. [*See* Doc. 134 at pp.21-22 ("[T]o the extent the Sills assert a defamation claim against Lyell for statements made prior to May 11, 2022 about Mrs. Sills, that claim will be dismissed as time-barred.")].

Sills cannot stretch the limitations period by relying on the prior action he filed in Alabama state court on November 21, 2022. While Tennessee has a savings statute, it only applies when the first action was commenced in Tennessee. *See Graham v. Ferguson*, 593 F.2d 764, 766 (6th Cir. 1979) (per curiam) ("[W]e decline to extend the exception to the statute of limitations provided in T.C.A. § 28-106 to actions filed outside the state of Tennessee."); *Sigler v. Youngblood Truck Lines, Inc.,* 149 F. Supp. 61, 66-67 (E.D. Tenn. 1957) (savings statute only applies when first

action is commenced in Tennessee). Sills' Alabama action thus does not trigger the savings statute.

Nor can Sills rely upon a continuing tort theory because Tennessee does not recognize the tort in defamation actions. *See Clark v. Viacom Intern. Inc.*, 617 Fed. Appx. 495, 501 (6th Cir. 2015) (unpublished) ("We conclude that the Tennessee Supreme Court would not diverge from the majority trend and adopt the 'continuing tort' theory in the defamation context."); *Rose v. Cookeville Regional Medical Center*, No. M2007-02368-COA-R3-CV, 2008 WL 2078056, at *5 (Tenn. Ct. App. May 14, 2008) ("Tennessee courts have never recognized a 'continuing defamation.'"). Accordingly, claims and damages based upon any statements / actions prior to May 11, 2022 are time barred.

## II. SILLS' DEFAMATION CLAIM IN COUNT I OF THE COMPLAINT FAILS AS A MATTER OF LAW.

"'To establish a *prima facie* case of defamation in Tennessee, the plaintiff must establish that: 1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.'" *Finley v. Kelly*, 384 F. Supp. 3d 898, 906 (M.D. Tenn. 2019) (quoting *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571-72 (Tenn. 1999). "In addition, a plaintiff must prove actual reputation damages from the defamation; damages cannot be presumed." *Doe v. Andrews*, 275 F. Supp. 3d 880, 890 (M.D. Tenn. 2017); *see also Davis v. The Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001) ("Damages from false or inaccurate statements cannot be presumed; actual damage must be sustained and proved.").[9]

---

[9] Tennessee has eliminated the distinction between defamation per se, where damages were presumed, and defamation per quod, where damages must be proven. *Hunt v. Southern Baptist Convention*, No. 3:23-cv-00243, 2024 WL 1019276, at *4 (M.D. Tenn. Mar. 8, 2024). As a result, "[u]nder Tennessee

13

Sills cannot establish at least two of these elements as a matter of law. First, Sills cannot

establish any actual damages from the allegedly defamatory statements made within the one-year

limitations period. Second, Sills cannot prove actual malice and even assuming that he is a private

figure, he cannot establish that the ECSBC acted negligently.

**A.** **Sills Cannot Show That Any Statements Made Within the One-Year Limitations Period Caused Him Reputational Harm and Actual Damages.**

With respect to damages, "'[i]t is reputation which is defamed, reputation which is injured,

and reputation which is protected by the law of defamation.'" *Spicer v. Thompson,* No. M2002–

03110–COA–R3–CV, 2004 WL 1531431, at *5 (Tenn. Ct. App. July 7, 2004) (quoting 50 Am

.Jur.2nd *Libel and Slander* § 2 (1995)); *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*,

876 S.W.2d 818, 820 (Tenn. 1994) ("The basis for an action for defamation, whether it be slander

or libel, is that the defamation has resulted in an injury to the person's character and reputation.").

As a result, "to establish any type of defamation claim, the plaintiff must show that

the defamation resulted in injury to his character and reputation." *Ingram v. Tennessee*

*Department of Health*, No. 3:17-cv-01565, 2018 WL 11586203, at *10 (M.D. Tenn. Feb. 6, 2018).

"'[T]he plaintiff must show that her standing in the community and her public reputation for

character has been injured by the alleged defamatory statement and that as a result she has suffered

real or actual damages due to that loss of standing or reputation.'" *Service Jewelry Repair, Inc. v.*

*Cumulus Broadcasting, LLC*, 145 F. Supp. 3d 737, 749 (M.D. Tenn. 2019) (quoting *McLeay v.*

*Huddleston*, No. M2005–02118–COA–R3–CV, 2006 WL 2855164, at *9 (Tenn. Ct. App. Oct. 6,

2006)); *see also Davis*, 83 S.W.3d at 130 ("[A] plaintiff in a libel action must be able to show that

his or her standing in the community and his public reputation for character has been injured by

---

law, a plaintiff is required to prove actual damages in all defamation cases." *Hibdon v. Grabowski*, 195
S.W.3d 48, 68 (Tenn. Ct. App. 2005).

14

the inaccurate statement and, further, must have suffered real or actual damages due to that loss of standing or reputation.").

It goes without saying that "[t]o suffer injury to one's standing in the community, or damage to one's public reputation, one must possess good standing and reputation for good character to begin with." *Id*. at 130. "[A]ccordingly, courts have long admitted evidence of a plaintiff's tarnished reputation as bearing on the question of defamatory harm." *Benanti v. Satterfield*, No. E2018-01848-COA-R3-CV, 2020 WL 1491374, at *4 (Tenn. Ct. App. Mar. 27, 2020) (internal quotations and citation omitted). This is particularly important here because Sills and his experts all admit his reputation had already been significantly and permanently tarnished by allegations of sexual abuse before May 11, 2022, well outside the one-year statute of limitations.

It is undisputed that an adulterous affair occurred and that it negatively affected Sills' ability to be employed as a Christian teacher, missionary or author as demonstrated by his resignation from the Seminary, the cancellation of his book deals and his resignation from mission boards in 2018. [Ex. A, Depo. D. Sills at 52:19-22; 54:24-25; 103:13-104:5]. Sills acknowledged this in 2021, when he wrote that even the "truth" in what he had done with Lyell had ended his ministry and career. [Ex. S, 10/3/21 Text].

The public allegations of sexual abuse began in 2019. Here, Sills' hired vocational expert conceded that those allegations negatively impacted his employability and were the reason Sills was unable to find employment in the years prior to May 2022. [Ex. T, Depo. E. Bailey 50:23-51:20, 57:22-60:16, 81:12-82:9]. Sills' "reputation repair" expert likewise admits Sills' reputation was harmed by public allegations of abuse starting in March 2019; he further testified that there was no way to distinguish alleged new reputational harm after May 2022. [Ex. U, Depo. R. Fisher 42:13-44:13].

Because Sills' reputation was already harmed by statements or conduct occurring outside the statute of limitations, his burden here was to prove that statements made after May 11, 2022, somehow harmed his reputation over and above that which already existed and further, that this new harm caused actual damages. He has failed in that burden.

This Court has found that conclusory statements of harm to reputation are insufficient to create a triable issue of fact. In *Service Jewelry Repair*, in support of its damages in a defamation claim, a jewelry company submitted a declaration from its CFO stating that "Service Jewelry was portrayed as a dishonest jeweler that resorts to false advertising and unfair attacks on its competitors;" that "reputation for honesty is of primary importance in the jewelry industry;" and that the communications "harmed Service Jewelry's reputation and standing in the community and in the industry" which led " to actual financial damages, including significant costs and expenses in attempting to set the record straight." 145 F. Supp. 3d at 744. This Court noted that the declaration contained no calculation of the jeweler's financial damages, costs, or expenses, nor was there any other evidence in the record concerning reputational harm, such as market research, consumer surveys, or expert testimony on the market impact of the statements. *Id.* The Court granted summary judgment and held the conclusory declaration was insufficient to create a genuine issue with respect to actual damages:

> Service Jewelry has failed to present any material evidence that its reputation was injured or that, as a result, it suffered real or actual damages . . . The Townsend Declaration contains just the sort of "[c]onclusory statements unadorned with supporting facts [that] are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource,* 576 F.3d 551, 560 (6th Cir. 2009). The Townsend Declaration states merely that Service Jewelry was 'harmed,' which 'further led to actual financial damages,' but it does not describe how Service Jewelry's reputation was impaired or to what extent, what the actual financial damages were, how they were calculated, or how those damages were caused by the loss of reputation.

16

*Id*. at 749-50.

Similarly, in *Thompson v. Hayes*, 748 F. Supp. 2d 824 (E.D. Tenn. 2010), the plaintiffs were cabin management companies who alleged defendant sent letters to cabin owners defaming them by claiming they were distributing documents that contained lies which intentionally misled other cabin owners. The plaintiffs sought injunctive relief. The court found plaintiffs' claimed reputational harm to be speculative:

> Plaintiffs submitted no evidence to the Court demonstrating their reputation has been diminished by defendant's actions, and, given the plethora of negative reviews posted online by cabin renters as well as the low rating given to the management companies by the Better Business Bureau, both of which were submitted by defendant, reputational harm is speculative.

*Id*. at 832. Thus, plaintiffs' reputation, which was not great to begin with, was not shown to have been made worse and denial of the relief requested was warranted.

Here, there is simply no admissible evidence establishing to what extent Sills' already tarnished reputation was further impaired by any publication of the sexual abuse allegations after May 11, 2022, or that he suffered resulting damages. Neither Sills nor his experts make any attempt to distinguish or otherwise identify what additional reputational harm and damages, if any, was sustained by publication of the Guidepost Report, the list of alleged abusers, or anything else after May 11, 2022.

Take, for example, Sills' inclusion on page 169 of the 205-page list. The source material for Sills' inclusion in the spreadsheet was the March 12, 2019 story in The Tennessean titled "Southern Baptist professor accused of sexually abusing student 'by design' over a decade," which also included his picture. [Ex. F, Depo. E. Dixon 23:2-19, 37:16-38:7, 46:21-47:15, 51:18-24,

17

52:10-19]. Sills has produced no evidence that after May 11, 2022, anyone scrolled to page 169 of the list, read the entry, and then viewed him negatively, for the first time, as a result.

Like *Service Jewelry Repair* and *Thompson v. Hayes*, Sills can present nothing more than conclusory and speculative assertions that he has been damaged by the post-May 11, 2022 publication of sexual abuse allegations against him, whether it be the Guidepost Report, the list, or anything else. This is insufficient and his defamation claim must be dismissed.

**B.**     **Sills Cannot Show That the ECSBC Acted With the Requisite Level of Fault.**

    **1.**     **Sills cannot show the ECSBC acted with actual malice.**

As the Tennessee Supreme Court observed, "[t]here are three kinds of public figures: general purpose, limited purpose, and involuntary." *Charles v. McQueen*, 693 S.W.3d 262, 274 (Tenn. 2024). When the plaintiff in a defamation case is a public figure, constitutional concerns require the plaintiff to prove that the libelous statement was made with actual malice, *i.e.,* "'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Hudik v. Fox News Network, LLC*, 512 F. Supp. 3d 816, 825 (M.D. Tenn. 2021). Whether one is a public figure in the first instance is a "question of law to be determined by the courts." *Falls v. Sporting News Pub. Co.*, 899 F.2d 1221 (Table), 1990 WL 41001, at *3 (6th Cir. 1990) (citing, *inter alia*, *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1293 n.12 (D.C. Cir. 1980)). The undisputed facts reveal that Sills is a public figure.

First, the controlling consideration is whether Sills is a public figure within the relevant community. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351-52 (1974) (noting that plaintiff had "no general fame and notoriety in the community" and that he was not generally known to "the local population."); *Waldbaum*, 627 F.2d at 1295 n.22 (nationwide fame not required); *Sack on Defamation* § 5:3:9 ("The president of a college student body, for example, might be a

'pervasive' public figure for purposes of commentary by the student newspaper but not for commentary by Time magazine or the 'CBS Evening News.'").

Sills' expert referred to him as an "international lecturer" and "prolific writer." [Ex. U, Depo. R. Fisher 93:4-10, 109:8-16]. News articles described Sills as a "prominent author and professor." [Ex. E, Courier Journal Article]. Sills testified that prior to 2019, he was scheduled 360 days a year and had "an international worldwide ministry." [Ex. A, Depo. D. Sills 142:17-20; 124:21-125:5].

Even before the allegations of sexual abuse became public in 2019, Sills' sudden resignation from the SBTS in 2018 was newsworthy in the evangelical community. [Ex. Y, Biblical Recorder Article]. [10] Sills confirmed there was widespread knowledge of his resignation and the connection to Lyell. When he was contacted by Baptist Press in March of 2019, about the relationship with Lyell, he stated, "I had just resigned from everything in the whole world. Everybody knew that that was the case." [Ex. A, Depo. D. Sills 87:2-22]. Sills also contends that when the BP published an apology to Lyell for mischaracterizing her allegations of sexual abuse as a "morally inappropriate relationship," because of his high profile, everyone in the SBC community instantly knew that he was the unnamed abuser. He testified, "So you may not see my name. There's nobody in the executive -- in the SBC or in evangelicalism at large that would not read that David Sills abused Jennifer Lyell in this statement. Everybody knows who this is talking about." [*Id.* 170:8-12].

By virtue of his high public profile, Sills has thus "invite[d] attention and comment." *Gertz*, 418 U.S. at 345. Even reading the record in the light most favorable to Sills, there is no doubt that he was—and is—a public figure in the evangelical community. It is the very reason

---

[10] https://www.brnow.org/news/David-Sills-resigns-leadership-roles/.

his resignation from the SBTS was newsworthy. Sills testified, within a day or two of resigning from the SBTS, "the rumors were everywhere." [*Id.* 91:18-92:1].

Sills is thus required to prove facts establishing actual malice—*i.e.,* that the challenged statements were made with knowledge of their falsity or reckless disregard for their truth. *See Moore v. Bailey*, 628 S.W.2d 431, 434 (Tenn. Ct. App. 1981) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Moreover, to defeat summary judgment, Sills must point to evidence sufficient to prove actual malice with "clear and convincing clarity." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-257 (1986); *see also Falls*, 1990 WL 41001, at *5 (affirming summary judgment where no evidence existed that defendant "entertained serious doubts about the truth of what he said [and] … [n]o reasonable jury could find clear and convincing evidence of actual malice."). As described above, Sills has presented no evidence that the ECSBC, a non-profit religious organization, was negligent, much less acted with actual malice.

### 2. Even assuming Sills is a private figure, he still cannot prove the ECSBC was negligent.

Even assuming, *arguendo*, Sills is a private figure with respect to the relevant community, he must, at a minimum, establish that the ECSBC was negligent. *See Finley*, 384 F. Supp. 3d at 906. As the Tennessee Supreme Court stated in *Memphis Pub. Co. v. Nichols*:

> In determining the issue of liability, the conduct of the defendant is to be measured against what a reasonably prudent person would, or would not, have done under the same or similar circumstances . . . . In our opinion, the appropriate question to be determined from a preponderance of the evidence is whether the defendant exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it.

569 S.W.2d 412, 418 (Tenn. 1978). Sills cannot prove the ECSBC was negligent with respect to any of the post-May 11, 2022 statements.

With respect to publication or endorsement of the Guidepost Report, Guidepost describes itself as a "global leader in investigations" with hundreds of professionals, including former prosecutors and law enforcement officials. [Ex. P, Depo. K. Tongring 27:12-28:11]. Guidepost was retained to conduct an independent investigation of the ECSBC itself. [Doc. 1-2 at pp.2-11]. To ensure the independence and transparency of the investigation, the ECSBC could not direct or influence the investigation and could not have any input into the contents of the Report. [*Id.* at p.4; Ex. P, Depo. K. Tongring 228:13-16]. Sills has no evidence that the ECSBC, a non-profit religious organization, was somehow negligent in relying upon the independent investigation of Guidepost, an industry leader in investigations. This is just the same as in *Hunt v. Southern Baptist Convention* where the plaintiff had no evidence that "the Executive Committee failed to act with reasonable care in relying on Guidepost's investigation and conclusions." 777 F. Supp.3d 776, 829 (M.D. Tenn. 2025); *see also Evans v. Amcash Mortg. Co., Inc.*, No. 01A01-9608-CV-00386, 1997 WL 43118713, at *4 (Tenn. Ct. App. Aug. 1, 1997) ("A reasonable and prudent person would rely upon their attorneys' observations and insights into a situation. Defendant, therefore, acted reasonably in relying upon its attorneys' judgment that Reynold's allegations were sincere and true and in relying upon its attorneys' advice to fire Plaintiff.").

Also, the role and effect of Sills' silence is significant. In March of 2019, Sills did not return Roach's request for comment in connection with the original Baptist Press article despite admittedly knowing the article was about his sexual relationship with Lyell, and knowing that in 2018 Lyell had alleged there were nonconsensual sexual acts. In fact, at no time between the

21

March 2019 release of public allegations of sexual abuse until November of 2022, did Sills, either himself or through a representative, issue any kind of statement denying her allegations. [Ex. U, Depo. R. Fisher 284:12-285:15].

Documents produced by Sills show that he considered doing so. On March 13, 2019, after Lyell had published her allegations on her website, Mary Sills noted that the story had "hit the Courier Journal and USA Today." [Ex. M, 3/13/19 M. Sills Email]. According to Mary Sills, her brother-in-law, a retired attorney, "said we should get a media consultant and make a statement." [*Id.*]. Sills and his wife elected not to do so.

By the time Guidepost was engaged to conduct an independent investigation, there had been public accusations against Sills for two and a half years. When the Report was published in May 2022, over three years had passed. During this time, Sills made no attempt to publicly deny the allegations. It was certainly reasonable for Guidepost, the ECSBC, or anyone else to consider Sills' silence in the face sexual abuse allegations as a corroborating factor. Further demonstrating its reasonable behavior, the ECSBC had the additional fact of the decision by Guidepost to include the allegations in its Report. See *Hunt,* 777 F. Supp.3d at 829.

Indeed, the law has long recognized the concept of admissions by silence. *See* Fed. R. Evid. 801(d)(2)(B) (2025). "When a statement is made in the presence of a party containing assertions of fact which, if untrue, the party would under all the circumstances naturally be expected to deny, failure to speak has traditionally been received as an admission." McCormick on Evidence §262 (7th ed. 2013); *see also People v. Green*, 629 P.2d 1098 (Colo. App. 1981) ("Underlying this 'adoptive admission' exemption from normal hearsay concepts is the general assumption that it would be reasonable to expect any person who hears a statement accusing him or her of misconduct to deny such statement."). An admission by silence is also firmly rooted in

Tennessee law:

> Tennessee has long recognized the rule that when a statement is made in the presence and hearing of one accused of an offense and the statement tends to incriminate him, or is of an incriminating character, and such statement is not denied or in any way objected to by him, both the statement and the fact of his failure to deny it or make any response to it, is admissible against him as evidence of his acquiescence in its truth.

*Ledune v. State*, 589 S.W.2d 936, 939 (Tenn. Crim. App. 1979).  A reasonable person would be expected to deny allegations of sexual abuse, if untrue. Sills' failure to do so could even be considered an admission.

The same can be said for maintaining Sills on the list of alleged abusers.  He was placed on the list based upon The Tennessean article published in March 2019.  When the list was released in May of 2022, three years had passed without Sills making a challenge to or rebuttal of Lyell's allegations.  It was reasonable to view this as tantamount to an admission.

At the end of the day, there was undisputedly a sexual relationship between Sills and Lyell. Sills and Lyell were the only parties participating in and present during those encounters.  One party to the relationship, Lyell, characterized and alleged that the sexual encounters were nonconsensual abuse.  Lyell provided the ECSBC communications she received from Mohler, the individual who confronted Sills, where Mohler affirmed that he believed sexual abuse had occurred.  Meanwhile, Sills elected to remain silent without even a denial of the allegations much less to provide information to refute the allegations.  Under these circumstances, it was certainly reasonable for Guidepost, the ECSBC, and others to believe the truth of Lyell's allegations.  Sills' argument now amounts to nothing more than a claim that the ECSBC "got it wrong" because he did not sexually abuse Ms. Lyell.  But that assertion by Sills is not sufficient evidence to prove the ECSBC acted unreasonably.

**III. SILLS' NEGLIGENCE CLAIM SHOULD BE DISMISSED AS DUPLICATIVE OF HIS DEFAMATION CLAIM AND, IN ANY EVENT, FAILS FOR THE SAME REASONS.**

Count III of the Complaint is titled "Negligence, Gross Negligence, and Wantonness." This claim should be dismissed as duplicative of and for the same reasons discussed above with respect to Sills' defamation claim.

As explained above, to establish a *prima facie* case of defamation in Tennessee, a plaintiff must establish the requisite level of fault on the part of a defendant. In the case of a private figure, the statement must be published "'with negligence in failing to ascertain the truth of the statement.'" *Finley*, 384 F. Supp. 3d at 906 (quoting *Sullivan*, 995 S.W.2d at 571-72).

The allegations in Count III of the Complaint allege that the ECSBC and other defendants owed Sills a duty to not make false statements about him, that this duty was breached by making false statements, and "[t]his misconduct by Defendants has libeled Plaintiffs." [Doc. 1 at pp.26-28]. As opposed to a standalone cause of action, this is nothing more than reciting the standard of fault required for a private figure defamation claim. *See, e.g.*, *Macineirghe v. County of Suffolk*, No. 13–cv–1512 (ADS)(SIL), 2015 WL 4459456, at *15 (E.D.N.Y. July 21, 2015) (finding the plaintiff's negligence claim to be "duplicative of and subsumed within their defamation claim" because "an essential element of libel also requires them to establish that [the defendants'] statements were negligently made"); *Wagner v. Allen Media Broadcasting*, 3 N.W.3d 758, 785 (Wis. Ct. App. 2024) ("[T]o the extent Plaintiff Wagner means to allege a claim for negligence that is separate and distinct from his defamation claim, we agree with the circuit court that any such claim should be dismissed . . . If negligence is the degree of fault applicable to Plaintiff Wagner's defamation claim, Plaintiff Wagner does not identify any benefit of maintaining two causes of action that are entirely duplicative, one for defamation and another for negligence.");

24

*Cook v. American Gateway Bank*, 49 So. 3d 23, 32 (La. Ct. App. 2010) ("To the extent that plaintiff may have properly asserted a claim based upon defendants' alleged 'negligent misrepresentation,' the elements of that claim would logically be subsumed within those of her related defamation claim, as both are based upon the identical communications supposedly made by defendants and the same operative facts.").

Accordingly, the negligence claim in Count III should be dismissed as duplicative. However, even if not dismissed as duplicative, Sills cannot establish negligence on the part of the ECSBC for the same reasons set forth above on his defamation claim.

## IV. SILLS' INTENTION INFLICTION OF EMOTIONAL DISTRESS CLAIMS FAILS AS A MATTER OF LAW.

"[U]nder Tennessee law, there are three essential elements to a cause of action: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). "[T]o demonstrate outrageous conduct is a high burden," *Lemon v. Williamson Cnty. Sch.*, 618 S.W.3d 1, 21 (Tenn. 2021), and requires "an exacting standard." *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999).

"To say that Tennessee courts narrowly define 'outrageous conduct' would be something of an understatement." *Finley v. Kelly*, 384 F. Supp. 3d 898, 911 (M.D. Tenn. 2019). As the Supreme Court of Tennessee has stated:

> [I]t is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress. A plaintiff must in addition show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.

25

*Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004) (internal quotations and citations omitted). Along those lines, Tennessee "has adopted and applied the high threshold standard described in the Restatement (Second) of Torts," *Bain v. Wells*, 936 S.W.2d 618, 622-23 (Tenn. 1997), which states follows:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Id.* at 623 (quoting, Restatement (Second) of Torts § 46 cmt. d); *see also Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 903 (M.D. Tenn. 2018) ("It is clear from this explanation that (a) the standard is not whether *an aggrieved person* (such as [plaintiff]) considers a party's actions to have been so outrageous, but whether *a civilized society* would so find, and (b) a plaintiff must prove that the conduct is outrageous in *character*, and not just in *motive*.") (emphasis in original). "It is for the trial court to determine, in the first instance, whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. Thus, the trial court may reasonably dismiss this legal theory as a matter of law." *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) (citation omitted).

"[C]ases finding conduct sufficient to support an intentional infliction of emotional distress claim are few and far between." *Cossairt v. Jarrett Builders, Inc.*, 292 F. Supp. 3d 779, 789 (M.D. Tenn. 2018). In describing the level of conduct required for a claim of intentional infliction of emotional distress, the court in *Cossairt* stated:

26

> Often cited in this regard is Johnson v. Woman's Hosp., 527 S.W.2d
> 133 (Tenn. Ct. App. 1975) where a mother was shown her deceased
> premature baby in a gallon jar of formaldehyde; Dunbar v. Strimas,
> 632 S.W.2d 558 (Tenn.Ct.App.1981), where a mother (who had
> recently had a nervous breakdown) was told her infant daughter had
> been sexually abused and there was a large tear in her rectum where
> sperm cells were found, when, in fact, the child had suffered a "crib
> death," and Dunn v. Moto Photo, Inc., 828 S.W.2d 747 (Tenn. Ct.
> App. 1991) where plaintiff was told that her film could not be
> developed when, in fact, it had been developed and nude
> photographs of plaintiff were shown to other employees and
> plaintiff's acquaintances. Another example is Lourcey v. Estate of
> Scarlett, 146 S.W.3d 48 (Tenn. 2004) where a postal worker
> suffered post-traumatic stress disorder after coming across a semi-
> nude woman in the middle of the street, was told by the husband that
> his wife was having a seizure, and, when the postal employee used
> her cellphone to call 911, witnessed the husband shoot his wife in
> the head and then turned the gun on himself, committing suicide.

*Id.* at 798-90. Also, "[o]utrageous conduct claims are not evaluated in a vacuum; they are evaluated in light of the category of conduct alleged. *Stacy v. MVT Servs., LLC*, No. 3:11-CV-01241, 2012 WL 2281495, at *8 (M.D. Tenn. June 18, 2012)). For example, "[s]exual harassment will only support an outrageous conduct claim when the harassment alleged is especially heinous compared to other sexual harassment claims." *Id.*

Again, Lyell and Sills undisputedly had a sexual relationship. [Ex. A, Depo. D. Sills at 33:18-25; 306:21-307:18]. Lyell alleged that she was sexually abused. Sills, who claims it was consensual, stood silent in the face of her allegations. The ECSBC believing and crediting Lyell's allegations under these circumstances does not, as a matter of law, rise to the extreme level of outrageous conduct. *See Hunt*, 777 F. Supp.3d at 833 ("The Court finds that Defendants' conduct fails to rise to the level of 'outrageous' conduct . . . ."). Nor does relying on the Guidepost investigative report.

Additionally, there is absolutely no evidence that Sills has suffered the required serious mental injury. Sills testified he suffered embarrassment and humiliation when his relationship

27

with Lyell was disclosed. [Ex. A, Depo. D. Sills at 123:24-125:20]. Sills admitted he had been prescribed medication for anxiety and depression prior to 2018, and continues similar medications today. [*Id.* at 125:17-126:6]. At the time of his deposition, Sills testified that he did not currently receive treatment with a psychiatrist or a counselor. [*Id.* at 126:10-11]. In sum, Sills testified that he has continued on medications for anxiety and depression conditions that predate any alleged act by the ECSBC after May 11, 2022. There is no evidence of new, serious mental injury that arose after this date. In fact, in 2024 alone, Mary and David Sills spent three months traveling "all over the country" of Panama for vacation, took a trip to Ecuador to visit their son, and took a two-week vacation with friends to Thailand. [Ex. V, Depo. M. Sills at 14:5-23; 15:24-16:17]. David Sills also traveled to Peru for mission trips twice in 2024. [*Id.* at 17:3-15]. This evidence contradicts any claim of a serious mental injury.

## V. SILLS' CIVIL CONSPIRACY CLAIM FAILS AS A MATTER OF LAW.

In Count II of the Complaint, Sills alleges that the defendants conspired to defame him. [Doc. 1 at p.25 ("Defendants acted together, as a cabal, to accomplish their campaign of defamation. Defendants had a meeting of the minds on the object or course of action underlying their pattern of recklessly defamatory broadcasts.")]. "The elements of a cause of action for civil conspiracy under Tennessee common law are: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) injury to person or property resulting in attendant damage." *Freeman Management Corp. v. Shurgard Storage Centers, LLC*, 461 F. Supp. 2d 629, 642 (M.D. Tenn. 2006).

"Under Tennessee law, civil conspiracy is not itself a cause of action." *JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, No. 3:19-cv-00469, 2020 WL 5877131, at *8 (M.D.

Tenn. Oct. 2, 2020). Instead, it "requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Freeman*, 461 F. Supp. 2d at 642. Along those lines, not any underlying tort will suffice. "[A] civil conspiracy requires that the alleged conspirators possess the specific intent to commit an unlawful act or a lawful act by unlawful means." *Nippert v. Jackson*, 860 F. Supp. 2d 554, 568 (M.D. Tenn. 2012). "Each conspirator must have the intent to accomplish this common purpose, and each must know of the other's intent." *Brown v. Birman Managed Care, Inc.,* 42 S.W.3d 62, 67 (Tenn. 2001). Thus, individuals cannot conspire to be negligent because negligence is not an intentional wrong. *See Nippert*, 860 F. Supp. 2d at 568 *Watson's Carpet and Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 186 (Tenn. Ct. App. 2007) ("A civil conspiracy is an intentional tort that requires damage to the plaintiff before it is actionable.").

Sills' claim of a civil conspiracy fails for multiple reasons. First, because his underlying defamation claim fails for the reasons stated above, Sills' claim of civil conspiracy also must fail. Second, Sills has no evidence that the ECSBC along and in agreement with another party had the specific intent to defame him with false allegations of sexual abuse. There is no evidence of any conspiracy with Guidepost which was retained to conduct an independent investigation *of the ECSBC* of which the ECSBC had no input. In fact, at the motion to dismiss stage, the Court already found insufficient allegations of a conspiracy with respect to Guidepost. [Doc. 134 at pp.29-30]. There is likewise no evidence the ECSBC conspired with Mohler or the SBTS to intentionally defame Sills. Beyond Roach's phone call with Mohler as he was preparing the original BP story, Mohler testified he could not recall having conversations with anyone at the ECSBC regarding Lyell's allegations. [Ex. W, Depo. A. Mohler 94:6-21].

29

Under the doctrine of intracorporate conspiracy immunity, the ECSBC cannot, as a matter of law, conspire with the other individual defendants named in this case because they were employees, officers, or directors engaged in actions in their official capacity on behalf of the ECSBC. *See Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703-04 (Tenn. 2002) ("[T]here can be no actionable claim of conspiracy where the conspiratorial conduct alleged is essentially a single act by a single corporation acting through its officers, directors, employees, and other agents, each acting within the scope of his or her employment.").

With respect to Lyell, the act of accepting her characterization of the sexual encounters with Sills as nonconsensual does not reflect a specific intent and agreement by the ECSBC to intentionally defame Sills with false allegations. Lastly, there is no evidence of a tort committed pursuant to the conspiracy. Sills has no evidence of any defamatory statement made by the ECSBC or a co-conspirator after May 11, 2022.

## CONCLUSION

For the above reasons, the ECSBC respectfully requests that its Motion for Summary Judgment With Respect to Plaintiff David Sills be granted.

EXECUTIVE COMMITTEE OF THE
SOUTHERN BAPTIST CONVENTION
AND ROLLAND SLADE

By counsel

*/s/ Gretchen M. Callas*
Thomas J. Hurney, Jr. (WVSB #1833)
(pro hac vice)
Gretchen M. Callas (WVSB #7136)
(pro hac vice)
Jonathan L. Anderson (WVSB #9628)
(pro hac vice)

30

JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
Post Office Box 553
Charleston, West Virginia 25322
Telephone: 304-340-1000
Fax: 304-340-1150
thurney@jacksonkelly.com
gcallas@jacksonkelly.com


Brigid M. Carpenter (BPR #018134)
Ryan P. Loofbourrow (BPR #033414)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
bcarpenter@bakerdonelson.com
rloofbourrow@bakerdonelson.com
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Telephone: (615) 726-7341
Fax: (615) 744-7341

*Attorneys for Executive Committee of the*
*Southern Baptist Convention and Rolland Slade*

31

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on September 19, 2025, the foregoing ***MEMORANDUM OF LAW IN SUPPORT OF THE EXECUTIVE COMMITTEE OF THE SOUTHERN BAPTIST CONVENTION's MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF DAVID SILLS*** has been served through the Court's electronic filing system on the following:

John W. Barrett
Katherine Barrett Riley
Barrett Law Group. P.A.
P.O. Box 927
404 Court Square
Lexington, Mississippi 39095
dbarrett@barrettlawgroup.com
kbriley@barrettlawgroup.com

Shannon M. McNulty
Clifford Law Offices, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602
smm@cliffordlaw.com
***Attorneys for Plaintiffs***

James C. Bradshaw, III
Wyatt, Tarrant & Combs, LLP
333 Commerce Street, Suite 1050
Nashville, Tennessee 37201
jbradshaw@wyattfirm.com

Byron E. Leet
Wyatt, Tarrant & Combs
400 West Market Street
Louisville, Kentucky 40202
bleet@wyattfirm.com

Thomas E. Travis
Wyatt, Tarrant & Combs
250 W. Main Street, Suite 1600
Lexington, Kentucky
ttravis@wyattfirm.com
***Attorneys for The Southern Baptist***
***Theological Seminary and Dr. R. Albert Mohler***

Alan S. Bean
Starnes, Davis, Florie LLP
3000 Meridian Blvd., Suite 350
Franklin, Tennessee 37067
Abean@starneslaw.com
***Attorneys for Willie McLaurin***

Matthew C. Pietsch
Gordon Rees Scully Mansukhani,
4031 Aspen Grove Drive
Suite 290
Franklin, Tennessee 37067
mpietsch@grm.com
***Attorneys for Southern Baptist Convention,***
***Dr. Ed Litton and Bart Barber***

Steven G. Mintz
Scott Klein
Alex Otchy
Mintz & Gold LLP
600 Third Avenue, 25th Floor
New York, New York 10016
mintz@mintzandgold.com
klein@mintzandgold.com
otchy@mintzandgold.com

John R. Jacobson
Katharine R. Klein
Riley & Jacobson
1906 West End Avenue
Nashville, Tennessee 37203
jjacobson@rjfirm.com
kklein@rjfirm.com
***Guidepost Solutions, LLC***

*/s/ Gretchen M. Callas*

33