## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| MICHAEL DAVID SILLS and MARY SILLS, <br><br> *Plaintiffs,* <br> v. <br><br> SOUTHERN BAPTIST CONVENTION, et al., <br><br> *Defendants.* | Case No. 3:23-cv-00478 <br><br> Chief Judge Campbell <br> Magistrate Judge Frensley |

# MEMORANDUM OF LAW IN SUPPORT OF MOTION BY DEFENDANT GUIDEPOST SOLUTIONS LLC FOR SUMMARY JUDGMENT

## INTRODUCTION

Defendant Guidepost Solutions LLC ("Guidepost") respectfully submits this memorandum of law in support of its motion pursuant to Fed. R. Civ. P. 56 for summary judgment as to each cause of action brought by Plaintiffs Michael David Sills ("Sills") and Mary Sills ("Mary").

## PRELIMINARY STATEMENT

Sills admits that he engaged in a years-long sexual relationship with the late Jennifer Lyell ("Lyell") that began when she was a student at Southern Baptist Theological Seminary ("SBTS").[1] At the outset, while Sills denies in his Complaint that he had "sexual intercourse" with or otherwise abused Lyell, the very fact that he involved himself with a person of unequal power suggests, of course, a different conclusion.

However, the Court is not called upon in this motion to decide whether the late Ms. Lyell's accusation that Sills sexually abused her was true. Rather, the unrefuted evidence shows that there

---

[1] Ms. Lyell died during the pendency of this lawsuit.

is no genuine issue of material fact that Guidepost acted without fault when it investigated and reported facts surrounding the treatment of her allegations by the Executive Committee ("EC") of the Southern Baptist Convention ("SBC"), including her allegations against Sills.

Guidepost's submission of the Report of the Independent Investigation (the "Report") to the Sexual Abuse Task Force ("SATF") did not constitute "publication" under Tennessee law because the SATF was its client and because Guidepost's inclusion of a hyperlink to the Report on its website did no more than bring the reader to the SATF website. (See Point I.A.). An action for defamation fails without publication. But even if the Court construed the delivery of the Report as "publication," it would still be unactionable under the common interest privilege because Guidepost acted without actual malice or bad faith.

Nor can Sills prevail on his theory that Guidepost libeled him by publishing the EC's list of alleged abusers (the "list"), which included Sills along with what he calls a "mugshot" photo. First, the list was not part of the Report. Second, like the Report, it was not "published" by Guidepost but was simply hyperlinked on the Guidepost website and hosted on the EC's website. (See Point I.B.) By the same token, Guidepost's hyperlinking to the EC's webpage enjoys absolute immunity under Section 230 of the Communications Decency Act. (See Point I.C.)

In addition, the absence of actual malice is fatal to Sills's libel claim because, by his own admission, he was a public figure due to his widespread recognition within the SBC and the larger evangelical community. Sills was otherwise either a limited-purpose or involuntary public figure due to his proximity to the sexual abuse scandal in the SBC. (See Point I.D.) And in any event, no reasonable jury could find that Guidepost was negligent in including Lyell's accusation against Sills in the Report because (1) Guidepost's duty was to investigate the EC's conduct, not Sills's and (2) Guidepost observed industry standards by conducting a painstaking review of documents

and witnesses in connection with the EC's treatment of Lyell and the handling of her abuse allegations. (See Point I.E.) Finally, not only were the elements of publication and fault absent, but there is no jury question on the indispensable element of *reputational damage*, because knowledge of Sills's misconduct was widespread long before the SBC engaged Guidepost. By Sills's admission, as of 2018 his reputation was already "totally destroyed"—long before Guidepost delivered the Report four years later—and it was destroyed precisely because the relevant community had already associated him with his own sexual immorality. There is nothing the Report could have done in 2022 to harm him any further. (See Point I.F.) Nor is there evidence that Guidepost libeled Mary or committed any tort against her. (See Point I.G.)

Guidepost further respectfully maintains that the entire action is barred by the ecclesiastical abstention doctrine. Although the Court did not dismiss the action at the pre-answer stage, the record leaves room for no other conclusion: Guidepost's engagement was undertaken as part of internal church discipline. (See Point II.)

For the same reason that Guidepost acted without fault for purposes of the libel claim, the Court should grant summary judgment as to the Sillses' third cause of action for negligence, gross negligence, or wantonness. (See Point III.) The Court should also dismiss the fourth cause of action for intentional infliction of emotional distress ("IIED"). The IIED claim is barred as a duplicative, repackaged version of the defective libel claim, and the evidence developed during discovery does not support a jury finding that Guidepost's conduct was outrageous or that the Sillses suffered serious mental anguish. (See Point IV.) Finally, Mary's claims should be dismissed because they are derivative of Sills's, and she identifies no tangible act on Guidepost's part to injure her.

**UNDISPUTED FACTS**

I.     **The Sexual Abuse Crisis and the Engagement of Guidepost to Prepare a Report.**

In 2021, Guidepost was engaged pursuant to an Engagement Agreement dated October 5, 2021 (the "Engagement Agreement"), to investigate the following five (5) topics: (1) allegations of abuse by Executive Committee [of the SBC] members; (2) mishandling of abuse allegations by EC members between January 1, 2000, to June 14, 2021; (3) allegations of mistreatment of sexual abuse victims by EC members from January 1, 2000, to June 14, 2021; (4) patterns of intimidation of sexual abuse victims or advocates from January 1, 2000, to June 14, 2021; and (5) resistance to sexual abuse reform initiatives from January 1, 2000, to June 14, 2021. (SOF ¶ 1.)

Under Section 2.1 of the Engagement Agreement, Guidepost worked with its client, the SATF, "while engaging with the Committee on Cooperation of the Executive Committee." (SOF ¶¶ 2, 3.) On or about May 20, 2022, Guidepost prepared and delivered the Report to the SATF. (SOF ¶ 4.)

II.     **Sills's Alleged Sexual Abuse of Lyell.**

Plaintiff Michael David Sills ("Sills") was a Southern Baptist missiologist, professor, and author in the SBC. (SOF ¶ 5.) In or around 2004-2005, when Jennifer Lyell was still a Master of Divinity student at Southern Baptist Theological Seminary ("SBTS"), and Sills was a Professor there, a sexual relationship began between Sills and Lyell. (SOF ¶ 7.) It is undisputed that the range of sexual activity with Lyell included oral sex—at times when Sills's wife and family were in the house at the very same time it was going on. (SOF ¶ 8.)

In 2018, Lyell reported that Sills had sexually abused her to her supervisor, Eric Geiger, at Lifeway Christian Resources of the Southern Baptist Convention ("Lifeway"), and to Dr. R. Albert Mohler ("Mohler"), President of SBTS. (SOF ¶ 9.) Sills admitted to Mohler that he had had an

inappropriate relationship with Lyell. (SOF ¶ 10.) Mohler advised Sills that he had two choices: dispute Lyell's account of sexual abuse and face an investigation at SBTS or resign his position. (SOF ¶ 11.) That same day, Sills resigned his position at SBTS, and he ultimately resigned from all boards of which he was a member. (SOF ¶ 12.)

### III.    <u>Lyell Goes Public With Her Allegations of Sexual Abuse</u>.

In or about March 2019, Lyell spoke to the *Baptist Press*. (SOF ¶ 13.) Lyell alleged that the sexual abuse began on a mission trip in 2004, when she was a student. (SOF ¶ 14.) However, although Lyell told the *Baptist Press* that the relationship constituted sexual abuse, following the intervention of the EC's counsel, the initial draft of the article dropped the phrase "sexual abuse," which was replaced with the euphemistic phrase "morally inappropriate relationship." (SOF ¶ 15.)

After the *Baptist Press* published the article on March 8, 2019, third parties reading the article interpreted the phrase "morally inappropriate relationship" to mean that Lyell consented at all times to sexual intimacy with Sills, as opposed to a pattern of sexual abuse, and published vicious comments on social media damning Lyell as an adulteress. (SOF ¶ 16.) After Lyell protested that *Baptist Press's* reporting falsely implied consent rather than abuse, the EC ultimately entered into two settlements with Lyell and two separate apologies were published, one by *Baptist Press* and the other by the EC. (SOF ¶ 17.)

### IV.    Guidepost's Investigation of the EC's Conduct in Relation to the *Baptist Press* <u>Article</u>.

Sills was never a member of the EC. (SOF ¶ 18.) Accordingly, Guidepost was not engaged to investigate Sills's alleged abuse of Lyell per se under Mandate # 1 (SOF ¶¶ 1, 35.) Because Lyell claimed to be a survivor of sexual abuse whose story was mishandled by the EC, Guidepost reviewed the circumstances of how the EC treated her case in connection with the *Baptist Press* story, *i.e.,* under Mandate #2 & 3 of the Engagement Agreement. (SOF ¶ 19.)

Guidepost interviewed numerous witnesses. (SOF ¶ 20.) Guidepost met with Lyell twice in person and again by Zoom, as well as in two phone calls, in addition to acquiring extensive documents from her, including a timeline. (SOF ¶¶ 21, 22.) Lyell told Guidepost that Sills had not only attempted full sexual intercourse against her will but had entered her apartment without permission and threatened her with violence. (SOF ¶ 23.)

Guidepost also interviewed Dr. David Roach of the *Baptist Press*, who confirmed that he had interviewed (1) Sills's superior, Mohler, who, in turn, was privy to conversations with both Lyell and Sills; (2) Eric Geiger, who was Lyell's superior at Lifeway to whom she first disclosed the allegations against Sills; and (3) Sills's pastor, Dr. Cook, who had "discussed with Sills his relationship with Jennifer and the sin involved in it." (SOF ¶ 24, 25, 27, 28.) In all, Guidepost interviewed approximately 300-400 witnesses (each of whom was asked about their knowledge of the Sills/Lyell encounters) and at no point did any witness throw doubt upon the validity of Lyell's accusations against Sills. (SOF ¶ 31.)

After the news about Lyell and Sills became public in 2019 and the *Baptist Press* and the EC apologized publicly to Lyell in 2019 and 2022, Sills did not come forward and put the *Baptist Press*, the EC, any media outlet, Guidepost, or the witnesses whom it interviewed on notice that he disputed any of Lyell's statements. Sills was keenly aware since 2018 that Lyell accused him of non-consensual sexual contact, and that "rumors" regarding his conduct were circulating in Southern Baptist circles. (SOF ¶¶ 32, 56, 61.) Guidepost did not submit the Report until May 2022.

## V.    Guidepost Submitted the Report to the SBC Committee on Cooperation and the SBC Task Force Only.

Guidepost acted in good faith and under circumstances of complete independence. The SATF and its advisors were appointed *before* Guidepost's engagement. The SATF was responsible for selecting the investigation firm pursuant to the mandate from the SBC's Messengers (*i.e.,*

delegates to the SBC Annual Convention). Guidepost had no input into the members or advisors of the SATF. (SOF ¶¶ 34-37.) At all times, Guidepost determined the content of the Report; neither the EC, the Committee on Cooperation, nor the SATF was allowed to edit or otherwise change the content. (SOF ¶ 37.)

Pursuant to Section 3.5 and 3.6 of the Engagement Agreement, to ensure the factual accuracy of the Report, Guidepost was to show factual portions of the Report to the Committee on Cooperation and the SATF. (SOF ¶ 38.)

Thus, on May 14, 2022, Guidepost presented a draft of the factual portions of the Report to the SATF and the Committee on Cooperation for review and ultimately submitted the final Report to the SATF on May 20, 2022. (SOF ¶ 39.) Guidepost presented the Report for review under conditions of a close hold and need to know basis only. (SOF ¶ 40.) Guidepost did not transmit the draft materials on Sills or the final Report to any other person. (SOF ¶ 41.)

## VI. Guidepost Submits the Report to the SATF, Which Publishes the Report on its Own Website.

When it delivered the final version of the Report to the SATF on May 20, 2022, it sent it in a password-protected file. (SOF ¶ 42.) Sills conceded that apart from Guidepost's delivery of the Report to the SATF, he is unaware of any publication of the Report by Guidepost to any third person. (SOF ¶ 43.)

The Report was never hosted on the Guidepost website at any time. Rather, Guidepost placed a hyperlink to the Report on an internal SBC Investigation webpage. When a person clicked on that hyperlink, the visitor immediately left the Guidepost website and was taken to the website of the *SATF*, which, in turn, hosted the Report. Once a visitor to Guidepost's website followed the hyperlink and arrived at the SATF's website, the viewer would then have to scroll down the SATF website past certain updates to the SBC community until coming to yet another hyperlink, which

7

only would then display the Report. Again, by this point the visitor was no longer on the Guidepost website. (SOF ¶ 44.) On or about May 22, 2022, the SATF—not Guidepost—published the Report on the SATF's website. (SOF ¶ 45.)

**VII.    <u>Guidepost Did Not Publish the Executive Committee's List of Alleged Abusers</u>.**

Long before the SBC engaged Guidepost in 2021, Elizabeth Dixon created a spreadsheet of alleged sexual abusers at the direction of her boss, Augie Boto, at the EC. (SOF ¶ 46.) Like the Report, the list was not hosted on the Guidepost website; rather, at all relevant times a hyperlink on the Guidepost website led the reader to another webpage which allowed the list to be displayed from another server used by the SBC/EC upon which it is hosted. (SOF ¶ 47.) Following a vote of EC committee members to publicly release the list of alleged abusers, the EC published the list on the *EC's* website on May 26, 2022. (SOF ¶ 49.)

Guidepost then placed a hyperlink to the list on its own website. (SOF ¶ 50.)

The portion of the Report that discusses the EC's mishandling of Lyell's accusation against Sills does not associate him with the list of alleged abusers. (SOF ¶ 51.) The list was never appended to the Report. (SOF ¶ 52.) Nor has Sills refuted the fact that the list resides on an *EC* server, not the Guidepost website. (SOF ¶ 53.)

Mary Sills is not mentioned in the Report. (SOF ¶ 55.)

**VIII.    <u>Sills Has Not Experienced Recoverable Damages for Defamation</u>**

After Sills resigned from SBTS in 2018, Sills was unemployable in the ministry and could not serve as a professor at SBTS due to the rumors of his sexual misconduct. (SOF ¶ 56.) Importantly, even Sills's admitted "morally inappropriate" relationship was incompatible with the Baptist faith's requirement that he live "above reproach." (SOF ¶ 57.) Sills could not even obtain work using his teaching skills, regardless of whether it involved opportunities as a minister or

missionary per se, even when approaching potential employers who were friendly. (SOF ¶ 58.) After resigning from SBTS in May 2018, Sills applied for 46 jobs through 2021 (again, before the SBC engaged Guidepost) and was either rejected or received no response. (SOF ¶ 59.)

Sills's reputation was not helped when *Baptist Press* issued two public statements regarding Jennifer Lyell's allegations. The first, on October 5, 2019, stated that the original *Baptist Press* article describing the Lyell-Sills relationship as "morally inappropriate" was inaccurate. The second, on October 15, 2019, was an apology, stating "*Baptist Press* ultimately failed to convey that the heart of Lyell's story was about sexual abuse by a trusted minister in a position of power at a Southern Baptist seminary." Another public apology was made – this time by the EC – on February 22, 2022, which stated that Lyell's abuse was "investigated and unequivocally corroborated by the SBC entities with authority over Ms. Lyell and her abuser." (SOF ¶ 62.) Again, this was long before Guidepost delivered the Report to the SATF.

On or about May 23, 2018 (long before the *Baptist Press* article, the subsequent apologies, and the Report), Sills contacted his pastor, Dr. Bill Cook, at 9th & O Baptist Church to inform him that he had resigned due an "inappropriate" relationship with Jennifer Lyell. Sills did not provide any specific details regarding their relationship. (SOF ¶ 63.)

After Sills left SBTS in 2018, he moved to Mississippi and obtained a letter of transfer from his church. Sills concedes, however, that after Sills disclosed to his pastor, Dr. Bill Cook, the reasons for his resignation from SBTS, Dr. Cook expelled him from the church. Further, Dr. Cook testified that if he had known that Sills's conduct with Lyell had gone beyond mere "cuddling" and had progressed to oral sex, the church would never have provided a letter of transfer to Sills's new church. (SOF ¶¶ 64, 66, 67.) All of this transpired well ***before*** the SBC engaged Guidepost and the

issuance of the Report. Accordingly, Sills has not shown any evidence of an injury suffered by him caused by the Report as all of his damages occurred before the issuance of the Report in May 2022.

### IX. The Sillses Have Not Experienced Severe Emotional Distress

The Sillses have not experienced a debilitating impairment of their normal lives. Sills never consulted a psychiatrist after his termination at SBTS or publication of the Report but relies solely upon pastoral counseling. (SOF ¶ 68.) The Sillses have continued a steady schedule of traveling for mission activities and personal reasons. (SOF ¶ 69.) For her part, Mary Sills has coped with the stress following publication of the Report through counseling. (SOF ¶ 70.) Mary was also able to work until her retirement in 2025. (SOF ¶ 71.)

## ARGUMENT

### I. THE SILLSES' CAUSE OF ACTION FOR DEFAMATION FAILS.

To establish a prima facie case of defamation, the plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d 569, 571 (Tenn. 1999). In cases where the plaintiff is a public figure, proof of actual malice is required to recover damages for defamation. See New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964).

Sills asserts that Guidepost defamed him by publishing (1) the Report and (2) the EC's list of alleged abusers. But there is no genuine issue of material fact regarding the first element of the defamation claim: Guidepost did not "publish" the Report under Tennessee law because it provided the Report only to its client, the SATF. And even if its transmission of the Report to the SATF were construed as a publication—and it was not—such a "publication" was protected under both the common interest privilege and the First Amendment. Furthermore, the only evidence in the record is that the *EC*, not Guidepost, published the list, which was referenced in the Report;

however, the list was not appended to the Report and none of the list's contents were reproduced within it or accessible to the reader.[2] (See Point I.B, infra.)

In either case, the Sillses have the burden of showing that Guidepost acted with actual malice. Alternatively, even if Sills were a private figure, Guidepost's submission of the Report to the SATF complied with the duty of care applicable to Guidepost.

A.    Guidepost's Communications With the SBC Did Not Constitute a "Publication" Under Tennessee Law or, in the Alternative, Were Protected by a Common Interest Privilege.

When a party to a legal relationship such as the one created by the Engagement Agreement provides factual information to its client within the subject matter of the relationship, as a matter of law statements made between the parties are deemed *not to have been published at all*, thereby negating altogether the required element of publication for a libel law claim. See Woods v. Helmi, 758 S.W.2d 219 (Tenn. Ct. App. 1988), appeal denied (Tenn. 1988) (communications between persons in "need to know" relationship held not a "publication" for purposes of libel claim).

The SATF was Guidepost's client, and Guidepost was expressly required in the Engagement Agreement to work with the Committee on Cooperation as its liaison to the Executive Committee. (SOF ¶¶ 2-3.) On May 14, 2022, Guidepost accordingly presented a draft of the factual portions of the Report to the SATF and the Committee on Cooperation, for review, and ultimately submitted the final Report to the SATF on May 20, 2022. (SOF ¶¶ 39, 42.) Guidepost did not transmit the draft materials on Sills or the final Report itself to any other person. (SOF ¶ 41.) Sills conceded that apart from Guidepost's delivery of the Report to the SATF, he was

---

[2]    Guidepost *references* the list at page 134, footnote 379 of the Report, but the list was not part of the Report and readers could not obtain access to the contents referenced by the footnotes. (SOF ¶ 52.)

unaware of any publication of the Report by Guidepost to any third person. (SOF ¶ 43.) That should end the matter.

Nevertheless, Sills maintains that Guidepost "published" the Report on its website. But the Report was never hosted on the Guidepost website. Rather, as Guidepost's Rule 30(b)(6) witness explained, Guidepost placed a hyperlink to the Report on an internal SBC Investigation webpage. When a person clicked on that hyperlink, the visitor immediately left the Guidepost website and was taken to the website of the SATF, which, in turn, hosted the Report. Once a visitor to Guidepost's website followed the hyperlink and arrived at the SATF's website, the viewer would then have to scroll down the SATF website past certain updates to the SBC community until coming to yet another hyperlink, which only would then display the Report. (SOF ¶ 44.) In other words, the Report was "published," not by Guidepost, but by the SATF. (SOF ¶ 45.)[3]

The courts are clear that a website's use of a hyperlink, by itself, constitutes no more than a reference directing the reader to a document published *elsewhere* and does not constitute publication. See Sack on Defamation, 7.3.1[B] Hyperlinks or Other References to Internet-Borne Material (citing, inter alia, In re Philadelphia Newspapers, LLC, 690 F.3d 161, 175 (3d Cir. 2012)). Because Guidepost submitted the Report to its client in the performance of a legal duty under the Engagement Agreement and in furtherance of their common interest, the transmission of the Report was privileged as a matter of law. Moreover, Guidepost did so under conditions of a close hold and need to know basis only. (SOF ¶ 40.) And, as noted below, Guidepost did not "publish"

---

[3] Sills's own web analysis/web search expert confirms that the Report and the list of alleged abusers were not posted directly to Guidepost's website; rather, they were linked to the SATF site and the SBC/EC's URL respectively. (SOF ¶ 54.)

the list of alleged abusers; the *EC* did, six days after the SATF published the Report. (See Point I.B, I.C, infra.) Thus, Guidepost committed no "publication" of the Report as a matter of law.

But even if the Court viewed communications between Guidepost and its client only in terms of a conditional, or qualified privilege (rather than the complete absence of the element of publication under Woods), Guidepost would still be entitled to summary judgment. Because the relationship between Guidepost on the one hand and the Committee on Cooperation and the SATF on the other gave rise *at least* to a conditional privilege, Sills bears the burden of proof under Tennessee law to show that Guidepost transmitted the statements in the Report in bad faith and with actual malice. See Southern Ice Co. v. Black, 189 S.W. 861, 863 (Tenn. 1916). See also Woods, 758 S.W.2d at 224. Cases involving an internal investigation or audit of wrongdoing within an organization are textbook examples of a qualified privilege. See, e.g., Bitner v. Ottuwa Comm. Sch. Dist., 549 N.W.2d 295 (Iowa 1996) (qualified privilege covered certified public accountant's audit report of school principal's misuse of funds even when state auditor allowed public access to audit); Hoth v. Am. States Ins. Co., 753 F. Supp. 703 (N.D. Ill. 1990) (special investigator's report covered by qualified privilege where employee engaged in purchase of company property; "[t]he company had every right to make an investigation of this transaction.").

In Tennessee, to show actual malice, "there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication, and that publishing, with such doubt, shows reckless disregard for truth or falsity and demonstrates actual malice." Pate v. Serv. Merch. Co., 959 S.W.2d 569, 577-78 (Tenn. Ct. App. 1996). But the record is devoid of evidence supporting a conclusion that Guidepost knew any of the allegations regarding Sills to be untrue or that they furnished the Report to the SBC recklessly, *i.e.*, while subjectively entertaining doubts concerning the allegations' validity. See Moore v. Bailey, 628

S.W.2d 431, 434 (Tenn. Ct. App. 1981) (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)). Absent evidence demonstrating that Guidepost communicated its findings to the SATF in bad faith, *i.e.,* with the intent to harm Sills, the privilege bars the defamation claim. See Bohler v. City of Fairview, No. 3:17-cv-1373, 2018 WL 5786234, at *15 (M.D. Tenn. Nov. 5, 2018). But the record is devoid of evidence of actual malice or bad faith.

*First,* Sills does not purport to have ***any*** evidence that Guidepost affirmatively knew Lyell's accusations against him were false. *Second,* there is no evidence from which a reasonable jury could find that Guidepost subjectively entertained doubts on the subject. Quite the contrary: in the course of investigating whether the EC had mishandled Lyell's allegation that Sills had sexually abused her and otherwise mistreated her as a victim of sexual abuse (the limit of Guidepost's investigative authority under the Engagement Agreement), Guidepost interviewed numerous witnesses. (SOF ¶ 20.) Guidepost spoke to Lyell herself twice in person, again by Zoom, and in two phone calls, in addition to acquiring extensive documents from her, including a timeline. (SOF ¶ 21.) Lyell told Guidepost that Sills had engaged in numerous acts of non-consensual oral sex with her, attempted full sexual intercourse against her will, and had entered her apartment without permission and threatened her with violence. (SOF ¶ 22.)

It is also undisputed that Guidepost interviewed David Roach of the *Baptist Press,* who confirmed that (1) he had spoken to Sills's superior, Dr. Mohler, who was privy to conversations with both Lyell and Sills; (2) Roach had seen Mohler's communications with Lyell in which Mohler indicated he believed Lyell and said that in making her comment to the *Baptist Press* she acted ***"righteously"*** (emphasis added); and (3) was aware of Mohler's confrontation with Sills in which Sills had acknowledged his sexual misconduct and had left employment at SBTS for that reason. (SOF ¶ 24.) Roach also confirmed that he spoke with Lyell's former supervisor at Lifeway,

Eric Geiger. (SOF ¶ 25.) Guidepost also interviewed approximately 300-400 witnesses (all of whom were asked about Sills and Lyell) and at no point did any witness throw doubt upon the validity of Lyell's accusations against Sills. (SOF ¶ 27.) Nor, even after the news about Lyell and Sills became public and the SBC twice apologized publicly to Lyell did Sills come forward and tell the *Baptist Press*, the EC, any media outlet, Guidepost, or the witnesses whom it interviewed that his encounters with Lyell were consensual—even though he knew that Lyell had told Mohler that his conduct amounted to sexual abuse. (SOF ¶¶ 29, 33.)

Far from entertaining doubts of the veracity of Lyell's account, Guidepost was also aware from its review of the EC's treatment of her story that she was consistently supported by Mohler, who had himself confronted Sills on May 23, 2018, and twice publicly confirmed her allegations against Sills. (SOF ¶¶ 24, 26.)

These facts all provide ample corroboration from Guidepost's perspective of the accusation that Sills's treatment of Lyell constituted sexual abuse, and no other facts exist from which a jury could infer that Guidepost subjectively entertained doubts regarding Sills's culpability. Thus, Guidepost neither had actual knowledge of any falsehoods in the Report nor acted in reckless disregard of the truth.

Nor does the record contain any evidence that Guidepost acted in bad faith, *e.g.,* with the particular object of harming Sills (or Mary, who was not even mentioned in the Report). Rather, the SATF and the Committee on Cooperation were set up to ensure Guidepost's independence. The Report was to be prepared under circumstances where the SATF and the Committee on Cooperation could review but not control the drafting of the Report. (SOF ¶¶ 34-37.) Accordingly, Guidepost is entitled to judgment a matter of law regarding claims based upon the Report.

B.    <u>Guidepost Did Not Publish the List of Alleged Abusers</u>.

Like the Report, the EC's list of alleged abusers was not hosted on the Guidepost website; rather, at all relevant times a hyperlink on the Guidepost website led the reader to another webpage which allowed the list to be displayed from another server used by the SBC/EC upon which it is hosted. (SOF ¶ 47.) <u>See</u> Sack on Defamation, <u>supra</u>, at ¶ 7.3.1[B]. Sills has not refuted the fact that the list resides on an *EC* server, not the Guidepost website. (SOF ¶ 50.) Because Guidepost did not add or republish any of the contents of the list on its own website, it did not publish the list as a matter of law.

In addition, nowhere in the Report itself does Guidepost mention Sills as having been identified in the list. Nor does the portion of the Report that discusses the EC's mishandling of Lyell's accusation against Sills associate him with the list. (SOF ¶ 51.) Again, the list was never appended to the Report. (SOF ¶ 52.) Accordingly, Guidepost did not publish the list and Sills's claim of libel with respect to the list ends there.

C.    Section 230 of the Communications Decency Act Also Bars Claims Based on
       <u>Guidepost's Hyperlink to the List of Alleged Abusers on the SBC Website</u>.

Guidepost's immunity from defamation due to mere hyperlinking is not founded solely upon court-made law (<u>see</u> <u>Point I.A</u>; Sack on Defamation, 7.3.1[B], above) but is separately provided for by statute. Under Section 230 of the Communications Decency Act ("<u>CDA</u>"), Guidepost enjoys absolute immunity from Sills's claim of libel as it relates to the list.

*First,* Guidepost, is an "interactive computer service" provider, which is defined as:

> … any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

47 U.S.C. § 230(f)(2). See Jones v. Dirty World Ent. Recordings LLC, 755 F.3d 398, 407 n.2 (6th Cir. 2014) ("providers include … hosting companies, and *website operators*") (emphasis supplied).

*Second,* Guidepost did not itself author, edit or publish the EC's list of alleged abusers. Plaintiffs claim Guidepost is responsible for the list's contents because it hyperlinked to it from the Guidepost website. But the undisputed facts establish that the list was created by Elizabeth Dixon at the direction of her boss, Augie Boto, at the EC. (SOF ¶ 46.)[4] During Guidepost's investigation, the list was provided to Guidepost by an authorized EC representative. (SOF ¶ 48.) Following a vote of EC committee members to publicly release the list, the EC published the list on the *EC's* website on May 26, 2022. (SOF ¶ 49.) Guidepost then linked to the list on its website. (SOF ¶¶ 47, 50.)

Because Guidepost did no more than provide a hyperlink on its own website, allowing the list to be displayed from a webpage under the EC's control, it cannot be held liable for defamation based upon the contents of the list that was hosted on an SBC/EC URL (SOF ¶ 47.) See, e.g., Vazquez v. Buhl, 90 A.3d 331, 339 (Conn. App. 2014) (CDA immunized a website operator that posted a hyperlink to an allegedly defamatory article); Barrett v. Fonorow, 799 N.E.2d 916, 926-27 (Ill. App. 2003) (dismissal based on Section 230 immunity after defendant posted articles containing allegedly defamatory information not created or altered by the defendant). Because Guidepost did not "publish" any defamatory content as to Sills, the claim for defamation ends—full stop—with no need to reach the element of fault. Id.

---

[4]    The name of a Guidepost employee appeared on the first page of the list because Ms. Dixon placed her name there prior to the EC's delivery of the list to Guidepost. There is no evidence to permit a juror to conclude that the Guidepost employee herself was the author of the list's contents. (SOF ¶ 46.)

17

D.   Dr. Sills Is a Public Figure and There is No Evidence that Guidepost Published a Defamatory Statement with Actual Malice.

As the Tennessee Supreme Court observed, "[t]here are three kinds of public figures: general purpose, limited purpose, and involuntary." Charles v. McQueen, 693 S.W.3d 262, 274 (Tenn. 2024). When the plaintiff in a defamation case is a public figure, constitutional concerns require the plaintiff to prove that the libelous statement was made with actual malice, *i.e.,* "'with knowledge that it was false or with reckless disregard of whether it was false or not.'" Hudik v. Fox News Network, LLC, 512 F. Supp. 3d 816, 825 (M.D. Tenn. 2021). Whether one is a public figure in the first instance is a "question of law to be determined by the courts." Falls v. Sporting News Pub. Co., 899 F.2d 1221, 1221 (6th Cir. 1990) (citing, inter alia, Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1293 & n.12 (D.C. Cir. 1980)). The undisputed facts now reveal beyond question that Sills is a public figure.

*First,* the controlling consideration is whether Sills was known within the relevant community. See Gertz, 418 U.S. at 351-52 (noting that plaintiff had "no general fame and notoriety in the community" and that he was not generally known to "the local population."). See also Waldbaum, 627 F.2d at 1295, n.22 (D.C. Cir. 1980) (nationwide fame not required). See also Sack on Defamation § 5:3:9 ("The president of a college student body, for example, might be a 'pervasive' public figure for purposes of commentary by the student newspaper but not for commentary by Time magazine or the 'CBS Evening News.'").

Guidepost acknowledges that the Court was not prepared at the pre-answer motion stage to find that Sills is a public figure. (ECF No. 24 at 26.) But discovery has created a fuller record. Significantly, Sills admitted that when the *Baptist Press* published an apology to Lyell for mischaracterizing her allegations of sexual abuse as a "morally inappropriate relationship," because of Sills's high profile everyone in the relevant community instantly knew that he was the

alleged abuser about whom the *Baptist Press* was writing: **"So you may not see my name. There's nobody in the executive -- in the SBC or in evangelicalism at large that would not read that David Sills abused Jennifer Lyell in this statement. Everybody knows who this is talking about."** (SOF ¶ 6; D. Sills Dep. at 170:8-12.)

By virtue of his high public profile, Sills has thus "invite[d] attention and comment." Gertz, 418 U.S. at 345. Even reading the record in the light most favorable to Sills, there is no doubt that he was—and is—a public figure in the evangelical community—exactly the group that would read the Report with interest. See Sack on Defamation § 5:3:9.

*Second,* Sills would at least be deemed a limited-purpose public figure or an involuntary public figure because he "voluntarily inject[ed] himself or [was] drawn into a particular public controversy," Gertz, 418 U.S. at 351, which in this case was the sexual abuse scandal that pervaded the SBC. As a prominent Baptist author and missiologist at SBTS, it was inevitable that his sexual improprieties would draw him into the vortex of the SBC's sexual abuse controversy. Thus, for example, the Sixth Circuit affirmed a grant of summary judgment where a sportswriter was "a public figure with regard to his sports writing activities." See Falls v. Sporting News Pub. Co., 899 F.2d 1221 (6th Cir. 1990) ("[t]he real question is whether Mr. Falls' career as a sportswriter made him a public figure for purposes of commentary on him as a sportswriter…. *The Sporting News* had a circulation of 700,000 in 1985. Given his weekly appearances before an audience of that size, Mr. Falls cannot persuasively claim to be a private figure.").

Having voluntarily accepted the position as a professor at SBTS, Sills put himself in a position where his abuse of a position of trust at SBTS would invite public scrutiny. Accordingly, Sills bears the burden of proof to show not only that Guidepost "published" a false statement, but that it did so with actual malice. He cannot.

Even if the Court accepted that Sills did not "insert" himself voluntarily into the crisis—and he did—he at least could not help being drawn into the vortex. See <u>Charles v. McQueen</u>, 693 S.W.3d at 274 (involuntary public figures drawn into public controversies "'by position, proximity, or chance."). Sills became a public figure through the intersection of his position at SBTS and his resulting proximity to a nationwide scandal affecting the SBC.

Plaintiffs are required to lay bare their proof of facts establishing actual malice—*i.e.,* that the challenged statements were made with knowledge of their falsity or reckless disregard for their truth. See <u>Moore v. Bailey</u>, 628 S.W.2d 431, 434 (Tenn. Ct. App. 1981) (quoting <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731 (1968)). Moreover, to defeat summary judgment, plaintiffs must point to evidence sufficient to prove actual malice with "*clear and convincing clarity*." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-257 (1986) (emphasis supplied). <u>See</u> <u>also</u> <u>Falls v. Sporting News Pub. Co.</u>, 899 F.2d 1221 (citing <u>Anderson</u>, 477 U.S. at 256-257) (Sixth Circuit affirmed summary judgment where no evidence existed that defendant "entertained serious doubts about the truth of what he said [and] … [n]o reasonable jury could find clear and convincing evidence of actual malice."). But the evidence developed during discovery is irreconcilable with any such showing.

As detailed in <u>Point I.A</u>, above, Sills does not have any evidence that Guidepost affirmatively knew Lyell's accusations against him were false or that Guidepost subjectively entertained doubts on the subject. Guidepost interviewed numerous witnesses including Lyell herself (several times) and Dr. Roach, who had performed the initial investigation of the *Baptist Press* story and himself received corroboration from his discussions with Mohler and Dr. Cook. (SOF ¶¶ 20-31.)

When a firm like Guidepost merely conveys the fact that witnesses reported information in the course of their engagement without knowledge that the information is false or subjective doubts of its veracity, First Amendment concerns protect the communication. See, e.g., Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP, 978 F. Supp. 2d 849, 859 (W.D. Mich. 2013), aff'd, 759 F.3d 522 (6th Cir. 2014) (where blogger issued a qualified statement that "there are reports that there [sic] students are defaulting on loans at an astounding 41 percent" and did not adopt the truth of the law school students' loan default rates, record did not support finding of actual malice). Therefore, under the First Amendment Guidepost is entitled to summary judgment.

E.     Even if Dr. Sills Were Deemed a Private Figure, There is No Evidence that Guidepost Was Negligent.

Under Tennessee law, even a private figure libel plaintiff must at a minimum establish negligence. See Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d at 571. But even under a negligence standard, the undisputed facts show that Guidepost amply discharged its duty of care as defined by the scope of the Engagement Agreement. To begin with, Guidepost was only engaged to investigate sexual abuse allegations, as such, if those allegations concerned conduct on the part of the EC or its members. (SOF ¶¶ 1, 35.) Because it is undisputed that Sills was not a member of the EC, no reader of the Report would understand it to constitute a detailed assessment of Sills's relationship with Lyell. The only part of the Report which undertook such an analysis was the portion detailing sexual abuse allegations against the former President of the SBC, Johnny Hunt.

Rather, as it concerns Sills, by the terms of the Engagement Agreement, Guidepost's task in the Report was not to make specific findings regarding Sills's sexual involvement with Lyell, as such, but to assess and report *"[m]ishandling of abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021"* (Engagement Agreement at § 3.1, bullet point # 2) as well as Lyell's allegation that by mishandling her interview with the *Baptist Press* the

EC mistreated her as a sexual abuse victim (bullet point # 3.) Specifically, the Report detailed whether by altering the original March 8, 2019 article in the *Baptist Press*, the EC wrongfully sought to blunt the force of Lyell's story by changing the original draft's description of "sexual abuse" to "morally inappropriate relationship," thereby giving readers the false impression that the relationship was consensual rather than abusive. (ECF Doc. No. 1, Compl., ¶ 58.)

No reasonable jury could construe the Report as the product of an investigation by Guidepost into Sills's relationship with Lyell and conclude that it presented a conclusion that Lyell was telling the truth and Sills was lying. Rather, the clear gist of the Report was that once Lyell accused Sills of sexual abuse and agreed to tell her story to the *Baptist Press*, the editors softened the allegation at the last minute, omitting references to sexual abuse and instead misleadingly described what had transpired as "a morally inappropriate relationship." (SOF ¶ 15.)

But even if Guidepost's duty of care required corroboration of the underlying abuse allegations, as opposed to merely investigating the EC's treatment of them, no reasonable jury could find that it failed in that duty. Two Guidepost investigators met with Lyell twice in person. (SOF ¶ 21.) One of the investigators, Krista Tongring, also spoke with Lyell separately via Zoom and again by phone, specifically asking for and obtaining details of the alleged abuse. (SOF ¶ 22.)

Nor could a reasonable jury determine that Guidepost merely took *Lyell's* word for it. It is undisputed that the investigators spoke to the *Baptist Press* correspondent, David Roach, who related that **he**, in turn, had interviewed Mohler. Mohler confirmed to Roach that Lyell had brought allegations regarding Sills to him, prompting SBTS to take immediate personnel action. Roach's article quoted Mohler (who himself was the only person to speak to both Sills and Lyell about her allegations) as saying that "I [Mohler] stand behind [Lyell] in [her statement to *Baptist Press*] and believe she is acting **righteously**." (SOF ¶ 24.) Roach further confirmed that Mohler had

encouraged Lyell to file a police report. (SOF ¶ 25.) Mohler continued to support Lyell in the intervening years between Lyell's 2018 disclosure to Geiger and SBTS and Guidepost's October 2021 engagement, publicly affirming Lyell's initial allegations of abuse. (SOF ¶ 26.)

Sills insists that Guidepost failed in its duty of care because the investigators did not call him, Mary, or their pastor. But "[t]he determination of what constitutes reasonable care under any particular circumstances is not always a jury question. Negligence will not be inferred from the mere happening of an accident or occurrence of injury." Hall v. Marshall, 394 F.2d 790, 793 (6th Cir. 1968) (citing Williams v. Jordan, 346 S.W.2d 583 (Tenn. 1961)). The controlling question, rather, is whether Guidepost acted reasonably under the circumstances. As this Court stated in Hunt v. Southern Baptist Convention, 777 F. Supp. 3d 776, 828 (M.D. Tenn. 2025), "[w]hether a duty exists is a question of law for the court" (citing Rice v. Sabir, 979 S.W.2d 305, 308 (Tenn. 1998)). When unrebutted evidence shows that the defendant discharged its duty of care as a matter of law, summary judgment is required. See Nye v. CSX Transp., Inc., 437 F.3d 556, 567 (6th Cir. 2006).

Here, while Sills complains that the Guidepost investigators failed to contact him or his pastor for details about Lyell's allegations, Roach told the Guidepost investigators that he **_had_** interviewed Dr. Cook and learned that Dr. Cook "discussed with Sills his relationship with Jennifer and the sin involved in it." (SOF ¶ 28.)

Roach also related to the Guidepost investigators that he had left a message on Sills's voicemail that he wanted to talk to him about Lyell's allegations, but that Sills did not call him back. (SOF ¶ 29.) There is therefore no logical reason why the Guidepost investigators should have anticipated that Sills would have called them back, even if they had reached out to him.

It should also be recalled that for over three years after the *Baptist Press* article detailing Lyell's accusations, Sills never surfaced to tell the *Baptist Press*, the EC, any media outlet,

Guidepost, or the witnesses whom it interviewed that Sills's relationship was "consensual," despite the fact that Sills was keenly aware from at least 2018 that Lyell accused him of non-consensual sexual contact, and that "rumors" regarding his conduct were circulating in Southern Baptist circles. (SOF ¶¶ 32, 61.) Thus, Guidepost neither had actual knowledge of any falsehoods in the Report nor entertained any doubts about the facts it reported. (SOF ¶ 33.) And as Guidepost's Rule 30(b)(6) witness testified, Guidepost interviewed Roach and learned from him what he had learned from his sources before publishing the March 6, 2019 article. Accordingly, because Guidepost had sufficient corroboration from the witnesses it spoke to, and no contrary evidence, no reasonable jury could find that Guidepost was careless in describing Lyell as a survivor.

F. Sills Has No Actual Damages Because He Was Unemployable Before the SBC Published the Report and He Was Otherwise Libel-Proof.

Even if the other elements of Sills's defamation claim were viable, the claim would still fail because there is no triable issue of fact for the jury regarding an indispensable element of the claim: *damages*. It should be recalled that in Tennessee, damages are not presumed in defamation cases; actual damage must be proven. See Emerson v. Garner, 732 S.W.2d 613 (Tenn. Ct. App. 1987), appeal denied (Tenn. 1987). As shown below, Sills cannot prove to a reasonable jury that any statement he attributes to Guidepost proximately caused him any damages at all.

Sills admitted that after he left SBTS in 2018, and long before Guidepost entered the picture, he was unemployable in the ministry and could not serve as a professor at SBTS—what Sills himself calls a "zero tolerance world"—due to the rumors of his sexual misconduct. (SOF ¶ 56.). In Sills's own words, his conduct with Lyell amounted to adultery and Christian ministry calls for ministers to live "above reproach." (SOF ¶ 57.) Sills could not even obtain work using his teaching skills, regardless of whether it involved opportunities as a minister or missionary per se, even when approaching potential employers who were friendly. (SOF ¶ 58.) In fact, after resigning

from SBTS in May 2018, Sills applied for 46 jobs through 2021 (again, before the SBC engaged Guidepost) and was either rejected or received no response. (SOF ¶ 59.) Moreover, Sills's vocational and reputational repair experts confirmed as much, testifying that Lyell's allegations had already negatively impacted his employment prospects and had prevented him from finding employment and ruined his reputation as early as March 2019 and well *before* May 2022. (SOF ¶ 60.) Sills's reputational repair expert also testified that that there was no way to distinguish any new reputational harm after May 2022. (SOF ¶ 60.)

Sills's claims are therefore barred by the "libel-proof plaintiff" doctrine. As the Tennessee Court of Appeals has explained, "[t]o suffer injury to one's good standing in the community, or damage to one's public reputation, one must possess good standing and reputation for good character *to begin with*." Davis v. The Tennessean, 83 S.W.3d 125, 126 (Tenn 2001), appeal denied (2001) (emphasis supplied). Here, Sills is a former Baptist seminary professor who had already ruined his own reputation within the community by involving himself sexually with a student *long before* Guidepost submitted its report to the SATF.

A subset of the libel-proof doctrine is the "incremental harm" doctrine. When non-actionable parts of a particular publication are damaging, another statement—even if false and published with malice—is not actionable because it causes no harm beyond the harm caused by the (truthful) remainder of the publication. See Masson v. New Yorker Magazine, 501 U.S. 496 (1991). See also Carnett v. WBBJ–TV, No. 14-01309-JDT, 2015 WL 10714007, at *3-4 (W.D. Tenn. 2015). Sills admits that he was having oral sex with Lyell—at times when his wife and family were in the house at the same time it was going on. (SOF ¶ 8.) But even if the public at large could only guess at how far Sills's sexual contact with Lyell had progressed, it is undisputed that because of his abrupt resignation from SBTS his reputation was, in Sills's own words, "totally

destroyed" by the (truthful) rumors of his involvement with Lyell—and this was **before** the Report repeated her allegation that the sexual contact had been nonconsensual. (SOF ¶ 56.)

Furthermore, before the Report repeated Lyell's allegation that the sexual contact had been non-consensual, *Baptist Press* issued two public statements regarding Jennifer Lyell's allegations, the first, on October 5, 2019, stating that the original *Baptist Press* article describing the Lyell-Sills relationship as "morally inappropriate" was inaccurate; the second, on October 15, 2019, taking the form of an apology, stating "*Baptist Press* ultimately failed to convey that the heart of Lyell's story was about sexual abuse by a trusted minister in a position of power at a Southern Baptist seminary." A second public apology was made – by the EC – on February 22, 2022, which stated that Lyell's abuse was "investigated and unequivocally corroborated by the SBC entities with authority over Ms. Lyell and her abuser." (SOF ¶ 62.) The Report's inclusion of Lyell's allegation of sexual abuse could not further destroy a reputation that was already destroyed (by Sills's own admitted conduct).

Similarly, while Sills was able to obtain a letter of transfer from his church after falsely telling his pastor that the physical contact with Lyell amounted to no more than "cuddling," his pastor, Dr. Bill Cook, testified that **if** Sills had in fact told him the encounters had progressed to oral sex (which Sills now admits), the church would **never** have issued a letter of transfer attesting to membership in good standing. (SOF ¶ 64.)[5] Sills also testified that Dr. Cook, who was his Pastor at Ninth & O in Louisville, expelled him from the church after Sills told him the reasons for his resignation from SBTS. (SOF ¶ 66.) Approximately a week after his May 23, 2018 resignation

---

[5]     Indeed, according to the Report, the *Baptist Press's* initial March 8, 2019 article, which described Sills's and Lyell's relationship as "morally inappropriate" rather than as "sexual abuse," was enough to prompt judgmental third parties to flood social media with toxic descriptions of Lyell as an adulteress and led one person to accost Lyell at the June 2019 SBC Annual Meeting and call her a "whore." (SOF ¶ 16.)

from SBTS, Dr. Cook asked Sills to speak to the Ninth & O congregation regarding his departure from the church and to address a "lot of questions going on at the church, what's happened, what's going on with Dr. Sills." Sills declined to speak to the church on the advice of counsel. (SOF ¶ 65.) In other words, if what Sills says is a truthful account of his transgressions was enough to make him a pariah in the church and his resignation from SBTS had already rendered him professionally radioactive,[6] the addition of Lyell's allegations of abuse, even if false, could have resulted in no greater incremental harm. There is, therefore, no triable issue regarding his damages.

G.    There is No Evidence That Guidepost Defamed Mary.

Mary does not have evidence that Guidepost defamed her in the Report, and she is not even mentioned in it.[7] (SOF ¶ 55.) Nor is Mary identified in the EC's list of alleged abusers. As such, she cannot establish a claim for libel against Guidepost. See Steele v. Ritz, 2009 WL 4825183, at *2-3 (Tenn. Ct. App. 2009) (plaintiff has the burden of establishing that the "language was directed to or concerning the charging party").

## II.    THE SILLSES' ACTION IS BARRED UNDER THE ECCLESIASTICAL ABSTENTION DOCTRINE.

The United States Supreme Court has consistently held that the ecclesiastical abstention doctrine prohibits courts from delving into matters of "'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them.'" Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 714 (1976) (quoting Watson v. Jones, 80 U.S. 679 (1871)). As Guidepost previously argued in its motion to

---

[6]    As early as June 2018, Sills was beset by "rumors" of his conduct, causing him to acknowledge to at least potential employers – Samaritan's Purse and NAMB – that he had been accused of "unfair accusations that went beyond inappropriate interaction." (SOF ¶ 61.)

[7]    To the extent Mary suggests Guidepost "aided and abetted" other Defendants in defaming her, the Court has already rejected such a claim, having dismissed the conspiracy count against Guidepost at the motion to dismiss stage. (ECF Doc. No. 134 at 29-30, Doc. No. 135.)

dismiss, courts lack jurisdiction over civil suits that arise out of church investigations and disciplinary actions. See also In re Diocese of Lubbock, 624 S.W.3d 506 (Tex. 2021), cert. denied, 142 S. Ct. 434 (2021) (libel suit "inextricably intertwined" with Catholic diocese's decision to investigate its own clergy; action dismissed under ecclesiastical abstention doctrine).

Guidepost realizes that the Court declined to dismiss the action on the basis of the ecclesiastical abstention doctrine at the pre-answer stage. Sills v. S. Baptist Convention, No. 3:23-cv-00478, 2024 WL 1020569, at *10-11 (M.D. Tenn. Mar. 8, 2024). Guidepost renews this argument at this stage to protect the record and preserve its rights. Guidepost also respectfully maintains that on the record before the Court—and particularly on the face of the Report—no genuine issue of material fact exists that Guidepost was engaged by the SBC, through the SATF, to conduct an independent investigation into the EC, and thereby hold it and others accountable for sexual abuse and institutional failures that enabled it. (SOF ¶ 1.) To permit this action to continue to trial would chill not only Southern Baptists and other religious bodies from preventing sexual abuse within their respective polities, but also firms such as Guidepost from accepting an engagement to investigate and report on such matters.

## III. THE THIRD CAUSE OF ACTION FAILS TO STATE A CLAIM FOR NEGLIGENCE, GROSS, NEGLIGENCE, OR "WANTONNESS".

The Third Cause of Action for negligence, gross negligence, and "wantonness" is predicated entirely upon the publication of the Report. It therefore duplicates the First Cause of Action for defamation and should be dismissed on that basis alone.

In any event, the negligence claim fails on this record. The elements of a claim for negligence are: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995). The threshold

question of whether the defendant owed the plaintiff a duty of care is an issue of law to be determined by the court. See West v. E. Tennessee Pioneer Oil Co., 172 S.W.3d 545, 550 (Tenn. 2005). Fundamentally, where there is no duty there can be no negligence.

As stated above, Guidepost was engaged by the SBC, acting through the SATF. It follows that, as a matter of law, the Guidepost undertook no duty at all to the Sillses and the claim for negligence should be dismissed as to the Guidepost. Guidepost's duty is analogous to that of an auditor, and by the terms of the engagement that duty is generally limited to the SATF, the client with which Guidepost was in privity. See Delmar Vineyard v. Timmons, 486 S.W.2d 914, 921 (Tenn. Ct. App. 1972). See also Brackin v. Trimmier Law Firm, 897 So. 2d 207, 226 (Ala. 2004) (auditor engaged by law firm to investigate misconduct at credit union owed a duty only to her principals, not to the subject of the investigation). The absence of any duty is doubly clear where Mary is concerned, as the Complaint nowhere alleges that Guidepost was engaged to investigate any misconduct on her part rather than the EC's (or that the Report even mentioned any).

Moreover, as set forth in Point I.E, above, the undisputed facts fail to create a triable issue as to whether Guidepost failed in its duty of care (even if one was owed to Sills), inasmuch as they exhaustively interviewed not only Lyell, but Roach (who disclosed to Guidepost what he had learned from Mohler and Cook), and many other witnesses. Nor does the record contain grounds upon which to find a duty of care on Guidepost's part to Mary, much less that it breached it.

For the same reason, the Sillses have no evidence of gross negligence to bring to a jury, which requires proof of an "utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." Ruff v. Memphis Light, Gas & Water Div., 619 S.W.2d 526, 528 (Tenn. Ct. App. 1981). "Wantonness" is similarly predicated upon recklessness and constitutes "intentional wrongful

conduct, done either with knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results." 8 Tenn. Prac. Pattern Jury Instr. – Civil § 3.30 (2022 ed.). Moreover, as stated in Point I.F, supra, Sills has no evidence of damage to reputation proximately caused by Guidepost's submission of the Report to the SATF, which is an indispensable element of any cause of action sounding in negligence. Accordingly, summary judgment should be granted to Guidepost as to the Sillses' Third Cause of Action.

## IV.    NO REASONABLE JURY COULD FIND FOR PLAINTIFFS UNDER THE FOURTH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

A plaintiff asserting a claim for IIED must prove that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff. See Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004). Moreover, IIED is a very narrow tort in Tennessee and "recovery for intentional infliction of emotional distress is limited to mental injury which is 'so severe that no reasonable [person] would be expected to endure it.'" Joiner v. Meharry Med. Coll., No. 3:18-CV-00863, 2020 WL 7027505, at *14 (M.D. Tenn. Nov. 28, 2020) (quoting Arnett v. Domino's Pizza I, L.L.C., 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003)). "A mental injury is serious if it causes a significant impairment to the daily life of a normally constituted person." 8 Tenn. Prac. Pattern Jury Instr. T.P.I. - Civil § 4.35 Intentional Infliction of Emotional Distress (2025 ed.).

First, the Sillses' Fourth Cause of Action is nothing more than a duplicative, repackaged version of their defective libel claim and does not allege mental anguish in other than a purely formulaic manner. See, e.g., Hustler Magazine v. Falwell, 485 U.S. 46, 50-51, 57 (1988) (where speech constitutionally protected, IIED claim based upon the same facts as unsuccessful libel claim cannot survive as an independent cause of action). Moreover, to the extent that Sills is a

public figure he is required to establish facts amounting to constitutional malice to sustain the IIED claim. See id. at 56. As set forth in Point II.A and B, above, he has not.

Second, the IIED claim also fails pursuant to the common interest privilege. Tennessee follows the Restatement (Second) of Torts § 46 in IIED claims. See Miller v. Willbanks, 8 S.W.3d 607, 615 (Tenn. 1999). Under comment (g) to the Restatement, "[t]he actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress."

Third, the undisputed facts also show that he does not have a viable claim to present to a jury. Regarding the element of "outrageous conduct," this Court squarely held in Hunt v. Southern Baptist Convention, 777 F.Supp.3d at 832, that publication in the Report of accusations of sexual abuse by the former SBC President, Johnny Hunt, fell short of the standard of outrageous conduct required under Tennessee law. See also Malmquist v. Hearst Corp., No. 209-CV-2416-JPM-CGC, 2010 WL 1257800, at *6 (W.D. Tenn. Mar. 26, 2010) (publishing an article which falsely portrayed plaintiff as an abusive spouse, by itself, did not rise to the level of conduct so "outrageous in character and so extreme in degree as to go beyond all bounds of decency"); In re Byrnes, 638 B.R. 821, 831 (Bankr. D.N.M. 2022) and cases there cited.

As to the element of intent, the only intent on Guidepost's part was to submit the Report to the SATF—not an intent specifically to harm Sills (or Mary). Indeed, the Sillses' entire theory of the case is that Guidepost failed to contact the Sillses and their pastor to vet Lyell's account, not that Guidepost sought to torment them through outrageous conduct. Nothing in this record establishes anything more than the submission of an allegedly defamatory report and hyperlinking on the Guidepost website, which is unactionable as IIED under the precedents cited above.

Moreover, the element of serious mental injury is absent: Sills admitted that he never consulted a psychiatrist but relies solely upon pastoral counseling. (SOF ¶ 68.) Sills has also disclosed in response to interrogatories that he was able to participate in mission trips in October 2022 and July 2023 and has traveled to on mission trips to Peru in 2024, and vacationed with Mary in Thailand, Ecuador, and Cancun in 2023 and 2024. (SOF ¶ 69.) Plainly, the Sillses are not unable to cope on a daily basis with whatever embarrassment they felt following the SBC's publication of the Report.

To the extent that Mary's claim for IIED is derivative of Sills's claim,[8] it fails for the same reason as his claim. What's more, given that Mary is not mentioned or referenced in any respect in the Report, the source materials, or the list, it defies credulity that Guidepost acted with deliberate disregard as to Mary; she played no part in the Report.

Moreover, Mary has admitted that she has been able to cope with the fallout from the publication of her husband's sexual improprieties even before the Report, through counseling. (SOF ¶ 70.) Mary was also able to work. (SOF ¶ 71.) And as stated above, her day-to-day activities have not been impaired as evidenced by her ability to travel abroad with her husband. (SOF ¶ 69.) Accordingly, no genuine issue of material fact exists with regard to the Fourth Cause of Action.

* * * * *

---

[8] Notably, the $750,000 Tennessee statutory cap for non-economic damages would not apply separately to Sills and Mary because Mary's claim – for libel, negligence, and IIED, are all, at best, derivative to Sills' claim, resulting in the application of a single cap to both Plaintiffs collectively. See Yebuah v. Center for Urological Treatment, PLC, 624 S.W.3d 481, 491 (Tenn. 2021); Tenn. Code. Ann. § 29-39-102.

## CONCLUSION

For the above reasons, Guidepost respectfully requests that this Motion for Summary Judgment be granted and Plaintiffs' claims be dismissed, with prejudice.

Dated: September 19, 2025

Respectfully submitted,

**RILEY & JACOBSON, PLC**

s/ John R. Jacobson
John R. Jacobson, Esq. (BPR # 014365)
Katharine R. Klein, Esq. (BPR # 019336)
1906 West End Avenue
Nashville, TN 37203
Telephone: (615) 320-3700
jjacobson@rjfirm.com
kklein@rjfirm.com

-and-

**MINTZ & GOLD LLP**
Steven G. Mintz (admitted pro hac vice)
Terence W. McCormick (admitted pro hac vice)
Scott Klein (admitted pro hac vice)
Alex Otchy (admitted pro hac vice)
600 Third Avenue – 25th Floor
New York, NY 10016
Telephone: (212) 696-4848
mintz@mintzandgold.com
mccormick@mintzandgold.com
klein@mintzandgold.com
otchy@mintzandgold.com

*Counsel for Guidepost Solutions LLC*

33

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via the ECF Court System on this 19th day of September, 2025 on the following:

| | |
|---|---|
| John W. Barrett<br>Katherine Barrett Riley<br>Sterling Aldridge<br>Barrett Law Group, P.A.<br>P.O. Box 927<br>404 Court Square North<br>Lexington, MS 39095<br>dbarrett@barrettlawgroup.com<br>kbriley@barrettlawgroup.com<br>saldridge@barrettlawgroup.com<br><br>Shannon M. McNulty<br>Kristofer S. Riddle<br>Clifford Law Office, P.C.<br>120 N. LaSalle Street, 36th Floor<br>Chicago, IL 60602<br>smm@cliffordlaw.com<br>KSR@cliffordlaw.com<br><br>***Attorneys for Plaintiffs***<br><br>James C. Bradshaw, III<br>Wyatt, Tarrant & Combs, LLP<br>333 Commerce Street, Suite 1050<br>Nashville, TN 37201<br>jbradshaw@wyattfirm.com<br><br>Byron Leet<br>Thomas E. Travis<br>Wyatt, Tarrant & Combs, LLP<br>400 West Market Street, Suite 2000<br>Louisville, KY 40202<br>bleet@wyattfirm.com<br>ttravis@wyattfirm.com<br><br>***Attorneys for The Southern Baptist Theological Seminary and Dr. R. Albert Mohler*** | Ronald G. Harris<br>Philip N. Elbert<br>Mariam N. Stockton<br>Satchel Fowler<br>Neal & Harwell, PLC<br>1201 Demonbreun Street, Suite 1000<br>Nashville, TN 37203<br>rharris@nealharwell.com<br>pelbert@nealharwell.com<br>mstockton@nealharwell.com<br>sfowler@nealharwell.com<br><br>***Attorneys for Jennifer Lyell***<br><br>Matthew C. Pietsch<br>Gordon & Rees Scully Mansukhani LLP<br>4031 Aspen Grove Drive<br>Suite 290<br>Franklin, TN 37067<br>mpietsch@grsm.com<br><br>Louis Gino Marchetti, Jr.<br>Taylor, Pigue, Marchetti & Blair, PLLC<br>2908 Poston Avenue<br>Nashville, TN 37203<br>gmarchetti@tpmblaw.com<br><br>***Attorneys for Southern Baptist Convention, Dr. Ed Litton and Dr. Bart Barber***<br><br>Alan S. Bean<br>Starnes, Davis, Florie LLP<br>3000 Meridian Blvd., Suite 350<br>Franklin, Tennessee 37067<br>Abean@starneslaw.com<br><br>***Attorneys for Willie McLaurin*** |

| | |
|---|---|
| Thomas J. Hurney, Jr.<br>Gretchen M. Callas<br>Jonathan Anderson<br>Jackson Kelly PLLC<br>500 Lee Street East, Suite 1600<br>Post Office Box 553 Charleston, West Virginia 25322<br>thurney@jacksonkelly.com<br>gcallas@jacksonkelly.com<br>jlanderson@jacksonkelly.com | Brigid M. Carpenter<br>Ryan P. Loofbourrow<br>Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.<br>1600 West End Avenue, Suite 2000<br>Nashville, TN 37203<br>bcarpenter@bakerdoneslon.com<br>rloofbourrow@bakerdonelson.com<br><br>***Attorneys for Executive Committee of Southern Baptist Convention and Rolland Slade*** |

s/ John R. Jacobson