# Exhibit A



# PARTIAL EXPERT OPINION

## ON GUIDEPOST SOLUTIONS LLC's May 15, 2022 "REPORT OF THE INDEPENDENT INVESTIGATION"

For the Southern Baptist Convention Executive Committee's Response to Sexual Abuse Allegations and and Audit of the Procedures and Actions of the Credentials Committee

Submitted to: Shannon McNulty, Partner
Clifford Law Offices

120 N. LaSalle Street
Suite 3600
Chicago, IL 60602
Phone: 312-899-9090

By: Amy E. McDougal, Esq., CCEP
President
703 909 8884
Amy.mcdougal@clearesources.com

June 20, 2025

# TABLE OF CONTENTS

**INTRODUCTION AND BACKGROUND**......................................................................................3

**EXECUTIVE SUMMARY**.....................................................................................................6

**LEGALITY**......................................................................................................................7

**OBSERVATIONS AND OPINION ON INDEPENDENCE**..............................................................9

    Ms. Rachael Denhollander ............................................................................13

    Composition of the Task Force.......................................................................25

    Guidepost's Financial Interests.....................................................................26

**DUE PROFESSIONAL CARE** ...........................................................................................31

    Objectivity. ..................................................................................................33

    Fairness & Thoroughness. ............................................................................37

    Conclusion...................................................................................................53

**RELIANCE MATERIALS** .................................................................................................54

**APPENDIX** ...................................................................................................................55

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege

**Prepared by:**



2

## INTRODUCTION AND BACKGROUND

Ms. Shannon McNulty, partner with Clifford Law Offices, represents Dr. Michael David Sills and Mrs. Mary Sills (the "Plaintiffs") in a legal action against several defendants as enumerated in the complaint. The action involves allegations of defamation among other tortious acts. One of the defendants is Guidepost Solutions LLC ("Guidepost").

The Southern Baptist Convention ("SBC") Sexual Abuse Task Force ("Task Force") engaged Guidepost to conduct an investigation and review of the SBC Executive Committee's actions and inaction related to allegations of sexual abuse in the church community nation-wide. The Guidepost engagement letter ("Engagement Letter") sets forth the scope of the engagement.

> 3.1 In accordance with the SBC Motion, the purpose of the engagement is for Guidepost to conduct an independent investigation into the Executive Committee of the SBC, and an audit of the procedures and actions of the Credentials Committee. Specifically, and as directed by the SBC Motion, Guidepost will investigate:
>
> - Allegations of abuse by Executive Committee members.
> - Mishandling of abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021.
> - Allegations of mistreatment of sexual abuse victims by Executive Committee members from January 1, 2000, to June 14, 2021.
> - Patterns of intimidation of sexual abuse victims or advocates from January 1, 2000 to June 14, 2021.
> - Resistance to sexual abuse reform initiatives from January 1, 2000, to June 14, 2021.

Guidepost spent approximately seven months reviewing documents and interviewing witnesses from October 2021 – May 2022. Guidepost authored and published a Report of the Independent Investigation ("Report") to the Task Force on May 15, 2022. The Report was made available to the public on or about May 22, 2022.

Ms. McNulty engaged my company CLEAResources LLC, to review the investigative portion of Guidepost's Report (but not the audit portion regarding the Credentials

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



Committee) for best practices and professional standards applicable to investigations. After I acknowledged and signed the Confidentiality Agreement, Ms. McNulty provided me access to the Report, its appendices, the complaint filed by her clients Dr. David Sills and Mrs. Mary Sills, and other documents related to and filed in the case for my review, including materials produced in discovery. I did not have access to the documents Guidepost cited in the footnotes of its Report. I did not interview any witnesses.

I relied on my qualifications and professional experience (See Appendix) and several authoritative resources in forming my opinions on the Report. Authoritative resources included:

The "Quality Standards for Investigations" by the Council of the Inspectors General on Integrity and Efficiency, November 15, 2011, https://www.ignet.gov/sites/default/files/files/invprg1211appi.pdf

The "Administrative Investigations Manual," Office of the Deputy Inspector General for Adminstrative Investigations, Department of Defense, September 23, 2022, revised December 4, 2024, https://www.dodig.mil/Portals/48/Documents/Components/AI/AI%20Manuals/AI%20Manual%20ALL%20-%20Final%2012-06-2024.pdf?ver=7C9hPE3QFXZ88G8fjmZ4KA%3D%3D

The "Uniform Principles of Investigations and Good Practice Guidance" by Jeffrey Giddings, published by Global Investigations Review, November 10, 2023, https://globalinvestigationsreview.com/guide/the-aci-corporate-investigators-handbook-in-association-gir/first-edition/article/uniform-principles-of-investigations-and-good-practice-guidance

The "Guide to Conducting An Effective Internal Investigation," McKenna, Long & Aldrige, published by the Association of Corporate Counsel, https://www.acc.com/sites/default/files/resources/vl/membersonly/ProgramMaterial/19856_1.pdf

The "Internal investigations of organizations — Guidance," ISO TS 37008, 2023, https://cdn.standards.iteh.ai/samples/74094/952821f672b1483ba6c19b7c34bf4e55/ISO-TS-37008-2023.pdf

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
Prepared by:



4

This is not a final report. This partial report was drafted under the assumption that all requested information provided to me was current, true, and accurate. It is my understanding that discovery is not complete in this case and various motions are pending with regard to discovery, including but not limited to discovery from Guidepost that may influence my partial analysis, preliminary opinions, and conclusions reflected in this report. I am aware that Guidepost produced to Plaintiff's counsel approximately 1,196 documents. It would be impossible for me to assess the content of that production and how it may or may not impact my analysis in the time between production and the due date of this partial opinion. To form a full and final opinion, I will need to review and analyze all new discovery materials.

Any opinions I offer in this case I hold to a reasonable degree of professional investigative certainty.

I am not aware of any relationships, financial holdings, experiences, or other bases that create a conflict of interest or bias in my review of the Guidepost Report. I do not know and have never heard of any of the witnesses in the case, the claimants, or their attorneys in this action. I am not and have never been Baptist, am not a survivor of sexual abuse or any criminal sexual offense, and have never been accused of sexual abuse. I have received, investigated, and prosecuted complaints of sexual abuse and assault as an attorney in the United States Air Force and as in-house corporate counsel.

I have been a named defendant in a defamation lawsuit filed by Mr. Stephen L. Hutchens, my former spouse. The alleged defamation did not involve sexual abuse or assault. Mr. Hutchens' complaint was dismissed after removal to federal court.

I do know Mr. Bart Schwartz, who is the founder and Chairman of Guidepost Solutions LLC. To my knowledge, he did not participate in the investigation. In 2015, Mr. Schwartz and I, among others, were asked by Mr. John Hanson to be founding board members of the International Association of Independent Corporate Monitors ("IAICM"). I also serve as the Corporate Secretary for IAICM. I have been present at three board meetings with Mr. Schwartz since 2015. In 2020, Mr. Schwartz and I, among others, were Finalists for the Compliance Week "Excellence in Compliance Awards" in the Best Consultant-Small Business category. Mr. Schwartz and Guidepost Solutions won that recognition.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



5

Mr. Schwartz and I do not have a personal or professional relationship outside of our service on the IAICM board. Guidepost Solutions and CLEAResources have never worked together on a project and do not have a business referral relationship.

Mr. Schwartz and Guidepost's CEO, Ms. Julie Myers Wood, are among my LinkedIn "connections." I have never met Ms. Wood, and I do not have a personal or professional relationship with her or any of the other named Guidepost investigators.

## EXECUTIVE SUMMARY

- The legality of the investigation could not be conclusively determined. Tennessee law is not clear on whether a licensed attorney in good standing in another jurisdiction may conduct an investigation for a client that the attorney does not represent as legal counsel.

- The independence of the investigation was severely impaired by the business relationship between Guidepost and Ms. Denhollander.

- The independence of the investigation was destroyed by conflicts of interest: specifically, the influence Ms. Denhollander had on the initiation and the course of the investigation, her role as a witness, legal counsel, victim advocate, her role on the Task Force overseeing the investigation, and the nature and extent to which Guidepost permitted her to influence the final Report.

- The independence of the investigation was impaired by Guidepost's financial interests in obtaining future work from SBC and Ms. Denhollander.

- The objectivity of the investigation was destroyed by the prior business relationship between Guidepost and Ms. Denhollander.

- Guidepost failed to meet professional standards of fairness and thoroughness of the investigation due to Guidepost's failure to fully investigate allegations against Dr. Sills. Due process and professional investigative standards required Guidepost to investigate and verify allegations prior to publishing any findings. To do this, Guidepost was required to obtain more evidence than mere allegations. Specifically, Guidepost failed to notify Dr. Sills of the nature of the allegations and

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



provide him an opportunity to respond and provide evidence. This investigative step was a necessary pre-requisite to investigating whether the Executive Committee had mistreated Ms. Lyell as a "survivor," mishandled her allegations, or engaged in a pattern of intimidation against her.

- Guidepost's Report lacks definitions of terms relevant to its scope such as "victim" and "survivor," "abuse" and "sexual abuse," "mishandling," "mistreatment," and "intimidation."

- The Report lacks any standard of proof by which evidence was considered to make factual findings and conclusions.

- The Report lacks adequate factual findings related to its scope of work.

## LEGALITY

The first issue I analyzed is whether the Guidepost investigation was conducted in compliance with the law. "Those establishing or conducting an internal investigation should identify the regulations and applicable statutes and legislation in all applicable jurisdictions to ensure the legality of the investigation." ISO TS 37008:2023, Section 4.5.

Guidepost's Engagement Letter states in paragraph 6.1: "In the course of the Engagement, Guidepost shall not knowingly engage in any activity, undertaking, or project that is unlawful or illegal under U.S. law or the laws of the place in which the activity occurs." Of course, Guidepost is expected to comply with all laws regardless of whether it is a contractual obligation.

Since many of the interviews for the investigation took place in Tennessee, and the SBC was headquartered there, I reviewed Tennessee law to determine the legality of the Guidepost investigation.

Tennessee law requires any person conducting a private investigation to be licensed by the state to do so. TN Code § 62-26-204 (2024). There is an exemption for an "attorney-at-law" who is licensed to practice law and in good standing. TN Code § 62-26-223 (b)

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



7

(3) (A) (i) (2024). That same code section also authorizes anyone not licensed to practice law but who is employed by the attorney-at-law to assist with an investigation within the scope of their employment.

Tennessee's statute is not clear on whether attorneys licensed only in other states fall into this "attorney-at-law" exception. I did find Tennessee Attorney General Opinion #03-097, August 13, 2003 that addressed this question.[1] That Opinion asserted that attorneys licensed in other states fit the attorney exception to the requirement for licensure to do private investigations. It is not clear whether Tennessee intended to restrict the attorney exemption to private investigations conducted by an attorney on behalf of *legal clients* whom they represent as counsel, or whether the exemption would also apply if a licensed attorney was acting solely in the capacity of a private investigator, as Guidepost was, but not engaged as legal counsel for a client.

The Opinion does not go as far as to say that a licensed attorney must be operating within the scope of the attorney's profession when conducting a private investigation in order to qualify for the exemption. However, the statute's use of "attorney-at-law" as opposed to "attorney" infers as much. Other jurisdictions include clarifying language that restricts attorneys to investigating only in the ordinary or regular practice of their profession. For example, in the District of Columbia where Guidepost's CEO Ms. Julie Myers Wood is based, a private investigator license is not necessary for "attorneys-at-law in the ordinary practice of their profession." See Code of the District of Columbia § 47–2853.181 (1). New York, where Guidepost is headquartered, uses similar language. New York law requiring licensure for private investigations exempts "attorneys or counselors at law in the regular practice of their profession." NY Gen Bus L § 83 (2024).

In sum, it is not clear whether out-of-state licensed attorneys in good standing are permitted, without Tennessee private investigator licensure, to conduct investigations for anyone the attorney does not represent as legal counsel. If Tennessee exempts only attorneys-at-law acting in the ordinary course of their profession, the entire Guidepost investigation would violate Tennessee laws, as none of the investigators were engaged as attorneys to represent SBC, and thus, were not engaged in the ordinary or regular practice of the legal profession in conducting the investigation.

---

[1] https://www.tn.gov/attorneygeneral/opinions/2003-opinions.html

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



8

The Guidepost website does not indicate whether Ms. Wood, who provided executive oversight for and participated in the investigation, is licensed to practice law and in good standing in any jurisdiction. However, I was able to confirm through the Illinois bar that she is licensed and in good standing as of the date of this partial report. I was not able to confirm that she was licensed and in good standing at the time of the investigation.

Ms. Krista Tongring, Guidepost "Project Manager" for the investigation, and now Guidepost's "President," appears to have held a New Jersey license to practice law beginning in 1996, but has not been eligible to practice law since October 16, 2023, when she was listed on a New Jersey Supreme Court "Order of Attorney Ineligibility for CLE Non-Compliance" as administratively ineligible due to failure to complete continuing legal education.[2] A check of the New Jersey database of licensed attorneys returned a result of "Admin Ineligible."[3] Therefore, it appears that Ms. Tongring is not currently "licensed to practice law" and "in good standing" in New Jersey. She may have been licensed and in good standing at the time of the investigation but if she was declared "admin eligible" in October 2023, she was probably deficient in CLE credits for 2022, and thus, may not have been "in good standing." However, she may have been licensed and in good standing in another state.

If neither Ms. Wood nor Ms. Tongring were licensed attorneys in good standing in any jurisdiction during the time of the investigation, they would have needed to be *employees* of a licensed attorney performing the investigation in order to be in compliance with Tennessee law. Without this information, I am not able to conclusively determine that the investigation was legal under Tennessee law.

## OBSERVATIONS AND OPINION ON INDEPENDENCE

It is my opinion that the independence of the Guidepost investigation was severely impaired.

---

[2] https://www.njcourts.gov/sites/default/files/notices/2023/10/n231016a.pdf
[3] https://portalattysearch-cloud.njcourts.gov/prweb/PRServletPublicAuth/app/Attorney/-amRUHgepTwWWiiBQpI9_yQNuum4oN16*/!STANDARD?AppName=AttorneySearch

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



9

The International Organization for Standardization ("ISO") Standard 37008 defines an investigation as a "professional fact-finding process, initiated by or for an organization, to establish facts in relation to alleged or suspected wrongdoing, misconduct or noncompliance." ISO TS 37008:2023.

The initiating organization in this situation was the Sexual Abuse Task Force ("Task Force") formed by the Southern Baptist Convention ("SBC") Executive Committee ("EC") for the purpose of overseeing the investigation, in conjunction with the Committee on Cooperation, newly formed to ensure cooperation with the investigation. The Task Force consisted of members appointed by the SBC Executive Committee and two advisors, one of which was Ms. Rachael Denhollander, a survivor advocate.

The Task Force was specifically listed as the "client" in the Guidepost Engagement Letter, page 1 ("Engagement Letter"). The Task Force engaged Guidepost to "conduct an independent investigation" of:

- Allegations of abuse by Executive Committee members.

- Mishandling of abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021.

- Allegations of mistreatment of sexual abuse victims by Executive Committee members from January 1, 2000, to June 14, 2021.

- Patterns of intimidation of sexual abuse victims or advocates from January 1, 2000 to June 14, 2021.

- Resistance to sexual abuse reform initiatives from January 1, 2000, to June 14, 2021.

Engagement Letter, page 2.

Independence is a critical professional standard of any investigation to ensure that the results of the investigation are credible and are worthy of trust and confidence.

According to ISO/TS 37008:2023, Section 4.1, "An internal investigation should not be influenced or controlled by other people, events or incentives in relation to the subject matter that is being investigated." Section 4.4 reads, "An internal investigation should be free from conflict of interest, conducted objectively and based on factual evidence. The investigation should not be influenced by personal feelings, interpretations or prejudice."

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



10

According to the Quality Standards for Investigations ("Standards")[4] issued by the Council of the Inspectors General on Integrity and Efficiency, independence is one of the general standards for investigations.

> In all matters relating to investigative work, the investigative organization must be free, both in fact and appearance, from impairments to independence; must be organizationally independent; and must maintain an independent attitude.

> This standard places upon agencies, investigative organizations, and investigators the responsibility for maintaining independence, so that decisions used in obtaining evidence, conducting interviews, and making recommendations will be impartial and will be viewed as impartial by knowledgeable third parties. There are three general classes of impairments to independence: personal, external, and organizational.

The Standards further define in more detail the impairments to independence:

> **Personal Impairments**—Circumstances may occur in which an investigator may experience difficulty in achieving impartiality because of their views and/or personal situations and relationships. These impairments may include the following:

1. Official, professional, personal, or financial relationships that might affect the extent of the inquiry; limit disclosure of information; or weaken the investigative work in any way;
2. Preconceived opinions of individuals, groups, organizations or objectives of a particular program that could bias the investigation;
3. Previous involvement in a decisionmaking or management capacity that would affect current operations of the entity or program being investigated;
4. Biases, including those induced by political or social convictions that result from employment in, or loyalty to, a particular group or organization; and
5. Financial interest in an individual, an entity, or a program being investigated.

> **External Impairments**— Factors external to the investigative organization may restrict its ability to conduct an independent and objective investigation and issue reports of investigation. Such factors include:

---

[4] https://www.ignet.gov/sites/default/files/files/invprg1211appi.pdf

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



11

1. Interference in the assignment of cases or investigative personnel;
2. Restriction on funds or other resources dedicated to the investigation or to investigative organizations;
3. Influence on the extent and thoroughness of the investigative scope, the way in which the investigation is conducted, the individual(s) who should be interviewed, the evidence that should be obtained, and the content of the investigative report; and
4. Denial of access to sources of information, including documents and records.

**Organizational Impairments**—An investigative organization's independence can be affected by its position within the hierarchical structure of the subject Government entity. To help achieve maximum independence, the investigative function should be positioned outside the staff or reporting line of the unit or employees under investigation. Investigations of OIG personnel should always reflect a special sensitivity to this issue of independence.

While Guidepost states in its titled "Independent Report," "[a]n overriding principle" (page 9) and "key component" (page 18) of the investigation was "our independence," and further emphasizes that the Task Force is the "client," and that the Committee on Cooperation will not "conduct, direct, or otherwise manage or influence our investigation in any manner," it is my opinion that the independence of the investigation was impaired and undermined by three major factors: the multiple conflicting roles of Ms. Rachael Denhollander's involvement, the composition of the Task Force that provided oversight, and Guidepost's desire for continuing engagements with SBC.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



<u>Ms. Rachael Denhollander</u>

Ms. Denhollander is a survivor and public advocate for survivors of sexual abuse. According to her website rachaeldenhollander.com, she is a licensed attorney who offers legal consultation and representation, institutional and leadership consulting, and public speaking on the topic of prevention and response to sexual abuse. Ms. Denhollander has played multiple roles related to the SBC, the Guidepost investigation and Report, and other witnesses, in addition to being a witness herself to facts within the scope of the investigation. These roles created conflicts of interest that destroyed the independence of the investigation and Report.

First, as legal counsel, Ms. Denhollander represented Ms. Jennifer Lyell, a named defendant in the Sills' complaint and the most featured and prominent individual in the Report who alleged abuse. Ms. Denhollander's representation appears to be in connection with Ms. Lyell's claims against the SBC Executive Committee – the target of the Guidepost investigation and the entity that formed the Task Force and Commmittee on Cooperation overseeing the Guidepost investigation. From the perspective of attorney rules of professional conduct, Ms. Denhollander would be considered an adversary of SBC in the role of legal counsel for Ms. Lyell on that matter.

Second, as an advisor to or agent of SBC, Ms. Denhollander previously provided advice to Southern Baptist Theological Seminary, ("SBTS") (an entity of SBC) through its President, Dr. Albert Mohler (Mohler Deposition, 110:7-14), in the immediate wake of Ms. Lyell's initial allegations. Ms. Denhollander was also formally retained by SCB EC to advise the Task Force and is listed as a member.[5] From the perspective of professional conduct rules for attorneys licensed in California, as Ms. Denhollander was/is, this creates conflict of interest concerns with her representation of Ms. Lyell against the same entity on the same matter. State bar rules vary on whether this conflict may be waivable by the clients after informed consent. Similar problems arise under the standards for professional victim advocates. I saw no evidence that Ms. Denhollander was certified as a Victim Advocate by the National Organization for Victim Advocates, but if I were to hold Ms. Denhollander to the Code of Professional Ethics for Victim

---

[5] https://www.baptistpress.com/resource-library/news/litton-names-task-force-to-over-see-third-party-review-of-sbc-executive-committee/



This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
Prepared by:

Assistance Providers, her conduct would have violated several of those professional standards.

Third, Ms. Denhollander is a witness with knowledge of facts relevant to Guidepost's scope. In a Facebook post made by Ms. Denhollander on June 9, 2025, in response to the death of Ms. Lyell, she stated, "I know what Jen disclosed when she spoke up about her abuse, and I know what her abuser said when he was confronted, because I was called by the leader of SBTS [an entity of SBC] for counsel shortly after." It appears from the evidence, the "leader" referenced here was Dr. Mohler, as he referenced in his deposition that he consulted her. Ms. Denhollander went on to write she did not know who Ms. Lyell was at the time Dr. Mohler called her for advice about Ms. Lyell's alleged abuse. Ms. Denhollander's Facebook statements evidence that she had first-hand knowledge of facts relevant to Ms. Lyell's allegations of abuse and claims against the SBC, and thus, relevant to Guidepost's investigation into how reports were handled (although the scope of the engagement included only how the Executive Committee handled reports of abuse, not how SBC entities had handled them).

From a professional standpoint, it appears that Ms. Denhollander engaged in "switching sides" even if she gave SBTS advice only from the perspective of a survivor and not that of a lawyer, but then later represented or advised Ms. Lyell as legal counsel on those same allegations for which she also had first-hand knowledge from the adversary. This is a classic case of switching sides. No doubt, both Dr. Mohler and Ms. Lyell considered Ms. Denhollander's advice to be invaluable, but the fact that she served (at least) "two masters" is problematic to the extent that a pivotal issue in Guidepost's investigation was how Ms. Lyell was treated by SBC's Executive Committee in the wake of her public disclosure of her allegations of abuse.

My concern about her status as a witness is compounded by the evidence that Ms. Denhollander herself has been the target of SBC EC's mistreatment of survivors and advocates in the years that are within the scope of the investigation. As noted in the Report, Ms. Denhollander had spoken critically of the SBC EC and its handling of sexual abuse reports. Report, page 177. Further, one member of the EC and its General Counsel, Mr. August Boto, alleged Ms. Denhollander was part of a "satanic scheme." Report, page 92, 170. Despite being an appointed advisor to the Task Force overseeing the investigation, not being a member of the EC or a Trustee during the scope of the investigative inquiry, not having been legal counsel to SBC or its entities,

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



14

and not having been noted in the Report as legal counsel for Ms. Lyell, Ms. Denhollander was named six times in the report. The fact that a person appointed to the Task Force is named in the Report is, and should have appeared to Guidepost to be, a major problem for the independence of the Report.

Fourth, Ms. Denhollander's history of and subsequent engagements with both Guidepost and SBC raise the appearance of bias and personal or financial interest in the outcome of the investigation and raises a question whether the trust Guidepost placed in Ms. Denhollander may have directly or indirectly impacted the objectivity, fairness, and thoroughness of Guidepost's inquiry into Ms. Lyell's allegations.

Ms. Denhollander and Guidepost have worked together on other abuse-related investigations that pre-date Guidepost's investigation. As reflected in Guidepost's August 2021 report in another case, Guidepost stated this about Ms. Denhollander:

> Throughout the engagement, our team worked closely and collaboratively with Rachael Denhollander, a well-known trauma informed advocate for survivors of sexual abuse. RZIM retained Denhollander as a consultant to educate and advise [the] Board and senior leadership in understanding trauma and abuse as well as best-standards practices and also to serve as a confidential liaison with survivors and to help guide the process of care, justice, and restitution for those who have been victimized. We value the experience and expertise of Denhollander as a trauma-informed victims' advocate in the sexual abuse area, and relied upon her advice throughout the course of our engagement to make sure we were sensitized to any area of concern for victims.[6]

An online article from June 2021 expressed concern about Guidepost as the third-party investigators of the SBC EC. It included a reference that Ms. Denhollander had endorsed Guidepost to look into what the author descibes as the "Lorrits situation."

In January 2021, Summit Church announced it engaged Guidepost to investigate whether allegations of abuse were covered up by Lorrits, who was a pastor.[7] Summit

---

[6] https://mennoniteabuseprevention.org/wp-content/uploads/2024/02/Guidepost-Solutions-report-2021-Ravi-Zacharias-International-Ministry.pdf

[7] https://thewartburgwatch.com/2021/06/18/is-guidepost-solutions-really-the-solution-to-investigations-in-the-sbc/

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



15

Church's announcement stated, "[w]e selected Guidepost Solutions at the recommendation of trusted advocates."[8]

In a previously issued statement, Summit Church stated it consulted its Church Cares Team for how to improve its processes. A click on the hyperlink "Church Cares Team" links to a website where Ms. Denhollander is featured in a training video produced by Lifeway, a SBC entity. She is also listed as a "Contributor" at the bottom of the webpage.[9] It is reasonable to infer from these facts that Ms. Denhollander referred Summit Church to Guidepost.

After the Report was issued to the Task Force on May 15, 2022, it appears that Ms. Denhollander and Guidepost remained in a business relationship that included at least referrals. It is even possible they may have an agreement for referral fees, commissions, or finder's fees between them, which would also destroy the independence of the investigation.

Only three days after the Report was made available to the public, the SBC announced on May 25, 2022 that it had selected Guidepost to continue to operate the survivor hotline it had established for its investigation.[10] This is discussed further *infra*. Subsequently, Guidepost referred hotline cases to Ms. Denhollander.

On the same day of the SBC announcement, Ms. Denhollander posted the below on X, notably omitting that she was one of the victim advocates (if not the only victim advocate) that Guidepost would refer calls to:

---

[8] https://summitchurch.com/Content/ExternalSite/Documents/Summit-Statement-and-Guidepost-Solutions-Report.pdf?utm_source=press_page&utm_medium=web&utm_campaign=guidepost_statement

[9] https://churchcares.com.

[10] https://guidepostsolutions.com/sbc-ec-investigation/#:~:text=SBC%20Hotline%20%2B%20Updated%20FAQ,or%20SBChotline%40guidepostsolutions.com

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
Prepared by:




**Rachael Denhollander**
@R_Denhollander
Follow

This hotline is a confidential line to Guidepost Solutions, the same firm which just did the SBC investigation. They will connect you with a victim advocate if requested, and ensure the report is properly handled.

Thread –


**Ruth Graham** @publicroad · May 25, 2022
New: Southern Baptists announce a confidential hotline (202-864-5578) for allegations of abuse within the SBC, which it describes as "a resource to survivors and entities in responding properly while we work to put more permanent procedures in place."

2:21 PM · May 25, 2022

In late 2022 or early 2023, Guidepost was engaged by Broadmoor Baptist Church to do an investigation into allegations of clergy sexual abuse. Again in this case, the Church Council first engaged Ms. Denhollander after the initial disclosure and then subsequently engaged Guidepost to do an investigation.[11]

Ms. Denhollander and Guidepost have worked together on at least three engagements in which they each have referred work to the other, both before and after the SBC investigation.

Several publicly available online articles also raise the issue of Ms. Denhollander's conflicts of interest arising from trying to fill too many roles.[12]

Survivor and advocate Ms. Christa Brown, also an attorney, raised the ethical issues of conflicts and transparency in an online article published in January 2023. Ms. Brown felt compelled to disclose that if a survivor calls the SBC sexual abuse hotline maintained by Guidepost, Ms. Denhollander is the "advocate" to whom survivors are referred to help them "evaluate press and legal options." Ms. Brown stated it this way:

---

[11] https://www.broadmoor.org/wp-content/uploads/2024/07/FAQ_rev07.14.24.pdf
[12] E.g. https://www.baptistpress.com/resource-library/news/sexual-abuse-hotline-fully-confidential-task-force-says/ **;** https://www.washingtonpost.com/reli-gion/2023/01/13/southern-baptist-sexual-abuse-hotline/ ; https://protes-tia.com/2023/01/11/sbc-in-turmoil-evidence-corroborates-browns-attack-on-denhol-lander/

This report was prepared at the direction of legal counsel in anticipation of litigation and may consti-tute attorney work product entitled to attorney-client privilege
Prepared by:



> Thus, Denhollander has been occupying dual and potentially conflicting roles: (1) as the designated advocate for individual survivors who make sexual abuse and concealment reports involving the SBC and its affiliated churches; and (2) as an adviser to the SBC on its handling of sexual abuse and concealment.
>
> At a minimum, these dual roles create the appearance of a conflict of interest, which would be troubling in and of itself, and they may potentially give rise to an actual conflict.[13]

In my opinion, Ms. Brown was soft in her language. The conflict of interest is more than an appearance. From the evidence I reviewed, it is clear that the trust and confidence Guidepost placed/places in Ms. Denhollander affected how Guidepost investigators decided who to interview and what evidence to collect and even what to include and how to say it in the Report.

Specifically, the evidence shows that the relationship between Guidepost and Ms. Denhollander, coupled with the relationship between Ms. Denhollander and Ms. Lyell, may have influenced Guidepost to give Ms. Lyell's allegations more credibility and focus than it would have absent Guidepost's relationship with Ms. Denhollander. It is notable that Ms. Lyell's allegations and history received more pages in the Report than any other allegations or substantiated cases of abuse. It is also notable that Guidepost did not appear to question or explore whether Ms. Lyell's allegations were true or had been verified by any investigation. It appears Guidepost relied on Ms. Denhollander's assurances as a trusted business partner that Ms. Lyell's allegations of abuse had been substantiated, or in the alternative, did not need to be substantiated. This is addressed in more detail *infra* under the Due Care section.

While there is nothing unethical about doing business with those whom you know, trust, and are experts in their field, an investigation cannot be deemed "independent" if the investigators have a prior relationship of trust with someone who is a witness, an advocate (of any kind) for a witness, or who sits on the committee overseeing the investigation. One need not be an expert in conflicts of interest to see the appearances of bias that arises from what is, in reality, a close and trusted relationship between Ms. Denhollander and Guidepost. It is clear Guidepost would be inclined to, and did, give more weight and credibility to Ms. Denhollander's statements and assurances as a

---

[13] https://baptistnews.com/article/sbcs-sexual-abuse-hotline-raises-ethical-issue/

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



business partner than if she was a random survivor advocate unknown to Guidepost. The Report indicates that investigators spoke with 14 survivor advocates, however, I saw no evidence that any of the other 13 advocates had the opportunity to review and edit the Report as Ms. Denhollander did.

Ms. Denhollander would certainly have known about her various conflicts but it is difficult to understand why none of the Guidepost investigators, many of whom are lawyers, did not see, acknowledge, address, disclose, or mitigate Ms. Denhollander's patent conflicts of interest or see how Guidepost's relationship with Ms. Denhollander might compromise the independence of its investigation.

Guidepost's Engagement Letter stated on page 7, section 10.2, "Guidepost is not aware at this time of any conflict of interest that would preclude Guidepost from providing services to the Task Force in this Engagement." However, Ms. Denhollander was mentioned in the Report as essentially a victim of the EC's mistreatment of advocates, which is directly within the scope of the engagement. This made her a "witness." In addition, she was named to the Task Force overseeing the investigation, featured in training products produced by SCB entity Lifeway, she had advised SBC entities in the past on how to respond to allegations of abuse (including Ms. Lyell's), and she was representing Ms. Lyell on a matter within Guidepost's scope. It is not reasonable to believe that Guidepost did not know any of this, given its prior work with Ms. Denhollander. Moreover, if Guidepost was awarded this engagement based on a referral from Ms. Dehollander, Guidepost should have addressed and disclosed that the moment it knew she was a witness in the case and when it knew she was an adviser to the entity overseeing its investigation, whichever came first.

The relationship between Guidepost and Ms. Denhollander may easily be deemed to create "personal impairments," creating a circumstance in which an investigator may experience difficulty in achieving impartiality because of their views and/or personal situations and relationships. Examples of personal impairments from the Quality Standards for Investigations include:

1. Official, professional, personal, or financial relationships that might affect the extent of the inquiry; limit disclosure of information; or weaken the investigative work in any way.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
Prepared by:



19

Here, there was clearly a pre-existing and then on-going professional relationship between Guidepost and Ms. Denhollander that seems to have affected the extent of the inquiry, specifically, Guidepost's willingness to question the credibility of Ms. Lyell's allegations or interview any witness that may have provided evidence that contradicted Ms. Lyell's and Ms. Denhollander's narrative. This is even more plausible if Ms. Denhollander had referred the SBC to Guidepost for this substantial engagement worth millions of dollars.

2. Preconceived opinions of individuals, groups, organizations or objectives of a particular program that could bias the investigation.

In my opinion, it is impossible for a reasonable person to believe that Guidepost had no "preconceived opinions" about Ms. Denhollander when they had served as referral sources to each other for at least a few years prior to October 2021 when the investigation began. The early pages of the Report do not name Ms. Denhollander but reference much of her involvement and objections to the SBC EC's inaction on the issue of sexual abuse by clergy.

On page 5, the last paragraph is titled "Pattern of Intimidation of Victims or Advocates" – "advocates" would include Ms. Denhollander who had spoken critically of the SBC EC's handling of allegations and been the target of Mr. Boto's denigrating words about being "satanic." If Ms. Denhollander provided evidence or a witness statement, or even endorsed the credibility of another witness, in my opinion, Guidepost would find that credible without further inquiry.

On page 111, the Report states that survivor advocate "Christa Brown" and "an advocate" criticized the Credentials Committee in a December 2019 article on churchleaders.com for not taking anonymous hotline calls. The "advocate" is mentioned twice in this paragraph and was discovered to be, after a brief online search, Ms. Denhollander.[14] Why didn't Guidepost use her name like it used Ms. Brown's name? An "advocate" is also referenced on page 171, apparently in connection with this same December 2019 article. In an investigative report, it is important to name individual

---

[14] https://churchleaders.com/news/367032-credentials-committee-portal-sexual-abuse.html/2

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
Prepared by:



20

witnesses unless there is a compelling privacy or other legal reason to leave a person unnamed. Guidepost appears to avoid naming Ms. Denhollander many places in the Report, instead frequently anonymizing her. That raises questions.

Footnote 320 on page 119 states, "A witness indicated that the NDA was designed to silence a survivor advocate from discussing Ms. Lyell's case in the future." Here again, Guidepost does not name the witness who shared this sensitive information about Ms. Lyell's settlement negotiations, and does not name the "survivor advocate." Given that Ms. Denhollander was representing Ms. Lyell, it is likely that she is the survivor advocate. How many other places in the Report is Ms. Denhollander's identity anonymized, and why? The fact that I am asking that question indicates the independence of the investigation is compromised.

Ms. Denhollander cannot credibly claim she did not know or did not control what made it into the final Report because she and Ms. Lyell had an opportunity to review and edit the draft before Guidepost finalized it. I reviewed both Ms. Denhollander's edit requests from May 17, 2022, and Ms. Lyell's requested edits from May 20, 2022. The fact that Guidepost permitted Ms. Denhollander and Ms. Lyell to review and edit the Report before finalizing it absolutely decimates any scintilla of independence that may have been arguable after considering Ms. Denhollander's many other conflicts of interest. This is the proverbial "final nail in the coffin."

Guidepost's Engagement Letter states in Section 3.6: "No member of the Committee on Cooperation, Task Force, the SBC, the Executive Committee, or the Credentials Committee shall be permitted by Guidepost to edit the report prior to its public release." In violation of the terms of the Engagement Letter, Guidepost permit such editing by Ms. Denhollander. Ms. Denhollander was officially engaged by SBC and announced as a member of the Task Force. On the contrary, Ms. Lyell is not a "member" of any of the above entities, however, it should be obvious to professional investigators that witnesses should not be permitted to review a draft report of investigation or make or suggest specific edits. I reviewed no evidence that any other witness, advocate, or Task Force member had the opportunity to review and edit the Report before its publication. Even if others had, it would not restore the independence of the investigation.

The final and fatal blow to the independence and objectivity of the investigation is Ms. Denhollander's statements in her May 17, 2022 list of requested corrections and edits.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
Prepared by:



First, in them, she confirmed she was a fact witness by corroborating the alleged contents of certain documents in her possession but that were apparently not provided to Guidepost. She further stated she could testify to certain statements made to her by EC members – statements that are within the scope of the investigation and should have been recorded by Guidepost as witness statements. "I can testify to all of this." "Ed confirmed to me . . . ." "I was working directly with Jonathan and Ed . . . to get this cleaned up quickly." "Dr. Mohler confirmed this to me himself at least twice when I was working with him to try to reach a private and calm resolution." [for Ms. Lyell] GPSILLS_009717.

Second, Ms. Denhollander confirmed that Ms. Lyell's "settlement and the hiding of it from the EC has been the driving force in getting this investigation underway in the last two years – this absolutely would not be happening if that had not happened. Because this has been *the* topic of conversation and the lynchpin for why we are here…" GPSILLS_009717 (emphasis in original). Ms. Denhollander goes as far as to write exactly what she wanted Guidepost to include in the Report. Guidepost wrote in response, "I'm okay with this if you want to modify the language and level of detail to fit our report – I've always felt we didn't add enough about the settlement." GPSILLS_009718. If the person who was the "driving force" behind the investigation edits the final report, it can no longer be called an "independent investigation."

The Report reads very differently after awareness of the pre-existing relationship between Guidepost and Ms. Denhollander and understanding Ms. Denhollander's was not only a witness to the facts under investigation, but she reviewed the Report and provided comments and edits to Guidepost before they finalized it. I am not the only one who has drawn these reasonable inferences. An article titled "Explaining the Very Strange Problems of the Guidepost Report on Sexual Abuse in the SBC," posted by The Jones on June 21, 2022, stated this in part:

> If you read what is below, I think you will see, as I do that despite a very real problem (which I described in the previous post, that you can view here) this $2,000,000 Guidepost Report does not deliver in any substantive way. Instead, it is mostly just a grift created to perpetuate the business prospects of Guidepost Solutions, Rachel Denhollander, and certain

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



people with active litigation against SBC affiliated entities and officials.[15]

3. Previous involvement in a decisionmaking or management capacity that would affect current operations of the entity or program being investigated.

I did not review evidence that indicated Guidepost had any previous involvement in institutional decisionmaking that would constitute a personal impairment of independence. As discussed *infra*, I believe that Guidepost's subsequent involvement in institutional decisionmaking negatively impacted the perception of independence of its investigation.

However, Ms. Denhollander, upon whom Guidepost primarily and heavily relied for this investigation *did* have previous involvement in decisionmaking that affected the entity being investigated. Evidence showed Ms. Denhollander was a key figure behind the motion approved by the Messengers that initiated and authorized the investigation. She stated, "The [    ] motion was about Jen's case, I expanded the date range to ensure we could go well beyond her." GPSILLS_009719. Ms. Denhollander casually ended her four-page list of requested edits, corrections, and additions for the Guidepost Report with this sign-off, confirming that the investigation was, in essence, the 'Jennifer Lyell Show'.

The evidence proves that the investigation was exactly what it appears to be: Ms. Denhollander wanted vindication and certain SBC actions for herself and her clients, so she advocated and as a trusted advisor, she influenced SBC to approve an "investigation" into "Jen's case," referred her close business partner Guidepost for the work, was then appointed by SBC to the committee overseeing the investigation into "Jen's case" while she was serving as Jen's legal counsel and abuse advocate against the SBC. She then crafted and sculpted the investigation findings and recommendations to meet her and her clients' needs. Whether and how much she was paid by Guidepost, the SBC, and her legal clients for her conflicting roles is not shown by the evidence I reviewed. She may have been paid a portion of Ms. Lyell's settlement, she may have been paid a referral fee by Guidepost, and she may have been compensated for her advisory role on the Task Force. These facts are relevant to analysis of the

---

[15] https://jcalebjones.com/2022/06/21/explaining-the-very-strange-problems-of-the-guidepost-report-on-sexual-abuse-in-the-sbc/

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
Prepared by:



23

independence and objectivity of the investigation, but regardless of what the evidence on compensation shows, those facts cannot resurrect the independence of the investigation.

4. Biases, including those induced by political or social convictions that result from employment in, or loyalty to, a particular group or organization.

The history of the business relationship between Guidepost and Ms. Denhollander creates a strong appearance of bias, if not actual bias, that impaired the independence of the investigation and its "findings." In my opinion, bias appears to have affected Guidepost's ability or willingness to fully, thoroughly, fairly, and independently investigate Ms. Lyell's initial non-public allegations and whether or not she was mistreated by the EC after she was requested to, or decided to, publicly disclose her allegations through Baptist Pres while an employee of SBC.

Guidepost was not free of bias with respect to Ms. Denhollander. One month prior to being engaged by SBC, Guidepost had just publicly stated of Ms. Denhollander, "We value the experience and expertise of Denhollander as a trauma-informed victims' advocate in the sexual abuse area, and relied upon her advice throughout the course of our engagement to make sure we were sensitized to any area of concern for victims."[16]

This segues to the reasonable conclusion that Guidepost's bias may have made it more willing to rely on and believe evidence Ms. Denhollander offered *or endorsed* because it valued her "experience and expertise." Ms. Denhollander stated she knew what Ms. Lyell alleged and what Dr. Sills stated in response because she was contacted by Dr. Albert Mohler immediately after Ms. Lyell's allegations. It is reasonable to infer that Ms. Denhollander corroborated to Guidepost the abuse Ms. Lyell alleged, when really the only thing she could corroborate was the *disclosure* of the abuse. Ms. Denhollander may even have told Guidepost it did not need to interview Dr. Sills or any witness other than herself. Dr. Sills never got to share any evidence to show that the sexual conduct between him and Ms. Lyell was consensual and not violent or forced, as alleged.

---

[16] https://mennoniteabuseprevention.org/wp-content/uploads/2024/02/Guidepost-Solutions-report-2021-Ravi-Zacharias-International-Ministry.pdf ; page 9

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege

**Prepared by:**



24

Further evidence of bias and that the Report was not independent but rather a manifesto of sorts to remedy Ms. Lyell's complaints is found in an email exchange between Ms. Wood and Ms. Lyell on May 19th and 20th, 2022. GPSILLS_031013. This exchange occurred after the internal publication of the Report but before the Report was made public. In that email exchange, Ms. Lyell had reached out directly to Ms. Wood, bypassing Project Manager Ms. Tongring, to express her concerns about the content of the Report. It appears Ms. Lyell wanted to be sure that nothing in the Report would raise questions about whether she had told the "truth," and that the Report did not deviate from her narrative as the Baptist Press article had. Ms. Wood responded, "We have been working extremely hard to ensure that the report is completely factual but happy to have a call to ensure you are comfortable." That was highly improper. Guidepost was engaged to be the "fact-finder" in an investigation. While it is acceptable to ensure interview techniques are trauma-informed for the comfort of a witness, the investigative findings must not be manipulated to make anyone "comfortable." Changing the findings or language of an investigative report to ensure a witness is "comfortable" shows bias. Ms. Wood's statement is evidence that Guidepost was aiming to please Ms. Lyell: by giving her access to review the Report before the public and by giving her a platform to massage Guidepost's "findings" and how they were presented to the client and the public.

Guidepost's bias impaired the independence of the investigation because Guidepost should have assessed the credibility of each witness in the same way and taken the time to ensure that there was enough evidence to support any statement in its Report that Dr. Sills had engaged in "abuse" of Ms. Lyell.

Composition of the Task Force

In my opinion, the composition of the Task Force and the manner by which it was formed compromised the independence of the Report.

First, as discussed *supra*, Ms. Denhollander was publicly listed as an advisor to the Task Force at the same time she represented Ms. Lyell as an advocate and possibly as legal counsel, and at the same time she had an established and on-going business relationship with Guidepost that is neither fully known, nor been disclosed. It is not clear from the evidence I reviewed whether Ms. Lyell, SCB EC, or Guidepost, or all of them,

This report was prepared at the direction of legal counsel in anticipation of litigation and may consti-
tute attorney work product entitled to attorney-client privilege
Prepared by:



were paying Ms. Denhollander or had an agreement to pay Ms. Denhollander for her services.

Second, the Task Force was appointed by a SBC President who is an *ex-officio* member of the entity under investigation. While the Task Force was a better option than the EC directly overseeing an investigation into itself, I cannot state that by forming an ad hoc committee to oversee the investigation did much of anything to create independence. This is especially true considering that yet another ad hoc committee was formed to ensure the EC's "cooperation" with the investigation.

Guidepost's Financial Interests

Subsection 5 of the Standards' "Personal Impairments" states "Financial interest in an individual, an entity, or a program being investigated" creates an impairment of independence.

It is my opinion that Guidepost's financial interests compromised the independence of its investigation and Report. Guidepost had an obvious and acceptable financial interest in being awarded the initial investigation. If that was the full extent of their engagement, it would not be my opinion that their financial interests were an impairment to the independence of the investigation. However, because Guidepost was awarded portions of the remedial measures it recommended, it unavoidably creates questions about why it made certain recommendations, thus, undermining independence.

It appears Guidepost was eager to be engaged for follow-on work with SBC after the $2M+ investigation and Report were finalized. It is notable that only three days after the Report was published, Guidepost was announced as being the vendor to provide the on-going SBC survivor hotline despite not being a regular vendor of those services. I did not review evidence one way or the other, but its difficult to believe that SBC released a request for proposals in that three days and fully evaluated any other bids for maintenance and management of the hotline from any companies that provide reporting hotlines and websites as their primary product.

While it is logical to have established a reporting hotline or other mechanism for the investigation so that survivors could reach out, it was not *necessary* for purposes of the investigation. Survivors could simply have been provided contact numbers and emails for Guidepost investigators. That is, after all, who received the hotline and email reports

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



26

during the investigation. With such a short runway between the Report release and the announcement of Guidepost's continuing engagement with SBC as the hotline manager, the appearance arises that Guidepost set up the reporting mechanism and made it a recommendation in its Report just to be able to position itself to offer that service after the investigation engagement was over. In addition to knowing its investigation would cost SBC millions, Guidepost must have known that its Report would trigger millions of dollars more in remedial measures to implement its recommendations. The fact that it positioned itself to be the beneficiary of its own recommendations undermines the independence of the investigation, especially when one considers that other vendors did not have time to bid on that work.

There are other damaging appearances that arose from the hotline contract award to Guidepost. Survivor and advocate Ms. Brown stated it best, "Guidepost works for the SBC Executive Committee."[17] Guidepost did not have to open itself up to such a charge, but it did by being engaged to do the remedial work it recommended. Even though Guidepost took pains to create an illusion of independence from the EC by being engaged by the Task Force (which was created by the EC), its subsequent selection by the EC for the hotline undermines independence because it appears Guidepost had a financial interest in finding things wrong with the EC so it could then make recommendations for remedial measures that it could be further contracted to provide.

There is a reasonable counter-argument to this position, and that is that Guidepost had already established the hotline and it seemed the easiest and quickest way to serve its client's needs. However, the independence of the investigation was further impaired in this same manner by Guidepost's subsequent efforts to bid on and contract with the SBC in early 2023 to establish and maintain "Ministry Check," a database of sexual offenders. Guidepost recommended SBC establish this databse as a result of its investigation. This contract was valued at several million dollars and was later cancelled due to concerns about Guidepost's social views. But again, Guidepost's business is a consulting business. I did not review evidence of how many "databases" Guidepost has provided other clients, but "databases" does not appear on Guidepost's website to be a product or service it regularly provides. However, Guidepost's website does show that Ms. Wood, who led and supervised this investigation, co-founded a compliance

---

[17] https://baptistnews.com/article/about-that-sbc-sexual-abuse-hotline-it-just-gets-worse/

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege

Prepared by:



software startup that was acquired by Guidepost Solutions.[18] While this is not wrongful, unethical, or illegal – it is mere entreprenuership – Guidepost's financial interests in being engaged to execute on its recommendations undermines and impairs the independence of the investigation on these facts.

Shortly after the Report was published, Guidepost was widely criticized within the Baptist community for its social media post supportive of LGBTQ people. It appears that in response to calls from the Baptist community for SBC to contract only with vendors who share their beliefs, in the November 2022 timeframe, Guidepost promoted employee Ms. Samantha Kilpatrick to head Faith-Based Solutions, a division of Guidepost.[19] She had worked on the initial investigation leading to the Report, and according to the Guidepost website, she has served on several faith-based non-profit boards and working groups including the Southern Baptist Convention Church Cares team where she was a contributor to the Caring Well curriculum. Notably, she received a Master of Arts from the Southeastern Baptist Theological Seminary (to be distinguished from the Southern Baptist Theological Seminary "SBTS" where Dr. Sills was employed).[20] It appears this division was created so that Guidepost could move forward with Ministry Check.

Despite Guidepost's extraordinary efforts to accommodate SBC's concerns, the contract for Ministry Check was ultimately cancelled.

While Guidepost's efforts and desire to continue to serve its client's needs are not "wrongful," what those efforts did was undermine the independence of its investigation. Guidepost is now vulnerable to the accusation – correct or not – that its investigation

---

[18] https://guidepostsolutions.com/people/julie-myers-wood/; https://www.cnsiusa.org/julie-myers-wood

[19] https://baptiststandard.com/news/baptists/guidepost-solutions-to-run-sbc-abuser-tracking-database/

[20] The fact that Ms. Kilpatrick is Baptist does not, in an of itself, mean that she could not be or was not objective in her investigative role, but it is a fact that should have been disclosed in the Report, in my opinion. Any relationship, allegiance, or loyalty to the entity being investigated opens the possibility of actual bias and the appearance of bias. The same would be true if any investigators had been victims of sexual abuse or assault, or who had at some point been falsely accused of such.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



28

was premised on and conducted for the purpose of making recommendations that it could then position itself to implement. This is a classic conflict of interest.

In government contracting, regulations prohibit a company from developing the technical specifications of a product for the government under one procurement and then bidding on the production of that product in another procurement, the obvious concern being that the company will develop specifications that only it can meet so that it can plant the seeds of future contract awards for itself. That is an impairment of the independence of the recommendation and constitutes a conflict of interest.[21] If the Pentagon contracted with Krispy Kreme to develop a meal plan for breakfast meetings, one could guarantee donuts would be on the menu. In many contexts, including corporate monitorships, there is typically a contractual prohibition of any business dealings between the two parties for a period of time (minimum of one year) to bolster the independence of the independent corporate monitor. This is to protect the monitor from charges of self-dealing and to ensure the monitor's reports are free of the suspicion that the findings therein were bought by the promise of future work. Obviously, this is not a situation involving a government contract or monitorship, but the analytical principles of conflicts of interest apply, and the set of facts here gives rise to concerns about independence.

In addition to personal impairments, it is my opinion that the circumstances of Guidepost and Ms. Denhollander's relationship created at least an appearance of, if not an actual, external impairment. Exernal impairments, as defined by the Quality Standards include external factors that may restrict the ability to conduct an independent and objective investigation. These factors include "influence on the extent and thoroughness of the investigative scope, the way in which the investigation is conducted, the individual(s) who should be interviewed, the evidence that should be obtained and the the content of the investigative report."

It appears the relationship between Guidepost and Ms. Denhollander affected the extent and thoroughness of Guidepost's investigation, who should be interviewed, and who should be named, not named, and/or anonymized in the Report. Guidepost should have

---

[21] See generally, Subpart 9.5 "Organizational and Consultant Conflicts of Interest," Federal Acquisition Regulation; https://www.acquisition.gov/far/subpart-9.5

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



29

included the names of certain individuals. Ms. Denhollander is one, but also, as another example, Mr. Eric Geiger.

Mr. Geiger was identified by Ms. Lyell in a letter to Pastor Rolland Slade as her supervisor at Lifeway to whom she first disclosed. Yet, Mr. Geiger is not named in Guidepost's Report. In the Report, Guidepost wrote "at the request of Lifeway executives as well as SBC entity heads" Ms. Lyell agreed to publicly disclose her allegations of abuse. Report, pages 6, 80. Given that the scope of the investigation included treatment of those who alleged abuse, it would be important to name exactly who requested that Ms. Lyell make her otherwise non-public report a public one. Why does the Report not name the Lifeway executives and SBC "entity heads" who made this heavy ask of Ms. Lyell even though she had requested her disclosure be kept confidential? Either Guidepost failed to ask the names or it was asked not to publish the names – perhaps by Ms. Lyell directly, or through her advocate, Ms. Denhollander. It is not clear, but the fact that the question has arisen is evidence that the Report authors were influenced in some way not to include the names of SBC individuals who were not "survivors"[22] who were entitled to confidentiality.

Of less import, but notable, is that Guidepost expressed gratitude multiple times in the Report. This also undermines independence and objectivity. For example, on page 27, Guidepost stated it was "deeply grateful" to the survivors who shared their histories. The Report also expresses "gratitude" to the Task Force on page 17 for facilitating access to information during the investigation, which is actually its duty.

In my opinion, expressing these sentiments is not appropriate in the context of an independent investigation. Guidepost investigators should not have any feelings or be expressing any of their own sentiments in an investigative report. Such language also compromises the objectivity of the Report.

As detailed above, there are many facts and circumstances that impaired the independence of Guidepost's investigation. Due to these, the investigation would not

---

[22] Notably, the Guidepost Report contains no definitions of "survivor," "sexual abuse," "sexual assault," "abuser," or "nonconsensual." This is addressed *infra*. The only defined term I found was "credible," defined in footnote 760 on page 266, as "not manifestly false or frivolous". No source was cited for this definition. The Merriam-Webster Dictionary defines credible as "offering reasonable grounds for being believed or trusted."

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



meet the Quality Standards set forth by the Council for Inspectors General and other investigative standards on the principle and standard of independence.

## DUE PROFESSIONAL CARE

It is my opinion that Guidepost did not meet the legal standard of due process or professional standard of due care for fairness, thoroughness, and objectivity in conducting its investigation. This is for several reasons, as detailed below, but the major fundamental failure was the failure to explore whether Ms. Lyell's allegations of abuse had merit. In so failing, Guidepost forfeited its objectivity and deprived Dr. Sills of the due process and fairness he was due as the subject of allegations of criminal conduct.

There is no single professional "Gold Standard" that serves as the treatise on quality investigations. Rather, there are principles and best practice standards that have evolved and are set forth in various articles, white papers, training materials, and government or commercial policies and guidelines. The Quality Standards for Investigations set by the Council for Inspectors General on Integrity and Efficiency are standards for the federal Inspector General community, however, in my opinion, they most succinctly and clearly set forth what are widely considered to be the professional standards and principles for investigations.[23] I referenced the second general standard of independence earlier in this report, and I relied on the third general standard of "due professional care" in this section, among other references that echo it, because I believe it encompasses all the minimum standards required for an investigation to be considered credible, professional, and reliable.

The "Due Professional Care" standard requires:[24]

> **Thoroughness**—All investigations must be conducted in a diligent and complete manner, and reasonable steps should be taken to ensure that pertinent issues are sufficiently resolved and to ensure that all appropriate criminal, civil, contractual, or administrative remedies are considered.

> **Legal Requirements**—Investigations should be initiated, conducted, and

---

[23] https://www.ignet.gov/sites/default/files/files/invprg1211appi.pdf
[24] https://www.ignet.gov/sites/default/files/files/invprg1211appi.pdf

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



31

reported in accordance with (a) all applicable laws, rules, and regulations; (b) guidelines from the Department of Justice and other prosecuting authorities; and (c) internal agency policies and procedures. Investigations should be conducted with due respect for the rights and privacy of those involved.

**Appropriate Techniques**—Specific methods and techniques used in each investigation should be appropriate for the circumstances and objectives.

**Impartiality**—All investigations must be conducted in a fair and equitable manner, with the perseverance necessary to determine the facts.

**Objectivity**—Evidence must be gathered and reported in an unbiased and independent manner in an effort to determine the validity of an allegation or to resolve an issue. This includes inculpatory and exculpatory information.

**Ethics**—At all times, the actions of the investigator and the investigative organization must conform with all applicable standards of ethical conduct.

**Timeliness**—All investigations should be conducted and reported in a timely manner. This is especially critical given the impact investigations have on the lives of individuals and activities of organizations. Hence, the effectiveness of an investigator depends, in part, on the promptness of finished work products, such as prepared findings and memorialized witness interviews.

**Accurate and Complete Documentation**—The investigative report findings and accomplishments (indictments, convictions, recoveries, etc.) must be supported by adequate documentation (investigator notes, court orders of judgment and commitment, suspension or debarment notices, settlement agreements, etc.) and maintained in the case file.

**Documentation of Policies and Procedures**—To facilitate due professional care, organizations should establish written investigative policies and procedures via handbook, manual, directives, or similar mechanisms that are revised regularly according to evolving laws, regulations, and executive orders.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



<u>Objectivity.</u>

I addressed the legality of the investigation in my introduction, *supra*. I next focused on "Objectivity." In addition to the description of objectivity above, other standards describe it as follows.

The Department of Defense Administrative Investigations Manual ("Manual") states this about investigative objectivity (underlining added):

> 4.1.2.1 Be Objective. Investigators should approach interviews with an open mind. Investigators should ask questions to <u>get both sides of the story</u>—<u>non-incriminating and incriminating information</u>. Investigators should not lead witnesses by asking questions designed to reach a pre-ferred answer, but should <u>let the witnesses tell their side of the story</u>.[25]

The Association of Corporate Investigators Uniform Principles of Investigations and Good Practice Guidance ("Uniform Principles"), published by Global Investigations Review, states this about objectivity:

> In order for an investigation to be objective, it must be led by evidence. This means that the investigation <u>must be guided by the facts that have been discovered and not speculation</u>. However, reasonable inferences can be made as long as there is sound judgement and that these inferences are thoroughly explained.
>
> <u>Objectivity is taking each case on its own merits</u>. This can be challenging for those who have to investigate but also have to make a decision on what to do afterwards. Again, there is a need to separate them out, treat as a two-phase project: (1) investigations and (2) decision-making, where one does not influence the other.[26]

ISO 37008, section 4.4 states this about objectivity and impartiality, "An internal investigation should be free from conflict of interest, conducted objectively and based on

---

[25] https://www.dodig.mil/Portals/48/Documents/Components/AI/AI%20Manu-als/AI%20Manual%20ALL%20-%20Final%2012-06-2024.pdf?ver=7C9hPE3QFXZ88G8fjmZ4KA%3D%3D
[26] https://globalinvestigationsreview.com/guide/the-aci-corporate-investigators-hand-book-in-association-gir/first-edition/article/uniform-principles-of-investigations-and-good-practice-guidance

This report was prepared at the direction of legal counsel in anticipation of litigation and may consti-tute attorney work product entitled to attorney-client privilege
**Prepared by:**



33

factual evidence. <u>The investigation should not be influenced by personal feelings, interpretations or prejudice</u>." ISO/TS 37008:2023.

My first major concern when I analyzed objectivity was that, in my opinion, Guidepost's investigation was inadequate and did not meet professional standards because it did not objectively and fully explore Ms. Lyell's allegations that Dr. Sills had sexually "abused" her or sexually assaulted her.

In addition to reporting that Guidepost investigators had spoken with 22 survivors, the Report stated, "We also met with advocates for survivors, survivors' family members, witnesses who corroborated survivors' histories, whistleblowers who have reported church clergy and staff sexual offenders, experts in issues related to sexual abuse and clergy sexual abuse in particular, and therapists." Notably, it states "witnesses who corroborated survivors' histories" with no mention of subjects of allegations, or witnesses who may have provided evidence that refuted survivors' accounts. Even this list is entirely one-sided.

With respect to Ms. Lyell's statements in the investigation, Guidepost wrote, "These facts were confirmed by numerous witnesses interviewed by our investigative team." Report, page 102. Who were these "numerous witnesses" and why were they not named in the Report? Regardless, none of those witnesses listed above included Dr. Sills – *the subject of those allegations*. According to discovery materials, Guidepost investigators spoke with the following 57 individuals relative to Ms. Lyell's portion of the Report:

Jennifer Lyell
Rachael Denhollander
Roger "Sing" Oldham
Art Tolston
Greg Addison
Andy Beachum
Phillip Bethancourt
Allan Blume
Kyle Cochran
Ernest Easley
Laura Erlanson
Ronnie Floyd
Charles Grant

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
Prepared by:



Jimmy Gergory
Jim Guenther
Jamie Jordon
Emily Liles
Wayne Mann
Adron Robinson
Roland Slade
Amy Thompson
Ruth Ann Williams
Grant Gaines
Jeff Pearson
Sharon Robinson
Becky Chandler
Griffin Gulledge
Janice Laroy
Mollie Duddleston
Palmer Williams
Robyn Hari
Ronnie Parrot
Russell Moore
Tiffany Thigpen
Tom Strode
Laura Erlanson
Diana Chandler
Lynn Richmond
Chris Chapman
Bill Townes
C. Ashley Clayton
Jeff Pearson
John Wilke
Ruth Ann Williams
Shawn Hendricks
George Schroeder
Elizabeth Gibson
Rod Martin
Mike Stone
Jared Wellman
Todd Unzicker
Kathy Litton
Janice LeRoy
Jason Allen

This report was prepared at the direction of legal counsel in anticipation of litigation and may consti-
tute attorney work product entitled to attorney-client privilege
**Prepared by:**



Joshua Bonner
Dean Inserra
Griffin Gulledge
Mark Stinson

According to its Report, Guidepost investigators spoke to only 22 survivors, (Report, page 134), but with respect to Ms. Lyell's allegations, investigators spoke to 57 people – more than double the number of survivor interviews, for just one person's allegations. And yet, Dr. Sills and Dr. Mohler, two key witnesses relevant to Ms. Lyell's narrative, were not interviewed. In fact, no one who was personally present when Ms. Lyell first made her allegations was interviewed. No one who heard Dr. Sills' statements in response to the initial allegations was interviewed. It is unclear who "confirmed" facts for Guidepost.

I noticed with interest that Guidepost listed Ms. Denhollander second on the list of witnesses, immediately after Ms. Lyell. This position further reinforces the prominent but unmentioned role Ms. Denhollander played in promoting, bolstering, and controlling the narrative Guidepost received from Ms. Lyell.

My next concern on objectivity is that Ms. Wood has her own history of allegations made against her when she was in a leadership role. The allegations were published in the New York Times in 2008 and alleged that Ms. Wood engaged in a workplace scandal cover-up by ordering subordinates to delete photos of her in a racially insensitive situation (another person in the photo wore a blackface as part of a costume).[27]

I cannot, and do not, conclude that this history made her biased, partial, or otherwise unobjective, but it is a relevant consideration that Ms. Wood was publicly (and she claimed falsely) accused of a workplace cover-up as a leader when the scope of investigation includes allegations of a leadership cover-up. These facts easily create an appearance that she may not be objective and make the investigation unnecessarily vulnerable to criticism that it was not objective.

---

[27] https://www.nytimes.com/2008/04/09/washington/09home-land.html?ex=1365393600&en=a4aca88a70f728a7&ei=5088&partner=rssnyt&emc=rss

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



<u>Fairness & Thoroughness.</u>

Objectivity was not the only standard that compelled Guidepost to verify Ms. Lyell's allegations, the standards of fairness and thoroughness also compelled it. In my opinion, Guidepost had professional duty to interview Dr. Sills to obtain his response to the allegations against him and an opportunity to clarify what exactly he admitted to and what exactly he was told the accusations were prior to making any admissions.

I did not see evidence that Guidepost asked for a report of investigation related to Ms. Lyell's initial allegations and Dr. Sills' resignation. Perhaps Guidepost asked, but was told there was no report from that time period, or even that there had been no investigation, facts that would be relevant and important to note in its Report, in addition to imposing a duty to inquire further before permitting the portrayal of Dr. Sills as a violent abuser in its Report. Guidepost requested documents of the EC and EC staff only "related to any individual who was identified to the EC or EC staff as a survivor or victim of sexual abuse" including Ms. Lyell, by name. Report Appendix 1, page 19.

Moreover, I did not see evidence that Guidepost reviewed emails between Ms. Lyell and Dr. Sills. I did not see any evidence that Guidepost attempted to contact or interview Dr. Sills, Dr. Mohler, or other witnesses who were present for Ms. Lyell's or Dr. Sills' statements during her first allegations: Dr. Adam Greenway, Mr. Eric Geiger, or Dr. Thom Rainer. Further, the Report does not name the Lifeway supervisor or "SBC entity heads" who were allegedly involved in Ms. Lyell's initial disclosure or who allegedly pressured her to make a public disclosure, so I have no way of determining whether those people were interviewed for the investigation or not. Mr. Geiger's identity was kept confidential in the Report but Dr. Sills was portrayed a violent abuser with no opportunity to refute the allegations in the investigation. This is a fundamental and structural flaw in the investigation and makes it appear to be more of a performative public-relations campaign than an actual fact-finding or truth-seeking investigation.

Guidepost's Engagement Letter states on page 5, "Guidepost will treat and maintain as confidential and private all information that has been or will be communicated or provided to Guidepost relating to any survivor or witness identity and will not reveal or utilize it in any way except with appropriate survival approval." Dr. Sills is a "witness," and according to his sworn depostition testimony, he is also "survivor," as he testified he was sexually touched by Ms. Lyell without his consent on more than one occasion.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



Guidepost may assert that determining whether or not Ms. Lyell's allegations were factually substantiated was not within the scope of its engagement because the scope included only allegations of abuse by EC members or EC member mistreatment or intimidation of survivors. Guidepost's discovery responses infer as much. However, Guidepost's scope *necessarily encompasses* determining whether or not Ms. Lyell's allegations were true because if they were not true, then it is not possible that the EC "mistreated" her or "mishandled" her allegations because she was not a "survivor" of abuse because no abuse had occurred. That is squarely within its scope, and Guidepost cannot reasonably deny it after devoting 37 pages of its Report to Ms. Lyell's allegations. If the "abuse" "violence" and "threats" Ms. Lyell alleged had no factual basis, then Baptist Press and the EC had done nothing wrong in the way they responded to her.

Furthermore, Ms. Lyell alleged in a letter to Pastor Rolland Slade on October 14, 2020, that Dr. Mohler had reported her allegations "to the entire Great Commission Council at the time (which included Augie Boto then Interim President and CEO of the EC)." If what Ms. Lyell wrote was true, Dr. Mohler violated her request for confidentiality at that time, and Mr. Boto became aware of abuse allegations and did not do anything with that information. This falls squarely within Guidepost's scope that included "Mishandling of abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021." Yet, Guidepost did not explore whether Dr. Mohler violated Ms. Lyell's request for confidentiality or whether Mr. Boto's failure to respond in any way constituted "mishandling of abuse allegations."

The other reality that would substantially undermine any Guidepost claim that verifying Ms. Lyell's allegations was outside its scope, is that the allegations against Dr. Hunt were arguably outside of Guidepost's scope. Nonetheless, Guidepost appears to have done at least the minimum required by professional investigative standards to make a conclusion on the veracity of those allegations. Guidepost spoke with witnesses, gathered physical evidence and performed forensic analysis on it, and confronted the subject with the allegations. Guidepost further made observations and determinations of credibility.

Also noteworthy is that Guidepost's Engagement Letter here does not disclaim the duty to factually substantiate past allegations. In prior engagements, Guidepost has made

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege

**Prepared by:**



the "boundaries" of its investigation clear.[28] In its report for Ravi Zacharias International Ministry, Guidepost expressly stated that it was not engaged to determine the truth of past allegations, while it also recognized the value to survivors of determining and publicly acknowledging the truth. Guidepost's Engagement Letter contains no such disclaimer to excuse it from thoroughly, fully, and fairly examining allegations that fell squarely within its scope.

The other irony that reflects on the professionalism of the Report is that Guidepost's scope included making a determination whether Ms. Lyell was mistreated by the EC in the wake of Baptist Press publishing what she claimed was a mischaracterization of the sexual relationship between her and Dr. Sills. In pursuing that determination, Guidepost made the same mistake Baptist Press made even after investigating what Baptist Press and the EC had done.

On page 86 of the Report, Guidepost included SBC counsel's (Mr. Jordan) questions and concerns regarding Baptist Press' publication of Ms. Lyell's allegations. His questions included valid points that Guidepost should have considered in making its in-scope determination whether the EC mistreated someone who alleged abuse and in deciding whether to portray Dr. Sills as an "abuser" in its Report. Mr. Jordan's concerns included:

> Her story uses the term "sexual abuse" but it is not clear to me whether she means child sexual abuse, abusing a relationship of trust, or some type of power differential abuse (such as professor/student). I think we need to be careful about those distinctions. Does this article cast Sill [sic] in a "false light" as a sex offender? Or is he someone who violated employment policies, Biblical commandments, and ethical standards but not any civil laws?

> What has [Baptist Press] done to corroborate this story if you decide to run it? Will Dr. Mohler say that Sill [sic] confessed to "sexual abuse?"

> Will [Baptist Press] ask Sill [sic] to comment before it runs the story? In a defamation lawsuit, one of the indicia of malice is whether the publisher of the defamatory statement gave the allegedly defamed person an opportunity to dispute the facts.

---

[28] https://mennoniteabuseprevention.org/wp-content/uploads/2024/02/Guidepost-Solutions-report-2021-Ravi-Zacharias-International-Ministry.pdf

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
Prepared by:



Guidepost acknowledged in its Report on page 84 that it had "evidence" that Ms. Lyell was concerned that her abuse would be characterized as consensual by her "abuser." Knowing that raised the issue of consent, Guidepost should have known it had an obligation to find out why Ms. Lyell was concerned about that and whether, in fact, Dr. Sills would say the sexual contact was consensual. Yet, instead of interviewing Dr. Sills, which was not only the logical and professional thing to do, but it was also what Guidepost knew counsel for Baptist Press had previously advised Baptist Press to do, Guidepost instead claimed "people to whom Ms. Lyell disclosed" corroborated her abuse. Report, page 84.

There are two major problems with Guidepost relying on these "people" for corroboration. First, Guidepost made no factual finding of corroboration. The "people to whom Ms. Lyell disclosed" could only corroborate that she *reported*, not that she was *abused*, whatever that undefined term meant in the context of this investigation. There is a difference between corroborating the *report* of an allegation and corroborating the *substance* of an allegation. This distinction should be obvious to professional investigators.

Second, this is second-hand information, *at best*. Professional investigators know to corroborate written or physical evidence by obtaining statements from witnesses about the written evidence, and to corroborate witness statements with written or physical evidence. Certainly, Guidepost appears to have conducted a very thorough investigation into the allegations of sexual impropriety made against Dr. Johnny Hunt. Notably, Dr. Hunt was not an Executive Committee member, but rather a former SBC President. As such, he was only an *ex-officio* member of the EC. The abuse allegations against him were not squarely within Guidepost's scope which included only "[a]llegations of abuse by Executive Committee members." Nevertheless, Guidepost spoke with the accuser and her spouse, four other witnesses who knew the accuser and/or Dr. Hunt, and spoke *twice* to Dr. Hunt. Report, pages 149-161. Guidepost even acknowledged in its Report it did not confront Dr. Hunt with the allegations in its first interview because investigators wanted to wait until after they had spoken with corroborating witnesses. It is best practice to confront the accused only after obtaining and reviewing as much evidence as possible.

Despite the fact Dr. Hunt was a former SBC President, investigators nonetheless clearly spent a significant amount of time and resources investigating them, and *corroborating*

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



40

them, and included them in the Report. Guidepost even mentioned it performed forensic analysis of a hard drive as part of its investigation into Dr. Hunt. Even so, only 12 pages of the Report were devoted to this extensive investigation of Dr. Hunt, in contrast to the triple amount of pages – 37 - devoted to Ms. Lyell's allegations which were *not investigated or corroborated* by Guidepost prior to the Report portraying Dr. Sills as a sexual "abuser."

I did not have access to the documents cited in Report footnotes 223 or 224, but it is not sufficient in an investigative report to list corroborating witnesses as "people to whom Ms. Lyell disclosed," "others who were contacted by BP staff," "people at her abuser's former mission agency," and "her employer." Dr. Mohler was not interviewed by Guidepost. No one who was present for Ms. Lyell's initial allegations was interviewed by Guidepost. Guidepost did not interview "others who were contacted by BP staff," so it does not appear that Guidepost had any corroboration to proceed with its in-scope investigation of whether the EC had mistreated Ms. Lyell as a "victim" of "sexual abuse."

I reasonably infer from the facts that Guidepost relied on Ms. Denhollander's "corroboration" as a fact witness who received a call from Dr. Mohler on the day of Ms. Lyell's accusations, as counsel to Ms. Lyell in her claims against SBC, as an adviser to the Task Force overseeing its investigation, and as a trusted past (and future) business and referral partner. If Guidepost relied on Ms. Denhollander to corroborate Ms. Lyell's allegations, the Report should clearly and unequivocally state that, as it does with corroboration for its findings with regard to Dr. Hunt. If Guidepost believed verifying Ms. Lyell's allegations was not within the scope of its investigation, it should have stated that in the Report. A professional investigation includes interviewing *all* witnesses and naming them in the Report if they relied on those witnesses to corroborate something as serious as alleged sexual assault or sexual battery.

Guidepost claims on page 22, "We interviewed or attempted to interview all persons who might have had relevant information regarding the investigation." However, Guidepost did obtain the necessary evidence to conclusively find that Dr. Sills had in fact "abused" Ms. Lyell before publishing its Report. Where Baptist Press had erred on the side of "innocent until proven guilty" in 2019 to avoid defaming Dr. Sills by libel, Guidepost walked right into that and did precisely what Baptist Press was trying to avoid – labeling Dr. Sills' a violent sexual abuser without more evidence than "Ms. Lyell said so, and Dr. Mohler heard her say so." Guidepost drafted the Engagement Letter, so it

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



clearly understood that it would be fully indemnified by SBC if any litigation arose from its investigation and Report. Thus, if Guidepost defamed Dr. Sills, it would harm only its client, the community of Baptists who trusted it and to conduct the investigation and paid it over $2,000,000.00.

That Ms. Lyell reported that she was "abused," and that others believed her when she said she felt "abused" does not factually equate to the conclusion that Dr. Sills was an "abuser" such that his photo and name could be properly added to a public investigative Report or a list of sexual offenders who were arrested, charged, and convicted of sexual crimes. Rape of a child and oral sex between a single woman and a married man may be equal sins in the eyes of God according to the Baptist faith, but they are not equal offenses under the law. Oral sex between a married man and a single woman does not constitute a criminal offense in most jurisdictions unless it occurs without mutual consent.

Investigations should not be influenced by interpretations or prejudice (meaning pre-judging any facts – such as whether Ms. Lyell's allegations were factual despite the fact they were not investigated at any time). It appears for reasons mentioned *supra* that Guidepost took Ms. Lyell's statements and allegations as true with no further inquiry. However, the professional standards and principles of fairness and objectivity impose a duty on investigators to get the other side of the story and to seek both inculpatory and exculpatory evidence. It appears Guidepost did that with the allegations against Dr. Hunt, however, investigators failed to verify any of Ms. Lyell's allegations against Dr. Sills. When Guidepost failed to do this, it failed in due professional care because it is required to be objective, fair, and thorough. An investigation that fails to obtain evidence from the subject of an allegation does not meet professional standards.

The Uniform Principles state this about Fairness (underlining added):

> There are many aspects to consider for an investigation to be considered 'fair'. The investigation must be impartial and without bias. It also should have procedural fairness that should include appropriate timelines for conducting the investigation. There should also not be determination of guilt or innocence when initiating the investigation and do not prejudge. Even if at the end of the investigation the allegations of misconduct were substantiated, <u>there are still rights afforded to the subject, or alleged offender, which should be respected</u>.

This report was prepared at the direction of legal counsel in anticipation of litigation and may consti-
tute attorney work product entitled to attorney-client privilege
**Prepared by:**



42

For fairness in investigations, one should think about what they can look for in trying to both prove and disprove the allegation. If you have a theory, do not just look at the elements or evidence that will prove your theory, but also evidence that might disprove or points away from your theory. Also, report the absence of evidence when that is the case e.g. 'inconclusive outcome'.[29]

The Department of Defense Administrative Investigations Manual provides guidance on the standards for the investigative plan, that is, how investigations are mapped to be carried out. The first "key element" of the Investigative Plan in this manual is "the subjects of the investigation." As indicated by the second bullet, "subjects" does not mean the allegations or topics of the investigation, it means the individuals who are alleged to have engaged in misconduct.

> 3.1.2    Key Elements of the Investigative Plan.  The key elements of the investigative plan include:
>
> - the subjects of the investigation;
>
> - allegations or issues to be examined;
>
> - applicable standards (laws, rules, or regulations) and the elements of proof for the standards;
>
> - documentary and other relevant evidence to be collected;
>
> - witnesses to be interviewed and questions relevant to allegation;
>
> - the travel location and dates;
>
> - investigation milestones; and
>
> - investigative steps necessary to execute an organized, thorough, and efficient investigation.

The investigative principles and standards of fairness and objectivity compelled Guidepost to ensure it had sufficient facts to report on its in-scope findings. To have sufficient facts in this context meant that Guidepost was compelled to interview Dr. Sills and permit him an opportunity to present his own account and any evidence he wished

---

[29] https://globalinvestigationsreview.com/guide/the-aci-corporate-investigators-handbook-in-association-gir/first-edition/article/uniform-principles-of-investigations-and-good-practice-guidance.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege

Prepared by:



43

to be considered that corroborated his account. If a fact-finder chose to believe both Dr. Sills and Ms. Lyell's accounts of what occurred between them after reading their depositions and considering their evidence, there is no other reasonable conclusion than both were a victim of the other on different occasions, as Dr. Sills testified Ms. Lyell made sexual contact with him in a manner that was unwelcome on more than one occasion.

There is no excuse for failing to obtain Dr. Sills' statement and evidence in connection with the Guidepost investigation. There is further no excuse for naming Dr. Sills in the Report on these facts. The Engagement Letter states: "4.3 Guidepost will treat and maintain as confidential and private all information that has been or will be provided to Guidepost relating to any survivor or witness identity . . ." Even without any definitions in the Report, Guidepost cannot refute that Dr. Sills is either a "survivor" or a "witness," *or both*. Ultimately, Guidepost does not know which and did not use due professional care to determine facts necessary to its analysis and findings on the EC's interactions with Ms. Lyell.

<u>Thoroughness.</u>

Beyond Guidepost's failure to interview all witnesses with evidence relevant to its scope, the Guidepost Report further fails this standard in several ways.

*Definitions*. The Report lacks definitions of key terms such as "abuse" and "sexual abuse." The investigation scope included four elements, all of which included the words "abuse" or "sexual abuse." Without a definition of these terms, Guidepost's factual findings are not credible or reliable. What one person defines as "abuse" is not necessarily what another defines as "abuse." Did the term "sexual abuse" include the legal definition of "sexual assault" or "rape?" Did the term "abuse" include only acts that were forced or without consent, or also acts where there was a power disparity at play, but they were otherwise fully consented to by adults? Did the term "abuse" exclude any conduct? If so, what conduct was excluded from the definition, and as a result, excluded from the scope of the investigation? It is not clear exactly what Guidepost was investigating or the meaning of its sparse "findings" because these terms are not defined.

The Report also lacks definitions of "mishandling" and "mistreatment." The Merriam-Webster Dictionary defines "mishandling" as "to deal with or manage wrongly or

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



ignorantly." "Mishandling" infers that there was a set, established, right way that EC Trustees and leaders were to handle reports of offensive sexual contact, such as a policy, process, or procedure. The investigation was instigated in large part because there *was no established way* to "handle" allegations of any kind. Guidepost confirmed this in its Report when it reviewed the EC Personnel Policies Manual. "EC written policies do not explain the specific procedures for reporting, investigating, and addressing complaints in areas of harassment, employee conduct, workplace conflict or other inappropriate employee behavior." Report, page 133. Therefore, if there was no right way of handling the reports, how could Guidepost determine if any had been "mishandled?" Any finding that the EC "mishandled" reports of allegations is inherently unreliable because there is no definition of "mishandled" for purposes of the investigation.

The same problem exists for "mistreatment." The Merriam-Webster Dictionary defines "mistreatment" as "to treat badly: abuse." Guidepost stated, "mistreatment of victims by some EC leaders – which ranged from decisions not to communicate with survivors and their advocates, to disparagement and outright hostility. . . ." Report, page 161. From this language, it seems that Guidepost defined "mistreatment" as anything between absolutely nothing and "outright hostility." Therefore, anyone on the EC who did not respond to a claimed survivor engaged in "mistreatment" of that person. Absent an affirmative legal duty to respond to someone, I am not aware of any reasonable standard by which a "decision not to communicate" can ever equate to "mistreatment." If a person expects a response to a communication and does not receive a response, they may subjectively *feel* that they were mistreated, but that does not mean they *were* mistreated. The Report is premised on the unreasonable assumption that if a survivor received no response or did not receive exactly the kind of response s/he wanted, then that was "mistreatment." Any findings of "mistreatment" are flawed and unreliable due to the lack of definition and clarity for that term.

Once again, the same problems arise with the terms "victim" and "survivor." Guidepost's scope included the term "victims" but not "survivors." However, the Report seems to use the terms interchangeably without definition. It appears from the investigation that anyone who claimed sexual contact of any kind was deemed a "survivor" and a "victim" whether or not their allegations had been investigated or verified as "abuse" or "assault" in any way at all: by internal investigation, external investigation, or law enforcement investigation with or without a court conviction.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege

Prepared by:



45

What highlights the enormity of this investigative flaw is that had Guidepost bothered to obtain evidence from Dr. Sills, it would have had no choice but to define Dr. Sills as a survivor himself, as he testified under oath that Ms. Lyell had made sexual contact with him without his consent on several occasions, most notably the first occasion. Reasonable minds can differ on what "consensual" means. If either SBC or Guidepost had defined this term and objectively, fairly, and thoroughly investigated the relationship between Ms. Lyell and Dr. Sills, it is unavoidable that consent would have been a major issue for which Dr. Sills' evidence would have been dispositive.

Further, it is inescapable that with evidence of consent, Ms. Lyell would no longer be a "victim" or "survivor" and would thus fall out of scope for the Guidepost investigation. Ms. Denhollander could not let that happen. In her own words, Ms. Lyell's case was the "driving force in getting this investigation underway . . . this would absolutely not be happening if that had not happened. . . . this has been the topic of conversation and the lynchpin for why we are here [having this investigation]." GPSILLS_009717. "Jen pushed so hard on her case because she knew it was the only one that could raise the others up again (Christa, Jules, Tiffany). She knew if she could use her case to push this investigation, it would open the door to be able to bring them back to front and center. The Gaines motion was about Jen's case, I expanded the date range to ensure we could go well beyond her." GPSILLS_009719. If what Ms. Denhollander stated was true – that the foundational premise of the entire Guidepost investigation was Ms. Lyell's allegations – then neither she nor Ms. Lyell could afford to have them undermined by the only other person with evidence of what transpired between Ms. Lyell and Dr. Sills. Thus, the lack of definitions for any of the above-mentioned terms served the purposes of the investigation as stated by Ms. Denhollander.

*Standard of Proof.* In addition to defining what the terms relevant to fact-finding mean, an investigator must also use a standard of proof. The standard of proof is crucial to determining the level of evidence required to support a factual finding or conclusion in an investigation. Guidepost's investigation lacks any standard of proof or even a mention of it. It appears Guidepost used the "any evidence" standard, meaning any evidence at all supports their factual findings. This is the lowest of all standards of proof.

A more typical standard of proof for a private investigation is "preponderance of the evidence." That means that after collecting all relevant evidence (both corroborating and contradicting), it is more likely than not that an allegation is true.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege

**Prepared by:**



In higher stakes investigations and some court cases, the "clear and convincing" standard of proof is used. That standard is higher than preponderance of the evidence, but lower than "beyond a reasonable doubt."

Guidepost's factual findings are inherently unreliable without definitions of key terms and any discernible standard of proof. The lack of these is further evidence that this was not an "independent investigation." It appears to be for purposes other than a neutral search for facts and the truth.

*Factual Findings.* Third, the Report is very thin on factual findings related to each element of its scope. This could be due in large part to the fact that there were no defined terms in the scope and no standard of proof. Section IV of the Report is titled "Factual Findings/Investigation." One would reasonably expect the headings under that title to be the four elements of the scope of Guidepost's investigative work as set forth in the Engagement Letter and include findings of fact related to each element of the scope. Instead, the elements of the scope are addressed under Section V, "Observations and Conclusions."

Under "Factual Findings," the first section is a general "Timeline" that includes 84 pages of screenshots of correspondence and a general recounting of witness statements. Report, page 39. More than half of these pages contains Ms. Lyell's allegations (roughly pages 80-123).

The Report included in its "timeline," a reference to Dr. Frank Page. Dr. Page was President of the EC during the timeframe included in Guidepost's scope. Report, page 75. Specifically, the Report mentioned that Dr. Page announced his retirement in 2018 which was "precipitated by a morally inappropriate relationship in the recent past." At the time the Guidepost investigation began, that was only three years prior. The Report goes on to note that Dr. Page had "maintained an improper relationship with a female from a church where he had been an interim pastor." Yet, Guidepost *did not investigate* whether Dr. Page – a member of the EC during dates within its scope – had engaged in a consensual relationship with this woman or whether he had abused his clergy position. The Report even acknowledged that "no further investigation" was done at the time, even noting that "Dr. Rummage noted it would have been helpful for the EC to have verified there nothing inappropriate done with the staff." Report, page 75.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



It appears that Dr. Page's conduct fell squarely within Guidepost's scope of work – allegations of sexual misconduct that could well be designated as abuse given the clergy-congregant relationship, that fell within the dates of Guidepost's scope of work, and had not been investigated. The fact that this was not further investigated and reported by Guidepost is evidence that the investigation was not thorough and not designed to actually investigate allegations of abuse by EC members.

Guidepost gave no indication it thoroughly investigated this "morally inappropriate relationship" even though it knew it had not been previously investigated. There is no evidence of a Guidepost investigation outside of footnote 183 that references "Memoranda of Rummage and Witness 1." It appears Guidepost took Dr. Page's word on the nature of the relationship as consensual and merely "inappropriate," as opposed to investigating further to reach a factual finding on whether the relationship was "consensual" or "abusive," as their scope expressly commanded. Guidepost did not even mention Dr. Page in its Report Section V, "Observations and Conclusions," subsection A "Allegations of Abuse Committed by Executive Committee Members." That subsection is exclusively dedicated to the allegations against Dr. Hunt, who was SBC President and merely an ex-officio member of the EC.

Only half a page was devoted to Dr. Page's admitted inappropriate sexual conduct that was squarely within the scope of work. Guidepost proceeded to move on to Dr. Paige Patterson's termination from a seminary position for alleged mistreatment of an alleged rape survivor. Regardless of the truth of that matter, Dr. Patterson was not within scope, as he was President of Southwestern Baptist Theological Seminary at the time, not an EC member.

Second, section B is "EC Trustee Interviews." Report, page 123. This section includes a summary of interviews of 175 EC Trustees. Guidepost noted a finding that "EC Trustees [who served prior to Dr. Greear's reference to the Houston Chronicle article] were largely unaware that survivors had been contacting the EC to report sexual abuse allegations." Report, page 124. Thus, most EC Trustees had no information relevant to support three of the four in-scope elements.

Further inflating the cost of the investigation, Guidepost reviewed the social media accounts of 202 EC Trustees and "other leaders" over the span of more than 21 years. Report, page 127. I assume investigators were looking for evidence of EC Trustees

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
Prepared by:



"mishandling" abuse allegations, "mistreatment" of abuse victims, "intimidation" of abuse victims or their advocates, or EC resistance to sexual abuse reform initiatives. From that massive and no doubt tedious effort, Guidepost made only one factual finding: EC Trustee, Mr. Rod Martin, had used "combative language" on social media towards a survivor with a lawsuit against SBC.

The next subsection is C, "EC staff Survey and Interviews." Guidepost began by stating it interviewed approximately 42 then current and former EC staff members. The Report then stated, "in this section, we describe some of the staff's general perceptions about EC workplace culture and attitudes towards sexual abuse allegations." The obvious problem is that the scope does not call for the EC staff's general perceptions about EC workplace cuture and attitudes. That is what culture and pulse surveys are for – not investigations. Guidepost was engaged to conduct an investigation into four distinct areas and none of them involve EC staff's perception of culture and attitudes.

Guidepost further undermined its credibility in this section when it wrote, "We did not assess the accuracy of employee's perceptions or opinions." I am not aware of a way an investigator could assess the "accuracy" of a perception or opinion. It is either that person's opinion or perception, or it is not. There is no "accuracy" determination that can be made. Guidepost investigators should know this, as immediately prior, the Report states: "Unsurprisingly, given the variety of employees with whom we spoke and who completed the survey, we gathered a variety of opinions." Report, page 129.

Guidepost proceeded on in total disregard of its scope, "the comments recounted herein are provided as insight and several themes emerged from employees' responses to our interview questions and our survey." Report, page 129. Guidepost's Engagement Letter does not state anything about surveying EC staff members opinions, perceptions, or any "themes" that may arise from them.  Other "findings" include that "some male leaders could be dismissive of female opinions" and "women were underrepresented at leadership levels," but many said they "do feel valued and appreciated." Report, page 129. These do not constitute "investigative findings."

The EC Staff Interview subsection 1 included only one factual finding: "one EC staff member heard Dr. Page make critical comments about [a survivor]" but this is then qualified by "Dr. Page said he regretted some of the words." Report, page 130.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
Prepared by:



Subsection 2, "Survey Results" follows. The stated purpose of the surveys was "to gather employees' opinions on how the EC handles issues relating to abuse." Report, page 131. This purpose is not within the scope of the investigation. It is not investigatory because it seeks to gather "opinions" and not "facts." In my opinion, the surveys were wholly superfluous, and as designed, could not lead to evidence relevant to Guidepost's scope of work as reflected in the Engagement Letter.

The final subsection of "Factual Findings/Investigation" is section D "Survivor Interviews." In this subsection, Guidepost detailed how it "conducted significant research" into an SBC list of "703 abusers" to determine whether any of them were affiliated with an SBC church. This is also outside the investigative scope. Unless Guidepost was reviewing the list to determine if any of the 703 "abusers" were EC members who abused someone between January 1, 2000 and June 14, 2021, the time spent on this was outside the scope of the investigation.

Guidepost at least acknowledged its scope when it admitted in subsection D that some of the 22 survivor interviews were outside its scope either because the survivor did not report allegations to the EC or the alleged conduct occurred outside the scoped time frame. Report, page 134-135. It is beyond *my* scope to determine how many hours Guidepost spent on interviews that were outside its scope, however, every interview that is outside scope dilutes the credibility of any assertion that interviewing Dr. Sills was outside its scope. From my review of the investigation, it does not appear that the scope limited Guidepost's activities in any way.

Guidepost does not appear to make any factual findings at all in subsection D with regard to survivors. Instead, it appears to be a whitepaper on the importance of the response to disclosures of abuse and the profound effects sexual abuse has on survivors. Subsection D appears to be written by a sexual abuse advocate and not a professional team of investigators.

In the Report's Section IV "Factual Findings/Investigation," sprawling pages 39-148, there are only three factual findings:

1. EC Trustees were largely unaware that survivors had been contacting the EC to report sexual abuse allegations;

2. An EC member used "combative language" on social media towards a survivor;

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



50

3.  An EC staff member heard Dr. Page, an EC member, make critical comments about a survivor but then said he "regretted" some of his words.

As noted above, the scoped elements are addressed under Section V, "Observations and Conclusions." Report, page 148. These are also extremely thin on factual findings.

The first scoped element addressed in Section V, subsection A is: "Allegations of abuse committed by Executive Committee members." Report, page 149. Subsection A addresses only one allegation – an allegation of sexual assault made against Dr. Johnny Hunt, a former President of the SBC, by "an SBC pastor and his wife," who is referred to as "Survivor." This allegation was arguably outside the scope of engagement, as the scope included "Executive Committee Members," and Dr. Hunt was SBC President, an *ex-officio* member of the EC. Nonetheless, Guidepost did more of an investigation into this allegation than any other mentioned in the Report, as addressed *supra*, including informing Dr. Hunt of the allegations and giving him an opportunity to respond.

Guidepost investigators noted they did not find Dr. Hunt's statements credible, but they did find the pastor, his wife, and other witnesses' statements credible, and therefore, Guidepost concluded that the allegation of non-consensual sexual contact was true. Guidepost justified including the allegation in the Report based on their credibility assessment. The Report avoids, in an obvious manner, making a "finding" that Dr. Hunt sexually abused the "Survivor." Rather, Guidepost included this allegation and its "conclusion" under the heading "Observations and Conclusions." Outside this one allegation that involved two adults and contradictory evidence on consent, Guidepost found no other evidence of "allegations of abuse by Executive Committee members" even after more than 100 interviews of former and then-current EC members.

Section V, subsection B addressed "Mishandling" and "Mistreatment" of sexual abuse victims. Report, page 161. In addition to the problems arising from the lack of definitions of these terms, the Report appears to fault EC leaders for relying on the advice of counsel to avoid liability for crimes of others. The Report "found" that EC leaders often did not respond to survivors "and took no action to address these allegations so as to prevent ongoing abuse or such abuse in the future." Report, page 162. The Report seems to place on EC leaders duties that they do not legally have to prevent sexual abuse in congregations across the country. These statements also run afoul of

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



perpetrator accountability, the established theory widely promoted by victim advocates that the perpetrator *alone* is responsible for their misconduct and crimes, not the victim, and not anyone else who "could have" or "should have" done something to prevent the misconduct or crimes of the perpetrator. Victim blame is misplaced, but so is third-party blame.

This subsection goes on to address "lack of transparency," despite the Report failing to indicate any duty of transparency imposed by law, internal policy, or otherwise. Similarly, in the next subsection, EC leaders are faulted for choosing not to "interact with sexual abuse victims," despite the Report not stating where a duty was owed to interact with victims. That section further faults the EC for responding to victims explaining why the SBC would not look further into allegations of abuse. However, the EC had no duty to look into the allegations due to its structure and limits of authority; investigation is the purview of law enforcement. Further examples are given wherein Guidepost recounts the complaints of various suvivors and how they were treated (or not). Guidepost does not make any "findings" that the EC mistreated survivors, it merely recounts what survivors' complaints were about the various responses they did and did not get. The rest of the subsection contains similarly unsupported subjective conclusory statements.

The underlying problem with this Section V is that none of it contains actual findings of fact on the elements included in the scope of investigation. Section V contains many pages of complaints about what various legal counsel advised, the fact Mr. Boto was a character witness for a "convicted child molester," the history of Judge Paul Pressler, who was not an EC member but a former SBC Vice President, so not within scope. What it does not include is investigatory findings of fact. It appears to be a Ms. Denhollander extended gripe session, not a report on findings of fact that indicate the existence of or absence of issues within the scope of the investigation.

As for the last subsection of Section V, "Resistance to Sexual Abuse Reform Initiatives from January 1, 2000, to June 14, 2021," without adequate definitions and a standard of proof, no "factual findings" can be made under this element either. The investigation made clear only one thing: that the "resistance" arose from advice of legal counsel to limit SBC liability.

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege

**Prepared by:**



Conclusion.

Due process requires three fundamental things: notice, an opportunity to respond, and a neutral fact-finder. Proceedings missing any of these three things are structurally flawed and are inherently unreliable in our system of justice. Under the principles of due process and professional due care, Dr. Sills was entitled during the investigation to notice of the allegations against him and the substance of the evidence against him, an opportunity to respond and provide his own exculpatory evidence, and an impartial and objective fact-finder. In my professional opinion, the Guidepost investigation provided him none of these three due process pillars. The investigation was not fair, thorough, or objective. Therefore, the investigation was fatally flawed and inconsistent with due process and professional standards.

**END OF PARTIAL REPORT**

Amy E. McDougal, Esq., CCEP
President
June 20, 2025

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege

Prepared by:



53

| RELIANCE MATERIALS |
|:---:|

Clifford Law provided access to discovery documents exchanged in this case as of the date of this partial report. <u>In addition to any publications specifically cited in this report</u>, I primarily relied on the following documents to form my opinion and prepare this partial report:

<u>Depositions</u>
Dr. David Sills
Mrs. Mary Sills
Ms. Jennifer Lyell
Dr. Albert Mohler
Ms. Elizabeth Dixon
Guidepost Solutions LLC (deposition from <u>Hunt v. Southern Baptist Convention, *et al.*)</u>

<u>Documents</u>
Guidepost Report (including the Engagement Letter, but excluding links to documents included in footnotes)

The Sills Complaint

Defendant Jennifer Lyell's Response To Plaintiffs' First Set Of Interrogatories

Responses And Objections Of Defendant Guidepost Solutions Llc To Plaintiffs' First Set Of Interrogatories

Guidepost Solutions Llc's Objections To Plaintiffs' First Set Of Requests For Admissions

Defendant Eric Geiger's Responses To Plaintiffs' First Set Of Requests For Admission

Plaintiff Michael David Sills' Responses And Objections To The Executive Committee Of The Southern Baptist Convention's First Set Of Interrogatories And Requests For Production To Plaintiff Michael David Sills

This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege
**Prepared by:**



This report was prepared at the direction of legal counsel in anticipation of litigation and may constitute attorney work product entitled to attorney-client privilege

**Prepared by:**



**AMY E. McDOUGAL, JD, CCEP**
amy.mcdougal@clearesources.com
703.909.8884

Founder and President/CEO of CLEAResources, LLC, a woman veteran-owned small business. Client-centered attorney, ethics and compliance professional, and independent corporate monitor experienced in advising executives on organizational ethics, mitigation of legal risk, regulatory and federal contracting compliance program infrastructure, and values-based business ethics. Veteran of the USAF Judge Advocate General Corps, 1997-2008.

PROFESSIONAL EXPERIENCE
CLEAResources, LLC                                          November 2013-Present
Founder and President/CEO, Brambleton, Virginia
- Advise client organizations on full-spectrum management of corporate compliance and values-based ethics programming; provide cradle to grave guidance to drive ethical culture and program visibility and growth.
- Devise and oversee creative, innovative and curated compliance solutions to fully integrate values-based ethics culture with the regulatory demands of doing business commercially and with government entities, including prior to or in response to conciliation and administrative compliance agreements and settlements.
- Serve as independent corporate monitor to oversee compliance with administrative agreements and as an outsourced chief ethics and compliance officer for several companies. Aid clients in identifying legal/ethical risk areas such as conflicts of interest, disclosures and reporting, and misuse of organizational assets and guide the sculpting of policy and ethical business cultures based on Chapter 8 of the U.S. Federal Sentencing Guidelines.
- Develop and deliver custom training courses for high-risk areas such as the ethics of government contracting, Federal Acquisition Regulation compliance, anti-bribery and corruption, labor relations, discrimination, and retaliation.
- Manage and conduct complex and sensitive high-level investigations and present facts in clear and concise manner enabling executives to take appropriate action.
- Public clients include U.S. Department of Veterans Affairs; Office of Personnel Management; Board of Supervisors of Loudoun County, Virginia. Global commercial clients draw from: defense and homeland security, construction, financial services, oil and gas, satellite telecommunications, healthcare, education, rail, technology, engineering, insurance, food and beverage, sporting goods, and manufacturing, including multiple Fortune 500 companies.

WATERMARK RISK MANAGEMENT INTERNATIONAL, LLC          July 2010 – November 2013
General Counsel / Vice President Compliance & Ethics Services, Fairfax, Virginia
- Advised client corporations and organizations on full-spectrum management of corporate compliance and values-based ethics programs.

1

- Worked with organizations publicly and privately held, across industries, in designing, developing and implementing elements of corporate compliance and ethics programs, as required by the U.S. Federal Sentencing Guidelines and the Federal Acquisition Regulation.
- Conducted complex and sensitive investigations into fraud and misconduct for government and commercial entities.

M.C. DEAN, INC.                                        April 2008 - June 2010
Associate General Counsel / Employment Law Counsel, Dulles, Virginia
- Created and managed the Government Contractor Ethics and Compliance Program and Wage and Hour Compliance Program.
- Advised executive management on synthesizing business goals with compliance; trained and educated company employees at all levels on full array of compliance requirements relevant to federal contractors, including Wage and Hour, Import/Export, American Recovery and Reinvestment Act, Clean Water Act, Clean Air Act, Government Ethics, Business Ethics, Immigration, OFCCP/EEO, Service Contract Act, Federal Acquisition Regulations, Cost Accounting Standards, Buy American Act, NISPOM, and Trade Agreement Acts.
- Conducted internal fraud and misconduct related investigations and managed interface with government officials during investigative inquiries and subpoenas.
- Developed and delivered industry-customized ethics education programs at all corporate levels.
- Managed Buy American Act and Davis-Bacon Act compliance on contracts totaling $650 million. Led project managers' efforts in seeking Buy American Act waivers with 90% success rate; saved millions of dollars.

UNITED STATES AIR FORCE RESERVE                February 2004 to October 2008
Government Appellate Counsel, Bolling AFB, District of Columbia
- Exclusively represented United States' position on substantive, procedural and constitutional errors raised on appeals to the United States Supreme Court, Court of Appeals for the Armed Forces, and the Air Force Court of Criminal Appeals. Advised and trained Air Force prosecutors world-wide on Uniform Code of Military Justice. Attained the rank of Major.
- Represented the United States in oral argument and on brief to the United States Court of Appeals for the Armed Forces and the United States Air Force Court of Criminal Appeals
- Appointed as Article 32 Hearing Investigation Officer: served as impartial investigator during pre-trial hearing phase of courts-martial, heard witnesses, gathered and analyzed evidence to formulate judicial recommendation for court-martial convening authority
- Chief of Military Justice: Managed trial attorneys and paralegal staff during period of overloaded courts-martial docket: managed docketing, budgeting, selection of service of expert witnesses and jurors, analysis of forensic evidence by experts
- Advised commanding Generals as Lead Counsel for ethical, legal, and fiscal issues surrounding State Funeral for President Ford
- Advised base commanders at all levels, including the elite Presidential Airlift Group (Air Force One), on every aspect of maintenance of good order and discipline in their units

2

- Co-authored brief for high-visibility and controversial Air Force Academy Cadet rape case
- Managed media coverage for sensitive rape trial of Air Force Vice-Presidential pilot defendant
- Managed inter-agency coordination of criminal investigations with the Office of Special Investigations, Air Force Security Forces, FBI, and other federal agencies
- Abolished 7-year backlog of military medical malpractice cases in 75 days, shielding the Air Force from over $15 million in liability; leveraged investigative resources to locate and interview witnesses

UNITED STATES AIR FORCE                              November 1997 to February 2004
Assistant Staff Judge Advocate, Bolling AFB, District of Columbia; Langley AFB, Virginia
- Routinely appointed as a trusted Article 32 Hearing Investigations Officer. Convened hearings, gathered evidence, made legal rulings and command recommendations. Advised commanders on military criminal, civil, and administrative law, issued legal opinions related to the Joint Ethics Regulation, federal sector labor law, military operational law and employment law
- Prosecuted 20+ courts-martial as Government Trial Counsel/Assistant Trial Counsel
- Prosecuted hundreds of civilian cases while appointed as a Special Assistant United States Attorney, including Magistrate Court and U.S. District Court cases
- Advised Security Forces on probable cause for military base searches
- Supervised investigations conducted by Security Forces and the Office of Special Investigations to ensure they were adequate for prosecution
- Routinely briefed and advised flag officers and senior military personnel on Joint Ethics Regulation requirements; including gifting, travel, use of government resources, political activities, and post-retirement employment, authored legal opinions and command policies on ethics issues.

EDUCATION & CERTIFICATIONS

Vanderbilt University School of Law        Johns Hopkins University
Nashville, Tennessee                       Baltimore, Maryland
Juris Doctor, 1997                         Bachelor of Music, Flute Performance, 1994

Certified Corporate Compliance and Ethics Professional (CCEP), Society of Corporate Compliance and Ethics, 2010 - present
Credentialed Advocate, Intermediate Comprehensive Victim Intervention Specialist (CA), National Organization for Victim Assistance, 2021-2023

PUBLISHED CASES, ARTICLES, SPEAKING ENGAGEMENTS
*United States v. Regan*, 62 M.J. 299 (C.A.A.F. 2006)
*United States v. Stewart*, 62 M.J. 291 (C.A.A.F. 2006)
*Dallow v. Dallow*, Georgia Supreme Court, September 2016

3

<u>2023</u>

Society of Corporate Compliance & Ethics, Compliance & Ethics Institute, Presenter, *"Compliance by Contract: Drafting and Negotiating Agreements That Support Compliance,"*

<u>2022</u>

SCCE Compliance & Ethics Professional Magazine, March 2022, Author, *"Legal Cannabis: A Compliance Challenge"*

Society of Corporate Compliance and Ethics, Compliance Manual, 2022, Author *"The Changing Landscape of Cannabis Legalization: Compliance and Ethics Program Challenges"*

American Bar Association, Judicial Bench and Bar Academy, Presenter, *"Cannabis Advising: Dilemmas for the Attorney"*

Practicing Law Institute, Presenter, *"Cannabis: Business Fundamentals"*

Inside Practice, Cannalaw Summit, Presenter *"The Business of Cannabis Law"*

<u>2021</u>

Ethikos Magazine, Author *"Speak Up Success: Training and Communications to Truly Encourage Reporting and Reduce Retaliation"*
Practising Law Institute, Presenter *"Legal Issues in Raising Money and Growth for a Cannabis Business;" "Substance Abuse, Harm Reduction, and Competence in the Practice of Law" "Psychedelics, Harm Reduction and Competence in the Law"*
Society of Corporate Compliance and Ethics Regional Conference, Richmond, Presenter, *"Cannabis & Your Compliance Program: What Every Compliance Professional Must Know"*
American Bar Association: *Global Business of Cannabis Conference*, Presenter

<u>2020</u>

Society of Corporate Compliance and Ethics, Compliance Manual, 2020, Author *"The Changing Landscape of Cannabis Legalization: Compliance and Ethics Program Challenges"*
International Cannabis Bar Association Cannabis Law Sessions: Panel Coordinator and Presenter, *"Ethics: Rule 1.2 - The Novel 'Also Advise' Provision Relating to Federal Law"* and Presenter, *"Corporate Governance: Best Practices, High-Profile Failures, and Lessons Learned"*
Society of Corporate Compliance & Ethics, Compliance & Ethics Institute, Presenter, *"Speak Up Success: Training and Communications to Truly Encourage Reporting and Reduce Retaliation"*
International Cannabis Bar Association Cannabis Law Institute: Presenter *"Re-establishing Investor Confidence: Corporate Governance"*
Government Technology and Services Coalition, Presenter, *"Ethics in Government Contracting"*

<u>2019</u>

MJBizCon NEXT: Presenter, *"Legal Ethics Update for Lawyers"* April 2019
National Cannabis Industry Association Conference: Presenter, *"Legal Ethics"* July 2019

4

Society of Corporate Compliance and Ethics, Compliance and Ethics Institute, Presenter, "*Compliance by Contract: Drafting and Negotiating Terms for Peer-to-Peer Compliance*" 2019; "*Compliance & Cannabis in the Workplace: Navigating the Changing Landscape of Legalization*"
Society of Corporate Compliance and Ethics, Compliance Manual, 2019, Author "*The Changing Landscape of Cannabis Legalization: Compliance and Ethics Program Challenges*"
International Cannabis Bar Association Cannabis Law Institute: Panel Coordinator and Presenter, "*Ethics*" October 2019

2018
International Cannabis Bar Association, Cannabis Law Sessions, "*Governance Tightrope: Balancing Rights and Responsibilities*" and "*Ethics Essentials: Rules You Need To Know Before Investing in Your Client's Business*"
Society of Corporate Compliance and Ethics, Compliance & Ethics Institute, "*Preventing Harassment: Can Compliance Ever Succeed?*" and "*Counseling Compliance in Small and Medium Sized Businesses*"

2017
Women Grow, Presenter, "*Your Compliance & Ethics Program as Sword & Shield*"
National Cannabis Industry Association and National Cannabis Bar Association, Presenter, Continuing Legal Education for Cannabis Attorneys, *Ethics Update*
Society of Corporate Compliance and Ethics, Compliance and Ethics Institute, Presenter, "*The Good Reasons Why People Do The Wrong Thing,*" and "*Eradicating Human Trafficking, Compliance Challenges*"

2016 and earlier
Government Technology and Services Coalition, Presenter, "*Ethics in Government Contracting*"
Society of Corporate Compliance and Ethics, Higher Education Conference, Presenter, "*Security on Campus: Beyond Clery and SaVE*
Society of Corporate Compliance and Ethics, Compliance and Ethics Institute, Presenter, "*Are your Contracts Running Offense and Defense for Your Compliance Program?*" Presenter, "*Wage and Hour: Mitigating this Risk in a New Era of Enforcement*" Compliance & Ethics Professional Magazine, "*The Role of Incentives in Compliance and Ethics Program Effectiveness;*"
Risk and Insurance Managers Assoc. (RIMS), Presenter "*Hungry for Business Growth? Manage Your Strategic Risks and Facilitate Success!*"
CLEAResources and Krevolin & Horst present moderated panel on "*What to Do When the Government Knocks on Your Door,*" presented with AUSA, N.D. of Georgia and FBI Special Agent Assoc. of Corporate Counsel: Organizer and Panelist, "*The Risk Intelligent Counsel: Keeping the Organization on Course;*" Panelist "*Compliance and Ethics Training;*" Presenter: "*Best Practices in Risk Assessment: Lessons from Compliance Programs*" and "*Covering the Bases: Does Your Code of Conduct Address Key Risks?*" Presenter, "*Wearing Two Hats: General Counsel and Chief Compliance Officer*" and "*Best Practices in Reporting to Your Board on Compliance*"

5

ACC Docket, "*Wearing Two Hats: Compliance Officer and Counsel*" Author; New-to-In-House InfoPak, Author, "*Risk Management*" and "*Corporate Governance*"

National Contract Management Assoc.: Webinar Series, Presenter "*Compliance and Ethics Programs as Sword and Shield*," Contract Management Magazine, Author, "*Wearing Two Hats*;" and "*Herding Cats – Managing Conflicts of Interest in Federal Contracting*;*" World Congress, Presenter "*Demystifying the Compliance and Ethics Requirements of FAR 52.203-13;"* Government Contract Management Conference, Presenter, *"Demystifying the Compliance and Ethics Requirements of the FAR: Setting Your Company Up for Success"*

PIAA Corp. Counsel Workshop, Presenter, "*Breaking It Down: Corporate Compliance & Ethics*,"

ABA Business Law Section Meeting Presenter, "*Should In-house Counsel be Navigating the Choppy Waters of Compliance,*"; Authored article under same name

DuPont Sustainable Solutions Webinar; "*U.S. Wage and Hour Law Update and Outlook,*" Presenter

DuPont Sustainable Solutions Ethics Day, Featured Speaker, *"12 Tips for 2012: Giving Your Code an Upgrade"*

SAI Global/Compliance360, Webinar Presenter "*Wage and Hour Compliance: Mitigating the Risks in a New Era of Enforcement*"


BAR MEMBERSHIPS, LICENSES, AND AFFILIATIONS

United States Supreme Court
United States District Court for the Eastern District of Virginia
United States Court of Appeals for the Armed Forces
Member of the Bar: Georgia, District of Columbia, Tennessee (inactive)
Compliance Week, Advisory Board member
International Association of Independent Corporate Monitors, Director, Corporate Secretary
International Cannabis Bar Association, Director, Chair of Ethics Committee (2018-2022)
Dynamic Security Concepts Inc., Director
Advisory Board Member: Compliance Week; Voices of Valor
Society of Corporate Compliance and Ethics
American Bar Association
Ethics and Compliance Initiative
Washington Business Journal Leadership Trust, 2019-present


AWARDS & RECOGNITION

Top 10 Compliance Training Provider, ManageHR Magazine, 2023
Compliance Week, 2020 "Excellence in Compliance Awards, Best Advisor/Consultant," Finalist
National Law Journal, Cannabis Law Trailblazer, 2020
Graduate, *Scaling4Growth*, Interise "Streetwise MBA" Program, Virginia Small Business and Supplier Diversity, 2020
Graduate, Inaugural Class, Women Veteran Owned Small Business Initiative, sponsored by the U.S. Department of Veterans Affairs, December 2019
Lawyers' Weekly Media, "Influential Women of Virginia," May 2013

6

Nominee, Virginia Conflicts of Interest and Ethics Advisory Council, non-legislative citizen nominee by the Virginia Speaker of the House, 2013
Boards of Contract Appeals Bar Assoc. Writing Award, December 2012
Association of Corporate Counsel Community Service Award, November 2012

7



# Expert Review Fee Schedule

Name: Amy E. McDougal, Esq., CCEP
Title: President/CEO
Address: ███████████████████████████
Phone: 703-909-8884
Email: amy.mcdougal@clearesources.com


**Professional Services and Rates**
Case Material Review & Consultation
- Rate: $500.00 per hour
- Billing Increment: Time is billed in 0.25-hour (15-minute) increments. Partial hours are pro-rated to the next quarter hour.
- Includes review of documents and preparation of written memoranda or reports.

Telephone & Video Conferences
- Billed at the standard hourly rate of $500.00/hour.
- Includes strategy sessions, attorney-client communications, and discussions with retaining counsel or other experts.

Deposition and Trial Testimony
- Rate: $600.00 per hour (minimum three hours billed).
- Includes preparation and testimony time.
- Travel time billed at half-rate.
- Expenses (airfare, lodging, meals, local transport) are billed at actual cost.

**Payment Terms**
- Retainer required prior to commencement of services (amount varies by scope).
- Invoices are issued monthly and due upon receipt.
- Late payments may incur a 1.5% monthly finance charge.

**Additional Terms**
- Fees do not include costs for copying, postage, courier services, or third-party services.
- Cancellations for deposition or trial appearances require 48-hour notice or minimum billing will apply.