# Exhibit F

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

|  |  |  |
|---|---|---|
| **MICHAEL DAVID SILLS and MARY SILLS,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No.: 3:23-cv-00478** |
| **v.** | ) ) | **Judge William L. Campbell, Jr.** |
| **SOUTHERN BAPTIST CONVENTION, et al.,** | ) ) ) | **Magistrate Judge Jeffery S. Frensley** |
| **Defendants.** | ) ) | |

<u>**EXPERT REPORT OF NATALIE SCHILLING**</u>

## I.    Introduction

1.      At the request of Clifford Law Offices, P.C. ("Clifford"), a law firm with offices in Chicago, Illinois, and counsel for Michael David Sills and Mary Sills ("Plaintiffs"), I have been asked to provide an expert opinion on issues I understand are relevant in this case. In particular, I have been asked to use my expertise in linguistics to assess documents and other communications associated with *Sills v. Southern Baptist Convention, et al.* for linguistic evidence bearing on Plaintiffs' allegations of defamation, conspiracy, intentional infliction of emotional distress, and negligence concerning claims of sexual abuse declared by Defendant Jennifer Lyell ("Lyell") and repeated and published by other Defendants. I am being compensated at my standard rate of $500 an hour for my services in this matter. My compensation in no way depends on the outcome of this litigation.

2.      In making my assessment, I draw on linguistic principles pertaining to Narrative Analysis, Discourse Analysis, Semantics (linguistic meaning), Pragmatics (meaning in context), and Syntax (grammar). These well-established areas of linguistic study allow for the consideration of (a) how language is used to shape accounts of events (narratives) such that certain events and

persons are positioned favorably and others appear in a negative light, even in narratives purporting to be objective reports; (b) how linguistic usages provide evidence of the circumstances of document production, indication of how undocumented events unfolded, and clues to authors' intentions, mental states, and emotions; and (c) how language features are likely to be interpreted by and affect readers and listeners. The analysis follows accepted procedures and best practices in linguistics and is based on my expertise in linguistics as well as the materials cited in this report. The materials provided to me by Clifford are listed in Appendix C. My opinions are based solely on these materials and are subject to change as additional evidence is produced and/or provided to me.

3.      I focus on several key documents that were published or otherwise made public (e.g. on websites, social media):

- "Guidepost Solutions Report of the Independent Investigation" ("Guidepost Report"), 15 May 2022

- "List of Abusers" (initially linked to "Guidepost Report" of 15 May 2022; now available on the SBC website (https://www.sbc.net/satf/; https://www.sbc.net/on-the-release-of-a-list-of-alleged-abusers/)

- "My Story of Sexual Abuse in the SBC," by Jennifer Lyell, March 2019 ("Lyell Draft Article")

- "New details of former SBTS prof's resignation alleged," by David Roach and Shawn Hendricks, Baptist Press, 8 March 2019 ("BP Article")

- "Lyell Perspective on 3/8/19 BP Story to Dr. Sing Oldham & Shawn Hendricks," 15 July 2019 ("Lyell Perspective")

- "A Statement from Baptist Press," 15 October 2019 ("Baptist Press Apology")

- "Statement from Jennifer Lyell regarding The Daily Wire's publication on June 14, 2022" ("Lyell on Daily Wire")

- "A Statement from SBS Executive Committee Chairman Rolland Slade on a resolution being reached with Jennifer Lyell," 22 February 2022 ("Slade Statement")

- "Statement from the President of the Southern Baptist Theological Seminary," by R. Albert Mohler, 8 July 2022 ("Mohler Statement 8 July 22")

4.    Other published/public documents considered include:

- "Southern Baptists' #MeToo Moment," by Megan Basham, Daily Wire, 14 June 2022

- "I Don't Know What to Believe Anymore," by Ron Henzel, Midwest Christian Outreach, 14 July 2022 (https://midwestoutreach.org/2022/07/14/i-dont-know-what-to-believe-anymore/;   "Henzel Article 14 July 2022")

- "Does Abuse Absolve Adultery? A Response to Rachael Denhollander and Others", by Ron Henzel, Midwest Christian Outreach, 3 August 2021 (https://midwestoutreach.org/2021/06/14/does-abuse-absolve-adultery-a-response-to-rachael-denhollander-and-others/)

5.    In addition, I examined the numerous private communications with which I was provided for linguistic indicators of circumstances of production of the published documents, as well as linguistic clues to intentions, mental states, and emotionality of authors. One central private communication is Mohler's email to Lyell dated 23 May 2018 ("Mohler 23 May 2018").

## II.    Background/Summary of Relevant Experience

6.    I am a Professor Emerita of Linguistics at Georgetown University, where I was a member of the faculty for 23 years and was tenured for 18 years.

7.    As a Professor of Linguistics, I designed and taught a number of courses focusing on many areas of linguistic study, including General Linguistics, Sociolinguistics (which includes Narrative Analysis and Discourse Analysis), Sociolinguistic Field Methods (research methods), Style and Stylistic Variation, Sociolinguistic Variation, American Dialects, and Forensic Linguistics.

8.    Throughout my scholarly and academic career, I have specialized in Sociolinguistics, the study of the interrelation between language and society, including how people use language to navigate interactions, shape identities, influence listeners/readers, and accomplish goals. Within this, I have focused on the history, structure, meaning, and use of American English,

with a particular interest in language variation and change; regional, ethnic, stylistic, and gender-based variation in American English dialects; variation and change in endangered languages and dialects; and forensic linguistics.

9.    I have authored, co-authored, or co-edited ten books, 47 journal articles and book chapters, nine articles in conference proceedings, and a number of book reviews and outreach publications and presentations, all on various issues in linguistics.

10.    I have designed and delivered 150 conference presentations and invited lectures in academic settings, including 10 keynote presentations at national and international conferences. I also authored and delivered an audio/video course for The Great Courses lecture series.

11.    I was awarded the title of Professor Emerita at Georgetown University in 2023. I was a Professor of Linguistics at Georgetown from 2017-2023, an Associate Professor there from 2005 to 2017, and an Assistant Professor there from 1999-2005. I received tenure in 2005.

12.    From 1998 to 1999, I was an Assistant Professor of English at Old Dominion University.

13.    From 1997-1997, I was an Andrew W. Mellon Postdoctoral Researcher in the Humanities in the Stanford University Linguistics Department. I have also served as Assistant Professor and Instructor at North Carolina State University and Duke University.

14.    I earned a Bachelor of Arts in English from the University of North Carolina at Chapel Hill in 1986, a Master of Arts in English from North Carolina State University at Raleigh in 1993, and a Doctorate in Linguistics from the University of North Carolina at Chapel Hill in 1996.

15.     I was inducted as a Fellow of the Linguistic Society of America in 2022. LSA Fellows are "Members of the Society who have made distinguished contributions to the discipline."

16.     Attached to this report as Appendix A is a summary of my professional background and a list of publications, including those authored in the previous ten years. I have testified as an expert witness at three depositions and one pre-trial hearing within the previous four years. A list of those cases is attached as Appendix B.

17.     In preparing this report, I relied on my knowledge, training, education, skill, and experience in the field of Linguistics, as well as the materials cited in this report. Additionally, the facts and data I considered are set forth in the following paragraphs.

## III.     Opinions

### A.     Summary of Conclusions

18.     The linguistic analysis of documents and communications associated with the case at hand lead me to render the following opinions.

19.     The Guidepost Report is rife with linguistic usages that render it biased against Plaintiff David Sills, including PRESUPPOSITIONS – that is, words, phrases, and linguistic structures through which an author indicates that certain information is to be taken for granted/assumed to be true; prejudicial terms of reference; use of ambiguous terms (i.e. words that can mean different things to different people) without definition (e.g. "sexual abuse"); use of legal and legal-sounding terms (e.g. "investigation," "corroboration") in vague, unclear ways that suggest rather than demonstrate investigative procedures or corroborating evidence; and problematic grammatical structures such as a double negatives and ambiguous phrase structure.

20.     Also important in the Guidepost Report are linguistic features that are NOT regularly used – namely, so-called EVIDENTIALS, or linguistic material that indicates source of

information (e.g. "Mohler said," "Lyell alleged," etc.). Overwhelmingly, in the Guidepost Report's account of the Sills/Lyell matter, allegations, viewpoints, beliefs, and opinions are presented baldly, without linguistic qualification, as established facts.

21. The Guidepost Report further creates bias against Plaintiff Sills through NARRATIVE FRAMING or DISCOURSE FRAMING – that is, the positioning of an extended discussion of Sills and Lyell within a larger narrative about sexual abuse in the SBC, including child abuse and other criminal activities. The narrative framing is made even more explicit in the List of Abusers (to which the Report initially linked), in which Sills is literally positioned next to a list of convicted and sentenced criminals. The juxtaposition of Sills within these frames predisposes the reader to presume that Sills fits the frame – that is, that he must also be a sex offender because he is included in a report on and list of known offenders. Furthermore, because discussion of Sills and Lyell is given a disproportionate amount of space in the Report (at least 37 pages out of 257 pages, not counting front matter or the lengthy list of recommendations at the end of the report), the interpretation is easily made that Sills' actions must be worse than those of others noted in the Report and on the List, including even convicted child abusers.

22. Given that Guidepost Solutions is a self-proclaimed "global leader in investigations" "comprising over 250 seasoned professionals"[1], including "former prosecutors, and law enforcement agents who have handled cases involving sex crimes and interpersonal violence"[2], it is to be expected that this investigative agency would fully understand that linguistic choices must be made carefully to avoid making presuppositions, using legal terms imprecisely, conveying unproven assertions as fact, and otherwise presenting a biased rather than unbalanced view (e.g. through discourse framing, disproportionate amount of space allotted to the Sills/Lyell

---

[1] https://guidepostsolutions.com/about/
[2] https://guidepostsolutions.com/solutions/investigations-business-intelligence/institutional-integrity/

matter). The implication therefore is that linguistic choices creating bias against Sills in the Guidepost Report were made purposefully.

23.     The communications and documents associated with this case are rich in INTERTEXTUALITY – that is, linguistic connections among communications – that indicate collaboration among Lyell and Defendants to produce or influence documents that were allegedly independently produced and, more broadly, to shape the narrative that Lyell's allegations of sexual abuse against Sills were investigated, corroborated, and confirmed. The intertextual connections among documents also demonstrate how recirculated material both persists across contexts and is reshaped as it spreads. For example, legal words like "investigate" and "corroborate" suggest that legal procedures were followed and that concrete evidence exists. However, close analysis reveals that what is presented in the Guidepost Report as "corroboration" of Lyell's account consists largely (if not entirely) of communications originating from Lyell and her co-communicators that were subsequently circulated and recirculated (whether verbatim or in essence) through various channels such as the Baptist Press and the Southern Baptist Convention Executive Committee. In other words, "corroborating evidence" for Lyell's claims comes from Lyell herself, often filtered through channels that obscure its origins and give it a veneer of objectivity.

24.     Lyell's various accounts of what she frames as her "sexual abuse" indicate changing and escalating language through which what she initially described as a "complicated, messy relationship" in which she "complied" at times and for which she bore "responsibility" is transformed into a relationship characterized by violence, a gun, and threats to kill. Similarly, while she initially reports that Sills admitted to "inappropriate sexual activity," her later accounts depict him as not denying non-consensual activity (which implies that he admitted to non-consensuality). Further, Mohler's initial response to Lyell's report of abuse and Sills' response indicates that the

accounts he initially heard in May 2018 were closer to Lyell's original version of events than her later recountings/transformations.

25.     There is no linguistic evidence in the communications between Sills and Lyell with which I was provided that indicates that Sills was violent toward Lyell, that he forced her to enter into or continue in a relationship with him, or that Lyell was fearful of violence from Sills. Instead, there is linguistic evidence that Lyell pursued Sills and that she had great affection for him, affection which was arguably excessive, as she frequently uses pleading and self-deprecating language indicative of desperation to have Sills return her affection.

## B.     Applying Linguistics in Legal Matters

26.     Linguistics is the scientific study of human language. It consists of a number of subfields, including, most relevant for this case, Narrative Analysis, Discourse Analysis, Semantics, Pragmatics, and Syntax. It involves close analysis of documents (and verbal communications) to discern systematic patterns of usages that shape narrative evaluation – that is, readers' and listeners' perceptions and judgments of events and people in stories – and, relatedly, narrative framing – that is, the frame or "lens" through which readers understand and assess stories, including "nesting" of narratives about specific events inside larger storylines, or cultural narratives.

27.     Linguists also consider how language features provide evidence of author/speaker intentions or goals, mental and emotional states, and circumstances of production (e.g. collaboration among authors). Linguists refer to how language reveals speaker and author intent as ILLOCUTIONARY FORCE; how language choices impact listeners and readers is known as PERLOCUTIONARY FORCE.

28.     There are many ways to produce any communication, and authors and speaker make choices among options as they write or speak. Individual linguistic choices can have

powerful effects, effects that are made even stronger when a number of features, on different linguistic levels (e.g. vocabulary; grammar or sentence structure) work together to shape perceptions in a certain way (e.g. toward portraying a person in a negative light). These effects are brought about by literal, "dictionary" definitions of words and straightforward interpretation of grammatical structures, as well as by meaning associations in context, or connotations.

29.     It is sometimes obvious how language features are used shape impressions, but very often linguistic impacts, and the cumulative effects of systematic usage patterns, are subtle. As is becoming increasingly evident in the age of the internet/social media, algorithms, and Artificial Intelligence, what may seem like objective, factual accounts may contain bias, or even erroneous information, often used purposefully to exert hidden influence readers/listeners. Linguistic analysis can point with precision to exactly what features shape reader/listener impressions, and how they do so. Among the features considered in the current analysis are presupposition, terms of reference, definitions and connotations of crucial words, grammatical structures like double negatives, evidentials, intertextual connections, escalating language, and language indicative of closeness and emotionality.

30.     Linguistic expertise in examining details of language can reveal hidden intent to steer readers toward certain impressions and can even be useful in reconstructing past events when accounts are disputed. Linguistics is therefore a valuable tool in legal cases like the current one that deal with questions of accuracy, bias, hidden corroboration, and author intent.

C.     **Details of Analysis**

31.     **The Guidepost Report is rife with linguistic usages that render it biased against Sills.** It is established in Narrative Analysis that all recountings of past events involve linguistic transformation of the original events. Regardless of intent, it is impossible to tell or write a narrative without presenting a perspective, as every linguistic choice the speaker or writer makes

9

carries literal meanings (semantics) and CONNOTATIONS (pragmatic associations, meanings in context) that shape the story and the impressions that listeners/readers take away. Many such shaping devices work to characterize events in the story as positive or negative, and people as protagonists (good guys) or antagonists (bad guys). These characterizations can be overt but are often subtle, and if numerous wording, phrasing, and structural choices all work toward the same characterization, the overall effect can be a story that is sharply, if subtly, slanted in favor of one party and against another. Linguistic features and structures that work to shape how characters and events are depicted and perceived are referred to in linguistics as EVALUATIVE DEVICES, or NARRATIVE EVALUATION.

32. Linguists also refer to language that that shapes people's narrative perceptions as FRAMING DEVICES or NARRATIVE FRAMING, as they steer readers/listeners toward viewing a narrative through a particular frame or "lens," sometimes a well-established storyline, part of a "bigger picture" story, or so-called MASTER NARRATIVE. (See the section below beginning with paragraph 73.)

33. The Guidepost Report is a narrative that is heavily slanted against Sills via linguistic devices that work to portray him as an admitted perpetrator of acts that have been determined to constitute sexual abuse and to portray Lyell as his victim. Some of these linguistic usages are as follows in paragraphs 34-85:

34. **The Guidepost Report recurrently uses words, phrases and structures that create the presupposition that the abuse is a "given" rather than a matter for investigation.** Typically, sentences expressing propositions consist of a combination of established or "given" information and new information. Presupposition involves using words, phrases, or structures in such a way that certain information will be taken to constitute the background or "given"

information in the sentence. The following are examples from the Guidepost Report, along with explanations (bolding added):

(1) "Jennifer Lyell, **a survivor of sexual abuse**, agreed in March 2019 to publicly **disclose** the details of **her abuse**." (p. 80)

35. In this sentence, the new information is that Jennifer Lyell agreed to disclose abuse; the given information is taken to be that Lyell was a victim of abuse (since she is presented as a "survivor of sexual abuse"), that something occurred that had been hidden (since something was "disclosed"), and that abuse occurred (since the alleged abuse is presented as "her abuse" rather than "alleged abuse" or "abuse"). A more neutral report would use wording such as: "Jennifer Lyell agreed in March 2019 to publicly report details pertaining to abuse she alleged took place" or "Jennifer Lyell agreed in March 2019 to publicly disclose details of what she claimed to be abuse."

(2) "Ms. Lyell agreed to go public with **her sexual abuse** after she learned that **her abuser** had been appointed as a missionary for a non-SBC entity and would be in a position to groom and abuse young women **again** as he did with her." (p. 80-81)

36. The main information conveyed in this sentence is that Lyell agreed to go public after learning certain information. It is taken as a given that abuse occurred, since the abuse is described as "her sexual abuse" (rather than "her allegations of sexual abuse" or "sexual abuse") and since the word "again" entails that the actions modified by this word (grooming and abuse) did in fact take place at some point in time; otherwise, they could not be described as taking place "again." (Compare the well-known hypothetical leading question, "Have you stopped beating your wife?", which cannot be answered with a "yes" or "no" without implicating the respondent in beating his wife.)

(3) "As indicated in her email, Ms. Lyell published her full statement **disclosing her abuse**, which **made it clear** that she had been sexually abused, and never had a consensual relationship with **her abuser**." (p. 89)

37. In this context, placing the information "she had been sexually abused" in a clause modifying "made it clear" creates the presupposition that what follows is to be taken as fact, even though the Lyell statement referred to here presents her perspective, not established fact. The presupposition could have been avoided with wording such as: "Ms. Lyell published her full statement…in which she stated that it was clear to her that she had been sexually abused."

(4) She was supported in the effort to change the nature of the story by Lifeway leadership at that time who personally spoke to Dr. Oldham about **the inaccuracies** in the story." (p. 89)

38. The use of "the inaccuracies" creates the presupposition that inaccuracies exist; more neutral wording would be "possible inaccuracies," "alleged inaccuracies," or "what Lyell claimed were inaccuracies."

(5) "The EC further acknowledged that they had failed to accurately report her abuse as nonconsensual…." (p. 117)

39. The use of "acknowledged" creates the presupposition that what follows is fact, in the eyes of the author, in this case, Guidepost Solutions. However, the verb "acknowledge" actually comes from a prior source, a statement from the Southern Baptist Convention Executive Committee ("Executive Committee") made by Rolland Slade on 22 February 2022 (Slade Statement):

(6) "The SBC Executive Committee **acknowledges** its failure to adequately listen, protect and care for Jennifer Lyell when she came forward to share her story of

abuse by a seminary professor. Baptist Press failed to accurately report the sexual abuse Jennifer Lyell reported…."

40. In retaining the verb "acknowledge," Guidepost Solutions creates the impression that they themselves are the body that established the "facts" of Lyell's abuse, when in fact they simply reported the Executive Committee's proclamation that the abuse was fact. An unbiased report would have replaced the leading word "acknowledged" with "stated": "The Executive Committee stated that it had failed to adequately listen, protect, and care for Jennifer Lyell when she came forward to share her story of alleged abuse…."

41. **The Guidepost Report recurrently uses terms of reference that depict Sills as a perpetrator and Lyell as a victim; in addition, terms are used that imply a dynamic in which Sills has power over Lyell.** Every person can be referred to in more than one way, and the choices authors and speakers make impact readers/listeners and can provide clues to author intent. In particular, as is established in Discourse Analysis, nouns describing categories of persons (e.g. "mother," "child," "teacher," "student") invoke qualities and actions typically (and stereotypically) associated with category members and are thus a powerful way of painting characters and shaping impressions.

42. In the Guidepost Report, Sills is repeatedly referred to as "the abuser" (e.g. p. 80, 81, 83, 84, 142) and only once as an "alleged abuser" (p. 6) (other than when "alleged abusers" are referred to as a group, e.g. p. 5). In contrast, in another case that receives extensive discussion in the Report, that of Christa Brown, the term "alleged abuser" is used. The term "the abuser" in reference to Sills conveys the impression that the abuse is a fact, that Sills has been conclusively identified as the "abuser," and that "abuser" is a key part of his identity. A term such as "the accused" would convey quite different impressions, as would, for that matter, "Sills." Sills is also

referred to as a "professor," "former professor," and "Professor Sills," a respectful title in many contexts, but here one which highlights the power he once arguably held over Lyell, who is referred to as a "student," even though for most of her relationship with Sills she was not his student. For example (bolding added):

> (7) "As a **student**, Ms. Lyell was sexually abused by a **professor** while she was a **student** at Southern Baptist Theological Seminary. My Lyell said the abuse began on a mission trip and continued for many years." (Guidepost Report, p. 142)

43.     As noted above, Lyell is also referred to as a "survivor of sexual abuse," another prejudicial term of reference that creates bias against Sills. When terms of reference such as "survivor of sexual abuse" are used in so-called appositive constructions (i.e. adjacent to another referring term, as in in "Jennifer Lyell, a survivor of sexual abuse"), the reading is that both terms are to be taken as equivalent, referring to the same person, without question. (Compare the interpretation if the phrasing had been something such as, "Jennifer Lyell, who some maintain is a survivor of sexual abuse…." or even "Jennifer Lyell has been found to be a survivor of sexual abuse.")

44.     **The Guidepost Report includes use of legal and legal-sounding terms in vague, unclear ways.** Like most words, terms like "investigate," "corroborate," and "evidence" have both literal meaning and connotations – that is, meaning associations or shades of meaning. Merriam-Webster provides the following definitions (https://www.merriam-webster.com/):

**corroborate**:
to give evidence or testimony to the truth or factualness of

**evidence**:
a: an outward sign : indication
b: something that furnishes proof : testimony
*specifically*: something legally submitted to a tribunal to ascertain the truth of a matter

**investigate**:
transitive verb: to observe or study by close examination and systematic inquiry

intransitive verb: to make a systematic examination
especially: to conduct an official inquiry

45.     As can be seen, each of these words can be used in an everyday sense but is also heavily associated with legal and "official" proceedings. Using such words in the context of an "independent investigation" of nefarious behavior by an official investigative agency conveys the impression that systematic study was conducted, likely by officials/authorities, that conclusions were backed up by objective proof, that there were witnesses to facts and events who can back up the assertions of accusers, and even that law enforcement and courts were involved. Further, the use of such words in the context of an official investigative report also implies that any "investigating" was done by the reporting agency, who themselves obtained and verified "evidence" and sought and obtained "corroboration."

46.     The Guidepost Report liberally uses words connoting official, legal investigation and determinations of fact. However, the uses are often vague and do more to suggest an impression that strict procedures were followed and concrete facts obtained than to provide specific details of procedures, proof, and findings. Following are several examples:

(8) "Dr. Mohler agreed to provide corroboration of the abuse to BP." (p. 81)

47.     It is not explicitly stated what this corroboration is; however, the material that follows this statement in the Guidepost Report suggests that the corroboration is to be found in Mohler's email to Lyell dated 23 May 2018, reproduced on p. 82 of the Report:

(9):



Jennifer Lyell

**concern and assurance**

R. Albert Mohler
To

Wed, May 23, 2018 at 3:09 PM

Dear Jennifer:

[____] and I have been praying for you in recent days, fervently and urgently. Thank you for your courage to call me on Monday. I have proceeded just as we discussed and after a confrontation this morning the employment of the individual involved has been ended.

Your courage is humbling and remarkable. We love you, believe you, and pray God's healing for you. We stand behind you.

I just want to assure you that our concern for you is ongoing and also urgent. I am trying to deal with this according to the very highest standards of personal and institutional responsibility — and beyond that, the spirit of Christ.

I want to affirm again that I encourage you to report any abusive behavior to legal authorities. I must leave that in your hands, but I want you to know of my full support.

Second, I would characterize the behavior involved as described in your call as abuse. I want to make certain that Southern Seminary and I do everything appropriate to reveal any abuse and protect anyone vulnerable. Please advise me if you know of any further investigation that we should undertake. I assure you we will act accordingly.

Know of our love and support. I so greatly admire your courage in this.

Sincerely,
Albert Mohler

48.     In this email, Mohler states feelings and opinions ( "We love you, believe you"); provides expressions of spiritual and emotional support ("and pray God's healing for you," "We stand behind you," "I want you to know of my full support"); and provides a (tentative) statement of his assessment of what she reported to him, with no mention of what specifically she reported: "I would characterize the behavior involved as described in your call as abuse". This last statement contains mitigating or hedging language through which Mohler distances himself from a direct assertion that Lyell was abused: "I **would** characterize" (rather than "I characterize"), "I would characterize the behavior involved **as described** as abuse" (rather than 'I characterize the behavior as abuse"), and "I would describe **the behavior involved**" (rather than naming the specific behavior(s)). Mohler also notes that he and the Southern Seminary want to "do everything appropriate to reveal **any** abuse" (rather than "the abuse" or "your abuse") indicating that he has not fully accepted that abuse occurred but only that it may have but still needs to be "revealed," pending "further investigation." In sum, Mohler's email, read closely, offers emotional and

spiritual support for Lyell but not corroboration of facts or their interpretation (that certain events happened that definitively constitute "sexual abuse").

49.     In addition, in (8) above, Mohler's "corroboration" is described as being provided to Baptist Press, not Guidepost Solutions itself. The use of phrases like "agreed to provide collaboration" in the context of a report in which Guidepost Solutions indicates that it obtained information directly from many people creates the impression that it was Guidepost itself that sought and obtained the "collaboration." Close reading of the literal meaning, though, indicates otherwise. A similar example follows:

> (10) "Ms. Lyell had numerous interactions with BP staff, as indicated in the evidence we reviewed. For example, BP staff asked her follow-up questions regarding her statement, which she answered, and she provided additional information regarding persons who would corroborate her story and her statements of abuse, including Dr. Mohler, the pastor at Professor Sills' former church, and people at his former missions agency." (p. 83)

50.     The excerpt indicates that it was Baptist Press staff who questioned Lyell and to whom she provided information. Further, the information she provided is not actual "corroboration" but "information on persons who **would** corroborate." Following this statement is this language:

> (11) "BP staff indicated they were reaching out for corroboration of Ms. Lyell's written statement to these people, and in fact we saw evidence that BP staff contacted these individuals who corroborated her statement." (p. 83)

51.     Again, the use of "evidence" and "corroborated" in the context of an investigative report by Guidepost Solutions strongly suggests that it was Guidepost Solutions who reached out

for evidence and also suggests that such evidence was obtained. However, as written, the sentence indicates again that Baptist Press, not Guidepost Solutions, was the entity who sought corroboration and that the "evidence" is that Baptist Press contacted certain individuals, not what the individuals actually reported, or even if the individuals were reached.

> (12) Further, our investigation revealed evidence that people to whom Ms. Lyell disclosed, including Dr. Mohler, corroborated her abuse, and that Dr. Mohler told BP staff that he believed Ms. Lyell had been abused. Others who were contact by BP staff and provided corroboration include people at her abuser's former mission agency and her employer at Lifeway. (p. 84)

52.     The use of "further" suggests that Guidepost Solutions found "evidence" additional to that already mentioned, but we are not told what this additional evidence consists of, who the "people" at Sills' former mission agency were, or how many there were. In addition, two of the "further" collaborators were already mentioned, Mohler and people at Sills' former agency.

53.     We are also again not told what Mohler's corroboration consisted of. If it refers to the email in (9) above, this communication does not indicate that Mohler "believed Ms. Lyell had been abused" but rather than if "the behavior involved" is "as described," he would characterize it as abuse, pending "further investigation."

54.     It could also be inferred that what Mohler "told BP staff" is what he is reported as saying in the Baptist Press Article (brackets original):

> (13) "Mohler told BP his 'encouragement from the start in any case such as this is that authorities be contacted' and that only law enforcement should judge whether laws have been violated in such situations."

(14) "Mohler commended Lyell's courage in coming forward "I stand behind her in [her public statement] and believe she is acting righteously', he told BP."

55.     Again, these are not direct statements that "he believed Ms. Lyell had been abused" or of what the abuse consisted of (e.g. a relationship in which there is a power imbalance vs. a violent relationship) but rather statements of emotional and spiritual support and belief in Ms. Lyell's course of action in reporting what she believed to be abuse.

56.     In either case, a clear report in investigative procedures and findings would have reported what the "corroboration" referred to in the various examples above actually was, not simply that certain people provided it to a recipient whose identity is unclear.

57.     **The Guidepost Report uses the term "sexual abuse" without providing definition.** It is well known in linguistics and beyond that many terms are ambiguous – that is, that terms may mean different things to different people, that terms may have different meanings in different contexts, and that terms with legal implications may be defined differently in different jurisdiction or cases. "Sexual abuse" is one such term. And while the purpose of this report is not to provide or assess legal definitions, linguistic evidence indicates that involved parties, including Guidepost Solutions, recognize the ambiguity of the term, and that for one key party, Mohler, "sexual abuse" can be applied to situations involving professors and students, regardless of any other circumstance (e.g. whether or not there was consent, coercion, violence, threats, etc.). For example, communications are reported in the Guidepost Report in which Jaime Jordan, then outside counsel for Baptist Press, essentially lists several of the various meanings that "sexual abuse" may have for different people:

(15) "Her [Lyell's] story uses the term 'sexual abuse' but it is not clear to me whether she means child sexual abuse, abusing a relationship of trust, or some type of power

differential abuse (such as professor/student). I think we need to be careful about those distinctions. Does the article cast Sills in a 'false light' as a sex offender? Or is he someone who violated employment policies, Biblical commandments, and ethical standards but not any civil laws?" (Guidepost Report, p. 86)

56.    Despite including this clear indication that not all parties involved in the Lyell matter (let alone the wide audience the Report was intended to reach) will hold the same definition of "sexual abuse," the Guidepost Report does not include discussion of how Guidepost Solutions defined "abuse" for investigating and reporting purposes, including when questioning alleged survivors, reporting people to be "abusers," or including vs. excluding names in the List of Abusers.

57.    In addition, Mohler, who allegedly "corroborated" Lyell's alleged sexual abuse, indicated in deposition testimony (8 October 2024) that, for him, "sexual abuse" can be used to characterize professor/student and employer/employee relationships (seemingly regardless of any other circumstances) and that he himself used the term in this way in communications about the Sills/Lyell matter. For example, Mohler tweeted the following in response to the release of the Baptist Press Apology on 15 October 2019:

(16) "Thankful for this article. I need to confirm to all that when Jennifer Lyell came to me with a report of abuse, she never described 'a morally inappropriate relationship.' It was clearly a report of sexual abuse." (Lyell_00091375)

58.    When questioned under oath about this tweet, he stated why he had characterized the relationship as "sexual abuse" (Mohler Deposition, pp. 117-118):

(17):

Q:    What is the evidence that you say constituted clearly a report of sexual abuse?

A:   Defined within this context, it is entirely the relationship, which included a professor and a student.

59.     In addition, in an email response dated 18 October 2019 to a request for a statement regarding the Baptist Press article and subsequent Baptist Press Apology, he stated:

(18) "I can approve this statement:

I am currently out of the country and on an international flight and must be brief. When in May 2018 Jennifer Lyell informed me of a sexual abuse by a member of our faculty, it was abundantly clear that what she described was by no means simply a matter of a 'morally inappropriate relationship.' It was clear that sexual abuse was the awful reality." (SBTS000666)

60.     When questioned about this statement in deposition, Mohler provided a definition of "sexual abuse" consistent with that noted above (Mohler Deposition, p. 175):

(19):

Q:   What evidence did she [Lyell] give you that caused you to say that?

A:   The evidence is simply the formal fact of the employment of Dr. Sills and the student status of Jennifer Lyell.

61.     The Guidepost Report does not discuss or question what Mohler means by "abuse." Instead, its lengthy discussion of Lyell's case, with repeated mention of Mohler's "corroboration" of "abuse," is presented within the context of cases involving children, coercion, violence, and convicted criminals, a juxtaposition, or discourse framing (see paragraph 73 and following, below), which strongly conveys the impression that what Lyell experienced, and what Mohler "corroborates," involves acts as heinous as those of the convicted offenders, perhaps even more so, given the extended amount of space devoted to the Sills/Lyell matter in the report.

62.     **The Guidepost Report includes grammatical constructions that are difficult to interpret and may obscure meaning.** For example, rather than directly stating whether or not Guidepost Solutions found evidence that Sills abused Lyell and then presenting such evidence, the Report states:

> (20) "We did not see any evidence that was presented to BP that indicated that the interactions between Ms. Lyell and Professor Sills was [sic] anything but sexual abuse." (p. 83)

63.     This sentence is difficult to interpret for a couple reasons. For one, it includes two negatives, the word "not," and the construction "anything but abuse," which means "non-abuse" (i.e. consensual behavior). Such wording is far less straightforward than phrasing such as, "We found no evidence of consensual behavior." In addition, readers are likely to be guided by the double negative (and the use of "abuse" rather than "consensual behavior") to interpret the sentence to mean that since no evidence of non-abuse was found, then there must be evidence that abuse occurred. This is a logical fallacy, encapsulated in a well-known quote by Carl Sagan: "Absence of evidence is not evidence of absence." Instead, the correct inference to draw from the sentence in (20) is that while there may be an absence of evidence of consent, this does not mean that there is evidence of an absence of consent (i.e. abuse). Further, framing the findings in terms of a lack of evidence for non-abuse equates to accepting that Sills is guilty until proven innocent: Since no evidence of consent was found, Sills will need to provide such evidence to clear the charge of abuse (see paragraph 73 and following).

64.     Following is another instance where grammatical constructions in the Guidepost Report obscure meaning:

(21) "she [Lyell] provided additional information regarding persons who would corroborate her story and her statements of abuse…. BP staff indicated they were reaching out for corroboration of Ms. Lyell's written statement to these people, and in fact we saw evidence that BP staff contacted these individuals who corroborated her statement." (p. 83)

65.    Here, it is unclear to whom the "corroboration" was provided – to Baptist Press or Lyell. The excerpt can be read in at least two ways:

(A)    Lyell provided information about people who told her they would corroborate her story, and Baptist Press staff contacted the individuals who had told Lyell they would corroborate her story (i.e. Lyell obtained the corroboration, or at least indicated that she could) OR

(B)    Lyell provided information about people who told her they would corroborate her story, and Baptist Press staff contacted these individuals, who then corroborated her story (i.e. BP obtained the corroboration).

66.    If it was indeed Baptist Press who obtained the corroboration (Interpretation B), a comma after "individuals" would make that clear. Since there is no comma, Interpretation A could hold, and it may be that the "corroboration" consisted only of the people's names provided by Lyell, not accounts from these people obtained by Baptist Press, or by Guidepost Solutions.

67.    **The Guidepost Report is also biased against Sills in its absence, in crucial places, of what are known in linguistics as "evidentials" – that is, linguistic material that indicates the source of the information being presented**, for example "Ms. Lyell alleged" or "Dr. Mohler told Baptist Press staff." When no such evidentials are present, statements will be taken as fact, including those expressing a person's understanding, point of view, or opinion rather

than established fact. For this reason, evidentials are typically absent in cases of presupposition, as seen above, since presupposition presumes the stated information to be given fact. Following in Examples (22)-(24) are a few additional examples of lack of evidentials in the Guidepost Report in which information is presented as fact accepted or established by Guidepost but is actually the viewpoint, opinion, or assertion of someone else:

> (22) "Dr. Mohler clearly understood not only the nature of Ms. Lyell's disclosure but expressly stated that he believed Ms. Lyell" (p. 81)

68. The Guidepost investigators could not know what Mohler's personal understanding was and so should have provided the evidential: "Dr. Mohler **said that** he clearly understood…."

> (23) "Ms. Lyell further reported that she lost a significant amount of weight and had other health issues, including hair loss and fainting. Ultimately, as described further below, Ms. Lyell lost her career, her health, and many of her colleagues and friends due to the way her 'relationship' with her abuser was portrayed in the article written by BP. These facts were confirmed by numerous witnesses interviewed by our investigative team." (p. 102)

69. The evidential "reported" appears in the first sentence but is stripped away from the second, which is presented as established fact. And even if "numerous witness" indeed asserted or agreed that "Ms. Lyell lost her career…due to the way her 'relationship' was portrayed," these are opinions, not factual evidence, since a definitive causal link between the wording of the Baptist Press Article and the losses Lyell reported experiencing cannot really be established. The losses may have been occasioned by factors other than or in addition to how she was portrayed in the article, for example, readers' negative reaction to the article, which may have been caused by Baptist Press's wording, by the agreed-upon facts of Lyell's relationship with Sills (her age, the

long-distance nature of the relationship), or many Southern Baptists' belief that extramarital relationships are sinful. In addition, it is not stated who the witnesses are, or how "numerous" they actually are.

> (24) "Regardless of the article and apology, Ms. Lyell ultimately had to resign her position at Lifeway due to the fallout from the original article…. Her resignation letter of October 18, 2019 specifically noted the March 2019 BP article and the fallout thereafter as the cause of her resignation." (p. 108)

70. The first sentence again represents Lyell's view of events, not necessarily the actual cause of her employment at Lifeway ending, though it is presented as fact and not as something Lyell "reported" or "believed." The evidence in the second sentence is, of course, no evidence at all, as it points directly back to Lyell's own views, as articulated in a resignation letter she composed. Later in the Guidepost Report, when Lyell is described as having been "forced into resigning her position at Lifeway," we are told that "[a] confidential 'Transition Agreement' was reached in which Ms. Lyell agreed to waive all legal actions against Lifeway" (p. 143). In other words, the reasons for Lyell's termination, from Lifeway's perspective, cannot be revealed. Therefore, the statement in (24) should has included an evidential, for example, "Ms. Lyell stated that she ultimately had to resign…."

71. When communications originating from a single individual are passed along to others who then share these communications, context is lost, wording changes can occur, and original sources of information can be obscured. This is particularly the case when a recipient of a communication feels supportive of the sender, is emotional about the sender or the message, and/or accepts what the sender tells them as fact (or possibly has an ulterior motive for obscuring the source of information). For example, if Jane Doe tweets that she has been abused, and I believe

her and am appalled by her assertion, I may retweet her statement with a comment such as, "Jane Doe was horrifically abused!" You, in turn, might take my tweet out of the context of Jane Doe's tweet, perhaps in an official statement in which you say, "My heart goes out to Jane Doe and other survivors of horrific abuse." As will be shown below (paragraphs 86 and following), recirculation of statements, many originating from Lyell, is widespread in the documents and communications connected with the Sills/Lyell matter, and much that is presented as the factual findings of "independent investigation" into the matter by Guidepost Solutions also consists of recirculated language that originated as personal assertions, points of view, beliefs, and opinions, now taken out of context and presented, often without evidentials, as bald fact.

72. Linguists refer to the circulation and recirculation of communications and parts thereof as INTERTEXTUALITY, and as intertextual connections are traced, it can be seen how stylistic and substantive changes occur as bits of language are moved from place to place, and how impression on readers and listeners are altered as context changes and original contexts and evidentials are lost. Appendix D presents a comparison of excerpts from two accounts of Lyell's alleged abuse: The Baptist Press Article, which includes appropriate evidentials indicating sources of information (including direct quotations from people interviewed), and the Guidepost Report's presentation of the Lyell matter, in which evidentials are largely absent and presuppositions of "fact" are frequent.

73. **The Guidepost Report creates bias against Sills through narrative framing or discourse framing – that is, the positioning of an extended discussion of Sills and Lyell within a larger narrative about sexual abuse** in the Southern Baptist Convention, including child abuse and other criminal activities. As described above, every narrative is necessarily presented from a perspective, via linguistic devices, often subtle ones, that work to portray characters and events in

a certain light and steer readers toward viewing the narrative through a particular frame or "lens." One powerful way of leading readers toward a given frame is to nest one story inside another, "bigger picture" story with which readers are likely to be familiar. This positioning, or discourse framing, creates the strong propensity to presume that the characters and events in the nested story are to be interpreted and evaluated in the same way as they have already been evaluated in the larger, known narrative. Nested narratives are also positioned within wider, culture-wide storylines. In narrative analysis, these nested relationship are sometimes described in terms in terms of SMALL-N NARRATIVES, accounts of specific events or interactions; BIG-N NARRATIVES, the themes overarching the small-n narratives; and MASTER NARRATIVES, culture-wide ideologies (belief systems) and storylines shaping big-N narratives.

74.     In the case at hand, the Sills/Lyell narrative (small-n) is presented within a narrative of systemic sexual abuse, including child abuse, within the Southern Baptist Convention and other religious entities (big-N Narratives), and both of these are also framed within the larger #MeToo narrative that peaked around the time of Lyell's initial allegations in 2018 (Master Narrative). This Master Narrative casts women who claim to have been victims of sexual abuse as survivors whose stories should be believed (but are often discounted or silenced) and accused men as perpetrators, often by default. This framework percolates down to general narratives about sexual abuse in churches, and then downward again to the specific Sills/Lyell story, which takes on the same shaping as the Master Narrative – that women like Lyell are to be believed and men like Sills are to be presumed to be "the abuser" unless evidence exculpates them.

75.     Evidence for framing within the #MeToo movement, including in the Guidepost Report, can be found in word choices like "survivor," "advocate," "safe space," and "systemic" abuse, while the framing of Sills as "guilty until proven innocent" is encapsulated in the statement

first presented as (20) above: "We did not see any evidence that was presented to BP that indicated that the interactions between Ms. Lyell and Professor Sills was [sic] anything but sexual abuse" (Guidepost Report, p. 83).

76. Further, language on Guidepost Solutions' website indicates that Guidepost frames its investigations into sexual abuse within the #MeToo narrative. For example, the agency places emphasis on "identifying" abuse rather than conducting systematic assessment of whether abuse occurred, correcting "systemic issues" (which presumes that such will exist), and caring for "reporting parties," with no mention of fairness toward accused parties:

(25) "We conduct sensitive investigations and reviews for faith-based institutions and have helped large and small institutions identify, address, and correct systemic issues related to sexual, gender-based, and racial misconduct within a faith-based context. Accordingly, our process and our efforts are governed by best standards and practices designed to ensure accountability, transparency, and care for the wellbeing of the reporting parties."

(https://guidepostsolutions.com/solutions/investigations-business-intelligence/institutional-integrity/)

77. The positioning of Sills as an abuser by association with the various other alleged abusers in the Guidepost Report is made even clearer in its original linking to a 205-page List of Abusers, published by the Executive Committee, still available on the Southern Baptist Convention website (e.g. https://www.sbc.net/satf/). Here, Sills is literally positioned next to numerous other men associated with abuse within the Southern Baptist Convention, many of whom were subject to official law enforcement and courtroom proceedings, including for crimes against children, as noted in the list entries. For example, even in the short list excerpt filed as an

attachment to GPSILLS_0056, one listed person is described as "agreed to consecutive life terms in prison for production of child pornography and first-degree sodomy of multiple 8-12 year-old males. He is a reregistered Sex Offender." The two entrants directly below Sills are also described as "sentenced" to extended time in prison, one for "allegations of sexually abusing a 12-year-old girl" and the other for "abusing a 14-yr-old and a12-yr-old [sic] girl in 2003." Each of these three entries is accompanied by links to the source or sources of the information, as are many of the list entries.

78.     In contrast, Sills' entry, which includes a mug shot-style photo, does not include any language indicative of criminal or legal proceedings, for example "arrested," "charged," "convicted," "sentenced," or even "investigated," "alleged," or "accused." Rather, "the abuse" is stated as bald fact, via presupposition and lack of evidentials, the same linguistic strategies used in the Guidepost Report to slant the narrative against Sills (bolding added):

> (26) "David Sills, former professor of missions and cultural anthropology, Southern
> Baptist Theological Seminary, **fired for sexually abusing** REDACTED from 2004-
> 2016. **The abuse** began when she was a 26-year-old Master of Divinity student."

79.     Also in contrast to other list entries, no URLs of sources are provided with Sills' entry; rather, a single source is listed as unlinked text: Baptist Press.

80.     Roger W. Shuy, considered one of the world's preeminent forensic linguists, coined the term LINGUISTIC CONTAMINATION to refer to how qualities, characteristics, behaviors, and so forth associated with a certain person or series of events can seep into perceptions of another person or string of events when the two are linguistically juxtaposed, or when one is framed within a larger narrative pertaining to the qualities, etc. in question. Aptly, he provides an example of contamination via discourse framing that is quite similar to the case at hand:

"the way the topic is verbally framed can lead to interpretations or understandings by audiences that are not explicit in the actual words. For example, framing a photo of a person who is a television program's subject next to a photo of a known criminal suggests strongly that they are associated or equal in the report that follows."[3]

81.     The inclusion of Sills in a list along with abusers who have been investigated, arrested, convicted, and sentenced via official channels (law enforcement, police) creates the strong impression that he, too, was officially investigated by law enforcement and found guilty in court, despite the fact that, to my knowledge, he has never been subject to police action or legal proceedings in connection with the accusations leveled on him by Lyell.

82.     In addition, the frequent use of law enforcement-related and legal language in the list gives the impression that it is an official list compiled by law enforcement or legal authorities, even though there is a disclaimer at the top noting that the list is simply "pulled from news articles," "is incomplete," "has not been proofed," and has not been "adequately researched" (https://sbcec.s3.amazonaws.com/FINAL+-+List+of+Alleged+Abusers+-+SBC+REDACTED.pdf).

83.     A further concern is that names and accompanying information (e.g. photos) have been redacted from the List of Abusers, following the parameters noted in an Southern Baptist Convention "statement on the release of a list of alleged abusers" (https://www.sbc.net/on-the-release-of-a-list-of-alleged-abusers/):

---

[3] Shuy, Roger W. 2010. The Language of Defamation Cases. Oxford University Press, p. 40.

(27):

In making redaction decisions, counsel to the Executive Committee included, in their entirety, entries that reference an admission, confession, guilty plea, conviction, judgment, sentencing, or inclusion on a sex offender registry. The only exception to those entries is the redaction of names or identifying information of survivors and/or other individuals unrelated to the offender. Many of the entries list either an arrest or charges, but no disposition. Since May 24, 2022, counsel to the Executive Committee has done preliminary research and, where guilty pleas, convictions, judgments, sentences, and/or inclusion on a sex offender registry could be easily verified, the entry was left unredacted. Other entries where preliminary research did not indicate a disposition that fits within the described parameters have been redacted. Entries that do not relate to sexual abuse or that resulted in an acquittal are also redacted.

We note that there will be more exhaustive research and analysis of the redacted entries and we anticipate that some of the redacted entries will be fully released in the future. We felt it was more important to release the list and redact rather than delay and investigate.

84. Despite the fact that Sills was not subjected to any of the official legal actions noted as necessary for unredacted inclusion in the list, his entry remains unredacted, further contributing to his framing as a proven abuser.

85. Given that Guidepost Solutions is a self-proclaimed "global leader in investigations" "comprising over 250 seasoned professionals," including "former prosecutors, and law enforcement agents who have handled cases involving sex crimes and interpersonal violence," it is to be expected that this investigative agency would fully understand that linguistic choices must be made carefully to avoid making presuppositions, using legal terms imprecisely, conveying unproven assertions as fact, and otherwise presenting a biased rather than unbalanced view (e.g. through discourse framing, disproportionate amount of space allotted to the Sills/Lyell matter). The implication therefore is that biased linguistic choices in the Guidepost Report were made purposefully.

86. **The communications and documents associated with this case are rich in intertextuality – that is, linguistic connections among communications. These connections indicate collaboration among Defendants to produce or influence documents that were allegedly independently produced and, more broadly, to shape the narrative that Lyell's allegations of sexual abuse against Sills were investigated, corroborated, and confirmed. The**

intertextual connections among documents also demonstrate how recirculated material both persists across contexts and is reshaped as it spreads. Of special concern, as in the Guidepost Report itself, is how authors pick up on others' uses of legal terms that create the impression that strict investigative and legal procedures were followed (without direct statement of what the procedures were) and how linguistic material indicating original sources of information is lost as communications circulate.

87.　　There are many intertextual connections among the documents associated with this case, as well as clear evidence of influence, and attempted influence, by Lyell and other Defendants on various communications and the Sills/Lyell narrative that forms such a large part of the Guidepost Report. For example, evidence of collaboration between Lyell and Eric Geiger, her former boss at Lifeway, to produce a story about sexual abuse can be found in a chat thread dated 28 March 2018, in which the two discuss how a media story "around the angle of why prominent Christian leaders keep falling to scandal" could "increase awareness and visibility of the book" (seemingly a new book of Geiger's, in the context of the thread) (LYELL_00357669-70); in addition, in a chat thread dated 25 May 2018, only four days after Lyell's initial report of abuse to Mohler, Lyell and Geiger discuss the possibility of her going public with a story if, in Geiger's words, "this gets framed as consensual by Sills" (LYELL_00344965).

88.　　Similarly, it is clear, as indicated in the testimony of then-Operations Coordinator of Baptist Press Laura Erlanson (e.g. Erlanson Deposition, pp. 25 -26, 35) and David Roach, co-author of the Baptist Press Article (e.g. Roach Deposition, pp. 86-89, 134-36), and demonstrated in the language of numerous emails written by Lyell, Lyell played a prominent role in attempting to shape the Baptist Press Article about her abuse. She submitted to them a first-person narrative written in her own words. Baptist Press instead wrote and published their own report on the matter;

however, evidence shows that Lyell helped shape this article, too. For example, email communication between Roach and Lyell dated 7 March 2019 indicates that Lyell was "emphatic" that certain portions of her original Draft Article be included, including the following language that suggests corroborating evidence (though only people's "belief" in her story is directly noted):

> (28) "The denominational institutions, the local church, and the missions agency ultimately believed me, supported me, and took the action for which they were responsible." (LYELL_00035912)

89. This language was included in the published article, with some qualification ("the missions agency [Sills led] ultimately believed me"); however other emails between Roach and Lyell from the same day show that language (from Lyell) directly stating that an investigation was conducted was removed, due to concerns from Bill Cook, the pastor at Sills' former church (who is described as providing corroboration of Lyell's account in the Guidepost Report). For example, Roach wrote to Lyell (strikeout original):

> (29) "I spoke with Bill Cook, and he was leery of classifying what Ninth and O [Sills' former church] did as an 'investigation'. He wondered if you might consider editing your statement according to what I've pasted below….
>
> "Following the seminary's action, Dr. Sills' church also ~~initiated an investigation and~~ took action." (LYELL_00035978-79)

90. Emails between Lyell and Roach also show Lyell's attempted shaping of the BP Article through asking to see and respond to statements from others before the article is finalized. For example, in an email to Roach dated 6 March 2019, she stated:

> (30) "And if David [Sills] says it was consensual, I would like to give an additional one sentence quote in response to that lie" (LYELL_00036392)

91.     She also requested to review any statement that Mohler, listed as one of her chief "corroborators" in the Guidepost Report, might provide:

> (31) "When you get Dr. Mohler's statement, I'd love to see that if you can (I'm sure Dr. Mohler wouldn't mind, we've been in touch)." (Lyell_00036333)

92.     Upon publication of the article, Lyell was subjected to social media and other attacks, which she attributed to the language of the article (especially the phrase "morally inappropriate relationship"), and she made concerted and repeated attempts to get Baptist Press to remove or "correct" the story. She drafted an Editorial Note she wanted Baptist Press to place at the top of the article, essentially framing the events the Press had reported on within her own perspective. The Note includes the following language:

> (32) "Since issuing the following article on March 8, 2019, Baptist Press has come to realize that some language we used in the article is inaccurate and misleading regarding the allegations made by Jennifer Lyell. Ms. Lyell did not report a 'morally inappropriate relationship' as we originally reported and in fact alleged having experience sexual abuse that was non-consensual. In hindsight, we…acknowledge that Baptist Press never received any information from any SBC entity, church, or leader that indicated anything other than an abusive relationship was reported by Ms. Lyell." (GPSILLS_002919)

93.     Though to the best of my knowledge the above was never published, Baptist Press did issue an Apology on 15 October 2019 that reflects the language of Lyell's draft, as seen in the excerpts in (33) – (35) below. (Note that while Baptist Press qualifies Lyell's accusations as "allegations" in (33), the sentence in (35) omits this evidential and can be read as Baptist Press's asserting that abuse occurred.):

(33) "we confirm and acknowledge that our story that ran on March 8, 2019, did not accurately communicate the allegations made by Lyell."

(34) "The story in its original draft form, as submitted by the writer, clearly communicated the emotional and sexual abuse that Lyell alleged took place at the hands of David Sills as she maintained a relationship with his family. However, the story in its finished state omitted references to abuse and was framed as a 'morally inappropriate relationship'."

(35) "Baptist Press ultimately failed to convey that the heart of Lyell's story was about sexual abuse by a trusted minister in a position of power at Southern Baptist seminary."

94.    In addition, the language of Lyell's draft Editorial Note is reflected in the Guidepost Report, published more than three years after Lyell composed the draft note. Compare the following two statements, the first from Lyell's draft Note, and the second from the Guidepost Report:

(36) "Baptist Press never received any information from any SBC entity, church, or leader that indicated anything other than an abusive relationship was reported by Ms. Lyell."

(37) "We did not see any evidence that was presented to BP that indicated that the interactions between Ms. Lyell and Professor Sills was [sic] anything but sexual abuse." (p. 83)

95.    As noted above, these statements, reflective of Lyell's original language, help construct the "guilty until proven innocent" frame that pervades the Guidepost's account of the Sills/Lyell's matter.

96.     Lyell's influence can also be found in the statement issued by Rolland on 22 February 2022 on behalf of the Executive Committee regarding the resolution it had recently reached with Lyell (Slade Statement). A draft of the Slade Statement was emailed to Lyell by Scarlett Nokes on 10 Feb 2022, containing the language in (38). It contained nothing about "investigation" or "corroboration":

> (38) "The Executive Committee of the Southern Baptist Convention wants to acknowledge its failure to adequately listen, protect, and care for Jennifer Lyell when she came forward to share her story of abuse by a seminary professor. Ms. Lyell worked with EC staff to have an article published in the Baptist Press sharing her story. Unfortunately, before publication, but without Ms. Lyell's review, changes were made to the Baptist Press article improperly implying that Ms. Lyell engaged in an immoral consensual relationship. As a result, the publication was inaccurate and hurtful to Ms. Lyell." (LYELL_00021549)

97.     Lyell replied with a draft statement of her own, adding language noting "investigation" and "corroboration" (underlining added, bolding original):

> (39) "It is in this context that an October 15, 2019 Baptist Press statement acknowledged a March 2019 BP news report had failed to accurately report the sexual abuse Jennifer Lyell reported to two SBC entities and local churches. However, the October 2019 statement still failed to report what BP should have originally reported – that <u>Ms. Lyell's allegations of nonconsensual sexual abuse were investigated **and corroborated** [bolding original] by the SBC entities with authority over Ms. Lyell and </u>the professor she accused of the conduct." (LYELL_00021548)

98.     The official Executive Committee Statement (Slade Statement), issued a few days later, on 22 February 2022, now contains the added language Lyell proposed, essentially verbatim (underlining added) (Sills Complaint, p. 16):

>   (40) "The SBC Executive Committee acknowledges its failure to Ms. Lyell, including the unintentional harm created by its failure to report <u>Ms. Lyell's allegations of nonconsensual sexual abuse were investigated and</u> unequivocally <u>corroborated by the SBC entities with authority over Ms. Lyell and</u> her abuser. (LYELL_00193125; Exhibit 3 to Slade Deposition)

99.     Not only are Lyell's words repeated, but they are now amplified by the adverb "unequivocally," although without mention of what the unequivocal corroboration consisted of. In addition, the Slade Statement uses the word "abuser" to refer to Sills, which, as noted, is a term of reference used frequently for Sills in the Guidepost Report, released three months after the Slade Statement.

100.    Following the posting of the Slade Statement, Lyell re-tweeted it, with commentary (LYELL_00349495; Sills Complaint, p. 17):

>   (41) "Beyond thankful for this. [EMOJI] Although I knew it was a possibility, I'm in shock that almost 4 years after @albertmohler investigated & corroborated what I reported as nonconsensual abuse, it is finally public that there was never any ambiguity." (LYELL_00349495; Sills Complaint, p. 17; Exhibit 8 to Mohler Deposition)

101.    Her tweet not only recirculates the assertion that her allegations were "investigated & corroborated" but creates the impression that she is echoing the words of official agencies, when in fact she is the original source. This impression is strengthened by the fact that she added

"@albertmohler" as the subject of the verbs "investigated & corroborated," thereby specifying that a particular individual was responsible for the actions rather than retaining the original passive construction ("Ms. Lyell's allegations…were investigated and corroborated") and vague reference to "SBC entities with authority."

102.    As discussed above, the Guidepost Report frequently uses the terms "investigation," "corroboration," and related words in discussion of the Sills/Lyell matter, though it is unclear in many instances what the investigation and corroboration consist of or who any specific individual corroborators are, other than Mohler (whose "corroboration" is also questionable, as shown above) and, reportedly, "the pastor at Professor Sills' former church" (Guidepost Report, p. 83). In addition, the language of the Guidepost Report indicates that much of the "corroboration" seemingly was provided to Baptist Press, not directly to Guidepost Solutions, and that some comes from Lyell herself (e.g. the material in (23) and (24) above).

103.    Given Lyell's impact on shaping and amplifying the language of Baptist Press and Southern Baptist Convention Executive Committee documents, including inserting language pertaining to "investigation" and "corroboration" into official statements, the conclusion can be drawn that the "corroboration" reported on in the Guidepost Report consists in large part of recycled verbiage rather than independent evidence.

104.    The circularity of relying on Baptist Press and Executive Committee statements of "corroboration" as themselves "corroborative" of Lyell's account is captured in Lyell's own words, in a published response to a Daily Wire article of 14 June 2022 questioning the account of Lyell's alleged abuse (Lyell on Daily Wire). Lyell writes:

  (42) "As also noted in the [Guidepost] report, at that same time (late February/early March, 2019), the two entity leaders with direct authority over the matter as well as

the pastor with authority over the accused had all unequivocally provided statements to the EC/BP that corroborated my allegations."

(43) "Guidepost did not need to interview the professor's pastor or my former boss to assert in the report that those individuals had corroborated the abuse allegations to the EC because the EC's own record – and public statements – reveal it."

105.    As can be seen, the statements recycle the word "corroboration" yet again (and in addition add other legal words like "authority," "record," and "public statements"), but they add no substance and simply point back to the same vague usages in the Report that have already been discussed, as well as to statements that Lyell herself helped author. (Note also that Lyell now recycles the Executive Committee's word "unequivocal," again intensifying the original language.)

106.    Further, there is linguistic evidence that what may seem to be independent statements of corroboration from men with firsthand knowledge of Lyell's initial report and Sills' initial response were also initiated and shaped by Lyell. These include statements posted on social media in support of Lyell following the Daily Wire article, as well as an email seemingly sent to the article's author, Basham. For example, in a chat thread with Adam Greenway dated 11 June 2022 (LYELL_00344974), Lyell asks Greenway to email Basham "his" corroborating statement, complete with an outline of what she wants main points to be. Geiger concurs, though he questions Lyell on what Mohler would think of the "quote" Lyell provides, suggesting that the words are not actually Mohler's but Lyell's:

(44):

JL:     Basically, you're the only one who can corroborate the things you brought up on our call and each is pertinent to the allegations she's [Basham] attempting to build

against me…. I typed up what you said on our call in case you don't have it typed yet. If you could reply to her tonight, I would be super grateful.

JL:     Here's what I typed from our convo in case it helps:

Two things from sbts

1. Didn't deny sexual encounters and justified it…

2. Mohler said, 'I've never seen such evil in my life'

…

EG:     I will do it. I am still at church but will when I am on email.

…

EG:     One last question – how do you think Mohler would respond if he is asked 'did you say this to Eric'

…

JL:     He won't comment….

107.     A few weeks later, Lyell asked Greenway to provide a tweet corroborating her abuse story; she provided several drafts for him (LYELL_00343354-55):

(45):

JL: So, Adam, I'm asking you as the one thing I've saved for my last only to be used when desperate ask of this whole ordeal – can you please tweet the following?

I was at SBTS on 5/23/18 as one of the leaders who met with Dr. Sills to present him with JL's allegations of nonconsensual sexual abuse. Sills' response to the allegations made it clear that Jennifer had told the truth. There should be no ambiguity about this matter.

…

JL: Here's a more clear draft:

I was in the meeting at SBTS on 5/23/18 in which Dr. Sills was presented with JL's allegations of nonconsensual sexual abuse. Sills' response to the allegations made it clear to me that Jennifer had told the truth. There should be no ambiguity about this matter.

108. Interestingly, as if sensing resistance from Greenway, Lyell edits her original draft to remove agency from Greenway by changing an active construction to passive (from "I was one of the original leaders…to present him with Jennifer Lyell's allegations" to "I was in the meeting…in which Dr. Sills was presented…") and adding the evidential "to me," so that it is not presented as given fact that it was "clear that Jennifer had told the truth." It does not appear that Lyell is successful in her efforts to get him to post the tweet; however, the evidence is clear that she attempted to shape her abuse story by crafting a statement of corroboration from Greenway.

109. Similarly, in a chat thread with Mohler and Greenway dated 8 July 2022, Lyell pushes for them to issue corroborating statements; her request/demand has the linguistic form of a conditional threat – that is, a threat presenting the consequences of not conceding to the demand (LYELL_00343639):

(46):

"So to be clear: unless you two publicly state that your determination that I had told the truth was made after directly confronting him and hearing his response to my allegations, then not only do I doubt I will be able to continue to live, but I can assure you that the narrative now established by your silence will continue to be used to dismantle any progress on abuse issues in the SBC."

110. The threat is adjacent in time with the following tweet from Mohler (as President of the SBTS), reportedly dated "on or about July 8, 2022") (Sills Complaint, p. 22):

(47):

In 2018, Jennifer Lyell came to me with an allegation of sexual abuse by David Sills. We followed appropriate processes and the accusation of abuse was confirmed, as we indicated publicly and have subsequently confirmed. Statements directly made by Sills in the course of our confrontation clearly confirmed the allegations of abuse."

111.    When questioned in deposition on how Lyell's accusations were "confirmed," Mohler testified as follows:

(48):

Q:    How were the accusations confirmed; in what way?

A:    By Dr. Sills saying there had been inappropriate sexual contact. (pp. 134-135)

112.    Mohler was also questioned on what "corroboration" was obtained in connection with the tweet given in (41) above, repeated here:

(49):

Q.    Okay.· "@albertmohler investigated and corroborated what I reported as nonconsensual abuse. It is finally public that there was never any ambiguity."· You never said that; did you?

A:    I know of no such statement, and I don't know the context for this.

…

Q.·    Yeah.· You never corroborated; did you?

…

A.·    There was no external corroboration." (Mohler Deposition, pp. 132-133)

113.    In sum, tracing the intertextual connections among documents connected with this case reveals that legal-sounding words like "confirmed" and "corroboration" are recirculated in private chats and emails, social media posts, official statements, and the Guidepost Report. This

recirculating, often accompanied by language that strengthens the original statements, heightens the propensity for readers to believe that there was indeed an investigation with findings backed by evidence, but analysis shows the words pointing back to language used by Lyell rather than to corroborating evidence beyond her words.

114. **The documents connected with this case also show how Lyell uses escalating language to shape increasingly negative portrayals of her relationship with Sills,** transforming what she initially describes as a "messy, complicated relationship" in which initially "complied" at times and bore "responsibility" into a relationship of abuse and assault, characterized by violence, a gun, and death threats.

115. In a chat with Geiger on the day of Lyell's report to Mohler, on 21 May 2018, Lyell describes her relationship with Sills by writing that she was at least partly "responsible," that she "did generally physically and verbally resist," and that she "often times … gave in and complied," not out of fear of violence but "because I didn't want him to be upset with me or to make him feel bad" (LYELL_00344952):

> (50) "I was responsible for much sin in the relationship…. I worked hard to try ways to prevent it and change…but I still couldn't let go of the dream and illusion of the family for a long time. I also did want his love and care, but I never wanted it that way – I promise before God. I didn't, however, spit on him and say you're gross, etc. I did generally physically and verbally resist and sometimes that would be sufficient. Other times I gave in and complied because I didn't want him to be upset with me or to make him feel bad. So I do think I had responsibility…."

116. Her account remains fairly consistent in the Lyell Draft Article (EC_0003663) she submitted to Baptist Press a few months later, in March 2019. Here, she uses hedging language to

indicate uncertainty over what specifically she reported to Mohler, describes Sills' behavior as "taking advantage of his student," and again indicates her "responsibility" and that she was "compliant at times." Importantly also, she indicates that she "was told" (using passive voice to avoid indicating by whom), that "he [Sills] had admitted, at least, to inappropriate sexual activity"– when he met with Mohler, not that Sills admitted to abuse or that he did not assert consensuality (bolding added):

> (51): "**I don't remember exactly what I said**, but it was something along the lines of, "I was sexually abused by one of my 'seminary professors.'…
>
> I had not disclosed this to SBTS or the missions agency Dr. Sills led…because of the **very complicated, messy nature of the relationship**…. The reason that a professor was able to continue grooming and **taking advantage of his student** was because I became like part of his family….
>
> I was quick also to **share the responsibility** I bore for being **compliant at times**, for not telling immediately…. I am not a sinless victim. But I am a victim nonetheless.
>
> I was told following that meeting [between Sills and Mohler] that **he had admitted, at least, to inappropriate activity** and tendered his resignation….

117.     After the original Baptist Press Article appeared on 8 March 2019, Lyell's descriptions become more definitive and less hedging. For example, in a chat thread with Earl Roberson, former Senior Vice President at Lifeway, dated 15 March 2019, Lyell introduces the word "force," and she now describes her response to Sills' alleged advances more definitively, indicating that "I always said no" rather than was "compliant at times." (LYELL_00356333; also a screenshot in LYELL_00356055, from Lyell chat with her friend Liz Lockwood):

> (52):    Mohler has come through with some strong quotes of support.

I wish I could have publicly talked about **him using force**.

And that **I always said no**.

118.    In addition, her statement following the Baptist Pres Article (Lyell Perspective), on 15 July 2019, also contains stronger, more definitive language than her original account. She now characterizes herself as consistently resistant and Sills as being "extremely forceful," and states that Sills "attempted to escalate his assaults":

(53) "I had provided detailed info of the nature of the abuse to Eric Geiger at LifeWay and Dr. Mohler on May 21, including the fact that **I had verbally and physically resisted Dr. Sills both in the initial encounter and throughout the subsequent encounters**.

…

"I shared how he had said he was sorry only a few times after some **extremely forceful instances** in which he **attempted to escalate his assaults even further**."

119.    Her language drastically escalates as she attempts to have the BP story taken down or "corrected." She moves the conversation beyond the Baptist Press to Ronnie Floyd, then CEO of the Executive Committee, and in an email to him dated 1 August 2019 (GPSILLS_000253-54), she refers to the relationship with Sills as "a demonically driven nightmare," repeats the word "assault," and suggests "the added dynamic of physical force and threats to kill if you told." She also now states that Sills "did not deny it when confronted, nor did he ever allege it was consensual" (as compared with her original wording that "he admitted, at least, inappropriate sexual activity." As discussed above, this revised wording implicates Sills in non-consensuality by placing the focus on absence of evidence of non-abuse rather than evidence of abuse. (Nor is it clear to what "it" refers to in "did not deny it.")

120. Finally, Lyell's language escalates to the point where she accuses Sills of "criminal" activity. For example, in another effort to re-shape a blog post she views as negative towards her, she emails the author, Ron Henzel, on 17 June 2021, and states the following:

> (54) "My thinking was I could just verbally work through your article and clarify/add the information you didn't have or was inaccurate as well as answer the broader questions you asked when the information didn't reconcile for you…. I have never been unwilling to be questioned when making allegations that aren't only moral but are also **criminal**." (LYELL_00176682; Henzel Article 13 July 2022)

121. She amplifies this language even further in a meeting with Ron Henzel and Don Venoit on 22 June 2021. The meeting was recorded and transcribed (LYELL_00177112), and so there is a record of Lyell now stating that Sills had a gun (p. 19, p. 20), that he had made threats against Mohler (p. 19), that he "had broken in my house" (p. 15) and "had broken into my house before" (p. 22), and that "he threatened my life multiple times" (p. 15). Such wording is of course dramatically different from the wording she used in her chat with Geiger on the day she made her report to Mohler, on 21 May 2018.

122. Discourse analysts who study conversational structure have established that even unplanned, casual conversations (and electronic interactions) are guided by unconscious rules that keep conversations operating smoothly. The most important is that of Relevance – namely, that as a rule, people make contributions to the conversation that are relevant responses to what has come before. Recalling Mohler's email response to Lyell's report of abuse, on the very day he met with Sills about it ("I would characterize the behavior involved as described as abuse") in light of the linguistic principle of Conversational Relevance, it can be seen that this response is far more

relevant to initial reports of compliance, mutual "responsibility," and a "complicated, messy relationship" than to reports of violence, guns, and threats to kill.

123.    In addition, the Baptist Press Article's report of a "morally inappropriate relationship" is not drastically different from Lyell's assertion in her Draft Baptist Press Article that Sills "had admitted, at least, to inappropriate sexual activity." (Note also Lyell's early use of "sexual **activity**" vs. "abuse," "assault," "attack," etc.) Thus, even the language in the Baptist Press Article that spurred Lyell to attempt "correction" or removal may have initially come from Lyell herself, despite her protestations that the Baptist Press Article constitutes "BP's fabricated language" (GPSILLS_000253; Lyell email to Floyd, 1 August 2019).

124.    **Finally, my analysis indicates that there is no linguistic evidence in the communications between Sills and Lyell with which I was provided that indicates that Sills was violent toward Lyell, that he forced Lyell into entering into and continuing in a relationship with him, or that Lyell was fearful of violence from Sills.** There is no direct reference to sexual activity between Sills and Lyell. Instead, there is linguistic evidence that Lyell pursued Sills and that she had great affection for him. This affection was arguably excessive, as she frequently uses pleading and self-deprecating language indicative of desperation to keep Sills' affection and her employment with him.

125.    There are numerous emails containing indicators of affection and emotional closeness such as babytalk (e.g. "siwwyhead" for "sillyhead"), abbreviations ("swh" for "siwwyhead"), emoticons like smiley faces, and nicknames (e.g. "siwwyhead," "Davicito" [little David, in Spanish] for "David," "jeffiner" for "Jennifer"), as well as frequent assertions of "I love you" and "I miss you." The email to Sills in (55) is illustrative (LYELL_0074752):

(55):



```
Message

From:          Jennifer Lyell [jennifer.lyell@gmail.com]
on behalf of    Jennifer Lyell <jennifer.lyell@gmail.com> [jennifer.lyell@gmail.com]
Sent:          11/27/2006 8:03:49 PM
To:            mdsphd@gmail.com
Subject:       Re: correa


PS- THANKS FOR WRITING.  Keep writing me all the time. It makes me smile.  I'm glad you are having fun,
but sad I'm not either there having fun with ya'll, or you here having fun where I can enjoy it too! Miss me
much and buy me a surprise!! :-)

On 11/27/06, Jennifer Lyell <jennifer.lyell@gmail.com> wrote:
   :( I miss you so much.  I wasn't writing because I was afraid I was driving you crazy.  That Michelle girl wrote
   and sent me a few of the pics of you guys.  They are FABULOUS.  Mary was really pleased, too.  Did I
   mention I miss you?  Are you excited that I got a chair? I'm starting to get pretty stressed and
   overwhelmed.  My phone is ringing off the hook with people wanting to talk to me and I just don't want to deal
   with it.  I can't deal with everyone and leaving at the same time.  I love, miss, and need ya much much
   much.  Oh, did you get a text from me? I tried to send one from my phone again because I found out my text
   stuff was messed up.  How's everyone else doing? Does Jeff seem to be getting it? Did I mention I miss you??
   Come home.  jeffiner/poophead
```

126.   At the same time, Lyell's emails contain language indicative of a sense of desperation, including frequent use of "please," including with repeated characters indicative of emphasis, for example (LYELL_00039266):

(56):



```
Message

From:          jennifer.lyell@gmail.com [jennifer.lyell@gmail.com]
on behalf of    RTIM <j@rtim.org> [j@rtim.org]
Sent:          8/18/2010 6:33:46 PM
To:            David [mdsphd@gmail.com]
Subject:       hey


so sad I was stuck and not online. please get on later and plllleeeaassseee let's skype because my heart is missing
you.
```

127.   There are also repeated pleas for Sills to not leave Lyell or give up on her (e.g. LYELL_00116087), as well as pleas for Sills to keep allowing Lyell to work for him, despite increasing busyness with other work, as for example, in the following (LYELL_00063630; highlights added:

(57):

On Tue, Oct 14, 2008 at 8:14 AM, RTIM <j@rtim.org> wrote:
PLEASE please please just don't give up on me. I will make it work. I made it work at Moody and for the most part, I think that even when my work interferes, I still get more done for you than anyone else would because no one else would give you night-and 24/7 availability almost always, with maybe the exception of one or two times a month... right? So, Please please please just don't give up on me. Trust me to work it out and I will. PLEASE. I DO NOT DO NOT NOT NOT NOT NOT want to work for B&H if I am not helping you. If it interferes- I will quit. I mean it. You promised that I would still be able to do everything for you when I go there. Please? I know you said in here you aren't firing me, but if you are waiting for me to let you down in your mind then I think it will seem like I am even more often. Sometimes I sense that- like you are just waiting for the thing to point to, to say, yep, see, you did it again-- I want you to be looking for the next time I knock it out of the park-- because I still will. I just need you to believe in me and trust me and expect good from me. PLEASE PLEASE. This is more important to me than anything, David. I mean it. Please.

128.    The only fear of Sills that Lyell expresses in her emails to him is that he might fire her, abandon her, or cease to care for her. Perhaps her strongest fear is that Sills will get angry at her for work-related matters, as in the example below. There is no linguistic indication that Lyell fears violence from Sills if he gets angry.

(58):

On Fri, Aug 1, 2008 at 12:58 PM, <mdsphd@gmail.com> wrote:
That's fine. Breathe.
------Original Message------
From: Jennifer Lyell
To: David Sills home
Sent: Aug 1, 2008 1:57 PM
Subject: some lame info

Hey, okay, so I tried to push a little to get some details on the Spanish deal. Here is what I found out. The rights issue has to go through the LIbrary of Congress to initially process the transfer of the Spanish copyright to Unilit, so it can take up to 6 weeks from when it was originated. That is when they can finalize the contract. However, there isn't an advance, just royalties, so Dave said that typically authors never see the contract or are notified until the book comes out. I told him that is absurd and he said they realized it needs to be changed and are trying to figure out how to do it. So-- I told him I'm not content with that. Fred is in China again, but will be here week AFTER next (week of August 11) and he said I can meet with him then to get the details from him. I told him that I want to make sure that you are able to interact with Unilit as they get into the process. So, this is yet another example of a broken system, but one I'm working around to make work for you. More waiting, though. I'm sorry. I wanted more exciting news for you-- hope this doesn't make you angry/upset/etc.. at me.

## IV.    Summary Conclusions

125.    In sum, I have presented linguistic evidence and analysis, grounded on linguistic principles and practices pertaining to Narrative Analysis, Discourse Analysis, Semantics, Pragmatics, Syntax, and Forensic Linguistics that lead me the following conclusions.

126.    The Guidepost Report is rife with linguistic usages that render it biased against David Sills, including presupposition (e.g. "Jennifer Lyell, a survivor of sexual abuse"); prejudicial

terms of reference (e.g. "the abuser"); use of legal-sounding terms in vague and unclear ways (e.g. "investigation," "corroboration"); use of the ambiguous term "sexual abuse" without definition; and grammatical constructions that are difficult to interpret, obscure meaning, and contribute to framing Sills as "guilty until proven innocent," especially "We did not see any evidence…that indicated that the interactions between Ms. Lyell and Professor Sills was anything but sexual abuse."

127.    The Guidepost Report is also biased against Sills in its absence, in crucial places, of evidentials, linguistic material that indicates the source of the information being presented, for example, "Dr. Mohler clearly understood the nature of Ms. Lyell's disclosure"; "Ms. Lyell lost her career…due to the way her 'relationship' with her abuser was portrayed." Instead, beliefs, opinions, and assertions for which there is no immediate evidence are presented as facts rather than as beliefs or individual (or collective) viewpoints.

128.    The Guidepost Report creates bias against Sills through narrative framing or discourse framing – that is, the positioning of an extended discussion of Sills and Lyell within a larger narrative about sexual abuse in the Southern Baptist Convention, including child abuse and other criminal activities. The positioning of Sills as an abuser by association is even clearer in his inclusion in the List of Abusers, published by the Southern Baptist Convention Executive Committee, to which the Guidepost Report originally linked and which is still available on the Southern Baptist Convention website as of this writing (https://www.sbc.net/satf/). Here, Sills is listed side-by-side with numerous people who have been convicted, sentenced, and imprisoned for sexual assault, including against children, creating the strong association that he, too, must have been found guilty of criminal sexual assault by law enforcement and the legal system. The disproportionate amount of space devoted to the Sills/Lyell account in the Guidepost Report also

works to frame Sills as the same type of heinous offender as others presented on more briefly in the Report.

129.    The communications and documents associated with this case are rich in intertextual connections that indicate collaboration among Defendants to produce or influence documents that were allegedly independently produced and, more broadly, to shape the narrative that Lyell's allegations of sexual abuse against Sills were investigated, corroborated, and confirmed. The intertextual connections among documents also demonstrate how recirculated material both persists across contexts and is reshaped as it spreads. For example, legal words like "investigate" and "corroborate" suggest that legal procedures were followed and that concrete evidence exists; however, close analysis reveals the words are verbiage often originating from Lyell, with no discernable substance behind them (i.e. no concrete descriptions of what investigative procedures were followed or what corroborating evidence consists of).

130.    Lyell's various accounts of what she frames as her "sexual abuse" indicate changing and escalating language in which what she initially described as compliance, mutual "responsibility," and a "complicated, messy relationship" is transformed into a relationship characterized by violence, a gun, and threats to kill. The linguistic principle of Relevance indicates that Mohler's early response to Lyell's and Sills' reports on the matter ("I would characterize the behavior involved as described as abuse") is more relevant to Lyell's initial characterization than her later report of being "trapped in a demonically driven nightmare."

131.    Finally, my analysis indicates that there is no linguistic evidence in the communications between Sills and Lyell to which I had access that indicates that Sills was violent toward Lyell, that he forced Lyell into entering and continuing in a relationship with him, or that Lyell was fearful of violence from Sills. Instead, there is evidence that Lyell pursued Sills, and that

she felt great affection for him, affection that was perhaps excessive, given linguistic evidence showing a sense of desperation to cling to Sills.

132. The overall conclusion is that Lyell had a heavy hand in crafting the communications of the Baptist Press, the Southern Baptist Convention, and Southern Baptist Theological Seminary, aided by Defendants such as Geiger, who suggested she go public with her abuse story, and Mohler and Slade, who published statements she drafted or approved, or otherwise recirculated her language. This language made its way into the Guidepost Report, where words like "investigation" and "corroboration" seem on the surface to indicate strict investigate procedures and concrete evidence but in reality simply constitute language that has been recirculated so that its origins are obscured.

133. Further, given that Guidepost Solutions is a self-proclaimed "global leader in investigations" "comprising over 250 seasoned professionals," including "former prosecutors, and law enforcement agents who have handled cases involving sex crimes and interpersonal violence," it is to be expected that this investigative agency would fully understand that linguistic choices must be made carefully to avoid making presuppositions, using legal terms imprecisely, conveying unproven assertions as fact, and otherwise presenting a biased rather than unbalanced view. The implication therefore is that biasing linguistic choices in the Guidepost Report were made purposefully, to ensure that the Sills/Lyell narrative fits the #MeToo frame within which the report is nested and/or to portray Sills as an abusive criminal and Lyell as an innocent victim/survivor.

134. The above opinions are those I hold as of the time of this report being served. My analysis will resume when the depositions of witnesses for Guidepost Solutions, Executive Committee and Southern Baptist Convention proceed. I understand depositions have been noticed, but witnesses have not been produced. I have reviewed the topics in the Notices of Deposition,

and nearly all of the topics enumerated in the three Notices are relevant to my continued analysis. The witnesses' testimony and exhibits used in those depositions may cause me to form additional opinions. Accordingly, this Report is not final. Further, I understand there are motions to compel defendants' production of responsive materials. As such, I may have additional opinions as additional evidence is produced in the case.

135.    The opinions presented in this report are based on my knowledge, training, education, skill, and experience in linguistics and forensic linguistics, as well as the materials cited in this report. In conducting my analysis and setting forth my opinions, I have followed established best practices in linguistics and forensic linguistics, and as such I hold these opinions with a high degree of certainty.

Natalie Schilling, Ph.D.                          20 June 2025

Natalie Schilling, Ph.D.                          Date