# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

MICHAEL DAVID SILLS and
MARY SILLS,

        Plaintiffs,

vs.                    3:23-cv-00478
                        Judge William L. Campbell Jr

SOUTHERN BAPTIST CONVENTION,
a non-profit corporation; et al,

        Defendants.


DEPOSITION OF AMY MCDOUGAL


WEDNESDAY, SEPTEMBER 10, 2025
10:02 AM



VIA ZOOM



Shawna H. Meeks

Certified Court Reporter

and Notary Public

1    thoughts regarding Mr. Leff's expert report?

2        A.   I did.

3        Q.   Have you shared those with your counsel?

4        A.   Yes.  I did.

5        Q.   Now there came a time -- there came a time when

6    you were contacted -- first contacted concerning this

7    case.  That's why you're here.  Who -- who contacted you?

8        A.   Her first name was Alejandra.  I don't remember

9    her last name.  She was from, I think, a firm that

10   searches for experts.  I believe it was called Case

11   Management.  At least the email came from something that

12   appeared to be from Case Management.

13       Q.   And when did you receive that email?

14       A.   I believe it was in the first week of June.  Of

15   course, I can look back on my emails if you need a

16   specific date, but I believe it was the first week of

17   June.

18       Q.   Let's put a pen in that and I would like you,

19   during our first break, if you can just get me that date.

20   We don't need to waste that time right now.  So tell me

21   about the communications you had, you said, I think,

22   Alejandra?  A woman, Alejandra?

23       A.   Yes.

24       Q.   Tell me about the conversations -- the

1  communications you had first with Alejandra.

2      A.   The email I received inquired about my rate for

3  expert witness services.  Didn't have any detail in the

4  email.  I responded that I don't typically throw out a

5  rate for something unless I have an understanding of what

6  the work entails, and doing a conflict check.  I wouldn't

7  want to go further with the conversation if it was

8  something that it wasn't appropriate for me to be involved

9  in.

10     Q.   Do you know how Alejandra had your name to reach

11 out to you?

12     A.   I do not.

13     Q.   Are you -- let me rephrase.  Do you advertise or

14 promote yourself or CLEAResources, LLC as an expert so

15 someone would be able to find you in a certain -- whether

16 it's online or elsewhere?

17     A.   Can you clarify whether your question is asking

18 whether I promote myself as an expert witness or if I

19 promote myself as an expert in my field?

20     Q.   Thank you.  Fair distinction.  What I was driving

21 at is do you promote yourself as an expert witness to

22 provide expert testimony in cases?

23     A.   I do not.

24     Q.   So but you still don't know how you were found by

1    Alejandra?

2         A.    I do not.

3         Q.    Alejandra --

4         A.    I do not know.

5         Q.    So ultimately, did you -- well, then finish the

6    conversation.  So you ultimately wanted to do a conflict

7    check and understand what this was about before agreeing

8    to any agreement; is that fair?

9         A.    Yes.

10        Q.    So tell me what happened in order for you to be

11   here today.

12        A.    I inquired -- as I mentioned, I inquired in my

13   response email I don't throw out my rates.  I didn't know

14   if this was -- was legitimate.  I don't know Case

15   Management company.  And so I said I don't throw out my

16   rates unless I understand more about the work that might

17   be entailed and I can do a conflicts check.  And so I said

18   can you, please, tell me, you know, where the case is

19   pending, who the parties are, and what's involved, and I

20   will, you know, I'll respond at that time.  She responded

21   with, I believe, the caption of the case.  Not much more

22   detail than that.  So I responded with my rates for that.

23        I think that was -- the next email I got from them

24   was, I believe, the counsel in the case would like to

16

speak with you.  And so there was an introduction there
and it was Ms. McNulty, and so we coordinated on a date
and a time to have a brief conversation.  And as an
attorney myself, I can only assume she wanted, you know,
to gauge my experience and talk a little more in depth
about whether I'd be the appropriate person to do this
work.  So -- and then Case Management was out of the
picture and I communicated from then on with Ms. McNulty.

Q.   Great.  Let me stop you right there and ask you a
few questions of what you just said.  You ultimately
received the caption of this case.  When you saw the
caption, did you recognize the names of any of the parties
in this caption -- in this case?

A.   No.  It was only the caption that included Sills
versus SBC.  I do remember mentioning to Alejandra that I
knew someone at Guidepost Solutions so I did respond and I
said if that's okay with counsel, then we can proceed with
the call.  If it's not okay with counsel, then -- then,
you know, maybe I'm not the right person.  So I think
maybe the -- either the caption included Guidepost
Solutions or she listed in the email all the names of the
defendants.  But either way, in that communication, I at
least saw the name Guidepost Solutions and responded that
I knew someone there.

17

1    Q.   And who did you know at Guidepost Solutions?  Was

2  that Bart Schwartz?

3    A.   Yes.

4    Q.   When you saw the caption, and I assume it had a

5  case number or docket number on it, did you go to the

6  docket sheet at the -- through the court's website to look

7  into what this case was about at that time when you first

8  received the caption?

9    A.   No.  I did not.

10    Q.   Did you, ultimately, ever go to the docket report

11  or docket sheet that's housed on the court's website to

12  see what has been filed in this case?

13    A.   I did not.  I don't have access to Pacer through

14  the course of my work so I did not.

15    Q.   Understood.  Had you heard of the Clifford Law

16  Firm or Barrett Law Group --

17    A.   No.

18    Q.   -- prior to receiving -- I'm sorry -- prior to

19  receiving that email from Alejandra?

20    A.   No.

21    Q.   When you had that first conversation with Ms.

22  McNulty, who else was present for that conversation?

23    A.   No one.  It was just --

24          MS. RILEY:  Object to the form.

1    report -- withdrawn.  Was it your understanding when you
2    finalized the June report that you would be submitting a
3    second report?
4               MS. RILEY:  Object to the form.
5       BY MR. KLEIN:
6       Q.    You can answer.
7       A.    Yes.  That's why I indicated that it was a
8    partial opinion because I knew that there were more
9    depositions and more discovery pending.
10      Q.    At that time, what open discovery were you aware
11   of that had not yet been completed?
12      A.    The Guidepost deposition, the Executive Committee
13   deposition, and the SBC deposition.
14      Q.    Were there any other materials that you believed
15   were opened -- what I mean opened, had not been completed
16   -- that you felt you needed in order to complete a final
17   report?
18               MS. RILEY:  Object to the form.
19               THE WITNESS:  Yes.  Guidepost materials
20   specifically.
21      BY MR. KLEIN:
22      Q.    What materials were those?
23      A.    As I recall, Guidepost produced somewhere around
24   1100 documents.  I don't know if it was a day or two or

1   hours before the deadline for the June report, but it
2   would have been impossible for me to review all of that
3   discovery prior to when I owed a partial final report.
4   So, you know, having more time with the Guidepost
5   deposition coming, gave a chance to consider what of that
6   production might be relevant to a final opinion.
7       Q.   Did you ultimately review those 1100 or so
8   documents that were provided prior to your June report?
9       A.   I'm confident I didn't review all 1100 documents.
10  I recall I reviewed some of the documents.  But exactly
11  which ones, I don't recall off the top of my head.
12      Q.   Did you ultimately rely on any of those documents
13  in your August report?
14      A.   If it's indicated in my August report that I
15  relied on them, yes.
16      Q.   I don't believe it is, but we'll get to that list
17  in a second.  But as your memory -- as your memory right
18  now, do you recall relying on any of those documents in
19  that August report?
20      A.   I don't specifically recall.
21      Q.   Do you remember when you began drafting the
22  August report?
23      A.   Can you clarify?  Are you asking me the day I
24  began drafting it?

1     Q.   Yes.  The date.

2              MS. RILEY:  Object to the form.

3              THE WITNESS:  I don't remember the exact

4     date.  I could reference my billing records to answer

5     that, but I don't recall off the top of my head what day

6     it was that I began drafting the August report.

7     BY MR. KLEIN:

8     Q.   If you can do that, that would be great.  And

9     also, I'll give you one point of reference.  Do you

10    remember if it was before or after the Guidepost 30(b)6

11    deposition at the end of July?

12    A.   It was after.

13    Q.   Do you remember if it was before or after the EC

14    30(b)6 deposition?

15    A.   I don't recall.

16    Q.   I believe you said that you reviewed -- you

17    revisited certain documents in preparing the August

18    report.  What documents did you revisit?

19    A.   I don't specifically recall.

20    Q.   Do you remember when you received the Guidepost

21    30(b)6 deposition transcript?

22    A.   I don't remember the date that I received it, no.

23    Q.   Do you know if you received a rough draft of the

24    transcript as opposed to the final draft of the

38

1  transcript?

2      A.   I believe I received a rough draft of the

3  transcript.

4      Q.   Did you ever receive and review a final version

5  of the transcript?

6      A.   I don't recall.

7      Q.   Okay.  Let's take a look at your CV.  I'm going

8  to start getting into a couple of questions about your CV.

9  Now I noticed, Ms. McDougal, that your CV was attached to

10 the June report, but I did not see it attached to the

11 August report.  Was that intentionally or inadvertent?

12     A.   That was inadvertent.

13     Q.   We'll go over it and I'll ask you if anything has

14 changed or been updated.  I just didn't know if there was

15 a reason why it was not attached to your August.  So for

16 purposes of now and for the screen -- for the Zoom viewers

17 at home, we're going to ask to mark as Exhibit 1 your June

18 expert report because that's where your CV is.  And for

19 Shawna, because your life should not be too easy, it's

20 Exhibit 12 in the document that Alex sent to you late

21 yesterday.  And so that will be marked Exhibit 1 for this

22 deposition.

23              (WHEREUPON, DEPOSITION EXHIBIT 1 WAS

24              MARKED FOR IDENTIFICATION AND IS ATTACHED

1    Tennessee law", and then you go to spend the next page as

2    well, which we'll get to in a second, and this is your

3    updated opinion that's new in this report, correct?

4        A.    Yes.

5        Q.    And a large portion or certainly some portion of

6    your opinion that the investigation was illegal is based

7    on this statute that you reference and even cite on page

8    10 of the report; is that correct?

9        A.    Can you restate the question?  My --

10       Q.    Sure.  You say in that very first sentence, "the

11   independent investigation was illegal under Tennessee

12   law"; is that correct?

13       A.    Yes.

14       Q.    Is it fair to say that one of the reasons for

15   your opinion is based on the Tennessee statute that you

16   cite on page 10 -- Alex, if you can turn to page 10 for a

17   second -- of this report.

18       A.    Yes.  One of my reasons for stating that is the

19   Tennessee statute, yes.

20       Q.    You had access to that statute well before your

21   June report, correct?

22       A.    I referenced that statute in my June report.

23       Q.    Yes.  But you now updated it here and actually

24   quoted the statute on page 10, correct?

1      A.    Yes.

2      Q.    And that page 10 referenced the quotation to 62-

3    26-202 was not in your original report, correct?  Your

4    June report.

5      A.    I don't specifically recall.

6      Q.    Well, I will represent to you that it was not

7    because the entirety of that -- basically, the

8    essentially, the entire part of that section is new and

9    I'll represent to you that it wasn't, but you would agree

10   that you had access to that statute for your June report,

11   correct?

12     A.    Yes.  And that -- it is included even though it's

13   not bolded, it is included as part of the updated opinion

14   on legality.

15     Q.    Understood.  And I took it -- and I understood

16   that.

17     A.    Yes.

18     Q.    You also reference in this updated opinion

19   section that Guidepost was the one engaged as the entity

20   to conduct the investigation and Guidepost is not licensed

21   under Tennessee law to conduct private investigations and

22   does not hold a private investigator license that has

23   reciprocity with Tennessee.  Do you see where I read on

24   the top of page 7?

1    A.    Yes.

2    Q.    How did you learn that Guidepost is not licensed

3    under Tennessee law and does not have reciprocity -- hold

4    a private license elsewhere that has reciprocity with

5    Tennessee?

6    A.    The Guidepost deposition, Ms. Tongring was asked

7    where Guidepost was licensed.  Remarkably, she said I have

8    no idea whether it's licensed in any jurisdiction as a

9    private investigator.  So I looked in the Tennessee

10   license database to see if Guidepost Solutions held a

11   license.

12   Q.    And you had access to that database for your June

13   report, as well, correct?

14   A.    I mean I had access to the database.

15   Q.    That was my question.  You just had access.  Now

16   on -- through the rest of this portion of your updated

17   opinion, you explain why you believe that the

18   investigation was illegal.  I think you said earlier that

19   you have not been retained in this case to provide a legal

20   opinion as to the legality of the investigation, have you?

21          MS. RILEY:  Objection.  Mischaracterizes

22   testimony.

23   BY MR. KLEIN:

24   Q.   I'll ask it -- I'll withdraw the question.  Have

1    report, in adding this sentence here since you did not

2    have his report when you filed your June report?

3         A.    I added this from the 30(b)6 deposition use of

4    commonsense definitions.  Ms. Tongring's reference to

5    commonsense definitions.

6         Q.    Were you aware in the Johnnie Hunt litigation

7    that the judge in that case addressed Guidepost's use of

8    the words specifically survivor and sexual assault and

9    found that Guidepost was fine using those words without

10   defining them?  Are you aware of that?

11        A.    I'm not aware of anything that went on in the

12   Hunt case except to the extent that I cited it.

13        Q.    And so then you did not read the summary of

14   judgment -- I'm sorry, the summary judgement opinion that

15   was issued in that case?

16        A.    I read nothing but what I mentioned before, which

17   is SI Global's expert report issued in the Hunt case.

18        Q.    And the 30(b)6 from the Hunt case?

19        A.    Correct.  Guidepost's 30(b)6 from the Hunt case.

20   Those are the only two things from the Hunt case that I

21   reviewed.  I have no knowledge of whatever else was filed

22   or occurred in that case.

23        Q.    Are you aware that the same judge is presiding

24   over this case as presided over the Johnnie Hunt case?

92

A.    I'm not aware of anything else about the case
other than really what's reflected in the report.  I don't
know who it's pending before or when it's pending.  I
stayed in my lane.

Q.    Give me a second.  I'm trying to streamline some
questions here.  Would that change your opinion -- let me
rephrase.  Ask a better question.  The fact that Judge
Campbell in the Middle District of Tennessee determined
that Guidepost -- that there was no problem with Guidepost
not defining specific terms like survivor, like sexual
assault, would that change your opinion that you've given
here had you known that Judge Campbell had already ruled
on that in a previous case?

A.    Probably not.  And my question -- my counter-
question would be not to you, but my counter-question
would be did Judge Campbell know at the time that Judge
Campbell made that determination that the entire
investigation was not legal under Tennessee law because if
that had not been determined, that might change Judge
Campbell's interpretation of these words.  I don't know,
but probably not.  I -- it would not change my opinion.
I'm an investigator.  I'm trained as an investigator and I
-- those terms, in my professional opinion as an
investigator, are important to define.  I don't think that

95

1      A.   -- for investigative purposes, mishandled means

2    you were supposed to have done A, B, and C and you only

3    did A.  You mishandled that.  Or it could be mishandled

4    according to ecclesiastical law, according to social

5    norms, according to corporate policy.  You can't mishandle

6    something unless there's some common understanding on how

7    something is properly handled.

8      Q.   We've been going about another hour and 15

9    minutes.  Do you want to take a break now?  Do you want to

10   keep going?  It doesn't matter.  Let's -- can we go off

11   the record for a second, actually, and we'll figure out

12   timing for a lunch break, et cetera?

13            MS. RILEY:  Certainly.

14            VIDEOGRAPHER:  This concludes Part 2.  The

15   time is 12:25 p.m.

16            (WHEREUPON, A BRIEF RECESS WAS TAKEN.)

17            VIDEOGRAPHER:  This is the beginning of Part

18   3.  The time is 12:35 p.m.

19   BY MR. KLEIN:

20     Q.   Okay.  Ms. McDougal, we are back on the record.

21            MR. OTCHY:  Back to the report?

22   BY MR. KLEIN:

23     Q.   Yeah.  We'll go back to the report and we'll go

24   to page 9.  Scroll down further so I can see the number

1    there.   Great.   So this part, number one through nine, is
2    all new for your August report, correct?
3        A.   Yes.
4        Q.   But isn't it true that, essentially, all of these
5    facts listed in one through nine, and it may even be ten,
6    as well, on the other page -- one through ten were all
7    facts that you had access to for your June report?   If you
8    answered that, I didn't hear you.   I'm sorry.
9        A.   I need to review all ten so I can answer that.
10       Q.   Well, certainly.   For a few of them -- let's do
11   the first two.   The actual client, the EC, is
12   headquartered in Tennessee.   That's on their website,
13   correct?   The EC's website.
14       A.   Yes.   I didn't go to their website, but I was
15   aware from discovery that, yes, they're headquartered in
16   Tennessee.
17       Q.   And that the subjects, the EC and the Baptist
18   Press, are headquartered in Tennessee.   The second one.
19   You also had access to that prior to your June report
20   correct?
21       A.   I don't know about Baptist Press.
22       Q.   Are you aware --
23       A.   I knew who the Executive Committee was, but I
24   don't -- I'm not sure that in my June report I knew the

1    Baptist Press was also headquartered in Tennessee.  I may

2    have gotten that from the EC's deposition.

3        Q.    You're aware that that's on their website, that

4    they are headquartered in Tennessee?

5        A.    I'm not aware that that's on their website

6    because I've never gone to the website.

7        Q.    But you had access to their website, obviously,

8    for the June report, correct?

9        A.    I suppose in theory I had access to every website

10   before my June report, so correct.

11       Q.    Okay.  Yes.  I guess the better question was you

12   had access to the internet for your June report, which

13   would --

14       A.    Yes.

15       Q.    -- include the Baptist Press website, correct?

16       A.    If that information in fact was on the Baptist

17   Press website prior to June 2018, then yes.  I would have

18   had access to that information prior to June 8, 2018.

19       Q.    You say 2018.  You mean June 2025?

20       A.    I'm sorry.  I definitely mean 2025.

21       Q.    And for number five, for example, the conduct

22   investigated largely occurred in Tennessee.  I assume you

23   were aware of that prior to June 2025, correct?

24       A.    I do not think that I would have said largely

98

1    occurred in Tennessee at that time.  I wasn't sure, I

2    think, at that time.  I -- I definitely believed that most

3    of the investigative activities had occurred in Tennessee,

4    but I drew from both -- both of the depositions to get

5    information about what happened in Tennessee.  And from

6    the depositions, I was in a position to address this in a

7    more comprehensive way and really root my feet under

8    Tennessee law.  So --

9        Q.    What about number -- I'm sorry.  Your delay, I

10   thought you were done.  Sorry.

11       A.    I'm done.

12       Q.    So for nine and ten, Guidepost sent its invoices

13   to the client in Tennessee.  An invoice had been produced,

14   albeit inadvertently, much earlier on in 2025, so you had

15   access to that invoice, correct?

16       A.    No.  I don't think I had access to any Guidepost

17   invoices at all at any point in time.  I took this

18   information from Ms. Tongring's deposition.

19       Q.    Are you aware that invoice --

20       A.    (inaudible)

21       Q.    I interrupted you.  I'm sorry, Ms. McDougal.

22       A.    I believe I took this information from the

23   deposition.

24       Q.    Were you not aware that Guidepost had sent at

1   least one invoice to -- and produced one invoice in this

2   case early on in 2025?

3            MR. RILEY:  Objection.  Can you show her the

4   invoice.  I don't even --

5        BY MR. KLEIN:

6        Q.   I don't have the invoice handy.  I'm asking if

7   she's aware that there was an invoice that was produced in

8   this case.  Maybe we'll get it at lunch.  But for now, I'm

9   wondering if you're just aware if an invoice was produced

10  in this case from the Guidepost to the EC?

11       A.   I was not aware.

12       Q.   Then the last one, ten, preliminary review of the

13  report by this committee on cooperation was done in person

14  in Tennessee.  You were aware of that based on your

15  reliance materials in the June report, correct?

16       A.   No.  This was also from Guidepost's 30(b)6

17  deposition where she described -- Ms. Tongring described

18  how she traveled to Tennessee and the nondisclosure

19  agreements were signed and they were in a room, but they

20  didn't stay in the room with them.  You know, her

21  testimony on how the review was done with the committee on

22  cooperation.

23       Q.   But that was also testified to by Ms. Tongring in

24  her Guidepost 30(b)6 in the Hunt case.  Do you remember

1    reviewing that when you relied on that transcript for your

2    June report?

3        A.    I did not rely on the -- well, I shouldn't -- I

4    reviewed the Guidepost's deposition -- 30(b)6 deposition

5    in the Hunt case.  That's why I listed it.

6        Q.    But you listed it on reliance materials, not just

7    reviewed materials.  It was reliance materials, correct?

8        A.    Yes.  Yes.  So but I was not -- it was the 30(b)6

9    in this case -- again, if I put my eyeballs on that

10   occurring in the Hunt 30(b)6, my eyeballs probably did not

11   register that that was important at that time when I was

12   reviewing that.  But for purposes of this August report, I

13   had more information from both the Guidepost 30(b)6

14   testimony and documents in addition to the EC documents to

15   more conclusively root the jurisdiction of this

16   investigation in Tennessee, and that's why I included

17   number ten.

18       Q.    Speaking of jurisdiction, I thought you said

19   earlier that you did not believe there was reciprocity --

20   this is on the licensing issue.  I'm sorry.  I'm sort of

21   going sideways for the moment.

22       A.    Okay.

23       Q.    You had looked into reciprocity with regard to

24   Guidepost being licensed in certain jurisdiction and

1    reciprocity in Tennessee.  Do I have that right?

2        A.    Yes.

3        Q.    Do you know if Florida has reciprocity with

4    Tennessee or Tennessee has reciprocity with Florida,

5    depending on how you want to look at it?

6        A.    I -- there's a memorandum that lists the states

7    for Tennessee on the states they have reciprocity with.

8    Obviously, I didn't memorize that.  There's, I don't know,

9    maybe six to eight of them.  I don't recall specifically

10   whether Tennessee has reciprocity with Florida and I did

11   not check the Florida databases for whether Guidepost

12   Solutions is licensed there.  I checked D.C. because

13   that's where Ms. Wood and Ms. Tongring work.  I checked

14   New York because that's where Guidepost is headquartered.

15   And I checked Tennessee because that's where this

16   investigation occurred.

17       Q.    Let's turn now -- give me one second, please.  On

18   the -- let's go to page 11.  Sorry.  Give me one second.

19   I have two versions in front of me, Ms. McDougal, so give

20   me a second to make sure I take you to the right place.

21       Do you know what the Tennessee statute that you

22   referred to has a private right of action that allows

23   private citizens to litigate or prosecute any claims based

24   on alleged violation of the statute?

1     A.    Which statute?

2     Q.    I'm sorry.   The statute you cited on page 10, 62-

3     26-202 and/or I believe you also referenced 62-20 -- 26-

4     204, I believe.

5     A.    Right.

6     Q.    Do either of those statutes, as far as you know,

7     give a private right of action to citizens to litigate or

8     prosecute any claims they had based on alleged violation

9     of those statutes?

10            MS. RILEY:   Object to the form.   Outside of

11    her scope.

12            MR. KLEIN:   She said her scope was

13    determining the legality of the investigation.

14            MS. RILEY:   The investigation, right, not

15    whether or not somebody else has a private right of

16    action.

17    BY MR. KLEIN:

18    Q.    Well, that goes, I would think, to the legality

19    of it, but subject to your objection, that's fine.   You

20    can answer, Ms. McDougal.

21    A.    The Tennessee code prescribes a penalty -- or

22    describes violations of that section as a Class A

23    misdemeanor.   In Tennessee, there's three levels of

24    misdemeanor.   A Class A is the most serious misdemeanor,

1   so because this statute is classified as a -- essentially,

2   violations are a criminal offense, then yes.  A person

3   would have the right to make a complaint to initiate that

4   the State of Tennessee prosecute violations of this

5   statute under the statute as Class A misdemeanors.

6       Q.   But that's not a private right of action.  That's

7   an action that the government can enforce the statute to

8   seek redress under the statute.  Is there a separate

9   private right of action that Scott Klein or Amy McDougal

10  could bring against a company if they believe the statute

11  was violated?

12              MS. RILEY:   Same objection.

13              THE WITNESS:   The statute provides that it's

14  a Class A misdemeanor.   That's the penalty that the

15  statute provides.

16     BY MR. KLEIN:

17      Q.   And that's the only penalty that you're aware of?

18  That's the only remedy that you're aware of for violating

19  the statute?

20              MS. RILEY:   Objection.   Mischaracterizes her

21  testimony.

22     BY MR. KLEIN:

23      Q.   Is that the only remedy that you're aware of for

24  violating the statute?

104

1          MS. RILEY:   Object to the form.

2          THE WITNESS:   It's what the statute says.

3     Whether someone could bring suit that because they weren't

4     licensed and they were essentially committing a criminal

5     offense while they took other actions, whether that would

6     then lead to an action for negligence, an action for

7     invasion of privacy, or intrusion upon seclusion, an

8     action for defamation in the course of committing the

9     Class A misdemeanor, certainly, those claims could be

10    brought.   The statute says what the statute says.   It does

11    not foreclose a private right of action.   It -- it just

12    lists a penalty as a misdemeanor.

13       BY MR. KLEIN:

14       Q.   So I'm going to move to strike.   I don't believe

15    that responds to my question.   I will -- I just want to

16    know if someone can seek civil remedies based on a

17    violation of the statute, if you know.

18          MS. RILEY:   Objection.   Outside the scope

19    and objection to your move to strike.

20       BY MR. KLEIN:

21       Q.   Do you know, Ms. McDougal?

22       A.   Anyone can seek a remedy for anything, Mr. Klein.

23    I mean we know this.   They can -- the statute says it's a

24    Class A misdemeanor.   If someone does not have a license

1    and they take your cell phone and download a bunch of

2    information under the guise of an investigation and it's

3    not an investigation, licensed, right?  They have no right

4    to do that.  Yes.  They have a private cause of action

5    under Tennessee law for other things because of what they

6    -- what they did.  So I will not say, yes.  That's the

7    only remedy that's available under the statute.

8        If someone falsely represents to you that they're an

9    investigator and they're not, there's fraud.  There's

10   misrepresentation.  There's false advertising.  If they

11   track your car and they don't have a license to do so,

12   that could be stalking, which could fall under criminal or

13   civil.  So the statute merely says the violations of the

14   statute are Class A misdemeanor.  There are any number of

15   other causes of action that could arise from violations of

16   this statute and by the language of the statute, as far as

17   I'm aware, nothing in the statute forecloses any of those

18   private rights of action.

19       Q.   Have you reviewed cases to see if people actually

20   brought claims based on this statute?

21               MS. RILEY:   Object to the form.  What do you

22   mean by people?

23       BY MR. KLEIN:

24       Q.   Have individuals -- have you seen, reviewed any

106

1    cases where a party has brought a claim based on a

2    violation of this statute in the civil context?

3              MS. RILEY:   Object to the form.

4              THE WITNESS:   No.   I did not --

5        BY MR. KLEIN:

6        Q.   Have you --

7        A.   -- I did not look for any cases.

8        Q.   Have you reviewed case law to see how this

9    statute and the statutes that you cited have been

10   interpreted under Tennessee law?

11       A.   I did research interpretation and I referenced

12   the attorney general opinion in my initial opinion.   The

13   attorney general opinion was issued to clarify whether out

14   of state attorneys were authorized to perform private

15   investigations under the language of the statute.   The

16   statute does not say that out of state attorneys are

17   permitted; however, that opinion from the attorney general

18   kind of expanded upon that language in saying we interpret

19   this to mean that an out of state attorney is authorized.

20       Now that's not -- as you know, that's not conclusive

21   interpretation of the statute.   That's not the court

22   saying that.   That's the attorney general's take on what

23   they will and will not prosecute.

24       Q.   Has that -- has that be stricken from this August

1    report or is that still part of this August report, that
2    attorney general's position?
3        A.    I don't recall off the top of my head, but it's
4    not -- I didn't deem the attorney analysis relevant after
5    having more facts from the Guidepost's deposition.  It was
6    my opinion that the attorney at law analysis was no longer
7    relevant and, therefore, I analyzed it on the entity,
8    Guidepost Solutions, as an entity being licensed,
9    therefore, Guidepost Solutions is obviously not an
10   attorney so I deemed that it was not -- it was no longer
11   relevant to my analysis of legality.
12       Q.    All right.  Let's do a couple of more questions
13   then before we break for lunch.  The bottom of page 11.
14   If you scroll down to the bottom paragraph.  Right there.
15   Thank you, Alex.  Beginning with "in Guidepost's 30(b)6
16   deposition."  Do you see that paragraph?
17       A.    Yes.
18       Q.    Let me make sure I have the right paragraph now.
19   Sorry about that.  Yes.  There we go.  The second to last
20   line, it says "she testified she had no idea, period."  Do
21   you see where I am right now?
22       A.    Yes.
23       Q.    Great.  The next sentence says "she holds the
24   title president, yet she had no idea if Guidepost is

121

1      Q.   You have no evidence that Guidepost played a role

2   in choosing the members of the taskforce, correct?

3                MS. RILEY:  Object to the form.

4                THE WITNESS:  I've not seen any evidence

5   that Guidepost was involved in the selection of the

6   taskforce.

7      BY MR. KLEIN:

8      Q.   Are you aware that the messengers directed that

9   an expert in sexual abuse allegations be appointed to the

10  taskforce?

11     A.   I read the annual report on what the messengers

12  were requesting.

13     Q.   So do you recall that the messengers directed

14  that one of the members of the taskforce be an expert in

15  sexual abuse allegations?

16     A.   Yes.  I believe that that's set forth on page 57

17  of the annual.

18     Q.   And do you find that to be, by itself, an

19  impairment of the investigation; that an expert in sexual

20  abuse allegations was appointed to the taskforce?

21     A.   I find that Ms. Denhollander's appointment to the

22  taskforce was an impairment.

23     Q.   She was an expert, or I imagine remains an expert

24  in sexual abuse allegations, though.  You would agree with

1   found this particular interaction to be improper and

2   inappropriate for an independent professional

3   investigator.

4       Q.    Were you aware that in the Johnnie Hunt case

5   there were texts produced between Ms. Wood and Jane Doe,

6   the accuser in that case?

7       A.    The only thing I'm aware of in the Hunt case is

8   Guidepost's 30(b)6 and SI Global's expert report.

9       Q.    I didn't know if you recalled in that 30(b)6 if

10  they discussed the text exchanges between Ms. Wood or Ms.

11  Tongring and Jane Doe in that case.   And you don't recall

12  that either way?

13      A.    I do not recall that.   And if those texts were

14  related to what time are we meeting tomorrow for my

15  interview, that would not push the needle for me on

16  professionalism.   But if it was hey, when the

17  investigation is completed, can you help me with this?

18  And the response.   And especially coupled with the fact

19  that Ms. Wood met with Ms. Lyell prior to the engagement

20  letter even being signed.   All of these facts together

21  paint a picture and the picture is that that's not an

22  objective professional way to engage.

23      If I was a witness and provided a statement to the

24  FBI, I wouldn't be like, you know, Agent Johnson, this,

1   that and the other thing, and then two weeks later say,

2   hey, Jim.  Can you tell me a good place to get a beer and

3   some wings, right?  That's -- that's -- and if I did that,

4   the FBI agent professionally should just not engage with

5   that, right?  That's not -- that's not -- it impairs their

6   independence if you provide aid to a person when you've

7   done an objective independent investigation.

8       Q.   Now -- well, withdrawn.  Let's talk about Ms.

9   Kilpatrick who you spent some time discussing in this

10  report.  Do you -- the information you got about Ms.

11  Kilpatrick surrounds the 2019 Caring Well Conference; is

12  that correct?  And I'm on, by the way, page 19 still as

13  well.  The bottom of page 19.  Is it fair to say that much

14  of the information that you obtained from Ms. Kilpatrick

15  at least surrounds the 2019 Caring Well Conference as you

16  referenced on the bottom of page 19?

17      A.   I'm not sure the word much of is accurate.  The

18  information about Ms. Kilpatrick attending the Caring Well

19  Conference is -- certainly I cited to that.

20      Q.   You seem to, among other things, be concerned

21  about the fact that they were on a panel together or wrote

22  a curriculum together; is that a fair statement?

23      A.   Yes.

24      Q.   The fact that an investigator previously was on

1    years before.

2        Q.    So the fact --

3        A.    And remember, I don't have all of the evidence.

4    I only have a little bit of evidence and the little bit of

5    evidence is pretty bad in this regard.    There is evidence

6    that Ms. Denhollander and Ms. Kilpatrick worked together

7    to make curriculum that addressed the very subject matter

8    issue of this investigation and Ms. Denhollander

9    recommended Ms. Kilpatrick to the SBC to bring her on

10   either to conduct an investigation or to advise or make

11   recommendations that was prior to June 2021.

12       Ultimately, Guidepost hires Ms. Kilpatrick and adds

13   her not only to the investigative team, but to investigate

14   the very allegations that Ms. Kilpatrick only years

15   earlier had written to the victim about and she's already

16   heard the story.    She clearly already believed the story

17   from her own words.    You know, I heard your story.    It's

18   very courageous of you.    She obviously is not objective

19   here.    So the moment that Guidepost hires Ms. Kilpatrick,

20   I mean that kind of -- it's imputed disqualification,

21   right?    It's she's not objective.

22       Now had they had her on the investigation but focused

23   on someone else's allegations, I would still say that

24   doesn't meet the standard.    There's still a conflict and

1   this is bad.  But it couldn't -- it couldn't be any worse
2   that Ms. Kilpatrick was added to do a, quote, independent
3   objective investigation into facts she already heard, she
4   apparently already believed, she'd already told the victim
5   that she -- she admires her courage.  That's not objective
6   or independent at all.
7        Q.   What evidence do you have that someone's saying I
8   admire your courage means that I'm not going to be
9   independent in a subsequent investigation?  What authority
10  do you have for that position?
11       A.   Well, I didn't need authority from Ms. Kilpatrick
12  because on her panel she said as soon as a survivor starts
13  telling me their story, I can finish it.  I can tell them
14  what happened because I see certain patterns.  Well, that
15  -- I don't need to say on authority who does or who
16  doesn't prejudge.  But I will tell you that on the panel
17  at the 2019 Caring Well Conference, Ms. Kilpatrick said
18  the words "when a survivor starts telling me their story,
19  I can finish it for them.  I know what happened because I
20  see certain patterns."  And no matter how you measure
21  this, that's not objective, it's not open minded, and it's
22  not independent.  Whether that was in regard to Ms.
23  Lyell's allegations are irrelevant.  That's what came out
24  of Ms. Kilpatrick's mouth.

1    Q.    But Ms. Kilpatrick, and more specifically or more

2    generally, Guidepost, as it relates to David Sills, was

3    not addressing or proving that the allegations occurred.

4    Weren't they focused on how the EC mishandled those

5    allegations, which is different than whether or not in

6    fact David Sills, we can prove that he committed whatever

7    offense was alleged?

8                MS. RILEY:    Object to form and object to

9    facts not in evidence.

10   BY MR. KLEIN:

11   Q.    You can answer.

12   A.    The answer is no.    And here's where Mr. Leff and

13   I disagree on our reports.    As much as Ms. Tongring in the

14   30(b)6 deposition tried to state that we were not doing an

15   independent investigation under the second mandate, they

16   did an investigation on the second mandate.    And what Ms.

17   Tongring tried to do was draw a false distinction between

18   investigation and corroborating.    She used the term we

19   found sufficient evidence.    She used sufficient evidence

20   approximately six times.    I cited exactly what pages in my

21   report that she used the term sufficient evidence.    She

22   absolutely investigated.    Not well, mind you.

23   So she's trying to say we didn't investigate.    They

24   talked to, according to the 30(b)6 deposition, 300 to 400

1    people.  They asked do you know anything about Jennifer

2    Sills [sic] and her allegations?  Plus, the 57 or so

3    people -- if I have the number wrong -- 57 people listed

4    in the interrogatories who they interviewed in regards to

5    Jennifer Lyell's allegations.  That's 457 people so far.

6        Then Ms. Tongring testified they reviewed five

7    terabytes of data.  Probably a lot of it submitted by Ms.

8    Lyell.  She doesn't say one way or the other, she just

9    said we reviewed five terabytes of data.  So you

10   interviewed almost 500 people, you reviewed five terabytes

11   of data to find sufficient evidence that made you

12   comfortable that this happened.  That's an investigation.

13   There's no difference between corroboration and

14   investigation.  There's no difference between the first

15   mandate, the second mandate, the third mandate.

16       In order to investigate whether Ms. Lyell's complaints

17   were mishandled by the EC, the fundamental threshold

18   question is was she a survivor in the first place.  Does

19   she fall within scope, right?  And if what had happened to

20   her had happened to her in 1999, she wouldn't be in the

21   report.  She shouldn't have been in the report.  It's out

22   of scope.

23       But to draw false distinction between -- we didn't

24   actually investigate this, when the front of their report

157

1   says independent investigation, and they reviewed hundreds

2   -- and they interviewed hundreds of people and reviewed

3   terabytes of data, that is an investigation.

4       Q.   Wasn't the fact that they spoke to hundreds of

5   people who were EC members or had knowledge of the EC's

6   conduct in order to establish whether or not allegations

7   of sexual abuse were mishandled in this matter?

8       A.   That's not what Guidepost testified to.

9   Guidepost testified that they asked them do you know of

10  Jennifer Sills [sic] and the allegations that she's made.

11      Q.   Exactly.  So doesn't that go to if they were

12  aware of the -- of the -- of the allegations and ignored

13  them, wouldn't that go to whether or not the people they

14  spoke to were part of a mistreatment or mishandling of the

15  allegations that they now were aware of after Guidepost

16  questioned them?

17              MS. RILEY:  Object to the form.

18              THE WITNESS:   It goes to an investigation.

19  They were investigating.

20      BY MR. KLEIN:

21      Q.   The mishandling of the allegations, correct?

22      A.   They were investigating Ms. Lyell's credibility.

23  They said so.  They testified to that.  They were -- they

24  said we assessed credibility with every witness we spoke

1  second and we'll see if we have any other questions for

2  you.  On the record just for a moment and I'll see quickly

3  -- I'm going to confer with Alex and see if we have

4  anything else to add.

5      I just need one more minute and then I think I'm just

6  going to have one more question, so bear with me.  I

7  apologize.

8      A.   Never say one more question.  Really?  We always

9      --

10     Q.   I currently -- I currently anticipate one more

11 question and that may change.

12     A.   There you go.  Yeah.

13     Q.   How's that?

14     A.   I've gotten burned on that one so many times,

15 Your Honor, just one more question.

16     Q.   Yeah.  So just give us a second and then I'll get

17 back to you, but we haven't forgotten about you,

18 obviously.

19     A.   No worries.

20     Q.   One last questions for now.  Are we still on the

21 record, Shawna?

22            COURT REPORTER:  Yes.

23 BY MR. KLEIN:

24     Q.   Great.  And I forgot to ask this early on, Ms.

1   McDougal.  What date were you formally retained by Ms.

2   McNulty's firm in June of 2025?  Do you have that

3   engagement letter?  I thought you said you had it with

4   you, so what date is -- was the actual engagement between

5   you and the Clifford Law Group?

6       A.    So --

7                 MS. RILEY:  I'm going to object.  You said

8   June of 2025, but I don't think she's testified to that.

9       BY MR. KLEIN:

10      Q.    Well, she said that she was first contacted by

11  that third party company in the first week of June, so I'm

12  trying to find out what date the engagement letter was

13  signed.  Ms. McDougal?

14      A.    So in full candor, I like to say that I'm someone

15  who won't do work without a written contract, but in this

16  case, I waited to provide one.  I just started working.

17  So I can give you the date on the engagement letter, but

18  what I would rather do is if you'll allow me to glance in

19  my inbox to see the date that we had a -- the date, I

20  guess, when I received the files and there was an

21  agreement that they already had my rate sheet, I already

22  started reviewing the files because that's the date that I

23  started.  But I was woefully slow in producing the

24  agreement and sending it over to be signed.

1    Q.   That's fine.  You can try to find that date for

2  me if you can do it quickly.

3    A.   Yeah.  I can do it quickly.  You also had asked

4  me for the dates that I heard from Alejandra, and I have

5  those right now, as well.

6    Q.   And what are those dates?  Thank you.

7    A.   This is Wednesday, May 28th, 2025.  That's not

8  the very first email.  It says my colleague reached out to

9  you regarding a legal case review.  The attorney is

10  possibly interested in retaining your services.  So there

11  would have been those emails I mentioned earlier about

12  hey, what's your rate?  And I said, hey, you need to tell

13  me who the parties are.  Those would have happened before

14  the May 28th email.

15    And according to my email, on June 2nd, 2025, I have

16  an email from Ms. McNulty, "thank you for your time today.

17  My paralegal is sending materials."  So June 2nd would be

18  the date that Ms. McNulty and I had talked.  She knew my

19  rate and I started reviewing the files.

20    Q.   When did you get the materials?  Because it

21  sounds like from that email that she would be sending you

22  the materials.  Did you receive them that day or

23  afterwards?

24    A.   Yes.  I got that same day, it was almost 10:00

226

1  o'clock at night, I got the agreed protective order and a

2  W-9 to complete, and I needed to sign off on -- on the

3  protective order, the confidentiality agreement, which I

4  signed and sent back.  And then I started to get documents

5  on the 4th -- June 4th.  Tons and tons of documents.

6      Q.   Great.  Okay.  Thank you for your time.  I have

7  no further questions on behalf of Guidepost, though there

8  may be others on this Zoom who may have questions.  Does

9  anyone -- I'll ask.  Does anyone -- any of the other

10  defendants -- do any of the other defendants have any

11  questions for Ms. McDougal?

12            MS. CALLAS:  No questions from the Executive

13  Committee.  Thanks.

14            MR. KLEIN:  Alan, Tom, Matt, and questions

15  from the three of you?

16            MR. BEAN:  This is Alan.  Not for me.  Thank

17  you.

18            MR. TRAVIS:  Nothing from me either, Scott.

19  Thanks.

20            MR. PIETSCH:  Nothing from Southern Baptist

21  Convention.

22            MR. KLEIN:  Thanks, Matt.  All right.  So

23  thank you, Ms. McDougal.  Thank you, Katherine.  We can go

24  off the record.

233

233

Amy McDougal                    9/10/25

REPORTER'S CERTIFICATE

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:


        I, Shawna Hyde Meeks, Notary Public within and for
the State of West Virginia, duly commissioned and qualified,
do hereby certify that the foregoing deposition of DR.
NATALIE SCHILLING was duly taken by and before me, under the
West Virginia Rules of Civil Procedure, at the time and place
and for the purpose specified in the caption thereof; the
witness having been duly sworn by me to testify the whole
truth and nothing but the truth concerning the matter in
controversy.

        I do certify that the said deposition was correctly
taken by me by means of stenomask and speech recognition;
which is reduced to written form under my direction and
supervision, and that this is, to the best of my knowledge
and belief, a true and correct transcript of the testimony
given by said witness, and meets the requirements set forth
within article 27, chapter 47 of the West Virginia Code.

        I further certify that I am not connected by blood
or marriage with any of the parties to this action, am not a

234

234

Amy McDougal                    9/10/25

relative or employee or attorney or counsel of any of the

parties, nor am I a relative or employee of such attorney or

counsel, or financially interested in the action, or

interested, directly or indirectly, in the matter in

controversy.

                                          st
        Given under my hand this 21 day of September,

2025.


        My commission expires March 15, 2030.


                _____

                Shawna Hyde Meeks, CCR

                Notary Public


                ************************

        Quoted material in this transcript is verbatim

          And may/may not reflect a direct quote.