# EXHIBIT 5



**SI Global**
PARTNERS

**REVIEW OF MAY 15, 2022,
SECOND MANDATE OF THE
GUIDEPOST SOLUTIONS REPORT
FOR THE SEXUAL ABUSE TASK FORCE
OF THE SOUTHERN BAPTIST CONVENTION**

Prepared By:

SI Global Partners

*Disclaimers: The content of this report is for <u>informational purposes only</u>. Any decision made on the basis of this report is done so at the sole authority and risk of the decision-maker. Strategic Initiatives Global Partners, LLC ("SI Global") is in no way responsible for any decisions made as a result of this report, nor is it responsible for the ramifications of any such decisions.*



SI Global
PARTNERS

# TABLE OF CONTENTS

**Executive Summary** ........................................................................................................ **4**

**Introduction** ................................................................................................................... **6**

*Objective* ........................................................................................................................ *6*

*Background* ..................................................................................................................... *6*

*Methodology* ................................................................................................................... *7*

*Compensation* ................................................................................................................. *8*

*Reviewer* ......................................................................................................................... *8*

**Findings—Application Of Quality Standards For Evaluation** ............................... **11**

*Categorization of the Guidepost Report* ...................................................................... *11*

*Qualifications* ............................................................................................................... *13*

*Independence* ................................................................................................................ *13*

*Due Professional Care* ................................................................................................. *19*

*Planning* ....................................................................................................................... *25*

*Executing Investigations* ............................................................................................. *25*

*Reporting* ...................................................................................................................... *26*

*Managing Investigative Information* ........................................................................... *27*

**Review of Plaintiffs' Expert Reports** ...................................................................... **28**

*The McDougal Report* .................................................................................................. *28*

*The Schilling Report* .................................................................................................... *29*

**Conclusion** .................................................................................................................... **30**

**EXHIBIT 1: List of Items Considered or Relied Upon** ......................................... **32**

**EXHIBIT 2: Prior Expert Witness Testimony** ....................................................... **36**

**EXHIBIT 3: Publications** ........................................................................................... **37**

**EXHIBIT 4: Interview of Julie Myers Wood and Krista Tongring** ...................... **38**

*§1. Interviews Conducted by Guidepost* ...................................................................... *38*

*§2. Indemnification Agreement* .................................................................................... *39*



SI Global
PARTNERS

*§3. Viewing of Report Drafts* .......................................................................................... *39*

*§4. Investigative Team* .................................................................................................. *40*

*§5. Sex Abuser Database* ............................................................................................... *40*

*§6. Guidepost's Relationship with SBC* ......................................................................... *41*

*§7. Follow-up work by Guidepost for SBC* ..................................................................... *42*

*§8. Report Verbiage* ...................................................................................................... *42*

*§9. License Requirements* .............................................................................................. *43*

*§10. Legal Terminology* ................................................................................................. *43*



**SI Global**
PARTNERS

# EXECUTIVE SUMMARY

SI Global Partners reviewed the May 15, 2022 Guidepost Solutions Report prepared for the Sexual Abuse Task Force of the Southern Baptist Convention in order to express an expert opinion on whether the Second Mandate of the Guidepost Report was investigated, analyzed, and formally reported in a manner that was within parameters and standards considered reasonable in the conduct of internal investigations, inspections, and audits. SI Global concluded that it was, applying the Quality Standards for Investigations, as promulgated by the Council of Inspectors General on Integrity and Efficiency, and in light of SI Global's collective training and experience in conducting investigations in both law enforcement and the private sector, and in reviewing investigations conducted by other entities. This experience includes work done with and for various federal inspectors general. SI Global detailed each of the standards below and applied it to Guidepost's investigation and its Report.

Guidepost's engagement with the Southern Baptist Convention called for five mandates and an audit to be done. SI Global focused on the Second Mandate, which was an investigation into whether there was mishandling of sexual abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021.

SI Global found, in accordance with the plain language of the letter of engagement and other documentation, that Guidepost was not engaged to determine the guilt or innocence of any individual alleged abuser. Rather, Guidepost was charged with evaluating the Executive Committee's process and response to sexual abuse complaints. Accordingly, Guidepost was not authorized to interview the alleged perpetrators of the sexual abuse, and to do so would have expressly exceeded the scope of their engagement.

Guidepost found the Executive Committee responsible for numerous failures and intentional acts of resistance from some of the Committee's members. SI Global found overwhelming evidence, consisting of witness statements and documentation, which supported Guidepost's conclusions.

SI Global also reviewed two expert witness reports asserting that Guidepost's investigation contained bias against Michael David Sills, the alleged abuser of Jennifer Lyell. SI Global found neither of them to be on point.

The expert report of Amy McDougal concentrated largely on purported conflicts of interest she claimed Guidepost had, such as previous referrals by Rachel Denhollander, a victim's advocate and advisor to the Sexual Abuse Task Force of the Southern Baptist Convention, and the selection



## SI Global
P A R T N E R S

of Guidepost for future work in furtherance of the recommendations contained in the Guidepost Report. SI Global found neither of the above concerns to be consistent with any bias or conflict of interest, and in fact observed them to be common scenarios in the fields of investigation and consulting. Ms. McDougal also highlighted the fact that Guidepost did not interview Dr. Sills as a demonstration of bias, despite it being outside the scope of Guidepost's Second Mandate which focused on the Executive Committee's mishandling of sexual abuse allegations – one example of which was how the EC handled the allegations brought by Jennifer Lyell against Dr. David Sills. Moreover, she ignored the existence of detailed facts collected by Baptist Press reporter David Roach (who communicated with Jennifer Lyell prior to writing the article for the Baptist Press), along with direct and circumstantial evidence that any attempt to interview Dr. Sills would have been futile.

As set forth in more detail below, Ms. McDougal also inferred several facts which were inaccurate, without basis, or both, and her conclusions were based in significant part on her incorrect assumptions.

The expert report of Natalie Schilling was not based on any law enforcement experience but rather linguistics expertise, and focused on the words used in the Guidepost Report to conclude that the investigation was biased against Dr. Sills because there were purported linguistics indicators that Guidepost was presuming him guilty. SI Global's interviews of Guidepost senior executives rendered Dr. Schilling's conclusion irrelevant, as the executives agreed that, based on the information Guidepost had reviewed and discovered, based on the conversations with Jennifer Lyell, and based on the length of time in which Dr. Sills failed to refute Ms. Lyell's public allegations, Guidepost could fairly conclude that Ms. Lyell's allegations were acknowledged by Dr. Sills. In any event, as the stated mission of Guidepost was to investigate the Executive Committee's process for addressing sexual abuse allegations, the actual culpability of Dr. Sills was immaterial. The Executive Committee did not accurately report the allegations against Dr. Sills, and in fact, they intentionally whitewashed them.

SI Global was not requested to investigate nor to reach any conclusion about the merits of the allegations against Dr. Sills and has no opinion with respect thereto.



# INTRODUCTION

## OBJECTIVE

The objective of this evaluation was to review the May 15, 2022 Guidepost Solutions Report (hereinafter the "Guidepost Report" or the "Report"), prepared by Guidepost for the Sexual Abuse Task Force of the Southern Baptist Convention (the "Task Force") and to express an expert opinion on whether the Second Mandate of the Guidepost Report was investigated, analyzed, and formally reported in a manner that was within parameters and standards considered reasonable in the conduct of internal investigations, inspections, and audits.

The Letter of Engagement entered into by Guidepost and the Southern Baptist Convention (SBC), dated October 5, 2021 (the "Engagement Letter"), § 3.1, provided that Guidepost would conduct five investigations and one audit. The second of these investigations, referred to in this SI Global Report as the "Second Mandate," set forth its scope as "Mishandling of abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021.

Accordingly, the review conducted by SI Global focused particularly on the sections of the Guidepost Report that addressed allegations of sexual abuse and Guidepost's collection of evidence, analysis, and conclusions as to whether any of those abuse allegations were mishandled. Based on the nature of the pending litigation, SI Global's Report primarily addresses Guidepost's inclusion of allegations against Michael David Sills (hereinafter "Dr. Sills"). Other portions of the Report were referred to and cited herein when relevant and necessary to formulating judgments about the overall procedures and substance utilized in the Report and the underlying investigations and analyses.

SI Global was not requested to investigate nor to reach any conclusion about the merits of the allegations made by Jennifer Lyell against Dr. Sills and has no opinion with respect thereto.

## BACKGROUND

Under the Engagement Letter, the Task Force was Guidepost's client, and Guidepost was guaranteed complete independence in its investigation. In fact, a Committee on Cooperation was established to ensure Guidepost had the access it needed while removing the Executive Committee from those interactions. Engagement Letter §§ 2.2, 2.3. And, the Executive Committee agreed to



**SI Global**
PARTNERS

waive attorney-client privilege to make available for Guidepost all relevant material. Engagement Letter §3.2.

The Engagement Letter provided that Guidepost would conduct an investigation into: (1) allegations of abuse by Executive Committee members; (2) mishandling of abuse allegations by Executive Committee members from January 1, 2000 to June 14, 2021; (3) allegations of mistreatment of sexual abuse victims by Executive Committee members from January 1, 2000 to June 14, 2021; (4) patterns of intimidation of sexual abuse victims advocates from January 1, 2000 to June 14, 2021; and (5) resistance to sexual abuse reform initiatives from January 1, 2000 to June 14, 2021. Moreover, Guidepost was required to "perform an audit of the procedures and actions of the [SBC] Credentials Committee after its formation in mid-June 2019, using best standards and practices designed to ensure accountability, transparency, and care for the wellbeing of survivors of sexual abuse." Id. at p. 5.

SI Global reviewed the efficacy of Guidepost's investigation pursuant to the Second Mandate above, namely, whether and to what extent there was mishandling of abuse allegations by Executive Committee members from January 1, 2000, to June 14, 2021.

*METHODOLOGY*

The standards utilized in SI Global's review were based on years of training and practical experience in the field of investigating, supervising, and conducting executive review of internal investigations in both the private and public sectors.

The most common and frequent occurrences of internal investigations, audits, and inspections are by offices of inspectors general. The most recognized standards for conducting and reviewing investigations are those as set forth in the Quality Standards for Investigations, as promulgated by the Council of Inspectors General on Integrity and Efficiency (CIGIE). Accordingly, those same standards were used by SI Global in its review of the investigation and analyses of the Guidepost Report.

SI Global relied on various documents, including exhibits and transcripts from the underlying litigation, which are set forth in Exhibit 1. We also relied on interviews of Guidepost senior executives Julie Myers Wood and Krista Tongring, which are summarized in Exhibit 4. Throughout this Report, these interviews are cited as "Interviews of Guidepost Senior Execs," with the corresponding section number from Exhibit 4.



**SI Global**
PARTNERS

*COMPENSATION*

SI Global is compensated on the basis of hourly rates multiplied by the number of hours worked on an assignment. For this matter, the rate of $500.00 per hour is being charged for all expert witness services that the Reviewer performs. SI Global's compensation in this matter is not contingent upon the outcome or reaching of certain conclusions. The Reviewer has no vested interest in the outcome of this matter. Before accepting this engagement, the Reviewer confirmed that neither he nor any other person at SI Global was aware of potential conflicts of interest with the parties to this matter.

*REVIEWER*

**Managing Director Douglas Leff:** Mr. Leff has developed a significant expertise in compliance matters through various aspects of his career in law enforcement and as a practicing attorney.

Mr. Leff served as a Special Agent with the Federal Bureau of Investigation (FBI) from 1996-2022. From the beginning of his career, he was assigned to FBI New York's Organized Crime Branch, where he worked labor racketeering cases, followed by an assignment to a squad that specialized in money laundering and asset forfeiture, which he was ultimately promoted to supervise. His work on both squads required extensive research and investigation of public and private entities to detect suspicious activities indicative of organized crime infiltration through bribery, kickbacks, and financial manipulation. Mr. Leff worked alongside federal, state, city, and private industry regulators to determine objectively reasonable business standards of companies ranging from machine building and construction to the communications field, and then compared those standards to evidence and intelligence collected through document subpoenas, interviews, and physical and electronic surveillance to determine whether an organization being investigated exhibited distinctions from those objective standards. Some of Mr. Leff's investigations yielded evidence of no-show jobs, over-invoicing for municipal contracts, antitrust violations, unfair hiring practices, and other labor law violations. After working closely with the U.S. Department of Labor Office of Inspector General to investigate a massive overbilling fraud on several federally funded construction projects, Mr. Leff was offered the opportunity to become cross designated as a Special Assistant United States Attorney in the Eastern District of New York. There, he litigated both criminal and civil asset forfeiture cases against businesses and individuals who had committed fraud against the government or regulated industries. In the civil forfeiture context, he wrote discovery demands that included interrogatories, notices of admission, and third-party subpoenas and took and defended lengthy depositions. These cases resulted in the identification of red flags,



SI Global
PARTNERS

best practices, and failures in the compliance programs of financial institutions and other businesses, which Mr. Leff was asked to share through written intelligence products, media interviews, and speaking on behalf of the FBI at industry, academic, and law enforcement conferences.

Mr. Leff received the Attorney General's John Marshall Award in 2005, after which the FBI promoted him to Chief of the Asset Forfeiture and Money Laundering Unit at FBI Headquarters, giving him global responsibility to work with government and industry representatives on areas of compliance related to, among other things, Know Your Customer, Due Diligence, and Countering the Financing of Terrorism programs. Mr. Leff worked closely with the United States Treasury Department to draft proposed compliance regulations which were eventually passed into law as part of the Corporate Transparency Act of 2022, requiring corporations with set amounts of assets to disclose their true beneficial ownership upon registration with state and county clerks. This was achieved in part through numerous case examples which Mr. Leff provided to his U.S. Treasury and Justice Department (DOJ) counterparts, and which demonstrated the inability of companies to engage in responsible compliance when corporate customers were able to shield their true ownership. Notably, the Corporate Transparency Act not only places additional requirements on corporations but redefines the scope of due diligence that businesses and financial institutions will need in order to be compliant with relevant laws such as the Foreign Corrupt Practices Act and the Securities Exchange Act.

As Mr. Leff was elevated to more senior level positions within the FBI, he took on additional leadership roles in advising industries on hallmarks associated with fraud, money laundering, and public corruption, and best practices for maintaining good and defensible compliance programs. As Assistant Special Agent in Charge of the FBI New York Field Office's Complex Financial Crimes Branch, Mr. Leff spoke at numerous industry compliance conferences and explained how law enforcement identifies and evaluates whether a compliance program was deficient, and he gave recommendations on triggers that should cause companies to consider reporting an issue to law enforcement before a formal criminal investigation is commenced. Mr. Leff jointly investigated complex frauds with the Securities and Exchange Commission and the Commodities and Futures Trading Commission and developed a good working knowledge of regulatory auditing processes along with a view of businesses who suffered serious consequences for failing to prioritize compliance or failing to properly document their compliance procedures.

In 2014, the FBI promoted Mr. Leff to the federal Senior Executive Service as an Inspector at FBIHQ. The FBI's Inspection Division conducts internal reviews of each FBI division's



**SI Global**

PARTNERS

compliance with federal law, regulation, and policy, and reviews field office investigative programs for their interaction with private sector partners and knowledge of corporate compliance issues. Mr. Leff represented the Bureau at the FBI's annual Compliance Academy, where he spoke to industry leaders about the latest best practices and pitfalls in companies' efforts to self-police their internal processes. As an inspector, Mr. Leff reviewed dozens of previously conducted FBI investigations, both external and internal, at the request of the FBI director, Congress, and the DOJ Office of Inspector General. In each of these instances, Mr. Leff led a team which evaluated the interviews, evidence collected, analysis, and conclusions of each of the investigations designated for review and made findings on any deficiencies in the investigations or supervision of those investigations.

In 2016, Mr. Leff was named Special Agent in Charge of the FBI San Juan Division, where he led over 400 employees spread among four offices in Puerto Rico and two in the United States Virgin Islands. The division made many large arrests for corruption in both government and the private sector, a significant portion of which was traceable to overseas transactions and revealed failures on the parts of some U.S. financial institutions and businesses to take sufficient steps to conduct due diligence. Mr. Leff spoke at several conferences held by the Puerto Rico Bankers Association and delivered presentations, some of which he provided in Spanish, to alert businesses of fact patterns indicative of corruption or money laundering. Mr. Leff also did numerous interviews and press conferences, all in the Spanish language, to provide similar information to citizens at large. The Puerto Rico governor's office and several local agencies requested Mr. Leff's participation on committees to help them pass government reforms in compliance and to set similar requirements applicable to the private sector.

Mr. Leff's final position in the FBI was Assistant Director in Charge of the Inspection Division, which is the top internal compliance investigative position in the agency. There, he authorized and reviewed hundreds of previously conducted investigations. Upon retirement from the Bureau, the Defense Department used their Highly Qualified Expert hiring authority to bring Mr. Leff in to lead the internal compliance program of the Pentagon Force Protection Agency, whose responsibilities include reviewing previously conducted law enforcement investigations. In June 2023, Mr. Leff received certification from the Defense Department's Joint Inspector General training program, the largest of its kind in the nation.

During his law enforcement career, Mr. Leff served as an expert witness on a number of occasions. He was an FBI and DOJ subject matter expert in the fields of money laundering, terrorist financing, and other complex financial crimes, and testified as an expert in federal court at criminal trials and



SI Global
PARTNERS

in the Grand Jury and also served as a money laundering expert witness for congressional committees. In addition, Mr. Leff testified for the government in civil proceedings as an expert witness in the field of compliance and administrative investigations. A list of recent trials where Mr. Leff testified as an expert witness is attached as Exhibit 2, and recent publications authored by him are attached as Exhibit 3. Since joining SI Global, Mr. Leff has provided expert witness reports and testimony in the areas of internal and external investigations, compliance, anti-money laundering, and countering the financing of terrorism. He has also written and participated in the writing of various internal corporate policies and given advisory opinions on gaps in existing internal policies and practices.

## FINDINGS—APPLICATION OF QUALITY STANDARDS FOR EVALUATION

### CATEGORIZATION OF THE GUIDEPOST REPORT

Initially, it is necessary to categorize the type of report under review in order to properly evaluate it.[1] This is because there are different standards that apply depending on the type of review that was undertaken.

Generally speaking, internal reviews are divided into:

- Audits, which are fairly strict reviews of established compliance standards.

- Inspections/Evaluations, which consist of a process for evaluating and analyzing programs and activities for the purposes of: (1) providing information to managers for decision making; (2) making recommendations for improvements to programs, policies, or procedures; and (3) identifying where administrative action may be necessary.

- Investigations, which are fact-finding examinations into allegations, issues, or adverse conditions in order to provide the party authorizing the investigation with a sound basis

---

[1] The descriptions of each of the following categories are based on the reviewer's training and experience, as well as definitions set forth in the United States Department of Defense Joint Inspector General Concept and System Guide and similar usage by the United States Department of Justice, Office of Inspector General.



SI Global
PARTNERS

for decisions and actions. Normally, investigations address allegations of wrongdoing by one or more individuals and involve the systematic collection and examination of evidence that consists of testimony, documents, and, in some cases, physical evidence. The results are set forth formally in a report of investigation.

Simply put, inspections/evaluations result in observations of an organization's compliance in a particular area and contain recommendations to remedy or improve issues found during the inspection/evaluation. On the other hand, an investigation involves specific allegations made against one or more individuals, and a collection of facts from which a determination can be made whether the allegation should be found substantiated or unsubstantiated.

Applying the above definitions, it is clear that while Guidepost's mission required both an inspection/evaluation and an investigation, the Report is largely dedicated to an inspection/evaluation of the Executive Committee's procedures to address sexual allegations and the prior history of its responses to such allegations.[2]  The determination that the Report described mainly the results of an inspection/evaluation is supported by the fact that the vast majority of the Report details interviews and surveys undertaken to determine the organization's overall response to sexual allegations and is followed by formal observations and recommendations designed to correct deficiencies and to improve the entire process.

Stated another way, inspections/evaluations, unlike investigations, focus on processes, and whether those processes are effective and are working as intended. Based on the scope set forth in the Engagement Letter, Guidepost was specifically not authorized to investigate matters that were collateral to the Mandates therein. Engagement Letter, § 3.1 ("Guidepost will only request documents and interview[s] relevant to the items specified above from the Motion [i.e., the list of Mandates]."

Below, SI Global applied the established industry standards in reviewing the Guidepost Report.

---

[2] This conclusion is evident despite the use of the term "investigation" in the title of the Guidepost Report and in the underlying letter of engagement. The term "investigation" is commonly used in reports of all types of internal reviews, including inspections/evaluations, to describe the activity at hand rather than the type of review involved.



## SI Global
### PARTNERS

*QUALIFICATIONS*

"Individuals assigned to conduct the investigative activities must collectively possess professional proficiency for the tasks required." CIGIE, Quality Standards for Investigations, p.2.

The team that reviewed the Executive Committee process related to Dr. Sills included attorneys and investigators with extensive legal experience. Their backgrounds consisted of, among others, prosecuting and investigating sex crimes. One of the former prosecutors had played a major role in a sex abuse investigation of the Catholic Church. These investigators were then overseen by another former federal prosecutor. Interviews of Guidepost Senior Execs § 4.

Moreover, the senior executives overseeing the case have vast law enforcement and private sector experience themselves. In fact, their professional histories are well known throughout the field and have enabled Guidepost to enjoy a top-tier reputation. See Julie Myers Wood | Industry Expert at Guidepost Solutions (website profile); Krista Tongring | Industry Expert at Guidepost Solutions (website profile).

SI Global found that the cumulative legal, investigative, and leadership experience, which encompassed successful investigations of other similar entities, possessed by the assigned Guidepost team rendered them well qualified to lead a challenging evaluation into the handling of sexual assault allegations by SBC's Executive Committee.

*INDEPENDENCE*

"In all matters relating to investigative work, the investigative organization must be free, both in fact and appearance, from impairments to independence; must be organizationally independent; and must maintain an independent attitude." CIGIE, Quality Standards for Investigations, p. 6.

The three classes of potential impairments to independence are: (1) personal; (2) external; and (3) organizational. Id., p. 7. SI Global has addressed these separately.

**Personal**: SI Global's review of the Report and relevant exhibits, as well as interviews of Guidepost senior executives, demonstrated that there were no preexisting relationships, opinions, involvement, biases, or financial interests that might have affected the assigned investigators or the investigation itself.

The preexisting relationships that did exist between Guidepost and the SBC and its leadership did not rise to even an appearance of impropriety. See Interviews of Guidepost Senior Execs § 6.



**SI Global**
PARTNERS

Prior to the engagement that produced the Report, the Southern Baptist Theological Seminary engaged Guidepost to assist them in developing and enhancing policies to address inappropriate behavior (including sexual abuse). In addition, Guidepost had a limited and short-lived engagement with the SBC a few months before the engagement at issue here. Ms. Myers Wood and Doctors Moeller, Floyd, and SBC's chief of staff spoke about doing a more limited report. The parties signed a letter of engagement and Guidepost put in about ten hours on the project but they were never paid for the time.

Guidepost and SBC then went from that narrower focus to a broader engagement. SBC initiated this new engagement by calling Guidepost's CEO Ms. Myers Wood. Ms. Myers Wood does not know if Ms. Denhollander recommended Guidepost.. Guidepost was already a well-known entity from other work they had done for another ministry which was similar in nature, and Ms. Denhollander had recommended Guidepost to that other ministry.

Even if Ms. Denhollander took part in SBC's selection of an investigative firm and SBC's interviews of Guidepost. Ms. Denhollander's focus in the interview was on the sexual assault survivors, and she made it clear that she preferred that whichever firm came in would treat the survivors with compassion.

Ms. Denhollander also knew Samantha Kilpatrick, one of the Guidepost investigators, through her previous experience in the field.

Ms. Denhollander had no conflict in recommending Guidepost to SBC because Guidepost understood that SBC was aware of her prior dealings with Guidepost at the time SBC was conducting its selection process. And Guidepost was not the only firm seeking this engagement. At least one other firm was interviewed as a candidate to conduct the investigative review.

Ms. Denhollander had no business relationship with Guidepost. She has referred and continues to refer business to Guidepost, but she has never been paid a referral fee, nor has she ever paid Guidepost anything.

Ms. Denhollander had some last-minute comments on the draft Report, which she sent to Guidepost investigators; however, at all times, Guidepost retained editorial control over the Report.

Guidepost was aware of the relationship between Denhollander and Lyell in conducting their investigation.

At no time did the Guidepost team believe that the Task Force or Committee on Cooperation tried to pressure them. Interviews of Guidepost Senior Execs § 6. Again, attorney-client privilege was



SI Global
P A R T N E R S

waived by the Executive Committee and the SBC for purposes of Guidepost inspecting/evaluating the Second Mandate (and all other Mandates), and at all times, Guidepost maintained editorial control. Engagement Letter §3.2.

None of the above facts yield anything more than the unremarkable inference that SBC chose the best qualified entity available to conduct the desired investigations.

The expert witness report of Amy E. McDougal, Esq. (the "McDougal Report") spends over twenty percent of its substantive content on the purported conflict created by Ms. Denhollander's prior dealings with Guidepost. However, the McDougal report relies on conjecture and incorrect facts to reach this conclusion. For one, Guidepost has never paid any money to Ms. Denhollander for SBC engagement nor for any other referral. Consequently, the portion of the McDougal Report that relies on the assumed existence of payments or other business relationships cannot be taken seriously.

The McDougal Report also cites to blogs of undescribed veracity or basis of knowledge, one of which complains of a conflict by having Ms. Denhollander serve as both a victim advocate and an advisor to SBC on handling victim complaints. McDougal Report, p. 15. However, neither Ms. McDougal nor her cited author explain why it would be anything but a commonsense approach for SBC to receive advice on handling victim complaints from someone with vast experience in handling victims. The U.S. Congress similarly benefitted from then-Representative Rodney Davis's leadership of the House Committee responsible for physical security of House Representatives after Rep. Davis had been shot at during a congressional baseball game. Indisputably, no conflict issue was raised with respect to Rep. Davis's committee role.

Furthermore, it is difficult to accept the suggestion that an investigative firm might be tainted in its work because it hopes to get additional work in the future from the party that hired it. If this were the case, every independent contractor who put forth their best efforts to impress could be accused of a conflict because all contractors naturally share the goal of repeat business.

The proposition is particularly at odds with the present fact pattern though, because Guidepost surely did not act in a manner consistent with a contractor willing to distort its work product because of a motive to please SBC and thereby assure future business. On the contrary, the Guidepost Report made drastically negative findings against SBC. So negative were these findings that they generated national news. The subsequent events made clear that the next generation of SBC leaders wanted to cleanse and reform their failed processes of the past, and rather than bring



SI Global
PARTNERS

in a new entity to start fresh and learn the facts Guidepost had been immersed in, SBC chose to continue with the firm that had already demonstrated first-hand its skill, candor, and integrity.

In any event, Guidepost's senior executives described all of their follow-up and contemplated business with SBC. See Interviews of Guidepost Senior Execs § 7.

The fact that SBC might need additional work done in the future had absolutely no bearing on Guidepost's investigation nor the Report. While there was an understanding that Guidepost might want to compete for future work, this had no effect on the Report.

After the Report was published by the Task Force, Guidepost was inundated with emails about the Report in general, as well as abuse allegations throughout SBC churches, requiring the need for a hotline to field the various tips, complaints and concerns. Ms. Myers Wood spoke with SBC, and the SBC formally asked Guidepost to handle the responses via a hotline. Initially, this was done on a temporary basis and has since lasted an additional three years, with a current goal of transitioning the hotline in-house at the SBC.

While the drafting of the Report was in progress, Guidepost pitched the Ethics & Religious Liberty Commission (ERLC), SBC's think tank, for selection to run a review that the ERLC planned to conduct. That work did not move forward. Additionally, Guidepost was considered by the Task Force to set up a "ministry check" of sorts for the SBC; however, because of a tweet published by Guidepost in June 2022 celebrating Pride month, the SBC decided it would no longer recommend Guidepost for the work.

The Task Force, which hired Guidepost, no longer exists. The Task Force was formed before the Request for Proposal went to Guidepost. Guidepost had no role in the formation of the Task Force.

Lastly, the McDougal report addressed the notion of SBC's subsequent engagement of Guidepost by comparing it with government regulations in the area of systems engineering, which in some cases prohibit a contractor providing technical direction from also contracting to sell required components. Federal Acquisition Regulation 9.505-1. This analogy does not bear scrutiny. Besides the fact that the cited Regulation itself does in fact contemplate a contractor being awarded both ends of the contract (see 9.505-1(a) (the provision applies to a contractor that "does not have overall contractual responsibility. . .")), SI Global, whose members have decades of collective private sector investigative contracting experience, recognizes that it is universally commonplace for an entity that is satisfied with its contractor's investigative work to inquire about additional capabilities that it may wish to hire that investigative firm to perform in the future.



SI Global
PARTNERS

**External:** From the time of the signing of the Letter of Engagement through the conclusion of the Guidepost Report, the process was designed to guarantee Guidepost's freedom from interference from anyone within the entity being investigated, and no restrictions were placed on the investigators' ability to obtain relevant evidence.

The establishment of a Committee on Cooperation goes far beyond the typical engagement in terms of ensuring that the investigators receive the necessary access. See Engagement Letter §§ 2.2, 2.3 (setting forth formal creation, process, and procedures for the Committee on Cooperation to function as a go-between for Guidepost with SBC). Guidepost found the Committee on Cooperation to be a valuable asset throughout the investigation. Guidepost Report p. 17 (recognizing the assistance of the Committee on Cooperation and the Task Force).

Additionally, the Engagement Letter directs that "No member of the Committee on Cooperation, Task Force, SBC, the Executive Committee, or the Credentials Committee shall be permitted to edit the report prior to its public release." Id. § 3.6. Guidepost mandated compliance with this directive by creating strict procedures for SBC entities to view draft portions of the Report and provide comment without being permitted to retain a copy of the drafts. See Interviews of Guidepost Senior Execs § 3.

During the investigation, Guidepost met with the Task Force and gave them memos but not the intended findings. The memos listed people who Guidepost had contacted and contained requests for assistance. The Committee on Cooperation helped Guidepost as needed.

The process put in place required the Committee on Cooperation to meet in Nashville, where they received paper copies of the factual information contained in the draft Report, with a signed non-disclosure agreement. At the conclusion of the meeting, Guidepost took back the paper copies. There was one person who could not make it to Nashville, and a Guidepost employee met with that person separately and followed the above procedures.

After the Johnny Hunt portion of the Report was done, Guidepost conducted the same procedure over Zoom for members of the Committee on Cooperation.

The Task Force was permitted to see the entire draft Report but only allowed to offer factual corrections. The Task Force members received it through a password protected link.

Guidepost was the final arbiter of what went into the Report.



SI Global
P A R T N E R S

The McDougal report claims that "In violation of the terms of the Engagement Letter, Guidepost permit [sic] such editing by Ms. Denhollander." McDougal Report, p. 21. On that same page and other pages, she claims that Ms. Denhollander and Ms. Lyell were permitted to edit the Report. These statements have no basis in fact and are false, as no one was permitted to do more than make factual suggestions to Guidepost, and only Guidepost determined whether any proposed edits would be accepted.

Guidepost allowed other named survivors, not just Ms. Lyell, to see drafts of the factual portions of their own statements to make sure the facts were accurately stated. The same procedure was followed with the Committee on Cooperation. However, the investigators' observations were not shown to the alleged victims in order to maintain the independence of the investigation. Interviews of Guidepost Senior Execs § 3.

To the extent Ms. Lyell and other alleged victims had comments on their draft statements. Guidepost took these under advisement, making changes only where they corroborated the requested change, otherwise Guidepost would not make the changes.

Ms. Myers Wood recalled an email from Ms. Lyell that may have contained comments on Ms. Lyell's statement, but she lacked any further recollection except the certainty that she must have passed the email to someone else because she would not have handled it without someone else participating and would not have had a call with Ms. Lyell without someone else present.

SI Global, based on its collective experience of hundreds of years of government and private sector investigations, finds that it is common practice to share draft findings in an inspection/evaluation with the entity being evaluated. The reasons for this are: (1) to make certain that the team's factual findings are correct by giving the entity a chance to rebut any findings they disagree with; and (2) to get initial readings on the recommendations that the team will set forth in its report. Engaging in discussions with the entity under review provides the best first-hand opportunities to accomplish both of these objectives. Of course, were this an investigation into the underlying conduct of the accused abusers, the decision to share draft factual findings would involve a different set of tactical considerations and would not occur nearly as frequently. But as noted throughout this Report, the review conducted by Guidepost was without question directed at SBC's processes, and not at any specific individual allegations of misconduct.

**Organizational:** As a separate, outside entity, Guidepost was not within the hierarchy of the entity it was investigating, thereby providing additional assurance that they would not be influenced in carrying out their investigative mission.



SI Global
P A R T N E R S

Accordingly, SI Global found that Guidepost operated freely and separately from the Executive Committee and the other SBC entities and thus there was no actual nor apparent threat to the independence of the investigation.

## DUE PROFESSIONAL CARE

"Due professional care must be used in preparing reports. This standard requires a constant effort to achieve quality and professional performance. It does not imply infallibility or absolute assurances that an investigation will reveal the truth of a matter." CIGIE, Quality Standards for Investigations, p.8.

Guidepost followed a consistent methodology whereby all alleged victims and witnesses who were willing to speak to Guidepost were interviewed, and relevant witnesses and other corroborating evidence was sought out, all in furtherance of Guidepost's Second Mandate, which was to determine whether complaints of alleged sexual abuse victims had been mishandled. See Guidepost Report, p. 18; Interviews of Guidepost Senior Execs § 1.

Dr. Sills was not interviewed, nor were any other accused abusers (unless they fit within Guidepost's First Mandate concerning allegations of abuse by EC members -e.g., Johnny Hunt), because Guidepost's Second Mandate was not to make findings as to the guilt or innocence of these alleged abusers. Rather, the mandate was to address the Executive Committee's response (or lack thereof) to allegations of abuse. None of the alleged abusers nor anyone else ever disputed the alleged victims' status as victims. Accordingly, Guidepost interviewed all of the alleged victims whose accounts would be mentioned in the Guidepost Report. Any alleged victims who were not interviewed were not discussed in the Report.

Guidepost spoke with Jennifer Lyell on multiple occasions and also received from her (among other documents) a two-page "story" that set forth her account of her encounters with Dr. Sills as well as a detailed timeline of events in her alleged abusive relationship with Dr. Sills;[3] Guidepost interviewed Baptist Press reporter David Roach who had communicated with Jennifer Lyell back in March 2019 when preparing the Baptist Press article; Guidepost also reviewed Dr. Mohler's statements regarding his meetings with Ms. Lyell and Dr. Sills surrounding Ms. Lyell's sexual abuse allegations, at which point he viewed Ms. Lyell's account as consistent with allegations of

---

[3] In 2019, Ms. Lyell ultimately published the "story" on the internet in direct response to the Baptist Press whitewashing her allegations in the March 2019 article.



## SI Global
### PARTNERS

sexual abuse; and Guidepost reviewed the EC's retraction of the original Baptist Press article and the EC's public apology to Ms. Lyell wherein they acknowledged that Ms. Lyell alleged that she was sexually abused by Dr. Sills. The account given by Ms. Lyell had been shared with SBC entities and known by Dr. Sills since 2018 and was unrebutted throughout that time. The Baptist Press had put out an apology for its whitewashing of Ms. Lyell's account, while the Executive Committee more explicitly stated that Ms. Lyell had been abused. Dr. Sills never rebutted this.

A Baptist Press reporter, David Roach, contacted Dr. Sills to get his version of events and received no response.

An additional four months took place after the explicit apology by the Executive Committee and Guidepost's naming of Dr. Sills as Ms. Lyell's abuser, and Dr. Sills never came forward in that time either.

Ms. Lyell's case and the Guidepost investigation were both talked about in SBC public forums.

As stated above, Johnny Hunt was interviewed because he had been a part of the Executive Committee, and the first of Guidepost's mandates was to investigate allegations of abuse by Executive Committee members, one of which had been Mr. Hunt. However, Dr. Sills was not explored under Guidepost's First Mandate, but rather under its Second Mandate, which was to investigate mishandling of abuse allegations by the Executive Committee.

Thus, only the First Mandate involved any investigation of individual misconduct. The Second Mandate was an investigation of alleged failures by the Executive Committee.

The Guidepost investigation was conducted appropriately. As noted in the CIGIE standards, "All investigations must be conducted in a fair and impartial manner, with the perseverance necessary to determine the facts." CIGIE, Quality Standards for Investigations, p.8. Here, the investigators, focused on their Mandate to evaluate SBC's responses to alleged sexual abuse victims, exhausted all logical leads to determine whether SBC had mishandled abuse allegations.

SI Global further found that the investigation was carried out in an objective manner. "Evidence must be gathered and reported in an unbiased and independent manner in an effort to determine the validity of an allegation or to resolve an issue. This includes inculpatory and exculpatory information." CIGIE, Quality Standards for Investigations, p.8. Guidepost reported on numerous serious allegations that fit within the parameters they were assigned to review and explained the evidence supporting their conclusions that SBC's Executive Committee had mishandled sexual abuse complaints and had mistreated victims. Guidepost Report, pp. 161-175. The Report lays out



SI Global
PARTNERS

statements from alleged victims, communications from Executive Committee members, and public statements on behalf of SBC, all of which support Guidepost's conclusions.

SI Global found that Guidepost acted in conformance with ethical standards expected of investigators conducting sensitive internal investigations. Highly experienced investigators asked appropriate questions to elicit necessary details, and no threats, false promises, nor other types of subtle coercion were employed by the investigators. They also treated the alleged victims with compassion and respect.

SI Global also determined the investigation was carried out within an amount of time that was appropriate to the level of complexity involved.

> All investigations should be conducted and reported in a timely manner. Time is especially critical given the impact investigations have on the lives of individuals and activities of organizations. Hence, the effectiveness of an investigator depends, in part, on the promptness of finished work products, such as prepared findings and memorialized witness interviews.

CIGIE, Quality Standards for Investigations, p.8. In the present case, Guidepost set reasonable deadlines for interviews and evidence collection to be completed so that the Report could be reviewed and finalized in a timely manner. This is evidenced by the regularly furnished progress update reports, each of which demonstrated how much had been completed since the previous report and the steps remaining to be conducted.

Additionally, SI Global found the Report to have been adequately documented, as evidenced by the large number of exhibits that were preserved along with it. Having done so, any future adjudications of the underlying sexual abuse allegations can proceed on a fully developed record.

The McDougal Report largely ignores the scope of the Second Mandate and treats the Guidepost investigation as if it included a full examination into Ms. Lyell's underlying allegations against Dr. Sills, and that it was a "fundamental failure" not to have determined if the allegations had merit. McDougal Report, p. 31. She then goes on to list potential investigative steps that might have been taken had Guidepost been investigating the underlying allegations. However, unlike Guidepost's investigation of Dr. Hunt under the First Mandate, Guidepost was not investigating the underlying allegations regarding Dr. Sills, because it was not part of Guidepost's Second Mandate.

Conducting interviews or collecting evidence outside of the scope of Guidepost's Mandates would have been an express violation of the Engagement Letter, § 3.1. While the McDougal Report



SI Global
PARTNERS

claims Dr. Sills was a witness and a survivor, Guidepost's methodology was clear in that they interviewed all survivors who came forward and were willing to be interviewed. This did not include Dr. Sills.

Notably, while criticizing Guidepost for not conducting collateral interviews or reaching conclusions outside the scope of its Mandates, the McDougal Report itself did not include any review of David Roach's deposition, a significant lapse since he received Ms. Lyell's allegations while preparing an article for the Baptist Press in March 2019. The article he had drafted ultimately was intentionally altered by persons above him at the EC, changing the allegations from sexual abuse to "morally inappropriate relationship". Moreover, Dr. Roach's deposition took place well before the McDougal Report was published. See Roach Deposition, pp. 64-66 (Guidepost interviewed Roach about his process in drafting the article and the persons involved in the editing process); id., pp. 109-110 (Guidepost asked Roach questions about his research and preparation of the article).

The bottom line on the Guidepost Report's reference to Dr. Sills is that the allegations were very serious and were mishandled by the Executive Committee and whitewashed by them. See Roach Deposition, p. 67 ("sexually abused" was removed during the editing process). These facts gave Guidepost compelling evidence for inclusion of the allegations in the Report as a clear example of the process failures Guidepost was assigned to investigate.

The manner in which an accused subject is referred to in an investigative report is largely a matter of editorial discretion. Guidepost used the word "abuser" to refer to Dr. Sills for a few reasons. First, soon after the March 2019 Baptist Press article was published, Ms. Lyell posted on her website the fact that the March 2019 article improperly described her encounters with Dr. Sills as "morally inappropriate" rather than allegations of sexual abuse, yet Dr. Sills remained silent. Second, in October 2019 when the Executive Committee corrected the original March 2019 article and acknowledged what the reporting had shown – that the Sills/Lyell relationship was abusive – neither Dr. Sills nor anyone on his behalf ever came forward to try to correct the record. Third, in early 2022, four months prior to the Report being delivered to the Task Force, the Executive Committee issued its own apology to Ms. Lyell, acknowledging that her allegations amounted to sexual abuse; yet Dr. Sills again remained silent. Given that Dr. Sills had been referred to in that manner for such a significant period of time, Guidepost felt it was a "foregone conclusion", consistent with the facts Gudiepost had reviewed and discovered in evaluating the Second Mandate, that Dr. Sills had sexually abused Ms. Lyell. Interviews of Guidepost Senior Execs § 8.



SI Global
P A R T N E R S

The facts produced thus far in the litigation validate Guidepost's choice of how it would refer to Dr. Sills and the surrounding allegations, namely:

- Mohler Deposition, p. 97: Ms. Lyell reported both consensual and nonconsensual acts.

- Roach Deposition, pp. 162-163: "sexual abuse" was a description with a "firm footing in reporting the facts" and the "most accurate and concise and informative way to render [Ms. Lyell's statement] . . ."

- Roach Deposition, pp. 163-164: "I was seeking to report in that first paragraph accurately the nature of the allegations Jennifer Lyell was making against David Sills."

- Mohler Deposition, p. 134: Testified to having written to Ms. Lyell: "Jennifer (I hope) we have steadfastly and consistently affirmed that we found you to have experienced sexual abuse by David Sills and that your accusations were confirmed."

- Mohler Interrogatory # 27: ". . . from the moment of her initial report to the Seminary and to this day, Lyell has reported that the actions were not consensual."

- David Sills Deposition, p. 63: admitted that he never said he engaged in consensual sexual activity with Ms. Lyell.

- Geiger Deposition, pp. 37-38: Ms. Lyell told him Dr. Sills had sexually abused her.

- Geiger Deposition, pp. 40-41: Ms. Lyell described an incident where Dr. Sills forced her up against a window in a hotel room and assaulted her, and a second incident on an airplane where Dr. Sills put a blanket over both of them and violated her.

- Geiger Deposition, p. 44: Ms. Lyell described what Geiger had "been taught was assault." This included Dr. Sills groping her, touching her private parts on an airplane, forcibly trying to kiss her, and restraining her when she wanted to move away.

- Geiger Deposition, pp. 45-46: found Ms. Lyell to be credible at all times, particularly because she knew her disclosure would affect her career.



SI Global
PARTNERS

- Geiger Deposition, pp. 50-52: Described specific nonconsensual instances related by Ms. Lyell and how, through his experience, he was able to distinguish those facts from consensual or romantic conduct.

- Geiger Deposition, p, 56: After Mohler's conversation with Dr. Sills, Dr. Mohler said, "This was the most evil conversation I've ever seen in my entire life."

- Geiger Deposition, p 62: had a conversation with Drs. Rainer and Waggoner about how their response would be different if this had been an affair as opposed to Ms. Lyell being a victim of abuse, which they determined she was.

- Geiger Deposition, pp. 62-63: in consensual affairs, both parties are removed from their positions in the ministry [explaining why Ms. Lyell was not removed from her position].

- Geiger Deposition, p. 85: very clear to Mr. Geiger when Ms. Lyell described the incidents of going down to basement to pleasure Dr. Sills that she did not want to have any sexual relationship with him.

Beyond all of this, it is clear that even if Guidepost had gone outside the scope of their Mandate and attempted to interview Dr. Sills, he would not have spoken to them, as he refused to speak to anyone:

- Roach Deposition, pp. 31-33: Left messages for Dr. Sills over the course of two days on Dr. Sills's cell phone, which Roach confirmed was a good number.

- Mary Sills Deposition, pp. 112-113: Author Megan Basham called and wanted to speak to Dr. Sills, and he refused.

- Mary Sills Deposition, pp. 105-106—Dr. Sills told her he had gotten a voicemail from David Roach and didn't return his call and that their attorney had told them not to speak to anyone.

Even in a plenary civil trial, an adverse inference can be taken against a witness who has asserted their Fifth Amendment right not to incriminate themselves. See Baxter v. Palmigiano, 425 US 308 (1976). Accordingly, Guidepost was well within accepted investigative standards to draw a negative inference from Dr. Sills's refusal to speak with anyone.



SI Global
P A R T N E R S

The McDougal Report claims there is a lack of corroboration in that, "Professional investigators know to corroborate written or physical evidence by obtaining statements from witnesses about the written evidence . . ." This overly broad statement ignores the reality that most sex crimes investigators treat witnesses to whom the alleged victim told of their abuse, who are known as outcry witnesses, as corroboration. Here, that would include Dr. Roach, Dr. Mohler and Dr. Geiger, all of whom spoke with Ms. Lyell about her allegations of sexual abuse against Dr. Sills. Even some state laws recognize outcry witnesses as corroboration and allow their testimony to be admissible at a criminal trial if made under specified circumstances. <u>See</u>, <u>e.g.</u>, New York Guide to Evidence § 8.37; Texas Code of Criminal Procedure Art. 38.07

*PLANNING*

"Organizational and case specific priorities must be established and objectives developed to ensure that individual case tasks are performed efficiently and effectively." CIGIE, <u>Quality Standards for Investigations</u>, p. 10.

Guidepost responded to this engagement by assembling a highly qualified team of investigators. Guidepost provided adequate direction and instructions to ensure an effective investigation would be carried out. Leadership all the way up to the chief executive officer were involved with oversight of these important investigations and allocated sufficient resources to be certain that the investigation would be carried out efficiently and effectively.

The progress updates and Guidepost Report brought out further details of the preparation taken to make certain that the goals and objectives of ascertaining all of the facts associated with the sexual assault allegation would be effectuated. <u>See</u> Guidepost Report, p. 19 (five terabytes of documentary evidence collected and uploaded); p. 20 (comprehensive document requests to SBC); p. 21 (reviews of archived records and documents obtained from survivors and other witnesses); and pp. 22-29 (describing the large-scale outreach efforts and interview process).

*EXECUTING INVESTIGATIONS*

Investigations must be conducted in a timely, efficient, thorough, and objective manner. The investigator is a fact-gatherer and should not allow conjecture, unsubstantiated opinion, bias, or personal observations or conclusions to affect work assignments. He or she also has a duty to be receptive to evidence that is exculpatory, as well as incriminating. The investigator should collect and analyze evidence through a number of techniques,



SI Global
PARTNERS

including but not limited to, interviews of complainants, witnesses, victims, and subjects; reviews of records; . . . and use of computer technology.

CIGIE, Quality Standards for Investigations, pp. 11-12. As detailed below, SI Global found that the Guidepost investigation was conducted in accordance with recommended CIGIE investigative best practices. Moreover, Guidepost used techniques that are standard and well accepted in the field of internal investigations.

The interviews conducted by Guidepost were done in a logical order and manner so as to permit the investigators to know as much as possible about the processes, or lack thereof, that SBC had utilized concerning sexual abuse allegations. As evidenced by the progress reports, each stage of interviews was organized so as to complement the amount of information gained from other sources.

The methodology used by Guidepost to collect evidence was well planned and executed. See Guidepost Report, pp. 19-22 (the massive amounts of data collected was placed into a keyword searchable format, and said data included news reports and other public source information, extensive document requests, archival searches, emails, written correspondence, audio recordings, notebooks, social media accounts, and others).

*REPORTING*

"Reports (oral and written) must thoroughly address all relevant aspects of the investigation and be accurate, clear, complete, concise, logically organized, timely, and objective." CIGIE, Quality Standards for Investigations, p. 13.

SI Global found that the Guidepost Report set forth a methodology that was consistent with best practices for internal investigations and that this methodology was followed throughout the investigation and in the reporting of the results of the investigation.

The drafts of the Report were subject to multiple levels of review (see Interviews of Guidepost Senior Execs § 4), thus ensuring that the Report objectively, accurately, clearly, and concisely reflected the relevant results of the investigators' efforts.

Reasonable investigators and supervisors can differ about the quantity or depth of facts to recount in a final report. Reviewing the context of the overall Guidepost Report, Ms. Lyell's allegations against Dr. Sills did not take up a disproportionate amount of space, particularly since the way in which the objective news report written by Mr. Roach was whitewashed was particularly powerful



SI Global

PARTNERS

evidence of a coverup that needed to be discussed in great detail. A typical report of this type, reporting on evidence of long-term actions and omissions which directly harmed sexual abuse survivors, required a sufficient description of the facts to enable the reader to appreciate the severity of the harm caused by SBC's policies. The Report unquestionably accomplished this.

SI Global also reviewed the facts known to the investigators to determine whether there was any "exculpatory evidence and relevant mitigating evidence," which should have been in the Report. CIGIE, Quality Standards for Investigations, p. 14. SI Global found that Guidepost conducted all logical investigative leads in an effort to discover any that might counter the overwhelming evidence of SBC's mishandling of alleged victims' complaints. Had there been any such evidence, there is little doubt that Guidepost would have found it.

SI Global additionally reviewed whether or not the evidence in the Report was "supported by documentation in the investigative case file." CIGIE, Quality Standards for Investigations, p. 14. The collection of investigators' notes, emails, and other documents leave no doubt that the investigators' conclusions were fully supported by the evidence they had gathered.

*MANAGING INVESTIGATIVE INFORMATION*

> Investigative data must be stored in a manner that allows effective retrieval, reference, and analysis, while ensuring the protection of sensitive data (i.e., personally identifiable, confidential, proprietary, or privileged information or materials).

CIGIE, Quality Standards for Investigations, p. 14.

While this final investigative quality standard relates more to organizational best practices than specific investigations, SI Global was able to conclude that Guidepost maintained a sophisticated process to collect, store, retrieve, and analyze information. This was established through the procedure, fully described above on p. 15, developed by Guidepost to ensure that the Task Force and Committee on Cooperation, as well as the survivors, had sufficient opportunity to provide comments on Guidepost's factual summaries without compromising the integrity of the investigators' observations.

The flow of information through the Guidepost chain of command worked effectively and efficiently, and they were able to timely open, complete, and report their investigations with respect to each of the Mandates set forth in the Engagement Letter.



**SI Global**
P A R T N E R S

# REVIEW OF PLAINTIFFS' EXPERT REPORTS

## *THE MCDOUGAL REPORT*

In addition to the points noted above, a couple of other conclusions from the McDougal Report were addressed.

Initially, Ms. McDougal suggested that Guidepost was not hesitant to defame Dr. Sills because it had an indemnification agreement with SBC. McDougal Report, pp. 41-42. But indemnification agreements, such as Guidepost has in this case, are standard in the industry. The agreement was in a format typical of Guidepost engagements, and Guidepost does not agree to engagements of this nature without an indemnification agreement. Interviews of Guidepost Senior Execs § 2. And notably, the indemnification agreement in this matter plainly states that if Guidepost is adjudged to be negligent by a court, Guidepost bears financial responsibility. SI Global concurs that this language is standard in letters of engagement throughout the field of professional investigators and consultants.

Tellingly, the above suggestion ignores the core fact that Guidepost was not rendering a formal investigative opinion on Dr. Sill's guilt, but only on the Executive Committee's response to the allegations. The McDougal Report then proceeds to contend that Guidepost was required to interview Dr. Sills before they could describe the allegation in the words used by Ms. Lyell. As demonstrated on pp. 19-20 above, Guidepost had more than ample grounds for describing the allegation as one of sexual abuse, and as further set forth above, it would have been unauthorized (p. 18) and futile (pp. 20-21) to try to interview Dr. Sills.

Also, the McDougal Report proclaims its uncertainty as to whether the investigation was properly conducted under Tennessee licensing authority. McDougal Report, pp. 6-9. This is a non-sequitur because Ms. Myers Wood was licensed by the Illinois Bar at the time of the investigation, it was not a Tennessee investigation, and the Engagement Letter is governed by New York law, not Tennessee. Interviews of Guidepost Senior Execs § 9.

The McDougal Report takes further issue with Guidepost's attempt to obtain additional business by maintaining a database of sexual offenders for SBC. McDougal Report, pp. 27-28. A proper history of the facts related to this database are as follows:

During the investigation, an SBC staff member provided Guidepost with a list of potential abusers. Guidepost had nothing to do with creating nor vetting the list but referenced its existence in the Report. Guidepost did not publish the list to anyone, nor did it identify publicly in the Report any individual who was included in the list. The Executive Committee published the list less than a



**SI Global**
PARTNERS

week after the Report was issued, which came as a surprise to Guidepost, who played no part in the Executive Committee's publication of the list. Shortly thereafter, Guidepost began receiving emails about the list and put a hyperlink to it on Guidepost's website. Guidepost did not alter, amend or contribute in any way to any portion of the list. Interviews of Guidepost Senior Execs § 5. Accordingly, Guidepost did nothing unreasonable here.

Finally, Ms. McDougal complains that the Guidepost Report did not provide definitions of various legal terms such as "victim," "survivor," "mishandled," and "mistreatment," nor did it set forth any standard of proof for its findings.

Guidepost would not have defined legal terms in the Report because it was not a legal document. Common sense definitions were used so that the Report would not be confusing. Interviews of Guidepost Senior Execs § 10. Furthermore, SI Global has observed that most government internal affairs and inspectors general offices similarly utilize common sense definitions of sexual assault, especially in the federal government where states define similar violations with some variations in terminology, making commonly known descriptors the most effective manner in which to keep an adjudication process uniform.

No particular standard of proof was utilized in the Report. If there had been any concerns about a close call, then Guidepost might have applied a standard of proof, but there was no issue as to whether or not SBC had done all of the things highlighted in the Report. Stated another way, the evidence was overwhelming. Interviews of Guidepost Senior Execs § 10.

Moreover, Guidepost was not investigating the underlying proof of Dr. Sills's guilt but rather SBC's process. SBC had already officially apologized for the conduct Guidepost described in the Report, so no standard of proof was needed. Id. SI Global is well aware, and a search of caselaw for many decades will confirm, that even proof beyond a reasonable doubt in a criminal trial for sexual assault can be reached through the credible testimony of a victim alone. See, e.g., Tucker v. Palmer, 541 F.2d 652 (6th Cir. 2008).

*THE SCHILLING REPORT*

In addition to Dr. Schilling's lack of formal investigative or law enforcement experience, two important factors prevent this Report from having any relevance to the Guidepost investigation.

First, the Schilling Report goes to great lengths to spot uses of English syntax that indicate Guidepost believed Ms. Lyell's allegations to be true. However, Guidepost acknowledged that it treated the allegations as true (based on information it gathered and received during the course of



SI Global
PARTNERS

the investigation), especially since its mission was to evaluate SBC's processes for addressing sexual abuse allegations. Consequently, the fact that there may have been implicit English language subtleties showing a belief in the underlying allegations matters little. Whether the allegations were true or false, SBC's Executive Committee not only failed to treat them with the requisite seriousness, but initially attempted to whitewash, or even to gaslight them.

Secondly, summary investigative reports which recommend a course of action by necessity convey a belief by the writer on the issue for which action is recommended. Dr. Schilling would be highly likely to find English language indicators similar to those she identified in this case in search warrant applications, prosecution memos, inspectors general reports, and other documents recommending a particular investigative or legal result. Certainly, there are some investigative reports written only to set forth the results of interviews and other evidence collection, and in those cases a neutral "linguistic pattern" would be expected. That is the opposite of the present situation, where Guidepost was required to make findings and recommendations. A lack of language supporting their findings would be tantamount to an incomplete product.

Along these same lines, Dr. Schilling's language analysis of emails between Ms. Lyell and Dr. Sills, wherein she professed an ability to conclude there had been a lack of violence on the part of Dr. Sills (Schilling Report ¶ 25), is equally irrelevant to the issue of whether the Executive Committee adequately responded to the allegations, the latter of which was Guidepost's sole focus.

## CONCLUSION

SI Global reviewed Guidepost's review of its Second Mandate under its SBC engagement and, applying nationally recognized standards for internal investigations as well as decades of collective training and experience in the conduct and review of internal investigations, concluded that Guidepost utilized reasonable and accepted practices and procedures in all aspects of the evidence collection, analysis, and reporting of their investigation.



## SI Global
### PARTNERS

Douglas A. Leff_____

Managing Director
SI Global Partners
199 Water Street, 16th Floor
New York, NY 10038
(212) 245-2918
leff@siglobalpartners.com
July 21, 2025



**SI Global**
P A R T N E R S

# EXHIBIT 1: LIST OF ITEMS CONSIDERED OR RELIED UPON

| ITEM | CITATION |
|---|---|
| Guidepost Report | Guidepost+Solutions+Independent+Investigation+Report.pdf |
| Letter of Engagement | |
| Council of Inspectors General on Integrity and Efficiency, <u>Quality Standards for Investigations</u> | <u>Microsoft Word - QSI 11-15-11.doc (ignet.gov)</u> [last accessed 07/07/2025] |
| United States Department of Defense, <u>Joint Inspector General Concept and System Guide</u> | <u>Microsoft Word - Cover Apr 11.doc (dodig.mil)</u> [last accessed 07/07/2025] |
| Deposition of David Roach | 2024-08-26 Deposition Transcript of David Roach, PhD - Condensed 4854-5147-2892 v.1 |
| Deposition of Dr. Albert Mohler, Jr. | 2024-10-08 Deposition Transcript of Dr. Albert Mohler, Jr. - Condensed.pdf |
| Mohler Interrogatories | EX003 RESPONSES TO PLAINTIFFS' AMENDED INTERROGATORIES.pdf |
| Deposition of David Sills | 100124MichaelSills |
| Deposition of Dr. Eric Geiger | 2024-10-30 Deposition Transcript of Dr. Eric Geiger - Condensed.pdf |
| 1st (November 8, 2021) progress update to Sexual Abuse Task Force | GPSILLS_008000-02.pdf |



SI Global
PARTNERS

| ITEM | CITATION |
|------|----------|
| 1st (November 11, 2021) Progress Update (Non-Final) | GP_000375-76 |
| 1st (November 15, 2021) Progress Update to COC | GPSILLS_009714-15.pdf |
| 2nd (December 13, 2021) progress update to Sexual Abuse Task Force | 2nd (December 13, 2021) progress update to Sexual Abuse Task Force (not yet produced) |
| 3rd (January 25, 2022) progress update to Sexual Abuse Task Force | GPSILLS_009750-9752.pdf |
| 3rd (January 2022) Progress Update (nonfinal) (To Sexual Abuse Task Force) | GPSILLS_006798-99.pdf |
| 4th (March 7, 2022) progress update Sexual Abuse Task Force | GPSILLS_009743-45.pdf |
| 4th (March 11, 2022) Progress Update (nonfinal) to COC | GPSILLS_006411-12.pdf |
| 5th & FINAL (April 26, 2022) progress update Sexual Abuse Task Force | GPSILLS_009731-34.pdf |
| 5th & FINAL (April 28, 2022) progress update Sexual Abuse Task Force | GPSILLS_009735-38.pdf |
| Ketamine Video | LYELL_00344663.MOV |
| Process Server Video | Sills_090658.mov |



SI Global

PARTNERS

| ITEM | CITATION |
|------|----------|
| Email: Lyell to Sills 04/13/2008, 12:05 PM | LYELL_00036970 2008 |
| Email: Lyell to Sills 05/18/2008, 8:26 PM | LYELL_00052810 |
| Louisville Public Records request | Sills_091155 - Louisville Metro |
| Capstone Report | Leaked audio interview with Jennifer Lyell.pdf |
| Original BP Email.pdf | LYELL_00113953 |
| Voicemail from Roach to Sills | Sills_091210 - voicemail-12894936992 |
| Ron Henzel Blog, "I Don't Know What to Believe Anymore" | I Don't Know What to Believe Anymore.pdf |
| Email chain between Lyell & Roach ending 03/06/2019, 11:04 AM | LYELL_00036111 |
| Email chain ending with Roach & Howe, 10/17/2019, 10:04 PM | EC_0001840 |
| McDougal Report on Guidepost Investigation | McDougal Report on Guidepost Investigation FINAL.pdf |
| Sills TN Complaint | 3:23-cv-00478 (MDTN) |
| Krista Tongring Draft Notes from Jen Lyell Call | GPSILLS_018902-03 |
| Guidepost - Confidential Mediation Statement | Guidepost - Confidential Mediation Statement.pdf |



SI Global
PARTNERS

| ITEM | CITATION |
| --- | --- |
| People v. Krivak (court opinion granting motion to preclude expert testimony) | 78 Misc.3d 988 (Putnam County Court 2023) |
| Baxter v. Palmigiano, | 425 US 308 (1976) |
| New York Guide to Evidence § 8.37 | |
| Texas Code of Criminal Procedure Art. 38.07 | |
| Tucker v. Palmer, | 541 F.2d 652 (6th Cir. 2008) |



SI Global
PARTNERS

# EXHIBIT 2: PRIOR EXPERT WITNESS TESTIMONY

| CASE | COURT | DESCRIPTION | APPROXIMATE DATE |
|------|-------|-------------|------------------|
| Hunt v. SBC, et. al | U.S. District Court, MDTN | Expert witness on reviewing previously conducted investigations | 2024 |
| Flaherty v. U.S. | U.S. District Court, SDNY | Expert witness on reviewing previously conducted employment discrimination investigation | 2020 |
| U.S. v Rudaj | U.S. District Court, SDNY (Grand Jury) | Expert witness on money laundering and financial crime investigations | 2009 |
| U.S. v. Arbel | U.S. District Court, EDNY (Grand Jury) | Expert witness on money laundering and financial crime investigations | 2005 |



SI Global
PARTNERS

# EXHIBIT 3: PUBLICATIONS

| PUBLICATION | APPROXIMATE DATE |
|---|---|
| "Money Laundering & Asset Forfeiture: Taking the Profit Out of Crime," FBI Law Enforcement Bulletin | 2012 and subsequently republished by U.S. Postal Inspection |
| "Money Laundering & Asset Forfeiture: Taking the Profit Out of Crime," United States Attorneys Bulletin | 2013 (updated version of previous article) |



**SI Global**
PARTNERS

# EXHIBIT 4: INTERVIEW OF JULIE MYERS WOOD AND KRISTA TONGRING

On June 29, 2025, Managing Director Douglas Leff interviewed Julie Myers Wood, Chief Executive Officer of Guidepost; and Krista Tongring, President, DEA Regulatory Compliance Practice at Guidepost[4]. They provided the following information:

## §1. INTERVIEWS CONDUCTED BY GUIDEPOST

David Sills was not interviewed, nor were any other accused abusers, because Guidepost's mandate was not to make findings as to the guilt or innocence of these alleged abusers. Rather, the mandate was to address the Executive Committee's response to allegations of abuse. None of the alleged abusers nor anyone else ever disputed the alleged victims' status as victims. Accordingly, Guidepost interviewed all of the alleged victims whose accounts would be mentioned in the Guidepost Report. Any alleged victims who were not interviewed were not discussed in the Report. (KT)

The account given by Ms. Lyell had been shared with SBC entities since 2018, was known by Dr. Sills, and was unrebutted throughout that time. The Baptist Press had put out an apology for its whitewashing of Ms. Lyell's account, while the Executive Committee more explicitly stated that Ms. Lyell had been abused. Dr. Sills never rebutted this. (KT)

A Baptist Press reporter contacted Dr. Sills to get his version of events and Dr. Sills did not respond. (KT)

An additional four months took place after this explicit apology by the Executive Committee and Guidepost's naming of Dr. Sills as Ms. Lyell's abuser and Dr. Sills never came forward in that time either. (KT)

Ms. Lyell's case and the Guidepost investigation were both talked about in SBC public forums. (JMW)

---

[4] The initials "JMW" refer to information provided by Ms. Myers Wood, while "KT" refers to information provided by Ms. Tongring.

Case 3:23-cv-00478    Document 398-5    Filed 10/14/25    Page 39 of 44 PageID #: 12835



SI Global
PARTNERS

Johnny Hunt was interviewed because he had been a part of the Executive Committee, and the first of Guidepost's mandates was to investigate allegations of abuse by Executive Committee members, one of which had been Hunt. However, Dr. Sills was not explored under Guidepost's first mandate, but rather under its second mandate, which was to investigate mishandling of abuse allegations by the Executive Committee. (KT)

Thus, only the first mandate involved any investigation of individual misconduct. The second mandate was an investigation of alleged failures by the Executive Committee. (KT, JMW)

## §2. INDEMNIFICATION AGREEMENT

Indemnification agreements, such as Guidepost has in this case, are standard in the industry. The agreement was in a format typical of Guidepost engagements, and Guidepost does not agree to engagements of this nature without an indemnification agreement. (KT, JMW)

## §3. VIEWING OF REPORT DRAFTS

Guidepost showed alleged victims drafts of the factual portions of their own statements in order to make sure the facts were accurately stated. The same procedure was followed with the Committee on Cooperation. However, the investigators' observations were not shown to the alleged victims in order to maintain the independence of the investigation. (KT)

During the investigation, Guidepost met with the Task Force and gave them memos but not the intended findings. The memos listed people who Guidepost had contacted and also contained requests for assistance. The Committee on Cooperation helped Guidepost as needed. (KT)

The letter of engagement provided that the Task Force and Committee on Cooperation would be permitted to see factual portions of the Report, while in draft form, and provide factual corrections. The process put in place required all of the above persons to meet in Nashville, where they received paper copies of the drafts, with a signed non-disclosure agreement. At the conclusion of the meeting, Guidepost took back the paper copies. There was one person who could not make it to Nashville, and a Guidepost employee met with that person separately and followed the above procedures. (KT)

After the Hunt portion of the Report was done, Guidepost conducted the same procedure over Zoom for members of the Committee on Cooperation. (KT)



**SI Global**
P A R T N E R S

The Task Force was permitted to see the entire draft Report but only allowed to offer factual corrections. The Task Force members received it through a password protected link. (KT)

Guidepost was the final arbiter of what went into the Report. (KT)

Guidepost allowed named survivors, not just Ms. Lyell, to see drafts of the factual portions of their own statements to make sure the facts were accurately stated. The same procedure was followed with the Committee on Cooperation. However, the investigators' observations were not shown to the alleged victims in order to maintain the independence of the investigation. (KT)

The alleged victims were permitted to see drafts of their statements but not the investigators' observations. To the extent, Ms. Lyell and other alleged victims had comments on their draft statements. Guidepost took these under advisement, making changes only where they corroborated the requested change, otherwise Guidepost would not make the changes. (KT)

Ms. Myers Wood recalled an email from Ms. Lyell that may have contained comments on Ms. Lyell's statement, but she lacked any further recollection except the certainty that she must have passed the email to someone else because she would not have handled it without someone else participating and would not have had a call with Ms. Lyell without someone else present. (JMW)

## §4. INVESTIGATIVE TEAM
The team that reviewed the Executive Committee process related to Dr. Sills included attorneys and investigators with extensive legal experience, which included backgrounds prosecuting and investigating sex crimes. One of the former prosecutors had played a major role in a sex abuse investigation of the Catholic Church. These investigators were then overseen by another former federal prosecutor. (KT)

## §5. SEX ABUSER DATABASE

During the investigation, an SBC staff member provided Guidepost with a list of potential abusers. Guidepost had nothing to do with creating nor vetting the list but referenced its existence in the Report. Guidepost did not disclose the list to anyone. (KT)

The Executive Committee published the list less than a week after the Report was issued, which came as a surprise to Guidepost, who played no part in the Executive Committee's publication of the list. Shortly thereafter, Guidepost began receiving emails about the list and put a hyperlink to it on Guidepost's website. Guidepost did not alter, amend or contribute in any way to any portion of the list. (KT)



**SI Global**
PARTNERS

## §6. GUIDEPOST'S RELATIONSHIP WITH SBC

Prior to the engagement that produced the Report, Guidepost had a minor pre-existing relationship with SBC. Ms. Myers Wood and Doctors Moeller, Floyd, and SBC's chief of staff spoke about doing a more limited report. The parties signed a letter of engagement and Guidepost put in about ten hours on the project but were never paid for the time. (JMW)

Guidepost and SBC then went from that narrower focus to a broader engagement. (KT) SBC initiated this new engagement by calling Ms. Myers Wood. (JMW)

Ms. Myers Wood does not know if Ms. Denhollander recommended Guidepost. Guidepost was already a well-known entity from other work they had done for another ministry which was similar in nature, and Ms. Denhollander had recommended Guidepost to that other ministry. (JMW)

Even if Ms. Denhollander took part in SBC's selection of an investigative firm and SBC's interviews of Guidepost. Ms. Denhollander's focus in the interview was on the sexual assault survivors, and she made it clear that she needed to know that whichever firm came in would treat the survivors with compassion. (KT)

Ms. Denhollander also knew Samantha Kilpatrick, one of the Guidepost investigators, through her previous experience in the field. (JMW)

Ms. Denhollander had no conflict in recommending Guidepost to SBC because Guidepost understood that SBC was aware of her prior dealings with Guidepost at the time SBC was conducting its selection process. (KT)

Ms. Denhollander had no business relationship with Guidepost. She has referred and continues to refer business to Guidepost, but there have been no referral fees, and she has never paid Guidepost anything nor has Guidepost ever paid her. (JMW)

At least one other firm was interviewed as a candidate to conduct the investigative review. (JMW)

Guidepost was aware of the relationship between Denhollander and Lyell in conducting their investigation. (KT)

Ms. Denhollander had some last-minute comments on the draft Report, which she sent in an email; however, at all times, Guidepost retained editorial control over the Report. (KT)



SI Global
P A R T N E R S

At no time did the Guidepost team feel that the Task Force or Committee on Cooperation tried to pressure them. (KT)

## §7. Follow-up work by Guidepost for SBC

The fact that SBC might need additional work done in the future had absolutely no bearing on Guidepost's investigation nor the Report. (KT) While there was an understanding that Guidepost might want to compete for future work, this had no effect on the Report. (JMW)

After the Report was published by the Task Force, Guidepost was inundated with emails with additional information. Ms. Myers Wood spoke with SBC, and they formally asked Guidepost to handle the responses via a hotline. Initially, this was done on a temporary basis and has since lasted an additional three years. (KT)

While the drafting of the Report was in progress, Guidepost pitched the Ethics & Religious Liberty Commission (ERLC), SBC's think tank, for selection to run a review that the ERLC planned to conduct. That work did not move forward. (JMW)

Guidepost was also considered by the Task Force to set up a "ministry check" of sorts for the SBC; however, because of a tweet published by Guidepost in June 2022 celebrating Pride month, the SBC decided it would no longer recommend Guidepost for the work. (JMW)

Guidepost is still managing a hotline for SBC. (JMW) The goal is to transition it in-house. (KT)

The Task Force, which hired Guidepost, no longer exists. (JMW)

The Task Force was formed before the Request for Proposal went to Guidepost. (KT)

Guidepost had no role in the formation of the Task Force. (JMW)

## §8. Report Verbiage

Guidepost used the word "abuser" to refer to Dr. Sills because everyone had been referring to him in that manner for such a significant period of time that Guidepost felt it was a "foregone conclusion" that Dr. Sills had sexually abused Ms. Lyell. (JMW & KT)



**SI Global**
PARTNERS

### §9. LICENSE REQUIREMENTS

Ms. Myers Wood was licensed by the Illinois Bar at the time of the investigation. Also, it was not a Tennessee investigation. (JMW)

### §10. LEGAL TERMINOLOGY

Guidepost would not have defined legal terms in the Report because it was not a legal document. Common sense definitions were used so that the Report would not be confusing. (KT)

No particular standard of proof was utilized in the Report. If there had been any concerns about a close call, then they might have applied a standard of proof, but there was no issue as to whether or not SBC had done all of the things highlighted in the Report. Stated another way, the evidence was overwhelming. (KT)

Moreover, Guidepost was not investigating the underlying proof of Dr. Sills's guilt but rather the Executive Committee's process. The Executive Committee had officially apologized for the conduct Guidepost described in the Report, so no standard of proof was needed. (KT)

Case 3:23-cv-00478     Document 398-5     Filed 10/14/25     Page 44 of 44 PageID #: 12840