**EXHIBIT 6**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                      NASHVILLE DIVISION

 3   --------------------------x
     MICHAEL DAVID SILLS and   :
 4   MARY SILLS,               :
                               :
 5          Plaintiffs,        : Case No. 3:23-cv-00478
                               :
 6      vs.                    :
                               :
 7   SOUTHERN BAPTIST          :
     CONVENTION, et al.        :
 8                             :
            Defendants.        :
 9   --------------------------x

10

11          VIDEO-RECORDED HYBRID DEPOSITION OF

12                    KRISTA TONGRING

13                    July 29, 2025

14

15

16

17

18

19

20

21

22

23

24   Reported by:  Susan L. Ciminelli, CRR, RPR

25
```

1      Q     Okay.  So do you know now, as you and I sit here

2  right now, if the document that we pulled up on the screen

3  was, in fact, the final report?

4      A     It likely was, but we didn't go through the

5  whole thing.  It likely was.

6      Q     Okay.

7            MS. RILEY:  Do you know, Kathy?

8            MS. KLEIN:  Based on the report, I couldn't tell

9  from that.

10           MS. RILEY:  We didn't have the Bates number

11  pulled up.  Okay.  We'll look at 8it later.  Okay.  So

12  we'll get back to the questioning.

13           BY MS. RILEY:

14     Q     I want to talk about the Caring Well Conference.

15  What was Samantha Kilpatrick's involvement with the Caring

16  Well Conference in 2021?

17     A     I don't know.  That was before we were engaged.

18           MR. ANDERSON:  Object to form.  This is Jon

19  Anderson.  I don't think the Caring Well Conference was in

20  2021.  I think your question said 2021.

21           BY MS. RILEY:

22     Q     Do you know when the Caring Well Conference was?

23     A     No, no.  Actually, I do.  It was 2019.

24     Q     2019.  That is correct.  And when was Samantha

25  Kilpatrick hired as a subcontractor?

```
 1     A      Sometime in 2021, I believe.

 2     Q      Wasn't she involved with this -- okay.  So the

 3 Caring Well Conference is 2019.  Samantha Kilpatrick was

 4 not an employee, nor a subcontractor for Guidepost, is that

 5 correct?

 6     A      Not to my knowledge.

 7     Q      Okay.

 8     A      I did go back and check, so I will have a more

 9 definitive answer.

10     Q      Did Guidepost have anyone at the Caring Well

11 Conference?

12     A      Not to my knowledge.

13                         (Tongring Exhibit No. 8 was

14                          marked for identification.)

15            BY MS. RILEY:

16     Q      All right.  I've handed you a document that I

17 will represent that I pulled from the internet.  Have you

18 seen the information that's on this document before?

19     A      No.

20     Q      Can you tell me what the title is?

21     A      Becoming a Church That Cares Well for the

22 Abused.

23     Q      Have you heard of this Bible study curriculum

24 before?

25     A      Not like this, no.
```

1    Q    What do you mean, not like this?

2    A    I've heard that there was -- like, that there

3    were Caring Well materials, but I've never seen or heard of

4    this.

5    Q    Okay.

6    A    And I don't have any -- know of any details

7    about Caring Well materials.

8    Q    Okay.  If you will look on the first page of the

9    contributors, who were the first and third people?

10   A    Rachael Denhollander and Samantha Kilpatrick.

11   Q    So does this show that the two of them were

12   working with -- working on Becoming a Church That Cares

13   Well for the Abused?

14        MS. KLEIN:  Object to form.

15        THE WITNESS:  That they were working on this

16   curriculum, this training curriculum, yes.  Oh, yes, that's

17   what it says.

18                    (Tongring Exhibit No. 9 was

19                     marked for identification.)

20        BY MS. RILEY:

21   Q    Ms. Tongring, I'll represent to you that I

22   pulled this from the internet, and it is JD Grear's

23   address to SBC Executive Committee on February the 18th,

24   2019.  And if you will turn to the next to the last page,

25   please.

```
 1              Up at the top, the first bullet point under the
 2  first full paragraph, it states, "we will equip churches
 3  and ministries in our state to care well for survivors by
 4  encouraging resource development.  We encourage the effort
 5  of the Sexual Abuse Presidential Study Group to develop the
 6  resource Becoming a Church that Cares Well for Abused."
 7              Did I read that correctly?
 8      A     You did.
 9      Q     So does it look like the -- that JD Greear was
10  promoting and partnering with Rachael Denhollander and
11  Samantha Kilpatrick in writing this curriculum?
12              MS. KLEIN:  I'm going to object to the form of
13  the question.  It's outside the scope.  She has not been
14  able to identify this document, nor the previous document.
15  So to the extent you're expecting Guidepost to make an
16  answer to these questions, I would object.  If she knows
17  from a her personal knowledge, she can testify, but it's
18  based on what she knows.
19
20              MR. ANDERSON:  Jon Anderson.  Sorry, and I join
21  in that objection, lack of foundation.
22              THE WITNESS:  So, no, I haven't seen this
23  document before.  And, no, I don't have any personal
24  knowledge that JD Greear was promoting this -- these
25  training materials.  But to answer your specific question,
```

1   **you read it correctly.**

2              BY MS. RILEY:

3      Q     As an independent investigator, is that the type

4   of information that you would want and need to know to

5   determine if there is a conflict of interest?

6              MS. KLEIN:  Object to the form.  Conflict of

7   interest in what regard?

8              BY MS. RILEY:

9      Q     Well, in the fact that you had Southern

10  Baptist -- JD Greear from the Southern Baptists, so he was

11  president of the SBC at this time, Rachael Denhollander,

12  and Samantha Kilpatrick all working together.  And then

13  they're working also on -- like, you all were doing an

14  investigation.

15             Samantha Kilpatrick and Rachael Denhollander

16  were working with JD Greear in his Presidential Advisory

17  Group.  And my question is, is that not a conflict of

18  interest, if then they are coming in, and doing an

19  investigation against the Southern Baptists?

20             MS. KLEIN:  Object to the form.  I'm still not

21  quite sure what you're asking.  But your question is if

22  these people worked together in 2019, is there a conflict

23  of interest for whom?

24             BY MS. RILEY:

25     Q     Is there any type of conflict of interest, as

1   far as the -- you know, abiding by professional standards

2   of an investigation.

3             MS. KLEIN:  Are you asking if Guidepost has a

4   conflict of interest, because these three people worked

5   together in 2019?

6             MS. RILEY:  I'm asking the witness if there is

7   any conflict of interest in any way.

8             MS. KLEIN:  Again, I'm going to object.

9             MS. RILEY:  You can.

10            MS. KLEIN:  Object to the form.  I don't know --

11  anyone, anywhere, any time?  Who has a conflict of

12  interest?

13            BY MS. RILEY:

14       Q    I mean, the relationship between Samantha

15  Kilpatrick, Rachael Denhollander, and the Southern Baptist

16  Convention, the three of them all working together, does

17  that -- on this curriculum, does that create any type of

18  conflict, of bias, of not being transparent in any way?  Is

19  that information that you would want to know, that they all

20  worked together prior to doing the investigation?

21

22            MR. ANDERSON:  Jon Anderson for the EC.  Object

23  to form, speculation, and lack of foundation, assumes facts

24  not in evidence.

25            THE WITNESS:  Okay.  So as the corporate

1   witness, I can say that Guidepost, for every engagement,

2   runs a conflicts check, and as we did here.  And there were

3   no conflicts found.  So we did not believe, based on our

4   processes, that we had any conflict of interest.

5           BY MS. RILEY:

6       Q    What -- when you said you ran a conflicts --

7   what did you say?

8       A    Conflicts check.

9       Q    Tell me what that is.

10      A    We have a process, an internal process, whereby

11  we send out various things about our client -- potential

12  clients.  And everyone in the company has an opportunity to

13  review that, and say, we have a connection here, a

14  connection there.  Let's talk about it.  Or this is a

15  conflict, or whatever.  And then it comes back.

16      Q    So what are the various things that were --

17      A    I don't know what the things were.

18      Q    Okay.  Did Samantha Kilpatrick report that she

19  had a -- or that she was partnering with SBC and Rachael

20  Denhollander and writing a book?

21          MS. KLEIN:  Object to the form.

22          THE WITNESS:  Two things.  One, I don't read

23  that to be a book, I read that to be training, which I see

24  are different things.  Two, I don't know.  And three, even

25  if she did, that would not have been a perceived conflict

```
 1  for us.

 2            BY MS. RILEY:

 3       Q    Why?

 4       A    Because if she did work previously for somebody,

 5  with somebody, and that work has been completed, and she no

 6  longer has a relationship, then we don't see that as a

 7  conflict.

 8       Q    Do you know for a fact that she did have a

 9  relationship?

10       A    Yeah.

11       Q    Okay.  Do you know if she was paid for -- any

12  royalties from the Becoming a Church That Cares Well for

13  the Abused?

14       A    I have no idea.

15       Q    Do you know if Jennifer Lyell attended the 2019

16  Caring Well Conference?

17       A    I believe she did.

18       Q    What about Rachael Denhollander?

19       A    She was on a panel.

20       Q    And do you understand that Samantha Kilpatrick

21  was also on that panel?

22       A    I believe -- yes, I believe I recall that.

23       Q    Did Samantha Kilpatrick already have a

24  relationship with Rachael Denhollander previous to the

25  Caring Well Conference in 2019?
```

1      A      I don't know.

2      Q      Do you know if she was paid for her appearance

3  at the Caring Well Conference?

4      A      No idea.

5              MS. RILEY:  Hey, T, can you pull up the report,

6  page 105?

7              BY MS. RILEY:

8      Q      Yeah, down at the last sentence of the last

9  paragraph, can you read that, Ms. Tongring?

10      A      I can.

11      Q      Okay.  It says, "during the second day of the

12  conference, one of the presenters publicly spoke about

13  Ms. Lyell's story."  Who was the presenter that publicly

14  spoke about Ms. Lyell?

15      A      Rachael Denhollander.

16      Q      Why didn't you list her name there?

17      A      We had a process by which we determined what --

18  what staff, what witnesses.  Survivors were only named if

19  they agreed to be named, or if they wanted to be named.

20  And who was going to be named.  And she was one of the

21  people who was not named.

22      Q      What was the discussion on not naming her in the

23  report?

24      A      It wasn't discussion on her.  It was basically,

25  anyone who had some -- who participated in some of the

Case 3:23-cv-00478   Document 398-6   Filed 10/14/25   Page 11 of 24 PageID #: 12851

1       A       **Again, without looking, I can't tell you.**

2       Q       Okay.

3       A       **And I don't want to speculate.**

4       Q       235.  But this is information you can get for us

5       after the deposition?

6       A       **Yes, I can look at the footnoted documents and**

7       **the witness statement from CC witness 12.**

8       Q       So you don't know how their services were

9       rejected, whether it was written or verbal?

10      A       **I don't.**

11      Q       Okay.

12              MS. RILEY:  All right, T, you can put that one

13      down.

14                              (Tongring Exhibit No. 11 was

15                              marked for identification.)

16              BY MS. RILEY:

17      Q       This is Exhibit 11, Bates number LIFE169278.

18      A       **Okay.**

19      Q       Have you seen this document before?

20      A       **No.**

21      Q       Was Guidepost aware that in February of 2019,

22      during the -- let me scratch that.

23              Was Guidepost aware that in February 2019, that

24      Jennifer Lyell was facilitating the Becoming a Church That

25      Cares Well for the Abused?

1      A      No.

2      Q      Do you think that was something that you should

3   have known?

4      A      No.

5      Q      It doesn't show a lack of independence?

6      A      No, it was Jennifer's job.

7      Q      Or you weren't concerned that it gave the

8   appearance of Guidepost being biased, because its

9   investigators had book deals with Jennifer Lyell?

10             MS. KLEIN:  I'm going to object to the form.  It

11   calls for speculation.  This document is dated March of

12   2019.  The Guidepost engagement with the SBC doesn't happen

13   for two plus years.

14             THE WITNESS:  I just want to correct something.

15   They didn't have a book deal with Jennifer Lyell.  The book

16   deal was with Lifeway.  Jennifer Lyell was an employee of

17   Lifeway.

18             BY MS. RILEY:

19      Q      Did Jennifer help facilitate?

20      A      Through her employment, when she wasn't an

21   employee of Lifeway, when our investigation began.

22      Q      Doesn't the fact that Samantha Kilpatrick

23   investigated the same group that she worked on a training

24   material with create a conflict of interest with the

25   Southern Baptist investigation?

```
 1              MS. KLEIN:  I'm going to object to the form of

 2   the question.  And I believe that misstates the facts.

 3              THE WITNESS:  Lifeway was an arm, or like a --

 4   see, this goes kind of back to the whole SBC thing.  They

 5   had various --

 6              BY MS. RILEY:

 7       Q    Can I stop you right there?  If you can answer

 8   maybe "yes" or "no" to the question, and then go into your

 9   answer of what you're trying to explain?

10       A    Okay.  Repeat the question, and then I'll see if

11   I can answer "yes" or "no."

12       Q    I'm just trying to keep the record clear.

13       A    Yep.

14              MS. RILEY:  Madam Court Reporter, would you mind

15   rereading the question?

16              (The requested testimony was read.)

17              MS. KLEIN:  Object to the form.

18              THE WITNESS:  No, because that's not a correct

19   statement.

20              BY MS. RILEY:

21       Q    What's incorrect about it?

22       A    Lifeway and the Southern Baptist Convention and

23   the EC are different entities.

24       Q    What's the document number?

25       A    That's 11.
```

1     Q     11.  Can you tell me what -- have you seen the

2  document, Exhibit Number 11?

3     A     No.

4     Q     And does that appear to be an email between

5  Samantha Kilpatrick and Jennifer Lyell in March 2019?

6     A     That's what it says on the document.

7     Q     Okay.  And does it state from Ms. Kilpatrick to

8  Jennifer, "we met briefly with the abuse panel a week or so

9  ago.  I just read your story on Twitter.  Just wanted to

10  say I support you and admire your courage."

11          Did I read that correctly?

12     A     You did.

13     Q     Okay.  You can put that down.  Tell me again

14  Guidepost's first interaction with Rachael Denhollander?

15     A     I don't know.

16     Q     And how many times have -- has Guidepost worked

17  with Rachael Denhollander before SB hired Guidepost to work

18  on this investigation?

19          MS. KLEIN:  What do you mean by "worked for"?

20          BY MS. RILEY:

21     Q     Engaged.  How many times had Guidepost worked

22  with Rachael Denhollander before June 2021?

23     A     I don't think we've ever worked with her.

24     Q     What do you mean by that?

25     A     We've never jointly worked -- I don't believe.

 1  report?

 2      **A      No.**

 3      Q      And you've already testified that Rachael

 4  Denhollander was Jennifer Lyell's attorney in one of her

 5  settlements with the Executive Committee, and that you

 6  learned that fact during the investigation, correct?

 7      **A      Yes.  In the 2019 -- I learned that she was, at**

 8  **some point, in some way, shape, or form, counsel to her**

 9  **during the 2019 mediation.**

10      Q      When you found that out, did that not make you

11  think, wait a minute, maybe Rachael Denhollander doesn't

12  need to be on the Sexual Abuse Task Force?

13      **A      No.  And it wasn't my decision.**

14      Q      Whose decision would it have been?

15      **A      The SBC.**

16                      (Tongring Exhibit No. 12 was

17                      marked for identification.)

18              MS. RILEY:  T, this is Exhibit 12, and it is

19  SBTS005904.  I need reading glasses.  I'm sorry.

20              BY MS. RILEY:

21      Q      Have you seen this document before?

22      **A      No.  Or at least I don't think so.  I don't**

23  **recall it.**

24      Q      If you turn to the second page, it states, "it

25  was Denhollander's talk at the ERLC conference, and her

1  words about Lyell that are going to be a major focus of the

2  investigation."

3          Did I read that correctly?

4    A    You did.

5    Q    "Also, Denhollander already believes that the EC

6  is guilty, and she has said so publicly."

7          Did I read that correctly?

8    A    You did.

9    Q    "How can she credibly be a part of the group

10  overseeing an investigation of which she is the subject,

11  and about which she already publicly expressed prejudicial

12  views?"

13          Did I read that correctly?

14    A    You did.

15    Q    Would you agree that not everyone agreed that

16  Rachael Denhollander could be objective?

17          MS. KLEIN:  Object to the form.

18          THE WITNESS:  I agree that's what this document

19  says.  I have no idea who is talking.

20          BY MS. RILEY:

21    Q    Had you heard that, or had anybody voiced

22  concern to Guidepost that Rachael Denhollander couldn't be

23  objective?

24    A    No.

25    Q    You can put that aside.

```
 1              MS. KLEIN:  Object to the form.

 2

 3              MR. ANDERSON:  Object to form and foundation,

 4   misstates.

 5              THE WITNESS:  I can't tell you what their

 6   opinion is.  I can tell you what is in this document, which

 7   is what they are saying based on their experiences.  And it

 8   appears, based on their experiences, that they didn't have

 9   good experiences.

10              MS. RILEY:  All right.  T, if you will pull up

11   LYELL_0035106, that will be marked Exhibit 14.

12                          (Tongring Exhibit No. 14 was

13                          marked for identification.)

14              (Discussion off the record.)

15              THE WITNESS:  Okay.

16              BY MS. RILEY:

17       Q     Do you agree that this is a text string with

18   Jennifer Lyell, Rachael Denhollander, and Julie Wood of

19   Guidepost?

20       A     Yes.

21       Q     And it's dated June the 11th, 2022?

22       A     Yes.

23       Q     And does it appear from this text string that

24   Jennifer Lyell has talked to Megan Basham, and she is

25   coming to Guidepost and asking to -- Julie Wood for
```

1  information to be provided to Megan Basham, is that

2  correct?

3      A      Yes, that's what's happening.

4      Q      Okay.  And Rachael Denhollander says,

5  "officially, Jen didn't hear back from you guys."

6              And then Jennifer says, "and am going to just

7  tell her, I wasn't able to speak with you in time, narrowly

8  construing the word 'speak.'"

9              Did I read that correctly?

10     A      You did.

11     Q      Does it appear to you that Rachael and Jennifer

12  are going to lie to Megan Basham about whether or not she

13  communicated with Jennifer?

14             MS. KLEIN:  Object to the form.

15             BY MS. RILEY:

16     Q      I mean Julie, I'm sorry.

17     A      It appears that they are using specific words.

18  I don't know that I would say lie.  But they are using the

19  literal sense of the word "speak."

20     Q      Does it look like they're using a particular

21  word to avoid telling the truth?

22             MS. KLEIN:  Object to form.

23             THE WITNESS:  It looks like they're using a

24  particular word to avoid saying that they communicated with

25  Julie.

```
 1              MS. RILEY:  All right.  We can put that down.

 2   T, can you pull up LYELL_00346983?

 3                          (Tongring Exhibit No. 15 was

 4                          marked for identification.)

 5              BY MS. RILEY:

 6         Q    And if you'll just look at it, and tell me when

 7   I can ask you some questions.

 8         A    Okay.

 9         Q    This is an email from Jennifer to Scarlet Nokes

10   on May 17th, 2022, correct.

11         A    It is.

12         Q    And do you see that Rachael Denhollander is

13   cc'd?

14         A    I do.

15         Q    Do you know who Scarlet Nokes is?

16         A    I do.

17         Q    And who is she?

18         A    At that time, I don't if it's true currently,

19   she was counsel for the EC.

20         Q    Okay.  Do you find it odd that Jennifer Lyell

21   was making introduction of Rachael to Scarlet, rather than

22   the Executive Committee doing it?

23              MS. KLEIN:  Object to the form.

24              THE WITNESS:  No.

25              BY MS. RILEY:
```

```
 1              MS. KLEIN:  That's it.  Thank you.
 2              THE WITNESS:  Yep, this is what I was just
 3   talking about.
 4              BY MS. RILEY:
 5      Q    Okay.  So out of all the conversations that you
 6   had with Jennifer Lyell, and in-person interviews, that's
 7   the only notes that you took?
 8              MS. KLEIN:  Object to the form.  That misstates
 9   her testimony.
10              BY MS. RILEY:
11      Q    That's what I'm asking.  I'm asking to clarify
12   it.  Is this the only notes --
13      A    If this is the only thing that was produced,
14   this is the only -- these are the only notes that I took.
15      Q    Is it possible that you have some notes in an
16   email or something else?
17      A    They scrubbed my emails and scrubbed my
18   documents.
19      Q    When did they -- who is "they"?
20      A    IT scrubbed our emails.  I scrubbed the
21   documents, when we were asked by counsel.  I can't --
22      Q    When was that?  When you say scrubbed, what do
23   you mean?
24      A    I mean went through every document to see
25   whether or not it may have been related to the Sills
```

1   matter.  IT went through and did a key word search of our

2   team site, to see whether or not it was related to the

3   Sills matter.  IT did a key word search of our emails to

4   see whether or not it was related to the Sills matter.  All

5   of that was gathered and then provided to counsel.  I can't

6   tell you what the date is.  I'm sorry, I don't remember.

7   Yeah, I can't.  I don't know.

8        Q     Well, let's just look at that document.

9        A     Yes.

10       Q     The first line says, "5-23-2018.  Email when he

11  confronted Sills.  Called every member of EC."  Who is --

12  who called every member of the EC?

13       A     I don't know if it was Al Mohler or Jennifer

14  Lyell.

15       Q     And then it says, "can we use Jen's after story

16  as not cooperating or resistant."  Did I read that

17  correctly?

18       A     You did.

19       Q     Isn't your job just to present the facts?

20       A     So sometimes what I do when I'm taking notes is

21  take notes -- my notes to myself.  I think that's my note

22  to myself.

23       Q     And then at the end of the next paragraph, it

24  says, "clergy sex abuse" -- the last sentence -- " - Jim

25  needs us to write something that this is true assault."

```
 1       A     Or that that's why he preyed on her.

 2       Q     That's why he preyed on her?

 3       A     I did not see written verification of that.

 4       Q     Okay.  All right.  Let's go back -- you can put

 5  that up.

 6       A     Thank you.

 7       Q     All right.  This is LYELL_357834.

 8                         (Tongring Exhibit No. 25 was

 9                         marked for identification.)

10             BY MS. RILEY:

11       Q     Exhibit 25.  If you'll identify this for me, if

12  you can.

13       A     It appears to be text messages between Jennifer

14  Lyell and Julie Myers Wood.

15       Q     About what?

16       A     We were -- this is the day -- or one of the days

17  of the EC meeting in Nashville.  And I don't remember what

18  it was, but she tweeted something and she wanted Bruce

19  Frank to see it.

20       Q     Were you a liaison between Jennifer Lyell and

21  Bruce Frank?

22       A     No.

23       Q     But you were that day?

24       A     No.

25             MS. KLEIN:  Object to firm.
```

```
 1          CERTIFICATE OF NOTARY PUBLIC & REPORTER

 2

 3  I, SUSAN L. CIMINELLI, the officer before whom the

 4  foregoing deposition was taken, do hereby certify that the

 5  witness whose testimony appears in the foregoing deposition

 6  was duly sworn; that the testimony of said witness was

 7  taken in shorthand and thereafter reduced to typewriting by

 8  me or under my direction; that said deposition is a true

 9  record of the testimony given by said witness; that I am

10  neither counsel for, related to, nor employed by any of the

11  parties to the action in which this deposition was taken;

12  and, further, that I am not a relative or employee of any

13  attorney or counsel employed by the parties hereto, nor

14  financially or otherwise interested in the outcome of this

15  action.

16

17

18

19                  SUSAN L. CIMINELLI

20              Notary Public in and for the

21              District of Columbia

22

23  My Commission Expires:  November 30, 2026

24

25
```

Susan L Ciminelli
Notary Public, District of Columbia
My Commission Expires November 30, 2026

844.533.DEPO