IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSE

NASHVILLE DIVISION


MICHAEL DAVID SILLS and MARY SILLS,


        Plaintiffs,


vs.                    3:23-cv-00478

                        Judge William L. Campbell, Jr.

SOUTHERN BAPTIST CONVENTION,

a non-profit corporation; et al,


        Defendants.



DEPOSITION OF ROBERT J. FISHER


THURSDAY, AUGUST 14, 2025

10:09 AM



VIA ZOOM



Shawna H. Meeks

Certified Court Reporter

and Notary Public

Robert Fisher
3:23-cv-00478

(1)     A.    Yes.   Yesterday, I was given a copy of a

(2)  deposition of Jonathan Howell, and I guess which was just

(3)  done -- I'm not sure.   It must have been done just

(4)  recently, but I had not seen his -- that was the only new

(5)  -- new documentation that I've received since I turned in

(6)  my report.   And so I managed to look at -- I didn't get

(7)  through all of it yesterday, but I got through about two-

(8)  thirds of it.

(9)     Q.   I -- I didn't, in your report, see any references

(10)  to them, but have you spoken to or been provided the

(11)  reports of any other of plaintiffs' experts in this case?

(12)     A.   No.   No.   I don't -- I don't even know who the

(13)  other experts they have retained in this case, but I have

(14)  not looked at -- the answer is no.   I have not looked at a

(15)  report of any other experts that the plaintiffs have in

(16)  this case.

(17)     Q.   Have you ever, in connection with your -- your --

(18)  this case and your opinions, have you reviewed or spoken

(19)  to either of the plaintiffs?

(20)     A.   The Sills, no.   I have not spoken to them.   I

(21)  have not communicated with them in any way.

(22)     Q.   Why don't you just, in your words, and for

(23)  purposes of the record, kind of explain, again, in your

(24)  words, what you consider to be your areas of expertise,

Robert Fisher
3:23-cv-00478

(1) testimony in this case?

(2)  A.  Well, I followed the evidence.  I took her own

(3) words.  I mean she, in her own words, she's -- she had a

(4) long letter to Mr. Slade I believe at one point and -- you

(5) know, a very long letter and she mentioned -- I'm just

(6) following the evidence.  She has self-admitted that she

(7) had a problem with lying.

(8)  The second thing is I followed the evidence.  The

(9) evidence is -- is that not only has she self-admitted that

(10) she had a problem with lying -- mostly, I think she --

(11) believe said earlier in her life but she's -- but there's

(12) evidence to that fact that she admitted that.

(13)  The second thing is, oh, I pointed out.  I don't know

(14) if it's in that particular section, that she had made

(15) representations of things being true that weren't true

(16) based on evidence from the people that she talked about.

(17) Like she -- there were several things with Dr. Cook or the

(18) Pastor Cook, whoever.  There was a section there that it

(19) was at least six, eight items that she made

(20) representations.  Mohler.  She made representations that

(21) he said things that he denies saying.  I'm just following

(22) the evidence.  I'm not making these up.  I'm saying she

(23) made statements that things were true, the people that

(24) were involved with the statements that she made and said

Robert Fisher
3:23-cv-00478

(1)     Q.   Okay.  I want to turn -- and we'll jump around

(2)  quite a bit, but if you could, turn to page 55.

(3)     **A.   Yes, sir.**

(4)     Q.   Which there's the heading there that starts

(5)  Reputation Damage Repair Program.  Do you see that?

(6)     **A.   Yes.  Correct, sir.**

(7)     Q.   Okay.  Now if you could scroll to the next page,

(8)  page 56, there at the bottom, it states "the following is

(9)  an outline for such a program."  Do you see that?

(10)    **A.   Yes.  I do.**

(11)    Q.   Okay.  Now again, now turning to the next page,

(12) page 57, do you see the heading "Program Activities"?

(13)    **A.   Yes.  I do.**

(14)    Q.   And the sentence after that states, "the

(15) following is an outline of a prudent and suitable

(16) reputation management/repair -- damage repair program

(17) which would seek to achieve -- sorry -- the objectives for

(18) such a program as stated above."  I read that correctly?

(19)    **A.   You did.**

(20)    Q.   And then if we turn to the next page, 58, there

(21) is the heading "Program Plan."  Do you see that?

(22)    **A.   Yes, sir.**

(23)    Q.   And it states "a strategy for the program would

(24) be formulated.  A detailed plan would be created for the

(1) program which would be implemented," correct?

(2)    **A.   Correct.**

(3)    Q.   And so what you've done here and I think it's,

(4) you know, where we just read and what your report states

(5) is you've prepared an outline of a reputation repair

(6) program, but you have not prepared an actual program, yet;

(7) is that -- is that fair?

(8)           **MS. MCNULTY:  Objection.  Misstates that**

(9) **opinions.**

(10)           **THE WITNESS:  Well, I'm not quite clear on**

(11) **that.  Yes.  This is a -- this is a -- based on**

(12) **information, knowledge, and whatever I have now, this is a**

(13) **projected program to meet the objectives of the program**

(14) **and do whatever is possible to restore the reputation of**

(15) **Dr. Sills and, to a lesser degree, his wife.  Things**

(16) **change.  For instance, Ms. Lyell recently passed away.  I**

(17) **mean this is program, I mean, which could alter somewhat**

(18) **the program I don't think really essentially much, but the**

(19) **bottom line is, this is a projected plan based on a set of**

(20) **what is real now and -- and it's open to adjustment**

(21) **depending on what may occur between now and the time it's**

(22) **implemented.**

(23)    BY MR. ANDERSON:

(24)    Q.   Let me ask it this way.  Have you, as we sit here

(1)  today, prepared a reputation management or damage repair

(2)  program for the Sills?

(3)           MS. MCNULTY:  Objection.  Form.  That's the

(4)  report, but go --

(5)           THE WITNESS:  Well, I don't understand,

(6)  quite frankly.  This is -- as I stated, this is a program

(7)  based on my 50 years.  I probably did 30 or 40 such

(8)  programs as a public relations professional over the

(9)  years.  I have a national reputation in that area of

(10) dealing with people in crisis situations who had

(11) reputation damage or whatever.  I'd go around the country

(12) or whatever and be retained to -- to, you know, try to

(13) repair their reputations.  This is -- this is a program

(14) that, at this point in time, on the, you know, the 14th of

(15) August in the year of our Lord, 2025, that -- that I --

(16) well, it was written in June, but I mean that I feel is a

(17) -- is a rational, reasonable program to achieve the

(18) objectives of restoring the plaintiffs' reputation.  As I

(19) said, it's open to adjustment if factors change, like Ms.

(20) Lyell's death or something like that.  I mean you never

(21) know what's going to happen, but as we sit here today,

(22) this is a realistic program to achieve that goal.

(23)   BY MR. ANDERSON:

(24)   Q.   So is there -- when you say that there is an

(1)   outline for a program -- we read those quotes.  Those are

(2)   -- I'm not trying to be difficult because those are words

(3)   from your report that we read.  Is there a difference

(4)   between the program and an outline for the program as

(5)   you've used that term in this report?

(6)       A.   Well, yes.  This is an outline for a program.  It

(7)   has -- for instance, if the outline says get media

(8)   exposure.  It doesn't identify, you know, what type of --

(9)   how you would do it.  Would it be news releases, press

(10)  conferences, interviews, guest editorials, whatever.  It

(11)  doesn't get to that finite of -- and which publications

(12)  you would go after.  In other words, it's an outline.

(13)  That's what it is; an outline.  It's not meant to be a

(14)  final plan in which, you know has A to Z spells out

(15)  everything you would do and who you would go after.  It's

(16)  an outline and that's -- that's what it is.  The devil is

(17)  in the details in the sense whoever does this program --

(18)  and by the way, it won't be me.

(19)      You know, attorney's first question on cross I get on

(20)  the stand is did you come up with this program and budget

(21)  to line your pockets, and so I can -- even though I've

(22)  done 40 or 50 -- either 30 or 40 in my lifetime, I don't

(23)  do them anymore.

(24)      So whoever is retained, whatever communications firm

(1)      So the whole dynamic of the program, the message, the

(2)   strategy, everything is going to change, you know, to

(3)   adjust to how you're moving forward based on what the

(4)   results in the court were.

(5)      BY MR. ANDERSON:

(6)      Q.   Is it -- is it fair to say that, you know, when

(7)   someone prevails, is that some of the best -- my words

(8)   here.  If someone prevails and is found to have been

(9)   vindicated that the statements made about them were false,

(10)  is that -- is that one of the best forms of reputation

(11)  repair that can be -- could be had?

(12)           MS. MCNULTY:   Objection.   Form.   Incomplete

(13)  hypothetical.  Go ahead.

(14)           THE WITNESS:   Yes. It is.  The problem is if

(15)  we're -- if I can surmise where you're coming from, if he

(16)  prevails, what's the need for a program.  I think you're

(17)  going that direction.  The problem is is no one knows

(18)  unless it's a national case that's in the news or on the

(19)  internet or something like that, which this wouldn't be --

(20)  well, it might be in the Baptist community, but it

(21)  wouldn't be in the general public.  No one is going to

(22)  know what happened in the court unless the media were to

(23)  pick up on it and run stories and got an internet.  So the

(24)  point is even though he was judged to be innocent of false

(1)  to reach out.  The program is going to have to reach out

(2)  to any geographical area that he had previously was known

(3)  in to resurrect his reputation to some degree.  Obviously,

(4)  the United States more than, you know, Guatemala or

(5)  something like that, but yeah.  I mean you're trying to

(6)  restore his reputation wherever geographically it was

(7)  damaged.

(8)     Q.   Do you have any -- have you seen any data or

(9)  analysis about how his reputation has been harmed among

(10) the general public outside of the Baptist community?

(11)                MS. MCNULTY:  Objection.  Form.

(12)                THE WITNESS:  Well, to answer your question,

(13) you said have I seen any data.  The answer to that is no.

(14)    BY MR. ANDERSON:

(15)    Q.   Have you seen any data about the extent or harm

(16) within the religious or evangelical community?

(17)    A.   Well, I'm quibbling over the word data.  If you

(18) mean information, yes.  There's plenty of information that

(19) it -- that it went out through the Baptist Press article,

(20) for one thing.  Not so much the original article which was

(21) -- I thought was okay, per say.  But although it did bring

(22) up allegations that he had a problem with Ms. Lyell, but

(23) particularly, the, you know, the retraction and the

(24) apology and all the aftermath of that article was highly

Robert Fisher
3:23-cv-00478

(1)  -- was highly damaging to him.  And -- and -- well, to

(2)  finish the answer to the question, and yes.  I mean it

(3)  obviously reached the religious community that -- that

(4)  reads the Baptist Press, if nothing else.

(5)  Q.   I mean and my question was more directed towards,

(6)  I mean obviously whatever articles are out there, but have

(7)  you been provided any information about target audience

(8)  surveys, analysis of web traffic, or anything of that

(9)  sort?

(10)  A.   No.  I have -- I have not seen any statistical

(11)  data or -- of that kind.  I mean sometimes things are

(12)  apparent that you don't really need to -- need to see to

(13)  know that there -- there was harm out there, obviously.

(14)  Q.   Well, you say that about being apparent, and I

(15)  know your report references defamation, per say.  Do you

(16)  have any -- I know you're not a lawyer, but since your

(17)  report references it, do you have any understanding as to

(18)  whether Tennessee law recognizes defamation per say any

(19)  longer?

(20)          MS. MCNULTY:  Objection.  Form.  Beyond the

(21)  scope.  Instructing the witness to not answer.

(22)          MR. ANDERSON:  Wait.  You're going to

(23)  instruct this witness to not answer?

(24)          MS. MCNULTY:  Yeah.  You're asking him a

Robert Fisher
3:23-cv-00478

(1)     Q.    You have not -- and if there's no way to do so,

(2)   tell me, but have you done any analysis, or is it even

(3)   possible to do an analysis, to determine the extent to

(4)   separate each communication out or communications and

(5)   determine the extent of reputational harm attributable to

(6)   each?

(7)     **A.    Well, I think this is a case of the whole is**

(8)   **equal to the sum of its parts kind of thing and -- but to**

(9)   **answer your question more specifically, did I take each**

(10)  **tweet that Barber made or each email that Lyell sent or**

(11)  **each -- I mean did I break those down individually -- the**

(12)  **Baptist Press -- did I break all these down as to the**

(13)  **degree of harm each one caused?  No.**

(14)    Q.    What is your understanding as to when public

(15)  allegations of sexual abuse began to be made against David

(16)  Sills?

(17)    **A.    Well, the first time Lyell called Geiger.  I mean**

(18)  **you know, she decided in 2019, 2018, you know -- 2019, she**

(19)  **heard that maybe Sills was back to preaching or counseling**

(20)  **people and didn't want to see the same thing happen again,**

(21)  **so she -- you know, she decided to go forward.  She wanted**

(22)  **to write -- write a statement or an article for the**

(23)  **Baptist Press.  So that's where it started.  I would say**

(24)  **that's the first time that there was a proactive move to -**

(1)  - for her to bring -- I mean she was the person that

(2)  originated all of this. That was the first time. I guess

(3)  the first time she whispered in Geiger's ear prior to him

(4)  notifying Mohler.  I would believe that was the first time

(5)  the sexual abuse came forward.

(6)     Q.   Are you aware or do you have any knowledge that

(7)  in March of 2019, Jennifer Lyell created a website about,

(8)  you know -- I think it was called Lyell's statement on

(9)  abuse and made posts or, you know, wrote on there

(10) allegations of sexual abuse?  Are you aware of that?

(11)    A.   I'm aware that she had -- she did put her own

(12) statement up on a website, but I don't know the time -- I

(13) don't remember the timing of it, but I know that she did

(14) do that.  She wanted to get her own words out there for

(15) the people to see and I think she called it

(16) www.JenniferLyellabuse or something.  I can't remember.  I

(17) know that she had one.

(18)    Q.   Do you know that there were news articles -- are

(19) you aware if there were news articles that were written

(20) around that same time referencing her allegations of abuse

(21) against David Sills, and, for example, I've seen one from

(22) the Tennessean and Louisville or Courier Journal.  I think

(23) -- it's in the record in this case.  Have you seen any of

(24) those?

Robert Fisher
3:23-cv-00478

(1)      A.   I haven't actually seen the articles, but I was,

(2)  you know,  in my research -- not research, but in the

(3)  information that was provided to me.  I can't remember the

(4)  exact -- which it was, but I do believe -- yes.  I do

(5)  believe I was aware that there -- that a couple of

(6)  publications had -- I don't know what was in them.  I

(7)  never saw the articles, but I do seem to remember that

(8)  someone picked it up.

(9)      Q.   We discussed just a moment ago about, you know,

(10)  how you didn't or, you know, you had not broke out, like,

(11)  separate communication or tweet or email the, you know,

(12)  alleged reputational harm from each.  And so along those

(13)  lines, is when you're speaking of a reputational repair

(14)  program, there would be no way within that program, or at

(15)  least you don't, or there's no way to differentiate

(16)  between reputational harm occurring to Dr. Sills, for

(17)  example, prior to 2022 versus after; is that correct?

(18)      A.   That would be -- I'm sorry to interrupt you.

(19)  There would be no need to.  You know, the train has left

(20)  the station, the horse is out of the barn.  You know, --

(21)  the ship has left. You know the bottom line at that point

(22)  in time that you would do a program, it wouldn't matter

(23)  timetable or whether the Baptist article was more hurtful

(24)  than a report or whether the tweet by -- by Barber was

(1) worse than the email by Lyell. At that point you're

(2) dealing -- you know, as I say, it -- it doesn't matter.

(3) You're dealing with reputational harm already exists and

(4) it doesn't matter where it came from so much. You have to

(5) deal with the problem, you know, and -- which is a

(6) reputation harm. So who caused it, when they caused it,

(7) at that point, is not germane.

(8)     Q.   By 2022, I think you used the term the train had

(9) left the station in terms of reputational harm; is that

(10) fair?

(11)     A.   Well, I think the reputational -- yeah.  I mean

(12) you have different levels of reputation harm. I mean when

(13) -- when Lyell went to Geiger who went to Mohler and Mohler

(14) called him in to his office and then he resigned or

(15) something, no one knew about her allegations or pretty

(16) much except the hierarchy of the SBC family. I mean it

(17) was not even the general. It was just a few people that

(18) were aware of what -- what went on. but I mean then you

(19) -- then it gradually grew as she -- like when she puts up

(20) a website or -- especially with the Baptist Press article,

(21) then -- and then, of course -- in other words, it was a

(22) gradual snowball effect or domino effect, you know, after

(23) that. I mean if it had been confined to just the Mohler

(24) meeting with Dr. Sills, if it had just been confined to

(1) just speaking from my own professional experience.

(2)   BY MR. ANDERSON:

(3)   Q.   You said there's literature out there discussing

(4) the programs.  Do you know --

(5)   A.   I assume there is, yes.  I assume there is.

(6)   Q.   Okay.  You assume there is, but you can't --

(7) you're not able to identify it, but you assume there is?

(8)   A.   Not --

(9)             MS. MCNULTY:  Objection.  Form.  Go ahead.

(10)            THE WITNESS:  Well, no.  I can't sit here

(11) today and give you a name of an author and a publication

(12) off the top of my head.  I -- I'm pretty sure that I've

(13) seen those in the past, but I don't pay attention anymore

(14) in a sense because they're not saying anything that I --

(15) not only I don't know, but probably I have more knowledge

(16) and background experience than the people that write the

(17) articles, you know.  It'd be like the -- it would be like

(18) a teacher reading the student's paper, you know.  I mean

(19) I'm the teacher and these people are the students.

(20)   BY MR. ANDERSON:

(21)   Q.   With -- when we talk about restoring and, you

(22) know -- just using this example of 70% -- and bear with me

(23) here.  So often times, when we, you know, with most things

(24) in life, and I'll give an example.  We have some

Robert Fisher
3:23-cv-00478

(1)    the damage is not so much the damages within the medical

(2)    profession.  And so therefore, you're going to -- there's

(3)    different ways to reach out to them.

(4)       It's like the rifle shot and shot gun approach.  If

(5)    the damages is only with certain individuals or companies

(6)    or so, then you can make phone calls.  You can go meet

(7)    with them.  You can send them an email.  What do you think

(8)    of this, whatever.  You know, you can do a rifle shot

(9)    approach because you can go directly.  If it's spread to

(10)   the public, then you have to look at other ways to -- you

(11)   can't go to ten million people who live in New York City

(12)   or whatever and ask them what they think.  You have to use

(13)   others.  So the -- the means -- the means by which you get

(14)   the -- do the assessment vary on who the, you know, who

(15)   you have to get the information from.

(16)      Q.   Where is there -- is there literature or guidance

(17)   out there that you've relied upon or that we can look to

(18)   to determine how to conduct these audits or assessments?

(19)      A.   Yes.  It's between my ears.  You know, the bottom

(20)   line is I -- and I'm not going to be doing this program.

(21)   You know, I mean I stated that to be clear.  Let's be on

(22)   the record with that.  I think I put it in my report, too.

(23)   But whatever the communication firm that is retained, the

(24)   PR firm, or I mean, not God knows not an advertising or

(1) what you're going to do, but you know, the importance of

(2) it, how much weight you're going to put to it, and

(3) therefore, that would dictate how much money would be

(4) allocated for that specific task.

(5)    Q.   Is this budget -- because I have not seen it

(6) broken out.  You know, we've talked about the results of

(7) the litigation and how it could affect things.  Is this

(8) budget associated with a certain result of the litigation?

(9)    A.   This budget is based on -- no.  Not necessarily.

(10) I mean you know, obviously, if the plaintiffs prevail as

(11) opposed to whether they don't prevail, affects the

(12) strategy and all which would mean the certain things you

(13) would do more of and other things you do less of depending

(14) on what the strength if you were going forward.  For

(15) instance, if they weren't to prevail and they were to do

(16) such a program, they would -- it might have to go back to

(17) square one on certain things, so you would have to put

(18) more emphasis in certain areas to like reinvent the wheel,

(19) so to speak, or whatever.

(20)    If they win, you don't have to deal with that stuff

(21) because, you know, it's not necessary because you're going

(22) out trumpeting the fact that after four years of

(23) litigation or whatever, you know, the judicial system has

(24) determined that the defendants were wrong and I wasn't an

(1) abuser, so you know, let's move on from there.

(2)     So for me, at this point in time -- first of all, I'm

(3) not going to be doing the thing, but beyond that, at this

(4) point in time to try to finite everything out not knowing

(5) whether you're going to be going from the position of

(6) strength or weakness, and to -- so what I did is I grouped

(7) them into like four categories.  I put a bunch into four

(8) categories based on what was going to be done in each

(9) category without breaking out the specific finite things

(10) which can't be determined at this point, therefore, you

(11) can't put a budget to it.  It's not realistic to do it at

(12) this point in time.

(13)     But what this is, it's a fair representation -- this

(14) is what this is.  This program -- okay.  Let's be clear on

(15) this program.  First of all, this program is a tried and

(16) -- I've done a few dozen.  Now a lot of them I did before

(17) the internet was around or whatever, but you know, I've

(18) since updated or whatever.  But this program is based on a

(19) successful model for such a program in the field to

(20) achieve the objectives of overcoming negative reputations.

(21) That's it.  It's tried and true kind of things to do, you

(22) know, that kind of -- so it's a realistic program as far

(23) as the activities to do.  As far as the budget goes, which

(24) is a separate component, the budget is the best projection

Robert Fisher
3:23-cv-00478

(1) of the allocation of money for general tasks as part of

(2) the program.

(3)     Now so I grouped them into four -- like four different

(4) areas.  Now it's not realistic at this point to break down

(5) those four areas into the -- each of them to say would

(6) have ten -- ten actions under each of the four categories.

(7) At this point, it's not -- it doesn't make any sense to

(8) put a budget -- I mean I've already listed what the

(9) actions would be.  That's earlier in the report. That's --

(10) I've got like ten different actions to take in the report,

(11) you know, speaking engagements, videos, you know, social

(12) media, publication relations, media program.  All of those

(13) are what adds up to these four -- four sections.  What

(14) I've done is put the four sections -- that's what's going

(15) to be in the four sections.  But to break down at this

(16) point how much money I spend for soliciting speaking

(17) engagements as opposed to how much money I spend for

(18) writing press releases or how many, you know social media

(19) sites to go on or something like that, is not -- it's not

(20) only not germane, it's not relevant because we haven't

(21) determined -- we don't know what the outcome of the trial

(22) is and we haven't determined where the focus for the

(23) program is going to be.

(24)     Q.  You had mentioned this being a successful model

(1)     and tried and true just now in your answer.  Is there

(2)     literature, guidance, peer review studies that we can go

(3)     find that, you know, discuss this successful model or

(4)     define how it's successful?

(5)         A.    Look, I've done this over a 40 year period.  I've

(6)     done these programs.  First of all, why would I go -- you

(7)     know, if anything, people are writing about what I've --

(8)     what I've done.  I'm not going to -- it's a

(9)     teacher/student thing again.  I mean I -- they're probably

(10)    writing -- look, as a PR professional, because I have a

(11)    national reputation among legal media, but particularly

(12)    the news media.  The legal profession and news media.  I

(13)    would get called from law firms all over the country when

(14)    they had clients that had problems.

(15)        When kids were killed in the high school in Kentucky,

(16)    I was -- I was -- the next day, I got a call at 1:00

(17)    o'clock and at 3:00 o'clock, I was on a plane going to

(18)    Kentucky.  I went all over the country handling crises and

(19)    handling the things like that.  So therefore, I was the

(20)    one that set the model for these programs.  I don't need

(21)    to read about somebody else writing about what I did.  I

(22)    mean, you know, I mean the news media.

(23)        The OJ Simpson case.  Probably from the time the

(24)    verdict came in in the criminal case through the two years

Robert Fisher
3:23-cv-00478

(1)    A.   No.  I don't do social media, myself.  I mean I -

(2)  - I have a Facebook page, but I never -- I've never -- had

(3)  a Facebook page for 12 years and never posted anything on

(4)  it.  I just use it to see what other -- what my people are

(5)  doing.  You know, I look at what they do and I reply.

(6)  Sometimes I'll add on to their posts, you know.  They'll

(7)  post a picture of them with their baby or something and

(8)  I'll say, gee, she's cute, you know, or something like

(9)  that.  But no.  I don't -- I'm on LinkedIn -- well, I'm

(10)  not active on that.  To answer, the only thing I have is

(11)  LinkedIn and Facebook and I don't -- I'm not proactive

(12)  with those.

(13)    Q.   So --

(14)    A.   I don't have a bad reputation so I don't -- I

(15)  don't -- you know, I don't need to -- I don't have an

(16)  overwhelming need to go on social media.  I don't get my

(17)  business that way.  I don't have a reputation to overcome,

(18)  bad reputation, so it's not important to me.

(19)    Q.   Is a full time social -- a full time professional

(20)  to, you know, for monitoring interaction with -- for

(21)  creating content and monitoring interaction, is a full

(22)  time professional in that regards something you recommend

(23)  in every case?

(24)    A.   Well, no.  All cases are different.  It depends

Robert Fisher
3:23-cv-00478

(1) on the need.  I mean a lot of times you have social media

(2) just for the purpose of promoting yourself, you know.  I

(3) mean in fact, most social media is to promote yourself and

(4) not to overcome negativity of any kind.  That would be

(5) semi-rare, but you know, I mean people jump on social

(6) media for -- I mean first of all, a lot of it isn't

(7) business oriented.  It's personally related.  To get on

(8) there personally and exchange their views and interact

(9) with friends or acquaintances and all that other thing.

(10) That kind of thing, and put up videos or, you know -- you

(11) know, we're talking about a different purpose here.  We're

(12) talking about overcoming negativity, not promoting

(13) yourself.

(14)     Q.   You said you don't recommend it in every case.

(15)     A.   Well --

(16)     Q.   What -- what methodology or factors do you look

(17) at to determine whether one is needed -- whether a full

(18) time professional is needed, as you've said in this case,

(19) versus not needed?  What's your methodology?

(20)          MS. MCNULTY:  Objection.  Asked and

(21) answered.  Go ahead.

(22)          THE WITNESS:  Well, the methodology depends

(23) on a function and a purpose.  I mean, you know, what is

(24) the purpose for being on it, what is the function you want

Robert Fisher
3:23-cv-00478

(1)  to achieve out of it, and the goals, the objections, and

(2)  all of that.  What do you want it to do for you.  What's

(3)  it going to take to achieve what you want to achieve

(4)  through it, and I'm just -- I'm just saying that

(5)  particularly, like the first year or so -- you know, a lot

(6)  of this -- you got to understand.  A lot of this is to

(7)  monitor things as you go and it's to determine -- I mean

(8)  you start out with a plan of action.  In any plan of

(9)  action, you implement it and then you make adjustments as

(10)  you go.  If you see something that's working, you keep it

(11)  up.  If you see it isn't working, you try something else.

(12)  I mean it's standard in any kind of a program is to -- is

(13)  to conceptualize what's needed to start, begin the

(14)  implementation of it, make midcourse corrections as

(15)  needed, and then evaluate how successful it is.

(16)      Like we have a component in here in evaluating the

(17)  program as it is.  We talk about one of the budgets, we

(18)  talked about having -- doing surveys, focus groups, and

(19)  all to monitor the program as we go to, you know, that's

(20)  in -- that's on page 62 there, the budget.  We have a

(21)  program to do quantitative analysis in here.  And you

(22)  know, to keep monitoring what's going on, is it effective,

(23)  is it not effective, you know, how are we doing.

(24)      I mean anybody that starts a program from ground zero

Robert Fisher
3:23-cv-00478

(1)  and says I'm going to go through with this program come

(2)  hell or high water, no matter whether it's successful or

(3)  not, this is the way to do it, I'm going to do it.  But

(4)  anyone that's smart makes corrections.  So how do you know

(5)  to make corrections unless you keep monitoring whether

(6)  what you're doing is successful or not.  We have it

(7)  spelled out in page 58 here that -- that we would have a

(8)  budget for ongoing voluntarily analysis and, you know, to

(9)  -- it's like getting benchmarks to see how we're doing,

(10)  what's working, what's not working.

(11)      BY MR. ANDERSON:

(12)      Q.  What are the factors and information specific to

(13)  David Sills that you relied upon in concluding that a full

(14)  time professional would be needed to create and monitor

(15)  interaction with content?

(16)      A.  Well, the nature -- the nature of the

(17)  allegations.  Start with that.  I mean, you know, he

(18)  wasn't accused of shoplifting or he wasn't -- I mean

(19)  heinous nature of what he did, in fact, says the

(20)  reputation I said earlier, you know, somebody is a burglar

(21)  is, you know, people will say shame on you for breaking in

(22)  that house and stealing something, but you know, then they

(23)  forget about it, you know.  That kind of thing as opposed

(24)  to someone being a sexual abuser.  In this day and age,

(1)   you know, it goes back to the Me Too movement in 2017,

(2)   which kind of, you know brought people out of the woodwork

(3)   and saying with the Weinstein and even Cosby and things

(4)   like that.  It's -- it requires more effort, more time,

(5)   more effort, more diversity of actions, longer term

(6)   actions to overcome that kind of a negative stain on your

(7)   reputation.

(8)      Q.   You mentioned the nature of the allegations or

(9)   sexual abuse as a factor.  Any other factors or

(10)  information as it pertains to David Sills that you relied

(11)  up in concluding or opining that this full time

(12)  professional is needed?

(13)     A.   Well, that and the -- the fallout of it.  You

(14)  know, the bottom line is is that -- I mean this is a man

(15)  that was an international lecturer, was a book writer, had

(16)  been a professor for 18, 20 years.  I can't remember

(17)  exactly how many.  I mean he had a full plate and he

(18)  belonged to -- he volunteered for a lot of organizations.

(19)  He did a lot of, you know -- not charity work, but a lot

(20)  of, you know, nonprofit work and all that.  And all of

(21)  that was ripped out from under him because of this.  So it

(22)  wasn't that, you know, one domino fell, he had a lot of

(23)  dominoes falling, so he has to build those back up, you

(24)  know.  I mean it's not like somebody broke a window in the

(1) whether he would have to resign over an adulterous affair

(2) anyway?

(3)    A.   I don't recall.  I did read his deposition.  I

(4) don't -- I don't necessarily recall him making such a

(5) statement.  I mean not to say it isn't in there, but I,

(6) you know, I read the deposition months ago, so I can't

(7) recall at this point seeing that.

(8)    Q.   Back to this -- the full time social media

(9) professional.  Is there literature or guidance that's out

(10) there that one can review to determine when you need a

(11) full time professional versus when you don't?

(12)    A.   There may be.  I'm not -- I'm not aware -- I

(13) think that's a judgment call, quite frankly.  First of

(14) all, I don't think there's a blanket statement on

(15) something like that.  I think it depends on the

(16) particulars.  I mean obviously some time -- some -- some

(17) instances don't require a full time one.  I mean you know,

(18) a guy put in an hour or two on it and then move on to

(19) something else, but -- so it depends on the particular

(20) circumstance and what's needed to achieve your objectives.

(21)    Q.   The next one down on -- I think -- page 59 is the

(22) search engine optimization, the SEO.  And that first

(23) sentence says "the internet would need to be reviewed for

(24) information relating to the plaintiffs and actions taking

Robert Fisher
3:23-cv-00478

(1)     Q.   How did you get the $50,000?  Was this based --

(2)  will it be hourly billing or how did you arrive at that?

(3)     A.   Yeah.  I mean I don't think any particularly

(4)  expenses are factored into this, for the most part,

(5)  although it might include expenses if somebody said, well,

(6)  you know, you should -- you should send him back to New

(7)  York to speak to the Elk's club or something like that,

(8)  you know.  I mean it would be -- there'd be some expenses,

(9)  but primarily, yes.  It would be for professional fees or

(10) -- professional fees for not only outreach work,

(11) investigations, monitoring, all that, but also for

(12) implementing new -- readjusting your plan, implementing

(13) new -- it might be new content writing if something -- I

(14) mean, you know, it would be -- but I guess to answer your

(15) question succinctly would be I would guess 80, 90% would

(16) be in fees.

(17)    Q.   Have you broke this out, like in any kind of

(18) spreadsheet by laying out, you know, the type of

(19) consultant, the anticipated hours?  Have you done any of

(20) that?

(21)    A.   Well, no.  It's just -- it's just a projection

(22) somewhat of hours based verse time, you know.  The kind of

(23) professions you're going to hire are probably -- I mean

(24) they're going to do -- maybe charging 400 or 500 an hour

Robert Fisher
3:23-cv-00478

(1) or something like this, you know.  I mean public relations

(2) professionals do not charge like expert witnesses do.

(3) Expert -- I've been both a public relations professional

(4) and I've been an expert witness and I can tell you my fees

(5) as an expert witness are -- are quite higher than they

(6) were as a public relations professional.  But I'm not

(7) talking about large firms, but your average say account --

(8) high account executive or low account supervisor level

(9) that would be doing a lot of this work, you know.  They're

(10) going to be charging 450 to 500 an hour so that you can,

(11) you know, divide that into the 50,000, you can come up

(12) with some sort of a blended figure of how many hours we're

(13) talking about and, you know, I mean that was the general

(14) basis of -- and I mean, again, a lot of if it is education

(15) projection of what -- what, you know, of what would be

(16) needed.

(17)     Q.    Let me -- let me ask -- let me ask you this based

(18) upon what you said, and we'll accept -- so that $500 an

(19) hour.  We'll take that, so at $500 an hour, 50,000 per

(20) month, that would be -- we can agree to math.  That would

(21) be 100 hours?

(22)     A.    Yeah.  That's not -- not a lot of time.  I mean

(23) when you figure there's 30 -- let's say 30 days in a month

(24) --

Robert Fisher
3:23-cv-00478

(1)     Q.   Let me -- let me -- I don't want to cut you off.

(2)  Let me ask my question.  Because my question was just that

(3)  it would be $100,000 and let me -- and you've answer that.

(4)     **A.   Well, you said --**

(5)     Q.   Sorry.  100 hours in that.  So I do want to cut

(6)  you off because you answered my question and I want to get

(7)  on to my next one.  So we're talking -- this is 50,000 per

(8)  month, you know, $500 an hour, so 100 hours per month.

(9)     **A.   And three hours --**

(10)          **MS. MCNULTY:  Let me him ask the question.**

(11)  **BY MR. ANDERSON:**

(12)     Q.   And then so if we assume 20 hours -- let's say 20

(13)  work days, Monday to Friday, whatever.  I mean we're

(14)  roughly looking at -- for a two year period, four to five

(15)  hours of consultations every work day for two years; is

(16)  that what this --

(17)     **A.   Well, you've got that wrong.  I didn't say**

(18)  **consultation.  I said I listed about seven different**

(19)  **actions that would be taken.  Consultation was one of**

(20)  **them, you know, that kind of thing.  That's -- that's --**

(21)     Q.   It says here "the budget for such consultations

(22)  should reflect $50,000 per month."

(23)     **A.   Okay.  Well, then I'm a bad boy.  Consultations,**

(24)  **I would stand with what I just testified to as opposed to**

Robert Fisher
3:23-cv-00478

(1)    what I wrote in the report.  It's more than consultations.

(2)    It would be -- you know, it would be not only

(3)    consultations.  In other words, picking other people's

(4)    brains, talking to them, running by what you're doing,

(5)    what do you think of that, do you have any other

(6)    suggestions.  I mean those kind of consultations.

(7)        But also, there would be actions spinning off those

(8)    consultations that would be reasonably -- for instance, if

(9)    I consulted with someone and he said you should be doing

(10)   this, this, or that.  I have two options.  I am doing it

(11)   myself or turning it over to someone else.  If you turn it

(12)   over to someone else, then you have to educate someone

(13)   else to what they're supposed to be doing.  You don't have

(14)   the direct contact, and it's just as easy to do it

(15)   yourself.

(16)       Like if somebody -- if a consultant says, you know, if

(17)   you wrote a letter to the President of the United States,

(18)   that would be very effective.  Well, I can turn to someone

(19)   else and say write a letter to the President of the United

(20)   States, but then I would have to tell them what to put in

(21)   it and what the guy told me to do.  It's just as quicker

(22)   to knock one off myself.  So part of it is, you know, a

(23)   lot of consultations and part of it is actions that you

(24)   would take based on that and you do it yourself rather

Robert Fisher
3:23-cv-00478

(1) than farming it out to someone.

(2)     Q.   And I need -- I need us to be clear about this

(3) because from what I think you just said that this $50,000

(4) a month would not just be for consultations.  I mean -- so

(5) I need to -- I need to figure what it's for.

(6)          MS. MCNULTY:  Well, it's on page 61.  He

(7) mentioned earlier in his answer the proceeding sentence

(8) and so --

(9)     BY MR. ANDERSON:

(10)     Q.   Right.  But he -- I thought he, at one point,

(11) indicated that it was for other actions on the program.  I

(12) just want his words or what does it represent?

(13)     A.   Well, no.  It's for actions that emanate directly

(14) from the consultations.  For instance, what is the purpose

(15) of consultations?  The purpose of consultations is

(16) twofold.  One is to pick somebody else's brains in these

(17) different fields who have more expertise than you do and

(18) can give you ideas and suggestions, whatever.  And the

(19) second thing would be to run by what you were doing and

(20) ask do you think that's -- you know, you may go to one guy

(21) and say this is what I'm planning to do.  The guys says

(22) you're -- go ahead and do it.  Another guy says boy,

(23) you're off the track.  This is what you need to be doing.

(24) So part of it is -- the bulk of it would be consultations,

Robert Fisher
3:23-cv-00478

(1) interacting with people, talking, meeting with them,

(2) emailing them, texting them, videotape -- I mean Zooming

(3) them or whatever, and/or going -- flying across the

(4) country to meet with them or something like that, if it

(5) was important enough. And then other is that the

(6) byproduct of those consultations, which would be doing

(7) like, as I said, as an example, some guy said you know, if

(8) you really wrote a letter to somebody, that would be very

(9) valuable. Well, you know, so I sit down and I write a

(10) letter. So part of it is consultations and part of it is

(11) actions emanating from those consultations.

(12)    Q.   We don't know what those actions are -- would be

(13) at this point?

(14)    A.   No.  An they're not part of --

(15)          MS. MCNULTY:  Wait.  Objection.

(16) Argumentative.  Misstates the testimony.

(17)    BY MR. ANDERSON:

(18)    Q.   Do you know what those actions would be at this

(19) point?

(20)          MS. MCNULTY:  Asked and answered.  Go ahead.

(21)          THE WITNESS:  Well, no.  Not specific

(22) because I don't know what they're going to recommend, you

(23) know.  Say some people say you're doing everything you can

(24) do and it's right.  It's great.  You don't need to do

Robert Fisher
3:23-cv-00478

(1) others would suggest something. At this point, I couldn't

(2) tell you what they were going to suggest to do because I

(3) haven't talked -- talked to them.

(4)   BY MR. ANDERSON:

(5)   Q.   The -- is consultations and actions emanating

(6) from them, is that something you recommend in every plan?

(7)         MS. MCNULTY:  Objection.  Form.  Relevance.

(8) I don't understand, but go ahead.

(9)   BY MR. ANDERSON:

(10)   Q.   Well, he recommended it in this case.  What I'm

(11) getting at is you've recommended $50,000 per month for 24

(12) months or $1.2 million for David Sills.  And what I'm

(13) trying to figure out is is that something you recommend in

(14) every case or not?

(15)   A.   No.  I mean it just --

(16)   Q.   Okay.  Let me stop you there.  I'm going to stop

(17) you there.  You answered the question.  You don't

(18) recommend it in every case.  What is the methodology and

(19) information that you used to be able to differentiate this

(20) case and recommend it in the case of David Sills versus

(21) others?

(22)   A.   Well, first of all, not every case I do is

(23) reputational harm.  I mean, you know, I put together --

(24) I've done -- as an expert witness, I've told you, I've

(1)  done 30 to 40 as a public relations.  As an expert

(2)  witness, I've done about 75 programs.  I've recommended 75

(3)  programs and each case is different.  You know, each one

(4)  is different than -- I mean the type of reputation harm.

(5)  First of all, what's the magnitude of the reputation harm?

(6)  What's the type of reputation harm?  What's -- how can it

(7)  be addressed?  Some don't require that kind of thing.

(8)  They require something else.  So it's just -- I mean you

(9)  don't cookie cutter these things, particularly.  It just

(10)  -- in this case, it was -- it was needed.  It was

(11)  required.  But no.  I don't -- I don't suggest that in

(12)  every case.  Some I do, some I don't.

(13)  Q.  You then say, the next paragraph down "with

(14)  regard to content, man hours alone for staff or two or

(15)  three professionals to design, implement and monitor for

(16)  two years would easily cost $600,000."  So are we

(17)  essentially saying -- I mean at $600,000 for two or three

(18)  people over two years, I mean we're talking full time

(19)  folks again?

(20)  A.  Yeah.  But those are the people that are

(21)  implementing the program as -- as it is.  Those are the

(22)  people that -- we had a program to start with.  We did a

(23)  program plan.  We had a program.  We started with day one

(24)  that is a program we had planned to go forward with at

Robert Fisher
3:23-cv-00478

(1)  labor.  So 80%, at least, of money in this program is

(2)  going to somebody putting in their time to do something.

(3)  So I just wanted to make that --

(4)      Q.    With respect to this 600,000, did you -- did you

(5)  do any kind of spreadsheet or itemization or anticipated

(6)  budget that breaks it out?

(7)      A.    No.  I didn't do any formal -- I mean I, you know

(8)  -- you know, I factored in -- as I said, basically,

(9)  it's --

(10)     Q.    I'm going to stop you there.

(11)            MS. MCNULTY:  No.  He gets to finish his

(12)  answer.

(13)            THE WITNESS:  Let me finish.

(14)     BY MR. ANDERSON:

(15)     Q.    If we go over time, I mean I've been giving a lot

(16)  of leeway to time.

(17)     A.    I got one sentence.  Just to repeat what I said

(18)  before.  It's mostly hours versus fees.  That's -- that's

(19)  the thing.  So it wasn't a great need for spreadsheets.

(20)  It's a basic hours -- I'm not itemizing costs or anything

(21)  like that.  It's hours versus fees.  There was real no

(22)  need to spell it out that much.

(23)     Q.    Did you rely upon any, you know, literature or

(24)  guidance in coming up with this figure of $600,000?

Robert Fisher
3:23-cv-00478

(1)     A.   Yeah.  I mean in the sense, I'm always looking

(2)  at, you know -- I mean the bottom line is when I was PR

(3)  professional for 42 years, I mean we had local, national,

(4)  regional publications.  I was -- I mean I was going to

(5)  national conferences, seminars, workshops, but I was also

(6)  reading publications that would say what other people were

(7)  doing.  Hell, I wrote articles for those publications, so

(8)  they read what I was doing.  But you know, you keep -- you

(9)  keep track through -- as a PR professional -- as an expert

(10) witness, there's no real publications I know that -- like

(11) magazines or monthly public news letters or something like

(12) that, although I do come across some on the internet from

(13) time to time.  But I try to keep up to speed by looking at

(14) things.

(15)    In PR, we had a lot of -- like the -- like your ABA

(16) journal or national law journal or whatever is equivalent

(17) of what they call the public relations journal.  And there

(18) were others.  And that was kind of the main one and I

(19) would, you know, read -- I mean, you know, I follow -- any

(20) professional read professional publications.  We do that.

(21)    Q.   Sir, my question is not whether you read any

(22) publications.  My question was simply whether -- with

(23) respect to this $600,000 cost, was there any literature or

(24) publications that you would rely on or that would

(1)     reference this methodology that you are aware of, that you

(2)     can identify today?

(3)         A.    No.  I can't identify it today, but they're no

(4)     different than the publications over 40 years I've -- I

(5)     mean we're talking about hourly fees to do certain --

(6)     these actions I'm representing are the same ones that I

(7)     did as a public relations professional for 40 years.  So

(8)     the methodology is the same now as it was then in terms of

(9)     how you cost out -- in terms of how you cost out labor

(10)    versus tasks, things like that.  So yes.  I mean it's

(11)    based on 50 years now between expert witness and PR

(12)    professional of, you know, things I've read, seen, but

(13)    more importantly, interacting with other experts or going

(14)    to conventions, talking to them, asking how they're doing

(15)    work.  And one of the most valuable things in methodology

(16)    is I'm often seeing other people's reports.  A lot of

(17)    times, they hire people to -- I have one case they hired

(18)    five experts to rebut me.  In one case.  Me and five

(19)    others.  I read the reports.  I see what they -- they have

(20)    to list out their methodology.  I mean that's a Rule 26.

(21)    They have to -- in their reports, I have to -- I look at

(22)    their reports and say is their methodology the same as

(23)    mine, and it is.  We all do things that same.

(24)        Q.    Whose reports have you looked at that they say

Robert Fisher
3:23-cv-00478

(1)  the methodology is the same as yours?

(2)      A.   Pardon?

(3)      Q.   Whose -- you just said I look at their reports

(4)  and the methodology is the same.  Whose reports have you

(5)  looked at that the methodology is the same?

(6)      A.   Well, I can't name them off the top of my head,

(7)  but I mean, the bottom line is I've been doing expert

(8)  witness for 18 years -- 19 years.  Most of it, the bulk of

(9)  it was in since 19 -- in 2018, I switched over from being

(10) a full time PR with doing a few expert witness cases from

(11) time to time to doing full time.  So the last seven years,

(12) I've been strictly an expert witness, not a PR.  And you

(13) know, I see -- you know, they hire -- I've been hired to

(14) rebut reports so I would say I see the report to rebut,

(15) you know, that kind of thing.

(16)      I mean I've just -- I got a call or case in Miami

(17) yesterday where they want me to -- to rebut a report in a

(18) major -- major case.  So you know, the bottom line is --

(19) what I'm saying is is that I have direct exposure to what

(20) -- the methodology that other experts use as experts.

(21) Reputation experts and some aren't, you know, professes

(22) and whatever, and I find that they don't do anything

(23) differently than I do.  We all -- our methodology is all

(24) the same.  So I keep up to speed -- if I see they're doing

Robert Fisher
3:23-cv-00478

(1)  any three.

(2)      A.   Yeah.

(3)      Q.   If you pick any three, it's still over $80,000

(4)  per stop.

(5)      A.   Yeah.  Well, then I wouldn't take that -- I mean

(6)  the bottom line is I've got a budget there.  If that

(7)  budget is approved, then if we can stretch that budget to

(8)  put him into six cities instead of three cities, we'll do

(9)  it.  If we have to set him up with a rent a car instead of

(10) planes from place to place to save money, we can do.

(11) You've got to take -- you've got to look at the -- what in

(12) general terms is being allocated, the purpose for it as

(13) opposed to at this point and time getting down to which

(14) particular city, how many cities, you do.  But that is --

(15) that budget is meant to be an allocation to achieve the

(16) purpose of what we're trying to do and not necessarily

(17) which city we go to -- or they go.

(18)     Q.   I take it you don't recommend a professional

(19) media tour in every case of reputational repair, do you?

(20)     A.   Well, again, it depends on the circumstances.  If

(21) -- if we -- if we --

(22)     Q.   Let me stop you.  Do you -- you said it depends

(23) on the circumstances.  Do you recommend this in every case

(24) or not?

Robert Fisher
3:23-cv-00478

(1)    A.   No.  Because some damage might be in Oshkosh,

(2)  Wisconsin.  Why would -- if the damage is in Oshkosh,

(3)  Wisconsin, why would you go to New York?  You just stay in

(4)  Oshkosh.  Every case is different.  It depends on the

(5)  geographical spread of where the damage is, where it makes

(6)  sense to go to that's most impactful, for the bang for the

(7)  buck, so to speak, that you have to spend and no.  I -- I

(8)  -- and every case -- some cases don't involve media at

(9)  all.  I've had reputation damage in a case where there was

(10)  nothing ever in the media.  So you wouldn't do media at

(11)  all.  In this case, it was in the media.

(12)    Q.   What are the factors -- the methodology factors

(13)  and data you relied upon to determine that one, likely

(14)  two, professional media tours were needed for David Sills

(15)  versus not needed?

(16)    A.   Methodology?

(17)    Q.   Uh-huh.

(18)    A.   The methodology is that -- is -- is what is the

(19)  most effective form of communications to reach a broad

(20)  audience to get your message across, and the media is --

(21)  is -- is the effective way to do it because one

(22)  publication may have 800,000 readers or something.  That's

(23)  better than going to 800,000 households.  I mean, you

(24)  know, it's the -- methodology is what -- what

Robert Fisher
3:23-cv-00478

(1) **communications, actions can you take that are most cost**

(2) **effective and to reach the -- to achieve your objectives.**

(3) Q. You say -- what's -- moving on down, what was the

(4) methodology -- you said -- you say 300,000 needed for --

(5) to obtain invitations to speaking and social engagements.

(6) What was the methodology, facts, or data that you used or

(7) relied upon to determine that was necessary in the case of

(8) David Sills?

(9) **A. Well, that's -- that's -- that's the same thing**

(10) **you're -- that's -- that's the -- give me a minute here.**

(11) **Well, that's what we talked about the tours. You're**

(12) **talking about the same thing, the tours. What do you**

(13) **mean? what's your question? What's the methodology?**

(14) Q. Your next sentence down says obtaining

(15) invitations to the most effective speaking and social

(16) engagement should have a $300,000 allocation. So is that

(17) within the -- well --

(18) **A. Yeah. I mean yeah. The bottom line is the -- as**

(19) **I said, face to face contact is the most effective. So**

(20) **while you can go and -- and -- so what we're talking**

(21) **about, those tours or a combination of face to face and**

(22) **also indirect communication -- indirect communications**

(23) **would be the media because you're meeting with a media**

(24) **person or print an article that will be in the papers, but**

Robert Fisher
3:23-cv-00478

(1) aware of any surveys or -- or studies of the general

(2) public out there to determine, you know, if somebody said

(3) do you know who David Sills is?  You're not aware of

(4) anything like that, right?

(5)    A.    Right.

(6)    Q.    I mean why do you have to go out and, you know,

(7) if -- do you have any information about how the general

(8) public nationwide was -- to the extent the general public

(9) was made aware of these allegations against David Sills?

(10)    A.    No.  And I don't really care, you know.  To be

(11) honest with you, somebody in,, again, Oshkosh, Wisconsin,

(12) I don't think they -- they -- they particularly care

(13) whether Sills has a good reputation or not.  We're talking

(14) about focusing on  -- the Southern Baptist Convention, as

(15) I understand it, has 49,000 churches and 14 million

(16) parishioners, if that's the word for it, and the bottom

(17) line is, obviously, we're not necessarily going to go to

(18) Hawaii or all 50 states.  The point is to find where --

(19) determine where the reputation harm geographically is most

(20) prevalent, and then zero in on -- on those areas.

(21)    If we find that somebody in Syracuse, New York happens

(22) to know about, one person there, we're not going to spend

(23) the budget to go to Syracuse to do something.  But yeah.

(24) No.  Both with the tours and with the focus of where we're

(1) that to the Duke student.  The Duke student didn't have a

(2) job.  The Duke student was still a student in college.  He

(3) didn't have a big reputation.  People didn't know him.  He

(4) hadn't written books.  He wasn't -- you know, the bottom

(5) line is you're trying to compare apples to oranges.  Every

(6) case is different.  Every budget is different.

(7)     Q.   I understand.  We're going to get to that where

(8) you opined about the Netflix prosecutor here in just a

(9) minute, which was somebody who was employed.  So we'll get

(10) to that.  So you say $2.6 million was on the high end.  Is

(11) it the highest ever?

(12)     A.   For a program I've had, yes.  It's the highest

(13) that I -- I've -- now it's not the high -- God, no.  As I

(14) said, the one case wanted 21 million.

(15)     Q.   I asked about the highest you did, sir.

(16)     A.   It's a piddling -- I've seen other cases --

(17)     Q.   Sir, I -- sir.  I need -- I just asked is it the

(18) highest you've done.  I think you said yes.  If you've

(19) answered the question, we can move on.

(20)     A.   Yes.  The highest I've done.  You said is it the

(21) highest -- repeat the question.  You didn't say is it the

(22) highest I've done.  You said it's the highest ever.  So if

(23) you want to repeat the question --

(24)     Q.   I said is 2.6 million the highest program you

Robert Fisher
3:23-cv-00478

(1)   have done in terms of costs?

(2)      A.   Yes.  Yes.  Answer, yes.

(3)      Q.   I think we're on Exhibit 4.  And it is a report

(4)   that you did -- well, let me -- let me ask you.  I got it

(5)   on the screen.  Do you recognize this document?

(6)            MS. MCNULTY:  Jon, it's not on our screen,

(7)   but which one is --

(8)            MR. ANDERSON:     I'm sorry.  Sorry, sorry,

(9)   sorry, sorry.

(10)           MS. MCNULTY:  Which one is it?  Which case?

(11)           MR. ANDERSON:  The Linda Fairstein.

(12)           THE WITNESS:  That -- that was a --

(13)           MS. MCNULTY:  Wait.  There's no question

(14)   pending.

(15)           (WHEREUPON, DEPOSITION EXHIBIT NO. 4 WAS

(16)           MARKED FOR INDENTIFICATION AND IS ATTACHED

(17)           HERETO)

(18)     BY MR. ANDERSON:

(19)     Q.   Do you recognize this document?

(20)     A.   You shouldn't have this document.

(21)     Q.   Well, it's publicly on Pacer, so you can see

(22)   where I got it.

(23)     A.   That is a privileged -- I mean that was under

(24)   seal.  That case --

(1)     Q.   Okay.  And it looks like here, and if I'm looking

(2)  at -- this would be page 7.  It says that Netflix, when

(3)  you talk about Netflix, Inc., Netflix has 222 million paid

(4)  members in 190 countries, correct?

(5)     **A.   Yes.**

(6)     Q.   And then if I go to page -- bear with me here as

(7)  I find it.  Now here at the top of page 11, it says "the

(8)  series four episodes of 74 minutes each was viewed in 190

(9)  countries.  According to IMDB, it had 27 distributors who

(10)  provided the series to all corners of the globe."  Did I

(11)  read that correctly?

(12)     **A.   It sounds good.  I didn't see it at the time.**

(13)     Q.   So I mean 222 --

(14)     **A.   I heard what you said, yes.  I see it now.**

(15)  **Series four episodes of 74 minutes each was viewed --**

(16)  **yeah.  I see that, yeah.**

(17)     Q.   And it looks like while it's redacted here, it

(18)  says there's a portion redacted and it says and it

(19)  received 16 Emmy nominations.  So was this series -- this

(20)  -- this "Where They See Us" or whatever it was called, it

(21)  received -- did it receive 16 Emmy nominations?

(22)     **A.   I don't know.  I assume so.  If it says that,**

(23)  **yes.**

(24)     Q.   And so 222 million subscribers, 190 countries and

(1)     16 Emmy nominations, is it fair that that -- that this

(2)     documentary was widely disseminated to millions if not

(3)     tens of millions of folks?

(4)         **A.   That's probably fair.**

(5)         Q.   And actually -- now so if we scroll down, I think

(6)     as you did here, you had a section in your report, but if

(7)     we scroll down to page 28 of this report, there's a

(8)     heading that days Media Coverage.  Do you see that?

(9)         **A.   Let me get to page 28.  Okay.  I'm on 28.  Media**

(10)    **coverage, yes.  I see it.**

(11)        Q.   And we see New York Post, New York Times, and

(12)    History Verse Hollywood; do you see that?

(13)        **A.   Uh-huh.**

(14)        Q.   I'm going to represent to you, I'm going to

(15)    scroll through.  I think we see USA Today.  There's

(16)    several pages of this.

(17)        **A.   Yes.**

(18)        Q.   We see LA Times, Hollywood Reporter --

(19)        **A.   Oh, yeah.  Every major publication --**

(20)            **MS. MCNULTY:  Hang on one second.  Hey, Jon,**

(21)    **can we take a two minute break.  We can stay on.  I've got**

(22)    **the -- we think there's a mistake in this docket.  I've**

(23)    **got the lawyers on the other line.  I'll be right back.**

(24)            **VIDEOGRAPHER:  This concludes Part 4.  The**

Robert Fisher
3:23-cv-00478

(1)     Q.   -- our break --

(2)     **A.   Proceed.   Proceed.**

(3)     Q.   Mr. Fisher, we were scrolling through here

(4)  starting on page 28 of this -- this -- I'll call it the

(5)  Netflix or Fairstein report.  But there was --

(6)     **A.   Yeah.   The media coverage --**

(7)     Q.   There was significant media coverage I think that

(8)  this bullet point list, Wall Street Journal, I mean it

(9)  goes on several pages.  Do you agree?

(10)    **A.   Oh, yeah.   I had -- I think I listed over 100**

(11)  **publications and there were probably more, but I, you**

(12)  **know, cut off at a certain point, but yes.   It got -- you**

(13)  **know, I mean it's the Central Park 5 case.   I mean that**

(14)  **was in 1989.   People, you know, it was a famous case.   I**

(15)  **mean and it got a lot of coverage.   Fairstein was a very**

(16)  **high profile person, too, nationally and --**

(17)    Q.   Was this media coverage after the Netflix

(18)  documentary?

(19)    **A.   Yes.   Yes.   I believe --  yeah.   I didn't bother**

(20)  **-- yeah.   It was all -- I believe it was all -- yeah.   No.**

(21)  **No.   Social media.   Wait a minute.   Yeah.   The -- the**

(22)  **Netflix series was, I believe in 2018, if I remember**

(23)  **right.   Yeah.   And all of this is after.   I believe some**

(24)  **of it -- I won't say all of it, but I think -- I would say**

Robert Fisher
3:23-cv-00478

(1) probably two-thirds of it is after -- I think some was

(2) before, but I think -- about 80% of it was probably after

(3) the -- after the coverage.

(4)   Q.   And I think there was some -- and bear with me

(5) again.  Sorry everyone on there if you get motion

(6) sickness.  I think your report also listed -- was there

(7) like -- I think I saw in there that there was a change.org

(8) petition against her.  Do you recall that?

(9)   A.   Yeah.  I think -- I think there was two in that

(10) case.  You know, they were after her.  They -- yeah.  I

(11) think there was, if I remember.

(12)   Q.   Was she accused of being racist?

(13)   A.   Oh, yeah.  Obviously.  From the beginning.  You

(14) know they said that she railroaded these -- well, five

(15) were black and one was Hispanic, and they were -- there

(16) were five of them.  Four were black and one was Hispanic.

(17) Yeah.  They said that she, you know, it was a racist thing

(18) all the way from the beginning.  That she railroaded these

(19) kids because they were -- they were, you know, Hispanic

(20) and black running through Central Park.

(21)   Q.   And I think here, looking at page 55, that you

(22) have a heading that said Negative Impact from Social Media

(23) Resulting from the Netflix Series, and you mention how

(24) there are 460,000 tweets during the launch weekend of the

(1) series.  Do you see that?

(2)          MS. MCNULTY:  I'm going to make an

(3) objection.  Form.  Relevance.  Go ahead.  Page 55.

(4)          THE WITNESS:  I'm down to 56.  Yeah.  I'm on

(5) 55.  Some redactions on there.

(6)    BY MR. ANDERSON:

(7)    Q.   But at the bottom, there's some -- it says

(8) Negative Impact --

(9)    A.   Yeah.  460,000 tweets. 1428 million video views.

(10) Yeah.  I see it.

(11)    Q.   And you say here, you note at the bottom, the

(12) hashtag, hashtag cancel Linda Fairstein was instituted on

(13) Twitter and you list some of the comments made.

(14)          MS. MCNULTY:  Objection.  Form.  Relevance.

(15) Go ahead.

(16)          THE WITNESS:  Yeah.  I see -- I see it.

(17)    BY MR. ANDERSON:

(18)    Q.   Okay.  and there was a lot of, obviously, very --

(19) here's one.  You are a monster, a horrible racist woman.

(20) So there were some pretty significant comments and

(21) impressions made about her, right?

(22)    A.   It said hang her or burn her at the stake.  Hang

(23) her.  You know, I hope she gets in jail and they do to her

(24) -- you know, I mean.  Yeah.  It was pretty bad.  It's --

Robert Fisher
3:23-cv-00478

(1) they castigated her in every way, shape, and form.

(2)     Q.   I want to scroll to 70 -- I think it's -- it

(3) starts on 73 of this report.  Well, at the bottom of 72

(4) and 73 -- the bottom of 72 it says program overview.  Do

(5) you see that?

(6)     A.   Bottom -- bottom of 72?

(7)     Q.   Yes.

(8)     A.   Okay.  I got that.  And if we scroll on down, on

(9) 73, we see program activities.  Do you see that?

(10)     A.   I see it.

(11)     Q.   And it looks like you list a lot of -- I take it,

(12) it looks like that introductory paragraph is, if not

(13) identical, substantially similar to what we read in this

(14) case; is that fair?  And you've testified --

(15)     A.   A great deal of it is the -- actually, in this

(16) case, there's more things then there were in this one, but

(17) this one was done, what, three or four years ago.  I can't

(18) -- '22, yeah.  Three years ago.  Yeah.  There -- there are

(19) more in the current case program than there are in this

(20) one, but the ones here are pretty much the same.

(21)     Q.   So we all see the same thing about audit and

(22) assessment?

(23)     A.   Yeah.  Yeah.  I see.

(24)     Q.   Program planning.  These -- these program