(1)    Q.  What are the factors, methodology and analysis

(2) different between this case with such significant

(3) dissemination exposure and David Sills that would result

(4) in almost a fourfold increase in the cost of a program?

(5) How do you account for that?

(6)         MS. MCNULTY: Objection. Form. Relevance.

(7) Incomplete hypothetical. Calls for speculation. Beyond

(8) the scope.

(9)         THE WITNESS: Well, I can answer that.

(10) First and foremost, let me go back to earlier in the

(11) testimony. We're talking about the Trump case. When the

(12) gal asks for 12 to 21 million, as you remember, I

(13) testified that I excoriated her and said that's ridiculous

(14) because only a million would be needed. Why would only a

(15) million be needed when she was asking for 12 to 21. And I

(16) said at -- testified at the time that the reason is is

(17) because the Trump case would be national news and if she

(18) prevailed in the case, she basically wouldn't need a

(19) reputation damage repair program because there was

(20) coverage -- it was covered on the daily basis in the news.

(21) Every day it was covered in all of the network TV,

(22) newspapers, AP, and whatever. So everyone knew what was

(23) going on, but more importantly, when the case was over and

(24) she prevailed, which she did, that everyone would know it

(1) so her slate would be wiped clean and she wouldn't -- she

(2) wouldn't need a program because already -- what's the

(3) purpose of the program? It's public awareness as much as

(4) anything else. Everyone would know. So why would she

(5) need a program? I mean for the most part. She might need

(6) to clean up some things, so I figured a million dollars.

(7) Turned out, I was right. She got 1.7.

(8)     But that's the difference. This -- this -- the main

(9) difference is no one is going to know -- there's not going

(10) to be any reporting on this internationally or nationally.

(11) No one is going to know that if he prevailed in the case.

(12) No one is going to know. So while that case didn't need a

(13) reputation damage program, this one has to start from

(14) scratch. Beyond that, as I said, I -- I -- there were

(15) more elements in this case than there was in the Trump

(16) case that I -- more actions. For instance, I --

(17)     BY MR. ANDERSON:

(18)     Q.   Let me stop you because you're talking about the

(19) Trump case.

(20)     A.   No, no, no. I'm talking about this case. I'm

(21) talking about this case.

(22)             MS. MCNULTY: He's talking about methodology

(23) relevant to this case.

(24)             THE WITNESS: No. I'm not talking about

(1)   had said if somebody in Oshkosh, who's just a member of

(2)   the general public, we don't really care about.  I mean so

(3)   I thought we had established we're concerned with the

(4)   religious evangelical community and less about the general

(5)   public.  So why with David Sills do we have to go out and

(6)   reach the general public?

(7)       A.   Well, you're right.  It is a narrower focus, but

(8)   I mean you know, it takes as much time to get an article

(9)   in the Dallas paper as it does to get an article in the

(10)  national paper.  So the bottom line, even though we don't

(11)  go after as many media, the time to go after it's many

(12)  media -- I mean it's still takes the same time to go after

(13)  a regional publication as it does a national publication,

(14)  it would reach the whole country.  So I mean, you know,

(15)  the time isn't cut that much short -- I mean some of the

(16)  things would take just as much time to impact 80,000 as it

(17)  would 300 million I think is in the US.  Something like

(18)  that.  So, you know, that's -- that's partially it.  I

(19)  mean, you know, the bottom line is every case is

(20)  different.  You can't necessarily -- this is apples --

(21)  oranges and apples situation and -- but anyway, that's --

(22)  that's the main reasons why there's such a discrepancy

(23)  between the two.

(24)      Q.   Do you -- do you believe if David Sills were to

(1)    -- I think you might have said this earlier, but if David

(2)    Sills prevails in this case, would you expect religious

(3)    publications, Baptist publications that, you know, had

(4)    previously reported to carry that story?

(5)                MS. MCNULTY:  Objection.  Form.

(6)                THE WITNESS:  Frankly, I don't know.  I mean

(7)    it depends on what their political bent is.  They may feel

(8)    -- they may feel he's still guilty so why should I give

(9)    him exposure, you know.  The SOB sexually abused her, so

(10)   why should I -- I, you know, say that some court --

(11)   kangaroo court let him off or something like that.  I mean

(12)   I don't know whether they would pick up his grudgels, so

(13)   to speak, and -- and whitewash him.  I -- I -- he wouldn't

(14)   know until he did it.

(15)    To be honest with you, I'm not -- I'm not that familiar

(16)   with the mindset of religious publications whether they

(17)   protect their own or whether they would say boy, he's

(18)   innocent.  Let's go out and ballyhoo the fact that, you

(19)   know, he's innocent.  I don't know.  You wouldn't know

(20)   until he actually did it, but I think it would cut 50/50

(21)   frankly that some would say we -- we need to atone for our

(22)   sins or so -- I mean he's cleared of the thing and where

(23)   others would say, well, he got off, but you know, we know

(24)   he's still guilty.  So it's hard to say.

Robert Fisher
3:23-cv-00478

(1)     BY MR. ANDERSON:

(2)     Q.   Well, I mean with -- with -- you mentioned the

(3)  Trump case.  We talked about this Netflix.  You said one

(4)  of the reasons it's lower is because you knew that if they

(5)  prevail from the results of litigation, there wouldn't

(6)  hardly be a need for one because it would be covered.  Are

(7)  you assuming -- I mean how -- how -- how do you know it

(8)  would be covered then if you're saying you can't assume it

(9)  would be covered in the religious community here?  What's

(10)  the difference?

(11)     A.   Well, because the religious community is a

(12)  cottage community.  I mean it's -- I mean in one case,

(13)  you're talking about the general populous or the nation's

(14)  population or the media and how they act.  The other,

(15)  you're talking about a subset of it.  What is that anyway?

(16)             MS. MCNULTY:  Air show.

(17)             THE WITNESS:  An air show?

(18)             MS. MCNULTY:  Yeah.  They're training for

(19)  the air show.

(20)             THE WITNESS:  I'm sorry.  Anyway, the other

(21)  is a subset -- I mean you know, my experience in 45 years

(22)  as a PR professional was -- was dealing with a -- with --

(23)  in a generic terms with the media or something like that.

(24)  I haven't -- to be honest with you, I haven't really --

Robert Fisher
3:23-cv-00478

(1)  none of my clients over the years were religious, that I

(2)  can remember, so I -- I don't know what the -- how

(3)  protective the religious media are or whether they --

(4)  let's circle the wagons kind of thing, you know to protect

(5)  the SBC or whatever.  So I mean I actually -- I don't

(6)  know, but I don't think you could assume one way or the

(7)  other, whether they're going to be supportive or not

(8)  supportive.

(9)     BY MR. ANDERSON:

(10)    Q.   But if -- let's -- let's hypothetically assume

(11) that he prevails and it gets widespread coverage in the

(12) religious community, the fact that he prevailed.  That

(13) could obviously communicate quite a bit from a

(14) reputational repair standpoint and what might be needed in

(15) a program.  Do you agree with that?

(16)    A.   Well, that would be certainly helpful, yeah.  I

(17) mean if they -- if they fell on their sword and said we

(18) were wrong.  We misjudged this man and -- or we bought the

(19) -- you know, we drank the Kool-Aid that was put out by the

(20) SBC or whatever.  Then -- that he was guilty.  Then -- or

(21) the GP report or whatever.  Then yes.  Then if they were -

(22) - if they were -- if they were willing to admit they were

(23) wrong and then go ahead and say it was wrong, that

(24) certainly would be helpful, yeah.  It's not the -- but

Robert Fisher
3:23-cv-00478

(1)    for consultants over two years and Linda Fairstein didn't?

(2)              MS. MCNULTY:  Objection.  Form.  Incomplete

(3)    hypothetical.  Irrelevant as to Fairstein.  Asked and

(4)    answered as to David Sills.

(5)              THE WITNESS:  Well, because -- the answer to

(6)    that is because of the nature -- the Fairstein thing

(7)    didn't need consultants because I mean it was pretty much

(8)    cut and dry.  I mean her -- her thing was -- was pretty

(9)    much cut and dry.  She was a nationally known figure where

(10)   -- where Sills wasn't.  I mean her issues were, you know,

(11)   black and white, so to speak.  In the Sills thing, there

(12)   was a lot of, you know, gray areas that you need to fill

(13)   in the blanks, so to speak on that.  So it would -- it

(14)   would have taken a more intensive program with Sills.  I

(15)   mean first of all, he's an unknown person, so you have to,

(16)   in a way, to do the program.  You have to build his -- the

(17)   recognition of who he was before Ms. Lyell came around or

(18)   came forward.  Let's put it this way.  You have to build

(19)   up that he was esteemed professor, he was an international

(20)   traveler, then he was a book, you'd have to indemnify who

(21)   he was, where everyone knew who Fairstein was.  So you had

(22)   -- you had to get -- create an awareness for him before

(23)   you could address the reputation harm that happened to him

(24)   almost.  And as I said, there's no -- in these kind of

(1)  case, it would -- there was not a lot of explanation

(2)  needed.  It was just okay.  That's it.

(3)     Sills is an unknown figure that no one knows.  And

(4)  frankly, to make the case, you would have to -- you would

(5)  almost have to build his reputation back up before you

(6)  could try to -- to get rid of the damage.  You'd have to

(7)  -- people would have to know what they were talking about.

(8)  You know, who's this obscure professor from -- I can't

(9)  remember.  Was he from Washington?  I can't remember the

(10) part where he was from, but -- but the point being is that

(11) -- as I say, again, I'm saying that no cases are alike.

(12) There are different needs, different requirements,

(13) different ways to approach things, different strategy,

(14) different -- I mean the activity --

(15)    BY MR. ANDERSON:

(16)    Q.   Let me -- let me ask you this.  So you say no

(17) cases are alike.  Okay.  And so like as an expert in your

(18) field, when somebody, you know, say I got a David Sills

(19) and Linda Fairstein, but what methodology or literature

(20) identifies the factors and information that one would look

(21) to to rely upon in determining what is required for a

(22) program in someone in David Sills' situation versus Linda

(23) Fairstein?  Is there any kind of literature or guidance

(24) you could look at?

(1)     area.  You know, it was something like that.

(2)        It's different with -- with -- you can't compare it to

(3)     Sills.  Sills is -- half of the United States falls in

(4)     Sills category.  Plus, international countries.  So you

(5)     know, you can't compare somebody that was harmed in a

(6)     three county area to someone that was in 40 different

(7)     countries and the lower half of the United States.  I

(8)     mean, you know, again, you can't -- you can't compare

(9)     them.

(10)       Q.   How did you determine that the harm with Morehead

(11)    was confined there versus Sills if you did no surveys or

(12)    -- or other of those analytics you've discussed?

(13)       A.   Because harm to him is he was only known in that

(14)    area.  No one knew Morehead outside -- do you think

(15)    someone in Sioux City, Iowa knew who Morehead is?  There's

(16)    no damage to someone if they don't know who you are or

(17)    care who you are, you know.  You know, Sills is -- Sills

(18)    is different.  I mean he had -- he had -- he was a private

(19)    person, but he was, you know, -- he had a reputation in a

(20)    religious community that had 49,000 churches and 14

(21)    million parishioners that are spread around several states

(22)    and throughout -- I mean the Southern Baptist Convention

(23)    is a very powerful, large, powerful organization --

(24)    religious organization, and, you know, there's word of

(1)  mouth that spread, all the preachers know each other.

(2)     Q.   Would you agree that if we just take out the

(3)  general public.  If we put a box around the Southern

(4)  Baptist community, would you agree in that community that

(5)  David Sills -- would you consider him a public figure?

(6)     A.   No.  No.  Because I mean -- maybe among the

(7)  hierarchy they know him, obviously, but I wouldn't say

(8)  necessarily that the rank and file -- not before this all

(9)  came about.  If Jennifer Lyell had kept her -- her

(10) complaints to herself and if the -- if the Baptist Press

(11) hadn't done an article and particularly if Guidepost

(12) hadn't done a bogus investigation -- boy, was that a bogus

(13) investigation.

(14)    Q.   Well, let me say that.  Let me ask you that.  Has

(15) a court in New Mexico --

(16)         MS. MCNULTY:  He's in the middle of an

(17) answer, Jon.  I appreciate you want to move things along,

(18) but --

(19)    BY MR. ANDERSON:

(20)    Q.   All right.  Keep going.  I'll let you -- because

(21) we're going to come back to the one in New Mexico court or

(22) Arizona court said about your investigation opinions, but

(23) go ahead.

(24)    A.   Pardon?

(1)     addressed by your plan, and I'd like to put as Exhibit 8,

(2)     a Tennessean report -- excuse me -- a Tennessean article

(3)     dated February 14, 2020.  You don't have a subscription to

(4)     the Tennessean, do you?

(5)         **A.   No.**

(6)                 **(WHEREUPON, DEPOSITION EXHIBIT 8 WAS**

(7)                 **MARKED FOR IDENTIFICATION AND IS ATTACHED**

(8)                 **HERETO)**

(9)         **BY MS. MCNULTY:**

(10)        Q.   Okay.  And I'm just going to indicate to you,

(11)    this is a article published by the Tennessean on February

(12)    14, 2020, and it has to do with Frank Paige, but there's

(13)    also reference to David Sills.  This is the type of

(14)    article that -- strike that.

(15)        This is type of publication and news outlet that your

(16)    plan would address; isn't that true?

(17)        **A.   Yes.  It's a daily newspaper and this certainly**

(18)    **-- you know, it's a public daily newspaper that goes to**

(19)    **all the citizens.**

(20)        Q.   Okay.

(21)        **A.   And it's not a trade publication.  It's not a**

(22)    **religious publication.  It's a general newspaper.**

(23)        Q.   And I'm going to mark as Exhibit 9 a Fox News

(24)    article dated May 23rd, 2022.  Go ahead and take a look at

308

Robert Fisher        8/14/25

REPORTER'S CERTIFICATE

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:

        I, Shawna Hyde Meeks, Notary Public within and for

the State of West Virginia, duly commissioned and qualified,

do hereby certify that the foregoing deposition of ROBERT J.

FISHER was duly taken by and before me, under the West

Virginia Rules of Civil Procedure, at the time and place and

for the purpose specified in the caption thereof; the witness

having been duly sworn by me to testify the whole truth and

nothing but the truth concerning the matter in controversy.

        I do certify that the said deposition was correctly

taken by me by means of stenomask and speech recognition;

which is reduced to written form under my direction and

supervision, and that this is, to the best of my knowledge

and belief, a true and correct transcript of the testimony

given by said witness, and meets the requirements set forth

within article 27, chapter 47 of the West Virginia Code.

        I further certify that I am not connected by blood

or marriage with any of the parties to this action, am not a

309

Robert Fisher        8/14/25

relative or employee or attorney or counsel of any of the

parties, nor am I a relative or employee of such attorney or

counsel, or financially interested in the action, or

interested, directly or indirectly, in the matter in

controversy.


                                          th
          Given under my hand this 25  day of August, 2025.


          My commission expires March 15, 2030.


                    _____
                    Shawna Hyde Meeks, CCR
                         Notary Public


               *************************
          Quoted material in this transcript is verbatim
             And may/may not reflect a direct quote.

# EXHIBIT 2

## REDACTED COPY OF THE SUPPLEMENTAL EXPERT REPORT OF ROBERT J. FISHER, DATED AUGUST 8, 2022

## UNREDACTED VERSION TO BE FILED UNDER SEAL



DEPOSITION
EXHIBIT
4
Fisher

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No. 1:20-cv-08042-PKC

LINDA FAIRSTEIN

v

NETFLIX, INC., AVA DUVERNAY AND ATTICA LOCKE

---

## SUPPLEMENTAL EXPERT REPORT PREPARED FOR PLAINTIFF LINDA FAIRSTEIN BY ROBERT J. FISHER

---

## BACKGROUND AND QUALIFICATIONS

### General Summary

I am a veteran public relations, advertising, marketing and communications executive and counselor and journalist with 54 years of experience, including 42 years operating my own communications firm, Fisher & Associates, Inc., located in the Los Angeles, California. During my professional career, I have provided counsel and services to clients in a broad range of businesses, professions and industries as well as to nonprofits and government entities on a local, national and international basis as required.

While I am a communications generalist through the breadth of my professional background and experience (e.g. journalism, public relations, marketing, advertising), I am also a nationally-recognized expert in crisis communications, reputation management and image repair and counseling. My firm was a (and possibly the) national pioneer in creating and developing public relations and marketing/communications programs for the legal profession. My firm has provided litigation support for over 100 civil and criminal cases (including trials) throughout the United States. Additionally, for the past 16 years I have served as an expert witness and for decades have functioned as an expert information source and analyst for the mass media on issues relating to crisis communications, damaged image and reputation.

### Litigation Experience

Because of my 42-year background in representing law firms and being involved in litigation and trials, handling communications and the "Court of Public Opinion," I have amassed a great amount of background and experience in the judicial process and all aspects of litigation. This has led to me periodically receiving calls from throughout the U.S. from those who needed aid and counsel. A brief list of some of the major litigation in which I was called to provide counsel or services, includes:

- Iranian Hostages before the U.S. Supreme Court (Washington, D.C.)
- Dennis Wilson (Beach Boys) Estate Dispute (Los Angeles)
- Maxicare Bankruptcy (Los Angeles)
- United Airlines Crash in Iowa Cornfield (Chicago)
- International Organization Branded Cult (Scottsdale, Arizona)
- Legislature Threat to Ban Brothels in Nevada
- High School Students Killed (Paducah, Kentucky)
- Rodney King Trial (Los Angeles)
- IRS Indictment of CPA Firm for Tax Fraud (San Francisco)
- Homeowners Facing Loss of Homes (Los Angeles)
- BKK/BFI Landfill Fraud (Southern California)
- Firestone Tire Class Action Lawsuit re Defective Tires (Los Angeles/Washington, D.C.)

## Media Expert/Analysis

As a direct result of my involvement in many litigious situations (many high profile), over the past few decades, I have often been sought out by the media as an expert information source and analyst to provide background, information, interpretation and analysis, commentary and opinions on news, issues and matters relating to those people, businesses, institutions, governments, etc. who were controversial, in conflict or in trouble. Generally, this related to what the public perception of the situation was, how could it be changed by those involved and what damage has or was it causing to their image, reputation or brand in the short and/or long terms. As an example, with both of the O.J. Simpson civil and criminal trials, and in-between the two, I was regularly interviewed by local, national and international print and electronic media as an expert media information source and analyst.

## Expert Witness

In 2006, due to my long career in journalism, public relations, marketing and advertising, I began providing service to litigants as an expert witness. Since then I have served as an expert witness in approximately 76 cases – 66 related to defamation or reputational harm - on behalf of both Defendants and Plaintiffs in 27 states throughout the United States (California, New York, Florida, West Virginia, Georgia, North Carolina, Mississippi, Virginia, Utah, Tennessee, Illinois, New Mexico, Nevada, Hawaii, Washington, Colorado, Minnesota, Maryland, Wisconsin, Louisiana, Delaware, Texas, Kentucky, Arizona, Texas, Michigan, Alabama) plus the District of Columbia. I have provided sworn testimony in depositions, hearings, arbitration hearings and trials. The bulk of the cases have primarily been in the areas of journalism, defamation (libel and slander) and public opinion/perception. I have also been involved in cases relating to professional malpractice, overbilling, inappropriate billing, loss of image and reputation, professional business operation and damage to a future professional career.

## Education

San Jose State College          Bachelor of Arts degree      Public Relations (1966)
University of California at Los Angeles (UCLA) Periodic courses taken to upgrade knowledge.
Numerous seminars, workshops and other education forums to enhance knowledge.

## Professional Experience

- New York Times          Newspaper          Reporter

Confidential

- Los Angeles Beautiful, Inc.
- Harshe, Rotman & Druck
- Burson-Marsteller, Inc.
- Atlantic Richfield Plaza
- Doremus & Company
- Fisher & Associates, Inc.

Non-profit organization
National PR Firm
National PR Firm
Shopping Center
National PR Firm
PR Firm (Founded 1978)

Public Relations Director
Asst. Account Executive
Account Executive
Promotion Director
Account Supervisor
President

Related Experience

While in the United States Army (1966-68), I served as a Public Information Officer in West Germany. I provided traditional public relations counsel and services for the Army and I also interacted with the German media/community.

Awards and Honors

I have received numerous awards from local and national public relations and marketing organizations for my counsel and service to clients during my four-plus decade career.

Professional Memberships

- Public Relations Society of America (former Executive Committee Member of Counselor's Academy)
- Public Communicators of Los Angeles (officer for five years)
- Institute of Management Consultants (board member)
- Public Interest Radio and Television Education Society
- American Heart Association (Vice Chairman, Communications Committee)

Lectures and Publications

Throughout my professional career, I have spoken and written on a wide variety of subjects related to public relations, marketing and communications for business as well as for specialty areas (e.g. crisis communications, legal marketing/litigation support).

- Lectures/Presentations – I have lectured at universities (e.g. UCLA), to national conventions (e.g. American Bar Association) and at a variety of speaking forums (e.g. weekly/monthly meetings, seminars, symposiums) held by a diverse range of professional and business organizations.

- Publications – I have written a large number of articles for a variety of local, regional and national general, business, professional (e.g. legal) and trade publications, online and offline, including newspapers, magazines, newsletters and websites. (I have also been interviewed for, quoted in and had articles written about me in local, regional and national legal publications.)

- Defamation/Reputation Harm Articles – Among the articles I have written specifically addressing reputation damage and defamation have included:

   - *"Image/Reputation/Brand Damage: Does Litigation Solve the Problem?"*
   - *"Defamation: The Stain That Can Never Be Removed."*
   - *"Negative Communications: The Process of Absorption and Transmission."*

Confidential

- *"Harmful Media Exposure: Beware of the Hidden Sources of Damage."*
- *"Defamation: Guiding Principles of Negative Communications That Result in Image and Reputation Damage."*
- *"Defamation Defense: Is there a Third Bite of the Apple."*
- *"Image/Reputation Damage From Media News Reports: Is it Legally Actionable."*
- *"Reputation Damage Can Emanate From Actions/In-Actions...As well as Words."*
- *"Defamation Cases: Why an Expert Witness is Vital."*

## LEGAL INFORMATION

Following is a list of cases for which I have provided testimony over the past four years.

During this period I have had my deposition taken 14 times:

- October 10, 2017 and November 6, 2017 – *Lewis M. McLeod v. Duke University, Suzanne Wasiolek, Stephen Bryan, Dr. Cecile Irvine Bradshaw (nee Cecile Starke Irvine) aka Dr. Celia Irvine Starke Irvine) aka Dr. Celia Irvine*, Superior Court, Durham County, North Carolina.

- April 18, 2018 – *UTC-10 Consulting LLC and Brian McKee v. Board of Water Supply, City and County of Honolulu*, Circuit Court of the First Circuit Court, State of Hawaii.

- December 19, 2018 – *Ohana Military Communities, LLC and Forest City Residential Management, LLC v Cara Barber*, United States District Court, District of Hawaii.

- May 8, 2019 – *Robert Gish, M.D.; Robert G. Gish Consultants, LLC v Celeste E. Le Sage*, Superior Court of California, County of San Diego.

- January 23, 2020 – *Kenneth L. Creal and Kenneth L. Creal, an Accountancy Corporation v Amitiss Nasiri,* Superior Court of the State of California for the County of Los Angeles.

- January 31, 2020 – *Examination Board of Professional Home Inspectors and American Society of Home Inspectors, Inc v International Association of Certified Home Inspectors and Nickifor Gromicko a/k/a Nick Gromicko.* United States District Court for the District of Colorado.

- February 27, 2020 – *Party Animal, Inc v Evanger's Dog and Cat Food Co, Inc., Nutripack, LLC,* United States District Court, Central District of California.

- June 12, 2020 – *Riley's American Heritage Farms, James Patrick Riley v James Elsasser, Steven Llanusa, Hilary LaConte, Beth Bingham, Nancy Treser Osgood, David S. Nemer, Ann O'Connor, and Brenda Hamlett,* United States District Court Central District of California – Eastern Division.

- February 24, 2021 - *Hebrew Health Homes Network, Inc., Arch Plaza, Inc. Arch Plaza Properties, Inc. Aventura Plaza, Inc. Jackson Plaza, Inc., Hebrew Homes of Miami Beach, Inc., Ponce Plaza, Inc. Ponce Plaza Properties, Inc., Hebrew Home Sinai, Inc., South Beach Plaza, Inc., Hebrew Homes of South Beach, Inc., South Beach Nursing and Rehabilitation Center, Inc., University Plaza Rehabilitation and Nursing Center,*

4

Confidential

*Inc., University Plaza Properties, Inc., Hebrew Homes management Services, Inc. v Greenberg Traurig, P.A.,* a Florida Corporation, Greenberg Traurig, LLP, a New York Limited Liability Partnership and William B. Eck. Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

- April 27, 2021 – *Russ Newman v American Psychological Association (APA), David H. Hoffman, Sidley Austin LLP and Sidley Austin (D.C.) LLP.* American Arbitration Association, Washington, D.C.

- June 18, 2021 - *The Law Offices of Brenden R. Appel and Brenden R. Appel v Georgia's Restaurant and Pancake House, Inc. and Harry Kulubis.* Circuit Court of Cook County, Illinois County Department, Law Division

- December 10, 2021 – *Legno Bastone, Inc. v Provenza Floors, Inc. and Brian J. Sullivan.* In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida Civic Action.

- March 16, 2022 – *Doan Restoration of Arizona, LLC and Doan Restoration of Michigan, LLC v Paul Curtis, Jane Doe Curtis and PR&C Specialities, LLC,* State of Michigan, In the Circuit Court for the County of Oakland.

- April 7, 2022 – *Michael Coleman and Jamael Stewart v City of Delray Beach.* In the Circuit Court of the 15th Judicial District in and for Palm Beach County, Florida.

During this period, I have testified at the following two arbitration hearings:

- On June 6, 2016, I provided video testimony at the American Arbitration Association hearing in the case of *Lopez v. UnitedHealth Groups, Inc.*, referenced above.

- On December 11, 2019, I testified at an arbitration hearing in the case of *Susan M. Packard v Morgan Stanley,* Financial Industry Regulation Authority, Washington, D.C.

During this period I have testified in three jury trials:

- On January 24, 2020, I testified in the trial of *Harry Loveland; Charlene Loveland v Sol Del Cielo, LLC; Abraham Sandoval, Jr, an individual; M. L. Culkin Construction Company, Inc.,* Superior Court of California County of Los Angeles.

- On February 24 and March 2, 2020, I testified in the trial of *Justice Protection Project, Lenore Albert v Xcentric Ventures LLC, Yelp, Inc. George Olivo, Megan Nikolic, Pam Ragland, Karen Rozier, Sheryl Alexander and Rene Dawson,* Superior Court of California County of Orange.

- On February 25, 2020, I testified in the trial of *Nicholas Krakana v Scottsdale Police Department,* United States District Court, District of Arizona.

During this period, I have testified in one bench trial:

- On September 21, 2021 I testified in the trial of *Kenneth L. Creal and Kenneth L. Creal, an Accountancy Corporation v Amitiss Nasiri,* Superior Court of the State of California for the County of Los Angeles.

5

Confidential

Assignment

I am a veteran communications professional, executive and counselor – acquired from my background as both a journalist (reporter for the New York Times) and a half-century career in the communications fields of public relations, advertising and marketing. I have been also acknowledged nationally by the legal profession and news media as an expert in the field of crisis communications and image/reputation management and damage repair. Additionally, I am an experienced expert witness who has been involved in approximately 76 cases, 66 of which were defamation or reputational harm-related cases. Due to that experience and expertise, I have been retained by the law firm of Nesenoff & Miltenberg LLP to serve as an expert witness in this case on behalf of the Plaintiff, Linda Fairstein. Specifically, I have been asked to analyze and offer my insights, comments, conclusions and opinions regarding the reputation harm and damage to the Plaintiff emanating from all Causes of Action relating to Defamation cited in this lawsuit by the Plaintiff as a result of the false statements, misrepresentations and actions attributed to her in the Netflix series "When They See Us" as well as other actions and inactions of the Defendants, Netflix, Inc., Ava DuVernay and Attica Locke.

Compensation for Review, Report and Testimony

For consultations, information gathering, research and the preparation of this report, my compensation is $600 per hour. If a deposition is required, the rate will be $700 per hour with a four hour minimum. Should I testify at the trial for this case, the rate will be $2,500 for a half day and $5,000 for a full day of testimony. Travel fee is $175 per hour and travel expenses would be reimbursed as well.

**CASE BACKGROUND**

Overview on Litigation

According to Netflix, its series, "When They See Us" was produced for the purposes of providing the "truth" of the "Central Park Jogger" rape and the subsequent investigation and litigation from the perspective of the five youths who were arrested, investigated and incarcerated for the crime. In what the internet TV network described as a "dramatization" of what transpired, it depicted the real people who were involved in the investigation and litigation in the series. One of those people was Linda Fairstein (Plaintiff in this lawsuit) who, at the time, was Chief of the New York County District Attorney's Sex Crimes Prosecution Unit. She filed this lawsuit because she contends that the portrayal of her in the series was false as it depicted her involved in activities and events which never occurred, actions she never took, and words she didn't utter – all of which resulted in severe reputational harm and damage to her professionally and personally.

Parties in this Case

A brief profile of the Plaintiff, Defendants and other pertinent individuals and entities to this case is as follows:

Plaintiff

Linda Fairstein ("Fairstein") – A resident of Boca Grande, Florida, she was formerly Chief of the New York County District Attorney's Sex Crimes Prosecution Unit. (A more complete profile of Ms. Fairstein appears below.)

Confidential

Defendants

- Netflix, Inc. ("Netflix") - A Delaware corporation, Netflix is an American subscription-based digital streaming service and original programming production company. It offers subscription-based video on demand from a library of films and television series, 40% of which is Netflix original programming produced in-house. It has 222 million paid members in 190 countries. Netflix produced, edited and approved the script and released the limited series, *When They See US* on its worldwide streaming service.

- Ava DuVernay ("DuVernay") – A resident of California, she is a writer, director, producer and film distributor. Ms. DuVernay co-wrote, directed, produced and served as the showrunner for the television series "*When They See Us*" in collaboration with Netflix.

- Attica Locke ("Locke") – A resident of California, she is a novelist as well as a screenwriter. She co-wrote, and produced *When They See Us* in collaboration with DuVernay and Netflix.

Others

- When They See Us ("series") – Netflix series featuring four episodes which chronicled the "Central Park Jogger" attack and its aftermath including the investigation and litigation.

- Kharey Wise, Raymond Santana, Kevin Richardson, Yusef Salaam, Antron McCray ("Central Park Five")

- Robert Morgenthau ("Morgenthau") – New York County District Attorney

- John Fried ("Fried") – Chief of the Trial Division in the New York County District Attorney's Office.

- Elizabeth Lederer ("Lederer") – New York County Assistant District Attorney and lead prosecutor in the two trials of the Central Park Five.

- Tim Clements ("Clements") – New York County Assistant District Attorney and co-counsel to Lederer on the two trials.

- Nancy Ryan "Ryan" – Deputy Chief of the New York County's Trial Division

- Jane Rosenthal ("Rosenthal") – A business associate of DuVernay, she is the head of Tribeca Productions, Inc., a producer of the series.

- New York City Police Department ("NYPD")

- Robin Swicord ("Swicord") – A scriptwriter hired by Netflix who wrote part of the series.

- Joanna Wolff ("Wolff") – Netflix Manager of Publicity.

- **Alison Engel ("Engel") – A Director of Original Series for Netflix.**

- **Christine Ball ("Ball") – Publisher for Dutton, Putnam and Berkley.**

- **Laura Rossi ("Rossi") – Owner of Lauri Rossi Public Relations firm.**

- **Esther Newberg ("Newberg") - Fairstein's Literary Agent who was a Partner of ICM and co-head of its publications department.**

- Patricia Meili ("Meili") – The female jogger attacked in Central Park.

- Matias Reyes ("Reyes") – A man who confessed to the rape and assault on Meili, in Central Park.

Fairstein Profile

A native of Mount Vernon, New York, Fairstein attended Vassar College from which she graduated with honors in 1969. She received her law degree from the University of Virginia Law School in 1972. Following graduation she became an Assistant District Attorney in New York County and in the mid-80's became a Deputy Chief of the Trial Division until her retirement in 2002. In 1976, she became Chief of the County's pioneering Sex Crimes Prosecution Unit, a position she held until 2002. During her tenure as Chief, the staff grew from four people to 40 and during that period, she trained and lectured to prosecutors and police officers throughout the United States. After leaving that position in 2002, she entered private practice and served as a legal consultant and public speaker on issues related to sexual violence. In addition to her legal career, Fairstein was a highly successful international best-selling author who wrote 24 books between 1996 and 2019, 16 of which were on the New York Times list of best sellers. Her book, Sexual Violence: Our War Against Rape, published in 1993, is used as a textbook on many college and university campuses and was a New York Times Notable Book of the Year.

(More extensive information on Fairstein's legal career, business and personal involvements will be provided later in this report.)

Central Park "Jogger" Attack

Following is a brief summary of the incident in Central Park that ultimately led to the arrest and conviction of what became known as the "Central Park Five." On the evening of April 19, 1989, approximately 30 to 40 young people, mostly African-American and Hispanic, entered Central Park and went on a rampage accosting and assaulting at least nine people and robbing them. One of the victims was a 29-year old white woman (Meili) who was jogging in the park. She was beaten and raped and left for dead. A total of 10 of the youths were arrested that night including five who were charged with the attack on Meili. They were: Kharey Wise (16), Raymond Santana (14), Kevin Richardson (14), Yusef Salaam (15) and Antron McCray (15). When interviewed by the police all five implicated themselves in the crimes in the park and as an accomplice in the incident and also accused others of the five of the rape. As there was little forensic evidence to tie the five youths to the rape by 1989 methods of DNA analysis, they were indicted on May 4, 1989 based on confessions and other information they provided.

Prosecution Background/Fairstein's Initial Involvement

The morning after the incident (April 20), Fairstein received a call from Sargent Robert Fiston of the NYPD asking her to assign a prosecutor to assist in the taking of video statements of those arrested. She talked with Fried and ultimately Morgenthau about who to appoint as prosecutor.

Confidential

Fairstein recommended Lederer, who was assigned to the case by Morgenthau. Approximately 21 hours after the arrests, on the night of April 20, Fairstein met Lederer at the 20th Precinct after 8 p.m. They later moved to the 24th Precinct shortly after midnight as Lederer wanted to use designed youth rooms for her questioning. During her time at the precincts, Fairstein served as liaison to Morgenthau, assisted Lederer and handled some administrative assignments. Fairstein maintains that at no time did she supervise the NYPD investigation of the attacks in the park. This was confirmed by the publicly available testimony of police officers, detectives, and supervising officers who worked on the investigation. The following day, Fairstein did make two brief visits to the crime scene – the first with two detectives and two of the suspects, Richardson and Wise. The second visit was with Lederer and Clements.

<u>Pre-Trials, Trials and Fairstein Role</u>

Two trials were held for the "Central Park Five" suspects. On August 18, 1990, McCray, Salaam and Santana went on trial and they were each convicted of Assault and Rape in the First Degree. On October, 23, 1990, the trial of Richardson and Wise began and that resulted in Wise being convicted of First Degree Assault and First Degree Sexual Abuse. Because of his age, the judge waived all the charges against Richardson except for Attempted Murder in the Second Degree and Robbery, Rape and Sodomy in the First Degree. Ultimately, Wise was in prison for 11.5 years, Salaam and Richardson each served seven years, Yusef was in prison for 6.89 months and Santana served five years.

Lederer, along with Tim Clements tried both cases and were in charge of the litigation. During the period leading up to the trials, Fairstein provided occasional technical support and consulted with Lederer as requested in preparation for the prosecutions and trials. She served as a liaison to Morgenthau providing him with updates at times throughout the prosecution. Fairstein testified at both trials.

<u>Confession/Convictions Vacated/Lawsuit</u>

In February 2002, an inmate (Reyes) who was imprisoned in the Auburn Correctional Center met Wise who was also serving his time there. He confessed to the attack on Meili and his DNA matched that found on her clothing. His account was corroborated in other ways and, as a result, the convictions of the "Central Park Five" were vacated and those still in prison were released. Subsequently, they sued New York City, New York District Attorney Robert Morgenthau, three prosecutors including Fairstein and scores of NYPD officers and detectives. The case settled in 2014 for $41 million.

<u>Assessments After Convictions Are Vacated</u>

In the wake of the Reyes confession and subsequent convictions of the Central Park Five being vacated, there was a significant amount of outrage expressed by various factions of the community from a number of perspectives, ranging from racial injustice to the five youths being "railroaded" as well as the incompetence and mishandling of the prosecution. Most if not all of these allegations and accusations were refuted by the following:

- Prior to their trials, the Central Park Five challenged the admissibility of certain of their statements at a Huntley hearing before Judge Thomas Galligan. Judge Galligan issued a lengthy decision, finding *"No constitutional or statutory violation by any officers or prosecutors involved."*

- The New York City Law Department Statement issued the following statement:

  > *"Our review of the record suggest that both the investigating detectives and the Assistant District Attorneys involved in the case acted reasonably given the circumstances with which they were confronted on April 19, 1989 and thereafter."*

- A report issued shortly after the convictions were vacated, at the conclusion of an investigation commissioned by the NYPD, (Armstrong Report) found that no misconduct occurred during the investigation and said it *was "more likely than not that the defendants participated in an attack upon the jogger."* The report concluded:

- There was no misconduct by police in arrests and investigations.
  - There was no evidence of coercion in questioning.
  - There was no criticism of interrogation or arrest techniques.

  (Note: In the report, the only mention of Fairstein's involvement was that she had visited the crime scene.)

- When New York City settled the Central Park Five's lawsuit, then New York District Attorney, Cyrus Vance, Jr. said *"[a]fter more than a decade in which numerous parties have investigated and litigated the case, there has been no finding of wrongdoing or unprofessional behavior by any of the prosecutors involved."*

- When New York City settled the Central Park Five's lawsuit, the New York City Law Department issued the following statement:

  > *"Our review of the record suggest that both the investigating detectives and the Assistant District Attorneys involved in the case acted reasonably given the circumstances with which they were confronted on April 19, 1989 and thereafter."*

Netflix "When They See Us" Series

The series emanated from a contact on Twitter made by Raymond Santana, one of the Central Park Five, to DuVernay in which he suggested a motion picture be made about the "Jogger" incident and subsequent prosecution. She decided to make it a limited series instead and approached Netflix with the concept in April or May of 2017. Ultimately, on May 31, 2019, Netflix aired a four-part series titled "When They See Us" which chronicled the "Central Park Five" case from the incident in the park through the trials of the Central Park Five and the subsequent confession of Reyes and the sentences being vacated. DuVernay directed and co-wrote the series with Locke and others. The episodes (each at least one hour in duration) focused on the following:

- Episodes one and two focused on the young teens and their parents' vulnerability during the investigation and controversial interrogations as well as the subsequent trials and convictions.

- Episode three explored the families' turmoil during the teens' incarceration and the struggles they faced rejoining society.

Confidential

- Episode four was devoted to Wise, the oldest of the Five who had disabilities and served the longest sentence; the episode reflects his harrowing experiences in adult prison and includes dramatic interior prison monologues and flashbacks.

The series (four episodes of 74 minutes each) was viewed in 190 countries. According to IMDB, it had 27 distributors who provided the series to all corners of the globe, including North America (e.g. U.S. Canada, Mexico), Asia (e.g. Japan, Thailand, Singapore, South Korea), Middle East (e.g. Israel, India), South America (e.g. Argentina, Brazil), Europe (e.g. France, Italy, Greece, Germany, Spain) and other geographical areas such Russia, Turkey, Australia and the United Kingdom.

██████████████████████████████████████████ and it received 16 Emmy nominations.

Netflix gave approval to the series because its audiences liked true stories. The series was marketed as being the truth based on research and evidence. Initially it was marketed as *"based on the true story of the (Five)"* and *"the truth they haven't heard."* Prior to the series airing, in a series of posts on its Twitter account between April 19 and May 28, 2019, Netflix reported:

- "The truth is coming out." (April 19)
- "It's a powerful story that allows for the truth to come out." (May 1)
- "It's time for the truth." (May 2)
- "We are ready to share the truth." (May 15)
- "The truth will finally be revealed." (May 28)

(It is important to note that Netflix aired a disclaimer with the series that essentially stated that the series was a dramatization based on real events. However, it was placed at the end of the credits which appear at the end of each episode instead of the beginning where it would have been more visible and warn viewers in advance that this is not entirely a true and factual accounting of what occurred.)

Pre-Series Airing Warnings

In 2017, prior to the release of the series, Fairstein learned of its development in a news article and notified Lederer. Aware of previous periodic misinterpretations and misrepresentations of the facts of the Central Park "Jogger" incident emanating from various sources in the wake of the Reyes confession, vacated convictions and the youths' lawsuit against the City (e.g. books and Burns documentary), Fairstein and Lederer decided to contact those responsible for the creation and production of the series and advise them of the importance of ensuring that the series was factually correct. Following are some of the actions taken in that regard:

- The first action taken was to hire a litigator. Fairstein and Lederer hired Robert Zimet, a litigation partner at Skadden Arps, to contact Netflix and DuVernay. On June 9, 2016, Zimet sent a letter to DuVernay and Rosenthal warning them about the importance of accuracy the past unfair treatment of them in the media and grossly inaccurate portrayals of them in public accounts in 2003 and thereafter. The letter recommended 20 sources for DuVernay's and Rosenthal's research for the series that would give them complete and accurate information. On July 25, 2016, DuVernay and Rosenthal's attorney responded by saying they wouldn't meet with Fairstein or Lederer under any preconditions and wrote that Fairstein and Lederer had no right to preemptively object to their portrayal in the

project and the "filmmakers" had no obligation to preserve evidence. DuVernay and Rosenthal's attorney also stressed that any portrayal of Fairstein and Lederer would be protected by the First and Fourteenth Amendments. On July 28, 2016, Fairstein's and Lederer's legal counsel sent a response letter.

- Lederer contacted DuVernay and during a telephone conversation asked her if she had reviewed specific documents in the public records when creating the series in order to avoid portraying the participants (including Fairstein) in a false and defamatory manner. DuVernay said she would not.   Lederer told her that extensive information and critical documents would soon be up on the New York City Law Department's website that she could review as part of her research. DuVernay replied that she didn't want to wait for them. She asked Lederer for an interview but Lederer declined because she felt DuVernay was not interested in presenting a true account of what transpired.

- Fairstein, responding to an email from Rosenthal, an associate of DuVernay, wrote her the following message:

    *"Hello, Jane – You say you would like to hear our 'perspective.' I'd like to make clear there are literally facts (in the form of sworn testimony, official reports and records, medical evidence just to name a few of the many forms the facts take) and evidence in this matter-from 1989,from 2002, and from the sworn depositions from 2003-2013). I don't expect you to go forward on a 'perspective' - I expect you to use facts.  Have you made any progress in researching any of those things?"*

- On June 9, 2016, legal counsel for both Fairstein and Lederer sent a letter to DuVernay and Rosenthal warning them about the importance of accuracy given the past unfair treatment of them in the media and grossly inaccurate portrayals of them in public accounts in 2003 and thereafter.  The letter recommended 20 sources for DuVernay's and Rosenthal's research for the series that would give them complete and accurate information.   On July 25, 2016, DuVernay's and Rosenthal's attorney responded by saying they wouldn't meet with Fairstein or Lederer under any preconditions, wrote that Fairstein and Lederer had no right to preemptively object to their portrayal in the project and the "filmmakers" had no obligation to preserve evidence. DuVernay's and Rosenthal's attorney also stressed that any portrayal of Fairstein and Lederer would be protected by the First and Fourteenth Amendments. On July 28, 2016, Fairstein's and Lederer's legal counsel sent a response letter.

- As it became clear to Fairstein that DuVernay intended to portray her inaccurately, or, at the very least, act in reckless disregard as to the truth or falsity on how she would be portrayed in the film series, on July 11, 2017 she had her attorney (and Lederer's) write a letter to Netflix's legal counsel expressing concern.  Netflix did not respond to this letter.

Disputed Portrayal of Plaintiff

Fairstein was depicted in episodes one, two and four of the series.  Following are the words and actions attributed to Fairstein in each of the series' episodes which she contends are false, defamatory and/or are misrepresentative:

Episode I

<u>Summary</u>:  Portrayed the Plaintiff Fairstein as desperate to pin the brutal rape and beating of Meili on innocent children of color; manipulating evidence and the media to build a case against the Central Park Five; and knowingly and willingly breaking the law to build the prosecution's case. Per the Court's decision regarding Defendants' motion to dismiss, discussed more fully below, the following scenes in Episode 1 are relevant to this litigation:

- Depicted Fairstein demanding a detective speed up the interrogation of the youth so she could produce a timeline.

- Shows Fairstein on April 20 putting "post-it" notes (one with the word "Rape") on a map of Central Park at the police station and telling a detective *"they're not witnesses, they're suspects."*

- Fairstein was shown in front of the map tracing the jogger's path and adjusting the timeline saying: *"How can the same kids be raping her at the same time they are jumping bicyclists way over there?"*

- Had Fairstein directing police officers to round up black youth in Harlem, stating:

    *"I need that whole group…I need all of them. Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now. I want units out strong. Come on, guys. What did we miss? Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see. You bring in every kid who was in the park last night.")*

- Another scene depicts Fairstein telling officers who are about to interrogate Mr. Richardson.

    *"We've got suspects, we've got kids in custody. Interrogate. Make them name their accomplices. This is not business as usual. The press is crawling all over this. No kid gloves here. These are not kids. They raped this woman. Our lady jogger deserves this."*

<u>Episode 2</u>

<u>Summary</u>:  The scene at issue in Episode 2 falsely portrays Ms. Fairstein as trying to conceal DNA evidence from defense counsel before the trials begin, directly attacking her prosecutorial ethics. Fairstein is portrayed having a conversation with Lederer and Morgenthau in which she suggests suppressing DNA evidence discovered on Meili's sock:

    *"We have a sock, those little bastards shot their wad into a sock thinking we wouldn't find it, but we found it." "We have it now and the kicker is none of the defense is aware yet so we can test it right before the trial—surprise!"*

(The events in this scene never occurred.)

<u>Episode 4</u>

<u>Summary</u>:  In the final scenes of this episode, Fairstein is portrayed as singularly responsible for jailing innocent young men of color after changing the theory of the case from a single attacker

13                                                      Confidential

to multiple attackers. As relevant to this lawsuit, as cited in the Complaint, one scene in Episode 4 depicts Ryan and Fairstein meeting in a restaurant. Fairstein says:

> *"You're here to gloat. It doesn't matter, you simply identified a sixth rapist, I always said there may be more."*

Ryan responded: "*You said that to cover because you knew you coerced those boys…*"

(Side note: Ryan's Vacatur affirmation does not describe the confessions as coerced, nor do any of the previous court decisions.  They still stand as valid – the law of the case.)

Fairstein General Denials

Just prior to the airing of the series, Fairstein issued a statement to Today which was published

on May 22, 2019 ("Read Linda Fairstein and Trisha Meili's Full Statements on the Netflix Series 'When They See Us'") that included these excerpts:

> *"Ava DuVernay's depiction of Linda Fairstein in her Netflix firm "When They See Us" is grossly and maliciously inaccurate.  It is very clear from the trailer that Netflix and Ms. DuVernay have created a fictional dramatization of events by misrepresenting the Facts in an inflammatory and inaccurate manner."*

> *"Netflix and Ms. DuVernay are doing a terrible disservice to the public, and should be Ashamed by their irresponsibility in failing to properly research the film and effectively compromising its accuracy."*

In reference to all the false statements, allegations, misrepresentations and the false depictions of her as she was portrayed in the series, Fairstein issued the following denials in a Declaration she filed in this case on June 29, 2020:

- She never created a timeline of events related to the "Jogger" attack.

- She never gave police orders to round up *"every young black male thug"* in the projects in Harlem.

- She didn't tell NYPD officers not to use *"kid gloves"* in questioning Richardson because she wasn't even present at time of the interview.

- She never presented a theory of the case to Lederer that it was a group assault.

- She was never confronted by Lederer about a lack of evidence against the five suspects.

- She never directed the NYPD investigation at any time.

- She was not in charge of, nor participated in, either the NYPD's or Lederer's stationhouse interviews of the Central Park Five or any other witnesses or suspects nor was she present for, or did she participate in, the videotaping of any statements made by the them or any other suspects.

Confidential

- She did not engage in a discussion with Morgenthau and Lederer about DNA found on Meili's sock because this meeting did not occur nor did a conversation of this nature occur through any other means.

- She did not fight with Lederer over inconclusive DNA evidence and did not attempt to force the theory of the case on Lederer that the youths participated in the attack on Meili.

- She did not encourage Lederer to continue prosecuting the case, despite a lack of substantial evidence, because "*the whole country is watching.*"

- She did not discuss any theories of the case with Ryan in April 1989 as she was neither assigned to nor involved in the investigation of the case.

Addition denials of Fairstein not included in the Declaration:

- She never made many of the comments/words that her character said in the series – many of them racist – which were outrageously offensive.

- She was not at the station house during the 22 hours of the police investigation as depicted in the series. She was at the New York District Attorneys' offices that entire day, and there is sworn proof of that. She states no documentation exists that supports any of their allegations.

(Source: Wall Street Journal Op-Ed piece authored by Fairstein, published on June 10, 2019)

## LAWSUIT INFORMATION

The lawsuit was originally filed on behalf of the Plaintiff, Linda Fairstein, on March 18, 2020 in the United States District Court, Middle District of Florida, Fort Myers Division. On September 24, 2020, it was transferred to the United States District Court, Southern District of New York.

Plaintiff's Position

In filing the lawsuit, the Plaintiff alleges that the Defendants marketed and promoted "When They See Us" as a true story and fact-based version of the events surrounding the Central Park Five. She also alleges that the series falsely shows her "as the singular mastermind behind a racist plot to obtain convictions of the Central Park Five *"at any cost."* Further she maintains that the Defendants agreed and maliciously conspired together to write, produce and publish scenes in Defendants' film series, *When They See Us*, which portray Fairstein in a false and defamatory manner, are essentially a complete fabrication and depict Fairstein as singlehandedly responsible for *inter alia* the arrest, conviction and wrongful imprisonment of the Central Park Five. Additionally, the Plaintiff makes the following assertions:

- As part of the settlement in the lawsuit brought by the Central Park Five, hundreds of thousands of pages of documents concerning the arrest, prosecution and conviction of The Five, and their subsequent lawsuit, were made publicly available on the New York City Law Department's website. The Defendants were made aware of the availability of this information and failed to review them and/or ignored their content during the creation of the series.

- There was never a plan of "surprise" presented by Fairstein to Lederer about the use of the sock evidence at trial.

- As a result, the Defendants falsely portrayed Fairstein - from the first scene in the series in which she appears and onward—as the "singular mastermind" behind a racist plot to obtain convictions of the Central Park Five and who was responsible for every aspect of the case against them including the prosecution.

- That the series falsely portrays her participation in the prosecution of the Five, and depicts her uttering comments that are "racist and unethical."

- That the series falsely shows her using "inflammatory language" by "referring to young men of color as 'thugs,' 'animals' and 'bastards,'" terms that she states Ryan never used.

It was further noted that there was extensive publicly-available evidence - which the Defendants were made aware of during the production process by both Fairstein and Lederer, and their counsel, Robert Zimet - that Defendants could have reviewed to obtain correct information, including hearing and trial transcripts, sworn testimony in the original proceedings against the Central Park Five and depositions taken in the subsequent lawsuit.

The Plaintiff contends that the Defendants further conspired and agreed to purposefully market and aggressively promote *When They See Us* as a true story, in order to cause substantial harm to the Plaintiff's reputation both personally and professionally in her careers as an attorney and author.

<u>Causes of Action/Relief</u>

The Causes of Action in this lawsuit are:

- Defamation Per Se (DuVernay)
- Defamation Per Quod (DuVernay)
- Defamation Per Se (Locke)
- Defamation Per Quod (Locke)
- Defamation Per Se (Netflix)
- Defamation Per Quod (Netflix)
- Conspiracy to Defame (All Defendants)

Through the lawsuit, the Plaintiff is seeking:

- <u>Defamation Per Se and Defamation Per Quod (DuVernay and Locke)</u>
    - Damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, and emotional distress.
    - Punitive damages
    - Costs and attorneys' fees
    - Injunctive relief against Duvernay directing her to:
    --- Remove the posts detailed specified posts from her social media accounts
    --- Refrain from making posts on social media, or making public statements, in the future which refer to Fairstein as responsible for the prosecution of the Central Park Jogger case

16                                                      Confidential

--- Remove all posts from her social media accounts which refer to *When They See Us* as a true, real or fact-based story

--- Issue a public statement correcting the false and defamatory statements concerning Fairstein that are present in *When They See Us*, as specified and which states that the series is "a fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Fairstein, for the public to hate, that never existed in reality

--- Direct the removal of Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed

--- Edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Fairstein detailed as specified are removed; and

--- Place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted.

- <u>Defamation Per Se and Defamation Per Quod (Netflix)</u>
    - ■ Damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, and emotional distress.
    - ■ Punitive damages
    - ■ Costs and attorneys' fees
    - ■ Injunctive relief against Netflix directing it to:
    - --- Issue a public statement correcting the false and defamatory statements concerning Fairstein that are present in *When They See Us*, as specified and which states that the series is a "fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Fairstein, for the public to hate that never existed in reality"
    - --- Remove Parts One, Two and Four of *When They See Us* from its streaming platform, and from any other platform, service or other medium that it controls through which the film series is, or will be, viewed
    - --- Edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Fairstein as specified are removed
    - --- Place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted
    - --- Categorize *When They See Us* on its streaming service only as a TV Drama; and
    - --- Remove all posts from its social media accounts which refer to *When They See Us* as a true, real or fact-based story, including those specified.

- <u>Conspiracy to Defame (All Defendants)</u>
    - ■ Damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, and emotional distress.
    - ■ Punitive damages
    - ■ Costs and attorneys' fees
    - ■ Injunctive relief against all Defendants, directing them to:
    - --- Issue a public statement correcting the false and defamatory statements concerning Fairstein that are contained in *When They See Us*, as specified and which states that the series is a "fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the

writers' fertile imagination and desire to create a fictional villain, in Fairstein, for the public to hate that never existed in reality."

--- Remove Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed.

--- Edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Fairstein are removed.

--- Place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted; (e) categorize *When They See Us* on only as a TV Drama on any streaming service or other Medium.

--- Remove all posts from their social media accounts which refer to *When They See Us* as a true, real or fact-based story.

--- Remove all posts from their social media accounts and refrain from making posts on social media, or making public statements, in the future which refer to Fairstein as responsible for the prosecution of the Central Park Jogger case.

--- Remove from their social media accounts the posts detailed in the Paragraphs specified.

Defendants' Position

The Defendants maintain that their portrayal of the Plaintiff in the series as the prime mover in the conviction of the Central Park Five is accurate based on the following facts:

- Plaintiff was the head of the Manhattan District Attorney's Sex Crimes Unit and was the public official who oversaw and had critical involvement in and responsibility for the prosecution of the Central Park Jogger case.
- Plaintiff assigned ADA Lederer to the case.
- Plaintiff spent more than 30 hours at the police stations during the investigation of the Five as the highest-ranking prosecutor from the D.A.'s office.
- Plaintiff served as a liaison to Morgenthau.
- Plaintiff visited the crime scene with detectives and two of the Five.
- Plaintiff testified for the prosecution at suppression hearings and trial regarding her personal involvement.

The Defendants contend that although she indisputably had critical responsibility for and direct oversight of the case, was intimately involved in the investigation and prosecution, and was its prime defender even after the convictions were vacated, she is suing on the implausible premise that she had little to do with the prosecution and was defamed by being portrayed expressing views about the case and the evidence she has consistently maintained to be true.

The Defendants also maintain that the series is not a documentary but a dramatization based on true events and that this was labeled as such at the end of each episode.

Defendants' General Defenses

With respect to the Causes of Action in this lawsuit, the Defendants offer the following General Defenses:

Confidential

- Defendants deny that the Series was "false and defamatory"
- Defendants admit that Plaintiff was not the trial prosecutor but deny that she did not "personally prosecute the case."
- Defendants deny that these documents "demonstrate the falsity of the manner in which [Plaintiff] is portrayed" and object to the generic allegation that a "great many" of these "millions of pages" of unspecified documents do so.
- Defendants deny that the dramatized dialogue and portrayal of which she complains was false.
- Defendants deny Plaintiff's characterization of Defendants' "marketing and promotion" and what Defendants "led the public to believe."
- Defendants deny that Plaintiff suffered damages "[a]s a result of" any "misrepresentations" by Defendants.
- Defendants state that the Series is a dramatization labeled as being "based on" a true story.
- Defendants deny that Plaintiff is entitled to any recovery in this lawsuit.
- Defendants deny Plaintiff's characterization of her involvement in the prosecution of the case.
- Defendants deny Plaintiff's characterization of the series, deny that the dramatized dialogue and portrayal of which she complains is actionable as defamation.
- Defendants deny Plaintiff's characterization of the Series and of her involvement in the investigation and prosecution, and deny that the portrayal of which she complains is actionable as defamation.
- Defendants deny that Plaintiff had no involvement in the NYPD's questioning of witnesses or suspects or in supervising the investigation.
- Defendants purport that the events surrounding the prosecution of the Five, and testimony about those events, have long been the subject of controversy and debate.
- Defendants deny Plaintiff's characterization of the Series.
- Defendants deny that the disclaimer at the end of the credits is "barely legible."
- Defendants deny that the Series or Ms. DuVernay's social media posts contain actionable defamatory statements about Plaintiff.
- Defendants deny that the Series or Ms. Locke's social media posts contain actionable defamatory statements about Plaintiff.
- Defendants deny that the Series or Netflix's social media posts contain actionable defamatory statements about Plaintiff.

Defendants' Affirmative Defenses:

In this lawsuit, the Defendants offer the following Affirmative Defenses:

- The challenged statements are not defamatory per se.
- The challenged statements are not reasonably capable of the defamatory meaning attributed to them by Plaintiff.
- Some or all of the statements at issue are matters of opinion that are not capable of being proven true or false.
- Some or all of the statements at issue under not actionable under the First Amendment and New York law because they constitute statements of opinion or rhetorical hyperbole.
- Some or all of the statements at issue are true or substantially true, and Plaintiff cannot carry her burden of proving that they are materially false.
- Plaintiff is a public figure for purposes of this case, and Defendants did not publish with Constitutional actual malice.

Confidential

- The Series and statements at issue are in furtherance of Defendants' exercise of the constitutional right of free speech in connection with an issue of public interest, and subject to the requirements of N.Y. Civil Rights Law §76-a(2) which Plaintiff cannot meet.
- Defendants acted without malice, in both the constitutional sense and the common law sense, and without the requisite scienter, in both the constitutional sense and common laws sense, in all of their conduct relating to the challenged statements.
- Defendants acted without fault as required by the U.S. Constitution and N.Y. Civil Rights Law § 76-a(2) in all of its conduct relating to the challenged statements.
- Plaintiff is barred from recovery, in whole or in part, by the doctrine of incremental harm.
- Plaintiff is barred from recovery, in whole or in part, by the doctrine of subsidiary meaning.
- Plaintiff cannot recover damages because, at the time the challenged statement was made, her reputation had already been irreparably damaged as a result of her own behavior or by the actions of others.
- Neither Defendants nor the Series proximately caused any injury that Plaintiff allegedly suffered.
- Plaintiff's alleged damages, if any, are the result of her own conduct or the conduct of others beyond Defendants' control and for whom Defendants are not legally responsible.
- Plaintiff is libel-proof with respect to the claims asserted in this action.
- Plaintiff has failed to mitigate her damages as required by law.
- Plaintiff has not suffered special damages.
- The challenged statements are protected by and privileged under the First Amendment to the U.S. Constitution.
- The challenged statements are protected by and privileged under Article I, Section 8 to the New York State Constitution.
- By reason of the First and Fourteenth Amendments to the Constitution of the United States, Defendants are immune from liability for punitive or exemplary damages under the circumstances alleged in the Complaint.
- Plaintiff's claims for punitive or exemplary damages are barred, in whole or in part, by the operation of the applicable provisions of the U.S. Constitution and the New York Constitution respecting due process of law and/or the imposition of excessive fines.

Motion to Dismiss

On December 18, 2020, the Defendants filed a motion to dismiss the Complaint, which Plaintiff opposed. The Court granted the motion in part and denied the motion in part. The Court allowed the Plaintiff's claims to go forward with respect to five (5) scenes in the film series:

- **Fairstein creating and manipulating a timeline of the events that took place in Central Park on the night of April 19, 1989 in order to pin the Meili rape on the Central Park Five**.

    Plaintiff asserted that the film series includes a false and defamatory depiction of her attempting to create a timeline for the attack on Meili which depicts Plaintiff as "imbuing urgency" to the investigation and "hastening the interview of unaccompanied minors." Plaintiff further asserted that she was not present in any precinct at the times depicted, never questioned unaccompanied minors, never directed the NYPD's investigation, never discussed which individuals should be held in custody, and did not plot the events of April 19 on a map. Plaintiff also asserted that the depiction is inaccurate because Lederer

led the prosecutorial investigation and, in the days immediately following the attack, Meili's route through Central Park was largely unknown.

Defendants asserted that their depiction of Plaintiff creating an attack timeline was "substantially true" because it is consistent with viewpoints that Fairstein publicly espoused over the past thirty years. Defendants further asserted that Fairstein has been an "outspoken public face" for the prosecution of the Central Park Five and publicly defended the theory behind their prosecution. Defendants also asked the Court to take "judicial notice" of a statement that Fairstein made in 2003.

The Court found that remarks the Plaintiff made in 2003 "do not render the depiction of her role in the creation of the timeline as substantially true and contradict the scene in important respects." According to the Court, if the portrayal of Plaintiff in the film series were substituted with some version of Plaintiff's 2003 remarks, it would have depicted "Lederer and the NYPD leading the investigation, and, at some later point, Fairstein's agreement with the NYPD's timeline of events. Such a version of events would plausibly have had a different effect on the mind of the viewer, one that did not depict Fairstein as the prime mover in marshaling evidence and drawing conclusions about the events of April 19." As a result, the Court denied Defendants' motion to dismiss Plaintiff's claim that this scene is false and defamatory.

- **Fairstein advocating for withholding from defense counsel that DNA evidence was found on Meili's sock to prevent the defense from using it at trial.**

  Plaintiff alleged that the scenes in the film series depicting Plaintiff's conversations with Lederer about a semen-stained sock found near the rape scene are defamatory. Plaintiff asserts that the scenes concerning the sock falsely depict her as desperate to prosecute the Central Park Five and, in truth, Lederer provided their defense counsel with DNA results from the stained stock immediately after it was discovered.

  Defendants argued for dismissal of these allegations on the ground that "in the context of dramatization based on controversial historical events, an average viewer would understand the scenes to be pure opinion reflecting a dramatized debate over the strengths and weakness of the prosecution's case."

  The Court found that the "average viewer would not understand 'When They See Us' to be a documentary that depicts a strictly factual version of events." However, the Court also found that the scenes relating to the sock DNA cannot be fairly classified as pure opinion because the statements and actions attributable to Plaintiff in the film series have a precise meaning, are cable of being proved or disproved and the average viewer could reasonably believe that the depictions of Plaintiff were based on undisclosed facts known to the filmmakers.

- **Fairstein's instructions to police officers during their interrogation not to use "kid gloves" when questioning the suspects.**

  Plaintiff alleged that this sequence of scenes portrays her as racist and unethical. Plaintiff further alleges that she was not involved in the NYPD's questioning of witnesses or suspects at any precinct and had no supervisory role in the police investigation.

21                                                          Confidential

Defendants argued that the phrases used in the scenes such as "no kid gloves here" are typical heated rhetoric used for dramatic purposes. Such a "dramatic trope" cannot support the conclusion that Plaintiff directed NYPD officers to bend rules or alter procedures.

The Court found that the Complaint plausibly alleged a defamatory meaning as to Plaintiff's instructions about suspect interrogation and that the depiction is false. The Court also found that the "average viewer could therefore interpret Fairstein's interrogation instructions as beginning the chain of events that resulted in the unjust conviction of the Central Park Five.

- **Fairstein's instructions to investigate young black males.**

  Plaintiff alleged that the film series includes a defamatory depiction of her instructions to investigate young, black males in Harlem. Plaintiff asserted that she did not instruct officers to round up young black men who were in Central Park and did not instruct officers in the case.

  Defendants argued that this scene was typical heated rhetoric used for dramatic purposes.

  The Court found that the average viewer could conclude that Fairstein directed officers to conduct a discriminatory canvas in Harlem and that the depiction has a precise meaning and is capable of being proved or disproved. The Court further found that, "[v]iewed in context and taken as a whole, the Complaint plausibly alleges that the dialogue attributed to Fairstein advocates unlawful police stops of young black males, without reasonable suspicion, thereby subjecting her to hatred and contempt. Further, the average viewer could reasonably believe that this depiction is based on facts known to defendants but unknown to the audience.

- **Ryan tells Fairstein that She "Coerced Those Boys" to confess.**

  Plaintiff alleged that the scene in which Nancy Ryan tells Plaintiff that she "coerced those boys" to confess is false because Plaintiff has never spoken with Ryan about the Reyes confession. The scene with Ryan also falsely attributes the prosecution's theory of the case to Plaintiff and falsely depicts her as responsible for implementing coercive interrogation techniques by the police.

  Defendants argued that Ryan's character merely engaged in "hyperbolic expression" which cannot be read as a factual statement that Plaintiff herself was responsible for alleged coercive tactics.

  The Court found that the average viewer could reasonably interpret Ryan's statement about Plaintiff to be a factual assertion, that Ryan's statements in the scene have a precise meaning and are capable of being proved true or false and *that "[t]he damning judgment of Fairstein's conduct voiced by a professional colleague could plausibly hold Fairstein up to shame, ridicule and contempt."* The Court also found that the average viewer could conclude that the Defendants know certain facts, unknown to the audience, which support the speaker's opinion and are detrimental to the person being discussed.

In addition, in its ruling, the court let stand the Cause of Action of Conspiracy to Defame in the lawsuit.

**INFORMATION/INPUT RECEIVED TO FORM OPINIONS**

In connection with my preparation of this report, I have received and reviewed from the Plaintiff's legal counsel the following documents and information relating to this case:

Complaints

- Complaint: Linda Fairstein v Netflix, Inc., Ava DuVernay and Attica Locke (March 18, 2020)

Legal Documents

- (Portions) Hearing Transcripts: Detective Michael Sheehan (October 25, 1989, July 25, 1990, July 20, 2011, May 9, 2013)
- (Portions) Hearing Transcripts: Officer E. Reynolds (October 13, 1989, July 2, 1990)
- (Portion) Hearing Transcripts: Detective W. Arroyo (November 8, 1989, July 16, 1990)
- (Portions) Hearing Transcripts: Officer Robert Powers (October 13, 1989, October 16, 1989)
- (Portion) Hearing Transcript: Detective Robert Honeyman (November 2, 1990)
- (Portion) Hearing Transcript: Detective John Farrell (February 22, 2013)
- (Portion) Hearing Transcript: Antron McCray, Kevin Richardson and Kharey Wise (October 24, 1989)
- (Portion) Hearing Transcripts: Linda Fairstein (October 27, 1989November 29, 1989, August 6, 1990, April 23, 2013)
- (Partial) Transcript of the trial of McCray, Santana and Salaam (August 6, 1990)
- Affirmation in Response to Vacate Judgment of Conviction, New York v. Central Park Five Indictment No. 4762/89 (December 5, 2002)
- (Portion) Examination Before Trial of Linda Fairstein (April 23, 2013)
- Order: Perri "Pebbles" Reid v Viacom International, Inc., Viacom, Inc. and Kate Lanier (May 1, 2013)
- (Portions) Deposition of Linda Fairstein in McCray, Richardson, Wise and Salaam litigation (May 1, 2013)
- Appendix of Additional Exhibits in Support of Netflix's Motion to Dismiss (May 18, 2020)
- Affidavit or Linda Fairstein (May 27, 2020)
- Declaration of Carolyn Madden (June 17, 2020)
- Declaration of Chad Leonard (June 19, 2020)
- Declaration of Linda Fairstein (June 29, 2020)
- Declaration of Linda Fairstein in Support of Opposition to Netflix, Inc.'s California Anti-Slapp Motion (June 29, 2020)
- Declaration of Linda Fairstein (July 1, 2020)
- Order Re change of venue (September 24, 2020)
- Civil Docket for Case #1:20-cv-08042-PKC (September 29, 2020)
- Motion to Dismiss Telephone Transcript (November 16, 2020)
- Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss (December 18, 2020)

- Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6)  (January 29, 2021)
- Appendix in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss (January 29, 2021)
- Declaration of Kara Gorycki  (January 29, 2021)
- Defendants' Reply Memorandum in Support of Motion to Dismiss  (February 19, 2021)
- Opinion and Order  (August 9, 2021)
- Defendants' Answer and Additional Defenses (September 22, 2021)
- Plaintiff's First Request for the Production of Documents to Defendant Ava DuVernay (October 4, 2021)
- Plaintiff's First Request for the Production of Documents to Defendant Attica Locke (October 4, 2021)
- Plaintiff's First Request for the Production of Documents to Defendant Netflix, Inc. (October 4, 2021)
- Plaintiff's Initial Disclosures  (October 4, 2021)
- Plaintiff's Objections and Responses to Defendant Netflix's Amended First Set of Interrogatories (December 13, 2021)
- Defendant Netflix, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories  (December 14, 2021)
- Defendant Ava DuVernay's Responses and Objections to Plaintiff's First Set of Interrogatories  (December 14, 2021)
- Defendant Attica Locke's Responses and Objections to Plaintiff's First Set of Interrogatories  (December 14, 2021)
- Defendant Netflix, Inc.'s Responses and Objections to Plaintiff's 30(B)(6) Notice to Netflix  (May 5, 2022)

Depositions

- (Portions) Linda Fairstein  (April 23, 2013)
- (Portions) Elizabeth Lederer  (July 24, 2013)
- Robin Swicord (May 12, 2022)
- Joanna Wolff (May 25, 2022)
- Ava DuVernay  (June 7, 2022)
- Linda Fairstein (June 15, 2022)
- **Christine Ball  (June 21, 2022)**
- **Attica Locke  (June 22, 2022)**
- **Allison Engel  (June 24, 2022)**
- **Laura Rossi  (June 30, 2022)**
- **Esther Newberg  (July 11, 2022)**

Miscellaneous Documents

- Linda Fairstein Biography  (No date)
- Ava DuVernay interview (partial) with Kevin Richardson  (No date)
- Ava DuVernay interview (partial) with Raymond Santana  (No date)
- Ava DuVernay interview (partial) with Michael Warren  (No date)
- Linda Fairstein: Ava DuVernay and Netflix:  The Lies Have It"  (No date)
- Chart of Alleged Film Series Scenes  (No date)
- Book:  Unequal Verdicts: The Central Park Jogger Trial  (No date)

- Felicity Huffman Biography  (No date)
- Book (Two portions):  Sexual Violence – Our War Against Rape  (No date)
- Vassar College Announcement Regarding Trustee Resignation  (No date)
- Netflix: When They See Us Social Campaign  (No date)
- Netflix: When They See Us WIP x Functional Campaign Timeline  (DEFS000648-000657)
- Netflix:  Untitled Central Park Project  (DEFS000692-DEFS000714)
- Central Park Five Writers' Room  (DEFS005074-005657)
- Central Park Five Research Binder  (DEFS006947-007495)
- Executive Summary  (DEFS008875-008917)
- Notes Central Park Five Documentary  (DEFS009694-009725)
- Central Park Five Timelines  (DEFS094398-094439)
- Netflix:  Editor's Work on Complete Cut  (DEFS 11037 – DEFS11041)
- Netflix:  "When They See Us aka Central Park Five PR Strategy  (DEFS144628-DEFS144666)
- When They See Us Trailer Sentiment Report  (DEFS145397-145405)
- When They See Us Fka Central Park Five PR Strategy  (DEFS144759-144767)
- The Central Park Five  (DEFS168672)
- When They See Us Task Force Agenda  (DEFS169055-169071)
- Book:  "Unequal Verdicts: The Central Park Jogger Trials (DEFS168809-168976)
- When They See Us Communications Plan  (DEFS169113-169117)
- Federal Bureau of Investigation DNA Analysis  (May 25, 1990)
- Linda Fairstein:  Statement for the Public Safety Committee of the New York City Council (January 30, 2003)
- Agreement: Fairstein Enterprises, LLC and Doubleday  (April 4, 2007)
- Agreement:  Fairstein Enterprises, LLC and Dutton, a Division of Penguin Group (USA), Inc. (June 15, 2009)
- The Central Park Five National Publicity Report  (May 10, 2013)
- Statements of Mayor de Blasio and Corporation Counsel Zachary W. Carter on Central Park Five Settlement  (September 5, 2014)
- Netflix: Central Park Five Writer's Room Notes, First Writer's Draft Notes PT 1-3 (January 8, 2018)
- Central Park Five Writers' Room Notes  (January 24, 2018)
- CP5 Part One Draft, Fairstein Scenes  (January 29, 2018)
- Netflix: Central Park Five Writers' Room Notes  (January 24, 2018)
- Netflix: Central Park Five Part One Linda Fairstein Scenes  (January 29, 2018)
- Netflix:  Central Park Five Network Notes  (February 6, 2018)
- Netflix: Central Park Five Writing Notes  (February 10, 2018)
- Statement:  "Mystery Writers of America Withdraw Fairstein Award  (November 29, 2018)
- When They See Us: Limited Series – CP&A Performance Update  (May 31, 2019)
- **Agreement between Fairstein Enterprises, LLC and Dutton  (June 4, 2019)**
- Color of Change Petition: Simon & Schuster Drop Central Park Five Prosecutor Linda Fairstein  (June 5, 2019)
- Petition:  Reopen Linda Fairstein's Cases Now  (May 13, 2020)
- Expert Witness Report of Doug Bania  (June 17, 2022)

25                                    Confidential

Letters

- Elizabeth Lederer to Michael Joseph  (No date)
- Elizabeth Lederer to Justice Thomas Galligan  (March 29, 1990)
- Linda Fairstein to Robert M. Morganthau  (January 4, 2010)
- Robert E. Zimet to Jane Rosenthal, Ava DuVernay and Tribeca Film  (June 9, 2016)
- Jonathan L. Segal to Robert E. Zimet  (July 25, 2016)
- Robert E. Zimet to Jonathan L. Segal  (July 28, 2016)
- Robert E. Zimet to David Hyman  (July 11, 2017)
- Linda Fairstein to Carey Dunne  (July 29, 2017)
- Linda Fairstein to Felicity Huffman  (September 6, 2018)
- Linda Fairstein to Anthony Friscia  (June 4, 2019)
- Christine Ball to Linda Fairstein  (June 7, 2019)
- Robert E. Zimet to Cyrus R. Vance, Jr.  (June 9, 2019)
- Matthew W. Knect, Tim Luongo and Stan German to Cyrus Vance, Jr.  (June 13, 2019)
- Linda Fairstein to Cyrus Vance, Jr.  (June 14, 22019)
- Linda Fairstein to Jim Kindler  (July 15, 2002)
- **Madeline McIntosh to Fairstein Enterprises, LLC  (June 26, 2019)**

Emails

- Nelson DeMille and Linda Stass to President and Board of Directors of Mystery Writers of America  (No date)

- **Linda Fairstein to Christine Ball  (March 12, 2013)**
- Linda Fairstein to Ben Dey  (May 5, 2016)
- Jane Rosenthal to Esther Newberg  (May 10, 2016)
- Esther Newberg to Linda Fairstein  (May 10, 2016)
- Linda Fairstein (5) to Elizabeth Lederer  (May 11, 2016)
- Elizabeth Lederer to Linda Fairstein  (May 11, 2016)
- Felicity Huffman to Linda Fairstein  (May 11, 2016)
- Trisha Meili to Linda Fairstein  (May 11, 2016)
- Linda Fairstein to Trisha Meili  (May 11, 2016)
- Linda Fairstein to Jane Rosenthal  (May 12, 2016)
- Jane Rosenthal to Linda Fairstein  (May 12, 2016)
- Elizabeth Lederer to Jane Rosenthal  (May 13, 2016)
- Linda Fairstein (2) to Elizabeth Lederer  (May 15, 2016)
- Elizabeth Lederer to Linda Fairstein  (May 15, 2016)
- Linda Fairstein to Elizabeth Lederer  (May 16, 2016)
- Elizabeth Lederer to Linda Fairstein  (May 16, 2016)
- Linda Fairstein (2) to Trisha Meili  (May 17, 2016)
- Trisha Meili (2) to Linda Fairstein  (May 17, 2016)
- Jane Rosenthal to Linda Fairstein and Elizabeth Lederer  (May 18, 2016)
- Jane Rosenthal to Linda Fairstein and Elizabeth Lederer  (June 2, 2016)
- Linda Fairstein to Jane Rosenthal  (June 7, 2016)
- Hannah Baker to Ava DuVernay  (March 27, 2018)
- Don Halcombe to Clarissa Colmenero  (August 2, 2018)

26                                                    Confidential

- **Linda Fairstein to Donna Andrews, Dan Hale and MWA Board of Directors (November 27, 2018)**
- **Linda Fairstein to Emily Canders  (November 27, 2018)**
- **Emily Canders to Linda Fairstein  (November 28, 2018)**
- Linda Fairstein to Donna Andrews  (November 28, 2018)
- **Amanda Walker to Claire Von Schilling and Stuart Applebaum  (November 29, 2018)**
- **Stuart Applebaum to Amanda Walker and Claire Von Schilling  (November 29, 2018)**
- **Claire Von Schilling to Amanda Walker and Stuart Applebaum  (November 29, 2018)**
- Donna Andrews to Linda Fairstein  (November 29, 2018)
- **Christine Ball to Linda Fairstein  (November 29, 2018)**
- **Linda Fairstein to Laura Rossi Totten  (November 29, 2018)**
- Nelson DeMille to MWA Board of Directors  (December 3, 2018)
- Linda Fairstein to Barbara (unknown)  (December 10, 2018)
- Denise Martin to Unknown Recipient  (February 15, 2019)
- Summer Simmons to Marleisee Stephens  (February 17, 2019)
- Clarissa Colmenero to Spencer Peeples, et. al.
- Linda Fairstein to Esther Newberg, Christine Ball and John Parsley  (March 4, 2019)
- **Christine Ball to Linda Fairstein  (March 4, 2019)**
- Clarissa Colmenero to Ava DuVernay, Jane Rosenthal, Berry Welsh, Jonathan King  (March 15, 2019)
- Joanna Wolff to Ava DuVernay  (May 1, 2019)
- Eliza Abramson to Joanna Wolff  (May 24, 2019)
- **Christine Ball to Emily Canders  (June 3, 2019)**
- **Emily Canders to Multiple Recipients  (June 3, 2019)**
- **Amanda Walker to Allison Dobson, Ivan Held and Claire Von Schilling  (June 3, 2019)**
- **Christine Ball to Amanda Walker  (June 3, 2019)**
- Rachel Krupitsky (PRH) to Claire Von Schilling  (June 3, 2019)
- **Linda Fairstein to Christine Ball and Esther Newberg  (June 6, 2019)**
- **Lucy Dauman to John Parsley  (June 6, 2019)**
- **Madeline McIntosh to Esther Newberg  (June 6, 2019)**
- **Sean Mandell to Emily Canders  (June 4, 2019)**
- **Emily Canders to Christine Ball, et. al.  (June 4, 2019)**
- Megan Tallmer to Elizabeth Barkley  (June 4, 2019)
- Marleisse Stephens to Ava DuVernay, Jane Rosenthal, Berry Welsh and Jonathan King  (June 4, 2019)
- Clarissa Colmenero to Unknown Recipient  (June 4, 2019)
- Clarissa Colmenero to Korey Wise, Yusef Salaam, Raymond Santanna, Antron Brown, Kevin Richardson  (June 5, 2019)
- **Claire Von Schilling to John Lovallo  (June 6, 2019)**
- **Skip Dye to Amanda Walker, Christine Ball and Claire Von Schilling  (June 6, 2019)**
- **Claire Von Schilling to Allison Dobson and Christine Ball  (June 6, 2019)**
- **John Lovallo to Claire Von Schilling  (June 6, 2019)**
- **Linda Fairstein to Christine Ball  (June 7, 2019)**

27

Confidential

- Robin Swicord to ▮▮▮▮▮▮▮ (June 10, 2019)
- Robin Swicord to David Kramer  (June 11, 2019)
- Robin Swicord to ▮▮▮▮▮▮▮ (June 13, 2019)
- Catherine Burke to Linda Fairstein  (October 23, 2019)
- Edward K. Cheffy and Andrew T. Miltenberg to Ava DuVernay  (March 2, 2020)
- Edward K. Cheffy and Andrew T. Miltenberg to Attica Locke  (March 2, 2020)
- Edward K. Cheffy and Andrew T. Miltenberg to David Hyman (Netflix)  (March 20, 2020)
- Martin London to Adam Liptak  (August 11, 2021)

Netflix Series

"When They See Us" (May 31, 2019)

Social Media

- NetflixTwitter Posts  (April 19, 2019, May 8, 2019, May 9, 2019), May 11, 2019, May 12, 2019, May 14, 2019, May 15, 2019, May 28, 2019, May 31, 2019, June 1, 2019, June 4, 2019, June 12, 2019), June 15, 2019, July 5, 2019)
- Ava DuVernay Social Media Posts (April 19, 2019, May 18, 2019, May 24, 2019, May 31, 2019, June 1, 2019, June 9, 2019, June 10, 2019, June 12, 2019, June 25, 2019)
- Attica Locke Twitter Posts  (November 27, 2018, May 25, 2019, May 31, 2019, June 3, 2019, June 4, 2019, June 7, 2019, June 11, 2019)
- Linda Fairstein Instagram Posts  (No date)
- Change.org: Remove Linda Fairstein From Vassar College Board of Trustees  (No date)
- YouTube:  Interview with Linda Fairstein at Lincoln Center.  (No date)

Media Coverage

(Note:  The media coverage listed below is a representative sample of the countless articles and reports that I reviewed.  There were dozens more I reviewed that aren't listed.)

- History vs Hollywood:  "When They See Us"  (No date)
- Mystery Tribune:  "The Abyss:  Linda Fairstein, 'When They See Us,' and the Central Park Five"  (No date)
- New York Post: "Central Park Five Fallout"  (No date)
- NPQ Magazine:  "When They See Us – Reflections as a White Woman in Newspaper Leadership"  (No date)
- New York Times:  "Literary Group is Chided for Honoring Central Park Five's Prosecutor  (No date)
- Emmy:  "Seeing and Believing"  (No date)
- (Unknown):  "Feeling Seen"  (No date)
- New York Post:  "Cancelling a Heroine"  (No date)
- **New York Times: "Literary Group is Chided for Honoring 'CP5' Prosecutor  (No date)**
- New York Times: "Jogger's Attackers Terrorized at Least 9 in 2 Hours"  (April 22, 1989)

- New York Times: "Genetic Tests 'Inconclusive' in Jogger Rape" (October 10, 1989)
- New York Times Magazine: "Linda Fairstein vs Rape" (February 25, 1990)
- New York Daily News: "DNA Prints Fail to ID Jogger's Attackers" (July 14, 1990)
- New York Times: "Semen Tested in Jogger Case Was Not That of Defendants" (July 14, 1990)
- Newsday: "Mother's Outburst at Jogger Trial: Proclaims Son's Innocence on Final Day of Testimony" (August 7, 1990)
- New York Daily News: "It is a Season to be Fearful" (April 19, 1994)
- Transcript: "Imus in the Morning" Radio Program (June 20, 2014)
- Variety: "Ava DuVernay Bringing Central Park Five Limited Series to Netflix" (July 6, 2017)
- USA Today: "The Real 'SVU' We Kicked on the Courtroom Doors and Got Justice for Sex-Crime Victims" (May 21, 2018)
- New York Times: "After Furor, Literary Group Withdraws Honor for 'Central Park Five' Prosecutor" (July 28, 2018)
- New York Law Journal: (Letter to the Editor): "In Defense of the Central Park 5 Prosecution" (July 31, 2018)
- Los Angeles Times: "Linda Fairstein's Past as a Prosecutor Overseeing the Central Park Five Case Causes Award Controversy" (November 27, 2018)
- New York Times: "Literary Group Under Fire For Honoring 'Central Park Five' Prosecutor" (November 28, 2018)
- Bustle: "A Literary Group Rescinds Award for Linda Fairstein Amid Outcry Over Her Role in the Central Park Five Case" (November 29, 2018)
- City Journal: "Linda Fairstein Defamed for Being Right" (December 13, 2018)
- New York Post: "The Defamation of Linda Fairstein and Other Commentary" (December 18, 2018)
- Screenrant.com: "When They See Us Trailer Teases Ava DuVernay's Central Park Five Series" (March 1, 2019)
- Netflix: Oprah Winfrey Special "When They See Us" (May 14, 2019)
- CBS This Morning: "The Untold Story: DuVernay's New Series on Wrongful Conviction of Central Park Five" (May 20, 2019)
- Today: "Read Linda Fairstein and Trisha Meili's Full Statements on the Netflix Series 'When They See Us'" (May 22, 2019)
- Hollywood Reporter: "Ava's Way" (May 22, 2019)
- The Daily Show: "Ava DuVernay – Revisiting the Central Park Jogger Case with 'When They See Us'" (May 28, 2019)
- Hollywood Reporter: "Murder They Wrote" (May 30, 2019)
- Los Angeles Times: "Power in the Retelling" (May 30, 2019)
- People: "Inside the Controversy About Linda Fairstein Central Park 5 Prosecutor Played by Felicity Huffman" (May 31, 2019)
- New York Times: "Suing the Accused Were Victims Too" (May 31, 2019)
- (Unknown): "What is 'Wilding' and What Does it Have to Do With the Central Park 5?" (May 31, 2019)
- New York Daily News: "Justice Denied" (May 31, 2019)
- Hyperallergenic: "Ava DuVernay's When They See Us is a Brutal Look at a 30-Year Old Injustice." (May 31, 2019)
- The Atlantic: "How the 'Central Park Five' Changed the History of American Law" (June 2, 2019)

- Associated Press: "Publisher Drops Central Park Five Prosecutor Linda Fairstein" (June 2, 2019)
- New York Law Journal: "Weaknesses in Central Park 5 Case Were Clear All Along" (June 3, 2019)
- The Root: "Raymond Santana Supports Boycott of Central Park Five Prosecutor Linda Fairstein: 'She Has to Pay for Her Crime'" (June 3, 2019)
- Newsweek: "Central Park Five Prosecutor Linda Fairstein Resigns From Vassar College Board of Trustees" (June 4, 2019)
- Glamour: " Note on Linda Fairstein's 1993 'Woman of the Year Award'" (June 4, 2019)
- Variety: "Central Park Five Prosecutor Resigns from Vassar Board Amid 'When You See Us' Criticism" (June 5, 2019)
- Washington Post: "The Slippery Moral Calculus of Linda Fairstein " (June 5, 2019)
- New York Post: "'Cancelling a Heroine:  The Mobbing of Linda Fairstein  (June 5, 2019)
- **Simple Justice: "Dramatic License: Is Fairstein Fair Game"  (June 6, 2019)**
- Variety: "Limited Series and TV Movie – Contenders: In Conversation"  (June 6, 2019)
- Washington Post: "A Critical Look at Linda Fairstein, an Acclaimed Sex Crimes Prosecutor"  (June 6, 2019)
  New York Times: "Linda Fairstein, Once Cheered, Faces Storm After 'When They See Us'"  (June 6, 2019)
- New York Post: "Canceling a Heroine"  (June 6, 2019)
- Esquire: "When They See Us Sparked a Boycott Against Central Park Five Prosecutor Linda Fairstein"  (June 7, 2019)
- Glamour: "What Real Reparations Could Look Like for the Exonerated Five"  (June 7, 2019)
- New York Times: "Prosecutor in Rape Case Dropped by Publisher"  (June 8, 2019)
- New York Times: "Trump Won't Retreat on his Central Park Five Comments"  (June 19, 2019)
- Roulou.com: "Elite Black Prosecutors Honor the Exonerated With Prestigious Award"  (July 7, 2019)
- Vox.com: "Who's the Villain in "When They See Us?"  (June 8, 2019)
- New York Times: "Prosecutor in Rape Case is Dropped by Publisher"  (July 8, 2019)
- CNN: "Linda Fairstein Resigns From Board of Alma Mater Vassar College"  (June 8, 2019)
- Associated Press: "Publisher Drops Central Park Five Prosecutor Linda Fairstein  (June 8, 2019)
- Variety: "Central Park Five Prosecutor Wouldn't  Consult on Netflix Show if Producers Spoke to Accused Men"  (June 9, 2019)
- New York Daily News: "They See' $3.9 Million More: State's Quiet Payout to Central Park Five Adds to City's $41 Million for Wrongful Conviction"  (June 9, 2019)
- Workers World: "Ongoing Repercussions for the Central Park Five Case"  (June 9, 2019)
- New York Times: (Op-Ed by Linda Fairstein) "Netflix's False Story of the Central Park Five"  (June 10, 2019)
- Wall Street Journal: "Netflix's False Series of the Central Park Five"  (June 10, 2019)
- Hollywood Reporter: "Ava DeVernay Talks Linda Fairstein With Oprah Winfrey During 'When They See Us' Event"  (June 10, 2019)
- Hostile Therapy (Podcast): "A Funeral for Linda Fairstein"  (June 10, 2019)

Confidential

- New York Times: "Linda Fairstein Attacks Her Portrayal "When They See Us" (June 11, 2019)
- Wall Street Journal: (Op-Ed by Linda Fairstein) "Netflix's False Story of the Central Park Five" (June 11, 2019)
- The Nation: "Linda Fairstein is Still Trying to Take Down the Central Park Five (June 13, 2019)
- Newsday: "Netflix Miniseries Spurs Prosecutor to Quit" (June 14, 2019)
- CNN: "Netflix Series About Central Park Five Case Accurate?" (June 14, 2019)
- Los Angeles Times: "'Central Park Five' Goes Where Netflix Doesn't" (June 17, 2019)
- NPR Radio (Transcript): "Ava DuVernay Focuses on the Central Park Five's Perspective: Now People Know" (June 19, 2019)
- Washington Post: "'WTSU' Tells the Important Story of the Central Park Five. Here's What it Leaves Out" (June 29, 2019)
- (Unknown): "Produced by Ava DuVernay (June-July 2019)
- New York Daily News: "A Prosecutor Unfairly Maligned: Linda Fairstein is Ill-Treated by a TV Movie about Central Park Five (July 1, 2019)
- **Washington Post: "A Mob is on the Loose and it's After Linda Fairstein" (July 1, 2019)**
- Vox.com: "A Changing America Finally Demands That the Central Park Five Prosecutors Face Consequences" (July 8, 2019)
- Preen.PH: "Fairstein and Lederer Deserve Their Fate After 'When They See Us' Premiered" (July 9, 2019)
- Variety: "Ava DuVernay on Moving from PR to Filmmaking, Directing 'When They See Us'" (August 9, 2019)
- Vanity Fair: "When They See Us and Chernobyl Prove Truth is Stronger Than Fiction" (August 28, 2019)
- Essence: "Linda Fairstein Dropped By Hollywood Literary Agency Amid 'When They See Us" Backlash" (June 27, 2002)
- Voice: "Ash Blonde Ambition" (November 19, 2002)
- Associated Press: "Key Prosecutor: No Regrets in Central Park Five Convictions" (November 25, 2002)
- New York Daily News: "5 'Absolutely' Guilty Prosecutor Has No Regrets in Jogger Rape Convictions" (November 25, 2002)
- New Yorker: "A Prosecutor Speaks Up" (November 25, 2002)
- New York Times: "New Light on Jogger's Rape Calls Evidence Into Question" (December 1, 2002)
- New York Daily News: "Joy and Rage Over Jogger 5 Morgy's Decision Clears Them of All Charges" (December 6, 2002)
- People: "A Radical Reversal" (December 23, 2002)
- Legal Affairs: "The Practitioner" (September/October 2003)
- New York Amsterdam News: "We Must Reopen Central Park 5 Prosecutor Linda Fairstein's Cases (September 27, 2019)
- YouTube: "When They See Us: Ava DuVernay Explains Series is 'Biased and Slanted'" (April 27, 2020)
- CBS News: "Ava DuVernay: Not Our Job to Explain to White Folk How to Combat Racism" (May 28, 2020)
- Variety: "Ex-Prosecutor Linda Fairstein Can Sue Netflix Over 'When They See Us' Portrayal" (August 9, 2021)

- Vogue: "Ava DuVernay's Moving New Netflix Show, Colin in Black & White" (November 2, 2021)
- New York Daily News: "Justice Delayed: How prosecutors Should and Shouldn't Revisit Past Convictions" (November 10, 2021)
- C/Net: "Netflix: 45 of the Absolute Best TV Shows to Watch" (December 12, 2021)

Internet Research

During the course of this assignment, I conducted research to obtain information on the internet as well as to seek clarification and definition on various subjects.

Sources to Obtain Information

The aforementioned documents and informational materials listed along with internet research I conducted and information I received from Plaintiff's legal counsel and the Plaintiff provided me with the information related to this case and specific to it which formed the basis for the findings, conclusions and opinions I offer in this report.

## PREFACE TO ANALYSIS AND OPINIONS

My Responsibility

Following are my conclusions and opinions as they pertain to the issues I was asked to address as outlined in the previous "Assignment" section of this report. My input in this report will be based on the information I obtained and reviewed in this case which was detailed in the "Information/Input Received to Form Opinions" section of the report. The information, which emanated from both sides in this litigation, reflects both of their understandings of the facts as well as their interpretations and views of them. In some instances, they agree on information and facts and in others they don't. It is not my task or responsibility to determine who is right or wrong; that will be determined in court. My responsibility is to analyze, evaluate and opine on reputational damage from the facts I know to be true. Where there is a disagreement, since I was retained by the Plaintiff, I will presume that the information provided on her behalf is correct and will base my conclusions and opinions on it being true unless I am made aware of – or will be subsequently provided - evidence to the contrary.

Methodology Utilized

To reach these conclusions and opinions, the methodology I used in this case is consistent with that which is standard operating procedure that public relations and communications professionals as well as expert witnesses use when addressing issues and situations for clients similar to those in this case in making their determinations and offering their findings, conclusions and opinions.

- Carefully reviewed all documentation and information on the background to this dispute as well as that related to the litigation as well any other unrelated information that is germane to this the issues in contention in this case.

- Carefully analyzed the information provided regarding the dispute and their positions on it as espoused by both parties in this litigation (as reflected in the Case Background section of this report).

- Queried Plaintiff's counsel to get additional information and clarification as needed.

- Queried the Plaintiff in this case to obtain relevant information as well as her personal assessment of the personal, professional and reputational harm and damage she incurred.

- Researched information as needed on the internet.

- Applied the principles of negative communications to this case as appropriate.

- Reviewed and analyzed previous applicable experiences I have had in my professional communications and expert witness background that may be applicable to this situation and would provide me with insight to assist me in forming my conclusions and opinions.

Relative to the last point above, it is important to note that any conclusions and opinions I offer are based on the professional background and the experience and expertise I have amassed during my 54-year background in communications (outlined in earlier sections of this report) and not emanating from surveys, studies, tests, research or other forms of qualitative or quantitative types of analyses or fact-gathering procedures. They are based on direct experience and observations working with people, businesses and/or entities in similar situations and what transpired from them. This is covered in Rule 702 and 703 which states:

- The use of opinions will continue to be permissible for the experts to take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts.

- The expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education."

- Using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert is qualified; (2) the testimony addresses a subject matter on which the factfinder can be assisted by an expert; (3) the testimony is reliable; and (4) the testimony "fit" the facts of the case.

My five-decade-plus background in all major professional areas of communications along with my 42 years of experience in litigation support, my specialization in reputation management and repair counseling and programs as well as my 16 years as an expert witness clearly gives credence to the validity of the following comments, conclusions and opinions I offer relating to this case.

Depiction Definition

The action or result of representing or characterizing someone or something in words or images. (The amalgamation of definitions by Merriam-Webster, Oxford and dictionary.com)

Legal Definitions

The reputational impact of the Causes of Action that I am addressing in this case and for this report all relate to Defamation. Following are the legal definitions of each under New York law:

- Defamation: A statement is defamatory if it tends to diminish the esteem, respect, goodwill, or confidence in which the plaintiff is held, or if it tends to excite adverse,

33                                                    Confidential

derogatory, or unpleasant feelings or opinions about the plaintiff. "Davis v. Costa-Gavras,619 F. Supp. 1372, 1375(S.D.N.Y. 1985).

- <u>Defamation Per Se</u> – Defamation per se recognizes that some statements are so inherently damaging that reputational harm will be presumed. These include:

    - Statements charging a Plaintiff with a serious crime.
    - Statements that tend to injure another in their trade, business, or profession.
    - Statements imputing a loathsome disease on a Plaintiff.
    - Statements imputing unchastity on a woman.

- <u>Defamation Per Quod</u> – A form of defamation that is either not apparent and requires extrinsic evidence to prove its injurious nature; or is apparent but is not an actionable per se statement. The plaintiff has to prove actual monetary damages.

- <u>Conspiracy to Defame</u> – Multiple parties joining together to conspire. Four elements required, include:

    - An agreement between two or more parties.
    - An overt act in furtherance of the agreement.
    - The parties' intentional participation in the furtherance of a plan or purpose.
    - Resulting in damage or injury.

<u>Reputation Importance</u>

One's reputation – regardless of whether it is a person, business, organization or any other type of entity is critical because that is most often the "prism" through which the subject is view and/or judged. According to an amalgamation of definitions offered by the Cambridge, Oxford and Merriam-Webster dictionaries, reputation is defined as:

> *"The beliefs or opinions that are generally held about someone or something. The overall quality or character as seen or judged by people in general; the opinion that people in general have about someone or something or how much respect; the estimation in which a person or thing is held."*

In the public relations profession, there is an old "tried and true" axiom that is sacrosanct and that is "perception is more important than reality." Reputation and perception are basically interchangeable in this context.

Further, when negative communications are directed at an individual related to his/her business or profession, the reputational harm is more widespread than on a business or other type of entity primarily because it can also negatively impact the individual's personal life as well. The damage does not stop at the "office door."

<u>Impact/Effects of Reputational Damage and Harm</u>

Prior to addressing the reputational harm in this case, there is one critical factor that needs to be understood and considered when analyzing the real and potential reputational harm to the Plaintiff as a result of false statements, misrepresentations, actions and inactions of the Defendants which has already has a profound negative impact on the Plaintiff.

When assessing a situation involving reputational harm and damage, it is important to understand how a stained reputation not only has a detrimental impact emanating from the Defendants in this case contributing to the negative communications but also the added negative consequences that occur when the Defendants will also be the catalyst to cause the negative communications to spread the reputational harm and damage to negatively influence even more people. These forms of reputational "negative communications" (e.g. word of mouth) are then communicated, transmitted and perpetuated which then often result in additional exposure that takes on a life of their own both in terms of the disparaging content and widespread distribution. Also, it is nearly impossible to counteract or negate the harmful effects of this negative reputational spread either in the short or long term.

There are several sayings that are apropos in relation to the dissemination of negative information about some person and/or entity – regardless of whether it is true or not, to wit:

- It takes years to establish a reputation and seconds to destroy it.
- You can't un-ring a bell.
- You can never wipe a slate clean
- Where there is smoke, there is fire.
- Perception is more important than reality

There are two methods of disseminating negative information (or, in this instance, a negative reputational view of the Plaintiff) – controlled and uncontrolled. "Controlled" means that one can pinpoint everyone who actually was exposed to the negative communications passed on (e.g. person-to-person remark, written communication to only certain people, a speech to a group of people) in a contained environment. The theory here is that only these people have the information and they have hopefully not yet passed it on in any way (e.g. word of mouth, written communication). When this occurs, there is a chance to be somewhat effective in refuting it by reaching those people and providing an opposing view to the input they received.

"Uncontrolled" means that either the negative communications resulting in the negative reputational view has already passed it on in various ways to others that cannot be identified or contacted – or it was disseminated in such a way (e.g. in the media or on internet) that there is no way of knowing exactly who received it or what they may have done with that information (e.g. disseminate it to others). In this instance, it is impossible to ensure that everyone exposed to the negative communications has access to the opposing viewpoint – and thus, without any counter information, the original (negative) view or opinion formed as a result of it could be considered to be accurate making it extremely damaging.

In this case, it is my opinion that the "uncontrolled" method of communication would clearly apply because of the type of exposure (four-part television series) that was widespread in its reach (seen internationally by millions of people) added to the massive media exposure that resulted, the extensive internet and social media exposure as well as a campaign initiated by all three Defendants both before and after the series aired to hype and proclaim the accuracy and justification for the series while at the same time disparaging the Plaintiff. One must reasonably add to this the "word of mouth" factor that would undoubtedly emanate from this widespread exposure. As both the Plaintiff and the Defendants are established and prominent in their fields, the supplemental distribution of the negative communications has realistically been substantial. Therefore, it is clear that the reputational damage was extensive, more absorbed and impactful.

Confidential

Negative impressions or perceptions, once implanted can often never be completely erased or overcome – to some people completely and for others, to a certain degree.

- To change their thinking is never as effective because the person may have already given credence to the initial opinion or they will filter the second outlook through the original information received (not a clean slate).

- Even if people receive a contrary view, there could always be an element of doubt (e.g. where there is smoke, there is fire).

- If someone receives contrary views of a reputation, and doesn't know which is right, it would be human nature to take a conservative approach to steer clear of the subject of the information (e.g. "why take the chance") and go with another choice.

- People will believe a negative impression or perception of a reputation if it seems plausible and there is no counterbalancing input that refutes or challenges that information.

- As a negative reputation is communicated to others, when there is no way to identify who has received the information, there is no chance to provide them with the correct the negative impression or perception.

- When a damaged reputation is communicated and isn't countered, it can be passed on by "word of mouth." This is particularly dangerous and harmful because when passing this view from one person to the other, the original view can be misinterpreted, exaggerated, embellished and/or distorted which could make it even more negative in nature.

- Finally, and most importantly, if the negative impression or perception cannot be stopped with the original people who heard it, it can go on forever and the spreading of it can be limitless.

In short, reputational damage through negative communications can be devastating and lasting.

## ANATOMY OF REPUTATION HARM

In her lawsuit the Plaintiff cites seven causes of action involving defamation. As an expert witness, I am not allowed to offer a legal opinion as to the validity of those claims. That is for the trier of fact (i.e. jury) to determine. My professional background, experience and expertise do however qualify me to assess the reputational damage and/or negative consequences emanating from the words and actions of the Defendants which led to this litigation. In this section I will offer my analysis and conclusions as to how the Netflix series from its conception through production and public airing as well as the actions and inactions of the Defendants have contributed to the damage to the Plaintiff's reputation and subsequent harm to her professionally and personally.

<u>Plaintiff's Pre-Netflix Series Reputation</u>

Prior to the issues the Plaintiff had with the series as well as the Defendants both before and after it aired which resulted in this lawsuit, the Plaintiff Fairstein had a long and distinguished career

36

Confidential