as an attorney, civil servant and as an author (briefly profiled in the Case Background section of this report) and had two thriving careers—one in the law and one in literature. She also had an excellent personal reputation based on her contributions to community, civic, cultural, educational and other non-business endeavors.

Throughout her service for 26 years as Chief of the New York County's Sex Crimes Prosecution Unit, Fairstein was held in high-esteem for her decades of work as a prosecutor and advocate for crime victims, including her work to assist the wrongfully accused. She was considered one of the best-known prosecutors in America. Her reputation is reflected in assessments by the National Book Review which wrote that Fairstein is "widely regarded as the nation's leading legal expert on sexual assault and domestic violence" and in a New York Post article on June 5, 2019 which reported:

> "She was a pioneer woman in courts that were male-dominated and in a society and legal system that did little to achieve justice for victims of sexual crimes. Far too many sexual predators get away with their crimes, and Fairstein spent her life fighting against that. There are few women who fill the role Fairstein did, or who can step in with the institutional knowledge and power to make an impact in the criminal justice system on behalf of victims as she did."

Fairstein, who was the recipient of a multitude of honors and awards during her legal career (as well as personally), was credited for innovations and initiatives she developed in the way sex crimes are investigated and prosecuted, to include:

- She pioneered the fight to gain access in courts for victims of sexual assault, domestic violence, and child abuse.
- She made it routine to have the victim of an acquaintance rape place a call to the accused and catch him on tape admitting the crime, or even apologizing for it.
- She got police to begin systematically dispatching Crime Scene Units to collect evidence of rape as well as at murder scenes.
- She pioneered practices that made it easier for women to see a rape prosecution through to the end and to have one assistant District Attorney follow each victim throughout the whole process.
- She had a reputation as a career prosecutor who pioneered the fight to gain access in courts for victims of sexual assault"
- She pioneered the prosecutions of the first "date rape" cases in New York State.
- She instituted the first drug-facilitation rape prosecutions.
- She instituted the first use of DNA matching technology in the investigation of Sexual assault and murder cases in New York.
- She instituted the first "John Doe DNA" indictments.
- She was responsible for the country's first rape kit backlog elimination of 16,000 cold cases.

The achievements and prominence of the Sex Crimes Unit which Fairstein headed was the inspiration for the NBC Television Series "Law & Order: Special Victims Unit." Individually, Fairstein was the model for the lead character in the television movie "Farrell For the People" starring Valarie Harper and she often served as a role model, advisor and technical consultant for female prosecutors in motion pictures (e.g. "The Accused" and "Presumed Innocent"). A testament to this was contained in an article in the Washington Post:

*"For years, Fairstein was renowned for being the New York prosecutor whose sex-crimes unit not only spawned a hit TV show but gave sex crimes the prominence they deserve. She garnered numerous honors and, after she retired, wrote several best-selling novels grounded in her long career as a prosecutor. "*

She was also "in the conversation" for future high level positions in law enforcement such as that of the New York District Attorney and United States Attorney General.

Regarding her literary career, she was a highly successful author, having written 24 fiction novels, a large portion of which were on the New York Times best-selling list and one was selected as its "Notable Book of the Year."

Fairstein was active in numerous community, charitable, educational and other public service endeavors as well serving on boards of directors and contributing her time, expertise and financial resources to community, nonprofit, charitable and educational organizations.

During her distinguished career, prior to the Netflix series, she received numerous honors and awards for her legal and literary accomplishments and community service. A partial list includes:

- New York Women's Agenda 2010 Lifetime Achievement Award
- Glamour Magazine's Woman of the Year Award
- American Heart Association Women of Courage Award
- Federal Bar Council's Emory Buckner Award for Public Service
- United Jewish Appeal Federation's Proskauer Award
- Nero Wolfe Award for Excellence in Crime Writing
- Columbia University School of Nursing's Second Century Award for Excellence in Health Care
- International Thriller Writers 2010 Silver Bullet Award
- Distinguished Woman of the Year Award - Boy Scouts of America
- Humanitarian Award – National Conference of Christians and Jews
- International Woman of Achievement – Sorophomists

Due to her achievements, national prominence and reputation in the field of seeking justice for abused women, Fairstein also functioned as a consultant and was a national lecturer and public speaker on such topics as violence against women, domestic violence, and aspects of the criminal justice system speaking to professional organizations, colleges and universities as well as healthcare professionals and women's groups.

While Fairstein, as is normal for a high profile public figure, was the source of periodic criticism for her words or actions, her reputation prior to the Netflix series was highly positive.

Netflix Series Mission

The Defendants have clearly stated, in information I have reviewed including records, legal filings and interviews, that their primary goal for the series was to "tell the truth" of what transpired - from the night of the attack through the subsequent litigation and their incarceration - from the point of view of the Central Park Five. The clear inference was that they much of the prior public exposure concerning them was distorted and this series would set the record straight.

Defendants Target

To accomplish this, through the Defendants' own admission, they sought to expose the unfair treatment the Central Park Five received and the injustices they experienced from the moment they were brought in for questioning through their trials and incarceration. To do so, they basically put the justice system on trial. According to the Defendants, for storytelling purposes, the best means of doing this was to select and focus on one primary "villain" who was a real person actually involved in this situation but would also serve the dual purpose of being the "face" of all the other individuals and segments of the law enforcement and the justice system whose words and actions were responsible for the plight of the Central Park Five. The person they selected was the Fairstein. Part of the rationale for that was expressed in a writers' room recording, in which the speaker said: *"How do we treat the fact that there is on one hero helping them throughout, there is no one clear villain?" Linda Fairstein is a clear villain..."* Also, in an email on February 17, 2019, Summer Simmons, Netflix's Director of Creative Product wrote:

> *"Felicity plays Linda Fairstein (the lead prosecutor) who is our #1villain and conspirator to lock these boys up."*

Possibly though the most damning example of this designation of Fairstein as the villain is an email from Wolff, the Director of Publicity, to DuVernay on May 1, 2019, a few weeks before the series aired, commenting on advance clips sent to CBS. She wrote:

> *"This was just a first round of clips that the CBS producer requested. He very much feels as though Linda is the villain, and we agree these clips paint her as such. It is a way for them to frame the injustices these men faced."*

In her deposition Wolff verified that the publicity team told the CBS Producer that *"Ms. Fairstein acts as a vehicle to represent the many injustices in the series."* She also acknowledged that the clips from the series sent to CBS portrayed Fairstein as a villain.

**The extent to which she was proclaimed the villain even extended to the description of her character which was submitted to actresses that were considered to portray her in the series. The description presented to them, as reported in Engel's deposition, read as follows:**

> ***"Fairstein, with the assistance of the detectives at the 20th precinct, coerced false confessions from the five arrested teenagers following 30 straight hours of interrogation and intimidation of both the youths and their supporting adults"***

In a following section of this report on the Development of the Plaintiff's portrayal, evidence on the Defendants' efforts to single out Fairstein as the primary source of blame will be detailed.

Media Assessment of Who Was Targeted

To reinforce the contention of the Plaintiff that the Defendants specifically targeted her as the centerpiece of their representation of who was responsible for the unjust conviction and resulting harm to the Central Park Five, the mass media weighed in with its own analysis, assessment and conclusions on who the series targeted in this respect. Following are some examples.

- *"Fairstein, who's set up to be the villain in the miniseries…"* DuVernay's trial-by-fiction has helped to convince the media, the public, and the original Central Park 5 that Fairstein is the villain.
  (History vs Hollywood)

- *"…and the villainous characterization of Ms. Fairstein…*
  (New York Times)

- *"With the exception of Mary Queen of Scots, probably no woman has risen as high and fallen so far as Linda Fairstein, the one-time sex-crimes prosecutor now accused of railroading the convictions of five teenagers for a rape they did not commit…it is not the Central Park Five who got railroaded, but Fairstein"*
  (New York Daily News)

- *"Fairstein as she is portrayed in the film, was in the crosshairs. "The anger spilling from viewers is being aimed at Linda Fairstein, perhaps the most conspicuous villain of the story."*
  (Vox.com)

- *"When I went home, I wanted to tweet-bomb Linda Fairstein for her role in sending five innocent black boys to jail, but others beat me to it".*
  (Glamour Magazine)

- Host: *"…singled out for particular scorn was Linda Fairstein."*
  (CNN News)

- *"In DuVernay's creative retelling, Santana, Salaam, Richardson, Wise and McCord are completely innocent. They are victims who were railroaded by Prosecutor Linda Fairstein…"*
  (New York Daily News)

- *"In the films, Linda Fairstein comes off as one of the principal villains."*
  (The Nation Magazine)

- "Fairstein is portrayed *in the series as willing to do anything to convict even when evidence didn't support her theories."*
  (Newsday)

- *"Felicity Huffman plays sex crimes prosecutor Linda Fairstein…as the ethically compromised, sanctimonious character…"*
  (Hollywood Reporter)

- *"Whether or not you believe the narrative that DuVernay presents, you can't argue with how effectively she presents it.    …a couple of ink-stained wretches yelling on Facebook   and in the pages of The Los Angeles Times isn't nearly the same as a deep, systematic racking by an Netflix mini-series executive-produced by Oprah."*
  (Mystery Tribune)

- *"When They See Us, a Docuseries on Netflix has brought a bright unforgiving light back to  the case and has made Linda Fairstein a pariah.*
  (Hostile Therapy Podcast)

Preemptive Warning and Response

The Plaintiff became aware of the plans by Netflix to produce and air a series about the Central Park "Jogger" case and the arrest and conviction of the Central Park Five. As there had been some sporadic comments over the years questioning her role in the investigation and litigation process, particularly after the Reyes confession and their convictions were overturned, Fairstein made every effort (in concert with Lederer and legal counsel) to caution the Defendants to do extensive research to get the facts and provide an accurate portrayal of the people and events in the series. These efforts are detailed in the earlier Case Background section of this report.

Theme/Story Development

Significant information on the process of developing the series is contained in the Case Background section of this report. The clear intent of the series, as reflected in all the information and documents I reviewed, was to present the viewpoint of the Central Park Five on what they experienced from their original arrest through the subsequent trials to the Reyes confession and their convictions being vacated. In her deposition, DuVernay demonstrated in her research a clear intention to present their story at the expense of a more balanced view. She stated that she interviewed some of the attorneys who represented the Central Park Five but never talked to anyone in law enforcement or the district attorney's office who were involved. She never personally reached out to or communicated with the Plaintiff Fairstein who she admitted she intended to focus the series on as representing the unfairness of the whole criminal justice system. While she instructed surrogates (e.g. Rosenthal) to reach out to her, she claimed that they never obtained Fairstein's input because allegedly Fairstein wanted to control the "narrative." In her deposition, she stated: *"she would not participate in any story that did not reflect her beliefs, her truth, what she saw as facts in evidence that supported her theories."*

(Side note: It is my opinion that if you are producing a four-part series based on true events that is going to be broadcast internationally and you have determined to make one individual – a real person – the most prominent nemesis to the central theme of the series – you would do anything and everything required to ensure that you received direct information and input from that person. This is particularly true when it is clear the portrayal of that person is going to be controversial and would result in severe reputational damage.)

More insight can be provided by the testimony of Swicord who was the primary writer on the first episode of the series (DuVernay also contributed to the first) which contains the bulk of the damaging portrayal of Fairstein. According to Swicord, an important and influential part of, and most of her research, came from two books:

- "The Central Park Five," a book authored by Sarah Burns
- "Unequal Verdicts The Central Park Jogger Trials" a book authored by Timothy Sullivan

(Observation: I reviewed both books and Fairstein was hardly mentioned in either. References to her were primarily in the beginning during the investigation phase and to a lesser degree when she testified at the trials. By contrast, Lederer was an integral part of the books and appeared in throughout them. Since Lederer actually led and oversaw the interviews and interrogations of the Central Park Five immediately following the incident in the park and was the lead prosecutor throughout both trials, the question arises as to why she wasn't targeted as the villain in the series instead of Fairstein. I would surmise there are three primary reasons.

41

Confidential

- Fairstein had a much higher position as head of the Sex Crimes Unit and had more authority (even though lot less involvement in the investigation and trials).

- Fairstein had a national reputation and was had a higher profile and was well known by the news media (good for ratings).

- Fairstein became somewhat controversial and upset many people when she actively and publicly continue to maintain the Central Park Five were guilty in the immediate aftermath of the Reyes Confession.

In short, because of her higher ranking position, public profile and making her the villain made for better "theatre" and would result in higher ratings.)

In an email to ████████████ on June 13, 2019, Swicord wrote *"We can back up every frame of what we made with evidence."* Yet, in relation to the two books, she admitted in her deposition that she did not know who the authors' sources were and never questioned the authors about parts of the books that were in doubt or highly contentious. She just accepted what they wrote as fact. Of other sources she cited (including an attorney who represented one of the Central Park Five in court), she stated that she never checked on the accuracy of information provided to her or verified it because she trusted them - because them seemed knowledgeable.

Equally concerning, when asked in the deposition dozens of times to explain how the source of a fact or how she knew it, her response was repeatedly *"I believe…"* In other words, she wrote a script that vilified an individual and caused severe reputational damage based on two books which contained information she "believed" was accurate (without knowing the sources or questioning the authors), from other sources who she "trusted" they were knowledgeable and wrote a script based on what she "believed." As a writer myself and former newspaper reporter, this is not how legitimate writers present information that they purport is true.

When you combine this with the obvious extreme bias of the other two primary writers of the series – DuVernay and Locke – who have publicly denigrated Fairstein, it provides a "window" of explanation and insight into why this series has caused her such reputational harm which translated to damage to her career and personal life.

<u>Development of Plaintiff Portrayal</u>

The most telling glimpse into their depiction of Fairstein in the series came from an assessment of her that was contained in some internal Netflix notes (DEFS009725)

> *"Vicious, overboard, opportunistic, would do anything to satisfy her appetite for vindictiveness as a sex crime prosecutor and enhance opportunities beyond the case."*

This is a reflection of the mindset of DuVernay who produced, directed, co-wrote and was the showrunner for the series. A "window" into her thinking was revealed throughout her deposition. She repeatedly stressed that she was convinced that Fairstein the "chief architect" and single-handedly masterminded the entire process from the time they were detained to the incarceration of the Central Park Five. She stated that Fairstein controlled all aspects of the investigation because of her relationship with and command over the police detectives and that she was in total charge of the litigation from the appointment of Lederer to supervising all aspects of the trials. Because of these assessments by DuVernay, Fairstein was targeted as the "villain" in the series. Some excerpts from her deposition reflect this:

Confidential

Q  *Were there conversations in the writers' room about Ms. Fairstein being the clear villain?*

A  *Probably...most likely.*

Q  *Is her character the villain in your series?*

A  *She represents the criminal justice system as a character, and the criminal justice system is the villain. So yes, she is -- can be seen as that.*

In her deposition, DuVernay stated that Fairstein was portrayed as a real person and not a "composite" character which would lead the viewer to believe the portrayal was real and accurate as opposed to a fictional character that was a combination of many. Despite that, she admitted the following

Q  *Is your portrayal of Linda Fairstein in the series an accurate portrayal of her role in the Central Park Jogger case?*

A  *My portrayal of Linda Fairstein as a character in the series speaks to what I believe she represents at large in this case.*

Q  *Are any aspects of Ms. Fairstein's character in the series fictionalized?*

A  *Aspects of her character. Yes. Dramatized and fictionalized, yes.*

It is clear from the following excerpts from the Writers' Room Notes of January 24, 2018, the pre-planned, intentional targeting of Fairstein by the Defendants as they sought to develop the series and write the script. Following is a small, representative sample of the innumerable notes that define the negative portrayal of Fairstein:

"*We don't want to introduce Fairstein in a soft way.*

"*Have Fairstein's language be more direct, vulgar.   "These guys jacked into this sock..."*

"*Showing Linda Fairstein with tears in her eyes twice (p32,p52) made her too sympathetic to Ava. We don't want to connect the audience to her. Ava doesn't want to communicate that her ferocious and malicious violence to these boys was based in a good place (her love for the victims.")*

"*How did she come to pinning it on them? How did she say "Those are going to be the boys I'm going to pin it on"? When did she do that math?  The whole story rests on the equation that she cooked up in that moment:  BOYS+PARK=RAPE."*

Another telling example of the Defendants' intent to make Fairstein the central villain came from Eliza Abramson, Head of Policy and Corporate Communications, APAC at Netflix in an May 14, 2019 email to Wolff, a company publicist, when she wrote:

"*When They See Us really paints a very critical portrait of Linda Fairstein and her heavy involvement in the case. Linda is almost absent in the 20/20 piece, minus a few interviews. Instead, they are much more focused on Elizabeth*

> *Lederer's role. It's almost unclear what Linda's role in the case was at all. In watching the series, I think it clearly comes across that Linda is leading the case and it almost seems at times that Elizabeth has moments of doubt.   We've always known that Linda would be critical of the series...but I do think that the 20/20 series will add questions about Linda and Elizabeth's portrayals in the series and their roles in the case."*

This demonstrates that two full weeks before the airing of the series, a senior communications executive at Netflix was questioning both the extent of Fairstein's role and the critical nature of it as portrayed in the series.

**As a postscript to the inaccurate portrayal of Fairstein, Locke once put up a Twitter post claiming that Fairstein was in charge of both the media and prosecution strategy.  When asked in her deposition where she obtained that information, she couldn't cite one source but she referenced it was based on "assumptions" she made from books which she had read.  I reviewed two of the four books she cited in her depositions that she read and didn't see any such insertions in them regarding Fairstein's role.**

<u>Plaintiff's Response to the Investigation Portrayal</u>

The bulk of distorted portrayal alleged by the Plaintiff Fairstein was contained in the first episode which concentrated on the capture, interrogation and arrest of the Central Park Five. It her deposition, she addressed several of the scenes she contends that had resulted in severe reputational harm to her.  In her deposition, stressed the inaccuracies as follows:

- In reference to her giving orders to and controlling the police detectives and micro-managing the alleged torturous and possibly illegal interrogations of the five youths.

    Q    *"As the head of the unit and the highest ranking prosecutor at the stationhouse, you were responsible for what was happening on your watch; were you not?"*

    A    *"I had no responsibility for the police investigation that was ongoing.  None.  I had no authority, once again, none at all, to change the direction of anything anybody in the NYPD was doing.  The members of the NYPD are directed by and responsive to their commanding officers and legal bureau.  So I have no power, had no power over them to direct actions or compliance.   I am their legal advisor.  I have no authority to give any police officer an order."*

- In reference to Fairstein ordering the police (using racist language) to conduct a mass roundup of all the youth rampaging in Central Park the night of the attack and rape.

    Q    *"The police were looking to round up the kids who were in the park that night rampaging, as you have described it previously.  Correct?"*

    A    *"It was a one by one by one location of the young men who had been involved. Not a sweep.  Not a let's just go get everybody and sweep them in.  It was precision searches one-by-one."*

- In reference to directing the creation of a timeline of the actions in Central Park at the precinct for the police to show the five youth could have committed the assault and rape.

44

Confidential

> *and Ms. Lederer and yourself working on trying to make sense of the timing of the attacks in the park the evening before?"*

A   *"In regard to the known attacks, I had no role, either at the precinct nor the DA's Office, in trying to establish the timing of the attacks. None. The prosecutors had nothing to do with the creation of this timeline."*

Manipulation of "Facts" to Fit Portrayal

As stated in the Case Background section both the Plaintiff and the lawsuit tie the defamation and reputation damage to her directly from the fabrication by the Defendants of the words and actions they attributed to her as well as activities and events she was involved in which never took place. Following are excerpts from a variety of documents I reviewed which demonstrate a clear pattern of manipulating the truth and creating false statements and situations that that misrepresent and justify their narrative of Fairstein as "mastermind and chief architect" of all the harm and damage to the Central Park Five.

- From Netflix notes on the second cut of the first episode of the series on January 15, 2019:

    > *"It feels like we've lost Fairstein midway through the ep as well as the tension of whether or not these families will be able to help their sons. We feel it would be helpful to pull up scenes from both the investigation/Fairstein thread and the Family threads to address this."*

    > *"After Fairstein talks to Lederer in the law library, should we see her go back to the cops to juice them to get what she needs?"*

    > *"Statement to the press and then Fairstein orders the cops to bring in every thug you see in Harlem – could this section potentially come before we see the cops at Tron's apartment and Tron and parents' arrival at precinct and before Raymond Sr. arrives? This order might help to better establish we're into the next morning? From here maybe we then go to 23:00 Linda's admonition about having12 kids in custody, make them name their accomplices. Could we try bringing up the press conference before the cops bring in Antron and right after Fairstein says they are suspects not witnesses?"*

    > *"Could we try bringing up the press conference before the cops bring in Antron and right after Fairstein says they are suspects not witnesses?."*

    > *"Could we try moving the Fairstein/Lederer library scene up sooner? This is such a critical moment that forces her back to the drawing board and to pressuring the cops to get the information she wants."*

- From an email written by Hannah Baker on March 27, 2018 email to DuVernay.

    > *"...perhaps link her in viewers minds to Trisha as the reason why she's so passionate" about the case at various points to add to just her blind ambition and bias..."*

*"...she thinks they are witnesses. I have her switch the suspects theory when she's fighting Nancy Ryan for the case. Is that clear or no?  Important for me to strengthen if not. Let me know.  The moment of the switching Fairstein's line of thought wasn't completely clear to me when I read over the script, but maybe it's just a matter of noting briefly in the scene that Fairstein's emotional state is somewhat haphazard or desperate."*

- From DuVernay's deposition:

  Q   *What specific source listed here revealed to you that Ms. Fairstein was in the precinct house creating a timeline of the attacks in the park?*

  A   *This is not a documentary.  So the movements, dialogue, actions of the characters are not pinned to, connected to, backed up by specific information.*

- **From Locke's deposition:  In the original script, there was a scene discussing the DNA found on one of the youth's socks. In it, Morgenthau was told that *"Lederer has to inform the defense."*  Fairstein wasn't in the scene at the time but she was inserted into it later to ostensibly have her part of the attempt to suppress that evidence.**

- **From Engel's Deposition: In reference to a scene which depicts Fairstein directing detectives to round up kids in Harlem without using a specific list of names:**

  Q   *And how would the men have known if Ms. Fairstein was directing police to conduct a roundup in Harlem if they had not yet been brought into a precinct house?*

  A   *Because it's not about the literal behavior; it's about their perception of how a system was behaving with regard to them."*

  Q   *But they would not specifically know what Ms. Fairstein was doing in regard to directing police activity, would they?*

  A   *Again, it's not about a literal document of what happened. It is their perception of how a system treated them.*

No better example possibly exists to both demonstrate the manipulation of the facts and the willful vilification, disparagement and demonization of Fairstein than the last scene in which she appears in the series.  Late in the fourth episode, it shows her meeting with Ryan in a restaurant (a fabricated scene, the meeting never happened).  The purpose of the meeting was for Ryan to inform Fairstein that all the forensic evidence (e.g. DNA, blood, semen test results) confirm that Reyes was the killer.  One by one, Ryan puts copies of four of Fairstein's books on the table and chastises her by saying:

*"While you were writing crime novels, Kevin, Antron, Yusef, Raymond and Korey were serving time for crimes they didn't commit."* (Or diplomatic-speak for "While you were stuffing your pockets with money, they were rotting in prison.")

46

Confidential

At that point, Fairstein says *"I'm damned if I am going to lose a wink of sleep over it."* She then stands up and says: *"Thank you for buying the books"* and walks off.    (Translated, that is effectively having her say, with much insensitivity, "Tough, who Cares!")

In my opinion, there was no purpose for the "book" part of this scene other than to further denigrate her. It was the last image of her in the series and serves as sort of an epitaph to the entire vilification of her throughout the series. The scene could have just encompassed Ryan telling her about the evidence and her defending her position. Putting the books on the table and commenting about her writing books was not needed or appropriate to what Ryan wanted to accomplish in the meeting. It is the type of gratuitous, deliberate attempt to disparage Fairstein that inevitably resulted in her reputation being destroyed as a result of her depiction in this series.

<u>Belief Not Knowledge</u>

Throughout the depositions of Swicord and DuVernay – both who wrote the script for Episode One – they sought to justify the words and actions they attributed to Fairstein in the series based on what they believed and not what they knew. Two examples:

- One the most harmful pieces of dialogue attributed to Fairstein in the series was an instruction she gave to police to go to Harlem and arrest all they youth they encounter:

  *"Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see. You bring in every kid who was in the park last night."*

  In reference to this, in her deposition, Swicord wrote those words because she "believed" Fairstein was at the precinct. In the testimony, Swicord stated:

  *"She is the face of the investigation and the face of the prosecution and so we **believed** that she would have been involved at this level."*

- In her deposition, DuVernay was also queried on the scene where Fairstein gave the police the order to go to Harlem to pick up kids. An excerpt:

  *Q   What evidence do you have that Ms. Fairstein gave such an order?*

  *A   The spirit of the scene is based on my **belief** about Linda Fairstein's role in the investigation. And I **believe** that she played a leading role.*

  *Q   But what source do you have that she actually gave an order to police to pick anyone up at all?*

  *A   Well, this is not a documentary. So it is not a point-to-point process. It's a creative process.*

  *Q   So the precinct scene is an invented scene?*

  *A   Yes. I stated that earlier.*

  *Q   And that means that it's not factual?*

  *A   That means that it is a fictional scene based on our research and what we **believe** to be true.*

It is my opinion that these are prime examples of negligence and reckless disregard for the truth. To make such a negative (and bigoted) portrayal about someone - which would clearly cause significant reputational harm - without taking time to check the facts or verify information is both lazy and reprehensible. It is indicative of the mindset and carelessness that permeates the entire depiction of Fairstein in this series.

## Public Perception of Plaintiff From Portrayal

Based on the portrayal of the Plaintiff in the series – which depicts actual events and had no clear disclaimer that the series wasn't entirely factual (see section on disclaimer to follow) – an average viewer/person could reasonably believe the following about Fairstein's involvement in the case, her actions relating to it and/or her character in general:

- That she was in charge of every aspect of the case against the Central Park Five from
  the first steps of the investigation in Central Park and throughout the trials.
- That she was a racist, unethical villain who was determined to jail innocent children of color at any cost.
- That she singlehandedly masterminded a theory of the case against the children engaging in unlawful and unethical conduct motivated by racism.
- That she was in total charge of the police investigation in Central Park and various stationhouses.
- That she unlawfully interrogated unaccompanied minors and subsequently called for the roundup of "young black thugs."
- That she directed police detectives to coerce confessions which conceivably led to them being beaten in custody.
- That she manipulated a timeline of events for the specific purpose of pinning the rape on the Central Park Five.
- That she forced her colleagues to prosecute a meritless case.
- That she suppressed DNA evidence.
- That she repeatedly attempted to cover up her misconduct.
- That she knew from the outset that only one person was responsible for the rape and it wasn't one of the Central Park Five but her actions were fueled by racist motivations against the young men who she referred to as "thugs" and "animals."

These perceptions of the Plaintiff could have reasonably emanated from the series depicting words she never said, actions she never took, events she was never involved in and decisions she never made – all of which the Defendants have admitted to fabricating in their depiction of the Plaintiff in the series. The fact that the series was treated like a documentary, had no disclaimer that was visible and was treated in many media reports as a semi-factual portrayal all contributed to a negative perception of her.

## Netflix Lack of Oversight and Accountability

Based on the evidence, while there was clearly animus (and possibly hate) towards Fairstein on the part of Defendants DuVernay and especially Locke, which can explain the negative depiction of Fairstein through their writing (and even directing), the other Defendant, Netflix, contributed greatly to the highly negative portrayal (and resulting reputation harm) by not taking prudent actions or providing oversight of the series that they produced and aired. This is particularly egregious given the controversial nature of

48

the subject and the universal agreement pre-airing that it would harm the reputations of many who were depicted negatively in the series (e.g. Fairstein, detectives, prosecutors). This was evidenced in the deposition of Engel, the person who was responsible for overseeing the development of the script, preparing the show for production and overseeing the services through its process and launch. Much of the "blind faith" (lack of oversight) was evident in this response:

> *Q    In telling stories based on real-life people such as Ms. Fairstein, is any consideration given to any harm that might occur by an inaccurate portrayal?"*

> *A    Nobody is sanctioning an inaccurate portrayal. Generally, we relied on the writers and trusted the writers and their integrity to do the research which supported what they believed to be true about the story.*

Once again, the reliance on "belief" - not facts - as addressed in the preceding section of this report. Some other alarming admissions by Engel in her deposition:

- Netflix did not conduct any research concerning Linda Fairstein's involvement in the Central Park Five case during the series development. It relied on the writers' research.

- Netflix did not ask to see any of the research conducted by writers and producers.

- Netflix did see all draft scripts and gave notes to writers.

- Netflix did not fact check the series before it was aired.

The "Ghost" Disclaimer

From all available evidence and even self-admission, the Defendants knew this series would be highly controversial and that some of some of the words and actions depicted could place some (e.g. Fairstein, detectives) in a negative light. They also recognized the need for a disclaimer.

Generally, if a production faces a known risk, it often put a disclaimer at the start of a program or each episode of a series to effectively alert (or warn) viewers that what they see may not be entirely true so they can keep that in mind and process it as they watch the program. As an example, the NBC television series "Law and Order" puts this disclaimer at the beginning of each program:

> *"The following story is fictional and does not depict any actual persons, entity or event."*

Additionally, the Showtime series "First Ladies" also places a disclaimer in front of its program with the following words:

> *"While this series is based on actual events, dramatic license was taken with certain scenes, dialogue and characters."*

Both programs have these 15-17 words in large type against a blank background and leave it visible for five to 10 seconds as the first visual scene when the program starts.

Contrast this to Netflix's disclaimer for its series. A few points:

- The disclaimer contains 65 words and is on the screen in small type and are sandwiched between other words in small type and immediately underneath is the words "When They See Us" in large bold type along with three logos. A viewers eyes would be drawn to them, not small type.

- The credits are rolling from bottom to top. From the disclaimer's first appearance at the bottom to it disappears at the top, it is in view for nine seconds. This means a viewers has to read 67 words in small type which are in motion in nine seconds without distraction of large bold copy and logos immediately underneath. (Note I tried it four times and I couldn't get past the first 20-25 words.)

- The disclaimer was at the end of the program not the beginning. Any "reasonable person" would know that very few people (probably less than 5%) watch credits at the end of a motion picture or television program to the end, if at all. In a motion picture, they get up and leave and at home, they switch the channel or do something else. (Side Note: For business reasons, I often stay to watch the credits until the end at a motion picture and 98% of the time I do, I am the only one left in the theatre when the cleaning crew comes in.)

- When the credits start, Netflix has two "buttons" on the screen. The first is to "Watch Credits" and the second is to "Watch Next Episode." If the viewer does not press either button in approximately four sections, it automatically goes to the next episode. Therefore, the viewer doesn't automatically see the credits (where the disclaimer is) and unless they act within four seconds, they won't.

- The disclaimer in the credits at the end of the last episode never appears. This is arguably the most important episode not only because it is the end of the series but also is the only one that shows photos and identifies all the actors. It is the credits that most viewers would most likely watch if any at all. At approximately four minutes into the credits, they cut off and Netflix goes to other content.

Given that the disclaimer is in the worst possible and most unlikely place for viewers to see it (end of credits), given that the disclaimer is buried in small type on a moving screen for such a short period of time that makes it impossible for anyone to read the whole disclaimer and understand it and given that it is not even available for viewing in some situations, it is my opinion that it is totally ineffective and basically useless for its purpose. This, in effect, adds to reputational damage because it does not alert or warn the viewers that it is a dramatization and that all words, actions and scenes depicted should not be taken as complete truth.

<u>Marketing of Series By Defendants</u>

The Defendants initially marketed the series as a true story. Some examples:

- Locke's twitter post that stated: *"One of the most accurate portrayals of a true story"* and her writing team *"took the truth as (their) bible."*

- Swicord's email to ███████████ *"We can back up every frame of what we made with evidence. Mission in writing room was to tell the truth."*

- Wolff acknowledged in her deposition that Netflix had declared in a social media post that through the series *"the truth is coming out."* She also said the phrase *"The truth you haven't heard"* had been used.

- Netflix made statements on its social media accounts which led the public to believe that the film series' portrayal of Ms. Fairstein was truthful, factually accurate and based on documentary evidence.

- The media reported its truth depiction. In a December 12, 2021 C/Net article: *"Ava DuVernay's When They See Us comes under the tough but essential viewing banner. It depicts the real life events of the 1989 Central Park jogger case."*

Internally, there were doubts though. In Netflix's Communications Plan, the question was raised:

███████████████████████████████

Eventually the Defendants changed its description to a "dramatization." The Defendants were well aware that their series would be controversial and would cause reputational harm. This evident in a comment in Netflix's Communications Plan which stated: ███████████████

███████████████████

The Defendants were well aware that Fairstein particularly would be upset by her portrayal in the series. An excerpt from an email from Don Halcombe, Netflix Director of Communications to Clarissa Colmenero on August 2, 2018 signals their concert.

> *"Yesterday, we had the marketing kick-off meeting for Central Park Five with Ava DuVernay, Jane Rosenthal and Berry Walsh from Tribeca and Jonathan King from Participant. I think it went well, but wanted to flag that Tribeca and Participant came up to us after the meeting and are concerned about Linda Fairstein. She is not portrayed favorably in the scripts and was obviously not interviewed by anyone for her side of the story for the series. She still believes the men are guilty and could be a vocal opposition and try to discredit the project in the press/on social. We could be extra cautious but just making sure this is on your radar as I still think she carries some influence s with certain circles in NY and within the media."*

An internal email from Denise Martin, Manager of Marketing, to unknown recipients on February 17, 2019 compares Fairstein to Mark Furhman as a threat over a bad depiction in the series:

> *"For me it's as if we were working on American Crime Story: The People vs OJ and knew Mark Fuhrman was going to come after us for an early promo. What is the worst case scenario? Fairstein made headlines last for having been on the wrong side of this case. That's not to say she wouldn't be able to give us trouble. I just have a hard time imagining anything she had to say would sway someone who might have been open to watching this in the first place."*

Indicative of the effort to villainize Fairstein in the marketing was the insistence of DuVernay in having Fairstein prominent in both the teaser and trailer for the series (as opposed to Lederer or the police). Against the advice and cautionary warnings of both marketing and publicity

51                                                    Confidential

personnel at Netflix, she insisted that she be prominent in both. This is reflected in an email from Ashley Lew to Denise Martin on February 18, 2019:

> *"If the only question that's really lingering in the back of my mind is whether this lean to Fairstein is to acquiesce to Ava/talent relations. Like would we be pushing this hard on Fairstein -- on Fairstein version if Ava wasn't pushing it? And the reason why I ask this: If the main reason why we're considering Fairstein is for Ava, then think we should call a spade a spade and say it's for talent relations versus trying to explain to others why we think this is the best approach?"*

(Note: The reputational damage incurred by Fairstein relating to the Defendants using her to hype the series in advance – which was marketed internationally - is reflected in the viewership numbers reported by Netflix. The teaser video was received 3.9 million views and the trailer was viewed 6.4 million times.

This anticipated adverse reaction from Fairstein was also evident through ▮▮▮▮ ▮▮▮▮ in the Communications Plan which was posed ▮▮▮▮



Tellingly, ▮▮▮▮

Finally, it is quite evident that disparaging Fairstein in the marketing (as well as in the teasers and trailers previewing the series in advance) of the series both before and after the series aired was a key part of the marketing strategy. As was reported earlier the Defendants felt they needed a villain. United States District Judge Kevin Castel even commented on it in a court hearing noting that DuVernay and Locke had made critical comments about Fairstein while promoting the series.

Post Series Actions/Disparagement

The campaign to vilify Fairstein was especially ratcheted up after the series aired – from Locke's vitriolic comments in social media formats (prior the series airing, she had led a campaign to deprive Fairstein of a writer's award) to Duvernay's numerous media interviews in which she disparaged Fairstein to Netflix's active social media campaign. The Case Background section of this report contains extensive information on their negative communications.

A social media campaign was launched by Netflix through their social media platforms (e.g. Facebook, Instagram, Twitter) to coincide with the release of the series. (Note: partnering in this effort with Netflix was the advocacy group Color of Change which independently was one of the leaders of the "#Cancel Linda Fairstein" campaign on the internet. The Defendants reported that the social media campaign was highly successful. (Viewer figures were reported in the Case Background section of this report.) In terms of reputational harm, it is significant to note that as reported by Wolff in her deposition, one of the three top "conversation drivers" was anger at Fairstein.

The extent of the involvement, control and coordination of the Defendants in executing such a campaign is uniquely exemplified by its manipulation of the Central Park Five as it relates to public exposure. This is best reflected in two emails:

- Excerpts from an email from Clarissa Collmenero to DuVernay, Rosenthal , Berry Welsh and Jonathan King on March 13, 2019:

  > *"As mentioned above, we would like to hire a media trainer to work with Antron, Kevin, Korey, Raymond and Yusef prior to the press we have coming up."*
  > *"Arm the men with the tools to navigate tough interview questions and topics (ranging from Trump, Linda Fairstein, NYPD, how accurate the portrayal/series is, etc."*

- An excerpt from an email by Clarissa Colmenero to unknown recipient on June 4, 2019:

  > *"We just got a request for CBS This Morning for Raymond to tape something out of Atlanta tonight and comment on the Linda backlash. Joanna and I were speaking and we were wondering if we can try to keep their comments under wraps until Oprah sits down with them on Sunday and we can tackle it there in a more controlled interview with our channels! Oprah channels that we can hopefully blow out. I'm not sure if we can keep the men quiet until then but we can try and obviously want to discuss this with Ava too so we will try to get to her ASAP about this."*

  (Observation: In this one email paragraph, Netflix seeks to put off an interview, suppress what the men might say, manipulate the interview with Oprah and keep the men quiet until the situation is under control.)

- An excerpt from an email from Clarissa Colmenero to the Central Park Five on June 5, 2019:

  > *"We want to reach out because you may be getting inquiries from press about Linda Fairstein. We would love for you to wait on responding if possible. We think this is something you could discuss with Oprah on Sunday night during the panel…we want to talk this through with you first."*

Basically, the Defendants sought to dictate what interviews the Central Park Five did, with whom, when, where and control what the message would be. In short, to program them to conform to their narrative – especially as it related to Fairstein.

## SOURCES OF REPUTATION HARM

After reviewing all the aforementioned documentation and informational materials along with input I have received and factoring in the principles of reputation damage as outlined above, I believe that the Plaintiff has been harmed as a result of the false statements, misrepresentations, actions and inactions of the Defendants.

Defendants Public Disparagement of Plaintiff

53                                                                                                Confidential

Both before and after the release of the Network series, the Defendants proactively engaged in a vitriolic campaign to denigrate Plaintiff Fairstein. It appears they had a vendetta to cause her irreparable professional and reputational arm. Foremost were the efforts of Locke to disparage Fairstein. As an example, following are a series of "tweets" negative to Fairstein which she placed on Twitter.

- "...was an "Unrepentant liar" and deserved "all the "rage and hate and consequences that are coming her way."

- "This blood is on Linda Fairstein's hands."

- "But fuck it: Linda Fairstein is trash, was trash, will always be trash."

- "This morning she showed us exactly why she deserves all the rage and hate and consequences that are coming her way. She is an unrepentant liar. Fuck her."

- "LADY, you stay seeing mobs where they ain't none. That's what got you in this trouble in the first place."

- "These women deserved better from NYPD and Linda Fairstein. By locking in on five children as rapists, many more lives were ruined."

- "She is almost singlehandedly responsible for the wrongful incarceration of the Central Park Five."

- "She has never apologized or recanted her insistence on their guilt for the most heinous of crimes, "guilt" based solely on evidence procured through violence and ill treatment of children in lock up."

- "Just because she has a flourishing publishing career does not mean we should ignore her past--or continued unwillingness to accept responsibility for ruining five innocent [sic] men's lives."

- "Ms. Fairstein deserved al the rage and hate and consequences that are coming her way."

- "...willingness to overlook Linda Fairstein's racist actions is very upsetting."

- "She tried to defend herself, couldn't, and started to duck and weave (with more lies)."

- "If you think that Linda Fairstein acted professionally and responsibly and without prejudice or malice in the Central Park Five case - which, don't get it twisted, she did lead - then I'm not sure who the real bully is."

- "I am generally someone who always tries to find the humanity in people, to understand the psychology behind what makes even people I hate act the way they do."

**Locke also disparaged Fairstein in a number of written communications with friends and colleagues:**

- **Email to** ▮▮▮▮▮▮▮▮▮▮▮ *"Linda's getting some comeuppance but not enough…but I'll take it."*

- **Locke to DuVernay:** *"She's so arrogant."* (To which DuVernay replied: *"She's about to feel it all."*

- **Email to** ▮▮▮▮▮▮▮ *"The ass-kicking has been a pleasure."*

DuVernay was also quite critical and disparaging of Fairstein at every opportunity she had both before the series aired, when she was promoting it, and after it aired when she was commenting on it. Some examples include the following.

- *"It is widely reported that detectives, influenced by the head of the Manhattan District Attorney's Sex Crimes Unit, Linda Fairstein, coerced the young men, then just seventh and eighth graders, into signing confessions."*

- *"These men are broken because of her actions. She has done more than enough damage."*

- *"I think it's important that people to be held accountable. But I think it would be a tragedy if this story and the telling of it…came down to one woman being punished for what she did. And so the goal of this – okay, Linda Fairstein…all these people need to be held accountable."*

- *"Not a single publication needs to give (Ms. Fairstein) a chance to speak. She has done more than enough damage."*

Finally, the disparagement of Fairstein by the Defendants is not in question. This was attested to by United States District Judge Kevin Castel who opined:

> *"The question of whether defendants actually agreed to defame Fairstein is properly subject to discovery, but the opprobrium expressed toward Fairstein in certain of defendants' public comments lends some plausibility to the claim."*

Negative Impact from Social Media Resulting from Netflix Series

Almost immediately after the airing of the first episode, a veritable "firestorm" of negative social media comments was leveled against Fairstein. As reported by Netflix, following is a glimpse of the impact the series generated on social media:

- On Twitter, 460,000 "tweets" were recorded during the launch weekend.
- Top conversation drivers and anger towards Fairstein ranked #3.
- As of January 2020, after the series aired, over 35 million impressions were recorded on Facebook and Twitter as well as 14.8 million video views and 1.45 engagements on other platforms.

After the series debut, the hashtag #CancelLindaFairstein was instituted on Twitter with generated such demeaning, denigrating and disparaging comments as:

55

Confidential

- *"Just finished When they see us on Netflix, broke my heart, most of all I never hated someone as much as I hate Linda Fairstein, she made innocent children go to jail, and suffer things no child should, so fuck you linda, say hi to the devil for me #CancelLindaFairstein."*

- *"There's absolutely NO excuse for her behavior. I can now understand why people want to #CancelLindaFairstein."*

- *"What #LindaFairstein did to these young men is beyond disgusting & excruciating to watch. Thank u @netflix for bringing their story to light."*

- *"Karmas a bitch Linda. Tsk. What goes around comes around #CancelLindaFairstein."*

- *"This bitch needs to be locked tf up and die in jail."*

- *"I hope the bitch dies she should rot in jail."*

- *"She should get 13 years in jail - the same as Korey Wise who served the longest sentence. Those she put behind bars were innocent."*

- *"There's a special V.I.P spot in hell for this wretched deceitful bitch may she suffer for the pain misery & heartache she caused…"*

- *"Having Linda Fairstein on Vassar's Board is utterly despicable.  She destroyed the lives of the innocent now involved in the Central Park Jogger's case."*

- *"Forget cancelling her put her ass in jail in a mens jail where she can be raped and maned like those poor boys #cancellindafairstein*

- *"I hope you burn in hell, you're a parasite to this society I really hope you die like a parasite for what you have done."*

- *"What a disgusting piece of human garbage.  Burning in hell is not good enough punishment for her! Why isn't this rapist b\*itch in jail for what she has done????? My heart bleeds for the injustice that has been done."*

- *"There's a special V.I.P. spot in hell for this wretched deceitful bitch may she suffer the pain misery & heartache she caused, she needs to be locked up for destroying the lives of those men."*

- ***"You are a monster, a horrible racist woman."***

- ***"You're a disgusting bitch @LindaFairstein!  I hope you rot in hell.  You're trash."***

- ***"Linda, how do you live with yourself.  From one white successful women to another, you are a pig a twit and should be in Guantanamo r better yet Rikers where you send innocent kids."***

- ***"@LindaFairstein also how do you feel that ultimately they got the justice they deserved and made your lying sack of shit ass look like a fucking crazed racist maniac."***

- ***"Linda only an evil twit wouldn think it's winning to build a resume on jailing innocent people. A evolved himan would want to only jail guilty and only want to. You are PAF that's Psycho. Hope they run you out of NYC."***

- ***"@LindaFairstein how do you feel being a racist fucking devil and that you effectively***
  ***ruined the lives of 5 black men".***

- *"Just finished "When They See Us on Netrlix, broke my heart most of all I never hated someone as much as I hate Linda Fairstein, she made innocent children go to jail and suffer things no child should, so fuck you Linda say hi to the devil for me."*

- *"She is pure evil."*

- *"What Linda Fairstein did to these young men is beyond disgusting and excruciating watch."*

- *"She lied and made things up about innocent kids karma is a bitch Linda. Tsk tsk tsk what goes around comes around."*

- *"This bitch needs to be locked up and die in jail."*

- *"Hope the bitch dies and rots in jail."*

- *"She's a sad excuse for a human being and should have lost her job, she is honestly the most disgusting person I've ever heard of, hope she has a horrible life being a racist asshole."*

- *"Fairstein committed a criminal act of being a thief who stole the childhood of FIVE innocent children. She knowingly and willfully frame them for a crime they didn't commit and proceeded to profit financially from her crime by writing…"*

- *"I'm disgusted by Linda's transgressions against the Central Park Five. She needs to pay restitution to these innocent now and be locked away for leading the witch hunt to falsely accuse and coerced the innocent boys. Justice needs to be served."*

- *"Having Linda Fairstein on Vassar's Board is a utterly despicable. She destroys the lives of the innocent now involved in the Central Park Jogger's Case."*

- *"Linda Fairstein led a witch hunt against five teenage boys. She hunted these boys for their lives. Her actions were led by greed and desire to be relevant and famous. These character flaws of hers led her to KNOWINGLY and WRONGFULLY hunt these boys into a conviction."*

- *"All my New Yorkers need to catch that raggedy bitch lacking beat TF out of her. I want to see blood period."*

- *"She is a racist pig who should be put behind bars."*

- *"Aww, my heart bleeds for this poor, poor racist lady."*

- *"She's racist.  She believes the ideology of a black man being nothing but a criminal, that's why it is easy for her to see those little boys as racists."*

- *"Never new a woman without a heart, now I saw one."*

- *"She was ready to destroy these boys lives."*

- *"She is a wickedness person."*

- *"Central Park 5 teens were framed by Manhattan DA/bestselling author Linda Fairstein of gangrape they never committed."*

- *"When They See Us #Centralpart5 the damn prosecutor is not only not held accountable but is a celebrated author and socialite?  Linda Fairstein, you white ass Karen ass Chihuahua bitch, pls suffer the equivalent of being imprisoned for 5-12 yrs for the color of your skin."*

- *"Why is Linda Fairstein still alive?  Trifling dirty white racist ass big fat bitch."*

- *"I hope Linda Fairstein rots in hell."*

- *"...joins Linda Fairstein and Elizabeth Lederer, the prosecutor's of the Central Park 5 and the prosecutor's of the Scottsboro Boys in a long line of people who are responsible for ruining the lives of black men with false rape allegations."*

- *"Linda Fairstein is odious, despicable & evil. A special place in hell is reserved for her for what she did to the Central Park Five YOUNG KIDS."*

- *"Why tf isn't Linda Fairstein in jail ??!!!?!?*

- *"Shame on you Linda Fairstein !! u got to go to jail."*

- *"OMG!  I just watched the Oprah Netflix documentary about the exonerated 5 in New York.  I hope @LindaFairstein has a special place in hell."*

- *"We definitely should. I'd love see an evil witch like Linda Fairstein tried and incarcerated."*

- *"When They see Us, swear i wanted to kill Linda Fairstein."*

- *"I really don't wish bad things on ppl but if I have to Linda Fairstein would be the number one person I'd like to see suffer, slowly."*

- *"Idc if Linda Fairstein is 90. When I catch her it's up."*

- *"I will never have faith in humanity because of horrible people like Fairstein."*

- *"Linda Fairstein should be in jail.  But it probably won't happen in this lifetime."*

Confidential

- *"Looks like #LindaFaristein deleted her account, your Time is up you vile disgusting creature."*

(Note: While this list may seem excessive, it is infinitesimal in terms of the possibly thousands of vitriolic and hateful comments made and reflects the passion and animosity that was targeted at Fairstein as a result of the depiction of her in the Netflix series.)

<u>Negative Impact From Media Exposure Resulting From Netflix Series</u>

In the "Information/Input Received to Form Opinions" section of this report, I list (98) media news reports that I read relating to the background that led to and revolved around this litigation. These are samples of hundreds of various types of media exposure. Roughly 95% are negative or detrimental to Fairstein's reputation.

One only needs to look at the headlines to see the damage that they would have on Fairstein's reputation and how people would form a negative opinion of her. Following are a few of these headlines which represent this harm:

- "A Funeral for Linda Fairstein" (Hostile Therapy Podcast)
- "The Slippery Moral Calculus of Linda Fairstein " (Washington Post)
- "'Cancelling a Heroine: The Mobbing of Linda Fairstein (New York Post)
- **"A Mob is on the Loose and it's After Linda Fairstein" (Washington Post)**
- "Fairstein and Lederer Deserve Their Fate After 'When They See Us' Premiered" (Preen P.H.)
- "A Critical Look at Linda Fairstein, an Acclaimed Sex Crimes Prosecutor" (Washington Post)
- "Linda Fairstein, Once Cheered, Faces Storm After 'When They See Us'" (New York Times)
- "Inside the Controversy About Linda Fairstein Central Park 5 Prosecutor Played by Felicity Huffman" (People Magazine)
- "We Must Reopen Central Park 5 Prosecutor Linda Fairstein's Cases" (New York Amsterdam News)
- "A Literary Group Rescinds Award for Linda Fairstein Amid Outcry Over Her Role in the Central Park Five Case" (Bustle Magazine)
- "Publisher Drops Central Park Five Prosecutor Linda Fairstein" (Associated Press)
- "Central Park Five Prosecutor Linda Fairstein Resigns From Vassar College Board of Trustees" (Newsweek Magazine)
- "Linda Fairstein Dropped By Hollywood Literary Agency Amid 'When They See Us' Backlash" (Essence Magazine)
- "Dramatic License: Is Fairstein Fair Game" (Simple Justice)
- "When They See Us Sparked a Boycott Against Central Park Five Prosecutor Linda Fairstein" (Esquire Magazine)
- "Linda Fairstein Resigns From Board of Alma Mater Vassar College" (CNN)
- "Publisher Drops Central Park Five Prosecutor Linda Fairstein" (Associated Press)
- "Raymond Santana Supports Boycott of Central Park Five Prosecutor Linda Fairstein: 'She Has to Pay for Her Crime'" (The Root)
- Dramatic License: Is Fairstein Fair Game" (Simple Justice)

As a former journalist (New York Times), I can attest to the fact that headlines in and of themselves can make a major negative impact on readers. In fact, they can be more harmful than if the reader actually read the article because the article would generally present both sides of a controversy to meet the journalistic creed of "fair and balanced" reporting.

As to the text/content of the news reports themselves concerning Fairstein in connection with her involvement and/or role in the Central Park Five investigation and litigation, often the reporting was extremely harsh, damning and detrimental. A few of many examples:

- *"There's more than enough horror to go around in "When They See Us. There are police officers who coerce confessions, and prison guards who brutalize the minors under their watch. But the most concentrated depravity by far, is embodied in Assistant District Attorney Linda Fairstein."*

  *"It is no surprise that viewers of 'When They See Us' have come away enraged; the character of Fairstein is enraging."*
  (Washington Post)

- *"In real life, Fairstein appears to be an even worse person than she is portrayed to be. Fairstein is full of it. She's been full of it for 30 years."*
  (The Nation Magazine)

- *"These interrogations were ordered by Linda herself just so she could justify her theory—even when the facts didn't align. Do you see how f*cked up all this is? It reeks of prejudice and discrimination."*
  (preen.ph website)

- *"It's easy to focus on Linda Fairstein. Her behavior is so unmitigated, her racism so overt and encompassing."*
  (NPQ Magazine)

- *"...the chief architect of their captivity was author and former prosecutor Linda Fairstein—which is Wakandan for "evil-ass white woman."*

  *"@lindafairstein went on to become a successful author after she coerced and convicted 5 innocent boys of a crime they did not commit. These boys sat in prison and lost their youth inside of a broken system while she made millions!"*
  (The Root Magazine)

- *Whether or not you believe the narrative that DuVernay presents, you can't argue with how effectively she presents it. ...a couple of ink-stained wretches yelling on Facebook and in the pages of* The Los Angeles Times *isn't nearly the same as a deep, systematic racking by an Netflix mini-series executive-produced by Oprah."*
  (Mystery Tribune)

The above excerpts are a representative sample of the negative comments the media offered about Fairstein in the wake of the Netflix series. The damage is compounded by the fact that they appeared in some of the nation's most respected media (e.g. New York Times, Washington Times, The Nation, Esquire Magazine).

Confidential

General Overview on Negative Perception of Plaintiff

It is my opinion that any reasonable person who read these alleged false statements outlined in the Case Background section as well as the misrepresentations by the Defendants contained in this report – without counter information - could plausibly conclude that the Plaintiff was:

- Racist/bigoted
- Ruthless
- Vindictive
- Spiteful
- Intolerant
- Manipulative
- Arrogant
- Deceitful

- Vengeful
- Vicious
- Resentful
- Uncaring
- Rigid
- Unrelenting
- Narcissistic
- Possessed

Therefore, clearly, the accumulated impact of all the negative communications emanating from the Defendants towards the Plaintiff represent considerable reputational harm in terms of how the public or "average person" would assess and view the Plaintiff.

Media Assessment of Harm to Plaintiff

The damage to Fairstein's reputation and the harm to her in general can be attested to by comments and reports in the mass media which validate the devastating effect that the Netflix series had on both her both professionally and personally.  Following are excerpts from media reports that specifically address this issue.

- *"A Netflix series about the Central Park jogger case has led to intense criticism of the famous prosecutor-turned-novelist who oversaw the investigation.  But the Netflix series has placed the prosecution back on center stage, where the power of television's narrative focus, the lightning speed of online reaction and the villainous characterization of Ms. Fairstein have made her a target of public outrage.  The script took liberties with dialogue and timing of events, a use of artistic license…" The facts now forcing Ms. Fairstein into exile."*
  (New York Times)

- *"After When They See Us was released last weekend, #Cancel Linda Fairstein started trending on Twitter, with users calling for a boycott of the prosecutor-turned-novelist's books."*
  (Esquire Magazine)

- *"Fairstein had a long and distinguished career both as prosecutor and author that has all but disappeared because of this one dramatization."*
  (Simple Justice Blog)

- *"Linda Fairstein, a former prosecutor who has been the focus of public outrage since Netflix began streaming a series based on the Central Park Five case…."*
  (New York Times)

- *"The miniseries turning Linda Fairstein, Elizabeth Lederer and others into racist villains is not only inaccurate, their fictional portrayals have led to a social media backlash that has largely ruined their lives."*

*"As much as the miniseries' fiction has made pariahs of the real-life Fairstein..."*

*"It placed blame on Fairstein for how she handled the case, but it didn't reason that this was mainly due to her being a racist. There's no evidence of that. Yet, it's largely why she has been the target of public outrage after the release of the miniseries."*
*"Creator and director Ava DuVernay has invented the incriminating comments sex-crimes prosecutor Linda Fairstein (Felicity Huffman) makes... We found no reports that anyone had ever witnessed these bigoted comments or heard such conversations taking place. Her reputation has been ruined."*
(History vs Hollywood)

- *"...viewers spent the weekend taking to social media to not only drag Fairstein to the gates of Hell and back, but to call for retailers and publishers to boycott her various bestselling novels—the first step in a plan to upend the lucrative empire she built on the backs of innocent black children."*
(The Root Magazine)

- *"It's the image of Fairstein – as a pugnacious figure cramming the confessions of five teenage boys into the mold she's already determined to fill – that has rocked the viewers of When They See Us. And it has rocked Fairstein!*
(Vox.com)

- *"Since the series 'When They See Us' premiered last week, Fairstein, 72, has been the target of tremendous public outrage..."*
(New York Post)

- *"When They See Us, a Docuseries on Netflix has brought a bright unforgiving light back to the case and has made Linda Fairstein a pariah.*
(Hostile Therapy Podcast)

- *"Trouble is, others feel it is not the Central Park Five who got railroaded, but Fairstein. But now a different sort of mob is on the loose, pillaging Linda Fairstein's reputation. In a movie, she's guilty. In real life, she's not."*
Washington Post)

- *"...show Linda Fairstein, head of the sex crimes unit of the Manhattan District Attorney's office, as a key orchestrator of the railroading..." As portrayed by Huffman, Fairstein is a psychopath's psychopath, breathtaking in her cruelty and disregard for human rights."*
(Mystery Tribune)

- *"Linda Fairstein Dropped By ICM Amid 'When They See Us' Backlash – The FORMER PROSECUTOR OF THE CENTRAL PARK FIVE CASE CONTINUES TO EXPERIENCE THE FALLOUT OF THE CRITICALLYACCLAIMED NETFLIX SERIES."*
(Essence Magazine)

- *"Author and former prosecutor Linda Fairstein—facing a swarm of controversy over a Netflix series that examines a wrongful conviction in a high-profile rape case...."*
(CNN)

62

Confidential

These comments are reflective of others in countless articles on this subject and clearly delineate the nature and extent of the damage inflicted on Fairstein as a result of the Netflix series.

## HARM AND DAMAGE TO THE PLAINTIFF

The reputational damage to the Plaintiff Fairstein from the Netflix series is evident and outlined in previous sections of this report. Following is an attempt to summarize and categorize the harm and negative consequences to her professional career and the severe adverse effect it has had on her personally.

Social Media

Doug Bania, an expert witness retained by the Plaintiff, conducted a study of Google Trends related to the Plaintiff and reported that the highest numbers of searches of her name throughout her career by a considerable amount came immediately after the airing of the Netflix series.

The negative repercussions began instantly with the airing of the first episode of the four-part series. It is reasonable to presume that the viewers and the public immediately adopted the false narrative espoused in the film series as true based on its incessant attacking of the Plaintiff's ethics and character. Examples of the vitriolic and disparaging comments are on social media are contained in an earlier section of the report. A hashtag #CancelLindaFairstein on Twitter was instituted immediately. This was not only a "call" for every person and entity to reject and divest themselves from Fairstein but it also spawned a "firestorm" of negative comments and vilification on social media. As previously mentioned in this report, within the first 28 days of the airing, 1.8 million posts were made on Twitter alone. This forced Fairstein to shut down her social media accounts which she utilized as a national, promotional tool for books and film projects.

Petitions

In addition to #CancelLindaFairstein, the series spurred the creation of numerous other petitions (e.g. Change.org, Color of Change) that had the sole aim of seeking such actions as urging her publishers to sever their relationships with her and for retailers not to sell her books.

Another form of petition was placed online coming from the legal community with a concerted effort to convince the New York District Attorney to examine all Fairstein's previous cases. Direct attempts were made as well. On June 13, 2019, three public defenders wrote a letter to Cyrus Vance, Jr. calling for such a case review:

> "...based on the deeply disturbing portrayal of both Fairstein and Lederer during the Central Park Five case in the Netflix miniseries "When They See Us." It is imperative that you investigate every case that has been led by Ms. Fairstein and Ms. Lederer to ensure that your office is not responsible for even one more innocent black or brown life sitting in prison today. Given the blatant and inexcusable foul play that Ms. Fairstein wielded during the prosecution of the Central Park Five, it is quite plausible that other innocent defendants have been wrongly convicted and arecurrently living in cages, lives and families destroyed."

Literary Career Impact

As detailed earlier in this report, Fairstein was a highly successful and acclaimed author. As a direct result of this public furor and pressure, both of the companies that published Fairstein's books – Dutton (Penguin Random House) in the United States and Little Brown/Hachette UK cancelled her contracts with them.  She had three books remaining on the Dutton contract.  Additionally her literary agent in the United States – ICM Partners – ended its business relationship with her after 25 years.  Her agent in the United Kingdom did so as well.

Consulting Work

After ending her legal career in New York, due to the national exposure for her successful career as a prosecutor and her pioneering efforts in the field of sexual assault and protecting women's rights, she was highly sought after as a consultant.   She was often referred for consulting work by other attorneys.   As a result of the series, such assignments ceased due to the negative exposure from the series.

Speaking Engagements

Fairstein's accomplishments and national prominence also generated opportunities across the country as a paid speaker at various types of forums.  These opportunities evaporated as well as a negative consequence of the series – both in terms of those she had scheduled which were cancelled and potential future opportunities.

Non-Business Harm

Throughout her career and life, Fairstein was actively involved and participated in many civic, community, charity, cultural and educational organizations as well as non-profit entities.  Due to the scandal emanating from the Netflix series, Fairstein was either ejected or forced to resign from many of these positions.  Examples of this harmful impact, include:

- Charitable Organizations – Fairstein was forced to resign from the Boards of Directors of these organizations:  Safe Horizon, Joyful Hearts Foundation, and God's Love We Deliver.

- Vassar College – Fairstein was forced to resign from the Board of Directors of Vassar College, her alma mater.

Loss of Honors and Awards

The reputational damage to Fairstein was so severe that it resulted in some honors and awards that she had received or scheduled to receive being cancelled.  Examples of this include:

- Glamour Magazine – Rescinded its 1993 "Woman of the Year" Award it had previously bestowed on her.

- Mount Vernon High School – As alumnus of the school, the institution removed her from its Hall of Fame.

Confidential

Additionally, prior to the airing of the series – because of all the pre-series public exposure for it, the Mystery Writers of America – a prestigious organization in the literary field – rescinded its announced awarding of its "Grand Master" Award to Fairstein for lifetime achievement. It gave the award to another recipient. (It should be noted that Defendant Locke spearheaded a vigorous campaign, both directly and through social media) to pressure the organization rescind the award to Fairstein.)

Economic Damage

While it is not my assignment to address the negative economic consequences of the Netflix series on the Plaintiff, clearly much of the economic loss to her emanates from reputational damage. As reported in this lawsuit, following is a partial summary of the ways that she lost income as a result of damage to her reputation as a direct result of the airing of the series:

- Lost income due to the cancellation of her publishing contracts with Dutton and Brown/Hachette UK.

- The corresponding removal of her novels from circulation in the United States and overseas, resulting in lost royalties.

- Dutton's refusal to publish the paperback versions of *Blood Oath* and the children's book *Secrets of the Deep*; lost royalties and the lost opportunity to publish the three books that remained on her publishing contract.

- Dutton also cancelled Plaintiff's Devlin Quick series of children's books and she was unable to contract for additional books as planned.

- Lost income due to the cancellation of speaking engagements for which Plaintiff was paid a fee, as well as appearances (e.g. book signings) at which books were sold. Plaintiff was also unable to book new and future speaking engagements.

- Lost income due to termination of consulting agreements, including one with a prominent, national athletic association that Plaintiff advised on issues concerning domestic violence and sexual assault.

Plaintiff Response to Defendants Theory of Reputation Harm

The previous section contained an itemization of all the negative consequences which the Plaintiff has experienced as a result of the reputation damage emanating from the Netflix series. The Defendants dispute that many if not all of these resulted from the poor reputation he had prior to the airing of the series (e.g. from books, documentaries, negative media exposure and her defense of the original conviction in the wake of the Reyes Confession). In her deposition, she was queried on some of these consequences and she directly tied the series reputation damage to each.

- In reference to having her talent agency, ICM, cease representing her. She cited the explanation of Newberg, the ICM literary agent who represented her.

  *"She told me because -- it was because of the portrayal of me, the very unflattering, false portrayal that was in the film series."*

65

Confidential

- In reference to losing her publisher, Dutton after the series aired.

Q    *"Were you told by anyone at Dutton as to why your contract was being cancelled?"*

A    *"That the film series had unleashed a torrent of calls blocking the phone lines at Penguin Random House."*

**(Side note:  In her deposition, Newberg stated that Penguin/Random House fired Fairstein because their phone lines were being tied up after the series aired.)**

- In reference to being forced to resign from the non-profit organization, Safe Horizon.

*"The week that the series aired, Ariel Zwang, the CEO, said that they had come to the conclusion, the decision that I had to resign.  Because of the film series."*

In her deposition, Zwang confirmed Fairstein's feedback as to why she had to be removed from the Safe Horizon board specifically because of the Netflix series . In the deposition, she verified that prior to the series airing, Fairstein's reputation was fine.

Q    *"In 2016 Safe Horizon did not view Ms. Fairstein as a problem with regards to Their image; correct?"*

A    "No"

Zwang then confirmed that she was forced to resign because of the Netflix series.

Q    *"Had the Netflix series not been released, would Linda Fairstein still have been a board member on June 4, 2019?"*

A    *"Quite possibly."*

- In reference to her being removed from the board of her alma mater, Vassar.

*"I was asked to resign by Elizabeth Bradley, the president, and Tony Friscia, the board chair.  I was told that there -- that as a result -- as a direct result of "When They See Us" airing, there was a student protest on campus, protesting my board involvement."*

(Side note:  At the same time, Fairstein had been picked to be one of the three speakers at the 50th Reunion of her graduating class.  That opportunity was cancelled.)

<u>Personal Harm</u>

It is evident that the fallout and negative consequences experienced by any individual from worldwide exposure of this magnitude would have a devastating impact.  Basically the Plaintiff's life work and her reputation were destroyed by the portrayal of her in the Netflix series (regardless if it was accurate or not which to a large extent will be determined in this litigation). The psychological and emotional distress would likely be significant from the extreme amount of public backlash (see earlier section with public comments on social media) that occurred to include threats of injury and death (e.g.*"die a horrific and painful death"* and *"be hanged, drawn and quartered"*).  One social media post published her home address which was a major

threat to her well-being.  As a result, from information and documents I reviewed, I learned of the following forms of personal harm she experienced:

- Experiencing mental anguish, emotional and psychological suffering.
- Subjected to hatred, scorn, contempt, ridicule, disgrace, embarrassment.
- Caused damage to her personal and social relationships.
- Victim of cyberbullying.
- Ostracized by people in both her professional and personal relationships.

For this report, I queried the Plaintiff directly to obtain additional information about the personal harm she has suffered and/or continues to experience emanating from the reputation damage she incurred.  Following is what she reported to me:

- Upon watching the series the day it aired, from beginning to end, she got violently sick, cried extensively and then throwing up at one point during the viewing.
- She didn't leave the house for 72 hours after the series aired and spent almost all of that time sick in bed.
- She is still prone to outbreaks of crying both privately and in public.
- She still finds it difficult to sleep and experiences ongoing anxiety.
- She has ongoing problems with her self-esteem.
- She stopped socializing for an extensive period of time and still socializes only with people she knows and trusts.
- She generally read three to four books a week and now rarely reads even one.
- She cannot focus or write anything that requires extensive organization or concentration. (She noted that she used to write one book a year.)
- She can't promote her books anymore because she cannot go on social media because of the vitriolic feedback she receives and she can't make public appearances any more.
- She used to campaign for political candidates which also benefited the promotion of her books but that has not been possible.

**The Phantom "Tarnished" Defense**

**Without question, it is reasonable to conclude that all of the above reputational damage and harm to Fairstein's career and the personal trauma she experienced was a direct result of the Netflix series.  A main thrust of the Defendants' defense is that her reputation had been tarnished by a series of actions and events and even her own words over the years which tarnished her reputation and made her "damaged goods" reputation-wise long before the Netflix series aired.  Following is a list of these cited by the Defendants and some facts and perspective on each:**

- **Reyes Confession** **– In 2002, in the aftermath of the confession which led to the Central Park Five's convictions being vacated, Fairstein continued to maintain their guilt publicly and that led to some short-term backlash and negative articles in the press.  There is no evidence that it had a significant impact on her reputation or stature in the legal community between then and when the series aired.  Also it had no impact on her career as evidenced by information provided by her agent, Newberg, during her deposition:**

■ At her deposition, Newberg had a chart of the total sum of the advances which Fairstein received for her books from 2003 (the year after the Reyes Confession) until she was terminated by her publishers in 2019 in the wake of the Netflix series. It revealed that she had received ████████████ in advances which clearly indicates the Reyes Confession had no impact on her book writing career.

■ In her deposition, Newberg was queried about Fairstein's writing career post-Reyes Confession. Following is a brief exchange:

Q   But you continued to represent her.

A   I did.

Q   What, 17 years after that; is that correct?

A.   I did, yes.

Q   Did Ms. Fairstein's involvement in the Central Park Jogger case prevent her from publishing her 24 novels?

A   No.

- **CP5 Lawsuit** – After their convictions were vacated, the Central Park Five filed a lawsuit against the City of New York. Fairstein was among the Defendants in the lawsuit. The Plaintiffs were awarded $40 million. This brought some negative attention to Fairstein at the time. Indicative of the lack of impact on her career, Ball gave the following response relating to Fairstein's publisher:



- **Burns Documentary** – In 2012, Ken Burns produced and aired a documentary called "Central Park Five" which partially portrayed Fairstein in a negative light. The documentary spurred newspaper articles on the documentary specifically and the experiences of the Central Park Five in general. From my perspective as a former journalist, I reviewed possibly 15-20 newspaper articles relating to the Burns documentary after it aired and only one or two of them mentioned Fairstein at all and the references about her weren't particularly negative. They also didn't have a negative impact on her career. Another response from Ball in her deposition attests to that:

*Q* ████████████████████████████

*A* ██

Another insight to the lack of reputation damage to Fairstein from the Burns documentary came in the deposition of Rossi:

> Q   *From time to time were there additional surges, if you will, of negative commentary following the airing of the Ken Burns documentary?*
>
> A   *My memory is that it was rarely and not often.*

- <u>Mystery Writers Award</u> – In 2018, the Mystery Writers of America organization decided to bestow one of its highest honors on Fairstein. When Locke, a previous recipient of the award, heard about it, she wrote the organization decrying the selection and started a campaign online to convince it to not to bestow the award. The organization subsequently withdrew the award. Between Locke's campaign, the organization's withdrawal and media coverage of the situation, Fairstein's reputation was indeed sullied to an extent – but, once again, not to the extent it negatively affected her career.

In reference to the negative exposure from the Locke campaign, Rossi addressed the harm relating to Fairstein's own social media outlets:

> Q   *Do you recall that there were additional negative comments on Ms. Fairstein's social media accounts following her Twitter exchange with Ms. Locke on social media?*
>
> A   *No, I don't.*

As to the effect on Fairstein's relationship with her publisher and any negative consequences to her publishing career, in her deposition Ball provided this insight:



It is clear and the evidence shows that nothing that happened prior to the airing of the Netflix series caused damage to her reputation and career to the extent that it resulted in her being dropped by two publishers and her literary agent, losing speaking engagements and consulting work, having awards rescinded, losing positions on boards of directors of nonprofit organizations and educational institutions and being savaged on the internet in a variety of social media platforms). All of this was directly attributable to her portrayal in the series. This is not my opinion, it is verifiable fact.

## Assessing the Post-Series Backlash and Reputation Damage

As I have opined throughout this report, the evidence shows that while Fairstein was controversial and her reputation had suffered to some degree from her actions and words prior to the airing of the Netflix series, none of that was consequential in interfering with or harming her professional career (and standing in the community as well). While there is evidence of some elements of the public being upset with her prior to the series, it was minimal and isolated and didn't translate into career damage. Addressing this subject, following are some comments and observations regarding the degree of negative backlash from the public both before and after the series.

- Newberg's assessment in her deposition:

    > Q  *Prior to the film series coming out, had Ms. Fairstein ever faced a public backlash like she had in June 2019?*

    > A  *I don 't think so. I don't know what happened. No, I don't think so.*

    > Q  *Ms. Fairstein had not faced the public backlash of the kind she faced after When They See Us came out; is that correct?*

    > A  *I think so.*

- Rossi's assessment in her deposition commenting on the negative feedback on the day of the airing of the series:

    > *"The difference was that May 31st there was more than I had ever seen in my entire time knowing Linda Fairstein on the day the series was released. It wasn't humanly impossible to keep up with the negativity and the content that was being posted on her social media on the release day of When They See Us."*

- A series of comments and observations from Ball made during her deposition:



Confidential



From any reasonable review of the evidence, the negative impact of the Netflix series to Fairstein's reputation is indisputable as is the resulting damage to her career. A few examples of the damage as testified to in depositions:

- Loss of Social Media - Commenting on the necessity of eliminating all of Fairstein's social media exposure in the wake of the series, Rossi stated:

    *"…but to the point of it being completely destroyed on all platforms, the decision was to take it all down and there was never a discussion because of how bad it had gotten to ever think about restoring starting new accounts or doing anything ever again. It was completely obliterated."*

- Loss of Publishing Contracts – In her deposition Ball addressed this subject:



71                                                    Confidential

## REPUTATION DAMAGE REPAIR PROGRAM

In the communications business, there are several axioms pertaining to reputational damage and harm – e.g. when a person or entity has been the recipient of negative input or communications – which I outlined earlier in this report, which include:

- It takes a lifetime to build a reputation and seconds to destroy it
- Perception is more important than reality
- You can never un-ring a bell
- Where there is smoke, there's fire
- You can never wipe a slate clean

In short, the image and reputation of the Plaintiff has been permanently stained by the onslaught of negative public exposure tracing to the Defendants. Regardless of what the outcome of this lawsuit is for her (prevail or not), the fact is her image and reputation has been severely and irreparably harmed and damaged. Should the Plaintiff prevail in this litigation, it would only be reasonable and fair that the Defendants should be responsible for funding a program to repair the damage to the Plaintiff's reputation. (Side note: A good analogy. If I was visiting my neighbor and broke a vase, I would of course pay for a new one.) Since the Defendants' "broke" the Plaintiffs' reputation, they should be required to pay for it to be restored (as much as possible).

Even a well planned and executed reputation damage repair program can only limit the damage by combatting or minimizing the negative exposure the Plaintiff received from the negative communications to a certain degree and it is not a short time effort. It takes careful planning, time, patience, a sustained, professional effort and sufficient funding.

(Side Note: Occasionally, in the past when I have proposed this type of program for a Plaintiff(s) in other cases, it has been challenged by opposing counsel. Such a program has validity and it is important to note that it has been upheld in previous litigation even in the face of numerous exclusion motions. In the case of *Nicholas Krakana v Scottsdale Police Department,* United States District Court, District of Arizona, Judge John J. Tuchi opined:

> *"In his report, Mr. Fisher opines that, where a Plaintiff's reputation and image have been so damaged, a repair program of certain duration and with itemized components would be needed to make that image and reputation as near whole as possible. Mr. Fisher assigns a value or cost to that remedial program and lists the steps such a program would entail. The Court concludes that addressing and repairing the harm a person's reputation and image could suffer as a result of defamation is specialized knowledge not within the ken of the lay juror, and which would assist jurors in determining issues of fact surrounding that aspect of damages. While the report lays out the bare minimum in terms of support for Mr. Fisher's damages figure and components of the remedial program he opines is necessary, it is sufficient to allow a jury to understand and evaluate the basis for his opinion."*

Important to add, I have subsequently testified to such a program in federal and state courts as well as arbitration hearings.)

The following is an outline for such a program.

Program Overview

- Objectives: The primary purposes of this program are as follows:

  - Through this program, to eliminate as much as possible and counter the negative communications which resulted in the reputational harm and damage that the Plaintiff, Fairstein, has incurred and ensure that the program reaches and impacts its target audiences to mitigate the negativity in the most timely, expeditious and effective way.

  - To restore her damaged reputation by generating positive exposure for the Plaintiff creating awareness for and emphasizing her long and distinguished professional career as well as her public service contributions and innumerable pioneering accomplishments in aiding and protecting victims of sexual violence.

- Target Audiences: The primary target audiences that this program is intended to impact, include:

  - The American public in general, the vast bulk of which, before the Netflix series, were unaware of the Plaintiff and as a result of her depiction or portrayal in the series, now have a negative view of her because there has been no counterbalancing positive view or impression.

  - Special emphasis on reaching all segments of life (e.g. public, business, society, government, media and community) in the state of New York where the Plaintiff lived the bulk of her life and where she was best known and suffered reputational harm and damage as well as the state of Florida where she now resides and is active.

  - Specific audiences to be targeted where the Plaintiff had the highest profile (e.g. legal profession, judicial system, law enforcement, publishing business, educational field, entertainment and community/charitable organizations).

  - Any other publics to be identified that are determined to be critical to approach and impact in order to restore the Plaintiff's reputation.

Program Activities

The following is an outline of a suitable and prudent reputation damage repair program which would seek to achieve the objectives for such a program as stated above. I believe that such a program is necessary and a realistic approach to correct reputational damage based on my 52 years of experience in handling crisis communications and reputational damage programs and on what information and insight I have at this point on this situation. As such, this outline is subject to adjustments if and when more information is obtained.

- Audit/Assessment – In order to fully assess the degree of the reputational harm that the Plaintiff has suffered since the series aired to which the program would have to address. Updated research and analysis would need to be conducted to determine the nature and extent of the damage emanating from the Defendants at that point in time (post-litigation). The result of the litigation will have an influence on the perspective and perceptions on how the Plaintiff's key target audiences view her and the harm that has (or will) occur. The program created would then be based on, and factor in, the litigation

results as to how best to counter the negativity and restore the Plaintiff's positive reputation to include what the message is, what needs to be done and to what extent.

- <u>Program Plan</u> – A strategy for the program would be devised and a detailed plan would be created to achieve the program's goals.

- <u>Search Optimization Program</u> - The internet would need to be researched and monitored for the negative information and content about the Plaintiff and actions taken to mitigate the damage as well as generate more positive links with high domain authority to effectively push down negative search results as much as possible. Positive content will have to be added to the internet as well.

- <u>Website</u> – A website is a very critical outlet for the dissemination of information and to impact reputations and public perception. One would be created for the Plaintiff and would contain not only standard information but also means by which she could provide ongoing information to key target audiences (e.g. blog, videos).

- <u>Internet/Social Media Exposure</u> – At this point in time, the Plaintiff has no website and virtually no social media presence. This is a result of the relentless and extensive negative feedback she received in the wake of the series. As social media exposure is vital to this type of program, a review and analysis of all existing social media platforms would be conducted and a plan generated and implemented to utilize them to generate ongoing internet exposure to effectively restore and enhance her reputation. Similarly, other forms of internet exposure would be created and utilized.

- <u>Public Relations Program</u> - As all matters relating to image and reputation are the purview of the public relations profession, such a program would be a critical element of this effort. There are myriad of activities that would need to be undertaken to help counter or overcome the damage and restore the Plaintiff's image and reputation.

  - ■ <u>Strategic planning/counseling/oversight for all aspects of the program.</u>

  - ■ <u>Generating Media Exposure</u> – This would be a critical component of the entire program to serve as a means to generate positive exposure for the Plaintiff to offset the negative communications emanating from the Defendants. Such exposure would be primarily targeted to reach and impact the public in general and all important target audiences as well. This exposure is needed to counter the negativity and restore her reputation plus this type of exposure can reach mass audiences in a cost-prudent manner. Such vehicles to general media exposure could include: news conferences, news releases and statements, media interviews, press events, bylined articles, columns and opinion-editorial pieces, press tours, editorial board meetings, etc.

  - ■ <u>Personal Outreach</u> - A vital component of the program will be to identify and take action to generate direct and indirect exposure for the Plaintiff with the general public or key target audiences directly (e.g. correspondence, direct meetings, speaking engagements, serving on panels, participation in/or presenting seminars, conferences, conventions, seminars) or indirectly (e.g. internet, social media, videos, direct mail)

■ <u>Informational Materials</u> - Creation of printed and electronic informational materials as warranted and needed.

(Note: All program management as well as the bulk of the creative and writing would be planned, implemented and coordinated under this program.)

- <u>Paid Exposure</u> – There will be times when certain types of exposure important to providing information or delivering messages to improve the Plaintiff's reputation aren't available and could be obtained through paid means. These will be investigated and utilized as appropriate.

- <u>Videos</u> – One or more videos would be produced for reputation restoration and the other for enhancement purposes and exposure for them would be placed on many places on the internet (e.g. Plaintiff website and its social media forums, YouTube) and also used for viewing on an individual basis.

- <u>Miscellaneous Communications</u> – Throughout the program, continual efforts would be made to seek out opportunities to generate exposure and deliver information through existing channels whether online or offline.

- <u>Additional Program Activities</u> – To be determined as needed to achieve goals.

<u>Program Overview and Budget</u>

Based on my extensive background conducting similar campaigns, and my analysis of the nature of the communications program that would be needed to counteract the damage to the Plaintiff's reputation from the harm caused by the Defendants' false statements and depictions, misrepresentations, actions and inactions, I believe a two year proactive reputation damage repair program would be required with the bulk of the program initiated in the first year and the second year devoted to continued reinforcement and maintenance of the program as needed. The primary focus of the program would be oriented to repairing the Plaintiff's reputation with a secondary goal of supplementing the restoration with generating as much positive exposure as possible. From past experience conducting similar reputation damage repair programs on various scales across the United States, I believe a very conservative estimate of the cost of such a program for the Plaintiff would be in the range of $650,000 to $700,000.

The scope of the program and the budget amount is based on my assessment of what I believe would be needed to repair the damage to the reputation of the Plaintiff based on the information I have at this point in time. Further, I have made no attempt to put individual budget figures to each of the program elements above because of the following factors:

- The result of the litigation. Should the Plaintiff prevail, it would validate that the false portrayal, misrepresentations and allegations made by the Defendants caused her severe reputation harm and this would provide a legal decision on which to create and build a program to restore the firm's reputation and good will. However, if the Plaintiff was not to prevail, it would require a totally different approach to the program to achieve its objectives as well as impact the scope of the program to be instituted.

75

Confidential

- The result of the litigation would dictate which of the program elements listed would become more essential and require more emphasis, thus it is not possible at this point to determine the exact expenditure for each. (Note: However, most all of them would likely be used regardless who prevails in the litigation, it is a matter of to what extent. The projected budget is appropriate range regardless of whether the Plaintiff should prevail or not.

- It's not prudent to plan the specifics of a program before receiving the approval of the Plaintiff as to what will be done and the nature and degree of her participation based on her preferences at the time. I would not expect the Plaintiff to make these decisions until she knows the results of the litigation.

To reiterate, this program and budget is a realistic assessment of the scope and cost of a program that would be required to meet the needs and goals of this reputation damage repair program based on my current knowledge.

## REPUTATIONAL DAMAGE COMPENSATION

The Plaintiff justly needs to be compensated for the "pain and suffering" she has incurred as well as the harm and damage to her reputation which emanated from the Defendants' false statements, misrepresentations, actions and inactions from the moment the series was conceived through production, airing and beyond as well as other resulting negative consequences. Also, even if the Plaintiff prevails in this litigation, the negative exposure she has suffered because of the Defendants will always be present to some degree and will continue to cause reputational harm and the damage to the professionally and personally to her well into the future.

Factoring in this negative impact on her, it would be my recommendation that the Plaintiff justifiably receives fair compensation from the Defendants based on the extent of the reputational damage and the massive disruption to her as a professional and personally as reflected in the observations, comments and opinions I have expressed in this report. The Plaintiff believes that a damage award in the range of $6,000,000 to $8,000,000 would be fair and equitable for the negative consequences she has had to bear. It is my opinion that is a very conservative range given the malicious intent and the reckless disregard for the truth exhibited by the Defendants and the extent of the damage to her professional career and harm to her personally.

## PERSONAL OBSERVATIONS

- In my 50 years as a public relations professional, during I which I represented hundreds of clients with reputation damage, as well my 16 years as an expert witness handling nearly 70 defamation and reputation harm cases, there is only one instance I can cite where the reputation damage has had a more devastating effect on an individual and /or entity who/which had the stature, success and/or prominence of Fairstein. Regardless of what is determined in this litigation, the negative impact on this person's reputation, business career and personal life has been truly consequential and devastating.

## OBSERVATIONS OF A VIEWER FROM TWO PERSPECTIVES

I've personally watched the series twice. The first was as an average viewer in 2019 within a week of its initial airing. I'm old enough that I was aware of the Central Park "Jogger" attack at the time it happened albeit I didn't follow the subsequent litigation and I don't remember hearing

76
Confidential

about the Reyes confession.    After viewing the series then, my impression was that there was a rush to judgment, the five youth weren't treated fairly and their lives were shattered, possibly irreparably even though ultimately they got a large monetary settlement and seemed to be leading normal lives (e.g. working, married with kids).    What I remembered most with the brutal way they were interrogated and deceived by the brutal, heavy handed tactics of the police, aided by the DA's representative (Fairstein), who was out to convict them at all costs. (Side note:  I didn't know who Fairstein was at that time).  Having represented nearly 100 law firms at that time and been involved in countless litigation and trials, I had no problem with Lederer who I remember thinking was very professional and a strong prosecutor.    It is important to add that I never sit through the credits when watching a television show so I never saw any disclaimer. Knowing that it was based on a true event, I assumed it was pretty much factual.

The second time I watched the series (June 18, 2022) – this time all four episodes in one sitting – I did so in my role as an expert witness.  I purposely waited to watch it again until I had the opportunity to go through all the discovery I was provided, do some research, communicate with the Plaintiff and be thoroughly acquainted with both sides of the case.  Having accumulated all that background, information, knowledge and insight, I had a totally different perspective on what I saw in this viewing which is reflected in the conclusions and opinions I have offered in this report.  The mission of the Defendants – to present the "truth" of the Central Park Five and their view of what transpired from the night of the attacks in Central Park to the airing of the series – was certainly accomplished and impressively so.    However as someone who was "schooled" while at the New York Times to adhere to the sacred journalistic creed of "fair and balanced reporting" – this series clearly failed the test.  I realize the Defendants purport that this was a "dramatization" (albeit the disclaimer was probably unseen to the vast majority of viewers like myself), it still presented a highly negative and misleading view of many of the participants depicted as well as self-admitted fabrications of words, actions, activities and events shown in the series.  Foremost was the depiction of Fairstein which led to the filing of this lawsuit.

## SUMMARY OF CONCLUSIONS AND OPINIONS

A general summary of my conclusions and opinions are as follows:

- The Defendants self-stated mission for the series was to "tell the truth" from the perspective of the five individuals convicted in the "Central Park Jogger" case.

- In doing so, they wanted to "put a face" to the injustice and unfair treatment which the five individuals ("Central Park Five") experienced which ultimately led to their conviction and incarceration.

- They predetermined that the Plaintiff would be the primary "villain" in this respect and further, for her to be the focal point in representing all those in the law enforcement and judicial system that contributed to the injustice.  In effect she would be the "boogeyman" that would be targeted as the chief culprit and architect of the wrongdoing.

- All the Defendants from the production company to the directors and producers to the writers and even marketing department conspired throughout the whole process – from series conception through the production process to the series airing and in the pre-and-post marketing - to lay the blame for the injustice to the Central Park Five on the Plaintiff.

Confidential

- In anticipation of a possible negative portrayal in the series, the Plaintiff along with her legal counsel and Lederer all reached out in advance of production and cautioned the Defendants to ensure the series was accurate in terms of the depiction of the Plaintiff and others. They referenced and provided information on where accurate records could be found of what had transpired from the time of the assault through the trials. The Defendants ignored the pleadings of Fairstein and Lederer to either review or factor in the evidence that was available in the creation of the series.

- The Defendants proceeded to prepare a script and produce the series to fulfill their mission without regard to the truth in their zeal to tell the story of the Central Park Five to the detriment of others. In doing so, they exhibited recklessness, disregard for the truth and malicious intent towards Fairstein, as evidenced by the way she was portrayed in the series, reflected by the detriment, disparagement and vitriol towards her as the primary target for their wrath. They self-admittedly sought to portray her as the primary person that choreographed masterminded and single-handedly directed the demise of the Central Park Five. In doing so, they portrayed her as a racist and bigot, a morally corrupt human being and someone who is insensitive and uncaring to the plight of others.

- Throughout the series, they fabricated her words and actions as well as activities and events in which she reportedly was involved. Their justification for this was they "believed" that many of the actions they depicted the Plaintiff involved in throughout the series were true based on what they "believed" her role was in the investigation and litigation. They "believed" the words they put in her mouth were representative of what she thought and expressed. In most cases, they had no direct knowledge, only belief.

- Through their own internal documents in the planning, preparation, writing and production of the series, the Defendants made clear every step of the process that the Plaintiff must be portrayed in the most negative light possible.

- In the period in advance of the airing of the series, the Plaintiff was featured in the series' marketing in a negative manner.

- The series was initially marketed, with heavy emphasis, as being a true story (i.e. *"the truth will be told")* and that was emphasized repeatedly. Somewhat later, they portrayed it as a dramatization.

- It was the Defendants' contention that viewers would understand that this was not actually a totally factual, true account. In a court finding, a judge disputed that contention. To cover themselves, the Defendants put a disclaimer at the end of each episode stating that it was a dramatization – completely ignoring the fact that 90% of television viewers do not watch the credits after a program – especially to the end. If they truly wanted to alert viewers that everything was not fact, they would have put the disclaimer before the episode began to pre-warn viewers not to accept everything as true. Further, the disclaimer would have been on its own page, devoid of any others words or graphics – and not buried in small type "lost" among other copy and artwork as it is.) Finally, he series is still on Netflix and the disclaimer does not appear after Episode Four and to see the disclaimer (or credits) in the first three requires selecting a button within four seconds or the start or the credits disappear.

78

Confidential

- Both before and after the series aired, the Defendants executed a massive publicity and promotional campaign both offline and online. Extensive media interviews were arranged, including many involving the participation of the Central Park Five. Evidence shows that they coached and manipulated them and dictated with whom they did interviews, when and what they said. Much to the detriment of the Plaintiff.

- Part of the marketing effort was generating exposure on social media in which all three defendants participated. Much of it contained disparagement of the Plaintiff. Defendant DuVernay remarked that the Plaintiff "must be held accountable" (purportedly for the unfair treatment and convictions of the Central Park Five) and Defendant Locke spearheaded a vitriolic social media campaign to disparage the Plaintiff.

- Defendant Locke also led a campaign prior to the series airing to cause direct negative consequences to the Plaintiff (e.g. instrumental in getting the Mystery Writers of America to rescind an award it had planned for the Plaintiff).

- The series itself, the pre-and-post airing marketing campaign and the proactive efforts of the Defendants to denigrate the Plaintiff caused both irreparable reputation harm to her personally but also had devastating negative consequences to her professional career.

- Despite this litigation, and the alleged devastating reputation harm to the Plaintiff, the series is still available for viewing today on Netflix.

- While it not my position to advocate for such an occurrence, if the Plaintiff should prevail in this case, it would only be reasonable for her to be compensated for the damage to her reputation in an amount that would be fair and equitable reflecting the harm to her personal life as well as professional career.

- Even if she were to prevail, that would not alter the fact that her reputation has been severely – if not fatally – damaged. The only way to mitigate the damage is to institute a reputation damage repair program. Much like "humpty dumpty," while it won't put all the pieces back together again, all efforts must be made to mitigate the damage to her reputation. It must be noted that even the most successful program will not restore her reputation to a pre-series level. Based on my experience of creating and implementing such programs for more than four decades, even the most effective program possibly might only restore 70% of her reputation.

- Netflix's mantra throughout both the marketing of the series and litigation is that the series was intended to tell the "truth" of what occurred from the viewpoint/perspective of the Central Park Five. In other words, to provide them a forum to get out their side of the story so-to-speak. What that doesn't explain is the demonization of Fairstein who did not nearly have as impactful a role in the Central Park "Jogger" case as Lederer did, for example. There is no reason why the Defendants couldn't tell their "truth" without singling out Fairstein to be the villain and creating a false, erroneous and highly damaging depiction of Fairstein.

- The Plaintiff is undoubtedly a "public figure" because of her nationally prominent legal career and her fame as an accomplished author. New York Times v Sullivan required the proof of "actual malice" in a defamation claim. While I can't offer a legal opinion, this case reeks with malice exhibited by the Defendants – emanating from the concept of the

Confidential

series until even now. Although their primary mission was to "tell the truth" from the perspective of the Central Park Five, their main means of achieving that was to use/portray the Plaintiff as the chief villain and person responsible for destroying the lives of the Central Park Five. Netflix clearly acted either with knowledge of, or in reckless disregard of, the falsity of the manner in which Fairstein was portrayed in the film series.

- The Plaintiff was once asked what she would like her legacy to be and she responded:

  *"I would hope to be remembered as a prosecutor who was fierce in her efforts to do justice for victims of violence, creative in her vision to lead investigations, fair in her dealings with all parties and whose integrity was paramount."* (LF0000805)

In her deposition, Fairstein opined that she believed that assessment was not realistic because the Netflix series had cast her in a negative light.

Q  *"Do you think that some people generally could have a basis for feeling hostility towards you for your participation in and continued defense of a prosecution that they believe to be a travesty of justice?"*

A  *"After the false portrayals of me that your clients have produced, I would expect anybody to be hostile to me."*

I was retained by the Plaintiff to assess the reputation damage to her in this case, not to offer a legal opinion. I cannot offer a legal opinion on the Causes of Action in this lawsuit. However, it is my professional opinion as an expert - based on all available evidence, the information I reviewed as well as my experience and expertise in the communications field and as an expert witness - that all the Causes of Action related to Defamation cited by the Plaintiff, Linda Fairstein, in this lawsuit against the Defendants, Netflix, Inc. Ava DuVernay and Attica Locke, I have concluded are valid based on the observations, conclusions and opinions I have offered in this report.

## REPORT DISCLAIMER

The views, conclusions and opinions stated in this report are based on information and input related to this case that I have received to date. Based on receiving additional documents or information (e.g. legal filings, expert reports, depositions or hearing transcripts, records, communications, data) that may be made available to me in the future, I would reserve the right to either add to, change and/or expand on the scope of what I have offered in this report.

_____
Robert J. Fisher

August 8, 2022
Date

80                                                        Confidential

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

JASON MOOREHEAD

v

SCHOOL DISTRICT OF THE CITY OF ALLENTOWN; BOARD OF SCHOOL
DIRECTORS OF THE SCHOOL DISTRICT OF THE CITY OF ALLENTOWN;
THOMAS PARKER; NANCY WILT; NICHOLAS MILLER; LISA A. CONOVER;
PHOEBE D. HARRIS; AUDREY MATHISON; CHARLES F. THIEL; ANTHONY
PIDGEON; MARILYN MARTINEZ; JENNIFER RAMOS; JOHN D. STANFORD;
PATRICK PALMER; LATARSHA BROWN; JENNIFER LYNN ORTIZ

(C.A. No. 5:22-cv-03959-JMG)

EXPERT REPORT OF ROBERT J. FISHER

PREPARED FOR PLAINTIFF JASON MOOREHEAD

July 3, 2024

DEPOSITION
EXHIBIT
5
Fisher
PENGAD 800-631-6989



1

# TABLE OF CONTENTS

Assignment.................................................................................    3

Compensation.............................................................................    3

Background and Qualifications.....................................................    4 - 7

Record of Testimony...................................................................    7 - 9

Case Background.........................................................................    9 - 24

Lawsuit Information.....................................................................    24 -39

Information/Input Reviewed to Form Opinions..............................    39 - 42

Methodology..............................................................................    42 -45

Preface to Findings.....................................................................    45 -48

Analysis and Opinions.................................................................    48 - 49

Analysis of Plaintiff's Reputation Pre-Suspension.........................    49 - 50

Analysis of Factors Impacting Reputation Harm...........................    50 - 59

Source of Harm to Plaintiff's Reputation.....................................    59 - 65

Reputation Damage to Plaintiff....................................................    65 - 67

Reputation Damage Repair Program.............................................    67 - 73

Reputation Damage Compensation...............................................    73 - 74

Observation and Perspective........................................................    74

Summary of Conclusions and Opinions.........................................    75 - 77

Report Disclaimer......................................................................    78

2

## ASSIGNMENT

I am a veteran communications professional, executive and counselor – acquired from my background as both a journalist (reporter for the New York Times) and a half-century career in the communications fields of public relations, advertising and marketing. During the time I owned and operated my public relations and communications firm in Los Angeles, it represented over 400 clients on local, national and international levels, to include a wide range of businesses and industries as well as government and nonprofit entities. The firm's areas of specialization included law (represented over 125 law firms), litigation (handled communications for hundreds of lawsuits and trials), crisis communications and reputation management and damage repair.

In addition to the legal profession, I have been acknowledged nationally by the news media for this background, experience and expertise fields of crisis communications and reputation management and damage repair and have served for more than 40 years as an expert media information source, analyst and commentator. Additionally, I am an experienced expert witness who has been involved in 100 cases in 31 states, 89 of which were for defamation or reputational harm during the past 18 years.

As a profession, I had amassed an extensive amount experience and expertise in aiding and counseling individuals, businesses, and entities that were in trouble, conflict, crisis situations or have been harmed by communications that damaged their name, goodwill, image, reputation, brand, etc.

Due to that experience and expertise, I have been retained by the law firm of Francis Alexander, LLC to serve as an expert witness in this case on behalf of the Plaintiff, Jason Moorehead. I have been asked to analyze and offer my insights, comments, conclusions and opinions as it relates to any reputation harm that may or may not have been incurred by the Plaintiff, is and/or will occur as a result of alleged false statements, misrepresentations, actions and inactions of the Defendants and their negative impact on the Plaintiff. I have also been asked to provide a recommended strategy, actions and a budget for a communications program which would be required to restore the reputation and mitigate the damage to the Plaintiff.

(Note: In this report I may use legal terminology and cite some legal standards, concepts or principles. These are not to be interpreted as my offering legal conclusions or arguments because I am not an attorney. Any I may offer will be for the purpose of providing insight, context or perspective to issues I am discussing or conclusions and opinions I am offering.)

## COMPENSATION

For consultations, information gathering, research and the preparation of this report, my compensation was $900 per hour. If a deposition is required, the rate will be $975 per hour with a four-hour minimum. Should I testify at the trial for this case, the rate will be $4,500 for a half day and $8,000 for a full day. Travel fee is $300 per hour and travel expenses would be required to be reimbursed as well.

(Note: My compensation is not predicated on or related to the conclusions and opinions will generate in this case nor is payment of my services dependent on the outcome of this litigation or the receipt of any funds to the Plaintiff emanating from it.)

## BACKGROUND AND QUALIFICATIONS

General Summary

I am a veteran public relations, advertising, marketing and communications executive and counselor and journalist with 54 years of experience, including 42 years operating my own communications firm, Fisher & Associates, Inc., located in the Los Angeles, California. During my professional career, I have provided counsel and services to clients in a broad range of businesses, professions, and industries as well as to nonprofit organizations and government entities on a local, national and international basis as required.

While I am a communications generalist through the breadth of my professional background and experience (e.g., journalism, public relations, marketing, advertising), I am also a nationally-recognized expert in crisis communications, reputation management and image repair and counseling. My firm was a (and possibly the) national pioneer in creating and developing public relations and marketing/communications programs for the legal profession. My firm provided litigation support in hundreds of civil and criminal cases (including trials) throughout the United States. Additionally, for the past 18 years I have served as an expert witness, representing both Plaintiffs and Defendants in 100 cases in 31 states and the District of Columbia. For decades I have functioned as an expert information source and analyst for the mass media on issues relating to crisis communications, damaged image and reputation.

Litigation Experience

Because of my 42-year background in representing law firms and being involved in litigation and trials by handling communications and the "Court of Public Opinion," I have amassed a significant amount of background and experience in the judicial process and all aspects of litigation. This has led to me periodically receiving calls from law firms, individuals and businesses throughout the U.S. from those who needed aid and counsel. A brief list of some of the major litigation and/or legal actions in which I was called to provide counsel or services, include:

- Iranian Hostages before the U.S. Supreme Court (Washington, D.C.)
- Dennis Wilson (Beach Boys) Estate Dispute (Los Angeles)
- Maxicare Bankruptcy (Los Angeles)
- United Airlines Crash in Iowa Cornfield (Chicago)
- International Organization Branded Cult (Scottsdale, Arizona)
- Legislature Threat to Ban Brothels in Nevada
- High School Students Killed (Paducah, Kentucky)
- Rodney King Beating (Los Angeles)
- IRS Indictment of CPA Firm for Tax Fraud (San Francisco)
- Homeowners Facing Loss of Homes (Los Angeles)
- BKK/BFI Landfill Fraud (Southern California)
- Firestone Tire Class Action Lawsuit re Defective Tires (Los Angeles/Washington, D.C.)

In providing litigation support to law firms in scores of cases, I assisted in the "Court of Public Opinion" by providing information and exposure through various channels of communications during the period from the filing of the civil or criminal action through to its conclusion. I also provided counsel and offer strategies relating to communications.

4

Media Expert/Analysis

As a direct result of my involvement in many litigious situations (many high profile), over the past few decades, I have often been sought out by the media as an expert information source and analyst to provide background, information, interpretation and analysis, commentary and opinions on news, issues and matters relating to those people, businesses, institutions, governments, etc. who were controversial, in conflict or in trouble. Generally, this is related to what the public perception of the situation was, how it could be changed by those involved and what damage has or was it causing to their image, reputation or brand in the short and/or long term. As an example, with both of the O.J. Simpson civil and criminal trials, and in-between the two, I was regularly interviewed by local, national and international print and electronic media as an expert media source/analyst.

Expert Witness

In 2006, due to my extensive career in journalism, public relations, marketing and advertising, I began providing service to litigants as an expert witness. Since then I have served as an expert witness in approximately 98 cases on behalf of both Defendants and Plaintiffs in 31 states throughout the United States (California, New York, Florida, West Virginia, Georgia, North Carolina, Mississippi, Virginia, Utah, Tennessee, New Mexico, Nevada, Hawaii, Washington, Colorado, Minnesota, Michigan, Maryland, Louisiana, Delaware, Massachusetts, Michigan, Wisconsin, Ohio, Louisiana, Kentucky, Arizona, Texas, Alabama) plus the District of Columbia. I am a court-qualified expert witness and I have represented both Plaintiffs and Defendants and provided sworn testimony in depositions, hearings, arbitration hearings and trials, both bench and jury, in state and federal courts. The bulk of the cases have primarily been in the areas of journalism, defamation (libel and slander) and public opinion/perception. I have also been involved in cases relating to professional malpractice, overbilling, inappropriate billing, loss of image and reputation, professional business operation and damage to a future professional career.

Education

San Jose State College    Bachelor of Arts degree    Public Relations (1966)
University of California at Los Angeles (UCLA) Periodic courses taken to upgrade knowledge.
Numerous seminars, workshops and other education forums to enhance knowledge.

Professional Experience

- New York Times             Newspaper                Reporter
- Los Angeles Beautiful, Inc.  Non-profit organization   Public Relations Director
- Harshe, Rotman & Druck      National PR Firm          Asst. Account Executive
- Burson-Marsteller, Inc.      National PR Firm          Account Executive
- Atlantic Richfield Plaza      Shopping Center           Promotion Director
- Doremus & Company           National PR Firm          Account Supervisor
- Fisher & Associates, Inc.     PR Firm (Founded 1978)    President

Related Experience

While in the United States Army (1966-68), I served as a Public Information Officer in West Germany. I provided traditional public relations counsel and services for the Army and I also interacted with the German media/community.

5

<u>Awards and Honors</u>

I have received numerous awards from local and national public relations and marketing organizations for my counsel and service to clients during the past four-plus decades.

<u>Professional Memberships</u>

- Public Relations Society of America (former Executive Committee Member of Counselor's Academy)
- Public Communicators of Los Angeles (officer for five years)
- Institute of Management Consultants (board member)
- Public Interest Radio and Television Education Society
- American Heart Association (Vice Chairman, Communications Committee)

<u>Lectures and Publications</u>

Throughout my professional career, I have spoken and written on a wide variety of subjects related to public relations, marketing and communications for business as well as for specialty areas (e.g. crisis communications, legal marketing/litigation support).

- <u>Lectures/Presentations</u> – I have lectured at universities (e.g. UCLA), to national conventions (e.g. American Bar Association) and at a variety of speaking forums (e.g. weekly/monthly meetings, seminars, symposiums) held by a diverse range of professional and business organizations.

- <u>Publications</u> – I have written a large number of articles for a variety of local, regional and national general, business, professional (e.g. legal) and trade publications, online and offline, including newspapers, magazines, newsletters and websites. (I have also been interviewed for, quoted in and had articles written about me in local, regional and national legal publications.)

- <u>Defamation/Reputation Harm Articles</u> – Among the articles I have written specifically addressing reputation damage and defamation have included:

  - American Bar Association TYL Magazine (Summer 2020): *"Image/Reputation/Brand Damage: Does Litigation Solve the Problem?"*

  - *"Defamation: The Stain That Can Never Be Removed."*

  - *"Negative Communications: The Process of Absorption and Transmission."*

  - *"Harmful Media Exposure: Beware of the Hidden Sources of Damage."*

  - *"Defamation: Guiding Principles of Negative Communications That Result in Image and Reputation Damage."*

  - *"Defamation Defense: Is there a Third Bite of the Apple."*

  - *"Image/Reputation Damage From Media News Reports: Is it Legally Actionable."*

6