Social Media

- 39 Posts on Raub Middle School Website  (No date)
- 27 Posts With Protect Our Children Petition  (No date)
- 4 Jason Moorehead Social Media Facebook Posts  (January 6, 2021)

Media Exposure

- Morning Call: "Allentown School District Removes Teacher Who Took Part in Washington, D.C. Protest" (January 8, 2021)
- Fox News: "Pennsylvania Teacher Suspended, Others Lose Jobs Over Capitol Riot" (January 8, 2021)
- NRP: "Allentown Teacher Suspended For Attending Capitol Riot" (January 12, 2021)
- Lehigh Valley Live: "A Lehigh Valley Teacher Was Suspended For Being Near D.C. Insurrection.  He Says He Was Only There to Witness a Historic Event" (January 23, 2021)
- (Unknown): "'My Reputation and Character Has been Destroyed': Allentown School District Teacher Suspended For Attending Protests and Lawsuit is Inevitable" (January 23, 2021)
- Lehigh Valley Live:  "Local Teacher's D.C. Trip On Insurrection Day Led to Calls For Firing, and Some Defenses" (February 12, 2021)

Internet Research

During this assignment, I conducted research to review information on the internet that might be pertinent about the litigants and the lawsuit as well as to seek clarification and definition on various subjects. (Note: the information I reviewed did not impact the conclusions or opinions I offer in this report.)

Sources to Obtain Information

The aforementioned documents and informational materials listed along with internet research I conducted and information I received from Plaintiff's legal counsel and a conversation with the Plaintiff provided me with the information related to this case and specific to it which formed the basis for the findings, conclusions and opinions I offer in this report.

## **METHODOLOGY**

As an expert witness, the methodology I utilize to gather and analyze information and form my conclusions and opinions in cases is standard to both public relations professionals in addressing reputation damage on behalf of clients and to expert witnesses in my field of expertise in litigation.  Further my methodology has been accepted and validated by both federal and state courts as I have testified in 10 legal proceedings, including bench and jury trials.

Information Gathering

In my assignments as an expert witness I fully endeavor to obtain information from both sides of the litigation because it is vital to know their positions and understanding of the facts as well as their interpretations and views of them.  In some instances, they agree on information and facts and in others they do not. It is not my task or responsibility to determine who is right or wrong;

that will be determined in court. My responsibility is to analyze, evaluate and opine on reputational damage from the facts I know to be true. In this case, where there is a disagreement, since the Plaintiff retained me, I am obligated to presume that the information provided on his behalf is correct and will base my conclusions and opinions on it being true unless I am aware of – or will be subsequently provided - evidence to the contrary.

Following are the actions I took to educate myself to the issues that led to this litigation and information on the litigation to date as well as the individual perspectives of both the Plaintiff and the Defendants:

- Reviewed all documentation and information on the background to this dispute as well as that related to the litigation as well as any other unrelated information that is germane to this the issues in contention in this case.

- Analyzed the information provided regarding the dispute and their positions on it as espoused by both parties in this litigation (as reflected in the Case Background section of this report).

- Obtained information, background and clarification from counsel to the Defendants on the dispute background and litigation as needed.

- Researched information as needed on the internet to search out additional information and clarify information I have already been provided.

- Communicated with the Plaintiff's legal counsel in the case to obtain more information and background as well as specific input on the nature and extent of the reputation damage he suffered.

- Communicated with the Plaintiff to obtain information as needed.

Forming Conclusions and Opinions

The conclusions and opinions I offer in cases are objective and not biased on behalf of the Plaintiff who I was retained as an expert witness on his behalf. They are based both the information and evidence I have reviewed which I believe to be accurate, reliable and authentic along with the insight and perspective accumulated from my professional background, experience and expertise in reputation management and repair.

To reach these conclusions and opinions, the methodology I used in this case is consistent with the standard industry operating procedures, generally accepted and/or peer-reviewed methods normally used by public relations and communications professionals on behalf of clients and as well as expert witnesses for litigants when performing reputation damage determinations, analyses and investigations. Based on this, I purport that they are reasonable, relevant and reliable having been honed and applied in approximately 90 cases related to reputation harm to date.

This methodology has been accumulated and enhanced through the following means:

- Over four decades as a public relations practitioner counseling and providing communications services to a wide variety of clients (e.g. businesses, industries,

43

individuals, government entities, nonprofit organizations, issue advocates) who were in a crisis situation or had damaged reputations. This included creation, development and implementation of dozens of reputation damage repair programs on local, national and international levels.

- As a professional over a 50-year span, I have interacted, conversed and exchanged information with other professionals through meetings, seminars, workshops, conferences and conventions which focused on the strategy, methods, techniques, procedures and systems used to counter negative impact to and/or repair reputations.

- I have written numerous articles about defamation and reputation harm (the last which appeared in the 2020 edition of ABA's national magazine).

- As an officer of both national and local public relations associations, I have lectured and spoken at numerous professional forums.

- I have attended expert witness conferences, attended sessions and interacted with other experts and obtained information on and discussed their methodologies as to obtaining, reviewing and interpreting information in order to formulate their conclusions and opinions – to include reviewing them my methodology.

- I have reviewed the methodology in reports of other experts which I was privy to because they were on opposing sides of cases I have had.

Therefore, the methodology I utilize as an expert witness in assessing and offering my conclusions and opinions is totally both peer-accepted and reviewed because it represents the almost universal consensus of how professionals in the field of reputation management operate when addressing reputation damage and repair as well as expert witnesses in formulating their conclusions and opinions in cases..

In this case, once I received all the input, following are the actions I took to form my conclusions and opinions:

- Applied the principles of negative communications to this case as appropriate (some of which are applicable and contained in following sections of this report).

- Followed peer accepted methods, procedures and forms of analyses in both the public relations and expert witness professions relating to how to analyze and assess situations which negatively impact reputations as well as devise strategies, plans and actions to restore them.

- Applied the facts of the case in consideration, creation and development of my conclusions and opinions.
- Reviewed past situations of reputation harm I addressed as a public relations professional and cases I have had as an expert witness which were similar in nature to this case and analyzed both the nature and extent of the reputational harm and determined its source. This information and insight were then factored in when developing my conclusions and opinions in this case.

44

Relative to the last point above, it is important to note that any conclusions and opinions I offer are based on the professional background and the experience and expertise I have amassed during my 54-year background in communications (outlined in earlier sections of this report) and not emanating from surveys, studies, tests, research or other forms of qualitative, qualitative types of analyses or fact gathering procedures. They are based on direct experience and observations working with people, businesses and/or entities in similar situations and what transpired from them.  This is covered in Federal Rule 702 and 703 which states:

- The use of opinions will continue to be permissible for the experts to take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts.

- The expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education."

- Using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert is qualified; (2) the testimony addresses a subject matter on which the factfinder can be assisted by an expert; (3) the testimony is reliable; and (4) the testimony "fit" the facts of the case.

(Note: Rule 702 was amended effective December 1, 2023, as follows:  *"The proponent of expert testimony must demonstrate "to the court that it is more likely than not" that the rule's three admissibility requirements (Rule 702(b)-(d) are met.")*

## Legal Determinations

As an expert witness, I am not allowed to offer any opinions on whether the Causes of Action of are legally correct in this litigation.  That is up to the jury, the trier of fact, to make that determination.  It is my task, based on my background, experience and expertise in the field of communications - and particularly in reputation management, damage and repair – to provide pertinent information and insight and offer appropriate conclusions and opinions that will provide worthwhile context and perspective on the facts and information the jury will receive to facilitate and aid its members in making their decision.

## Litigant Assertions

The information I have received and reviewed falls into two categories, accepted fact and representations of fact provided by the Plaintiff.  In the latter instance, I may not testify on them in court but I reserve the right to consider them in developing my conclusions and opinions

## **PREFACE TO FINDINGS**

The comments, conclusions and opinions in this report pertain to the issues I was asked to address as outlined in the "Assignment" section of this report. My input in this report will be based on the information I obtained and reviewed in this case which was detailed in the "Information/Input Received to Form Opinions" section of the report.

I have reviewed the legal documents and other types of information listed in a previous section of this report and have conducted internet research to obtain some general background on the litigants as well as to determine what other information was available relevant to the issues

related to the lawsuit filed by the Plaintiff. As a result, I am versed in the facts related to this litigation emanating from the information and evidence that is available.

As an expert witness, I am not allowed to offer an opinion on whether the Counts of Libel and Defamation are legally correct in this litigation. That is up to the jury, the trier of fact, to make that determination. It is my task, based on my background, experience and expertise in the field of communications - and particularly in reputation management, damage and repair – to provide pertinent information and insight and offer appropriate conclusions and opinions that will provide worthwhile context and perspective on the facts and information the jury will receive to facilitate and aid its members in making their decision.

The analysis of the information and evidence related to this case which I have seen are germane and at the core of this litigation, which includes the words and actions of both the Plaintiff and Defendants. Also included is my assessment of what, if any, reputation harm the Plaintiff has incurred resulting from the words, misrepresentations, actions and inactions of the Defendants.

Reputation Importance

One's reputation – regardless of whether it is a person, business, organization or any other type of entity is critical because that is most often the "prism" through which the subject is viewed and/or judged. According to an amalgamation of definitions offered by the Cambridge, Oxford and Merriam-Webster dictionaries, reputation is defined as:

> *"The beliefs or opinions that are generally held about someone or something. The overall quality or character as seen or judged by people in general; the opinion that people in general have about someone or something or how much respect; the estimation in which a person or thing is held."*

Additionally, as applies to an individual, the vital interest in a person's own good name and reputation surpasses its relation to or impact on his occupation, finances, business and personal relationships, etc. It is a fundamental part of its identification, of his self-image, standing and sense of worth.

In the public relations profession, there are two old "tried and true" axioms that are sacrosanct and they are *"It takes years to build a reputation but only seconds to destroy it"* and *"perception is more important than reality"* (in most cases, reputation and perception are basically interchangeable in this context).

Impact/Effects of Reputational Damage and Harm

Prior to addressing the reputational harm in this case, there is one critical factor that needs to be understood and considered when analyzing the real and potential reputational harm to the Plaintiff as a result of alleged false statements, misrepresentations, actions and inactions of the Defendants which have already has a profound negative impact on him.

When assessing a situation involving reputational harm and damage, it is important to understand how the negative communications emanating from the Defendants serve to stain the reputation of the Plaintiff, which in turn, translates into negative consequences that have a detrimental impact on him. There are numerous means through which negative communications can be transmitted and spread, including: oral and written messages, internet/social media formats, media exposure, print publications, etc. A particularly damaging means is through "word of mouth" which

further perpetuates the reputational harm through widespread distribution of its disparaging content and the original message can be altered or enhanced through individual interpretation of the negative comments and alterations in what is passed on to others.

Also, it is nearly impossible to counteract or negate the harmful effects of this negative reputational spread either in the short or long term.

There are several principles accepted in various communications professions that are apropos in relation to the dissemination of negative information about some person and/or entity - regardless of whether it is true or not, to wit:

- It takes years to establish a reputation and seconds to destroy it.
- You can't un-ring a bell.
- You can never wipe a slate clean
- Where there is smoke, there is fire.
- Perception is more important than reality

Succinctly, this means that once a reputation is damaged, it cannot be fully restored.  These principles are the basis of many of my conclusions and opinions in this report.

There are two methods of disseminating negative information (or, in this instance, a negative reputational view of the Plaintiff) – controlled and uncontrolled. "Controlled" means that one can pinpoint everyone who was exposed to the negative communications passed on (e.g. person-to-person remark, written communication to only certain people, a speech to a group of people) in a contained environment.  The theory here is that only these people have the information and they have hopefully not yet passed it on in any way to others.  When the negative content is limited to only those exposed, there is a chance to be somewhat effective in refuting it by reaching those people and providing an opposing view to the input they received.

"Uncontrolled" means that either the negative communications resulting in the negative reputational view has already passed it on in various ways to others that cannot be identified or contacted – or it was disseminated in such a way (e.g. in the media or on internet) that there is no way of knowing exactly who received it or what they may have done with that information (e.g. disseminate it to others).  In this instance, it is impossible to ensure that everyone exposed to the negative communications has access to the opposing viewpoint – and thus, without any counter information, the original (negative) view or opinion formed as a result of it could be considered to be accurate making it extremely damaging.

Negative impressions or perceptions once implanted can often never be completely erased or overcome – for some people completely and for others, to a certain degree.  In reputation management and the communications field in general, there are accepted principles that apply to the transmission, absorption and impact of negative communications on a subject, which include:

- To change their thinking is never as effective because the person may have already given credence to the initial opinion or they will filter the second outlook through the original information received (not a clean slate).

- Even if people receive a contrary view, there could always be an element of doubt (e.g. where there is smoke, there is fire).

47

- If someone receives contrary views of a reputation, and does not know which is right, it would be human nature to take a conservative approach to steer clear of the subject of the information (e.g. "why take the chance") and go with another choice.

- People will believe a negative impression or perception of a reputation if it seems plausible and there is no counterbalancing input that refutes or challenges that information.

- As a negative reputation is communicated to others, when there is no way to identify who has received the information, there is no chance to provide them with the correct information to offset the negative impression or perception.

- When a damaged reputation is communicated and is not countered, it can be passed on by "word of mouth."  This is particularly dangerous and harmful because when passing this view from one person to the other, the original view can be misinterpreted, exaggerated, embellished and/or distorted which could make it even more negative in nature.

- Finally, and most importantly, if the negative impression or perception cannot be stopped with the original people who heard it, it can go on forever and the spreading of it can be limitless.

In short, reputational damage through negative communications can be devastating and lasting.

## ANALYSIS & OPINIONS

Preface

Following is an analysis of the information and evidence emanating from the words, actions and inactions of the Defendants I have seen that are germane and at the core of this litigation as well as my assessment of their contributing to what, if any, reputation harm the Plaintiff has incurred as a result.

My five-decade background in all major professional areas of communications along with my 42 years of experience in litigation support, my specialization in reputation management and repair counseling and programs as well as my 18 years as an expert witness clearly gives credence to the validity of the following comments, conclusions and opinions I offer relating to this case.

General Overview

In the previous section on the Impact/Effects of Reputation Damage and Harm, I outlined the two methods of disseminating negative information. In this case, it is my opinion that the "uncontrolled" method of communication would clearly apply because of the type of exposure that was widespread in its reach due to the extensive public exposure, including media coverage as well as significant internet exposure, notably social media.  One must reasonably add to this the "word of mouth" factor that would undoubtedly emanate from this widespread and repeated negative exposure incurred by the Plaintiff over a period. This is particularly true when it happens in a relatively small city (Allentown's population was 125,845 in 2020, ranking it as the 237th city in size in the United States) as people are more aware and invested in local affairs as opposed to a major metropolitan city.

48

"Bond of Trust"

There are people in many types of businesses, professions and trades that can experience, survive and shake off negative information about them that might stain their image, reputation, brand and the goodwill with those they service. There are some that cannot because of the nature of what they do and the impact on those they serve. They are held to a higher standard and forgiveness is rare. This includes those in government, (who make the laws), law enforcement (which safeguards us), the legal profession (which protect our legal rights), financial professionals such as accountants, financial planners, investment advisors (who protect our financial well-being) and the clergy (who are responsible for our spiritual well-being). This also applies to educators who we trust with the responsibility of educating, nurturing and protecting our children. As it is clear from the evidence, this is particularly true with the Plaintiff who saw a nearly 18-year career teaching at the same school lose his position and almost assuredly end his ability to find future employment in teaching. Therefore, it is reasonable to project – and has been demonstrated - that the reputational damage and harm to someone in his position is even more significant and impactful because of the nature of his profession and his obligation to serve.

Government Condemnation

In the previous section I pointed out the additional reputational damage that is accrued by those professions, businesses and trades that fall in the category of "Bond of Trust." This applies as well to any individual or entity that has been the recipient of some form of negative communications (e.g. criticism, censure, denouncement, disparagement, denunciation, condemnation) when the source is from a government entity. All public schools and colleges in the United States are part of the government, and they are funded and operated by the state. They must follow federal laws and regulations, but a local school board or education department oversees them. Therefore, because of its position of authority, negative comments from an educational entity would carry more weight and result in more damage than negative communications that emanate from an individual, business or organization.

## ANALYSIS OF PLAINTIFF'S REPUTATION PRE-SUSPENSION

Prior to assessing what damage to the Plaintiff Moorehead's reputation may have been caused by the alleged false statements, misrepresentations, actions and inactions of the Defendants, it is important to factor in what his reputation was before the January 6, 2021 incident and resulting termination including the negative communications to which he was subjected.

From the information I have seen, there is no indication that there was any damage to Moorehead's reputation prior to his trip to Washington, D.C. He had been with the ASD for nearly 18 years – all at the same school – which is an indication his performance was at least satisfactory and his employment was stable. Further, he had not received any complaints or cited for violations. This was verified by Wilt in her deposition:

> Q.   In his 17 or 18 years as a teacher, Allentown School District, was there ever any complaints against him for anything?
> A.   Not that I'm aware.

In addition to being a teacher, he was active in school affairs and participated in the after school program, tutored students and even served as a coach. As to allegations that he was a racist, his students were 90% ethnic.

49

## ANALYSIS OF FACTORS IMPACTING REPUTATION HARM

The Plaintiff has clearly suffered reputation harm in the aftermath of his attendance at the "Save America Rally" held at the Washington Monument on January 6, 2021. My professional background, experience and expertise does qualify me to assess the reputational damage and/or negative consequences emanating from the alleged false statements as well misrepresentations, actions and inactions alleged by the Plaintiff against the Defendants which led to this litigation. In this section I will analyze the factors that resulted in the reputation damage.  They are important to assess as they lend context, perspective and often clarity in understanding the nature of the reputation harm and to gauge the likelihood, and to what extent, the harm will continue in the future.  They also serve the basis for the development of my conclusions and opinions.

Plaintiff Identified as Teacher Prior to Statement

In releasing the statement on January 7, ASD was careful not to identify the teacher that they alleged was at the Capitol Building riots.  However, ASD was fully aware even before issuing the statement that those in the school district and surrounding community had already identified Moorehead as the teacher.  This was reflected in the testimony from the depositions of Wilt:

> Q. *"So members of the public who read the statement could and did, in fact, ascertain that this press release letter was about Mr. Moorehead. Right?*
> A. *Well, you could deduce it if you saw the Facebook post. Yes, I would assume so.*

and Parker:

> Q. *Okay.  You understand, though, that generally one can refer to someone without using their name, using certain factors or characteristics, and people will understand who they are based on, you know, maybe public facts, public knowledge.  Do you understand that?*
> A. *Yes*

> Q. *My question is:· People did, as evidenced by Exhibit 22 which we have been looking at, people did accurately associate Jason Moorehead with the statement put out under your name on January 7th, correct?*
> A. *Yes*

> Q. *Okay. And you were aware that people thought that Mr. Moorehead had stormed the Capitol Building and committed serious crimes, right?*
> A. *Yes.*

and Ramos

> Q. *You don't dispute that when this press release went out on January 7 that Mr. Moorehead was already being widely identified on social media, including on Allentown School District Facebook pages, as the teacher who was in Washington, DC. on January 6, 2021. Correct?*
> A. *Correct.· These postings were being shared for sure.*

> Q. *And you knew that people were widely identifying Jason Moorehead as the Allentown School District teacher.*
> A. *Yes.*

*Q.   Prior to the press release coming out. Right?*
*A.   Yes.*

*Q.   So do you understand that --- do you understand, as a practical matter, many*
*people reading that press release would already know that it was talking about*
*Jason Moorehead?*
*A.   Yes*

False Statement Regarding Plaintiff at Capitol Building

The January 7 statement disseminated by the ASD contained this false statement:

> *"On January 7, 2021, the Allentown School District (ASD) was made aware of a*
> *staff member who was involved in the electoral college protest that took place at*
> *the United States Capitol Building on January 6, 2021."*

This was possibly the single most critical component to the generation of reputation harm to the
Plaintiff. Given the shameful, tragic, heinous and historic incident that occurred at the Capitol ,
the allegation that the Plaintiff was involved would be devastating to anyone's reputation.
Following are excerpts from the depositions of the Defendants which address this false
statement.

- From Parker, who sent the statement out under his name:

    *Q.   March 17, 2021, it's undisputed the District knew Jason Moorehead wasn't at*
    *the Capitol Building, right?*
    *A.   Based on this, yes.*

    *Q.   I'm asking:· Why would they put out a statement stating that a staff member was*
    *at the U.S. Capitol Building when they – when they hadn't verified it and they*
    *hadn't done any investigation to confirm that?· Why would that statement go out*
    *saying that a  staff member was at the Capitol Building?*
    *A.   I mean, the -- so -- so I think -- again, I think the reason we put out the*
    *statement was to inform the community. There – maybe the language could read*
    *differently, but it was to inform the community that the issue had been shared*
    *with the District and that, subsequently, we would learn more.*

- From Wilt:

    *Q.   And so I'll ask the same question again that I did a few moments ago.  When*
    *this press release says that a staff member was involved in the Electoral College*
    *protest that took place at the United States Capitol Building on January 6,*
    *2021, that statement is factually false. Correct?*
    *A.   Yes.*

    *Q.   And you didn't see any evidence on Facebook that Mr. Moorehead was actually*
    *at the Capitol Building as opposed to being somewhere else in Washington,*
    *D.C. on January 6th?*
    *A.   Correct.*

51

> Q.  *But you knew that he was saying that he was not at the capitol?*
> A.  *Correct.*

- From Ramos:

> Q.  *You'd agree it's pretty conclusive, as of the date of this report, that Mr. Moorehead was not at the Capitol building, according to the FBI?  Correct?*
> A.  *Yes*
>
> Q.  *And you knew that the FBI said there was no evidence and no investigation and no charges against Mr. Moorehead for being at the Capitol building. Right?*
> A.  *Yes.*
>
> Q.  *And the public was told that he was at the Capitol building. Right? ·*
> A.  *That he was in the electoral college protest, yes.*
>
> Q.  *The investigation pretty conclusively, established early on that there was no evidence he was at the Capitol Building. Correct?*
> A.  *What we received from Mr. Freund, yes, I guess so.*

<u>Failure to Correct Statement</u>

The Defendants learned almost immediately after the release of the statement that the Plaintiff was not at the Capitol Building and did not participate in the riots. They never corrected the statement publicly that I am aware of even, to this day. They finally acknowledged it to Moorehead himself in the letter from Pidgeon to Moorehead on July 16, over six months from the issuance of the statement.  Following are excerpts from the depositions of the Defendants addressing the failure to acknowledge that the statement that he was at the Capitol Building was in error:

From Parker

> Q.  *Sure.· You're saying this is appropriate. Do you think the full statement is inappropriate?*
> A.  *I'm saying I think the full statement could probably have been, you know, written better.·*
>
> Q.  *If a person or an entity puts out false information about someone else that's damaging to their reputation, would you agree that they have to -- they should correct that false information?*
> A.  *I think generally, yes.*

From Wilt

> Q.  *So basically, you know that the press release that went out was false, but you and no one you, the Board President and everybody else in the Allentown School District haven't taken responsibility or accountability and posted a public apology.  Right?*
> A.  *I've answered that.  That's correct.*

From Ramos

52

Q. *So flip to the next page beyond this one. First paragraph says there's no way that I can return to the Allentown School District given the way the district has publicly vilified and defamed me, poisoned the community against me, put me and my family's safety in jeopardy and never corrected the record. Do you think that's an unreasonable position for Mr. Moorehead to have in light of the prior seven months at this point and the fact that the public statement was never corrected?*

A. *I believe there should have been other conversation beyond the letter asking the district to create a situation that would have been better.*

Q. *Take a look at Exhibit 29 --- July 16, 2021 letter from Anthony Pidgeon to Jason Moorehead. Correct?*

A. *Correct.*

Q. *And you agree that the first paragraph, it says that his presence at the January 6th gathering did not violate school board policy 419. Right?*

A. *Correct.*

Q. *This was never publicly disclosed – the content of the letter, was it?*

A. *Not to my knowledge.*

Q. *What's the justification for privately clearing Mr. Moorehead of the accusation that he participated in the attack on the Capitol Building, but not publicly releasing it?*

A. *I'm not sure.*

From Pidgeon

Q. *How could trust come back to the community if the press release is uncorrected?*

A. *I don't know the answer to that.*

Q. *Okay. So this is what we keep running up against. You keep talking about working him back in, and establishing trust in the community. But you'd agree there seems to be a pretty big roadblock, which is that a public statement went out to all his coworkers, including the ones in the Administration building, saying he was at the Capitol building on January 6; right?*

A. *Correct.*

Q. *What concrete steps had the District done to show Mr. Moorehead good faith, that they were actually there to protect him and respect his rights? What concrete steps had they taken?*

A. *At that point, none.*

Q. *Okay. And so at that point, in August -- we're talking January, February, March, April, May, July, and then part of August -- there's no correction of this press release that's out there?*

A. *Correct.*

Q. *And you heard the community outrage at the February 11 board meeting; right?*

A. *Yes, I did.*

In his deposition, Pidgeon also admitted that the community outrage against Plaintiff was caused by Defendants' statement which stated that Moorehead was at the Capitol Building riot.

Defendant Pidgeon admitted that Defendants could have anesthetized that outrage by issuing a correction. He commented:

> "I know the community was outraged. I don't know that it would have been a good move for the District to put him there or for him to want to go there, because of the way people were reacting."

Violation of Collective Bargaining Agreement

Article 10 to the ASD's Collective Bargaining Agreement, to which the Plaintiff is a party, states:

> "Any criticism by an administrator or Board Member of a Member of the Bargaining Unit shall be made in confidence and not in the presence of students, parents, or at public gathering unless the same is subject at a hearing provided by the applicable statute of the Commonwealth."

Further, district and Board Policy is to not comment on personnel matters. ASD effectively did that in its public pronouncements related to Moorehead. This was acknowledged by the Defendants in their depositions, as witness the following excerpts:

From Mathison

> Q. The collective bargaining agreement prohibits the district from publicly commenting on employee disciplinary matters. Right?
> A. Yes.

From Parker

> Q. Okay. And you don't dispute that the Board, when asked for comment on the Jason Moorehead matter after January 7th, repeatedly stated to various news outlets, we – we can't comment on pending disciplinary matters of employees. Do you dispute that?
> A. I don't dispute that.

From Ramos

> Q. Isn't it true that the collective bargaining agreement that Mr. Moorehead is party to and the district is bound by forbids public criticism of any teacher?
> A. Yes.

Damage to Plaintiff's Reputation

As various points, the Defendants, directly or indirectly, through their actions, inactions and words were a likely contributor to fostering the impression with others that the Plaintiff was a racist, terrorist, white supremacist, and/or insurrectionist particularly since there was no reported accusations to this effect before January 6. Through their testimony in depositions, they acknowledged this. Some excerpts from Parker's deposition:

> Q. And they thought he was a white supremacist and a racist, right?
> A. I recall some of that in the documents, yes.

54

*Q. Is Jason Moorehead a white supremacist? 12· ·*

*A. No. Not to my knowledge, no.*

*Q. And you're not disputing that Mr. Moorehead got a death threat and threatening phone calls, correct?*

*A. I don't dispute, but I don't remember details of kind of acknowledging that.*

*Q. Well, the parents and the students at that board meeting were pretty furious at Mr. Moorehead for being a lying insurrectionist who attacked the Capitol building. You would agree. Correct?*

*A. Yes*

Question of Plaintiff Media Interviews Impacting Reputation

In their legal filings, the Defendants have alleged that much of the negative media exposure was the result of the Plaintiff seeking out interviews and the exposure from them. This was addressed in his deposition. Following are excerpts on this subject:

*Q. Let me ask you, would you agree that the multiple television interviews reemphasized the events that happened on January 6?*

*A. I think the Smerconish show kickstarted the opportunity for me to clear my name and tell the community I was safe and to inform them I was frustrated with the district who had failed to push forward the investigation and clear my name. I was concerned about my family's safety. I needed people to know that I had done nothing wrong and that this abuse by the district needed to stop, and since the district wasn't doing it, my union wasn't doing it, my administration wasn't doing it, I needed help, and I had to do it. What I know is that I was able to tell my side of the story, and the side against me had gone viral and then national weeks before, so for two weeks I was trying to figure out what was going on. My family was scared shitless, hiding in the house, curtains drawn, the drapes, afraid to leave the home. I installed security, and nothing was helping them, and to protect my family, I had to do something to protect my name.*

*Q. And you did media appearances during the lifespan or during the time period that investigation was being conducted?*

*A. When the community was told I was there, I knew I had to do something to protect myself. I wasn't worried about waiting for the district to decide to move. We all know how sometimes slow school districts get things done. I was concerned about my immediate fright, my immediate family and their safety. Again, the amount of hatred that existed from January 6th in the afternoon towards me, that was allowed to ratchet up to responses to online Morning Call or Facebook posts on Morning Call, concerning the article that was written where I was told I was doing things that were unaversive -- or un-American and subversive, where my character was attacked. I had to defend myself. I could not wait for the district that appeared to have no interest in protecting me or protecting my family. Shame on them. Sorry.*

(Side Note: During my nearly half century counseling clients who did and/or were accused of doing something wrong and it received public attention, there were two ways of handling the situation to combat the negative communications. The first was to take the "ostrich approach" (i.e. bury your head in the sand and hope the problem goes away) and the other was to address it directly to get correct information out and/or refute incorrect information. The risk with the

55

latter is that you increase exposure of the problem/situation to those who may not have known about it. I always counseled clients that the prudent course was to be proactive and address the negativity to mitigate the damage. This also reflects the consensus of other professionals who counsel in matters of reputation damage.)

Given the firestorm that erupted in the country in the aftermath of the January 6 Capitol Riot and its highly negative impact on participants and those judged to have taken part (legally and reputation-wise), it was the most viable and sensible course for the Plaintiff to take.

February 11 and 25 ASD Board Meetings

Along with the release of the statement and subsequent negative exposure for the Plaintiff online and in the news media, the most damaging generator of reputation harm to him were the two ASD board meetings which provided a forum for the public to castigate him either for his alleged participation in the Capitol building riot on January 6 or in general. Allegations by those at the meeting accused him of being a racist, terrorist, insurrectionist, white supremacist and having committed treason, etc. While it is reasonable to deduce that much of these emanated from the January 7 ASD statement and subsequent furor resulting from the online and from media coverage, the evidence shows that it was also generated by the actions and words of ASD board members Conover and Harris

At the two board meetings, which were chaired by Conover, the public was given free rein to make any comments and opinions of the Plaintiff that they wished, the vast majority of which were disparaging and a condemnation of him through allegations and accusations that were highly negative. Following are some examples of these:

*"We have to take a stand, because if we don't take a stand, we're gonna allow this wolf out of the jungle and he will come and take our children."*

*"Moorehead was engaging in misconduct in the classroom, which could send a child spiraling to prison or death."*

"Jason Moorehead attended a failed coup where two police officers were murdered. He was *among local, homegrown terrorists who travelled to the capital to intimidate, harm, and disrupt the national election. He teaches BIPOC children, and has the power to influence them, and has general power over them in this classroom. How many microaggressions has he gotten off his chest to our black and brown children? Your teacher is a walking liability."*
*"Make sure that man never, ever teaches BIPOC children in the school district of Allentown"* and that Moorehead *"took part in the attempt to overthrow our government, in our election, our democracy."*
(This speaker also accused Moorehead of harassing and treating students differently because of race.)

*"Jason Moorehead has identified himself as a White Supremacist by his participation in the Capitol insurrection. And it is you know, your duty as educators in our community and as leaders in our community to hold him accountable and protect our children. We understand that traumatization occurs through racism and through white supremacy especially students of color experienced this on a daily basis. And, it's impossible to learn when you have that fight or flight response occurring constantly*

*being around a person who you know through his participation in an insurrection does not believe that you are a full human, deserving of rights and love."*

Comments such as these and others became so vitriolic that, at the February 11 meeting, Fruend was in attendance on three occasions cautioned and specifically warned Conover that the comments were defamatory and baseless and to exercise some control. On one occasion, when he cautioned her about defamation, she replied: *"No one is asking for your counsel right now."* On a second attempt, Fruend stated:

> *"There is a line here, Ms. Conover, between legitimate expressions about legitimate concern about the impression that has been made in terms of the effectiveness of this person as a teacher. There's a difference between that and defamatory statements about his character, and we shouldn't be tolerating that."*

She responded by saying once again she wasn't asking for his counsel and said, *"okay with that, whatever comes out of it, let it come out."*

During her deposition, Mathison acknowledged Conover had ignored Fruend's warnings:

> *Q. Well, you do recall Mr. John Freund, then the solicitor of the school district, interjecting that many of the community members were making extremely defamatory comments about Mr. Moorehead and Lisa Conover, telling him that she did not want his counselor advice and that all the members of the public were going to be able to say whatever they wanted about Mr. Moorehead. Right?*
> *A. Yes.*

The essence of the meeting was captured in an article published in Lehigh Valley Live the next day (February 12) titled: *"Local Teacher's D.C. Trip On Insurrection Day Led to Calls For Firing, and Some Defenses"* Excerpts from the article:

*"The facts aren't yet in as far as the Allentown School District is concerned, but community members had a message Thursday night for the school board. Fire Jason Moorehead.*

*"Freund on Thursday sought to block residents from making defamatory statements about Moorehead as the investigation is continuing and drew rebukes from the public for his interruptions. School board member Lisa Conover was presiding over that portion of Thursday's meeting during an initial public comment period...and let the comments continue uncensored.*

*"Most who spoke during a public comment period lasting about 75 minutes Thursday called for him to be fired."*

During the meetings, Conover was allegedly engaged in texting with staff members of Promise Neighborhoods expressing pleasure over how the "attacks" were going and encouraging community protests against Moorehead from those in attendance through text messages and selecting who was called on to speak. One example of this is:

> *"I was moderating and did not see this text. We are on a roll. This will be a long night but please encourage folks to stick it out. Thanks."*

A text she received from the Promise Neighborhoods Executive Director Hassan Betts:

*"You asked your community to show up so they showed up." Reply: "I am loving it!!"*

Both ASD board meetings were heavily promoted to the community by ASD board members Conover and Harris. The Plaintiff maintains this was in response and a counter to Moorehead speaking in his defense at the January 28 board meeting. He contends that Conover – who is also a member of the board of directors of Promise Neighborhoods – secretly arranged for the organization to launch a widespread attack on Plaintiff at the February 11 board meeting based on the falsehood that Moorehead had stormed the Capitol Building. She was aided in this effort by Harris. Allegedly, Conover instructed Promise Neighborhood staffers on how to submit the petition to every board member and the district to try to push the district and board to fire Moorehead and she later urged more people to speak at the February 25 board meeting, and followed up with Promise Neighborhoods to make sure they were forwarding the petition to the Board Members and District.

Harris was in contact with Promise Neighborhoods prior to the board meetings and apparently coordinated with the organization in promoting the meeting and encouraging dissidents who opposed Moorehead to attend and air their views. In her deposition, she admitted to:

- Speaking to Promise Neighborhoods prior to the February 11 meeting about its campaign to attack Moorehead at the meeting.

- Placing the Promise Neighborhood petition to terminate Moorehead on her Facebook page.

- Placing a notice on her Facebook page on February 5 to create awareness of the meeting and the plan to speak out against Moorehead.

Additionally, after the District Solicitor cautioned the district that the comments were baseless, Harris encouraged more defamatory comments, at the Feb. 11 board meeting. She later encouraged more people to speak at the February 25 board meeting, and followed up with Promise Neighborhoods to make sure they were forwarding the petition to the Board Members and District so Moorehead would be fired. Evidence of this is in text messages she disseminated which read:

- "Those that cannot stay on please make sure they log on Thursday after next, February 25th."

- "Oh, ok! Make sure he is on Feb25th. We can't let up!"

- "Reach out to those that could not hold on and advise to show up next week."

It is apparent that both Conover and Harris were heavily involved prior to, during and between both board meetings in coordinating opposition to Moorehead and encouraging attendance at them from those who wish to express their views.

Plaintiff's Political Views

The Defendants ascribe much of the outrage in the community and the negative public exposure to his political views. All members of the ASD Board are Democrats and the bulk have admitted liberal leanings and support liberal causes. The Plaintiff has admitted

58

he is a conservative and a Trump supporter. In their Summary Judgment motion, the Defendants support this assertion as follows:

> *"Plaintiff's injudicious posting of photographs wearing apparel and carrying banners which made him appear in sympathy with groups and ideologies antithetical to the interest of minority groups, can undermine his credibility to teach what is a student population primarily made up of students of color. The overwhelmingly negative response from the ASD Community demonstrates that Moorehead's publication of his association with MAGA, and his carrying banners with the ambiguous admonition "Join or Die," is perceived in the same light by a community of color as a Klan Hood or a Confederate flag."*

In his defense, the Plaintiff contends that he, like every citizen, has a right to his own political views and emphasized that he has never brought them into the school or classroom. An excerpt from his deposition:

> *Q. Has anyone in your time in Allentown School District or in any teaching role ever accused you of trying to interject politics into classrooms?*
> *A. No. I've worked there for 17 years. I've not had a single academic concern or social concern, or a character concern, a discipline issue. So, no, I recognize that my job as associate teacher was to always try to get the kids to figure out things on their own and try to be as neutral as 5 possible so they can do that.*

It is my opinion that given the magnitude of the protest and the widespread vitriolic comments about the Plaintiff, it is unreasonable to project that this was caused strictly by his political views without the words and actions of the Defendants which spurred and/or provided outlets for his public condemnation.

## SOURCE OF HARM TO PLAINTIFF'S REPUTATION

This section will detail the various ways that resulted in the Plaintiff's reputation being damaged through the alleged false statements and misrepresentations of the Defendants, both verbally and in writing.

Defendants' Communications

The damage can be traced to January 7, 2021 with the release of the ASD Statement which falsely reported that the Plaintiff was at the Capitol Riot to the subsequent interview of Freund with The Morning Call where he surmised that Moorehead's actions could be "un-American and subversive" through Conover and Harris' communications surrounding the two ASD board meetings and beyond. The accusations and allegations against the Plaintiff as well as the disparagement were ongoing and involved many of the Defendants.

Media Exposure

The negative media exposure for the Plaintiff was not confined to the Lehigh Valley but was national, including coverage by (but not limited to) such media as:

- Fox News  (January 8, 2021)
- New York Post  (January 8, 2021)
- PoliticsPA News Blast  (January 8, 2021)
- The Blaze  (January 8, 2021)

59

- WLVR Radio  (January 12, 2021)
- Politico  (January 13, 2021)
- The Broadcaster  (January 14, 2021)
- Philly Voice  (January 2021)
- Reddit Thread  (January 2021)

As the ASD is located in a relatively small population area, there is a greater likelihood of negative occurrences being covered by the news media and thus contributing to the spread of information that is negative.    Some of the headlines of the coverage reflect the reputation damage that the Plaintiff would incur.  Some examples:

- *"Allentown School District Removes Teacher Who Took Part in Washington, D.C. Protest"*

- *"Pennsylvania Teacher Suspended, Others Lose Jobs Over Capitol Riot"*

- *"Allentown Teacher Suspended for Attending Capitol Riot"*

- *"A Lehigh Valley Teacher Was Suspended for Being Near D.C. Insurrection.  He Says He Was Only There to Witness a Historic Event"*

- *"My Reputation and Character Has been Destroyed': Allentown School District Teacher Suspended for Attending Protests and Lawsuit is Inevitable"*

- *"Local Teacher's D.C. Trip on Insurrection Day Led to Calls For Firing, and Some Defenses"*

The average  person who read those headlines could reasonably be expected to conclude that the Plaintiff:

- Was present and involved in the "Capitol Riot."

- That he may have done something illegal and was violent.

- Was relieved (removed, suspended) of his teaching duties because of a bad act.

- That he was a person of bad character.

- Was the subject of community residents filing protests.

All of these would cause great damage to his reputation.

(Side note.  In the public relations business, two of the key axioms are "Perception is more important than reality" and "It takes years to build a reputation and seconds to destroy it."  Both are applicable in this situation.)

For some perspective, even if the only media coverage had been in The Morning Call newspaper, the exposure would have been national because it and all media have websites and any coverage would have been accessible online on their websites.)

60

<u>Social Media</u>

The amount of social media posts disparaging the Plaintiff was extensive because there were multiple forums where comments could be placed online. Following are posts from these sites:

From Francis D. Raub Middles School Facebook Page:
(Note: Some of these posts are contained in the Case Background section.)

- *"Racist teachers shouldn't be working in minority schools." (Alyssa Heckman)*

- *"He participated in an act of terrorism and must be held accountable for his actions in even participating in such a thing. He also teaches at a MINORITY school." (Destiny Roman)*

- *"Damn delusional…no wonder this con man was able to bamboozle so many of you." (Lalo O Barajas)*

- *"He won't have time to teach because he is going to be in jail." (Tracey Wahlenburg)*

- *"Digusting. Fire him. We have a white supremacist terrorist teaching poor and minority kids. He had no business teaching in the Allentown school district." (Alexander Vasquez)*

- *"Those who protect the people who supported this attack on our country should be treated the same way as those who were there. I hope the administrators in the district realize this and stop protecting this teacher and paying him to stay home." (Elijah Lopinto)*

- *"Digusting. Not an example for children and should not be teaching." (Michelle Neifert)*

- *"A social  studies teacher non the less. I sincerely hope you relieve him of his duties permanently." (Fawn McCool Lcsw)*

From Protect Our Children Petition Site

- *"White supremacists and terrorists do not belong in our country, let alone teaching children. The teacher from ASD who stormed the Capitol on January 6th in attempt to execute members of Congress and overthrow our government deserves to be fired and forever remembered as a traitor to our country." (Maggie Riegel)*

- *"White nationalists do not belong in positions of power and authority over children." (Christopher Haring)*

- *"Jason Moorehead needs to be fired immediately." (Liz Mietz)*

- *"Anyone who participated in a blatant coup attempt must be held accountable for attacking our democracy." (Jefferson Vitelli)*

61

- *"This teacher action should have consequences. The parents, students and citizens of Allentown have the right to not have a person with now known racist, white supremist, terroristic destructive leanings teach their precious children. How many times have you already transferred that hate you carry to our children? How many times have you made a decision that was against a child of color?  (Sharon Fraser)*

- *"Black and brown children deserve better and there are plenty of more qualified people out there that can do this job." (Morgan Tucker)*

- *"I don't really want some racist Trump supporter teaching my black child." (Rebecca Serba)*

- *"I'm signing because hate does not belong in our schools, and his actions have demonstrated that is a clear rist to BIPOC students."*
  *(Adelle Mantle)*

Other Media Posts (Origin Unknown

- *"The parents, students and citizens of Allentown have the right to not have a person with now known racist, white supremist, terroristic destructive leanings teach our previous children. How many times have you already transferred that hate you carry to our children? How many times have you made a decision that was against a child of color? We should not have to second guess your attitude and behavior." (Sharon Fraser)*

- *"My concern would be regarding his beliefs affecting his ability to unbiasly teach children that consists largely of minorities. I don't really want some racist Trump supporter teaching my black child." (Rebecca Serba)*

- *(White supremacy does not belong in schools. Our students deserve to feel safe and this teacher has already made discriminatory remarks towards students in the past. He should not be reinstated." (Sophie Goodfellow)*

- *"A person who was part of an insurrection gave up their right to be considered a sane, law-abiding, country-loving individual." (Julie Vautrin)*

- *"White nationalists do not belong in positions of power and authority over our children." (Christopher Haring)*

- *"It was a white supremacist take over of the Capitol – you want a white supremacist teaching the youth." (Jaycie Marie)*

<u>Internet Exposure</u>

Possibly the most consequential – and long lasting - source of damage to the Plaintiff's reputation in this modern age is the negative content on the internet, specifically on the search engines for those who use them to seek information on him. Today, 2-1/2 years after the January 6, 2021 rally, someone who would Google his name would see at the top of the first page the following headlines:

- *"Allentown School District Teacher Accused of Being (at January 6th riot)"*

- *"Former Allentown Teacher Who Attended Jan. 6...."*

- *"Fired Allentown Teacher Who Went to D.C. on Jan. 6"*

- *"Teacher who attended Jan. 6 'Stop the Steal' Rally Fired..."*

- *"PA Teacher Suspended After Jan. 6 Fired For Not Working"*

- *'Shame on You'; Fired Allentown Teacher Who Went to D.C...."*

- *"Let's Not Make Allentown Teacher Who Attended Capitol..."*

- *"Jason Moorehead Returns After Termination From..."*

- *"Teacher Suspended For Attending Capitol 'Stop The Steal' Rally"*

- *"Pennsylvania Middle School Teacher Rightfully Suspended..."*

- *"Jason Moorehead: Social Studies Teacher on the Wrong..."*

- *"Allentown School Board Fires Teach Who Was Suspended..."*

<u>Direct Public Comments</u>

All these sources of communications undoubtedly contributed to and resulted in the kind of negative assertions, allegations, accusations and vitriolic remarks (including threats) that spewed out almost immediately about the Plaintiff through various forms of communications transmissions. Following are some examples of these.

Through emails:

- On the very afternoon of the Capitol Riot, Katie Schick sent an email to the ASD Superintendent and Board Secretary which read:

   *"As a former member of the ASD community and a graduate class of 2009, I want to let you know that it would be completely unacceptable to continue to allow a domestic terrorist to continue to educate the young and diverse students of Raub Middle School.*

   *This educator must be removed from any contact with students, immediately. Allentown School District must not allow a domestic terrorist among its ranks."*

- On January 23, 2021, Howard Weiss wrote to Alexander:

   *"You scum sucking cunt...the PA resistance has stated that Moorehead will be sentenced to execution and found guilty soon. He is a lying insurrectionist and they have said "he's a dead man!!!"*

Through Voice Mails to the Plaintiff:

63

- *"Hey, idiot, I saw you on the news. I think you're a piece of shit and you got conned by Donald Trump participating in a coup. Call me back if you want to talk about it like a man, but you're a Trump supporter, so you're a scared little bitch."*

- *"Hello, Jason.· What are you doing down at the Capitol?· You should be teaching those kids how to be good kids, not how to be racist white supremacists who want to overturn an election that was certified for every state in the United States. Are you too stupid to be a teacher?  Do you even have a degree or is your head shut directly up your white supremacist ass?· Get the fuck off the news, Jason. You need not more head. You need less head. You fucking stupid, you son of bitch. You basic piece of shit. I educate you, okay?· You dumb piece of shit."*

- *"Hello, Jason.· Why don't you pick up? Are you too busy making your intervention plan. Just curious that you studied social studies so you understand how fair and free elections work. And I'm really just curious to understand why you think you being a crazy interactionist attack on the Capitol is you exercising First Amendment right. I don't think I understand. I think there's something either wrong with your brain, or you're just a white supremacist and you're just too afraid to admit it. I think if it's the latter, I think. How stupid --- don't be white supremacist. I live in Allentown, Pennsylvania. I have no culture. I have no education. I am stupid fucking idiot. And I think white people are bad enough. Why don't you just come out instead of going on the TV and saying oh, look at me, I got suspended.  You got suspended because Allentown School District needs to do an investigation to fully understand your participation on the insurrection of January 6th. You stupid motherfucker, Jason.· You're dumb. You should get your teaching licenses revoked. You should be put in jail. You are a piece of shit, Jason."*

- Other miscellaneous voice mail accusations, threats and insults the Plaintiff received:

  - Accusing him of *"lying"* that he had not been at the riot

  - Claiming he was *"participating in a coup,"*

  - Stating he should be *"teaching those kids to be good kids not racist white supremacists."*

  - Accusing him of being a *"white supremacist,"*

  - Calling him a *"Racist piece of shit,"*

  - Threatening him *"I come down your house, I find you, I educate you,  you dumb piece of shit."*

  - Calling him an *"insurrectionist,"*

  - Stating he *"attacked the capitol,"*

All the elements in this section were contributing factors to reputation damage and harm experienced by the Plaintiff.

**REPUTATION DAMAGE TO PLAINTIFF**

Since January 6, 2021, the Plaintiff has suffered severe reputation damage which had resulted in extensive negative consequences to him professionally and personally, most emanating from the Defendants' alleged false statements and misrepresentations as well as their actions land inactions which have translated into a wide array of harmful and negative consequences which he has experienced and which he expects to continue in the future. This section will detail the reputation harm he has suffered to date along with my projection of what can be expected in the future based on the facts and information provided by him through his deposition and a conversation I had with him. This analysis will address the damage to him professionally and personally.

<u>Professionally</u>

The Plaintiff's only teaching position was at the ASD's Raub Middle School but he had nearly 18 years of service there. In his deposition, he testified that after the vitriol he witnessed at the February 11 and 25 Board Meetings, he realized he could never work again at the ASD. Some excerpts from his deposition on a teaching career, present and future:

> Q.  So as you sit here today, what is the status of your teaching career?
> A.  It's nonexistent. It's gone. I can't return to teaching. You know, when I say -- I can't predict the future. As far as teaching goes, that's never going to happen. There's too many people who still believe -- I'm unsafe.

> Q.  Do you have any interest in ever teaching again?
> A.  What I know is that the damage to my career was devastating and I haven't even begun to process what my future may be there. I know I can't teach because of what the community still believes about me

The Plaintiff is currently employed by the law firm that is representing him in this lawsuit. In our conversation he reported that his situation has spread throughout the educational field. Factoring it the extensive negative content when his name is put in the search engine with the fact that this content will remain indefinitely and that most businesses, industries, and professions (including educational) online, it is highly doubtful he would ever be hired again as a teacher.

Additionally, post-January 6, he lost many of his closest relationships. When he moved from Seattle to take the position with the ASD, he established his relationships within the school community. Most of those were lost due to his situation and strain with those he was closest to.

<u>Personally</u>

In his deposition and through our conversation, the Plaintiff discussed the negative impact on him personally.

As a preface to this part of the section, following is testimony he offered in his deposition which provides insight into how this negatively impacted him from January 6 until the present

65

Q.  Now, when Superintendent Parker issued the statement on January 7th, what did you do, if anything, once you first read it?

A.  Crumpled it to the ground. I was devastated. I was accused of being at a riot and a violent protest at the Capitol building, which is criminal, and recognized that my world was turning upside down because it meant -- it meant that the community was going to be told that I was there, and they were never going to be corrected, and it was going to be allowed for them to think horrible, horrible things about me. I felt immediately unsafe because of the hatred that I had seen from a quick look at some Facebook comments, so it was -- it was terrifying.

Q.  Any other type of pain and suffering losses that you're claiming as part of this lawsuit?

A.  I don't know how to claim destruction of a dream and the destruction of a family. I worked for so long to build a career and a life that I had been dreaming of and believing in. I had a great career that's gone. I had a family, and that's broken. I had a future, and that's broken.

Some of the negative consequences he reported, included:

- <u>Reputation Damage</u> – Destroyed his character and reputation as a human being. Because of the internet, negative content about him will remain indefinitely as it will always be accessible through search engines.

- <u>Economic Impact</u> – Immediately upon his termination, he lost his income as well as health insurance, pension and other benefits.

  (Note: Any economic or financial loss he incurred is not part of my assignment and will be addressed by another expert.)

- <u>Family Disruption</u> – The toll on his family ultimately after a year and one-half resulted in his wife divorcing him. In his deposition, he addressed this subject. An excerpt:

  Q.  Do you believe what occurred to you with regards to Allentown was a cause or factor in the divorce?

  A.  I believe it is. We were married when I lost my job, and the family -- things got hard after I lost my job and January 6th. There was a noticeable change in how we were treated and how we felt we were being treated and how we felt the community was treating us, and that led to a lot of -- or it led to changes in our dynamics of our 19 year marriage, and things got tough.

  The breakup of the marriage resulted in his wife taking primary custody and he only his children (now 12 years old) 10 days a month instead of them permanently residing with him.

  Due to the turmoil and scandal, his children were impacted as the family faced various forms of ostracization in the community. As a result, the children were withdrawn from all outside activities (e.g. sports, music.)

  The family had to sell their home.

66

- <u>Personal Safety</u> – In his deposition and in our conversation, the Plaintiff stressed the fear that he and his family had for their personal safety in the wake of the statement and subsequent turmoil.  He had begun to receive threats of physical harm by email and voice mails, he was uneasy to the reaction of people recognizing him on the streets and the comments being made, the vitriolic comments on social media and at the board hearings, etc.  The concern was so deep that he reported he installed security cameras at his house, kept the windows covered and *"hid in the house."*

- <u>Mental Trauma and Physical Harm</u> – Mentally, the Plaintiff reported that a byproduct of the public outrage was that he was subjected in the community and experienced ridicule, scorn, shame, humiliation, embarrassment, condemnation, disparagement and all forms of vitriolic remarks which caused him severe, ongoing emotional trauma.

-  Required extensive amount of time and energy as well as emotional distress to respond to and refute the allegations of wrongdoing from questions of people he knew and did not.

  Physically, this resulted in him taking pills, not being able to sleep at nights, overeating (added 30 pounds), drinking more alcohol and seeking counseling for a period of time from his minister.

  (Note:  As I am not a trained medical professional (mental or physical), I will not be testifying on this form of reputation harm.)

## REPUTATION DAMAGE REPAIR PROGRAM

In the communications business, there are several axioms pertaining to reputational damage and harm – e.g. when a person or entity has been the recipient of negative input or communications – which I outlined earlier in this report, which include:

- It takes a lifetime to build a reputation and seconds to destroy it
- Perception is more important than reality
- You can never un-ring a bell
- Where there is smoke, there's fire
- You can never wipe a slate clean

For more than four decades, as a professional, I counseled clients on issues relating to reputation, image or brand damage.  I have also created, planned and implemented dozens of reputation damage repair programs to aid in repairing and recovering their reputations and to mitigate the damage that was caused.  As an expert witness, I have created, outlined and budgeted reputation damage repair programs for Plaintiff(s) in over 60 cases and have testified on some of these programs in depositions, trials and arbitration hearings.

It is my strong belief that a Reputation Management/Repair Program is vitally needed for the Plaintiff as his reputation has been stained with the public, within his profession, with the general Allentown community and with any other audiences that has resulted from the Defendants' alleged false statements, misrepresentations, actions and inactions. Regardless of whether the Plaintiff prevails in this lawsuit or not, the fact is his reputation has been harmed and damaged and that will not change unless some proactive action is taken to counter the negative information disseminated about him as well as to restore his reputation and good will.

The best case scenario is that such a program can mitigate the damage to some extent by combatting or minimizing the negative exposure he received from the negative communications as well as offsetting it with positive exposure. This can be accomplished to a degree through a public relations and communications program utilizing both online and offline communications channels. It is my opinion as a public relations and communications professional who has extensive experience and expertise in reputation management and damage repair and has implemented many such programs for clients with tarnished reputations that there are reasonably prudent and effective actions that the Plaintiff can and should take to improve his reputation regardless of the outcome of the litigation.

(Side Note: Federal and state courts have ruled in the past that when reputation damage has occurred, the Plaintiff(s) has the right to recover damages from the Defendant(s) to fund such a program to mitigate the reputation harm and restore the reputation. Despite that, occasionally, in the past when I have proposed this type of program for a Plaintiff(s) in other cases, it has been challenged by opposing counsel. Such a program has validity and it is important to note that it has been upheld in previous litigation even in the face of exclusion motions. In one recent case, the judge opined:

> *"In his report, Mr. Fisher opines that, where a Plaintiff's reputation and image have been so damaged, a repair program of certain duration and with itemized components would be needed to make that image and reputation as near whole as possible. Mr. Fisher assigns a value or cost to that remedial program and lists the steps such a program would entail. The Court concludes that addressing and repairing the harm a person's reputation and image could suffer as a result of defamation is specialized knowledge not within the ken of the lay juror, and which would assist jurors in determining issues of fact surrounding that aspect of damages. While the report lays out the bare minimum in terms of support for Mr. Fisher's damages figure and components of the remedial program he opines is necessary, it is sufficient to allow a jury to understand and evaluate the basis for his opinion."*

Important to add, I have subsequently testified to such a program in federal and state courts as well as arbitration hearings.)

The following is an outline for such a program. This is based on my professional background of having created and implemented over 30 reputation damage repair programs as a public relations professional over four decades on behalf of clients who suffered reputation harm and damage. I have also created another 60 such programs as an expert witness.

Program Overview

- Objectives: The primary purposes of this program are as follows:

    - Through this program, to eliminate as much as possible and counter the reputational harm that has incurred and ensure that the program reaches and impacts the target audiences in the most timely, expeditious and effective way.

    - To restore the image and reputation of the Plaintiff as needed by minimizing the negative communications emanating from the Defendants while generating positive exposure for the Plaintiff to portray him as reputable and responsible person of excellent character and a dedicated educator who had

provided nearly 18 years of service to the School District with an unblemished record.

- **Target Audiences**:  The "publics" that this program is intended to impact, include:

    - The public in Allentown and surrounding area.

    - The education profession both locally and nationally.

    - Those segments of the community that are associated with interests relating to youth and education.

    - The general community as well as other factions and groups in the community that are of special interest and relevance to the Plaintiff and his interests.

## Program Activities

The following is an outline of a prudent and suitable reputation damage repair program which would seek to achieve the objectives for reputation repair as stated above.  I believe that such a program is necessary and a realistic approach to correct reputational damage as much as possible based on my half century of experience in handling crisis communications and reputational damage programs and on what information and insight I have at this point on this situation.  As such, this proposed program is subject to adjustments if more information is available and obtained.

- **Audit/Assessment** – In order to fully assess the degree of the reputational harm that the Plaintiff has suffered, some research and analysis would need to be conducted to determine the nature and extent of the damage emanating from the Defendants' negative communications about the Plaintiff.  The result of the litigation will have an influence on the perspective and perception of how the Plaintiff's key target audiences view her and the harm that has occurred and that which could happen in the future.  The program would then be based on and factor in the litigation result as to how best to counter the negativity and restore the Plaintiff's positive image and reputation to include determine what the strategy is, the message to be projected and what actions need to be taken and to what extent.  The Audit would include a detailed analysis of relevant online keyword search volume post-litigation, which will be the foundation to determine the appropriate plan for creating content for the Plaintiff's online presence.

- **Program Plan** – A strategy for the program would be formulated, a detailed plan would be created for the program which would be implemented.

- **Online Communications** - There are two aspects to a person's or entity's online presence: the precise online platforms in existence (e.g. a website, a YouTube channel, a Facebook page, etc.) and the content found on those platforms. The platforms are inextricably linked to the content they contain. As illustrations, a website is merely a container to which content is added; social media platforms such as a LinkedIn page or Facebook page are simply blank pages to which copy, images and videos are added. This is where the role of the keyword research from the Audit/Assessment becomes paramount. It is crucial to create content that people are searching for to establish a high

69

level of visibility online. In addition, it must be emphasized that for reputation repair or enhancement, all content relating to the Plaintiff - Press Releases, Blog articles, videos, interviews with news organizations, mentions in the general press - must be distributed through all online channels, including social media. Following are some of the actions relating to online communications and exposure which would be utilized for this program.

- **Website** – The Plaintiff has no website at this time. A website is an extremely critical outlet for the dissemination of information and to impact reputations and public perception. One would be created for the Plaintiff and would contain not only standard information but also communications channels by which he could provide ongoing information to key target audiences. It would also serve the dual purpose  enabling the Plaintiff to address the allegations against him and subsequent termination as well as to generate positive messages on it that would offset the reputation damage from the Defendants' alleged false statements and misrepresentations.

- **Integrated Website Blog** - A blog with new content continually added is a crucial element in creating and enhancing an online presence. Individual blog pages each have their own unique URL, which creates the opportunity for focusing on sub-categories of search terms and increases the likelihood of a prominent position in a search result for that term. The blog would allow the Plaintiff to speak out on various subjects related to his background and expertise and help project a positive image.

- **Social Media Communications** - Now, the Plaintiff has virtually no significant social media presence. This is a result of the relentless and extensive negative feedback he has received. Social media platforms provide an ideal way to leverage content originally published in a website blog. Content can be summarized (instead of copied) and edited to reach a particular target audience. Also, links can be added to social media posts which lead people to the original content and enhance the blog page's ranking in the various search engines' results. However, choosing specific social media that allows civil discourse is an increasingly difficult challenge. Determining which platforms to establish is dependent on controls that will be in place at the time chosen to begin reputation repair and ongoing program management. Platforms including LinkedIn, YouTube, Facebook personal and professional pages, Instagram and X (formerly Twitter) accounts will all be evaluated in regard to their security setting capabilities at the point a reputation repair and management campaign is ready to begin, specifically to eliminate any opportunity for negative or disparaging content.

- **Search Engine Optimization (SEO)** – As an example of the continuing negative internet exposure to the Plaintiff, I searched Google on June 18, 2024 – 3-1/2 years after the January 6, 2021, Rally – and found over two dozen negative pieces on him related to this case. The internet would need to be researched and monitored for the negative information and content about the Plaintiff and actions taken to mitigate the damage as well as generate more positive links with high domain authority to effectively push down negative search results as much as possible. Positive content will have to be added to the internet as well. Optimizing content to positively

70

affect a search engine's determination of a website page's value in relation to a key word or phrase is the essence of SEO. It consists of creating content of interest and value to someone searching for a particular term, as noted above. Although content is the essence, there are many technical aspects of SEO that also require constant attention. Readability of a page on a mobile device, website accessibility according to the terms of the Americans with Disabilities Act (ADA) and page download speed are three examples of the numerous factors that affect a website page's ranking in a search engine result. An effective SEO campaign must include constant monitoring and attention to all these factors.

- ■ <u>Videos</u> - Videos would be produced for reputation restoration and enhancement for reputation purposes and exposure for them would be generated on many places on the internet (e.g. Plaintiff website and its social media forums, YouTube) and could also be used for communications purposes offline as well. The importance of creating videos to enhance a person's reputation cannot be overstated. YouTube is the world's second largest search engine behind Google (See: open.library.okstate.edu/), although many people do not think of it as such. The process for creating videos that rank high in a search on YouTube, consequently, requires a process like SEO for traditional website pages. Videos, therefore, are not only extremely effective at creating and enhancing a reputation because of the powerful impact of visual images, they are a key component of a larger integrated SEO campaign. It is important to publish all videos on YouTube, which allows the owner to disallow the public from commenting on videos. This also gives the owner the ability to use links to the original YouTube video post in social media posts, and to use "embed coding" when publishing on a website.

- ■ <u>Miscellaneous</u> – Working with independent contractors, contracting for IT Support. Website Hosting and purchasing software required for Plaintiff's Online Presence.

- • As image, reputation and brand are the purview of the public relations profession, such a program would be a critical element of this effort. There are a myriad of activities that would need to be undertaken to help counter or overcome the damage and restore the Plaintiffs' reputation and goodwill.

  - ■ Strategic planning/counseling/oversight.

  - ■ Generating positive media exposure to reach key target audiences through a variety of communications means as appropriate for the purpose variety of communications means as appropriate for the purpose (e.g. news conferences, news releases, media interviews, written pieces such as columns, guest editorials, bylined articles, etc.).

  - ■ Set up interaction of Plaintiff with his key target audiences as needed through means to include personal contact (e.g. in person or electronic meetings, written outreach such as letters, emails, newsletters).

- Counsel on social media outreach.

- Investigate benefit of involvement in appropriate community, civic, youth, charitable and cultural events/activities to position the Plaintiff as a good citizen.

- Seeking positive exposure for the Plaintiff through his participation in events and activities in the community.

- Speakers Forums (if there are opportunities that are appropriate).

- <u>Outreach Through Entities</u> – A critical component of the public relations portion of this program would be to reach out to groups, organizations, institutions and other established entities that provide opportunities for outreach to disseminate messages and achieve the program's goals that are vital to the Plaintiff. Every appropriate form of communication that exists would be analyzed to reach target audiences most effectively through them.

- <u>Paid Exposure</u> – There will be times when broad public exposure will be important to deliver the message and if it cannot be obtained through free channels of communications, options will be explored that would require payment for the exposure.

- <u>Miscellaneous Communications</u> – Throughout the program, continual efforts would be made to seek out opportunities to generate exposure and deliver information through existing channels whether online or offline.

- <u>Additional Program Activities</u> – To be determined as needed to achieve goals.

The proposed actions outlined for this program have been utilized by communications professionals to restore reputations in the past and constitute a sound and effective means to do so. As a professional, I have successfully created and implemented dozens of these programs for clients and they have proven to be successful.

(Note: Should the Plaintiff prevail in this litigation and a reputation damage repair program be implemented, I would not be a participant in the physical operation of the program.)

<u>Program Overview and Budget</u>

Based on my extensive background conducting similar campaigns, and my analysis of the nature of the communications program that would be needed to counteract the damage to the Plaintiff's reputation that is attributed to the Defendants' alleged false statements, misrepresentations and actions, I believe a two-year proactive reputation damage repair program would suffice with the bulk of the program implemented in the first year and the second year for providing maintenance and taking new actions as warranted. Having planned and implemented many such programs on behalf of clients with damaged reputations, it will take significant time and effort to restore the reputation to whatever degree possible.

From past experience conducting similar reputation damage repair programs for individuals, businesses and other entities across the United States, I believe a very conservative estimate of the cost of such a program for the Plaintiff would be in the range of $200,000 to $225,000.

72

(Note:  This budget for reputation repair is distinct and separate from any monetary award that may receive for compensation for his reputation damages.)

The scope of the program and the budget amount is based on my assessment of what I believe would be needed to repair the damage to the Plaintiff's reputation based on the information I have at this point in time.  Further, while I have projected costs for each of the activities and program elements, I will not delineate them at this time because of the following factors:

- The result of the litigation.  Should the Plaintiff prevail, it would validate his image as a reputable public servant and a person of good character.  This would greatly enhance the message and what would be required to seek to overcome the reputational harm.  However, if the Plaintiff were to lose in this lawsuit, such a program would require a totally different approach to achieve its objectives.

- The result of the litigation would also dictate which of the program elements listed would become more essential and need more emphasis, thus it is not possible at this point to determine the budget for each.  (Note:  However, most all of them would most likely be used regardless of who prevails in the litigation, it is a matter of to what extent.)

- It's not prudent to plan the specifics of a program before receiving the approval of the Plaintiff as to what specifically will be done and the degree of his personal participation.  I would not expect the Plaintiff in this case to make these decisions until he knows the results of the litigation and can assess the situation and program at that time.

To reiterate, this program and budget is a realistic assessment of the scope and cost of a program that would be required to meet the needs and goals of this reputation management repair program based on my current knowledge.

## REPUTATIONAL DAMAGE COMPENSATION

Factoring in this negative impact on the Plaintiff from the Defendants alleged false statements, misrepresentations, actions and inactions as well as the resulting negative consequences he experienced from them, it would be my recommendation that the Plaintiff justifiably receives fair compensation from the Defendants for the "pain and suffering" he has incurred based on the extent of the reputational damage and the massive disruption to both his professional career and his personal life as reflected in the observations, comments and opinions I have expressed in this report.  It is important to consider that even if the Plaintiff prevails in this litigation, the negative exposure he has suffered attributable to the Defendants will always be present to some degree and will continue to cause reputational harm and the damage to him both professionally and personally well into the future.

## OBSERVATION AND PERSPECTIVE

In my nearly 50 years as a professional communicator as well as 18 years of an expert witness, I have encountered a significant amount of instances whereby reputation harm was caused through a "kneejerk reaction by someone who made a "rush to judgment" decision to take immediate action without regard to due process or investigating the situation and carefully considering what they are doing.  (This is true both with an outside party causing harm to another and, in some cases, the party who their own self-inflicted reputation harm.)  In my opinion, this is exactly

what transpired when the ASD's inactions, actions and words resulted in the reputation harm incurred by the Plaintiff Moorehead. A brief review of the situation:

- Moorehead attended the rally at the Washington Monument and posted photos of himself there and made some comments on his private Facebook account which one or more individuals republished on social media.

- Those who saw the photos/comments assumed that he was at the Capitol Building during the riots despite the photos and his comments gave no evidence of that.

- Upon being alerted to this later in the day, in the next 24 hours ASD chose to do the following:

    - It did not contact him to ask him directly what he had done that day and if he was at the Capitol Building during the riots.

    - It suspended him without a preliminary form of investigation first.

    - It issued a statement and gave it broad direct distribution and also placed it on the internet in numerous places where it would have extensive exposure.

    - The statement contained a false statement (i.e. he was at the Capitol Building) which was extremely damaging to his reputation given the heinous nature of what transpired that day at that site.

    - It violated the Collective Bargaining Agreement and the District policies which prohibit public criticism of a teacher.

    - When an article was published the next morning in The Morning Call newspaper, its legal counsel, Freund, was interviewed by the publication and remarked that Moorehead was being charged with participating and advocating un-American and subversive doctrines, stating and implying that he had attacked the Capitol Building.

Given that the rioting at and break-in of the Capitol Building on January 6 was one of the most shocking and tragic incidents domestically in United States history, which has resulted to date in hundreds of arrests and convictions, it is my opinion that the inactions, actions and words of ASD were egregiously inappropriate, misguided and reckless and has, is now and will have a devastating effect on Moorehead's reputation in the future.

## SUMMARY OF CONCLUSIONS AND OPINIONS

This report contains my analysis of what, if any reputation harm has been incurred by the Plaintiff because of the words, actions and inactions of the Defendants that he cites in this lawsuit. I have also offered my comments, observations, conclusions and opinions in respect to the reputation harm that he has suffered and identified the sources. Following is a summary of the facts of this lawsuit that are relevant to reputation harm as well my conclusions and opinions based on these.

(Note: I will not address any matters relating to his termination as that is outside the scope of my assignment.)

<u>Facts</u>

Following are the facts in this dispute and litigation which constitute the basis for the formation of my opinions.

- The Plaintiff attended the "Save America Rally" at the Washington Monument on January 6, 2021 but never was at the Capitol that day which was 1.5 miles away.

- At the Rally, the Plaintiff put four posts on his Facebook page which is private. Widespread circulation of them could only have happened by individuals reposting them.

- Individuals knew that day through social media that the Plaintiff was in Washington, D.C.

- ASD never asked the Plaintiff if he was in Washington, D.C. that day.

- ASD suspended the Plaintiff before it conducted any investigation.

- Before issuing its statement on January 7, which did not contain the Plaintiff's name, the ASD new the public was aware he was the person from the district in Washington, D.C.

- ASD issued the statement which contained false information that the Plaintiff was at the Capitol Building at the time of the riot and break-in.

- ASD violated its Collective Bargaining Agreement as it related to public exposure for personnel matters.

- ASD knew within days that the Plaintiff was not at the Capitol Building and never publicly acknowledged the information in its statement was incorrect.

- Board Member Conover consulted with and possibly assisted Promise Neighborhoods in filing a Change.org petition seeking removal of the Plaintiff from ASD.

- Boards Members Conover and Harris were actively engaged in promoting and encouraging attendance at the February 11 and 25 board meetings for the purposes of disparaging the Plaintiff.

- Board Member Conover, despite "cease and desist" warnings from Fruend, allowed citizens at the board meeting to continue to disparage the Plaintiff and make defamatory statements.

<u>Conclusions and Opinions</u>

Based on these facts, following is a summary of my conclusions and opinions as they relate to the factors that resulted in the reputation harm as well as the nature and extent of the reputation

damage to the Plaintiff emanating from the false statements, misrepresentations, inactions and actions of the Defendnts.

- The fact that they did not reach out to the Plaintiff and ask him if he were in Washington, D.C. before taking any action (e.g. suspension, statements) was the root of all the reputational harm if you assume that they would have spoken or acted differently with that knowledge.

- For whatever purposes (possible legal) that they did not put the Plaintiff's name in the statement released on January 7 and distributed broadly throughout the ASD community, it was disingenuous because they fully knew at that time that the general community already had identified him as the "staff member" in Washington, D.C.

- Freund's interview with The Morning Call that afternoon in the wake of the article it had published earlier in the day was particularly impactful from a negative standpoint to the Plaintiff because he segued the situation from announcing an investigation of a staff member being at the Capitol Riot to inferring that he engaged in "Un-American and subversive" activities.

- The statement was reckless in two ways: (1) it was made before any form of even a preliminary investigation (even to determine if the Plaintiff was at the Capitol Building); and (2) they placed the Plaintiff at the scene of one of America's most shameful incidents without verifying its accuracy.  Even if they had refuted it the next day, the damage to his reputation would have been almost irreversible.

- The Defendants, self-admittedly in their depositions, knew almost immediately that the Plaintiff was not at the Capitol Building.  It took them six months to acknowledge their error to him personally and they never admitted the error publicly.  As a reputation damage expert, I can attest that if they had publicly admitted the error when they first learned of it and made a full public disclosure, it would have mitigated the damage significantly.

- Board Members Conover and Harris contributed greatly to the reputation damage by both proactively working with the Promise Neighborhoods organization first in the creation of the Change.org petition and subsequent distribution of it and then Conover's actions surrounding the two board meetings to promulgate both dissent and attendance for the purposes of disparaging the Plaintiff.

- The Defendants, in seeking to explain away the reputation damage of the Plaintiff has blamed it on him in two ways:

  - That he sought and conducted media interviews and that generated much of the exposure that was harmful to him.  To the contrary it was incumbent on him to do everything possible to protect his good name and reputation and their "let sleeping dogs lie" would have done just the opposite.

  - Their contention that his radical conservative views were not in sync with

one must question how he made it through nearly 18 years in the school district without someone attacking him for his views.

- The combination of the release of the statement (and Freund's interview) which fueled negative social media comments and media coverage undoubtedly fueled the outpouring of vitriolic comments at the board meetings. It became a snowball effect.

- From the reports of the Plaintiff, the reputation damage has already had a devastating effect on both his professional and personal life. Based on my nearly 50 years as a public relations professional representing clients who were in crisis along with my 18 years (and 90 reputation harm cases) as an expert witness, the negative consequences he has suffered is consistent with those experienced by others who has suffered similar reputation harm.

- There is every reason to project that this reputation damage will continue well into the future if not his lifetime due mainly to the internet. Hypothetically, if he were to move to a small town in Montana, they might have known about it except that anyone who seeks information on the internet will be indefinitely exposed to the negative communications.

- In my report I have recommended a reputation damage repair program which is a wise, sound and prudent means of mitigating the damage and restoring his reputation. However, as a professional who has created, planned and implemented about 40 of them during my career, even the best, well-funded program may only restore his reputation possibly 70 percent.

In summary then, it is my professional and expert opinion - based on all available evidence and the information I reviewed as well as the insight I have amassed from my experience and expertise in both the communications field and as an expert witness – that the Plaintiff, Jason Moorehead, has been severely impacted by negative consequences and suffered significant reputation damage directly attributable to the Defendants, School District of the City of Allentown; Board of School Directors of the School District of the City of Allentown; Thomas Parker; Nancy Wilt; Nicholas Miller; Lisa A. Conover; Phoebe D. Harris; Audrey Mathison; Charles F. Thiel; Anthony Pidgeon; Marilyn Martinez; Jennifer Ramos; John D. Stanford; Patrick Palmer; LaTarsha Brown; and Jennifer Lynn Ortiz. Further, based on my direct experience and observations of similar reputation damage situations both as a public relations professional and expert witness, I can reasonably project this reputation will undoubtedly be long lasting and will continue well into the future if not indefinitely.

### REPORT DISCLAIMER

This report provides my findings, views, conclusions and opinions based on information and input related to this case that I have received to date. If there are further developments in this case and/or if I receive additional documents or information related to it in the future, I reserve the right to supplement, change and/or expand on the conclusions and opinions which I have offered in this report.

Robert J. Fisher

Date    July 3, 2024

77