EXHIBIT C

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                     NASHVILLE DIVISION

 3
     MICHAEL DAVID SILLS and )
 4   MARY SILLS,             )
                             )
 5      Plaintiffs,          )
                             ) Case No. 3:23-cv-00478
 6   VS.                     ) Judge William L. Campbell, Jr.
                             ) Magistrate Judge
 7   SOUTHERN BAPTIST        ) Jeffery S. Frensley
     CONVENTION, a non-profit)
 8   corporation, et al,     )
                             )
 9      Defendants.          )
     _____X
10

11

12

13

14   _____

15

16        VIDEOTAPED DEPOSITION OF MICHAEL DAVID SILLS

17                TAKEN ON OCTOBER 1-2, 2024

18

19   _____

20

21

22
     Prepared by:
23   Carole K. Briggs, LCR #345
     Briggs & Associates
24   222 Second Avenue, North, Suite 340M
     Nashville, Tennessee  37201
25   Carole@Briggscourtreporting.com
```

```
 1   BY MS. CALLAS:
 2        Q.   And is that something that your employer, the
 3   seminary, would have wanted to know?
 4        A.   I -- I will say they would want to know, yes.
 5        Q.   And why would they want to know that their
 6   faculty member had engaged in the sin of adultery?
 7             MS. McNULTY:  Objection, calls for
 8   speculation.  Go ahead.
 9             THE WITNESS:  The Christian ministry calls
10   for ministers to live above reproach.  And any failure
11   to do so would be something that should be addressed.
12   And the seminary is a zero-tolerance world.
13   BY MS. CALLAS:
14        Q.   At any time did you disclose to the seminary
15   that you had been involved in an adulterous relationship
16   with Jennifer Lyell?
17        A.   No.
18        Q.   And why did you not do that?
19        A.   I personally struggled with whether or not to
20   reveal it and to walk away from everything.  I shared
21   the struggle with Jennifer.  Jennifer felt that we
22   didn't know what other professors, other people at the
23   seminary, had in their own lives.  And I always
24   struggled with whether or not I should be there, even
25   before anything happened.
```

1   Q.   Can you expound on that?  What do you mean
2   even before?
3   A.   I had a high view of that seminary and
4   calling.  And it was -- it's a -- was a high honor to do
5   that.  And I wonder about people who do think they're
6   worthy to be there.
7   Q.   So in the end, though, you did not, on your
8   own, conclude that you would reveal to the seminary this
9   ongoing sexual relationship, correct?
10  A.   That's right.
11  Q.   What about Reaching and Teaching?  Tell me
12  about Reaching and Teaching.  Is that something that
13  that organization would have found adultery to be
14  against their policies, their beliefs, and teachings?
15  A.   I would say yes, but there were no set
16  policies that you could point to and say, here, this is
17  a violation of that one.  But in general, in the spirit
18  of the organization, yes.
19  Q.   In fact, when this relationship with Jennifer
20  was disclosed, you resigned from Reaching and Teaching;
21  is that correct?
22  A.   I did.
23  Q.   And why did you resign?
24  A.   Because I did not want this to splash onto
25  that organization.

 1    Q.   Meaning you did not want your adulterous
 2 relationship to affect the organization's mission?
 3         MS. McNULTY:  Objection, form, argumentative.
 4 Go ahead.
 5         THE WITNESS:  I wouldn't say the mission, but
 6 just their reputation in the world.  Jennifer was a
 7 board member and an officer in the organization, and I
 8 was, as well.  Jennifer had basically formed the
 9 organization by filling out all of the paperwork,
10 researching how to do it.  So I didn't want the agency,
11 the 501(c)(3), to be negatively impacted.  So I
12 preempted that by resigning on my way home.
13 BY MS. CALLAS:
14    Q.   So Reaching and Teaching was an organization
15 Jennifer founded?
16    A.   She -- yeah, well, I did that with her.  I
17 didn't think I had the time to do it.  I was -- I had my
18 plate full.  She researched it, said we could do it.
19 She would fill out all of the paperwork and get it
20 started.  And that's how it got started.
21    Q.   Were you paid income from Reaching and
22 Teaching?
23    A.   No, not until 2016.
24    Q.   So you were paid income from Reaching and
25 Teaching in 2016?

1    A.    Or '17.  I think it was passed in '16, but it
2    started in '17.
3    Q.    When was the organization created?
4    A.    '10, 2010.
5    Q.    And what about Global Outreach, did you
6    understand that Global Outreach would find your
7    adulterous affair to be against its policies, beliefs,
8    or mission?
9    A.    My relationship with Global Outreach was
10   before I even came to seminary.  After all of this
11   happened, after 2018 -- of course, through the years, I
12   was just a board member with them, but as a board
13   member, it's a big board, 70-something people.  So it's
14   big, so it's not like a close board.
15              But after the revelation and all of the other
16   is when I went to Global Outreach and suggested that I
17   didn't want to be a missionary, and I didn't want to be
18   a staff member, but that I could do consulting using
19   cultural anthropology for governments and businesses.
20   And that was the relationship I was going to have with
21   Global Outreach.  But that was -- that was after all of
22   this happened.  And I explained to them everything that
23   had happened.
24   Q.    Did you resign your board seat in 2018?
25   A.    I resigned every board I was on.

 1  Lyell, correct?
 2           MS. McNULTY:  Object to the form.
 3           THE WITNESS:  That is correct.  I never said
 4  that.
 5  BY MS. CALLAS:
 6       Q.  So when you said it was inappropriate, you
 7  did not offer any detail about what it, in fact, was,
 8  which was sexual contact with Jennifer Lyell?
 9           MS. McNULTY:  Object to the form.
10           THE WITNESS:  I did not offer any definition
11  specifically of what had happened.
12  BY MS. CALLAS:
13       Q.  So you were offered either a third-party
14  investigation by the seminary, or you could resign that
15  day; is that right?
16           MS. McNULTY:  Object to the form.
17           THE WITNESS:  Yes, that is right, and that
18  was what was on the table.
19  BY MS. CALLAS:
20       Q.  Was that, in your mind, an inappropriate
21  position for the seminary to take?
22       A.  No.  I think that was -- in a zero tolerance
23  world, that is a fair policy -- fair thing to take.
24       Q.  If you had said in that meeting, I had a
25  sexual relationship with Jennifer Lyell over the course

1  of many years, was it appropriate for the seminary to
2  say, then you should resign?
3           MS. McNULTY:  Objection, form.
4           THE WITNESS:  It depends on who you're
5  talking to.  They should say, you should resign, or
6  you're fired.  But in a zero-tolerance world, you don't
7  continue employment after admitting something of that
8  nature.
9  BY MS. CALLAS:
10      Q.   Tell me what -- well, I guess so when you're
11 making your decision, which you said you needed an hour
12 to pray with Mary; is that correct?
13      A.   I didn't need an hour.  I needed a thousand
14 years.  I needed one second.  But Mary was coming to
15 spend and an hour with me, and I was telling him, you
16 can give me the lunchtime with my wife to pray about
17 this.
18      Q.   So you left the room?  Was that the end of
19 the discussion when they said, yes, go ahead, David, you
20 can --
21      A.   That was it.
22      Q.   You described your statements, I believe, as
23 there may have been something inappropriate; is that
24 correct?
25      A.   Uh-huh.

(1) what you're going to do, but you know, the importance of
(2) it, how much weight you're going to put to it, and
(3) therefore, that would dictate how much money would be
(4) allocated for that specific task.
(5)    Q.   Is this budget -- because I have not seen it
(6) broken out.  You know, we've talked about the results of
(7) the litigation and how it could affect things.  Is this
(8) budget associated with a certain result of the litigation?
(9)    A.   This budget is based on -- no.  Not necessarily.
(10) I mean you know, obviously, if the plaintiffs prevail as
(11) opposed to whether they don't prevail, affects the
(12) strategy and all which would mean the certain things you
(13) would do more of and other things you do less of depending
(14) on what the strength if you were going forward.  For
(15) instance, if they weren't to prevail and they were to do
(16) such a program, they would -- it might have to go back to
(17) square one on certain things, so you would have to put
(18) more emphasis in certain areas to like reinvent the wheel,
(19) so to speak, or whatever.
(20)    If they win, you don't have to deal with that stuff
(21) because, you know, it's not necessary because you're going
(22) out trumpeting the fact that after four years of
(23) litigation or whatever, you know, the judicial system has
(24) determined that the defendants were wrong and I wasn't an

(1) abuser, so you know, let's move on from there.
(2)   So for me, at this point in time -- first of all, I'm
(3) not going to be doing the thing, but beyond that, at this
(4) point in time to try to finite everything out not knowing
(5) whether you're going to be going from the position of
(6) strength or weakness, and to -- so what I did is I grouped
(7) them into like four categories.  I put a bunch into four
(8) categories based on what was going to be done in each
(9) category without breaking out the specific finite things
(10) which can't be determined at this point, therefore, you
(11) can't put a budget to it.  It's not realistic to do it at
(12) this point in time.
(13)   But what this is, it's a fair representation -- this
(14) is what this is.  This program -- okay.  Let's be clear on
(15) this program.  First of all, this program is a tried and
(16) -- I've done a few dozen.  Now a lot of them I did before
(17) the internet was around or whatever, but you know, I've
(18) since updated or whatever.  But this program is based on a
(19) successful model for such a program in the field to
(20) achieve the objectives of overcoming negative reputations.
(21) That's it.  It's tried and true kind of things to do, you
(22) know, that kind of -- so it's a realistic program as far
(23) as the activities to do.  As far as the budget goes, which
(24) is a separate component, the budget is the best projection

1    Kindle Direct Publishing of 2022.  Is that a correct --
2    getting us forward or updated on your books?
3         A.    That should be right.
4         Q.    So as far as articles, there were not any
5    articles published after 2015, and the book, Hearts and
6    Hands, when did you start working on that?
7         A.    Over a sabbatical a year or so before that.
8    It took a year to write.  And, in fact, it first came
9    out in book form.  And then at my editor's suggestion,
10   which would be Jennifer Lyell, it was reissued in
11   chapter booklets as separate books.  But it was
12   basically just the chapters, individual chapters.
13        Q.    Were some of your publications and books
14   removed from sale by your publishers, or are they still
15   available for sale?
16        A.    No, they were all removed from -- except the
17   ones that I had self-published.
18        Q.    And why did that occur?
19              MS. McNULTY:  Objection, form.
20              THE WITNESS:  I have no idea.
21   BY MS. CALLAS:
22        Q.    Do you know when that occurred?
23        A.    Virtually immediately after I resigned.
24        Q.    In May of 2018?
25        A.    I would say within that year, they all began

1  to send me notices saying your books have been

2  remaindered or whatever.  And I think I contacted my

3  agent that Jennifer had connected me with and told him

4  that I had resigned, and so he immediately cancelled his

5  contract as well.

6       Q.    And who was that?

7       A.    His name was Andrew Wolgemuth,

8  W-o-l-g-e-m-u-t-h.

9       Q.    In your time as faculty and a missionary,

10 have you seen publications be removed from availability

11 because of acts of adultery or infidelity?

12            MS. McNULTY:  Objection, form.  In

13 particular, the notion of the ambiguous term, adultery,

14 being referenced here, and also speculation.  Go ahead.

15            THE WITNESS:  I have never, personally, been

16 aware of a book that has been pulled from a publisher

17 and erased from a catalogue, taken out print, et cetera

18 because of anything like that.  I have known people who

19 did things like that.  I have never known a book to be

20 completely pulled.

21 BY MS. CALLAS:

22      Q.    So you have known authors who have engaged in

23 emotional sexual affairs with people they are not

24 married to and their books have remained available?

25            MS. McNULTY:  Objection, form.

1   extramarital relationship with a former student?

2        A.    Sure.

3              MS. McNULTY:  Objection, form.

4              THE WITNESS:  With regard to suffering

5   embarrassment and humiliation, of course.

6   BY MS. CALLAS:

7        Q.    Did that cause you mental anguish in 2018?

8        A.    It caused me great personal conviction of

9   sin, knowing that what I had done against the Lord and

10  the people, in addition to myself, who had been hurt.

11       Q.    Did you suffer mental anguish while the

12  extramarital relationship with Jennifer Lyell was

13  ongoing?

14       A.    Sure.

15       Q.    And did you suffer anxiety and depression

16  while that relationship with Jennifer Lyell was ongoing?

17       A.    To some degree, to some degree.

18       Q.    Did you report to Jennifer that you had

19  anxiety, and depression, and deep sorrow in 2012?

20       A.    I'm sure.

21       Q.    Did you see a physician for issues of anxiety

22  and insomnia in --

23       A.    Not related to her, but I am sure that I must

24  have during that time.

25       Q.    Well, what would that have been related to?

1  first...
2     Q.   You have no recollection, as you sit here
3  today, of even a time frame of a year when you might
4  have started taking prescription Xanax?
5     A.   No.
6     Q.   Did you --
7     A.   But I've never taken it nonstop for all of my
8  adult life.  There have been seasons when I needed it,
9  but I have no idea when those were.
10    Q.   Have you ever obtained Xanax or a generic
11 equivalent in South America where you didn't need a
12 prescription?
13    A.   No, you can't do without a prescription.
14    Q.   How about Levapro (phonetic)?  When were you
15 first prescribed Levapro?
16    A.   2019 or '20.  Joe Green, I think, is his
17 name.
18    Q.   You have struggled at times with back pain?
19    A.   Uh-huh.
20    Q.   Is that a yes?
21    A.   Yes.
22    Q.   I'm not trying to be rude.
23    A.   No, I get it.
24    Q.   Did you take medication for back pain?
25    A.   No, I mean, you can't just take medicine for

**CERTIFICATE**

I, CAROLE K. BRIGGS, Licensed Court Reporter within and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not a relative, counsel or attorney of either party nor employed by any of the parties in this case or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto affixed my official hand on this 17th day of October 2024.

_[signature: Carole K. Briggs]_

CAROLE K. BRIGGS

Shorthand Reporter

Tennessee License No. 345