# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **MICHAEL DAVID SILLS** | ) | |
| **and MARY SILLS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CASE NO. 3:23-cv-00478** |
| **v.** | ) | |
| | ) | **JUDGE WILLIAM L. CAMPBELL, JR.** |
| | ) | **Magistrate Judge Frensley** |
| **SOUTHERN BAPTIST CONVENTION,** | ) | |
| *et al.* | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' REPUTATION REPAIR EXPERT, ROBERT FISHER

Defendants the Executive Committee of the Southern Baptist Convention and Rolland Slade respectfully submit this Memorandum of Law in Support of their Motion to Exclude Plaintiffs' Reputation Repair Expert, Robert Fisher, and state as follows:

## STATEMENT OF FACTS

**A.     MR. FISHER DOES NOT PRESENT A REPUTATION REPAIR PROGRAM, BUT AN OUTLINE FOR A FUTURE PROGRAM THAT IS DEPENDENT UPON A JURY VERDICT AT TRIAL.**

Plaintiffs disclosed Robert Fisher as a purported expert on reputational repair to opine about the cost of a reputational repair "program" for David and Mary Sills. The word program is emphasized because what Mr. Fisher set forth in his report is not the actual reputation repair program for Plaintiffs, but a general outline of activities that a to-be-determined reputational repair program might include. [Ex. A, Depo. R. Fisher 25:7-28:16; Doc. 390-3 at p.57 ("The following is an outline for such a program."); *id.* at 58 ("The following is an outline of a prudent and suitable

reputation management/damage repair program . . . .")].[1]  In fact, it is only after the jury returns a verdict at trial that "[a] strategy for the program would be formulated" and "a detailed plan would be created for the program."  [*Id*. at p.59].

Mr. Fisher therefore admits that he cannot offer opinion testimony at trial on the specific program, its scope or the activities required to repair the reputation of David and Mary Sills until he knows whether or not Plaintiffs will prevail:

> The result of the litigation will have an influence on the perspective and perception of how key target audiences were impacted and the harm has occurred and could happen in the future.  The program would then be based on and factor in the litigation result as to how best to counter the negativity and restore Plaintiffs' positive reputations to include determining what the strategy is, the message to be projected and what actions need to be taken and to what extent.

[*Id*. at pp.58-59; *see also id*. at p.63 ("The result of the litigation would also dictate which of the program elements listed would become more essential and need more emphasis . . . ."); Ex. A, Depo. R. Fisher 32:1-4 ("[T]he whole dynamic of the program, the message, the strategy, everything is going to change . . . to adjust how you're moving forward based on what the results in the court were."); *id*. at 80:21-23 ("[W]e don't know what the outcome of the trial is and we haven't determined where the focus for the program is going to be.")].

Despite the lack of any reasonable certainty on what will be needed, Mr. Fisher opines that the cost of this to-be-developed reputation repair program is $2.6 million, [Doc. 390-3 at p.62], which, he admits, is the most expensive program he has ever created.  [Ex. A, Depo. R. Fisher 155:7-156:2].  Astonishingly, Mr. Fisher has put forth the highest priced reputation repair program he has ever developed with little to no information on the extent and scale of the reputational harm, if any, Plaintiffs allegedly suffered.  To start, Mr. Fisher admits he has not spoken with or relied

---

[1]    The "program activities" as Mr. Fisher's report refers to them, include things such as online communications, search engine optimization, videos, and paid exposure.

upon any other experts in this case and has not seen or been provided any qualitative or quantitative data on dissemination such as target audience surveys, analysis of web traffic, media mentions, etc. [*Id*. at 11:9-16, 34:8-35:13]. While Mr. Fisher has read Plaintiffs' depositions, he has never spoken to or otherwise communicated with them. [*Id*. at 11:17-21].

Putting a multi-million dollar figure on an incomplete plan, the proverbial "cart before the horse", Mr. Fisher admits that he still needs to perform an audit or assessment to determine the extent and nature of any reputational harm to Plaintiffs caused by Defendants. His report states:

> Audit / Assessment—In order to fully assess the degree of the reputational harm that the Plaintiffs have suffered, some research and analysis would need to be conducted to determine the nature and extent of the damage emanating from the Defendants' actions and negative communications.

[Doc. 390-3 at p.58]. This work has not been done. Thus, instead of treating any reputational harm as part of their prima facie burden (which it is), Plaintiffs seek to recover money damages from Defendants to then be used to determine whether or not there was any reputational harm attributable to Defendants "actions and negative communications."

**B.** **MR. FISHER IDENTIFIES LITTLE TO NO DATA, FACTORS, OR INFORMATION HE RELIES UPON TO ESTIMATE THE COSTS OF THE TO-BE-DETERMINED REPUTATION REPAIR PROGRAM.**

When asked whether there is literature discussing reputation repair programs like his, Mr. Fisher testified that he could not identify any, but "assume[s] there is." [Ex. Depo. R. Fisher 59:3-5]. Be that as it may, Mr. Fisher testified that he does not need to read or review any literature on reputation repair programs because he has more knowledge than anyone else on the subject:

> Well, no. I can't sit here today and give you a name of an author and a publication off the top of my head. I'm pretty sure that I've seen those in the past, but I don't pay attention anymore in a sense because they're not saying anything that I—not only I don't know, but probably I have more knowledge and background experience than the people that write the articles, you know. It'd be like the—<u>it would be like a teacher reading the</u>

> student's paper, you know. I mean I'm the teacher and these people are the students.

***

> Q.   You had mentioned this being a successful model and tried and true just now in your answer. Is there literature, guidance, peer review studies that we can go find that, you know, discuss this successful model or define how it's successful?
>
> A.   Look, I've done this over a 40 year period. I've done these programs. First of all, why would I go—you know, if anything, people are writing about what I've—what I've done. I'm not going to—it's a teacher / student thing again.

[Ex. A, Depo. R. Fisher 59:10-19, 80:24-81:9 (emphasis added); *see also id.* at 72:16-19 (describing the literature and guidance as being "between my ears")].[2]

While Mr. Fisher's report provides a general outline of activities that a to-be-determined reputational repair program may include, he does not allocate his total $2.6 million cost by all the activities he might recommend. For example, the audit and assessment needed to determine the harm caused by defendants has no price tag. For other activities, he simply offers a bulk sum without any itemization. Examples include:

- $50,000 per month for consultations over a two-year period, for a total of $1.2 million;

- $600,000 for three crisis management professionals, including a full-time professional to create and monitor social media content;

- $500,000 for two professional media tours, including $300,000 to obtain Sills invites to speaking and social engagements; and

---

[2]   An errata sheet was recently produced by Mr. Fisher where he improperly attempts to change the actual words used in many of his answers at deposition. For example, when testifying that literature and guidance was "between [his] ears," Mr. Fisher wants to change this to "It's based on professional experience." In other instances, Mr. Fisher changes his frequent use of slang and even profanity claiming it was "inappropriate wording." This includes his testimony: "That's B.S.," "blah, blah," and "the hell." If Mr. Fisher used inappropriate wording during his deposition, then those are the words he chose to use. He does not get to change it after the fact in an attempt to present himself as a more qualified, "appropriate" professional.

- $500,000 for qualitative and quantitative analysis to determine the effectiveness of the reputation repair plan.

[Doc. 390-3 at pp.62-63].[3]  Mr. Fisher offered no objective methodology or clear calculations to support these figures in his report or clarity on the issue at his deposition.

During his deposition Mr. Fisher attempted to do some math to support his cost estimates. For example, taking the $50,000 per month he proposed for "consultations" over two years, Mr. Fisher testified that 80 to 90 percent of this monthly amount would be in professional fees for the consultants, [Ex. A, Depo. R. Fisher 119:1-24], whom he assumes will charge $400-500 per hour. [*Id*. at 119:17-120:1].  Thus, Mr. Fisher is projecting these professionals will spend 100 hours per month for consultations, which breaks down to 4 to 5 hours of work activity every business day for a two-year period. [*Id*. at 120:17-121:23].  When asked to explain what these people will be doing, Mr. Fisher testified this cost estimate would cover activities or actions "emanating" from the consultations, but admitted he has no idea what those specific actions may be.  [*Id*. at 121:21-125:3].  Mr. Fisher testified that a million dollars of consultations is not something he recommends in every case.  [*Id*. at 125:10-126:12].  When asked for the methodology and data upon which he relied to recommend consultation fees at this level in this particular case, Mr. Fisher identified nothing more than the "magnitude of the reputational harm."  [*Id*.].   Yet, as discussed above, determining the alleged magnitude of the harm caused by Defendants is something that has yet to be done and, according to Mr. Fisher's program outline, is not to be done until post litigation.  [*Id*. at 34:8-35:13; Doc. 390-3 at p.58].

Similarly, Mr. Fisher suggests Plaintiffs may need a full-time staff of three crisis management professionals at a total cost of $600,000 over two years: "With regard to content,

---

[3]      While Mr. Fisher opines the cost of the program would be $2.6 million, it is unclear how he arrives at this figure.  The four component costs in his report total $2.8 million.

manhours alone for a staff of two or three professionals to design, implement and monitor for two years would easily cost $600,000. The staff of three crisis management professionals is necessary given the volume of material that has circulated about Sills." [Doc. 39-3 at p.63; Ex. A, Depo. R. Fisher 126:13-11]. Again, Mr. Fisher does not offer the method or cost variables used to calculate this figure. [Ex. A, Depo. R. Fisher 129:4-9]. He cannot identify any literature or guidance he relied upon to determine this cost or even the need for three, as opposed to two, full-time crisis management professionals, particularly when Mr. Fisher does not recommend this in every case. [*Id*. at 105:19-106:1, 106:16-108:10, 113:8-20. 129:23-132:6]. When asked to explain why these Plaintiffs require a full-time professional to create and monitor social media content, all Mr. Fisher could do was point to the nature of the allegations against Sills. [*Id*. at 108:12-109:7].

Despite saying David Sills is a private figure, Mr. Fisher opines that $500,000 may also be needed for two professional media tours to take place in various cities throughout the United States and Central America. [Doc. 390-3 at p.63]. Like some of his other recommendations, professional media tours are not something that Mr. Fisher recommends in every case. [Ex. A, Depo. R. Fisher 143:18-144:11]. But, Mr. Fisher could not identify any specific factors or methodology that serve as a basis for his opinion that David Sills, in particular, needs not one, but two, professional media tours beyond saying these are the most effective form of communication. [*Id*. at 144:12-145:2].

Mr. Fisher's lack of methodology in this matter becomes more apparent when it is compared with nearly identical plans he has prepared for Plaintiffs in other cases. Mr. Fisher prepared a report in the case of *Linda Fairstein v. Netflix, Inc.* [*Id*. at ex.4]. Ms. Fairstein was a New York City prosecutor in the highly publicized case in which five black teenagers were accused of the rape of a Central Park jogger. Netflix ran a four-part documentary titled "When They See Us," which portrayed Ms. Fairstein as having engaged in prosecutorial misconduct and having

racist motivations to pin the rape on innocent children of color. The documentary was viewed by tens of millions of people and nominated for over a dozen Emmy awards. [*Id*. at 163:1-164:4]. Ms. Fairstein was the subject of a large volume of negative press in national and international publications, extensive social media mentions, and multiple change.org petitions. [*Id*. at 168:3-171:1]. Mr. Fisher's program recommendations on behalf of Ms. Fairstein are largely the same as his recommendations for Plaintiffs – in fact, some are verbatim. [*See id*. at ex.4 at pp.73-75]. Despite the unquestionably national scale of Ms. Fairstein's alleged defamation, Mr. Fisher opined that Ms. Fairstein's reputation repair program would be four times <u>less</u> expensive than the potential program outlined in this case. [*Id*.]. When asked about this dramatic difference in cost, Mr. Fisher explained that Ms. Fairstein didn't need as much because she was a "legitimate public figure" and, if she prevailed in the litigation, this victory would receive widespread coverage whereas, if David Sills prevails, "there's not going to be any reporting on this internationally or nationally" and "no one is going to know." [*Id*. at 173:1-174:12]. In other words, Plaintiffs' reputation program is four times more costly than Ms. Fairstein's because more people know about her which makes it cheaper to "rehabilitate" her reputation. Remarkably, Mr. Fisher is actually suggesting that because the public will not know if David Sills prevails, more money is needed to notify the public that he was defamed and to repair his reputation.[4]

Mr. Fisher's rationale for the extraordinary cost of repairing David Sills' reputation is belied by his own testimony. He agrees with the obvious proposition that an individual's reputation

---

[4]     In the case of another private figure for whom he prepared a report, an individual defamed by his alleged participation in the January 6th riots, Mr. Fisher prepared a report with nearly identical, often verbatim, program activities as Plaintiffs. [Ex. A, Depo. R. Fisher at ex.5]. Despite admitting this individual was a private figure more closely analogous to David Sills, but also that there was more negative media coverage with respect to this individual, Mr. Fisher opined that the reputation repair program in that case would only cost $200,000-$225,000, or ten times less than Sills'. [*Id*. at ex.5 at p.72]. There is no identifiable rhyme or reason for these differences and it appears Mr. Fisher just pulls numbers out of thin air.

cannot be harmed among a cohort that does not know who you are: "There's no damage to someone if they don't know who you are or care who you are, you know," [*Id*. at 202:15-17] and "Sills is an unknown figure that no one knows" among the general public. [*Id*. at 185:3-14; *see also id*. at 183:15 (referring to David Sills and stating "he's an unknown person")]. Along those lines, Mr. Fisher testified that he does not care about the extent the general public was made aware of the allegations against David Sills; instead, he focused on the Southern Baptist community:

> Q.   Do you have any information about how the general public nationwide was—to the extent the general public was made aware of these allegations against David Sills?
>
> A.   No. And I don't really care, you know. To be honest with you, somebody in, again, Oshkosh, Wisconsin, I don't think they— they—particularly care whether Sills has a good reputation or not. We're talking about focusing on—the Southern Baptist Convention . . . .

[*Id*. at 150:7-14].[5] Yet, despite the contention that the allegations against David Sills were newsworthy in religious publications, Mr. Fisher could not say whether or not it would be newsworthy if David Sills prevails in this case. [*Id*. at 177:24-180:8]. In a rare concession, Mr. Fisher admitted that he has never had a client in the religious field. [*Id*.].

It is because of David Sills' lack of reputation that Mr. Fisher says his program is designed to first create awareness before there can be repair of any reputational harm. Essentially what Mr. Fisher is proposing is that Sills needs to first be made into a public figure before his reputation can be repaired:

> A.   [Fairstein] was a nationally known figure—where Sills wasn't . . . You have to build his—the recognition of who he was before Ms. Lyell came around or came forward. Let's put it this way. You have to build up that he was [an] esteemed professor, he was an

---

[5]     And while Mr. Fisher references the number of local churches that cooperate with the Southern Baptist Convention, he testified that Sills was still not a public figure within the Southern Baptist community. [*Id*. at 203:2-9].

international traveler . . . where everyone knew who Fairstein was. <u>So you had—you had to get—create an awareness for him before you could address the reputation harm that happened to him almost.</u>

\*\*\*

A.      Sills is an unknown figure that no one knows. And frankly, to make the case, you would have to—<u>you would almost have to build his reputation back up before you could try to—to get rid of the damage. You'd have to—people would have to know what they're talking about.</u> You know, who's this obscure professor . . . .

[*Id.* at 183:9-24, 185:3-9 (emphasis added)]. Thus, in this defamation action where the plaintiff has the burden to prove damages for harm to reputation, Mr. Fisher has testified that the program will first need to create a reputation for David Sills, an unknown and obscure person, and then apparently repair that newly created reputation.[6]

## C.    MR. FISHER DOES NOT DIFFERENTIATE REPUTATIONAL HARM OUTSIDE THE ONE-YEAR STATUTE OF LIMITATIONS.

Under Tennessee law, actions for libel and personal injury, including negligence and intentional infliction of emotional distress, are subject to a one-year statute of limitations. *See* Tenn. Code Ann. § 28-3-104(a)(1). As such, harm from statements made prior to May 11, 2022, is not actionable or recoverable.

Mr. Fisher agrees that public allegations of sexual abuse against Sills began in 2019, [Ex. A, Depo. R. Fisher 40:14-42:8], but testified that there was no way to decipher or determine the reputational harm that occurred prior to May 11, 2022, versus after that date. According to him, when the reputational harm occurred is not germane:

Q.      [W]hen you're speaking of a reputational repair program, there would be no way within that program, or at least your don't, or

---

[6]      Aside from being completely contrary to the law of defamation, the concept proposed by Mr. Fisher that reputational damage can only be repaired by first creating a public awareness of Sills appears to be illogical. The law does not contemplate recovery in the form of the creation of a public reputation where none existed.

9

there's no way to differentiate between reputational harm occurring to Dr. Sills, for example, prior to 2022 versus after; is that correct?

A.    There would be no need to.  You know, the train has left the station, the horse is out of the barn.  You know—the ship has left.  You know the bottom line at that point in time that you do a program, it wouldn't matter timetable or whether the Baptist article was more hurtful than a report or whether the tweet by—by Barber was worse than the email by Lyell.  At that point you're dealing—you know, as I say, it—it doesn't matter.  You're dealing with reputational harm already exists and it doesn't matter where it came from so much. You have to deal with the program, you know, and—which is a reputation harm.  So who caused it, when they caused it, at that point, is not germane.

[*Id*. at 42:13-43:7 (emphasis added)].

In fact, Mr. Fisher's report, has a section titled "Harm to Sills" [Doc. 390-3 at pp. 53-55], where he provides five bullet points of the negative effects to Sills professionally.  Each occurred not only long before May 11, 2022, but also before the allegations of sexual abuse became public. In addition, most of these harms were related to Sills having an admittedly inappropriate extramarital affair with Jennifer Lyell.  [*Id*. at p.54].

These "harms" listed by Mr. Fisher were imposed by Sills himself.  As alleged in the Complaint, Sills "rightly resigned" from the Southern Baptist Theological Seminary ("SBTS") in May 2018 because of his inappropriate sexual relationship with Jennifer Lyel.  [Doc. 1 at p.4; *see also id.* at p.5].  Sills testified he chose to resign because SBTS and the Christian ministry is a "zero-tolerance world" and an extramarital affair alone would result in his termination.  [Ex. B, Depo. D. Sills 51:5-12, 72:13-73:8].  Then, immediately after he resigned from the SBTS, Sills resigned from all other boards on which he was serving, including Reaching and Teaching Ministries.  [*Id*. at 52:19-22, 54:24-25].  Sills' Christian book publisher(s) also terminated his contracts before there was any public statement about sexual abuse.  [*Id*. at 103:13-104:5].

Regardless of who caused these harms, they all occurred in 2018, five years prior to suit being filed, and as a direct result of Sills' admitted adulterous relationship.

Similarly, in response to questions by Sills' own counsel, Mr. Fisher agreed that a February 14, 2020, article in The Tennessean, which was published well outside the statute of limitations, is the very type of publication his plan would address. [Ex. A, Depo. R. Fisher 288:10-19]. Even Plaintiffs' counsel failed to elicit testimony from Mr. Fisher differentiating between untimely statements and actionable statements by Defendants in connection with his damages calculation. Instead, an article published by a non-party and well outside the statutory period was highlighted.

Mr. Fisher also plans to testify about the personal harms caused by the defamation — "[t]he stress, anxiety and depression has resulted in him having to take Xanax, Zoloft and Lexapro and he experiences insomnia as well." [Doc. 390-3 at p.55]. Despite reading David Sills' deposition, Mr. Fisher ignored Sills's testimony that he saw a physician for anxiety and insomnia long before he was accused of sexually abusing Jennifer Lyell, [Ex. B, Depo. D. Sills 124:15-24], and that he was prescribed Lexapro in 2019 or 2020, well before the date of any statements or actions within the one-year statute of limitations. [*Id*. at 185:14-17].

## ARGUMENT

### I.   LEGAL STANDARD.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony and provides "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the following requirements are met: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b)  the testimony is based on sufficient facts or data; (c)  the testimony is the product of reliable principles and

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702 (2025).

Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993). This "gatekeeping" function has as its objective "to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999). "It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997); *see also Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 975 (M.D. Tenn. 2002) (a court should not "simply take [an expert's] bare assertions as gospel"). An expert's knowledge must "be premised on 'good grounds based on what is known' and not on 'subjective belief or unsupported speculation.'" *Lyngaas v. Curaden Ag*, 992 F.3d 412, 431 (6th Cir. 2021) (quoting *Daubert*, 509 U.S. at 590). "[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation "opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005); *see also R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the experts conclusory opinions.") (internal quotations and citation omitted).

"'[W]here such testimony's factual basis, data, principles, methods, or their application' are called sufficiently into question, the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline." *Huddleston v. Springfield Health Services, LLC*, No. 3:22-cv-00718, 2025 WL 57709, at *2 (M.D. Tenn. Jan. 8, 2025) (quoting *Kumho Tire*, 526 U.S. at 149). A court's "reliability determination must be based on a deeper analysis of a witness's use of particular methodology, in order to determine whether the witness's testimony is sufficiently reliable to allow the trier of fact to deem their testimony 'expert' in this case." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 975 (M.D. Tenn. 2002). Non-exhaustive factors to be considered include: "(1) whether the theory, conclusion, or technique has been tested or is testable; (2) whether it has been published or subjected to peer review; (3) whether it has a potential or known error rate; and (4) whether the theory, conclusion, or technique enjoys general acceptance within the relevant scientific community." *U.S. v. Roberts*, 830 F. Supp. 2d 372, 377 (M.D. Tenn. 2011) (citing *Daubert*, 509 U.S. at 593-94). A key consideration is "whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *see also Davis Electronics Co., Inc. v. Springer Capital, LLC*, 558 F. Supp. 3d 443, 449 (W.D. Ky. 2021) ("The critical factor in comporting with the reliability standard set forth in FRE 702 is that the expert 'makes clear the evidence he is relying on to form his conclusions' and '[i]t is clearly possible to test those conclusions objectively.'") (citation omitted).

II. **MR. FISHER'S OPINIONS ARE NOT RELEVANT AND, THEREFORE, NOT HELPFUL TO THE JURY BECAUSE HIS REPORT SEEKS TO REMEDY HARMS FROM STATEMENTS WELL OUTSIDE THE ONE-YEAR STATUTE OF LIMITATIONS.**

Rule 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Civ. P. 702(a). It is from this language that the relevancy requirement arises. *See Johnson v. Manitowoc Boom Trucks, Inc.*, 406 F. Supp. 2d 852, 859 (M.D. Tenn. 2005) ("The relevancy requirement stems from the mandate of Rule 702 that the testimony should 'assist the trier of fact to understand the evidence or to determine a fact in issue.'") (quoting *Daubert*, 509 U.S. at 591). In other words, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotations and citation omitted). "Whether an opinion 'relates to an issue in the case' or helps a jury answer a 'specific question' depends on the claims before the court." *Madej v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020). The relevancy requirement is clearly not met here.

Under Tennessee law, actions for libel and personal injury, including negligence and intentional infliction of emotional distress, are subject to a one-year statute of limitations. *See* Tenn. Code Ann. § 28-3-104(a)(1). As such, the one-year statute of limitations prevents Plaintiffs from recovering for any harm associated with any statements prior to May 11, 2022. [*See* Doc. 356 at pp.12-13]. Because reputational harm and damages associated with statements made outside the statute of limitations are not recoverable, it was incumbent upon Sills and his experts to differentiate and prove that statements made after May 11, 2022, somehow harmed his reputation over and above that which already existed and further, that this new harm caused actual damages. *See, e.g., Zucchella v. Olympusat, Inc.*, No. CV 19-7335 DSF (PLAx), 2023 WL 2628107, at *10 (C.D. Cal. Jan. 10, 2023) (expert's damages testimony excluded when calculations improperly included damages for years beyond the relevant statute of limitations); *Goldman v. Healthcare Management Systems, Inc.*, 559 F. Supp. 2d 853, 863 (W.D. Mich. 2008)

("Mr. Thomas' damage calculation improperly includes infringements outside the three year statute of limitations. Such damage calculations are barred from presentation to the Jury.").

Here, however, Mr. Fisher plainly testified that his program does not differentiate between reputational harm due to statements prior to May 11, 2022 versus statements made after that date. According to Mr. Fisher, "[t]here would be no need to. You know, the train has left the station, the horse is out of the barn. You know—the ship has left . . . So who caused it, when they caused it . . . is not germane." [Ex. A, Depo. R. Fisher 42:19-43:7]. But the distinction is very germane in the context of the recoverable harm. And, as discussed above, in the section of his report titled "Harm to Sills," most of the harms Mr. Fisher identified occurred three to four years prior to May 11, 2022. [Doc. 390-3 at pp.53-55]. Because Plaintiffs can only recover for harm caused by statements made within the one-year limitations period, and because Mr. Fisher's plan is designed to repair reputational harm from statements well outside the limitations period, this opinion testimony is not relevant and not helpful to the jury. This alone is sufficient reason to exclude Mr. Fisher's testimony.

## III. MR. FISHER'S OPINIONS ARE NOT BASED UPON ANY RELIABLE METHODOLOGY OR SUFFICIENT FACTS OR DATA.

### A. Mr. Fisher's Opinions Are Not Based Upon Sufficient Facts Data or the Application of Reliable Principles to Facts or Data.

In addition to being unhelpful, Mr. Fisher's opinions are not admissible because they are not based upon sufficient facts or data nor the application of any reliable principles or methods to the facts or data. *See* Fed. R. Evid. 702(b)-(d). While Mr. Fisher has opined that a to-be-determined reputation repair program for Plaintiffs will cost $2.6 million, his highest ever, it is simply based upon his say so.

Mr. Fisher admitted he has little to no information on the extent and scale of any reputational harm Plaintiffs have suffered, nor did he seek any. Mr. Fisher has not spoken with or relied upon any other experts and has not seen or been provided any qualitative or quantitative dissemination data such as target audience surveys, analysis of web traffic, media mentions, etc. [*Id*. at 11:9-16, 34:8-35:13]. While he read Plaintiffs' deposition transcripts, Mr. Fisher did not speak to, interview, or otherwise communicate directly with them. [*Id*. at 11:9-21]. Instead, as stated in his report, he doesn't need this information because determining the nature and extent of any harm to the Sills is a post-litigation activity. [Doc. 390-3 at p.58].

The same is true for the costs of the proposed "remediation" program. Mr. Fisher provides no objective data, literature, or guidance to explain how he arrived at his cost figures, certainly nothing that permits his opinions to be objectively analyzed and assessed. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment. While he says these Plaintiffs will need $50,000 for consultant fees per month every month for two years, [Ex. A, Depo. R. Fisher 125:10-126:12], along with three full-time crisis management professionals over two years at $600,000, he admits there is no literature, objective calculation, or data offered to support these dollar figures. [*Id*. at 105:19-106:1, 106:16-109:7, 113:8-20. 129:23-132:6].

The lack of any measurable basis or methodology is made even more apparent when this case is compared to reports Mr. Fisher has authored in other litigation. The cases all have very similar, if not boilerplate program activities. But yet, Mr. Fisher offers a completely and dramatically different cost at the conclusion of each report. One program may cost $200,000, one $600,000, or here, $2.6 million, all for nearly identical components.

Mr. Fisher's only explanation for this discrepancy is because he is an expert, he has done this for a very long time, and he is experienced; he doesn't need to consult literature because he is

the preeminent authority in this field. "I'm the teacher and these people are the students." [*Id*. at 59:19]. But this court cannot "simply take [an expert's] bare assertions as gospel." *Coffey*, 187 F. Supp. 2d at 975. Instead:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'

*Neal v. Fort*, No. 3:15-cv-0425, 2017 WL 455499, at *4 (M.D. Tenn. Jan. 20, 2017) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

Here, Mr. Fisher does not explain why his experience is a sufficient basis or how it is "reliably applied to the facts." And this is not the first time. A federal district court in New York found Mr. Fisher's "reputational repair" opinions to be unreliable, stating "Mr. Fisher's blanket invocation of his experience in the communications field to justify his conclusion does not suffice. Instead, an expert must show how his or her experience led to his conclusion, which Mr. Fisher has not." *Carroll v. Trump*, 22-cv-10016 (LAK), 2023 WL 2652636, at *4 (S.D.N.Y. Mar. 27, 2023) (internal quotations and citation omitted).

Mr. Fisher's opinions are classic *ipse dixit* opinion which are inadmissible under Rule 702 because "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. His opinions, therefore, are not based on any data or methodology – other than his say so – and do not satisfy Rule 702.

**B.     Mr. Fisher's conditional opinion is inherently speculative and not helpful to the jury.**

In his report states and testimony, Mr. Fisher freely admits that what a reputation repair program would look like depends on the results of the litigation:

The result of the litigation. Should the Plaintiffs prevail, it would validate that both of them are people of character and integrity and that Sills' reputation as a respected profession [sic], accomplished author and an esteemed figure in the religious community is valid. However, if they were to lose in this lawsuit, such a program would require some additional approaches and resources to achieve its objectives. The result of the litigation would also dictate which of the program elements listed would become more essential and need more emphasis . . . .

[Doc. 390-3 at p.62; *see also id.* at pp.58-59]. Mr. Fisher was asked whether his budget figure, $2.6 million, was based upon a particular outcome of the litigation. He admitted it was not:

Q.     [W]e've talked about the results of the litigation and how it could affect things. Is this budget associated with a certain result of the litigation?

A.     The budget is based on—no. Not necessarily. I mean, you know, obviously, if the plaintiffs prevail as opposed to whether they don't prevail, affects the strategy and all which would mean the certain things you would do more of and other things you do less of depending on what the strength if you were going forward. For instance, if they weren't to prevail and they were to do such a program, they would—it might have to go back to square one on certain things, so you would have to put more emphasis in certain areas to like reinvent the wheel so to speak, or whatever.

If they win, you don't have to deal with that stuff because, you know, it's not necessary because you're going out trumpeting the fact that after four years of litigation or whatever, you know, the judicial system has determined that the defendants were wrong and I wasn't an abuser, so you know, let's move on from there.

[Ex. A, Depo. R. Fisher 78:6-79:1]. As a result, Mr. Fisher's opinion is inherently flawed.

First, Mr. Fisher's opinions are facially speculative; "the whole dynamic of the program . . . everything is going to change . . . based on what the results in the court were." [*Id*. at 32:1-4]. Despite this, he proposes a budget of $2.6 million — his highest ever — which he admits does not take into account the results of the litigation. In other words, at the time he might offer his testimony at trial he admits there will be no clarity as to what is actually needed in this program or the related cost.

Second, Mr. Fisher's opinions are not helpful to a jury. *See* Fed. R. Civ. P. 702(a) (expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue"). Obviously, it does not help the jury to suggest there is a potential, undefined version of this reputation repair program if Plaintiffs win and something different if they lose. If Plaintiffs lose, the jury need not consider any plan. Mr. Fisher's testimony and opinions are only relevant and helpful to a jury if Plaintiffs prevail. Because he has not differentiated between the two possible results (a win and a loss) his reputation repair budget is misleading and unhelpful.

Finally, there is no fit with the issues presented in this case. "The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation." *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 820 (Tenn. 1994); *see also Ingram v. Tennessee Department of Health*, No. 3:17-cv-01565, 2018 WL 11586203, at *10 (M.D. Tenn. Feb. 6, 2018) ("[T]o establish any type of defamation claim, the plaintiff must show that the defamation resulted in injury to his character and reputation." *Ingram v. Tennessee Department of Health*, No. 3:17-cv-01565, 2018 WL 11586203, at *10 (M.D. Tenn. Feb. 6, 2018). Mr. Fisher says his program is designed to first create an awareness of David Sills among the public and <u>then</u> to repair his reputation. [Ex. A, Depo. R. Fisher 183:9-24, 185:3-9]. Because Mr. Fisher cannot quantify the harm to the pre-existing reputation of David Sills but rather must first create a reputation that did not exist in the first place, his opinions and program are not admissible.

## IV. MR. FISHER'S REPORT INVADES UPON THE PROVINCE OF THE JURY AND INCLUDES OPINIONS FOR WHICH HE IS ADMITTEDLY NOT QUALIFIED.

Mr. Fisher's report consists of sixty-three pages, with only five or six of those actually addressing the outline of a to-be-determined reputation repair program. Throughout his report, Mr. Fisher consistently provides his own commentary on the evidence, such as the credibility of

witnesses and the motivation of parties, that reads more as a closing argument than an expert report. For example, Mr. Fisher's report contains a section titled "Lyell's Penchant for Being Untruthful," stating, "It is appropriate to consider the evidence in his [sic] case as reflecting a pattern of untruthfulness by Lyell, and consider Lyell's habit of fibbing as important context and perspective in evaluating whether Lyell or Sills is providing the accurate view of their relationship." [Doc. 390 at pp.43-44]. In addition to making credibility determinations, Mr. Fisher also discusses his "opinions" on the purported motivations of the parties: "It is important to assess the motivation of both Lyell and the SBC-related defendants in their words and actions against Sills. Lyell (whether true or not) portrayed herself as a victim and that was both motivation and justification for her actions." [*Id*. at p.45]. He further states, "It would appear [the defendants'] mindset was that meeting Lyell's needs could solve their own 'PR problem." [*Id*.]. When asked whether he, for example, believed making credibility determinations to be within his expertise, he responded that he is just "following the evidence." [Ex. A, Depo. R. Fisher 17:2-7].

The finder of fact, in this case a jury, is quite capable of "following the evidence" and determining who is credible or not and what the parties' intents or motivations may have been. They do not need Mr. Fisher to do this for them. In fact, Mr. Fisher has previously been chastised and excluded for such arguments on the evidence. *See Carroll v. Trump*, 2023 WL 2652636, at *3 (finding Mr. Fisher's report contained "arguments about the evidence" that is not "a proper subject of expert testimony"). The result is the same here and Mr. Fisher must be precluded from invading the province of the trier of fact and making arguments and commentary on the evidence.

## CONCLUSION

For the above reasons, Defendants respectfully request their Motion *In Limine* be granted and Plaintiffs' expert, Robert Fisher, be precluded from testifying at the trial of this matter.

EXECUTIVE COMMITTEE OF THE
SOUTHERN BAPTIST CONVENTION
AND ROLLAND SLADE

By Counsel

*/s/ Gretchen M. Callas*
Thomas J. Hurney, Jr. (WVSB #1833)
(pro hac vice)
Gretchen M. Callas (WVSB #7136)
(pro hac vice)
Jonathan L. Anderson (WVSB #9628)
(pro hac vice)
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
Post Office Box 553
Charleston, West Virginia 25322
Telephone: 304-340-1000
Fax: 304-340-1150
thurney@jacksonkelly.com
gcallas@jacksonkelly.com


Brigid M. Carpenter (BPR #018134)
Ryan P. Loofbourrow (BPR #033414)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
bcarpenter@bakerdonelson.com
rloofbourrow@bakerdonelson.com
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Telephone: (615) 726-7341
Fax: (615) 744-7341

***Attorneys for Executive Committee of the
Southern Baptist Convention and Rolland Slade***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2025, the foregoing **MEMORANDUM OF LAW IN SUPPORT OF *MOTION TO EXCLUDE PLAINTIFFS' REPUTATION REPAIR EXPERT, ROBERT FISHER*** has been served through the Court's electronic filing system on the following:

John W. Barrett
Katherine Barrett Riley
Barrett Law Group. P.A.
P.O. Box 927
404 Court Square
Lexington, Mississippi 39095
dbarrett@barrettlawgroup.com
kbriley@barrettlawgroup.com

Shannon M. McNulty
Clifford Law Offices, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602
smm@cliffordlaw.com
***Attorneys for Plaintiffs***

James C. Bradshaw, III
Wyatt, Tarrant & Combs, LLP
333 Commerce Street, Suite 1050
Nashville, Tennessee 37201
jbradshaw@wyattfirm.com

Byron E. Leet
Wyatt, Tarrant & Combs
400 West Market Street
Louisville, Kentucky 40202
bleet@wyattfirm.com

Thomas E. Travis
Wyatt, Tarrant & Combs
250 W. Main Street, Suite 1600
Lexington, Kentucky
ttravis@wyattfirm.com
***Attorneys for The Southern Baptist***
***Theological Seminary and Dr. R. Albert Mohler***

Alan S. Bean
Starnes, Davis, Florie LLP
3000 Meridian Blvd., Suite 350
Franklin, Tennessee 37067
Abean@starneslaw.com
***Attorneys for Willie McLaurin***

Matthew C. Pietsch
Gordon Rees Scully Mansukhani,
4031 Aspen Grove Drive
Suite 290
Franklin, Tennessee 37067
mpietsch@grm.com
***Attorneys for Southern Baptist Convention,***
***Dr. Ed Litton and Bart Barber***

Steven G. Mintz
Scott Klein
Alex Otchy
Mintz & Gold LLP
600 Third Avenue, 25th Floor
New York, New York 10016
mintz@mintzandgold.com
klein@mintzandgold.com
otchy@mintzandgold.com

John R. Jacobson
Katharine R. Klein
Riley & Jacobson
1906 West End Avenue
Nashville, Tennessee 37203
jjacobson@rjfirm.com
kklein@rjfirm.com
***Guidepost Solutions, LLC***

*/s/ Gretchen M. Callas*