# Exhibit 2




IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

MICHAEL DAVID SILLS and MARY SILLS,

    Plaintiffs,

v.                        Case No. 3:23-cv-00478

SOUTHERN BAPTIST CONVENTION, et al.

    Defendants.

30(B)(6) VIDEOTAPED DEPOSITION OF

JON AUSTIN

TAKEN ON

THURSDAY, JANUARY 16, 2025

11:06 A.M.

THE SOUTHERN BAPTIST THEOLOGICAL SEMINARY

2825 LEXINGTON ROAD

LOUISVILLE, KENTUCKY 40280

1      Q.  Yeah.

2      A.  It was long.

3          MS. RILEY:  I don't -- just withdraw the

4   question.  Okay.

5          If you'll hand me the -- this is Bates

6   number Lyell 350673, and it is Exhibit 12.

7   BY MS. RILEY:

8      Q.  Can you tell me what this is, Mr. Austin?

9          (WHEREUPON, Exhibit 12 was marked for

10  identification.)

11         THE DEPONENT:  It is a tweet from Dr.

12  Mohler.

13  BY MS. RILEY:

14     Q.  Okay.  And it states, "Thankful for this

15  article.  I need to confirm to all that when

16  Jennifer Lyell came to me with report of abuse, she

17  never described 'a morally, inappropriate

18  relationship.' It was clearly a report of sexual

19  abuse.  Very thankful for her courage." Did I read

20  that correctly?

21     A.  Yes.

22     Q.  And the statement was made by Dr. Mohler in

23  the scope of his employment as president of the

24  seminary, correct?

25     A.  Yes.

1  allegation, but --
2  BY MS. RILEY:
3      Q.  Can you confirm that Dr. Mohler tweets
4  states that Jennifer's report was clearly a report
5  of sexual abuse?
6      A.  Yes.
7      Q.  Okay.  You can put that down, Mr. Austin.
8  I'm going to hand you a document Bates numbered --
9          UNIDENTIFIED MALE SPEAKER 1:  Lyell.
10         MS. RILEY:  -- 176574 -- Lyell.  And it is
11 Exhibit 13.
12         (WHEREUPON, Exhibit 13 was marked for
13 identification.)
14         UNIDENTIFIED MALE SPEAKER 2:  What's the
15 number?
16         MS. RILEY:  Which one?
17         UNIDENTIFIED MALE SPEAKER 2:  The one you
18 just read.  The number --
19         MS. RILEY:  The Bates number or the
20 exhibit?
21         UNIDENTIFIED MALE SPEAKER 2:  The Bates
22 number.
23         MS. RILEY:  176574.
24         UNIDENTIFIED MALE SPEAKER 2:  It's a long
25 document.

1  Seminary whether criminal sexual abuse had occurred
2  in determining if he needed to let Dr. Sills go if
3  sexual contact had been made?
4      A.  Yes.
5      Q.  Seminary buried its head in the sand after
6  that, did it not?
7          MR. LEET:  Objection to the form.  I don't
8  know what that means.
9  BY MS. RILEY:
10     Q.  After finding out that sexual contact had
11 been made between David Sills and Jennifer Lyell,
12 Seminary asked no more questions, did it?
13     A.  I don't -- I don't believe so.
14     Q.  In making the determination of whether
15 Sills had violated the code of conduct, Dr. Mohler
16 testified that he relied on two facts.  One, the --
17 the prepared statement read to him by Jennifer Lyell
18 that was recorded, and two, David Sills' confession
19 that sexual contact had occurred; is that correct?
20     A.  Yes.
21     Q.  And that was enough to have -- to ask for
22 David Sills' resignation, correct?
23     A.  Yes.
24     Q.  Mohler and Seminary required no further
25 investigation since David Sills corroborated

1  Jennifer Lyell's statement that sexual contact had
2  occurred, correct?
3      A.   Correct.
4      Q.   In Mohler's -- in Seminary's answers to
5  interrogatories, it was stated that Mohler did not
6  conduct any investigation of the allegations made by
7  Lyell in 2018, other than hearing Lyell's initial
8  report and meeting with David Sills.  So my question
9  is: Did the seminary ever conduct any additional
10 investigation beyond that?
11     A.   No.
12     Q.   So the question "was there sexual contact,"
13 was the only question that Dr. Mohler needed
14 answered when he met with David Sills; is that
15 right?
16     A.   (No audible response.)
17     Q.   He needed to determine if sexual contact
18 had been made to make a -- to make a baseline
19 decision, right?
20     A.   Yes.
21     Q.   Once he extracted the information for
22 Sills, he didn't need nor want to hear anything
23 further; am I right?
24          MR. LEET:  Objection to the form.
25          THE DEPONENT:  I can't speak for him, but

1  like to.

2          Do you need a break?

3          THE DEPONENT:  I'm -- whatever.

4          MS. RILEY:  No.  Let's just keep going.

5  BY MS. RILEY:

6      Q.  The seminary agrees that Dr. Mohler nor
7  anyone else at Seminary did an investigation into
8  Jennifer Lyell's allegation that criminal sexual
9  abuse occurred, correct?

10     A.  (No audible response.)

11     Q.  You agree with Dr. Mohler that Seminary did
12 not do an investigation into Jennifer Lyell's
13 allegation that criminal sexual abuse had occurred?

14         MR. TRAVIS:  Objection to the form.

15         THE DEPONENT:  I agree.

16 BY MS. RILEY:

17     Q.  Seminary did not investigate whether a
18 crime had been committed, correct?

19     A.  Correct.

20     Q.  Seminary did not seek to find any police
21 reports concerning David Sills, did they?

22     A.  No, it did not.

23     Q.  The seminary did not check to see if David
24 Sills had ever in his life been convicted of any
25 charge of sexual abuse, did it?

1      Q.  The truth is Seminary, through Mohler,
2   allowed the public to believe Seminary determined
3   that David Sills physically and sexually abused
4   Lyell; am I right?
5           MR. LEET:  Objection to the form of that.
6           THE DEPONENT:  What -- what the public
7   believe --
8           MS. RILEY:  Wait.  Just object to the form
9   --
10          MR. LEET:  Object to the form.
11          MS. RILEY:  Okay.
12          THE DEPONENT:  I can't speak to what the
13  public thought.
14  BY MS. RILEY:
15     Q.  I -- I wasn't -- the seminary did nothing
16  to dispute the statements made by Jennifer Lyell
17  that Seminary had -- that Seminary believed that
18  David Sills was -- had sexually abused her, correct?
19     A.  We did nothing to dispute that?  Was --
20     Q.  Uh-huh.
21     A.  No, we did not.
22     Q.  So you just left it out there, right?
23          MR. LEET:  Objection.
24          THE DEPONENT:  Well --
25          MR. LEET:  Form.

1           THE DEPONENT:  These -- we put forward
2   these two statements you've already introduced.
3   BY MS. RILEY:
4       Q.  The seminary didn't want to be in conflict
5   with Jennifer Lyell and her supporters, did they?
6           MR. LEET:  Objection to the form.
7           THE DEPONENT:  I don't know.
8   BY MS. RILEY:
9       Q.  You agree that Seminary does not believe
10  that sexual misconduct is a synonym for sexual
11  abuse?
12          MR. LEET:  Objection to the form.
13          THE DEPONENT:  Do I think -- does the
14  institution think --
15  BY MS. RILEY:
16      Q.  Yes, sir.
17      A.  -- that they are synonyms?  No, they are
18  not synonyms.
19      Q.  On behalf of Seminary, you also agree that
20  sexual contact, while inappropriate between two
21  unmarried adults, is not synonymous with sexual
22  abuse, correct?
23          MR. LEET:  Objection.  In any context or in
24  this one?
25          MS. RILEY:  In any context.

1  criminal act of sexual abuse, it had a duty to
2  report that to the law enforcement, according to the
3  handbook?
4      A.  Yes.
5      Q.  And do you agree that no one from Seminary
6  felt the need to make such a report after the
7  meeting with David Sills?
8          MR. LEET:  Objection to the form.
9          MS. RILEY:  What?
10         MR. LEET:  Only the "felt the need" part.
11 Nobody did make such a report.
12 BY MS. RILEY:
13     Q.  Nobody reported David Sills to the police
14 after his meeting, correct?
15     A.  Correct.
16     Q.  Do you know why it wasn't reported?
17     A.  I was not in the meeting.
18     Q.  But --
19     A.  No.
20     Q.  Well, who at Seminary -- because I'm
21 reminding you, you know, that you're speaking on
22 behalf of Seminary.  So my question is not you
23 personally, but why didn't Seminary report it?
24         MR. LEET:  Objection.  Asked and answered.
25 BY MS. RILEY:

1      Q.  Why didn't Seminary report David Sills for
2  sexual abuse after his meeting with Dr. Mohler?
3      A.  I don't know.
4          MR. LEET:  And -- and you're saying report
5  criminal sexual abuse after the meeting, correct?
6  There --
7          MS. RILEY:  Yes.  That's my -- my question
8  is about criminal sexual abuse.
9  BY MS. RILEY:
10     Q.  Why didn't the seminary report it?
11     A.  I don't know that they thought it was
12 criminal.
13     Q.  In Dr. Mohler's deposition, Dr. Mohler
14 testified -- testified that the first Baptist Press
15 article written about Lyell's allegations against
16 Sills was inadequate because she clearly had made a
17 report of sexual abuse.  That's background.
18         When we asked him to provide his support
19 for that claim, he testified, "Defined within this
20 context, it is entirely the relationship which
21 included a professor and a student." Do you -- did I
22 state that correctly?  I mean, or did -- is that
23 your understanding of what Dr. Mohler's testimony
24 was?
25     A.  Yes.

**1**     Q.  Okay.  Does Seminary dispute that?

**2**     A.  No.

**3**     Q.  Dr. Mohler also testified that the evidence

**4**  of sexual abuse was simply, "Was simply the formal

**5**  fact of the employment of Dr. Sills and the student

**6**  status of Jennifer Lyell." You don't object to that

**7**  testimony that Dr. Mohler testified to, do you?

**8**     A.  No.

**9**     Q.  Mohler made the statement in the course and

**10** scope of his employment as president?

**11**    A.  Yes.

**12**    Q.  And Seminary does not object to it, as

**13** y'all sit here today?

**14**    A.  No.

**15**    Q.  According to Dr. Mohler's -- or Seminary's

**16** definition, the sexual abuse ended when Jennifer

**17** Lyell left and went to -- when -- when she left the

**18** seminary, correct?

**19**    A.  According to our definition?

**20**    Q.  Yes, sir.

**21**    A.  Yes.

**22**    Q.  Did Seminary --

**23**    A.  When you say left -- when she left the

**24** institution, can you clarify that?

**25**    Q.  Well, when she was no longer a student

1  here.
2       A.  Okay.
3       Q.  I'll -- just so the record is clear, I'm
4  going to --
5       A.  Thank you.
6       Q.  -- restate the question.  According to
7  Seminary's definition, the sexual abuse ended when
8  Jennifer Lyell left the seminary in 2005 and was no
9  longer a student.
10      A.  Correct.
11      Q.  Did Seminary ever publicly explain that to
12 anybody?
13      A.  No.
14      Q.  So after --
15      A.  Well, when you say -- what do you mean,
16 anybody?
17      Q.  The public.
18      A.  No.
19      Q.  The seminary doesn't consider -- let me
20 back up.  Are you aware that the relationship went
21 on for ten-plus years?
22      A.  I have heard that.
23      Q.  And you -- Seminary is not stating that
24 once she left, the -- the sexual abuse -- no, that's
25 not -- hold on.  Let me think about this.  Hold on.

1      A.  Yes, I support -- yes.
2      Q.  Okay.  Now we're going to get into
3  Guidepost. What was Seminary's participation in the
4  publication of the report?
5      A.  And you're referring to the Guidepost
6  report?
7      Q.  Uh-huh.
8      A.  There was no participation by Southern.
9      Q.  Did Guidepost or anyone working with
10 Guidepost or anyone from the Sexual Abuse Task Force
11 send a draft of any portion of the report to review
12 before it was published?
13     A.  No.
14     Q.  Did Guidepost or anyone working with
15 Guidepost or anyone from the Sexual Abuse Task Force
16 ask for feedback on the report before it was
17 published?
18     A.  No.
19     Q.  For these line of questionings, for the
20 record, when I say Guidepost, I'm talking about
21 Guidepost, anybody that -- any third party that
22 worked for Guidepost, or the, okay, Sexual Abuse
23 Task Force.
24     A.  I'd like to clarify, we have, like, over
25 600 employees, so I've not discussed the matter with

1  doing as far as the question --
2          MS. RILEY:  Yeah.
3          MR. ANDERSON:  -- but the inclusion of that
4  task force because they're separate.
5          MS. RILEY:  Okay.
6          MS. KLEIN:  And -- and I'm -- I'm going to
7  object to your -- your shorthand for this line of
8  questioning because --
9          MS. RILEY:  Okay.
10         MS. KLEIN:  -- you're lumping in these
11 separate individuals and entities that have nothing
12 to do with Guidepost.
13         MS. RILEY:  Okay.  Well, I'll read the
14 whole question.  I tried.
15 BY MS. RILEY:
16     Q.  Did Guidepost, anyone working with
17 Guidepost, or anyone from the Sexual Abuse Task
18 Force asked Seminary to comment on the report before
19 it was published?
20     A.  No.
21     Q.  Did Guidepost, anyone working with
22 Guidepost, or anyone from the Sexual Abuse Task
23 Force call Seminary to update them on how the report
24 was coming?
25     A.  No.

1   Q.  Did Guidepost, anyone working with
2   Guidepost, or anyone from the Sexual Abuse Task
3   Force ask Seminary to provide evidence or details of
4   the investigation that Guidepost thought Seminary
5   conducted?
6   A.  No.
7   Q.  Did Guidepost, anyone working with
8   Guidepost, or anyone from the Sexual Abuse Task
9   Force call Seminary to update them on the progress
10  of the report?
11  A.  No.
12  Q.  Did Guidepost, anyone working with
13  Guidepost, or anyone from the Sexual Abuse Task
14  Force call Seminary to let it know how the
15  investigation was going on the Lyell allegations?
16  A.  No.
17  Q.  Was Seminary ever told that Guidepost was
18  investigating the truth of the allegation of
19  Jennifer Lyell's accusation of sexual abuse against
20  David Sills?
21  A.  No.
22  Q.  How many times did Jennifer Lyell
23  communicate with Mohler or anyone at Seminary to
24  discuss the Guidepost investigation before it was
25  published?