# Exhibit 5

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSE

NASHVILLE DIVISION


MICAHEL DAVID SILLS and MARY SILLS,

       Plaintiffs,

vs.                      3:23-cv-00478
                           Judge William L. Campbell, Jr.

SOUTHERN BAPTIST CONVENTION,
a non-profit corporation; et al,

       Defendants.



DEPOSITION OF ERIN S. BAILEY, CRC, ABVE/D


FRIDAY, AUGUST 8, 2025
10:03 AM



VIA ZOOM



Shawna H. Meeks

Certified Court Reporter

and Notary Public

1    So like in this case, obviously, this is a defamation

2    case.  We have a trial date.  Assumingly we'll go to trial

3    at some point.  So when you say permanent, and I'll give

4    you an example.  So hypothetically, if Dr. Sills were to

5    succeed in this case and a jury says -- finds he didn't

6    commit sexual abuse, hypothetically, is it your opinion

7    that his reputation is still permanently damaged and is

8    not subject to any kind of repair in terms of

9    employability?

10    A.    I think it's going to be really hard for his

11    reputation to be repaired.  There's a lot of negative -- a

12    lot of negative press, if you will, on the internet

13    regarding Dr. Sills.  There's a lot of -- the Southern

14    Baptist Community seems -- as big as it is, seems like

15    it's fairly small at the same time and considering his --

16    the players that have been involved and the comments that

17    have been made and the tweets that have been posted, all

18    of that is out there and it remains out there, and so, you

19    know, I think repairing -- it would take a lot to repair

20    his reputation by way of key players within the Southern

21    Baptist Convention community coming forward to support him

22    when they, in fact, did not support him initially.

23    Q.    And then so I don't want to put words in your

24    mouth, but is it -- is it your opinion that basically once

Page 51

1  public allegations of sexual abuse are made, that there's

2  kind of a permanent stigma that is carried with those; is

3  that fair?

4      A.    In my opinion, with respect to sexual -- the term

5  sexual abuse, in and of itself, yes.  I mean you have

6  somebody -- again, we're working in a social services

7  sector and you have somebody that's accused and the -- the

8  -- yeah.  Accused of sexual abusing somebody, a woman.

9  You have a man being accused of sexually abusing a woman.

10  The chances that they're going to seek employment in some

11  type of missionary position or another professor position

12  or where you're working with people and for people, and

13  certainly traveling internationally in these remotes areas

14  and so on, that's -- employers are not going to hire

15  somebody with that type of allegation, in my opinion.

16      Q.    And so do you agree that it's -- do you agree

17  that it is your opinion then if there's a public or a

18  permanent stigma associated with the making of the public

19  sexual abuse allegations?

20      A.    I do.

21      Q.    Now when you say that the -- he's been

22  permanently jeopardized because of his sexual abuse

23  allegations, I mean I take it is -- is there some

24  vocational or scientific basis that you're -- you're

1    Dr. Sills said, "Yes.  I think they would."

2       Question was, "And is that something that your

3    employer, the seminary, would have wanted to know?"

4    Answer by Dr. Sills was, "I would say they would want to

5    know, yes."

6       Question was, "Why would they want to know that their

7    faculty member had engaged in the sin of adultery?"

8    Again, there's an objection, but he answers, "The

9    Christian ministry calls for ministers to live above

10   reproach and any failure to do something -- and any

11   failure to do so would be something that should be

12   addressed and the seminary is a zero tolerance world."

13      You, as a vocational expert, don't have any reason to

14   disagree with Dr. Sills' answer there, do you?

15      A.   I do not.

16      Q.   Now as this is about the public allegations of

17   sexual abuse and the impact on his employability, what --

18   what's your understanding of -- of when those allegations

19   were first made?

20      A.   Jennifer Lyell came forward in May 2018, and that

21   was the first -- her first expression of the allegations.

22      Q.   And so do you know when they became publicized?

23              MR. RIDDLE:  Object to form.

24              THE WITNESS:  The Baptist Press article in

Page 58

1    2019, I forget the month, but certainly the Guidepost

2    article that was posted in May 2022, and the subsequent

3    publicity that was placed out there after that article.

4        BY MR. ANDERSON:

5        Q.   Okay.  I'd seen in your reliance materials that

6    were forwarded to us -- I don't have it in front of me,

7    but I can bring it up later if we need.  But there was a

8    -- I think there was a March 2019 article by the

9    Tennessean.  It was either the Tennessean or Courier

10   Journal -- let me see.  I can probably bring it up.  Okay.

11   Let me share the screen.

12       Are you aware -- and we can mark this as Exhibit 3.

13   Court reporter, I don't think it was in the list, but I

14   will -- I'll forward it during the next break.

15               (WHEREUPON, DEPOSITION EXHIBIT 3 WAS

16               MARKED FOR IDENTIFICATION AND IS ATTACHED

17               HERETO)

18       BY MR. ANDERSON:

19       Q.   Do you recall seeing this article before?  I

20   think it was in reliance materials that were provided to

21   us.

22       A.   I have seen it before.

23       Q.   And it's an article and I'm going to represent

24   that I think it's March 12th, 2019, and the title of it is

1    "Southern Baptist Professor Accused of Sexually Abusing

2    Student by Design Over a Decade," correct?

3        A.    Yes.

4        Q.    And this -- this would be a -- I take it you

5    would consider this to be a public allegation of sexual

6    abuse by Dr. Sills?

7        A.    Yes.

8        Q.    And do you know -- are you aware, from reading

9    any of the transcripts or materials, that Jennifer Lyell

10    had a website?  I think it was called Lyell's statement on

11    abuse or something to that affect.  Are you aware of that?

12        A.    Yes.

13        Q.    And are you aware that it kind of -- I think it's

14    referenced in this article, but that went online around

15    the same timeframe, in March of 2019; are you aware of

16    that?

17        A.    I don't know when it went online, but I do know

18    that it was -- it was there.

19        Q.    And on that website, she was also making public

20    allegations of sexual abuse; is that correct?  Your

21    understanding.

22        A.    My understanding, yes.

23        Q.    And so there were -- is it fair then -- by at

24    least March of 2019, and we can go through some other

Page 60

1    articles as we go, but do you -- do you agree that at

2    least as of March of 2019, there were public allegations

3    of sexual abuse being made against David Sills?

4        A.   Yes.

5        Q.   And earlier, you had said that how public

6    allegations of sexual abuse, you know, once made, kind of

7    -- again, I'm not trying to quote you directly because I

8    know I'll misstate it, but we talked about how public

9    allegations of sexual abuse, in your opinion, carry a

10   permanent effect on employability?  Do you remember that?

11       A.   I do.

12       Q.   And then so by making these public allegations of

13   sexual abuse against him in March of 2019, do you agree

14   that as of that time, his employability was harmed?

15       A.   There was certainly an impact to his

16   employability at that time, yes.

17       Q.   Was it permanently impacted?

18       A.   I don't think that it was -- I think it was too

19   soon to tell what the impact was going to be at that

20   point, but I think that it started to become impacted

21   during that timeframe.

22       Q.   And you've not been -- I know earlier you had

23   said you've not looked at any other expert reports or

24   talked to any other experts.  You've not been provided, or

1    was obtained through labor market research.

2       Q.    Okay.   What -- what did that entail?   Was it like

3    just going to various college websites or was there

4    something -- what --

5       A.    I think ultimately that's what I ended up doing

6    was going to college websites and -- and I don't recall

7    how I got -- how I did this, but I did do it and I saw

8    that that's what colleges were -- more than one college

9    and I don't have the -- the names of the colleges or, you

10   know, that information, but I do know that that's what --

11   many of them had stated would happen.

12      Q.    Next was consideration of the elements

13   encompassed within a diligent job search with analysis of

14   the plaintiff's job search efforts.   Just explain what was

15   entailed there.

16      A.    Really looking at what he was doing in his job

17   search.   So his method, what it entailed, how he did it.

18   Was it -- you know, some people say that they text

19   messaged two people and that was their job search and they

20   got turned down.   So it was really looking at his efforts

21   and understanding the diligence in which he employed in

22   his job search.

23      Q.    All right.   Let's go back to what we have marked

24   as Exhibit 5, which is the -- I'll call it the job search

1    job?  I mean I know a lot of them have a zero or no

2    response, but did you get any information from the

3    employers or been provided any information as to why he

4    did not receive a position?

5        A.    I did not.

6        Q.    So do you, yourself, have any knowledge or

7    opinions as -- you know, as to any of these particular

8    employers as to why he didn't receive a job?

9        A.    I mean I can certainly surmise in my vocational

10   opinion why he didn't receive a job or a job offer, but

11   you know, I don't have the tangible facts.

12       Q.    What's your vocational opinion about why he

13   didn't?

14       A.    Well, I think that, again, as I had eluded to

15   earlier today, that when an individual is applying for a

16   job, often times, you know, there are going to be

17   questions on the -- throughout the application process.

18   There may be questions, you know, with respect to have you

19   ever been accused of sexual misconduct, so that's part of

20   it.

21       The other part is in some of these where it's -- you

22   know, Baptist Missionary Association of America, for

23   example.  I just kind of looked at it.  In November 2018,

24   again, this is a small niche area.  As big as the Southern

Page 82

1    Baptist Convention is, it seems very clear especially from

2    the records that were produced in this case that word was

3    out that Dr. Sills had these sexual abuse allegations, you

4    know, made against him.  And in the human service, social

5    service related occupations, an employer is going to look

6    at that as a huge risk and a huge liability.  So

7    therefore, in my opinion, I would say that he was not

8    hired because of the allegations that were made against

9    him.

10       Q.   So in your opinion, starting with -- from August

11   27th, 2018 -- I think the last one on 2021 is September

12   28th, 2021.  So your opinion is that during this

13   timeframe, he was already damaged from an employability

14   standpoint from public allegations of sexual abuse?

15       A.   To some degree.  I mean he had -- with global

16   outreach, he had, you know, attended an orientation.  He

17   went to the chair -- the chairman's house, I believe, for

18   the weekend and he -- he was really making inroads with

19   Global Outreach and was really going to -- it sounded like

20   and he was under the impression that he was going to be

21   hired in that occupation or with that organization and

22   Jennifer Lyell and Dr. Eric Greiger --

23       Q.   Grieger.

24       A.   -- told them that he should not work with them,

1    and that are highly -- they're well respected.  I'm a

2    president of the international association of

3    rehabilitation professionals and if I were to tweet or put

4    something publicly out there, you know, people could

5    really respect my opinion and if I believe it, then, you

6    know, hundreds of other people could believe it as well.

7    And that seems to be the case in what happened here.  Is

8    that people -- Dr. Bart testified and -- excuse me, he

9    posted -- he tweeted.  Dr. Geiger -- sorry.  I pause every

10   time because I got to think how to pronounce his name.

11   Dr. Geiger, you know, ultimately agreed and said what a

12   great guy he was and of course, he trusted his opinion.

13   So -- and that could have a snowball effect and word

14   spreads and gets out there.  So that's the impact that it

15   had.

16       Q.   Okay.  So but you had said further impacted, but

17   just so I'm clear on this point, but you're not able to

18   tell me how much further?

19       A.   He had no responses to people after that time.  I

20   mean especially after the 2021-2022 timeframe.  At that

21   point, when he saw this Guidepost report, he decided not

22   to even try to get employment in this field anymore

23   anyways because he decided, to his credit, to try to go

24   into a different field because he was not going to get

Page 104

1   hired, especially after this report.  So I think that this

2   was ultimately, you know, the stamp on the -- on his not

3   getting employment in his intended field.

4       Q.   So let me ask this way.  January 1st, 2022, in

5   your opinion, is Dr. Sills employed -- employable or not?

6       A.   I think it depends on how people perceived his --

7   he was certainly -- he was trying or he was -- you know,

8   he had been trying to look for employment.  But, you know,

9   he was not getting positive feedback or positive responses

10  from any inquiries that he had.

11      Q.   By January 1st, 2022?

12      A.   Throughout.

13      Q.   So back to my question, though.  My question was

14  as of January 1st, 2022, was Dr. Sills employable or not,

15  and do you have an answer --

16              MR. RIDDLE:  Object to the form.

17              MR. ANDERSON:  -- for that or not.

18              MR. RIDDLE:  Pardon me, counsel.  Sorry

19  about that.  Object to form.  Asked and answered.

20  BY MR. ANDERSON:

21      Q.   So as of January 1st, 2022, and I -- trust me, as

22  a lawyer, I hate when people say yes or no because not

23  everything is yes or no, but as of, you know -- I promise

24  I'll give you a chance to explain, but as of January 1st,

1    2022, do you have an opinion as to whether Dr. David Sills

2    was employable in missiology or his chosen fields?

3                    MR. RIDDLE:  Same objection.

4                    THE WITNESS:  I think that he -- he -- I

5    think it's possible.  You know, I think that he -- again,

6    Global Outreach was going to hire him and -- until that

7    opportunity was discontinued or ended because of outside

8    influence.  So that demonstrates that he could have been

9    hired in a job if people didn't talk to that employer.  I

10   do think that the Guidepost report and the support of this

11   report from the executive committee is what truly impacted

12   his ability to become employable in this field.

13   BY MR. ANDERSON:

14      Q.   And what literature or guidance have you

15   consulted to make that statement about, you know, that the

16   Guidepost report and what happened afterwards was the

17   straw there?  Have you looked at -- what are you looking

18   at to make that statement?

19      A.   Well, I'm looking at his -- his job searches.

20   I'm looking at his attempts to look for work and I'm

21   looking at he -- his inability to obtain employment in

22   this field.  And this -- this now -- these allegations of

23   sexual abuse were talked about.  There was no

24   investigation.  There were -- they were just simply -- it

Page 108

1   opinion that the Guidepost report in May of 2020 and the

2   fact he only applied for 5 after, but it's your opinion

3   that the Guidepost report in May of 2022 is why he's not

4   employed?

5          MR. RIDDLE:  Object to form.

6          THE WITNESS:  I think that it has -- it

7   solidified his unemployability in this case because not

8   only -- again, as I and testified to, this report was done

9   where there said there was an investigation.  You have

10  high level people in the SBC corroborating and supporting

11  this.  So therefore, it's -- he didn't try and based upon

12  what he told me because he knew that he wasn't going to

13  get a job.  And that's when he, again, tried to pivot and

14  start his real estate company.

15  BY MR. ANDERSON:

16  Q.   All right.  You said solidify, but let me ask it

17  this way then.  Is it going to be your opinion at trial

18  that but for -- but for the publication of the Guidepost

19  report in May of 2022, despite this history we've talked

20  about, but for the Guidepost report, David Sills would be

21  employed?  Is that going to be your testimony?

22  A.   I think I've --

23          MR. RIDDLE:  Object to form.

24          THE WITNESS:  -- I've answered that several

1   times.  I think that the Guidepost report further

2   solidified that he was going to be unemployable in this

3   field with the support and corroboration from the Southern

4   Baptist Convention executive committee.

5       BY MR. ANDERSON:

6       Q.   I disagree that that -- saying it further

7   solidified is kind of fluid and I disagree that that's an

8   answer.  I just want to know because in law, we do this

9   where there's but for and typically that's -- but for

10  means yes, he would be or no, he wouldn't, and so I'll ask

11  again.  But for the Guidepost report, to a reasonable

12  degree of vocational certainty, is it your opinion that

13  but for the Guidepost report in May of 2022, David Sills

14  would be employed; yes or no?

15          MR. RIDDLE:  Object to the form.  It's a

16  self-limiting question and it's an inappropriate but for

17  question.  It's been asked and answered.

18      BY MR. ANDERSON:

19      Q.   Well, solidifying and the straw that -- or the

20  stamp is not an answer to a but for question, so but for,

21  is it your opinion to a vocational certainty, or

22  reasonable certainty in your field, that but for the

23  Guidepost report, he would be employed?  Are you able to

24  say that under oath or not?

Page 110

1           MR. RIDDLE:  Objection.  It's been asked and

2    answered.  It's a self-limiting question.  Improper to

3    form.

4           THE WITNESS:  Again, I think that it's -- he

5    had an employment prospect with Global Outreach and was

6    going to get hired; however, Jennifer Lyell and Dr. Geiger

7    contacted Global Outreach and said do not work with David

8    Sills.  There was an Ecuadorean missionary division or

9    something with Ecuadorian, they wouldn't work with Global

10   Outreach if David Sills was working there.  So people

11   were --

12   BY MR. ANDERSON:

13   Q.   Why were --

14          MR. RIDDLE:  Don't interrupt her, counsel.

15   Let her finish her answer, please.

16          THE WITNESS:  I lost my train of thought.

17   BY MR. ANDERSON:

18   Q.   And I'm sorry.  I shouldn't have interrupted you,

19   but I asked about 2022, the Guidepost report, and we've

20   already established Global Outreach was in 2019 because

21   the pending question is about but for the Guidepost report

22   in May of 2022.

23   A.   Right.  So had the Guidepost report not been

24   posted or published, could he have been employable?  It's

1    possible.  I mean, you know, the reason why it's not a yes

2    or no response is because he had an employment prospect

3    and people went and spoke to them and said don't hire him.

4    So could he have independently sought employment with no

5    interference?  He could have, yes.  That demonstrates

6    because he did.  But people interfered with it.  Once this

7    Guidepost report came out in May of 2022, and again, it

8    was supported by high level people within the Southern

9    Baptist Convention executive committee.  It was supported.

10   Then that's what, in my opinion, made him unable to

11   further obtain employment because it was further out there

12   that -- it was now not just an allegation.  It was an

13   investigation was reportedly conducted and supported.

14       Q.    And what literature or guidance are you relying

15   upon about the difference or the -- between pre-'22, how

16   it was being reported versus after the Guidepost report?

17   Is there guidance or literature that you're relying upon

18   about the impact of -- the difference?

19       A.    Well, reading the records and reading what was

20   out there, it was abuse allegations.  It wasn't an

21   investigation was conducted to confirm the abuse had

22   occurred.

23       Q.    So if someone with allegations of public --

24   public allegations of sexual abuse, as long as they're