# Exhibit 10



IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION


MICHAEL DAVID SILLS and MARY SILLS,

     Plaintiffs,

vs.                  Case No.: 3:23-cv-00478

SOUTHERN BAPTIST CONVENTION, et al,

     Defendants.


FINAL

VIDEOTAPED DEPOSITION OF

DR. BILL COOK

TAKEN ON
FRIDAY, JANUARY 17, 2025
8:29 A.M.

2825 LEXINGTON ROAD
LOUISVILLE, KENTUCKY 40280



1      Q.   Did Jennifer ever express any hesitancy

2   about taking a mission trip with David Sills?

3      A.   No.

4      Q.   Was she actively involved with the

5   logistics of planning the trips for 9th and O?

6      A.   Not that I'm aware of.

7      Q.   And at any time, was David Sills employed

8   as a staff member at 9th and O?

9      A.   No.

10      Q.   Dr. Cook, I'm going to hand you a

11   document, and if you could look at it.

12      A.   It'll be highly unlikely -- it's going to

13   be highly unlikely I won't be able to read it.

14      Q.   Okay.

15      A.   I'm sorry but --

16      Q.   That's okay.

17      A.   -- I can look at it to see.

18      Q.   Okay.  I'll identify it for you, if that

19   would help.

20      A.   Yes, ma'am.  I can't read it.  I'm sorry.

21      Q.   And so in this -- in our lawsuit, we

22   pulled everybody's text messages, emails, both sides

23   did, and produced all of those.  And this is a text

24   message, it appears, between David Sills and you.

25      A.   And me?

1      Q.   Yes, sir.

2      A.   Okay.

3      Q.   Yes, sir.

4      A.   Mm-hmm.

5      Q.   And it's dated June 18th, 2018, and let me

6   pause right there and give the other lawyers the

7   Bates numbers so that they can pull up.

8           MS. RILEY:  It's Sills 076517.  You got

9   it?  Okay.

10  BY MS. RILEY:

11     Q.   June 18th, 2018, and it says, "Bill, I've

12  had a couple of texts since yesterday's

13  announcement.  Can you share the gist of what you

14  said?"  And then -- and let me ask you this.  Is

15  your telephone number -- I need my reading glasses -

16  - 502-296-9235?

17     A.   That's right.

18     Q.   Okay.  And so you responded, "Sure.  Much

19  like I did with the worship intern, you resigned

20  from the seminary and as president of reaching and

21  teaching due to an inappropriate past relationship

22  that you have confessed it and have sought

23  repentance."

24           And then David responds, "Thank you.  I'm

25  so sorry to have put you through that.  I love you,

1  Brother."  And then you respond, "Thanks.  Praying

2  for you guys.  We'll see you soon."

3          Do you have any reason to doubt that this

4  is a text message communications between you and

5  David?

6      A.  No.

7      Q.  Okay.  And is that, in fact, what you told

8  him you said?

9      A.  Is what I said -- in summary form?

10     Q.  Yes, sir.

11     A.  Yes.

12     Q.  Okay.

13     A.  In summary form.

14     Q.  You can put that down.

15     A.  This is -- yeah.  This is the summary.

16     Q.  Yeah.

17     A.  Yeah.

18     Q.  How did you find out about the

19  relationship between Jennifer and David?

20     A.  From David.

21     Q.  Okay.  Can you tell us about that?

22     A.  To the best of my recollection -- it's

23  been quite a while -- he called me on the phone and

24  said that he had resigned from the seminary, and

25  that he would like to talk with me.  So my wife and

1  I went to their home the evening, I think, that they

2  resigned -- he resigned.  And so do you want me to

3  just keep talking --

4      **Q.    Yes, sir.**

5      A.    -- about what he said?

6      **Q.    Mm-hmm.**

7      A.    So what he described to me was that he had

8  engaged in tawdry behavior, that he had snuggled on

9  the couch with Jennifer after Mrs. Sills had went to

10  bed.  They had long hugs that he felt like were

11  inappropriate, and that Jennifer was suggesting that

12  the behavior was non-consensual.

13      **Q.    Was David repentant?**

14      A.    David said to me that it had been two

15  years, and that he had confessed it to Mary, and

16  that they had -- and, again, I'm having to, you

17  know, recollect.  I think he said that they had

18  counseling, and that their marriage was in a good

19  place.

20      **Q.    What did Mary say?**

21      A.    Mary was -- Ms. Sills was very upset, it

22  seemed like, towards Jennifer.  There seemed to be

23  quite a strain, though, between she and David.  They

24  sat at separate ends of the couch from one another.

25  If I recall, she didn't look his way very much.  You

1  could tell that there was tension between them, but

2  most of her angst seemed to be toward Jennifer.

3      **Q.   That's not surprising, considering what**

4  **had happened that day, correct?  Would you agree**

5  **with that?**

6      A.   No.  That's correct.

7      **Q.   Was David boastful about his behavior?**

8      A.   No.

9      **Q.   Did he seem shamed by it?**

10     A.   Yes.

11     **Q.   Was he defiant?**

12     A.   He seemed defiant about feeling that the

13  seminary had acted unjustly toward him.

14     **Q.   And did he say in what way?**

15     A.   I think that he had said that it had ended

16  two years ago, that he and Mrs. Sills were in a good

17  place, and that he didn't feel like that it was

18  appropriate for them to have, I think, forced him to

19  resign, is maybe the way that he would've --

20     **Q.   Did he feel like he had been**

21  **rehabilitated, at that time?**

22     A.   I'm not sure exactly what you mean by,

23  "rehabilitated."

24     **Q.   I guess, they had dealt with it and**

25  **confessed to each other, and it was between them,**

1  and they had moved on, and things were --

2       A.   Yes.  I think that would be an accurate

3  statement.

4       Q.   Did he acknowledge that the relationship

5  was sinful between him and Mary -- I mean Jennifer?

6       A.   Yeah, yeah.  He used the word, "tawdry."

7       Q.   Did you ask him if he sexually abused

8  Jennifer?

9       A.   I did not.

10      Q.   Did he tell you they had never had

11 intercourse?

12      A.   You know, I just -- I can't recollect

13 that.  Yeah.

14      Q.   Yes, sir.

15      A.   Yeah.

16      Q.   Did he tell you the relationship was

17 consensual between the two of them?

18      A.   Yes.

19      Q.   And you understand, that both Dave and

20 Jennifer were adults when they first met?

21      A.   Yes.

22      Q.   Did anyone ever report they suspected

23 anything was going on between Jennifer and David,

24 outside of the church?

25      A.   Outside of the church?

1      Q.   Yes, sir.

2      A.   Yes.

3      Q.   Can you tell me about that?

4      A.   David told me -- Dr. Sills told me that

5  night, or it might have been at the second time we

6  met after, that Justin Clark, who is a seminary

7  student, went to Dr. Russell Moore, reported to Dr.

8  Moore that he felt like there was something

9  inappropriate between David and Jennifer.  And that

10 he was called into Dr. Moore's office, and it came

11 to naught.  Yes, ma'am.

12     Q.   Do you remember when that occurred?

13          MR. LEET:  Just to clarify, when that

14 occurred, being when he heard this from Dr. Sills,

15 or when the report had been made?

16          MS. RILEY:  Thank you.

17          MR. LEET:  Yeah.

18 BY MS. RILEY:

19     Q.   Do you recall when the report was made by

20 Justin Clark?

21     A.   No.

22     Q.   Would it have been back in 2004 or on the

23 later end?

24     A.   Early end.

25     Q.   Okay.  I'm skipping through some of my

1          MR. ELBERT:  Object to the form of the

2  question.  Facts not in evidence.

3  BY MS. RILEY:

4      **Q.   Did you understand that Jennifer**

5  **continually pursued him romantically from the time**

6  **they met through her years in Chicago, and then when**

7  **she moved to Nashville?**

8          MR. ELBERT:  Object to the form.

9          MR. LEET:  Object to form.

10  BY MS. RILEY:

11      **Q.   They're just making a record for this so -**

12  **-**

13      A.   Yeah, yeah.  I understand.  Yeah, yeah.

14  No.

15      **Q.   Beyond speaking with David, did you do**

16  **anything else to investigate the allegations that**

17  **Jennifer made against David Sills?**

18      A.   In that -- in those initial days?

19      **Q.   Yes, sir.**

20      A.   No, ma'am.

21      **Q.   Did David Sills face official church**

22  **discipline?**

23      A.   Not beyond that verbal rebuke that I gave

24  on Sunday morning.

25      **Q.   Okay.  Let's go back to when you were**

1      Q.   Okay.  And can you tell me about that

2  meeting?

3      A.   That meeting, I told him what I was --

4  what I intended to do, that my preference would be

5  for him to come before the church and acknowledge

6  that he had acted in a tawdry, inappropriate way,

7  and that he would ask the church for forgiveness.

8      Q.   And what did David say?

9      A.   David said that he would like -- that's

10  what he would like to do, but his lawyers told him

11  not to do it.

12      Q.   Okay.  And so what else was discussed at

13  that meeting?

14      A.   I think that he told me that they were

15  going to leave Louisville and move to Mississippi.

16      Q.   Okay.

17      A.   Yeah.

18      Q.   Did -- at what point did you learn that

19  Jennifer had alleged that it was physical, sexual

20  abuse?

21      A.   And so all of that timing is a little bit

22  foggy.

23      Q.   Yes, sir.

24      A.   A little bit foggy for me, and so I

25  believe after -- I believe it was after David and

1  Mary had left Louisville.

2      Q.   Okay.  And how did you come about finding

3  that information?

4      A.   Jennifer called my wife and I.

5      Q.   And I asked you if you had done any

6  investigation into whether or not the allegations

7  were true of physical, sexual abuse.  Did anybody in

8  your church do an investigation?

9      A.   No.

10      Q.   All right.  So after that meeting, the

11  second meeting --

12      A.   Yes, ma'am.

13      Q.   -- with Dr. Sills, did you have another

14  meeting with him?

15      A.   Not that I recollect, no.

16      Q.   So the only one time that --

17      A.   Now, let me see.  I can't remember, again,

18  all of the precision of it.  It might be that -- and

19  I can't remember if it was my wife.  I think that

20  Jeff and I went to their home just days before they

21  moved.

22      Q.   Okay.  And what was that for?

23      A.   That was basically to pray for them and to

24  see them off.  I think that's right.

25      Q.   Okay.

1     A.   Yeah.

2     **Q.   Tell me about the announcement that you**

3 **made at the church.**

4     A.   And so it came at the end of the service,

5 and I said -- the kind of thing I think I would've

6 said, is that Dr. Sills has resigned from the

7 seminary, he had resigned from reaching and

8 teaching.  He had confessed to me that he had been

9 involved in tawdry acts with someone that wasn't his

10 wife.

11          We had entrusted him with responsibilities

12 to be able to preach on a semi-regular basis, to

13 lead mission trips at one -- to be a Sunday School

14 teacher and at one point, to be over our missions

15 ministry.  And that in light of that, I am -- I was

16 publicly rebuking him, and that we were going to

17 remove his sermons from our website.

18     **Q.   Okay.  Dr. Cook, Jennifer said that you**

19 **and your wife called and shared that a senior and**

20 **executive pastor met with Dr. Sills individually**

21 **once and two subsequent meetings with David and**

22 **Mary.  Did the senior and executive pastors all meet**

23 **with David and Mary?**

24     A.   No, no.  Just the executive pastor and

25 myself.

1      Q.    She also stated that the senior and

2  executive pastors questioned Dave and Mary on the

3  allegations reported to you by Southern Seminary.

4  Did Southern Seminary report allegations to 9th and

5  O and executive pastors?

6      A.    No, ma'am.

7      Q.    She also said that you told her that if

8  she had been -- that it had been announced in church

9  that morning that David was under investigation for

10  non-consensual sexually immorality -- sexual

11  immorality.  Is that a true statement?

12           MR. LEET:  Objection to the form.  Go

13  ahead.  You can go ahead.

14           THE DEPONENT:  Okay.  Yeah, yeah.  No.

15  BY MS. RILEY:

16      Q.    She also said you called her a week or two

17  later to tell her you had, quote, officially

18  concluded David Sills was 100 percent guilty of

19  sexual sin, end quote.  Did you call and tell her

20  that?

21      A.    Not that I can remember.

22      Q.    She also said that it was announced to the

23  congregation that David's membership had been

24  removed as a matter of church discipline.  That's

25  not true, is it?

1     A.    Yes.

2     Q.    Because you had not done an investigation?

3     A.    That's correct.

4     Q.    And neither had 9th and O?

5     A.    That's correct.

6     Q.    Do you remember what you told David Roach?

7     A.    No.  Only, I guess, maybe that if that's

8  what he's said, that that was too strong of a way to

9  put it.

10    Q.    David Roach said that you felt more

11 comfortable saying you took action.

12    A.    Yes.

13    Q.    And the action that you took was

14 announcing it in church, what you had just

15 previously described?

16    A.    Yes, ma'am.  Mm-hmm.

17    Q.    And how many times did you make that

18 announcement?

19    A.    One time.

20    Q.    And did you make it -- you have two

21 services?

22    A.    We do, yes.  I'm sorry.  Yeah.  Both

23 services, so twice.

24    Q.    So you made an announcement in each

25 service one Sunday?

1          MS. RILEY:  I will pass the witness.

2          MR. LEET:  He's my witness, so others

3    should go first, if anybody has anything.  I will

4    have -- I anticipate, I will have a handful of

5    questions, but I welcome you all go first.

6          MR. ELBERT:  Why don't you go first and

7    then --

8          MR. ANDERSON:  I have a handful.  I can go

9    if you want me --

10          MR. LEET:  Go ahead, Mr. Anderson.

11          MR. ANDERSON:  All right.

12   EXAMINATION

13   BY MR. ANDERSON:

14        Q.   Dr. Cook, I know you can't see me, but --

15        A.   Thank you.

16        Q.   -- I know very well you can hear me.

17        A.   Yeah.  Thank you.

18        Q.   I'm Jon Anderson, and I represent the

19   executive committee of the Southern Baptist

20   Convention and Pastor Roland Slade.  I just have a

21   few quick follow-ups.  It's what lawyers always say,

22   but I'll try to stick to it.  You had mentioned,

23   before Dr. Sills had left the church, he did not

24   have any paid position with 9th and O, did he?

25        A.   No.

1        Q.   What -- I know you had mentioned Sunday

2   School and some missions.  What was he -- what kind

3   of positions, whether formal or informal, was he --

4   services was he doing at 9th and O?

5            MS. RILEY:  Object to form.

6            THE DEPONENT:  Okay.  So he would

7   occasionally preach, as regularly as anybody other

8   than me, and he has taught Sunday School, was the

9   director of the missions, our missions team for a

10  period of time, and then led numerous mission trips.

11  BY MR. ANDERSON:

12       Q.   You had mentioned that -- I think you

13  testified earlier, that upon the disclosure of the

14  relationship, that his sermons were removed from the

15  website?

16       A.   Yes.

17       Q.   And so setting aside the issue of

18  consensual or non-consensual --

19       A.   Mm-hmm.

20       Q.   -- Dr. Sills admitted a relationship, you

21  know, with a woman not his wife.  Was that

22  sufficient, in your mind, obviously, to remove his

23  sermons?

24       A.   So what I knew at that point was that he

25  had admitted to tawdry behavior and that that

 1 | further.

 2 | EXAMINATION

 3 | BY MR. ELBERT:

 4 |      **Q.    Doctor, my name is Phil Elbert and --**

 5 |      A.    Yes, sir.

 6 |      **Q.    -- we were just introduced here this**

 7 | **morning.**

 8 |      A.    Yes, sir.

 9 |      **Q.    I represent Jennifer Lyell, and I just**

10 | **have a few follow-up questions.  So in June of 2004,**

11 | **David Sills was -- when you weren't personally**

12 | **preaching, he was regularly preaching at 9th and O?**

13 |           MS. RILEY:  Object to the form.

14 | BY MR. ELBERT:

15 |      **Q.    Would that be correct?**

16 |      A.    With a group of other --

17 |      **Q.    Right.**

18 |      A.    Of other men, yes.

19 |      **Q.    And as a pastor who preached he was a**

20 | **pastor to the congregation?**

21 |      A.    No.  He was -- I think he was -- he would

22 | be thought of as a leader.

23 |      **Q.    Okay.  But in a pastoral capacity, since**

24 | **he's preaching?**

25 |           MS. RILEY:  Object to the form.

1            THE DEPONENT:  I think that, yeah, from my

2    perspective, David was not a pastor.  I think that

3    there would be people in the church, because of his

4    position, that would've thought of him in a pastoral

5    way, but not officially a pastor.

6    BY MR. ANDERSON:

7        **Q.   Not a formerly staff pastor?**

8        A.   That's correct.

9        **Q.   But performing a pastoral role to**

10   **congregants?**

11           MS. RILEY:  Object to the form.

12   BY MR. ANDERSON:

13       **Q.   In a ministerial capacity?**

14       A.   Yes.

15       **Q.   Is that a yes?**

16       A.   Yes.

17       **Q.   Okay.  He was teaching Sunday School.  The**

18   **same would've been true as a Sunday School teacher,**

19   **that would be a pastoral role in a ministerial**

20   **capacity?**

21       A.   No.  We consider our Sunday School

22   teachers to be, in a sense, lay pastors and -- yeah.

23       **Q.   So that would be a yes?**

24       A.   Yes.

25       **Q.   Okay.  He was director of the missions**

1  team?

2      A.   That's correct.  Yes.

3      Q.   Okay.  And in that capacity, back in June

4  of '04, he would've planned mission trips, say, to

5  Ecuador?

6      A.   Yes.

7      Q.   He would've been the one to be in charge

8  of recruiting congregants to go and participate in

9  the mission trips?

10      A.   It's usually like we put it out, and

11  people would volunteer.  But at times, the mission

12  team leaders would go to particular people and ask

13  them to join the trip.

14      Q.   Okay.  And when you would put it out there

15  --

16      A.   Mm-hmm.

17      Q.   -- to invite the congregants --

18      A.   Yes.

19      Q.   -- he would be the one to put it out

20  there?

21      A.   Probably -- it would've probably have been

22  me.

23      Q.   Okay.

24      A.   Yes.

25      Q.   And --

1 Sometimes we don't and so, yes.

2       **Q.    Okay.**

3       A.    Yeah.  I'm sorry.

4       **Q.    And then in terms of the trips itself, he**

5 **would lead the trip?**

6       A.    He led a number of trips, yes, primarily

7 to Ecuador and Peru.

8       **Q.    Okay.  And that would've been true in June**

9 **of 2004?**

10      A.    Yes.

11      **Q.    Did anyone else from 9th and O lead trips**

12 **to Ecuador in June of 2004?**

13      A.    I can't recall.

14      **Q.    You don't recall anyone else?**

15      A.    Well, I'm sorry.  Yeah.  I don't recall if

16 anybody else did or didn't.

17      **Q.    How about would the same -- as those**

18 **questions I just asked you, the same answers be true**

19 **as to July of 2004?**

20           MS. RILEY:  Object to form.

21 BY MR. ELBERT:

22      **Q.    David Sills was preaching, teaching Sunday**

23 **School, director of the mission team, as we've**

24 **talked about, leading trips to Ecuador in July of**

25 **'04, as well as in June of '04?**

1      A.    Yeah.  And so again, I would say that I
2  don't recall exactly who was leading the trips.  It
3  would be unusual, if we went to Ecuador or Peru, if
4  Dr. Sills didn't lead those trips.
5      **Q.    Okay.  David Sills made it clear to you --**
6  **when he met you on the night he resigned -- was**
7  **confronted and resigned from his position at the**
8  **seminary, he made it clear to you that he knew that**
9  **Jennifer Lyell had reported that there had been non-**
10 **consensual sexual contact between him and her?**
11          MS. RILEY:  Object to form.
12          THE DEPONENT:  He didn't use, "sexual
13 contact."  He just said -- he used the word, like I
14 said, "tawdry," snugging on the couch, long hugs,
15 and that Jennifer was saying that it wasn't
16 consensual.
17 BY MR. ELBERT:
18     **Q.    Was not consensual?**
19     A.    He was -- that's right.  He said that
20 Jennifer was alleging that it was non-consensual.
21     **Q.    Okay.  Did he ever admit to you anything**
22 **beyond cuddling and snuggling on the couch?**
23     A.    No.
24     **Q.    So if, in fact, things had progressed to**
25 **where he was fondling her or there was oral sex to**

1      A.    -- the progression of dates.

2      Q.    If you had known that David Sills' sexual

3   contact with Jennifer Lyell had progressed to the

4   point of oral sex to completion, would you have

5   written the recommendation letter of transfer?

6      A.    No.

7      Q.    So if he had been truthful with you when

8   he met with you, and admitted to that, or had been

9   clear about it, would you have written the letter of

10   transfer?

11      A.    No.

12      Q.    And Jennifer was a congregant of 9th and O

13   in June and July of 2004, a member of the

14   congregation?

15      A.    Again, to the best of my recollection, I

16   can't recall when she actually moved to Chicago.

17      Q.    If the mission trip to Ecuador was in July

18   of 2004, she would've still been a congregant of 9th

19   and O; would you agree with that?

20      A.    Yes.

21      Q.    Okay.  Is there a distinction, in your

22   mind, in publishing between being an editor and

23   being the, quote, publisher of an author?

24      A.    Yes.

25      Q.    If Jennifer was the editor or worked as an