# Exhibit 11



UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION


MICHAEL DAVID SILLS and MARY SILLS,

       Plaintiffs,

v.                    Case No. 3:23-cv-00478

SOUTHERN BAPTIST CONVENTION,

a non-profit corporation; et al.,

       Defendants.


VIDEOTAPED DEPOSITION OF


ELIZABETH DIXON


TAKEN ON

TUESDAY, FEBRUARY 11, 2025

1:47 P.M.


RILEY & JACOBSON, PLC

1600 WEST END AVENUE

NASHVILLE, TENNESSEE 37203





1  would take instruction from Mr. Boto for that

2  project?

3        A.   Yes.

4        Q.   What's another project that you did?

5        A.   I -- I assisted Becky Chandler, who is the

6  administrative assistant for Morris Chapman, on

7  committee on nominations assignments, which is the

8  -- all the board trustees.  And I also for the

9  meetings, whoever needed help with their background

10  material, that document, I would help with that.  I

11  would draft documents for that for review by the

12  vice president.  I just sent in drafts.

13       Q.   In creating the drafts, would you

14  coordinate with other staff members at executive

15  committee?

16       A.   Yes.

17       Q.   And would they send you information or

18  materials that you could use?

19       A.   Yes.

20       Q.   With respect to the -- that Becky Chandler

21  committee on nominations project, were you still

22  taking direction from Mr. Boto?

23       A.   Becky Chandler for that assignment.

24       Q.   Okay.  And she was administrative

25  assistant to, was that Mr. Chapman?

1 | by then.
2 | **Q.   Okay.  Before I give you an exhibit,**
3 | **today, you brought a document to your deposition.**
4 | A.   Yes.
5 | MS. MCNULTY:  I ask the court reporter to
6 | mark that as Exhibit 1.
7 | (WHEREUPON, Exhibit 1 was marked for
8 | identification.)
9 | THE REPORTER:  Exhibit 1 is marked.
10 | BY MS. MCNULTY:
11 | **Q.   Okay.  And what is Exhibit 1?**
12 | A.   That is the newspaper article that I
13 | pulled information from David Sills from.
14 | **Q.   I see.  So when you were -- and we'll get**
15 | **more into this.**
16 | A.   Yes.
17 | **Q.   When you were creating the list, this is**
18 | **the article on which you relied?**
19 | A.   Yes.
20 | MS. MCNULTY:  Okay.  So I'm going to just
21 | set aside Exhibit 1, and we'll go back to that.  I'm
22 | going to mark as Exhibit 2 EC0012455 through 475.
23 | (WHEREUPON, Exhibit 2 was marked for
24 | identification.)
25 | THE DEPONENT:  This is just more?

1      Q.   Pleasantries?

2      A.   Yes.

3      Q.   Okay.  Do you know approximately when that

4   lunch was taking place, even if it's just a season

5   and year?

6      A.   Let's see.  I -- I actually don't

7   remember. It was -- it was in 2002, I believe.

8      Q.   Did you say 2002?

9      A.   I think so.  He -- I don't remember.

10      Q.   Okay.

11      A.   I don't.

12      Q.   Okay.  But are you suggesting it was,

13   like, not a memorable lunch?  It was just co-

14   workers.

15      A.   It was just him meeting me.

16      Q.   Okay.  You had brought to the deposition

17   this article, which is, "Southern Baptist Professor

18   Accused of Sexually Abusing Student By Design Over a

19   Decade."

20   And it looks like -- did you get this from

21   tennessean.com?

22      A.   I believe so.

23      Q.   Okay.  Now, the article that you brought

24   with you today, when did you access this article

25   that was marked as Exhibit 1?

1    A.   That I had in a file.

**2    Q.   Okay.  What file?**

3    A.   It -- it was just a file of people on --

4    on that list.

**5    Q.   I'm sorry.  It was a file of what?**

6    A.   People on the list.  It just was -- it was

7    in a file.

**8    Q.   Now, at some point, did you give that file**

**9    that you've just described, did you give that to**

**10   Guidepost?**

11   A.   I gave -- I gave Guidepost the list.

**12   Q.   But not the file?**

13   A.   Not the file.  It's just news articles.

**14   Q.   Sure.  Okay.  And that's a file that even**

**15   as you sit here today, you maintain.**

16   A.   I have it.  Yes.  It's a box of articles.

**17   Q.   And where do you keep this box?**

18   A.   In my office.

**19   Q.   Okay.  And about how big is the box?**

20   A.   It's just a box of -- little box of

21   articles.  I'm sorry.  I mean, it's not like a tote.

22   I'm sorry.

**23   Q.   It's okay.  So you gesturing helps.**

24   A.   Okay.

**25   Q.   Show me with your arms the dimensions.**

1      A.   I don't know.  It's just a box.

2      **Q.   About two and half feet.  And how tall is**
3 **the box?**

4      A.   Like a tote.  It's just a -- I'm sorry,

5 nobody knows what tote is.  A rubber -- it's just a

6 box like this big probably that just has articles in

7 it.

8      **Q.   Okay.  And for how long have you**
9 **maintained the box?**

10      A.   Since I started in 2006, I believe.

11      **Q.   Okay.  Since you started what in 2006?**

12      A.   In 2006, the -- Augie Boto asked me to

13 begin studying and gathering research on sexual

14 abuse, specifically children.  We had had a motion

15 in 2004 that was ruled out of order.

16           But then at some point, Christa Brown

17 heard -- it's -- Snap Network asked the executive

18 committee to consider some recommendations that they

19 had.  And in 2008, there was a motion at the

20 convention for the executive committee to study it,

21 study the issue, and that's what we did.

22      **Q.   Okay.  Were you present at the convention**
23 **in 2008?**

24      A.   No.

25      **Q.   Okay.  Well, what about in 2006?**

1        Q.    You didn't observe anything missing?

2        A.    No.

3        Q.    Okay.  And the article that has been

4    marked as Exhibit 1, am I to understand that this

5    article, the one that we've actually marked as

6    Exhibit 1, was in that box?

7        A.    It would have been.  Yes.

8        Q.    Is this a copy?  Or is this the actual

9    article that was in that box?

10       A.    That's a copy.

11       Q.    Okay.  So at your home exists the box, and

12   the original of this article that we've marked as

13   Exhibit 1 is in that box?

14       A.    Yes.

15       Q.    Okay.  I'm going to ask that you not do

16   anything with that box --

17       A.    Okay.

18       Q.    -- and that you put it somewhere safe so

19   that we can have access to that box, okay?

20       A.    Okay.

21       Q.    It looks like this article at the top, it

22   has a -- a line

23   www.tennessean.com/story/news/religion/2019/03/12.

24   Do you know the time that you first identified this

25   article online?

1          A.    No.

2          Q.    Do you know the date of when this article

3     was first published?

4          A.    No.

5          Q.    What made you -- strike that.

6                Describe for me how you located this

7     article.

8          A.    I would search for articles.  I would just

9     do a baptist abuse and articles.  I would Google

10    that or I would see it in the Baptist press release.

11    Those are -- or after -- after Augie Boto retired,

12    that's the only way I was sent articles.  Prior to

13    that, it was different.  Mr. Boto would send the

14    articles to me. But that article would have come

15    from a search I did.

16         Q.    And you know that because why?

17         A.    Because nobody else would have sent it to

18    me.

19         Q.    Okay.  So prior to -- so Mr. Boto retired

20    sometime in 2019 or 2020 --

21         A.    I don't know.

22         Q.    Prior to his retirement, Mr. Boto would e-

23    mail articles to you about allegations of abuse; is

24    that right?

25         A.    Yes.

1       Q.   And what would you do with those articles?

2       A.   I -- we'd catalog them.

3       Q.   Would you print them?

4       A.   Sometimes.

5       Q.   Do you have all of the e-mails Mr. Boto

6  sent you with those articles?

7       A.   No.

8       Q.   When --

9       A.   No.  I -- I don't know.

10       Q.   When Mr. Boto would send you articles,

11  would he e-mail them?

12       A.   Yes.

13       Q.   And would he use the e-mail address that

14  you gave us a moment ago?

15       A.   Yes.

16       Q.   Have you always had the same e-mail

17  address?

18       A.   Yes.

19       Q.   Sometimes you would print the articles,

20  sometimes you wouldn't; is that right?

21       A.   Right.

22       Q.   What would be the deciding factor as to

23  whether you would print an article or not?

24       A.   There would be no deciding factor.

25  Generally, I would print them, if not, I would just

1      Q.   How much time -- you said you started the
2  project in 2006, was it?
3      A.   Yes.
4      Q.   From 2006 forward -- and do you still do
5  that today?  You still maintain --
6      A.   No.
7      Q.   When's the last time you maintained the
8  list either by hand or by computer?
9      A.   2002.  I -- when I print the -- printed
10 the list to send to Amy, I made some marks on it,
11 but that would have been -- then I updated the list.
12 So they got the final list.
13     Q.   So a moment ago --
14     A.   I'm sorry.
15     Q.   I think you just said 2002.
16     A.   Okay.
17     Q.   Did you mean 2022?
18     A.   Oh, yes.  I'm so sorry.  I'm sorry.
19     Q.   That's okay.  That's all right.  So you
20 started in --
21     A.   I'm sorry.
22     Q.   You started in 2006.
23     A.   Yes.
24     Q.   And you ended in 2022.
25     A.   Yes.

1        Q.    Would that have been about February of

2   2022?

3        A.    Yes.

4        Q.    Okay.  From 2006 until the time of Boto's

5   retirement, how many hours a week would you spend on

6   the list?

7        A.    It was not a weekly thing.  I mean,

8   sometimes it would be once a month that I might

9   revisit the list. Sometimes it might be once a week.

10  Sometimes it -- there was no regular -- regular

11  timing of that.

12       Q.    With what frequency did Mr. Boto e-mail

13  you articles?

14       A.    Not that frequently.  In 2018, 2019, I got

15  more articles because Houston Chronicle came out

16  with their -- with their list.  So I compared those

17  documents, but --

18       Q.    Did Mr. Boto e-mail you -- I think we

19  covered it, but did Mr. Boto e-mail you the article

20  that's marked as Exhibit 1?

21       A.    No.

22       Q.    That was only found because of a Google

23  search you did?

24       A.    Yes.

25       Q.    The computer that you used, was that a

1  computer given to you by the executive committee for

2  your work, for your professional use?

3       A.   Yes.

4       Q.   And did you submit invoices for those

5  searches or the compilation of those articles?

6       A.   It would have been included on just a

7  general invoice.

8       Q.   You were paid for the work in other words?

9       A.   Right.

10      Q.   Yeah.  You don't know when you first

11  located this article about David Sills that we

12  marked as Exhibit 1.  You don't know when that was?

13      A.   No.  I would imagine it was the date on

14  that article.  It would have been then or after that

15  time.

16      Q.   The 3-12/2019?

17      A.   Yes.

18      Q.   Do you think it was then?

19      A.   I think so.

20      Q.   After you printed this article, did you

21  share it with anyone?

22      A.   The Department of Justice.

23      Q.   Okay.  Did you click on any of the links,

24  the hyperlinks that are in the article?

25      A.   It's a possibility.

1      Q.    Would you have printed those?

2      A.    Doubtful.

3      Q.    When you clicked on the links, the

4    hyperlinks in the article, did you notice anything

5    about the articles in the hyperlink versus the

6    article that's marked as Exhibit 1?  Was there any

7    disparity?

8      A.    Regarding that particular one?  I have no

9    idea.

10     Q.    Did you -- with respect to David Sills,

11   did you ever see or hear of an admission that he

12   made?

13     A.    No.

14     Q.    With respect to David Sills, did you ever

15   see or hear of a confession that he made?

16     A.    No.

17     Q.    With respect to David Sills, did you ever

18   see or hear of a guilty plea concerning David Sills?

19     A.    No.

20     Q.    With respect to David Sills, did you ever

21   see or hear about a conviction for any sexual

22   misconduct or abuse?

23     A.    No.

24     Q.    With respect to David Sills, did you ever

25   see or hear of a judgment concerning sexual abuse or

1  sexual misconduct by David Sills?

2      A.   No.

3      Q.   With respect to David Sills, did you ever

4  see or hear of him being included on a sex offender

5  registry?

6      A.   No.

7      Q.   Did you research or attempt to locate any

8  of those things?

9      A.   No.

10      Q.   Was there a reason that you didn't attempt

11  to locate those things?

12      A.   I only got articles and recorded them.

13      Q.   I'm going to ask you, did you read the

14  entire Houston Chronicle report concerning sex abuse

15  allegations in the Baptist Church?

16      A.   The Houston Chronicle one?

17      Q.   Yeah.

18      A.   I don't know that I read the whole thing.

19          MS. MCNULTY:  I'm sorry for these giant

20  exhibits.  There was a problem printing and this was

21  the size paper that it ended on.  The great news is

22  that they are easier to read.  This will be Exhibit

23  4.

24          (WHEREUPON, Exhibit 4 was marked for

25  identification.)

1       Q.    What was your assignment?

2       A.    To record publicly published articles,

3   just to add those to the list I was keeping.

4       Q.    Okay.  And what we've marked as Exhibit 1

5   is an article.  The article is essentially two

6   pages.  I can't tell how many words it is.  And it

7   has a photo of David Sills; is that right?

8       A.    Yes.

9       Q.    Okay.  Did you copy and paste the photo of

10  David Sills from this article that we know as

11  Exhibit 1 into your list?

12      A.    Yes.

13      Q.    Why?

14      A.    I just did.

15      Q.    Did somebody tell you to get photos of

16  people?

17      A.    No.

18      Q.    I think I know your answer, but I'm going

19  to ask you the question just for completeness of the

20  record.  What are all of the sources of information

21  you consulted before putting David Sills on your

22  list?

23      A.    I Googled.

24      Q.    And got this article?

25      A.    And got this article.  Yes.

1  work product made it highly confidential?

2      A.   Because I have questions to myself all the

3  way through here.  It was just not -- it's not --

4  it's not a finished product.

5      Q.   And when you say you had questions to

6  yourself, meaning, are you literally typing

7  questions --

8      A.   Yes.

9      Q.   -- to yourself in the document?

10     A.   Yes.

11     Q.   Okay.  The next line says, "Released to

12 Guidepost Solutions, Sunny Lee, 2/28/2022." Do you

13 see that?

14     A.   Yes.

15     Q.   Did you type that in?

16     A.   Yes.

17     Q.   Okay.  Why did you type that in?

18     A.   I had interviewed with Guidepost.

19 Guidepost asked for it.  I said I needed to get

20 permission to release it.  I asked Amy Thompson.

21 She apparently asked Willie McLaurin, and he said,

22 yes, to turn it over.  So I -- I gave it -- I e-

23 mailed it to Amy.  And then I don't know what

24 happened, where it went.

25     Q.   Did you tell Sunny Lee -- was she one of

1   your best friends?

2       A.   Yes.

3       Q.   Okay.  Did you tell Sunny Lee that you

4   considered this highly confidential and that you

5   were still asking yourself questions in the list?

6       A.   I -- I felt like I made it clear that it

7   was just my working document.

8       Q.   Okay.  The next line says, "This is a

9   fluid working document,"

10      A.   I don't know what else to say.

11      Q.   "Produced by redaction, which is not to be

12  published." Did you type that statement?

13      A.   I did because I did not want it to be.

14      Q.   Did you put "not" in all caps?

15      A.   Yes, I did.

16      Q.   Did you make the redaction?

17      A.   No.

18      Q.   Okay.  Whose name is there?  Who's under

19  that redaction?

20      A.   My name.

21      Q.   Okay.  And then you go on to say -- well,

22  let me ask.  Did you type the next paragraph and the

23  third --

24      A.   Yes.

25      Q.   -- paragraph?

1       A.    They were just -- in 2009, I -- I would

2   print off more information.  I don't know that I

3   went through each article.  They -- they were just

4   listed.

5       Q.    So in the description, it says he is a

6   registered sex offender.  Do you see that?

7       A.    Yes.

8       Q.    What would have been your source of

9   information for that?

10      A.    I went to the -- well, either -- I don't

11  know.  It was either in an article or I went to the

12  registration.  I don't know.

13      Q.    Sometimes you would personally search a

14  sex offender registry?

15      A.    In -- in the initial investigation, yes.

16      Q.    Okay.  Then the next one, the name is

17  redacted.  The full name of the abuser is redacted.

18  It says 2018.  And then you give a description.  "On

19  July 19, 2018, redaction, youth minister, redaction,

20  was charged with two counts of third degree criminal

21  sexual assault with a minor, and three counts of

22  second degree assault and battery." Do you see that?

23      A.    Yes.

24      Q.    Did you make the redactions?

25      A.    No.

1  published, first off, did you have notice that that

2  was going to happen?

3       A.   About a minute.

4       Q.   And did you -- who told you?

5       A.   I heard it -- I was listening to the

6  executive committee meeting.

7       Q.   And were you listening in the same room --

8       A.   No.  No.

9       Q.   -- where it was happening?

10      A.   No.

11      Q.   Okay.  Did you tell anyone that the list

12  was not in condition to be published publicly?

13      A.   That is what I assumed this would do.

14      Q.   Okay.  And the witness pointing to the

15  title up at the top.

16      A.   Yes.

17      Q.   Okay.  But at the moment you hear it's

18  going public, did you remind people that's not

19  really what that list is for, I wasn't expecting to

20  publicly publish it?  Did you say that?

21           MS. CALLAS:  Object to the form.

22           THE DEPONENT:  Yes.

23  BY MS. MCNULTY:

24      Q.   And who did you say that to?

25      A.   Amy Thompson.

1          Q.    And what did Amy say in response?

2          A.    She would tell Gene Besen.

3          Q.    And do you know if she did?

4          A.    I don't know.

5          Q.    As you sit here today, with respect to

6    David Sills, knowing that Exhibit 1 constitutes the

7    extent of your research concerning David Sills, can

8    you, as you sit here today, say one way or the other

9    whether he is a sexual abuser?

10              MS. ARBONEAUX:  Object to form.

11              THE DEPONENT:  I can't say anyone on this

12   list is because I have -- I cannot do that.

13   BY MS. MCNULTY:

14         Q.    Okay.  And just for today, I'm only

15   concerned about David Sills.  As you sit here today,

16   can you say one way or the other --

17         A.    No.

18         Q.    -- that David Sills is a sexual abuser?

19         A.    No.

20         Q.    Did you ever review -- and I know I asked

21   you about writings by Jennifer Lyell, but

22   specifically, did you ever review any writings

23   between Jennifer Lyell and Pastor Slade?

24         A.    No.

25         Q.    Have you ever spoken with or met Pastor

1  were on the list.  He -- let's see.  Let me go back.

2  He just wanted to know if I could put together a

3  list of incidences, which we had.

4      Q.   Okay.  When is the -- when is -- when is

5  the last time you saw this e-mail?

6      A.   I don't know.

7      Q.   All right.  So it appears that you're

8  talking about that you have three different lists,

9  and you're going to try to merge the list.  And then

10  you go on to talk about so many of the articles just

11  state someone has been arrested, and it doesn't tell

12  if the person was convicted and sentenced since this

13  often happens years later.

14          And you go on to give an example.  And you

15  say, "A simple list makes it easy for someone to

16  check for someone.  We could do it like this to give

17  a brief description instead of running the full

18  article." Did you then create what is, like, the

19  template really for your list?  Is that what I'm

20  seeing?

21      A.   That was just --

22      Q.   It has Brian Birchfield example?

23      A.   It was an example that he -- he -- I was

24  just throwing it out there.

25      Q.   Okay.  Going back up where you say, "I'm

1       Q.   Okay.  Have you previously seen the

2   document that we marked as Exhibit 8?

3       A.   I did.

4       Q.   When is the first time you saw the

5   document we marked as Exhibit 8?

6       A.   It would have been October of '23.

7       Q.   In what context were you shown this

8   document?

9       A.   Department of Justice interview.

10      Q.   Was that the first time you had seen this

11  document?

12      A.   Yes.

13      Q.   Do you have an independent recollection of

14  your interview with Sunny Lee and Samantha

15  Kilpatrick?

16      A.   I -- yes.

17      Q.   Other than in your interview, or I should

18  say, since the time of your interview, have you had

19  any reason to communicate with Sunny Lee or Samantha

20  Kilpatrick?

21      A.   Sunny Lee, following my interview,

22  followed up with me and asked if I had any -- any

23  things I wished to add to that interview.  And she

24  asked for the list.

25      Q.   Did she ask you for the list in the -- in

1          MS. CALLAS:  Object to the form.

2          THE DEPONENT:  I don't even know.  I don't

3   remember.

4      Q.   When you would raise a query like that,

5   would they respond?

6      A.   Who are you --

7      Q.   Would Sunny and Samantha respond during

8   the interview?

9      A.   It was a discussion.  Yes.

10     Q.   We're now on Page 831.  Okay.  And in

11  Section G, it says, "What were you tasked to do?"

12  And you describe the Google searches, and those are

13  the Google searches that you described earlier in

14  your testimony here, right?

15     A.   Yes.

16     Q.   And then it goes on and there's one, two,

17  three, four.  And at four, it says, "Elizabeth

18  remembers this being the time of concern that EC

19  gets it right.  Elizabeth would look at press

20  releases of SB incidents and see that there were no

21  updates on what actually happened to resolve the

22  case.  But Elizabeth/EC could not investigate."  Do

23  you see that?

24     A.   Yes.

25     Q.   What is being reported here?  What were

 1              THE DEPONENT:  Oh, I'm sorry.  You throw

 2  me off.  Yes, there would have to be funding for

 3  anyone to do a database.

 4  BY MS. MCNULTY:

 5      Q.   And -- but your point was that -- I mean,

 6  you had a database.

 7      A.   I had a list.

 8      Q.   But you did not consider it a database?

 9      A.   No.

10      Q.   You did not consider your database to be

11  the most accurate or reliable database to send out

12  publicly, correct?

13              MS. CALLAS:  Object to the form.

14              THE DEPONENT:  Correct.

15  BY MS. MCNULTY:

16      Q.   Okay.  Just a couple more questions.

17  We're almost done here.  Do you know Charlie Hott,

18  H-O-T-T?

19      A.   No.

20      Q.   Did -- in your interview, did Guidepost

21  ask you about Charlie Hott?

22      A.   Not that I remember.

23      Q.   Okay.  There is a document that's produced

24  by Guidepost updated on February 17, 2022, and it

25  has -- it says, "Date 1982, Charlie Hott met Boto