# Exhibit 14

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSE

NASHVILLE DIVISION

MICHAEL DAVID SILLS and MARY SILLS,

    Plaintiffs,

vs.                  3:23-cv-00478
                    Judge William L. Campbell, Jr.

SOUTHERN BAPTIST CONVENTION,
a non-profit corporation; et al,

    Defendants.

DEPOSITION OF ROBERT J. FISHER

THURSDAY, AUGUST 14, 2025

10:09 AM

VIA ZOOM

Shawna H. Meeks

Certified Court Reporter

and Notary Public

Robert Fisher
3:23-cv-00478

Page 33

1  accusations, who knows about it.  So the reputation is
2  still damaged.  You still have to proactively go forward
3  and communicate it to the public.
4     It's like the trial with Donald Trump against
5  something.  You don't really have to do anything because
6  it's national news and the minute he walks out of court,
7  everyone in the world knows about it.  So he's vindicated.
8      But in the case of someone like Dr. Sills, who isn't a
9  public figure and is not known to anyone outside of maybe
10 the Baptist community that wouldn't be the case.  So he
11 would still need a program.
12     BY MR. ANDERSON:
13    Q.  So you -- you say Dr. Sills is not a public
14 figure known outside the Baptist community, but you would
15 need a program to target the general public?
16    A.  Well, you'd need a program to target all the
17 audiences that we -- not only general public.  For
18 instance, I think he's known in 40 different countries.
19 He's certainly traveled around the world and, you know,
20 gave lectures and consulted and preached or whatever,
21 yeah.  I mean it's -- you know, he made a lot of -- his --
22 a lot of money or a lot of his attention or a lot of --
23 going around the world, he wasn't just confined to -- to
24 the south or something like that.  So yes.  You would have

Meeks Reporting, LLC
(304) 342-4758

1    Q.   You have not -- and if there's no way to do so,
2  tell me, but have you done any analysis, or is it even
3  possible to do an analysis, to determine the extent to
4  separate each communication out or communications and
5  determine the extent of reputational harm attributable to
6  each?
7    A.   Well, I think this is a case of the whole is
8  equal to the sum of its parts kind of thing and -- but to
9  answer your question more specifically, did I take each
10  tweet that Barber made or each email that Lyell sent or
11  each -- I mean did I break those down individually -- the
12  Baptist Press -- did I break all these down as to the
13  degree of harm each one caused?  No.
14    Q.   What is your understanding as to when public
15  allegations of sexual abuse began to be made against David
16  Sills?
17    A.   Well, the first time Lyell called Geiger.  I mean
18  you know, she decided in 2019, 2018, you know -- 2019, she
19  heard that maybe Sills was back to preaching or counseling
20  people and didn't want to see the same thing happen again,
21  so she -- you know, she decided to go forward.  She wanted
22  to write -- write a statement or an article for the
23  Baptist Press.  So that's where it started.  I would say
24  that's the first time that there was a proactive move to -

1  - for her to bring -- I mean she was the person that
2  originated all of this.  That was the first time. I guess
3  the first time she whispered in Geiger's ear prior to him
4  notifying Mohler.  I would believe that was the first time
5  the sexual abuse came forward.
6     Q.   Are you aware or do you have any knowledge that
7  in March of 2019, Jennifer Lyell created a website about,
8  you know -- I think it was called Lyell's statement on
9  abuse and made posts or, you know, wrote on there
10 allegations of sexual abuse?  Are you aware of that?
11    A.   I'm aware that she had -- she did put her own
12 statement up on a website, but I don't know the time -- I
13 don't remember the timing of it, but I know that she did
14 do that.  She wanted to get her own words out there for
15 the people to see and I think she called it
16 www.JenniferLyellabuse or something.  I can't remember.  I
17 know that she had one.
18    Q.   Do you know that there were news articles -- are
19 you aware if there were news articles that were written
20 around that same time referencing her allegations of abuse
21 against David Sills, and, for example, I've seen one from
22 the Tennessean and Louisville or Courier Journal.  I think
23 -- it's in the record in this case.  Have you seen any of
24 those?

1    A.   I haven't actually seen the articles, but I was,
2  you know, in my research -- not research, but in the
3  information that was provided to me. I can't remember the
4  exact -- which it was, but I do believe -- yes. I do
5  believe I was aware that there -- that a couple of
6  publications had -- I don't know what was in them. I
7  never saw the articles, but I do seem to remember that
8  someone picked it up.
9    Q.   We discussed just a moment ago about, you know,
10  how you didn't or, you know, you had not broke out, like,
11  separate communication or tweet or email the, you know,
12  alleged reputational harm from each. And so along those
13  lines, is when you're speaking of a reputational repair
14  program, there would be no way within that program, or at
15  least you don't, or there's no way to differentiate
16  between reputational harm occurring to Dr. Sills, for
17  example, prior to 2022 versus after; is that correct?
18    A.   That would be -- I'm sorry to interrupt you.
19  There would be no need to. You know, the train has left
20  the station, the horse is out of the barn. You know, --
21  the ship has left. You know the bottom line at that point
22  in time that you would do a program, it wouldn't matter
23  timetable or whether the Baptist article was more hurtful
24  than a report or whether the tweet by -- by Barber was

1  worse than the email by Lyell.  At that point you're
2  dealing -- you know, as I say, it -- it doesn't matter.
3  You're dealing with reputational harm already exists and
4  it doesn't matter where it came from so much.  You have to
5  deal with the problem, you know, and -- which is a
6  reputation harm.  So who caused it, when they caused it,
7  at that point, is not germane.
8     Q.   By 2022, I think you used the term the train had
9  left the station in terms of reputational harm; is that
10 fair?
11    A.   Well, I think the reputational -- yeah.  I mean
12 you have different levels of reputation harm.  I mean when
13 -- when Lyell went to Geiger who went to Mohler and Mohler
14 called him in to his office and then he resigned or
15 something, no one knew about her allegations or pretty
16 much except the hierarchy of the SBC family.  I mean it
17 was not even the general.  It was just a few people that
18 were aware of what -- what went on.  but I mean then you
19 -- then it gradually grew as she -- like when she puts up
20 a website or -- especially with the Baptist Press article,
21 then -- and then, of course -- in other words, it was a
22 gradual snowball effect or domino effect, you know, after
23 that.  I mean if it had been confined to just the Mohler
24 meeting with Dr. Sills, if it had just been confined to

1  that, with just a few people in the hierarchy knew about
2  it and it never went beyond that.  I mean he resigned and
3  he went his own way and all people heard of was Dr. Sills
4  resigned his post and he's gone, and that was the extent
5  of it.
6    That's why when she came forward in 2019, that's where
7  they -- you know, I mean it just -- the bottom line is, it
8  could have been contained.  That only maybe 12 people knew
9  about it.  But then it was a progressive thing as each
10 new form of communications came out, it just escalated to
11 the point where, eventually, after the GP report --
12 Guidepost report, eventually AP picked it up and, you
13 know, I mean all of the sudden, everyone knew about it.
14             MR. ANDERSON:  Shannon, we've been going
15 slightly under an hour.  Let's take a five to ten minute
16 break.  Since 'm the questioner and I need to go to the
17 restroom, I guess I get that right.
18             MS. MCNULTY:  Sure.  We'll take a Zoom five
19 minute break.
20             THE WITNESS:  You got to raise your hand if
21 you want to go to the restroom.
22             MS. MCNULTY:  Jon, I think you coined it as
23 a Zoom five or something earlier.
24             MR. ANDERSON:  Or attorney five, which five

1  get up and have another forum, another communications
2  forum by which he can, you know, get his own views out
3  there.
4     Q.   You mentioned he was a prolific writer.  What's
5  your understanding of how prolific he was?
6     A.   Well, I read he wrote nine books.  I considered,
7  you know, someone that's authored nine books -- it's not a
8  guy wrote one book and that was it, you know.  You know,
9  he -- I would say anybody that authored nine books is a
10 prolific write.  Let's put it that way.  In my mind.
11    Q.   From a public relations standpoint, is it
12 important at times to -- strike that.
13    Can counter messaging in public relations be a form of
14 mitigation?
15    A.   I'm sorry.  Is a form of what?
16    Q.   Mitigation.  Mitigating the reputational harm.
17    A.   I'm sorry.
18    Q.   Let me give you an example.  You got Person A and
19 Person B.  Person A says -- says something happened.
20 Person B denies it.  Would -- can Person B counter
21 messaging and kind of getting -- trying to get a head of
22 it, mitigate some of his reputational harm?
23    A.   Well, unquestionably yes.  I mean you have a
24 perfect example of Ms. Lyell putting up a website or

1  you know, it goes back to the Me Too movement in 2017,
2  which kind of, you know brought people out of the woodwork
3  and saying with the Weinstein and even Cosby and things
4  like that. It's -- it requires more effort, more time,
5  more effort, more diversity of actions, longer term
6  actions to overcome that kind of a negative stain on your
7  reputation.
8     Q.   You mentioned the nature of the allegations or
9  sexual abuse as a factor. Any other factors or
10 information as it pertains to David Sills that you relied
11 up in concluding or opining that this full time
12 professional is needed?
13    A.   Well, that and the -- the fallout of it. You
14 know, the bottom line is is that -- I mean this is a man
15 that was an international lecturer, was a book writer, had
16 been a professor for 18, 20 years. I can't remember
17 exactly how many. I mean he had a full plate and he
18 belonged to -- he volunteered for a lot of organizations.
19 He did a lot of, you know -- not charity work, but a lot
20 of, you know, nonprofit work and all that. And all of
21 that was ripped out from under him because of this. So it
22 wasn't that, you know, one domino fell, he had a lot of
23 dominoes falling, so he has to build those back up, you
24 know. I mean it's not like somebody broke a window in the

1  defendants?  I didn't have any additional ones.  I know I
2  said I might look through my notes, so Shannon --
3              MS. MCNULTY:  Yes.  I have some follow up,
4  if we can just take a two minute break.  Not even.  I just
5  need to use the restroom.
6              MR. ANDERSON:  Sure.
7              VIDEOGRAPHER:  This concludes Part 8.  The
8  time is 6:00 p.m.
9              (WHEREUPON, A BRIEF RECESS WAS TAKEN.)
10             VIDEOGRAPHER:  This is the beginning of Part
11 9.  The time is 6:07 p.m.
12                  E X A M I N A T I O N
13    BY MS. MCNULTY:
14    Q.   Okay.  Mr. Fisher, you were asked some questions
15 a moment ago by Guidepost's attorney as to whether or not
16 you were aware of any statements of denial concerning the
17 abuse allegations made by Jennifer Lyell.  And you agree
18 with me that David Sills' deposition testimony made clear
19 that he denied any abuse of Ms. Lyell; is that right?
20    A.   Yes.  When -- when Ms. Klein was -- was
21 questioning me, you know, she kept talking about public
22 statements that Ms. Lyell had made.  Then she asked me if
23 I was aware of any -- what I understood to be public
24 statements.  Yes.  I saw in his -- he definitely in his

1 deposition denied, you know, many times throughout his
2 deposition Ms. Lyell's allegations, but I didn't consider
3 the -- I was taking it in the context of a public
4 statement and a deposition isn't a public statement. He
5 also denied -- denied it basically when he met with
6 Mohler, as well.
7     Q.  Okay.
8     A.  But again, that's not a public statement. That's
9 a private meeting and the deposition is not a public -- so
10 I answered the question in the context did he come out
11 and, you know, put out a statement or did he send an email
12 to everybody or did he make any kind of a public
13 declaration, and he didn't deny it through a public
14 declaration, but he did in private. You know, in his
15 testimony and in a private meeting.
16     Q.  And you're not aware, as you sit here today,
17 you're not aware that -- of any conversations that Dr.
18 Sills had with any pastor who may have been advising him
19 on the heels of these allegations; is that true, you're
20 not aware?
21     A.  No. In -- in all of the discovery that I saw,
22 the only pastor I was ever referenced he talked to was --
23 was Cook.
24     Q.  Okay.