# Exhibit 15

1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF TENNESSEE

3                    NASHVILLE DIVISION

4    MICHAEL DAVID SILLS and MARY    )

     SILLS,                          )

5                                    )

                                     )

6                                    )

                   Plaintiffs,       )

7                                    )

     vs.                             ) No. 3:23-cv-00478

8                                    )

                                     )

9    SOUTHERN BAPTIST CONVENTION, a  )

     nonprofit corporation, et al.,  )

10                                   )

                                     )

11                                   )

                                     )

12                                   )

                   Defendants.       )

13

14

15

16

17         VIDEOTAPED DEPOSITION OF DR. ERIC GEIGER

18                   Irvine, California

19               Wednesday, October 30, 2024

20

21

22

23   Reported by:

     Heather Ayers

24   CSR No. 11871

25   Job No. MDLG6982715

Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 2 of 23 PageID #: 14007

1    Featherstone?

2        A    I do not.  I -- I'm -- clearly, I -- I would have

3    said it was 2016 when I started working with Jennifer, and

4    she says '17.  So a lot of this -- a lot of the time

5    frames are blurred in my mind.  I do not remember when I

6    was aware of the resource.

7        Q    So kind of to simplify things, did you know

8    David Sills or know of David Sills prior to May of 2018?

9        A    I knew --

10           MS. MCNULTY:  Objection.  Form.  Compound.

11           Go ahead.

12           THE WITNESS:  I knew of -- of David Sills because

13    of his resource and because he -- the resource was

14    recommended via David Platt, who was an author that we

15    worked with and -- and had respect for.

16    BY MS. CALLAS:

17        Q    So let's -- let's talk about May of 2018.

18           Do you recall having a conversation with Jennifer

19    Lyell in May of 2018 that related to David Sills?

20        A    I do.

21        Q    And tell us what you recall of that conversation.

22        A    She stopped by my office, and I remember I was

23    eating pistachios.  It's in -- it's like I would snack on

24    them and, like, just printed in my mind.  It was a very

25    painful conversation.  Jennifer shared that she had been

Case 3:23-cv-00478    Document 411-11    Filed 11/03/25    Page 3 of 23 PageID #: 14008

1  sharing with her therapist and -- that she had been

2  sexually abused by David Sills who was employed at

3  Southern Seminary.  I think the conversation was probably

4  an hour, maybe longer.  I listened a lot and then asked

5  some questions to try to understand what she was accusing

6  him of.

7       Q    Tell me, if you know, what prompted her to come

8  to your office that day.

9       A    I would be speculating.

10      Q    We don't want you to do that.

11      A    Okay.

12      Q    Do you remember, was it in the morning or the

13 afternoon?

14      A    It was in the morning.

15      Q    Was there any other meetings scheduled that day?

16 Did you have to change your schedule?

17      A    I had -- I had an executive leadership team

18 meeting that day.  And I -- after the meeting with

19 Jennifer, I walked into the executive leadership team

20 meeting and shared.  And so everything that I did

21 subsequent in the next several days was with full

22 visibility from the executive leadership team of Lifeway,

23 and no decision I made was an isolation without the

24 executive leadership team of Lifeway knowing and

25 supporting all actions that I took.

Case 3:23-cv-00478    Document 411-11    Filed 11/03/25    Page 4 of 23 PageID #: 14009

1    were just trying a lot of different things.  And so we

2    were all stopping by each other's offices frequently.  So

3    her stopping by my office wasn't strange.

4          She asked me a question if I had seen -- this was

5    a time when there was other abuse coming forward in the

6    SBC, and she had asked me if I was aware of I believe it

7    was a woman named Megan Leavey and Southeastern Seminary.

8    And I was aware.  And I said something on -- "I don't know

9    much about it, but it sounds horrific and tragic."  And

10   she said "Well, I have" -- "I have something very similar,

11   and I want to share with you."

12         And then she shared a general overview of the

13   relationship with David and the abuse and the alleged

14   assault that began the -- and then I -- so I listened, and

15   then I -- I asked a lot of questions trying to understand,

16   so that I could better understand what I would need to do

17   and how to best care for Jennifer.

18   BY MS. CALLAS:

19        Q    She came into your office.

20             Did she shut the door?  I mean --

21        A    Yes.

22        Q    -- was there privacy?

23        A    We had windows.  I mean, it would -- it would be

24   similar to -- sorry.  It would be similar to this where

25   there -- there is glass.  And so -- but it was a sliding

1    door, but it was -- it was closed.

2         Q    And did she sit down in your office?

3         A    She sat down.

4         Q    Okay.  Tell me if you -- what you recall her

5    saying to you.  This was a long conversation, but tell me

6    the details you recall today in that conversation.

7         A    While she was a student at Southern Seminary,

8    they were on a global trip, and in a hotel room, he,

9    against a window, assaulted her.  I asked a couple of

10   questions but also did not want to -- this is the first

11   time someone's shared that with me.  And I wanted to be

12   sensitive to her but also wanted to understand so that I

13   could -- I realized at this point that I was in a place

14   where I was going to have to do some follow-up.  And I

15   wanted to understand what exactly the allegation was.

16            And so I remember asking, "When you say that he

17   assaulted you, what" -- "what's the nature of the

18   assault?"  And she described him forcing himself on her

19   and groping her and forcing himself in a way trying to

20   kiss her.

21            And then she described, on the airplane home, how

22   he put a blanket over them and -- and touched her and --

23   inappropriately, violated her that way.

24            And then the language he used, according to

25   Jennifer, which then I later -- later found out was used

Case 3:23-cv-00478    Document 411-11    Filed 11/03/25    Page 6 of 23 PageID #: 14011

1    similarly with Dr. Mohler and Dr. Stinson and

2    Dr. Greenway, was, "Just be part of our family.  I'm

3    trying to heal something in you.  There's something in you

4    that's causing me to do this to you.  And if you would

5    just be a part of our family, then every" -- "then" --

6    "then this would be good.  You" -- "you just need a

7    family."

8              And Jennifer longed for a family, and her story

9    was, I -- I know -- I know one brother was in jail.  I

10   know that -- a horrible relationship with the father.  I

11   know that when she became a Christian, it was a big deal

12   in the whole town because she was from -- from the wrong

13   side of the tracks and, you know, a -- a -- a young woman

14   who was very troubled.  She lived in her car.

15             MS. MCNULTY:  Wait.  Ob- -- objection.  This is

16   all nonresponsive.  And it's hearsay and double hearsay.

17   I'm moving to strike.

18             I would request that the court reporter please

19   read the pending question, and that the witness be

20   instructed to only answer the pending question.

21             MS. CALLAS:  Shannon --

22             MS. MCNULTY:  I would also note --

23             MS. CALLAS:  Okay.

24             MS. MCNULTY:  -- on the record that we're not

25   going to be able to satisfy counsel's request that the

Golkow Technologies,
A Veritext Division
877-370-3377                                              www.veritext.com
Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 7 of 23 PageID #: 14012

1    deposition only go seven hours.

2             Mr. Barze, there's no way it can go seven hours

3    at this pace.

4             MR. BARZE:  Just for the record, it's not my

5    request.  That's the federal rules.

6             MS. MCNULTY:  Oh, no.  I'm sorry.  I saw an email

7    that it's your request, and I know you haven't been part

8    of the meet and confers or anything that the magistrate

9    judge has said, but that -- that may be the rules.

10   However, it is not a -- a firm rule in this litigation.

11   But, like, we cannot have rambling answers with hearsay

12   and double hearsay taking up the record for -- for the

13   day.

14            So I -- I'm just going to make that objection now

15   and revisit it, and I'm happy to call the Court if we need

16   to get any direction or clarification.  Thank you.

17            MS. CALLAS:  All right.  Well, we will move more

18   quickly if we have fewer speaking objections, Shannon.

19   Your -- your statement is noted.  It's on the record, and

20   we'll proceed.

21   BY MS. CALLAS:

22       Q    So, Dr. Geiger, I asked for detail about what

23   Jennifer reported to you on the day that she came to your

24   office.

25            You stated that you asked her some questions

1    about her description of an assault; is -- is that

2    correct?

3        A    That is correct.

4        Q    And was your question to her, "Provide me some

5    detail" -- "factual details about" --

6            MS. MCNULTY:  Objection.  Leading.

7            MR. BARZE:  You can answer.

8    BY MS. CALLAS:

9        Q    You can answer.

10       A    I don't remember the wording of the question.

11   But I -- I asked several questions to ascertain from her

12   more details.

13       Q    And you -- you were asking for details about what

14   exactly happened?

15       A    Because the word "assault" is a big word.  I was

16   trying to understand what the nature of that contact was

17   for it to be called assault.

18       Q    And she did describe to you the contact that

19   occurred?

20       A    She described what I have been taught is assault.

21       Q    And could you -- I -- I know it's not a

22   comfortable topic.

23       A    Forcibly placing himself on her, groping her,

24   touching her on an airplane in her private parts, forcibly

25   trying to kiss her, restraining her when she wanted to

Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 9 of 23 PageID #: 14014

1    move away.  That's what was described to me.

2       Q    While you were talking to Jennifer in your

3    office, was she emotional or showing to you emotion?

4       A    In and out.

5            MS. MCNULTY:  Objection.  Leading.

6    BY MS. CALLAS:

7       Q    Okay.

8       A    The emotion would vary throughout our

9    conversation.

10      Q    Did Jennifer cry?

11      A    I remember her crying.

12      Q    Did you, at any point, feel emotional?

13      A    Absolutely.

14      Q    Did you cry during that meeting?

15      A    Absolutely.

16      Q    At the time Jennifer was making this report to

17   you, did you find her to be credible?

18      A    I believed her to be credible in all of my

19   dealings with her for two years.

20           MS. MCNULTY:  Objection.  Move to strike.

21   Nonresponsive.

22           MR. BARZE:  You can answer.

23           THE WITNESS:  She was credible.  My perception of

24   Jennifer in our entire relationship was that she always

25   told the truth.  Even when things were difficult at times

Golkow Technologies,
A Veritext Division
877-370-3377                                                   www.veritext.com
Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 10 of 23 PageID #:
14015

1    and -- or even when there wasn't good news, she told the

2    truth in our business dealings.  I believe that she was

3    telling the truth here.  And the reason I believed that

4    she was telling the truth is because we both knew that

5    this moment was going to radically impact what was really

6    clear to everybody was the most important thing in her

7    life, which was her career.

8    BY MS. CALLAS:

9        Q    You left the meeting with Jennifer.

10            Did you have any instruction to her or was there

11   a- -- anything she needed to do after this meeting?

12       A    I told her, "I'm responsible to report this.  I'm

13   going to talk to Dr. Rainer about how to best get in touch

14   with Dr. Mohler.  I would like you to be available for us

15   to" -- "to talk to Dr. Mohler together."

16       Q    You testified earlier this was the first time

17   you'd ever had a person come to you with a report of this

18   nature; is that right?

19       A    The first time that I have had a report that

20   included assault.

21       Q    When you received this report from -- from

22   Jennifer, were you thinking in terms of you're her

23   employer and she's your employee?  Is that how you were

24   approaching this report?

25       A    I remember thinking so many different layers, but

Golkow Technologies,
A Veritext Division
877-370-3377                                                    www.veritext.com
Case 3:23-cv-00478    Document 411-11    Filed 11/03/25    Page 11 of 23 PageID #:
14016

1    I don't believe that that was the most important layer.  I

2    think the most important layer I was thinking is, This is

3    a woman who's said that she's been assaulted by a -- a

4    super- -- someone in a supervisory or educational

5    supervisory role at a seminary.  What am I -- what is the

6    ethical thing that I am to do, and how am I to care for

7    this person.

8                MS. MCNULTY:  Objection.  Assumes facts not in

9    evidence.  Moving to strike.

10               Go ahead.

11   BY MS. CALLAS:

12        Q    You went to the leadership team next; is that

13   correct?

14        A    I did.

15        Q    And you reported what you had been told by

16   Jennifer; is that correct?

17               MS. MCNULTY:  Objection.  Leading.

18               THE WITNESS:  I reported to the leadership team a

19   summation of what was reported to me from Jennifer.  I did

20   not recite the whole meeting.

21   BY MS. CALLAS:

22        Q    Tell me what response that team had.

23               MS. MCNULTY:  Objection.  Assumes facts not in

24   evidence.

25               Go ahead.

Golkow Technologies,
A Veritext Division
877-370-3377                                                    www.veritext.com
Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 12 of 23 PageID #: 14017

1          THE WITNESS:  The team responded with, "We have

2     to act.  Yes, you should talk to Mohler right a-" --

3     "Dr. Mohler right away."

4     BY MS. CALLAS:

5          Q    Was it decided that you would talk to Dr. Mohler?

6          A    It was because I was the one who had -- Jennifer

7     had come to.  We also were trying to care for Jennifer.

8     At this point, Jennifer didn't -- was not wanting this to

9     become this massive.  Because I had mentioned to her going

10     to the authorities, and she was hesitant to go to the

11     authorities because of her relationship with the children

12     of David Sills and then their children.  And so at -- I

13     remember wanting to -- to be sure I did things right, but

14     also not wanting to overexpose this because -- at a pace

15     that Jennifer did -- wasn't ready for.

16          Q    You -- you described two occurrences in some

17     detail between David Sills and Jennifer Lyell.

18          Did she tell you about any other occurrences?

19          A    She did.

20          Q    What -- what occurrence did -- did she tell you

21     about?

22          A    So I asked her lots of questions about, "So

23     why" -- "why did this relationship continue?"  So I know

24     that when I was in the lawsuit, it was -- and people have

25     said I simply believed her.  But if you had listened to

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com
Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 13 of 23 PageID #:
14018

1   the whole conversation, I don't think someone would say I

2   simply believed.  I asked a lot of follow-up questions

3   trying to understand what she was saying.  Why would --

4   why -- why would this relationship continue to go -- go

5   forward?

6          She described how -- she alleged in that moment

7   that David Sills had invited her essentially to be a part

8   of the family, which was normal in the -- the seminary

9   community where professors would have relationships with

10  students in terms of a family way, you know, inviting them

11  to dinners and things.  So --

12          MS. MCNULTY:  Objection.  Hearsay.

13          MR. BARZE:  Go ahead.

14          Shannon, can you object to the questions and quit

15  cutting off the witness, please?

16          MS. MCNULTY:  No.  I actually can't, because this

17  is trial testimony.  So thank you, though.  I don't know

18  who said that.

19          MR. BARZE:  This is Bruce.

20          And you --

21          MS. MCNULTY:  Oh, thanks, Bruce.  Yeah.

22          MR. BARZE:  You can -- you can continue if

23  you're -- if you're not finished.

24          THE WITNESS:  Great.  Thank you.

25          She -- so am I being asked what I was told?

Golkow Technologies,
A Veritext Division
877-370-3377                                                    www.veritext.com
Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 14 of 23 PageID #:
14019

1    BY MS. CALLAS:

2       Q    Yeah.  I -- I -- the question was, you have

3    testified in some detail about two occurrences Jennifer

4    described to you.

5       A    Yes.

6       Q    And did she describe other occurrences?

7       A    Yes.

8           So can I answer that --

9           MS. MCNULTY:  Objection.  Form.

10         We're going to -- I'm sorry.  Let -- let's agree,

11    Eric, that I am going to be making objections both to the

12    question and, from time to time, to your answer.  And I'm

13    entitled to do that by court rules, but I think it will be

14    helpful to the attorneys, to you, the witness, and to the

15    court reporter if you can just give a pause, just a very

16    slight pause so that we can keep the record clear on this.

17    Thank you.

18          THE WITNESS:  You're welcome.

19         She described other interactions other than those

20    two.

21    BY MS. CALLAS:

22       Q    And describe for us what Jennifer told you about

23    other occurrences of sexual contact with David Sills.

24       A    The three that stand out in my mind are the

25    two --

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com
Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 15 of 23 PageID #: 14020

1          MS. MCNULTY:  Objection.  Hearsay.

2          THE WITNESS:  The three occurrences that stand

3  out in my mind are the two I have mentioned already, and

4  then I asked, "What has been the nature of the

5  relationship since?"  And she said, at times, she would go

6  down to the basement even while his wife was upstairs and

7  that he -- that the wife even knew that she would go down

8  to the basement and that she would pleasure him in some

9  way.

10  BY MS. CALLAS:

11     Q   And you asked questions about that relationship

12  and why it was ongoing?

13     A   I was trying --

14          MS. MCNULTY:  Objection.  Leading.

15          Please.

16          Objection.  Leading.

17          Go ahead.

18          THE WITNESS:  I did ask questions about --

19  because I was trying to understand, "Is this some type of

20  romantic relationship that has now happened between you

21  and David Sills?"  I was trying to understand if this was

22  a consensual romantic relationship, and what was described

23  to me was not.  And I have heard lots of those as a pastor

24  in my day of people dealing with the fallout of an affair,

25  and that is not the nature of the relationship that was

Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 16 of 23 PageID #:
14021

1    described.  This was not roses and dinners.  This was go

2    down to the basement and please the patriarch of the

3    family.

4            MS. MCNULTY:  Objection.  Hearsay.  Assumes facts

5    not in evidence.  Incomplete hypothetical.

6    BY MS. CALLAS:

7        Q    So it was decided or agreed that you would

8    contact Dr. Mohler; is that right?

9        A    Yes.  It was decided from Thom Rainer and myself

10   that I would call Dr. Mohler.

11       Q    And did you?

12       A    I did.

13       Q    And when did you do that?

14       A    Actually, I think -- I think Thom called

15   Dr. Mohler letting him know that I would call him.  I

16   don't think I had a phone call with Mohler prior to the

17   phone call that Jennifer and I had with him.

18            So I then called Dr. Mohler, and he was expecting

19   my phone call.  And Jennifer then joined the phone call.

20   That was the afternoon of the morning that she shared

21   this -- the allegations with me.

22       Q    So the same day?

23       A    The same day.

24       Q    And when you made the call to Dr. Mohler, was

25   Jennifer in the room with you?

1           MS. MCNULTY:  Objection.  Hearsay.  Incomplete

2    hypothetical.  Assumes facts not in evidence.

3           Go ahead.

4           THE WITNESS:  I believe that Jennifer was on a

5    phone call or was patched in on a phone.

6    BY MS. CALLAS:

7       Q    Were you at your office when this phone call

8    occurred?

9       A    Yes.

10          MS. MCNULTY:  Objection.  Form.

11   BY MS. CALLAS:

12      Q    Do you know if Jennifer was in the office with

13   you?

14      A    I do not remember her being in the office.  I

15   believe that even reading the transcript and the

16   deposition with Dr. Mohler, that she was not in the

17   office.  I believe that she was --

18          MS. MCNULTY:  Objection.  Double -- maybe even

19   triple hearsay for once.  This is -- this is -- this

20   should all be stricken.  This is -- now we're testifying

21   about sworn testimony of another witness.  So, I -- I

22   mean, this is improper.

23          Go -- go ahead.  Go ahead.

24          THE WITNESS:  Gladly.

25          Um --

Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 18 of 23 PageID #:
14023

```
 1              MS. MCNULTY:  Excuse me?

 2              THE WITNESS:  I'll -- I'll gladly go ahead.

 3              MS. MCNULTY:  Oh, yeah.  Go ahead.

 4              THE WITNESS:  Thank you.

 5              This -- this -- I was on the phone call with

 6       Dr. Mohler and doc- -- and Jennifer Lyell.  I do not

 7       remember where she was when the phone call was made.

 8       BY MS. CALLAS:

 9          Q    Do you recall talking to Dr. Mohler after

10       Jennifer spoke, that is you --

11              MS. MCNULTY:  Objection.  Leading.

12       BY MS. CALLAS:

13          Q    Do you recall speaking to Dr. Mohler at the end

14       of the phone call with Jennifer?

15          A    Yes.

16          Q    And was there some discussion about what should

17       occur next?

18          A    Yes.

19          Q    Do you -- did you have any influence or give any

20       guidance to Dr. Mohler as to what he should do?

21          A    No.

22          Q    Did you understand from Dr. Mohler what would

23       occur next on the seminary side?

24          A    I understood that there would be a

25       confrontational meeting, but -- but I did not understand
```

1    article published in March of 2019.  I don't think that's

2    disputed.

3           But if your memory is that's approximately the

4    time you talked to David Roach, my question is this:  Have

5    you talked to anyone affiliated with Baptist Press since

6    that conversation with David Roach?

7           MS. MCNULTY:  Objection.  Form.  Incomplete

8    hypothetical.  Lack of foundation.

9           Go ahead.

10           THE WITNESS:  I do not remember talking to anyone

11    associated with Baptist Press.  If I did, it would be

12    someone who I don't know is associated with Baptist Press,

13    meaning someone in the SBC world that has some kind of

14    tangential relationship with Baptist Press.  But I don't

15    remember any conversation about the article with someone

16    that I know is part of Baptist Press.

17    BY MS. CALLAS:

18    Q    Prior to receiving contact from David Roach, did

19    you understand or know that there was an article in the

20    works?

21    A    I think Jennifer gave me a heads-up that someone

22    was going to be contacting me.  And I believe that I got

23    contacted really quickly after receiving the heads-up.

24    Q    Do you know if you had any communications with

25    Jennifer about whether or not she was going to publish or

1    Sills for all of the years that their relationship

2    spanned?

3        A    I do not remember her showing me emails.

4        Q    Did you ask for any?

5        A    I did not.

6        Q    Uh-huh.

7             Okay.  Looking at paragraph 7.  Now, this is your

8    statement made under oath.

9             "An investigation was initiated by Dr. Mohler on

10   behalf of Southern Seminary, but I did not participate in

11   that investigation."

12            Do you see that?

13       A    I do.

14       Q    That's not true, is it?

15       A    No, that's true.  It's very true.

16       Q    Okay.  Why didn't you participate in the

17   investigation?  You see where you say, "But I did not

18   participate"?  Why?  Were you asked?

19       A    I was not asked.

20       Q    Did you make inquiry as to how you might

21   participate in the investigation?

22       A    I did not.

23       Q    Why not?

24       A    I never -- I never did.  In any instance like

25   this, in other cases, I never participated in the

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com
Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 21 of 23 PageID #:
14026

1    investigation.  It was not my role.

2         Q    Uh-huh.

3              This is your first one, right?  So when we're

4    talking about this investigation and the fact of you not

5    participating in it, the fact is you had never been

6    involved in another case where there had been purported

7    allegation of abuse, right?

8         A    True when it comes to abuse.  But in terms of how

9    us, as a publisher, would respond, I wou- -- I thought you

10   were asking in a broader sense of people who were removed

11   out of print for sexual immorality that wasn't

12   characterized as abuse.  In those --

13        Q    I'm going to get to that.  So --

14        A    Okay.

15        Q    -- I'm just meaning about paragraph 7 --

16        A    All right.

17        Q    -- "I did not participate in that investigation."

18   And I'm exploring why you didn't participate in that

19   investigation.  And we've covered it.  You weren't

20   invited, right?  That's the first reason we covered.

21             Is that true, you weren't invited?

22        A    I was not invited.

23        Q    Okay.  And you did not request --

24        A    No.

25        Q    -- to participate?

Golkow Technologies,
A Veritext Division
877-370-3377                                              www.veritext.com
Case 3:23-cv-00478   Document 411-11   Filed 11/03/25   Page 22 of 23 PageID #:
14027

1       A     I do.

2       Q     Okay.  And what is the source of that

3    information?

4       A     Dr. Mohler, Dr. Stinson, Dr. Greenway.

5       Q     Okay.  And what -- what do you say is the

6    investigation that you're referring to right there in your

7    paragraph 7?

8       A     When Dr. Sills was confronted and he confessed to

9    an improper sexual relationship, there's no need for any

10   further investigation when the individual has already

11   confessed.

12            MS. MCNULTY:  Well, I'm going to move to strike

13   as hearsay.

14   BY MS. MCNULTY:

15      Q     You weren't present for any so-called

16   "confessions," right?

17      A     I was not in that meeting.

18      Q     Yeah.

19            So those -- that -- you're taking some liberties

20   on that, right?

21            MS. CALLAS:  Object to the form.

22            MR. BARZE:  Object to the form.

23   BY MS. MCNULTY:

24      Q     Go ahead.

25            I mean, you weren't there, true?