# Exhibit 22

**In the Matter of:**

# MICHAEL DAVID AND MARY SILLS

vs

# SOUTHERN BAPTIST CONVENTION, ET AL.

*LEFF, DOUGLAS*

*September 16, 2025*



1   want to be clear, I'm not saying -- using
2   "insufficient" saying that -- saying that by any
3   means the victim was disregarded by us or
4   couldn't be believed.  These were things that we
5   knew that we would have to address from the first
6   moment we met the victim, such as what their
7   relationship was with the person they were
8   accusing, if there were any motives that they
9   might be perceived to have to fabricate the
10  allegations, the hostilities between them, any
11  biases, any motives they might have to want to
12  have a case investigated or prosecuted as well as
13  what type of -- the victim's background -- the
14  alleged victim's background, whether they had any
15  kind of medical issues, psychological issues,
16  whether they were substance abusers.
17           I'm sure there's other things I'm
18  leaving out, but that -- but generally, that's --
19  we would look at things in the victim's overall
20  background, as well as their relationship with
21  the subject they were complaining about.
22  BY MS. RILEY:
23      Q.   You just said -- tell me, why is it
24  important to know about, like, the victim's
25  mental health?

1         A.   Well, just as in any case, a victim's
2    credibility, a complainant's credibility is
3    squarely an issue.  So it's important for us to
4    resolve whether there's something so paramount in
5    there that either we just can't in good faith
6    accept their allegations, or that we would -- in
7    the case that I was mostly working, this was in a
8    law enforcement capacity, so whether it would be
9    something so legally insufficient as a matter of
10   law that we couldn't even, at this point, present
11   it to the prosecutors to consider.
12        Q.   How can you tell if a client is
13   fabricating -- not a client -- a victim is
14   fabricating something?  What are the indicators?
15        A.   It takes a little while to know for
16   sure because that's what the experts have taught
17   us.  Different people have what we call different
18   baseline reactions to things, so there's no one
19   way to say.  Some could be incredibly nervous,
20   but that's because they've been through a
21   terrible trauma.  That's not necessarily an
22   indicator.
23             So I couldn't put my hand on one
24   indicator just by facial reaction or something.
25   But the most certain way to do it is by

 1   reviewed their investigation to see whether it
 2   was followed in accordance with industry
 3   standards and guidelines, and then I documented
 4   our findings and testify to them.
 5        Q.   And in those cases, did you find that
 6   the investigations had been -- had been done
 7   properly?
 8        A.   Yes.  Not perfectly, but properly, yes.
 9        Q.   And those were filed cases?
10             MR. KLEIN:  From my side, I didn't
11   hear that question.  I'm sorry, Katherine.  Did
12   you say filed cases?
13   BY MS. RILEY:
14        Q.   Yes.  Filed, like, they were a court
15   case.
16        A.   No, they weren't.  They were in the
17   context of, like, either a mediation or an EEO
18   type of hearing.
19        Q.   Have you ever been recognized as an
20   expert in a sexual abuse investigation?
21             MR. KLEIN:  Objection as to form.  You
22   can answer.
23        A.   Just to the extent that I've testified
24   in these cases because they recognize me as an
25   expert informally.  But if you're talking about a

1　court has said that I'm an expert, no, that has
2　not happened.
3　BY MS. RILEY:
4　　　Q.　How many times -- and I think you've
5　said this, but I just want to make it clear for
6　the record.  How many times have you been hired
7　to review the investigative work of another
8　investigating firm?
9　　　MR. KLEIN:  Objection.  Asked and
10　answered.  You can answer, though.
11　　　A.　If we're talking about the private
12　sector -- because when we say "hired," that's
13　what I did with the government for several years.
14　So I wouldn't use the word "hired," because I was
15　already assigned, and I would be reviewing other
16　components of the investigations that they did.
17　So that's probably 100 or 200 or more times.  But
18　since the two years I've been with the private
19　sector, I -- probably 10 or so times.
20　BY MS. RILEY:
21　　　Q.　Okay.  When -- on the 10 or so that you
22　just talked about since you've been in the
23　private sector, who did you interview in those
24　cases?
25　　　A.　The parties that did the investigation

1  as well as the preparers of any summary reports
2  and exhibits.  Things that were involved that
3  were directly relevant.
4        Q.   Did you review more information in
5  those cases than you did in the Sills case?
6             MR. KLEIN:  Objection as to form.  You
7  can answer.
8        A.   It's just -- well, the job -- when you
9  say "more," are you talking specifically
10 quantities of pages, whether they were more in
11 depth?  It's hard to say.  I mean, there was
12 one case where the issue had to do with --
13 basically, like, a national security type thing.
14 And so I don't know if there were -- it was a
15 very deep issue as far as the process of
16 determining whether it was within industry
17 standards.  But -- I would say probably this case
18 is probably on par with the majority of the cases
19 since I've been in the private sector that I've
20 been asked to review.
21 BY MS. RILEY:
22       Q.   Mr. Leff, tell me about exculpatory
23 evidence and its significance in an investigation
24 and a report.
25            MR. KLEIN:  Objection as to form.  You

1  can answer.
2       A.   Exculpatory evidence is evidence that
3  goes to mitigate the acts alleged or to reduce
4  the potential punishment for the acts alleged and
5  would tend to show that a person -- it would some
6  way cast doubt on the accused's commission of the
7  alleged crime.
8  BY MS. RILEY:
9       Q.   What is the importance in an
10 investigative report of making sure that
11 exculpatory evidence is also included in the
12 report?
13           MR. KLEIN:  Again, are you asking
14 generally or about this particular investigation
15 that he's been assigned to?
16           MS. RILEY:  Generally.
17      A.   Generally speaking, exculpatory
18 evidence is -- is essential because it's
19 something that, without having considered it, you
20 haven't done a full investigation.  You have to
21 show why -- first of all, it may completely
22 exonerate the accused.  In which case, the
23 investigation is over.  But even if it doesn't in
24 the opinion of the investigators, it might in the
25 opinion of a later reviewer.  So it needs to be

```
 1   included for that purpose, so it can be
 2   considered with all the other evidence.
 3   BY MS. RILEY:
 4        Q.   And does it make it neutral -- more
 5   neutral if it's got both inculpatory and
 6   exculpatory evidence in the report?
 7        A.   Yes.  That's fair to say.  Yes.
 8        Q.   When you personally are conducting
 9   investigations, how do you determine what
10   information you need in your investigation?
11        A.   It really depends on the type of
12   investigation we're talking about.  If we're
13   talking about an investigation such as the one
14   here or an investigation that's already been
15   done, in that case, basically I look at the
16   guidelines that the Inspector General's Integrity
17   Commission has put together.  And in order to be
18   able to answer the various subcomponents of those
19   guidelines, you necessarily have to have a very
20   complete picture of things.
21             So in looking at that, I can tell if
22   there's something that I can't answer a question
23   to, it means I would need to request additional
24   information or do whatever we have to do to be
25   able to capture that -- that evidence.
```

 1            MR. KLEIN:  Do you want him to read it
 2   to himself, obviously, and let --
 3            MS. RILEY:  Yes.
 4            MR. KLEIN:  -- you know when he's
 5   done?
 6            **THE WITNESS:  Okay.**
 7            MR. KLEIN:  And 3.6 you said, or just
 8   3.5?  I'm sorry, Katherine.  Both?
 9            MS. RILEY:  3.5 and 3.6.
10            MR. KLEIN:  And 3.6, okay.
11            **THE WITNESS:  I got them.  Okay.**
12   BY MS. RILEY:
13       Q.   Can you point to, in these paragraphs,
14   where it gives authority for Guidepost to give
15   the sexual abuse task force -- let me rephrase
16   that.
17            I want you to read those sections and
18   tell me where it allows the sexual abuse task
19   force to review and edit the entire report.
20       **A.   I don't see anything in there where it**
21   **does authorize them to edit the report.**
22       Q.   Do you agree with me that 3.5 states
23   the sexual -- the task force may only review the
24   factual sections?
25            MR. KLEIN:  Objection as to form.  You

1　to the investigation, who is also an attorney for
2　an alleged victim regarding the claims being
3　investigated, to be editing the report?
4　　　　MR. OTCHY:  Object to the form.
5　Objection.  Misstates facts in evidence, not in
6　evidence.
7　　　　**A.   If it --**
8　　　　MR. OTCHY:  You can answer.
9　　　　**THE WITNESS:  You're ready?**
10　　　　MR. OTCHY:  Yes, sir.
11　　　　**A.   If anyone -- witness, victim, anybody**
12　**-- is allowed to actually edit the report**
13　**themselves, it would not be best practice.  It --**
14　**it wouldn't even be a minimally acceptable**
15　**practice.**
16　　　　MS. RILEY:  T., will you pull up
17　GPSILLS_07955, please?
18　　　　(Exhibit No. 14 was marked.)
19　　　　MS. RILEY:  T., I need you to go to
20　the content page of the actual Guidepost report
21　first, please.  I need to lay a foundation.
22　　　　Yes.  Can you blow up the fourth
23　section?
24　　　　MS. MADDUX:  Sorry, you broke up.
25　What section?

```
 1   can answer.
 2        A.   I didn't see their 30(b)(6) deposition,
 3   so I don't know for sure what they testified to,
 4   but they -- what you're saying is consistent with
 5   things that I learned at some point during this.
 6   BY MS. RILEY:
 7        Q.   Okay.  And this document that you've
 8   just read over was not provided to you in
 9   conducting your report for the Sills case,
10   correct?
11        A.   I have no recollection of -- of seeing
12   it before.
13        Q.   And the very --
14             MS. RILEY:  T., I think go up a little
15   bit.
16   BY MS. RILEY:
17        Q.   Where it says, "Note.  In case you find
18   it important," Page 173, would you agree with me
19   that this is Rachael Denhollander making
20   suggestions to pages that are outside of the
21   factual section as shown in the table of
22   contents?
23        A.   That is what this indicates, yes.
24             MS. RILEY:  T., could you go up,
25   please, to where it says Page 114?
```

```
 1  BY MS. RILEY:
 2       Q.   Mr. Leff, do you see in the highlighted
 3  section where -- where Rachael Denhollander is
 4  suggesting that they include Jennifer Lyell's
 5  settlement in the report?
 6       A.   Yes, I read that.
 7       Q.   You understand that Guidepost did, in
 8  fact, include the settlement as a result of this
 9  request?
10            MR. OTCHY:  Objection.  Misstates
11  facts not in evidence.  And objection;
12  foundation.
13       A.   I don't recall knowing that.  I don't
14  recall knowing that before now.
15  BY MS. RILEY:
16       Q.   Do you agree with me that after
17  reviewing this document, that it appears that
18  Rachael Denhollander is trying to influence more
19  than just facts in the report?
20            MR. OTCHY:  Objection to form.
21  Objection; foundation.
22       A.   I -- yeah, I would agree that's what it
23  appears, yes.
24  BY MS. RILEY:
25       Q.   And per the quality standards, isn't
```