# Exhibit 23

**In the Matter of:**

MICHAEL DAVID and MARY SILLS

vs

SOUTHERN BAPTIST CONVENTION, ET AL.

---

*LITTON, JR., HARRY E.*

*May 14, 2025*

---



844.533.DEPO

1      Q.   Is that right?

2      A.   That's correct.

3      Q.   Okay.  In what year were you

4  elected to serve as SBC president?

5      A.   That would have been June 15, 2021.

6      Q.   And what was your last day as SBC

7  president?  What was the date?

8      A.   It would have been a year later.

9  It would have been around June -- I don't

10 remember the exact date, but it would have

11 been 2022.

12     Q.   Why did you not seek reelection?

13     A.   Well, there's several reasons for

14 it, but just -- I had some personal reasons,

15 but ultimately felt like it was best for the

16 convention for a man like Bart Barber to

17 succeed me.

18     Q.   Before you -- strike that.

19          When did you decide that you would

20 not seek reelection?

21     A.   It was probably February or early

22 March of 2022.

23     Q.   In February or March of 2022, or

24 prior to that time, did you have any

25 discussion with Bart Barber about the fact

1  title all of the persons who received the

2  draft report?

3      A.   Oh, boy.  Not off the top of my

4  head, I can't.  I -- we -- it was a group of

5  people that were well-versed in Baptist

6  polity and were trusted to be able to read

7  it and look for anything that didn't fit our

8  polity or anything that -- misspells or

9  factual errors and things like that.  And --

10     Q.   And as you sit here today, --

11     A.   Uh-huh.

12     Q.   -- do you contend that the

13  Guidepost Report lacks any factual error?

14  Is that your position?

15          MR. PIETSCH:  Object to the form.

16          MR. OTCHY:  Object to form.

17          THE COURT REPORTER:  I'm sorry.

18  Who was objecting?

19          MR. OTCHY:  Alex Otchy for

20  defendant, Guidepost.

21          THE COURT REPORTER:  Okay.  If

22  you're going to object on the Zoom, would

23  you please state your name first, because I

24  can't see all the boxes to see who it is?

25          MR. OTCHY:  Alex Otchy for

Case 3:23-cv-00478    Document 411-15    Filed 11/03/25    Page 4 of 30 PageID #: 14605

 1  defendant, Guidepost.

 2          MR. PIETSCH:  And you noted my

 3  objection?

 4          THE COURT REPORTER:  Yes.

 5          MR. PIETSCH:  You can still answer.

 6     A.   Would you remind me of the question

 7  again, please?

 8          MS. MCNULTY:  Madam Court Reporter,

 9  could you please read back the question?

10  And I'll stipulate to the objection, meaning

11  that it doesn't have to be said again.

12

13          (Whereupon, the court reporter read

14  the question back.)

15

16     A.   No.

17     Q.   Can you identify any error in the

18  Guidepost Report?

19          MR. OTCHY:  Alex Otchy, defendant

20  Guidepost, object to form.

21          MR. PIETSCH:  Objection to the

22  form.  You can answer.

23     A.   No.

24     Q.   I'm going to set that aside for a

25  minute.

1  the Guidepost Report?

2      A.   No.

3      Q.   Have you ever met David Sills?

4      A.   I'm not aware that I've ever met

5  him.  I don't think I would know him if I

6  met him today.

7      Q.   Yeah.  So the next question is

8  probably the same.  Have you ever met Mary

9  Sills?

10     A.   No.

11     Q.   When you were SBC president from

12 June of '21 to June of '22, what were your

13 daily responsibilities as SBC president?

14     A.   Well, I still pastored a church,

15 but I had responsibilities to -- well, my

16 initial responsibility was the task force

17 appointment; but other responsibilities to

18 plan who would -- who we would bring as a

19 slate of trustees and nominees for all of

20 our different agencies and entities, which

21 is a massive task.  And so on a regular

22 basis, we were looking at names and

23 interviews and things like that.  Some

24 traveling, some planning, a few visits to --

25 several visits in my presidency to Nashville

1  for meetings, board meetings and so forth.

2      Q.   And I was going to ask you but your

3  answer kind of touched on it.  You

4  maintained your day-to-day duties as pastor;

5  is that right?

6      A.   That's correct.

7      Q.   Was there any reduction in those,

8  or did you pretty much keep it at the same

9  pace it had been prior to your presidency?

10     A.   There definitely would be a

11 reduction.  I have a large staff.  It's a

12 larger church, and -- and so they were able

13 to fill in some of those spaces for me.

14     Q.   Prior to your presidency, in the

15 year or two preceding your presidency, with

16 what frequency were you preaching at church?

17     A.   Just about every Sunday.  Yeah.

18     Q.   During your presidency, with what

19 frequency were you preaching at church?

20     A.   It was pretty much the same.  It

21 was a few examples, but I would say I kept a

22 pretty hardy schedule.  I would say probably

23 those years, I was preaching 45 times a year

24 out of 52 or 53 -- 52.

25     Q.   When you say "the task force," what

 1  is the full name of the task force to which

 2  you were referring to a moment ago?

 3      A.   I'm so used to calling it "the task

 4  force"; but it -- I could -- the official

 5  name, I'm a little lost at this moment to

 6  give it to you.  But it was dealing with the

 7  sexual abuse or sexual abuse task force of

 8  the Southern Baptist Convention.

 9      Q.   Yeah.  And is that sometimes

10  referred to by its abbreviation of the

11  initials SATF?

12      A.   I'm not familiar with that

13  language.  We just called it "the task

14  force."

15      Q.   What was the purpose of the Sex

16  Abuse Task Force?

17      A.   Well, it was appointed by the

18  convention itself in session.  The Southern

19  Baptist Convention technically only exists

20  for a few days in June.  That's when the

21  whole body speaks, those who attend as

22  messengers.  And they -- they basically

23  passed a resolution to launch an

24  investigation, hire a firm, and that the

25  president would have 30 days to do -- to

1   appoint the task force that would lead in

2   the hiring process of a firm to conduct the

3   investigation.

4       Q.   And so the appointment of the task

5   force members was one of your charges; is

6   that right?

7       A.   Yes.

8       Q.   Tell me about the process you used

9   to appoint task force members.

10      A.   Well, I knew that it had to be

11  something extremely confidential and it

12  isn't public, and so I -- I -- at least not

13  to the point I made it public, announced it.

14          So I just went through a process of

15  looking at people that I thought -- pastors

16  and leaders, lay leaders in the Southern

17  Baptist Convention, that would do an

18  effective job of a -- of the kind of report

19  that people would know was extensive enough

20  and yet it was factual and trustworthy.

21      Q.   And what was being investigated

22  specifically?

23      A.   Primarily from what the resolution

24  said, primarily it was the work of the

25  Executive Committee.

1      Q.   And when you say "the work of the

2   Executive Committee," what does that mean?

3      A.   The Executive Committee functions

4   in lieu of the Southern Baptist Convention

5   when we're not meeting.  And they -- of

6   course, we believe in our polity that they

7   follow the direction of the convention.  And

8   their -- their job is to maintain business

9   for the SBC in all the times that we're not

10  meeting as a convention.

11     Q.   Okay.  So am I understanding that

12  the Executive Committee -- let me back up

13  even further.

14          The Southern Baptist Convention

15  assembles once a year; --

16     A.   Right.

17     Q.   -- is that right?

18     A.   Right.  That's correct.

19     Q.   Is there ever an instance in which

20  it assembles more than once a year?

21     A.   No.

22     Q.   Okay.  And during the interim

23  period, the Executive Committee carries out

24  the day-to-day operations; is that right?

25     A.   That's correct.

1      Q.   And the instructions on how to

2  carry out the day-to-day operations is, in

3  part, informed by the annual meeting --

4      A.   Yes.

5      Q.   -- amongst the messengers; is that

6  right?

7      A.   Well, and particularly in this

8  case, because the messengers very strongly

9  supported an investigation, and that was the

10  resolution that was passed by a significant

11  number.  And so I had clear instructions in

12  that to appoint the task force and then

13  allow the task force to do their job.

14      Q.   Were there deliberations amongst

15  the messengers concerning whether or not to

16  proceed with the task force investigation?

17      A.   Deliberations in what sense?

18      Q.   Well, there was a vote -- it sounds

19  like --

20      A.   Right.

21      Q.   -- there was a vote and --

22      A.   Well, originally -- originally it

23  was tabled to go to the Executive Committee

24  for further discussion, but there was a

25  parliamentary procedure that someone in

1      A.   Yeah.  Dr. J.D. Greear.  So I was

2  in the room just as a messenger.  My

3  presidency begins at the last gavel on the

4  Wednesday of that week.  So --

5      Q.   Okay.  Can you recall, prior to the

6  vote being taken, any discussion amongst the

7  messengers as to why an investigation would

8  not be beneficial or worthwhile?

9      A.   I don't recall, no.

10      Q.   Did you have any written criteria

11  that you used or referenced in selecting

12  task force members?

13      A.   Just what the resolution said.

14      Q.   Uh-huh.

15      A.   And there -- there's criteria in

16  there about it being for -- like most task

17  force would be all Southern Baptist, but

18  allows -- it allowed me the liberty to

19  appoint non-Southern Baptist also because of

20  their skills or abilities.

21      Q.   And did you appoint non-Southern

22  Baptists?

23      A.   I did in the case of advisory

24  members of the task force.

25      Q.   Who were the advisory members that

1  were not Southern Baptist?

2      A.   Well, Rachel Denhollander was one

3  of the advisory.  The other was actually the

4  pastor of a Southern Baptist church.  His

5  name escapes me right now.  But he had -- he

6  had expertise in therapy and counseling.

7      Q.   Is there a document or a resource

8  that you could, at some point, consult to

9  assist in your recollection of that pastor's

10  name?

11      A.   Oh, I'm sure it's -- it's in the

12  Baptist Press, and it's -- yeah, it -- I

13  would look through the Baptist Press.  I

14  would just do a Google search.

15      Q.   For how long have you known Rachel

16  Denhollander?

17      A.   Well, I was never introduced to her

18  until I became president.

19      Q.   When is the last time that you

20  spoke with Rachel Denhollander?

21      A.   It's been over a year.  Maybe a

22  year and a half ago.

23      Q.   Where were you when you last spoke

24  with her?

25      A.   I was at home.

1  for ministry, but I'm not sure.

2      Q.   Okay.  Did every member of the Sex

3  Abuse Task Force receive a draft of the

4  Guidepost Report?

5          MR. OTCHY:  Object to form.

6          MR. PIETSCH:  Object to form.  You

7  can answer.

8      A.   I'm not aware.  I don't know the

9  answer to that.

10     Q.   In your role as SBC president, who

11 was controlling the individuals who received

12 the draft of the report?

13         MR. PIETSCH:  Object to the form.

14         MR. OTCHY:  Object to the form.

15         MR. PIETSCH:  You can answer.

16     A.   I'm not sure if it was my office

17 that invited the people to attend the

18 preview of it -- "the preview" may not be

19 the best word -- or the viewing of it

20 looking for errors, mistakes, typos, et

21 cetera.

22     Q.   Uh-huh.

23     A.   But it may have been out of my

24 office.

25     Q.   Did you have an assistant or a

 1            THE COURT REPORTER:  I'm going to

 2   remind you to state your name when you're

 3   objecting, please.

 4            MR. OTCHY:  Alex Otchy, defendant,

 5   Guidepost.  Object to the form.

 6            THE COURT REPORTER:  Thank you.

 7       Q.  Go ahead, sir.

 8       A.  Take me back to the question,

 9   please.

10       Q.  All right.  So here, I'm trying to

11   ascertain whether you controlled the persons

12   who previewed the report or if you did not

13   have full knowledge of who all received a

14   copy of the draft.  So there's a draft

15   report that's disseminated.

16       A.  Right.

17       Q.  Do you know who received copies of

18   the draft?

19       A.  What I can tell you is that --

20            MR. PIETSCH:  I'm objecting to the

21   form of that.

22            MS. CALLAS:  Object --

23            MR. OTCHY:  Alex Otchy, defendant,

24   object to the form as well.

25            THE COURT REPORTER:  And who was

MICHAEL DAVID and MARY SILLS vs SOUTHERN BAPTIST CONVENTION, ET AL.

Harry E. Litton, Jr. - 05/14/2025                                      Page 38

 1  the other one?

 2          MR. OTCHY:  Alex Otchy from

 3  defendant, Guidepost.

 4          THE COURT REPORTER:  I know.  There

 5  was someone before you.

 6          MS. CALLAS:  It was Gretchen Callas

 7  from the Executive Committee.  Thank you.

 8          THE COURT REPORTER:  Thank you.

 9          MR. PIETSCH:  You can answer.

10      A.  The control factor was a room that

11  we all sat in together and that no one -- no

12  one left the room.  We would take a break,

13  if somebody needed; but the materials never

14  left the room.  There were no cell phones

15  allowed for the purpose of copying anything

16  off of those.  We wanted to keep it as

17  secure as possible.

18      Q.  As you sit here today, do you know

19  whether only the people invited to the

20  preview were the only people who received a

21  draft report?

22      A.  That is correct.

23      Q.  And how do you know -- describe for

24  me the mechanism by which you know that

25  Guidepost did not preview a draft to anyone

 1  other than the people you invited to the

 2  preview.

 3          MR. PIETSCH:  Object to the form.

 4          MR. OTCHY:  Alex Otchy, object to

 5  the form.

 6     A.   I would have no way of knowing

 7  that.

 8     Q.   Okay.  At the end -- strike that.

 9          How long did the preview session

10  last?

11     A.   Maybe four to five hours.

12     Q.   Did you serve refreshments or food?

13     A.   Food -- there were refreshments

14  there, uh-huh.

15     Q.   And where did the preview take

16  place?

17     A.   It took place in the Executive

18  Committee building, second floor.  There was

19  a conference room.  They have several

20  conference rooms.

21     Q.   At that preview, did Rachel

22  Denhollander voice any proposed changes to

23  the report?

24          MR. PIETSCH:  Object to the form.

25          MR. OTCHY:  Alex Otchy, object to

 1  proposing changes to the draft report?

 2      A.   I am not.

 3      Q.   If such proposals had been made,

 4  would you have expected to be told that

 5  there were proposed changes to the draft

 6  report?

 7           MR. OTCHY:  Alex Otchy, object to

 8  the form.

 9      A.   Certainly.

10      Q.   In your capacity as SBC president,

11  did you have supervisory authority over

12  Rolland Slade?

13      A.   No.  No.

14      Q.   In your capacity as SBC president,

15  did you have supervisory authority over

16  Willie McLaurin?

17      A.   I did not.  As SBC president, I

18  don't think I had advisory over anybody.

19      Q.   Okay.  Pastor Slade testified at

20  his deposition that the responsibilities of

21  the president of the SBC include being the

22  spokesperson, the head of PR, the face of

23  the convention, that the president makes

24  appointments to committees and is a member

25  of the Executive Committee as well.

1              Do you agree with that?

2       A.    Not completely.  Definitely

3  appointment to committees and boards.  The

4  first -- say again the first one.  I do

5  serve as ex officio -- or served as ex

6  officio member of the Executive Committee.

7  And I think that also gave me the privilege

8  of going to other board meetings, which I

9  only went to one as president.  That was the

10  International Mission Board meeting.  And

11  that was more inspirational.  I didn't vote,

12  although I probably could have.

13              Would you please repeat the first

14  two things he said?

15       Q.    Sure.  Spokesperson, head of PR.

16       A.    Yeah, I don't understand that's

17  anywhere in our documents.  I'm not the head

18  of PR; and, frankly, I don't speak on behalf

19  of Southern Baptist.

20              As president of a denomination that

21  is very autonomous, made up of 45,000-plus

22  autonomous churches, you can't possibly

23  speak for everybody.

24       Q.    With respect to your role as

25  president, you did have authority relative

1  to the Sex Abuse Task Force; correct?

2      A.   That's correct.  Because it was

3  given by the messengers in meeting, an

4  annual meeting.  Right.

5      Q.   Yeah.  Yeah.  And when you were SBC

6  president, if you did speak in your capacity

7  as SBC president, you would agree that would

8  be a statement, perhaps even a prepared

9  statement, intended as coming from you, the

10 president?

11          MR. PIETSCH:  Object to the form.

12 You can answer.

13     A.   Well, it is a statement, and people

14 understand I am the sitting president; but

15 it is not speaking on behalf of the entire

16 SBC.

17     Q.   Okay.  Yep.  Thank you for the

18 distinction.

19          When you would make statements

20 while you were president, --

21     A.   Uh-huh.

22     Q.   -- who would prepare those remarks

23 or statements?

24     A.   I would as a starting point, and my

25 chief of staff sometimes would review.  We

1      Q.   And if they testified differently,

2  you would defer to that testimony?

3      A.   Yes.  They would be the expert on

4  who wrote their statements, not I.

5      Q.   Yeah.

6      A.   Right.

7      Q.   You didn't write their statements?

8      A.   No.

9      Q.   That's their -- right?  We're clear

10  on that.  You did not write them?

11      A.   No, I did not.  And I'm responsible

12  for my own statements.

13      Q.   Okay.  Did the SBC investigate the

14  allegations of sexual abuse made against

15  David Sills?

16          MR. PIETSCH:  Object to the form.

17  You can answer.

18          MR. OTCHY:  Object to the form,

19  Alex Otchy.

20      A.   Well, my question would be, what do

21  you mean by the SBC?

22      Q.   I mean the Southern Baptist

23  Convention, as distinct from the Executive

24  Committee.

25      A.   What I'm aware of, it was my task

1  it to yourself and read the answer and --

2      A.   Could you make it a little bit

3  larger, please?

4      Q.   Yes, sir.

5      A.   Thank you.  Okay.  There we go.

6      Q.   Is that okay?

7      A.   Yes.  That's better.

8      Q.   And when you're done with the

9  interrogatory, let me know that I can ask

10 you a question.

11     A.   All right.

12     Q.   Okay.  Did you have any

13 conversation with Jennifer Lyell at any time

14 about her allegations of sex abuse made

15 against David Sills?

16     A.   Yes.

17     Q.   Okay.  When is the first time you

18 had a conversation with her?

19     A.   I don't recall the exact date; but

20 after I appointed the task force, I

21 attempted to talk to as many survivors as I

22 could, the schedules and everything else,

23 and I heard from each of the survivors their

24 details of their -- their experiences.

25     Q.   Uh-huh.  And what did Jennifer

1  was done and it was sometimes 10, 20 years

2  ago.

3      Q.   That wasn't true with Jennifer

4  Lyell?

5      A.   I don't recall the conversation in

6  detail with Jennifer.  A lot of it for

7  Jennifer was the emotional impact of it, not

8  the details of it.

9      Q.   In your call with Jennifer Lyell,

10 did you receive information concerning acts

11 of sexual abuse she says were committed on

12 her?

13          MR. PIETSCH:  Object to the form.

14 You can answer.

15     A.   Not in any detail.

16     Q.   Okay.  And it's for that reason

17 that you made no reports to law enforcement?

18     A.   There was no --

19          MR. PIETSCH:  Object to the form.

20     A.   Yes.

21          MR. PIETSCH:  You can answer.

22     A.   Yes, there was nothing to report.

23     Q.   And when you say, "There was

24 nothing to report," it's because you're

25 saying the call was primarily about her

1  emotional condition?

2      A.    It was to express care for her and,

3  yes, for her emotional condition and that

4  she was being heard.

5      Q.    In that call, did she describe to

6  you any specific acts of abuse that she

7  alleges David Sills performed on her or

8  against her?

9      A.    No.

10     Q.    Okay.  Did you ask her if she had

11  any police reports?

12     A.    I do not recall asking that

13  question.

14     Q.    Do you recall in conversation with

15  other victims that in the call with you, you

16  became aware that reports -- police reports

17  had been made; is that right?

18     A.    That's correct.

19     Q.    And am I understanding correctly

20  that was not discussed with Jennifer Lyell

21  in her call with you at that time?

22     A.    Right.  I did not ask that

23  question.  It -- either in their narrative,

24  they explained some of the legal processes

25  they were involved in to some detail.  It

1   wasn't much.  Most of the interviews or most

2   of the conversations that I had were people

3   expressing appreciation for the call and

4   talking about how difficult this has been

5   for them.

6        Q.   As you sit here today, can you tell

7   me any act of sexual abuse committed by

8   David Sills against Jennifer Lyell?

9        A.   That I'm personally aware of?

10       Q.   That's right.

11       A.   Not that I'm personally aware of.

12       Q.   Okay.  At any time from your

13  installation as president until today, did

14  you ever ask for any reports -- police

15  reports, investigative reports concerning

16  any actions committed by David Sills against

17  Jennifer Lyell, as she alleges?

18       A.   No.  No.

19       Q.   As you sit here today, do you

20  believe that David Sills threatened Jennifer

21  Lyell's life?

22       A.   I -- I have no information to make

23  that conclusion.

24       Q.   As you sit here today, you don't

25  have an opinion one way or the other; is

1          What qualifications did Rachel

2    Denhollander have to cause you to appoint

3    her as a member of the SBC Sexual Abuse Task

4    Force?

5          A.    I appointed her as an advisor to

6    the task force.

7          Q.    So you would correct your

8    answer where you -- that's what I thought

9    you had testified to; but here it says,

10   "Dr. Litton had multiple communications with

11   Rachel Denhollander in her role as a member

12   of the SBC Sexual Abuse Task Force."

13         She was an advisor to the task

14   force; is that right?

15         A.    That's correct.

16         Q.    Okay.  And so what caused you to

17   appoint her as an advisor?

18         A.    She was familiar with the subject.

19         Q.    Did she disclose to you that she

20   was serving as counsel to Jennifer Lyell?

21         A.    I didn't ask her that question.  I

22   did not know that.

23         Q.    So just to be clear so there's no

24   confusion when we get the transcript back,

25   did she disclose to you that she was serving

1  as counsel to Jennifer Lyell, and is your

2  answer, no?

3      A.   It's no.

4           MR. FOWLER:  Satchel Fowler, object

5  to the form.

6      A.   There was no disclosure.

7      Q.   Okay.  Did any other victim have an

8  attorney appointed to the Sexual Abuse Task

9  Force?

10          MR. PIETSCH:  Object to the form.

11     A.   No.  Not that I'm aware of.

12     Q.   Now, looking at No. 13, go ahead

13  and read that to yourself and then let me

14  know that I can ask you a question, please.

15     A.   Okay.

16     Q.   Okay.  So here it's asking you for

17  your definition of sexual abuse, and you

18  have an objection that it's vague and overly

19  broad and that it requires additional

20  context or clarification.

21          As you sit here today, do you have

22  any clarification -- what type of

23  clarification do you think you need to

24  provide your definition of sexual abuse?

25     A.   Well, I would say my definition as

1  emails that she exchanged with David Sills

2  during the period of time she claims abuse;

3  is that fair to say?

4      A.   That's fair to say.

5      Q.   Okay.  Look at No. 14 and then let

6  me know when I can ask you a question.

7      A.   Okay.  Okay.

8      Q.   Okay.  This asks you, "For the

9  years 2000 to present, identify with

10  specificity every rule or condition of

11  employment at Seminary and/or SBC that you

12  contend was violated by David Sills, the

13  date of any such violation, and the action

14  taken by you."

15          And your response is, "Dr. Litton

16  has no responsive information."

17          Do you see that?

18      A.   I do.

19      Q.   Okay.  As you sit here today, are

20  you aware of any rule or condition of

21  employment at Seminary that David Sills

22  violated?

23      A.   I'm not -- I'm not aware of the

24  policies of Southern Seminary, no.

25      Q.   Okay.  Did you ever have any

1    these answers, have you become aware of

2    other settlements Jennifer Lyell has had

3    concerning the Executive Committee?

4        A.   No.  The -- the -- in the January

5    meeting where Rolland Slade and I both spoke

6    to her, there was some kind of a vote for

7    some kind of a settlement, but that's --

8    that's all I'm aware of.

9        Q.   Okay.

10       A.   And I'm not sure "settlement" was

11   the right terminology.  I'm not sure --

12   the -- the committee acted and did

13   something.

14       Q.   You know that they paid her money?

15       A.   Yes.  Well, they voted to.

16       Q.   Uh-huh.  I want to be clear.  You,

17   as SBC president, undertook no investigation

18   of the claims made by Jennifer Lyell against

19   David Sills; is that fair?

20       A.   I personally did not.

21       Q.   And so when you say you personally

22   did not, you did not do so in your capacity

23   as SBC president either; true?

24       A.   That's correct.  Absolutely.

25   That's correct.

 1  Are you familiar with that congregation and

 2  church?

 3      A.   Not really.  I know it exists

 4  because --

 5      Q.   Yeah --

 6      A.   -- I've heard of it.  But --

 7      Q.   Did anyone ever share with you what

 8  Pastor Cook told the entire congregation in

 9  a Sunday morning worship service?

10      A.   No.

11      Q.   Are you aware of what Dr. Mohler

12  communicated to the Great Commission Council

13  members?

14      A.   No.

15      Q.   We've already testified that you

16  have never met David Sills.  Are you aware

17  of anyone interviewing David Sills?

18      A.   I am not.

19      Q.   Looking in paragraph No. 2, in the

20  second sentence, it starts, "The mishandling

21  and mistakes could have been corrected both

22  to alleviate the damage being done to me

23  before it was irreversible.  So I quietly

24  worked behind the scenes through all of the

25  proper channels in SBC life to correct the