Exhibit 30

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

MICHAEL DAVID SILLS and
MARY SILLS,

    Plaintiffs,

vs.                      3:23-cv-00478
                          Judge William L. Campbell Jr

SOUTHERN BAPTIST CONVENTION,
a non-profit corporation; et al,

    Defendants.


DEPOSITION OF AMY MCDOUGAL


WEDNESDAY, SEPTEMBER 10, 2025
10:02 AM


VIA ZOOM


Shawna H. Meeks

Certified Court Reporter

and Notary Public

1  communications you had first with Alejandra.
2     A.   The email I received inquired about my rate for
3  expert witness services.  Didn't have any detail in the
4  email.  I responded that I don't typically throw out a
5  rate for something unless I have an understanding of what
6  the work entails, and doing a conflict check.  I wouldn't
7  want to go further with the conversation if it was
8  something that it wasn't appropriate for me to be involved
9  in.
10    Q.   Do you know how Alejandra had your name to reach
11 out to you?
12    A.   I do not.
13    Q.   Are you -- let me rephrase.  Do you advertise or
14 promote yourself or CLEAResources, LLC as an expert so
15 someone would be able to find you in a certain -- whether
16 it's online or elsewhere?
17    A.   Can you clarify whether your question is asking
18 whether I promote myself as an expert witness or if I
19 promote myself as an expert in my field?
20    Q.   Thank you.  Fair distinction.  What I was driving
21 at is do you promote yourself as an expert witness to
22 provide expert testimony in cases?
23    A.   I do not.
24    Q.   So but you still don't know how you were found by

1  Alejandra?

2     A.   I do not.

3     Q.   Alejandra --

4     A.   I do not know.

5     Q.   So ultimately, did you -- well, then finish the
6  conversation.  So you ultimately wanted to do a conflict
7  check and understand what this was about before agreeing
8  to any agreement; is that fair?

9     A.   Yes.

10    Q.   So tell me what happened in order for you to be
11 here today.

12    A.   I inquired -- as I mentioned, I inquired in my
13 response email I don't throw out my rates.  I didn't know
14 if this was -- was legitimate.  I don't know Case
15 Management company.  And so I said I don't throw out my
16 rates unless I understand more about the work that might
17 be entailed and I can do a conflicts check.  And so I said
18 can you, please, tell me, you know, where the case is
19 pending, who the parties are, and what's involved, and I
20 will, you know, I'll respond at that time.  She responded
21 with, I believe, the caption of the case.  Not much more
22 detail than that.  So I responded with my rates for that.
23    I think that was -- the next email I got from them
24 was, I believe, the counsel in the case would like to

1  speak with you.  And so there was an introduction there
2  and it was Ms. McNulty, and so we coordinated on a date
3  and a time to have a brief conversation.  And as an
4  attorney myself, I can only assume she wanted, you know,
5  to gauge my experience and talk a little more in depth
6  about whether I'd be the appropriate person to do this
7  work.  So -- and then Case Management was out of the
8  picture and I communicated from then on with Ms. McNulty.
9     Q.   Great.  Let me stop you right there and ask you a
10 few questions of what you just said.  You ultimately
11 received the caption of this case.  When you saw the
12 caption, did you recognize the names of any of the parties
13 in this caption -- in this case?
14    A.   No.  It was only the caption that included Sills
15 versus SBC.  I do remember mentioning to Alejandra that I
16 knew someone at Guidepost Solutions so I did respond and I
17 said if that's okay with counsel, then we can proceed with
18 the call.  If it's not okay with counsel, then -- then,
19 you know, maybe I'm not the right person.  So I think
20 maybe the -- either the caption included Guidepost
21 Solutions or she listed in the email all the names of the
22 defendants.  But either way, in that communication, I at
23 least saw the name Guidepost Solutions and responded that
24 I knew someone there.

1  found this particular interaction to be improper and
2  inappropriate for an independent professional
3  investigator.
4     Q.   Were you aware that in the Johnnie Hunt case
5  there were texts produced between Ms. Wood and Jane Doe,
6  the accuser in that case?
7     A.   The only thing I'm aware of in the Hunt case is
8  Guidepost's 30(b)6 and SI Global's expert report.
9     Q.   I didn't know if you recalled in that 30(b)6 if
10 they discussed the text exchanges between Ms. Wood or Ms.
11 Tongring and Jane Doe in that case.  And you don't recall
12 that either way?
13    A.   I do not recall that.  And if those texts were
14 related to what time are we meeting tomorrow for my
15 interview, that would not push the needle for me on
16 professionalism.  But if it was hey, when the
17 investigation is completed, can you help me with this?
18 And the response.  And especially coupled with the fact
19 that Ms. Wood met with Ms. Lyell prior to the engagement
20 letter even being signed.  All of these facts together
21 paint a picture and the picture is that that's not an
22 objective professional way to engage.
23    If I was a witness and provided a statement to the
24 FBI, I wouldn't be like, you know, Agent Johnson, this,

1  that and the other thing, and then two weeks later say,
2  hey, Jim. Can you tell me a good place to get a beer and
3  some wings, right? That's -- that's -- and if I did that,
4  the FBI agent professionally should just not engage with
5  that, right? That's not -- that's not -- it impairs their
6  independence if you provide aid to a person when you've
7  done an objective independent investigation.
8      Q.   Now -- well, withdrawn. Let's talk about Ms.
9  Kilpatrick who you spent some time discussing in this
10 report. Do you -- the information you got about Ms.
11 Kilpatrick surrounds the 2019 Caring Well Conference; is
12 that correct? And I'm on, by the way, page 19 still as
13 well. The bottom of page 19. Is it fair to say that much
14 of the information that you obtained from Ms. Kilpatrick
15 at least surrounds the 2019 Caring Well Conference as you
16 referenced on the bottom of page 19?
17     A.   I'm not sure the word much of is accurate. The
18 information about Ms. Kilpatrick attending the Caring Well
19 Conference is -- certainly I cited to that.
20     Q.   You seem to, among other things, be concerned
21 about the fact that they were on a panel together or wrote
22 a curriculum together; is that a fair statement?
23     A.   Yes.
24     Q.   The fact that an investigator previously was on

1  -- shared a panel with someone who also was in a similar
2  field, that automatically does not create an impairment of
3  independence, does it?
4     A.  It does on these facts.
5     Q.  Do you have any idea what they spoke about and if
6  they even spoke socially or outside of the panel?
7            MS. RILEY:  Object to the form.
8            THE WITNESS:  Yes.  There's evidence that
9  Ms. Kilpatrick contacted Ms. Lyell shortly after that
10 conference to -- to say that she had heard of her story.
11 I don't know if she heard it from Ms. Lyell or Ms.
12 Denhollander at Ms. Denhollander's presentation.  I can't
13 say where Ms. Kilpatrick heard Ms. Lyell's story, but she
14 did because she says in an email to Ms. Lyell, you know, I
15 heard or saw your story and it was very courageous of you
16 and she communicates with Ms. Lyell.
17    BY MR. KLEIN:
18    Q.  I was talking -- I'm sorry if I misunderstood or
19 if you misunderstood and I apologize, Ms. McDougal.  I was
20 talking about Ms. Kilpatrick and Ms. Denhollander, not Ms.
21 Lyell.  So the fact that Ms. Denhollander and Ms.
22 Kilpatrick previously were on a panel at the Caring Well
23 Conference, does that, by itself, create an impairment of
24 independence?

1   A.   Two people who attended the same conference with
2   no other facts, the answer is no.  Because maybe they
3   didn't cross paths.  Two people who connected at a
4   conference and authored materials together on an issue,
5   then that changes the facts.
6   Q.   Do you know how many --
7   A.   I do not know -- I do not know if Ms. Kilpatrick
8   and Ms. Denhollander had a conversation at the Caring Well
9   Conference.  I do not know whether Ms. Denhollander
10  attended Ms. Kilpatrick's panel or if Ms. Kilpatrick
11  attended Ms. Denhollander's panel.  I don't know those
12  facts.  They were both there.  Ultimately, they both were
13  involved with authoring curriculum together.  They clearly
14  know each other.  They clearly have worked together prior
15  to June of 2018 -- 2021.  I don't know why I keep saying
16  2018.  2021.  June of 2021, they knew each other prior to
17  that date -- Ms. Kilpatrick and Ms. Denhollander.
18  Q.   The fact that they know each other does not, by
19  itself, impair their independence or impair Guidepost's
20  independence on conducting an investigation two years
21  later, does it?
22  A.   It does the moment Guidepost brings Ms.
23  Kilpatrick in to do an investigation into the very same
24  thing that Ms. Kilpatrick has firsthand knowledge of from

1  years before.

2      Q.   So the fact --

3      A.   And remember, I don't have all of the evidence.
4  I only have a little bit of evidence and the little bit of
5  evidence is pretty bad in this regard.  There is evidence
6  that Ms. Denhollander and Ms. Kilpatrick worked together
7  to make curriculum that addressed the very subject matter
8  issue of this investigation and Ms. Denhollander
9  recommended Ms. Kilpatrick to the SBC to bring her on
10 either to conduct an investigation or to advise or make
11 recommendations that was prior to June 2021.

12     Ultimately, Guidepost hires Ms. Kilpatrick and adds
13 her not only to the investigative team, but to investigate
14 the very allegations that Ms. Kilpatrick only years
15 earlier had written to the victim about and she's already
16 heard the story.  She clearly already believed the story
17 from her own words.  You know, I heard your story.  It's
18 very courageous of you.  She obviously is not objective
19 here.  So the moment that Guidepost hires Ms. Kilpatrick,
20 I mean that kind of -- it's imputed disqualification,
21 right?  It's she's not objective.

22     Now had they had her on the investigation but focused
23 on someone else's allegations, I would still say that
24 doesn't meet the standard.  There's still a conflict and

1  this is bad.  But it couldn't -- it couldn't be any worse
2  that Ms. Kilpatrick was added to do a, quote, independent
3  objective investigation into facts she already heard, she
4  apparently already believed, she'd already told the victim
5  that she -- she admires her courage.  That's not objective
6  or independent at all.
7     Q.   What evidence do you have that someone's saying I
8  admire your courage means that I'm not going to be
9  independent in a subsequent investigation?  What authority
10 do you have for that position?
11    A.   Well, I didn't need authority from Ms. Kilpatrick
12 because on her panel she said as soon as a survivor starts
13 telling me their story, I can finish it.  I can tell them
14 what happened because I see certain patterns.  Well, that
15 -- I don't need to say on authority who does or who
16 doesn't prejudge.  But I will tell you that on the panel
17 at the 2019 Caring Well Conference, Ms. Kilpatrick said
18 the words "when a survivor starts telling me their story,
19 I can finish it for them.  I know what happened because I
20 see certain patterns."  And no matter how you measure
21 this, that's not objective, it's not open minded, and it's
22 not independent.  Whether that was in regard to Ms.
23 Lyell's allegations are irrelevant.  That's what came out
24 of Ms. Kilpatrick's mouth.

1    Q.   But Ms. Kilpatrick, and more specifically or more

2   generally, Guidepost, as it relates to David Sills, was

3   not addressing or proving that the allegations occurred.

4   Weren't they focused on how the EC mishandled those

5   allegations, which is different than whether or not in

6   fact David Sills, we can prove that he committed whatever

7   offense was alleged?

8              MS. RILEY:  Object to form and object to

9   facts not in evidence.

10   BY MR. KLEIN:

11   Q.   You can answer.

12   A.   The answer is no.  And here's where Mr. Leff and

13  I disagree on our reports.  As much as Ms. Tongring in the

14  30(b)6 deposition tried to state that we were not doing an

15  independent investigation under the second mandate, they

16  did an investigation on the second mandate.  And what Ms.

17  Tongring tried to do was draw a false distinction between

18  investigation and corroborating.  She used the term we

19  found sufficient evidence.  She used sufficient evidence

20  approximately six times.  I cited exactly what pages in my

21  report that she used the term sufficient evidence.  She

22  absolutely investigated.  Not well, mind you.

23       So she's trying to say we didn't investigate.  They

24  talked to, according to the 30(b)6 deposition, 300 to 400

1  people. They asked do you know anything about Jennifer
2  Sills [sic] and her allegations? Plus, the 57 or so
3  people -- if I have the number wrong -- 57 people listed
4  in the interrogatories who they interviewed in regards to
5  Jennifer Lyell's allegations. That's 457 people so far.
6     Then Ms. Tongring testified they reviewed five
7  terabytes of data. Probably a lot of it submitted by Ms.
8  Lyell. She doesn't say one way or the other, she just
9  said we reviewed five terabytes of data. So you
10 interviewed almost 500 people, you reviewed five terabytes
11 of data to find sufficient evidence that made you
12 comfortable that this happened. That's an investigation.
13 There's no difference between corroboration and
14 investigation. There's no difference between the first
15 mandate, the second mandate, the third mandate.
16    In order to investigate whether Ms. Lyell's complaints
17 were mishandled by the EC, the fundamental threshold
18 question is was she a survivor in the first place. Does
19 she fall within scope, right? And if what had happened to
20 her had happened to her in 1999, she wouldn't be in the
21 report. She shouldn't have been in the report. It's out
22 of scope.
23    But to draw false distinction between -- we didn't
24 actually investigate this, when the front of their report