Exhibit 36

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                      NASHVILLE DIVISION

 3
    MICHAEL DAVID SILLS and )
 4  MARY SILLS,             )
                            )
 5     Plaintiffs,          )
                            ) Case No. 3:23-cv-00478
 6  VS.                     ) Judge William L. Campbell, Jr.
                            ) Magistrate Judge
 7  SOUTHERN BAPTIST        ) Jeffery S. Frensley
    CONVENTION, a non-profit)
 8  corporation, et al,     )
                            )
 9     Defendants.          )
    _____X
10

11

12

13

14  _____

15

16           VIDEOTAPED DEPOSITION OF MARY SILLS

17                  TAKEN ON OCTOBER 3, 2024

18

19  _____

20

21

22
    Prepared by:
23  Carole K. Briggs, LCR #345
    Briggs & Associates
24  222 Second Avenue, North, Suite 340M
    Nashville, Tennessee  37201
25  Carole@Briggscourtreporting.com
```

1        A.      Mary Phillip Sills.

2        Q.      And how old are you today?

3        A.      Sixty-seven.

4        Q.      You have two children; is that right?

5        A.      I do.

6        Q.      And how many grandchildren?

7        A.      Ten.

8        Q.      I understand you recently retired from your
9    job; is that correct?

10       A.      I did.

11       Q.      Tell me first, what was your job?

12       A.      I was assistant to the provost at Millsaps
13   College in Jackson.

14       Q.      And when did you start that position?

15       A.      September of 2018.

16       Q.      And this is a college, higher education
17   institution?

18       A.      It is.

19       Q.      And where is it located?

20       A.      Jackson, Mississippi.

21       Q.      And the provost, I assume, is somebody in the
22   administrative staff of that college?

23       A.      The number two person.

24       Q.      And when you started the position at Millsaps
25   College, you were working for the provost?

 1        A.    I started in an adult education office,

 2   community education.  And I was there for about four or

 3   five months and then went to the provost's office.

 4        Q.    Did the provost seek you out, or did you seek

 5   out the new position?

 6        A.    I think a little of both.

 7        Q.    And who is the provost you were working for?

 8        A.    His name is Keith Dunn, but he is no longer

 9   there.

10        Q.    When did he leave?

11        A.    He left in June.  He's on a final sabbatical

12   from there.

13        Q.    Is Millsaps College affiliated with any

14   religious instruction?

15        A.    Methodist church.

16        Q.    Did you have friends and co-workers at

17   Millsaps College?

18        A.    I did.

19        Q.    Did you find that to be a positive place of

20   employment?

21        A.    Overall, yes.

22        Q.    You did earn some income there; is that

23   right?

24        A.    I did.

25        Q.    And how did that income compare to income you

1   had earned in your past?  I mean, had you had prior

2   jobs?

3        A.    I had.

4        Q.    And compare the wage or the salary you made.

5        A.    It was less.

6        Q.    By how much, do you know?

7        A.    Probably about seven or eight dollars an hour

8   less.

9        Q.    Tell me, prior to working at Millsaps

10  College, what was your employer just prior to that?

11       A.    Jefferson County Public Schools in

12  Louisville, Kentucky.

13       Q.    What was your last day working there?

14       A.    May of 2018.

15       Q.    Was that a job that was a school-year job,

16  meaning you got the summers off in --

17       A.    No.

18       Q.    -- Louisville?

19       A.    I didn't.  It was not.

20       Q.    It was 12-month?

21       A.    It was.  I was an instructor for the refugee

22  center for English as a second language.

23       Q.    And this was -- I'm sorry, was it like a

24  county school board position?

25       A.    It was.

1      Q.   And, in fact, you found a job that you were

2   happy with; is that right?

3      A.   Overall, yes.  It's not in the field that I

4   was in, which I would have preferred, but that's okay.

5      Q.   So your retirement was a decision you made?

6      A.   Yes.

7      Q.   It was not your employer telling you --

8      A.   No.

9      Q.   -- it was time to retire?

10     A.   No.

11     Q.   And when was your last day at Millsaps?

12     A.   May 14th of this year.

13     Q.   And then I understand you took a trip; is

14   that correct?

15     A.   I did.

16     Q.   And where did you go?

17     A.   Panama.

18     Q.   How long were you in Panama?

19     A.   Three months.

20     Q.   And what were you doing in Panama?

21     A.   We were traveling all over the country.

22     Q.   Was this a vacation, relaxing?

23     A.   Pretty much, yes.

24     Q.   You seem to be pausing.  Was there work

25   involved in this trip?

```
 1        A.    No.

 2        Q.    Were there family members involved in this

 3   trip?

 4        A.    No, just David and I.

 5        Q.    Any visits to churches, or missions, or --

 6        A.    We went to church on Sundays when there was

 7   an English speaking church available in the area.

 8        Q.    Had you been to Panama before?

 9        A.    Yes.

10        Q.    How many times?

11        A.    Twice.

12        Q.    Were there people there that you knew?

13        A.    No.

14        Q.    So you were not visiting friends?

15        A.    No.

16        Q.    Where did you stay, in a home, a hotel, a

17   resort?

18        A.    Usually in Airbnb.  Sometimes a hotel, if we

19   couldn't find one.

20        Q.    Did you have a car while you were there?

21        A.    No.

22        Q.    How did you travel from place to place?

23        A.    On the buses.

24        Q.    Have you taken other trips in 2024, other

25   than Panama?
```

 1     A.    Yes, we went to see our son in February in
 2  Ecuador.  And we just got back from a trip in Thailand.
 3     Q.    And how long were you in Ecuador in February?
 4     A.    Probably ten days.
 5     Q.    Was that just a vacation time for you?
 6     A.    To visit with our son and grandchildren.
 7     Q.    And then how long were you in Thailand?
 8     A.    Two weeks.
 9     Q.    And what kind of trip, or what was the nature
10  of that trip?
11     A.    Vacation with friends.
12     Q.    And so there are people there that you know
13  and you were visiting?
14     A.    No, they went to Thailand, also.
15     Q.    I see.  So you had other people join you on
16  the trip to Thailand, correct?
17     A.    Yes.
18     Q.    Had you been to Thailand before?
19     A.    Yes.
20     Q.    How many times?
21     A.    Once.
22     Q.    Who were the friends that traveled with you?
23     A.    The Waltmans from Texas and the Robinsons
24  from Texas.
25     Q.    And I may have asked you this, I apologize.

1       Q.    Is this your handwriting?

2       A.    Yes.

3       Q.    And is this a document that you would have

4    kept in the form of a diary?

5       A.    Yes.

6       Q.    So there is a date on this, the first page.

7    It's the 619 document, and it's dated June 29th, 2004;

8    is that correct?

9       A.    Yes.

10      Q.    And would these notes written by you have

11   been written on that date?

12      A.    Yes.

13      Q.    Whose birthday do you mention in the first

14   sentence, if you know?

15      A.    Molly, my daughter.

16      Q.    When you said brother wrote her and sent out

17   an e-mail -- I don't know what the word is there.  Could

18   you read that to me?

19      A.    Brother wrote her and sent out a blanket

20   e-mail.

21      Q.    Who is brother?

22      A.    Christopher.

23      Q.    Then you mention Jennifer in this entry; is

24   that correct?

25      A.    Yes.

1      Q.    So at this time you knew Jennifer Lyell in

2   June of 2004; is that correct?

3      A.    Yes.

4      Q.    And you say, she is being adopted by us.

5   Tell me what you meant by that.

6      A.    Jennifer was a lonely, needy person.  And we

7   thought it would be a good ministry to welcome her into

8   our family, and to make her feel less lonely, and cared

9   for.

10      Q.    So this was in June of 2004 that you were, in

11   your hand, commenting that you were -- she was being

12   adopted; is that right?

13      A.    Adopted in the sense as we were taking her on

14   as a ministry as a family.

15      Q.    How long had you known Jennifer before this

16   diary entry?

17      A.    Well, it could not have been before 2003

18   because we didn't live in Louisville.  So sometime

19   between when we moved to Louisville in the beginning of

20   2003 and this time.

21      Q.    This statement would appear to be a decision,

22   Jennifer is being adopted by us; is that correct?  You

23   were making a decision --

24      A.    As a family.

25      Q.    -- to adopt her?

1          A.     To care for her, to minister to her.

2          Q.     And how long had it taken you, and you can

3     speak for yourself, of course, to make that decision to

4     adopt her and minister to her?

5                 MS. RILEY:  Object to the form and

6     mischaracterizes testimony.

7                 THE WITNESS:  It was not a one-day conscious

8     decision.  It was a gradual decision as we observed her

9     and her life, and that she was lonely and needy.  And we

10    thought we could help her.

11    BY MS. CALLAS:

12         Q.     So how many weeks or months did you observe

13    her prior to June --

14         A.     I don't know.

15         Q.     And so part of my questioning relates to

16    timing here.  Jennifer had been around you, that is, you

17    had spent time with her, prior to June of 2004; is that

18    correct?

19         A.     Yes.

20         Q.     And would you agree that was a regular

21    occurrence, you would be spending time with Jennifer

22    prior to June of 2004?

23         A.     I don't know how much time.

24         Q.     Your next sentence is, Lord, please help this

25    to be the right -- is that thing?  It's covered up by,

1    it looks like, a little sticker.  Do you see that?

2        A.    Yes.

3        Q.    Tell me what you meant by that.

4        A.    That we would minister her -- to her in a way

5    that would help her, that would ease her loneliness.

6    And we just wanted to be a good Christian example to our

7    children as to what kindness was.

8        Q.    What was your concern about whether this was

9    the right thing?  Was it for you or for her?

10       A.    For both of us.

11       Q.    And you mean both Jennifer and you?

12       A.    Yes.

13       Q.    The next sentence, would you read that,

14   please.

15       A.    Don't let David get carried away and ruin it.

16       Q.    I think it may be a sentence before that.  It

17   starts with don't.

18       A.    Don't let this be another disaster.  Help us

19   to minister to her.

20       Q.    Tell me what you meant by don't let this be

21   another disaster.

22       A.    I don't know what I meant by that.  That was

23   20 years ago.

24       Q.    Had there been a disaster?

25       A.    No.

1      Q.   So when you said, don't let this be another
2  disaster --
3      A.   I don't know.
4      Q.   What did you mean when you said, don't let
5  David get carried away and ruin it?
6      A.   David is -- this-one-thing-I-know, this-one-
7  thing-I-do person.  And when we agree to do something,
8  he's all in.  And we don't -- I did not want that to be
9  overwhelming to her, to us, to my children.
10     Q.   So you had concern in June of 2004 that David
11  would be carried away with the ministry to Jennifer or
12  what aspect?
13          MS. RILEY:  Object to the form.
14          THE WITNESS:  Please don't put words in my
15  mouth.  I didn't want -- I didn't want David to think
16  that he needed to be more than a counselor or a friend.
17  I wanted him to realize that she was a person that was a
18  lonely person, but that he didn't have to fill that void
19  for her.
20  BY MS. CALLAS:
21     Q.   And what would be being more than a counselor
22  or a friend?
23     A.   I don't know.  I would not want him to -- I
24  need to think about my response.  I would want him to be
25  able to guide her Biblically, to learn what a

1   into our family and sometimes expected too much.

2        Q.   And what was your opinion that was opposite

3   of others?

4        A.   I don't remember what that was about.

5        Q.   So you don't recall what your opinion was?

6        A.   I don't know if it was about her or if it was

7   about her moving.  I don't -- I don't remember.

8        Q.   Do you recall, as you sit here today, in

9   August of 2004, if you had an opinion about Jennifer?

10            MS. RILEY:  Object to the form.

11            THE WITNESS:  I have no idea.

12   BY MS. CALLAS:

13        Q.   You -- could you describe to us how you felt

14   about her in August of 2004?

15        A.   I have no idea.  I don't remember.  I mean,

16   that was 20 years ago.

17        Q.   Did you like her?

18        A.   Yes.  She was a dynamic, intelligent, funny

19   person.

20        Q.   Did you dislike her?

21        A.   No.

22        Q.   Did you trust her?

23        A.   Yes.

24        Q.   Did you have any mistrust of her?

25        A.   We did see that there were times when she was

1  see that at the top?

2       A.    Yes.

3       Q.    And who is Denise Richardson?

4       A.    My counselor.

5       Q.    So would this form completed on May 8th, 2023

6  be the first time you saw Denise Richardson or completed

7  a form for her?

8       A.    Yes.

9       Q.    Had you, prior to May of 2023, seen, either

10  in an office or virtually, a counselor?

11      A.    No.

12      Q.    How is it that Denise Richardson was

13  recommended to you?

14      A.    Through church.

15      Q.    And is she a psychologist or counselor?  Do

16  you know her title?

17      A.    Counselor.

18      Q.    This form starts by asking you, what brings

19  you to counseling at this time?  Is there something

20  specific, such as a particular event?  Be as detailed as

21  you can.  Do you see that question at the top --

22      A.    Yes.

23      Q.    -- of the first page?  And are the -- it's

24  typewritten, obviously, but do you see that the next

25  words on the form are a woman accused my husband of

 1   brings you to counseling at this time; am I correct?

 2       A.    Yes.

 3       Q.    You've indicated you're taking Levepro,

 4   Xanax, and then -- I can't tell if that's --

 5       A.    Amitriptyline.

 6       Q.    Amitriptyline for sleeping; is that right?

 7       A.    I'm not taking Levapro anymore --

 8       Q.    How long -- I'm sorry, go ahead

 9       A.    Xanax, as needed, and Amitriptyline, I'm

10   still taking.

11       Q.    How long did you take Levapro?

12       A.    Just a couple of months.  I didn't like it.

13       Q.    Are you taking any other medications?

14       A.    No.

15       Q.    So today you're taking Xanax, as needed?

16       A.    Yes.

17       Q.    When did you first take Xanax?

18       A.    Maybe a year or two years ago.

19       Q.    Do you know how frequently you take it?

20       A.    Rarely.

21       Q.    And then you do take a medication to help you

22   with sleep?

23       A.    Yes.

24       Q.    How long have you been taking a medication to

25   help you with sleep?

1        A.      Two years, three years.

2        Q.      Do you take that every night?

3        A.      Yes.

4        Q.      Is it helpful?

5        A.      Yes.

6        Q.      This form does indicate that you occasionally

7    drink alcohol; is that correct?

8        A.      Rarely.

9        Q.      So this next page of this form indicates that

10   you are currently having trouble concentrating; is that

11   right?

12       A.      At the time.

13       Q.      How long had you had trouble concentrating?

14       A.      Since May of 2018.

15       Q.      Difficulty sleeping?

16       A.      That just comes with age.

17       Q.      Low motivation?

18       A.      Occasionally.

19       Q.      And how long had you had low motivation?

20       A.      That's up and down.

21       Q.      Isolation from others?

22       A.      Sometimes.

23       Q.      When did that start?

24       A.      About the same time.

25       Q.      May of 2018?

1        A.     Yes.

2        Q.     Do you recall visiting or seeing Denise

3    Richardson on May 16th of 2023?

4        A.     Yes.

5        Q.     And did she tell you that she was diagnosing

6    you with anxiety disorder?

7        A.     Yes.

8        Q.     That appointment last 50 minutes.  Does that

9    sound right to you?

10       A.     Yes.

11       Q.     And was this just an opportunity for you to

12   talk to Denise Richardson?

13       A.     Yes, my first appointment, evidently.

14       Q.     She has here you were at your home for the

15   session.  Was this a Zoom session?

16       A.     Yes.

17       Q.     So she's indicated, and I think it's -- CL is

18   the abbreviation.  I assume that's for you, either you

19   as a client, or I don't know, but it says, CL reported

20   on her multi-year-long chronic trauma resulting from

21   family issues.  Do you see that statement about halfway

22   down the page?

23       A.     Yes.

24       Q.     Do you agree with that description of what

25   you reported to Denise Richardson on that date?

1      A.    Yes.

2      Q.    So this had been a multi-year-long chronic

3  trauma; is that right?

4      A.    Yes.

5      Q.    You were describing how you had been dealing

6  with your trauma through values of strong work ethic and

7  commitment to Christian vals.  Do you see that

8  statement?

9      A.    Yes.

10      Q.    And did Mrs. or Ms. Richardson offer you

11  exploration of coping skills, or did she give you advice

12  on how to cope?

13      A.    Yes.

14      Q.    Did you find this to be a helpful session

15  with her?

16      A.    Yes.

17      Q.    Let's turn two pages to the next visit on May

18  23rd, 2023, at Sills 1106 -- I'm sorry 110867.  Again,

19  would this have been a Zoom session with Denise

20  Richardson?

21      A.    Yes.

22      Q.    And when you started these sessions, did you

23  have an idea of how many times you would meet with her,

24  you know, either at your or her suggestion?

25      A.    No.

1          Q.    So, again, in the middle of the page, she

2    begins to report that client reported continued grief

3    and stress from her ongoing difficulties resulting from

4    marital distress five years ago.  Do you see that

5    statement?

6          A.    Yes.

7          Q.    And is that something you told Denise

8    Richardson at the time?

9          A.    Yes.

10         Q.    The session today marks the fifth anniversary

11   of the presenting event.  Do you see that?

12         A.    Yes.

13         Q.    And what was the fifth anniversary?

14         A.    Of Jennifer going to Al Mohler.

15         Q.    Toward the bottom, there are two numbered

16   paragraphs, No. 1 -- and these are suggested exercises

17   for you to write a letter to your estranged daughter.

18   Do you see that?

19         A.    Yes.

20         Q.    Did you do that?

21         A.    Yes.

22         Q.    The next page, it indicates that you were

23   taking medication for anxiety and that you reported it

24   had been helpful.  Do you see that on the page?

25         A.    Yes.

1    tweet of Eric Geiger; is that correct?

2         A.    Yes.

3         Q.    What about the Baptist Press, what statement

4    has the Baptist Press made about Mary Sills?

5         A.    I don't know if that's specifically about me,

6    but if it involves my husband, it involves me.

7         Q.    And what about -- you said Guidestone, and

8    I'll -- Guidepost.

9         A.    Post, sorry.

10        Q.    So you've mentioned Guidepost.  What

11   statement did Guidepost make about Mary Sills?

12        A.    Not about me, specifically.  But, again, when

13   you talk about my husband, you talk about me.

14        Q.    There are other defendants.  Do you

15   understand there are other defendants you have sued?

16        A.    Yes.

17        Q.    And you don't recall the specific names; is

18   that right?

19        A.    Yes.

20        Q.    I will identify them for you, and you can

21   tell me what you understand they have done or how

22   they've acted to harm you, Mary Sills?

23        A.    Okay.

24        Q.    Ed Litton is one of those people.

25        A.    Also a member of the Southern Baptist

1       Q.    You mentioned the Baptist Press.  Did your

2  name appear in any Baptist Press article or press

3  release, if you recall?

4       A.    I don't recall.

5       Q.    Did your name appear in the Guidepost report,

6  if you know?

7       A.    I don't know.

8       Q.    Did you look for your name in the report?

9       A.    I didn't want to read the whole report.

10            MS. CALLAS:  Why don't we -- let's take a

11  five- or ten-minute break.  We may come back, or have

12  lunch, or do something, but we'll take a little break.

13            THE VIDEOGRAPHER:  Off the record at 11:42.

14            (Recess observed.)

15            THE VIDEOGRAPHER:  Back on the record at

16  12:27.

17  BY MS. CALLAS:

18       Q.    Mrs. Sills, what year did your daughter

19  graduate from college?

20       A.    2009?  I don't remember.

21       Q.    Do you recall that Jennifer Lyell attended

22  some aspect of the graduation ceremony or celebration?

23       A.    I don't remember.

24       Q.    Did you ever have a conversation with Molly

25  -- instead of saying ever, let me say around the time of

1     A.    Yes.

2     Q.    And when did he tell you this had happened?

3     A.    Not long after it had happened.

4           MS. CALLAS:  I am going to hand you what we

5     will mark as the next exhibit.  This is Exhibit No. 8.

6           (Exhibit 8 was marked.)

7           MR. LOOFBOURROW:  Bates is cut off, but it's

8     108505 Sills.

9     BY MS. CALLAS:

10    Q.    Mrs. Sills, you'll see this is a text

11    exchange.  It was produced by your attorneys to us.  Do

12    you have any reason to question whether this is your

13    text messaging?

14    A.    No.

15    Q.    Is that your -- well, hot mail?

16    A.    Yes.

17    Q.    And who is Carol Sills?

18    A.    My daughter-in-law.

19    Q.    You have a text message at the top of the

20    page dated May 31st, 2018.  Tell us what you are saying

21    in that text message.

22    A.    That we're going to have an attorney.

23    Q.    Well, does it not say you are afraid she will

24    press charges or a lawsuit?

25    A.    Yes.

1      Q.    And what do you mean by that?

2      A.    Just what it says, that we're afraid that

3   Jennifer would press charges or have a lawsuit.

4      Q.    By press charges do you mean criminal

5   charges?

6      A.    Yes.

7      Q.    What kind of criminal charges were you

8   concerned about in May of 2018?

9      A.    Any kind.

10     Q.    Did you discuss what types of criminal

11  charges could be made?

12     A.    We had no idea what she was thinking.

13     Q.    Did you understand that she was alleging what

14  could be considered criminal activity?

15     A.    Yes.

16     Q.    And what kind of criminal activity did you

17  understand she was alleging?

18     A.    Sexual abuse.

19     Q.    And so in May of 2018, you understood

20  Jennifer was making allegations that could be considered

21  criminal in nature; is that right?

22     A.    I don't know what Jennifer was thinking.  We

23  were doing this to protect ourselves.

24     Q.    So you had concern in May of 2018 that she

25  may press charges or file a lawsuit against you or

1    David or both?

2          A.     We had no idea.

3          Q.     And you were planning at that time to get an

4    attorney, and did you do that?

5          A.     Yes.

6          Q.     Do you recall or were you aware that a man by

7    the name of David Roach had contacted your husband,

8    David Sills, in March of 2019?

9          A.     I know that he tried to get in touch with

10   David at some point, but I don't know when that was.

11         Q.     And how did you learn that David Roach was

12   trying to get in touch with your husband, David Sills?

13         A.     My husband told me.

14         Q.     So at the time that David Roach was making an

15   attempt to contact David Sills, your husband told you

16   I've had a call?

17         A.     Yes.

18         Q.     So what do you remember being told at that

19   time?

20         A.     That he had tried to call my husband.

21         Q.     And who was David Roach?

22         A.     A reporter for the Baptist Press.

23         Q.     And did your husband express what the reason

24   or the subject matter of the call was?

25         A.     We assumed it was about Jennifer.

1      Q.    Did you actually hear the voice mail that was

2  left by David Roach?

3      A.    No.

4      Q.    Did David Sills tell you what the voice mail

5  said?

6      A.    He said he wanted to talk to David.

7      Q.    About Jennifer?

8      A.    David wanted to talk to David.

9      Q.    So Roach wanted to talk to Sills; is that

10  right?

11      A.    Yes.

12      Q.    And what did David Sills decide to do?

13      A.    Nothing.

14      Q.    Did he talk to you about that decision?

15      A.    We just thought it would be better to keep

16  our mouths shut.

17      Q.    Did you confer with your counsel?

18      A.    Our attorney told us not to talk to anybody.

19      Q.    Who was your attorney at that time?

20      A.    I don't remember her name.  She was in

21  Louisville.

22      Q.    You did understand, though, that the call

23  from David Roach at the Baptist Press did relate in some

24  way to Jennifer Lyell, correct?

25      A.    Yes.

1   down the table.

2   EXAMINATION BY MR. OTCHY:

3       Q.    Ms. Sills, my name is Alex Otchy.  I

4   represent Guidepost and I'm from Mintz and Gold.  How

5   are you today?

6       A.    I'm okay.

7       Q.    Just a few follow-up questions.  This will be

8   very short.  You mentioned that you did not read the

9   entire Guidepost report; is that correct?

10      A.    Yes.

11      Q.    Do you know how much of the Guidepost report

12  you did read?

13      A.    No.

14      Q.    Did you read any section of the Guidepost

15  report that included your name personally?

16      A.    No.

17      Q.    Do you have any evidence that the Guidepost

18  report, as a whole, included your name?

19      A.    I don't know.

20            MR. OTCHY:  No further questions.

21  EXAMINATION BY MR. TRAVIS:

22      Q.    Good afternoon, Mrs. Sill.  I'm Tom Travis.

23  And I mentioned earlier today, I represent the Southern

24  Baptist Theological Seminary and Dr. Al Mohler.

25            I think as part of your exchange with counsel

1    earlier today, you referenced the seminary and its

2    inclusion in your lawsuit; is that right?

3         A.    Yes.

4         Q.    And I believe you said earlier that you sued

5    the seminary because it is part of the SBC.  Is that

6    your belief as to why you sued the seminary?

7         A.    Yes.

8         Q.    Are you aware of any statements made by the

9    seminary specifically including your name?

10        A.    No.

11        Q.    And as for Dr. Al Mohler, I believe you said

12   earlier today that you have not had any communications

13   with Dr. Mohler since 2018.  Is that fair to say?

14        A.    Yes.

15        Q.    Are you aware of any public statements or

16   statements at all from Dr. Mohler specifically

17   mentioning your name?

18        A.    I don't know.

19        Q.    So you are not sitting here today aware --

20        A.    I am not aware.

21        Q.    I'm sorry, you're not aware of any statements

22   from Dr. Mohler specifically including your name; is

23   that correct?

24        A.    That's correct.

25              MR. TRAVIS:  No more questions for me.  Thank