Exhibit 37

**In the Matter Of:**

SILLS vs SOUTHERN BAPTIST CONVENTION

3:23-cv-00478

---

**DAVID ROACH, PHD**

*August 26, 2024*

---

ESQUIRE

DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1        A.   (Document review.)  Okay.

2        Q.   So the document marked EC 3758 appears to

3   be emails between you and Ms. Lyell, again, related

4   to this article; is that fair?

5        A.   That's correct.

6        Q.   And I realize that we have an incomplete

7   email at the bottom from Ms. Lyell.  And I'm really

8   actually interested in asking you about the top

9   email from you.

10       A.   Okay.

11       Q.   And that is dated March 7, 2019, at

12  12:53 p.m.

13            Do you see that?

14       A.   I see that.

15       Q.   And it says in the second paragraph:

16                "No word from Sills.  I

17             left messages for him

18             yesterday and today, and I

19             confirmed he still uses

20             that cell number."

21            Do you see that?

22       A.   I see that.

23       Q.   Based on that, when had you called

24  Dr. Sills related to this article?

25       A.   Based on that, it appears I called him

1  Wednesday, March the 6th, and Thursday, March the

2  7th.

3        Q.   Did you ever receive a return phone call

4  from Dr. Sills related to this article?

5        A.   No, I did not.

6        Q.   When you called Dr. Sills, did you leave

7  a message?

8        A.   Yes, I did.

9        Q.   And did you tell him the subject of the

10  message?

11        A.   Yes, I did.  You mean the subject of the

12  article?

13        Q.   Yes.

14        A.   Yes, I did.

15        Q.   As best you can recall -- and I know it's

16  been more than five years -- but could you tell the

17  jury what you stated in your messages that I assume

18  were left by voicemail?

19        A.   Yes, they were left by voicemail.

20             I hesitate to be too specific because I

21  don't remember specifically.  I can say that it was

22  a substantive message that referred to something of

23  the topic of the article and told him that I would

24  like to get his response to the allegations.

25        Q.   And you mention in this email:

1              "I confirmed he still uses

2              that cell number."

3         Prior to reaching out to Dr. Sills

4   related to this article, did you have Dr. Sills'

5   cell number?

6         A.   Yes, I did.

7         Q.   And had you communicated with Dr. Sills

8   through that number previously?

9         A.   I assume so.

10        Q.   You don't have a specific recollection?

11        A.   I don't have a specific recollection.

12        Q.   How did you confirm that Dr. Sills still

13  used that cell number?

14        A.   I believe I asked one of the gentlemen

15  from Reaching & Teaching to confirm that he still

16  used that cell number.

17             MS. CARPENTER:  All right.  I'd like to

18  make this document Exhibit 4.

19             (EXHIBIT 4 WAS MARKED

20              FOR IDENTIFICATION.)

21             MS. CARPENTER:  And I am going to hand

22  Dr. Roach documents that are marked EC 66 through

23  EC 73.

24        Q.   And I realize, Doctor, that this is a

25  little bit more pages.  This is more pages that

1  at the communications office.  I also had one

2  doctoral seminar with him, and it was a small

3  seminar with just me and one other guy who would

4  meet with Dr. Mohler in his office.

5       Q.   Did you speak with Dr. Mohler related to

6  the article that was published March 8 of 2019?

7       A.   Yes.

8       Q.   And tell me what you recall about that.

9       A.   I asked him questions about his

10  conversation with Jennifer, and I asked him

11  questions about the nature of Dr. Sills' departure

12  from the Seminary.

13       Q.   And what did he tell you?

14       A.   I don't want to be too specific just

15  because I don't recall specifically.  But I do

16  remember that he cited the confidentiality of

17  personnel matters.  He confirmed that he had talked

18  with Jennifer.  And I do remember asking him if he

19  knew that she had reported the incidents to the

20  police, and he said he did not know that.

21       Q.   Anything else you can recall --

22            MS. RILEY:  Can you read back his answer?

23  I just didn't hear it.

24            (REQUESTED PORTION OF RECORD READ.)

25       Q.   And just to clarify, I think you said:

1      Q.    And not in Saraland?

2      A.    No, I was not.

3      Q.    Did you speak during your research for

4   the article with Eric Geiger?

5      A.    Yes, I did.

6      Q.    Who is Eric Geiger?

7      A.    He was a former vice president at

8   LifeWay, and at the time he was the pastor of a

9   church in California.

10     Q.    Was that discussion also by telephone?

11     A.    Yes, it was.

12     Q.    And how many times did you speak with

13  Eric Geiger?

14     A.    I believe just once.

15     Q.    Why was it that you reached out to -- I

16  don't know if it's Mr. or Dr. Geiger?

17     A.    Ms. Lyell said that she had disclosed her

18  allegations to him when he worked at LifeWay, and

19  so it was just another effort by me to confirm

20  facts and get as many facts as I could.

21     Q.    What did Mr. Geiger or Dr. Geiger tell

22  you when you contacted him?

23     A.    He confirmed that he had had a

24  conversation with Ms. Lyell where she made

25  allegations about Dr. Sills, and he -- I don't know

1  either if it's Mr. or Dr. Geiger, but he seemed to

2  be very sympathetic to Jennifer and commended her

3  character in making her allegations public.

4       Q.   Did you know Eric Geiger personally?

5       A.   It's possible that I had dealt with him

6  in the course of writing some article, but I don't

7  recall specific personal interactions with him.

8       Q.   Is there anyone else that you spoke to in

9  researching this article that I have not asked you

10  about?  And I'm happy to kind of summarize who I

11  think I have asked you about, if that's helpful.

12       A.   Please do.

13       Q.   Okay.  We just talked about Eric Geiger,

14  we talked about Dr. Mohler, you spoke with -- did

15  you ever speak with Jennifer Lyell or was that by

16  email only?

17       MS. RILEY:  I'm not objecting.  Who was

18  the person you just asked him about, Brigid?

19       MS. CARPENTER:  Jennifer Lyell.

20       MS. RILEY:  Oh, okay.

21       A.   I dealt with her at least mostly in

22  written communication.  I may have talked with her

23  on the phone, but I'm not positive about that.

24       Q.   And then I believe Dr. Bill Cook,

25  Ninth & O?

1        Q.   I am handing you a document marked

2   GPSILLS 2601.  And take a moment to read that, and

3   then I'll ask you questions.

4        A.   (Document review.)  Okay.

5        Q.   And at the bottom there is an email from

6   you to Jim Guenther, Friday, May 8th, 2019, at

7   12:33.

8             Do you see that?

9        A.   Yes.

10       Q.   And what were you communicating to

11  Guenther?

12       A.   I asked him if he was able to review the

13  Baptist Press story for any legal concerns.

14       Q.   And I note you said "Shawn" -- would that

15  be Shawn Hendricks?

16       A.   Yes.

17       Q.   -- "has been working with Jaime"?

18       A.   Yes.

19       Q.   Who is Jaime?

20       A.   Jaime Jordan.

21       Q.   And who is Jaime Jordan?

22       A.   He was an attorney for the Executive

23  Committee at the time.

24       Q.   So what are you -- I'm sorry, I may be

25  repeating.  What were you asking Mr. Guenther

1  there?

2      A.   I asked him to review the article for any

3  legal concerns.

4      Q.   And how did Mr. Guenther respond?

5      A.   He asked:

6              "Might you say in the

7              first paragraph:  Details

8              of what she says was a

9              morally inappropriate

10             relationship with Sills for

11             more than a decade,

12             beginning while she was a

13             Southern Seminary student."

14         And then he went on to add:

15             "And the alleged

16             relationship continued in

17             the second."

18     Q.   And then he said:

19             "I'm glad to see you

20             tried to contact Sills."

21         Is that right?

22     A.   That's correct.

23     Q.   And when was Mr. Guenther's email back?

24     A.   From the timestamp, it looks like he

25  emailed me Friday, March the 8th, at 12:45 p.m.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:23-cv-00478    Document 411-21    Filed 11/03/25    Page 10 of 26 PageID #:
14705

1   all be in the past and that he could move on.

2        Q.   Based on that answer, you understood that

3   Dr. Cook had spoken to Dr. Sills about Ms. Lyell's

4   allegations?

5        A.   That was my understanding.  Well, I'm not

6   sure I would want to say he had spoken to Dr. Sills

7   about Ms. Lyell's investigation -- I mean

8   Ms. Lyell's allegations.  He was aware of a

9   relationship of some sort that had gone on between

10  the two of them, and he spoke to Dr. Sills about

11  that.  I'm not sure how Dr. Cook knew about the

12  relationship.

13       Q.   But he had spoken to Dr. Sills about it?

14       A.   He indicated that to me.

15       Q.   And in addition to Dr. Cook speaking with

16  Dr. Sills about the relationship, had Ninth & O

17  taken any action as to Dr. Sills specifically, to

18  your knowledge?

19       A.   I don't remember.

20            I do remember one other thing that

21  Dr. Cook told me that I don't believe I knew --

22  well, he either told me or reminded me that

23  Jennifer Lyell also had been a member of Ninth & O

24  Baptist Church.

25       Q.   Did he know Ms. Lyell personally, or do

1  told was that counsel had suggested we needed a

2  more thorough knowledge of the specific acts being

3  alleged by Ms. Lyell.

4       Q.   Do you know what conversations

5  Mr. Hendricks had had with Ms. Lyell about the

6  specific acts being alleged?

7            MS. RILEY:  Object to the form, calls for

8  speculation.

9       Q.   Do you know?

10      A.   He indicated to me that he had had such

11  conversations.  My position at the time was that I

12  was not comfortable talking to Jennifer Lyell or

13  David Sills about specific sexual acts that were

14  alleged to have taken place.

15      Q.   In the article that you wrote that was

16  submitted -- and that's Exhibit Number 6, I

17  believe, which you've testified is the original

18  article which you had carefully prepared based on

19  information made available to you.

20           MS. RILEY:  Object to the form.

21      Q.   Is that right?

22      A.   Yes.

23      Q.   Exhibit Number 6 wasn't a first-thought

24  rough draft or general editorial commentary; it

25  was submitted --

1      A.    Correct.

2      Q.    Okay.  But whatever they were, it's your

3  understanding from Dr. Mohler that it was

4  Ms. Lyell's allegations at that time which resulted

5  in the action of Dr. Sills resigning from the

6  Seminary?

7           MS. RILEY:  Object to the form.

8      A.    Dr. Mohler told me that she shared

9  allegations and they took action.  He also said

10 that he couldn't say why Sills' employment ended.

11     Q.    And he told you that that had happened in

12 May of 2018?

13          MS. RILEY:  Object to form.

14     A.    I didn't remember that until I read it

15 here, but I believe that to be an accurate

16 recounting of what he told me.

17     Q.    All right.  I just have a few more.

18          Do you see in the story in Exhibit 6 that

19 you drafted on the second page, EC 1171, the third

20 full paragraph down from the top --

21     A.    Yes.

22     Q.    And are you quoting Dr. Mohler there?

23     A.    Yes.

24     Q.    And would you read that quote from

25 Dr. Mohler into the record?

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:23-cv-00478   Document 411-21   Filed 11/03/25   Page 13 of 26 PageID #:
14708

1    statement.

2            MS. RILEY:  Also calls for speculation.

3        Q.  Let me show you a document marked EC 3663

4    through EC 3664.

5            MR. ELBERT:  And let's mark this

6    document, those two pages, as Exhibit 10.

7                (EXHIBIT 10 WAS MARKED

8                 FOR IDENTIFICATION.)

9        Q.  Can you see that document, Doctor?

10       A.  Yes.

11       Q.  What is that document?

12       A.  That appears to be the statement that

13   Jennifer Lyell submitted to Baptist Press.

14       Q.  And is that the statement then that was

15   sent -- forwarded on to you by Mr. Hendricks to

16   follow up on?

17       A.  Yes.

18       Q.  I'm scratching through my notes, which is

19   a good sign, Dr. Roach.  I'm getting there.

20           Based on your recollection and your

21   review of the emails in advance of the deposition

22   here today, do you have any recollection of

23   Jennifer Lyell ever attempting to dissuade you from

24   following up with any witness or asking any

25   question you thought appropriate as a reporter

1   what I probably am in a position to give on that.

2   It was Shawn's prerogative to take it and go

3   through whatever process he felt was appropriate.

4        Q.    Are you aware of some of the process that

5   it went through?

6        A.    Yes.

7        Q.    Can you tell me what you do know?

8        A.    I know that Shawn read it.  I know that

9   he seemed to think very carefully over it over a

10  longer period of time than usual.  I got the

11  impression at the time that he had discussed it

12  with Sing Oldham, who is Shawn's boss and took a

13  very active role in some Baptist Press stories.  I

14  knew that Jaime Jordan and Jim Guenther, legal

15  counsel for the Executive Committee, were

16  consulted.  I knew there were some discussions in

17  the office and that Laura Erlanson was part of the

18  discussions.  Shawn mentioned to me some of his

19  thoughts on it, and I knew that one of his issues

20  he was kicking around in his own mind was whether

21  it ought to say she alleged sexual abuse or not.

22            Those strike me as a good list of things

23  that I knew or thought had went on in the process.

24       Q.    Did Shawn share with you about his

25  thoughts or concerns on the sexual abuse language?

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 3:23-cv-00478   Document 411-21   Filed 11/03/25   Page 15 of 26 PageID #:
14710

1      A.   Yes.

2      Q.   What were his thoughts?  What were his

3  concerns about the term "sexual abuse?

4           MR. ELBERT:  Object to the form of the

5  question.

6      A.   It makes me a little uncomfortable to

7  testify about someone else's mental acts.  But if

8  you'd like me to state what I thought his

9  concern -- what was at least amongst his concerns,

10  I can do that.  But I wouldn't want to say this is

11  definitely what he was thinking or most important

12  in his thoughts.

13      Q.   What did he tell you personally about the

14  term "sexual" -- about using the term "sexual

15  abuse" in the article?

16      A.   I do think there was some concern that

17  there could be legal ramifications of passing

18  along -- of publishing an allegation that someone

19  had committed a crime.

20      Q.   What did Mr. Hendricks actually tell you?

21      A.   I'm not sure.

22      Q.   Did he tell you he had concerns that

23  there might be legal ramifications for using the

24  term "sexual abuse"?

25      A.   There were a group of people that were

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:23-cv-00478   Document 411-21   Filed 11/03/25   Page 16 of 26 PageID #:
14711

1 | Dr. Cook on them and put them in a file related to
2 | that particular article that you're writing?
3 |     A.   Not typically.
4 |     Q.   Did you do it with Dr. Cook or any of the
5 | people you interviewed for this particular article?
6 |     A.   I don't recall doing that.
7 |     Q.   And you don't remember what Dr. Cook told
8 | you of what action the church took?
9 |     A.   No, I don't.
10 |     Q.   How many times did you talk to Dr. Cook?
11 |     A.   I believe just once.
12 |     Q.   And Jennifer Lyell told you that Bill
13 | Cook had conducted an investigation; is that
14 | correct?
15 |     A.   The emails in this case reminded me of
16 | that.  But yes, that appears to be the case.  It
17 | appears to be the case that she said they conducted
18 | an investigation, to clarify my statement.
19 |     Q.   Okay.  And did Dr. Cook confirm that they
20 | had done an investigation?
21 |     A.   He was not comfortable with the term
22 | "investigation."
23 |     Q.   And what do you mean by that?
24 |     A.   I don't remember all the details of the
25 | conversation.  Reviewing the emails in preparation

1       A.   Regarding the circumstances and reason

2   for Dr. Sills leaving the employment of Southern

3   Seminary, Dr. Mohler indicated that HR matters

4   largely could not be discussed.  So that one --

5   that was the answer that I got with that.  He said

6   that he doesn't have the power to make an adult

7   make a police report, but I believe he said that he

8   encouraged Jennifer to make a police report.

9       Q.   Did you discuss or ask him what Ms. Lyell

10  actually reported to him?

11      A.   I don't remember the questions that I

12  asked him.  I don't think he got into what she

13  reported to him.  But he seemed to affirm her

14  courage in making the report without specifically

15  speaking to the facts that she reported.

16      Q.   The article that was published, it said

17  that -- well, let me find it.  I don't want to say

18  it said it without actually finding it.

19           Did Reaching & Teaching, Dr. Roach, take

20  any action other than accepting Mr. Sills'

21  resignation?

22           MR. ELBERT:  Object to the form of the

23  question.

24           MS. CARPENTER:  Same objection.

25      A.   I don't remember if I ever learned the

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 3:23-cv-00478   Document 411-21   Filed 11/03/25   Page 18 of 26 PageID #:
14713

1 | of the facts.

2 |     Q.   Did you personally learn any additional

3 | facts about these allegations in between the time

4 | that you wrote the first article and the time when

5 | this article on October the 15th was published?

6 |     A.   I don't think so.

7 |     Q.   As far as you're aware, did Baptist Press

8 | have any additional evidence corroborating

9 | Ms. Lyell's story that it had at the time that you

10 | wrote your article when they wrote this article on

11 | the 15th?

12 |        MR. ELBERT:  Object to the form of the

13 | question.

14 |     A.   No.  But after I left employment with

15 | Baptist Press in May, I really wouldn't have been

16 | in a position to be in the loop on that issue.

17 |     Q.   Have you ever spoken to Ms. Lyell?

18 |     A.   Have I ever spoken to her?

19 |     Q.   Yeah.  Let me rephrase that.

20 |        Did you speak to Jennifer Lyell in

21 | preparation of writing your article?

22 |     A.   It's possible that I had a brief phone

23 | conversation or two with her.  I'm inclined to

24 | think that happened, but I'm not sure.  And I know

25 | that the bulk -- the vast, vast bulk of the

1  time when I was employed by Southern Seminary.  It

2  appeared in the Southern Seminary Magazine.  And

3  then I don't know how many other times I have

4  interviewed him.  But I've gone to him at other

5  times as a source on missions-related matters,

6  definitely when I was employed by Southern

7  Seminary.  And it wouldn't surprise me if I had

8  done that after I left Southern Seminary as well.

9       Q.   What's your relationship with Dr. Sills?

10  What was your relationship like?

11            MR. ELBERT:  Object to the form of the

12  question.

13       A.   We weren't real close, but we had a

14  friendly relationship up until this point.  And I

15  haven't seen him or communicated with him since

16  this.

17       Q.   You have testified that you called

18  Mr. Sills two times in preparation of your article.

19  Did you leave two voicemail messages or just call

20  two times?

21       A.   I'm certain that I left one voicemail

22  message.  I don't remember what happened on the

23  second call.

24       Q.   So it's possible you only left one

25  voicemail?

1      A.   That's possible.

2      Q.   Okay.  Did you send him an email to try

3   to reach out to him?

4      A.   Not that I recall.  And I don't think

5   that I had his email address.

6      Q.   How did you communicate with him the

7   first time if you didn't have his email?

8      A.   You mean when I left a voicemail?

9      Q.   No.  When you said you previously had

10  written an article about him, how did you

11  communicate with him then if you didn't have his

12  voicemail -- I mean his email?

13     A.   Well, I had his email when he was

14  employed at Southern Seminary, but I didn't have

15  his email after he was employed at Southern

16  Seminary.  So I have communicated with him by email

17  probably a number of times while he had that

18  dsills@sbts.edu email address.

19     Q.   Okay.

20     A.   And then I went to his office to

21  interview him at least once or twice.

22     Q.   Face to face?

23     A.   Yes, face to face, at least a couple of

24  times, maybe more than that.

25     Q.   In your interaction -- how did you find

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:23-cv-00478   Document 411-21   Filed 11/03/25   Page 21 of 26 PageID #:
14716

1      (A RECESS WAS TAKEN.)

2              THE VIDEOGRAPHER:  We're back on the

3  record at 3:33 p.m.

4              MS. RILEY:  I'd like to mark as

5  Exhibit 18 an audio recording that I'll play for

6  you now, Dr. Roach.

7      A.   Okay.

8              (EXHIBIT 18 WAS MARKED

9               FOR IDENTIFICATION.)

10             MS. RILEY:  And for the record, it is

11  Sills -- it'S Bates numbered Sills091210.

12             (AUDIO RECORDING PLAYED - NO SOUND.)

13             THE WITNESS:  We don't hear anything.

14             MS. RILEY:  I don't either.

15             MS. MADDUX:  Oh, I'm sorry.  I thought it

16  was playing.  I thought you all could play it.

17  Well, hold on.  Maybe if I'm unmuted, it will --

18  let me know.

19             (AUDIO RECORDING PLAYED AS FOLLOWS:)

20                 "DR. ROACH:  Hello, Dr

21                 Sills.  This is  Dr. David

22                 Roach with Baptist Press.

23                 Jennifer Lyell has released

24                 a statement to us claiming

25                 you had a sexual

1             relationship with her while

2             she was a Southern Seminary

3             student.  She wants to make

4             those allegations public,

5             and I'm working on a story.

6             I wanted to see if you had

7             any response.

8                "You can call me at

9             615-782-8661.  I'll be in

10            my office for about another

11            45 minutes or a little less

12            this afternoon or you can

13            call me in the morning any

14            time after 8 o'clock

15            Central.  We welcome the

16            chance to include any

17            response you have.  Again,

18            615-782-8661.  Thanks."

19        (AUDIO RECORDING STOPPED.)

20    Q.   Dr. Roach, I'm going to ask you a couple

21 of questions about that voicemail.  Do you need me

22 to play the first half of it again for you?

23    A.   No.  We got it that time.

24    Q.   Okay.  Is that your voice, Dr. Roach?

25    A.   Yes.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:23-cv-00478   Document 411-21   Filed 11/03/25   Page 23 of 26 PageID #:
14718

1      Q.    Is that the voicemail that you left David

2   Sills that we've been referencing?

3          MR. ELBERT:   Object to the form of the

4   question.

5      A.    Yes.

6          MR. ELBERT:   He mentioned two calls.

7          MS. RILEY:   Well, he only referenced one

8   voicemail, so that is the one that I'm referring

9   to.

10     Q.    You remember leaving one voicemail;

11  correct?

12     A.    I remember leaving one voicemail, and it

13  was of the nature of what you just played.

14     Q.    And do you have any reason to doubt that

15  the voicemail that you just listened to is the

16  voicemail that you left for Dr. Roach (sic)?

17     A.    You mean for Dr. Sills?

18     Q.    Yes.  Sorry.  Dr. Sills.

19     A.    No, I do not.

20     Q.    Does that recording truly and accurately

21  depict the voicemail that you left for David Sills?

22     A.    Yes.

23     Q.    In that voicemail you told Mr. Sills that

24  you were writing an article about his sexual

25  relation with Ms. Lyell; correct?

1      A.   Correct.

2      Q.   Nowhere in that voicemail did you tell

3   him that you were going to -- or that you were --

4   let me start over.

5           Nowhere in that voicemail did you mention

6   that Ms. Lyell had alleged sexual abuse, did you?

7      A.   That's correct.

8      Q.   You would agree, Dr. Roach, that when

9   Baptist Press, at the blessing of the Executive

10  Committee, changed your wording to, quote, unquote,

11  "sexual abuse," that at a minimum Sills should have

12  been contacted to comment about that allegation?

13          MS. CALLAS:  Object to the form.

14          MR. ELBERT:  Object to the form.

15     A.   Let me make sure I understand the

16  question.  You're saying that when the original

17  draft was changed -- ask it again.  I just want to

18  make sure that I understand.

19     Q.   Okay.  The voicemail that you left did

20  not mention sexual abuse; correct?

21     A.   Correct.

22     Q.   Do you think that he should have been

23  informed that an article about sexual abuse rather

24  than sexual relations was being written, giving him

25  an opportunity to comment?

1           MS. RILEY:  Yeah, the court reporter.

2   And then I'll move on from that line of

3   questioning.

4           (REQUESTED PORTION OF RECORD OF READ.)

5       A.   I sought to confirm all the details

6   available from all the sources.  Those included

7   Dr. Mohler stating he had encouraged her to file a

8   police report.  It included Eric Geiger saying that

9   he believed she was courageous and that if this

10  could happen to her, it could happen to anyone.

11  Dr. Mohler also said that he -- maybe not in these

12  words -- but that he appreciated her courage.  Bill

13  Cook discussed and corroborated that he had

14  discussed with Dr. Sills his relationship with

15  Jennifer and the sin involved in it.

16          So those were among the ways that I

17  sought corroboration.

18          MS. RILEY:  Why don't we take a

19  five-minute break.

20          THE WITNESS:  Okay.

21          MS. RILEY:  Off the record.

22          THE VIDEOGRAPHER:  We're off the record

23  at 4:53 p.m.

24          (A RECESS WAS TAKEN.)

25          THE VIDEOGRAPHER:  We are back on the