# Exhibit 40

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                      NASHVILLE DIVISION

 3
    MICHAEL DAVID SILLS and )
 4  MARY SILLS,             )
                            )
 5     Plaintiffs,          )
                            ) Case No. 3:23-cv-00478
 6  VS.                     ) Judge William L. Campbell, Jr.
                            ) Magistrate Judge
 7  SOUTHERN BAPTIST        ) Jeffery S. Frensley
    CONVENTION, a non-profit)
 8  corporation, et al,     )
                            )
 9     Defendants.          )
    _____X
10

11

12

13

14  _____

15

16      VIDEOTAPED DEPOSITION OF MICHAEL DAVID SILLS

17             TAKEN ON OCTOBER 1-2, 2024

18

19  _____

20

21

22
    Prepared by:
23  Carole K. Briggs, LCR #345
    Briggs & Associates
24  222 Second Avenue, North, Suite 340M
    Nashville, Tennessee  37201
25  Carole@Briggscourtreporting.com
```

1   student enrolled at the seminary?

2        A.    In 2004, I would have understood that because

3   the person who worked in that office would be a student.

4        Q.    And was it a part-time position, if you know?

5        A.    I do not know.

6        Q.    Do you know what her rate of pay was in that

7   position?

8        A.    No, I had no -- I had nothing to do with

9   that.

10        Q.    Did you interact with Jennifer to get tasks

11   or assignments done?  Would you give her work to do in

12   any capacity?

13             MS. McNULTY:  Object to the form.  Go ahead.

14             THE WITNESS:  No, I didn't have anything to

15   do with that.  I simply was a colleague on campus who

16   would help them promote things.

17   BY MS. CALLAS:

18        Q.    So when did you first have Jennifer as a

19   student in one of your classes?

20        A.    I do not recall.  I would say probably late

21   2004, 2005.  I don't recall.

22        Q.    I'm going to hand you a couple of documents.

23   I brought two copies.

24             MS. McNULTY:  Is this all one exhibit?

25             MS. CALLAS:  I'm going to say we'll do two

1    exhibits.  The first page, which for the record is Bates

2    No. SBTS 495, is a course list.  We'll put that in front

3    of -- so that's yours, Shannon.

4              MS. McNULTY:  Thank you.  I appreciate that.

5              MS. CALLAS:  That will be marked as Exhibit

6    1.

7              (Exhibit 1 was marked.)

8    BY MS. CALLAS:

9        Q.    Dr. Sills, I've handed you a document.  We've

10   marked it as Exhibit 1.  It was produced by the seminary

11   in the discovery in this case.  It's a list of courses.

12   Do you see that?

13       A.    I do see that.

14       Q.    Is your name on that document anywhere?

15       A.    It is.

16       Q.    And are there courses associated with your

17   name on that list?

18       A.    Yes.

19       Q.    Do you have an idea of the time frame that

20   course description might pertain to?

21       A.    No.

22             MS. CALLAS:  I am going to hand you what

23   we'll mark as Exhibit 2.

24             (Exhibit 2 was marked.)

25   BY MS. CALLAS:

 1        Q.    Again, this is a document that was produced

 2   by the seminary.  And I believe it is Jennifer Lyell's

 3   transcript.  Do you understand that's what this document

 4   is?

 5        A.    I do.

 6        Q.    Now, can you see on this document, which

 7   lists her course work over time, any classes that you

 8   may have taught?

 9        A.    You know, I'm not the only one who taught

10   these courses, so without the professor's name, I don't

11   know.

12        Q.    Could you reference Exhibit 1 and tell me if

13   there's any way for you, by looking at Exhibit 1 --

14        A.    Um --

15             MS. McNULTY:  There's an incomplete question.

16   Let her finish the entire question.

17   BY MS. CALLAS:

18        Q.    Yeah, if you could look at Exhibit 1 and tell

19   me if there are courses with your name next to them that

20   -- let's use 405.  It's Course Code 33477, topics of

21   missions.  Do you see that?

22             MS. McNULTY:  Objection, form, incomplete

23   question, and disregards the prior answer.  He said

24   already that he can't identify.

25             MS. CALLAS:  I'm asking him just to be clear

1   if he can connect Exhibit 1 to any of the courses on

2   Exhibit 2.  If he cannot, he can answer that.

3           MS. McNULTY:  Objection, form.

4           THE WITNESS:  There are numbers of courses

5   that correspond to the transcript, but, again, on the

6   transcript it doesn't say who the professor was, and I

7   wasn't the only one who thought these courses.

8   BY MS. CALLAS:

9       Q.   So today, you cannot tell me, looking at

10  Jennifer Lyell's transcript what, if any, courses you

11  taught her; is that correct?

12      A.   The only one on here that I would have taught

13  that I don't think anyone else would have taught is the

14  Spanish-related courses, the ones that say topics and

15  missions, Spanish.

16      Q.   And to be clear, that is on Exhibit 2, and it

17  is the fall of 2004; is that correct?

18      A.   Right.

19      Q.   And what grade did Jennifer receive in that

20  class?

21      A.   According to the transcript, it says A.

22      Q.   Now, you did not teach or you do not recall

23  if you taught the intercultural communications class

24  right above that?

25      A.   I do not recall.  I wasn't the only one who

1    taught that.

2         Q.    But you don't recall, sitting here today,

3    whether you had Jennifer in two courses in the fall of

4    2004?

5         A.    No, I do not recall.

6         Q.    What about the spring of 2004, would you have

7    taught Jennifer in cultural anthropology?

8         A.    It's possible, but I wasn't the only one who

9    taught that.

10        Q.    Yeah, that's right.  So if you'll go back,

11   look at Exhibit 1 for me.  And see the first column, it

12   says year code?

13        A.    Right.

14        Q.    If you go down the list, you'll see '03-'04,

15   '03-'04.  Do you see that?

16        A.    Yes.

17        Q.    Specifically, we're looking at '04-'05,

18   which, if you look again at Jennifer's transcript, it

19   says 2004-'05 fall.  Do you see that?

20        A.    Right.

21        Q.    So your name does appear on both the topics

22   in missions and intercultural communication for '04-'05.

23        A.    Okay.

24        Q.    Do you see that, sir?

25        A.    I do.

1        Q.    Does that suggest to you that Exhibit 1 is

2   indicating the professor, David Sills, who will be

3   teaching those two courses in the '04-'05 term?

4              MS. McNULTY:  Objection, form.

5              THE WITNESS:  It appears to, but, again,

6   there were -- there was at least one other professor who

7   taught the intercultural communication class.  So I'm

8   not certain, but it appears to.

9   BY MS. CALLAS:

10       Q.    But that person's name is not on this course

11  catalogue document, correct?

12       A.    No, but this --

13             MS. McNULTY:  Object to form relative to the

14  characterization of Exhibit 1.

15             THE WITNESS:  This is not a complete list of

16  courses that are offered by Southern Baptist Theological

17  Seminary in these years.

18  BY MS. CALLAS:

19       Q.    And how do you know that?

20       A.    Because we had about seventy professors, and

21  each one taught at least three classes, so there would

22  be many more classes than this.

23       Q.    So let's look at your name on the '04, so

24  we're looking down the first column at the bottom.  We

25  see '04-'05, and you do have three classes here,

 1    correct?

 2         A.    Right, yes.

 3         Q.    But are you suggesting you may have been

 4    teaching this missions course -- or let's use the

 5    intercultural communication course.  You were teaching

 6    it in '04-'05?

 7         A.    Yes.

 8         Q.    But somebody else may have, as well?

 9         A.    That's my -- that's my concern.

10         Q.    I understand t.  Okay, you can put those

11    documents aside.

12         A.    All right.

13         Q.    So is it correct, sir, that your allegation

14    in this case is that when you and Jennifer Lyell began a

15    sexual relationship, you were co-workers?

16               MS. McNULTY:  Objection, misstates the

17    pleadings.

18               THE WITNESS:  I knew Jennifer as a colleague.

19    We were co-workers, yes.

20    BY MS. CALLAS:

21         Q.    And not as a student?

22         A.    My relationship with Jennifer was a

23    friendship, based on being a colleague.

24         Q.    Well, I'm asking about the sexual aspect of

25    your relationship with Jennifer.  Did that relationship,

1    the sexual aspect of it, begin while you were co-workers

2    or faculty/student?

3                MS. McNULTY:  Objection, form.  Go ahead.

4                THE WITNESS:  I'm not sure that anything of a

5    sexual nature occurred while she was a student.

6    BY MS. CALLAS:

7        Q.   Well, let's talk about the timeline of those

8    events, then.

9        A.   Okay.

10       Q.   We have asked you in discovery if you had

11   physical contact with Jennifer Lyell of a sexual nature.

12   Do you recall being asked those questions in discovery?

13       A.   I do.  I don't remember being defined what

14   those were specifically referencing.

15       Q.   Well, why don't you and I talk about how

16   we're going to define those for this --

17       A.   Okay.

18       Q.   -- case today.

19               MS. McNULTY:  Objection, form.  Allow for the

20   entire question to come out, okay?

21               THE WITNESS:  Okay.

22   BY MS. CALLAS:

23       Q.   So what do you consider to be sexual contact?

24       A.   Well, sexual contact would be anything of a

25   sexual nature.  Not as being friends, or hugging, or

 1   Jennifer Lyell in a way that you would consider a sexual

 2   nature?

 3        A.   Well, going back to my first answer, I'm not

 4   exactly sure.  I mean, I didn't write down on a calendar

 5   when that day occurred.  The relationship was a

 6   friendship, as colleagues.  And it went on for -- we

 7   were friends for a number of years.

 8        Q.   So if I were to ask you the year that your

 9   friendship with Jennifer Lyell became sexual, could you

10   tell me when that occurred?

11        A.   The year?

12        Q.   Yes.

13        A.   I would say in 2005 it became inappropriate,

14   sexually.

15        Q.   And where was that first encounter?

16        A.   The very first time, as I recall, I was

17   driving around the corner to get my wife's car fixed,

18   tire.  Jennifer offered to ride with me.  And driving

19   out of the driveway, she reached over, and she put her

20   hands down my pants.  I was wearing running pants, and

21   put her hand down my pants.  And I reacted strongly.  As

22   far as of a sexual nature, I guess I would say that was

23   the first time.

24        Q.   So she actually had her hand through your

25   waistband and down --

1      A.    Yes.

2      Q.    -- touching your skin?

3      A.    Skin to skin.

4      Q.    And this occurred in the car while you were

5  driving?

6      A.    As I was pulling out of the driveway, yes.

7      Q.    So you were -- the car was moving, or the car

8  was stopped?

9      A.    The car was moving.

10     Q.    And tell me what you did next.  Did you --

11     A.    I asked her if she was -- I asked her if she

12  was crazy.  And she removed her hand and laughed.  And

13  -- I mean, nothing else happened.  So I don't know --

14  what do you want?

15     Q.    I'm just asking --

16     A.    I answered.

17           MS. McNULTY:  Yeah, if you are done with your

18  answer, then you can just stop.

19  BY MS. CALLAS:

20     Q.    So you proceeded to drive to get the tires?

21     A.    The tire, yes.

22     Q.    So this was sometime in 2005?

23     A.    Uh-huh.

24     Q.    Is that correct?

25     A.    Yes.

1      Q.    And you don't recall the date?

2      A.    No.

3      Q.    And when was the next encounter of that type

4  or any type involving sexual contact with Jennifer

5  Lyell?

6      A.    Again, I'm not sure if you're defining actual

7  success in sexual encounter, but in the fall of 2004,

8  there was an attempt that was not successful.

9      Q.    Why don't you describe to me what the attempt

10  was.

11     A.    The attempt was, I was with a team in

12  Ecuador, and she was on that team.  And I had the girls,

13  including my daughter, in one hotel room.  I was in the

14  middle.  The guys were in another hotel room on the

15  other side.  And about midnight, there was a knock on my

16  door at my room.  My heart stopped, thinking there may

17  be something wrong with a team member.

18            I got up and opened the door.  She rushed

19  into the room into my arms and said, kiss me, I am not

20  wearing a bra.  And, again, I said, are you crazy?  And

21  I sent her back to her room.  So whether that's of a

22  sexual nature or not, I don't know, but that's what

23  happened.  And that was in 2004, in the fall.

24     Q.    Did she kiss you on the lips?

25     A.    Yes.

1      Q.    Did she put her tongue in your mouth?

2      A.    That, I don't recall.

3      Q.    Did you kiss her back?

4      A.    I wouldn't define it as that.

5      Q.    Did you embrace her or put your arms around

6   her?

7      A.    I didn't embrace her.  She rushed into my

8   arms, and I mean, I'm sure that -- my arms are on the

9   sides of my body.  I'm sure that there was contact with

10  her arms, or her back, or something like that as she

11  did.  But, again, I was in the middle of sleep halfway

12  through the night.

13     Q.    So you got up from your bed to answer the

14  door, correct?

15     A.    Yes.

16     Q.    And she was at the door when you opened it?

17     A.    She rushed in the door.

18     Q.    She came into your room?

19     A.    As it was opening, she came into the room.

20     Q.    So my question was did you put your arms

21  around her at that time?

22     A.    Only to push her away.

23     Q.    So you've described -- this was in the fall

24  of 2004?

25     A.    Yes.

1      Q.    And at that point, did you know she was a

2   student at the seminary?

3      A.    At that point, I would have known she was a

4   student at the seminary.  It wasn't a seminary trip.

5   This was a church trip with all kinds of people in it.

6      Q.    Did you have any conversation with Jennifer

7   Lyell at that time regarding this contact or conduct?

8      A.    On the trip, no.  When we got back, we -- I

9   explained that this wasn't correct.  She felt the same.

10   It was just an awkward moment.  And we moved on from

11   there.

12      Q.    And when did that conversation occur?

13      A.    When we got back.  I would say within a week

14   or so after we got back.

15      Q.    Was this at your office at the seminary?

16      A.    Could have been, or it could have been when

17   she -- or it could have been on the phone.  It could

18   have been when she came by the house.  I suspect it

19   would have been on the phone, though.

20      Q.    So in 2004, was Jennifer Lyell visiting you

21   at your home?

22            MS. McNULTY:  Object to the form.

23            THE WITNESS:  Jennifer and other students

24   would come by our home.  Sometimes we had pizza for

25   discussion of mission things or whatever, but...

1    BY MS. CALLAS:

2        Q.    In the fall of 2004, how frequently was

3    Jennifer Lyell coming to your home?

4        A.    I have no idea.

5        Q.    So you've described two events or incidents

6    involving sexual contact or comments.  Does that sound

7    right?

8        A.    Yeah.

9        Q.    Tell me, after the 2005 car incident, what

10   was the next event of that type with Jennifer Lyell?

11       A.    I was in my office in Norton Hall, second

12   floor, in the afternoon, working at my desk, preparing

13   classes.  Knock on my door, and I opened the door, and

14   it was Jennifer.  And she reached in and grabbed me by

15   my genitals, and was just standing there in the hallway,

16   but reaching in through the doorway so that if anyone

17   had happened to walk down the hallway, she could just

18   withdraw.  That happened more than once.

19       Q.    So this was in your office?

20       A.    Yes.

21       Q.    Could you tell me the year again?

22       A.    2006, '5 or '6.

23       Q.    Was she a student enrolled in classes at that

24   time?

25       A.    As far as I know -- I don't remember, but it

1    seems like she was graduated, but had not moved on and

2    was trying to decide what she was wanted to do, either

3    more graduate work or find a job.  I don't remember, but

4    she was working on campus.

5         Q.    At this time, how would you describe Jennifer

6    Lyell and your relationship?  Was she a friend, a

7    colleague, a student?

8              MS. McNULTY:  Objection, form.  Go ahead.

9              THE WITNESS:  She was a friend, and

10   increasingly so, with not just me, but with my whole

11   family.

12   BY MS. CALLAS:

13        Q.    So this was the third time that Jennifer had

14   acted in a way that made you uncomfortable; is that

15   fair?

16        A.    That's fair.  It's also fair that I didn't

17   react by running to the dean and reporting her.  In

18   other words, I wasn't the one acting out, but I wasn't

19   resisting.

20        Q.    What about reporting to Mary, your wife?

21        A.    No, I didn't report that to Mary at that

22   time.

23        Q.    What about distancing yourself from Jennifer,

24   who was acting this way?

25        A.    Sometimes there was that, yeah.  It would be

1      Q.    Did you speak to Jennifer after the fact

2    about the behavior, or was that the end of it?

3      A.    That was probably the end of it, which was

4    indicative that, again, I wasn't running and reporting

5    her.

6      Q.    Was there a time where your reaction to this

7    behavior changed?

8      A.    I mean, eventually, yes.

9      Q.    Tell me when eventually was.

10     A.    There were numbers of times starting about

11   2008 when I asked her specifically to not come to my

12   office, meaning my office at home, because she was no

13   longer at the seminary.  She was my editor, and she

14   would come to our home.  And I would say, don't come

15   down to where my office is.  If you want to see the

16   family, you stay upstairs, but we can't do anything like

17   that anymore.  That's got to stop.

18     Q.    So in 2008, Jennifer would come to your home,

19   correct?

20     A.    Not starting in 2008.  She never stopped

21   coming to our home all along the way.

22     Q.    So she started coming to your home on a

23   regular basis in what year?

24     A.    2006, maybe, '5 or '6.  She was regularly at

25   our house.

1   BY MS. CALLAS:

2       Q.   So before -- well, while Jennifer was living

3   in Louisville that time frame, you've described three

4   events that you do remember?

5       A.   Uh-huh.

6       Q.   Is that correct?

7       A.   Yes.

8       Q.   Were there other events or encounters with

9   Jennifer Lyell of a sexual nature while she was living

10  in Louisville?

11      A.   Yes.

12      Q.   And is it your testimony you don't remember

13  when those occurred?

14      A.   Yes.

15      Q.   And can you tell me how many of those there

16  were?

17      A.   I cannot.

18      Q.   So we know that Jennifer was visiting your

19  home on a weekly basis while she was living in

20  Louisville, correct?

21      A.   Yes.

22      Q.   Is it fair to say at some point you were

23  having a sexual encounter with her on each of those

24  visits?

25      A.   No.

1      Q.    How many, 50 percent of those visits?

2      A.    Not that many.

3      Q.    So before Jennifer left Louisville, can you

4  give me an estimate of how many times the two of you had

5  an encounter or contact of a sexual nature?

6      A.    I -- I cannot.  I would -- I cannot say how

7  many.

8      Q.    Well, let's talk about what types of

9  encounters.  You've described a couple to me already,

10  both of them involving Jennifer touching your genitals;

11  is that right?

12     A.    Yes.

13     Q.    Were there other encounters of that type

14  where Jennifer touched your genital area?

15     A.    Yes.

16     Q.    And this is while she was living in

17  Louisville?

18     A.    Yes.

19     Q.    And in those encounters, did you have your

20  clothing on or off?

21     A.    My clothing would have been on.

22     Q.    So she would have touched you through your

23  clothes?

24     A.    Yes.

25     Q.    Would she have touched you to a point that

1   you became aroused?

2        A.    Yes.

3        Q.    Would you have arousal to the point of

4   ejaculation?

5        A.    Eventually, but I'm not sure -- I think those

6   kind of events happened after she left Louisville.

7        Q.    So while she's still living in Louisville,

8   she was touching you through your pants.  She never

9   removed your clothing?

10       A.    She never removed my clothing as far as

11  taking all of my clothes off, but there were times when

12  there was skin to skin.  She would reach in and touch

13  me.

14       Q.    So she would access your penis with her hand?

15       A.    Uh-huh.

16       Q.    Is that a yes, sir?

17       A.    Yes.

18       Q.    So you're telling me she didn't actually

19  remove your pants.  Would she unzip your fly or --

20       A.    Yes.

21       Q.    What about you, were you touching Jennifer

22  Lyell's body?

23       A.    There was -- there were often occasions where

24  -- there were much more than the occasions you just

25  described.  There were many more occasions where there

1     to your house?

2          A.    For a number period of times, yes.

3          Q.    When, specifically, if you remember?

4          A.    Repeatedly for -- sometimes for a year there

5     would be no contact, could not come down to my office,

6     things like that.

7          Q.    Do you have a year in particular you

8     remember?

9          A.    I don't have a year.  You mean, as far as

10    when there would be absolutely no contact whatsoever?

11         Q.    Correct.

12         A.    No, I don't know the years, but there were

13    numerous times because we both realized that did not

14    need to happen.

15         Q.    So, again, while Jennifer was living in

16    Louisville and visiting your home on a weekly basis, you

17    were engaged in sexual contact with her; is that right?

18         A.    There were some times when that happened.

19         Q.    And where did that happen?

20         A.    It would usually happen in the basement area,

21    which is where our television room was.

22         Q.    And where was your family at that time?

23         A.    The family was -- my son was at college.  My

24    daughter, I guess she was still at home then.  They

25    would have been upstairs.  Maybe we had watched a movie,

1   and everyone else had retired.  And Jennifer would hang

2   around.

3        Q.    And why did you not, at that time, ask

4   Jennifer to leave your home?

5        A.    Well, as I said, because it was beginning to

6   be a very close relationship.  We weren't just

7   colleagues anymore.  We were friends.  We were

8   confidantes.  We shared a lot of visioncasting about

9   ministry, and about work together, and how eventually

10  what kind of things I should be writing, and what she

11  would like me to do, and things, you know,

12  professionally, and that kind of thing.

13            So I didn't -- I didn't come down harder on

14  her in that aspect of -- but it was sincere, this has

15  got to stop.  We can't do this anymore.  But it wasn't

16  unilaterally.  She would agree.

17       Q.    So when you were in the basement of your home

18  with Jennifer and your family was upstairs, would you

19  engage in sexual contact with Jennifer?

20       A.    There was some times that that happened.

21       Q.    And how many times did that happen?

22       A.    I can't tell you.

23       Q.    Did you consider these acts of sexual contact

24  with Jennifer to be a sin?

25       A.    Yes.

1    and everyone else had retired.  And Jennifer would hang

2    around.

3          Q.    And why did you not, at that time, ask

4    Jennifer to leave your home?

5          A.    Well, as I said, because it was beginning to

6    be a very close relationship.  We weren't just

7    colleagues anymore.  We were friends.  We were

8    confidantes.  We shared a lot of visioncasting about

9    ministry, and about work together, and how eventually

10   what kind of things I should be writing, and what she

11   would like me to do, and things, you know,

12   professionally, and that kind of thing.

13             So I didn't -- I didn't come down harder on

14   her in that aspect of -- but it was sincere, this has

15   got to stop.  We can't do this anymore.  But it wasn't

16   unilaterally.  She would agree.

17         Q.    So when you were in the basement of your home

18   with Jennifer and your family was upstairs, would you

19   engage in sexual contact with Jennifer?

20         A.    There was some times that that happened.

21         Q.    And how many times did that happen?

22         A.    I can't tell you.

23         Q.    Did you consider these acts of sexual contact

24   with Jennifer to be a sin?

25         A.    Yes.

1      A.    I'm sure that we kissed at some point.

2      Q.    Did you ever place your mouth on her breasts?

3      A.    I don't think so.

4      Q.    Did you ever place your mouth on her genital

5   area?

6      A.    No, I don't think so.

7      Q.    Did you ever touch her breasts with your

8   hands, the skin of her breasts with your hands?

9      A.    That's possible.  I don't know.

10      Q.    Is it fair, sir, that this sexual contact

11   with this woman who was not your wife is not memorable

12   to you today?

13            MS. McNULTY:  Objection, form, misstates

14   testimony.

15            THE WITNESS:  I am not sure I understand the

16   testimony question.

17   BY MS. CALLAS:

18      Q.    You are having trouble remembering what

19   sexual acts you engaged in with Jennifer Lyell; is that

20   correct?

21            MS. McNULTY:  Objection, misstates.  He never

22   said that.

23            THE WITNESS:  No, I never said that.  I

24   didn't say I didn't under -- had trouble -- that I was

25   having trouble remembering which.  I'm trying to

1    remember when and exactly what happened on each

2    occasion.  I can't do that.

3              MS. McNULTY:  And, Counsel, I will just say,

4    the witness understands the seriousness of this matter.

5    And if he requires time or seeks clarification, it's his

6    effort to be earnest in being complete and truthful.  He

7    is not having any problems remembering.

8              MR. ELBERT:  I'm going to objection to the

9    coaching.

10             MS. McNULTY:  I'm not coaching him.  That was

11   prejudicial.

12             MR. ELBERT:  No, you are continuing to coach

13   the witness, and I would ask that objections be to

14   objection to form, or if privilege is raised and you

15   want to make an instruction not to answer, and just stop

16   coaching the witness.

17             MS. McNULTY:  I'm not coaching the witness.

18             MR. ELBERT:  You are coaching the witness.

19             MS. McNULTY:  I am not going to have a record

20   where he's being accused of not being able to remember.

21             MR. ELBERT:  You're repeatedly coaching the

22   witness, and the record speaks for itself.  But go

23   ahead.

24   BY MS. CALLAS:

25        Q.   Is it true, Dr. Sills, that you never had

1    sexual intercourse, that is penetration with your penis,

2    with Jennifer Lyell?

3        A.    That's true.

4        Q.    And, in fact, in your complaint in this case,

5    you -- and there are two of them.  But in one of the

6    complaints in this case, you use the word importantly.

7    Importantly, you never engaged in intercourse with

8    Jennifer Lyell.  Do you recall making that allegation in

9    this case?

10       A.    I don't recall the use of the word

11   importantly.

12       Q.    Well, let me show you.

13             MS. CALLAS:  So I'll hand you a document that

14   we can mark as Exhibit 3.

15             (Exhibit 3 was marked.)

16   BY MS. CALLAS:

17       Q.    This is a complaint.  Have you seen that

18   document before?

19       A.    Yes.

20       Q.    Now, this document was filed in the State of

21   Alabama.  Do you remember that?

22       A.    Yes.

23       Q.    The last -- it may be toward the end of the

24   document, there are verifications.  They are not on a

25   numbered page, or I would direct you to that, but toward

1   the word importantly.

2       A.   Uh-huh.

3       Q.   So I'm just asking if you know why the word

4   importantly was added?

5            MS. McNULTY:  Objection, seeks to invade work

6   product and attorney/client privilege.  I am instructing

7   him to not answer.

8   BY MS. CALLAS:

9       Q.   Sir, is it important that you did not engage

10  in sexual intercourse with Jennifer Lyell?

11      A.   To me, yes.

12      Q.   Tell me why.

13      A.   To me, that is a line that, when she

14  encouraged that, I said that would be a line I would

15  never cross.  And for me, I've wrestled with that,

16  myself, why that was such a hard line.  But that, to me,

17  in my mind was a line I could not cross.

18      Q.   Is there any difference in the sin committed?

19      A.   No.

20      Q.   Did you commit the sin of adultery in your

21  acts with Jennifer Lyell?

22      A.   I think so.

23           MS. McNULTY:  Objection.  Go ahead.  He's

24  answered.  Go ahead.

25           THE WITNESS:  I think so.

1   BY MS. CALLAS:

2        Q.    And is that, whether or not it was a sin,

3   important in your work at the time, 2008, 2009, was the

4   fact that that was a sin significant in the work you

5   were doing?

6             MS. McNULTY:  Objection, form.  Do you need

7   the question repeated?

8             THE WITNESS:  No, I -- was it important that

9   it was a sin?  Yes, it -- any sin is important.

10  BY MS. CALLAS:

11       Q.    Did this particular sin -- is this -- would

12  you characterize this particular sin a grave sin?

13            MS. McNULTY:  Objection, relevance.  This is

14  not a church proceeding.

15            MS. CALLAS:  I understand your objection.

16  BY MS. CALLAS:

17       Q.    Can you answer the question?

18       A.    I can answer the question that any, any sin

19  is a grave sin.

20       Q.    Is the sin of adultery something that your

21  employer, the seminary, would have found to be in

22  violation of their policies, their values, or beliefs,

23  if you know?

24            MS. McNULTY:  Objection form.

25            THE WITNESS:  Yes, I think they would.

1   BY MS. CALLAS:

2        Q.   And is that something that your employer, the

3   seminary, would have wanted to know?

4        A.   I -- I will say they would want to know, yes.

5        Q.   And why would they want to know that their

6   faculty member had engaged in the sin of adultery?

7             MS. McNULTY:  Objection, calls for

8   speculation.  Go ahead.

9             THE WITNESS:  The Christian ministry calls

10  for ministers to live above reproach.  And any failure

11  to do so would be something that should be addressed.

12  And the seminary is a zero-tolerance world.

13  BY MS. CALLAS:

14       Q.   At any time did you disclose to the seminary

15  that you had been involved in an adulterous relationship

16  with Jennifer Lyell?

17       A.   No.

18       Q.   And why did you not do that?

19       A.   I personally struggled with whether or not to

20  reveal it and to walk away from everything.  I shared

21  the struggle with Jennifer.  Jennifer felt that we

22  didn't know what other professors, other people at the

23  seminary, had in their own lives.  And I always

24  struggled with whether or not I should be there, even

25  before anything happened.

1      Q.    Can you expound on that?  What do you mean

2   even before?

3      A.    I had a high view of that seminary and

4   calling.  And it was -- it's a -- was a high honor to do

5   that.  And I wonder about people who do think they're

6   worthy to be there.

7      Q.    So in the end, though, you did not, on your

8   own, conclude that you would reveal to the seminary this

9   ongoing sexual relationship, correct?

10     A.    That's right.

11     Q.    What about Reaching and Teaching?  Tell me

12   about Reaching and Teaching.  Is that something that

13   that organization would have found adultery to be

14   against their policies, their beliefs, and teachings?

15     A.    I would say yes, but there were no set

16   policies that you could point to and say, here, this is

17   a violation of that one.  But in general, in the spirit

18   of the organization, yes.

19     Q.    In fact, when this relationship with Jennifer

20   was disclosed, you resigned from Reaching and Teaching;

21   is that correct?

22     A.    I did.

23     Q.    And why did you resign?

24     A.    Because I did not want this to splash onto

25   that organization.

1      Q.    Meaning you did not want your adulterous

2   relationship to affect the organization's mission?

3             MS. McNULTY:  Objection, form, argumentative.

4   Go ahead.

5             THE WITNESS:  I wouldn't say the mission, but

6   just their reputation in the world.  Jennifer was a

7   board member and an officer in the organization, and I

8   was, as well.  Jennifer had basically formed the

9   organization by filling out all of the paperwork,

10  researching how to do it.  So I didn't want the agency,

11  the 501(c)(3), to be negatively impacted.  So I

12  preempted that by resigning on my way home.

13  BY MS. CALLAS:

14     Q.    So Reaching and Teaching was an organization

15  Jennifer founded?

16     A.    She -- yeah, well, I did that with her.  I

17  didn't think I had the time to do it.  I was -- I had my

18  plate full.  She researched it, said we could do it.

19  She would fill out all of the paperwork and get it

20  started.  And that's how it got started.

21     Q.    Were you paid income from Reaching and

22  Teaching?

23     A.    No, not until 2016.

24     Q.    So you were paid income from Reaching and

25  Teaching in 2016?

1        A.    Or '17.  I think it was passed in '16, but it

2   started in '17.

3        Q.    When was the organization created?

4        A.    '10, 2010.

5        Q.    And what about Global Outreach, did you

6   understand that Global Outreach would find your

7   adulterous affair to be against its policies, beliefs,

8   or mission?

9        A.    My relationship with Global Outreach was

10  before I even came to seminary.  After all of this

11  happened, after 2018 -- of course, through the years, I

12  was just a board member with them, but as a board

13  member, it's a big board, 70-something people.  So it's

14  big, so it's not like a close board.

15            But after the revelation and all of the other

16  is when I went to Global Outreach and suggested that I

17  didn't want to be a missionary, and I didn't want to be

18  a staff member, but that I could do consulting using

19  cultural anthropology for governments and businesses.

20  And that was the relationship I was going to have with

21  Global Outreach.  But that was -- that was after all of

22  this happened.  And I explained to them everything that

23  had happened.

24        Q.    Did you resign your board seat in 2018?

25        A.    I resigned every board I was on.

1       A.      I had been listening to a series of sermons

2   by a guy named Chuck Swindoll, Charles Swindoll, and as

3   I -- on my commute.  And I just genuinely felt convicted

4   that while it had been repented of, and was over with,

5   and it had been stopped, I needed to talk to with Mary

6   about it, so I did.

7       Q.      So in 2016, the relationship with Jennifer

8   was no more or had stopped?

9       A.      Yes, had stopped.

10      Q.      And when did that occur?

11      A.      That really happened in, as far as

12  physically, about '14, as far as I remember.  But there

13  was a very significant date in -- or time in '16 when

14  Jennifer finally acquiesced to be of the same mind that

15  this absolutely had to stop.  And it was over.  And

16  there were times that she would come to our home.  We

17  had moved in that year, so that's how I remember when it

18  was.  She would come to visit, and it was fine.

19      Q.      And that means she did not initiate sexual

20  contact with you?

21      A.      Nor was there any of any kind.

22      Q.      When there was sexual contact between the two

23  of you before 2016, is it your testimony that she

24  initiated those events?

25              MS. McNULTY:  Objection, form.  Misstates the

1    testimony with respect to time.

2                    THE WITNESS:  I would say yes, whether that

3    was her intention or not.

4    BY MS. CALLAS:

5         Q.    Explain what that means.

6         A.    What that means is that she would come sit

7    next to me on the couch when everyone got ready to go

8    up.  I don't know that she intended for things to

9    develop from there.

10        Q.    Would you be the first one to touch her?

11        A.    No.

12        Q.    She would always be the first one to touch

13   you?

14        A.    As -- yes, as I remember.

15        Q.    You said you were called in 2016.  Was that

16   the conversation that you just discussed between the two

17   of you, was it in 2016 that you and Jennifer had a

18   conversation in which you agreed to end the sexual

19   aspect of your relationship?

20        A.    And virtually every other aspect of the

21   relationship.

22        Q.    So tell me again when was your last sexual

23   contact with Jennifer Lyell.

24        A.    I go back to not keeping a calendar.  I don't

25   know the specific date except that it was prior to then.

1   But in my mind, as far as any actual encounter between

2   us, I'll -- in my mind, it's like 2014, around in there.

3       Q.    In 2013, can you give us an estimate of how

4   many times you and Jennifer were together alone and

5   engaged in some sexual contact?

6       A.    No.

7       Q.    I assume, and should have asked you, that

8   these would have only occurred when you were alone; is

9   that right?

10      A.    Yes.

11      Q.    There weren't other people in the room?

12      A.    No.

13      Q.    Did you take steps to keep your intimate and

14  sexual relationship with Jennifer Lyell a secret?

15      A.    No.

16      Q.    Did you ever lie to Mary or anyone else about

17  whether you were spending time with Jennifer Lyell

18  alone?

19      A.    No, not about that, no.

20      Q.    So there were not times where you might say,

21  I'm going to run to the store --

22      A.    Oh, no.

23      Q.    -- but you were actually going to see

24  Jennifer?

25      A.    No.

1        Q.    Were there ever times where you saw Jennifer
2   and the two of you were alone together, but you did not
3   report that to Mary, for example?
4        A.    No.
5        Q.    Other than your home, where else would you
6   spend time with Jennifer Lyell alone?
7        A.    At her -- alone at her home.
8        Q.    And where was that?
9        A.    In Nashville.
10       Q.    So after Jennifer moved from Nashville, were
11   your times together alone always at your home?
12       A.    After she moved from Nashville?
13       Q.    Yeah.
14       A.    I don't know that she ever moved from
15   Nashville.
16       Q.    So let me -- you're right.  I didn't ask a
17   very good question.  When she lived in Louisville, were
18   you ever at her home?
19       A.    No.
20       Q.    And for a while she lived in Chicago; is that
21   correct?
22       A.    Right.
23       Q.    So she moved from Louisville to Chicago; is
24   that your memory?
25       A.    Right.

1        Q.    Were you ever with her alone in Chicago?

2        A.    No.

3        Q.    Other than your home and her home in

4    Nashville, was there any other place, like a hotel or an

5    office, where the two of you were alone together?

6        A.    No, but there were times that she would come

7    to -- with us for family visits to Jackson, Mississippi.

8    And there were times there when it would be a similar

9    situation.

10        Q.    So there were times in Jackson, Mississippi

11    that you and Jennifer were together alone?

12        A.    Surely.

13        Q.    And there may have been sexual contact

14    between the two of you?

15        A.    There may have been, but I don't really

16    remember about Jackson.  Those would have been just

17    visits when we came to visit family.

18             MS. CALLAS:  I'm going to hand you, sir, a

19    document we'll mark as Exhibit 5.

20             (Exhibit 5 was marked.)

21    BY MS. CALLAS:

22        Q.    I've handed you a document we've marked as

23    Exhibit 5 that appears to be an e-mail between you and

24    Jennifer Lyell dated Tuesday, September 7th, 2010.  It's

25    Sills 11547.  Do you see that?

1      Q.    Did you ever tell Jennifer that she should

2   not speak to Mary Sills, your wife, about her

3   relationship -- Jennifer's relationship with you?

4      A.    No.

5      Q.    When did you first learn that your

6   relationship with Jennifer had been disclosed to Dr.

7   Mohler?

8      A.    On May 21st, 2018 -- May 23rd, 2018.

9      Q.    Where were you?

10     A.    I was in teaching a Ph.D. seminar at Southern

11  Seminary and my dean had texted the night before and had

12  said, are you back?  I had been on a trip -- on a B trip

13  to Thailand.  I said, I'm back.  And he said, well, we

14  need to meet with Mohler.  I said, okay.  I said, I'm

15  teaching a Ph.D. seminar, which is a week-long seminar,

16  on campus all day every day.  I'm teaching that starting

17  tomorrow.

18          And he said, well, we'll go at lunch.  I

19  said, okay.  So I taught my class until lunch, met Adam

20  Greenway.  We walked over to Al Mohler's office.  And

21  that's when I found out she had made this allegation.

22          MS. McNULTY:  Before we start this line of

23  questioning, can we take a break?  We've been going

24  about an hour.

25          MS. CALLAS:  Sure.

1              MS. McNULTY:  Just like five minutes.

2              MS. CALLAS:  Yeah, that's fine.  Thank you.

3              THE VIDEOGRAPHER:  Off the record at 10:32.

4              (Recess observed.)

5              THE VIDEOGRAPHER:  We're back on the record

6      at 10:42.

7      BY MS. CALLAS:

8          Q.    Dr. Sills, I was beginning to ask you about

9      the discussion with Dr. Mohler.  Just so we're clear on

10     the dates, you indicated you received a message on May

11     23rd; is that your memory, from Adam Greenway?

12         A.    I believe that that year, the Sunday night

13     would have been the 21st.  That's when I returned from

14     Thailand.  And I had an e-mail from him asking if I was

15     back.  And I said -- well, maybe it was the 22nd, but

16     whatever it was, it was the night I got back.  And I

17     said, I am teaching a Ph.D. seminar starting tomorrow on

18     campus, and that was May 23rd, 2018.  And that's when we

19     went to Mohler's office, and I heard about this for the

20     first time.

21         Q.    So you believe the meeting with Dr. Mohler

22     was on the 23rd?

23         A.    Yes.

24         Q.    And I'm -- all right.  So let's -- what gap

25     of time between hearing from Adam Greenway that you

1    needed to have a meeting to the time there was a

2    meeting?  Do you know?

3         A.    I mean, I taught the Ph.D. seminar that week.

4    It could be that the seminar started on Tuesday, and he

5    got in such with me Sunday night.  But he was insistent,

6    so I would -- I'm -- in my mind, it was the next day.

7    But it would have been the night or so before.

8         Q.    You received an e-mail.  Did you call Adam

9    Greenway to discuss the meeting beforehand?

10        A.    No, I didn't get a call.  He texted me and

11   said, are you back?  And I said, yes, I am back.  Still

12   catching up, or something like that.  And he said we

13   needed to meet with Mohler.  And I said, okay, what

14   about?  And he said, it's something -- I think he said

15   it's something about which we need to speak in person,

16   or face to face, or something like that.  So I had no

17   idea what they were talking about.

18        Q.    So as you entered the meeting with Dr.

19   Mohler, you did not know what the topic would be?

20        A.    No.

21        Q.    You did not suspect it might be Jennifer

22   Lyell?

23        A.    I had no idea.

24        Q.    So tell me, as you entered the meeting -- and

25   just to be clear, you walked in with Adam Greenway, or

1  was he there already?

2      A.    No, I walked in with Adam Greenway.

3      Q.    And as you walked in with Adam Greenway, he

4  didn't give you any further information about what the

5  topic was?

6      A.    No.

7      Q.    So you --

8      A.    I had no idea.

9      Q.    This meeting was in Dr. Mohler's office?

10     A.    Yes.

11     Q.    Who else was there?

12     A.    Well, if I'm at twelve o'clock on a clock, to

13  the three o'clock position was Dr. Mohler.  So I'm

14  sitting on a couch, on this end of the couch.  Dr.

15  Mohler was sitting here in a chair.  At the five o'clock

16  position was Randy Stinson, who, at that time, was

17  senior vice president of academic administration.

18          And then over at about the eight o'clock

19  position was a guy named Craig Parker, who was something

20  to do with development or something like that at that

21  time.  And then on the other end of the couch from me

22  was Adam Greenway.

23     Q.    So who spoke first at the meeting?

24     A.    Mohler has several offices, layers of

25  offices, so he was walking, I think, from his desk over

1   to where we were sitting.  And as he sat in the chair,

2   he said, do you know why you're here?  And I said, no.

3   And he said, well -- and I don't remember his exact

4   wording here, but it was along the lines of Jennifer

5   Lyell has accused you of nonconsensual, like a sexual

6   relationship, something like that.  It was something

7   with very odd like that.

8              And he said, does that make any sense to you?

9   And I said, no, of course not.  And then he said, well,

10  that's what she is alleging.  Are you saying that there

11  is nothing nonconsensual going on, anything like that?

12  And I said, anything, any friendship, any kind of

13  relationship, anything I ever had with Jennifer Lyell

14  was completely consensual.  Because that was the

15  emphasis he was making that this was a nonconsensual

16  thing.  And I said, no, it would have been completely

17  consensual.

18             So he looked around at the other guys, and he

19  said, you know, we need to -- we need to resolve this.

20  He said something like, we can either do a big

21  investigation, third-party investigation, call in a

22  bunch of people.  If you are going to deny it, we can do

23  that.  Or you can just resign.  And I said, well, Mary

24  is on the way here to get me for lunch.  I said, I need

25  to pray with her about this.  He said, no, no, you

Case 3:23-cv-00478    Document 411-24    Filed 11/03/25    Page 43 of 152 PageID #:
14771

1    cannot leave this office until you give me an answer.

2          And I said, I have worked for you for 15

3    years.  I said, I have fallen on my sword many times.

4    You can give me an hour to make the most important

5    decision I will ever make.  He looked at the other guys,

6    and they nodded.  And he said, okay.  And I said, I'll

7    let you know my answer after lunch.

8          Q.   So when confronted with Jennifer Lyell's

9    allegations, did you admit that there was a sexual

10   relationship with her?

11         A.   No, I was never asked that.  What I said was

12   -- he said, has there ever been anything inappropriate?

13   And I said, in all of the years that we have known her,

14   there may have been something inappropriate.  And he

15   said she had not given him details, but that she was

16   willing to give him details if I denied it.

17         Q.   And you are saying today you did not deny

18   that it was inappropriate.  You admitted it was

19   inappropriate?

20         A.   I admitted it was an inappropriate

21   relationship.

22         Q.   And what did that mean?

23         A.   I don't know what it -- what did it mean for

24   me to say that?

25         Q.   Yes.

1       A.    Oh, it meant that it was -- as I phrased it

2   to him, I'm sure in the years that we've known her,

3   things would have happened that I wouldn't want to

4   happen on the platform of the chapel, is the way I put

5   it.  And I said there were probably some inappropriate

6   things that have happened.  That is all I said.  And so

7   what it meant, though, as for like what it meant, it

8   meant that I would be either fighting or resigning.

9   That was what it meant.

10      Q.    And when you say fighting it --

11      A.    Having the big investigation.

12      Q.    And the big investigation would be to

13  determine what, if you know?

14      A.    I don't know.

15      Q.    So when you said it was inappropriate, was

16  there a question in your mind as to whether your

17  relationship and the sexual activity with Jennifer was

18  appropriate?

19      A.    The question in my mind was the -- was the

20  elephant in the room that was swirling around, was

21  nonconsensual.  I just -- honestly, I was just

22  dumbfounded by that -- by that term, by that word.  And

23  that was the question that was in my mind.

24      Q.    But at no time, Dr. Sills, did you say, I

25  engaged in consensual sexual activity with Jennifer

1   Lyell, correct?

2              MS. McNULTY:  Object to the form.

3              THE WITNESS:  That is correct.  I never said

4   that.

5   BY MS. CALLAS:

6       Q.   So when you said it was inappropriate, you

7   did not offer any detail about what it, in fact, was,

8   which was sexual contact with Jennifer Lyell?

9              MS. McNULTY:  Object to the form.

10             THE WITNESS:  I did not offer any definition

11  specifically of what had happened.

12  BY MS. CALLAS:

13      Q.   So you were offered either a third-party

14  investigation by the seminary, or you could resign that

15  day; is that right?

16             MS. McNULTY:  Object to the form.

17             THE WITNESS:  Yes, that is right, and that

18  was what was on the table.

19  BY MS. CALLAS:

20      Q.   Was that, in your mind, an inappropriate

21  position for the seminary to take?

22      A.   No.  I think that was -- in a zero tolerance

23  world, that is a fair policy -- fair thing to take.

24      Q.   If you had said in that meeting, I had a

25  sexual relationship with Jennifer Lyell over the course

1    of many years, was it appropriate for the seminary to

2    say, then you should resign?

3              MS. McNULTY:  Objection, form.

4              THE WITNESS:  It depends on who you're

5    talking to.  They should say, you should resign, or

6    you're fired.  But in a zero-tolerance world, you don't

7    continue employment after admitting something of that

8    nature.

9    BY MS. CALLAS:

10       Q.    Tell me what -- well, I guess so when you're

11   making your decision, which you said you needed an hour

12   to pray with Mary; is that correct?

13       A.    I didn't need an hour.  I needed a thousand

14   years.  I needed one second.  But Mary was coming to

15   spend and an hour with me, and I was telling him, you

16   can give me the lunchtime with my wife to pray about

17   this.

18       Q.    So you left the room?  Was that the end of

19   the discussion when they said, yes, go ahead, David, you

20   can --

21       A.    That was it.

22       Q.    You described your statements, I believe, as

23   there may have been something inappropriate; is that

24   correct?

25       A.    Uh-huh.

1    Q.    Can you say yes?

2    A.    I'm sorry, yes.  I said, there -- in the

3    years that I've known her, yes, there may have been

4    things that were inappropriate.

5    Q.    It sounds as though you were saying may, but

6    not that there were, in fact?

7    A.    Again, I was still hung up on this word

8    nonconsensual.  And the reason the investigation was

9    even an option in my mind is because of that word.

10    Q.    Did you, at any point in that meeting with

11    Dr. Mohler, say that you -- your interactions with

12    Jennifer Lyell were to teach her how to be with a man?

13    A.    No.

14    Q.    So you left the meeting with Mohler, and

15    Greenway, and Stinson, and you left the room; is that

16    right?

17    A.    Yes.

18    Q.    And what did you do next?

19    A.    I went downstairs.  About that time, Mary was

20    arriving.  I got in the driver's seat.  And as we drove

21    down Lexington Avenue, I explained to her what the

22    conversation I just had.  Her mouth was hanging open.

23    She could not believe it either.  And we went.  We had

24    lunch.  We prayed together.  And we decided naively that

25    rather than do the big investigation, I would just walk

1   away.

2        Q.    Why do you say naively?

3        A.    Because at the time I thought -- well, it was

4   true, what I knew to be true, that this was an

5   inappropriate relationship that resulted in me leaving

6   the seminary.  And that in a couple of years, I would be

7   able to get a job of some sort and move on with my life.

8        Q.    So I'm clear, did you return to the office to

9   --

10       A.    Yeah, I had to go back and give my answer.

11  So I typed up a resignation statement, and I gave it to

12  Adam Greenway.

13       Q.    Did you go back to your office at the

14  seminary to type that up?

15       A.    Yes, because the Billy Graham School is in a

16  separate building from where Mohler's office was.  So I

17  went to my office, typed it up.  Greenway was in his

18  office.  I handed it to him.  He asked me, can you redo

19  this and make it to Mohler instead of to me?  And I just

20  stood there and held it.  And he said, nevermind, this

21  will be okay.  And he took it.

22       Q.    Did you push it at him?

23       A.    No, I held it up, and he took it.

24       Q.    Did you, at any time, either with Adam

25  Greenway or in the meeting with Mohler, say, I did not

1  engage in nonconsensual sexual conduct with Jennifer

2  Lyell?

3       A.    I did say -- yeah, I did say that.  I don't

4  know if I said sexual contact, but I said I never had

5  anything nonconsensual with Jennifer, ever.

6       Q.    When did you disclose to your two children

7  that you had had a sexual relationship with Jennifer

8  Lyell?

9       A.    I disclosed to them that day that I had been

10 accused of nonconsensual stuff from Jennifer and that

11 there had been some inappropriate interaction in the

12 years that we had known her.  And that I had left the

13 seminary.

14      Q.    What is stuff?  Did you actually say stuff?

15      A.    Yeah, I probably did.  I didn't say -- I

16 didn't describe to my kids the nature of any kind of

17 physical contact.

18      Q.    So you told your adult children, right?

19      A.    Uh-huh.

20      Q.    I am sorry, is that a yes?

21      A.    Oh, I'm sorry, yes.

22      Q.    That Jennifer had accused you of

23 nonconsensual stuff and that you resigned from the

24 seminary; is that right?

25            MS. McNULTY:  Objection, misstates.  Go

1   ahead.

2            THE WITNESS:  I told the kids that there was

3   an accusation of a nonconsensual nature.  I am not sure

4   whether I said stuff, or something else, or

5   inappropriate relationship.  But I did tell them that

6   that accusation had come in, and that I had resigned,

7   and everything else I had resigned from.

8   BY MS. CALLAS:

9       Q.    In the context of this litigation, is it your

10  contention that Dr. Mohler or the seminary encouraged

11  Jennifer Lyell to accuse you of nonconsensual sexual

12  activity?

13      A.    I am not sure where the encouragement came

14  from.

15      Q.    Is it your contention in this lawsuit, sir,

16  that the Executive Committee for the Southern Baptist

17  Convention or the Southern Baptist Convention encouraged

18  Jennifer Lyell to make allegations against you of

19  nonconsensual sexual contact?

20      A.    I am not sure where the encouragement came

21  from.

22      Q.    It is true, however, that on this date in May

23  of 2018, you learned that Jennifer was making

24  allegations against you of nonconsensual sexual contact,

25  correct?

1        A.      For the first time.

2        Q.      But you understood that that's what she was

3    saying, right?

4        A.      That's what I understood Mohler to say.

5        Q.      Did you speak to Jennifer Lyell?

6        A.      Never, not since then.

7        Q.      So when was the last time, if you remember,

8    that you spoke --

9        A.      Um --

10       Q.      Well, let me finish.  I'm sorry.

11       A.      I'm sorry.  Go ahead.

12       Q.      Either on the phone, speaking with your

13   voice, or through texting, or e-mailing?

14       A.      The last time I spoke to her was the evening

15   I got back from Thailand.  And I said, I am back in the

16   country.  Is anything going on that I need to know

17   about?  Because she basically ran the ministry while I

18   was gone.  She was on the board.  She -- I just needed

19   to know was there anything going on, and I never got a

20   response.  So that's the last time I talked to her.

21   Last time she talked to me, I don't recall.

22       Q.      Was it before that?

23       A.      Clearly, it would be before that.

24       Q.      Well, she might have reached out to you at

25   some point later?

1    you knew that she did tell Christopher it was an

2    accident.  Do you see where you say that here?

3         A.    Yes.

4         Q.    So you did have some understanding of the

5    contents of the e-mail between Jennifer and Christopher;

6    is that right?

7         A.    I did.  But I have never seen the e-mail.

8    Christopher explained to me when this all happened, that

9    he reached out to her very frustrated.  Not coming down

10   on her for having done anything, but simply to say, why

11   did you do it this way?  Why did it have to be this

12   blowup, 60 Minutes kind of thing when he goes to work?

13              And she said, I didn't mean to.  I was

14   talking with some friends at work, and it came out that

15   I had a relationship or something had happened at

16   Seminary.  She said, the next thing you know, Eric had

17   me in his office.  And he grilled it out of me and told

18   me I had to call Mohler.  That it was a complete

19   accident that it ever came out.

20        Q.    Did Christopher also inform you that Jennifer

21   told him in that e-mail that the sexual contact with you

22   was not consensual?

23        A.    No, he never told me anything beyond that,

24   about how it came out.

25        Q.    Did he tell you that Jennifer disclosed to

1   him in that e-mail that she physically and verbally

2   resisted you?

3        A.    No, he never told me that.

4        Q.    In this litigation, is it your contention or

5   allegation that the defendants that you've sued

6   encouraged Jennifer Lyell to make allegations of

7   physical or verbal abuse by you?

8        A.    I'm not sure where the influence came from

9   for her to make the accusations in the form that she

10  did.

11       Q.    Do you dispute that Jennifer Lyell was

12  accusing you of abusing her sexually in May of 2018?

13  And if I need to rephrase that, but she was accusing you

14  in May of 2018 of acts that had occurred before that?

15            MS. McNULTY:  Objection, form.  Go ahead, if

16  you can.

17            THE WITNESS:  I was aware that she was

18  referencing things that had happened prior to 2018.  I

19  was not aware that she was categorizing it as abuse, no.

20  BY MS. CALLAS:

21       Q.    What -- so when Dr. Mohler said it was not

22  consensual, is that something different than abuse?

23       A.    You know, at that time in my life, I never

24  had sat down to think, okay, you know, what is abuse,

25  what is nonconsensual.  You know, you could have a

1    nonconsensual greeting in the elevator when somebody is

2    not on speaking terms.  You say hello.  They don't say

3    hello back.  That's non -- so I mean, I wasn't -- again,

4    that was the elephant in the room, the word

5    nonconsensual.  When he mentioned that, I couldn't get

6    past that.

7          Q.    Is there such a thing of nonconsensual sexual

8    activity that is not abusive?

9                MS. McNULTY:  Objection, form.

10               THE WITNESS:  I've never had to sort through

11   all of the arguments about that before, whether -- but

12   no, if someone is being forced to receive a sexual

13   interest or activity that they're not consensual for,

14   then, yeah, that would be abuse.

15   BY MS. CALLAS:

16         Q.    How did you view Jennifer Lyell in 2008?  Was

17   she a surrogate daughter?

18         A.    Oh, no, she was -- she's always been a

19   co-partner and a colleague, confidante, friend, helper.

20   You know, she -- in 2008, she was my editor.  She was

21   the one telling me what to write, and what platforms I

22   ought to speak in, different things like that.

23         Q.    Was she a family member?

24         A.    No, not a -- not family member.  She was a

25   close family friend.  In fact, that's how we would

1    introduce her.

2         Q.   When you had your meeting with Dr. Mohler and

3    Adam Greenway, did you tell them that Jennifer had

4    initiated or cultivated a physical relationship with

5    you?

6         A.   I don't recall saying that.

7         Q.   Do you recall having a voicemail from David

8    Roach?

9         A.   I do.

10        Q.   Did you know David Roach before he left that

11   voicemail?

12        A.   I knew of him.  I think he did -- I think he

13   -- I think he worked for one of the seminary

14   publications at one point and had done an interview with

15   me about something in the past, I think.

16        Q.   So when you heard the voicemail from David

17   Roach, did you at that moment say, I know this person or

18   --

19        A.   I recognized that he was a writer for some

20   Baptist publication.

21        Q.   And you received a voicemail from him in

22   March of 2019; is that correct?

23        A.   I think that's right.

24        Q.   And was it one phone call, or did he call you

25   a second time?

1       A.      I remember getting one phone call voicemail.

2       Q.      And you recall that he did mention he was

3   preparing an article for the Baptist Press?

4       A.      Yes.

5       Q.      And it was going to relate to Jennifer Lyell?

6       A.      That's right.

7       Q.      And did you call David Roach back?

8       A.      No.

9       Q.      Why did you not call him back?

10      A.      Because he said in the voicemail --

11  partially, I was at my father-in-laws's house.  But he

12  said in the voicemail, I am preparing an article.

13  Jennifer Lyell has come forward and said she had a

14  relationship with you while you were at Seminary and --

15  or while she was at Seminary, something like that.  And

16  I just wanted to know if you wanted to speak to that.

17              And what he said on the voicemail was right.

18  I had just resigned from everything in the whole world.

19  Everybody knew that that was the case.  And I thought,

20  well, he's making the -- and then his article came out,

21  and what he said was true.  So I had no reason to stir

22  the waters.

23      Q.      So as relates to your review of the Baptist

24  Press article of March 2019, it is true?

25      A.      That he said we had an inappropriate

1    relationship, yeah, that would be true.

2         Q.    But, again, in March of 2019, you were aware

3    because of your communication with Dr. Mohler that

4    Jennifer Lyell had asserted it was nonconsensual sexual

5    contact, right?

6         A.    I knew that was the accusation she had made.

7         Q.    Did you also receive a call from Laura

8    Erlanson of the Baptist Press?

9         A.    I don't recall that, no.

10        Q.    What about an e-mail, do you remember around

11   March of 2019 receiving an e-mail from Laura Erlanson?

12        A.    I don't recall that.

13        Q.    Did you receive contact from a reporter at

14   the Louisville Courier-Journal in the 2019 time frame?

15        A.    I don't think so.  I don't remember.  Part --

16   part of the problem is I didn't have any more e-mail

17   access.

18        Q.    In 2018, you e-mailed with Randy Smith.  Who

19   is Randy Smith?

20        A.    2018?

21        Q.    Yes.

22        A.    Randy Smith is a guy that, by that time, had

23   been a professor at Boyce College, which is the

24   undergraduate program of Southern Seminary.  And he

25   owned -- or led a ministry called Youth Ministry

1    International.

2         Q.    And do you remember reaching out to Randy and

3    six other men in 2018?

4              MS. McNULTY:  Objection, form, vague.

5              THE WITNESS:  Yeah, about what?  I mean what

6    other -- no, I don't recall.

7              MS. McNULTY:  If you don't know, then --

8    BY MS. CALLAS:

9         Q.    That's fine if you don't recall.  How did you

10   know Randy?

11        A.    Again, Randy had been a professor at

12   Seminary.

13        Q.    So in November of 2018, you do not recall

14   writing to six men you considered to be friends to see

15   if they had opportunities?

16             MS. McNULTY:  Well, objection to form.

17   Misstates the prior testimony.

18   BY MS. CALLAS:

19        Q.    Do you recall reaching out to six men you

20   considered to be friends by e-mail in November of 2018?

21        A.    I don't recall that e-mail.  I am sure that I

22   reached out to people I considered to be friends.

23        Q.    And were you seeking employment

24   opportunities?

25        A.    I was, very likely.  I don't remember that

1    e-mail, but I would imagine I was trying to feed my

2    family.

3        Q.    Do you recall Randy Smith responding to you

4    in November of 2018, indicating that there were rumors

5    flying around that you had an emotional affair with

6    another woman?

7                MS. McNULTY:  Objection, form.  If there's a

8    document you want to show him, I think that's helpful,

9    based on his prior answers.

10               MS. CALLAS:  I think I can ask him if he has

11   a recollection of the communication with Randy Smith in

12   2018.

13               THE WITNESS:  I have -- a specific

14   communication, I don't know.  Randy was a friend.

15   BY MS. CALLAS:

16       Q.    So were you aware in November of 2018 that

17   there were rumors circulating among people that you

18   knew?

19       A.    In 2018, November?

20       Q.    Yes, sir.

21       A.    Of course there were.  I had left the

22   seminary.

23       Q.    Okay.  And what were the rumors?

24       A.    Well, and the article had already gone out

25   among people.

1      Q.    What was the article, sir?

2      A.    The article that -- the e-mails, and the

3   Twitter world, and Twitterverse, whatever you call it.

4   Everybody was talking about, Dr. Sills, tell me it's not

5   true, and all these other kind -- rumors were going

6   everywhere.  Why does a professor leave a seminary?

7      Q.    And what article?  Was it an article about

8   your resignation?

9      A.    No, I mean, it wasn't an article, but

10  whatever you call the things that go out on social

11  media, the blurbs and all of that kind of stuff.  People

12  were saying all kinds of things.  I mean, of course I

13  was aware of rumors going around.

14     Q.    So in November of 2018, there were rumors

15  going around you had left the seminary because you had

16  an extramarital affair; is that correct?

17     A.    That was the rumor.

18     Q.    And do you know who was the source of the

19  rumor?

20     A.    I would guess it would be the person who made

21  the accusation to the seminary that that had happened.

22     Q.    And that would be Jennifer Lyell?

23     A.    I guess.  I don't know who actually started

24  the rumors, but very demonstrably.  By the time I left

25  the seminary, within the next day or two, the rumors

1    were everywhere.

2        Q.    And your understanding of the rumors were

3    that you had engaged in an extramarital affair with a

4    former student; is that right?

5              MS. McNULTY:  Objection, form.

6              THE WITNESS:  There were rumors, but who

7    knows what people are saying in rumors.

8    BY MS. CALLAS:

9        Q.    Did those rumors impact your ability to find

10   a position, a ministry position or missionary position?

11       A.    I don't -- I don't know the answer to that

12   question.  People -- if that's all that had happened,

13   people would have said, let's talk about that.

14             MS. CALLAS:  I'm going to try to find this

15   e-mail.  I just need a moment, so why don't we go off

16   the record for a moment and take a five-minute break.

17             THE VIDEOGRAPHER:  Off the record at 11:18.

18             (Recess observed.)

19             THE VIDEOGRAPHER:  We're back on the record

20   at 11:26.

21             MS. CALLAS:  Dr. Sills, I'll hand you what

22   we'll mark as our next exhibit, No. 8.  It's Bates No.

23   76527.

24             MS. McNULTY:  Just to be clear on the record,

25   are you counting all of the pages as one exhibit or just

1    that page that you read off?

2              MS. CALLAS:  That document Bates number I'm

3    using just to let people know where to go.  But yes, I

4    would like to count the entire document I've handed to

5    you as an exhibit.

6              MS. McNULTY:  So it's through 076530?

7              MS. CALLAS:  Correct.

8              (Exhibit 8 was marked.)

9              THE WITNESS:  Okay.  Sorry.

10   BY MS. CALLAS:

11        Q.    That's all right.  Dr. Sills, you've had an

12   opportunity to review, and you did seem to be reading

13   the entire document; is that correct?

14        A.    That's right.

15        Q.    It starts on Bates No. 76529 with an e-mail

16   from you on November 9th, 2018.  Do you see that?

17        A.    Yes.

18        Q.    So that's the start of this e-mail chain.

19   Would you agree?

20        A.    I think so, yes.

21        Q.    It's, again, November 9th.  You've addressed

22   this to Randy and then Stewart.  Were you sending this

23   same e-mail to two different people, both Randy and

24   Stewart?

25        A.    I was sending it to several different people.

1    I was copying and pasting what I had written to one

2    person, to Randy, and the Stewart was inadvertently

3    included in the e-mail.

4        Q.    In this e-mail from you to Randy, were you

5    indicating you were prepared for ministry to the

6    hopeless, lost, and to the hurting, saved; is that

7    correct?

8        A.    No, in fact, I clarified later because I

9    think he wondered that, as well, that I was not looking

10   for a ministry position.  I really wanted to use my

11   skills, which is what I did with Global Outreach, as

12   well.

13       Q.    So you were not indicating to Randy that you

14   were looking for opportunities in ministry; is that

15   right?

16       A.    Not as a minister or missionary, that's

17   right.

18       Q.    So Randy did respond to you some days later.

19   It was November 13th.  Do you see that response?

20       A.    I do.

21       Q.    And at the end, he does indicate that he

22   hopes it works out, but with rumors flying around that

23   you had an emotional affair with another woman, it makes

24   it difficult to understand how to help without hearing

25   from you directly.  Do you see that?

```
 1        A.    I do.
 2        Q.    Did you speak to Randy directly after this
 3   e-mail?
 4        A.    Only in the e-mail that follows.
 5        Q.    In your e-mail that follows, and I'm looking,
 6   actually, just above Randy's, there is a paragraph at
 7   the top of Page 76528.  And it says, however, the tone
 8   of your e-mail seems to indicate your feeling that if
 9   any of the rumors are true, then nothing like that would
10   be possible anyway.  Is that what you said?
11        A.    Right.
12        Q.    And tell me what you meant by that.
13        A.    Well, what I said in the sentence prior to
14   that, if I have to get a basic job of some kind, I would
15   love to -- for it to be in the area that is -- in the
16   arena that is near to my heart, experience, education,
17   calling, not as a leader, but as a servant.  And what I
18   had said, same thing I said to Global Outreach, is that
19   I would love to do consulting, help people adjust to
20   other cultures, that kind of thing, for businesses,
21   governments, different organizations.
22              But he seemed to make it clear in his e-mail
23   that working with me or helping me in any way, if any of
24   the rumors were true, would not be an option, as far as
25   he was concerned.
```

1        Q.    And, again, as Randy described the rumors,

2    they were an emotional affair with another woman; is

3    that what he said?

4        A.    That's what he said.

5        Q.    So you do end your e-mail to Randy in saying,

6    I hope and pray that you never sin, brother.  Do you see

7    that paragraph?

8        A.    On the first or the second e-mail?

9        Q.    It's the --

10       A.    The second.  My response to his?

11       Q.    Yes, sir.

12       A.    Yes.

13       Q.    And you say, and if you ever do sin or ever

14   have sinned badly, and someone learns about it, that you

15   don't make such a disaster of your life and ministry as

16   that which surrounds and destroys mine now.  Is that

17   your -- are those your words?

18       A.    Those are my words.

19       Q.    In November of 2018, is it true that your

20   life and your ministry you viewed as a disaster?

21       A.    Totally destroyed, yes.

22       Q.    And you were having difficulty even reaching

23   out to individuals, the six men that you reference on

24   the first page, in finding opportunities; is that

25   correct?

1              MS. McNULTY:  Objection, form.

2              THE WITNESS:  And this is within six or eight

3    months of this having happened.  Yeah, and so in the

4    initial year or so after something like this, it's very

5    hard.  People are still hurt.

6    BY MS. CALLAS:

7         Q.    Well, when does it become easier?

8         A.    It becomes easier when you've demonstrated

9    repentance and restoration, which I believe we have

10   shown.  And we did go through -- that's when it gets not

11   easier, but you begin to find employability.

12        Q.    When did you go through restoration?

13        A.    The exact dates you should have.  I don't --

14   I can't reference the dates.  But they were with a team

15   of pastors, including our pastor, and several pastors

16   from the Houston area that I've worked with

17   internationally.  They reached out to me and asked if I

18   would be willing to go through a restoration process.

19   We agreed to that, Mary and I both.

20             About a nine-month process, which culminated

21   in them coming to Jackson and declaring -- issuing a

22   letter for us and for anybody that would be interested,

23   that they considered us to have repented and moved past

24   this.  And in their minds, worked through this, not

25   necessarily restoration to ministry, but restoration to

1    Christian fellowship.

2         Q.    And this was a process you went through.  How

3    long did it take?

4         A.    Nine months.

5         Q.    It did not go through your church at the

6    time?

7         A.    It did in the sense that our pastor was the

8    head of the restoration committee.

9         Q.    And who was your pastor at that time?

10        A.    Donnie South.

11        Q.    And where was he?

12        A.    Good Hope Baptist Church.

13        Q.    But the specific dates of that restoration

14   process are not known to you?

15        A.    Off the top of my head, they are not.

16        Q.    You have talked to Megan Basham.  Who is

17   Megan Basham?

18        A.    Megan Basham, as I understand it, is a

19   reporter for a news organization.  I don't know, Daily

20   Wire, I think.

21        Q.    And when did you talk to her?

22        A.    Again, I don't know the date off the top of

23   my head.  But she reached out and asked if she could ask

24   background material.  And I agreed to that only, and not

25   to go on record about anything.

1          Q.    Thank you.  So you had retained counsel --

2    you had retained an attorney by November of 2018; is

3    that correct?

4               MS. McNULTY:  Objection, form.  Misstates,

5    and he is not answering that.

6               MS. CALLAS:  He is not telling me when he

7    retained counsel?

8               MS. McNULTY:  That's right.

9    BY MS. CALLAS:

10         Q.    Okay.  Let's move on.  So you gave Megan

11   Basham background information?

12         A.    Uh-huh.

13         Q.    What did that entail?

14         A.    Just the background of the situation, who I

15   was, the other parties involved.  What had happened, is

16   what was being -- it would have been, I think, after the

17   big -- probably after Guidepost.  I don't know.  But it

18   was -- she had all of this information.  And she was

19   saying, this is -- I just want to get more information

20   about this.  What is going on here?  And so I said, I'm

21   not going on record, but I agreed to give background

22   information.

23         Q.    Did you give her any of the details about

24   your involvement, physical contact, with Jennifer Lyell?

25         A.    No.

1  Kindle Direct Publishing of 2022.  Is that a correct --

2  getting us forward or updated on your books?

3      A.    That should be right.

4      Q.    So as far as articles, there were not any

5  articles published after 2015, and the book, Hearts and

6  Hands, when did you start working on that?

7      A.    Over a sabbatical a year or so before that.

8  It took a year to write.  And, in fact, it first came

9  out in book form.  And then at my editor's suggestion,

10  which would be Jennifer Lyell, it was reissued in

11  chapter booklets as separate books.  But it was

12  basically just the chapters, individual chapters.

13      Q.    Were some of your publications and books

14  removed from sale by your publishers, or are they still

15  available for sale?

16      A.    No, they were all removed from -- except the

17  ones that I had self-published.

18      Q.    And why did that occur?

19            MS. McNULTY:  Objection, form.

20            THE WITNESS:  I have no idea.

21  BY MS. CALLAS:

22      Q.    Do you know when that occurred?

23      A.    Virtually immediately after I resigned.

24      Q.    In May of 2018?

25      A.    I would say within that year, they all began

1    to send me notices saying your books have been

2    remaindered or whatever.  And I think I contacted my

3    agent that Jennifer had connected me with and told him

4    that I had resigned, and so he immediately cancelled his

5    contract as well.

6        Q.    And who was that?

7        A.    His name was Andrew Wolgemuth,

8    W-o-l-g-e-m-u-t-h.

9        Q.    In your time as faculty and a missionary,

10   have you seen publications be removed from availability

11   because of acts of adultery or infidelity?

12           MS. McNULTY:  Objection, form.  In

13   particular, the notion of the ambiguous term, adultery,

14   being referenced here, and also speculation.  Go ahead.

15           THE WITNESS:  I have never, personally, been

16   aware of a book that has been pulled from a publisher

17   and erased from a catalogue, taken out print, et cetera

18   because of anything like that.  I have known people who

19   did things like that.  I have never known a book to be

20   completely pulled.

21   BY MS. CALLAS:

22       Q.    So you have known authors who have engaged in

23   emotional sexual affairs with people they are not

24   married to and their books have remained available?

25           MS. McNULTY:  Objection, form.

1      Q.    Tell me what you told Steadman Harrison at

2   that time.

3      A.    Exactly what had happened.  That there had

4   been an inappropriate relationship.  I had left the

5   seminary, and we were on the coast spending some time in

6   prayer, and Bible study, and personal time between me

7   and Mary, seeking the Lord's direction about the future.

8   And that I had kept coming back to, the Lord had put

9   these things in my life, how could I still use them

10  without having to be a minister of some kind.

11     Q.    Did you tell them you had a moral failure?

12     A.    Yes.

13     Q.    Did you tell them that your time away from

14  the seminary and your other boards was for a personal

15  issue?

16     A.    No.  He understood what had happened.  I

17  explained to Steadman what happened.  But for the kind

18  of position, Steadman didn't think it was pertinent.

19     Q.    Did Steadman change that view?

20     A.    Steadman did not.  Steadman -- Stan May -- I

21  don't know if he changed his view, but was approached by

22  someone outside of the Global Outreach organization and

23  said, if you continue with this guy, we're going to go

24  public and spread Global Outreach's name as not being

25  concerned about these kind of issues.  Stan May was

1    concerned about that.  Steadman still said, if you want

2    to fight this, we'll stand with you.  And I said, no, I

3    don't even work for Global.  I don't want to embarrass

4    y'all.

5         Q.    So Stan May is the one who had the

6    conversation with this person?

7         A.    No, Steadman received a letter from someone

8    outside of the organization that said -- or at least

9    that's what he explained to me.  It could have been a

10   phone call, but he said, we got -- no, he said it was a

11   letter.  And he said, at that time, you should fight

12   this because of the -- I don't even know what he meant

13   by that, so don't ask me to speculate.  But because of

14   the return address on the envelope, you need to fight

15   this, whatever that meant.  Steadman stood with me, and

16   he was head of the organization.  I didn't want to put

17   the organization through that.

18        Q.    When was the last time you talked to

19   Steadman?

20        A.    During this time frame.  He went back to the

21   field, to Ethiopia.

22        Q.    So did Steadman show you the letter?

23        A.    No.

24        Q.    Did he and Stan have a conversation?  I'm

25   trying to figure out who spoke to this person.

1    What is true is I did suffer an impairment because there

2    had been an inappropriate relationship.  Period.

3    Subsequently -- and that kind of -- that kind of

4    impairment, people can get jobs selling shoes, they can

5    get jobs at insurance companies, et cetera, down the

6    road.  A person who has suffered the subsequent

7    allegations that were untrue is a hard-core unemployable

8    in any industry.

9         Q.    Did you make efforts to seek employment in

10   2018 and 2019?

11        A.    You've already referenced some, yes.

12        Q.    And you were unable to secure employment in

13   2018 and 2019, correct?

14        A.    I wasn't unable.  They said we need to have

15   another conversation.

16        Q.    And did you have another --

17        A.    And then the Global Outreach conversation.

18   Apparently, this was already being made known because

19   someone contacted Global Outreach and took it to the

20   next step.

21        Q.    So in 2018 and 2019, were you able to secure

22   employment of any kind?

23        A.    No.

24        Q.    Isn't it true you also experienced public and

25   personal humiliation in 2018 because of your

1    extramarital relationship with a former student?

2         A.    Sure.

3               MS. McNULTY:  Objection, form.

4               THE WITNESS:  With regard to suffering

5    embarrassment and humiliation, of course.

6    BY MS. CALLAS:

7         Q.    Did that cause you mental anguish in 2018?

8         A.    It caused me great personal conviction of

9    sin, knowing that what I had done against the Lord and

10   the people, in addition to myself, who had been hurt.

11        Q.    Did you suffer mental anguish while the

12   extramarital relationship with Jennifer Lyell was

13   ongoing?

14        A.    Sure.

15        Q.    And did you suffer anxiety and depression

16   while that relationship with Jennifer Lyell was ongoing?

17        A.    To some degree, to some degree.

18        Q.    Did you report to Jennifer that you had

19   anxiety, and depression, and deep sorrow in 2012?

20        A.    I'm sure.

21        Q.    Did you see a physician for issues of anxiety

22   and insomnia in --

23        A.    Not related to her, but I am sure that I must

24   have during that time.

25        Q.    Well, what would that have been related to?

1        A.    Having an international worldwide ministry,

2    teaching a full-time load, starting another

3    organization, speaking for other organizations, having a

4    wife and kids, and trying to take care of a house,

5    things like that.

6        Q.    So your life caused you anxiety and sorrow?

7              MS. McNULTY:  Objection, form.

8              THE WITNESS:  Yeah, I -- my life caused me

9    anxiety and stress.  I'll put it that way.  The sorrow

10   was as a result of a host of things in my life.

11   BY MS. CALLAS:

12       Q.    So was the ongoing sexual contact with

13   Jennifer Lyell part of that or not?

14       A.    In retrospect, it must have been.  There was

15   not a cognizant awareness of, this is what is causing me

16   difficulty right now.

17       Q.    So were you prescribed medication for anxiety

18   and depression by a physician prior to 2018?

19       A.    I mean, I don't remember the years, but

20   surely I think I have along the way.  But not ongoing.

21       Q.    Currently, are you taking medications?

22       A.    Yes.

23       Q.    What are you currently taking?

24       A.    I take Ambien to get to sleep.  I take -- I

25   don't know what it's called, but it's Levapro

1  (phonetic).  I take -- and that's for like depression

2  stuff.  I have Xanax for panic attacks kind of things.

3  I am taking -- well, I'm taking -- what is it called?

4  It's called Flomax.  I think it's Tamsuloson or

5  something like that, and that's for BPH, benign prostate

6  hyperplasia or whatever that is, an enlarged prostate.

7       Q.    Who do you currently treat with for any

8  emotional or physical ailment?

9       A.    My doctor is Jeffrey LeDuff.

10       Q.    Do you see a psychiatrist or a counselor?

11       A.    No, my pastors are my counselors.

12       Q.    Your pastor at one point was Bill Cook; is

13  that right?

14       A.    That's right.

15       Q.    And what church was he affiliated with?

16       A.    He -- denomination or church?

17       Q.    Both.

18       A.    Well, the church was Ninth & O Baptist

19  Church, and the denomination was the Southern Baptist

20  Convention.

21       Q.    Did Pastor Cook tell you not to return to

22  that church?

23       A.    Personally, yes.

24       Q.    What does that mean, personally?

25       A.    And I appreciate the question because it's a

1    little irregular.  When this happened, I -- at Dr.

2    Mohler's office, on the way home, after Mary and I had

3    agreed, I gave my letter of resignation.  On driving

4    home, I called Dr. Cook, and I said -- told him what had

5    happened.  And he goes, oh, my goodness.  He said, well,

6    we're on the way over.

7              And so he and his wife came -- came to our

8    house.  And so Mary and I sat on the couch.  And Bill

9    and Jaylynn, his wife, sat there.  And I told him.  And

10   he was, you know, devastated.  And he said -- and I

11   said, Bill, I said, if you want me to go under church

12   discipline, brother, I said, I will do anything.

13   Whatever you want me to do, I will do it.

14             And he said, well, he said, you said this was

15   over before, and you had confessed it to Mary, and y'all

16   worked through it, and this is not happening, ongoing?

17   And I said, that's right.  And he said, well, church

18   discipline is for people who refuse to repent of their

19   sin, they want to continue in it, and we have to

20   discipline them, Matthew 18.  So he said, we're not --

21   we can't -- we wouldn't do that.  He said, you know, but

22   we're praying for you, everything else.  And I said,

23   great.  So they left.

24             About a week later, Bill and the associate

25   pastor, Jeff Elieff, came back to me and said -- in

1    fact, that would have been time for the Southern Baptist

2    Convention, which is in the middle of June every year.

3    So it was about a week later, they came back, and Bill

4    said, look, I am going to be out of town this weekend.

5    What I would like for you to do is go to the church and

6    just -- there's a lot of questions going on at the

7    church, what's happened, what's going on with Dr. Sills.

8              Let's just -- you just go in there and tell

9    the church everything that happened.  And I said, well,

10   Bill, I can't really do that.  And I have been informed

11   -- been told that I am not to make any public statements

12   about anything.  I said, but I tell you what, as soon as

13   this is over, I will come.  I will make a full

14   explanation.  Ask forgiveness from the church,

15   everything.  But I just can't do that right now.

16             And he said, well, I will do that.  Don't

17   worry about it.  I will do it.  And I said, but, now, I

18   later, I will be glad to.  And he said, oh, no, after I

19   do this, I don't expect -- ever expect to see you back

20   at our church again.  And Mary and I just looked at each

21   other, and Bill.  Because, I mean, that's not Biblical.

22   You can't do that because if there is no church

23   discipline, there is never hope for restoration.  You

24   are just kicking somebody out of your church.  And

25   Biblically, a pastor can't do that.  The church is the

1  only one who can do that.

2           And so he circumvented the entire Biblical

3  guidelines for discipline of a person and just said,

4  leave.  And nine months later, when we did join another

5  church after our time on the coast -- we moved back to

6  Jackson.  That church requested our membership

7  information from Ninth & O.  And it came in that we're

8  still members in good standing at Ninth & O Baptist

9  Church.  So this was just his decision that he didn't

10  expect me to come back.

11       Q.   So he offered you an opportunity to speak to

12  the church; is that right?

13       A.   He did.

14       Q.   And why did you decline?

15       A.   Because I had had counsel not to make a

16  public statement like that.

17       Q.   You think this was in June of 2018?

18       A.   It would have been probably the first Sunday

19  in June.

20       Q.   And did, if you know, Pastor Cook make an

21  announcement of some sort to the congregation?

22       A.   I don't know, personally.  I heard through

23  the grapevine that he did.

24       Q.   And you -- because you weren't there, you

25  don't know what he said?

1      A.    All I remember is the word that came to me is

2   that he had used the term or had said that what I had

3   done was of an egregious nature.

4      Q.    When you spoke to Pastor Cook the first day,

5   what did you tell him had happened?

6      A.    That there had been an inappropriate

7   relationship between me and Jennifer.

8      Q.    You did not provide him any of the details of

9   that relationship?

10     A.    No.

11     Q.    If you will go back to the e-mail to Randy,

12   which I think is in front of you.

13     A.    Yes.

14     Q.    It's in the -- so this is exhibit -- can you

15   tell me, sir?

16     A.    Oh, Exhibit 8.

17     Q.    So this is -- we talked about the statement

18   about our counsel there in the second full paragraph on

19   Document 76527.  The sentence before that is, or two,

20   earlier this year, in a series of coordinated moves

21   against a number of leaders, someone who knew or found

22   out about it was able to use it for harm.  Tell me what

23   you meant by that sentence.

24     A.    I have no idea except I believe that this is

25   referencing a man named Eric Geiger, who -- perhaps at

1    about counsel being a pastor; is that right?

2        A.    I have sought counsel from a pastor.  When I

3    -- if I say I was advised by counsel, I'm speaking of an

4    attorney.

5        Q.    Okay.  So, again, when Pastor Cook asked you,

6    in June of 2018, to speak to Ninth & O congregation, you

7    declined, correct?

8        A.    That's right.

9        Q.    And it was based on advice of counsel, an

10   attorney; is that right?

11       A.    That's right.

12            MS. CALLAS:  I'm getting close to the end.

13   We could take a lunch break now, and then I will come

14   back for a little while, or how do you all feel?  Or we

15   can keep going until your lunch comes.

16            MS. RILEY:  We can do that.  It should be ten

17   or fifteen minutes.

18            MS. CALLAS:  I don't care.  Does anybody

19   else?

20            MR. ELBERT:  I think we should take this --

21   12:20, just go off the record.

22            MS. CALLAS:  We'll come -- yeah.

23            MS. McNULTY:  What's the lunch break, because

24   I want to -- I don't want to waste 15 or 20 minutes --

25            MR. ELBERT:  Are we off the record?

1   schedule?

2        A.    It would say how many?

3        Q.    You said --

4              MS. McNULTY:  Where is that at in the

5   exhibit?

6              MS. CALLAS:  It is the same exhibit we're

7   looking at --

8              THE WITNESS:  Oh, I see.  On the second page.

9              MS. McNULTY:  Which page, as a courtesy?

10  Thank you.

11             THE WITNESS:  Yeah.

12             MS. CALLAS:  Yeah, the second paragraph of --

13             THE WITNESS:  Yeah, that's true.

14             MS. CALLAS:  -- 115577.

15             THE WITNESS:  Yeah.

16  BY MS. CALLAS:

17       Q.    So you were scheduled 360 days a year prior

18  to 2019?

19       A.    Yeah, either out of the city, out of the

20  country, or in town.

21       Q.    And if you know, what was your annual income?

22       A.    My annual income for the seminary was around

23  $60,000 or so.  Honoraria would normally average

24  anywhere from 500 up to 5,000, depending on the kind of

25  event.

1    the top three up here in 2019, Latin America coordinator

2    of Samaritan's Purse, they indicated why.  Missions

3    director, North American Baptist, they indicated why.

4    Intercultural consultant, Global Outreach International,

5    they indicated why.  These others down here, as I said,

6    these were the ones you do online on a portal.  And

7    there is not a personal response back.

8         Q.    So the first three at the top of Page 13 --

9         A.    It's the second three.  I mean, it starts

10   with Latin American coordinator, 2019.

11        Q.    Gotcha.  So three that are from 2019,

12   correct?

13        A.    That's right.

14        Q.    And you've just testified that those three

15   organizations did tell you why they rejected your

16   application; is that right?

17        A.    That's right.

18        Q.    And what did they tell you?

19        A.    It was -- some would phrase it in a more

20   polite way, but basically the fact that there were

21   accusations of -- not just of inappropriate interaction,

22   or an affair, or anything like that, but since there

23   were accusations of abuse or nonconsensual forced sexual

24   activity, that they could not get into that, that would

25   expose their organization.

1       Q.    And how did these three organizations, if you
2  know, become aware of allegations of abuse in 2019?
3       A.    The Latin American coordinator, Samaritan's
4  Purse, I am not totally sure how they found out.  I
5  think -- it seems like they were asking some pointed
6  questions, and so I just told them what was currently
7  going on.  Again, so nothing would splash on them bad.
8             The missions director at North American
9  Baptist, which is a -- which is denomination, but it's
10  not connected to Southern Baptist, and it's in
11  California, about that same time, I thought, I will tell
12  them as well, so I did.  And, then, of course, you know
13  the story from Global Outreach International.
14       Q.    So the Latin America coordinator position,
15  Samaritan's Purse, you said they were asking you some
16  pointed questions, correct?
17       A.    Right.  Why did you leave the seminary?  What
18  is going on?  And, of course, andy social media search
19  these days, everything that's being said out there pops
20  up.
21       Q.    Let me ask you, what --
22             MS. McNULTY:  Are you done?  Sorry, you --
23             THE WITNESS:  Yeah, everything -- everything
24  pops up.  It's all -- it's all out there.
25  BY MS. CALLAS:

1      Q.    In 2019, though?  We're talking --

2      A.    Yes.

3      Q.    Okay.  Did these people at Samaritan's Purse

4  do a social media search?

5      A.    Everybody in PR, HR today does a social media

6  search when you apply for any position of any

7  responsibility.

8      Q.    In 2019, did Samaritan's Purse do a social

9  media search of you?

10      A.    I don't know how they got the information

11  that they were using to ask me pointed -- pointed

12  questions.  It had gotten to the second or third layer

13  of interview when I told them what was going on.

14      Q.    Do you know, again, was that in 2019?  That's

15  the date here?

16      A.    Yeah.

17      Q.    So in 2019, what was on social media at this

18  time?  Do you know?

19      A.    Off the top of my head, no.  Except that

20  there were all of the rumors that were going around.

21      Q.    What time of year, if you remember, was the

22  Samaritan's Purse interview process?  You said you went

23  through three levels?

24      A.    I don't know, but if everybody has access to

25  my e-mails, that should be easy to find out.

1     Q.    What did you tell them?

2     A.    I told them that an unfair accusation had

3  been made that went beyond an inappropriate interaction,

4  and I did not know if they would like to press forward

5  with this, given that.  And they were very disappointed

6  and said, I'll get back with you.  And I got an e-mail

7  that said, we won't be moving forward with this.

8     Q.    So when you revealed to them that there were

9  unfair accusations being made, did they indicate that

10  they knew that already?

11     A.    He didn't volunteer any information.

12     Q.    What about the North American Baptists, how

13  did they have information, if at all, about --

14     A.    Same way.  The days of the internet,

15  everything is available to everybody that wants to ask.

16     Q.    So how do you know, as you sit here today,

17  what the North American Baptists knew in 2019?

18     A.    I don't know, specifically, except that this

19  had just been a very emotional situation with

20  Samaritan's Purse.  It had gone to the second or third

21  interview.  And it was about -- they were about to offer

22  me the position.  That's what the last call was about.

23  And I said, in fairness, you guys, I need to let you

24  know that this is going on.  And they said, well, let us

25  get back to you.

1        Q.    And is that the statement or apology that you

2    understand was made by the Executive Committee --

3              MS. McNULTY:  Objection, form.

4    BY MS. CALLAS:

5        Q.    -- that you have alleged in this case was

6    defamatory?

7        A.    Yes.

8              MS. McNULTY:  Objection, form.

9    BY MS. CALLAS:

10       Q.    Is your name in this statement, sir?

11       A.    There is only one accuser of Jennifer Lyell

12    in the public record that has been made known by the

13    SBC.

14       Q.    My question, sir, is your name in this

15    statement that appears in your complaint at Paragraph

16    52?

17       A.    No, only in the sense of a seminary

18    professor.

19       Q.    So other than this statement from February of

20    '22 and the endorsement of the Guidepost report, what

21    other statements by the Executive Committee of the

22    Southern Baptist Convention have been made against you

23    that were defamatory?

24              MS. McNULTY:  Objection, form.

25              THE WITNESS:  The Baptist Press issued an

1    apology to Jennifer Lyell correcting a previous

2    statement or article, I think, referencing David Roach's

3    article that this had been an inappropriate

4    relationship, when, in fact, it had now come to very

5    much basically what this statement is.  And that it was

6    apologizing to her for the abuse that took place, that

7    they misreported, et cetera.

8              Clearly tied right into this.  So you may not

9    see my name.  There's nobody in the executive -- in the

10   SBC or in evangelicalism at large that would not read

11   that David Sills abused Jennifer Lyell in this

12   statement.  Everybody knows who this is talking about.

13   BY MS. CALLAS:

14        Q.    Let's look at your Tennessee complaint.

15   Paragraph 81.  That's Page 24.

16        A.    Okay.

17        Q.    Do you see the list there of statements and

18   publications, May 22nd, 2022, June 14th of 2022, June

19   18th of 2022, and July 8th of 2022?

20        A.    Yes.

21        Q.    Do you know what those specific statements

22   were?

23        A.    I don't have them in front of me.

24        Q.    Do you know if whether your lawsuit here

25   relates to any statements, other than these listed in

1    I'm asking did --

2                MS. McNULTY:  I --

3                MR. ELBERT:  Let me get the question out.

4    BY MR. ELBERT:

5        Q.    Did you form an opinion as to whether

6    Jennifer was troubled dealing with issues out of her

7    childhood?

8                MS. McNULTY:  Wait.  Objection, form.  Calls

9    for expertise not possessed, and privilege claimed.

10               MR. ELBERT:  Just say object to the form.

11               THE WITNESS:  My answer is that she was --

12   and I told her -- one of the smartest people I had ever

13   met.  She was in charge.  She was focused.  And no, she

14   seemed very gregarious, outgoing, laughed all of the

15   time.

16   BY MR. ELBERT:

17       Q.    You mentioned, though, to me just a couple of

18   minutes ago that when you heard about her background,

19   you thought, gosh, if that's true or even half true,

20   she's been through a lot?

21               MS. McNULTY:  Objection, form, misstates.

22   BY MR. ELBERT:

23       Q.    Would you agree with that?

24       A.    No, because I said the narrative that she

25   began to weave in grew over the years.  And we never

1          Q.   It looks like going and joining a rock and
2     roll band, getting in bar fights, talking about using
3     chains in bar fights.
4               MS. McNULTY:  Objection, argumentative, and
5     it really --
6               MR. ELBERT:  That's not argumentative.
7               MS. McNULTY:  It really is, and it's kind of
8     --
9     BY MR. ELBERT:
10         Q.   Do you recall discussing those circumstances
11    with Jennifer Lyell?
12         A.   Let me answer your question first.  No, I
13    never rebelled against my parents, if that's how you are
14    defining.  Number two, I've never been in a fight in my
15    life of any kind, physically.  And what was the last
16    thing, using chains?
17         Q.   Had you talked to Jennifer Lyell about your
18    days when you played in a rock and roll band?
19         A.   No, all she knows is that I was in a rock and
20    roll band.
21         Q.   How is your health, physically and
22    emotionally, today?
23              MS. McNULTY:  Objection, form.
24              THE WITNESS:  I don't know completely how my
25    health is.  Emotionally, I am struggling because I have

1   been labeled as an abuser, and I'm seen that way by

2   anyone who has ever known me in the past, which were

3   thousands of people, and anyone who wants to interact

4   with me today.

5   BY MR. ELBERT:

6       Q.   Have you sought psychological counseling or

7   psychiatric counseling for that?

8       A.   I have sought pastoral counsel, Biblical

9   counseling, for that.

10      Q.   With whom?

11      A.   With my pastor and my elders.

12      Q.   Can you name those?

13      A.   Yeah.  Donnie South, Wally Bumpas, Randy Ray,

14  Phillip Palmertree.

15      Q.   But you never sought any kind of counsel with

16  an actual licensed psychologist, or psychiatrist, or

17  social work counselor?

18      A.   I have sought Biblical counseling.

19      Q.   My question is have you sought counseling

20  with any licensed --

21      A.   Do you understand the difference between

22  Biblical counseling and clinical counseling?

23      Q.   I'm asking you -- I am going to ask you the

24  questions, sir.

25      A.   Yeah.

1    will point you back to what God says are the answers for
2    issues that you are facing.
3            But your question also included how is my
4    health.  And that was what I was starting to say.
5    Physically, I don't know, because there are things I am
6    being tested for right now.  And that also weighs into
7    my emotional state right now.
8        Q.    What are those things you are being tested
9    for?
10       A.    Things like a peak in my PSA doubled from
11   last year, which means they have to follow up and see
12   whether I have cancer for that or not.
13       Q.    Any others?
14       A.    Not that I know of right now.
15       Q.    Did -- have you taken any medications,
16   prescription medications or non-prescription
17   medications, within the last 24 hours?
18       A.    Yes, I have taken the Tamsulosin, which the
19   market or brand is like Flomax, but it's Tamsulosin.
20   I've taken that.  I took Ambien last night.  I took half
21   of a Xanax this morning.  I took two Vitamin C.  I took
22   one of those zinc lozenge things for when you're getting
23   over a cold.  They are not prescription, but just you
24   everything I have taken.  That's it.
25       Q.    Have you had any alcohol to drink within the

1          Q.    Well, have you had discussions with your

2    children or their spouses about whether they would be

3    willing to testify on your behalf in this case?

4          A.    No, I have not.

5          Q.    When is the last time that you spoke to

6    Molly?

7          A.    The last time I spoke to Molly was

8    Thanksgiving -- it's been a couple of years ago now.

9    When we filed this case, that was the last time I talked

10   with her.

11         Q.    Tell me about that conversation.

12         A.    They are nervous about anything legal, any --

13   Molly is -- I don't know if the word for it is high

14   strung or tends to be anxious.  She was at Union

15   University in Jackson, Tennessee when the tornado hit,

16   and anything stressful really taxes her a lot.  Daniel,

17   on the other hand, my son-in-law, worked for Russ Moore,

18   and is -- I don't want to say an up-and-comer, because I

19   don't have that kind of information anymore.  But he was

20   ambitious within the SBC ranks.  I think this bothered

21   him, as well.

22               So they said if this is going to be ongoing,

23   we can't have a conversation because anything that we

24   could ever talk about, even personal things, they felt

25   like could be called in for part of the record.  And so

1    they said, while the case is going on, we're out.  And

2    so that was the last time I talked with her.

3          Q.    Have you been able to visit with your

4    grandchildren since then?

5          A.    No, not her kids.

6          Q.    How about Christopher's kids?

7          A.    Yeah, we were --

8                MS. McNULTY:  Objection.

9                THE WITNESS:  Oh, sorry.

10               MS. McNULTY:  Just objection to relevance

11   with the minor grandchildren.  Go ahead.

12               THE WITNESS:  We were there in February.  I

13   think it was February, in Ecuador, to visit them.

14   BY MR. ELBERT:

15         Q.    Did they allow you to be alone with their

16   children?

17         A.    Sure.

18         Q.    Did -- when the tornado hit in Jackson at

19   Union University, what year was that?

20         A.    I want to say it was '05, 2005.

21         Q.    And what was Molly's experience in that?

22         A.    I don't know how much you want, but she --

23   they had tornado drills all of the time because Union

24   had had a bad experience years before, so they were very

25   careful.  The sirens went off.  Molly lived in a

1      seminary to attend seminary after that.

2            Q.    And it's your testimony that you had no

3      encounter with Jennifer Lyell during that trip to

4      Jackson, Tennessee to try to help out Molly in

5      connection with the tornado?

6            A.    No, not only, but that Jennifer wasn't on

7      that trip.  Because when Mary and I went the next

8      morning to get Molly, we drove her back to Louisville.

9            Q.    Were you a member of Ninth & O Baptist

10     Church?

11           A.    Yes.

12           Q.    Was Jennifer a member of that church?

13           A.    Eventually.  She came after we were there.

14           Q.    And did she follow you to that church?

15           A.    Yes.

16           Q.    Did she attend with you at that church or

17     with Mary for a period of time before she officially

18     joined the church?

19               MS. McNULTY:  Objection, form.

20               THE WITNESS:  I don't remember that.

21     BY MR. ELBERT:

22           Q.    Was she attending Ninth & O Baptist Church at

23     the time of the Ecuador missions that you went on,

24     including the two -- the first one and then the second

25     one to -- I may not say it right -- Quito, where the

1    first sexual encounter occurred in Ecuador?

2              MS. McNULTY:  Objection, form.

3              THE WITNESS:  Yeah, number one, there was not

4    a sexual encounter in Quito, and that wasn't the trip to

5    Quito.  It was a trip that was -- went to -- it went

6    through Quito, but it was to a place called Mindo where

7    Jennifer makes this allegation.  But the -- that was the

8    first mission -- or the first mission trip to Ecuador

9    was not a church trip.  It had nothing to do with Ninth

10   & O.  That was a Seminary.  The opposite was true for

11   the second one.  It was a church trip that had nothing

12   to do with the seminary.

13   BY MR. ELBERT:

14        Q.   When was the first trip, and where did you

15   go?

16        A.   March, maybe.  I can't remember.  It was the

17   first part of the year.  And we were in Guayaquil,

18   Ecuador.

19        Q.   Do you know how long you stayed there?

20        A.   Both trips would have been a week.

21        Q.   And how many people were there?

22        A.   On the first trip, about 15, 16 maybe.

23        Q.   And were you the leader of that trip?

24        A.   The leaders of the trips were the

25   missionaries on the field.  And I was the person that

1    took the team to get us there, but we worked under the

2    auspices and the direction of a missionary there.

3          Q.    And the team that you took there, did they

4    work under your guidance and direction?

5          A.    No, as I said, worked under the guidance of a

6    missionary there.

7          Q.    Did you feel a responsibility when you took a

8    team down there to -- out in the field to those young

9    people?

10              MS. McNULTY:  Objection, form.

11              THE WITNESS:  To get them there and back, I

12   guess, but on the field, it was under the missionary.

13   BY MR. ELBERT:

14         Q.    So your testimony here today, under oath, is

15   that you've never stated that you have always felt

16   tremendous responsibility to people that you take out on

17   mission trips into the field?

18              MS. McNULTY:  Objection, form.  Misstates the

19   testimony for which it's documented on the record what

20   he said.

21              THE WITNESS:  Yeah, I don't remember ever

22   saying that.  I said they weren't working under my

23   supervision in the field.

24   BY MR. ELBERT:

25         Q.    My question is have you ever, to your

1   BY MR. ELBERT:

2       Q.    During the time that she was staying there

3   during that time, did you have any sexual contact with

4   her?

5       A.    I do not recall.

6       Q.    One way or the other?

7       A.    (No answer.)

8       Q.    In other words, you can't say yes or you

9   can't say no?

10      A.    Yeah.  Well, that's what I mean when I say I

11  don't recall.

12      Q.    So when you -- you told us, I think we got

13  through yesterday, the plane ride back from Ecuador from

14  Quito to Houston to Louisville.  When is the next time

15  after that that you recall having sexual contact with

16  Jennifer Lyell?

17      A.    I don't have a -- I don't have a date.

18      Q.    Do you know what year it was?

19      A.    The year that that mission trip took place.

20      Q.    What year did the mission trip take place?

21      A.    2004.

22      Q.    And what month in 2004?

23      A.    The church trip in which the accusation was

24  made, that was November or December, around in there.

25  It was toward the end of the year.

1      Q.    Leaving, or you requiring her to leave if you

2  became displeased with her, would require her also to

3  lose the relationship with Molly and Christopher?

4            MR. ELBERT:  Objection, form.  Misstates

5  testimony.  Go ahead.

6            THE WITNESS:  No, at that time she had no

7  relationship with Molly or Christopher.

8  BY MR. ELBERT:

9      Q.    They had not become close?

10     A.    No.

11     Q.    When was it she and Molly became close?

12     A.    Several years after Jennifer began to come

13  around to our house while my daughter was away at

14  college.

15     Q.    Did -- do you recall an occasion the night

16  before Molly's wedding where you put your penis in

17  Jennifer's mouth?

18     A.    No, I do not.

19     Q.    Do you recall an occasion at -- in

20  Mississippi at your sister-in-law's house where there

21  was completion of oral sex in 2014?

22     A.    I do not remember any dates.

23     Q.    Do you remember that occurring at your

24  sister-in-law's house?

25     A.    I remember it having happened in Mississippi,

1    yes.

2         Q.    At your sister-in-law's house?

3         A.    That would be the only place it could have

4    happened.

5         Q.    Can you tell me those circumstances as best

6    you recall?

7         A.    No.

8         Q.    Can you recall how frequently after the

9    initial oral penile contact that we've talked, about how

10   frequently that would occur going forward?

11        A.    Episodically.  Every once in a while.

12   Sometimes a year or more in between.  There was no

13   frequent regular ongoing interaction.

14        Q.    So during most of the times Jennifer was

15   frequently in your home and around you, correct?

16             MS. McNULTY:  Objection, form.

17             THE WITNESS:  Correct.

18   BY MR. ELBERT:

19        Q.    And she was with your family frequently too,

20   your children, your wife?

21        A.    Increasingly.

22        Q.    And eat meals with you?

23        A.    Yes.

24        Q.    Go to church with you?

25        A.    Well, it was her church.

1        Q.    But you went, too?

2        A.    Right, but she didn't go with us.  She would

3   be at church.

4        Q.    Sat with your family?

5        A.    Sometimes.

6        Q.    You preached there on Wednesday nights also,

7   too?

8        A.    No, they didn't have a Wednesday night

9   service.  I preached there Sunday nights, and only every

10  once in a while.

11       Q.    So as that relationship with the family

12  deepened, most of the time the home would be a safe

13  place where no sexual activity between you and Jennifer

14  took place?

15            MS. McNULTY:  Objection, Form.  Misstates

16  testimony.  Go ahead.

17            THE WITNESS:  You need to understand when you

18  say home when most of the family was around, my son was

19  away at college and then my daughter was away at

20  college, and then my son was at seminary himself.  And

21  then he came -- when he got married, the last few months

22  they were in the country, they lived in our home before

23  they went to the mission field themselves.  So there was

24  no one big happy family kind of ever setting.  It was

25  largely an empty home, or empty nest, as they say.

1    BY MR. ELBERT:

2        Q.    Would it be correct that the homeplace, your

3    house where you lived with your wife, Mary, shared with

4    your wife, Mary, most of the time when Jennifer would be

5    there, and she was there frequently, and as that

6    relationship deepened, there would be no sexual contact

7    at all?

8            MS. McNULTY:  Objection, form.  Assumes facts

9    not in evidence.  Go ahead.

10           THE WITNESS:  Considering the fact that any

11   inappropriate activity was episodic, yes, most of the

12   times there would not be any sexual activity at all.

13   BY MR. ELBERT:

14       Q.    You talked about boundaries.  Jennifer was

15   setting boundaries?

16       A.    She would sin or was sin?

17       Q.    Setting boundaries.

18           MS. McNULTY:  Objection, form.

19           THE WITNESS:  No, absolutely not.

20   BY MR. ELBERT:

21       Q.    So any time that you desired to have sexual

22   contact you could have it with Jennifer?

23           MS. McNULTY:  Objection, form.

24   Argumentative, misstates testimony.

25           THE WITNESS:  I never approached her with the

1    desire for sexual contact.

2    BY MR. ELBERT:

3        Q.    Did you think about sexual contact with her

4    when she wasn't around?

5            MS. McNULTY:  Objection, form.

6            THE WITNESS:  Being a fallen person, I am

7    sure my mind went there, but I did not pursue sexual

8    contact.  I did not initiate sexual contact.  I

9    didn't...

10   BY MR. ELBERT:

11       Q.    Do you deny, under oath here today, that you

12   ever initiated sexual contact with Jennifer Lyell?

13           MS. McNULTY:  Objection, form.

14           THE WITNESS:  Of the oral nature that took

15   place, yes.

16   BY MR. ELBERT:

17       Q.    Do you deny here, as you sit here under oath,

18   that you ever initiated the type of cuddling, touching,

19   that you described would precede the oral contact?

20           MS. McNULTY:  Objection, form.

21           THE WITNESS:  Again, in an environment where

22   hugging was a normal expected thing, I do not deny that

23   I ever initiated a hug.

24   BY MR. ELBERT:

25       Q.    Well, what you have described on this first

1    have hugged her.

2         Q.    And then did you touch her, progress from

3    hugging --

4         A.    And then she took the next step to something

5    else.

6         Q.    -- and touching her --

7              MS. McNULTY:  Guys, the court reporter can

8    only take down one person.

9    BY MR. ELBERT:

10        Q.    So you deny that you ever did anything with

11   your arms and hands other than a hug, you deny kissing,

12   you deny moving your hands over her body or doing

13   anything that might lead or reasonably potentially lead

14   to further sexual contact?

15             MS. McNULTY:  Objection, form.  Conclusory.

16   Go ahead.

17             THE WITNESS:  The question was did I initiate

18   that?

19   BY MR. ELBERT:

20        Q.    Yes.

21        A.    No, I never initiated something to lead it to

22   that sexual contact.

23             MS. McNULTY:  I need to take a break.  So

24   we're going to take a break with no question pending.

25   Thank you.

1          A.     I don't recall.  I'm sure that that is

2     likely.

3          Q.     Were there times you had oral genital contact

4     with Jennifer Lyell while your wife, Mary, was upstairs

5     in the home?

6                 MS. McNULTY:  Objection, form.  Go ahead.

7                 THE WITNESS:  There were times, yes, when we

8     would be in the T.V. room downstairs, and that is where

9     it would happen.

10    BY MR. ELBERT:

11         Q.     Were those times when Mary was asleep and had

12    taken Ambien?

13         A.     Mary doesn't take Ambien.

14         Q.     She's never taken Ambien?

15         A.     No, I didn't say that.  She does not normally

16    take Ambien.  She did not take Ambien in those days.

17    She started taking Ambien after all of this started.

18         Q.     There was no occasion you supplied her with

19    Ambien?

20         A.     Never.

21         Q.     So --

22         A.     Referring to that time, since all of this has

23    started, there have been times when her prescription had

24    run out, I would supply her with some.  But in those

25    days Mary didn't take Ambien.

1      A.    That's right, or either we stayed in her

2  room.

3      Q.    Do you recall having a sexual encounter with

4  Jennifer Lyell on that trip?

5      A.    No, that's absolutely not true.

6      Q.    How many times did you have sexual contact

7  with Jennifer Lyell on the couch in your basement?

8      A.    Define that.

9      Q.    Well, we've talked about the term sexual

10 touching.  How many times did you have sexual touching

11 with Jennifer Lyell on the couch in your basement?

12         MS. McNULTY:  Objection, form.

13         THE WITNESS:  That's still broad.  We've

14 defined that several different ways.  Do you mean oral

15 sex?

16 BY MR. ELBERT:

17     Q.    I mean kissing mouth to mouth.  I mean

18 touching of breasts or in the area of the vagina or on

19 the buttocks.

20     A.    Over the period of time that we have known

21 her, I would say less than ten times.

22     Q.    How many times did you have oral sex in the

23 basement with Jennifer Lyell?

24         MS. McNULTY:  Objection, form.  Misstates the

25 testimony.  Go ahead.

1                THE WITNESS:  Less than ten times.

2    BY MR. ELBERT:

3        Q.    When you did have sexual touching in the

4    basement, you said -- you gave an estimate of ten times

5    or less?

6        A.    (Nodding head.)

7        Q.    Would that ordinarily lead to oral sex, or

8    were those two distinct situations?

9        A.    There were a number of times when there was

10   an effort at oral sex and I would try to be strong and

11   say no and I would succeed.  There were other times when

12   I would try to be strong and say no and I did not

13   succeed.  But I still say less than ten times.

14       Q.    Were there ever any times when cuddling or

15   other touching or proximity was leading towards a sexual

16   touching or sexual touching was initiated and Jennifer

17   stayed strong and said no?

18       A.    No.

19       Q.    Never?

20       A.    Not in my experience.

21       Q.    Did you ever have any indication that

22   Jennifer experienced organism during her sexual contact

23   with you?

24       A.    I don't know how to judge that.

25       Q.    Did you ever do anything during sexual

1            MS. McNULTY:  Objection, form.  Misstates
2    prior testimony.  Go ahead.
3            THE WITNESS:  I don't know the question.
4    BY MR. ELBERT:
5        Q.   The question is, we've just talked about
6    times when it was cuddling, caressing, comforting?
7        A.   Uh-huh.
8        Q.   And it did not lead to sexual contact?
9        A.   That's one question.  There were times when
10   that is true.
11       Q.   Right.  And you have just told me that on
12   those times you didn't want it to lead to sexual
13   contact, correct?
14       A.   That's right.
15       Q.   Would you agree with me that on those times
16   Jennifer didn't want it to lead to sexual contact
17   either?
18            MS. McNULTY:  Objection, form.  Misstates
19   prior testimony.  Go ahead.
20            THE WITNESS: Clearly not on those same times
21   or it never would have happened; but there were times.
22   I'm sure, when she just wanted to cuddle, she wanted to
23   be close.
24   BY MR. ELBERT:
25       Q.   Did you ever get in a position where your

1    pelvis and penis were up against Jennifer's body?

2         A.    There was a time when my penis was not up

3    against her body, but that she had disrobed and --

4    completely -- and wanted more than that.  Wanted us to

5    have sexual intercourse.  And had positioned us to the

6    place where that could have happened.  But I told her

7    that if I had ever crossed that line, that that would be

8    the end of me.  I could not go on.  I couldn't breathe

9    another day.  I think she believed that, and she never

10   pushed for it after that.

11        Q.    Were there ever any times when you were on

12   top of her, clothed or unclothed, with her clothed or

13   unclothed, other than that one occasion where --

14        A.    Clothed?  Sure there were times that we would

15   cuddle.  And if she was laying on the couch or I was

16   laying on the couch.  Many times I would be laying on

17   the couch watching T.V. or whatever, she would come and

18   she would lay next to me when she didn't expect more

19   than that or vice versa.  There were many times like

20   that.

21        Q.    Were there occasions where you had an erect

22   penis and were up against her vaginal area?

23        A.    No.

24              MS. McNULTY:  Objection, asked and answered.

25   Just give me a minute to get the objections out.

 1              THE WITNESS:  I'm sorry.

 2     BY MR. ELBERT:

 3          Q.    The occasions you've told me about where she,

 4     quote, got undressed, was that unusual for her to be

 5     undressed during your sexual encounters?

 6          A.    Yes.

 7          Q.    Was it unusual for you to have your pants

 8     unzipped or pulled down during your sexual encounters?

 9          A.    Again, going back to however you are defining

10     sexual encounter, it would not be unusual for them to be

11     unzipped if she was doing oral sex.

12          Q.    How many times have you been -- you've been

13     naked with Jennifer Lyell?

14          A.    Completely naked?

15          Q.    Let's go completely naked first.

16          A.    Never.

17          Q.    How about partially disrobed?

18          A.    There have been times when I was partially

19     disrobed.

20          Q.    Describe what you are talking about.

21          A.    It could be that my pants were pulled down.

22     There was a time when I was in my basement working out

23     during the day, a Saturday, and was doing curls with

24     dumbbells.  And she walked into my basement smiling.

25     And I continued working out, not knowing if she was

1                    THE WITNESS:  When did it --

2     BY MR. ELBERT:

3          Q.    When did it stop?

4          A.    Again, '14, '15.

5          Q.    Do you remember a month?

6          A.    I do not remember a month.  I do know that by

7     the time we moved in 2016, nothing else ever happened

8     again.  Even though she was around us some more during

9     that time, nothing else ever happened.

10         Q.    Did she ever attempt to initiate anything

11    even though she was around -- while she was around

12    during that time?

13         A.    The last thing she ever attempted, it would

14    be unfair to even call it an attempt.  But we were in

15    our new house.  I was walking up my stairs from my study

16    up into the main part of the house.  She was walking up

17    behind me.  We were showing her around the new house.

18    She was walking up behind me and she reached up, pinched

19    or touched, whatever, my bottom.  I turned around and

20    looked at her and she just kind of smiled.  I don't

21    think she was attempting anything, but if you would

22    count that sexual touching, that was the last time

23    anything ever happened.

24         Q.    What did you say to her?

25         A.    I didn't say anything.  She just smiled.  I

1    pulled it down into her bra.

2         Q.    What did you do?

3         A.    I didn't yank it right back out.  I didn't

4    know what to do.  But it didn't go anywhere beyond that.

5         Q.    When was that?

6         A.    I could look back and see on the database,

7    but that would have been 2005, 6, 7, around there.  It

8    was in the first office that I had at seminary.  So I

9    could look and see.

10        Q.    Did you ever put one or both of your hands

11   down her pants?

12             MS. McNULTY:  Objection, asked and answered.

13             THE WITNESS:  I don't remember putting my

14   hands down her pants.  If I ever touched her in that

15   region, it would have been because she had facilitated

16   that, opening her pants.  In other words, I didn't while

17   they were still all attached and everything, I didn't

18   stick my hand down in her pants.

19   BY MR. ELBERT:

20        Q.    The occasion you've testified about where you

21   say Jennifer was naked, and according to you wanted

22   vaginal intercourse?

23        A.    Uh-huh.

24        Q.    Or appeared to want vaginal intercourse,

25   where was she, where were you?

1         A.     We were downstairs in the basement in the

2    T.V. room that I've referred to.  And she was asking for

3    intercourse.  And I explained -- in context of

4    explaining no I said, besides, you wouldn't do that even

5    if I did do that.  You know better than that.  You know

6    you wouldn't do that.  And she said, I would do that.

7    And I said, no, you wouldn't.  She said, watch.  She ran

8    upstairs.  She was staying in my son's room at that time

9    that night whenever it was.  This was during the

10   afternoon that this happened.  She ran upstairs.  She

11   took off all of her clothes and got in the bed and was

12   laying there naked and called me up there.

13              I went up there.  She was completely naked.

14   I did not get naked, but she pulled me over onto her and

15   we hugged for a minute.  And I got up and I left the

16   room.  Later on she said it's a good thing you didn't

17   take your clothes off because we would have done it.

18        Q.     Did she have to get out of the bed to reach

19   you to pull you over?

20        A.     No, I walked up to where she was on the bed.

21        Q.     And she was under the sheets?

22        A.     No.

23        Q.     Did you sit on the bed with her next to her?

24        A.     No.

25        Q.     Did she force you onto the bed?

1        A.    We were downstairs in the basement in the

2   T.V. room that I've referred to.  And she was asking for

3   intercourse.  And I explained -- in context of

4   explaining no I said, besides, you wouldn't do that even

5   if I did do that.  You know better than that.  You know

6   you wouldn't do that.  And she said, I would do that.

7   And I said, no, you wouldn't.  She said, watch.  She ran

8   upstairs.  She was staying in my son's room at that time

9   that night whenever it was.  This was during the

10  afternoon that this happened.  She ran upstairs.  She

11  took off all of her clothes and got in the bed and was

12  laying there naked and called me up there.

13            I went up there.  She was completely naked.

14  I did not get naked, but she pulled me over onto her and

15  we hugged for a minute.  And I got up and I left the

16  room.  Later on she said it's a good thing you didn't

17  take your clothes off because we would have done it.

18       Q.    Did she have to get out of the bed to reach

19  you to pull you over?

20       A.    No, I walked up to where she was on the bed.

21       Q.    And she was under the sheets?

22       A.    No.

23       Q.    Did you sit on the bed with her next to her?

24       A.    No.

25       Q.    Did she force you onto the bed?

1        Q.    Did you and Mary undertake to try to give

2   guidance and care to Jennifer in her life journey?

3               MS. McNULTY:  Objection, form.

4               THE WITNESS:  The counsel or guidance that I

5   can remember giving Jennifer was that she should not --

6   that she was gifted.  She was intelligent.  She did not

7   need to settle for an administrative job as an assistant

8   at the seminary.  She could do much more.  And when

9   there was an opportunity for her to move on in -- go to

10  work for a publisher, I told her this was a wonderful

11  idea, she should do that.

12  BY MR. ELBERT:

13       Q.    How about Mary, in terms of guidance that

14  Mary attempted to give?

15       A.    That would probably be the limit.  Mary was

16  not a counsel giver in that sense, but Mary would pray

17  for her.  Mary is a prayer.  She would pray for her and

18  she would -- she realized that Jennifer was being a help

19  to us.  And, you know, she's a gracious person, so she

20  didn't want to be ugly.

21       Q.    Did Jennifer frequently have meals at your

22  home with you and Mary?

23       A.    Yeah, we've said that a number of times.  She

24  would come and have meals with us at our house.

25       Q.    Did she help with preparation, clean-up with

1      Q.   Was there ever of any accusation or
2  questioning of you about possible indiscretion on your
3  part involving a young lady at Woodland Hills?
4           MS. McNULTY:  Objection, form.
5           THE WITNESS:  There was a rumor that went
6  around about that during that time.  That's not why I
7  left the church, but there was a rumor that went around.
8  BY MR. ELBERT:
9      Q.   What was the rumor?
10     A.   Just that.  What is going on in this
11 friendship relationship that is going on between David
12 and this person.
13     Q.   Did you feel like it had reached the point of
14 an inappropriate emotional entanglement?
15     A.   It had, yeah.
16     Q.   Was there ever any physical contact?
17     A.   It had developed into physical contact.
18     Q.   Was there sexual contact?
19     A.   There was sexual contact.
20     Q.   And do you have that person's name?
21     A.   I don't.  I have the person's name, what it
22 was then.  Her name was Brenda.  Her last name May.  But
23 She has since moved on with her life.
24     Q.   Do you know where she lives?
25     A.   I have no idea.

1          Q.    Did Mary become aware of that?

2          A.    She did.

3          Q.    Had Brenda May gotten close to the family

4    where she was coming around the home, eating meals with

5    you, that type of thing?

6          A.    No.

7          Q.    How many times did you have sexual contact

8    with Brenda May?

9          A.    I don't remember.

10         Q.    How long did the inappropriate relationship

11   persist?

12         A.    A matter of months.

13         Q.    What year would that have been?

14         A.    That would have been 1997.

15         Q.    Was Brenda May married at that time?

16         A.    She was either divorced or it was still going

17   on, the divorcing.

18         Q.    Had you counseled with her, pastoral

19   counseled with her or her ex-husband or soon-to-be

20   ex-husband?

21         A.    No.  When I was pastoring I didn't offer

22   that.  I had a list of people that I would refer to

23   people for counseling.

24         Q.    And did you confess that relationship to any

25   of the leadership or the pastor of Woodland Hills?

1              MS. McNULTY:  Objection, form.  Go ahead.

2              THE WITNESS:  No, because that wasn't the

3    reason why I left, and that was still -- the major

4    issue, the big issues that were blowing up around all of

5    that were the racial thing that I was trying to

6    integrate the church, which I was, and the thing that I

7    was trying to make it Presbyterian which I was not.  But

8    that was the reason.

9    BY MR. ELBERT:

10        Q.    Where did sexual contact with Brenda May

11   occur, in your home or in the church?

12        A.    With her it would have been in the car.

13        Q.    Your car or her car?

14        A.    My car.

15        Q.    Did anyone ever walk in on you and Brenda May

16   when you were in what would appear to be a compromising

17   position?

18        A.    No.

19        Q.    How old was Molly at the time?

20        A.    Molly would have been 7th grade maybe.

21        Q.    Did Molly ever walk in on you when you were

22   in a situation with Brenda May that might be

23   interpreted, correctly or incorrectly, by a small child

24   as intimacy?

25        A.    No.

1      Q.    Did Molly ever walk in on you when you were

2   in intimate contact with Jennifer Lyell?

3      A.    No.

4      Q.    Was there ever oral sex between Brenda May

5   and you?

6      A.    Yes.

7      Q.    How many times?

8      A.    No recollection.  A few, more than once, but

9   not...

10      Q.    On those occasions who instigated?

11      A.    Brenda instigated it.

12      Q.    You never instigated it?

13      A.    No.

14      Q.    Did you ever have vaginal intercourse with

15   Brenda?

16      A.    No.

17      Q.    Did you touch her breast?

18      A.    Likely.  I don't recall ever doing that.

19      Q.    Did you ever take her hand and put it on your

20   body?

21      A.    Never.

22      Q.    Did you tell Jennifer Lyell about the Brenda

23   May story?

24      A.    No.

25      Q.    Did -- have you, since you've been married to

1    Mary, had sexual contact with anybody else besides

2    Brenda May and Jennifer Lyell?

3         A.    Yeah, when we were first married.  And we

4    were married when we were twenty.  In the first couple

5    years of the marriage we weren't believers yet.  There

6    were a couple of one-night stands when I played music in

7    bars back in the day.  There were a couple of those.

8         Q.    Did you tell Mary about that?

9         A.    Yes.

10        Q.    And was there oral sex involved in those one-

11   night stands?

12             MS. McNULTY:  Objection, form, relevance.

13             THE WITNESS:  I have no idea.

14   BY MR. ELBERT:

15        Q.    Was there vaginal intercourse?

16        A.    In the one-night stands, yes.

17        Q.    Was there ever a pregnancy?

18        A.    No.

19        Q.    What did you do for birth control?

20             MS. McNULTY:  Objection, form, relevance.  I

21   mean... Just if you understand -- go ahead.  What did

22   you do for birth control is the pending question?

23             THE WITNESS:  I personally didn't do

24   anything.

25   BY MR. ELBERT:

1      Q.    Did you ask about it?

2            MS. McNULTY:  Objection, relevance.  I

3    mean...

4    BY MR. ELBERT:

5      Q.    Were you concerned that if --

6            MS. McNULTY:  There is a pending question.

7            MR. ELBERT:  Well, let me strike that

8    question.

9    BY MR. ELBERT:

10     Q.    Were you concerned when you had vaginal --

11   strike that question.  Were you concerned in your

12   relationship with Jennifer Lyell that if you had vaginal

13   intercourse with her, she might become pregnant?

14           MS. McNULTY:  Objection, form, hypothetical.

15   Go ahead.

16           THE WITNESS:  No, I wasn't concerned about

17   that.

18   BY MR. ELBERT:

19     Q.    When you applied to the job at Samaritan's

20   Purse in 2019, I think you testified yesterday that you

21   reached a second or third level of interviews and then

22   you had to answer some pointed questions.  What were

23   those questions?

24     A.    Why exactly did you leave the seminary.

25     Q.    And what did you say?

1        A.    I said, well, there was an accusation --

2   first, when it all first started, I told them that I

3   left the seminary because of an inappropriate

4   relationship.  As we went on, they said, now, why

5   exactly did you leave the seminary?  What was there

6   about that?  And I said, well, there has been an

7   accusation that it was not a mutual romantic

8   relationship, inappropriate relationship, it was in fact

9   non-consensual.  And the guy said, I will get back in

10  touch with you.  And the next time he did, it was an

11  e-mail saying we won't be moving forward.

12       Q.    Who was that guy?

13       A.    I don't know.  It's a matter of record.  I

14  have submitted that.

15       Q.    Did you ever tell Global Outreach,

16  Samaritan's Purse or any other potential employer that

17  the only -- the reason that you had to leave the

18  seminary was because of an old indiscretion from many

19  years before, referencing the Woodland Church situation?

20       A.    I never said that.  I am aware that that went

21  around as a report when all of the allegations came up,

22  but that is a mistaken conclusion.  I never said that.

23       Q.    Did you ever tell anybody that it was some

24  twenty or thirty years ago that you had been involved in

25  a morally inappropriate relationship and that you had

1      Q.    And then there was a period after that where

2   there were discussions taking place prior to a

3   correction or an apology being published by the Baptist

4   Press.  Would you agree with that?

5             MS. McNULTY:  Objection, form.  Calls for

6   speculation.  Go ahead.

7             THE WITNESS:  No.  My recollection is that

8   David Roach called me, left a voice mail.  What he

9   referenced was accurate.  And what he wrote was

10  accurate.  The next thing I knew, in chronological time

11  was when -- I don't even know what his position is, a

12  man named Jonathan Howell wrote some Baptist Press

13  article saying that they were apologizing to Jennifer,

14  that, in fact, it wasn't an inappropriate relationship,

15  it was more than that, and whatever he wrote in that

16  article.

17     Q.    When that article came out, authored by

18  Jonathan Howell, whatever he wrote, was Mary aware of

19  that at that time?

20     A.    Sure.

21     Q.    Did -- between the original David Roach

22  article being published and the Jonathan Howell article

23  being published -- well, let me back up.

24             Before the original David Roach article was

25  published in the Baptist Press, did you have any

1   relationship with me that was inappropriate while she

2   was at seminary.

3   BY MR. ELBERT:

4        Q.    So you made no attempt to reach him back to

5   see exactly what she was saying had happened that was

6   inappropriate that might appear in publication?

7        A.    No.  He asked me, based on what she said, did

8   I -- asked me if I wanted to respond to that.  I did not

9   because what he said was accurate.  It was an

10  inappropriate relationship.

11       Q.    But you didn't know at that point when you

12  got that message what the details were going to be, if

13  any, that would be published in the article?

14            MS. McNULTY:  Objection, misstates testimony.

15  Asked and answered.  Form.  Go ahead.

16            THE WITNESS:  He did not -- I did not know

17  and nor did he publish any details.  What he said he

18  would publish is exactly what he published.

19  BY MR. ELBERT:

20       Q.    But he wasn't telling you in the voice mail

21  what he was going to publish.  He told you that there

22  had been a report by Jennifer of an inappropriate

23  relationship?

24       A.    Uh-huh.

25       Q.    And at that time and prior to publication,

1          MR. ELBERT:  That's for the witness.  Maybe

2    the court reporter should mark it first, next numbered

3    exhibit.

4          MS. McNULTY:  Do you have copies for me and

5    the witness?

6          MR. ELBERT:  For me and the witness, yes.

7          MS. McNULTY:  No, I said for me and the

8    witness.

9          MR. ELBERT:  Oh, you have them on your

10   computer.

11         MS. McNULTY:  No, I don't.  I am in the

12   middle of a deposition.  So if we're going to do this,

13   we can do it this way, but then we'll do it this way at

14   all depositions.

15         MR. ELBERT:  That's okay.  You can have my

16   copy.  So if we can mark this as the next be numbered

17   exhibit.

18         (Exhibit 14 was marked.)

19   BY MR. ELBERT:

20   Q.    Can you identify that document for me?

21   A.    Yes.

22   Q.    What is it?

23   A.    This is a picture of us on a visit through

24   Union to Jackson, Tennessee to Union University where my

25   daughter was in college.

1        Q.    And what is the physical location where the

2   photograph was taken?

3        A.    In my daughter's dorm room.

4        Q.    Can you identify the people in that

5   photograph?

6        A.    Clockwise it's Christopher, my son, my wife,

7   Mary, Molly, me, and then Jennifer sitting on the floor.

8        Q.    What was the occasion for the visit?

9        A.    It's October 2006.  Apparently, we were on

10  the way to Jackson or maybe we were going to Ole Miss

11  and we had gone to Jackson on the way to Ole Miss which

12  is on the way.  I don't know.  October 2006.

13       Q.    Why was Jennifer taken along on that trip?

14       A.    She was always on our family trips.

15            MR. ELBERT:  Let's mark -- this is Lyell

16  79975 as the next numbered exhibit.

17            (Exhibit 15 was marked.)

18  BY MR. ELBERT:

19       Q.    What exhibit number is that?

20       A.    15.

21       Q.    Can you tell me what is Exhibit 15?

22       A.    This is a picture of my daughter's home in

23  Nashville.

24       Q.    And who else is present?

25       A.    The people present are my granddaughter,

1    REDACTED, Carol.  She's holding REDACTED and REDACTED.

2    Jennifer is behind them.  Christopher is holding

3    REDACTED.  My daughter is next to him.  And seated on

4    the couch are Mary and me.  We're each holding

5    grandchildren.  And Daniel, my son-in-law, and REDACTED.

6         Q.    When was that photograph taken?

7         A.    Yes, I have no idea.

8         Q.    Do you remember the occasion?

9         A.    Well, no.  It's got to be winter.  My

10   daughter has on a heavy winter coat, the kids have on

11   sweaters.

12        Q.    Holiday time?

13        A.    Who knows?  Whenever we went to visit family,

14   Jennifer would often go with us.  It could be Jennifer

15   was already living there then.  I don't know.

16        Q.    Jennifer generally joined the family for

17   holiday meals?

18        A.    Not always for meals, but she would travel

19   with us if we went to Jackson for holidays.

20        Q.    Would she come to your home for holidays?

21        A.    Sometimes.

22        Q.    Did you keep a stocking for her like you did

23   for Christmas for Molly and Christopher?

24        A.    That's possible.  That goes back to my wife's

25   hospitality and being gracious to everyone.

1        Q.    With Mary being gracious, she would be

2   included as having a stocking like your biological

3   children did at Christmastime when she was there?

4               MS. McNULTY:  Objection, form.  Go ahead.

5               THE WITNESS:  I think that's reading a little

6   bit too much into it.  If you know the southern culture,

7   you don't want to be rude to anybody else who is going

8   to be present.  So it would be gracious in that sense.

9   It doesn't automatically assume that she's become a

10  family member.  Nobody put her into their Wills or...

11       Q.    No, I'm sure not.

12       A.    Although --

13              MS. McNULTY:  Objection.  No question is

14  pending.

15  BY MR. ELBERT:

16       Q.    You started to say although.

17       A.    No, I don't even remember what I was saying.

18              MR. ELBERT:  Let me hand you Lyell 79976.

19  Let's mark that as the next numbered exhibit.

20              (Exhibit 16 was marked.)

21  BY MR. ELBERT:

22       Q.    What is Exhibit 16?

23       A.    That is -- that would be our home.  And that

24  is -- I'm not sure which home.

25       Q.    In Louisville?

1        A.    This March 20th, 2008 exchange was Jennifer

2    was the editor for -- she was at Moody in Chicago.  She

3    was my editor for The Missionary Call.  She had arranged

4    for the book to be translated and published in Spanish.

5    And then she sent me out of the blue an e-mail said,

6    hey, do you think you could translate the introduction

7    and the first chapter of the book?  Fred who was their

8    -- I forget what they called him, but he was the guy

9    that did other translations around the world at

10   different places.  Fred has Spanish language house that

11   wants to see it in Spanish.  If so, how fast do you

12   think you could it.  Don't hate me for asking.

13       Q.    Your response, if we go backwards in order,

14   5367, you e-mailed her back.  And in connection with

15   that e-mail at 14:40 p.m. on March 20th, you said,

16   Jennifer, I am, all caps, not happy, correct?

17       A.    No.  I said, Jennifer, given my current load

18   it would take me one to two weeks to translate the intro

19   and Chapter 1, and even then it would still need to be

20   smoothed out.  Number two, Moody told me that a Spanish

21   translation would be forthcoming, hot on the heels of

22   the English one.  I am very, all caps, very unhappy that

23   this is still -- that this is up in the air and you guys

24   are asking me to translate this.  If you remember, Lisa

25   asked me if I wanted to translate it a long time ago and

1        A.    Yes.

2        Q.    And as part of that employment, you signed a

3   contract with the seminary on a periodic basis; is that

4   correct?

5        A.    Initially, and then it became a tenured

6   position for a long time.  And then they took tenure

7   away from everybody and I think it went back to a

8   contractual basis, like every three years or something.

9              MR. TRAVIS:  I am going to hand you a

10   document that we are going to mark as -- is it 45 now?

11             (Exhibit 45 was marked.)

12   BY MR. TRAVIS:

13        Q.    Dr. Sills, on the top cover sheet of this

14   document, this looks like it's a letter to you from Dr.

15   Mohler dated November 10th, 2014; is that right?

16        A.    That's right.

17        Q.    And so the first sentence of this letter

18   references -- it states that Dr. Mohler is enclosing a

19   copy of your faculty appointment contract as a professor

20   of Christian missions and cultural anthropology

21   effective August 1st, 2014?

22             MR. LOOFBOURROW:  Is there a Bates Number?

23             MR. TRAVIS:  I think there is actually on the

24   one I handed you, but not the one I'm looking at.

25             THE WITNESS:  Mine is cut off.

1              MS. McNULTY:  It's SBTS and then I think it

2      might be 001261 through 6.  That's my best guess.

3              MR. TRAVIS:  That sounds right, but I

4      apologize if it cut off the bottom of the page.

5      BY MR. TRAVIS:

6          Q.    Feel free to take a second to look at the

7      remaining four pages.  And I'll give you a second just

8      to refresh your memory.

9          A.    I haven't read all of the fine print, but I

10     know the document.

11         Q.    You're familiar with this?

12         A.    I am.

13         Q.    So if you'll turn to the second page of the

14     contract, Item No 5, 5.1, do you see that?

15         A.    Yes.

16         Q.    Where it references a term?

17         A.    Right.

18         Q.    It says here the first sentence, the

19     agreement term shall be for five years commencing on

20     August 1st, 2014; is that right?

21         A.    That's right.

22         Q.    So would this have been the contract, your

23     contract with seminary.  Or I suppose your final

24     contract with the seminary?

25         A.    I would think so, yes.

1    exists as those elected messengers from those various

2    churches meet wherever the meeting is going to be that

3    year, usually over a couple-day period of time, and they

4    make decisions based on whatever business is at hand or

5    who should be the new officers or things like that.

6         Q.    Would you consider a messenger resolution to

7    be important?

8         A.    Absolutely.  Yeah.

9         Q.    Correct me if I'm wrong, but I believe

10   yesterday you testified that the Bible calls ministers

11   to be above reproach morally; is that correct?

12        A.    Yes, that's right.

13        Q.    Does that statement come from a particular

14   source of authority?

15        A.    It comes from first Timothy 3:1 through 7 and

16   also Titus I 5 to 9.

17        Q.    Is this something that may have also been

18   commemorated by a messenger resolution?

19        A.    I don't know.  I haven't been in conventions

20   for all of these years.

21        Q.    I'll ask you about it.  So are you aware of a

22   2002 annual meeting resolution on the integrity --

23   sexual integrity of ministers?

24        A.    2002?

25        Q.    Correct.

1   construe this to mean there's more than one way sexual

2   abuse can occur?

3            MS. McNULTY:  Objection, form.  Lacks

4   foundation as to this witness.

5            THE WITNESS:  I don't understand all, and

6   don't want to understand all, of the different ways

7   legally that abuse takes place today.

8   BY MR. TRAVIS:

9       Q.   Well, this isn't asking about legal sexual.

10  This is asking about in the eyes of God.

11           MS. McNULTY:  Objection, form, lacks

12  foundation.

13           THE WITNESS:  I would defy anyone to find in

14  the eyes of God in the Bible a passage that speaks --

15  that differentiates between sexual sin and sexual abuse

16  and then tells us this is why this is sexual abuse and

17  not just sexual sin.

18  BY MR. TRAVIS:

19      Q.   I guess I'll just return to the basic premise

20  of my question, and that this would indicate there are

21  multiple forms of sexual abuse?

22      A.   It seems that this document says there must

23  be other forms because it says all forms of sexual

24  abuse.  So whether this would be an elder brother of a

25  younger neighbor, or a friend of a younger sibling, or

1   confessed to defendants, Eric Geiger, Lifeway, SBC, the

2   executive committee seminary, and Mohler about her

3   affair with plaintiff, Sills.  Do you see that?

4        A.    I see that.

5        Q.    Of course we know that she didn't just

6   confess the existence of an affair; is that right?

7        A.    She did confess an affair.  She just said it

8   was non-consensual.

9        Q.    So I guess my question.  Strike that, excuse

10  me.

11            What basis do you have to allege that Lyell

12  called this an affair when she disclosed her testimony

13  or her story to Dr. Mohler?

14            MS. McNULTY:  Objection to the extent it

15  seeks work product or attorney/client privileged

16  information.  So go ahead.

17            THE WITNESS:  There's not a definition here

18  about what an affair is nor was one offered in Dr.

19  Mohler's office.  It was -- I mean this could easily say

20  about the interaction between her and plaintiff, Sills.

21  BY MR. ELBERT:

22        Q.    Well, turn to Paragraph 38 of the complaint,

23  please.

24        A.    Okay.

25        Q.    The third sentence of that paragraph states:

1   that it was an inappropriate relationship, no one at

2   that time expected the fire storm that would come her

3   way when people began to wonder why she still had her

4   job.  It wasn't from me.  I assure you.  But even her

5   own authors were concerned with that.

6       Q.    Yes, but you knew that when this was

7   disclosed and when you were confronted, her allegations

8   were that your relationship was non-consensual; is that

9   right?

10      A.    But it was my understanding that those

11  allegations or the way it was phrased by Dr. Mohler to

12  me as he had received it from her were dismissed while I

13  was in his office that day.  Because he said this has

14  come to me.  Does this make any sense to you?  I said

15  no.  And I categorically denied there had ever been

16  anything non-consensual in any form whatsoever.  We

17  moved on from there.  We talked about other things.

18  Then he said, well, what are we going to do with this?

19  Are we going to have a big investigation or... He said,

20  I don't have any details, but she said she would give

21  details.  So we need to do something.  You can either

22  resign or we'll have to have this big investigation.  I

23  asked for time to pray with Mary.  I came back.  I said,

24  I'll just resign.

25              This aspect, I thought was over with.  If it

1    That's what I said in the office.  And he said, well --

2    again, I still thought that the non-consensual aspect

3    was either a misspeaking or it had been dealt with by my

4    saying no.

5         Q.   And with the discussion we've just had about

6    your contract and the SBC denominational doctrines, it's

7    fair to say even your account of what happened between

8    you and Jennifer would not allow you to continue on as a

9    tenured member of the seminary?

10        A.   That is true, but the 2019 resolution about

11   sexual abuse and all of the different forms of sexual

12   abuse and all of that is after the fact, after I had

13   left.

14        Q.   Yes, I'll give you that was adopted by the

15   messengers the following year.

16        A.   But I agree.  That's why --

17             MS. McNULTY:  Wait, wait.

18             THE WITNESS:  I'm sorry.

19   BY MR. TRAVIS:

20        Q.   My question to you, though, you would have

21   understood based on your concessions the last two days

22   with respect to the various extramarital sexual contact

23   that you've talked about, you would have been in

24   violation of your employment agreement?

25        A.   I agree with that.

1      Q.    And that you would have been terminated had

2  you not resigned?

3      A.    That is true.

4      Q.    I believe in your complaint you refer -- you

5  state that you rightly resigned; is that correct?

6      A.    That's right.

7      Q.    And, accordingly, you could not have

8  anticipated to continue receiving a salary from the

9  Southern Baptist Theological Seminary?

10     A.    That is right.

11     Q.    Okay.  After this meeting with Dr. Mohler,

12 did you ever have any sort of follow-up conversations

13 with anyone at the seminary?

14     A.    Never.  Well, informally.

15     Q.    What does that mean?

16     A.    Means not as official, this is a seminary

17 conversation.

18     Q.    What about Craig Parker, did you have any

19 contact with Craig Parker?

20     A.    Craig Parker came to me afterwards and he

21 said, hey, look, if you'll sign this nondisclosure or

22 some sort of don't talk bad about the seminary kind of

23 thing, we'll pay your insurance for six months;

24 otherwise, you're on your own.  And I had no intention

25 of saying anything bad about the seminary.  According to

1    what you just said, I admitted to the inappropriate

2    aspect of our relationship.  I realized somebody who

3    confesses to that should not continue as a professor.  I

4    resigned.

5              Based on that, an article went out in the

6    Baptist Press saying he resigned because of an

7    inappropriate relationship.  All of that was fine.  We

8    were thankful for six months of insurance.  It was all

9    done as far as we were concerned.  When the backlash

10   happened and it was republished as now it was actual

11   abuse that had taken place and all of these other

12   aspects of it, at that point it was a different ball

13   game.

14        Q.    In connection with those insurance benefits,

15   do you remember ever expressing to Craig Parker your

16   love for the seminary and Dr. Mohler or apologizing for

17   any difficulty you caused?

18        A.    Yes, I do remember that.  I still hold to

19   that.

20        Q.    Did you ever tell Craig Parker that you were

21   in counseling at that time?

22        A.    I was.

23        Q.    Have you ever spoken to Dr. Mohler since that

24   meeting in his office?

25        A.    No.

1                  And then when that is all over the internet
2    and the Twitter-verse at that time, Dr. Mohler released
3    this because people were beginning to question that,
4    saying wait a minute, did he confess to sexual abuse?
5    What's going on?  And he came out with this statement.
6    Jennifer responded to this statement saying, thank you,
7    Dr. Mohler, for going on record for that.
8         Q.    Did Dr. Mohler directly call you a criminal
9    in that statement?
10        A.    No, but I must not be the only one who thinks
11   accusing someone of sexual abuse makes them a criminal
12   because it says that in the...
13        Q.    Are there any other defamatory public
14   statements made by Dr. Mohler or the seminary that you
15   are aware of sitting here today other than the two we've
16   talked about?
17        A.    I am not.
18        Q.    Do you have any basis for believing Dr.
19   Mohler acted with malice?
20        A.    Toward me?
21        Q.    Correct.
22        A.    No.
23        Q.    Do you have any basis for claiming Dr. Mohler
24   made statements with reckless disregard for the truth?
25                  MS. McNULTY:  I just want to make an

1    objection.  Calls for a legal conclusion and seeks

2    testimony that will invade the attorney/client and work

3    product privilege.  So these answers are reflecting his

4    answers independent of his counsel.

5              MR. TRAVIS:  Understood.

6              THE WITNESS:  Do I have any basis, is that

7    the premise of the question?  I don't have any proof or

8    any basis for that.

9    BY MR. TRAVIS:

10       Q.    Did you ever tell Dr. Mohler your story of

11   this relationship or contact with Jennifer Lyell other

12   than just a general denial of non-consensual?

13       A.    Yeah, in the meeting that day.  He asked

14   about the -- then what is it, what is going on?  And we

15   discussed the relationship we had with Jennifer.  And

16   then I admitted that there had been inappropriate

17   interaction.

18       Q.    And then you resigned, right?

19       A.    Well, after I met with Mary, explained to her

20   what was going on, we both agreed I would just resign.

21       Q.    The last question I think I have for you, Dr.

22   Sills, just to backtrack, going to Paragraph 40 of your

23   complaint.

24       A.    Same one?

25       Q.    Same one.  That one states that defendants

1             MR. TRAVIS:  I pass the witness.

2             MS. McNULTY:  Can we take five minutes?

3             THE VIDEOGRAPHER:  Off the record at 3:51.

4             (Recess observed.)

5             THE VIDEOGRAPHER:  Back on the record at

6    4:01.

7    EXAMINATION BY MR. OTCHY:

8         Q.    Hi, Mr. Sills.  My name is Alex Otchy.  I am

9    an attorney at Mintz and Gold and I represent Guidepost

10   Solutions.  Thank you for being here today and

11   yesterday.  I know it's been a long two days and I

12   appreciate it.

13            Can you please identify any defamatory

14   statements that Guidepost has made about you to any

15   third parties?

16        A.    Guidepost report.

17        Q.    And what third parties did Guidepost send

18   that report to?

19        A.    Everyone it was published to.

20        Q.    Do you have any evidence that Guidepost

21   published that report?

22        A.    I have the evidence in the Southern Baptist

23   website and Southern Baptist Convention entities that

24   shared the Guidepost report, and it was a report that

25   they supposedly paid millions of dollars for and were

1   readily sharing among themselves the fruit of their

2   investment.  And the Guidepost report included the list

3   of alleged abusers.  And it was the culmination of a

4   long-anticipated, long-awaited investigation.

5        Q.    So you said the SBC website.  What else did

6   you mention?

7        A.    Well, the SBC website, but people obtained

8   access to it from there.  So Baptist Accountability was

9   another site that got it.  Mission agencies that were

10  interested in who they might have as a part of their

11  ongoing activities, mission trips, or anything like

12  that.  The Guidepost report is -- the sharing of it has

13  been prolific.  It's everywhere.

14       Q.    You have no evidence that Guidepost actually

15  shared the report, though, do you?

16       A.    I have --

17             MS. McNULTY:  Wait.  Objection, form.

18  Invades the attorney/client privilege and work product

19  privilege.  Go ahead.

20             THE WITNESS:  The contention is that

21  Guidepost produced a report that I believe was

22  irresponsible.

23  BY MR. OTCHY:

24       Q.    Who did Guidepost produce the report to?

25       A.    The report produced it as a result of their

1    request by the Southern Baptist Convention to

2    investigate this matter for us.

3         Q.    Who did Guidepost send the report to?

4         A.    Initially, I assume the executive committee

5    of the Southern Baptist Convention.

6         Q.    You have no evidence that Guidepost, itself,

7    personally published the report, do you?

8              MS. McNULTY:  Objection, form.  Misstates

9    testimony.  Go ahead.

10             THE WITNESS:  The source of the report is

11   Guidepost.

12   BY MR. OTCHY:

13        Q.    I am not talking about the source.  Do you

14   understand that?

15        A.    I am not sure I understand the distinction.

16        Q.    You don't understand the distinction between

17   a source and a publication and you, yourself, are an

18   author?

19        A.    You are asking me if I have seen a copy of

20   the Guidepost report in a book store?

21        Q.    That's not what I am asking you.  I am asking

22   you for your personal --

23        A.    As an author -- I'm sorry, go ahead.

24        Q.    I am asking for your personal evidence, your

25   personal knowledge --

1        A.      Right.

2        Q.      -- that Guidepost published the report?  Not

3    somebody else, not the other, SBC website, Baptist

4    Accountability, mission agencies.  What evidence do you

5    have that Guidepost personally published the report?

6                MS. McNULTY:  Objection, form, asked and

7    answered, argumentative.  Go ahead.

8                THE WITNESS:  I believe that the Guidepost --

9    if you want to count it publishing, published by

10   submitting it to the Southern Baptist Convention.

11   BY MR. OTCHY:

12       Q.      So your only evidence is that Guidepost

13   published by providing it to the SBC?

14               MS. McNULTY:  Objection, form.  Misstates

15   testimony and evidence.  Go ahead.

16               THE WITNESS:  I think the fact that it was

17   made available from Guidepost, whatever you want to call

18   publishing, it was conducted by, compiled by, and

19   provided by Guidepost.  If you want to call that

20   publishing, I do.  It was published by submitting that

21   to the Southern Baptist Convention as the fruit, as the

22   result of an exhaustive investigation.

23   BY MR. OTCHY:

24       Q.      You said it was made available by Guidepost?

25       A.      Yes, sir.

1       Q.    What evidence do you have that it was, quote,

2   unquote, made available by Guidepost?

3             MS. McNULTY:  Objection.  Invades the work

4   product and attorney/client privilege.  Go ahead.

5       A.    There were two answers or ways that I would

6   answer that.  One was that the Southern Baptist

7   Convention made available to all of their churches, this

8   is finally, we have the report, here is the report.  And

9   there was a link on the Southern Baptist Convention

10  website that made -- that linked to the report.

11            If you go to Guidepost, when it initially

12  came out there was a link that listed the report.

13  Whether they're still there or not, I don't know, but I

14  did look at them at one time.

15      Q.    Both of those links --

16      A.    Sources.

17      Q.    -- that you just mentioned?  Those sources?

18      A.    Yes.

19      Q.    And on Guidepost's website did you click on

20  the link that you just mentioned?

21      A.    I think the link that I clicked on it

22  mentioned -- it listed the title that that was the

23  report.  When I clicked on it, it linked back to the

24  Southern Baptist Convention's website of it.

25      Q.    So it hyperlinked back to the SBC's website

1   to find the actual full report?

2       A.    Right.  So Guidepost would have published it

3   on their web page that you find the actual report housed

4   at SBC website, Southern Baptist Convention's website.

5       Q.    Are you alleging that Guidepost made any

6   defamatory statements that are not otherwise contained

7   in the report?

8             MS. McNULTY:  Objection, form.

9             THE WITNESS:  I am contending that the report

10  itself was defamatory.

11  BY MR. OTCHY:

12      Q.    Nothing outside of the report that Guidepost

13  said was defamatory?

14      A.    The compilation of alleged abusers was

15  defamatory.

16      Q.    And that's the database that you were

17  referring to earlier --

18      A.    That was the database that --

19      Q.    -- with the mug shots?

20      A.    That's right.

21      Q.    I'm sorry, I didn't mean to interrupt you.

22      A.    No, no, I'm sorry.  That's right.

23      Q.    And is it your allegation that the database

24  is actually in the Guidepost report?

25      A.    It is my -- I haven't made it a habit to look

1   at it ever since it first came out.  When it first came

2   out, I did check and it was either a part of it or it

3   was hyperlinked.  Both of those hyperlinks together,

4   here's the report, the Guide Stone [sic] report, here is

5   the list of alleged abusers.  I didn't look to see who

6   exactly, but they were clearly tied together, same color

7   hyperlink.

8       Q.    And this is the SBC website?

9       A.    It was when it first came out.  I don't look

10  at it regularly.

11      Q.    So based on what you're saying, Guidepost did

12  not publish this mug-shot-style list that you are

13  stating?

14            MS. McNULTY:  Objection to form.  Misstates

15  testimony and evidence.  Go ahead.

16            THE WITNESS:  Again, I reiterate, Guidepost

17  was the source of the information.  No one else would

18  have just ex nihilo just come up with a bunch of names

19  to put on a list.  It came from the Guidepost

20  investigation.

21      Q.    Guidepost was the source of all of that

22  information?

23      A.    That's right.

24      Q.    Where do you think Guidepost got that

25  information from?

1              MS. McNULTY:  Objection, form.  Calls for

2    speculation by the witness.

3              THE WITNESS:  It would be pure speculation.

4    I don't know where they got all of their information.

5    They didn't get it from investigating the situation.

6    BY MR. OTCHY:

7         Q.    And, again, you have no evidence that

8    Guidepost published that -- we'll call it a database?

9              MS. McNULTY:  Objection, form.  Misstates.

10   BY MR. OTCHY:

11        Q.    I don't know what else to call it.

12        A.    Yeah, I didn't come with evidence to show

13   where the actual publication originated.

14        Q.    I will look at a few of your responses to

15   supplemental interrogatories.  I don't know what exhibit

16   we're at.

17              (Exhibit 49 was marked.)

18   BY MR. OTCHY:

19        Q.    When you are ready, please look at your

20   response to No. 2.

21        A.    On the first page, No. 2?

22        Q.    Actually Page 4 of the document.

23        A.    Okay.  Okay, I've read No. 2.

24              MS. McNULTY:  Did you read your answer to

25   yourself?  Take a look at all of it and let counsel know

1    your dep.  You go ahead and ask him about the final

2    report, and you're welcome to put the laptop in front of

3    him.

4               MR. OTCHY:  I think he can answer the

5    questions.  It's his complaint.  He doesn't have to do

6    that anymore.

7               THE WITNESS:  Well, then if you go to

8    Guidepost Solutions and you go to the SBC report

9    investigation, SBC investigation and report on Guidepost

10   solutions dot com.  SBC investigation and report, and

11   then you click -- it says in the very first paragraph in

12   response to requests, the SBC executive committee has

13   released a list of the pastors, which of course is

14   published on your website.  You click on the little

15   hyperlink and it goes to the database.

16   BY MR. OTCHY:

17        Q.    And what database is that?

18        A.    The database that your website references.

19        Q.    On Guidepost website?

20        A.    If you click the link on Guidepost website,

21   it goes to this list.  I mean you can do it with my

22   phone if you want.

23        Q.    I'd prefer not to.

24               MS. McNULTY:  No, he doesn't need to.  You're

25   doing yours and he's doing his.

 1    settle the case.

 2    BY MR. OTCHY:

 3         Q.    How did you learn that defendant, Lyell, had

 4    allegedly may or may not have been engaged in settlement

 5    discussions?

 6              MS. McNULTY:  Objection, form.  Seeks

 7    attorney/client privileged information and work product

 8    privilege.  Go ahead.  You can answer only to the extent

 9    it doesn't reveal work product or things we have

10    discussed.

11              THE WITNESS:  Okay.  Defendant, Lyell's,

12    testimony in social media and interactions with others

13    about her situation.

14    BY MR. OTCHY:

15         Q.    Go to Paragraph 57, please.

16         A.    Okay.

17         Q.    The opening statement says on May 22nd, 2022,

18    defendants, SBI and Guidepost, published a report

19    stating, colon.  I ask you again what evidence do you

20    have that defendants, SBI or Guidepost, published the

21    report?

22              MS. McNULTY:  Objection, form, asked and

23    answered.

24              THE WITNESS:  I would refer to my earlier

25    answer.

1  phone down, I just pulled up on Guidepost and it still

2  lists click on this hyperlink to go to the list or click

3  on this for the abuse reform investigation report.

4       Q.   Go to Paragraph 62, please.  Can you explain

5  what you meant when you said the report, published in

6  May of 2022, redirected, and then you finished the

7  sentence.  What did you mean by redirect?

8            MS. McNULTY:  Objection, form, to the extent

9  it seeks work product or attorney/client privileged

10  information.  Go ahead.

11           THE WITNESS:  The report directed, included a

12  link -- you can't have a report that lists hundreds and

13  hundreds of people on there.  So it clicks, you go to

14  this link, and there is all of that information.  That's

15  what I mean by redirect.

16  BY MR. OTCHY:

17       Q.   So a link redirected you to somewhere else;

18  is that what you're saying?

19       A.   I don't know where it went.

20       Q.   I am just asking for clarity.  That's it.

21       A.    And I'm answering, I don't know where it

22  went.  When you look at that and you click go here and

23  you click on it, who knows where it is physically

24  housed.  In someone's closet somewhere, I don't know.

25  But that's where it goes.  It goes to that information.