# Exhibit 51



Date of Interview:[1]   Jan 10, 2022

Interviewers: Krista Tongring, Laura Rogers

Interviewee: Laura Erlanson

Location/Method of Interview: In person

---

Please use this document with each interview. All interview notes should be embedded herein under the appropriate question. Additional questions should be added prior to the interview if at all possible, and if not, should be included in the note-taking with the answer following the question.

When finalizing the interview notes, please use the full last name of each person referenced so that the document can be properly searched in the future. Other names and common references pertinent to the investigation should be written out unless otherwise indicated. A list of permitted abbreviations will be circulated and maintained on Teams.

I. Introduction

    A. Introduction of interviewers and role

    B. "Housekeeping"

- Thank you for agreeing to meet with us
- Please let us know if you need a break or would like to end the discussion at any point – you control the discussion
- Feel free to ask questions – I will answer anything to the best of my knowledge

    C. Scope of Guidepost Investigation want to be sure that our role is clear to make sure there are no misunderstandings

- Want to make sure our role is clear so that are no misunderstandings

    D. Motion – have you seen/read it (SBC Convention June 2021) (if yes, don't go through detailed bullet points – but do go to E./F.) Investigation into the following:

- Allegations of abuse by Executive Committee members.
- Mishandling of abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021.

---

[1] These notes are not a word-for-word transcription of the call; they do not necessarily reflect the exact words used by the participants, but rather are meant to convey the sum and substance of the conversation.

CONFIDENTIAL GPSILLS_014823



- Allegations of mistreatment of sexual abuse victims by Executive Committee members from January 1, 2000, to June 14, 2021.
- Patterns of intimidation of sexual abuse victims or advocates from January 1, 2000, to June 14, 2021.
- Resistance to sexual abuse reform initiatives from January 1, 2000, to June 14, 2021.
- An audit of the procedures and actions of the Credentials Committee after its formation in mid-June 2019, using best standards and practices designed to ensure accountability, transparency, and care for the wellbeing of survivors of sexual abuse.

E. High level description:

- Guidepost retained by Task Force on behalf of SBC to:
- Conduct investigation of SBC EC related to how sexual assault allegations were handled and survivors were treated and assessment of CC

F. Investigation output – what will happen at the end?

- Detailed report which will be made public
- a **complete set of factual findings**
- **comprehensive recommended framework within which the SBC can operate in order to continue to address the concerns raised by the SBC Motion in a transparent, accountable, and scriptural manner that prioritizes survivor support and care and enhances practices for the prevention of sexual abuse, harassment, and violence**

G. Who controls the investigation and report? Guidepost – complete independent third-party review

H. What is role of Task Force?

I. Are you familiar with the Task Force and its role? If not, do you want me to list/explain?

- The Task Force appointed to oversee investigation (list of Task Force members below)
- The Task Force does not no control – there is no attorney/client privilege between Guidepost/Task Force
    o Bruce Frank
    o R. Marshall Blalock
    o John Damon
    o Liz Evan
    o Heather Evans

2

CONFIDENTIAL                                                                                              GPSILLS_014824



- o Andrew Hébert
- o Bucas Sterling
- o **Advisors to the Task Force**
- o Rachael Denhollander
- o Chris Moles

J. A few principles of Guidepost's methodology (Use judgment – discuss if needed)

- Though the Task Force is **overseeing the investigation**, **Guidepost will remain independent of the Task Force, the SBC, the Executive Committee, and the Credentials Committee**. **No attorney-client relationship** will be formed between Guidepost and the Task Force, the SBC, the Executive Committee, or the Credentials Committee. Accordingly, communications between Guidepost (including its employees and agents) on the one hand, and the Task Force, the SBC, the Executive Committee, and/or the Credentials Committee will not be protected by the attorney-client privilege. **Guidepost will document in its written report whether any person or entity has withheld access to information, documents, records, facilities and/or employees, officers, agents, or others through a claim of attorney-client privilege** or the attorney work product doctrine, particularly if claimed by the SBC, the Executive Committee, the Credentials Committee, the Task Force, or any member of the aforementioned.
- At the conclusion of the investigation and audit, Guidepost will prepare a **complete set of factual findings and a comprehensive recommended framework within which the SBC can operate in order to continue to address the concerns raised by the SBC Motion in a transparent, accountable, and scriptural manner that prioritizes survivor support and care and enhances practices for the prevention of sexual abuse, harassment, and violence**.

**NOTE: the below are suggested questions regarding the general investigation. Interviews are not limited to these questions, nor will each interview necessarily touch on each topic. Please use these as a guide supplemented by your review of documents, interview notes, and discussions with the investigatory team.**

II. General Introductory Questions

A. Where do you currently attend Church?
B. Has your Church location changed over the years?
C. Which SBC Annual Meetings have you attended?
D. What can you tell us about the discussions regarding sexual abuse that have occurred at the annual meeting or committee meetings?
E. How did you originally hear about our investigation?
F. What was the attitude among the EC when you heard about the investigation?

CONFIDENTIAL                                                                                         GPSILLS_014825



    G. How was the investigation by the Task Force received by the EC?
    H. Was the EC cooperative with the Task Force?
    I. Survey-most of the questions did not apply to LE. Felt like could not answer many of the questions. Took the survey when had covid and don't really remember how answered many of the questions. Never felt that there was something that could not bring to a supervisor. Always felt there has been an open door policy. Wilkerson was before Jack. Always felt the culture was good here. Never deal with sexual abuse. Not part of our world. No reason to know how to report sexual abuse. Not applicable. The EC is not the place to deal with this. The CC should deal with this. Christy Peters deals with the CC.

III. SBC EC Questions
    A. During your time at the EC are you aware of anyone (survivor/advocate/other reporter(family/friend/pastor)) who has reported allegations of sexual abuse to the SBC EC?
    B. With respect to each person,
        i. How was abuse reported?
        ii. To whom was abuse reported?
        iii. What was the response the survivor received?
        iv. Were there any BP articles published about the survivors abuse? If not, why not. If so, use questions under BP section.
        v. What was the culture at the EC with respect to sexual abuse in the SBC?
        vi. What was the culture at the EC with respect to survivors of sexual abuse who reported to the EC?
            1. Specifically, Patterson
                a. Statements regarding specific survivors
                b. Statements regarding sexual abuse in the Church
                c. Statements regarding sexual abuse initiatives
                d. Statements regarding attempts to cover up sexual abuse within the Church
            2. Specifically Pressler
                a. Statements regarding specific survivors
                b. Statements regarding sexual abuse in the Church
                c. Statements regarding sexual abuse initiatives
                d. Statements regarding attempts to cover up sexual abuse within the Church
            3. Specifically Boto
                a. Statements regarding specific survivors
                b. Statements regarding sexual abuse in the Church
                c. Statements regarding sexual abuse initiatives
                d. Statements regarding attempts to cover up sexual abuse within the Church

CONFIDENTIAL    GPSILLS_014826



        4. Specifically Toalston
           a. Statements regarding specific survivors
           b. Statements regarding sexual abuse in the Church
           c. Statements regarding sexual abuse initiatives
           d. Statements regarding attempts to cover up sexual abuse within the Church
        5. Specifically Oldham
           a. Statements regarding specific survivors
           b. Statements regarding sexual abuse in the Church
           c. Statements regarding sexual abuse initiatives
           d. Statements regarding attempts to cover up sexual abuse within the Church
    C. Understanding the scope of our investigation, can you tell me a bit more about the relevant information you would like to provide?
    D. Have you witnessed or do you have information regarding retaliation or intimidation of survivors/witnesses/advocates by SBC EC/staff after they reported allegations of sexual abuse to SBC EC/staff?
    E. Have you witnessed or do you have information regarding obstruction by SBC EC/staff after they reported allegations of sexual abuse to SBC EC/staff?
    F. Have you witnessed or do you have information regarding sexual abuse initiatives by SBC EC/staff?
    G. Have you heard any discussion at the EC regarding the cooperation of Geunther, Jordon with the Guidepost investigation?
        i. Who have you heard discussing this? What has been said?

IV. Credentials Committee
    A. You of course are you aware of the Credentials Committee?
    B. What is your understanding of its purpose related to allegations of sexual abuse?
    C. How was the CC was formed? Who was on it?
    D. Are you aware of how the CC received/processed complaints?
    E. Do you know if documents were kept/maintained?
    F. Do you know how did CC make decisions on complaints related to sexual assault?

V. Baptist Press
    A. I would like to discuss your position as managing editor of the BP.
    B. Can you give us a brief history of your employment with BP? Been at BP for 18 years. More of an editorial role. Input into stories, more as the years have gone on. In 2020 promoted to production editor, then to managing editor-what sotries were going to run-summer to run
    C. During your time at BP what has been the policy at BP regarding the drafting and editing of articles? Not really a policy—daily procedure-changed over time—vast majority orginiates with BP/ Was a time when content was st partners, free lancers.

5

CONFIDENTIAL    GPSILLS_014827



<ol type="A" start="3">
<li>Rarely use them anymore. 3 full time writers, VP writes, each story get submitted assoc vp.</li>
<li>Has the policy every changed? More of a procedure. Depends on the story. Decision making did not take full form until the last 2 years. Not priviy on early times. No pressure applied. There were sometimes conflict btw acting editor BP and president or attys. Not a daily issue. Never a part of the discussion.</li>
<li>I would like to discuss the articles related to Ann Marie Miller. Proofreading and posting original articles was LE's involvement. In 2020 BP was approached via live conversation by IMB to rewrite the story BP was not inclined to rewrite bc it looked like BP made a mistake. BP was happy to write a story that IMB wanted to write a new story. BP did this and linked back to old story. Can't change the first story. LE was part of the meeting where the compromise wass devised.</li>
<li>Who made the decisions with respect to the original publication of the article regarding Ms. Miller?</li>
<li>Who made the publishing decisions with respect to Ms. Miller's article? Shawn Hendricks</li>
<li>Please explain the situation regarding what occurred with IMB. Julie McGowan published the orifinal IMB article.</li>
<li>Who dealt with Mr. Chitwood during the negotiations regarding the discussion of the apology to Ms. Miller?</li>
<li>How much of a role did Julie McGowen play?</li>
<li>What is the significance of an editors note? Not part of the story from the publication that pertains to the story some new information, addendum, clarification-usually after the fact but sometimes give context.</li>
<li>How was this situation resolved?</li>
<li>Tell us about the input that the Guenther law firm had in editing the article? No idea</li>
<li>Who made the final decisions about what would be published regarding the apology to Ms. Miller? Joint decision –4 or 5 including LE</li>
<li>Let's now turn to the article regarding Jennifer Lyell?</li>
<li>Who made the publishing decisions with respect to Ms. Lyell's article? Shawn Hendricks and Sing-VP of convention news and relations put Sing over BP—not a lot of day to day input. JL sought out BP to publish her article.</li>
<li>Who had final editing authority in 2019? Shawn Hendricks</li>
<li>Who made the decision not to discuss the article with Ms. Lyell before it was published.</li>
<li>Who made the decision not to take the article down from Facebook? Sing may have made the decision to take the article down. It would have been sing's call. March 7, 2019 sent email . LE was so troubled about the article and sent the email. Spoke to husband. Misgivings were about this is not who BP is. We do not write articles that we cant confirm the story. Without there being a police report or local authorics, BP does not need to accuse a person of SA and were opening ourselves up to liability. Felt J:L needed to go to the tennesseean or a secular paper. Felt they were crossing</li>
</ol>

6

CONFIDENTIAL

GPSILLS_014828



the line. Email was received well. Vouch for the integrity of shawn, sing –now have a policy that there is a requirement of a police report before will write an article or a confession.
T. Who finally did make the decision to take her article down?
U. Has final editing authority changed since 2019?
V. Same questions for any other survivors that articles were published on….
W. Do you have any documents that you believe would be helpful to us?
X. Do you believe that the editing by the EC prevented an accurate history of events from being printed?
  i. If so, in which survivors case?
  ii. Did you ever have any discussions about this?
  iii. With who did these discussions take place?
Y. Were the wishes of the suriviors foremost in the mind of the EC when publishing articles about sexual abuse?
Z. Was the concern of the EC to protect the reputation of the alleged abuser more than the reputation of the survivor?
AA.  If yes, would you agree that sometimes the articles did not always accurately portray the facts of what occurred?
BB.  Please tell us about anything else you believe would be helpful in our investigation.

BP has a specific position based on the guidelines.  There has been situations where someone from EC has exerted too much control over an article. EC members are over BP. If they feel like there is a problem they can deal with it.
Communications work group to have more day to day awareness –vast majority of the time no one is looking over the shoulder
Treated with respect,

CONFIDENTIAL

GPSILLS_014829