# Exhibit 67



Date of Interview:

Interviewers:

Interviewee:

Location/Method of Interview:

_____

Please use this document as a starting point for each interview. It is likely the course of an interview will lead to additional subject matter. All interview notes should be embedded herein under the appropriate question. Additional questions should be added prior to the interview if possible, and if not, should be included in the note-taking with the answer following the question.

When finalizing the interview notes, please use the full last name of each person referenced so that the document can be properly searched in the future. Other names and common references pertinent to the investigation should be written out unless otherwise indicated. A list of permitted abbreviations will be circulated and maintained on Teams.

The Interview team should compare Individual notes to prepare a final Interview report and delete the Individual notes after jointly approving the final[1].

Key foundational documents for Trustees are the SBC Constitution (https://www.sbc.net/about/what-we-do/legal-documentation/constitution/) and the SBC Bylaws, particularly section 18 which discusses the Executive Committee in which all trustees serve, (https://www.sbc.net/about/what-we-do/legal-documentation/bylaws/).

I. Introduction

    A. Introduction of interviewers and role

    B. "Housekeeping"
        i. Thank you for agreeing to meet with us.
        ii. Please let us know if you need a break
        iii. Feel free to ask questions – we will answer anything to the best of my knowledge and ability

    C. Investigation so far

---

[1] These notes are not a word-for-word transcription of the call; they do not necessarily reflect the exact words used by the participants, but rather are meant to convey the sum and substance of the conversation.

Confidential GPSILLS_003370



      i. Over 300 current and former Trustees have been contacted.
     ii. All current Executive Committee staff and many former EC Staff have been contacted and interviewed to the extent possible
    iii. Collected and reviewed over 4 terabytes of relevant information collected from various sources
1. SBC EC
2. Archives
3. Guenther firm
4. Survivors, witnesses, advocates
5. ERLC

D. Scope of Guidepost Investigation arises from Messengers' Motion at June 2021 SBC Convention.

Note: May be familiar – so best to ask if they are familiar with the investigation and whether they want to discuss the scope.
      i. Guidepost retained by Task Force on behalf of SBC to conduct investigation of SBC EC related to how sexual assault allegations were handled and survivors were treated and an assessment of CC.
     ii. Offer to review the following If Interviewee would like:
1. Allegations of abuse by Executive Committee members.
2. Mishandling of abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021.
3. Allegations of mistreatment of sexual abuse victims by Executive Committee members from January 1, 2000, to June 14, 2021.
4. Patterns of intimidation of sexual abuse victims or advocates from January 1, 2000, to June 14, 2021.
5. Resistance to sexual abuse reform initiatives from January 1, 2000, to June 14, 2021.
6. An audit of the procedures and actions of the Credentials Committee after its formation in mid-June 2019, using best standards and practices designed to ensure accountability, transparency, and care for the wellbeing of survivors of sexual abuse.

E. Investigation output – what will happen at the end?
      i. Detailed report which will be made public
     ii. Complete set of factual findings
    iii. Recommended comprehensive framework within which the SBC can operate in order to continue to address the concerns raised by the SBC Motion in a transparent, accountable, and scriptural manner that prioritizes survivor support and care and enhances practices for the prevention of sexual abuse, harassment, and violence.

Confidential

GPSILLS_003371



    F. Independent review: Guidepost controls the investigation and the content of the report, and reports to the Task Force appointed by former SBC President of SBC. We can Identify the members and advisors of the Task Force If Interviewee would like:
        i. Task Force members: Bruce Frank, R. Marshall Blalock, John Damon, Liz Evan, Heather Evans, Andrew Hébert, Bucas Sterling
        ii. Advisors: Rachael Denhollander and Chris Moles

    G. Interviewees may question our knowledge of SBC Polity or how SBC structure and autonomy affects the ability of the Executive Committee to address sexual abuse and other issues. We understand that the structure provides challenges. Our role is to understand and document what has been done, and to make recommendations for Task Force, Messengers and SBC Leadership to consider which is why getting input and perspective from the Trustee is critical.

**NOTE: Below are suggested questions regarding the general investigation. Interviews are not limited to these questions, nor will each interview necessarily touch on each topic. Please use these as a guide supplemented by your review of documents, interview notes, and discussions with the investigatory team.**

Fully in favor with what GPS is doing.

II.   Questions Concerning Being a Trustee:

**[Always note in the beginning that we've reviewed the documents provided to the SBC EC so we do have background, but it is always helpful when conducting an investigation to hear things directly from a witness.]**

    A. What years were you on the EC or part of the SBC EC staff (If the interviewee does not recall, prompt her/him with the information in our spreadsheet of Trustee terms of office.)

    Served as a pastor from 86-07 here in TN. Asked in 2002 serve the EC from TN. Four years on the Communications workgroup. Dr. Chapman began to observe that he wanted to do research, asked him to serve on the funding committee, then asked him 2006 to come on staff. Funding Committee was ad hoc to increase funding for seminaries to give them a more livable wage. Researched with diminishing budget how to do that. CP has been declining for 25 years. Helped write final reports. Declined in 2006. Came back to him 2007. Decided to follow direction of the Lord, came on August 1, 2007, as VP for convention relations through tenure of Chapman. Frank Page elected as successor. October 1, 2010, Frank Page came on and downsized the organization. November expanded his duties to VP of Communications and relations. Over both areas which had been led by two VPs.

3

Confidential   GPSILLS_003372



Wanted him to be the last set of eyes on all things published. Developed a protocol, that if he didn't respond within a certain amount of time, they could publish it. He looked at it from a relationship standpoint, being careful not to harm relationships, internal or external publics. Interpret policy, polity to situations. Example, pastor about to be nominated as second VP was accused of lying. Was explainable due to replacing air conditioning. Didn't want to mischaracterize a situation. He was last set of eyes. When R Floyd was elected April 2, 2019, too broad, didn't want to be in communications, didn't have training, behind all the time, 70 hours per week. If you are elected, I cannot do both. Didn't come here to do communications, came to do relations. Brought in a new VP for convention communications, Jonathan Howe came in and relieved him in that area.

Served on the EC from 2002-2006, and 2006-2010

Committee on Convention Events and Strategic Planning, Chair

Vice President of Convention Communications and Relations 2007-2019

What did you understand your duties and responsibilities as Vice President of Convention Communications and Relations to be?

B. Did you have any other roles within the SBC / SBC EC during this time (i.e., committee chairs)?

Committee on Convention Events and Strategic Planning, Chair – what years? What did this entail?

C. Did you have, and if so, please explain frequency and nature of contact with: (tailor to witness's position)

    i. EC Officers
   ii. Other Trustees in the Executive Committee
  iii. SBC EC General Counsel
  iv. SBC EC Staff
   v. SBC EC outside counsel

D. Understand that EC met 3x/year. Between these meetings, did the any group of the EC executive leadership meet/discuss sexual abuse matters? Who participated? What was discussed? (interviewer can use timeline to ask about specific initiatives)

4

Confidential    GPSILLS_003373



Three committees and nine work groups, each committee had 27 people. 2002-2006 in the coms workgroup, adopted resolutions for recognizing state execs and entity leaders on their retirement. Second term, transitioned to CP in 2006 and served one year, primarily contact was during the three meetings, Monday and Tuesdays in September, February and June. Was still a pastor so didn't go to all meetings. For Example, didn't go in 2006, missed maybe 2-3 meetings over the five-year period. Had conversations with Bob Rogers and Augie Boto on funding committee meetings from time to time all six seminary presidents there. They all spoke. Interaction was on occasion had lunch with staff. He was in Tennessee so he would go home.

Where there any meetings that stood out when SA was discussed? He does not recall being in those meetings or even having hallway discussions. Remembers there was a meeting in spring of 07 that a victim group met with bylaws WG, read about it later in SBC Life. Would read the background material on motions and what was going to be presented.

Do you remember any motions having to do with sexual abuse? From 2002-2006, I don't remember any motions when he was a member.

In August 2007, he discovered that there had been conversations about SA and victims. He did not fully understand before he came onboard how his role would morph. He received several media inquiries. Wasn't up to speed to know how to respond, with EVP D. August Boto. Began having conversations with him as needed. John Revel was executive editor of SBC Life. He went back and read the articles from 2007 about motions. Was not as engaged as a messenger that year because he was resigning that year as pastor to work at the SBC. Led to report in 2008. Conversations with Boto: in 2002 and 2007, there were motions, 2002 was general, 2007 was sexual abuse of children, we stand against and repudiate sexual abuse of children. Sinful and criminal and must be reported to law enforcement immediately. Sexual abuse of children was the dominant focus. In follow-up, what was SBC going to do. Article 4 while sovereign in it's own sphere…in those conversations with A Boto, report to law enforcement and don't have the authority. Is there a way that the SBC can do something, i.e. report to law enforcement. He only had media inquiries not from victims of abuse. In 2007, Dr. Chapman told him that all sexual abuse matters would go to A Boto, who was delegated with that responsibility. If it did come to him, he would give it to Augie. In light of his conversations with Augie, a few came in later in his tenure. CR inbox, general delivery inbox, trained people to go through inbox and it goes to Augie. He contracted with Dr. Stephen Wilson, PHD in

5

Confidential

GPSILLS_003374



History. He and Janice Leroy would go through the emails. Got variety of requests in this mailbox. Didn't get many sexual abuse reporting in the early years, can't confirm how many, Janice sent to Augie and she would occasionally copy him, Stephen would copy him. He would follow up with Augie to make sure he got them. Augie said he had reached out and contacted them and told them maybe it was outside the statute of limitations and contact law enforcement. Yes, he did raise questions along the way, because he views him self as pastor first. The 2008 report, with legal counsel, rt was a direct response to creating a database. The collective response was that there is an existing database of sex offenders posting on the SBC site. He set up a google alert for Baptist and arrest and forwarded it from time to time. Not trying to throw anyone under the bus but asked can we at least not post stories about Baptists who were arrested if they were an SBC church. Response would be an inexact science there would be gaps and people might see it as a registry. If something doesn't show up, there is a liability factor if people think it's a registry. He raised the question from time to time because it bothered him. He cannot say that it was not a liability concern primarily. 2018 motion impetus was two entity leaders who supported an entity leader. Al Mohler, Danny Akin and CJ Matheny, they should have repudiated him from the beginning. The fact that they continued to defend him caused the 2013 motion, don't support people like him. Danny kept having Martin Driscoll come to speak, cavalier with sexual impropriety matters. In 2008, they did put forward that they did have an entity that could support, ERLC. Richard Land was the president then, then Russell Moore. Several years in they realized this was a significant issue and they took it up. After HC AoF, he developed a relationship with John Tedesco, who contacted him about one of the churches in their report. His wife had just been diagnosed with an illness. Told him that they had withdrawn and were no longer a cooperating church in the SBC. Told him there was nothing that they could do, just like they couldn't before. The only thing that they can do is lift up resources and disfellowship the church, Article IV. Not a church, network of churches, convention of messengers. Can set the parameters of participation. If you employ knowingly (offenders), you are no longer members of our fellowship. Had the ability to do it before the Credentials Committee was formed but it wasn't clearly defined but now it's more clearly defined. The 2008 response was in long form, training at seminaries, Dru Sjodin database on the site. Janice Laroy was a social worker, he asked her to write the article on duty to report. Criminal background checks, lifted that up, lifeway began to contract, they developed relationships with those companies that do the background checks. All of these things came out of the 2007 motion and 2008 report. But we did not lift up the database. I wish we could do a database, because what is the way with accused versus conviction. Taught Laroy the protocol, keep emails,

Confidential

GPSILLS_003375



push to legal. Pentagon shut down SBC. Net to military bases because they were conservative but it was breaches from China. Forwarded to legal. Janice sends it to Augie Boto. Would and wouldn't surprise him that the SA reporter was never contacted. There were other inboxes, could have come in through other portals. There were 8-10 mailboxes at one time. Through 2011 plus, they externally contracted with an individual managed their website and went through their mailbox and sent them to the appropriate person.

He had a conversation with A Jordan after Amy Smith picketed at convention in Houston. Got a thousand emails from Allen Jordan. Spoke to John Tedesco. 2013 convention. She was member of a Houston church. Amy has alleged that someone had been abused and it was covered up. Another conversation with a pastor named Greg Belzer who had been accused of mishandling an abuse case. Greg Belzer had told him that someone had been accused many years ago. Police had informed him. The Pastor allowed him to retire rather than terminating him. Frank Page had him contact Allen Jordan and sent those to Augie Boto. Prestonwood, Jack Graham new pastor, Allen Jordan defended him as he had just arrived. Offender was pass along to another church. Abused two boys. One was Jordan's son.

Another case, Romeoville, IL that had called a pastor who was convicted and came out and became a pastor. Then he brought another former convict to become associate pastor. 2007, talked to Augie Boto, nothing they could do. Didn't disfellowship that church. Once in always in unless they decide to leave or they are disfellowship. No record if they left on their own.

    E. Did you discuss allegations of sexual abuse or the response to allegations of sexual abuse?

        1. With whom? (List out specific individual names that the documents show that the witness had correspondence with on these issues.)

        2. When?

        3. Concerning what survivor(s)?

7

Confidential

GPSILLS_003376



F. In your role as VP Communications did you had any interactions with a survivor of sexual abuse?

[Make sure to list in the interview draft the contacts we already know about in case the say they don't remember or something else inconsistent with the documents/witness statements – **Be careful to maintain anonymity of survivors where necessary/requested – can refer to documents received from SBC EC (but not CC), public statements from survivors, any approved information from survivors**]

G. Can you explain the details?

H. In your role as xxxxx, did you ever discuss or hear discussions of reports of sexual abuse made to the SBC EC or how the SBC responds to such reports with:

  i. Any SBC EC Officer?
  ii. Any SBC EC Trustee
  iii. SBC EC General Counsel
  iv. Any SBC EC Staff
  v. SBC EC outside counsel

  vi. If yes, explore details re who, when, substance of discussion and if a particular report of sexual abuse was discussed.

  vii. Any written or email communications?

I. Why did your role as VP end?

J. In your role as a VP, did you ever discuss reports of sexual abuse or how the SBC responds to such reports with any other Trustee, EC officer or any staff member of the SBC outside of Executive Committee (such as ERLC, IMB, NAMB, Seminary Presidents)?

This is a general question – we are aware of the specific reports that would come to your office and will discuss those BUT this question is whether you discussed with anyone how to handle those reports? Augie? Jamie/Jordan? Ronnie? Mike Stone? Frank Page? Greg Addison?

  i. If yes, explore details re who, when, substance of discussion and if a particular report of sexual abuse was discussed.

  ii. Any written or email communications?

Confidential                                                                                                                          GPSILLS_003377



III. <u>SBC EC Questions:</u>

**[Some of the answers to these questions may have been answered above. Make it clear that our questions are neutral and guided by the particulars of the motion. We want to hear all sides of what has occurred in order to write a full, fair, and independent report.]**

**Note: For all of these questions, make sure to have details of known answers to each from documents, witness interviews, public reports, etc. in order to follow-up on responses such as I don't know/remember. Same caveat re: survivor anonymity.**

    A. Are you aware of anyone (survivor/advocate/other reporter such as family, friend or pastor) who has reported allegations of sexual abuse to the SBC EC?

Appears to have happened all the time – see attached documents

https://plusnxt.relativity.one/Relativity/go?id=8252197-2482495

Couldn't these responses be seen more as protective of the SBC and its staff and officers rather than the survivors? Instead of acting to help, always considering how any action would hurt the SBC – how is that biblical?

https://plusnxt.relativity.one/Relativity/go?id=8252197-2482457

"Sing Out!" Doesn't that seem callous or not convey the appropriate amount of seriousness that should accompany these types of allegations?

        i. If so, ask for details, including source of knowledge (first-hand, documents, second-hand (if so, from whom did they hear the information?)

        ii. Who was the reporter?

        iii. When did they report?

        iv. Method of reporting (in person, phone, letter/email)

        v. To whom did they report?

        vi. Aware of any Internal discussions or communications within EC regarding the report? If yes, explore details and ask If there were any emails or other written communications.

        vii. What was the outcome?

Confidential
GPSILLS_003378



B. Have you witnessed or do you have information regarding retaliation or intimidation of survivors/witnesses/advocates by anyone at the SBC EC after they reported allegations of sexual abuse?

Ask about what happened to David Roach – why was he fired?

C. Have you witnessed or do you have information regarding retaliation or intimidation of survivors/witnesses/advocates by anyone at the SBC EC after they reported allegations of obstruction by anyone in the SBC?

D. Have you witnessed or do you have information regarding retaliation or intimidation of survivors/witnesses/advocates by anyone at the SBC EC after they reported resistance to initiatives to change how the SBC responds to reports concerning sexual abuse?

E. Why do you think there was so much tension/heated debates around the issue of sexual abuse?

IV. <u>Credentials Committee Questions for Non-Members Only:</u> [Note: Our questions related to the Credentials Committee are only related to the scope of our investigation – so only June 2019 to June 2021 and only with respect to submissions regarding allegations of sexual abuse.]

A. What is your understanding of the purpose of the Credentials Committee as it relates to sexual abuse?

B. Did you have any involvement in the creation or structure of the CC? If yes, what was your understanding of how it was designed to work?

   i. If applicable, are you aware of the members of the CC (originally or at present)?
   ii. If applicable, do you know whether any CC members have experience/training with abuse/trauma?

C. Were you ever privy to discussions regarding the SBC Churches that the Credentials Committee was considering due to allegations of sexual abuse?

D. Do you have any recommendations for changes or enhancements to Credentials Committee, consistent with Baptist governance?

Confidential                                                                                      GPSILLS_003379



V. Baptist Press/Communications Questions:
    A. VP Communications – you were the VP over Baptist Press? The editor would solicit from the writers, contact the state convention to get information to write a story. If he became aware of a story, he would pass along.
    B. Had that role in 2019?
    C. You are familiar with Jennifer Lyell? She contacted BP wanting them to publish her story. Shawn Hendricks, Art Toalston, Will were editors. Art began generating stories. Art assigned writers. Not common for him to be in the editorial process. Only when a legal team would be involved. He was not aware of a first-person op-ed column. Sent the article to Shawn asking to run as a first person. Shawn sent it to legal. Jamie answered Shawn saying that legal had a problem due to an allegation of a sex crime. Shawn reached out to him saying that she would go to Washington Post. He said they could do it as a story. That's how he got looped in. Shawn had the authority and it was fairly common to go to legal. Frank told him that he was the last set of eyes. That case was typical of how things were done. When there was a relation question, it would come to him. They had four trained journalists, Art, Diana Chandler, Shawn Hendricks and Laura Erlanson. David Roach PHD, skilled writer. Assigned to David as the writer, draft went to Shawn. There was a lot of back and forth. There were multiple smallish edits. Shawn was having conversations with David, Jennifer. Sing asked Shawn and David to send him emails. He raised up several questions verbally and by email. Monday-Tuesday. Then Wednesday through Friday he was in Atlanta. He wasn't under any pressure to get the pressure. Shawn was under pressure from Jennifer, he learned later. She wanted to know so she could let the professor's family know that the story was coming out as she was still close with them. At some point, Shawn made the decision to make the complete shift. Art T. brought up the news peg, as to why publish the story now. Not disagreeing with Shawn's answer, when JD Greear named 10 churches and a firestone ignited in secular and social media, BP got castigated for story that BLWG had met for hours and identified that churches merited further inquiry and some didn't. BLWG cleared churches without investigating. If we don't run her story, the story will be that BP didn't run the story. He didn't disagree with the peg but wanted it done right. Whether it was done right is the fulcrum of what was done right. Believes he did what was right at the time based on the information that he had. If he's collateral damage than it was worth it. Iwo Jima analogy. Grateful that it occurred. Not looking for sympathy. Hinge took place on Thursday night and Friday, he wasn't here. Laura raised question about why to carry story without corroboration with Shawn. Laura checked in the state of KY that there was no statute of limitations and emailed it to Shawn, who then reframed the story. Now story is fuller light shined on seminary professor resigned. Didn't have a conversation but

11

Confidential   GPSILLS_003380



read the emails, in a book to Brotherhood Mutual. Same week Patterson resign, Mohler let Sills resign and seek future employment. Shawn, pretty sure, mentioned that. No longer written by David but now David and Shawn because he is contributing. Seth Brown, Recorder, reported resignation about two resignations. June the 6th. David reached out to Al Mohler who said they had handled a personnel matter properly and wouldn't share more. Not aware that Jennifer reported to law enforcement. She showed him a screen shot showing that she tried to call SVU. He grieves for Jennifer. He went to the Convention and saw handouts with six victims. Read it, four of the six named the abuser and J Lyell did not. He thought his name ought to have appeared. He has no doubt he abused his position, power differential, abused his position as a professor. Knowing David, the way he knows him, he would have tried to get a copy of the report. If she reported a rape to Al Mohler, why didn't he take her to the police after what happened with Paige Patterson. Saw Shawn's draft Friday morning didn't include that she was a seminary student when it began. He didn't have issue with the word abuse being in the report. When she came to speak to him, he was in favor of them doing editorial note to the story. She wanted BP to affirm and assert that she had been sexually abuse when they did not have adequate information. They did have enough to say that there was an inappropriate relationship sexual in nature that cause him to resign. Looked to journalists and lawyers to give guidance. Al Mohler confronted a pastor for adultery in 2005 but then let Sills resign and that didn't square with him. He understands how it is seen today. If it was sexual abuse, why did Mohler let him resign and seek other employment. Mohler doesn't strike him as someone that would let him off the way he did. His testimony is more indicative of a sexual inappropriate relationship. He has no reason to doubt it was a crime but there was no corroboration, colored by Jamie's email about criminal act. Story is still tremendously terrible story. Sing told Shawn to put the fact that she was groomed into the story because that is what predators do. In retrospect, he has emails with Ronnie, he wishes they had done differently like not rushed the story out on Friday. Wished they had done more reflection and communication with Al Mohler. Laura checked in KY that there was no statute of limitations. Peg is we have more information on why he resigned.
D. When did you first become familiar with her? Ask details [she approached Shawn – worked with him at first – then David wrote story – submitted to Shawn – Shawn had meetings with Sing/Augie – got story back and it was different]
E. Have both versions to show him
F. Who made decision to change?
G. The words have very different meanings?
H. Abuse and morally inappropriate relationship?
I.
J. Again – concern is about being sued, not about care for survivor
K. What did Ms. Lyell want to fix it? Why couldn't BP do that for her?

12

Confidential                                                                                                                              GPSILLS_003381



L. How do you think she was treated? They had a no linking policy so they couldn't link to that outside source (Jennifer's story). He communicated with Augie and he agreed that there were 4-5 indicators that there was abuse. For them to claim abuse, it would have raised their liability for not corroborating that criminal act. He doesn't think that was the reason for changing the wording. At the time, no. He talked with Sean, she didn't not say morally inappropriate relationship. Jim was a terse person. He emailed Shawn, "she said.." Made the change with no mal intent. To claim abuse without corroboration is not appropriate for them to do.

M. Letter to Jennifer – how drafted – what was its purpose?
https://plusnxt.relativity.one/Relativity/go?id=8252197-2480866

Asked if care of Jennifer was the focus or liability for the SBC? He was focused on personal issues in his life. Never met Jennifer. Shawn was handling things. He didn't know she was unhappy until July. Then he was focused on Ronnie Floyd election in April. Four weeks between when the story posted and Floyd's election. Didn't get feedback. Story had run. Didn't get sense of a hunkering-down. In other cases, he would ask Art why something was published and Art would tell him it was published and they move on. Wasn't that level of violation on his radar that it is now. Had you seen that attacks on Jennifer as a result of the article? Story published Friday, Saturday he got a text from Pastor Crawford asking if he had seen what was on Facebook. He called Shawn, Shawn said it's pretty bad so he told Shawn to take it down and so he did. He doesn't use Facebook. Brad Wagner, VP, called him and said what does BP have against Lifeway, botched job on J Lyell story. Ronnie asked how J Lyell got his number, Augie suggested Sing contact her. She told him she had been called a whore. His heart breaks for her and it has since he met her. She told him that he is worse than the abuser and not to contact her again unless it was to apologize to her. Her stated goals was that David Sills would no longer be employed in Christian Ministry. So,he doesn't understand why should would feel that way. He didn't see what they did as adding weight to a weighty matter of life.

Does it make sense that the abused don't report to police but can still be abused? It makes sense to me, but it was ingrained at the SBC that this is the first response. Because he has not have been involved with the abused, it would not have made sense but it does now. He has a much greater awareness now. Thinks Caring Well is a good thing that ERLC did. Sent him documents for proofreading. Positive resource. He's fully in favor of whatever they can do. An evolution has taken place on what they can do. He never heard about adult victims of abuse until the last 5-6 years. Only child sexual abuse. That's my generation. I have three girls and grandchildren. He gets that. He hates that this has happened. Collateral damage, he's been vilified in social media to this day. No right to live, shouldn't be in leadership.

Confidential                                                                        GPSILLS_003382



VI. Recommendations

    A. With respect to issues surrounding sexual abuse allegations, initiatives, or survivor care, are there any areas that you believe that the EC handles particularly well? SBC generally?

    B. In hindsight, are there any initiatives that you think should have been studied closer, given greater consideration or adopted during your tenure related to sexual abuse allegations, initiatives or survivor care?

    C. Recognizing SBC governance and structure, do you have any recommendations for the way that the Executive Committee should address sexual abuse allegations, initiatives or survivor care?

    Raised to Ronnie in 2019, that he wouldn't stay past June. That Friday night, Rachel Denhollander called him out by name as a lowlife for ruining Jennifer Lyell's life. Jonathan on Saturday said BP messed up. Adele Banks wrote a good article about the phrase morally inappropriate relationship. Suggested that they incorporate her article and an apology. Instead, J. Howe wrote an article saying that BP messed up. He never construed what they wrote as a consensual relationship. Sunshine is the best antiseptic. Shining light on sexual abuse is a good thing. If a church knowingly employ an accused in a public way/credibly accused, if it means something. He thinks nominating of CC members is all over the map between EC nominations, committee on nominations. Ronnie said that they need a process for the Credentials Committee, so he wrote the flow chart based on polity. Now state conventions are using that model. He raised the idea that if someone needs help so he linked up the Babb Center. He framed it out to make it user friendly. State conventions want to put that on their convention websites. Thinks Credentials Committee is a convoluted mess. Make the process, sunshine antiseptic approach. ERLC needs a ministry statement regarding sexual abuse. Entities take on projects that their president has an affinity for. Russell Moore did that after years of seeing the problem. Convention owns the ministry assignments. Entity obligated to fill the assignment. Need story-telling. Need to optimize search engines so people are taken to the SBC link not an article.

VII. Closing

    A. Thank you so much for your time today.

14

Confidential GPSILLS_003383



    B. As we come to a close, is there anything else you think might be helpful to share with us?
    C. Is there anyone else we should talk to or other steps we should take?

    D. If there is anything you would like to share in the future, please do not hesitate to contact us


Guenther response – sexual abuse inquiry sent to Sing/Boto
https://plusnxt.relativity.one/Relativity/go?id=8252197-2484410
https://plusnxt.relativity.one/Relativity/go?id=8252197-2484481
https://plusnxt.relativity.one/Relativity/go?id=8252197-2484480

What if anything did you have to do with the Sexual Abuse Summit in Oct 2015? Did it occur? Purpose? Impetus?
https://plusnxt.relativity.one/Relativity/go?id=8252197-2441142

15

Confidential     GPSILLS_003384