# Exhibit 85



Date of Interview: 2/17/2022

Interviewers: Krista Tongring and Chris Kim

Interviewee: David Roach

Location/Method of Interview: Teams

---

Please use this document as a starting point for each interview. It is likely the course of an interview will lead to additional subject matter. All interview notes should be embedded herein under the appropriate question. Additional questions should be added prior to the interview if possible, and if not, should be included in the note-taking with the answer following the question.

When finalizing the interview notes, please use the full last name of each person referenced so that the document can be properly searched in the future. Other names and common references pertinent to the investigation should be written out unless otherwise indicated. A list of permitted abbreviations will be circulated and maintained on Teams.

The Interview team should compare Individual notes to prepare a final Interview report and delete the Individual notes after jointly approving the final[1].

I. Introduction

A. Introduction of interviewers and role

B. "Housekeeping"

i. Thank you for agreeing to meet with us

ii. Please let us know if you need a break or would like to end the discussion at any point – you control the discussion

iii. Feel free to ask questions – we will answer anything to the best of my knowledge and ability

C. Confidentiality and Anonymity

i. Over 300 current and former Trustees being contacted.

ii. All current staff and many former being Interviewed as well.

[1] These notes are not a word-for-word transcription of the call; they do not necessarily reflect the exact words used by the participants, but rather are meant to convey the sum and substance of the conversation.



iii. Survivor names will remain anonymous – not released to anyone unless consent; will remain in Guidepost files; will redact/attempt to redact if files are sought for litigation purposes after investigation concludes
iv. Witness names – you can request that your identity be confidential; will withhold name in report
v. For witnesses – name may be released if investigative files are successfully subpoenaed post-investigation by third-party, may or may not happen but is a possibility you should be aware of

D. Scope of Guidepost Investigation arises from Messengers' Motion at June 2021 SBC Convention.
   i. Guidepost retained by Task Force on behalf of SBC to conduct investigation of SBC EC related to how sexual assault allegations were handled and survivors were treated and assessment of CC
   ii. Offer to review the following If Interviewee would like:
      1. Allegations of abuse by Executive Committee members.
      2. Mishandling of abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021.
      3. Allegations of mistreatment of sexual abuse victims by Executive Committee members from January 1, 2000, to June 14, 2021.
      4. Patterns of intimidation of sexual abuse victims or advocates from January 1, 2000, to June 14, 2021.
      5. Resistance to sexual abuse reform initiatives from January 1, 2000, to June 14, 2021.
      6. An audit of the procedures and actions of the Credentials Committee after its formation in mid-June 2019, using best standards and practices designed to ensure accountability, transparency, and care for the wellbeing of survivors of sexual abuse.

E. Investigation output – what will happen at the end?
   i. Detailed report which will be made public
   ii. Complete set of factual findings
   iii. Recommended comprehensive framework within which the SBC can operate in order to continue to address the concerns raised by the SBC Motion in a transparent, accountable, and scriptural manner that prioritizes survivor support and care and enhances practices for the prevention of sexual abuse, harassment, and violence.

F. Independent review: Guidepost controls the investigation and the content of the report, and reports to the Task Force appointed by former SBC President


Case 3:23-cv-00478 Document 411-52 Filed 11/03/25 Page 3 of 14 PageID #: 15242
Confidential GPSILLS_001480



of SBC. We can Identify the members and advisors of the Task Force If Interviewee would like:

i. Task Force members: Bruce Frank, R. Marshall Blalock, John Damon, Liz Evan, Heather Evans, Andrew Hébert, Bucas Sterling

ii. Advisors: Rachael Denhollander and Chris Moles

G. If the interviewee wants more of an explanation, you may discuss the following:

i. Guidepost has received a great number of documents from SBC, all of which are being reviewed.

ii. Though the Task Force is **overseeing the investigation**, **Guidepost is and will remain independent of the Task Force, the SBC, the Executive Committee, and the Credentials Committee**. **No attorney-client relationship** exists or will exist between Guidepost and the Task Force, the SBC, the Executive Committee, or the Credentials Committee. Accordingly, communications between Guidepost (including its employees and agents) on the one hand, and the Task Force, the SBC, the Executive Committee, and/or the Credentials Committee will not be protected by the attorney-client privilege.

iii. **Guidepost will document in its written report whether any person or entity has withheld access to information, documents, records, facilities and/or employees, officers, agents, or others through a claim of attorney-client privilege** or the attorney work product doctrine, particularly if claimed by the SBC, the Executive Committee, the Credentials Committee, the Task Force, or any member of the aforementioned.

iv. At the conclusion of the investigation and audit, Guidepost will prepare a **complete set of factual findings and a comprehensive recommended framework within which the SBC can operate in order to continue to address the concerns raised by the SBC Motion in a transparent, accountable, and scriptural manner that prioritizes survivor support and care and enhances practices for the prevention of sexual abuse, harassment, and violenc**e.

**NOTE: Below are suggested questions regarding the general investigation. Interviews are not limited to these questions, nor will each interview necessarily touch on each topic. Please use these as a guide supplemented by your review of documents, interview notes, and discussions with the investigatory team.**

II. Questions Concerning Being a Trustee:

A. What years were you a Trustee of SBC? (If the interviewee does not recall, prompt her/him with the information in our spreadsheet of Trustee terms of office.)



B. How did you become a Trustee?

C. What were your duties and responsibilities as a Trustee?

D. Do all Trustees have the same duties and responsibilities?

E. What is the relationship between the Trustees and the Executive Committee?

F. Do Trustees have any authority over the Executive Committee or its members?

G. How much contact did you have with the Executive Committee?

  i. Please explain frequency and nature of contacts

  ii. Regarding what subject matters?

  iii. Any contacts regarding allegations of sexual abuse or the response to allegations of sexual abuse?

    1. With whom?

    2. When?

    3. Concerning what survivor(s)?

H. As Trustee did you ever request information from the Executive Committee?

  i. Regarding what kind of matters?

  ii. Regarding issues concerning sexual abuse?

  iii. Did you get answers?

I. As Trustee, did you ever advise or give an opinion on matters pending with the Executive Committee?

  i. Concerning issues of sexual abuse or responding to an allegation?



ii. How often?

iii. When?

iv. To whom?

J. Why did your role as Trustee end?

K. In your role as a Trustee, did you ever discuss reports of sexual abuse or how the SBC responds to such reports with any other Trustee or any staff member of the SBC outside of the Executive Committee?

i. If yes, explore details re who, when, substance of discussion and if a particular report of sexual abuse was discussed.

ii. Any written or email communications?

L. If the interviewee was also a staff member of SBC, ask the same questions regarding such conversations while she/he was a staff member.

M. Where you also ever an employee of SBC?

i. If yes:

1. Positions?

2. Time frame for each?

3. Duties for each?

4. Supervisors?

5. Colleagues?

6. Did you ever discuss reports of sexual abuse or how the SBC responds to such reports with any staff member of the SBC outside of the Executive Committee?

a. If yes, collect details as above.

N. As a Trustee, were you provided with an SBC email account?

O. If no, what email account did they use for SBC communications?



P. Did they ever communicate regarding SBC business with any SBC staff person who was using her/his personal email account?

Q. Have you ever attended an SBC Annual Meeting? If yes, ask which ones and role(s) played.

III. <u>SBC EC Questions:</u> *Again when we ask these questions, make it clear that we are not here to indict the SBC, or anyone on the SBC EC, or make any judgments. We want to conduct an independent investigation as directed by the Messengers. Our questions are not meant to offend or imply that anything occurred. Also, there may be some overlap with the questions in the prior section, so adjust as needed in each interview.

A. Are you aware of anyone (survivor/advocate/other reporter such as family, friend or pastor) who has reported allegations of sexual abuse to the SBC EC?

i. If so, ask for details, including source of knowledge (first-hand, documents, second-hand (if so, from whom did they hear the information?)

ii. Who was the reporter?

iii. When did they report?

iv. Method of reporting (in person, phone, letter/email)

v. To whom did they report?

vi. Aware of any Internal discussions or communications within EC regarding the report? If yes, explore details and ask If there were any emails or other written communications.

vii. What was the outcome?

B. Have you witnessed or do you have information regarding retaliation or intimidation of survivors/witnesses/advocates by anyone at the SBC EC after they reported allegations of sexual abuse?

C. Have you witnessed or do you have information regarding retaliation or intimidation of survivors/witnesses/advocates by anyone at the SBC EC after they reported allegations of obstruction by anyone in the SBC?



D. Have you witnessed or do you have information regarding retaliation or intimidation of survivors/witnesses/advocates by anyone at the SBC EC after they reported resistance to initiatives to change how the SBC responds to reports concerning sexual abuse?

E. What is your perspective on the current EC functioning/climate with respect to sexual abuse?

F. Has the this changed since you were a Trustee?

IV. Credentials Committee Questions: [Note: Our questions related to the Credentials Committee are only related to the scope of our investigation – so only June 2019 to June 2021 and only with respect to submissions regarding allegations of sexual abuse.]

A. What is your understanding of the purpose of the Credentials Committee?

B. Do you know how it was formed? Who were the original Committee members? How were they chosen? By whom? Did any CC members have experience/training with abuse/trauma?

C. Were you ever privy to discussions regarding the SBC Churches that the Credentials Committee was considering due to allegations of sexual abuse?

V. Trustee Questions:

VI. Baptist Press/Communications Questions:

A. Are you aware of how BP articles are drafted or edited?

B. Who had final editing authority in 2019?

C. Did EC executives collaborate or make suggestions/write Baptist Press publications?

D. How much influence do EC executives have on Baptist Press publications and operations? Has this changed from the past years? How?

E. Do you know Jennifer Lyell?



F. Do you have any personal knowledge of the Jennifer Lyell events?

VII. SBC EC Operations & Culture Questions:

A. What is the onboarding process for EC staff?

i. Training – sexual abuse/harassment

ii. Code of ethics

iii. Procedures & protocols – reporting HR incidents; document retention; sexual abuse/harassment; communications

B. What is the general culture of the EC workplace? Past to present, if long-time relationship with SBC

C. What does the EC do well?

D. Do you have any concerns or recommendations for the EC staff?

E. Do you have any information you would like to share relevant to this investigation?

**Background:**

- Attended Vanderbilt University and graduated in May 2002
- Attended and graduated from Southern Seminary, Master and PhD in Divinity
- His wife worked at the EC in various positions with EC including BP from 2002 to 2014
- Father was in EC ending 1985
- Started at the SBC in 1999 as an intern until 2002, 2014 Chief Correspondent until 2019
- Serving as pastor of church Shiloh Baptist Sarah Lane, Alabama Sarah Lane

**SBC atmosphere:**



- Joyful place to work / formal atmosphere dress/policy. Evangelical college student who was challenged in college because of his faith and the SBC was very supportive of him in college.
- SBC and other SBC entities were generally kind and trustworthy people and he benefitted from it.

**Baptist Press Writing/Editor Process:**

- 2014 to 2019
- Pretty consistent – nuances changed bit depending on the leadership
- His input is more persuasion/influence regarding articles not authority.
- His process usually started in the morning by listening to NPR during his commute to consider what Christian article he should write (article per day), contacting sources once an assignment had been assigned, article to editor at 1 to 2 pm, editing process sometimes lighting fast or other days took a day or 2.
- Final editing authority – President or CEO (Page or Boto), most stories did not get to that level, varied depending on the story, Shawn Hendrikson and Sing (final approval) when he was there.
- Will Hall – VP for BP, Keenan Careton VP prior to Sing being assigned to VP, Bill Merrill (mentor).
- Diana Chandler, Shawn Hendrikson, Art Towlson were writers at BP.

**Jennifer Lyell / BP Article**

- Jennifer Lyell – initial contact with Shawn and brought in David Roach to write the article.
- He contacted sources, wrote the first draft, passed over to others – several days (not aware of who was editing the article), passed it to Shawn, knows Shawn worked with Sing, confirmed Guenther & Jordan was involved in the process.



- Thinks he conferred with Guenther & Jordan regarding the story. After the article was published, he conferred with Guenther & Jordan.
- Started with Jennifer's written statement, he had lots of emails to Jennifer with follow-up questions & texts, knew Jennifer at seminary & Dr. Sills at seminary (were friends with both), talked to leaders at reaching & teaching organization where Sills worked at, talked to Dr. Mohler (confirmed talked to Jennifer, her statement was courageous – thinks Mohler encouraged Jennifer to make a police report), talked to Eric Geiger (recounted about what Jennifer's allegations were and how courageous she was, called Dr. Mohler together), contacted Sills (did not call back), contacted Pastor Bill Cook, contacted Louisville PD, Special Victims unit, (Jennifer gave him her phone record - one minute calls to Special Victims i.e. voice mail never called back), talked to Special Victims possible not to call back if a voicemail was left during the weekend and the voicemail was never turned over to a detective.
- Hearsay – editorial process / Shawn / Sing would usually be involved with back & forth - Sing was heavily involved, Shawn had decided to take abuse out – suspected not a unilateral decision, suspects that Boto was involved with the editing process because of Jordan and Guenther involvement.
- Ever see Jennifer / Sills at the seminary – did not recall.
- First draft to Shawn and return the article back to him after the edits were done – recall – sexual assault language in the first draft, impression in the midst of ME2 movement shifting of lawsuits - 180 degrees – editing process – libel risks of criminal activities played some role in the editing into the final form, greater legal danger from the accused vis a vis the victim.
- Communication with Jennifer – expectations – don't recall seeing a draft, she was anxious when it will be published so she can see it, concerns when it was first published, remembers deferring to Shawn re: communications with Jennifer,



"million" emails from Jennifer. It wasn't his place to communicate/discuss with Jennifer.

- Did Jennifer ever reach out to you personally? Texted him one time since he has been in Sarah Lane can you give me more information – not sure if he can do anything at this point.
- Sources were accurate.
- "***Morally inappropriate" & "Sexual Assault" - Jennifer reported it was both.***
- ***Jennifer did something wrong and that there was sexual abuse – most comfortable with this statement.***
- ***Taking out sexual abuse allegation from the story makes it radically different.***

**Observations in the BP regarding the article publication**

- Conversation over protracted period of time – a lot of thought given to the matter.
- Discussion with two groups of leadership, e.g., Floyd and Jonathan Howe – compassion to do right thing in both groups of leadership – Western culture was shifting so much during this period.
- Howe – do you think this piece should have been written in the first place?

**Departure from the SBC – Why did he leave**

- Went to Dallas to cover Ronnie Floyd election – right before this meeting – Sing said to him - don't leave but stay for the Executive Session, he was responsible for Tweeting.
- Houston Chronicle article re: SBC and sexual abuse came out. Steve Swafford, Chairman of the search committee to elect Floyd denied the allegations re: Houston Chronicle article, David tweeted Swafford's denial and the tweet was up for two minutes, Sing said listen not to report via Tweet, David was asked for his resignation by Sing after his temporary Tweet after a couple of days met with Sing, remembers conversation with Boto immediately after the

tweet incident and Boto said don't lose about losing sleep about it, told Boto that he would be resigning because he serves at the favor of the EC. He wanted to leave graciously.

- David believes he was asked to resign from the SBC possibly because of Lyell article.

**After his resignation, SBC/BP**

- Asked to come back on staff when he became pastor but declined.
- Jonathan – great relationship, started writing articles initially without his name, then with his name.
- Sing why he left? Jonathan acted like he did not like the way Sing handled different things, suggested that had a role in Sing leaving.
- Attended February 2020 – Executive Committee meeting – Christianity Today asked him to go to the meeting re: Sing's retirement – Mike Stone spoke publicly of him very well, respect – wisdom. Jonathan said behind the scene, there was something not favorable about Sing.
- Boto – less knowledge – Riley Foundation issue came out after he departed and it appeared to have affected Boto (according to Becky and Sharon during a conversation with them on his last day in the SBC), he remembers his last conversation with Boto when he left SBC and Boto treated him in a completed different manner. Boto was a friend and a big cheerleader for David since 1999 but the during the conversation he had with Boto when he left, Boto said the mistake was egregious, no place for you at the SBC.

**Possible witnesses**

- Art Towlson, Becky Chandler, Sharon
- In writing his resume, he remembers he wrote a bullet re: how many articles he wrote re: sexual abuse, he wrote about 100 articles about it, i.e., talked to accused and victims.



**Recommendations:**

- Depoliticization of sexual abuse.
- Safe space to speak / to do the right thing without fear of retaliation, i.e., legal and/or career implications – e.g., to be able to say that how a sexual abuse matter was handled appropriately.

*Confidentiality was never requested.*



Case 3:23-cv-00478 Document 411-52 Filed 11/03/25 Page 14 of 14 PageID #: 15253