IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MICHAEL DAVID SILLS and MARY SILLS, *Plaintiffs,* v. SOUTHERN BAPTIST CONVENTION, et al., *Defendants.* | Case No. 3:23-cv-00478 Chief Judge Campbell Magistrate Judge Frensley **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS WILLIE MCLAURIN AND ROLLAND SLADE'S MOTION FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION

Slade and McLaurin move for summary judgment on claims for defamation, negligence, gross negligence, IIED, and conspiracy, but the record is full of factual disputes. They knew or should have known that Jennifer Lyell's abuse allegations were uninvestigated yet accepted them as true to protect the SBC's image. On May 26, 2022, they publicly branded David Sills ("Sills") a sexual abuser and published his photo online, despite no criminal charges and no effort to verify or corroborate Lyell's claims.

## II.    FACTUAL BACKGROUND

This case arises from Guidepost's investigation and 2022 publication of the Report which, in part, concerned Jennifer Lyell's ("Lyell") sexual abuse allegations against Sills. Guidepost had been retained in 2021 by the Executive Committee ("EC").[1] The investigation made on behalf of

---

[1] Prior to the creation of the Task Force, the EC had already retained Guidepost to investigate the EC's mishandling of sexual abuses cases. (Erin Roach, *Motion spurs task force to oversee EC review*, BAPTIST PRESS (June 16, 2018), https://www.baptistpress.com/resource-library/news/motion-spurs-task-force-to-oversee-ec-review/; SBC Executive Committee Engages Guidepost Solutions to Conduct Independent Process Assessment (June 11, 2021), https://www.baptistpress.com/wp-content/uploads/2021/06/SBCEC-Guidepost-FINAL-1.pdf).

1

the EC, was to be overseen by a committee appointed by the SBC President, which became known as the Sexual Abuse Task Force (the "Task Force") formed specifically for the investigation.[2] The operative contract required various interactions between Guidepost and the EC, namely though EC's Task Force and "Committee on Cooperation" to whom Guidepost would provide drafts of the factual sections of the report, and also transmit monthly invoices.[3] The EC paid Guidepost for its services.[4]

The parties sharply dispute the timing and nature of the relationship, and Plaintiffs, as nonmovants, are entitled to all reasonable inferences in their favor. Sills acknowledges *consensual* encounters with Lyell, but only after Lyell was no longer his student.[5] Prior to that time, Sills refused Lyell's advances. He emphatically denies any sexual contact while she was a student or any nonconsensual conduct at any time.[6]

The Report repeatedly describes Lyell, without qualification, as a "survivor" of sexual abuse, and Sills, without qualification, as "her abuser." [7] The Report goes much further than merely stating that there were "allegations" of sexual abuse – it plainly concludes that Sills *was* a "sexual abuser" and repeatedly refers to him as such. [8]

---

[2] Task Force is not a legal entity and was an *ad hoc committee* that no longer exists. Ex. 18, EC 30(b)(6) Dep. 58:4-6.

[3] Dkt. No. 373-1, Engagement Agreement, §§ 2.1, 3.5, 9.1.

[4] Ex. 31, McLaurin Dep., at 24:3-9.

[5] Ex. 40, Sills Dep., at 23:1-5.

[6] The first sexual encounter occurred when Lyell tried to kiss him while on a mission trip to Ecuador and the second with Lyell occurred when Lyell "put her hands down my [Sills] pants," and he "reacted strongly." *Id.*, at 24:15-23.

[7] Dkt. No. 390-7, McDougal Final Report, at 47, 54-55; Ex. 47, Guidepost 30(b)(6) Dep., at 121:16-25; Ex. 49, Guidepost 30(b)(6) Dep. Ex. 20.

[8] Dkt. 390-7, McDougal Final Report, at 81-107.

2

Guidepost did not perform anything resembling a competent investigation.[9] Guidepost never contacted Sills, his wife Mary, their pastor, SBC President Dr. Albert Mohler ("Mohler"), or other key witnesses who could corroborate or rebut Lyell's story. ███████████████ ████████████████████████████████████.[10] Guidepost's 30(b)(6) witness Krista Tongring admitted that investigators "were relying on things that we had," i.e., Lyell's version of the facts.[11] ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████."[12]. Indeed, Guidepost's own notes record multiple doubts of the corroboration of her account.[13] SBC official David Roach was told that Mohler, who had publicly praised Lyell's courage, "was affirming [her] courage in coming forward, but not necessarily her facts," and that Lyell did not even specify whether the alleged abuse was physical or emotional.[14] For example, Laura Erlanson, an Executive Committee employee assigned to Baptist Press, warned her supervisor that "journalistic malpractice" would result from accusing someone of abuse absent police reports or other confirmation, cautioning that since it is improper to call someone a "survivor" without also calling "someone else . . . an abuser."[15] This contradictory evidence – witnesses uncertain of the facts, Guidepost's failure to

---

[9] Dkt. 390-7, McDougal Final Report at 47, 54-55; Ex. 47, Guidepost 30(b)(6) Dep., at 121:16-25; Ex. 49, Guidepost 30(b)(6) Dep. Ex. 20.
[10] Ex. 26, Lyell Dep, Day 2., at 118:22-119:4.
[11] Ex. 47, Guidepost 30(b)(6) Dep., at 209:23-24.
[12] Ex. 58, Guidepost 30(b)(6) Dep. Ex. 49, at SBC_EC_GJPLaw_00001468.
[13] Ex. 69, at GPSILLS_001353 at 65.
[14] Ex. 37, Roach Dep., at 156:13-15.
[15] Ex. 50, Guidepost 30(b)(6) Dep. Ex. 22.

interview critical witnesses, and its own awareness of no corroboration – creates triable issues on Guidepost's investigative practices and the truth of its Report.

In connection with the Report, on May 26, 2022, a List of Abusers (the "List")[16] was published that included a photograph of Sills restyled as a mug shot that falsely labeled him as an abuser. Sills's name was cut and pasted from a working document compiled by Elizabeth Dixon that was NOT meant for publication.[17] Dixon's document merely compiled a list of news articles resulting from Google searches for news related to allegations of sexual misconduct.[18]

Both McLaurin and Slade admit there was no investigation of Lyell's accusations beyond simply accepting her version of events as fact, and that neither knew of any evidence to support her allegations. For example:

- McLaurin testified that he did not recall ever asking anyone to corroborate Lyell's allegations as they were referenced in the Report.[19]

- In his role as Interim President, McLaurin never "heard of any violence or threats of violence or coercion by David against Lyell" and the "only information I'm aware of is information that is contained here in the [Guidepost] report."[20]

- In fact, McLaurin has never heard anything about Sills other than what was reported by Lyell.[21]

- When asked to describe the acts the EC contended that Sills committed in the Report, his and Slade's statement, and the List, McLaurin stated, "I cannot." He continued, "[T]his statement [Slade and I made] the—here was all related to the list that was released And so it was based off the alleged [sic], but I don't have any specific evidence."[22]

---

[16] Ex. 45, Slade Dep. Ex. 10 ("May 2022 Statement"); *See also* Ex. 46, Slade Dep. Ex. 11, the List.
[17] Ex. 11, Dixon Dep., at 64:3-15.
[18] *Id.* at 42:2-15, 103:10-15. Dixon testified that McLaurin gave his permission for the List to be released. She had taken every effort to clearly mark the document as a "working document" that was "NOT" for publication and asked Amy Thompson, who asked McLaurin, before releasing it to Guidepost. Dixon testified that Thompson related to her that McLaurin said, "yes, to turn it over." *Id.* at 63:18-24.
[19] Ex. 31, McLaurin Dep., at 47:6-12.
[20] *Id.* at 51:12-18.
[21] *Id.* at 57:11-13.
[22] *Id.* at 71: 4-16. (Emphasis added).

- Slade admitted that Sills should not have been included on the List.[23] Yet, McLaurin and "Slade, as the leaders," put the List and redactions together, with their counsel assisting.[24] They then affirmatively published the List along with their joint statement.[25]

- Slade never even knew until his deposition, when Plaintiffs' counsel told him, that Sills had said his relationship with Lyell was consensual.[26]

- Slade took Lyell's accusations as fact, without any verification.[27]

- Instead of asking whether her allegations were true or not, Slade was more concerned about protecting the EC and SBC from Lyell.[28] Plaintiffs were simply collateral damage.

Their "statement on the release of a list of alleged abusers" explained why some names on the list were redacted while others, including Sills's, remained unredacted.[29] The letter published by Slade and McLaurin explained that individual names were redacted that were not the subject of "guilty pleas, convictions, judgments, sentences, and/or inclusion on a sex offender registry [that] could be easily verified."[30] Thus, both the List and the separate statement of Slade and McLaurin indicated that Sills was, as a settled matter of fact, a sexual abuser. This is patently untrue. There is no evidence that Sills has ever entered a guilty plea, been convicted, had a judgment entered against him, been sentenced, or been included on sex offender registry. Slade himself admitted that Sills should not have been on the list.[31]

The statements of February 2022 and May 2022 and following about Sills were not isolated but, instead, continued to perpetuate ongoing attacks on Sills and his wife's honesty and character,

---

[23] Ex. 43, Slade Dep., at 94-96.

[24] Ex. 31, McLaurin Dep., at 72:17-20.

[25] *Id.* at 73:19-22.

[26] Ex. 43, Slade Dep., at 32:20-33:1.

[27] *Id.* at 33:25-35:5 (By Ms. Riley: Q: "How do you know that she was a victim other—" A: "She said she was…I do not know of any investigator or investigation that was done."). *See also id.*, 74:17-21.

[28] *Id.* at 32:20-33:1. ("[W]hat I was dealing with was how the EC had treated Jennifer Lyell.").

[29] *See supra note* 22.

[30] *Id.*

[31] Ex. 43, Slade Dep., 94-96.

falsely painting him as a sexual abuser. Slade and McLaurin's own awareness of no corroboration creates triable issues on all Plaintiffs' claims. Mary Sills, though not mentioned in the Report, suffered emotional distress from the public dissemination of the allegations against her husband. In sum, the factual record is hotly disputed, and reasonable jurors could resolve these disputes only after trial.

## III. ARGUMENT

### A. The Record Shows Plaintiffs Timely Filed Their Claims Against Slade and McLaurin

Defendants argue that Plaintiffs' claims are time barred. Br. at 3-4. This is a smokescreen. Slade and McLaurin publicly made a false statement about Sills on May 26, 2022.[32] Plaintiffs filed their complaint in this Court on May 11, 2023, within the statutory allowed one year.[33] Slade and McLaurin argue that any claims for libel or personal injury, including negligence, based upon any statements or actions of Slade or McLaurin before May 11, 2022, are barred by a one-year statute of limitations.[34] They reference, for instance, factual allegations in the Complaint about Slade's February 22, 2022, public apology to Lyell.[35] However, their own brief implicitly admits the fact that even statements made before May 11, 2022, can be used to give context to the claims asserted. They acknowledge that, for instance, "Outrageous conduct [i.e., intentional infliction of emotional distress] claims are not evaluated in a vacuum.[36] Nothing prohibits Plaintiffs from alleging facts that predate May 11, 2022, to (a) provide such context to support their claims and (b) demonstrate

---

[32] *See supra note* 22.
[33] Dkt. No. 1.
[34] Dkt. No. 365, at 3-4.
[35] Dkt. No. 365, at 4 (citing Dkt. No. 1, at ¶¶ 52-24). *See also* Ex. __, Slade Dep. Ex. 3.
[36] Dkt. No. 365, at 11 (quoting *Stacy v. MVT Servs., LLC,* No. 3:11-CV-01241, 2012 WL 2281495, at *8 (M.D. Tenn. June 18, 2012)).

6

the ongoing nature of the conduct at issue.[37]

The alleged conduct constitutes a continuing tort. The May through July 2022 statements and "renewed accusations" merely extended earlier defamatory acts, including Slade's February 2022 apology to Lyell. Defendants' reliance on *Clark v. Viacom Int'l Inc.*, 617 F. App'x 495 (6th Cir. 2015), and *Rose v. Cookeville Reg'l Med. Ctr.*, 2008 WL 2078056 (Tenn. Ct. App. May 14, 2008), is misplaced. Neither binds this Court, and both involved single online publications—not coordinated, ongoing defamatory acts over several years. Here, Defendants repeatedly republished false statements as part of a continuous effort to scapegoat Sills, making *Clark* and *Rose* inapposite. Even if Tennessee declined to recognize a continuing tort, the February 2022 statement remains admissible to show Defendants' knowledge and malice when they made the May 2022 publication. *See Clark*, 617 F. App'x at 505 (republication with intent constitutes new reputational harm).

## B. The Record Establishes a Triable Claim for Defamation

To prevail on defamation under Tennessee law, a plaintiff must show publication of a false statement made knowingly, recklessly, or negligently. *Sullivan v. Baptist Mem. Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). Public figures must also prove "actual malice." *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 279–80 (1964)). Slade and McLaurin dispute only damages and fault—both are without merit.[38]

---

[37] Dkt. No. 1, ¶ 76. The Complaint alleges just that: "The comments and statements made by Defendants as recently as May, June, and July 2022 (and as previously set forth herein) did not occur in isolation. Rather, the statements were a continuation and elaboration of a yearslong campaign to falsely attack the honesty of Plaintiffs, casting them as violent criminals."

[38] Slade and McLaurin make a conclusory statement that Sills "cannot show reputational injury and actual damages" arising from their statements of May 26, 2022, and rely on the argument and authorities of EC's brief with respect to damages. Br. at 6. To that extent, Plaintiffs similarly adopt and incorporate by reference their argument and authorities set forth in their Response to EC's Motion for Summary Judgment.

7

### 1. The Record Supports a Finding that Sills Is Not a Public Figure

McLaurin and Slade contend that the heightened "actual malice" standard applies because Sills is a public figure that Sills must prove a higher level of fault as to Slade, and that there is no evidence McLaurin was negligent. All of these arguments fail.

Since the argument that a plaintiff is a public figure (who must show actual malice) is in the nature of an affirmative defense (it is not an element of the state common law tort of defamation, but rather, an affirmative defense created by federal common law in the 1970s), the burden to demonstrate that Sills is a "public figure" is on the Defendants.[39] Slade and McLaurin argue Sills is a public figure "in the evangelical community." As explained below, he is not.

General-purpose public figures are those who have achieved "such pervasive fame or notoriety that [they] become[] a public figure for all purposes and in all contexts." *Charles*, 693 S.W.3d at 274 (quoting *Gertz*, 418 U.S. at 351). The Tennessee Supreme Court explained that "general-purpose public figures are celebrities or household names." *Charles*, 693 S.W.3d at 274 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980)). Slade and McLaurin never suggest that Sills is, or ever was, a celebrity or household name within the SBC or evangelical community. Sills was not well-known in the SBC community, with SBC leaders admitting that they did not recognize him.[40]

---

[39] *Foretich v. Capital Cities/ABC*, 37 F.3d 1541, 1553 (4th Cir. 1994) ("We have proceeded upon the initial presumption that the defamation plaintiff is a private individual, subject to the defendant's burden of proving that the plaintiff is a public figure to whom the *New York Times* standard applies"); *Lewis*, 238 S.W.3d at 295 (Tenn. Ct. App. 2007) ("[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. . . . A *libel defendant* must show more than mere newsworthiness to justify application of the demanding burden of *New York Times*.").

[40] Ex. 43, Slade Dep., at 14:6-17 (Slade never met Sills, did not know Sills by reputation and agreed Sills was never a member of the EC); Ex. 31, McLaurin Dep., at 57:6-13 (McLaurin has never met or spoken to Sills and other than the allegations made by Lyell has never heard anything about him); Ex. 23, Litton Dep., at 22:3-6 (Ed Litton, former SBC President, never met Sills and

Slade and McLaurin point to the fact that Sills was an author, lecturer, and international mission work as evidence that he had "invited attention and comment" about anything he did. Br. at 7. However, Sills' professional and missionary endeavors did not render him a public figure. If Sills was the prominent figure that Defendants contend, members of the EC such as Slade and McLaurin would have known him. Instead, both testified they did not know him. McLaurin testified that he had "never" even "heard" anything about Sills other than what Lyell reported— that is, he had not heard of Sills's scholarship, his mission work, or any other thing for which he supposedly was prominent or well-known.[41] Neither Sills nor his spouse[42] are public figures.[43]

Further, college professors are generally not public figures, except in very unusual circumstances in which they obtain considerable fame or thrust themselves into the spotlight. In *Hutchinson v. Proxmire*, 443 U.S. 111, 135-36 (1979), a U.S. senator publicly criticized a professor and researcher. The Supreme Court held that the professor was not a "public figure," and reversed the award of summary judgment to the senator. *Id*. at 135-36.[44] The same is true for pastors, to the extent that Sills might be construed as such.[45]

---

testified "I don't think I would know him if I met him today."); Ex. 6, Barber Dep., at 20:11-15; 21:1-15 (Barber, another former SBC President, never met and does not know Sills).

[41] Ex. 31, McLaurin Dep., at 57:4-13; Ex. 43, Slade Dep., 14:6-12.

[42] Slade and McLaurin effectively concede that Mary Sills is not a public figure. She never sought public attention or involvement in any controversy; Defendants' defamatory actions alone thrust her into the public eye, causing the very harm for which she seeks redress.

[43] Ex. 14, Fisher Dep., at 33:8-10 (testifying about rehabilitation of reputation, the allegations publicly leveled against him would require a rehabilitation program, even though Sills "isn't a public figure and is not known to anyone maybe outside the Baptist community").

[44] *Accord, e.g.*, *Sewell v. Trib. Publications, Inc.*, 622 S.E.2d 919, 276 Ga. App. 250 (2005) (professor not a limited purpose public figure, *even with respect to subject matter of lectures*); *Taus v. Loftus*, 40 Cal. 4th 683, 54 Cal. Rptr. 3d 775, 151 P.3d 1185 (2007) (same).

[45] In *Ogle v. Hocker*, 279 F. App'x 395 (6th Cir. 2008) (unreported), the plaintiff and defendant were both religious leaders affiliated with the same church. The Sixth Circuit held that the plaintiff was *not* a limited purpose public figure and applied the applicable negligence standard. *Accord, e.g.*, *Gallagher v. Connell*, 123 Cal. App. 4th 1260, 20 Cal. Rptr. 3d 673 (2004) ("priest and [] pastor" is not a public figure and "[w]e have found no case which has held simply being a member

### a. Regardless of Whether Plaintiffs Must Show that Slade or McLaurin Acted with Actual Malice or Merely Negligence, The Evidence is More than Sufficient to Create a Jury Question

In a defamation action governed by a negligence standard, it is sufficient to show that the defendant acted with negligence in failing to ascertain the truth of the statement. *Sullivan*, 995 S.W.2d at 571. To determine negligence, "the conduct of the defendant is to be measured against what a reasonably prudent person would, or would not, have done under the same or similar circumstances." *Pate*, 959 S.W.2d at 574-75 (quoting *Nichols*, 569 S.W.2d at 418). To prove actual malice, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication, and that publishing, with such doubt, shows reckless disregard for truth or falsity and demonstrates actual malice. *Pate*, 959 S.W. 2d at 577-78 (citing *Moore v. Bailey*, 628 S.W.2d 431, 433-4 (Tenn. App. 1981)).

The Supreme Court and the Sixth Circuit make clear that deliberately ignoring readily available contradictory evidence constitutes "reckless disregard" of the truth.[46] Tennessee follows the same rule: "failure to thoroughly investigate" is negligence, but "purposeful avoidance of the truth" is evidence of actual malice. *Charles*, 693 S.W.3d at 282 (citing *Harte-Hanks and Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 74–75 (Tenn. Ct. App. 1986)). The key inquiries include whether Guidepost "entertain[ed] serious doubts," or "when there exists obvious reasons to doubt the veracity of [Lyell] or the accuracy of the information itself." *Hibdon*, 238 S.W.3d at 301.

---

of the clergy makes one an all-purpose public figure for purposes of a defamation action. We hold it does not. Clearly Gallagher is no Jerry Falwell, Jesse Jackson, or Louis Farrakhan"); *Davis v. Keystone Printing Service, Inc.*, 155 Ill. App. 3d 309, 108 Ill. Dec. 17, 507 N.E. 2d 1358 (1987) (reverend accused of certain sexual misconduct not a public figure).

[46] *See Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (purposeful avoidance of the truth supports actual malice, including refusing to interview key witnesses and ignoring recordings undermining the story); *Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 411 (6th Cir. 1991) (same); *Cobb v. Time, Inc.*, 278 F.3d 629, 639–40 (6th Cir. 2002); *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 522 (6th Cir. 2007) (purposeful avoidance distinct from mere non-investigation).

10

Actual malice can be shown even when a lengthy investigation takes place, as it is but the *quality* of an investigation – not just its length – matters for malice. *Compuware* teaches that even an "investigat[ion]" does not preclude a finding of malice if contradictory evidence is ignored. 499 F.3d at 528. As the Sixth Circuit explained, "the sum total" of evidence must be viewed to determine if a jury could find actual malice. *Id.* Here, even if an "actual malice" standard applies, Plaintiffs have presented evidence that Slade and McLaurin acted with at least reckless disregard for the truth and the evidence far surpasses the threshold of what a negligence standard requires.

### i.    Slade and McLaurin Did Not Perform Any Investigation

Plaintiffs have presented evidence that Slade and McLaurin acted with at least reckless disregard for the truth and the evidence far surpasses the threshold of what a negligence standard requires. By Slade's own admission, SBC and EC officers had concerns about the truth of the allegations of sexual abuse against Sills, yet Slade and McLaurin acted to purposefully avoid any efforts to find out that Lyell's allegations were untrue—they did not question the allegations, investigate them, or ask if Sills had responded to them.[47] They did nothing to verify the allegations, seeking only to show that the EC was taking action by way of commissioning the Report and apologizing to Lyell. Slade and McLaurin ignored the fact that Guidepost was not hired to investigate Lyell's underlying allegations. Slade testified that he never asked Mohler, whom Lyell had first told about her allegations, if Sills denied them.[48] He never asked any of Sills's colleagues if the allegations were true.[49] He never asked for any corroborating evidence.[50] Failing to make these simple inquiries allowed him to avoid the possibility that the allegations were false. He did this despite concerns about the truth of the allegations having been "discussed in our [EC] officers

---

[47] Ex. 43, Slade Dep., at 19:13-21; 62:23-63:2; 63:6-8; 65:10-20.
[48] *Id.* at 62:23-63:2.
[49] *Id.* at 63:6-8.
[50] *Id.* at 63:9-11.

meeting."[51] Instead, Slade testified the EC was solely addressing "how Baptist Press had handled the story that was given to us—given to them."[52] Whether or not Lyell's "story" was true was, simply put, something Slade and McLaurin, as agents of the EC, wanted to avoid.[53]

Slade and McLaurin further acted with malice and reckless disregard in failing to redact Sills' name and photo from the List. As mentioned previously, the List published by Slade and McLaurin contained a mugshot-style photo of Sills. It also contained redactions to protect survivors or other individuals unrelated to the offender.[54] However, entries on the List that referenced "an admission, confession, guilty plea, conviction, judgment, sentencing, or inclusion on a sex offender registry."[55] Slade and McLaurin made the decision to make redactions to the List,[56] but importantly included Sills in the List despite there being no admission, confession, guilty plea, conviction, judgment, sentencing, or inclusion on a sex offender registry by Sills.

If Slade and McLaurin had investigated within their own Executive Committee, they also would have become aware of its own lawyer's concerns. Jamie Jordan, counsel for the EC, told Ed Upton, an Assistant to the SBC President, that (1) Lyell's story was not clear whether the alleged abuse was "child sexual abuse, abusing a relationship of trust, or some type of power differential abuse (such as professor/student)," (2) the possibility of "abuse" was questionable, as Lyell said "that the abuse continued for more than a decade, apparently part of which time she was in

---

[51] *Id.* at 19:13-21 (Slade had a conversation with ███████████, who expressed concerns about whether or not Lyell's allegations were true); 65:10-20.
[52] *Id.* at 65:21-24.
[53] An actual investigation of the allegations could have surfaced, for example, email correspondences over a seven-year period between Lyell and David that include things like her telling him multiple times that she missed him, expressed "concern for each other" (Slade's words), and constitute evidence that the relationship was consensual. *See id.* at 37:7-55:21.
[54] Ex. 43, Slade Dep. at 93:7-9.
[55] Ex. 45, Slade Dep. Ex. 10, May 2022 Statement.
[56] Ex. 31, McLaurin Dep. at 72:10-20.

counseling,…continu[ing] [while] the victim ha[d] become a mature adult," and (3) "[i]f BP writes that Sills sexually abused Ms. Lyell, it has a made a statement which would be reasonably expected to gravely harm his reputation and his ability to earn a living in his profession . . . and if BP cannot provide that proof, then it may be held legally liable." [57]

### ii. There Were Many Reasons for Slade and McLaurin to Question Lyell's Account of Events

The consensual sexual relationship started in 2006 (Sills testified about Lyell's rejected advances prior to 2006), when Lyell was 28, and ended in approximately 2016,[58] when she was 38. Lyell did not report the alleged abuse to anyone until 2018. Lyell incongruously stated that she participated in a non-consensual relationship, involving physical violence and coercion (including coercion in the form of threats of violence),[59] over a period of 10+ years, while at times driving hundreds of miles to see Sills and his family, and performing oral sex. ████████████████████

████████████████████████████,[60] which should have prompted closer scrutiny of Lyell's credibility, as mental health is a proper consideration in evaluating witness credibility.[61]

---

[57] Ex. 47, Guidepost 30(b)(6) Dep., at 205:25-206:11.

[58] Ex. 40, Sills Dep. at 24:8-14; 56:7-9; 57:15-21; Ex. 103, Lyell Rogg. Responses, at 6-7.

[59] According to the Report, Lyell "told Dr. Mohler and her boss at Lifeway that any sexual contact she had with Professor Sills had been nonconsensual and involved violence, threats of violence against her and others, and coercion." Report at 81.

[60] Ex. 80, Lyell Demand Letter, at GPSILLS_000205 and GPSILLS_000211.

[61] Guidepost's expert, Douglas Leff, Esq., an experienced investigator and prosecutor, when asked why it was " important to know about, like, the victim's mental health," he responded that "in any case, a victim's ·credibility, a complainant's credibility is squarely an issue.· So it's important for us to resolve whether there's something so paramount in there that either we just can't in good faith accept their allegations, or that we would – in the case that I was mostly working, this was in a law enforcement capacity, so whether it would be something so legally insufficient as a matter of law that we couldn't even, at this point, present it to the prosecutors to consider." Ex. 22, Leff Dep., at 31:23-32:11.

### iii. If McLaurin and Slade had Bothered to Investigate, They Would Have Discovered That Many Witnesses Raised Doubts that Sills Was a Sex Abuser

Others within the SBC umbrella who expressed doubts include Laura Erlanson, an Executive Committee employee assigned to Baptist Press and journalist who told her superiors at Baptist Press that David Sills should not be accused of sexual abuse if that allegation could not be confirmed or corroborated.[62] Erlanson viewed Lyell's story as "a long term affair between two adults" which should have been reported to police if true.[63] ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████"[64] Even the former SBC CEO Augie Boto questioned Lyell's allegations.[65] Slade and McLaurin, as Chairman of the EC and Interim President/CEO of the EC, had the ability to contact each of these EC employees, but chose not to before publishing the defamatory statements against Sills. Slade and McLaurin's decision to publish without consulting witnesses who directly contradicted Lyell's account constitutes clear evidence of reckless disregard for the truth.

### iv. Slade and McLaurin Refused to Retract Their Defamatory Statements

After the Report was released, Plaintiffs requested that each Defendant retract their defamatory statements.[66] "A refusal to retract after a request for retraction is made or the republication after notice is given of the falsity of the statements is evidence of malice." *Myers*, 959 S.W.2d at 164. To date, neither Slade nor McLaurin have not retracted their defamatory statements.

---

[62] Ex. 70, GPSILLS_000781 at GPSILLS_000787; Ex. 25, EC_0002462.
[63] *Id.*; Ex. 70, GPSILLS_000781 at GPSILLS_000787.
[64] Ex. 75, GPSILLS_013523 at GPSILLS_013535.
[65] Ex. 83, GPSILLS_001185 at GPSILLS_001189.
[66] Ex. 131, Ltr. From D. Barrett to Seminary, et al. (Nov. 15, 2022).

14

### b. In Light of the Evidence of Malice and Gross Negligence, Plaintiffs Can Easily Prove Negligence.

Plaintiffs also satisfy the standard of ordinary negligence as to Slade and McLaurin. Slade relies on *Evans v. Amcash Mortg. Co., Inc.*, No. 01A01-9608-CV-000386, 1997 WL 415319 (Tenn. Ct. App. Aug. 1, 1997), claiming he cannot be negligent because he relied on counsel to set redaction parameters for the List. That argument is misplaced. In *Evans*, counsel had investigated the underlying misconduct and the statement at issue was made internally, not published. Here, counsel merely applied redaction criteria and conducted no investigation into Sills or the truth of Lyell's allegations, and Slade publicly released the List. *Evans* offers no protection where, as here, the defendant personally publishes false and damaging information without verifying its accuracy.

For many of the same reasons set forth above, McLaurin was negligent. The argument McLaurin makes echoes the *Evans* argument with respect to his reliance on counsel's redactions, and for the same reasons, that argument fails with respect to McLaurin.[67]

### C. Plaintiffs Present Sufficient Evidence to Support Their Negligence Claim

Under Tennessee law, the elements of negligence are (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause. *Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005) (citing *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998)). Defendants claim that Plaintiffs' negligence claim is duplicative and should be dismissed.[68] Plaintiffs incorporate by reference Section III(B), *supra*, which

---

[67] *See also* Ex. 31, McLaurin Dep., at 99:7-22 (McLaurin admits he does not know whether or not Sills sexually abused Lyell).

[68] Slade and McLaurin incorporate and rely on the EC's argument and authorities concerning Sills' lack of damages. As such, Plaintiffs incorporate their response to that argument in their Opposition to the Executive Committee's Motion for Summary Judgment.

15

discusses why Slade and McLaurin were negligent (and, indeed, reckless) and Section III(B) of their Opposition to Guidepost's motion for summary judgment.

### D. Plaintiffs Present Sufficient Evidence of Intentional Infliction of Emotional Distress to Preclude Summary Judgment

The elements of IIED are (1) intentional or reckless conduct; (2) that is "so outrageous" as to exceed all bounds of decency; and (3) that results in "serious mental injury" to the plaintiff. *Joiner v. Meharry Med. Coll.*, No. 3:18-cv-00863, 2020 U.S. Dist. LEXIS 222240, at *27-28 (M.D. Tenn. Nov. 28, 2020) (quoting *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). Tennessee courts describe the required conduct as "atrocious," "utterly intolerable," and "beyond all possible bounds of decency." *Doe v. Belmont Univ.*, 334 F. Supp. 3d at 903 (quoting *Goldfarb v. Baker*, 547 S.W.2d 567, 569 (Tenn. 1977)). Damages are limited to the most severe emotional injuries. *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003). Slade and McLaurin argue that their statements and actions do not constitute "outrageous" conduct, and that Plaintiffs suffered no "severe" injury. But those are jury questions.

#### 1. There is Evidence of Outrageous Conduct by Slade and McLaurin

Plaintiffs have shown outrageous conduct by Slade and McLaurin, in particular falsely branding Sills a sex offender and featuring him alongside child abusers on the List while neither of them conducted an investigation. For Sills, a respected professor, to be labeled a "sexual abuser" and hung out to dry without evidence is profoundly humiliating and distressing.

In his capacity as Chairman of the EC, Slade signed the engagement agreement hiring Guidepost to investigate how the Executive Committee handled sexual abuse.[69] Importantly, this "investigation" was not intended to assess the veracity of Lyell's allegations against the Sills.[70]

---

[69] Dkt. No. 373-1, Engagement Agreement; Ex. 43, Slade Dep., at 59:1-18.
[70] Dkt. No. 373-2, the Report, at 17.

Knowing that Lyell's claims against Sills had never been investigated, Slade and McLaurin nevertheless published the List labeling him a sexual abuser. Using their authority as EC Chairman and Interim President, they promoted this false narrative to thousands online without any factual basis or verification. Publicly accusing someone of sexual abuse with no evidence is reckless, indecent, and among the most damaging acts imaginable.

Defendants' claim that relying on counsel's redactions excuses their conduct grossly understates the seriousness of their actions. They cannot hide behind counsel's redactions—there was no investigation. Publicly and falsely accusing someone of sexual assault, knowing it would destroy his reputation and career, is plainly outrageous.

Allegations of sexual abuse by a professor of theology at a religious seminary are outrageous.[71] Defendants downplay their misconduct. Slade and McLaurin cannot escape liability by citing counsel's redactions, which lacked any investigation. Falsely accusing a seminary professor of sexual assault, knowing it would ruin his reputation, is inherently outrageous and caused severe emotional harm—a question for the jury.

### 2. There is Sufficient Evidence for the Jury to Find that Plaintiffs Suffered Severe Injuries

Tennessee law recognizes that psychological symptoms such as sleeplessness, depression, and anxiety constitute evidence of "severe mental injury" for purposes of intentional or negligent infliction of emotional distress. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 210–11 (Tenn. 2012). In *Rogers*, the Tennessee Supreme Court outlined six factors for severe emotional injury, including physical or psychological symptoms, medical treatment, duration and intensity of

---

[71] *See Hatfill v. New York Times Co.*, 416 F.3d 320, 336 (4th Cir. 2005) (a newspaper's publication of the name of a research scientist as a suspect in sending anthrax-laced letters without any regard for the truth of the accusation, the conduct was "outrageous" such that it could support a claim for intentional infliction of emotional distress under Virginia law.).

17

distress, impaired functioning, and the outrageousness of the defendant's conduct. Such evidence may come from the plaintiff, lay witnesses, or medical experts. *Id.*

Plaintiffs have presented evidence demonstrating that Sills has suffered nightmares, insomnia, depression, and significant harm to his career and marriage, effects that extend well beyond mere annoyance or inconvenience.[72] Mary Sills also suffers from depression, grief, and insomnia and currently sees a counselor who has diagnosed her with anxiety as a result of the false public allegation that her husband is an abuser.[73] A reasonable jury could find Slade and McLaurin's conduct outrageous and that Plaintiffs suffered serious harm; these issues are for the jury, not summary judgment.

### E.     Sills Has Stated an Actionable Civil Conspiracy Claim

A civil conspiracy is "a combination of two or more persons who, each having the intent to accomplish an unlawful purpose or a lawful purpose by unlawful means, do an overt act in furtherance of the conspiracy, resulting in damage to the plaintiff." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002). "The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy." *Danny L. Davis Contractors, Inc. v. Hobbs*, 157 S.W.3d 414, 419 (Tenn. Ct. App. 2004) (citing *Dale v. Thomas H. Temple Co.*, 186 Tenn. 69, 208 S.W.2d 344 (1948). As the Tennessee Supreme Court has recognized, "civil conspiracies are rarely proven directly. They are more often established using circumstantial evidence and inferences drawn from the evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances. Thus, fact-finders may consider the nature of the acts themselves, the relationship of the parties, the interests of the conspirators, and other circumstances." *First Cmty. Bank, N.A.*

---

[72] Ex. 40, Sills Dep., at 125:21-126:11; 201:21-202:11; 204:6-12.
[73] Ex. 36, M. Sills Dep., at 85:3-86:3; 88:2-7; 90:1-14; Ex. 128, Sills_110911.

18

*v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 396 (Tenn. 2015) (quoting *Stanfill v. Hardney*, No. W2006-00217-COA-R3-CV, 2007 Tenn. App. LEXIS 620, at *1 (Tenn. Ct. App. Sept. 27, 2007)).

### 1. Plaintiffs Have More Than Sufficient Evidence of Underlying Intentional Torts

A claim for civil conspiracy "requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007). But it is *not* necessary to demonstrate each element against each member of the conspiracy – it is enough to show that there was a common purpose, and *collectively* the members of the conspiracy engaged in the requisite elements.[74]

Slade and McLaurin's argument that they are entitled to judgment as a matter of law on the Plaintiffs' civil conspiracy claim hinges on their assertion that no reasonable finder of fact could determine that either of them had an agreement with another party and specific intent to defame Sills. Dkt. No. 365, at 17-18. That is, they claim that the defamation claim fails and, therefore, a civil conspiracy claim based on defamation as the underlying tort must also fail. This argument fails. In addition to defamation, Plaintiffs have also asserted an IIED claim. For the reasons stated in Sections III(B) and Section III(D), *supra*, the evidence is sufficient to establish the elements of those torts *individually* as to Defendants Slade and McLaurin and is much more than is needed to support a conspiracy claim.

---

[74] A civil conspiracy claim is not defeated simply because one underlying tort claim fails as to a particular defendant. Under Tennessee law, civil conspiracy imposes joint and several liability for all acts committed by any conspirator in furtherance of the unlawful scheme. *Brown v. Birman Managed Care, Inc.*, No. M1999-02551-COA-R3-CV, 2000 Tenn. App. LEXIS 66, at *7–9 (Tenn. Ct. App. Feb. 1, 2000) (quoting 16 Am. Jur. 2d Conspiracy § 58). Accordingly, even if the Court were to conclude that Slade and McLaurin themselves were not liable for defamation, they may still be held liable for civil conspiracy if they agreed with another Defendant to disseminate the defamatory allegations and any co-conspirator committed defamation, intentional infliction of emotional distress, or another tortious act in furtherance of that agreement.

19

## 2. There is Ample Evidence that Slade and McLaurin Entered Into a Combination With the Other Conspirators

Slade and McLaurin argue that there is no evidence that they had an agreement with another Defendant to defame Sills. Br. at 18. But there is ample evidence to support a finding that Slade and McLaurin participated in the agreement with Lyell, Seminary, Mohler, the Executive Committee, the SBC, Litton and Barber (we refer to these defendants, with Slade and McLaurin, as the "Conspiracy Defendants") to defame Plaintiffs in order to salvage the reputation of the SBC and its affiliates, and that of its leaders. Specifically, they agreed to bolster, endorse and amplify Lyell's uninvestigated and uncorroborated allegations of sexual abuse against Sills in order to create public support for Defendants in rehabilitating their damaged public image.[75] SBC leadership sought to restore credibility by embracing a survivor-advocacy narrative.[76] Lyell's disputed allegations offered a convenient opportunity to save face. Defendants, including Slade and Litton, conspired to spread the destructive lie that Lyell's account of abuse had been "investigated and unequivocally corroborated."[77]

Lyell's motive was both personal and financial: revenge against Sills and public vindication through SBC endorsement.[78]

## 3. The SBC Bought Lyell's Cooperation in its Project to Rehabilitate its Image

In March 2019, the Seminary, through President Mohler, agreed to pay Lyell's attorney fees in the event Sills filed suit against Lyell.[79] On October 15, 2019, the same day the Baptist Press issued its first public "apology" to Lyell, Lyell and Seminary entered into a confidential

---

[75] Ex. 66, GPSILLS_002938.
[76] Ex. 63, EC_0012032.
[77] Ex. 44, Slade Dep. Ex. 3.
[78] Exhibit 105, Lyell_00356812; Exhibit 53, Lyell_00345167.
[79] Ex. 26, Lyell Dep., Day 1, at 77:6-78:20; Ex. 79, GPSILLS_017909; Ex. 96, LYELL_00128024.

20

agreement for Seminary to pay Lyell $100,000.00 to "reimburse" her for "medical and treatment expenses she claimed she incurred as a result of the conduct of … Sills."[80]

In May 2020, after falsely claiming defamation, Lyell and her counsel Rachael Denhollander ("Denhollander") negotiated directly with EC officers the terms of a "Settlement Agreement and Release," which purports to be between Lyell and the EC. That agreement required the EC to pay Lyell ████████████ exchange for her to release any claims Lyell might have against the EC ████████████████████████████.[81]

In February 2022, Lyell, SBC and the EC, with active participation by its Chairman Slade and President McLaurin, entered into another so-called "settlement," memorialized in a "Settlement Agreement."[82] The agreement was confidential, and provides for payment to Lyell of ████████████ and required the SBC to publicly apologize, and cause Slade, through the Baptist Press, to issue a second public apology, to Lyell.[83] This February 2022 agreement and public apology, entered into just months before the Report and the List came out, released the SBC and EC from "Contemplated Litigation,"[84] but Lyell had already released all of these claims in May

---

[80] Ex. 108, LYELL_00178061; Exhibit 112, SBTS000634 at SBTS000678. In her demand to Seminary, Lyell noted that she "was sensitive to the media escalation that would inevitably come" with her initiating suit against Seminary. *Id.* at SBTS000673. Just days before, on October 8, 2019, Mohler prepared a statement for Religious News Service stating that "The original description in Baptist Press was not accurate . . . Later, I supported Jennifer in making her statement requiring a correction by Baptist Press." *Id.* at SBTS000666.

[81] Exhibit 62, EC_0003129. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████ Obviously, the SBC is an affiliate, parent, or someone who might be derivatively liable through the EC.

[82] Ex. 61, EC_0012449.

[83] *Id.*; Ex. 44, Slade Dep., Ex. 3, Feb. 2022 Apology.

[84] Ex. 61, EC_0012449.

2020.[85] Each agreement with Lyell was reached without a lawsuit, discovery, sworn statements, or any investigation, and the EC never sought Sills's response to her allegations.

### 4. The Purported Investigation Was Carefully Coordinated With Lyell Behind the Scenes

The most prominent and powerful advisor to the Task Force was Denhollander, a nationally known advocate for sexual abuse victims and Lyell's personal attorney, who was retained as an advisor to the Task Force.[86] She represented Lyell in the settlement adverse to the SBC in May 2020, that recovered a significant sum of money for her client despite never filing suit.[87]

In July 2021, Seminary officials privately admitted Denhollander's bias (as to report) but stayed silent.[88]

Lyell was not merely a witness in the investigation and Report. She was a collaborator. On February 2, 2022, Mohler wrote to Lyell to tell her he had spoken to someone that day who gave him "further assurance" that the task force report will bring clarity and truth to her allegations against Sills.[89] The Guidepost "investigation" was in its very early stages at that time. Indeed, by March 2022, Lyell



.[90]

_____

[85] ███████████████████████████████████████████████████. Ex. 107, Lyell_00006303.
[86] Litton names task force to oversee third-party review of SBC Executive Committee, Baptist Press (July 9, 2021), *available at* https://www.baptistpress.com/resource-library/news/litton-names-task-force-to-oversee-third-party-review-of-sbc-executive-committee/#:~:text=Additionally%2C%20Litton%20announced%20two%20advisors,former%20SBC%20President%20J.D.%20Greear.
[87] Ex. 89, LYELL_00012354.
[88] Ex. 120, SBTS005904-5 ("How can [Denhollander] credibly be a part of the group overseeing an investigation of which she is a subject and about which she already publicly expressed prejudicial views?").
[89] Ex. 4, Seminary (Austin) 30(b)(6) Dep. Ex. 21.
[90] Ex. 99, LYELL_00101993-94.

Denhollander, working with Lyell, was allowed to edit and otherwise comment on the Report prior to its publication.[91] Indeed, Guidepost coordinated with Lyell and Denhollander during the final edits, incorporating Lyell's input through Denhollander.[92] All the while, Lyell kept her part of the bargain by placing the blame for any misdeeds related to sexual abuse allegations on *past* members of the EC, exonerating and boosting the public profile and reputations of recent and current officers.[93]

### 5. The Defendants' Defamatory Statements Were Made Serially and in Close Coordination

Slade and McLaurin, as Chairman and Interim President of the EC, acted in concert with Seminary, Lyell, SBC, and EC to disseminate false and defamatory statements about Plaintiffs. The defamatory statements made by Slade and McLaurin and the other Defendants were admittedly made in close coordination.[94] These statements were plainly part of a coordinated effort and not merely the actions of unrelated actors acting in parallel:

- In March 2019, Mohler stating to Baptist Press, in a comment included in a Baptist Press article that he believed Lyell was acting "righteously" in presenting accusations of nonconsensual sexual behavior against Sills.
- On October 15, 2019, the Baptist Press issued an apology to Lyell for its earlier accounts of her allegations that suggested Lyell's relationship with Sills was consensual.[95] This happened in conjunction with the first of at least three settlements with Lyell. The apology suggested that the relationship was *not* consensual.
- On Feb. 22, 2022, in conjunction with the third settlement:
  - The EC, through Slade, apologized to Lyell.

---

[91] Ex. 57, Lyell_00193078; Ex. 53 and 54, Guidepost 30(b)(6) Dep. Exs. 26 and 30; Ex. 56, Guidepost 30(b)(6) Dep. Ex. 41, at GPSILLS_018922, GPSILLS_018941-942; Ex. 47, Guidepost 30(b)(6) Dep., at 98:13-21; Ex. 86, at GPSILLS_007952; Ex. 22, Leff Dep., at 220:11-15; 225:16-23;195:17-21; 224:17-23

[92] Ex. 47, Guidepost Dep. at 190:1-13; 195:23-196:9; Exhibit 57, Lyell_00193078.

[93] Ex. 93, LYELL_00051691; Ex. 95, Lyell_00021411, Ex. 94, LYELL_00033547-49; Ex. 100, LYELL_00345098-9.

[94] EC counsel coordinated Lyell, EC's and Seminary's statements in July 2022. Ex. 100, LYELL_00345098; Ex. 158, LYELL_00345100.

[95] Ex. 74, GPSILLS_002789.

- o Baptist Press apologized a second time.
- In May 2022, the Report was published. It repeatedly describes Lyell, without qualification, as a "survivor" of sexual abuse, and repeatedly describes Sills, without qualification, as a "her abuser." The Report goes much further than merely stating that there were "allegations" of sexual abuse – it plainly concludes that Sills *was* a "sexual abuser" and repeatedly refers to him as such without qualification.
- Contemporaneously with the publication of the Report in May 2022,
  - o Baptist Press published the "findings" of the Report.[96]
  - o Defendant Mohler expressly stated that "[w[hat happened to Jennifer [Lyell] was sexual abuse, unquestionably" and he endorsed the Report.[97]
  - o On May 26, 2022, Slade and McLaurin, in conjunction with the SBC released a list of purported sex abusers, publicly grouping Sills with a variety of miscreants.[98]
- In June 2022, Lyell issued a public statement in which she praised and acknowledged the Report and the SBC-related Defendants.[99]
- On July 7-8, several Defendants made public statements, at or around the time that Lyell threatened suicide unless leaders *again* publicly reaffirmed her.[100]
  - o On July 7, 2022, Defendant Barber published a sequence of statements on Twitter praising the Report and its findings, as well as the accuracy of Lyell's accusations.
  - o On July 8, 2022, Defendant Mohler further endorsed the Report's findings, stating Lyell's allegations were "confirmed."
  - o On or before July 14, 2022, former defendant Geiger published one or more tweets asserting that he, Mohler, and other members of Mohler's team understood Lyell's allegations against Sills to constitute sexual abuse, that Mary Sills knew of that abuse, and that an investigation had found Lyell's account to be credible.[101] Defendant Barber retweeted Geiger's tweet.

Accordingly, the SBC and affiliated persons, including Slade and McLaurin, issued a series of apologies and statements, along with the publication of the Report, the List, and a series of public statements by the Defendants, many drafted together with Lyell, that labeled Sills a sexual

---

[96] Timothy Cockes, Guidepost investigation prompts recommendations for reform, Baptist Press (May 23, 2022), *available at* https://www.baptistpress.com/resource-library/news/guidepost-investigation-prompts-recommendations-for-reform/
[97] Ex. 113, SBTS000612 at SBTS000629.
[98] Ex. 45, Slade Dep. Ex. 10, May 2022 Statement; *see also* Ex. 46, Slade Dep. Ex. 11, the List.
[99] Ex. 81, GPSILLS_008715.
[100] Ex. 21, LYELL_00348701.
[101] Ex. 9, Barber Dep. Ex. 13.

24

abuser and claimed that conclusion was reached through "investigation and unequivocal corroboration." Each defendant knew that to be a lie, yet relied on the statement published with full power and influence of the SBC, EC, and its officers behind it.[102] Despite knowing there had never been an investigation nor corroboration of Lyell's claims, the EC, SBC, Slade, and McLaurin published press releases and created a web page labeling Sills a sexual abuser and causing him to be included with convicted and admitted abusers on a notorious and widely published "list."[103]

### F. Mary Sills's Claims Are Legally Viable

Slade and McLaurin contend that Mary Sills has no claim, but she does. Tennessee law permits a spouse to recover for emotional injuries arising from the defamation of the other spouse. *See* Tenn. Code Ann. § 25-1-106; *Spicer v. Thompson*, 2004 WL 1533828 (Tenn. Ct. App. July 7, 2004); *Dunn v. Alabama Oil & Gas Co.*, 299 S.W.2d 25 (Tenn. Ct. App. 1956). Mary suffered significant mental anguish from the public defamation of her husband, and Defendants offer no evidence to the contrary.

## IV. CONCLUSION

For these reasons, and those stated in Plaintiffs' Response to Defendants' Statement of Undisputed Facts, the Court should deny Slade and McLaurin's Motion for Summary Judgment.

Dated: November 3, 2025.                     Respectfully submitted,

                                             */s/ Katherine B. Riley*
                                             Katherine Barrett Riley (TN BPR#021155)
                                             John W. ("Don") Barrett (admitted *pro hac vice*)
                                             Sterling Aldridge (admitted *pro hac vice*)
                                             BARRETT LAW GROUP, P.A.
                                             P.O. Box 927
                                             404 Court Square North

---

[102] Ex. 33, Mohler Dep., at 74:3-12; Ex. 2, Seminary (Austin) 30(b)(6) Dep., at 44:11-19; Ex. 23, Litton Dep., at 39:16-25; Ex. 10, Cook Dep., at 29:5-9, 31:7-14, 34:2-3; Ex. 6, Barber Dep., at 27:15-23, 156:11-17; Ex. 43, Slade Dep., at 34:22-25; Ex. 47, Guidepost 30(b)(6) Dep., at 121:16-25.
[103] Ex. 45, Slade Dep. Ex. 10, May 2022 Statement; *see also* Ex. 46, Slade Dep. Ex. 11, the List.

25

Lexington, MS 39095
Ph: (662) 834-2488
Fax: (662) 834-2628
kbriley@barrettlawgroup.com
dbarrett@barrettlawgroup.com
saldridge@barrettlawgroup.com

*/s/ Shannon M. McNulty*
Shannon M. McNulty (admitted *pro hac vice*)
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, 36th Floor
Chicago, Illinois 60602
(312) 899-9090
(312) 251-1160 Facsimile
SMM@cliffordlaw.com

**Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I, Katherine Barrett Riley, hereby certify that on November 3, 2025, I served the above and

foregoing on all counsel of record via the Court's CM/ECF filing system.

*/s/ Katherine Barrett Riley*
Katherine Barrett Riley