## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

MICHAEL DAVID SILLS
and MARY SILLS,

*Plaintiffs,*

v.

SOUTHERN BAPTIST CONVENTION, et al.,

*Defendants.*

Case No. 3:23-cv-00478

Chief Judge Campbell
Magistrate Judge Frensley

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT SOUTHERN BAPTIST CONVENTION'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Michael David Sills ("Sills") and Mary Sills (collectively "Plaintiffs") respectfully submit this memorandum in opposition to Defendant Southern Baptist Convention's ("SBC") Motion for Summary Judgment (the "Motion"). Dkt. No. 377. For the reasons stated below, the motion should be denied in its entirety.

## I.   INTRODUCTION

SBC seeks dismissal of Plaintiffs' claims for defamation, negligence, intentional infliction of emotional distress ("IIED"), and civil conspiracy. But the record is full of genuine issues of material fact that preclude summary judgment. SBC, by and through its agents and various entities, published multiple defamatory statements to thousands of followers, falsely asserting that Sills's alleged misconduct had been "investigated and corroborated" when, in fact, no such investigation ever occurred. Further, SBC's conduct, both in endorsing and amplifying the false narrative, supports claims of negligence and IIED. The evidence also supports an inference that SBC entered a conspiracy with other Defendants to advance a coordinated effort to legitimize these false claims and shield themselves from public criticism.

1

## II.   FACTUAL BACKGROUND

This case arises from a coordinated campaign of defamation carried out by SBC and other Defendants, which included the publication of the report (the "Report") prepared by Defendant Guidepost Solutions, LLC ("Guidepost"), the release of a "List of Abusers," and a series of false and defamatory public statements made by Defendant Bart Barber ("Barber"), Defendant Dr. Ed Litton ("Litton") and others after the Report was published.

The record contains no factual evidence beyond Jennifer Lyell's ("Lyell") own allegations to suggest that any sexual abuse ever occurred. Sills has always acknowledged that he engaged in a consensual sexual relationship with Lyell beginning when Lyell was no longer a graduate student at the Southern Baptist Theological Seminary ("Seminary"),[1] but Sills has consistently and adamantly denied (and is entitled to inferences, as the nonmovant) that the relationship was ever nonconsensual.[2] And there is no evidence[3] to suggest their sexual relationship began while Lyell was a graduate student.[4]

Before becoming President of SBC, Barber served as a Messenger at the SBC and voted in favor of hiring Guidepost to conduct an investigation into the alleged mishandling of sexual abuse allegations by members of the SBC's Executive Committee ("EC").[5] Importantly, the scope of that investigation did not include examining or verifying the truth of Lyell's personal allegations against Sills, which Barber knew.[6] Once Barber assumed the role of SBC President, he used his

---

[1] *See* Ex. 40, Sills Dep., at 24; 29:9-22.
[2] *Id.* at 69.
[3] Lyell confirmed the first instance of oral sex occurred in September or October of 2006 (Ex. 103, Lyell Rogg. Responses, at 6-7) and at this time, she was an Acquisitions Editor at Moody Publishing (Ex. 90, Lyell Resume, at LYELL_00123414).
[4] *Id.* at 22.
[5] Ex. 6, Barber Dep., at 43; 27.
[6] As directed by the Messengers' Motion, Guidepost was charged with investigating:

2

influence and public platform to promote a false and damaging narrative in order to promote and protect himself, other SBC leaders, and the public image of the SBC. In July of 2022, Barber published tweets to his thousands of followers asserting that the Lyell's allegations had been "investigated and corroborated" by Guidepost and others close to the situation.[7] No such investigation ever occurred, and Lyell's claims were never corroborated.

Barber worked in conjunction with other Defendants to spread the defamatory narrative against Plaintiffs. Former Vice President of Lifeway, Eric Geiger ("Geiger"), tweeted that he, Albert Mohler[8] ("Mohler"), and others on Mohler's team understood Lyell's claims to constitute sexual abuse and that an investigation had found her account credible.[9] Geiger further claimed to have reviewed correspondence between Mary Sills and Lyell confirming Lyell's story.[10] These assertions were entirely false, as no such correspondence existed, nor did any investigation ever take place.[11] Despite the falsity of these statements, Lyell publicly responded to Geiger's tweet, amplifying the post to her followers.[12] Barber then retweeted Lyell's post, disseminating the false narrative to thousands more and lending it additional credibility.[13]

During this time, the SBC was facing overwhelming public scrutiny for its handling of

---

"Allegations of abuse by EC members; Mishandling of abuse allegations by EC members between January 1, 2000, to June 14, 2021; Allegations of mistreatment of sexual abuse victims by EC members from January 1, 2000, to June 14, 2021; Patterns of intimidation of sexual abuse victims or advocates from January 1, 2000, to June 14, 2021; and Resistance to sexual abuse reform initiatives from January 1, 2000, to June 14, 2021."

See Dkt. No. 373-3, at GPSILLS_005576. Notably, Sills did not fit into any of those categories.
[7] Ex.7, Barber Dep. Ex. 10.
[8] Mohler is the president, chief executive officer, and chief academic officer of the Southern Baptist Theological Seminary. Ex. 33, Mohler Dep., at 19:17-20.
[9] Ex. 9, Barber Dep. Ex. 13.
[10] Id.
[11] Ex. 6, Barber Dep., at 156:17; Ex.33, Mohler Dep., at 74:3-12.
[12] Ex. 9, Barber Dep. Ex. 13.
[13] Id.

sexual abuse allegations.[14] Rather than risk further backlash for "questioning a survivor," Barber and Litton and the other Defendants chose to sacrifice Sills to protect their own images and the image of the EC and SBC. They publicly labeled Sills a sexual abuser based solely on a belief[15] that Lyell was telling the truth, without any independent investigation into the allegations or any corroborating evidence.[16]

## III.   ARGUMENT

### A.   SBC's Motion Should Be Summarily Denied for Failure to Follow the Court's Rules

SBC attempts to adopt and incorporate by reference 1) the facts and evidence collected by the EC in relation to the March 2019 publication by the Baptist Press concerning the Lyell Allegations and corrections in the separately filed EC Motion for Summary Judgment; 2) facts, discussion and evidence regarding the authoring of the Guidepost Report in the separately filed Guidepost Motion for Summary Judgment and 3) the entirety of both Barber and Litton's motions for summary judgment each separately filed.[17] SBC relies on Fed. R. Civ. P. 10(c) as authority for this adoption, but that rule only permits adoption by reference of statements made in *pleadings*.[18] Neither statements of fact nor motions are defined as pleadings pursuant to Fed. R. Civ. P. 7(a).[19] Accordingly, "the narrowly tailored provisions of Rule 10(c) that allow adoption by reference of

---

[14] Ex. 64, EC_0001602.

[15] Ex. 47, Guidepost 30(b)(6) Dep., at 117:1-7, 119:2-120:3.

[16] Ex. 33, Mohler Dep. 74:3-12; Ex. 2, Seminary (Austin) 30(b)(6) Dep., at 44:11-19; Ex. 23, Litton Dep., at 39:16-25; Ex. 10, Cook Dep., at 29:5-9, 31:7-14, 34:2-3; Ex. 6, Barber Dep., at 27:15-23, 156:11-17; Ex. 43, Slade Dep., at 34:22-25; Ex. 47, Guidepost 30(b)(6) Dep., at 121:16-25.

[17] Br. at 7, 8, 18.

[18] Fed. R. Civ. P. 10(c) provides that "[a] statement in a pleading may be adopted by reference in the same pleading or in any other pleading or motion."

[19] *See* Fed. R. Civ. P. 7(a) (defining pleadings as (1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer).

4

a pleading's specific allegations do not allow for a general adoption of another party's arguments made in support of a motion."[20]  At a minimum, because SBC's adoption of Barber's and Litton's previous motions for summary judgment and EC's and Guidepost's, facts, discussion and evidence, these materials should not be considered by the Court in deciding its Motion.

### B.    Sills' Claims Are Not Time Barred by Any Statue of Limitations

Tennessee procedural law imposes a one-year statute of limitations on negligence, defamation, civil conspiracy and intentional infliction of emotional distress.  SBC, via the Executive Committee, issued actionable statements and/or acted with neglectful conduct during the relevant period of time. Plaintiffs have timely pled a cause of action against all Defendants, including Executive Committee. Having originally filed suit on November 21, 2022, the claims encompass statements made and/or conduct occurring for one year prior to November 21, 2022 (i.e., November 21, 2021).

Defendants contend, only through footnote, that the statements and/or conduct at issue may only reach back to May 11, 2022, suggesting the savings statute does not apply because the first complaint was filed in Alabama as opposed to Tennessee. The Tennessee Supreme Court has opined that "Tennessee law strongly favors resolution of all disputes on their merits, and saving statute is to be given broad and liberal construction in order to achieve this goal." *Henley v. Cobb*, 916 S.W.2d 915 (Tenn. 1996). The Court clarified, "notice to party affected is true test of saving statute's applicability." *Id.* In *Henley*, the Tennessee Supreme Court did not bar application of the

---

[20] *Southall v. USF Holland, Inc.*, No. 3:19-cv-01033, 2023 U.S. Dist. LEXIS 52141, *13 (M.D. Tenn. Mar. 28, 2023) (citing *Marco Int'l, LLC v. Como-Coffee, LLC*, No. 17-CV-10502, 2018 U.S. Dist. LEXIS 63249, (E.D. Mich. Apr. 16, 2018)); *Green v. Campbell Cnty.*, 352 F. Supp. 3d 860, 867 (E.D. Tenn. 2018) ("The Federal Rules of Civil Procedure only authorize adoption by reference of statements in pleadings, not statements in motions.").

saving statute where both defendant and defendant's insurer had actual notice of claim from a prior filing. *Id.*

The law permits application of Tenn. Code Ann. § 28–1–105, the current saving statute, such that the filing date of November 21, 2022, applies. Plaintiffs conform with the Supreme Court's rationale explained in *Henley*. Plaintiffs' complaint was initially filed on November 21, 2022 in Alabama, where former SBC president, Defendant Ed Litton (who was at the helm of the SBC during the relevant time), is a resident.[21] All of the defendants in the case at bar were also sued in the Alabama complaint, and all of them were served no later than November 30, 2022.[22] In other words, as of November 30, 2022, every defendant in this case was on notice of the litigation and their role.

Even if the Court were to base the claims on statements and conduct triggered by the May 11, 2023 filing date, ample evidence exists to reflect Defendants' misconduct. In particular, as set forth more fully below, the May 26, 2022 Press Release and List created by the SBC's Executive Committee was especially damning.[23] *See* Dkt. No. 1, para. 63.

### C. Plaintiffs Have Stated an Actionable Defamation Claim

The elements of defamation are that (1) a party published a statement, and did so (2) with knowledge that the statement was false and defaming to the other, *or* (3) with reckless disregard for the truth of the statement or negligence in failing to ascertain the truth of the statement. *Sullivan v. Baptist Mem. Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999).

#### 1. SBC Published Defamatory Statements

To satisfy the publication element for a libel claim under Tennessee law, a plaintiff must

---

[21] Ex. 41, Sills Dep. Ex. 3, AL Compl.
[22] Ex. 42, AL Proofs of Service.
[23] Exs. 45 and 46, May 26, 2022 Press Release with accompanying List.

6

show that the defendant communicated a defamatory statement to a third person.[24] *Myers v. Pickering Firm*, 959 S.W.2d 152, 163 (Tenn. Ct. App. 1997) (citing *Little Stores v. Isenberg*, 26 Tenn. App. 357, 172 S.W.2d 13 (1943)). On July 7, 2022, Barber published a series of tweets on Twitter (now "X") regarding the legitimacy of Lyell's claims against Plaintiffs.



Ex.7, Barber Dep. Ex. 10; Ex. 8, Barber Dep. Ex. 11. Barber admits he was referring to Sills in his tweets and that he assumed that his readers knew he was referring to Sills.[25]

At the time that these tweets were published, Barber was President of the SBC and had approximately 20,000 followers[26] on Twitter.[27] Barber's posts on Twitter to his thousands of followers constitutes a communication to a third party and satisfies the publication element.

---

[24] Barber does not appear to contend that his statements were not defamatory.
[25] *Id.* at 151.
[26] Notably, Barber currently has approximately 34,000 followers on X (formerly "Twitter"). Each of the tweets depicted above are still posted on X for Barber's followers to see.
[27] Ex. 6, Barber Dep., at 11:12-14; 139:16-17.

7

Additionally, SBC via its Executive Committee authored and published Press Releases about the Report and published a List of Abusers ("the List") which portrayed David Sills as a criminal, namely, a sex abuser who had a guilty plea, conviction, judgment, sentence, and/or inclusion on a sex offender registry, which had been "easily verified." [28] The Press Release and List are still on the SBC's website.[29]

Executive Committee and SBC also made copies available at the Annual Meeting in Anaheim on June 14-15, 2022, and the related "List"—a rogue's gallery featuring Sills among sex offenders—was published following demand triggered by the Report, a consequence the Executive Committee leadership, itself, acknowledged.[30]

### 2. SBC Acted Negligently and Recklessly

To determine whether a defendant was negligent in publishing a defamatory statement, "the appropriate question . . . is whether the defendant exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it." *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 418 (Tenn. 1978). Actual malice[31] requires a showing that the defendant acted with knowledge that the statement was false or with reckless disregard for the truth of the statement. *Id*. To prove actual malice, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication, and that publishing, with such doubt, shows reckless disregard for truth or falsity and demonstrates actual malice. *Pate*, 959 S.W. 2d at 577-78 (citing *Moore v. Bailey*, 628

---

[28] Exs. 45 and 46, May 26, 2022 Press Release with accompanying List.
[29] https://www.sbc.net/on-the-release-of-a-list-of-alleged-abusers/ last accessed on Nov. 3, 2025.
[30] Ex.12, SBC 30(b)(6) (Finn), 136:9-11.
[31] If the plaintiff is a public figure, the plaintiff is required to show by clear and convincing evidence that the defamatory statement was made with "'actual malice' - that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005), quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

S.W.2d 431, 433-4 (Tenn. App. 1981)). Every person who chooses to speak has an independent duty under the law of libel and slander not to negligently or recklessly defame the subject of their statements, even when republishing content generated by others.[32]

Here, Plaintiffs have presented evidence from which a reasonable jury could find negligence or actual malice.

### a. SBC Did Not Perform Any Investigation

Barber made no effort to verify the accuracy of his claims, never reviewed any corroborating evidence, was unaware of any specific details concerning Lyell's allegations, never contacted Mary or David Sills, and had no knowledge of Sills admitting to sexual abuse.[33] Barber asserts that his tweets about the Report were made "based upon his understanding and belief, based upon his reading of the Report, that Lyell's claims pertaining to Sills had been investigated and corroborated."[34] But his tweets contain no disclaimer communicating that to his audience. Instead, they simply state that Lyell's allegations were investigated and corroborated by Guidepost and others close to the situation.[35] In one post, Barber even defends Guidepost's credibility and argues that they are experts in the field. *Id.* A reader would interpret Barber's tweets as an affirmative representation by the sitting president of the SBC that Lyell's claims had, in fact, been investigated

---

[32] Restatement (Second) of Torts § 578 (1977) ("[O]ne who repeats or otherwise republishes defamatory material is subject to liability as if he had originally published it."); 1 Robert D. Sack, Sack on Defamation § 2.7.1 (3d ed. 2009) ("The common law of libel has long held that one who republishes a defamatory statement adopts it as his own and is liable [for false, defamatory statements] in equal measure to the original defamer.'" (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1298 (D.C.Cir.1988))

[33] Ex. 6, Barber Dep., at 27, 30-31, 83, 134, 147-149, 183, 196. *See also* Ex. 103, Lyell Rogg. Responses, at 6-7.

[34] Dkt. No. 383.

[35] Ex. 7, Barber Dep. Ex. 10.

and corroborated. Barber admits that if Guidepost's "interrogatory answers are accurate [that Guidepost did not investigate Lyell's claims]," then his tweet about Sills is inaccurate.[36]

The Geiger tweet that Barber retweeted contained similar allegations, along with claims that Geiger had seen correspondence between Lyell and Mary Sills that corroborated Lyell's story.[37] Unsurprisingly, Barber never talked to Mohler, did not seek out any information about these claims, or review any of the alleged correspondence between Mary Sills and Lyell before retweeting Geiger's to his thousands of followers.[38] Barber testified that even if he knew that Mohler did not investigate, he still would have been comfortable making the tweets.[39] Barber justifies this by stating that any relationship between Lyell and Sills constituted "sexual abuse" because Sills held a position of trust,[40] But, for the reasons stated in detail in the Section III(C)(2)(b), *infra*, there was no possible abuse of trust.

Any reasonable individual in Barber's position would understand both the seriousness of a sexual abuse accusation and the influence their words carry. Barber himself admitted that he was fully aware of that influence while serving as SBC President.[41]

SBC and Executive Committee's recklessness aimed at David Sills was similarly showcased on May 26, 2022, when Executive Committee, through their leaders, Willie McLaurin and Roland Slade, released the List of Abusers with redactions applied with a specific methodology. McLaurin and Slade wrote:

---

[36] Ex. 6, Barber Dep., at 157.

[37] Ex. 9, Barber Dep. Ex. 13.

[38] Ex. 6, Barber Dep., at 182.

[39] *Id.* at 169.

[40] *Id.*, at 70-71. The "position of trust" Barber referred to was Sills being a professor and Lyell being a graduate student. However, there is no evidence that the sexual relationship began until after Lyell was no longer a graduate student at Seminary. Ex. 40, Sills Dep., at 22:4-5 ("I'm not sure anything of a sexual nature occurred while she was a student.").

[41] Ex. 6, Barber Dep., at 89.

10

In making redaction decisions, counsel to the Executive Committee included, in their entirety, entries that reference an admission, confession, guilty plea, conviction, judgment, sentencing, or inclusion on a sex offender registry. The only exception to those entries is the redaction of names or identifying information of survivors and/or other individuals unrelated to the offender. Many of the entries list either an arrest or charges, but no disposition. **Since May 24, 2022, counsel to the Executive Committee has done preliminary research and, where guilty pleas, convictions, judgments, sentences, and/or inclusion on a sex offender registry could be easily verified, the entry was left unredacted.** Other entries where preliminary research did not indicate a disposition that fits within the described parameters have been redacted. Entries that do not relate to sexual abuse or that resulted in an acquittal are also redacted. (emphasis supplied).

SBC's Executive Committee stated in its Press Release that between May 24, 2022 and May 26, 2022, it had conducted research to determine which entries on their list were entitled to redactions. The Executive Committee decided that when a guilty plea (not David Sills), conviction (not David Sills); judgment (not David Sills); sentence (not David Sills) and/or inclusion on a sex offender registry (not David Sills) could be "easily verified" the entry was left unredacted. David Sills fit none of the qualifying criteria. Yet, SBC's Executive Committee left his already improper placement on the List unredacted, implying that they had "easily verified" he had pled guilty, been convicted, subjected to judgment, sentenced, or otherwise on a sex offender registry. Not one scintilla of evidence demonstrates any basis for the placement of David Sills on the List.

Elizabeth Dixon, a former assistant to Augie Boto, compiled the List.[42] In her work for Executive Committee, she took direction form Mr. Boto, and she would coordinate with staff at Executive Committee and staff at Executive Committee would send her information and materials that she would use in her assignments.[43] Augie Boto asked Ms. Dixon to compile a List as of 2006, however, Dixon would update the List.[44] Ms. Dixon did not maintain a file, rather, she kept the

---

[42] Ex. 11, Dixon dep., at 86:1-3.
[43] *Id.* at 19:1-19
[44] *Id.* at 50:11

materials that formed the basis for the Executive Committee's List in a rubber tote, since 2006.[45]

Ms. Dixon testified that to acquire information for David Sills she did one thing: "I Googled."[46]

Ms. Dixon testified under oath as to all that Executive Committee did _not_ do relative to David

Sills' appearance on the List:

> 10     Q.  Did you -- with respect to David Sills,
> 11  did you ever see or hear of an admission that he
> 12  made?
> 13     A.  No.
> 14     Q.  With respect to David Sills, did you ever
> 15  see or hear of a confession that he made?
> 16     A.  No.
> 17     Q.  With respect to David Sills, did you ever
> 18  see or hear of a guilty plea concerning David Sills?
> 19     A.  No.
> 20     Q.  With respect to David Sills, did you ever
> 21  see or hear about a conviction for any sexual
> 22  misconduct or abuse?
> 23     A.  No.
> 24     Q.  With respect to David Sills, did you ever
> 25  see or hear of a judgment concerning sexual abuse or
> 1  sexual misconduct by David Sills?
> 2     A.  No.
> 3     Q.  With respect to David Sills, did you ever
> 4  see or hear of him being included on a sex offender
> 5  registry?
> 6     A.  No.
> 7     Q.  Did you research or attempt to locate any
> 8  of those things?
> 9     A.  No.
> 10     Q.  Was there a reason that you didn't attempt
> 11  to locate those things?
> 12     A.  I only got articles and recorded them.[47]

Of course, when names were redacted it was effective; not even Ms. Dixon (who had

originally compiled the names) knew to whom a redacted entry referred.[48] Despite qualifying for

---

[45] *Id.* at 39:12-21. 38:16-39:7
[46] *Id.* at 60:23.
[47] *Id.* at 53:10-54:12
[48] *Id.* at 67:16-68:5

redaction under the criteria established by Executive Committee, in late May 2022 when the List was publicized, Executive Committee's entry for David Sills was not redacted, the implication being that the trusted Executive Committee investigators had "easily verified" a guilty plea, conviction, judgment, sentence, and/or inclusion on a sex offender registry. None of that was true with respect to David Sills, and Executive Committee knew that.[49] Ms. Dixon testified that she had no basis to say David Sills was a sex abuser.[50]

In relation to the reckless and harmful inclusion of Sills on the List, unredacted no less, Slade testified that if a person's name was included on the List without redaction, a reasonable person, after reading the Executive Committee's May 26, 2022 Press Release, would assume a person had committed sexual abuse.[51] Furthermore, Slade testified that he could not identify any act committed by Sills that qualified Sills for inclusion on the List, and testified that, accordingly, Sills should not be on the List.[52]

Former Interim President Willie McLaurin similarly testified that McLaurin and Slade made redaction decisions, with counsel (another friend of Jennifer Lyell, Gene Besen) who purportedly assisted with the parameters, and then Executive Committee published the List with the Press Release on May 26, 2022.[53] Willie McLaurin testified that he literally had <u>no</u> <u>evidence</u> of the purported heinous acts Executive Committee alleged David Sills to have committed, yet there were no redactions to the preposterous entry made for Sills on the List.[54]

### b. There Were Many Reasons for SBC to Question Lyell's Account of Events

---

[49] Ex. 3, EC memorandum to insurance adjuster; Ex. 25, Laura Erlanson emails; Exhibit 11, Dixon Dep at. 53:10-54:12;
[50] *Id.* at 74:18-19.
[51] Ex. 43, Slade dep., at 90:2-11
[52] *Id.* at 95:20-96:15.
[53] Ex. 31, McLaurin dep., at 73:19-22.
[54] Ex. 31, McLaurin dep., at 71:4-16.

The consensual sexual relationship started in 2006 (Sills testified about Lyell's rejected advances prior to 2006), when Lyell was 28, and ended in approximately 2016,[55] when she was 38. Lyell did not report the alleged abuse to anyone until 2018. Lyell incongruously stated that she participated in a non-consensual relationship, involving physical violence and coercion (including coercion in the form of threats of violence),[56] over a period of 10 years, while at times driving hundreds of miles to see Sills and his family, and performing oral sex. ██████████████████ █████████████,[57] which should have prompted closer scrutiny of Lyell's credibility, as mental health is a proper consideration in evaluating witness credibility. [58]

To the extent SBC is contending that the relationship was inherently coercive due to a power imbalance, that notion is ridiculous. Sills testified[59], and Lyell did not dispute, that the sexual relationship started in 2006, after Lyell, then 28, was no longer a graduate student.[60] Lyell spent all, or nearly all, of the duration of the relationship working in publishing.[61] Sills was not Lyell's co-worker, much less her boss. Lyell was largely responsible for getting certain of Sills's

---

[55] Ex. 40, Sills Dep., at 24:8-14; 56:7-9; 57:15-21.

[56] According to the Report, Lyell "told Dr. Mohler and her boss at Lifeway that any sexual contact she had with Professor Sills had been nonconsensual and involved violence, threats of violence against her and others, and coercion." Report, at 81.

[57] Ex. 80, Lyell Demand Letter, at GPSILLS_000205 and GPSILLS_000211.

[58] Guidepost's expert, Douglas Leff, Esq., an experienced investigator and prosecutor, when asked why it was " important to know about, like, the victim's mental health," he responded that "in any case, a victim's credibility, a complainant's credibility is squarely an issue. So it's important for us to resolve whether there's something so paramount in there that either we just can't in good faith accept their allegations, or that we would – in the case that I was mostly working, this was in a law enforcement capacity, so whether it would be something so legally insufficient as a matter of law that we couldn't even, at this point, present it to the prosecutors to consider." Ex. 22, Leff Dep., at 31:23-32:11.

[59] Ex. 40, Sills Dep., at 23:1-5.

[60] Ex. 110, SBTS000495 at SBTS000528 (Seminary withdrawing Lyell from PhD program because she had "not registered for classes for some time."); *Id.* at SBTS000555 (anticipated graduation date of May 2005).

[61] Ex. 26, Lyell Dep., Day 1, at 31:1-12.

14

writings published, an unusual service to perform for one's sexual abuser.[62] By the time the relationship ended in 2016, Lyell, then 38 and Vice President of a SBC subsidiary, was described as "the highest-ranking woman at any of the SBC's major entities — a publishing editor and publisher who'd worked on a dozen bestsellers."[63] Following her unexpected passing, a peer journalist, Robert Downen of *Texas Monthly*, tweeted "[d]o not let all of the posts talking about how kind Jen Lyell was distract you from the fact that she was probably the smartest person in almost any room."[64]

### c. If SBC Had Investigated, It Would Have Discovered That Many Witnesses Had Doubts About Lyell's Allegations.

Many insiders within the SBC umbrella expressed serious concern about Sills being labeled a sexual abuser due to a lack of corroboration of Lyell's allegations.

Jamie Jordan, counsel for the EC, told Ed Upton, an Assistant to the SBC President, that (1) Lyell's story was not clear whether the alleged abuse was "child sexual abuse, abusing a relationship of trust, or some type of power differential abuse (such as professor/student)," (2) the possibility of "abuse" was questionable, as Lyell said "that the abuse continued for more than a decade, apparently part of which time she was in counseling,…continu[ing] [while] the victim ha[d] become a mature adult," and (3) "[i]f BP writes that Sills sexually abused Ms. Lyell, it has a made a statement which would be reasonably expected to gravely harm his reputation and his

---

[62] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 98, LYELL_00049087; Ex. 104, LYELL_00098548.

[63] Smietana, Bob, "At memorial, friends mourn loss of Jennifer Lyell, SBC whistleblower and publishing exec," *Religion News* (June 27, 2025), https://religionnews.com/2025/06/27/in-nashville-jen-lyells-friends-mourn-her-passing-at-memorial-service/.

[64] R. Downen Tweet (June 8, 2025), https://x.com/RobertDownen_/status/1931796464285401177.

ability to earn a living in his profession . . . and if BP cannot provide that proof, then it may be held legally liable."[65]

Others who expressed doubts include Laura Erlanson, an EC employee/journalist who told her superiors at Baptist Press that Sills should not be accused of sexual abuse if that allegation could not be confirmed or corroborated.[66] Erlanson viewed Lyell's story as "a long term affair between two adults" which should have been reported to police if true.[67] ███████████████

████████████████████████████████████████████████████████

███████████████████████████████"[68] Even the former SBC CEO Augie Boto questioned Lyell's allegations.[69] Barber and Litton, as SBC Presidents, had the ability to contact each of these SBC-affiliated employees, but chose not to before publishing the defamatory statements against Sills. Barber and Litton's decision to publish without consulting witnesses who directly contradicted Lyell's account constitutes clear evidence of reckless disregard for the truth.

### d.    SBC Refused to Retract Its Defamatory Statements

After the Report was released, Plaintiffs requested that each Defendant retract their defamatory statements.[70] "A refusal to retract after a request for retraction is made or the republication after notice is given of the falsity of the statements is evidence of malice." *Myers*, 959 S.W.2d at 164. To date, SBC has not retracted its defamatory statements.

### 3.    Plaintiffs Have Suffered Reputational Harm and Damages

Tennessee sets a fairly low bar for the recovery of damages in a defamation action, as "[t]he issue is whether the record contains *any* material evidence of impairment of reputation and

---

[65] Ex. 47, Guidepost 30(b)(6) Dep., at 205:25-206:11.
[66] Ex. 70, GPSILLS_000781 at GPSILLS_000787; Ex. 25, EC_0002462.
[67] *Id.*; Ex. 70, GPSILLS_000781 at GPSILLS_000787.
[68] Ex. 75, GPSILLS_013523 at GPSILLS_013535.
[69] Ex. 83, GPSILLS_001185 at GPSILLS_001189.
[70] Ex. 131, Retraction Letter.

16

standing in the community, personal humiliation, or mental anguish and suffering." *Myers*, 959 at 164 (citing *Handley v. May*, 588 S.W.2d 772, 776 (Tenn. Ct. App. 1979)) (emphasis added). Thus, "any" evidence of "personal humiliation, or mental anguish and suffering" is enough to go to trial, and a person wrongfully and publicly accused of being a sex offender easily makes such a showing. Mary and David Sills both testified to all of the above plus more in how they have suffered since the Report was published.[71]

Moreover, Plaintiffs can show much more than that, as Sills lost professional opportunities, too. Indeed, "the tweets of Bart Barber . . . detrimentally influenced David Sills' employability."[72] Contrary to SBC's argument,[73] Plaintiffs' vocational expert testified that she did not think there was a permanent impact to Sills's employability as a result of what was known about Lyell's allegations as of March 2019.[74] She further testified that starting in August 27, 2018, to September 2021, that "to some degree" he became damaged from employability. Bailey does not testify that Sills is permanently unemployable. Rather, she explained that his employment prospects were "further impacted because … people in high-level positions, in leadership [were] agreeing with these allegations," and that the Guidepost Report "was ultimately … the stamp on his not getting employment in his intended field."[75] Bailey further testified that Global Outreach International[76] had planned to hire Sills, but that "outside influence" caused the opportunity to be withdrawn— demonstrating that he could have obtained employment "if people didn't talk to that employer."

---

[71] Ex. 40, Sills Dep., at 123:24-124:6l, 125:21-126:2, 201:21-202:2; Ex. 36, M. Sills Dep., at 83:4, 85:3-12, 85:15-86:3, 88:2-7, 90:1-14.
[72] Dkt. No. 390-4, Bailey Report at 5.
[73] Br. at 12.
[74] Ex. 5, Bailey Dep., at 60:12-21.
[75] *Id.* at 103:22–104:3.
[76] Global Outreach International is an interdenominational missions sending agency that partners with the church in the sending of cross-cultural missionaries. *See* https://www.globaloutreach.org/about.

She concluded that "the Report and the support of this report from the executive committee [are] what truly impacted his ability to become employable in this field."[77] Barber's tweets in support of the Report, Lyell's false allegations, Press Releases authored and published by the SBC's EC, the published List of Offenders and the copies of the Guidepost Report and List made available by the SBC at the Annual Meeting in June of 2022 and on their website likewise impacted Sills's ability to become employable.

Robert Fisher, Plaintiffs' reputational repair expert, stated in his deposition that there are different levels of reputational harm.[78] Sills's harm "gradually grew" and it was a "gradual snowball effect."[79] The harm could have been contained in 2019, but after the Report and Associated Press picked it up "all of a sudden, everyone knew about it."[80]

Mary Sills likewise suffered considerable mental anguish.[81] This was a result both of statements referring to her, but also the defamation of her husband. With respect to the latter, it is established by statute[82] and the common law[83] in Tennessee that a spouse can sue for loss of consortium when his or her spouse is a tort victim.

---

[77] Ex. 5, Bailey Dep., at 105:5–12.
[78] Dkt. No. 355-21, Fisher Dep. at 41:11-12.
[79] *Id.* at 43:19-22.
[80] *Id.* at 44:19-22.
[81] Ex. 128, Sills_110911. *See also* Ex. 36 , M. Sills Dep., at 85:3-86:3; 88:2-7; 90:1-14.
[82] Tenn. Code Ann. § 25-1-106.
[83] *Spicer v. Thompson*, No. M2002-03110-COA-R3-CV, 2004 Tenn. App. LEXIS 436, at *113 (Tenn. Ct. App. July 7, 2004) (unpublished) (affirming award to spouse of defamed person in defamation action. Accord, e.g., *Benton v. Knoxville News-Sentinel Co.*, 130 S.W.2d 106, 108 (Tenn. 1938) ("A husband may maintain an action to recover damages suffered by him as the result of the libel of his wife."); *Dunn v. Alabama Oil & Gas Co.*, 42 Tenn. App. 108, 299 S.W.2d 25 (1956) (loss of consortium recoverable in malicious prosecution action). At the time *Benton and Dunn* were decided, only a husband (not a wife) could recover under Tennessee common law. Tenn. Code Ann. § 25-1-106 was designed to make this reciprocal, and allow a wife to also recover this element of damages from a tort directed at their husband.

18

The case at bar is easily distinguishable from *Service Jewelry Repair* on which Defendants rely. SBC Br. At 12. In *Service Jewelry Repair, Inc. v. Cumulus Broadcasting, LLC*, the plaintiff submitted only his employee's affidavit to say that the plaintiff has suffered harm, without attributing any dollar value to the losses. 145 F. Supp. 3d 737, 744 (M.D. Tenn. 2015). In the case at bar, Plaintiffs have submitted an economic analysis, which Defendants do not acknowledge at all. *See* Dkt. No. 390-5, Report of Economist, Dr. Ralph Scott. Additionally, the court in *Service Jewelry Repair* observed the absence in the record of expert testimony concerning reputational harm suffered. Here, Plaintiffs have submitted evidence of their reputational harm, both in their own testimony[84] as well as the analysis and reports of Erin Baily and Robert Fisher. Dkt. Nos. 390-4 and 390-3.

### D. Plaintiffs Have Stated an Actionable Claim of Negligence

The elements of negligence are (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause. *Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005) (citing *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998)). Defendants claim that Plaintiffs cannot establish that SBC was negligent or at fault, to any degree as it pertains to the July 2022 tweets. However, the record is rife with triable facts showing that SBC did, in fact, act negligently.

### 1. SBC Had a Duty of Care to Plaintiffs

A duty is "the legal obligation a defendant owes to a plaintiff to conform to the reasonable person standard of care in order to protect against unreasonable risks of harm." *Leatherwood v. Wadley*, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003) (citing *McCall v. Wilder*, 913 S.W.2d 150,

---

[84] Ex. 40, Sills Dep., at 123:24-124:6l, 125:21-126:2, 201:21-202:2; Ex. 36, M. Sills Dep., at 83:4, 85:3-12, 85:15-86:3, 88:2-7, 90:1-14.

153 (Tenn.1995)). The "existence and scope of the duty of the defendant in a particular case rests on all the relevant circumstances, including the foreseeability of harm to the plaintiff and other similarly situated persons." *Id.* (citing *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 433 (Tenn. 1994)). A harm is foreseeable "if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable." *Doe v. Linder Const. Co.*, 845 S.W.2d 173, 178 (Tenn.1992).

There are many contexts in which courts have sustained negligence claims brought by persons who were foreseeably harmed by negligent investigations. In *Wolfe v. MBNA Bank*, 485 F. Supp. 2d 874 (W.D. Tenn. 2007), for example, the court held had a duty of care existed under Tennessee law to the purported applicant for a credit card to take adequate precautions to verify[85] that the person submitting the application was indeed the applicant.[86]

In this case, SBC owed Plaintiffs a duty to exercise reasonable care to those people named in the Report by verifying (or at least attempting to verify) the truth before publishing statements that gave credibility to an accusation of sexual abuse. This is especially true when SBC's Executive Committee concedes that it was only the Executive Committee who was to be part of the investigation. SBC's Executive Committee received Guidepost's Report that revealed by name and detail highly sensitive allegations that people, like David Sills, had no idea were underway. SBC though its Executive Committee in electing to publish, post, spread, propagate and expand dissemination of their Report thus owed basic duties of care: to withhold dissemination of the

---

[85] The court dismissed a separate claim based on a negligent *investigation*, but only because it held the claim was preempted by the federal Fair Credit Reporting Act.

[86] *Accord, e.g.*, *Sharpe v. St. Luke's Hospital*, 821 A.2d 1215 (Pa. 2003) (subject of drug test can sue for reputational damage against firm that negligently performed drug test); *Texas Farm Bureau Ins. Co. v. Sears*, 54 S.W.3d 361, 369 (Tex. App. 2001) (employer had duty to subject of investigation "to use reasonable care in conducting the investigation").

Report, to identify and supply all contrary evidence, to uniformly and fairly apply redactions, to altogether remove from the List anyone who does not fit the redaction parameters developed by McLaurin and Slade and to avoid defaming an innocent person. Any reasonable person serving as president of a prominent religious organization such as the SBC, like Barber and Litton, and its Executive Committee would recognize the gravity of such an allegation and take the appropriate steps to confirm its accuracy before making it public. Even a minimal investigation would have uncovered the truth that the veracity of Lyell's claims was never investigated or corroborated and was based solely on Lyell's allegations. It was plainly foreseeable that falsely attributing sexual abuse to someone could cause severe personal and reputational harm.

SBC cites various cases from other jurisdictions[87] suggesting that a defamation claim displaces a negligence claim when they arise from the same set of facts, but none are governed by Tennessee law. The better rule is that a plaintiff should be able to sue under both causes of action. First, there may be a negligent investigation that harms the plaintiff, but not a publication by the person performing the investigation, as in *Wolfe*. Here, for example, some defendants challenge the allegations that they published statements.[88] Second, there may be damage that a plaintiff could recover under a negligence theory but not a defamation theory. And to the extent that the elements overlap, the jury will be asked to make a determination just once (such as whether a defendant was negligent) and there will be no inefficiencies or duplication.

### 2. SBC Breached Its Duty of Care

As discussed in Section III(C)(2), *supra*, SBC acted negligently, and recklessly.

---

[87] Br. at 8.

[88] While Plaintiffs vigorously contest this, outcomes are uncertain. Plaintiffs should be able to recover under a negligence theory if (1) the investigation was negligent, and (2) it set in motion a natural and foreseeable chain of events that led to a publication by others that (3) harmed the plaintiff (all three are questions for the jury).

21

### E. Plaintiffs Have Stated an Actionable Claim of IIED

The elements of IIED are (1) intentional or reckless conduct; (2) that is "so outrageous" as to exceed all bounds of decency; and (3) that results in "serious mental injury" to the plaintiff. *Joiner v. Meharry Med. Coll.*, No. 3:18-cv-00863, 2020 U.S. Dist. LEXIS 222240, at *27-28 (M.D. Tenn. Nov. 28, 2020) (quoting *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). Tennessee courts describe the required conduct as "atrocious," "utterly intolerable," and "beyond all possible bounds of decency." *Doe v. Belmont Univ*., 334 F. Supp. 3d at 903 (quoting *Goldfarb v. Baker*, 547 S.W.2d 567, 569 (Tenn. 1977)). Damages are limited to the most severe emotional injuries. *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003).

### 1. SBC's Conduct Was Outrageous.

Plaintiffs have provided sufficient evidence upon which a reasonable jury could conclude that SBC's conduct constitutes IIED under Tennessee law. Contrary to the contention of SBC, there is no evidence to suggest that there was any sexual contact between Sills and Lyell while Sills was a professor and Lyell was a 26-year-old graduate student at Seminary.[89] By Lyell's own admission the first oral sex didn't occur until October 2006 when she was no longer a student.[90] Additionally, Sills testified that any inappropriate touching that did occur while Lyell was a student was initiated by her and rebuffed by him.[91] Sills has never denied that he had a sexual relationship with Lyell.[92] However, it is very important to note that Sills has not only never admitted but has staunchly denied all allegations of non-consensual sexual contact between himself and Lyell.[93]

---

[89] Sills testified, "I'm not sure anything of a sexual nature occurred while she was a student." Ex. 40, Sills Dep., at 22.
[90] Ex. 103, Lyell Rogg Responses, at 6-7; Ex. 1, Seminary (Akin) 30(b)(6) Dep. Ex. 7.
[91] Ex. 40, Sills Dep., at 22, 24-30.
[92] Sills and Lyell never had sexual intercourse at any point during their relationship. Ex. 40, Sills Dep., at 45-46. Sills testified that Lyell was always the first one to touch him. *Id.* at 57.
[93] *Id.*, at 69.

Sills testified that he resigned from his role at Seminary "because at the time I thought—well, it was true, what I knew to be true, that this was an inappropriate relationship that resulted in me leaving the Seminary. And that in a couple of years, I would be able to get a job of some sort and move on with my life."[94] David resigned because he knew his relationship with Lyell was inappropriate, not because it was non-consensual.

In his capacity as a Messenger at the SBC, Barber voted in favor of hiring a third-party to investigate allegations of abuse mishandling by members of the EC[95] between June 14, 2021, and January 1, 2022.[96] Importantly, this "investigation" was not intended to assess the veracity of Lyell's allegations against the Sills.[97] With knowledge that the investigation Barber supported did not address Lyell's specific claims against the Sills, Barber nevertheless published a tweet to thousands of his followers asserting that Lyell's allegations had been "investigated and corroborated" by those familiar with the situation.[98] Further, Barber never took any steps whatsoever to investigate whether Lyell's claims were true.[99] In fact, Barber did not even know any specific details of Lyell's allegations or talk to Mohler about the allegations.[100]

The SBC's Executive Committee received a sloppy and incompetent investigation into what Guidepost itself has characterized as "the sexual abuse scandal that pervaded the SBC." Guidepost Br. at 19. Executive Committee then did a series of Press Releases to drum up attention for the

---

[94] *Id.*, at 74-75.
[95] Barber was fully aware that Sills had no connection to the EC. Sills was never a trustee, employee, officer, or holder of any position within the EC or its Board. Barber Dep., at 21.
[96] Ex. 6, Barber Dep., at 43; the Report, at 17.
[97] *Id.*
[98] Ex. 7, Barber Dep. Ex. 10.
[99] Barber made no effort to verify the accuracy of his claims, never reviewed any corroborating evidence from Mohler or others, was unaware of any specific details concerning Lyell's allegations, never contacted Mary or David Sills, and had no knowledge of Sills admitting to sexual abuse that would constitute a crime. *Id.*, at 27; 30-31; 83; 134; 147-149; 183; 196.
[100] *Id.*

Report falsely branding Sills a sex offender, ultimately featuring him alongside child abusers on a now-public List that is still on the SBC Executive Committee's website today. For Sills, a respected Bible professor, to be labeled a "sexual abuser" and hung out to dry without evidence is profoundly humiliating and distressing. Reasonable minds could differ whether that rises to "extreme and outrageous" but Tennessee law permits a jury to decide that question when there is sufficient evidence of recklessness or malice. *Moorhead v. J. C. Penney Co.,* 555 S.W.2d 713, 718 (Tenn. 1977). Here, the record shows SBC's Executive Committee either intentionally or recklessly published the false allegations.

Despite an overwhelming lack of evidence that Lyell's allegations against the Sills were investigated or corroborated by Guidepost, Barber, Litton, the SBC's EC or any other entity, Barber, Litton, and the SBC, through the EC, nevertheless used their influence as SBC Presidents and SBC entities to promote the false and damaging narrative to thousands, including online, that Lyell's allegations had been investigated and corroborated by Guidepost and others close to the situation. These statements were made without any factual basis and in reckless disregard for the truth. Making a public accusation of this kind without any evidentiary basis is conduct that exceeds all standards of decency and is intolerable in a civilized community. Few charges are more serious, or more damaging to one's reputation, than an accusation of sexual abuse.

### 2. Plaintiffs Suffered Severe Injuries.

Tennessee law recognizes that psychological symptoms such as sleeplessness, depression, and anxiety constitute evidence of "severe mental injury" for purposes of intentional or negligent infliction of emotional distress. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 210–11 (Tenn. 2012). In *Rogers*, the Court identified six nonexclusive factors that guide the analysis, including: (1) physiological symptoms like headaches or weight changes; (2) psychological symptoms such as sleeplessness, depression, anxiety, or emotional outbursts; (3) medical diagnosis or treatment

24

for conditions like depression or PTSD; (4) the duration and intensity of symptoms; (5) impairment

of daily functioning; and (6) the extreme or outrageous nature of the defendant's conduct itself.

Evidence may come from the plaintiff, lay witnesses, or medical professionals. *Id.*

Plaintiffs have presented evidence demonstrating that Sills has suffered nightmares,

insomnia, depression, and significant harm to his career and marriage, effects that extend well

beyond mere annoyance or inconvenience.[101] Mary Sills also suffers from depression, grief, and

insomnia and currently sees a counselor who has diagnosed her with anxiety as a result of the false

public allegations that her husband is an abuser, and by Barber's republication of baseless

allegations about Mary Sills.[102] Whether Sills's distress is "so severe that no reasonable person

would be expected to endure it" is again a factual determination. *Joiner v. Meharry Med. Coll.*,

2020 U.S. Dist. LEXIS 222240, No. 3:18-cv-00863, 2020 U.S. Dist. LEXIS 222240, at *37 (M.D.

Tenn. Nov. 28, 2020).

### F. Plaintiffs Have Stated an Actionable Civil Conspiracy Claim

A civil conspiracy is "a combination of two or more persons who, each having the intent

to accomplish an unlawful purpose or a lawful purpose by unlawful means, do an overt act in

furtherance of the conspiracy, resulting in damage to the plaintiff." *Trau-Med of Am., Inc. v.

Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002). "The agreement need not be formal, the

understanding may be a tacit one, and it is not essential that each conspirator have knowledge of

the details of the conspiracy." *Danny L. Davis Contractors, Inc. v. Hobbs*, 157 S.W.3d 414, 419

(Tenn. Ct. App. 2004) (citing *Dale v. Thomas H. Temple Co.*, 208 S.W.2d 344 (1948). "Civil

conspiracies are rarely proven directly," and "are more often established using circumstantial

evidence and inferences drawn from the evidence, coupled with common-sense knowledge of the

---

[101] Ex. 40, Sills Dep., at 125:21-126:11; 201:24-202:14.
[102] Ex. 36, M. Sills Dep., at 85:3-86:3; 88:2-7; 90:1-14; Ex. 128, Sills_110911.

behavior of persons in similar circumstances," and "fact-finders may consider the nature of the acts themselves, the relationship of the parties, the interests of the conspirators, and other circumstances." *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 396 (Tenn. 2015) (quoting *Stanfill v. Hardney*, No. W2006-00217-COA-R3-CV, 2007 Tenn. App. LEXIS 620, at *1 (Sept. 27, 2007)). SBC, in a *single paragraph*, rattles off a list of alleged defects in the claim, without making a good faith effort to actually brief any of them.[103] But we address all arguments in an abundance of caution.

### 1. Plaintiffs Have More Than Sufficient Evidence of Underlying Intentional Torts.

A claim for civil conspiracy "requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007). But it is *not* necessary to demonstrate each element against each member of the conspiracy – it is enough to show that there was a common purpose, and *collectively* the members of the conspiracy engaged in the requisite elements.[104]

SBC argues that "Plaintiffs have no evidence of "an underlying predicate tort."[105] But Plaintiffs have alleged two intentional torts – defamation and IIED. For the reasons stated in those Sections III(C) and Section III(E), *supra*, the evidence is sufficient to establish the elements of those torts *individually* as to SBC, and is much more than needed to support a conspiracy claim.

---

[103] Br. at 13-14.

[104] A civil conspiracy claim is not defeated simply because one underlying tort claim fails as to a particular defendant. Under Tennessee law, civil conspiracy imposes joint and several liability for all acts committed by any conspirator in furtherance of the unlawful scheme. *Brown v. Birman Managed Care, Inc.*, No. M1999-02551-COA-R3-CV, 2000 Tenn. App. LEXIS 66, at *7–9 (Feb. 1, 2000) (quoting 16 Am. Jur. 2d Conspiracy § 58). Accordingly, even if the Court were to conclude that SBC is not liable for defamation, it may still be held liable for civil conspiracy if it agreed with another Defendant to disseminate the defamatory allegations and any co-conspirator committed defamation, intentional infliction of emotional distress, or another tortious act in furtherance of that agreement.

[105] Br. at 14.

26

### 2. The Court Has Not Adjudicated the Question of Whether SBC, or any Defendant Other than Guidepost, Engaged in a Conspiracy.

SBC alleges that "*this Court has already decided* that there is no evidence of any conspiracy by Dr. Barber with Guidepost – or any other defendant – in this case."[106] This is not true. The Court held that Plaintiffs had not adequately *pleaded* a conspiracy claim against *Guidepost*.[107] The Court did not decide that there was no conspiracy involving any other defendant, much less find that there was any lack of evidence

### 3. There is Ample Evidence that SBC Entered Into an Agreement With the Other Conspirators

What is left of SBC's one paragraph of arguments is a single sentence summarily concluding that "Plaintiffs have no evidence that the SBC, in agreement with another party, had the specific intent to defame David or Mary Sills with allegedly false allegations of sexual abuse."[108] But there is ample evidence to support a finding that SBC, through its agents and entities (Barber, Litton and the EC) participated in the agreement with Lyell, Seminary, Mohler, the EC, Barber, Slade, Litton, and McLaurin (we refer to these Defendants, with SBC, as the "Conspiracy Defendants") to bolster, endorse and amplify Lyell's uninvestigated and uncorroborated allegations of sexual abuse, and to defame Plaintiffs, in order to salvage the reputation of the SBC and its affiliates, and that of its leaders, as they agreed against Sills in order to create public support for and to rehabilitate their damaged public image.[109] SBC leadership sought to restore credibility by embracing a survivor-advocacy narrative.[110] Lyell's disputed allegations offered a convenient opportunity to save face. SBC and the other Defendants conspired to spread the lie that Lyell's

---

[106] Br. at 14 (emphasis added).
[107] Dkt. No. 134, at 29-30.
[108] Br. at 14.
[109] Ex. 66, GPSILLS_002938.
[110] Ex. 63, EC_0012032.

allegations had been "investigated and unequivocally corroborated."[111] Lyell's motive was both

personal and financial: revenge against Sills and public vindication through SBC endorsement.[112]

### a. The SBC Bought Lyell's Cooperation in its Project to Rehabilitate its Image

In March 2019, the Seminary, through President Mohler, agreed to pay Lyell's attorney

fees in the event Sills filed suit against Lyell.[113] On October 15, 2019, the same day the Baptist

Press issued its first public "apology" to Lyell, Lyell and Seminary entered into a confidential

agreement for Seminary to pay Lyell $100,000.00 to "reimburse" her for "medical and treatment

expenses she claimed she incurred as a result of the conduct of … Sills."[114,115]

In May 2020, after falsely claiming defamation, Lyell and her counsel Rachael

Denhollander ("Denhollander") negotiated directly with EC officers the terms of a "Settlement

Agreement and Release," which purports to be between Lyell and the EC. That agreement required

the EC to pay Lyell ▮▮▮▮▮▮ in exchange for her to release any claims Lyell might have

against the EC and a large class of persons associated with it.[116]

[111] Ex. 7, Barber Dep. Ex. 10; Ex. 8, Barber Dep. Ex. 11.

[112] Ex. 91, LYELL_00043695; Ex. 92, LYELL_00027914; Ex. 95, LYELL_00021411; Ex. 94, LYELL_00033547.

[113] Ex. 26, Lyell Dep., Day 1, at 77:6-78:20; Ex. 79, GPSILLS_017909; Ex. 96, LYELL_00128024.

[114] Just days before, on October 8, 2019, Mohler prepared a statement for Religious News Service stating that "The original description in Baptist Press was not accurate . . . Later, I supported Jennifer in making her statement requiring a correction by Baptist Press." Ex. 112, SBTS000634 at SBTS000673, SBTS000666.

[115] Ex. 108, LYELL_00178061; Ex. 114, at SBTS000678. In her demand to Seminary, Lyell noted that she "was sensitive to the media escalation that would inevitably come" with her initiating suit



Obviously, the SBC is an affiliate, parent, or someone who might be derivatively liable through the EC.

On February 22, 2022, Lyell, SBC and its EC, with active participation by its Chairman of the EC Board Slade and EC President McLaurin, entered into a "Settlement Agreement."[117] The agreement was confidential, and provides for payment to Lyell of ██████, and required the SBC to publicly apologize, and cause Baptist Press to issue a second public apology, to Lyell.[118] This February 2022 settlement and public apology, entered into just months before the Report and the List came out, purported to release the SBC and EC from "████████████,"[119] but Lyell had already released all of these claims in May 2020.[120] So what was the SBC buying in the February 2022 Settlement? While taking the form a legal settlement, it was in substance an agreement that the SBC would bolster Lyell's allegations and Lyell would help the SBC rehabilitate its public image.

All of these agreements with Lyell were reached with no lawsuit filed by Lyell, no discovery undertaken, no sworn statements made, no investigation undertaken whatsoever. The EC never contacted Sills to obtain his response to Lyell's characterization of their relationship.

> **b.** **The Conduct of SBC and Guidepost Was Carefully Coordinated With Lyell**

The most prominent and powerful advisor to the Task Force was Denhollander, a nationally known advocate for sexual abuse victims and Lyell's personal attorney,[121] who was retained as an advisor to the Task Force.[122] She represented Lyell in the settlement adverse to the SBC in May

---

[117] Ex. 61, Feb. 2022 Settlement, EC_0012449.

[118] *Id.*; Ex. 43, Slade Dep., Ex. 3, Feb. 2022 Apology.

[119] Ex. 61, EC_0012449.

[120] When EC attempted to have its insurer cover this second payment, the insurer stated that it could see no grounds for liability and rightly refused to pay. Ex. 107, Lyell_00006303.

[121] Ex. 47, Guidepost 30(b)(6) Dep., at 70:21-71:24.

[122] ████████████, Litton names task force to oversee third-party review of SBC Executive Committee, Baptist Press (July 9, 2021), *available at* https://www.baptistpress.com/resource-library/news/litton-names-task-force-to-oversee-third-party-review-of-sbc-executive-committee/#:~:text=Additionally%2C%20Litton%20announced%20two%20advisors,former%20SBC%20President%20J.D.%20Greear.

29

2020, that recovered a significant sum of money for her client despite never filing suit.[123] In July 2021, Seminary officials privately admitted Denhollander's bias (as to the Report) but stayed silent.[124] Denhollander was appointed by SBC President, Litton.[125]

Lyell was not merely a witness in the investigation and Report. She was a collaborator. On February 2, 2022, Mohler wrote to Lyell to tell her he had spoken to someone that day who gave him "further assurance" that the Task Force report will bring clarity and truth to her allegations against Sills.[126] By March 2022, Lyell was on a first name basis with Guidepost's investigators, and had a close relationship with them that strongly suggested collaboration, rather than a witness communicating with an investigator at arm's length.[127]

Denhollander, working with Lyell, was allowed to edit and otherwise comment on the Report prior to its publication.[128] Indeed, Guidepost coordinated with Lyell and Denhollander during the final edits, incorporating Lyell's input through Denhollander.[129] All the while, Lyell kept her part of the bargain by placing the blame for any misdeeds related to sexual abuse allegations on *past* members of the SBC's EC, exonerating and boosting the public profile and reputations of recent and current officers.[130]

---

[123] Ex. 89, LYELL_00012354.
[124] Ex. 120, SBTS_005905 ("How can [Denhollander] credibly be a part of the group overseeing an investigation of which she is a subject and about which she already publicly expressed prejudicial views?").
[125] Ex. 23, Litton Dep., at 85:1-6.
[126] Ex. 2, Seminary (Austin) 30(b)(6) Dep. Ex. 21.
[127] *See* LYELL_00101993-94.
[128] Ex. 57, Lyell_00193078; Exs. 53 and 54, Guidepost 30(b)(6) Dep. Exs. 26 and 30; Ex. 56, Guidepost 30(b)(6) Dep. Ex. 41, at GPSILLS_018922, GPSILLS_018941-942; Ex. 47, Guidepost 30(b)(6) Dep., at 98:13-21; Ex. 86, at GPSILLS_007952; Ex. 22, Leff Dep., at 220:11-15; 225:16-23;195:17-21; 224:17-23.
[129] Ex. 47, Guidepost Dep., at 190:1-13; 195:23-196:9; Ex. 57, Guidepost 30(b)(6) Dep. Ex. 46, Lyell_00193078.
[130] Ex. 93, LYELL_00051691; Ex. 95, Lyell_00021411, Ex. 94, LYELL_00033547-49; Ex. 100, LYELL_00345099.

### c.     The Defamatory Statements Were Made in Concert

SBC, acted in concert with Seminary, Lyell, Barber, Litton and EC to disseminate false and defamatory statements about Plaintiffs. The defamatory statements, at least some of which were admittedly coordinated,[131] were made in concert:

- Mohler stated to Baptist Press, in a comment included in a Baptist Press article in March 2019 that he believed Lyell was acting "righteously" in presenting accusations of nonconsensual sexual behavior against Sills.[132]

- Baptist Press issued an apology to Lyell on Oct. 15, 2019 for its earlier accounts of her allegations that had suggested the relationship was consensual. The apology, suggesting the relationship was not consensual, happened in conjunction with the first of at least three settlements with Lyell.

- Baptist Press issued an apology to Lyell on Oct. 15, 2019 for its earlier accounts of her allegations that had suggested the relationship was consensual. The apology, suggesting the relationship was not consensual, happened in conjunction with the first of at least three settlements with Lyell.

- On Feb. 22, 2022, in conjunction with the third settlement:
  - The EC apologized to Lyell.
  - Baptist Press apologized a second time.

- In May 2022, the Report was published, describing Lyell, as a "survivor" and Sills as "her abuser."

- Contemporaneously with the publication of the Report in May 2022:
  - Baptist Press published the "findings" of the Report.[133]
  - Mohler expressly stated that "[w]hat happened to Jennifer [Lyell] was sexual abuse, unquestionably" as he endorsed the Report.[134]
  - On May 26, 2022, the SBC released a list of purported sex abusers, publicly grouping Sills with a variety of miscreants.[135]

---

[131] EC counsel coordinated Lyell, EC's and Seminary's statements in July 2022. Ex. 100., Lyell_00345099-00345100.

[132] Ex. 47, Guidepost 30(b)(6) Dep., at 116-123.

[133] Timothy Cockes, Guidepost investigation prompts recommendations for reform, Baptist Press (May 23, 2022), *available at* https://www.baptistpress.com/resource-library/news/guidepost-investigation-prompts-recommendations-for-reform/

[134] Ex. 113, SBTS000612 at SBTS000629.

[135] Ex. 45, Slade Dep. Ex. 10, May 26, 2022 Statement; *see also* Ex. 46, Slade Dep. Ex. 11.

31

- In June 2022, Lyell issued a public statement in which she praised and acknowledged the Report and the SBC-related Defendants.[136]

- In July 2022, Mohler made public statements, at or around the time that Lyell threatened suicide unless leaders *again* publicly reaffirmed her.[137]
  - On July 8, 2022, as discussed in detail in Section III(C)(1), *supra*, Barber published a sequence of statements on Twitter praising the Report and its findings, as well as the accuracy of Lyell's accusations.
  - On July 8, 2022, Mohler further endorsed the Report's findings, stating Lyell's allegations were "confirmed."[138]
  - On or before July 14, 2022, Geiger published one or more tweets asserting that he, Mohler, and other members of Mohler's team understood Lyell's allegations against Sills to constitute sexual abuse, that Mary Sills knew of that abuse, and that an investigation had found Lyell's account to be credible.[139]

The trier of fact could reasonably find that these statements were made in concert. Each Defendant knew that to be a lie, yet relied on the statements published with full power and influence of the SBC, EC, and their officers.[140]

## IV.  CONCLUSION

For all the foregoing reasons, SBC's Motion for Summary Judgment should be denied in its entirety.

Dated: November 3, 2025.                   Respectfully submitted,

/s/ Shannon M. McNulty

*/s/ Shannon M. McNulty*
Shannon M. McNulty (admitted *pro hac vice*)
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, 36th Floor
Chicago, Illinois 60602
(312) 899-9090
(312) 251-1160 Facsimile
SMM@cliffordlaw.com

---

[136] Ex. 81, GPSILLS_008715.
[137] Ex. 21, LYELL_00348701.
[138] Ex. 106, LYELL__00176021.
[139] Ex. 9, Barber Dep. Ex. 13. Barber retweeted Geiger's tweet.
[140] Ex. 33, Mohler Dep., at 74:3-12; Ex. 2, Seminary (Austin) 30(b)(6) Dep., at 44:11-19; Ex. 23, Litton Dep., at 39:16-25; Ex. 10, Cook Dep., at 29:5-9, 31:7-14, 34:2-3; Ex. 6, Barber Dep., at 27:15-23, 156:11-17; Ex. 43, Slade Dep., at 34:22-25; Ex. 47, Guidepost 30(b)(6) Dep., at 121:16-25.

/s/ *Katherine B. Riley*
Katherine Barrett Riley (TN BPR#021155)
John W. ("Don") Barrett (admitted *pro hac vice*)
Sterling Aldridge (admitted *pro hac vice)*
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, MS 39095
Ph: (662) 834-2488
Fax: (662) 834-2628
kbriley@barrettlawgroup.com
dbarrett@barrettlawgroup.com
saldridge@barrettlawgroup.com


**Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I, Shannon M. McNulty, hereby certify that on November 3, 2025, I served the above and

foregoing on all counsel of record via the Court's CM/ECF filing system.

*/s/ Shannon M. McNulty*
Shannon M. McNulty
