## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |
|---|---|
| MICHAEL DAVID SILLS and MARY SILLS,<br><br>*Plaintiffs,*<br><br>v.<br><br>SOUTHERN BAPTIST CONVENTION, et al.,<br><br>*Defendants.* | Case No. 3:23-cv-00478<br><br>Chief Judge Campbell<br>Magistrate Judge Frensley<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT GUIDEPOST SOLUTIONS, LLC'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs Michael David Sills ("Sills") and Mary Sills (collectively, "Plaintiffs") respectfully submit this memorandum in opposition to Defendant Guidepost Solutions, LLC's ("Guidepost") Motion for Summary Judgment ("Motion" or "Mot."). For the reasons stated below, the Motion should be denied in its entirety.

## I.    INTRODUCTION

Guidepost seeks dismissal of Plaintiffs' claims for defamation, negligence, and intentional infliction of emotional distress ("IIED"). But the record is rife with genuine disputes of material fact. As shown below, key witnesses questioned the truth of Jennifer Lyell's ("Lyell") allegations against Sills, Guidepost ignored exculpatory evidence, and Guidepost's own notes concede there is no independent corroboration of the Lyell allegations and misconduct it reported. These facts preclude summary judgment, especially given Tennessee's high bar for judging reputational claims before trial.

Guidepost's defenses — lack of publication, qualified privilege, alleged absence of fault or harm, ecclesiastical abstention, and the like — all fail outright as a matter of law or raise factual issues. For example, Guidepost, in arguing that it did not publish the defamatory content, ignores

that its report[1] was transmitted directly to parties unaffiliated with Guidepost (including Defendant Southern Baptist Convention ("SBC"), its Executive Committee (the "EC") and Lyell), and that it is also liable for foreseeable distributions of its defamatory statement by other persons (such as the related "mugshot list" placing Sills among a rogue's gallery of sex criminals). In arguing it is faultless, Guidepost ignores that it did not interview the accused, overlooked severe credibility issues relating to the accuser and ignored concerns about the accuser raised by several witnesses. Notwithstanding Guidepost's vague position that it was not obligated to do any of those things (itself a question of fact for the trier of fact), Guidepost lacked any basis to publish and transmit material in which Guidepost characterized Sills as a sexual abuser.

## II. FACTUAL BACKGROUND

This case arises from Guidepost's investigation and 2022 publication of the Report which, in part, concerned Lyell's sexual abuse allegations against Sills. Guidepost had been retained in 2021 by the EC.[2] The investigation made on behalf of the EC, was to be overseen by a committee appointed by the SBC President, which became known as the Sexual Abuse Task Force (the "Task Force") formed specifically for the investigation.[3] The operative contract required various interactions between Guidepost and the EC, namely though EC's Task Force and "Committee on Cooperation" to whom Guidepost would provide drafts of the factual sections of the report, and

---

[1] Guidepost's report (the "Report") was attached to Guidepost's brief as Exhibit 2, Dkt. Nos. 373-2 and 373-3.

[2] Prior to the creation of the Task Force, the EC had already retained Guidepost to investigate the EC's mishandling of sexual abuses cases. (Erin Roach, *Motion spurs task force to oversee EC review*, BAPTIST PRESS (June 16, 2018), https://www.baptistpress.com/resource-library/news/motion-spurs-task-force-to-oversee-ec-review/; SBC Executive Committee Engages Guidepost Solutions to Conduct Independent Process Assessment (June 11, 2021), https://www.baptistpress.com/wp-content/uploads/2021/06/SBCEC-Guidepost-FINAL-1.pdf).

[3] The Task Force is not a legal entity and was an *ad hoc committee* that no longer exists. Ex. 18, EC 30(b)(6) Dep. 58:4-6.

2

also transmit monthly invoices.[4] The EC paid Guidepost for its services.[5]

The parties sharply dispute the timing and nature of the relationship, and Plaintiffs, as nonmovants, are entitled to all reasonable inferences in their favor. Sills acknowledges *consensual* encounters with Lyell, but only after Lyell was no longer his student.[6] Prior to that time, Sills refused Lyell's advances. He emphatically denies any sexual contact while she was a student or any nonconsensual conduct at any time. The first sexual encounter occurred when Lyell tried to kiss him while on a mission trip to Ecuador and the second with Lyell occurred when she "put her hands down my [Sills] pants," and he "reacted strongly."[7]

The Report repeatedly describes Lyell, without qualification, as a "survivor" of sexual abuse, and Sills, without qualification, as "her abuser." The Report goes much further than merely stating that there were "allegations" of sexual abuse – it plainly concludes that Sills *was* a "sexual abuser" and repeatedly refers to him as such.

Guidepost did not perform anything resembling a competent investigation.[8] Guidepost never contacted Sills, his wife Mary, their pastor, SBC President Dr. Albert Mohler ("Mohler"), or other key witnesses who could corroborate or rebut Lyell's story. ██████████████████ ██████████████████████████████.[9] Guidepost's 30(b)(6) witness Krista Tongring admitted that investigators "were relying on things that we had," i.e., Lyell's version of the facts.[10] In fact, Guidepost never conducted an independent investigation of Lyell's allegations

---

[4] Dkt. No. 373-1 at §§ 2.1, 3.5, 9.1.
[5] Ex. 31, McLaurin Dep., at 24:3-9.
[6] Ex.40, Sills Dep., at 23:1-5.
[7] *Id.*, at 24:15-23.
[8] Dkt. No. 390-7, at 47, 54-55; Guidepost 30(b)(6) Dep., at 121:16-25; Guidepost 30(b)(6) Dep. Ex. 20.
[9] Ex. 27, Lyell Dep., Day 2 at 118:22-119:4.
[10] Ex. 47, Guidepost 30(b)(6) Dep., at 209:23-24.

3

of sexual abuse. ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████.".[11] Indeed, Guidepost's own notes record multiple doubts of the corroboration of her account.[12] SBC official David Roach was told that Mohler, who had publicly praised Lyell's courage, "was affirming [her] courage in coming forward, but not necessarily her facts," and that Lyell did not even specify whether the alleged abuse was physical or emotional.[13] Former SBC journalist Laura Erlanson warned her supervisor that "journalistic malpractice" would result from accusing someone of abuse absent police reports or other confirmation, cautioning that since it is improper to call someone a "survivor" without also calling "someone else . . . an abuser."[14] This contradictory evidence – witnesses uncertain of the facts, Guidepost's failure to interview critical witnesses, and its own awareness of no corroboration – creates triable issues on Guidepost's investigative practices and the truth of its Report.

## III.   ARGUMENT

### A.   The Record Establishes a Triable Claim for Defamation

A defamation plaintiff must prove that "1) a party published a statement" and that the party acted "2) with knowledge that the statement is false and defaming to the other; *or* 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999) (emphasis added).

---

[11] Guidepost 30(b)(6) Dep. Ex. 49, at SBC_EC_GJPLaw_00001468.
[12] Ex. 69, GPSILLS_001353.
[13] Ex. 37, Roach Dep., at 156:13-15.
[14] Ex. 50, Guidepost 30(b)(6) Dep. Ex. 22.

4

1.  **There is Ample Evidence for the Trier of Fact to Find that Guidepost Published the Defamatory Statements**

    a.  **The Report**

It is clear that "[c]ommunicating a defamatory statement to a third person establishes the element of publication for a libel claim." *Myers v. Pickering Firm*, 959 S.W.2d 152, 163 (Tenn. Ct. App. 1997) (citing *Little Stores v. Isenberg*, 172 S.W.2d 13 (Tenn. Ct. App. 1943)).

    i.  **Guidepost is Liable for its Publication of the Report to the EC, Affiliated Persons, Committees, and Advisors**

Communication to *any* outside person, even a contractor or subcontractor, constitutes publication. In *Myers*, the court flatly rejected the same argument made by Guidepost that communications with an outside contractor or outside advisers cannot constitute "publication." In *Myers*, the plaintiff hired an architecture company to design and build two construction projects. *Id.* at 156. Problems arose during construction, and the architecture firm hired the defendant, a law firm, to conduct an independent review of the projects. *Id.* The law firm sent its report, which allegedly contained defamatory statements, to the architecture company, and to a contractor and subcontractor. *Id.* The Court rejected the plaintiff's contention that the communications to the contractor and subcontractor[15] did not constitute publication, noting that the separate entities were not part of the same entity or managerial structure.

Similarly, in *Watson v. Golden N. Van Lines, Inc.*, No. 2:24-cv-2227, 2025 U.S. Dist. LEXIS 94031, at *16–18 (W.D. Tenn. May 16, 2025), the court rejected a nearly identical argument. There, the defendants were creditors of the plaintiff's employer, and an employee of the creditor, who were given access to the employer's records after executing an NDA that permitted

---

[15] The transmission from the law firm to the architecture company, the law firm's client, was held to be protected from a defamation claim by attorney-client privilege, *not* because the communication to the client was not a publication.

5

them to review the information. The plaintiff alleged that the defendants then defamed him by telling an officer of his employer that the plaintiff had stolen funds. The court held that the communication was a "publication," emphasizing that an NDA granting access to records did not create a "managerial chain of command" or otherwise collapse the separate identities of the parties. *Id.*

This action is square on all fours with *Myers* and *Watson*. Guidepost is a separate outside contractor independent of the SBC, the EC and the Task Force, and Committee on Cooperation. Under the express terms of its Engagement Agreement, Guidepost was to remain "independent" and neither the EC, nor its Task Force or Committee on Cooperation were to "conduct, direct, or otherwise manage or influence [Guidepost's] independent investigation in any manner."[16] The Task Force likewise had no control over Guidepost, as Guidepost's methodology, moreover, expressly included the principle that "Guidepost will remain independent of the Task Force, the SBC, the EC, and the Credentials Committee"[17]--all of which are entirely separate from Guidepost.

Additionally, Guidepost published a draft of the Report with at least one person who was **not** on the Task Force or the Committee on Cooperation.[18] Rachel Denhollander received a draft of the Report's factual information on May 12, 2022.[19] Denhollander was only an *advisor* to the Task Force.[20] Nowhere in the Engagement Agreement does it provide that Task Force *advisors*

---

[16] Dkt. No. 373-1, Engagement Agreement.
[17] Ex. 68, Interview Template, at GPSILLS_000127-28 ("The Task Force does not no [sic] control . . .").
[18] Dkt. 373-1, Engagement Agreement at § 3.5.
[19] Ex. 72, May 12, 2022, Email, at GPSILLS_015430.
[20] ████████████████████████████████████████████████████████████████
████████████████████████████████████. Ex. 65, at GPSILLS_018922; Ex. 68, Guidepost Interview Template, GPSILLS_000127-28 (same).

would be provided the opportunity to review the Report before publication. *See generally* Engagement Agreement.

Guidepost claims it did not publish the Report because it "delivered" the Report only to the Task Force, and merely placed a hyperlink on its own website, taking a reader to the website operated by the EC (although attributed to the Task Force) where the Report was hosted. Br. at 11-12. Guidepost attempts to rely on *Woods v. Helmi*, 758 S.W.2d 219 (Tenn. Ct. App. 1988), in which the court held that a communication between workers in the same hospital was not a "publication," even though they were employed by different entities. The Court in *Woods* modestly expanded the established rule that communications among officers of the same corporation are not "publications," previously articulated in *Freeman v. Dayton Scale Co.*, 159 Tenn. 413, 19 S.W.2d 255 (1929).

Guidepost argues (albeit erroneously) that *Woods* stands for the proposition that "[w]hen a party to a legal relationship such as the one created by the Engagement Agreement provides factual information to its client within the subject matter of the relationship, as a matter of law statements made between the parties are deemed *not to have been published at all*, thereby negating altogether the required element of publication for a libel law claim." Br. at 11 (emphasis in original). As later explained in *Myers*, there was no publication in *Woods* because those that received the defamatory statements concerning an employee's performance all "had managerial, supervisory or administrative responsibilities and oversight" in the hospital's anesthesiology department. *Woods*, 758 S.W.2d at 222. In other words, they effectively operated within the same organization, where the statements remained. The *Watson* court also distinguished *Woods* on the same grounds, noting that in *Watson* the speaker "communicated her allegedly defamatory statements to a distinct entity, which can establish the element of publication." *Watson*, 2025 U.S. Dist. LEXIS 94031, at *17.

7

Here, unlike the unusual scenario in *Woods*, and much like *Myers* and *Watson*, Guidepost was not part of the same organization as the persons it was communicating with, and its transmissions were plainly publications.

ii. **Guidepost is Also Liable for the Damage Caused by the Broader Public Distribution of the Report, Regardless of the Extent Guidepost Participated in the Public Distribution**

Guidepost argues that it cannot be liable for harm caused by the broader publication (on the internet, for general public distribution) of the Report by the EC. Guidepost is incorrect.

While Plaintiffs are not aware of any Tennessee authority on point (and Guidepost cites none), the overwhelming weight of decisional authority[21] and respected treatises,[22] establish that a

---

[21] For just a small sampling of decisions, *see Luster v. Retail Credit Co.*, 575 F.2d 609 (8th Cir. 1978) (affirming district court's prediction that Arkansas Supreme Court would hold that a defendant could be liable for unauthorized republications if such republications were reasonably foreseeable); *Braxton v. La. State Troopers Ass'n*, 333 So. 3d 516 (La. Ct. App. 2022); *Shepard v. Nabb*, 84 Md. App. 687, 581 A.2d 839 (1990); *Mitchell v. Superior Court*, 37 Cal. 3d 268, 208 Cal. Rptr. 152, 690 P.2d 625 (1984); *Newson v. Henry*, 443 So. 2d 817 (Miss. 1983) (author of defamation is liable for any secondary publication which is a natural consequence of author's original action); *Weaver v. Beneficial Fin. Co.*, 199 Va. 196, 98 S.E.2d 687, 689 (1957) (same). The *only* contrary authority we are aware of is various decisions under the law of New York (global center of the publishing industry) which seem to hold that the original author can only be liable if it participated in the republication. *See, e.g., Lehman v. Kornblau*, 12 Misc. 3d 1, 4, 820 N.Y.S.2d 397 (Sup. Ct. 2006) (defamation republication claim dismissed against defendants "since they were not part of the decision-making process to rebroadcast the program").

[22] As explained by a commentator in a 1964 article that remains a seminal authority on the question, an author of a defamatory statement is *not* liable for "voluntary and unauthorized repetition or republication of the defamatory matter by others who act independently." M.C. Dransfield, Annotation, *Liability of publisher of defamatory statement for its repetition or republication by, others*, 96 A.L.R.2d 373, 374 (1964) (annotation collecting cases decided as of that date and updated by the publisher thereafter). But the original author *is* liable when "the repetition or republication by others is the natural and probable consequence of the original act of uttering or publishing the libel or slander." *Id.* at 376. *See also, e.g.*, 18 Libel & Slander, Ind. Law Ency. § 43 (1959) (original publisher is liable for any republication which is "the natural consequence of his act," but not a republication "which results from the independent and unauthorized act of another person"); 53 C.J.S., Libel & Slander § 85 (1947) (becoming with minor edits 53 C.J.S. Libel and Slander § 105 (2021)) ("The originator of a defamation is not liable for any repetition or republication thereof, or any additional circulation given to it which is not the natural consequence

8

speaker is liable for republication of its defamatory statements by another person when that republication is the foreseeable and natural consequence of the original publication by the defendant.

Here, the republication of the Report was a *certain* consequence of the original act of publishing the Report to the EC, its Task Force and its Committee on Compliance, and not merely a "natural" or "probable" consequence. The retention of Guidepost by the Task Force to investigate sex abuse at the SBC was a very public event, and the SBC spent millions on the subsequent investigation. The mandate in the 2021 Annual Report obligated the SBC to obtain its Report. All of the SBC member churches voted on exactly that.[23] It was *inevitable* that the Report would become public. Indeed, edits were discussed amongst persons beyond the Task Force membership for that very reason.[24] In fact, Guidepost made a party admission under oath in the *Hunt* case testifying that it *expected* the Report to receive national publicity.[25] Even Guidepost's title page on the Report contemplates a risk of triggering "readers" and that children (none of which were members of the Task Force or Committee on Credentials) could possibly read the Report.[26] Guidepost expected, and prepared for, mass circulation of this Report. Once released in the days

---

of his act, but results from the independent and unauthorized act of another, that is, where defamatory matter is republished by a person other than the original author, the author is not liable therefor unless the republication is the natural and probable consequence of his own act. ...").

[23] Ex. 13, SBC 30(b)(6) Dep. Ex. 4, at 57 and 83.

[24] Ex. 47, Guidepost 30(b)(6) Dep., at 98:13-21; Ex. 86, at GPSILLS_007952; Ex. 22, Leff Dep., at 220:11-15; 225:16-23.

[25] Ex. 130, *Hunt* SOF, at 63 (No. 174) ("I [Samantha Kilpatrick] expected it to be out in the national news").

[26] The title page states: "WARNING: This report includes information and descriptions related to sexual assault. This may be triggering to readers who have had similar experiences. We encourage you to care for your safety and well-being. The content of this report is not appropriate for children." Dkt. No. 373-2, the Report at GPSILLS_005560.

leading up to the 2022 Annual Meeting, the EC's public relations arm Baptist Press, not the Task Force, then made available hundreds of copies of the Report for meeting attendees.[27]

Moreover, Guidepost's linking the Report on its own website would further support a jury finding that the public distribution of the Report was a natural and probable consequence of the original distribution of the Report. If the subsequent distribution of the Report by the SBC was truly independent and "unauthorized," both of which are required for Guidepost to avoid liability, Guidepost should have told the Task Force in advance not to release it to the public or later demanded that it be taken down. Instead, Guidepost *provided a link* to the Report, thus endorsing and assisting in its republication.

### b. Guidepost is Liable for the Republication of Its Defamatory Content in the Form of the List

#### i. The Publication of the List by the EC was a Foreseeable and Natural Consequence of Guidepost Telling the EC that Sills Was a Sex Abuser

Guidepost argues that it did not author or publish the List and cannot be liable for it. But that does not matter. The gravamen of this case is that Guidepost, as memorialized in the Report, told the EC, its Task Force, the Committee on Cooperation, and at least one outside advisor, that Sills was a sexual abuser. Guidepost then proceeded to prepare the Report for release in the days leading up to the 2022 Annual Meeting, where it would be disseminated and discussed to people from churches that were not part of the SBC or EC.[28] As noted in the previous subsection, the law provides that Guidepost is liable for the publication and re-republication of the Report, which was

---

[27] Ex. 12, SBC 30(b)(6) Dep., at 136:4-11.

[28] *See* Joe Carter, *The FAQs: What You Should Know About the Southern Baptist Convention's Annual Meeting*, The Gospel Coalition (May 5, 2025), *available at* https://www.thegospelcoalition.org/article/faqs-sbc-annual-meeting/#:~:text=Who%20attends%20the%20annual%20meeting,gatherings%20in%20the%20denomination's%20history.

eminently foreseeable. But it was just as foreseeable that the EC would take the defamatory statement that Sills was an abuser and redistribute it in other formats. One of those formats was the List, which also identified Sills as an abuser, and placed his photo in a rogue's gallery including convicted sex offenders. The List had been previously designated as "NOT to be published."[29]

Guidepost linked the Report and List from its website knowing that the List was confidential and not to be published.[30] Guidepost's linking to the List on its own website would further support a jury finding that the public distribution of the List was a natural and probable consequence of the original distribution of the Report.

### ii. Section 230 of the Communications Decency Act is a Red Herring

Guidepost contends that it is immune from liability for merely providing hyperlinks to the List and relies on Section 230 of the Communications Decency Act (the "CDA"). Guidepost misconstrues the basis for its liability relating to the List, and the CDA is irrelevant to the facts at hand. Guidepost is liable for telling the Task Force and Committee on Cooperation that Sills was a sex abuser and is liable for the additional harms caused by the publication of the List by the SBC, because the publication by the SBC of that List was a natural and probable consequence of Guidepost's defamatory statements to the Task Force, Committee on Cooperation, and others. Furthermore, Slade testified that the reason the List was published was because the Report triggered a demand for it to be released.[31] Plaintiffs do *not* allege that Guidepost is liable merely for placing a hyperlink[32] to the List on its website, and the CDA is completely irrelevant.

---

[29] Ex. 46, Slade Dep. Ex. 11, the List.

[30] Ex. 11, Dixon Dep., at 64:1-15.

[31] Ex. 43, Slade Dep., at 88:4-9;85:16-21; 90:22-25.

[32] To be clear, the placement of the link on Guidepost's website is quite relevant to the factual question of whether the publication of the list was a natural and foreseeable consequence of Guidepost telling the Task Force that was a sex abuser, and the related question of whether the insertion of that information into List was independent of, and unauthorized by, Guidepost.

11

## 2. The Record Demonstrates Guidepost Acted with the Requisite Fault

### a. The Court Should Apply a Negligence Standard

As noted above, the general standard of care for a defamation claim brought by a private figure is that the plaintiff must show that the defendant "with negligence in failing to ascertain the truth of the statement." *Sullivan*, 995 S.W.2d at 571. To determine whether a defendant was negligent in publishing a defamatory statement for a private person, "the appropriate question . . . is whether the defendant exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it." *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 418 (Tenn. 1978).

Guidepost contends that the heightened "actual malice" standard applies because Guidepost contends that (1) Sills is a public figure. and (2) its statements are subject to a conditional "common interest" privilege. Both arguments are without merit.

### i. Sills is Not a Public Figure

Since the argument that a plaintiff is a public figure (who must show actual malice) is in the nature of an affirmative defense (it is not an element of the state common law tort of defamation, but rather, an affirmative defense created by federal common law in the 1970s), the burden to demonstrate that Sills is a "public figure" is on the Defendants.[33]

---

[33] *Foretich v. Capital Cities/ABC*, 37 F.3d 1541, 1553 (4th Cir. 1994) ("We have proceeded upon the initial presumption that the defamation plaintiff is a private individual, subject to the defendant's burden of proving that the plaintiff is a public figure to whom the *New York Times* standard applies"); *Lewis*, 238 S.W.3d at 295 (Tenn. Ct. App. 2007) ("[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. . . . A *libel defendant* must show more than mere newsworthiness to justify application of the demanding burden of *New York Times*.").

12

Guidepost begins its discussion of the "public figure" issue with an enumeration of the "three kinds of public figures: general purpose, limited purpose, and involuntary."[34] But the argument quickly goes downhill after that, as Guidepost *never* chooses what type of public figure Sills is, and assiduously *avoids* discussing the requirements for any of the three options.

### A) Sills is Not a "General Purpose" Public Figure

General-purpose public figures are those who have achieved "such pervasive fame or notoriety that [they] become[] a public figure for all purposes and in all contexts." *Charles*, 693 S.W.3d at 274 (quoting *Gertz*, 418 U.S. at 351). The Tennessee Supreme Court explained that "general-purpose public figures are celebrities or household names." *Charles*, 693 S.W.3d at 274 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980)). Guidepost never suggests that Sills is, or ever was, a celebrity or household name. To the extent Guidepost implicitly argues that Sills is a general public figure in the more narrow SBC community, this argument also fails. Sills was not well-known in the SBC community, with SBC leaders admitting that they did not recognize him.[35]

### B) Sills is Not a Limited Purpose Public Figure, as He Did Not "Voluntarily Inject or Thrust" Himself Into Any Controversy

Ordinarily, someone becomes a limited-purpose public figure by "voluntarily inject[ing]" or "thrust[ing] [himself] to the forefront of [a] particular public controvers[y] . . . to influence the resolution of the issues involved." *Press, Inc. v. Verran*, 569 S.W.2d 435, 439 (Tenn. 1978)

---

[34] Br. at 18 (quoting *Charles v. McQueen*, 693 S.W.3d 262, 274 (Tenn. 2024) (internal citations omitted by Guidepost)).

[35] Ex. 43, Slade Dep., at 14:6-17 (Rolland Slade, chair of the SBC EC Board of Directors, never met Sills, did not know Sills by reputation and agreed Sills was never a member of the EC); Ex. 31, McLaurin Dep., at 57:6-13 (McLaurin, former SBC interim executive president, has never met or spoken to Sills and other than the allegations made by Lyell has never heard anything about him); Ex. 23, Litton Dep., at 22:3-6 (Ed Litton, former SBC President, never met Sills and testified "I don't think I would know him if I met him today."); Ex. 6, Barber Dep., at 20:11-15; 21:1-15 (Barber, another former SBC President, never met and does not know Sills).

13

(quoting *Gertz*, 418 U.S. at 344-45). Guidepost identifies the public controversy "in this case []as the sexual abuse scandal that pervaded the SBC." Br. at 19.

Here, Sills had a dysfunctional relationship with Lyell that included certain consensual sexual acts initiated by Lyell in her late 20s and 30s.[36] The relationship was not "sexual abuse" and reasonable persons, even amongst the Defendants, agree that the relationship was not abuse.[37] Having a consensual affair does not make him a sexual abuser, nor does it cause his purely private persona to become public. Defendants made him the scapegoat and thrust him into the public after recklessly labelling him an abuser. The basis was one-dimensional: Lyell said so.[38]

Sills was not a *participant* in that controversy. Instead, other higher ups at SBC were participants in that controversy. Defendants used Lyell to create the distraction away from the powerful and, instead, implicate Sills. It was Lyell who craved the public attention. And though unpleasant in all respects, the facts remain woefully insufficient to make him a limited purpose public figure. A private person must participate in a manner "invite[s] attention and comment" and gives him "special prominence" in the controversy,[39] and "inject" or "thrust themselves to the forefront" of the controversy so as to become factors in its ultimate resolution.[40]

Another relevant consideration is whether the individual has "access to the channels of effective communication" so that he may easily rebut or counteract defamatory statements." *Id.* (quoting *Gertz*, 418 U.S. at 344).[41] Here, Sills had not the slightest awareness of the Report being

---

[36] Ex. 40, Sills Dep., at 56:22-57:14.
[37] Ex. 43, Slade Dep., at 19:13-20:21; 65:10-17; 66:5-24.
[38] *Id.* at 69:10-70:7; 73:17-74:3; 74:17-21.
[39] *Verran*, 569 S.W.2d at 439 (quoting *Gertz*, 418 U.S. at 345, 351).
[40] *Gertz*, 418 U.S. at 345.
[41] *See also*, *e.g.*, *Carr v. Forbes, Inc.*, 259 F.3d 273, 280 (4th Cir. 2001) (considering whether the plaintiff had "access to channels of effective communication"); *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 530 (6th Cir. 2014) (same); *Harris v. Quadracci*, 48 F.3d 247,

14

prepared by Guidepost. He was not contacted by Guidepost, and Guidepost did not solicit for any and all persons to reach them with (or for) information concerning the Report. The Report was kept under wraps except for a select few at the EC, on the Task Force, on the Committee on Credentials, and other people with special access, including Lyell. Sills had no idea he was the subject of fabricated stories that lacked any accompanying evidence all for investigation and publication by Guidepost, nor that he was on the List.

Sills was a professor, not a pastor as Guidepost suggests, although he did preach occasionally. College professors are generally not public figures, except in very unusual circumstances in which they obtain considerable fame or thrust themselves into the spotlight. In *Hutchinson v. Proxmire*, 443 U.S. 111, 135-36 (1979), a U.S. senator publicly criticized a professor and researcher. The Supreme Court held that the professor was not a "public figure," and reversed the award of summary judgment to the senator. *Id.* at 135-36.[42] The same is true for pastors, to the extent that Sills might be construed as such.[43]

---

251 (7th Cir. 1995) (noting that a public figure "is usually one whose status ensures easy access to the media so as to rebut defamatory statements"); *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 13637 (2d Cir. 1984) (considering whether the plaintiff "maintained regular and continuing access to the media").

[42] *Accord, e.g.*, *Sewell v. Trib. Publications, Inc.*, 622 S.E.2d 919, 276 Ga. App. 250 (2005*)* (professor not a limited purpose public figure, *even with respect to subject matter of lectures*); *Taus v. Loftus*, 40 Cal. 4th 683, 54 Cal. Rptr. 3d 775, 151 P.3d 1185 (2007) (same).

[43] In *Ogle v. Hocker*, 279 F. App'x 395 (6th Cir. 2008) (unreported), the plaintiff and defendant were both religious leaders affiliated with the same church. The Sixth Circuit held that the plaintiff was *not* a limited purpose public figure, and applied the applicable negligence standard. *Accord, e.g.*, *Gallagher v. Connell*, 123 Cal. App. 4th 1260, 20 Cal. Rptr. 3d 673 (2004) ("priest and [] pastor" is not a public figure and "[w]e have found no case which has held simply being a member of the clergy makes one an all-purpose public figure for purposes of a defamation action. We hold it does not. Clearly Gallagher is no Jerry Falwell, Jesse Jackson, or Louis Farrakhan"); *Davis v. Keystone Printing Service, Inc.*, 155 Ill. App. 3d 309, 108 Ill. Dec. 17, 507 N.E. 2d 1358 (1987) (reverend accused of certain sexual misconduct not a public figure).

15

First, Sills hardly had a "special prominence" in the controversy, much less in society, nor that he did anything to "invite… attention and comment." He is at best a minor player in a massive controversy that spanned decades (Guidepost's investigation was to cover *all* allegations of sexual abuse by EC members, and to a time period from 2000-2021) and involved many accusers and accused persons. And Sills was not a member of the EC, which was the focal point of the investigation and the Report. He was simply a scapegoat.

Second, and most importantly, there is not one shred of evidence in the record that Sills "*voluntarily* injected" himself into anything. Sills was dragged into that controversy. As explained by the Supreme Court in *Hutchinson*, "[c]learly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." 443 U.S. at 135 (citing *Wolston v. Reader's Digest Assn., Inc.*, 443 U.S. 157, 167-168 (1979)). Sills has hardly "thrust himself to the forefront," invited comment or sought to influence public discourse. In fact, Guidepost and other Defendants criticize Sills for a *lack* of public statements about the matter. *See, e.g.*, Guidepost Statement of Facts No. 31. Defendants cannot have it both ways, claiming Sills injected himself into a controversy while at the same time asserting that he remained silent.

Sills was not even aware that Guidepost was preparing to defame him. Guidepost did not transmit any correspondence to him; they did not phone him; they did not seek an interview or send the contents of their Report in advance of publication. Guidepost did not share with Sills any of the meritless accusations that served as an unvetted basis for Guidepost's defamatory findings published in their Report. Sheepishly, Guidepost merely suggests that Sills is a limited purpose public figure because, as they describe him, he is, or at least was, a "prominent Baptist author and missiologist." Br. at 19. But even assuming he was a "prominent Baptist author and missiologist"

16

at the time of publication (which he was not[44]), it is doubtful that would make him a public figure *even if the controversy was actually about his writings or teachings*. In *Hutchinson*, *Sewell* and *Taus*, for example, the subject of the defamation of the professors was their academic work, and it was still not enough to make them into limited public figures. And, while it is conceivable that a sufficiently prominent professor's writings could make him a limited purpose public figure, it would only be for purposes of any controversy arising over his writings or teachings.[45]

### C)     Sills is Not an Involuntary Public Figure

What remains is the scant possibility that Sills is an "involuntary public figure." The involuntary public figure doctrine has its origins in one sentence from the U.S. Supreme Court decision in *Gertz*, in which the Court speculated that "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own." *Gertz*, 418 U.S. at 345. But the *Gertz* Court, and the Tennessee Supreme Court, have cautioned that "the instances of truly involuntary public figures must be exceedingly rare." *Verran*, 569 S.W.2d at 439 (quoting *Gertz*, 418 U.S. at 345). Remarkably, since *Gertz*, neither the U.S. Supreme Court nor Tennessee Supreme Court has *ever* found a plaintiff to be an involuntary public figure. Just last year the Tennessee Supreme Court questioned whether this classification should even exist.[46]

---

[44] Guidepost seems to agree that Sills was *not* a prominent author or missiologist at the time of publication. In fact, Guidepost goes as far as to suggest that he was completely unemployable.

[45] The case relied upon by Guidepost says exactly this – Guidepost cites *Falls v. Sporting News Pub. Co.*, 899 F.2d 1221, 1990 WL 41001 (6th Cir. Apr. 10, 1990) (unreported), in which the Sixth Circuit held, as noted by Guidepost itself, that the plaintiff's "career as a sportswriter made him a public figure *for purposes of commentary on him as a sportswriter*." 1990 WL 41001, at *3 (emphasis added); Br. at 19. But Mr. Falls' career as a sportswriter did not make him a public figure for purposes other than his *writing about sports*. *Accord, e.g.*, *Lerman v.*, 745 F.2d at 138 (writer's participation in public discussions about "contemporary standards regarding nudity" made her a "willing participant in *this* public controversy") (emphasis added).

[46] The Court noted that "[s]ome commentators have questioned the viability of the involuntary public figure category." *Charles*, 693 S.W.3d at 274 n.6 (citing Jeffrey Omar Usman, *Finding the*

In in *Lewis v. Newschannel 5 Network, L.P.*, 238 S.W.3d 270 (Tenn. Ct. App. 2007), the Tennessee Court of Appeals held that the appropriate universe of "involuntary public figures" would approximate that "category of involuntary public figure described in Justice White's concurrence in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29 (1971)." *Lewis*, 238 S.W.3d at 299. Justice White predicted that "involuntary figures" would be persons implicated in actions relating to public officials, stating that "the [d]iscussion of the conduct of public officials cannot ... be subjected to artificial limitations designed to protect others involved in an episode with officials from unfavorable publicity." 403 U.S. at 61 (White, J. Concurring). In *Lewis,* the Tennessee Court of Appeals expressly endorsed the view, endorsed for decades by commentators,[47] that the cohort of involuntary public figures predicted by Justice White in *Rosenbloom* "provides the 'breathing' space required by the First Amendment and Article I, Section 19 of the Constitution of Tennessee." 238 S.W.3d at 299.

Sills is not an "involuntary public figure" under *Lewis*. The statements at issue in this matter do *not* address the conduct of public officials.

### ii.    Guidepost Has No Common Interest Privilege

The common interest privilege is a conditional privilege which "has been recognized in Tennessee to cover communications *between employees or agents of the same business or corporations*." *Tate v. Baptist Mem'l Hosp.*, No. W1999-00553-COA-R3-CV, 2000 Tenn. App.

---

*Lost Involuntary Public Figure*, 2014 Utah L. Rev. 951, 952-53 (2014); Rodney A. Smolla, *Law of Defamation* § 2:33 (2d ed.), Westlaw (database updated May 2024)). The *Charles* court included the classification in its definition of public figure only because the U.S. Supreme Court had not yet expressly abandoned it.

[47] The *Lewis* Court cited two commentaries supporting this view. David A. Anderson, "Libel and Press Self-Censorship," 53 Tex. L. Rev. 422, at 450-51 (1975) (concluding that the *Gertz* opinion suggests a "category of involuntary public figures" roughly equivalent to "individual(s) involved in or affected by . . . official action" as defined by Justice White's concurrence in *Rosenbloom*); Laurence H. Tribe, *American Constitutional Law* § 12-13, at p. 880 (2d ed.1988).

LEXIS 505, at *14-15 (Tenn. Ct. App. Jul. 28, 2000) (emphasis added) (citing *Pate v. Serv. Merch. Co.*, 959 S.W.2d 569, 576 (Tenn. Ct. App. 1996), *Woods*; and *Southern Ice Co. v. Black*, 189 S.W. 861 (Tenn. 1916)).[48] Common interest privilege cases in Tennessee "deal with employer-employee relationships, which are a specific, close, contractual relationship." *Watson*, 2024 U.S. Dist. LEXIS 218410, at *20 (collecting cases).

As discussed above, the communications between Guidepost and the Task Force were not between employees or agents of the same business, so the common interest privilege does not apply. The *Watson* court refused to expand the common interest privilege to include situations "where two separate corporations shared a mutual interest in the subject matter of their communications," reasoning that the relationship between the parties did not rise "to either the contractual interest present in [an] employer-employee relationship, nor [a] parental or regulatory interest." 2024 U.S. Dist. LEXIS 218410, at *21-23.[49] Likewise, Guidepost cannot claim a common interest privilege for its communications with the SBC and affiliates (much less to Denhollander as a mere Task Force advisor). This Court should be "wary to expand the bounds of the privilege and decline[] to do so." *Watson*, 2024 U.S. Dist. LEXIS 218410. at *25 (citing *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004)).

---

[48] Tennessee courts have narrowly expanded the common interest privilege to also include a school's communications with parents of its students and communications between a hospital and medical group. *Watson*, 2024 U.S. Dist. LEXIS 218410, at *20 (citing *McGuffey v. Belmont Weekday Sch.*, No. M2019-01413-COA-R3-CV, 2020 Tenn. Ct. App. LEXIS 242, at *45 (May 27, 2020) (holding common interest applied to communications between schools and parents of students) *Bernard v. Sumner Reg'l Health Sys. Inc.*, No. M2000-01478-COA-R3CV, 2002 Tenn. Ct. App. LEXIS 213 (Mar. 26, 2002) (communications between hospital and medical group).

[49] Neither of the cases relied on by Guidepost applied Tennessee law's narrow common interest privilege. *See Bitner v. Ottumwa Cmty. Sch. Dist.*, 549 N.W.2d 295 (Iowa 1996) (applying Iowa law); *Hoth v. Am. States Ins. Co.*, 753 F. Supp. 703 (N.D. Ill. 1990) (applying Illinois law).

19

### b. Regardless of Whether Plaintiffs Must Show that Guidepost Acted with Actual Malice or Merely Negligence, The Evidence is More than Sufficient to Create a Jury Question

In a defamation action governed by a negligence standard, it is sufficient to show that the defendant acted with negligence in failing to ascertain the truth of the statement. *Sullivan*, 995 S.W.2d at 571. To determine negligence, "the conduct of the defendant is to be measured against what a reasonably prudent person would, or would not, have done under the same or similar circumstances." *Pate*, 959 S.W.2d at 574-75 (quoting *Nichols*, 569 S.W.2d at 418).

To prove actual malice, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication, and that publishing, with such doubt, shows reckless disregard for truth or falsity and demonstrates actual malice. *Pate*, 959 S.W. 2d at 577-78 (citing *Moore v. Bailey*, 628 S.W.2d 431, 433-4 (Tenn. App. 1981)).

The Supreme Court and the Sixth Circuit make clear that deliberately ignoring readily available contradictory evidence constitutes "reckless disregard" of the truth.[50] Tennessee follows the same rule: "failure to thoroughly investigate" is negligence, but "purposeful avoidance of the truth" is evidence of actual malice. *Charles*, 693 S.W.3d at 282 (citing *Harte-Hanks and Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 74–75 (Tenn. Ct. App. 1986)). The key inquiries include whether Guidepost "entertain[ed] serious doubts," or "when there exists obvious reasons to doubt the veracity of [Lyell] or the accuracy of the information itself." *Hibdon*, 238 S.W.3d at 301. Actual malice can be shown even when a lengthy investigation takes place, as it is but the *quality* of an investigation – not just its length – matters for malice. *Compuware* teaches that even an

---

[50] *See Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (purposeful avoidance of the truth supports actual malice, including refusing to interview key witnesses and ignoring recordings undermining the story); *Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 411 (6th Cir. 1991) (same); *Cobb v. Time, Inc.*, 278 F.3d 629, 639–40 (6th Cir. 2002); *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 522 (6th Cir. 2007) (purposeful avoidance distinct from mere non-investigation).

"investigat[ion]" does not preclude a finding of malice if contradictory evidence is ignored. 499 F.3d at 528. As the Sixth Circuit explained, "the sum total" of evidence must be viewed to determine if a jury could find actual malice. *Id.* Here, even if an "actual malice" standard applies, Plaintiffs have presented evidence that Guidepost acted with at least reckless disregard for the truth and the evidence far surpasses the threshold of what a negligence standard requires. Guidepost declined to consider readily available contrary evidence and avoided obvious sources that would have undercut its conclusions.[51]

### i. Guidepost Made No Attempt to Interview Sills and Other Key Witnesses

Guidepost inexplicably made no attempt to interview Sills.[52] This, in and of itself, was a fatal shortcoming. All definitions of sex "abuser" are focused on consent - *i.e.*, did the accused have the consent of the accuser? In comparison, the accused plaintiff in *Hunt was* interviewed, apparently more than once,[53] and, in fact, Hunt was given an additional opportunity to provide more information and/or rebut statements made by other witnesses shortly before Guidepost published the Report to the SBC, but he failed to do so and, accordingly, neither "Hunt nor his retained legal counsel ever told the investigators that he viewed the encounter as consensual."[54]

Mary Sills was not interviewed either.[55] Guidepost also neglected to interview the Seminary president, Mohler, and the other witnesses present at the meeting when Mohler confronted Sills: Dr. Adam Greenway (Dean of the Billy Graham School), Dr. Randy Stinson

---

[51] Ex. 69, GPSILLS_001353, 65.
[52] Ex. 47, Guidepost 30(b)(6) Dep., at 32:10-12.
[53] *See, e.g.*, Report at 66 n.166 (citing "Interview Memorandum of Hunt"); *See also Hunt*, 777 F. Supp. 776, 828 (M.D. Tenn. 2025) (*Hunt* Summary Judgment Opinion) (referring to Hunt's "last interview"); *Hunt SOF* at 27 (No. 69).
[54] *Id.*
[55] Ex. 47, Guidepost 30(b)(6) Dep., at 32:10-12.

21

(SBTS Provost), and Craig Parker (SBTS Senior Vice President).[56] Guidepost did not interview any police department (for which no records exist); they did not interview any of Lyell's family members who would dispute Lyell's characterization of her childhood and them; they did not explore Lyell's Seminary applications which highlighted psychological struggles; they did not explain EC's prior position that Lyell was not truthful. Instead, they took Lyell's explanations (and those of her attorney, Denhollander) as the primary (and nearly exclusive) source. In so doing, Guidepost abandoned its duty of thoroughness.[57]

### ii. Guidepost Was Aware of Questions About Lyell's Account of Events

Guidepost had many reasons to be concerned about the veracity of Lyell's accounts of events. The consensual sexual relationship started in 2006 (Sills testified about Lyell's rejected advances prior to 2006), when Lyell was 28, and ended in approximately 2016,[58] when she was 38. Lyell was not a child. Lyell did not report the alleged abuse to anyone until 2018. And she incongruously stated that she participated in a non-consensual relationship, involving physical violence and coercion (including coercion in the form of threats of violence),[59] over a period of 10 years. While it is certainly plausible that a colleague might be subjected to an unwanted or nonconsensual touching once or twice, Lyell kept voluntarily spending time with Sills "over a period of approximately 10 years," at times driving hundreds of miles to see Sills and his family, which militates strongly against any inference that the relationship, which included her performing oral sex, was non-consensual.

---

[56] Ex. 33, Mohler Dep., at 34:14-22.
[57] Dkt. No. 390-7, at 67-68.
[58] Ex. 40, Sills Dep., at 24:8-14; 56:7-9; 57:15-21.
[59] According to the Report, Lyell "told Dr. Mohler and her boss at Lifeway that any sexual contact she had with Professor Sills had been nonconsensual and involved violence, threats of violence against her and others, and coercion." Report at 81.

And to the extent any Defendant is contending that the relationship was inherently coercive due to a so-called power imbalance, that notion is ridiculous. Sills testified[60] (and is entitled to an inference for summary judgment purposes) that the sexual relationship started around 2006, after Lyell was no longer a graduate student.[61] And even if the jury were to find that the relationship *started* when Lyell was a graduate student, she spent nearly all of the duration of the relationship working in publishing.[62] ████████████████████████████████████████ ████████████████████████████████████████████.[63] By the time the relationship ended in 2016, Lyell, then 38 and Vice President of a SBC subsidiary, was described as "the highest-ranking woman at any of the SBC's major entities — a publishing editor and publisher who'd worked on a dozen bestsellers."[64] Following her unexpected passing, a peer journalist, Robert Downen of *Texas Monthly*, tweeted "[d]o not let all of the posts talking about how kind Jen Lyell was distract you from the fact that she was probably the smartest person in almost any room."[65]

████████████████████████████████████████,[66] and the fact that mental health is always a proper consideration in an investigation that rests heavily on witness

---

[60] Ex. 40, Sills Dep., at 23:1-5.
[61] Ex. 110, SBTS000495 at SBTS000528 (Seminary withdrawing Lyell from PhD program because she had "not registered for classes for some time."); *Id.* at SBTS000555 (anticipated graduation date of May 2005).
[62] Ex. 26, Lyell Dep., Day 1, at 31:1-12.
[63] ████████████████████████████████████████
[64] Smietana, Bob, "At memorial, friends mourn loss of Jennifer Lyell, SBC whistleblower and publishing exec," *Religion News* (June 27, 2025), https://religionnews.com/2025/06/27/in-nashville-jen-lyells-friends-mourn-her-passing-at-memorial-service/.
[65] R. Downen Tweet (June 8, 2025), https://x.com/RobertDownen_/status/1931796464285401177.
[66] Ex. 80, ████████████████████████████

credibility, should have prompted closer scrutiny of Lyell's credibility.[67] But these issues were ignored.

### iii. Many Insiders Raised Doubts About the Quality of Guidepost's Investigation and the Proposition that Sills Was a Sex Abuser

Many insiders expressed concern about Sills being labeled a sexual abuser due to a lack of corroboration of Lyell's allegations, including telling Guidepost they had no proof of abuse.

Guidepost was also aware of the concerns of Jamie Jordan, counsel for the EC, made to Ed Upton, an Assistant to the SBC President, regarding Lyell's allegations.[68] Mr. Jordan expressed that (1) Lyell's story was not clear whether the alleged abuse was "child sexual abuse, abusing a relationship of trust, or some type of power differential abuse (such as professor/student)," (2) that the case "was all 'abuse' may be harder to make, at least to a jury" when Lyell said "that the abuse continued for more than a decade, apparently part of which time she was in counseling,…continu[ing] [while] the victim ha[d] become a mature adult, and (3) that "[i]f BP writes that Sills sexually abused Ms. Lyell, it has a made a statement which would be reasonably expected to gravely harm his reputation and his ability to earn a living in his profession . . . and if BP cannot provide that proof, then it may be held legally liable."[69]

Laura Erlanson, , an Executive Committee employee assigned to Baptist Press[70] and journalist was interviewed by Guidepost in connection with Lyell's allegations on January 10,

---

[67] Guidepost's expert, Douglas Leff, an experienced investigator and prosecutor, when asked why it was "important to know about, like, the victim's mental health," he responded that "in any case, a victim's credibility, a complainant's credibility is squarely an issue. So it's important for us to resolve whether there's something so paramount in there that either we just can't in good faith accept their allegations, or that we would – in the case that I was mostly working, this was in a law enforcement capacity, so whether it would be something so legally insufficient as a matter of law that we couldn't even, at this point, present it to the prosecutors to consider." Ex. 22, Leff Dep., at 31:23-32:11.

[68] Ex. 47, Guidepost 30(b)(6) Dep., at 205:25-206:11.

[69] *Id.*

[70] The Baptist Press is "under the umbrella of the SBC [EC]." Ex. 24, Erlanson Dep., at 12:10-14.

2022.[71] Guidepost questioned Erlanson about her March 7, 2019, email to Sing Oldham, Shawn Hendricks and David Roach.[72] Erlanson expressed the same concerns to Guidepost as she did to her superiors at Baptist Press: that *David Sills should not be accused of sexual abuse if that allegation could not be confirmed or corroborated*.[73] Guidepost knew Erlanson viewed Lyell's story as "a long term affair between two adults" which should have been reported to police if true.[74] Erlanson further informed Guidepost: "When the circumstances are murky and there is no outside confirmation (police report, civil action, third party [public] testimony, etc.), it is journalistic malpractice to accuse a person of criminal behavior."[75] Erlanson's name does not appear anywhere in the Report.



---

[71] Ex. 70, GPSILLS_000781.
[72] Ex. 25, EC_0002462.
[73] Ex. 70, GPSILLS_000781 at GPSILLS_000787; Ex. 25, EC_0002462 (emphasis added).
[74] *Id.*; GPSILLS_000781 at GPSILLS_000787.
[75] Ex. 70, GPSILLS_030938.
[76] Ex. 75, at GPSILLS_013523.
[77] *Id.* at GPSILLS_013534.
[78] *Id.* at GPSILLS_013535.
[79] Ex. 76, at GPSILLS_014867.

Jonathan Howe, EC VP of Communications, similarly told Guidepost that there should be an arrest or lawsuit (among other things) before it is covered by the Baptist Press.[80]

██████████████████████████████████████████████████████████████

███████████████████████████████████████████ ██ ████████████

██████████████████████████.

Jamie Jordan and Jim Geunther, in-house counsel for EC told Guidepost during their interview that Lyell's allegations could not be "substantiate[d] or prove[d]."[82]

Ed Upton, EC VP, reported to Guidepost that Augie Boto, former SBC CEO, questioned Lyell's allegations: "how someone can be raped for 12 years without it being consensual."[83]

██████████████████████████, ████████████████████████████████

██████████████████████████████████████████████████████████████

████████"[84]

David Roach, who wrote the first draft of the March 2019 Baptist Press article, acknowledged the "libel risks of criminal activities" of that article, acknowledged that Lyell indeed reported a "morally inappropriate" relationship with Sills and that "Jennifer did something wrong."[85]

And finally,[86] Sing Oldham, VP of Convention Communications and Relations, told Guidepost that there was "no corroborating testimony from external source;" that "JL [Lyell]

---

[80] Ex. 77, GPSILLS_014902 at 913.
[81] Ex. 78, at GPSILLS_013739.
[82] Ex. 82, at GPSILLS_000864.
[83] Ex. 83, at GPSILLS_001189.
[84] Ex. 84, at GPSILLS_001527.
[85] Ex. 85, at GPSILLS_001488-89.
[86] This list of people interviewed by Guidepost who expressed doubts as to Lyell's allegations is not exhaustive, but rather illustrative of the information Guidepost possessed. Other examples exist.

want[ed] BP [Baptist Press] to affirm and assert that she had been sexually abused when BP did not have adequate information that had occurred;" "for [Baptist Press] to claim abuse . . . would increase liability exposure that [Sills] performed a criminal act without corroboration of criminal act;" "to claim abuse without corroboration is not appropriate for [Baptist Press] to do."[87]

Additionally, Guidepost's expert conceded that exculpatory evidence must be gathered in any full investigation, yet Guidepost ignored exactly the evidence that might exonerate Sills.[88]

A jury could easily conclude Guidepost proceeded "knowing [the statement] was false or with reckless disregard." *Finney v. Jefferson*, No. M2019-00326-COA-R3-CV, 2020 Tenn. App. LEXIS 428, at *1 (Ct. App. Sept. 23, 2020). Indeed, the only published source for Guidepost's defamatory conclusions was Lyell herself – hardly a bastion of objectivity. ██████████████

████████████████████████████████████████████████████████████████████

████████████████.[89] Those communications would have revealed numerous instances of Lyell's expressing her desire for Sills.[90] A reasonable jury could infer that Guidepost deliberately ignored obvious discrepancies and published the allegations anyway.

### iv.    Guidepost Refused to Retract Its Defamatory Statements

After the Report was released, Plaintiffs requested that each Defendant retract their defamatory statements.[91] "A refusal to retract after a request for retraction is made or the

---

[87] Ex. 69, at GPSILLS_001353.
[88] Ex.22, Leff Dep., at 39-41.
[89] Ex. 27, Lyell Dep., Day 2, at 81:15-82:8.
██ ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████  These examples are just a small sample of Lyell
expressing affection for Sills throughout their relationship.
[91] Ex. 131, Retraction Letter.

republication after notice is given of the falsity of the statements is evidence of malice." *Myers*, 959 S.W.2d at 164. To date, Guidepost has not retracted its defamatory statements.

### 3. Plaintiffs Present Sufficient Evidence of Reputational and Emotional Harm

Guidepost argues that Sills cannot show harm because his reputation was already "totally destroyed" by 2018. Br. at 3. Though Guidepost's assessment is not accurate, Tennessee sets a fairly low bar for the recovery of damages in a defamation action, as "[t]he issue is whether the record contains *any* material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering." *Myers*, 959 at 164 (citing *Handley v. May*, 588 S.W.2d 772, 776 (Tenn. Ct. App. 1979)) (emphasis added). Thus, "any" evidence of "personal humiliation, or mental anguish and suffering" is enough to go to trial, and a person wrongfully and publicly accused of being a sex offender easily makes such a showing. Plaintiffs disclosed physicians to support these facts (Dkt. No. 309), however, Defendants elected to not solicit the testimony. Nonetheless, Plaintiffs can show much more than that, as Sills lost professional opportunities, too.

Plaintiffs' vocational expert, Erin Bailey, opined that the allegation of a sometimes non-consensual relationship, made by Lyell in March 2019, did not result in a permanent impact to Sills employability.[92] She further testified that starting in August 27, 2018, to September 2021, that "to some degree" he became damaged from employability. She did not say Sills was permanently unemployable. "It's further impacted because you have people in high level positions, in leadership agreeing with these allegations hired, especially after this report. So I think that this was ultimately, you know, the stamp on the -- on his not getting employment in his intended

---

[92] Ex. 5, Bailey Dep., at 60:12-21.

28

field."[93] "You know, I think that he -- again, Global Outreach was going to hire him and -- until that opportunity was discontinued or ended because of outside influence. So that demonstrates that he could have been hired in a job if people didn't talk to that employer. I do think that the Guidepost report and the support of this report from the [EC] is what truly impacted his ability to become employable in this field."[94]

Guidepost mischaracterizes the testimony of Robert Fisher, Plaintiffs' reputational repair expert. Fisher's job was dealing with the problem of a restoring reputation that has been harmed. For his expertise, "who caused it, when they caused it, at that point, is not germane."[95] He stated in his deposition that there are different levels of reputational harm.[96] He stated the harm "gradually grew" and it was a "gradual snowball effect."[97] He further stated that the harm could have been contained in 2019, but after publication of the Report "all of a sudden, everyone knew about it."[98]

Finally, Guidepost states that "[t]here is no evidence that Guidepost defamed Mary." Br. at 27. This is true enough, at least as to Guidepost,[99] but misses the point. Mary Sills suffered emotional damage from the defamation of her husband as a result of the defamatory statements of all Defendants. It is established by statute[100] that a spouse can sue for loss of consortium when his or her spouse is a tort victim. Further, Tennessee is among those jurisdictions in which a spouse may recover for emotional injuries in an action not involving physical injury to either spouse.[101]

---

[93] *Id.* at 103:22-104-3.
[94] *Id.*, at 105:5-12.
[95] Dkt. 355-21, Fisher Dep., at 43:6-7.
[96] *Id.*, at 41:11-12.
[97] *Id.*, at 43:19-22.
[98] *Id.*, at 44:19-22.
[99] This is not true as to Defendants Barber and SBC, as they did defame Mary Sills.
[100] Tenn. Code Ann. § 25-1-106
[101] *Spicer v. Thompson*, No. M2002-03110-COA-R3-CV, 2004 Tenn. App. LEXIS 436, at *113 (Tenn. Ct. App. July 7, 2004) (unpublished) (affirming award to spouse of defamed person

Plaintiffs have pleaded that Mary suffered considerable mental anguish as a result of the defamation of her husband, and Guidepost has *not* suggested that her claim fails for any lack of such injury.

### B. Plaintiffs Present Sufficient Evidence to Support Their Negligence Claim

Under Tennessee law, a negligence claim requires proof of the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause. *Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005) (citing *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998)). Guidepost contends it owed Sills no duty, acted with due care, and that Plaintiffs have no injury proximately caused by their conduct. Br. at 28-30.

#### 1. The Record Supports the Existence of a Duty of Care Owed by Guidepost

A duty is defined as "the legal obligation a defendant owes to a plaintiff to conform to the reasonable person standard of care in order to protect against unreasonable risks of harm." *Leatherwood v. Wadley*, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003) (citing *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn.1995)). "Whether a defendant owes a duty to a plaintiff, in any given situation is a question of law for the court." *Id.* (citing *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn.1993)). The "existence and scope of the duty of the defendant in a particular case rests on all the relevant circumstances, including the foreseeability of harm to the plaintiff and other

---

in defamation action. Accord, e.g., *Benton v. Knoxville News-Sentinel Co.*, 130 S.W.2d 106, 108 (Tenn. 1938) ("A husband may maintain an action to recover damages suffered by him as the result of the libel of his wife."); *Dunn v. Alabama Oil & Gas Co.*, 42 Tenn. App. 108, 299 S.W.2d 25 (1956) (loss of consortium recoverable in malicious prosecution action). At the time *Benton and Dunn* were decided, only a husband (not a wife) could recover under Tennessee common law. Tenn. Code Ann. § 25-1-106 was designed to make this reciprocal, and allow a wife to also recover this element of damages from a tort directed at their husband.

similarly situated persons." *Id.* (citing *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 433 (Tenn. 1994)). A harm is foreseeable "if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of dallier to the party to whom is owed a duty is probable." *Doe v. Linder Const. Co.*, 845 S.W.2d 173, 178 (Tenn.1992).

There are many contexts in which courts have sustained negligence claims brought by persons who were foreseeably harmed by negligently performed investigations. In *Wolfe v. MBNA Bank*, 485 F. Supp. 2d 874 (W.D. Tenn. 2007), for example, the court held had a duty of care existed under Tennessee law to the purported applicant for a credit card to take adequate precautions to verify[102] that the person submitting the application was the person s/he purported to be.[103]

A plaintiff should be able to sue for negligence and defamation over similar facts. First, there may be a negligent investigation that harms the plaintiff, but not a publication by the person performing the investigation, as in *Wolfe*. Here, for example, Guidepost alleges it did not publish anything. While Plaintiffs vigorously contest this, outcomes are uncertain.[104] Second, another reason to allow both claims to go forward is if, hypothetically, there are damages that a plaintiff could recover under a negligence theory but not a defamation theory.

Here, too, as in *Wolfe*, it was not only *foreseeable* that persons identified in Guidepost's investigation who were wrongly accused of sexual abuse, and their immediate families, would

---

[102] The court dismissed a separate claim based on a negligent *investigation*, but only because it held the claim was preempted by the federal Fair Credit Reporting Act.
[103] *Accord, e.g.*, *Sharpe v. St. Luke's Hospital*, 821 A.2d 1215 (Pa. 2003) (subject of drug test can sue for reputational damage against firm that negligently performed drug test); *Texas Farm Bureau Ins. Co. v. Sears*, 54 S.W.3d 361, 369 (Tex. App. 2001) (employer had duty to subject of investigation "to use reasonable care in conducting the investigation").
[104] Even without a publication, a plaintiff should be able to recover under a negligence theory if (1) the investigation was negligent, and (2) it set in motion a natural and foreseeable chain of events that harmed the plaintiff.

31

suffer reputational and pecuniary injuries – it was absolutely *certain*. Under the circumstances, Guidepost had a duty of care to the subjects of its investigation. Guidepost undertook a professional investigation of highly sensitive allegations and thus owed basic duties of care: to conduct interviews fairly, to include contrary evidence, and to avoid defaming an innocent person.

Guidepost relies on cases concerning accountants, Br. at 29, which are not particularly analogous. Barring unusual circumstances, the subject of an accountant's work is its client and will rarely be a third person. In the accountant cases, the question is whether there is a duty of care f to non-clients who *rely* on the report – not whether there is any duty of care to the *subject* of the report.

### 2. There is Sufficient Evidence for the Trier of Fact to Find that Guidepost Breached Its Duty of Care

Plaintiffs incorporate by reference Section III(A)(2)(b), *supra*, which discusses why Guidepost was negligent (and, indeed, reckless).

### 3. Evidence Shows Defendants' Failure to Exercise Due Care Caused Plaintiffs' Harm

As discussed in Section III(A)(3), *supra*, Plaintiffs have suffered pecuniary and reputational harm and related emotional injury as a result of Defendants' conduct.

### C. Plaintiffs Present Sufficient Evidence of Intentional Infliction of Emotional Distress to Preclude Summary Judgment

The elements of IIED are (1) intentional or reckless conduct by Guidepost; (2) that is "so outrageous" as to exceed all bounds of decency; and (3) that results in "serious mental injury" to the plaintiff. *Joiner v. Meharry Med. Coll.*, No. 3:18-cv-00863, 2020 U.S. Dist. LEXIS 222240, at *27-28 (M.D. Tenn. Nov. 28, 2020) (quoting *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). Tennessee courts describe the required conduct as "atrocious," "utterly intolerable," and "beyond all possible bounds of decency." *Doe v. Belmont Univ.*, 334 F. Supp. 3d at 903 (quoting *Goldfarb*

32

*v. Baker*, 547 S.W.2d 567, 569 (Tenn. 1977)). Damages are limited to the most severe emotional injuries. *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003).

### 1. There is Evidence of Outrageous Conduct by Guidepost

Plaintiffs have shown outrageous conduct: Guidepost completed a sloppy and incompetent investigation into what Guidepost itself has characterized as "the sexual abuse scandal that pervaded the SBC" (Br. at 19), then cherry-picking compliant subjects to interview, avoiding important witnesses, before falsely branding Sills a sex offender and featuring him alongside child abusers on a public list. For Sills, a respected professor, to be labeled a "sexual abuser" and hung out to dry without evidence is profoundly humiliating and distressing. Reasonable minds could differ whether that rises to "extreme and outrageous." Tennessee law permits a jury to decide that question when there is sufficient evidence of recklessness or malice. *Moorhead v. J. C. Penney Co.*, 555 S.W.2d 713, 718 (Tenn. 1977). Here, the record shows Guidepost either intentionally or recklessly published the false allegations.

### 2. There is Sufficient Evidence for the Jury to Find that Plaintiffs Suffered Severe Injuries

As for injury, Sills has presented evidence (through his own testimony and that of his wife) of nightmares, insomnia, depression, anxiety, and damage to his career and marriage – far beyond mere annoyance. Guidepost's dismissal of Sills's emotional distress because he continued working and traveling is not decisive; mental anguish can occur even if outward life appears normal. Whether Sills's distress is "so severe that no reasonable person would be expected to endure it" is again a factual determination. *Joiner v. Meharry Med. Coll.*, No. 3:18-cv-00863, 2020 U.S. Dist. LEXIS 222240, at *37 (M.D. Tenn. Nov. 28, 2020). Sills *has* come forward with evidence of harm. Defendants elected to not proceed with the disclosed witnesses on this subject. To the extent Guidepost claims Mary Sills's claim should fail because she was "not mentioned" in the report,

33

that is also erroneous. It is established by Tennessee statutory and common law that a spouse may recover damages from a tort directed towards her husband, even when there is no physical injury. Because genuine disputes remain on each IIED element as to both Plaintiffs, summary judgment is unwarranted.

### D. Ecclesiastical Abstention Is Inapplicable Because the Issues Are Secular, Not Religious

Guidepost[105] asserts that all of Plaintiffs' claims are barred by the ecclesiastical abstention doctrine, which prohibits civil courts from resolving intra-church disputes involving faith or doctrine. Br. at 27-28. But courts have repeatedly rejected the application of this doctrine to defamation claims concerning allegations of sexual misconduct, including in two recent cases relating to the very same Guidepost Report. *Hunt v. S. Baptist Convention*, No. 3:23-cv-00243, 2024 U.S. Dist. LEXIS 41021 (M.D. Tenn. Mar. 8, 2024) (doctrine did *not* apply where statements were made "outside of the religious practice context" and involved no doctrinal issue); *Garner v. S. Baptist Convention*, No. E2024-00100-COA-R3-CV, 2025 Tenn. App. LEXIS 4, at *29 (Tenn. Ct. App. Jan. 8, 2025) (no allegation that the defendants' "conduct resulted from the application or interpretation of any religious canon"). This case, like *Hunt* and *Garner*, involves no application or interpretation of religious doctrine, and ecclesiastical abstention is not applicable.

## IV. CONCLUSION

For all the foregoing reasons, Guidepost's Motion for Summary Judgment should be denied in its entirety.

Dated: November 3, 2025           Respectfully submitted,

By: /s/ *Katherine B. Riley*
Katherine Barrett Riley (TN BPR#021155)

---

[105] Guidepost is not a religious organization., instead describing itself as ". . . a leader in domestic and international investigations, compliance solutions, monitoring, and security and technology consulting." *See* https://guidepostsolutions.com/, last accessed on Oct. 30, 2025.

34

John W. ("Don") Barrett (admitted *pro hac vice*)
Sterling Aldridge (admitted *pro hac vice*)
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, MS 39095
Ph: (662) 834-2488
Fax: (662) 834-2628
kbriley@barrettlawgroup.com
dbarrett@barrettlawgroup.com
saldridge@barrettlawgroup.com

*/s/ Shannon M. McNulty*
Shannon M. McNulty (admitted *pro hac vice*)
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, 36th Floor
Chicago, Illinois 60602
(312) 899-9090
(312) 251-1160 Facsimile
SMM@cliffordlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Katherine B. Riley, hereby certify that on November 3, 2025, I served the above and foregoing on all counsel of record via the Court's CM/ECF filing system.

*/s/ Katherine B. Riley*
Katherine B. Riley