IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **MICHAEL DAVID SILLS and MARY SILLS,** | ) | |
| | ) | **NO. 3:23-cv-00478** |
| **Plaintiffs,** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **v.** | ) | **MAGISTRATE JUDGE FRENSLEY** |
| | ) | |
| **SOUTHERN BAPTIST CONVENTION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM</u>**

Amid criticism of its handling of sexual abuse allegations, the Executive Committee of the Southern Baptist Convention (the "Executive Committee")[1] retained Guidepost Solutions LLC ("Guidepost") in 2021 to conduct an independent investigation into the Executive Committee's mishandling of allegations of sexual abuse, the mistreatment and intimidation of victims and advocates, and other related matters. At the conclusion of its investigation, Guidepost issued a "Report of the Independent Investigation" (the "Report").[2] The Report includes details about allegations of sexual abuse made by Jennifer Lyell against Plaintiff Michael David Sills ("Sills"), a professor at the Southern Baptist Theological Seminary (the "Seminary"). (Report at 81). In discussing Lyell's allegations and the response to her allegations, the Report refers to Lyell as a "survivor of sexual abuse" and to Sills as "her abuser." (Report at 80-92, 116-117, 119, 142-

---

1 The Southern Baptist Convention ("SBC") is under the direction of the representatives of over 47,000 Baptist churches that cooperate with the SBC. These representatives, known as "Messengers" convene once a year at a two-day annual meeting to determine officers, policies, and budget of the SBC. The day-to-day functioning of the SBC is managed by the Executive Committee. (*See* Doc. No. 424, SBC SOF ¶¶1-3).

2 The Report is filed at Doc. No. 384-8 and is cited as "Report at [page]."

143). After the Report was issued, the Executive Committee published a list of ministers who had been accused of sexual abuse (the "List"). (Doc. No. 355-18). Although some names were redacted, Sills's name was not. (*Id.*). Following issuance of the Report, various individuals posted statements on social media about Lyell's allegations against Sills. (*See* Pl. Ex. 7, Doc. No. 413-1; Pl. Ex. 8, Doc. No. 413-2; Seminary SOF ¶¶ 46, 48).

Sills claims the statements labeling him a "sexual abuser" are false and defamatory. Sills and his wife Mary Sills bring claims for defamation, conspiracy to defame, negligence, and intentional infliction of emotional distress against Guidepost, the SBC, the Executive Committee, the Seminary and Albert Mohler, the Seminary's president (collectively, the Seminary and Mohler are the "Seminary Defendants"), Bart Barber and Ed Litton, each a former SBC president, Rolland Slade, the chair of the Executive Committee, and Willie McLaurin the former interim president/CEO of the Executive Committee.[3] Each of these defendants seeks summary judgment under Federal Rule of Civil Procedure 56. (Doc. Nos. 355, 359, 364, 369, 377, 380, and 382). The motions are fully briefed and ripe for adjudication.

For the reasons stated in this Memorandum, the motions filed by Litton, Barber, McLaurin, and Slade will be **GRANTED** and these defendants dismissed. The motions filed by Guidepost, the SBC, the Executive Committee, and the Seminary Defendants will be **GRANTED** as to the claims for civil conspiracy, negligence, and intentional infliction of emotional distress, and **DENIED** as to their defamation claims.[4]

---

[4] The civil conspiracy claim against Guidepost was previously dismissed. (See Memorandum and Order, Doc. Nos. 134, 135).

## I. BACKGROUND[5]

### A. The Relationship

In 2004, Lyell was a graduate student in the Billy Graham School of Missions, Evangelism, and Church Growth at the Seminary in Louisville where Sills was a professor of missiology. (*See* Doc. No. 413-53 (Lyell Academic Transcript); Doc. No. 1 ¶ 14; Sills Dep. 17-20).[6] Mary Sills testified that, in 2004, her family decided "to take [Lyell] on as a ministry as a family," and to "minister to her." (Seminary SOF ¶ 6). Thereafter, Lyell attended church with the Sills family (where Sills preached on Sunday night "every once and while"), received Christmas stockings from the Sills family, and was included with the family at various major life events (weddings, graduations, etc.). (*Id.* ¶ 8).

The parties agree that Sills and Lyell engaged in a sexual relationship, but they dispute when it began, whether it was consensual, and whether any sexual contact occurred while Lyell was a Seminary student. (Sills Dep. 24, 26-28, 339, Lyell Dep. 268). Lyell testified that the first sexual contact occurred in 2004, while she was a student. (Lyell Dep. (Day 2) 281–83). Sills maintains that no sexual contact occurred while Lyell was his student and that a consensual sexual relationship began in 2006; he testified that any sexual contact before 2006 was initiated by Lyell and rejected by him.[7] (Sills Dep. 24, 26–28; Sills Resp. to Guidepost SOF ¶ 32). Sills testified that

---

5 For ease of reference, the statements of undisputed material facts ("SOF") are cited as "[Defendant] SOF ¶ ___." The SOFs together with the Plaintiffs' responses are filed in the record as follows: Guidepost (Doc. No. 416); Executive Committee (Doc. No. 422); SBC (Doc. No. 424); Seminary Defendants (Doc. No. 420); and Slade and McLaurin (Doc. No. 418). Many of the factual assertions are repeated among the various filings.

6 Sills recommended Lyell for the Seminary's doctoral program in November 2004. (*See* Doc. No. 359-4 (recommendation)). Lyell completed her Master of Divinity in spring 2005 and began doctoral studies at the Seminary that fall. (*See* Doc. No. 413-53 (Lyell Academic Transcript)).

7 The parties dispute when the sexual relationship began, apparently in part based on what is encompassed by the term. When asked when sexual contact with Lyell began, Sills testified that, while

the relationship ended in 2014 or 2015. (Sills Dep. 339(testifying that "it stopped" in 2014 or 2015 and that "by the time [they] moved in 2016, nothing else ever happened again")).

**B. Lyell's 2018 Report of Sexual Abuse**

In May 2018, Lyell told her supervisor at Lifeway Christian Resources, Eric Geiger, that Sills had sexually abused her. (Seminary SOF ¶ 9; *see also* Geiger Dep. 41, 44-45).[8] Thereafter, in a recorded telephone call with Albert Mohler, President of the Seminary, Lyell disclosed allegations that expressly included nonconsensual or unwanted sexual contact involving Sills. (Seminary SOF ¶ 10). Lyell's disclosure was documented in a Seminary memorandum dated May 21, 2018. (Seminary SOF ¶ 11). The memorandum summarized Lyell's report as follows:

> Lyell accused current [Seminary] professor, Dr. David Sills (Sills) of sexual misconduct and assault (all unwanted) over a period of years during Lyell's tenure at [Seminary]. Lyell apparently did work at Dr. Sills' home from time to time, which is where the bulk of the alleged misconduct occurred.

(Doc. No. 413-55).

Shortly thereafter, Mohler and other Seminary administrators (Adam Greenway, Randy Stinson, and Craig Parker) met with Sills in person and told him that Lyell had alleged that he committed nonconsensual sexual acts against her. (Seminary SOF ¶¶ 12-13; EC SOF ¶ 2). Sills admitted that "there were probably some inappropriate things that ha[d] happened" that he "wouldn't want to happen on the platform of the chapel." (Seminary SOF ¶ 14; Sills Dep. 71-72).

---

Lyell was a student at the seminary in the fall of 2004, there was a "an attempt that was not successful." (Sills Dep. at 26-28 (stating that they kissed on the lips in his hotel room while on a church trip)). He testified that the relationship became "inappropriate, sexually" in 2005, the year Lyell graduated from the master's division and began doctoral studies. (*Id*. at 24; Doc. No. 413-34 (Lyell Resume); Doc. No. 413-53 (Lyell Academic Transcript)).

[8] Geiger testified in 2024 that Lyell told him that Sills "forcibly plac[ed] himself on her, grop[ed] her, touch[ed] her on an airplane in her private parts, forcibly tr[ied] to kiss her, restrain[ed] her when she wanted to move away" while they were outside of the United States when she was a Seminary student. (Geiger Dep. 41, 44-45).

The Seminary has a "zero tolerance" policy with respect to any form of adultery or sexual misconduct outside of marriage and Sills's employment contract included provisions concerning actions of "moral turpitude" and expectations of behavior consistent with Southern Baptist statements of faith and sexual morality. (Seminary SOF ¶¶ 16, 17). Based on Sills's admissions during the meeting, Sills was presented with two options: resign or invoke his right for the Seminary to fully investigate Lyell's claims as specified in the Seminary's personnel policies. (Seminary SOF ¶ 18; EC SOF ¶ 3; Guidepost SOF ¶ 11). Sills chose to resign and tendered his resignation later that same day. (Seminary SOF ¶ 19; EC SOF ¶ 4; Guidepost SOF ¶ 12). Sills later resigned from all boards of which he was a member. (Guidepost SOF ¶ 12). After his resignation, Sills's publishers terminated his contracts. (EC SOF ¶ 7).

On the evening of his resignation, the Sillses met with their pastor, Dr. Bill Cook. (Seminary SOF ¶ 21). Sills disclosed to Dr. Cook that Lyell had made allegations concerning nonconsensual sexual contact and confessed to inappropriate behavior with Lyell consisting of "hugging" or "snuggling" on the couch in the basement of his home. (Seminary SOF ¶ 23). Cook asked Sills to go before the church congregation to acknowledge that he had acted in a "tawdry, inappropriate way" and ask for forgiveness, and Sills declined, stating that he had been advised by counsel not to do so. (Seminary SOF ¶¶ 24, 25; Cook Dep. at 28; Sills Dep. at 129 and 132). Cook later informed the congregation that Sills had confessed that he had been involved in "tawdry acts with someone that wasn't his wife"; had resigned from "reaching and teaching"; was being publicly rebuked; and would have his sermons removed from the church's website. (Cook Dep. at 30).

By June 2018, Sills was beset by "rumors," causing him to acknowledge to at least potential employers – Samaritan's Purse and NAMB – that he had been accused of "unfair accusations that

went beyond inappropriate interaction." (Guidepost SOF ¶ 61). On June 22, 2018, *Baptist News Global* reported on his resignation. Bob Allen, *Amid #MeToo fallout, Southern Baptist males quietly leaving jobs*, BAPTIST NEWS GLOBAL, June 22, 2018.[9] Years later, in October of 2021, in what appears to be a private electronic communication, Sills reflected that "[t]he grain of truth was sufficient to end my ministry and career, but the manner of untrue accusations have prevented me from finding a job of any kind since then." (Doc. No. 355-19).

**C. 2019 Baptist Press Article**

In early March 2019, Lyell approached *Baptist Press*, a division of the Executive Committee, about publishing a first-person piece concerning her alleged abuse by Sills. (EC SOF ¶ 8; Roach Dep. at 129). Lyell provided *Baptist Press* a document she drafted titled "My Story of Sexual Abuse in the SBC." (*Id.*). Before publishing the article, *Baptist Press* reporters spoke with Lyell, Mohler, and Cook. (Guidepost SOF ¶¶ 24, 28; Roach Dep. at 79). One of these reporters, David Roach, also called Sills and left a voicemail stating:

> Hello, Dr. Sills. This is David Roach with *Baptist Press*. Jennifer Lyell has released a statement to us claiming you had a sexual relationship with her while she was a Southern Seminary student. She wants to make those allegations public, and I'm working on a story. I wanted to see if you had any response.
>
> …I'll be in my office for about another 45 minutes or a little less this afternoon or you can call me in the morning any time after 8 o'clock Central. We welcome the chance to include any response you have.

(Roach Dep. 188:19-189:19). Sills received Roach's voicemail and did not respond. (EC SOF ¶ 10).

---

9 Article available at https://baptistnews.com/article/amid-metoo-fallout-southern-baptist-males-quietly-leaving jobs/.

Although Lyell told the *Baptist Press* correspondent that the relationship constituted sexual abuse, following discussions with the Executive Committee's attorney Jim Guenther, and others, the article published on March 8, 2019, removed references to "sexual abuse" and replaced them with the phrase "morally inappropriate relationship." (*See* Guidepost SOF ¶ 15; Roach Dep. 51-52, 128-29, 263; Doc. No. 373-35). Lyell then published the written narrative she had originally provided *Baptist Press* on her own website later the same day. (Lyell Dep. 281:17-282:1). The narrative stated:

> Just over nine months ago I heard the story of Megan Lively, the former Southeastern Baptist Theological Seminary student who had reported her 2003 sexual assault to Dr. Paige Patterson and SEBTS. Megan attests that Dr. Patterson did not take proper steps reporting the sexual assault or caring for Megan in its aftermath. Records regarding her allegation show that in 2003 she very clearly reported a nonconsensual sexual act performed against her person.
>
> When I heard this story, something broke in me. Something that had been held tightly for years. I walked into the office of my boss at LifeWay and told him what I'd just heard about Megan's story. I don't remember what he said in reply, but it was something along the lines of how shocking it was. Except I wasn't shocked; if anything, I was shocked that he was. I remember thinking, "God is purifying His church. God be glorified" and then I spoke. I don't remember exactly what I said, but was something along the lines of, "I was sexually abused by one of my seminary professors."
>
> My boss was shocked and appalled. That one sentence I uttered began a rapid sequence of events that modeled the best of what advocates of sexual abuse response reform are calling for in the Southern Baptist Convention. I was asked many questions to get clarity around what I was alleging as well as who was responsible. I shared how Dr. David Sills, then a tenured professor at The Southern Baptist Theological Seminary, first sexually acted against me on a mission trip in 2004, a pattern that continued and escalated for more than a decade following that trip.
>
> By the time I shared about my abuse, I had been in counseling for more than two years, which had given me the tools and support I needed to extract myself from the situation. I had told my counselor, closest friends, as well as my pastor and his wife. I had not disclosed this to SBTS or the missions agency Dr. Sills led (on which I had previously served on the board) because of the very complicated, messy nature of the relationship and my fear of the

collateral damage that telling would cause for these around him. That collateral damage was the reason that the abuse had continued for so long. The reason that a professor was able to continue grooming and taking advantage of his student was because I became like part of his family. This wasn't by accident; I believe it was by design. Having known that I experienced sexual abuse growing up, Dr. Sills assured me that the first incidents that happened on that mission trip weren't really my fault as I naturally felt—even though I had not initiated them and was shocked as the actions took place. He explained they were because of what happened to me when I was a child, He said that he could fix it by me becoming part of his family and then once I was part of his family, that sort of thing would never happen again. I now wonder if the only reason that a family relationship was ever presented as an option was to ensure I wouldn't tell what had happened in those first instances.

But a family relationship *did* develop. Over the years I spent weekends with them, my holidays with them, became an "aunt" to their grandchildren, and their grown children became like siblings to me. It looked idyllic on the surface. Except the pattern of inappropriate sexual activity continued throughout the relationship.

So that day when I shared what had happened to me with my boss at LifeWay and then later with SBTS President, Dr. Albert Mohler, I was quick to also share the responsibility I bore for being compliant at times, for not telling immediately, and for so idolizing the idea of a whole family that I protected it despite what was happening within it. I am not a sinless victim. But I am victim nonetheless.

Dr. Mohler and SBTS immediately took action. After receiving my statement, they waited for Dr. Sills to return a couple days later from an overseas trip and met with him. I was told following that meeting that he had admitted, at least, to inappropriate sexual activity and tendered his resignation. At that time I requested very strongly that SBTS not share anything about the reason for his resignation as I was trying to protect his family who I knew was about to be reeling. They took that path, which is the standard protocol for employment matters, and the Baptist Press article noting his resignation did not reference a reason for his resignation. Following the seminary's action, Dr. Sills' church also initiated an investigation and took action. The denominational institutions, the local church, and the missions agency ultimately believed me, supported me, and took the action for which they were responsible.

Over the past nine months, I have walked through the aftermath of the disclosure, which has been traumatizing itself, at times. I have lost some of the relationships dearest to me and have sat ensconced in a grief that can only be caused by sin. I have come forth now, though, because I recently learned

> that Dr. Sills had been appointed as a missionary with a non-SBC missions agency. Multiple individuals who knew what happened with me heard about this and notified the missions agency of the reasons for his departure from his previous positions while letting me know they were doing so. As a result, he is no longer listed as a missionary with this agency.
>
> But, I now realize that despite SBTS handling the situation justly and as I asked —without stating the reason for his resignation—it led to the exact kind of scenario the SBC is now trying to prevent.
>
> If I were not to come forward with this letter, a church or ministry who receives Dr. Sills' CV and does an internet search for him would have no way to know the truth behind his resignation. There are plenty of reasons to stay silent in a situation such as this. But we must not be silent. We must clearly tell the truth so that our churches and ministries are safe and pure as they can be.
>
> It is my hope that my story, one in which a SBC entity and its leaders acted swiftly and justly to remove an abuser, but in which that same individual was also in a ministry position only months later, will also help to illustrate the need for same form of a reporting tool that can ensure that those who have victimized others from a ministry position are unable to ever do so again. The only way I know to do that is to come forward myself. So, this is my way of doing just that. May God be glorified.

(Doc. No. 376-3).

Lyell's allegations were reported by numerous news outlets.[10] *See e.g.*, Brent Hobbs, *Lyell Statement on Sexual Abuse Released, Details Circumstances of SBTS Professor Resignation*, SBC VOICES, March 9, 2019 (Doc. No. 355-8); Bob Allen, *Women in SBC leadership post says #MeToo*, BAPTIST NEWS GLOBAL, March 11, 2019 (Doc. No. 355-9); Andrew Wolfson, *Southern Baptist professor accused of sexually abusing student 'by design' over a decade*, THE TENNESSEAN and LOUISVILLE COURIER-JOURNAL, March 12, 2019 (Doc. No. 355-5, 355-6 (the same article was published by both newspapers)); Samuel Smith, *Ex-SBTS prof. accused of 'grooming' former

---

[10] The Court takes judicial notice of the publication of the news articles. *See* Fed. R. Evid. 201(a)-(b) (The Court may take judicial notice of an adjudicative fact that "is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

*student in decade-long abusive relationship*, THE CHRISTIAN POST, March 12, 2019 (Doc. No. 355-7). *The Tennessean* and the *Louisville Courier-Journal* (each published the same article) reported that Sills did not return a request for comment.

### D. Executive Committee and *Baptist Press* Publicly Acknowledge that the March 2019 Article Did Not Accurately Communicate Lyell's Allegations

Ultimately, the Executive Committee entered into two settlements with Lyell and issued three separate statements, two by the Executive Committee and the other by the *Baptist Press*.

On October 5, 2019, the Executive Committee stated:

> On March 8, 2019, Baptist Press released a news story that was referenced today, October 5, 2019, by Rachael Denhollander in an interview at the Caring Well Conference.
>
> In recent days, I've been made aware of the situation surrounding the article and the decisions made by Baptist Press at the time of publication. I'm also aware that the story omitted all references to abuse and lack of consent to sexual activity, and was framed as "a morally inappropriate relationship." This also led to a general understanding that what happened between Dr. David Sills and Ms. Jennifer Lyell was a consensual affair. As I understand it, that is not accurate.
>
> As the official news service for the Southern Baptist Convention, Baptist Press should be known for integrity, truth, and accuracy. Ensuring that is my top priority.

(Doc. No. 373-21).[11]

Less than two weeks later, on October 15, 2019, *Baptist Press* issued the following statement:

> At the Caring Well conference in Dallas, Texas, several survivors shared traumatic experiences of being victims of sexual abuse (Oct. 3-5, 2019). These courageous stories, along with keynote speeches from others, greatly impacted those in attendance and those watching online.

---

[11] Sills disputes that the original *Baptist Press* article was inaccurate. He does not dispute, however, that the Executive Committee stated that the article did not accurately reflect Lyell's allegations (Guidepost SOF ¶ 62 (response)).

One of the presenters, Rachael Denhollander, shared her personal testimony of suffering through multiple instances of sexual abuse. In her interview with Russell Moore, Denhollander mentioned a situation involving the reporting of Jennifer Lyell's abuse allegations that came to light through the Baptist Press in March 2019.

Following Denhollander's comments, our staff worked diligently to reexamine Lyell's statement she provided and all communications surrounding the original publishing of her claims. After a thorough review of what was presented to the writers and editors, and discussions with those involved with its publishing, we confirm and acknowledge that our story that ran on March 8, 2019, did not accurately communicate the allegations made by Lyell.

The story in its original draft form, as submitted by the writer, clearly communicated the emotional and sexual abuse that Lyell alleged took place at the hands of David Sills as she maintained a relationship with his family. However, the story in its finished state omitted references to abuse and was framed as "a morally inappropriate relationship." This change in language seems to have led to a general public understanding that what happened between Sills and Lyell was a consensual affair.

Baptist Press ultimately failed to convey that the heart of Lyell's story was about sexual abuse by a trusted minister in a position of power at a Southern Baptist seminary. The story, as written, made concessions to legal and policy concerns, and Sills never responded to Baptist Press' request for comment. While we acknowledge these issues are always present in journalism, in this case our story apparently made it easy for some to miss what should have been the main focus. For that, we are deeply sorry.

Since the story's publication, Lyell had been the recipient of un-Christlike slurs – some by fellow Southern Baptists – and her reputation has been besmirched. In fact, the story stayed on the Baptist Press Facebook page for many hours where many of those slurs were posted. The conversation that occurs on our social media profile pages should glorify Christ in the way we treat one another and in the way we support those who report sexual abuse. In this case, it did not. Since this incident, we have enacted a more stringent Facebook commenting policy and monitor the page much more closely in order to prevent situations like this from occurring again.

For these actions, we offer a sincere apology. Lyell came to us with an allegation of abuse and should have been cared for throughout the entire process. Instead, for many this incident may have contributed to a perception that the Southern Baptist Convention is not a safe place for sexual abuse survivors to disclose. Our readers must be able to trust that the news they

> receive from us is accurate and trustworthy and that the stories we print will ultimately protect and aid those involved.
>
> This entire season of discovery of and enlightenment about sexual abuse within Southern Baptist churches and entities has caused tremendous pain and sorrow for many. We are grieved at the trauma the survivors of sexual abuse have endured and continue to endure.
>
> Baptist Press is committed to Christian journalism that prioritizes integrity, truth, and accuracy. We will pursue all of these things as we move forward, and we pray that God will find us faithful.

(Doc. No. 373-22).

In February 2022, the Executive Committee published a formal apology to Lyell:

> The SBC Executive Committee acknowledges its failure to adequately listen, protect, and care for Jenniffer Lyell when she came forward to share her story of abuse by a seminary professor. Baptist Press failed to accurately report the sexual abuse Jennifer Lyell reported to two SBC entities and local Southern Baptist churches.
>
> The SBC Executive Committee acknowledges its failures to Ms. Lyell, including the unintentional harm created by its failure to report Ms. Lyell's allegations of nonconsensual sexual abuse were investigated and unequivocally corroborated by the SBC entities with authority over Ms. Lyell and her abuser.
>
> The SBC Executive Committee apologizes for all the hurt it has caused, is grateful for Ms. Lyell's perseverance and engagement, and prays for her complete healing from the trauma she has endured.

(Doc. No. 1 ¶ 54; Doc. No. 327-9).

The Executive Committee's handling of Lyell's allegations became its own news story. *See e.g.*, Bob Smietana, *Jennifer Lyell wanted to stop her abuser by telling her story. Instead, her life fell apart.*, RELIGION NEWS SERVICE, March 18, 2021; Liam Adams, *Top Southern Baptist committee apologizes to abuse survivor for mishandling case*, THE TENNESSEAN, Feb. 22, 2022.[12]

---

[12] The Court takes judicial notice of the publication of these articles – that they were published and that they contained certain statements. *See* Fed. R. Evid. 201(a)-(b). Judicial notice does not, however, accept the truth of the factual assertions in them.

A reporter from *Religion News Service* texted Sills prior to publication of the March 18, 2021 story to talk about "a story surrounding the abuse case of Jennifer Lyell." (Guidepost SOF ¶ 30). Sills read the message, and discussed it with his wife, and chose not to respond. (Guidepost SOF ¶ 30; EC SOF ¶¶ 21-22).

### E. Independent Investigation

In 2021, in response to allegations suggesting the Executive Committee had ignored complaints of sexual abuse, the Messengers to the 2021 SBC Convention approved a motion authorizing the creation of a Sexual Abuse Task Force (the "Task Force") to engage a third party to conduct an independent investigation. (SBC SOF ¶ 15). Dr. Ed Litton, who served as the elected president of the SBC from June 2021 to June 2022, appointed the members of the Task Force, which was responsible for hiring the entity to conduct the investigation. (SBC SOF ¶¶ 27, 28). Litton also appointed advisory members of the Task Force, including Rachel Denhollander, who represented Lyell. (Litton Dep. at 29-30, 86 (Litton testified that Denhollander did not disclose to him that she was Lyell's attorney)).

Guidepost, an entity that describes itself as a "global leader in investigations" with hundreds of professionals, including former prosecutors and law enforcement officials, was engaged to investigate. (*See* Engagement Agreement, Doc. No. 373-1; SBC SOF ¶ 16; EC SOF ¶ 26; Guidepost SOF ¶ 1). Under the Engagement Agreement, the Executive Committee could not "conduct, direct, or otherwise manage or influence [Guidepost's] independent investigation" or edit, alter, modify, or otherwise have input into the contents of Guidepost's investigation report. (EC SOF ¶ 29 (citing Engagement Agreement, Doc. No. 1-2); Tongring Dep. (Guidepost 30(b)(6)) at 228).

The scope of Guidepost's engagement included investigating: (1) allegations of abuse by Executive Committee members; (2) mishandling of abuse allegations by Executive Committee members between January 1, 2000, and June 14, 2021; (3) allegations of mistreatment of sexual abuse victims by Executive Committee members from January 1, 2000, and June 14, 2021; (4) patterns of intimidation of sexual abuse victims or advocates from January 1, 2000, and June 14, 2021; and (5) resistance to sexual abuse reform initiatives from January 1, 2000, and June 14, 2021.

Guidepost explained that because Lyell reported that she had been sexually abused and that the Executive Committee mishandled her account, it investigated the circumstances of how the Executive Committee treated her case in connection with the *Baptist Press* story. (Tongring Dep. (Guidepost 30(b)(6)) at 95-96). Guidepost interviewed 300-400 witnesses as part of its investigation, including Lyell, *Baptist Press* reporter David Roach, and the other individuals involved in preparing the *Baptist Press* article and responding to its publication. (Guidepost SOF ¶¶ 20-22, 24, 31). Guidepost did not contact or attempt to contact Sills, Cook, Mohler, or Geiger.

Guidepost investigators met with Lyell twice in person and once by Zoom and acquired extensive documentation from her. (*Id*. ¶¶ 21-22). During one of the meetings with Lyell, Guidepost asked her for and obtained details of the alleged abuse. (*Id*.). Lyell told Guidepost that Sills had not only attempted "full sexual intercourse" against her will but had also entered her apartment without permission and threatened her with violence. (*Id*. ¶ 23).

Guidepost also interviewed *Baptist Press* correspondent David Roach, one of the authors of the March 8, 2019 article. (Roach Dep. 109). Roach told Guidepost investigators that, in drafting the article, he spoke with Lyell, Mohler, Cook, and Geiger. (Roach Dep. at 111). Mohler confirmed that Lyell had shared allegations about Sills and that the Seminary "took action," but would not

confirm why Sills's employment ended. (Roach Dep. at 43, 91). Mohler also told Roach that he encouraged Lyell to file a police report, but he did not know whether she had done so. (Roach Dep. 43, 236). Roach spoke with Cook who confirmed that he was "aware of a relationship of some sort that had gone on between [Lyell and Sills]" and that he "had discussed with Dr. Sills his relationship with Jennifer and the sin involved in it." (Roach Dep. 30, 61, 236). Roach also confirmed with Geiger that Lyell made allegations against Sills. (Roach Dep. 45-46). Roach recalled that Geiger and Mohler commended Lyell's courage. (Roach Dep. 236). Roach also told investigators that he left Sills a voicemail and that Sills did not respond. (Roach Dep. 188-89, 191).

Guidepost investigators asked everyone they interviewed if they knew anything about Lyell and the allegations she made. (Guidepost SOF ¶ 31 (citing Guidepost 30(b)(6) Deposition 217:1-218:9)). Guidepost maintains that none of these witnesses provided information that caused its investigators to doubt Lyell's allegations. (*Id.*).[13]

In addition to interviewing witnesses, the investigators examined internal correspondence and documents relating to the Executive Committee's handling of sexual abuse allegations. These materials included internal communications related to the decision to change the March 2019 *Baptist Press* story to state that Lyell made allegations of a "morally inappropriate relationship" rather than allegations of "sexual abuse," and communications with Lyell and others. Some of this correspondence is published in the Report. (*See* Report at 80-102).

---

[13] Sills disputes "that no witness expressed doubt about the validity of Lyell's accusations." The statement as issue does not say otherwise but rather speaks to *Guidepost's subjective view at the time of publication* that none of the witnesses had provided information *that caused Guidepost to doubt the validity of Lyell's accusations against Sills*.

Guidepost did not contact or attempt to contact Sills. and Sills did not contact Guidepost or make any other public comment. (Guidepost SOF at ¶ 32).[14]

## F. The Report

Guidepost prepared the Report summarizing the results of its investigation. A substantial portion of the Report is dedicated to a chronology of the Executive Committee's response to sexual abuse issues from January 1, 2000, to June 14, 2021. (*See* Report 39-123). Jennifer Lyell's allegations against Sills are discussed in this context. (*Id*. at 80-123). The Report details her allegations of sexual abuse, the Seminary response, the *Baptist Press* article and the decision to change her allegation of "sexual abuse" to a "morally inappropriate relationship," Lyell's efforts to have the original article taken down or corrected, the subsequent apologies, and the impact of the misrepresentation in the article on Lyell.

The Report refers to Sills's conduct as "sexual abuse," to Sills as an "abuser," and to Lyell as a "victim" or "survivor." (*Id*.).

For example, the Report includes the following statements:

> Jennifer Lyell, a senior executive at an SBC entity, was asked by executives at Lifeway and SBC entity heads to disclose her sexual abuse at the hands of her former seminary professor through a first person account to be published in [Baptist Press]. (Report 6).
>
> Jennifer Lyell, a survivor of sexual abuse, agreed in March 2019 to publicly disclose details of her abuse. Prior to this time, Ms. Lyell had not disclosed her abuse to anyone other than her therapist, closest friends, and her pastor and his wife. (Report 80)

---

[14] Prior to publication of the Report, Sills never publicly denied Lyell's allegations. Sills disputes "that the Sills remained silent" based on an undated statement Mary Sills posted online: "Friends please don't believe everything you read. The devil is alive and well and wearing a female's clothing seeking whom she'll devour next." (Doc. No. 411-30). The Sillses also claim to have told friends that Lyell's allegations were false. (Response to Guidepost SOF ¶ 32). Because the timing and scope of those communications are unclear, they do not establish that Guidepost received notice from Sills disputing Lyell's allegations before publication.

> …Ms. Lyell agreed to go public with her sexual abuse after she learned that her abuser had been appointed as a missionary for a non-SBC entity and would be in a position to groom and abuse young women against as he did with her. (Report 80-81).
>
> This disclosure was also coordinated with Dr. R. Albert Mohler, President of Southern Baptist Theological Seminary ("SBTS"), as her abuser had been employed at SBTS during his abuse of Ms. Lyell. Dr. Mohler agreed to provide corroboration of the abuse to [*Baptist Press*]. (Report 81).
>
> Professor Sills' long-time church was advised of Ms. Lyell's abuse after which he was no longer a member at that church. (Report 82).
>
> At Ms. Lyell's request, no public disclosures were made of the abuse by Lifeway or SBTS." (Report 82).
>
> Ms. Lyell was clear that any sexual contact she had with her abuser was nonconsensual and involved violence, threats of violence against her and others, and coercion. (Report 83).
>
> We did not see any evidence that was presented to [Baptist Press] that indicated that the interactions between Ms. Lyell and Professor Sills was anything but sexual abuse. (Report 83).
>
> Further, our investigation revealed evidence that people to whom Ms. Lyell disclosed, including Dr. Mohler, corroborated her abuse. (Report 84).
>
> Ms. Lyell published her full statement disclosing her abuse, which made it clear that she had been sexually abused, and never had a consensual relationship with her abuser. (Report 89).
>
> …Ms. Lyell lost her career, her health, and many of her colleagues and friends due to the way her "relationship" with her abuser was portrayed in the article written by [*Baptist Press*]. (Report 102).
>
> Essentially the fact that Ms. Lyell had been falsely portrayed as an adulteress by [Baptist Press] rather than a victim of sexual assault caused her to lose her position as a senior executive at an SBC entity, among other things. (Report 108).
>
> As a student, Jennifer Lyell was sexually abused by a professor while she was a student at Southern Baptist Theological Seminary. (Report 142).

(Report, Doc. No. 384-8).

The Report itself does not provide a definition of "sexual abuse" and used "common sense, everyday definition[s]." (Tongring Dep. (Guidepost 30(b)(6)) at 9-10, 17-18). Guidepost

representative Krista Tongring testified that, for purposes of the investigation and Report, Guidepost defined "sexual abuse" as "nonconsensual sexual touching"; a "survivor" as "someone who was the recipient of non-consensual sexual touching"; and an "abuser" as "the person who did the nonconsensual sexual touching." (Tongring Dep. (Guidepost 30(b)(6)) at 10-11). Tongring agreed that when the Report used the term "abuser," Guidepost was "indicating that the person had in fact sexually abused somebody." (*Id.*). She confirmed that these terms applied to Sills: "Q: In the report when you called David Sills an abuser, were you saying that he sexually abused Jennifer Lyell? A: Yes." (*Id.*).

Guidepost presented a draft of the Report to the Task Force for review in May 2022. (Guidepost SOF ¶ 39). The final Report was presented to the Task Force on or about May 20, 2022, and the Task Force provided the Report to the Executive Committee, which then published the Report on its website and distributed copies at the 2022 Annual Meeting. (Nathan Finn (SBC 30(b)(6)) Dep. at 136). Guidepost placed a hyperlink to the Report on its website. (Guidepost SOF ¶ 44).

### G. The List of Alleged Abusers

The Report stated that an Executive Committee staff member had been maintaining a list of ministers accused of sexual abuse (the "List"), including the minister's name, year reported, relevant news articles, state, and denomination. (Report 4-5). The 205-page List contains over 700 entries; Sills appears on page 169. (EC SOF ¶¶ 32, 35; Doc. No. 355-18 at 169).

Other than mentioning its existence, the Report made only limited reference to the List; it did not state that Sills was listed; and it did not provide a copy of or link to the List. (Report 4-5). The employee who compiled the list did so by conducting periodic Google searches for news articles regarding church sexual abuse and would add to the spreadsheet based on the results. (EC

SOF ¶ 32). Sills was added to the list based on an article published in *The Tennessean* in March 2019. (EC SOF ¶ 33).

On May 26, 2022, the Executive Committee publicly released the List with a separate "Statement on the release of a list of alleged abusers" authored by Willie McLaurin, then-interim president and CEO of the Executive Committee, and Rolland Slade, then-chair of the Executive Committee. (Slade SOF ¶¶ 1-2, 11). Some of the names on the list were redacted. Sills's name was not. McLaurin and Slade's statement explained the decision to release the List and the redaction decisions as follows:

> The recently released Guidepost report revealed a list of alleged abusers compiled by a former employee of the SBC Executive Committee. This list is being made public for the first time as an initial, but important, step towards addressing the scourge of sexual abuse and implementing reform in the Convention. Each entry in this list reminds us of the devastation and destruction brought about by sexual abuse. Our prayer is that the survivors of these heinous acts find hope and healing, and that churches will utilize this list proactively to protect and care for the most vulnerable among us.
>
> Our God invites us to do justice, love mercy and walk humbly with God. (Micah 6:8). As a network of Great Commission churches, we are commissioned to live out the Great Commandment and to fulfill the Great Commission. It is our hope that releasing this list places a spotlight on truth and transparency. Southern Baptists have made it clear that transparency in the area of sex abuse should be the norm.
>
> We are releasing the list in the exact format that it was provided to Guidepost Solutions by an Executive Committee staff member. We have not made any additions to the list, nor any alterations other than converting it from Microsoft Word to portable document format (pdf) format and redacting information detailed below.
>
> In making redaction decisions, counsel to the Executive Committee included, in their entirety, entries that reference an admission, confession, guilty plea, conviction, judgment, sentencing, or inclusion on a sex offender registry. The only exception to those entries is the redaction of names or identifying information of survivors and/or other individuals unrelated to the offender. Many of the entries list either an arrest or charges, but no disposition. Since May 24, 2022, counsel to the Executive Committee has done preliminary research and, where guilty pleas, convictions, judgments, sentences, and/or

> inclusion on a sex offender registry could be easily verified, the entry was left unredacted. Other entries where preliminary research did not indicate a disposition that fits within the described parameters have been redacted. Entries that do not relate to sexual abuse or that resulted in an acquittal are also redacted.
>
> We note that there will be more exhaustive research and analysis of the redacted entries and we anticipate that some of the redacted entries will be fully released in the future. We felt it was more important to release the list and redact rather than delay and investigate.

(Doc. No. 373-43).

It is undisputed that neither Slade nor McLaurin knew of the existence of the List before the Report was released, and that the Executive Committee's outside counsel determined the redaction parameters for the List and made the redaction decisions. (Slade SOF ¶¶ 12-13).

### H. Post-Publication Statements

The Report generated commentary on social media, including posts from Seminary President Albert Mohler and then-SBC President Bart Barber. (*See e.g.*, Pl. Ex. 7, Doc. No. 413-1; Pl. Ex. 8, Doc. No. 413-2; Seminary SOF ¶¶ 46, 48). The same day that the Report was published, May 22, 2022, Mohler posted the following statement online:

> From the beginning we were prepared and determined to assist the investigators in any way possible and to support their work. What happened to Jennifer was sexual abuse, unquestionably.

(Seminary SOF ¶ 46).

On July 8, 2022, Mohler posted:

> In 2018, Jennifer Lyell came to me with an accusation of abuse by David Sills. We followed the appropriate processes and the accusation of abuse was confirmed, as we indicated publicly and have subsequently confirmed. Statements made directly by Sills in the confrontation clearly confirmed the allegations of abuse.

(Seminary SOF ¶ 48).

On July 7, 2022, Barber posted:

> Jennifer Lyell's claims have been investigated and corroborated. They have been investigated by people close to the situation who have first-hand knowledge of the people and the context involved.
>
> Those people, including people I know at SBTS with whom I have spoken directly, have said that they believe Jennifer and that what she has said about the abuse she experienced is true.
>
> Her claims have been investigated by @GuidepostGlobal, and whatever you think of their political positions or positions on social issues of the day, they are experts in this subject matter: investigation of sexual abuse claims. This is what they do.

(Doc. No. 413-1).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The summary judgment movant has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of

evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

Given the common factual basis for the asserted claims, some of the Defendants rely upon facts and discussion submitted by other defendants. Although these Defendants rely upon Fed. R. Civ. P. 10(c) as providing procedural authority for incorporation by reference, that Rule does not apply here. *See* Fed. R. Civ. P. 10(c) (providing that a "statement in a pleading may be adopted by reference"). Nevertheless, incorporation by reference is not prohibited. Indeed, given the common facts and issues in this case, incorporation by reference reduces unnecessary redundancy and is welcomed. Plaintiffs' argument that these motions should be "summarily denied" or "stricken" for failing to file a separate statement of material facts, or that the Court should decline to consider material incorporated by reference is without merit. In fact, the Court's review of these motions would have been facilitated if the parties had engaged in more, not less, consolidated briefing.

## III. ANALYSIS

### A. Ecclesiastical Abstention

Guidepost asserts that the Sillses' claims are barred by the ecclesiastical abstention doctrine. The ecclesiastical abstention doctrine looks to whether the lawsuit would require the court to consider disputes involving "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 714 (1976).

The Court addressed the application of the ecclesiastical abstention doctrine at the motion to dismiss stage. (*See* Mem. Op., Doc. No. 134; Order, Doc. No. 135). The Court denied the

Defendants' motion to dismiss on ecclesiastical abstention grounds because the claims asserted could be resolved without reference to religious doctrine and did not seek secular judicial review of a "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Id.* (citing *Milivojevich*, 426 U.S. at 714; and *Ogle v. Hocker*, 279 F. App'x 391, 395 (6th Cir. 2008)). The Court finds no cause to reach a different conclusion on summary judgment.

**B. Statute of Limitations**

Defendants argue that Tennessee's one-year statute of limitations applies to the claims asserted in this case and that claims based on statements or actions prior to May 11, 2022, are therefore barred. Tenn. Code Ann. § 28-3-104(a)(1). Sills argues that, under Tennessee's "savings statute," Tenn. Code Ann. § 28-1-105(a), the limitations period should be measured from the filing of his November 21, 2022 Alabama action, which he later voluntarily dismissed. The Sixth Circuit has held the Tennessee savings statute only applies when the original action was commenced in Tennessee. *See Graham v. Ferguson*, 593 F.2d 764, 766 (6th Cir. 1979) (per curiam). Plaintiff does identify any subsequent controlling authority indicating that the savings statute applies to out-of-state actions. Further, to the extent Sills contends that the statements published in May through June 2022 extended earlier defamatory acts and constitute a continuing tort such that the earlier statements are also actionable, the Court is not persuaded. Sills does not identify any authority suggesting that defamation can be a continuing tort, particularly considering Tennessee adherence to the single publication rule and no Sixth Circuit authority to the contrary. *See Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 501 (6th Cir. 2015) (unpublished) ("We conclude that the Tennessee Supreme Court would not diverge from the majority trend and adopt the 'continuing tort' theory in the defamation context.").

Accordingly, the Court finds that Sills's earlier filed Alabama action does not trigger the savings statute and claims predicated on allegedly tortious statements or conduct occurring before May 11, 2022, are barred.

**C. Defamation**

Sills brings timely defamation claims based on the Report, the List, and online statements made by Bart Barber and Albert Mohler. To establish a prima facie case of defamation, the plaintiff must prove that the defendant published a statement and acted either with knowledge that the statement was false and defamatory, with reckless disregard for its truth or falsity, or negligently in failing to ascertain its truth. *Sullivan v. Baptist Mem'l Hosp*., 995 S.W.2d 569, 571 (Tenn. 1999). The standard for establishing liability for defamation depends on whether the plaintiff is a public figure or a private figure. *See Charles v. McQueen*, 693 S.W.3d 262 (Tenn. 2024). Private individuals need only show that the statements were made negligently. *Id*. at 269. Public figures, by contrast, must show that the statements were made with actual malice. *Id*.

In addition, "[t]he basis for an action for defamation … is that the defamation has resulted in an injury to the person's character and reputation." *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc*., 876 S.W.2d 818, 820 (Tenn. 1994). Therefore, "a plaintiff in a libel action must be able to show that his or her standing in the community and his public reputation for character has been injured by the inaccurate statement and, further, must have suffered real or actual damages due to that loss of standing or reputation." *Davis v. The Tennessean*, 83 S.W.3d 125, 130 (Tenn. Ct. App. 2001).

All Defendants raise two threshold issues. First, they argue that, given the prior allegations of abuse and admitted infidelity, Sills cannot show that he suffered reputational harm as a result of statements made after May 11, 2022. Second, the parties dispute whether Sills is a public or private

figure, which determines the applicable fault standard. Each defendant also argues that Mary Sills's defamation claims should be dismissed. The Court begins with Mary Sills's defamation claims and then turns to the threshold issues of reputational harm and David Sills's public or private figure status.

1. Mary Sills

The Court previously dismissed Mary Sills's defamation claims against the Executive Committee and Rolland Slade arising out of Bart Barber's repost of a prior post by Eric Geiger, as barred by Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1). (*See Order*, Doc. No. 481 (granting the Executive Committee's and Slade's motion for summary judgment)). For the same reasons, any claims asserted by Mary Sills against Bart Barber predicated on that repost are dismissed.

The remaining statements concern only Sills. Mary Sills concedes that she does not have a defamation claim against Guidepost or other defendants based on the statements about her husband. (Doc. No. 415 at 29 (Guidepost); Doc. No. 360 at 27-28 (Seminary)). Although Mary Sills states that she can bring a claim for loss of consortium based on emotional damage from the defamation of her husband, no such claim is included in the complaint. (*See* Doc. No. 1). Accordingly, summary judgment will be entered against Mary Sills on her defamation claims.

2. Reputational Harm

The next issue is whether Sills can show reputational injury attributable to the statements at issue – the Report, the List, and the online posts. Each defendant contends Sills cannot make this showing for substantially the same reasons. Defendants contend Sills suffered no damage to his reputation arising from any statements made about Lyell's accusations because the substance of Lyell's accusations had been publicly reported long before May 2022. Those allegations had

received both local and national attention, and thus Sills was unemployable and otherwise libel-proof.

Guidepost contends that Sills admitted that his sexual relationship with Lyell had "totally destroyed" his reputation long before the Report characterized Sills's conduct as sexual abuse and stated that Lyell had described the sexual contact as nonconsensual, allegations that had been publicly reported in 2019. (Doc. No. 370 at 25-26 (citing Guidepost SOF ¶ 56)). Defendants point to evidence that Sills resigned from the Seminary in 2018 and was unable to find new employment in his field due to rumors of his sexual misconduct. (Guidepost SOF ¶¶ 56-58). Moreover, they argue that neither Sills nor his experts make any attempt to distinguish or otherwise identify what additional reputational injury, if any, resulted from the publication of the Report, the List of alleged abusers, or later statements, or what damages resulted from any such injury. Indeed, Sills's vocational and reputational repair experts confirmed that Lyell's allegations had already negatively impacted his employment prospects well before May 2022 and that there was no way to distinguish new reputational harm after May 2022. (Guidepost SOF ¶ 60). Sills disputes that he was unemployable and argues even if that were the case, employability is not the only measure of reputational harm.

Defendants' arguments rest on two related legal theories – the concept of the libel-proof plaintiff and the doctrine of incremental harm. The libel-proof plaintiff doctrine "essentially holds that 'a notorious person is without a 'good name' and therefore may not recover for injury to it.'" *Davis v. The Tennessean*, 83 S.W.3d 125, 126 (Tenn. Ct. App. 2001), *appeal denied* (2001) (citing Robert D. Sack, *Sack on Defamation: Libel, Slander and Related Problems*, 35 (Cum. Supp. 1998)). In other words, "[t]o suffer injury to one's standing in the community, or damage to one's public reputation, one must possess good standing and reputation for good character to begin

with." *Id*. The doctrine has "often been applied in a situation where the plaintiff's complaint is that the publication accused him of the wrong crimes." *Id*. The plaintiff in *Davis*, who had been convicted of aiding and abetting murder, fit that description. *Id*.

Under the incremental harm doctrine, when nonactionable parts of a particular publication are damaging, another harmful statement is not actionable if it causes no harm beyond the harm caused by the nonactionable portions of the same publication. *See Masson v. New Yorker Magazine*, 501 U.S. 496 (1991); *see also Carnett v. WBBJ–TV*, No. 14-01309-JDT, 2015 WL 10714007, at *3-4 (W.D. Tenn. 2015). Defendants contend that the undisputed portions of the statements – that Sills engaged in sexual conduct with Lyell – are sufficiently damaging to his reputation that the statements attributing abuse rather than merely infidelity cause no incremental harm.

Regardless of his employability within the evangelical community or even in the teaching field in general, the Court is not persuaded that Sills's reputation was so damaged that it was incapable of further injury, especially given that the additional statements came in the form of a report of independent investigation which a reasonable jury could find carries greater weight than earlier allegations by an individual.[15] Ultimately, damages from statements made in May 2022 and later may prove to be nonexistent or nominal given the undisputed harm attributable to statements made before then. That question will be for the jury to decide.

---

[15] Sills has submitted expert reports addressing reputational and vocational harm: Erin Bailey, a vocational expert, and Robert Fisher, a reputational-repair expert. (Expert Report of Erin Bailey, Doc. No. 390-4; Expert Report of Robert Fisher, Doc. No. 390-3). But neither of these experts differentiate between the harm caused by pre-May 2022 statements and reputational harm caused by the Report and subsequent statements. For purposes of these motions, the Court need not consider the expert reports because the proposition that an official report of independent investigation could cause additional harm beyond that of allegations from years earlier is not a proposition for which expert proof is necessary.

3. Public or Private Figure

The Tennessee Supreme Court has recognized "three kinds of public figures: general purpose, limited purpose, and involuntary." *See Charles v. McQueen*, 693 S.W.3d 262, 274 (Tenn. 2024). "A general-purpose public figure is one who attains 'such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.'" *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 527 (6th Cir. 2014) (citing *Gertz v. Robert Welch*, Inc., 418 U.S. 323, 351 (1974)). A limited purpose public figure, on the other hand, is an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id*. "Involuntary public figures, by contrast, enter public controversies against their will. They become public figures through no purposeful action of their own, but rather by position, proximity, or chance." *McQueen*, 693 S.W.3d at 274 (citation modified). Defendants bear the burden of establishing that Sills is a public figure of any kind.

Each Defendant to address the issue argues that Sills is a public figure. Guidepost, the Executive Committee, McLaurin, and Slade argue that Sills is a general purpose public figure. (EC Memo., Doc. No. 356 at 18-20; McLaurin/Slade Mem., Doc. No. 365 at 7; Guidepost Mem., Doc. No. 370 at 18-19). In the alternative, Guidepost argues that Sills was a limited purpose or involuntary public figure, and the Seminary Defendants argue that he is an involuntary public figure or, alternatively, that he was a limited purpose public figure by July 2022 at the time of Mohler's allegedly defamatory Tweet. The Court concludes that Sills was not a public figure of any kind.

*a. General Purpose Public Figure*

Guidepost, the Executive Committee, McLaurin, and Slade argue that Sills was a general purpose public figure. Although they each raise slightly different specific points, generally, they

assert that Sills is a general purpose public figure because he was a college professor, "international lecturer," and "prolific writer" who was well known within the relevant community and had "an international worldwide ministry." His abrupt resignation from the Seminary in 2018 was newsworthy in the evangelical community, and there was widespread knowledge that his resignation was connected to Lyell. When the Baptist Press published an apology to Lyell for mischaracterizing her allegations as a "morally inappropriate relationship," Sills stated that those in "the SBC or evangelism at large" would know that Lyell had accused him of abuse. (Sills Dep. at 170). Defendants contend that because of his "high public profile," Sills invited attention and comment.

Sills argues that even if the public controversy was about his writings or teachings (which it was not), his status as a professor and missiologist would not be sufficient to make him a public figure with regard to statements arising out of his work. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135-36 (1979) (professor not a public figure). He contends this conclusion is even clearer as to statements concerning his relationship with Lyell.

Sills is correct that professors and pastors are generally not public figures. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135-36 (1979) (professor not a public figure); *Ogle v. Hocker*, 279 F. App'x 395 (6th Cir. 2008) (religious leader not a public figure). The fact that his resignation was newsworthy or that people knew he was the subject of Lyell's accusations does not show that he was a general purpose public figure. *See Wolston v. Reader's Digest Ass'n, Inc*., 443 U.S. 157, 167 (1979) ("[T]he simple fact that these events attracted media attention [] is not conclusive of the public-figure issue.").

The record simply does not reflect that Sills was of such pervasive fame or notoriety generally or even within the evangelical community that he should be considered a public figure

for all purposes. In fact, various SBC leaders indicated that they did not know him. (*See* Slade Dep. at 14:6-7 (stating that he did not know Sills by reputation before May 2018, had never met him, and did not know him personally); McLaurin Dep. at 57:6-13 (stating that he had never met Sills, did not know him personally, and had never heard anything about him other than what was reported by Lyell); Litton Dep. at 22:3-6 (stating that he had never met Sills and would not know him if they met now); Barber Dep. at 20:11-15, 21:1-15 (stating that he knew Sills was a professor because he had read an article Sills wrote but otherwise had no personal knowledge of him other than Lyell's publicly reported allegations)).

Because Sills was not of pervasive fame or notoriety even within the Baptist community, he is not a general purpose public figure.

*b. Limited Purpose Public Figure*

Guidepost and the Seminary Defendants argue Sills was a limited purpose public figure. Limited purpose public figures are those who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. Determination of whether an individual is a limited public figure is a two-step process. First, the Court must first determine whether there is a public controversy – *i.e.*, "a real dispute, the outcome of which affects the general public or some identifiable segment of the public in an appreciable way." *Hibdon v. Grabowski*, 195 S.W.3d 48, 59 (Tenn. Ct. App. 2005); *see also Clark v. ABC, Inc.*, 684 F.2d 1208, 1218 (6th Cir. 1982). The public controversy in question must be what "g[ave] rise to the defamation." *Gertz*, 418 U.S. at 352. The second step is to determine whether the individual has become so involved in the public controversy as to constitute a public figure through his involvement. *Clark*, 684 F.2d at 1218 (citing *Gertz*, 418 U.S. at 352). On this question, the Court considers three factors: (1) the voluntariness of his involvement; (2) the extent to which

he had access to channels of communication to counteract false statements; and (3) the prominence of his role. *Id*.

There is no dispute that the SBC sexual abuse crisis was a public controversy and that the statements about Sills were germane to that controversy.[16] The parties disagree regarding whether he voluntarily involved himself in the controversy to affect the outcome and about the prominence of his role.

The Seminary Defendants argue that Sills is a limited purpose public figure because he was a central figure in the public debate over the mishandling of sexual abuse claims by virtue of Lyell's allegations. (*Id*. at 21). They point out that the "the basics of Lyell's allegations against Sills … had been public for *years* prior to release of the Guidepost Report or any of the Seminary Defendant's statements" and that Lyell's 2019 statements garnered an "enormous social media response and reaction." (*Id*. at 21 (emphasis in original)). They contend that Sills was at a minimum a limited purpose public figure in July 2022 when Mohler posted the allegedly defamatory online statement because after the Report was made public, Sills communicated with Megan Basham, a reporter for the Daily Wire, and relayed "aspects of his side of the story." (Doc. No. 360 at 22 (citing Sills Dep. at 98, 101)). The Seminary Defendants contend that Sills "inserted himself into the public controversy (through Basham), and her article prompted additional speech." (Doc. No. 435 at 7).

Guidepost argues that Sills was a limited-purpose public figure because he "voluntarily inject[ed] himself or [was] drawn into a particular public controversy," namely the sexual abuse controversy in the SBC. (Doc. No. 370 at 19 (citing *Gertz*, 418 U.S. at 351)). Guidepost contends

16 Sills does not dispute the existence of an ongoing public controversy about sexual abuse in the SBC or that he has been an involuntary but central figure in that public debate since at least March 2019 by virtue of Lyell's public allegations of sexual abuse against him. (*See* Plf. Resp. to Seminary at 13-14).

Sills voluntarily accepted the position of professor at the Seminary, thereby placing himself in a position where his abuse of a position of trust at the Seminary would invite public scrutiny. (*Id.*). Guidepost argues it was, therefore, "inevitable that [Sills's] sexual improprieties would draw him into the vortex of the SBC's sexual abuse controversy." (*Id.*).

The Court is not persuaded that Sills, through his conduct with Lyell while employed as a professor (conduct that he claims was consensual and not abusive), had voluntarily injected himself into the SBC sexual abuse controversy. Were that the case, virtually anyone in the SBC who was publicly accused would be deemed a public figure for purposes of those accusations. Nor did Sills's limited communications with a reporter establish that he voluntarily assumed a prominent role in the controversy.

*c. Involuntary Public Figure*

Finally, Guidepost and the Seminary Defendants argue that even if Sills did not *voluntarily* inject himself into the public controversy, he was part of the public controversy *involuntarily* because of his position at the Seminary and Lyell's allegations and therefore should be deemed an involuntary public figure.

Both the United States Supreme Court and the Tennessee Supreme Court recognize that there may be public figures who "enter public controversies against their will" and obtain the status of public figure "by position, proximity, or chance." *See Charles v. McQueen*, 693 S.W.3d 262, 269 (Tenn. 2024) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)). The Supreme Court first mentioned the concept of an involuntary public figure as a hypothetical possibility in *Gertz* in 1974, but cautioned that "involuntary public figures must be exceedingly rare." *Gertz*, 418 U.S. at 345. In the ensuing 50 years, neither the Supreme Court nor the Sixth Circuit has found a plaintiff to be an involuntary public figure. In 2024, the Tennessee Supreme Court recognized

that the concept of "involuntary public figure" has not been abandoned as a classification by the Supreme Court but noted that "some commentators have questioned the viability of the involuntary public figure category." *McQueen*, 693 S.W.3d at 274 n. 6.

In *Lewis v. Newschannel 5 Network, L.P.*, the Tennessee Court of Appeals held that a person may be deemed an involuntary public figure when his or her conduct is related in an integral and meaningful way to the conduct of a public official with regard to a matter of public concern. 238 S.W.3d 270, 298-99 (Tenn. Ct. App. 2007) (citing *Rosenblum v. Metromedia, Inc.*, 403 U.S. at 61 (White, J., concurring)). The criteria of *Lewis* plainly are not met here because the conduct of public officials is not at issue.

Although Sills has unquestionably entered a public controversy involuntarily by virtue of Lyell's allegations against him and the manner in which those allegations were handled, the Court is not persuaded that the Sixth Circuit or the Tennessee Supreme Court would find that Sills is the rare involuntary public figure to whom the actual malice standard should apply.

Accordingly, Sills is a private figure to whom the negligence standard applies. The Court next turns to consideration of the defamation claims with respect to each statement.

4. <u>Guidepost – Report and List</u>

Sills asserts that Guidepost defamed him by publishing the Report and the List. (*See* Doc. No. 415 at 3). Guidepost argues that it did not "publish" either document and that, even if it could be deemed to have published the Report, any such publication is subject to qualified privilege to which the actual malice standard of fault applies. Sills disagrees and argues that regardless of whether Guidepost's delivery of the Report to the Task Force constituted publication or was privileged, Guidepost is liable for foreseeable republication by the Executive Committee and the SBC. For the reasons discussed below, the Court agrees that Guidepost can be liable for foreseeable

publication. Accordingly, the Court does not address whether Guidepost published the Report to the Task Force or whether such publication is subject to qualified privilege.

*a. Foreseeable Republication*

Sills argues that Guidepost is liable for the Executive Committee's publication of the Report because it was certain or at least foreseeable that the Executive Committee would publish the Report to third parties. (Doc. No. 415 at 9). Sills acknowledges that there is no Tennessee or Sixth Circuit authority addressing an original speaker's liability for republication, but argues that the "overwhelming weight of decisional authority and respected treatises establishes that a speaker is liable for republication of its defamatory statements by another person when that republication is the foreseeable and natural consequence of the original publication by the defendant." (Doc. No. 415 at 8-9 and n.21 (collecting cases)).

Sills contends that Guidepost is also liable for publication of the List because it was foreseeable to Guidepost that the Executive Committee would publish the statement that Sills was an abuser in other formats, such as the List. Sills argues that Guidepost's hyperlink on its website to the Report and the List supports a jury finding that the public distribution of those documents was a natural and probable consequence of the original distribution of the Report.

Guidepost acknowledges that it expected the Report to be made public. (Doc. No. 437 at 6). It argues, however, that Sills has not identified any Tennessee authority that the original speaker is liable for republication and has not explained how the common interest privilege asserted with regard to the original communication would apply to a later republication.

Even if providing the report to the Task Force is not a publication or is subject to qualified privilege, given that Guidepost knew the Report would be made public and even drafted the Report with such publication in mind, the Court finds that Guidepost is subject to potential liability under

the standard applicable as if Guidepost itself published the Report directly to the public. The Restatement (Second) of Torts § 576 confirms the general rule advocated by Sills. It provides that "publication of a libel or slander is a legal cause of any special harm resulting from its repetition by a third person if, but only if, (a) the third person was privileged to repeat it, or (b) the repetition was authorized or intended by the original defamer, or (c) the repetition was reasonably to be expected." Restatement (Second) of Torts § 576 (1977). While Tennessee has not addressed this section of the Restatement, the Court finds that Tennessee would hold an original publisher in Guidepost's position liable for harm resulting from a republication under these circumstances, particularly given that Guidepost's intent and knowledge with regard to the public dissemination of the Report was more than merely "foreseeable." Guidepost knew and intended that the Executive Committee would make the Report available to the public, and drafted and edited the Report with public dissemination in mind.[17]

The Court does not reach the same conclusion with regard to the List. The authority Sills relies upon provides that the original publisher of a defamatory statement is responsible for a second publication of *that statement* when the second publication is a natural and probable consequence of the first. It does not provide that a publisher is responsible for subsequent publication of *other* defamatory statements. Even if that were the case, publication of the List was not a foreseeable consequence of publication of the Report. If so, Plaintiffs' theory would extend to any later publication of materials mentioned in the Report, which it plainly does not. There is no evidence to suggest that the List would be published, and no legal basis to hold Guidepost

[17] Guidepost stated that it expected the Report to receive national publicity. (Doc. No. 415 at 9 (citing Ex. 130, Hunt SOF at 63); Kilpatrick Dep. at 264). In addition, it informed witnesses that "at the end [of the investigation]" Guidepost will produce a "[d]etailed report which will be made public." (*See* e.g., Doc. No. 411-44 at PageID# 15138).

responsible for its publication.[18] Accordingly, claims against Guidepost with regard to the List will be dismissed.

*b. Fault*

The Court next turns to whether Guidepost acted negligently in publishing the challenged statements in the Report. To determine negligence, "the conduct of the defendant is to be measured against what a reasonably prudent person would, or would not, have done under the same or similar circumstances … the appropriate question is … whether the defendant exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it." *Pate v. Service Merchandise Co., Inc.*, 959 S.W.2d 569, 574-75 (Tenn. Ct. App. 1997) (quoting *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 418 (Tenn. 1978)). Failure to thoroughly investigate a claim may constitute negligence. *McQueen*, 693 S.W.3d at 282 (citations omitted).

Guidepost argues that it discharged its duty of care as defined by the scope of the Engagement Agreement, which did not require it to investigate sexual abuse allegations except those concerning conduct on the part of the Executive Committee or its members. Guidepost states that, consistent with the scope of the engagement, the portion of the Report concerning Sills was an assessment of mishandling of abuse allegations and mistreatment of sexual abuse victims. Guidepost contends that because Sills was not a member of the Executive Committee, no reader of the Report would understand it to constitute a detailed assessment of Sills's relationship with Lyell. Guidepost argues that "the clear gist of the Report was that once Lyell accused Sills of sexual abuse and agreed to tell her story to the *Baptist Press*, the editors softened the allegation at the last

---

[18] Sills does not claim that Guidepost's hyperlinks alone constitute the basis for liability. Rather, they offer the hyperlinks as evidence bearing on whether publication of these documents was foreseeable.

minute, omitting references to sexual abuse and instead misleadingly described what had transpired as 'a morally inappropriate relationship.'" (Guidepost Memo, Doc. No. 370 at 22). Guidepost argues that no reasonable jury could construe the Report as the product of an investigation into Sills's relationship with Lyell and conclude that it presented a conclusion that Lyell was telling the truth and Sills was lying.

Guidepost further argues that it conducted an exhaustive review of the EC's conduct, beginning with the March 8, 2019 article, and culminating with the EC's February 2022 apology to Lyell, which acknowledged that her allegations had been "investigated and unequivocally corroborated by the SBC entities with authority over Ms. Lyell and her abuser." (Guidepost Ex. 20). Even assuming its duty of care required corroboration, Guidepost contends it satisfied this duty because its investigators met with Lyell and spoke with the Baptist Press correspondent David Roach who related that he interviewed Mohler (the only person to have spoken to both Lyell and Sills) and Sills's pastor, Dr. Cook, and left a message for Sills that went unreturned. (Guidepost SOF ¶¶ 24, 28, 29). And Guidepost argues that there was "no logical reason why Guidepost investigators" should have anticipated that Sills would have returned a call even if they had called him. (Doc. No. 370 at 23). Finally, Guidepost points out that between 2018 and the issuance of the Report in 2022, "Sills never surfaced to tell Baptist Press, the EC, any media outlet, Guidepost, or any of the witnesses it interviewed that Sills's relationship was 'consensual.'" (*Id*. at 23-24). In summary, Guidepost argues that because it had what it contends is sufficient corroboration from the witnesses it spoke to, and no contrary evidence, "no reasonable jury could find that Guidepost was careless in describing Lyell as a survivor." (Doc. No. 370 at 24).

Sills argues that Guidepost was negligent when it referred to him as an "abuser" in the Report because it took Lyell's statements as the primary source and made no attempt to interview

him, Mary Sills, Mohler, or the other witnesses present at the meeting when Mohler confronted Sills; and Guidepost did not investigate other avenues he contends were required for a thorough investigation. Sills argues that the circumstances should have raised "concern[s] about the veracity of Lyell's accounts of events." He points to her age, education, the length of the relationship, alleged mental health and memory issues, and the fact that she did not report abuse to anyone until 2018. He further argues that any contention that the relationship was "inherently coercive" because it began when Lyell was a student is "ridiculous" because "Sills testified … that the sexual relationship started around 2006, after Lyell was no longer a graduate student." (Doc. No. 415 at 23).

Finally, Sills points to concerns raised by those involved in the decision to publish the *Baptist Press* article in 2019. Their concerns, which were discussed in the Report and in some cases reproduced with screenshots of the communications, did not necessarily concern the truth of Lyell's account; rather they concerned the liability and journalistic implications of labeling Sills an "abuser," a term some warned suggests Sills performed a criminal act, without more specificity regarding use of the term and/or independent confirmation or corroboration. (Doc. No. 415 at 24-25).

Guidepost's investigation focused on the Executive Committee's handling of Lyell's allegations rather than on an independent determination of the truth of those allegations. That limited scope may bear on what investigation was reasonable. The question raised here, however, is whether Guidepost exercised reasonable care before repeatedly describing Sills as an "abuser" thereby suggesting the allegations had been confirmed. Indeed, in describing the investigative process, the Report states, "We interviewed or attempted to interview all persons who might have had relevant information regarding the investigation." (Report at 22). A reasonable reader could

understand this language to mean that Guidepost had conducted, or relied on, a thorough investigation. But Guidepost investigators never attempted to interview Sills.

To be sure, given that Sills never challenged the Executive Committee's statements in February 2022 that Lyell's abuse had been "investigated and unequivocally corroborated by the SBC entities with authority over Ms. Lyell and her abuser" (*see* Guidepost Ex. 20, Feb. 22, 2022 apology and statement), failed to respond to requests for comment by *Baptist Press*, and never publicly disputed Lyell's allegations or the Executive Committee's finding that the abuse was "investigated and unequivocally corroborated," a reasonable jury *might* find that Guidepost acted reasonably in describing him as an "abuser" without asking him for his side of the story. But a reasonable jury might also find that in failing to ask Sills for his response to Lyell's allegations, Guidepost was negligent in failing to ascertain the truth of the statement. This is particularly true considering that while the term "abuser" can carry different meanings in different contexts, including abuse of authority, emotional abuse, or sexual abuse, Guidepost stated that, as used in the Report, the term meant "[a] person who [commits] nonconsensual sexual touching." (*See* Tongring Dep. (Guidepost 30(b)(6)) at 10-11).

Therefore, summary judgment will be denied as to Sills's defamation claim against Guidepost based on the Report.

5. <u>Executive Committee and the SBC – Report</u>

The Executive Committee and SBC argue that there is no evidence from which a reasonable jury could conclude that either entity acted negligently in connection with the Report's publication because Guidepost, a "global leader in investigations" with hundreds of professionals, including former prosecutors and law enforcement officials, was retained to conduct an independent investigation into the conduct of the Executive Committee itself, and the Executive Committee

had no input into the contents of the Report. (Tongring Dep. at 27:12 – 28:11 and 228:13-16; Engagement Agreement at 2-11). The Executive Committee and the SBC contend they were not negligent in relying on Guidepost's expertise concerning the contents of the Report, particularly given that there is no dispute that Sills and Lyell had a sexual relationship and Sills was silent in the face of Lyell's accusations for years. The Executive Committee and the SBC contend that under these circumstances it was reasonable for them to believe the truth of Lyell's allegations and to rely on Guidepost's Report.

Sills argues the Executive Committee and SBC were negligent when they referred to him as an abuser for the same reasons he asserts Guidepost was negligent – they did not consider contradictory evidence that, according to Sills, would have undermined the conclusion that Sills is an "abuser." He argues the Executive Committee and SBC had a duty to independently investigate before republishing content generated by others and could not reasonably rely on Guidepost's investigation. Moreover, Sills argues that because Guidepost was "retained to make an independent investigation of the [Executive Committee] itself" – not to investigate Lyell's allegations against Sills – the Executive Committee effectively "admits that Guidepost and the [Executive Committee] called Sills a sex abuser even though no one performed an investigation pertinent to such allegation." (Doc. No. 421 at 19). Finally, Sills contends that he was not silent in the face of accusations of sexual abuse and that Mohler was the only one who ever asked him about his relationship with Lyell. (Sills Dep. at 68-70; 502-503). Sills contends that Mohler did not accuse him of "sexual abuse" in that conversation and that he (Sills) only admitted to a consensual sexual relationship.

While it is technically accurate that Mohler did not accuse him of "sexual abuse" – Sills testified that Mohler said that Lyell accused him of a "nonconsensual … sexual relationship" – the

difference in word choice is semantic. (Sills Dep. at 69). Sills also ignores that David Roach reached out to him before the *Baptist Press* article was published in March 2019 and asked about his relationship with Lyell and that in March 2021, Bob Smietana, a reporter for *Religion News Service*, emailed him about a story about Lyell's abuse allegations; Sills never returned their messages. (Sills Dep. at 86-88; Doc. No. 373-48 (email from Smietana); Doc. No. 373-49 (text message from Sills to Mary Sills regarding email from Smietana)).

This is a close call. However, ultimately, the Court concludes that there is evidence from which a reasonable juror could conclude that the Executive Committee and the SBC reasonably relied on Guidepost to conduct an appropriate investigation and reasonably believed that any statements made by Guidepost in the Report were the product of a thorough and diligent investigation. On the other hand, a reasonable jury could also reach the opposite conclusion – *i.e.*, that the Executive Committee and SBC knew that Guidepost was not investigating the veracity of Lyell's claims, only the Executive Committee's response to her allegations, and that under these circumstances it was negligent for the Executive Committee and the SBC to republish statements labeling Sills an "abuser." Because the Court must draw all reasonable inferences in favor of Sills, and there is evidence to support either outcome, summary judgment is not appropriate.

6. <u>Executive Committee and the SBC – List</u>

Sills argues that publishing the List with his name unredacted while stating that the only names left unredacted were those with "easily verified" "guilty pleas, convictions, judgments, sentences, and/or inclusion on a sex offender registry" falsely implies that he fits into one of those categories. Sills also asserts this claim against both the Executive Committee and the SBC. The SBC does not specifically address publication of the List in its motion.

The Executive Committee contends it was reasonable not to redact Sills from the List of alleged abusers because it reasonably believed the truth of Lyell's allegations given that Sills had not challenged or rebutted them. It argues that Sills's assertion that he did not sexually abuse Lyell is insufficient evidence to prove that it acted unreasonably.

A reasonable jury could conclude that the Executive Committee negligently failed to ascertain the truth of the statement implicit in including Sills's unredacted name on the List. Accordingly, summary judgment will be denied as to Sills's List-based defamation claim against the Executive Committee. To the extent the SBC seeks summary judgment on the same theory, its motion will also be denied.

7. <u>McLaurin, Slade – List</u>

Sills's defamation claims against Rolland Slade and Willie McLaurin are based on their publication of the List and the accompanying statement on May 26, 2022. At the time, Slade was chairman of the Executive Committee and McLaurin was its interim president and CEO. Slade and McLaurin argue that they published only the statement, not the List itself, and that even if they can be found to have published the List, Sills cannot succeed on a defamation claim because they relied on the Executive Committee's outside counsel to determine the redaction parameters for the list and to make redaction decisions. (Slade Dep. at 89:10-15, 92:10-93:3, 94:10-24; McLaurin Dep. at 65:23-66:6, 73:5-8).

*a. Slade*

Slade argues that, as a member of a governing body of a nonprofit organization, he is immune from suit unless his conduct amounts to "willful, wanton, or gross negligence." (Doc. No. 365 at 9 (citing Tenn. Code Ann. § 48-58-601(c)). Unlike ordinary negligence, gross negligence "requires proof of the defendant's subjective mental state." *Lawson v. Hawkins County*, 661

S.W.3d 54, 61 (Tenn. 2023). "The required 'mental attitude' is instead 'one of indifference to injurious consequences, conscious recklessness of the rights of others.'" *Id.* at 61-62 (quoting *Craig v. Stagner*, 19 S.W.2d 234, 236 (Tenn. 1929)). "In order to prevail on a claim of gross negligence, a plaintiff must prove that the act was 'done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law.'" *McCaig v. Whitmore*, No. W2015–00646–COA–R3–CV, 2016 WL 693154, at *6 (Tenn. Ct. App. Feb. 22, 2016) (quoting *Leatherwood v. Wadley*, 121 S.W.3d 682, 693–94 (Tenn. Ct. App. 2003)); *see also Conroy v. City of Dickson,* 49 S.W.3d 868, 871 (Tenn. Ct. App. 2001) ("Gross negligence has been defined as arising from 'a conscious neglect of duty or a callous indifference to consequences.'") (quotation marks and citation omitted).

Slade argues that his reliance on outside counsel to determine the parameters for redactions from the list cannot be deemed grossly negligent. He points to a Tennessee Court of Appeals case in which reliance on advice of counsel was deemed sufficient evidence of reasonable conduct to defeat a claim of ordinary negligence. (Doc. No. 365 at 11 (citing *Evans v. Amcash Mortg. Co., Inc*., No. 01A01-9608-CV-000386, 1997 WL 431187 (Tenn. Ct. App. Aug. 1, 1997)). Slade argues that such reliance is, therefore, more than sufficient to defeat a claim requiring a showing of gross negligence. (Doc. No. 365 at 11 (citing *Evans*, No. 01A01-9608-CV-000386, 1997 WL 431187 (Tenn. Ct. App. Aug. 1, 1997)).

Sills argues that *Evans* does not apply because in that case the statement at issue was not published and was conditionally privileged. Sills also contends Slade cannot rely on advice of counsel because the attorneys merely applied redaction criteria and neither the attorneys nor Slade conducted an investigation into the truth of Lyell's allegations.

On this record, no reasonable jury could find that Slade was grossly negligent – *i.e.*, acting in reckless disregard for the rights of others or conscious indifference or reckless disregard to the consequences of his actions – when he sought legal advice regarding the dissemination of the List and relied on his attorneys to set the parameters for redaction and to make the redaction decisions.

*b. McLaurin*

McLaurin argues that he cannot be liable for publication of the List because, like Slade, he relied on the Executive Committee's outside counsel to set the parameters for redaction and to make redaction decisions. In Tennessee, officers of nonprofit corporations are entitled to "rely on information, opinions, reports, or statements" prepared by legal counsel "as to matters the officer reasonably believes are within the person's professional or expert competence." Tenn. Code Ann. § 48-58-403. On this record, Sills has not produced evidence from which a jury could find negligence.

Accordingly, the summary judgment will be granted to Slade and McLaurin on Sills's List-based defamation claims.

8. <u>Litton – Report and List</u>

Dr. Ed Litton served as president of the SBC from June 2021 to June 2022. (SBC SOF ¶ 25). He was President when the Executive Committee published the Report and the List. Sills contends Litton is liable for defamation arising out of the publication of those documents. As there is no evidence that Litton published either of those documents or argument that he is personally and individually responsible for actions of the Executive Committee or the SBC merely because he was SBC president when the documents were published, he is entitled to summary judgment on Sills's defamation claims based on the Report and the List.

9. The SBC and Barber – Tweets

Bart Barber served as the elected president of the SBC from June 2022 to June 2024. Sills brings defamation claims against the SBC and Barber based on statements Barber published online in July 2022 (the "Barber Tweets"), which Sills contends falsely assert that Lyell's allegations about Sills had been "investigated and corroborated" although, according to Sills, no investigation ever occurred.[19]

To the extent Sills's defamation claim against Barber is also based on Barber's retweet of a tweet made by Eric Geiger, Barber argues that any such claim is barred by Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1). (Doc. No. 383 at 4-5, n. 3 (incorporating the prior briefing and legal arguments filed by the Executive Committee with respect to Mary Sills (Doc. Nos. 310, 312, 314-16)). Sills does not respond to the argument. For the reasons stated in the Court's prior Order (Doc. No. 481), any claims arising from Barber's repost are barred.

Barber's statement that "Lyell's claims have been investigated and corroborated" is substantially true, and therefore not actionable in defamation. Lyell's claims *were* investigated and corroborated. Sills may believe that the investigation was inadequate, but the adequacy of the investigation is not the subject of Barber's tweet. The statement that the claims were investigated is not false. The same is true of the statement that Lyell's claims were "corroborated." Moreover, the Report states that the claims were investigated and corroborated and Barber's post clearly refers to the Guidepost investigation. Under these circumstances, no reasonable juror could conclude that

[19] Barber argues that any claims against him based on the publication of the Report (or the List), are not supported by evidence of any conduct attributable to Barber. The Sillses' response to Barber's motion indicates that the defamation claims against Barber are based solely on his online statements in July 2022. Accordingly, the Court does not consider defamation claims against Barber based on the Report.

Barber negligently made a false statement. Accordingly, the SBC and Barber are entitled to summary judgment on Sills's defamation claim based on Barber's July 2022 Tweets.

10. <u>The Seminary and Mohler – Tweets</u>

Albert Mohler is the Seminary's president. After the Report was published, Mohler posted two statements on social media (the "Mohler Tweets"), which serve as the sole source of Plaintiffs' claims against the Seminary Defendants. First, on May 22, 2022—the day the Report was released—Mohler posted:

> From the beginning we were prepared and determined to assist the investigators in any way possible and to support their work. What happened to Jennifer was sexual abuse, unquestionably.

(Doc. No. 1 at ¶ 59).

Second, on July 8, 2022, Mohler posted:

> In 2018, Jennifer Lyell came to me with an accusation of sexual abuse by David Sills. We followed appropriate processes and the accusation of abuse was confirmed, as we indicated publicly and have subsequently confirmed. Statements made directly by Sills in the confrontation clearly confirmed the allegations of abuse.

(*Id*. at ¶ 71).

The Seminary Defendants contend that "sexual abuse" does not necessarily equate to criminal conduct and that, in a Southern Baptist religious context, "sexual abuse" encompasses not only physical force, but also "manipulation, coercion, or deception" and "abuse of authority by a perpetrator over a victim." (Doc. No. 360 at 17-18 (citing Jun. 1, 2019 SBC Messenger Resolution On the Evil of Sexual Abuse)).[20] They argue that under this religious definition of sexual abuse,

---

[20] The Resolution is published on the SBC website at: https://www.sbc.net/resource-library/resolutions/on-the-evil-of-sexual-abuse.

To the extent the Seminary Defendants contend that the term sexual abuse is not capable of defamatory meaning, that argument fails. This is because, in determining whether a statement is capable of defamatory meaning, the Court considers "whether the meaning reasonably conveyed by the published

Mohler's statements are fundamentally true. There does not seem to be a dispute that Lyell went to Mohler with accusations of sexual abuse or that the Seminary followed "appropriate processes." Sills takes issue with the statements that the accusation of abuse was "confirmed" and that what happened to Lyell was "sexual abuse, unquestionably." Given the multiple potential meanings of the term "sexual abuse," some of which Sills contends are false, the question becomes whether the speaker made the statement with the requisite level of fault. As stated above, Sills is not a public figure, so the negligence standard applies.

The Seminary Defendants argue that given the time and proximity of the statements in connection to the release of the Report, there is no evidence that they lacked reasonable care in issuing the Mohler Tweets in response to the contents of the Report, particularly when there is no evidence indicating that Mohler had any basis to believe the allegations against Sills, allegations that had been published for years, were false. Sills argues that it was negligent to state that he is an abuser without confirmation of non-consensual sexual conduct.

As before, this is a close call – perhaps even closer here because Mohler spoke directly with Sills about the allegations of nonconsensual sexual conduct, Sills admitted an inappropriate relationship and, when given the choice between an investigation or resignation, chose resignation, and then never publicly refuted subsequent statements accusing him of abuse and nonconsensual conduct. In addition, the Report, which was issued after an independent investigation, labeled Sills a sexual abuser. Under these circumstances, a reasonable jury could find that Mohler was entirely truthful when he stated that the allegations of abuse were "confirmed" and that what happened to Lyell was "sexual abuse, unquestionably." But a reasonable jury could also find that more careful

words is reasonably understood in a defamatory sense by the reader or listener." *See Pate v. Serv. Merch. Co.*, 959 S.W.2d 569, 574 (Tenn. Ct. App. 1996). Accusing a person of abuse, whether criminal or not, may cause reputational harm.

and specific wording was warranted. Accordingly, summary judgment is not warranted as to the defamation claim based on the Mohler Tweets.

### D. Negligence, Gross Negligence, or "Wantonness"

All of the Defendants argue that the Sillses' negligence claim is merely a repackaging of their defamation claim and should be dismissed. Sills argues that he should be able to pursue negligence claims alongside defamation claims based on similar facts because there may be a negligent investigation that harms the plaintiff, even if the investigator does not itself publish the resulting report. Sills argues that if Guidepost is found not to have published the Report, he should be able to proceed on a negligence theory with respect to the investigation. Sills argues that the remaining defendants had a duty to exercise reasonable care by verifying (or at least attempting to verify) the truth before publishing statements that gave credibility to an accusation of sexual abuse and that he should be able to proceed with a negligence claim in the event they are found not to have published statements. Sills further argues that "hypothetically" there are damages that a plaintiff could recover under a negligence theory, but not a defamation theory.

To prevail on a negligence claim, a plaintiff must prove (1) a duty of care owed by the defendant to the plaintiff; (2) conduct below the applicable standard of care that amounts to breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) legal cause. *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). A duty is the legal obligation a defendant owes to a plaintiff to conform to the reasonable-person standard of care in order to protect against unreasonable risks of harm. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). The question of whether the defendant owed the plaintiff a duty of care is an issue of law to be determined by the Court. S*ee West v. E. Tenn. Pioneer Oil Co*., 172 S.W.3d 545, 550 (Tenn. 2005).

The Sillses assert that the duty owed to them is with respect to the publication of defamatory statements. (*See e.g.*, Doc. No. 421 at 26 ("In this case, [defendant] owed Plaintiffs a duty to exercise reasonable care by verifying (or at least attempting to verify) the truth before publishing statements that gave credibility to an accusation of sexual abuse."); Doc. No. 423 at 21 (same)). With respect to the negligence claim asserted by Mary Sills, the Sillses have not cited authority, and the Court is aware of none, suggesting that a duty of care is owed to family members of those under investigation or about whom allegedly defamatory statements are made. Accordingly, Mary Sills' negligence claims will be dismissed. Furthermore, although couched as a negligence claim, Plaintiffs' theory of negligence is entirely duplicative of the defamation claims. Although Sills contends that Guidepost owed an independent duty with respect to the conduct of the investigation, the only potential harm associated with the allegedly negligent deficient investigation is that the results of the investigation would be conveyed to third parties and thereby cause reputational harm to Sills. This too is duplicative of the defamation claim.

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' negligence claims.

## E. Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress under Tennessee law, a plaintiff must allege that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff. *Lemon v. Williamson Cnty. Sch.*, 618 S.W.3d 1, 21 (Tenn. 2021). The Tennessee Supreme Court has endorsed the "high threshold" standard stated in the Restatement (Second) of Torts:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been

> characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Id*. at 21 (quoting Restatement (Second) of Torts § 46 cmt. d) (other citations omitted).

The Sillses contend that labeling Sills a "sexual abuser" following a "sloppy and incompetent" investigation by Guidepost and "without evidence" meets the high standard for outrageous conduct. It does not. As an initial matter, Defendants did not label Sills an abuser "without evidence." They had considerable evidence in the form of Lyell's statements, an investigation by Guidepost, the Baptist Press, and the Seminary, and Sills's lack of response in the face of those allegations. The alleged deficiencies in the evidence and investigation do not rise to the level of outrageous conduct required for intentional infliction of emotional distress. Accordingly, this claim is dismissed.

**F. Civil Conspiracy**

"The elements of a cause of action for civil conspiracy under Tennessee common law are: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) injury to person or property resulting in attendant damage." *Freeman Management Corp. v. Shurgard Storage Centers, LLC*, 461 F. Supp. 2d 629, 642 (M.D. Tenn. 2006). Civil conspiracy is not a standalone cause of action; it requires an underlying predicate tort allegedly committed pursuant to the conspiracy. *Id*. "[A] civil conspiracy requires that the alleged conspirators possess the specific intent to commit an unlawful act or a lawful act by unlawful means." *Nippert v. Jackson*, 860 F. Supp. 2d 554, 568 (M.D. Tenn. 2012). "Each conspirator must

have the intent to accomplish this common purpose, and each must know of the other's intent." *Brown v. Birman Managed Care, Inc.,* 42 S.W.3d 62, 67 (Tenn. 2001). For example, an alleged conspiracy to defraud requires proof that each co-conspirator have the requisite intent to defraud and must know of the other's intent to defraud. *Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 189 (6th Cir. 2004).

"Civil conspiracies are rarely proven directly," and "are more often established using circumstantial evidence and inferences drawn from the evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances," and "fact-finders may consider the nature of the acts themselves, the relationship of the parties, the interests of the conspirators, and other circumstances." *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 396 (Tenn. 2015) (quoting *Stanfill v. Hardney*, No. W2006-00217-COA-R3-CV, 2007 Tenn. App. LEXIS 620, at *1 (Sept. 27, 2007)). "However, circumstantial evidence regarding the existence of a civil conspiracy must create more than a suspicion or conjecture that a conspiracy exists. It must enable reasonable persons to infer that two or more persons jointly assented to accomplish [the conspiracy]." *Id.*

The Sillses claim Lyell, the Seminary, Mohler, the EC, the SBC, Slade, Litton, Barber and McLaurin participated in a conspiracy to defame them in order to salvage the reputation of the SBC, its leaders, and affiliates. They allege that "Defendants acted together, as a cabal, to accomplish their campaign of defamation. Defendants had a meeting of the minds on the object or course of action underlying their pattern of recklessly defamatory broadcasts." (Compl., Doc. No. 1 at ¶ 95). Plaintiffs describe the conspiracy as follows:

> [Defendants] agreed to bolster, endorse and amplify Jennifer Lyell's uninvestigated and uncorroborated allegations of sexual abuse against Sills in order to create public support for Defendants in rehabilitating their damaged public images. SBC leadership sought to restore credibility by

> embracing a survivor-advocacy narrative. Lyell's disputed allegations offered a convenient opportunity to save face, and have a "victim" who was, more or less, complimentary of Defendants, especially EC. Defendants— including the Seminary Defendants—conspired to spread the destructive lie that Lyell's account of abuse had been "confirmed." Lyell's motive was both personal and financial: revenge against Sills and public vindication through SBC endorsement.

(Pl. Resp. to EC, Doc. No. 421 at 29-30; *see also* Pl. Resp. to Seminary, Doc. No. 419 at 30; Pl. Resp. to SBC, Doc. No. 432 at 27-28 (same except that the Sillses contend the Defendants "conspired to spread the destructive lie that Lyell's account of abuse had been 'investigated and unequivocally corroborated'"); Pl. Resp. to Slade and McLaurin, Doc. No. 417 at 20 (same); Pl. Resp. to Litton, Doc. No. 425 at 21 (same); Pl. Response to Barber, Doc. No. 414 at 21 (same)).

As an initial matter, because Mary Sills has no actionable predicate tort claims, her claim for civil conspiracy fails. David Sills has stated a claims for defamation. Defendants argue that Sills does not have evidence from which a reasonable jury could conclude that they each had the specific intent to defame him, and that each knew of the other's intent. Assuming for the sake of argument that Defendants' statements are false, Sills does not identify any evidence that the Defendants *knew* that the statements were false or even that the statements were made with reckless disregard. *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 531 (6th Cir. 2014) ("To make a statement with reckless disregard for the truth, a defendant must have made the statement 'with a high degree of awareness of probable falsity,' or must have entertained serious doubts as to the truth of his publication[.]'" (quoting *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989)). This is the case whether the statements are Lyell's allegations against Sills, that Sills sexually abused Lyell, or that the allegations had been investigated or confirmed. Sills argues only that Defendants should not have believed all of Lyell's allegations and that the investigation into her claims should have been better.

At best, some of the statements could be deemed to have been made with negligence in failure to ascertain the truth. But one cannot conspire to be negligent. *See Nippert*, 860 F. Supp. 2d at 568 (citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) ("negligence by definition is not an intentional wrong[,] and a "civil conspiracy requires specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means."); *see also*, *JRS Partners, GP v. Leech Tishman Suscaldo and Lampl, LLC*, 615 F. Supp. 3d 750 (M.D. Tenn. 2022), affirmed in part and reversed in part on other grounds, 2024 WL 2874575 (6th Cir. Jun. 7, 2024) ("it is not enough for a defendant to have a common design with others to accomplish a purpose that is *in fact* unlawful; for the defendant to be subject to liability as a civil conspirator, the defendant must *intend or at least know of* the unlawfulness of the purpose"); 16 Am. Jur. 2d Conspiracy § 61 ("For a plaintiff to state a cognizable claim that the defendant engaged in a civil conspiracy to defame the plaintiff, the plaintiff must sufficiently allege that the defendant knew that the conduct of the tortfeasor constituted defamation and that the defendant substantially assisted the tortfeasor in or encouraged that conduct."). Therefore, the conspiracy to defame claim fails on this basis alone.

Even if it were possible to conspire to defame based on negligence in failure to ascertain the truth of a matter, Sills has not shown that Defendants had a "common design" and knew of the others' intent. As evidence that the defendants had a "common design" and knew of the others' intent to label him an abuser and claim that the allegations of abuse had been "confirmed" or "investigated and corroborated" in order to bolster their public image, Sills points to: (1) settlement agreements with the Seminary, the SBC, and the EC; (2) that Denhollander (Lyell's attorney) was an advisor to the Task Force; (3) that Lyell and Denhollander had input into the Report; (4) statements supportive of Lyell issued by the Baptist Press, the SBC, Barber, Geiger, and Mohler;

and (5) Lyell's statements praising the Report and SBC-related defendants while placing the blame for any misdeeds on past members of the EC. Sills characterizes many of these statements as made "in concert" – *i.e.*, in conjunction with the Baptist Press article, apology, settlements, and issuance of the Report.

Under Federal Rule of Evidence 408, the settlement agreements are inadmissible to show liability. The remaining evidence consists primarily of an agreement to defame Sills is that the parties each made statements supportive of Lyell and that her allegations had been investigated and confirmed. Although Sills asserts that some of these statements were "coordinated," the cited evidence – a text message from Gene Besen (attorney to Slade and McLaurin) to Lyell advising her that a statement from Adam Greenway (dean at the Seminary) was "coming" are insufficient evidence from which to conclude that any combination of the defendants agreed with others to defame Sills to improve the reputation of the SBC.

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' civil conspiracy claim.

## IV. CONCLUSION

For the reasons stated herein, the motions for summary judgment filed by Ed Litton (Doc. No. 380), Bart Barber (Doc. No. 382), and Willie McLaurin and Rolland Slade (Doc. No. 364) are **GRANTED** and the claims against these defendants are **DISMISSED**. The motions filed by Guidepost (Doc. No. 369), the SBC (Doc. No. 377), the Executive Committee (Doc. No. 355), and the Seminary Defendants (Doc. No. 359) are **GRANTED IN PART and DENIED IN PART** as follows:

- The motions are **GRANTED** as to all claims asserted by Mary Sills;
- The motions are **GRANTED** as to the claims for civil conspiracy, negligence, and intentional infliction of emotional distress;
- The motions are **GRANTED** as to the defamation claims asserted by David Michael Sills ("Sills") against the SBC based on the Barber Tweets.
- The Seminary Defendants' motion is **DENIED** as to the defamation claims asserted by Sills based on the Mohler Tweets.
- The motions are **DENIED** as to the defamation claims asserted by Sills against Guidepost, the Executive Committee and the SBC based on the Report;
- With respect to the defamation claims asserted by Sills based on the List, Guidepost's motion is **GRANTED**, and the motions of the Executive Committee and the SBC are **DENIED**.

An appropriate Order will enter.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE